**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| NAUTICAL SOLUTIONS, L.L.C., *et al.*,[1] | ) |
| | ) Case No. 23-90002 (CML) |
| Debtors. | ) |
| | ) (Jointly Administered) |

**NOTICE OF FILING OF SECOND AMENDED PLAN SUPPLEMENT**

On January 9, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Plan Supplement for the Debtors' Joint Prepackaged Plan of Reorganization* [Docket No. 9] (the "Plan Supplement") in support of the *Joint Prepackaged Plan of Reorganization of Nautical Solutions, L.L.C. and Its Debtor Affiliate Pursuant to Chapter 11 of the Bankruptcy Code*.

On February 14, 2023, the Debtors filed an amendment to the Plan Supplement [Docket No. 188] (the "Amended Plan Supplement") in support of the *Amended Joint Prepackaged Plan of Reorganization of Nautical Solutions, L.L.C. and Its Debtor Affiliate Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 182] (as modified, amended, or supplemented from time to time, the "Plan").[2]

The Debtors hereby file this amendment to the Plan Supplement (this "Second Amended Plan Supplement") in support of the Plan.  The documents contained in this Second Amended Plan Supplement are integral to, and are considered part of, the Plan.

This Second Amended Plan Supplement contains the following documents (as defined in the Plan), as may be modified, amended, or supplemented from time to time in accordance with the Plan:

| | |
|---|---|
| **Exhibit D** | New Senior Secured Notes Documents |
| **Exhibit D-1** | Redlined to the New Senior Secured Notes Documents Filed on February 14, 2023 |

If you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, the Amended Plan Supplement, the Second Amended Plan Supplement, or related

---

[1]   The Debtors in these chapter 11 cases are:  Nautical Solutions, L.L.C. and Nautical Solutions (Texas), LLC.  The location of Debtor Nautical Solutions L.L.C.'s principal place of business and the Debtors' service address in these chapter 11 cases is 16201 East Main Street, Cut Off, Louisiana 70345.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

documents, you should contact Kurztman Carson Consultants LLC, the notice and claims agent retained by the Debtors in these chapter 11 cases by: (a) visiting the Debtors' restructuring website at: http://www.kccllc.net/nautical; (b) emailing NauticalSolutionsInfo@kccllc.com; or (c) calling the Debtors' restructuring hotline at (866) 523-2941 (US toll free) or (781) 575-2044 (international).  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov.

Houston, Texas
February 24, 2023

/s/ *Matthew D. Cavenaugh*

| | |
|---|---|
| **JACKSON WALKER LLP** | **KIRKLAND & ELLIS LLP** |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Jennifer F. Wertz (TX Bar No. 24072822) | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) |
| Victoria Argeroplos (TX Bar No. 24105799) | John R. Luze (admitted *pro hac vice*) |
| Javier Gonzalez (TX Bar No. 24119697) | Jeffrey T. Michalik (admitted *pro hac vice*) |
| 1401 McKinney Street, Suite 1900 | 300 North LaSalle Street |
| Houston, TX 77010 | Chicago, IL 60654 |
| Telephone:   (713) 752-4200 | Telephone:   (312) 862-2000 |
| Facsimile:    (713) 752-4221 | Facsimile:    (312) 862-2200 |
| Email:       mcavenaugh@jw.com | Email:       patrick.nash@kirkland.com |
|              jwertz@jw.com |              john.luze@kirkland.com |
|              vargeroplos@jw.com |              jeff.michalik@kirkland.com |
|              jgonzalez@jw.com | |

| | |
|---|---|
| *Co-Counsel to the Debtors* | *Co-Counsel to the Debtors* |
| *and Debtors in Possession* | *and Debtors in Possession* |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NAUTICAL SOLUTIONS, L.L.C., *et al.*,[1] | ) | Case No. 23-90002 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND AMENDED PLAN SUPPLEMENT FOR THE**
**DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION**

**TABLE OF CONTENTS[2]**

| Exhibit | Description |
|---|---|
| D | New Senior Secured Notes Documents |
| D-1 | Redline to the New Senior Secured Notes Documents Filed on February 14, 2023 |

---

[1] The Debtors in these chapter 11 cases are:  Nautical Solutions, L.L.C. and Nautical Solutions (Texas), LLC.  The location of Debtor Nautical Solutions L.L.C.'s principal place of business and the Debtors' service address in these chapter 11 cases is 16201 East Main Street, Cut Off, Louisiana 70345.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the *Amended Joint Prepackaged Plan of Reorganization of Nautical Solutions, L.L.C. and Its Debtor Affiliate Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 182] (as amended, modified, or supplemented from time to time, the "Plan").

# EXHIBIT D

**New Senior Secured Notes Documents**

NAUTICAL SOLUTIONS, L.L.C.

$587,500,000.00

Senior Secured Notes, due February 24, 2028

_____

NOTE EXCHANGE AGREEMENT

_____

Dated February 24, 2023

**<u>TABLE OF CONTENTS</u>**

**Page**

**SECTION 1    AUTHORIZATION OF NOTES.** .......................................................................1

**SECTION 2    EXCHANGE OF NOTES.** ...............................................................................2
Section 2.1.    Exchange of Notes ...................................................................................2

**SECTION 3    CLOSING.** ......................................................................................................2

**SECTION 4    CONDITIONS TO CLOSING.** ......................................................................2
Section 4.1.    Representations and Warranties ..............................................................2
Section 4.2.    Performance; No Default; No Material Adverse Effect ...........................2
Section 4.3.    Compliance Certificates...........................................................................2
Section 4.4.    Opinions of Counsel ................................................................................3
Section 4.5.    Exchange Permitted By Applicable Law, Etc ..........................................3
Section 4.6.    Payment of Fees and Expenses ...............................................................3
Section 4.7.    Private Placement Number ......................................................................3
Section 4.8.    Changes in Corporate Structure ..............................................................3
Section 4.9.    Excess Cash Payment; Interest ...............................................................3
Section 4.10.    Certain Documents .................................................................................5
Section 4.11.    Bankruptcy Matters ...............................................................................8
Section 4.12.    Possession of Consents, Permits, Licenses, Etc ....................................8
Section 4.13.    Equity Contribution ...............................................................................8
Section 4.14.    Proceedings and Documents ..................................................................8
Section 4.15.    Tax Status ..............................................................................................8

**SECTION 5    REPRESENTATIONS AND WARRANTIES OF THE NOTE PARTIES.** ...8
Section 5.1.    Organization; Power and Authority.........................................................8
Section 5.2.    Authorization, Etc ...................................................................................9
Section 5.3.    Disclosure ...............................................................................................9
Section 5.4.    Organization and Ownership of Shares of Subsidiaries; Affiliates ..........9
Section 5.5.    Financial Statements; Material Liabilities ..............................................10
Section 5.6.    Compliance with Laws, Other Instruments, Etc .....................................10
Section 5.7.    Governmental Authorizations, Etc .........................................................11
Section 5.8.    Litigation; Observance of Agreements, Statutes and Orders...................11
Section 5.9.    Taxes......................................................................................................11
Section 5.10.    Title to Property; Leases.......................................................................11
Section 5.11.    Intellectual Property; Licenses .............................................................11
Section 5.12.    Compliance with ERISA .......................................................................12
Section 5.13.    Private Offering by the Company..........................................................12
Section 5.14.    Use of Proceeds; Margin Regulations ...................................................13
Section 5.15.    Existing Indebtedness; Future Liens......................................................13
Section 5.16.    Foreign Assets Control Regulations, Etc...............................................13
Section 5.17.    Status under Certain Statutes ................................................................14
Section 5.18.    Environmental Matters ..........................................................................14
Section 5.19.    Chief Executive Office ..........................................................................15
Section 5.20.    No Encumbrances ..................................................................................15
Section 5.21.    Validity of Security Documents ............................................................15
Section 5.22.    Other Matters ........................................................................................16

Section 5.23.    Title to Mortgaged Vessels ................................................16
Section 5.24.    Fiscal Year .........................................................................16
Section 5.25.    Citizenship ........................................................................16
Section 5.26.    Solvency ............................................................................16
Section 5.27.    Transactions with Affiliates ...............................................16
Section 5.28.    Separate Legal Existence of the Note Parties .....................17
Section 5.29.    Charter Agreements, Etc ....................................................17
Section 5.30.    [Reserved] ..........................................................................17
Section 5.31.    Employment Matters ..........................................................17
Section 5.32.    Affected Financial Institutions ...........................................17
Section 5.33.    [Reserved] ..........................................................................17
Section 5.34.    No Burdensome Restrictions ..............................................17
Section 5.35.    Ownership of the Company ................................................17

SECTION 6       REPRESENTATIONS OF THE NOTEHOLDERS. ..................18
Section 6.1.     Acquisition for Investment ................................................18
Section 6.2.     Exchanged Debt ................................................................18

SECTION 7       INFORMATION AS TO COMPANY. ......................................18
Section 7.1.     Financial and Business Information ...................................18
Section 7.2.     Officer's Certificate ..........................................................24
Section 7.3.     Visitation ...........................................................................24
Section 7.4.     Electronic Delivery ...........................................................25

SECTION 8       PAYMENT AND PREPAYMENT OF THE NOTES. ...............26
Section 8.1.     Mandatory Payments and Prepayments; Interest; Fees .........26
Section 8.2.     Optional Prepayments .......................................................28
Section 8.3.     [Reserved] ..........................................................................28
Section 8.4.     [Reserved] ..........................................................................28
Section 8.5.     Pro Rata Payments; Payments Generally ...........................29
Section 8.6.     Maturity; Surrender, Etc ...................................................30
Section 8.7.     Purchase of Notes ..............................................................30
Section 8.8.     Exit Fee .............................................................................30
Section 8.9.     Cash Sweep .......................................................................30
Section 8.10.    [Reserved] ..........................................................................30
Section 8.11.    Taxes .................................................................................30

SECTION 9       AFFIRMATIVE COVENANTS. ..............................................34
Section 9.1.     Compliance with Laws ......................................................34
Section 9.2.     Insurance ...........................................................................34
Section 9.3.     Maintenance of Properties .................................................40
Section 9.4.     Payment of Taxes and Claims ...........................................40
Section 9.5.     Existence, Etc ....................................................................40
Section 9.6.     Books and Records ............................................................41
Section 9.7.     Operations .........................................................................41
Section 9.8.     Further Assurances ............................................................41
Section 9.9.     [Reserved] ..........................................................................41
Section 9.10.    Classification of Vessels ....................................................41
Section 9.11.    New Vessels .......................................................................42
Section 9.12.    Citizenship ........................................................................42
Section 9.13.    Delivery of Vessel Certificates and Notices of Assignments of Insurance .42

Section 9.14.   Covenant to Secure Notes Equally ..............................................42
Section 9.15.   Documentation of Affiliate Transactions .....................................42
Section 9.16.   Allocation of Indirect Operating Expenses....................................42
Section 9.17.   Compliance with Charter Agreement ............................................43
Section 9.18.   Restrictions on Charterers of Vessels ...........................................43
Section 9.19.   [Reserved]......................................................................................43
Section 9.20.   Manager's Undertakings................................................................43
Section 9.21.   Vessel Sales ...................................................................................43
Section 9.22.   Material Agreements ......................................................................44
Section 9.23.   Anti-Corruption Policies................................................................44
Section 9.24.   Material Contracts .........................................................................44

**SECTION 10   NEGATIVE COVENANTS. .........................................................45**
Section 10.1.    Transactions with Chouest Affiliates .............................................45
Section 10.2.    Merger, Consolidation, Etc ...........................................................45
Section 10.3.    Line of Business ............................................................................45
Section 10.4.    Terrorism Sanctions Regulations ..................................................45
Section 10.5.    Liens...............................................................................................46
Section 10.6.    Financial Covenants.......................................................................47
Section 10.7.    Indebtedness ..................................................................................47
Section 10.8.    Issuance of Company Preferred Stock and Subsidiary Stock; Limitation
                on Subsidiary Assets......................................................................48
Section 10.9.    Investments, Loans ........................................................................48
Section 10.10.   Acquisitions ...................................................................................48
Section 10.11.   Restricted Payments.......................................................................48
Section 10.12.   Asset Sales .....................................................................................48
Section 10.13.   Sale and Lease-Back Transactions .................................................49
Section 10.14.   Sales of Receivables; Pledge or Sale of Current Assets .................49
Section 10.15.   Limitation on Certain Restrictive Agreements ...............................49
Section 10.16.   ERISA Compliance ........................................................................49
Section 10.17.   Change of Flag and location of Mortgaged Vessels........................50
Section 10.18.   Compliance with Charter Agreements and other Material Contracts......50
Section 10.19.   Restrictions on Charterers of Vessels ............................................50
Section 10.20.   Deposit Accounts...........................................................................50
Section 10.21.   Most Favored Lender Status ..........................................................51
Section 10.22.   Use of Proceeds .............................................................................51
Section 10.23.   Repayments to Chouest Affiliates ..................................................51
Section 10.24.   Capital Expenditure .......................................................................51
Section 10.25.   Anti-Corruption Laws and Economic Sanctions ............................51
Section 10.26.   Passive Holding Company...............................................................51

**SECTION 11   EVENTS OF DEFAULT..............................................................52**
Section 11.1.    Events of Default ...........................................................................52
Section 11.2.    Right to Cure..................................................................................55

**SECTION 12   REMEDIES ON DEFAULT, ETC................................................55**
Section 12.1.    Acceleration...................................................................................55
Section 12.2.    Other Remedies..............................................................................56
Section 12.3.    Rescission ......................................................................................56
Section 12.4.    No Waivers or Election of Remedies, Expenses, Etc .......................56
Section 12.5.    Application of Funds ......................................................................57

**SECTION 13   REGISTRATION; EXCHANGE; SUBSTITUTION OF NOTES.** ...............57
    Section 13.1.    Registration of Notes ....................................................57
    Section 13.2.    Transfer and Exchange of Notes.................................57
    Section 13.3.    Replacement of Notes ...................................................59
    Section 13.4.    Agent.............................................................................59

**SECTION 14   EXPENSES, ETC.** ..........................................................................**59**
    Section 14.1.    Transaction Expenses ...................................................59
    Section 14.2.    Survival ........................................................................60

**SECTION 15   SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE
    AGREEMENT.** .............................................................................**60**

**SECTION 16   AMENDMENT AND WAIVER.** ..................................................**61**
    Section 16.1.    Requirements ................................................................61
    Section 16.2.    Solicitation of Noteholders .........................................62
    Section 16.3.    Binding Effect, etc .......................................................63
    Section 16.4.    Notes Held by Company, etc ........................................63

**SECTION 17   NOTICES.** ......................................................................................**63**

**SECTION 18   REPRODUCTION OF DOCUMENTS.** .....................................**64**

**SECTION 19   CONFIDENTIAL INFORMATION.** ..........................................**64**

**SECTION 20   AGENTS.** ........................................................................................**65**
    Section 20.1.    Authorization and Action ............................................65
    Section 20.2.    Agent's Reliance, Indemnification, Etc......................67
    Section 20.3.    Posting of Communications.........................................69
    Section 20.4.    Successor Agent and Collateral Agent .......................70
    Section 20.5.    Acknowledgment of Noteholders ...............................71
    Section 20.6.    Collateral Matters ........................................................71
    Section 20.7.    Credit Bidding .............................................................72
    Section 20.8.    Certain ERISA Matters ................................................73
    Section 20.9.    Erroneous Payment.......................................................74
    Section 20.10.    Indemnification of Agents ...........................................75

**SECTION 21   [RESERVED].** ................................................................................**76**

**SECTION 22   MISCELLANEOUS.** ......................................................................**76**
    Section 22.1.    Successors and Assigns ...............................................76
    Section 22.2.    Accounting Terms ........................................................76
    Section 22.3.    INDEMNIFICATION ...................................................76
    Section 22.4.    Severability ..................................................................78
    Section 22.5.    Construction, etc ..........................................................78
    Section 22.6.    Counterparts.................................................................78
    Section 22.7.    Governing Law .............................................................78
    Section 22.8.    Jurisdiction and Process; Waiver of Jury Trial.........78
    Section 22.9.    Press Release; Public Offering Materials ...................79
    Section 22.10.    Acknowledgment Regarding Any Supported QFCs............79

Section 22.11.  Acknowledgment and Consent to Bail-In of Affected Financial
                Institutions ............................................................................................80
Section 22.12.  Tax Treatment......................................................................................80

SCHEDULE A              —       INFORMATION RELATING TO NOTEHOLDERS

SCHEDULE B              —       DEFINED TERMS

SCHEDULE C              —       Mortgaged Vessels

SCHEDULE 4.10(g)        —       Exchanged Debt

SCHEDULE 4.10(k)        —       Deposit Accounts Subject to Control Agreements

SCHEDULE 5.4            —       Note Parties; Subsidiaries; Affiliates; Directors and Senior Officers

SCHEDULE 5.5            —       Financial Statements

SCHEDULE 5.15           —       Existing Indebtedness

SCHEDULE 5.27           —       Transactions with Affiliates

SCHEDULE 10.9           —       Existing Investments

SCHEDULE 10.20          —       Deposit Accounts Not Subject to Control Agreements

EXHIBIT A               —       Form of Senior Secured Note, due February 24, 2028

EXHIBIT B               —       Form of Assignment of Charters and Hire by the Company

EXHIBIT C               —       Form of Assignment of Charters and Hire by a Chouest Corporate
                                Affiliate

EXHIBIT D               —       Form of Assignment of Insurances

EXHIBIT E               —       Form of Fleet Mortgage

EXHIBIT F               —       Form of Security Agreement

EXHIBIT G               —       Form of Supplement to the Fleet Mortgage

EXHIBIT H               —       Form of Monthly Reporting

EXHIBIT I               —       Form of Support Agreement

EXHIBIT J               —       Form of Master Services Agreement

EXHIBIT K-1             —       Form of Know-How Agreement

EXHIBIT K-2             —       Form of NAS License Agreement

EXHIBIT L               —       Form of Pledge Agreement (Holdings)

EXHIBIT M — Form of Financial Statement Compliance Certificate

EXHIBIT N — Form of Assignment and Acceptance Agreement

EXHIBIT O — Form of Assignment of First Preferred Fleet Mortgage

EXHIBIT P — Form of Amended and Restated First Preferred Fleet Mortgage

EXHIBIT Q — Form of Collateral Assignment of Master Services Agreement

NAUTICAL SOLUTIONS, L.L.C.
16201 East Main St.
Cut Off, Louisiana 70345

Senior Secured Notes, due February 24, 2028

February 24, 2023

TO EACH OF THE NOTEHOLDERS LISTED IN
SCHEDULE A HERETO:

Ladies and Gentlemen:

Nautical Solutions, L.L.C., a Louisiana limited liability company (the "**Company**") and Nautical Solutions Holdings, LLC, a Louisiana limited liability company ("**Holdings**"), agree with each of the Noteholders and Wilmington Trust, National Association, as the administrative agent (in such capacity, together with its successors and permitted assigns in such capacity, the "**Agent**") and as Collateral Agent as follows:

**SECTION 1    AUTHORIZATION OF NOTES.**

Upon the terms and subject to the conditions set forth in (i) the Existing Credit Agreement, the Company amended and restated the Exchanged Term Loan on December 7, 2018 with the principal balance outstanding at such time of $502,225,010.68, (ii) the Series A Note Purchase Agreement, the Company amended and restated its Exchanged Series A Notes on December 7, 2018 with the principal balance outstanding at such time of $365,254,552.95, and (iii) the Series B Note Purchase Agreement, the Company amended and restated its Exchanged Series B Notes on December 7, 2018 with the principal balance outstanding at such time of $91,313,638.24.

Upon the terms and subject to the conditions set forth in this Agreement, the Company will acquire and will immediately, automatically and irrevocably cancel and extinguish all Exchanged Debt from the Noteholders in exchange for the Notes.  Immediately following the effectiveness of this Agreement and the Closing, (i) all Obligations under, and as defined in, the Existing Credit Agreement, and all Note Obligations under, and as defined in, the Series A Note Purchase Agreement and Series B Note Purchase Agreement, as applicable, shall be deemed irrevocably satisfied and paid in full and (ii) the Existing Credit Agreement, the Series A Note Purchase Agreement and the Series B Note Purchase Agreement and all Loan Documents (as defined in the Existing Credit Agreement) and all Note Documents (as defined in the Series Note Purchase Agreement and the Series B Note Purchase Agreement) entered into pursuant thereto shall be automatically and irrevocably terminated; provided that, the Mortgage (as defined in the Existing Credit Agreement)/Fleet Mortgage (as defined in each of the Series A Note Purchase Agreement and the Series B Note Purchase Agreement) and any rights and obligations under the Existing Credit Agreement, the Series A Note Purchase Agreement, the Series B Note Purchase Agreement, all Loan Documents (as defined in the Existing Credit Agreement) and all Note Documents (as defined in the Series Note Purchase Agreement and the Series B Note Purchase Agreement) entered into pursuant thereto and each collateral document entered into pursuant thereto that, in each case, by its terms expressly survive the termination of such document shall remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the termination of the Existing Credit Agreement, the Series A Note Purchase Agreement, the Series B Note Purchase Agreement, or the entry into the Assignment of First Preferred Fleet

Mortgage and the Amended and Restated First Preferred Fleet Mortgage to be executed contemporaneously therewith.

The Company has authorized the issuance and transfer to the Noteholders of $587,500,000 aggregate principal amount of its Senior Secured Notes, due on February 24, 2028 under this Agreement (as amended, restated or otherwise modified from time to time pursuant to Section 16 and including any such notes issued in substitution therefor pursuant to Section 13, the "**Notes**").  The Notes shall be substantially in the form set out in Exhibit A hereto.  Certain capitalized and other terms used in this Agreement are defined in Schedule B hereto; and references to a "Schedule" or an "Exhibit" are, unless otherwise specified, to a Schedule or an Exhibit attached to this Agreement.  References to a "Section" are references to a Section of this Agreement unless otherwise specified.

## SECTION 2    EXCHANGE OF NOTES.

**Section 2.1.    Exchange of Notes**.  Subject to the terms and conditions of this Agreement, on the Closing Date, the Noteholders hereby tender, severally and not jointly, their respective portion, as set forth on Schedule A, of (a) the Exchanged Term Loan, (b) the Exchanged Series A Notes and (c) the Exchanged Series B Notes (collectively, the "**Exchanged Debt**") to the Company for cancellation in exchange for the issuance and transfer by the Company to the Noteholders, at the Closing provided for in Section 3, of the Notes in the principal amount specified opposite such Noteholder's name in Schedule A (the "**Exchange**"). The Noteholders' obligations hereunder are several and not joint obligations and no Noteholder shall have any liability to any Person for the performance or non- performance of any obligation by any other Noteholder hereunder.

## SECTION 3    CLOSING.

The closing of the exchange described in Section 2.1 (the "**Closing**") shall occur on February 24, 2023 (the "**Closing Date**").  At the Closing (a) each Noteholder shall deliver, cause to be delivered to the Company or shall have been deemed to deliver all right, title and interest in and to its Exchanged Debt free and clear of any Liens, together with any documents of conveyance or transfer that the Company may reasonably deem necessary or desirable to transfer to and confirm in the Company all right, title and interest in and to the Exchanged Debt, and (b) Company will deliver to each Noteholder the Notes to be issued and transferred to such Noteholder in the form of a single Note (or such greater number of Notes in denominations of at least $100,000 as such Noteholder may request) dated the Closing Date and registered in such Noteholder's name (or in the name of its nominee), in exchange for the Exchanged Debt of such Noteholder.

## SECTION 4    CONDITIONS TO CLOSING.

Each Noteholder's obligation to exchange the Exchanged Debt for the Notes to be received by such Noteholder hereunder at the Closing is subject to the fulfillment or waiver by the Required Consenting Creditors (as defined in the Restructuring Support Agreement), prior to or at the Closing, of the following conditions:

**Section 4.1.    Representations and Warranties**.  The representations and warranties of the Note Parties in this Agreement and the other Note Documents shall be correct when made and at the time of the Closing.

**Section 4.2.    Performance; No Default; No Material Adverse Effect**.  Each Note Party has performed and complied with all agreements and conditions contained in this Agreement and the other Note Documents required to be performed or complied with by it prior to or at the Closing.  Before and after

giving effect to the issue and transfer of the Notes (and the deemed application of the proceeds thereof as contemplated by Section 5.14), no Default or Event of Default shall have occurred and be continuing.  No Note Party nor any Subsidiary of the Company shall have entered into any transaction since December 31, 2021 that would have been prohibited by Section 10 had such Section applied since such date.  Since the date of the Restructuring Support Agreement, there shall have been no change in the financial condition, operations, business or properties of Holdings, the Company and their Subsidiaries, taken as a whole, except changes that individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect.

Section 4.3.    **Compliance Certificates**.

(a)    *Officer's Certificate*.  The Note Parties shall have delivered to the Agent an Officer's Certificate, dated the Closing Date, certifying that the conditions specified in Sections 4.1, 4.2, 4.8 and 4.10(g) and (s) have been fulfilled.

(b)    *Manager's Certificate*.  Each Note Party shall have delivered to the Agents a certificate of its managers, dated the Closing Date, certifying as to (i) the resolutions attached thereto and other corporate (or similar) proceedings relating to the authorization, execution and delivery of, as applicable, the Notes, this Agreement and the other Note Documents, (ii) its Organizational Documents as then in effect and (iii) the names, titles and true signatures of the officers of such Note Party who are authorized and will be signing the Note Documents and any other documents to be delivered by such Note Party hereunder or in connection herewith in each case, as applicable.

Section 4.4.    **Opinions of Counsel**.  The Agents and the Noteholders shall have received opinions in form and substance satisfactory to the Required Holders, dated the Closing Date (a) from Phelps Dunbar, L.L.P., special Louisiana counsel for the Note Parties, covering such matters incident to the transactions contemplated hereby as the Required Holders or their counsel may reasonably request (and the Note Parties hereby instruct their counsel to deliver such opinion to the Agent and the Noteholders) and (b) from Kirkland & Ellis LLP, special New York counsel for the Note Parties, covering such matters incident to the transactions contemplated hereby as the Agent, the Required Holders or their counsel may reasonably request (and the Note Parties hereby instruct their counsel to deliver such opinion to the Agent for the benefit of the Noteholders).

Section 4.5.    **Exchange Permitted By Applicable Law, Etc**.  On the Closing Date such Noteholder's acquisition of Notes shall (a) be permitted by the laws and regulations of each jurisdiction to which such Noteholder is subject, without recourse to provisions (such as section 1405(a)(8) of the New York Insurance Law) permitting limited investments by insurance companies without restriction as to the character of the particular investment, (b) not violate any applicable law or regulation (including, without limitation, Regulation T, U or X of the Board of Governors of the Federal Reserve System) and (c) not subject such Noteholder to any tax, penalty or liability under or pursuant to any applicable law or regulation, which law or regulation was not in effect on the date hereof.  If requested by such Noteholder, such Noteholder shall have received an Officer's Certificate certifying as to such matters of fact as such Noteholder may reasonably specify to enable such Noteholder to determine whether such purchase is so permitted.

Section 4.6.    **Payment of Fees and Expenses**.  Without limiting Section 14.1, the Company shall have paid all documented fees, charges and disbursements of each of the Noteholders party to the Restructuring Support Agreement as of the Closing Date, including all of such Noteholders' Fees and Expenses, the Agent and the Collateral Agent, as reflected in statements rendered to the Company at least one Business Day prior to the Closing.

**Section 4.7.    Private Placement Number**.  A Private Placement Number issued by Standard & Poor's CUSIP Service Bureau (in cooperation with the SVO) shall have been obtained for the Notes.

**Section 4.8.    Changes in Corporate Structure**.  No Note Party shall have changed its jurisdiction of incorporation or formation, as applicable, or been a party to any merger or consolidation or succeeded to all or any substantial part of the liabilities of any other entity, at any time following the date of the most recent financial statements referred to in Schedule 5.5.

**Section 4.9.    Excess Cash Payment; Interest**.

(a)    Subject to Section 4.9(b), the Company shall pay directly to the Noteholders, (i) within one (1) Business Day of the Closing Date, an amount equal to the unrestricted balance sheet cash (including amounts received from the Equity Contribution) as of the Closing Date (after payment of or reduction for all agreed closing costs and fees, including the Tax Liability Amount) in excess of $25,000,000 which shall be applied to the principal of the Note Obligations, without premium or penalty and (ii) on the Closing Date, an amount equal to the accrued interest from September 1, 2022 until the Closing Date, pursuant to Section 8.1(b).

(b)    The Closing Date payment provided in Section 4.9(a) shall be determined taking into account an estimate of the Tax Liability Amount as provided in Section 4.9(c), which amount shall be held by Holdings in a segregated interest bearing account (the "**Tax Account**") until the determination of the Final Tax Liability Amount.  Following the determination of the Final Tax Liability Amount, Holdings shall pay the excess (if any) of the amount in the Tax Account over the Final Tax Liability Amount to the Noteholders, pro rata, as a prepayment of principal on the Note Obligations without premium or penalty, and the remaining portion shall be distributed by  Holdings to the Members of Holdings to assist in the payment of each such Member's respective portion of the Final Tax Liability Amount; <u>provided</u>, if the Final Tax Liability Amount is greater than the amount in the Tax Account, all funds in the Tax Account shall be distributed by Holdings to the Members of Holdings and, further, Holdings shall be permitted to make additional distributions in amounts that, in total, equal the difference between the Final Tax Liability Amount and the amount in the Tax Account.

(c)    No later than ten (10) Business Days prior to the Closing Date, the Company shall provide the Noteholders with a written statement reflecting the Company's good faith estimate of the Tax Liability Amount, including reasonably detailed calculations and supporting workpapers.  The Company shall incorporate and update the calculations for any reasonable comments from the Noteholders, provided that if the Company and the Required Holders are unable to resolve any dispute with respect to the estimated Tax Liability Amount, such dispute shall not delay or impede the Closing and the Company's estimate (taking into account any agreed changes) shall be used as the estimated Tax Liability Amount.  After the end of the year in which the Closing Date occurs and no later than September 15th, the Company shall provide to the Noteholders a written statement setting forth an updated calculation of the Tax Liability Amount based on the actual items of income, gain, loss, deductions and credits of the Members, including reasonably detailed calculation and supporting workpapers (such Tax Liability Amount as finally determined in accordance with this Section 4.9(c), the "**Final Tax Liability Amount**").  The Noteholders shall provide any comments with respect to such calculations within twenty (20) days of the receipt of such statement.  If the Company disputes such comments, the Company and Noteholders shall negotiate in good faith to resolve such dispute, and if such dispute cannot be resolved, then the matter shall be submitted to a nationally recognized accounting firm, mutually agreeable to the Company and the Required Holders, to resolve the dispute consistent with this Section 4.9.  At or prior to such engagement, the Company and the disputing Noteholders shall submit to the accounting firm such party's computation of the proposed Final Tax Liability Amount.  There shall be no ex parte communications with the accounting firm and all written communications to the accounting firm shall be made with copy to the other party, and the accounting firm

shall be directed by each party to copy each other party on any communications.  The Final Tax Liability Amount determined by the accounting firm shall in no event be (i) greater than the Company's proposed Final Tax Liability Amount or (ii) less than the proposed Final Tax Liability Amount after taking into account the comments provided by the Noteholders.  The decision of the accounting firm shall be final, conclusive and binding on the Parties, absent manifest error.  The fees and expenses of the accounting firm shall be paid by the Note Parties.

(d)      The Note Parties shall cooperate with the Noteholders in connection with the determination of the estimated Tax Liability Amount and the Final Tax Liability Amount, including providing any assistance (including access to Company accountants and employees) and information (including documentation) reasonably requested by the Noteholders.  For purposes of determining the estimated Tax Liability Amount and the Final Tax Liability Amount, each Member of the Company (or Holdings as a continuation of the Company) and any beneficiary or direct or indirect owner thereof as applicable shall cooperate with the Note Parties and the Noteholders in connection with the determination of such amounts.

**Section 4.10.    Certain Documents**.  The Agent, the Collateral Agent and/or the Required Holders, as applicable, or in the case of the Notes, each Noteholder, shall have received the following:

(a)      The Note(s) to be provided to each Noteholder pursuant to Section 2.1.

(b)      The Security Agreement and each other Security Document executed by the Note Parties, including the Pledge Agreement executed by Holdings with any certificates representing such equity interests and related stock powers executed in blank.

(c)      A forecast in form and substance reasonably satisfactory to the Required Holders, setting forth the Forecasted Average Annual EBITDA through the term of this Agreement.

(d)      The consent of each Chouest Corporate Affiliate charterer required under Section 9.18 under any applicable Assignment of Charters and Hire.

(e)      The Fleet Mortgage executed by the Company.

(f)      Certificates from the Secretary of State or other appropriate public official as to the continued existence and good standing of the Note Parties in their jurisdiction of formation, dated within five (5) days of the Closing Date.

(g)      Subject to Section 4.10(h), satisfactions or releases of mortgages, including the Release and Reassignment and UCC-3 termination statements and such other instruments as may be required or reasonably requested by the Agent or the Required Holders with respect to the Indebtedness listed on Schedule 4.10(g) in order to evidence the release of Liens and security interests thereunder, such that after giving effect the transactions contemplated by this Agreement, the Note Parties and their Subsidiaries shall have outstanding no Indebtedness other than (a) the Notes, and (b) other Indebtedness permitted pursuant to this Agreement to be incurred or outstanding on the Closing Date.

(h)      Evidence of all such actions as the Required Holders shall reasonably require to perfect the Liens created by the Security Documents, including (i) with respect to the Mortgaged Vessels, the Fleet Mortgage, the Assignment of First Preferred Fleet Mortgage and the Amended and Restated First Preferred Fleet Mortgage, each in proper forms for filing, registration and recording with NVDC, (ii) the delivery to the Collateral Agent of all property with respect to which possession is necessary or desirable for the purposes of perfecting such Liens, (iii) with respect to personal property collateral covered by the

Security Documents, appropriately completed and duly authorized Uniform Commercial Code financing statements in proper form for filing, registration or recording and (iv) to the extent applicable, with respect to Intellectual Property collateral covered by the Security Documents, the filing of appropriately completed and duly authorized filings with the U.S. Patent and Trademark Office and U.S. Copyright Office for the purposes of perfecting, enforcing, maintaining and protecting the Liens created pursuant to the Security Documents.

(i)        Evidence reasonably satisfactory to the Required Holders that the Liens created by the Security Documents constitute legal, valid, binding and enforceable first priority liens in the collateral covered thereby, including, without limitation, a first preferred mortgage lien over the whole of each Mortgaged Vessel and a first priority security interest in all earnings, insurances and requisition compensation of such Mortgaged Vessels and a first priority security interest in all rights under all policies of insurance taken out from time to time in respect thereof (except, in each case, for any liens expressly permitted in the Note Documents), including satisfactory Uniform Commercial Code or other applicable search reports and satisfactory authorizations to file releases of Liens or termination statements with respect to any existing prior liens to be released.

(j)        (i) Standard market letters of undertaking, including, without limitation, certificates of insurance satisfactory to the Required Holders in all respects evidencing the existence of all insurance required to be maintained by Holdings, the Company and its Subsidiaries pursuant to the Note Documents, including, without limitation, in respect of the Mortgaged Vessels, and the names of the companies issuing such insurance, the amounts of coverage, the stated deductibles and expiration dates of such insurance and the risks covered thereby and certificates or opinions of the issuers of such policies or their brokers or agents evidencing the existence of such policies, and that such insurance complies in all respect with the applicable requirements contained in the Note Documents, including Section 9.2, including the fact that there are no mortgagee endorsements, other than those in favor of the Collateral Agent, with respect to the Mortgaged Vessels, together with loss payable endorsements in favor of the Collateral Agent and additional insured endorsements in favor of the Collateral Agent, for the benefit of the Noteholders, and (ii) executed notices of assignment prepared for delivery to each insurance underwriter and broker in respect of each policy of insurance subject to the Assignment of Insurances.

(k)        Control Agreements with respect to each deposit account listed on Schedule 4.10(k), executed by the Collateral Agent, the Company and the applicable financial institution listed on such schedule.

(l)        Copies of each Certificate of Documentation (USCG Form CG- 1270) showing the due registration of each Mortgaged Vessel on the Closing Date in the name of the Company under the laws and the flag of the United States duly endorsed for operation in the United States coastwise or other applicable trade.

(m)        One or more United States Coast Guard Certified Abstracts of Title (USCG Form CG-1332A) and, if required, a Certificate of Ownership (USCG Form CG-1330) for each of the Mortgaged Vessels dated as of a recent date prior to the Closing Date, demonstrating that the Mortgaged Vessels are owned by the Company and that there are on record in the office of NVDC, no mortgages, liens or other encumbrances in respect of any Mortgaged Vessel, except for those mortgage liens securing Exchanged Debt that are being assigned simultaneously with the Closing.

(n)        To the extent available, (i) a Confirmation of Class issued by ABS and dated not more than ten (10) days prior to the Closing Date for each Mortgaged Vessel, indicating that such Mortgaged Vessel is in a class, free of outstanding recommendations or conditions affecting her class and without any overdue surveys, (ii) the most recent valid Certificate of Inspection (USCG Form CG-841) or

Load Line Certificate, as applicable, for each Mortgaged Vessel, indicating that such Mortgaged Vessel is in compliance with all Coast Guard requirements or load line requirements, as applicable, and (iii) the most recent valid ABS Summary Report of Class Survey for each Mortgaged Vessel.

(o)      Such other trading certificates relating to the Mortgaged Vessels or the operation thereof (including, without limitation, a certificate of financial responsibility for each Mortgaged Vessel with respect to which the Company is required under the Oil Pollution Act of 1990, as amended, to obtain such a certificate), as of the Closing Date as may be requested by the Collateral Agent or any Noteholder.

(p)      An Appraisal for each Mortgaged Vessel, which Appraisal shall be made at the sole expense of the Company, and shall be in form and substance reasonably acceptable to the Required Holders.

(q)      Fully executed copies of the Support Agreements which, in each case, shall be in form and substance satisfactory to the Required Holders, shall have become effective in accordance with their respective terms, and shall not have not been terminated, amended or otherwise modified without the approval of the Required Holders.

(r)      A fully executed copy of the Master Services Agreement which shall be in form and substance satisfactory to the Required Holders, shall have become effective in accordance with its terms and shall not have been terminated, amended or otherwise modified without the approval of the Required Holders.

(s)      Fully executed copies of the Asset Sale Agreements which, in each case, shall be in form and substance satisfactory to the Required Holders, shall have become effective in accordance with their respective terms, and shall not have been terminated, amended or otherwise modified without the approval of the Required Holders.

(t)      Fully executed copies of the Intellectual Property Agreements which, in each case, shall be in form and substance satisfactory to the Required Holders, shall have become effective in accordance with their terms, and shall not have been terminated, amended or otherwise modified without the approval of the Required Holders.

(u)      The Restructuring Support Agreement previously delivered to the Noteholders shall not have been terminated, amended or modified except in accordance with the terms thereof, other than termination as a result of the consummation of the transactions contemplated herein.

(v)      Evidence that the Mutual Release is in full force and effect and signed by holders of 100% of the aggregate outstanding principal amount of the loans outstanding under the Existing Credit Agreement, together with a fully executed copy thereof which shall be in form and substance satisfactory to the Required Holders, which has not been amended or otherwise modified without the approval of the Required Holders.

(w)      [Reserved].

(x)      Delivery of (i) documentation and other information as reasonably requested by the Agent, the Collateral Agent or any Noteholder requested at least five (5) Business Days prior to the Closing Date under "know your customer" and anti-money laundering rules and regulations in relation to each Note Party and each Subsidiary that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation and (ii) the Beneficial Ownership Certification in relation to the Company.

(y)      Delivery to the Agent of a duly executed W-9 (or such other applicable tax form) from each of the Note Parties.

(z)      Delivery to the Agents of the fully executed Agent Fee Letter.

**Section 4.11.    Bankruptcy Matters**.  To the extent this Agreement is effectuated pursuant to the Plan, the Confirmation Order shall be in full force and effect and no stay thereof shall be in effect and the Confirmation Order shall not have been reversed, modified, amended or vacated or any provision contained therein waived.  All conditions precedent to the effectiveness of the Plan shall have been satisfied or waived (to the extent such waiver is not materially adverse to the Noteholders) and the effective date under the Plan shall have occurred.

**Section 4.12.    Possession of Consents, Permits, Licenses, Etc**.  The Note Parties (i) possess all consents, certificates, licenses, permits and other authorizations from governmental political subdivisions or regulatory authorities, and all patents, trademarks, service marks, trade names, copyrights, licenses, and all other rights, that are necessary in any material respect for the ownership, maintenance and operation of their businesses (including the operation of the Mortgaged Vessels), and the Note Parties are not in violation of any such certificates, licenses, permits or other authorizations in any material respect and (ii) have executed and delivered to the Collateral Agent all documentation required to own, maintain and operate the Note Parties' businesses and the Collateral, in each case, in form and substance satisfactory to the Required Holders and consistent with past practice and in the ordinary course in the event of a foreclosure by the Noteholders (and any subsequent third party sale related thereto) in accordance with the terms of this Agreement or the other Note Documents.

**Section 4.13.    Equity Contribution**. The contribution of new cash equity investments in the Company in an aggregate amount of net proceeds not less than $10,000,000 from the Company's Affiliates (the "**Equity Contribution**") shall have been consummated.

**Section 4.14.    Proceedings and Documents**.  All corporate and other proceedings in connection with the transactions contemplated by this Agreement and all documents and instruments incident to such transactions shall be satisfactory to the Required Holders and their counsel, and the Agent, the Required Holders and their counsel shall have received all such counterpart originals or certified or other copies of such documents as the Agent, the Required Holders or their counsel may reasonably request.

**Section 4.15.    Tax Status**. (i) Holdings is properly classified as a partnership and treated as a continuation of the Company for U.S. federal and applicable state and local income tax purposes, and (ii) the Company is a wholly owned subsidiary of Holdings classified as an entity disregarded as separate from Holdings for U.S. federal income tax purposes.

**SECTION 5    REPRESENTATIONS AND WARRANTIES OF THE NOTE PARTIES.**

The Note Parties represent and warrant (each as to itself) to each Noteholder on the Closing Date that:

**Section 5.1.    Organization; Power and Authority**.  Each Note Party is a limited liability company duly organized or formed, validly existing and in good standing under the laws of the State of Louisiana. Each of the Note Parties is duly qualified as a foreign limited liability company and is in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  The Note Parties have the limited liability company power and authority to own or hold under lease the properties they own or hold under lease, to

transact the business they transact and propose to transact, to execute and deliver this Agreement, the Notes and the other Note Documents to which they are party and to perform the provisions hereof and thereof and to consummate the Exchange.

Section 5.2.    **Authorization, Etc**.  This Agreement, the Notes and the other Note Documents to which a Note Party is a party have been duly authorized by all necessary limited liability company actions on the part of such Note Party, and this Agreement constitutes, and upon execution and delivery thereof each Note and each other Note Document to which such Note Party is a party will constitute, a legal, valid and binding obligation of such Note Party enforceable against such Note Party in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 5.3.    **Disclosure**.

(a)     As of the Closing Date, this Agreement and the documents, certificates or other writings delivered to the Agent, the Collateral Agent or the Noteholders by or on behalf of the Note Parties in connection with the transactions contemplated hereby, and the financial statements listed in Schedule 5.5 herein and delivered to the Agent, the Collateral Agent or any Noteholder prior to the Closing Date (collectively, the "**Disclosure Documents**"), taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading in light of the circumstances under which they were made; underlined *provided* that any forecast, projections and pro forma financial information contained in such materials are based upon good faith estimates and reasonable assumptions believed by such Note Party to be reasonable at the time made, it being recognized by the Noteholders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results.  Except as disclosed in the Disclosure Documents, since December 31, 2021, there has been no change in the financial condition, operations, business, properties or prospects of any Note Party or their Subsidiaries except changes that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  As of the Closing Date, there is no fact known to a Note Party that could reasonably be expected to have a Material Adverse Effect that has not been set forth herein or in the Disclosure Documents.

(b)     Neither Holdings, the Company nor or any Subsidiary is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (a) any material agreement to which it is a party or (b) any agreement or instrument evidencing or governing Indebtedness.

Section 5.4.    **Organization and Ownership of Shares of Subsidiaries; Affiliates**.

(a)     Schedule 5.4 herein contains (except as noted therein) complete and correct lists at the Closing Date of (i) the Note Parties or any of the Note Parties' Subsidiaries, showing, as to each Subsidiary, the name thereof, the jurisdiction of its organization, and the percentage of shares of each class of its capital stock or similar equity interests outstanding owned by the Note Parties and each other Subsidiary, (ii) the Company's Affiliates having net equity of $20,000,000 or more, and (iii) the Note Parties' directors and senior officers.

(b)     All of the outstanding shares of Capital Stock of each Subsidiary shown in Schedule 5.4 herein as being owned by the Note Parties and their Subsidiaries have been validly issued, are

fully paid and nonassessable and are owned by the Company, Holdings or another Subsidiary free and clear of any Lien, except for Liens granted pursuant to the Security Documents.

(c)     Each Subsidiary is a corporation or other legal entity duly organized, validly existing and, where applicable, in good standing under the laws of its jurisdiction of organization, and is duly qualified as a foreign corporation or other legal entity and, where applicable, is in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each such Subsidiary has the corporate or other power and authority to own or hold under lease the properties it purports to own or hold under lease, to transact the business it transacts and proposes to transact, to execute and deliver the Note Documents to which it is a party and to perform the provisions thereof.

(d)     No Subsidiary is party to, or otherwise subject to any legal, regulatory, contractual or other restriction (other than this Agreement, and the agreements listed on Schedule 5.4 herein and customary limitations imposed by corporate law or similar statutes) restricting the ability of such Subsidiary to pay dividends out of profits or make any other similar distributions of profits to a Note Party or any of its Subsidiaries that owns outstanding shares of capital stock or similar equity interests of such Subsidiary.

Section 5.5.     **Financial Statements; Material Liabilities**.  The Note Parties have delivered to the Noteholders copies of the financial statements of the Note Parties and their Subsidiaries listed on Schedule 5.5 herein (it being understood that only the financial statements of the Company are available on the Closing Date).  All of such financial statements (including in each case the related schedules and notes) fairly present in all material respects the consolidated financial position of the Note Parties and their Subsidiaries as of the respective dates specified in such Schedule and the consolidated results of their operations and cash flows for the respective periods so specified and have been prepared in accordance with GAAP consistently applied throughout the periods involved except as set forth in the notes thereto (subject, in the case of any interim financial statements, to normal year-end adjustments and other adjustments taking into account entering into this Agreement and related transactions).  As of the Closing, the Note Parties and their Subsidiaries do not have any Material liabilities that are not disclosed on such financial statements or otherwise disclosed in the Disclosure Documents.

Section 5.6.     **Compliance with Laws, Other Instruments, Etc**.  The execution, delivery and performance by the Note Parties of this Agreement, the Notes and the other Note Documents to which it is a party, will not (i) contravene, result in any breach of, or constitute a default under, or result in the creation of any Lien (except as contemplated by the Security Documents) in respect of any property of the Note Parties or any Subsidiary under, any indenture, mortgage, deed of trust, loan, purchase or credit agreement, lease, charter, Organizational Document, or any other agreement or instrument to which the Note Parties or any Subsidiary is bound or by which the Note Parties or any Subsidiary or any of their respective properties may be bound or affected; provided, that consents of the applicable charterers would be required under any Assignment of Charters and Hire, all of which (to the extent required under Section 9.18) have been received as of the date hereof, (ii) conflict with or result in a breach of any of the terms, conditions or provisions of any order, judgment, decree, or ruling of any court, arbitrator or Governmental Authority applicable to any Note Party or any Subsidiary or (iii) violate any provision of any law, statute or other rule or regulation of any Governmental Authority applicable to any Note Party or any Subsidiary.

Section 5.7.     **Governmental Authorizations, Etc**.  Except for filings to perfect or to continue the perfection of the Liens created by the Security Documents, no consent, approval or authorization of, or registration, filing or declaration with, any Governmental Authority is required in connection with the execution, delivery or performance by the Note Parties of this Agreement, the Notes or any other Note Document.

10

**Section 5.8.    Litigation; Observance of Agreements, Statutes and Orders**.

(a)    There are no actions, suits, investigations or proceedings pending or, to the knowledge of the Note Parties, threatened against or affecting a Note Party or any Subsidiary or any property of any Note Party or any Subsidiary in any court or before any arbitrator of any kind or before or by any Governmental Authority that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    No Note Party nor any Subsidiary is (i) in default under any term of any agreement or instrument to which it is a party or by which it is bound, (ii) in violation of any order, judgment, decree or ruling of any court, arbitrator or Governmental Authority or (iii) in violation of any applicable law, ordinance, rule or regulation of any Governmental Authority (including, without limitation, Environmental Laws, the USA PATRIOT Act or any of the other laws and regulations that are referred to in Section 5.16), which default or violation could, individually or in the aggregate for all matters addressed by clauses (i) - (iii) above, reasonably be expected to have a Material Adverse Effect.

**Section 5.9.    Taxes**.  Each Note Party and their Subsidiaries have timely filed all tax returns and reports that are required to have been filed in any jurisdiction, and have timely paid all Taxes required to have been paid by it, except for any Taxes (i) the amount of which is not, individually or in the aggregate, Material or (ii) the amount, applicability or validity of which is currently being diligently contested in good faith by appropriate proceedings and with respect to which the Note Parties or their Subsidiaries, as the case may be, have established adequate reserves in accordance with GAAP on the books of the applicable Note Party or Subsidiary.  The charges, accruals and reserves on the books of the Note Parties and their Subsidiaries in respect of Taxes for all fiscal periods are adequate.

**Section 5.10.    Title to Property; Leases**.  The Note Parties and their Subsidiaries have good and sufficient title to their respective properties that individually or in the aggregate are Material, including all such properties reflected in the most recent audited balance sheet referred to in Section 5.5 herein or purported to have been acquired by the Note Parties or any of their Subsidiaries after such date (except as sold or otherwise disposed of in the ordinary course of business), in each case free and clear of Liens prohibited by this Agreement.  All leases that individually or in the aggregate are Material are valid and subsisting and are in full force and effect in all material respects.

**Section 5.11.    Intellectual Property; Licenses**.

(a)    The Note Parties and their Subsidiaries own or possess all licenses, permits, franchises, authorizations, patents, copyrights, proprietary software, service marks, trademarks, trade names and other Intellectual Property used in or necessary for the conduct of their respective businesses as currently conducted, and rights thereto, that individually or in the aggregate are Material, in each case without known conflict with the rights of others and free and clear of any Liens except for Liens granted under the Security Documents.  All such licenses, permits, franchises, authorizations and Intellectual Property are valid and subsisting and are in full force and effect and are subject to the Intellectual Property Agreements to the extent licensed or serviced by an Affiliate of the Note Parties.

(b)    To the knowledge of the Note Parties, the conduct of the respective businesses (including the products and services) of the Note Parties or any of their Subsidiaries as currently conducted does not, in any Material respect, infringe, misappropriate or otherwise violate any patent, copyright, proprietary software, service mark, trademark, trade name or other Intellectual Property, or rights thereto, owned by any other Person.

(c)      To the knowledge of the Note Parties, there is no Material violation by any Person of any right of the Note Parties or any of their Subsidiaries with respect to any patent, copyright, proprietary software, service mark, trademark, trade name or other Intellectual Property, or rights thereto, owned or used by the Note Parties or any of their Subsidiaries.

(d)      No Chouest Affiliate owns, controls or has any right, title or interest in or to, or has contributed, any Intellectual Property, software, or other technology used in or necessary for the operation of the Vessels, other than the Intellectual Property, technology, and systems licensed to Company pursuant to the Intellectual Property Agreements.

Section 5.12.    **Compliance with ERISA**.

(a)      The Note Parties and each ERISA Affiliate have operated and administered each ERISA Plan, and each ERISA Plan is, in compliance with all applicable laws except for such instances of noncompliance as have not resulted in and could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  None of the Note Parties nor any ERISA Affiliate have incurred any liability pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans (as defined in section 3 of ERISA), and no event, transaction or condition has occurred or exists that could, individually or in the aggregate, reasonably be expected to result in the incurrence of any such liability by any Note Party or any ERISA Affiliate, or in the imposition of any Lien on any of the rights, properties or assets of any Note Party or any ERISA Affiliate, in either case pursuant to Title I or IV of ERISA or to section 430(k) of the Code or to any such penalty or excise tax provisions under the Code or federal law or section 4068 of ERISA or by the granting of a security interest in connection with the amendment of an ERISA Plan, other than such liabilities or Liens as would not be individually or in the aggregate Material.

(b)      The present value of the aggregate benefit liabilities under each of the ERISA Plans (other than Multiemployer ERISA Plans), determined as of the end of such ERISA Plan's most recently ended plan year on the basis of the actuarial assumptions specified for funding purposes in such ERISA Plan's most recent actuarial valuation report, did not exceed the aggregate current value of the assets of such ERISA Plan allocable to such benefit liabilities.  The term "**benefit liabilities**" has the meaning specified in section 4001 of ERISA and the terms "**current value**" and "**present value**" have the meaning specified in section 3 of ERISA.

(c)      The Note Parties and their ERISA Affiliates have not incurred withdrawal liabilities (and are not subject to contingent withdrawal liabilities) under section 4201 or 4204 of ERISA in respect of Multiemployer ERISA Plans that individually or in the aggregate are Material.

(d)      [Reserved].

(e)      The expected postretirement benefit obligation (determined as of the last day of the Note Parties' most recently ended fiscal year in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 715-60, without regard to liabilities attributable to continuation coverage mandated by section 4980B of the Code) of Note Parties and their subsidiaries individually or in the aggregate is not Material.

Section 5.13.    **Private Offering by the Company**.  Neither the Company nor anyone acting on the Company's behalf has offered the Notes or any similar Securities for sale to, or solicited any offer to buy any of the same from, or otherwise approached or negotiated in respect thereof with, any Person other than the Noteholders, each of which has been transferred the Notes at a private sale for investment.  No Note Party nor anyone acting on their behalf has taken, or will take, any action that would subject the

issuance, transfer or sale of the Notes to the registration requirements of section 5 of the Securities Act or to the registration requirements of any Securities or blue sky laws of any applicable jurisdiction.

**Section 5.14.   Use of Proceeds; Margin Regulations**.  The Company will exchange the Notes for the Exchanged Debt on a cashless basis.  The Note Parties are not engaged and will not engage, principally or as one of their important activities, in the business of buying or carrying margin stock or extending credit for the purpose of buying or carrying margin stock, and no part of the proceeds from the transfer of or exchange for the Notes hereunder will be used, directly or indirectly, for the purpose of buying or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System (12 CFR 221), or for the purpose of buying or carrying or trading in any Securities under such circumstances as to involve the Note Parties in a violation of Regulation X of said Board (12 CFR 224) or to involve any broker or dealer in a violation of Regulation T of said Board (12 CFR 220).  Margin stock does not constitute more than 2% of the value of the consolidated assets of the Note Parties and their Subsidiaries and the Note Parties do not have any present intention that margin stock will constitute more than 2% of the value of such assets.  As used in this Section, the terms "margin stock" and "purpose of buying or carrying" shall have the meanings assigned to them in said Regulation U.

**Section 5.15.   Existing Indebtedness; Future Liens**.

(a)    Other than as to the Note Obligations, <u>Schedule 5.15</u> herein sets forth a complete and correct list of all outstanding Indebtedness of the Note Parties and their Subsidiaries as of the Closing Date (after giving effect to the exchange of the Exchanged Debt) (including descriptions of the obligors and obligees, principal amount outstanding, any collateral therefor and any Guaranties thereof).  Other than as to the Exchanged Debt which is to be discharged concurrently with Closing, neither the Note Parties nor any Subsidiary of the Note Parties is in default and no waiver of default is currently in effect, in the payment of any principal or interest on any Indebtedness of the Note Parties or their Subsidiaries, and no event or condition exists with respect to any Indebtedness of the Note Parties nor any Subsidiary of the Note Parties that would permit (or that with notice or the lapse of time, or both, would permit) one or more Persons to cause such Indebtedness to become due and payable before its stated maturity or before its regularly scheduled dates of payment.

(b)    Neither the Note Parties nor any Subsidiary of the Note Parties has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien not permitted by Section 10.5.

(c)    On the Closing Date, neither the Note Parties nor any Subsidiary of the Note Parties is a party to, or otherwise subject to any provision contained in, any instrument evidencing Indebtedness of the Note Parties or any Subsidiary of the Note Parties, any agreement relating thereto or any other agreement (including, but not limited to, its charter or any other organizational document) which limits the amount of, or otherwise imposes restrictions on the incurring of, Indebtedness of the Note Parties, except as disclosed in <u>Schedule 5.15</u> herein.

**Section 5.16.   Foreign Assets Control Regulations, Etc**.

(a)    None of the Note Parties, any Controlled Entity, or any director, officer, or (to the Note Parties' knowledge) employee of the Note Parties or any Controlled Entity, or any vessel owned by the Note Parties or Controlled Entity or, to the knowledge of the Note Parties or any Subsidiary of the Note Parties, any agent of the Note Parties or any Subsidiary of the Note Parties that will act in any capacity in connection with or benefit from the Notes established hereby, is a Blocked Person.  Neither the Notes Parties nor any Controlled Entity has been notified that its name or the name of any vessel owned by it appears or may in the future appear on an official list of Persons or vessels that engage in investment or

other commercial activities (i) in Iran or with any Sanctioned Country; (2) with any Blocked Persons; or (iii) otherwise in violation of Economic Sanctions.

(b)     No part of the deemed proceeds from the Exchange for the Notes hereunder constitutes or will constitute funds obtained on behalf of any Blocked Person or will otherwise be used by the Note Parties or any Controlled Entity, directly or knowingly indirectly, (i) in connection with any investment in, or any transactions or dealings with, any Blocked Person or Sanctioned Country in violation of applicable Economic Sanctions, or (ii) otherwise in violation of Economic Sanctions or Anti-Corruption Laws (as defined below).

(c)     Neither the Note Parties nor any Controlled Entity (i) is, or in the last five years has been in material violation of, or is charged with, or convicted of money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes under the Currency and Foreign Transaction Reporting Act of 1970 (otherwise known as the Bank Secrecy Act), the USA PATRIOT Act, any Economic Sanctions, any other United States law or regulation governing such activities or under any other similar laws of any other jurisdiction governing such activities (collectively, "**Anti-Money Laundering/Anti-Terrorism Laws**") or (ii) to the Note Parties' knowledge after making due inquiry, is under investigation by any Governmental Authority for possible violation of Anti-Money Laundering/Anti-Terrorism Laws;

(d)     Neither the Notes Parties nor any Controlled Entity (i) is in material violation of or charged with bribery or any other anti-corruption related activity under any applicable laws, rules or regulation in a U.S. or any non-U.S. country or jurisdiction, including but not limited to, the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010 (collectively, "**Anti-Corruption Laws**") or (ii) to the Note Parties' knowledge after making due inquiry, is under investigation by any U.S. or non-U.S. Governmental Authority for possible violation of Anti-Corruption Laws;

(e)     No part of the deemed proceeds from the transfer of and exchange for the Notes hereunder will be used, directly or knowingly indirectly, for any improper payments, including bribes, to any Governmental Official or commercial counterparty in order to obtain, retain or direct business or obtain any improper advantage, in each case which would be in violation of, or cause any Noteholder to be in violation of, any applicable Anti-Corruption Laws;

(f)     The Note Parties have implemented and maintains in effect policies and procedures designed to ensure compliance by the Note Parties, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Economic Sanctions, and the Company, its Subsidiaries and their respective officers and directors and, to the knowledge of the Note Parties, their employees and agents (in their capacity as such) are in compliance with applicable Economic Sanctions and not knowingly engaged in any activity that would reasonably be expected to result in the Note Parties being designated as a Blocked Person.

**Section 5.17.     Status under Certain Statutes**.  Neither the Note Parties nor any Subsidiary of the Note Parties is subject to regulation under the Investment Company Act of 1940, as amended, the Public Utility Holding Company Act of 2005, as amended, the ICC Termination Act of 1995, as amended, or the Federal Power Act, as amended.

**Section 5.18.     Environmental Matters**.

(a)     Neither the Note Parties nor any Subsidiary of the Note Parties have knowledge of any claim or has received any notice of any claim, and no ongoing proceeding has been instituted asserting any claim against the Note Parties or any Subsidiary of the Note Parties or any of their respective real

properties now or formerly owned, leased or operated by any of them, alleging any damage to the environment or violation of any Environmental Laws, except, in each case, such as could not reasonably be expected to result in a Material Adverse Effect.

(b)     There is no unresolved claim, public or private, of violation of Environmental Laws or damage to the environment emanating from, occurring on or in any way related to real properties now or formerly owned, leased or operated by any of the Note Parties or any Subsidiary of the Note Parties, except, in each case, such as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c)     Neither the Note Parties nor any Subsidiary of the Note Parties have stored any Hazardous Materials on real properties now or formerly owned, leased or operated by any of them in a manner which is contrary to any Environmental Law.

(d)     Neither the Note Parties nor any Subsidiary of the Note Parties have disposed of any Hazardous Materials in a manner which is contrary to any Environmental Law.

(e)     All Mortgaged Vessels and other vessels owned or chartered by the Note Parties or any of their Subsidiaries, and all buildings on all real properties now owned, leased or operated by the Note Parties or any of their Subsidiaries are in compliance with applicable Environmental Laws, except where failure to comply could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(f)     The Note Parties and their Subsidiaries have obtained all permits, licenses and other authorizations and have made all filings, registrations and other submittals which are required of them under all Environmental Laws except to the extent the failure to have any such permits, licenses or authorizations or to have made any such filings, registrations or submittals individually and in the aggregate could not reasonably be expected to have a Material Adverse Effect.

Section 5.19.    **Chief Executive Office**.  The chief executive office and sole principal place of business of the Note Parties and the office where they maintain their records relating to the transactions contemplated by this Agreement and the other Note Documents is located at 16201 East Main Street, Cut Off, Louisiana 70345.

Section 5.20.    **No Encumbrances**.  The Mortgaged Vessels are free from all encumbrances and liens, maritime or otherwise, or any other debts whatsoever, other than Liens in favor of the Collateral Agent under the Fleet Mortgage and the other Security Documents and liens or other encumbrances that are being released contemporaneously with the Closing and Liens otherwise permitted under Section 10.5.

Section 5.21.    **Validity of Security Documents**.  Each of the Security Documents creates in favor of the Collateral Agent, for the benefit of the Agents and the Noteholders, a legal, valid and enforceable preferred mortgage lien or security interest in the Mortgaged Vessels and other Collateral described therein provided that consent of (i) the applicable charterer would be required under any Assignment of Charters and Hire (reference being made to Section 5.6 for a related representation and warranty as to consents), (ii) the relevant parties party to the Support Agreement and the Master Services Agreement would be required as to such agreements, which consents have been received, (iii) North American Shipbuilding, L.L.C. would be required as to the NSA License Agreement, which consent has been received and (iv) Marine Technologies would be required to as to the Know-How Agreement, which consent has been received. Upon the filing of the Fleet Mortgage, the Assignment of First Preferred Fleet Mortgage and the Amended and Restated First Preferred Fleet Mortgage with the NVDC, the Uniform Commercial Code financing statements in the appropriate governmental offices, and (if applicable) Intellectual Property security

agreements with the U.S. Patent and Trademark Office and U.S. Copyright Office, and the giving of the notices contemplated by the Assignment of Insurances, such Liens and security interests on the Collateral granted thereby that may be perfected by such aforementioned filings or recordings shall constitute fully perfected Liens on and security interests in, all right, title and interest of the Company in the Mortgaged Vessels and such other Collateral, in each case prior and superior in right to any Person (subject, as to priority, only to Liens permitted under Section 10.5 that, as a matter of law, would be prior to the Liens of the Collateral Agent), and no further recordings or filings are or will be required in connection with the creation, perfection or enforcement of such security interests and Liens, other than (a) the filing of Supplements to the Fleet Mortgage and the Amended and Restated First Preferred Fleet Mortgage with respect to Mortgaged Vessels acquired after the Closing Date and (b) the filing of continuation statements in accordance with applicable law.

Section 5.22.   **Other Matters**.  (i) No loss, constructive loss, or requisitioning for use by any Governmental Authority of any of the Mortgaged Vessels has occurred; (ii) no change has occurred in applicable law or regulations thereunder or in interpretations thereof by any regulatory authority which would make it illegal for the Note Parties to enter into any of the transactions contemplated in or by any such document or which would subject the Note Parties to any penalty or other liability as a result of any of the transactions contemplated in or by any such document; (iii) no material adverse change has occurred in the physical condition of the Mortgaged Vessels and each of the Mortgaged Vessels is tight, staunch, strong and well and sufficiently tackled, appareled, furnished and equipped and in every respect seaworthy, in accordance with the specifications, in good working order, condition and repair (normal wear and tear excepted) and without defect in condition, design, operation or fitness for use; and (iv) no default by the Note Parties or any Subsidiary of the Note Parties under any charter of any Mortgaged Vessel has occurred and is continuing.

Section 5.23.   **Title to Mortgaged Vessels**.  The Company is the sole legal and beneficial owner of each of the Mortgaged Vessels and all of their component parts, and each such Mortgaged Vessel is duly documented in the name of the Company with NVDC, under the laws and flag of the United States, and with a certificate of documentation endorsed to evidence such Mortgaged Vessel's qualification to engage in the United States coastwise or other applicable trades in which it engages.

Section 5.24.   **Fiscal Year**.  The Note Parties' fiscal year is the twelve months ending December 31 of each year.

Section 5.25.   **Citizenship**.  The Company is a "citizen of the United States" within the meaning of 46 U.S.C. Section 50501 et seq. eligible to own and document the Mortgaged Vessels in its own name. The Company is also in compliance with the citizenship requirements imposed under the Merchant Marine Act of 1920, as amended, the Merchant Marine Act of 1936, as amended and all other applicable United States laws, qualified to operate the Mortgaged Vessels in the U.S. coastwise trade, to participate in the government programs of the nature participated in by the Company and to receive subsidies.

Section 5.26.   **Solvency**.  As of the date of Closing, and after giving effect to the transactions contemplated by the Note Documents, the Note Parties and their Subsidiaries, on a consolidated basis, are Solvent.

Section 5.27.   **Transactions with Affiliates**.  Each transaction between a Note Party, any Subsidiary of the Note Parties, and one or more of their Affiliates complies with the "arm's length" requirements of Section 10.1.  As of the Closing Date, there are no transactions or series of related transactions within the last eighteen months preceding the Closing Date between a Note Party or any Subsidiary of the Note Parties, on the one hand, and one or more of their Affiliates, on the other hand, which in the aggregate, have a Fair Market Value of $5,000,000, except as identified on Schedule 5.27.

Section 5.28.    **Separate Legal Existence of the Note Parties**.  Each Note Party and their Subsidiaries maintain their financial and other records and books of account separate from those of their Affiliates and maintains their assets in a manner that facilitates their identification and segregation from those of their Affiliates.  Each Note Party and their Subsidiaries observe all requisite limited liability company or corporate formalities in their dealings with its Affiliates and do not commingle their funds or other assets with those of their Affiliates or maintain joint bank accounts with their Affiliates.  Each Note Party and their Subsidiaries do not hold themselves out, or permit themselves to be held out, as having agreed to pay or be liable for the Indebtedness of any Affiliate except pursuant to written Guaranties executed by each Note Party and their Subsidiaries from time to time for the furtherance of their own business objectives.

Section 5.29.    **Charter Agreements, Etc**.  Each of the charters, contracts of affreightment and other contracts (if applicable) with respect to each Mortgaged Vessel (including each bareboat charter to an Affiliate of the Note Parties and each third-party charter between any Affiliate of the Note Parties and unaffiliated charterers with respect to a Mortgaged Vessel) is in full force and effect and both the Note Parties and the other party or parties to each such charters, contracts of affreightment or other contracts are in full compliance with their respective obligations thereunder, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 5.30.    **[Reserved]**.

Section 5.31.    **Employment Matters**.  As of the Closing Date, there are no strikes, lockouts or slowdowns against the Note Parties, any Subsidiary of the Note Parties or any Relevant Group member pending or, to the knowledge of the Note Parties, threatened.  The hours worked by and payments made to employees of the Note Parties, Subsidiaries of the Note Parties and Relevant Group members have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters.  All payments due from the Note Parties, any Subsidiary of the Note Parties or any Relevant Group member, or for which any claim may be made against the Note Parties, any Subsidiary of the Note Parties or any Relevant Group member on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Note Parties, such Subsidiary of the Note Parties or such Relevant Group member.

Section 5.32.    **Affected Financial Institutions**.  No Note Party is an Affected Financial Institution.

Section 5.33.    **[Reserved]**.

Section 5.34.    **No Burdensome Restrictions**.  No Note Party is subject to any Burdensome Restriction except Burdensome Restrictions permitted under Section 10.15.

Section 5.35.    **Ownership of the Company**.  Gary Chouest and his Immediate Family legally or beneficially own not less than 70% of the ownership interests of Holdings and as of the Closing Date not less than 100% of the ownership interests of Holdings.

## SECTION 6    REPRESENTATIONS OF THE NOTEHOLDERS.

Section 6.1.    **Acquisition for Investment**.

(a)    Each Noteholder severally represents that it is receiving the Notes for its own account or for one or more separate accounts maintained by such Noteholder or for the account of one or more pension or trust funds and not with a view to the distribution thereof, provided that the disposition of

17

such Noteholder's or their property shall at all times be within such Noteholder's or their control.  Each Noteholder understands that the Notes have not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Company is not required to register the Notes.

(b)     At the time such Noteholder was offered the Exchange, it was, and at the date hereof it is, either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) not a U.S. person (as defined in Regulation S of the Securities Act), or (iii) an "accredited investor" as defined in Rule 501(a) under the Securities Act.

Section 6.2.     **Exchanged Debt**. Each Noteholder severally represents that it is the sole legal and beneficial owner of the Exchanged Debt being exchanged for the Notes.  Such Noteholder has good, valid and marketable title to its Exchanged Debt, free and clear of any Liens (other than pledges or security interests that such Noteholder may have created in favor of a prime broker under and in accordance with its prime brokerage agreement with such broker).  Such Noteholder has not, in whole or in part, except as described in the preceding sentence, (a) assigned, transferred, hypothecated, pledged, exchanged or otherwise disposed of any of its Exchanged Debt or its rights in its Exchanged Debt, or (b) given any Person or entity any transfer order, power of attorney or other authority of any nature whatsoever with respect to its Exchanged Debt.  Upon such Noteholder's delivery of its Exchanged Debt pursuant to the terms of the Restructuring Support Agreement, such Exchanged Debt shall be free and clear of all Liens created by such Noteholder.

## SECTION 7     INFORMATION AS TO COMPANY.

Section 7.1.     **Financial and Business Information**.  The Note Parties shall deliver to each of (i) the Agent for distribution to each Noteholder, (ii) AIG and (iii) Prudential:

(a)     *Quarterly Statements* — within 60 days (or, in respect of last quarterly fiscal period of each fiscal year, 90 days) after the end of each quarterly fiscal period in each fiscal year of the Company, commencing with the quarterly fiscal period ending December 31, 2022 copies of:

(i)     a consolidated balance sheet of the Note Parties and their Subsidiaries as at the end of such quarter, and

(ii)     consolidated statements of income, changes in members' equity and cash flows of the Note Parties and their Subsidiaries, for such quarter and (in the case of the second and third quarters) for the portion of the fiscal year ending with such quarter,

setting forth in each case in comparative form the figures for the corresponding periods in the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP applicable to quarterly financial statements generally, and certified by a Senior Financial Officer as fairly presenting, in all material respects, the financial position of the companies being reported on and their results of operations and cash flows, subject to changes resulting from year-end adjustments;

(b)     *Annual Statements* — within 150 days after the end of each fiscal year of the Company beginning with fiscal year ending December 31, 2022, copies of:

(i)     a consolidated balance sheet of the Note Parties and their Subsidiaries as at the end of such year, and

18

(ii)     consolidated statements of income, changes in members' equity and cash flows of the Note Parties and their Subsidiaries for such year,

setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP, and accompanied by an opinion thereon (without a "going concern" or similar qualification or exception and without any qualification or exception as to the scope of the audit on which such opinion is based, except this qualification shall not apply for the issuance of an audit in a year of maturity of the Notes) of independent public accountants of recognized national standing, which opinion shall state that such financial statements present fairly, in all material respects, the financial position of the companies being reported upon and their results of operations and cash flows and have been prepared in conformity with GAAP, and that the examination of such accountants in connection with such financial statements has been made in accordance with generally accepted auditing standards, and that such audit provides a reasonable basis for such opinion in the circumstances;

(c)     Information related to Affiliates —

(i)     within 180 days after the end of each fiscal year of (x) Edison Chouest Offshore Worldwide, the ECO Worldwide Annual Report, for which the delivery of an opinion shall not be required, submitted by a financial officer of the ECO Worldwide Companies and (y) each Relevant Group, copies of a balance sheet of each of the Relevant Groups as of the end of such year and the prior fiscal year and statements of comprehensive income, changes in members' equity and cash flows of each of the Relevant Groups for the year then ended, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP (as to the extent required or permitted by GAAP, on a combined or consolidated basis, as applicable), submitted by a financial officer of the ECO Worldwide Companies; provided that if any audited statements of any of the foregoing are available, such audited statements shall be provided; and

(ii)     within 90 days after the end of each fiscal quarter (including the fourth fiscal quarter) of Edison Chouest Offshore Worldwide, a balance sheet and income statement of Edison Chouest Offshore Worldwide as at the end of such quarter, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP (and to the extent required or permitted by GAAP, on a combined or consolidated basis, as applicable); and

(iii)     within 90 days after the end of each fiscal quarter (including the fourth fiscal quarter but within 90 days after that quarter) of each Relevant Group, a balance sheet and income statement of each Relevant Group (on a consolidated basis) as at the end of such quarter, prepared in accordance with GAAP; and

(iv)     within 45 days after the end of each calendar month a monthly utilization report for all vessels owned by Chouest Corporate Affiliates, substantially in the form attached hereto as Exhibit H; and

(v)     within 10 Business Days of any written request by the Required Holders:

(1)     the most recent annual statements of income, balance sheet and, if available, members' equity and cash flows, setting forth in each case in comparative form the figures for the previous fiscal year, all

in reasonable detail, prepared in accordance with GAAP (as to the extent required or permitted by GAAP, on a combined or consolidated basis, as applicable), of any Relevant Group Member or any Chouest Corporate Affiliate which has assets of greater than $10,000,000 or Indebtedness of greater than $10,000,000 submitted by a Senior Financial Officer; provided that if any audited statements of any of the foregoing are available, such audited statements shall be provided; and

(2)     the most recent quarterly statements of income and balance sheet as of the end of the applicable quarter prepared in accordance with GAAP of any Chouest Corporate Affiliate which has assets of greater than $10,000,000 or Indebtedness of greater than $10,000,000 and which is not included in the quarterly reporting provided pursuant to paragraphs (ii) or (iii) above or Section 7.1(a),

in each case as may be reasonably requested by the Agent or any Noteholder; provided, that (y) each such request shall name the specific Relevant Group Member or Chouest Corporate Affiliate(s) and whether annual or quarterly financial statements, or both, are required.

(vi)     within five (5) Business Days of delivery to any agent or lender of a Chouest Corporate Affiliate, each certificate delivered by such Chouest Corporate Affiliate to any such agent or lender during or in respect of any fiscal year or quarter establishing whether such Chouest Corporate Affiliate is or is not in compliance with the requirements set forth in the documents governing the Indebtedness of such Chouest Corporate Affiliate to which such agent or lender is a party; and

(vii)     within 90 days after the end of each fiscal year, an updated complete and correct list of Relevant Groups as of the end of such fiscal year.

(d)     *Other Reports* — promptly upon their becoming available, one copy of (i) each financial statement, report, notice or proxy statement sent by the Note Parties or any Subsidiary of the Note Parties to its principal lending banks as a whole, if any (excluding information sent to such banks in the ordinary course of administration of a bank facility such as information relating to pricing and borrowing availability) and (ii) all press releases and other statements made available generally by the Note Parties to the public concerning developments that are Material;

(e)     *Annual Budget* — on or prior to January 30 of each fiscal year of the Company, a management-prepared budget of the Note Parties and their Subsidiaries for (i) such fiscal year with a projected consolidated balance sheet, income statement and cash flow statement for such fiscal year along with projected calculation of financial covenants for such fiscal year, in each case broken out by fiscal quarter, and (ii) the following three years with a projected income statement for such three fiscal years;

(f)     *Notice of Default or Event of Default* — promptly, and in any event within five days after a Responsible Officer of the Note Parties becoming aware (i) of the existence of any Default or Event of Default or that any Person has given any notice or taken any action with respect to a claimed default hereunder, (ii) that any Person has given any notice or taken any action with respect to a claimed default of the type referred to in Section 11.1(f), and (iii) of the existence of any default or event of default under any charter with respect to a Mortgaged Vessel, the Support Agreements, the Master Services Agreement, the Asset Sale Agreement or the Intellectual Property Agreement or that any Person has given any notice or taken any action with respect to a claimed default thereunder, a written notice specifying the

20

nature and period of existence thereof and what action the Note Parties are taking or propose to take with respect thereto;

(g)     *ERISA Matters* — promptly, and in any event within five days after a Responsible Officer of the Note Parties or any of their Subsidiaries becoming aware of any of the following, a written notice setting forth the nature thereof and the action, if any, that the Note Parties or an ERISA Affiliate proposes to take with respect thereto:

(i)     with respect to any Plan, any reportable event, as defined in section 4043(c) of ERISA and the regulations thereunder, for which notice thereof has not been waived pursuant to such regulations as in effect on the date hereof; or

(ii)     the taking by the PBGC of steps to institute, or the threatening by the PBGC of the institution of, proceedings under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by the Note Parties or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by the PBGC with respect to such Multiemployer Plan; or

(iii)     any event, transaction or condition that could result in the incurrence of any liability by the Note Parties or any ERISA Affiliate pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans, or in the imposition of any Lien on any of the rights, properties or assets of the Note Parties or any ERISA Affiliate pursuant to Title I or IV of ERISA or such penalty or excise tax provisions, if such liability or Lien, taken together with any other such liabilities or Liens then existing, could reasonably be expected to have a Material Adverse Effect;

(h)     *Notices from Governmental Authority* — promptly, and in any event within 30 days of receipt thereof, copies of any notice to the Note Parties or any Subsidiary of such Note Party from any federal or state Governmental Authority relating to any order, ruling, statute or other law or regulation that could reasonably be expected to have a Material Adverse Effect;

(i)     *Resignation or Replacement of Auditors* — within ten days following the date on which any Note Party's auditors resign or any Note Party elects to change auditors, as the case may be, notification thereof, together with such supporting information as the Required Holders may request;

(j)     *Information Required by Rule 144A* — upon the request of the Agent or any Noteholder (and shall deliver to any qualified institutional buyer designated by such Noteholder), such financial and other information as the Agent or such Noteholder may reasonably determine to be necessary in order to permit compliance with the information requirements of Rule 144A(d)(4) under the Securities Act (or any successor rule) in connection with the resale of Notes, except at such times as such Note Party is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act (for the purpose of this Section 7.1(k), the term "qualified institutional buyer" shall have the meaning specified in Rule 144A under the Securities Act);

(k)     *Private Letter Rating from NRSRO* — at the sole expense of the Company, (x) on or prior to the date which is 45 days after the Closing Date delivery of a private letter rating of the Notes and (y) thereafter on or prior to December 31 of each fiscal year of the Company commencing in 2023, satisfactory evidence from a Rating Agency of a review and re-certification of the private letter rating of the Notes;

(l)      *Appraisals* — on or before November 30th of each calendar year starting with November 30, 2023, an Appraisal with respect to the Mortgaged Vessels; provided that if an Event of Default has occurred and is continuing, the Note Parties shall cause to be delivered to the Agent such additional Appraisals as the Agent or Required Holders may request; provided further that all such Appraisals shall be arranged by, and made at the sole expense of, the Note Parties.  Not later than 120 days prior to the required delivery date for an annual Appraisal referenced in the preceding sentence, the Note Parties shall coordinate with the Required Holders regarding the form, substance and basis for such Appraisal;

(m)      *Information Related to Appraisal Value* — together with the delivery of financial statements pursuant to Section 7.1(a) and Section 7.1(b), the Note Parties shall provide documentation, in form and substance satisfactory to the Required Holders, as to the current fair market value based on the most recent Appraisal delivered pursuant to this Agreement, of the Mortgaged Vessels that are secured by a first priority Lien pursuant to the Fleet Mortgage in favor of the Collateral Agent, not subject to any superior charterer Liens as recognized in the 5th Circuit under Mr. Dean (including by way of subordination provision built into the underlying charter)

(n)      *Information Related to Mortgaged Vessels* — promptly after the filing or receiving thereof, (i) copies of all material reports and notices with respect to the Mortgaged Vessels which the Note Parties or any Subsidiary of the Note Parties files with the United States Coast Guard or the United States Maritime Administration or which the Note Parties or any Subsidiary of the Note Parties receives from either of the foregoing entities, (ii) and no later than 30 days prior to the date of expiration of any existing insurance policy, updated certificates of insurance, containing the information and endorsements described in Section 4.10(m), (iii) together with the delivery of financial statements pursuant to Sections 7.1(a) and (b), a report listing each Mortgaged Vessel by name and hull number, the general location of such Mortgaged Vessel, the charter customer to whom such Mortgaged Vessel is chartered, a description of the charter (including, if applicable, the schedule number to any master charter agreement) under which such Mortgaged Vessel is currently chartered, the expiration date of each such current charter or schedule and a copy of each such charter or schedule, to the extent not previously delivered to the Agent or Collateral Agent and (iv) any communications related to the amendment, modification or proposed amendment or modification of any of the Support Agreements, Master Services Agreements, Asset Sale Agreement or Intellectual Property Agreement including with respect to the potential inability to perform any of such agreements;

(o)      *Information Related to Laborers, Subcontractors and Materialmen* — upon request of the Agent or any of the Noteholders at any time, and from time to time, affidavits listing all laborers, subcontractors, materialmen, and any other Persons who might or could claim statutory or common law liens, and who are furnishing or have furnished labor or material in connection with the Vessels, or any part thereof, in each case in excess of $100,000 and in the aggregate in excess of $250,000, together with affidavits or other evidence satisfactory to the Required Holders, showing that such parties have been paid all amounts then due for labor and materials furnished.  The Note Parties shall furnish to the Agent, at any time and from time to time upon demand by the Agent or any Noteholder, lien waivers bearing a then current date and prepared on a form satisfactory to the Agent or any Noteholder from any such subcontractors or materialmen to whom amounts equal to or exceeding $100,000 are owed, in each case, and $250,000 in the aggregate, as the Agent or the Noteholders may request;

(p)      *Information Related to Sale of Vessels* — upon request by the Agent or any Noteholder at any time, and from time to time, any information or communications relating to any Asset Sale, including sale of Vessels under the Asset Sale Agreement, the PSV Vessel Sale Proceeds and the status of any sales of Vessels to any Affiliates of the Note Parties.

(q)     *Requested Information* — with reasonable promptness, such other data and information relating to the business, operations, affairs, financial condition, assets or properties of the Note Parties or any of their Subsidiaries or their Affiliates relating to the ability of the Note Parties to perform their obligations hereunder, under any Note Document and under the Notes as from time to time may be reasonably requested by any such Noteholder or the Agent;

(r)     *Galliano Marine Indirect Operating Expenses* – within (x) 45 days after the end of each calendar month if such calendar month is neither the end of a fiscal year or fiscal quarter, (y) 60 days after the end of each fiscal quarter which is not the end of a fiscal year and (z) 90 days after the end of each fiscal year, as applicable, (i) a break-down of the amount of indirect operating expenses allocated to the Note Parties or any of their Subsidiaries in accordance with Section 9.16 and to each other Person to which operating expenses are allocated or services provided in such calendar month, including a description of how allocated and calculation of daily rates and (ii) a schedule of the total Indebtedness or other amounts owing by the Note Parties to any Chouest Affiliate or any other Person in connection with such operating expenses;

(s)     *Organizational chart* – at the time of delivery of each Officer's Certificate in accordance with Section 7.2, (i) an updated organizational chart of all Chouest Affiliates, in each case regardless of whether such entity is included in any financial statements of the Relevant Groups but which has assets of greater than $10,000,000 or Indebtedness of greater than $10,000,000, in form and substance satisfactory to the Required Holders, with written certification in such Officer's Certificate that the chart is true and correct or (ii) confirmation in such Officer's Certificate that the organizational chart last delivered pursuant hereto remains true and correct or otherwise certifying the applicable changes;

(t)     *Information on Mortgaged Vessels and vessels* – within (x) 45 days after the end of each calendar month, and promptly upon request at any time by the Agent or any Noteholder, a report listing the jurisdiction in which each Mortgaged Vessel and any other vessel owned by the Note Parties or their Subsidiaries is located, together with the working status of such vessel and any customer, day rate, contract start and end date associated with such vessel, copies of any new charters entered into as well as the other information required to be provided pursuant to Section 9.19 hereof to the extent not previously provided, and such other information as the Agent or any Noteholder requires;

(u)     *Defaults in relation to Affiliate Indebtedness* - promptly, and in any event within five days of a Responsible Officer of the Note Parties becoming aware, notice of the existence of any default (howsoever described) related to payments due and owing, insolvency, bankruptcy events or covenants or any event of default (howsoever described), in each case, in relation to Indebtedness of any Chouest Corporate Affiliate in an amount exceeding $1,000,000;

(v)     *Plan and Forecast* – as soon as available, but in any event no later than 60 days after the end of each fiscal quarter of the Company, a copy of the plan and forecast (including a projected consolidated balance sheet, income statement and cash flow statement and projected calculation of financial covenants) of the Company for each quarter of the upcoming twelve month period (the "**Projections**") in form reasonably satisfactory to the Required Holders;

(w)     *Intercompany Balances* – as soon as available, but in any event no later than 60 days after the end of each fiscal quarter of the Note Parties, a listing of the intercompany balances between (i) a Note Party and each Relevant Group Member and (ii) a Note Party and each Affiliate with balances over $1,000,000 as at the end of such quarter;

(x)     *Accounting Practices* – notice of any material change in accounting or financial reporting practices by the Note Parties or any Subsidiary of any Note Party; and

(y)     *Beneficial Ownership Certification* – notice of any change in the information provided in the Beneficial Ownership Certification delivered to any Noteholder that would result in a change to the list of beneficial owners identified in such certification.

**Section 7.2.     Officer's Certificate**.  Each set of financial statements delivered pursuant to Section 7.1(a) or Section 7.1(b) shall be accompanied by a certificate of a Senior Financial Officer substantially in the form of Exhibit M (a "**Financial Statement Compliance Certificate**"):

(a)     *Covenant Compliance* — calculating the ratios of Funded Debt to EBITDA for purposes of determination of the applicable interest rate under Section 8.1(b), and setting forth the information (including detailed certified calculations) that is required to determine whether the Note Parties were in compliance with the requirements of Sections 10.6, 10.7, 10.9, 10.11 and 10.12 during the quarterly or annual period covered by the statements then being furnished (including with respect to such Section, where applicable, certified calculations of the maximum or minimum amount, ratio or percentage, as the case may be, permissible under the terms of such Section, and the certified calculation of the amount, ratio or percentage then in existence).  In the event that the Note Parties or any Subsidiary of such Note Party has made an election to measure any financial liability using fair value (which election is being disregarded for purposes of determining compliance with this Agreement pursuant to Section 22.1) as to the period covered by any such financial statement, such Senior Financial Officer's certificate as to such period shall include a reconciliation from GAAP with respect to such election; and

(b)     *Event of Default* — certifying that such Senior Financial Officer has reviewed the relevant terms hereof and has made, or caused to be made, under his or her supervision, a review of the transactions and conditions of the Note Parties and their Subsidiaries from the beginning of the quarterly or annual period covered by the statements then being furnished to the date of the certificate and that such review shall not have disclosed the existence during such period of any condition or event that constitutes a Default or an Event of Default or, if any such condition or event existed or exists (including, without limitation, any such event or condition resulting from the failure of the Note Parties or any Subsidiary of such Note Party to comply with any Environmental Law), specifying the nature and period of existence thereof and what action the Company shall have taken or proposes to take with respect thereto.

(c)     *PSV Vessel Sale Proceeds* — certifying the total PSV Vessel Sale Proceeds received as of the date of such financial statement and the timing of receipt of such PSV Vessel Sale Proceeds for the purposes of calculating the Specified Noteholder Fee pursuant to Section 8.01(c).

**Section 7.3.     Visitation**.  The Note Parties shall permit the representatives of each Noteholder:

(a)     *No Default* — if no Default or Event of Default then exists, at the expense of the Note Parties for any such visits not to exceed one per year, of the Agent, the Collateral Agent or any Noteholder, and upon reasonable prior notice to the Note Parties, to visit the principal executive office of the Note Parties, to discuss the affairs, finances and accounts of the Note Parties and their Subsidiaries with the Note Parties' officers, and its independent public accountants, and (with the consent of the Company, which consent will not be unreasonably withheld) to inspect the Collateral (<u>provided</u> that any such inspections of the Collateral are not to unreasonably interfere with the conduct of business) and to visit the other offices and properties of the Note Parties and each Subsidiary or the Affiliates of any Note Party, all at such reasonable times; <u>provided</u>, that with respect to the Affiliates of any Note Party, any visit or discussions required under the foregoing sentence shall be limited to items reasonably related to the business and affairs of the Note Parties or the Collateral; and

(b)     *Default* — if a Default or Event of Default then exists, at the expense of the Note Parties to visit and inspect any of the offices, the Collateral (<u>provided</u> that any such inspections of the

Collateral are not to unreasonably interfere with the conduct of business) or properties of the Note Parties or any Subsidiary or the Affiliates of any Note Party, to examine all their respective books of account, records, reports and other papers, to make copies and extracts therefrom, and to discuss their respective affairs, finances and accounts with their respective officers and independent public accountants (and by this provision the Note Parties authorize said accountants to discuss the affairs, finances and accounts of the Note Parties, its Subsidiaries and the Affiliates of such Note Party), all at such times and as often as may be requested; provided, that with respect to the Affiliates of the Note Parties, any visits, inspections or discussions required under the foregoing sentence shall be limited to items reasonably related to the business and affairs of the Note Parties or the Collateral; and

(c)     *Meeting with Management* — to meet in person or by telephone a Responsible Officer of the Company acceptable to the Required Holders at least once each calendar month and more often if requested by the Agent or any Noteholder to discuss the Company's relationships and negotiations with its customers and the Company's current or new business opportunities. The Agent and any requesting Noteholder and the Company shall coordinate with one another to schedule any such meeting.

Nothing herein constitutes a waiver of attorney-client privilege.

**Section 7.4.     Electronic Delivery**.   Financial statements, opinions of independent certified public accountants, other information and Officer's Certificates that are required to be delivered by the Note Parties pursuant to Sections 7.1(a), (b) or (c) and Section 7.2 shall be deemed to have been delivered if the Note Parties satisfies either of the following requirements with respect thereto:

(i)     such financial statements satisfying the requirements of Section 7.1(a) or (b) and related Officer's Certificate satisfying the requirements of Section 7.2 are delivered to the Agent by e-mail or posted by or on behalf of the Note Parties on IntraLinks or any other similar website to which the Agent has free access (provided that the Agent shall promptly make such statements and certificates available to the Noteholders in electronic form via e-mail or IntraLinks or other similar website to which each Noteholder has free access);

provided however, that the Note Parties shall have given the Agent and each Noteholder prior written notice, which may be by e-mail or in accordance with Section 17, of such posting in connection with each delivery, provided further, that upon request of any Noteholder to receive paper copies of such forms, financial statements and Officer's Certificates or to receive them by e-mail, the Note Parties will promptly e-mail them or deliver such paper copies, as the case may be, to such Noteholder.

**SECTION 8     PAYMENT AND PREPAYMENT OF THE NOTES.**

**Section 8.1.     Mandatory Payments and Prepayments; Interest; Fees**

(a)     *Amortization*.  Commencing on the last Business Day of the first full fiscal quarter after the Closing Date, on the last Business Day of each December, March, June and September prior to the Maturity Date, the Company will repay $2,000,000 in principal amount (or such lesser principal amount as shall then be outstanding) of the Notes at par.

(b)     *Interest*.  Accrued interest on each Note shall be payable in arrears on each Interest Payment Date and on the Maturity Date at a rate per annum equal to 9.50% per annum, commencing the Closing Date; provided, that interest shall begin to accrue on each Note at a rate of 8.50% per annum, commencing September 1, 2022, regardless of the Closing Date, and all interest that accrued from September 1, 2022 until the Closing shall be due and payable on the Closing Date to the Noteholders;

_provided_ _further_ _that_, commencing with the quarter beginning on April 1, 2023 and for each quarter ending thereafter, the interest rate per annum applicable to the Notes for the period from the beginning of such quarter to the next Interest Payment Date shall be the rate set forth across from the ratio of (x) Funded Debt of the Company for the most recently ended period of four consecutive fiscal quarters for which a Financial Statement Compliance Certificate has been delivered to the Agent to (y) EBITDA for such period, as set forth in the Financial Statement Compliance Certificate then most recently delivered to the Agent prior to the commencement  of such quarter:

| Ratio of Funded Debt to EBITDA | Rate |
|---|---|
| Greater than or equal to 4.00 to 1.00 | 9.50% |
| Less than 4.00 to 1.00 and greater than or equal to 2.75 to 1.00 | 8.00% |
| Less than 2.75 to 1.00 | 7.50% |

Notwithstanding anything to the contrary contained above in this Section 8.1(b) or elsewhere in this Agreement, if it is subsequently determined that the ratio set forth in any Financial Statement Compliance Certificate delivered to the Agent pursuant to Section 7.2 is inaccurate for any reason and the result thereof is that the Noteholders received interest for any period based on an interest rate that is less than that which would have been applicable had the ratio above been accurately determined, then, for all purposes of this Agreement, the interest rate for any day occurring within the period covered by such Financial Statement Compliance Certificate shall retroactively be deemed to be the relevant percentage as based upon the accurately determined ratio for such period, and any shortfall in the interest or fees theretofore paid by the Company for the relevant period pursuant to this Section 8.1(b) as a result of the miscalculation of the ratio shall be deemed to be (and shall be) due and payable under the relevant provisions of this Section 8.1(b) at the time the interest for such period were required to be paid pursuant to this Section (and shall remain due and payable until paid in full, together with all amounts owing under Section 8.1, in accordance with the terms of this Agreement); provided that, notwithstanding the foregoing, so long as an Event of Default described in Section 11(g) or (h) has not occurred with respect to any Note Party, such shortfall shall be due and payable ten (10) Business Days following the determination described above; provided, further, that to the extent the Financial Statement Compliance Certificate has not been delivered, the Ratio of Funded Debt to EBITDA shall be deemed to be the highest rate set forth above until the Business Day following receipt by the Agent of the applicable Financial Statement Compliance Certificate.

(c)  _Specified Noteholder Fee._  As additional yield to the Noteholders on the Notes and in consideration for the Noteholders exchanging the Exchanged Debt hereunder for the Notes, on the Maturity Date (or such earlier date that the aggregate outstanding principal amount of the Notes is prepaid in full (together with all accrued interest thereon and other outstanding Note Obligations)), the Company shall pay to the Noteholders a fee (the "**Specified Noteholder Fee**") in an amount equal to the Specified Noteholder Fee Amount. The Company will give the Agent written notice of the Accrual End Date not later than one (1) Business Day after the occurrence of clause (i) of the definition of Accrual End Date, which notice shall include the Specified Prepayment Amount and date on which the Specified Prepayment Amount was applied to repay the principal of the Notes.

For purposes of this Section 8.1(c), the following terms shall have the following meanings:

"**Accrual End Date**" means the earlier of (i) the date on which the Specified Prepayment Amount (but no less than the Specified Prepayment Amount) has been applied to reduce the aggregate principal

amount of the Notes and (ii) the Maturity Date (or such earlier or later date on which either the aggregate outstanding principal amount of the Notes is prepaid or repaid in full in cash).

"**_Specified Noteholder Fee Amount_**" means an amount equal to the amount of interest that would have accrued on the Notes from the Closing Date through and including the Accrual End Date as if interest had been accruing at the Fee Amount Rate and assuming on each Interest Payment Date from the Closing Date through and including the Accrual End Date such interest had been added to the principal of the Notes; provided, however, that if (x) the Specified Prepayment Amount is equal to or greater than $90,000,000, and such Specified Prepayment Amount is applied to repay the principal amount of the Notes on or before the 13-month anniversary of the Closing Date or (y) the aggregate outstanding principal amount of the Notes is prepaid in full (together with all accrued interest thereon and other outstanding Note Obligations) before the 13-month anniversary of the Closing Date, the Specified Noteholder Fee Amount shall be $0.

For the purposes of this agreement, the "**_Fee Amount Rate_**" shall be equal to 3.00% per annum; provided, however, that if the Specified Prepayment Amount is (a) equal to or greater than $84,000,000 but less than $90,000,000 and (b) such Specified Prepayment Amount is applied to repay the principal amount of the Notes on or before the 15-month anniversary of the Closing Date, the Fee Amount Rate will be adjusted to the lowest applicable percentage per annum set forth in the chart below retroactively from the Closing Date and the Fee Rate Amount for purposes of calculating the Specified Noteholder Fee Amount will be re-calculated accordingly:

| | Specified Prepayment Amount | | |
|---|---|---|---|
| **Months from Closing Date** | **Equal to or above $84 million and below $87 million** | **Equal to or above $87 million and below $90 million** | **Equal to or above $90 million** |
| **After 14 months and on or before 15-month anniversary** | 2.50% | 2.00% | 1.50% |
| **After 13 months and on or before 14-month anniversary** | 2.00% | 1.50% | 1.00% |
| **On or before 13-month anniversary** | 1.50% | 1.00% | 0.00% |

As provided in the Notes, (i) the entire unpaid principal balance of the Notes shall be due and payable in cash on the Maturity Date, (ii) all accrued and unpaid interest pursuant to Section 8.1(b) on the principal amount of the Notes prepaid or repaid shall be payable in cash on the date of any prepayment of the principal amount of any Note, including on the Maturity Date and (iii) the Specified Noteholder Fee shall be payable on the Maturity Date (or such earlier date that the aggregate outstanding principal amount of the Notes is prepaid in full (together with all accrued interest thereon and other outstanding Note Obligations)).

(d)     _Vessel Sales_.  Promptly upon (and in any event not later than 2 Business Days after) the receipt thereof of Net Cash Proceeds of the Vessel Sale or any other sale of the PSV Vessels described in Section 9.21(a) or any additional Vessel sales as described in Section 9.21(b), the Company will prepay the aggregate principal amount of the Notes in an amount equal to the Net Cash Proceeds of such sale. The Company will give each of the Agent, AIG and Prudential written notice of any mandatory prepayment under this Section 8.1(d) not less than 3 Business Days prior to the date of such prepayment (or such later time as agreed to by the Agent), which notice shall specify the date of such prepayment (which shall be a Business Day) and the aggregate principal amount of the Notes to be prepaid on such date.

(e)      *Default Interest.*  Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, the principal amount of all Notes outstanding, and to the extent permitted by applicable law, any due and unpaid interest payments on the Notes or any other unpaid amounts hereunder (other than default interest accruing under this Section 8.1(e)), shall, commencing on the date of the occurrence of such Event of Default, bear interest (including post-petition interest in any proceeding under the bankruptcy code or other applicable bankruptcy laws whether or not allowed in such proceeding) payable in cash on demand at the Default Rate with respect to the Notes to the date of payment to the Agent.  Payment or acceptance of the increased rates under this Section 8.1(e) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Agent or any Noteholder.

(f)      *Insurance Proceeds*.  No later than five (5) Business Days following the date of receipt by any Note Party or any of its Subsidiaries of any net proceeds in respect of any insurance proceeds received in connection with a Loss Event the Company will prepay the outstanding principal amount of the Notes; <u>provided</u> that so long as no Event of Default shall have occurred and be continuing, if the insurance proceeds received in connection with such Loss Event will be applied as described in Section 9.2(b)(iii)(B)(1) to pay for repairs, liabilities, salvage or other charges and expenses covered by the relevant insurance policies, the Company shall not be required or permitted to prepay the Notes.  The Company will give each of the Agent, AIG and Prudential written notice of any mandatory prepayment under this Section 8.1(f) not less than 3 Business Days prior to the date of such prepayment (or such later time as agreed to by the Agent), which notice shall specify the date of such prepayment (which shall be a Business Day), the aggregate principal amount of the Notes to be prepaid on such date, and the interest to be paid on the prepayment date with respect to such principal amount being prepaid.

(g)      *Fees*. The Company shall pay to the Agent and the Collateral Agent for their own account the fees and expenses set forth in the Agent Fee Letter in the amounts and at the times specified therein.

(h)      *Computations of Interest*.  All computations of interest for the Notes shall be made on the basis of a year of three hundred sixty-five (365) or three hundred sixty-six (366) days, as the case may be, and actual days elapsed.

**Section 8.2.      Optional Prepayments**.  Subject to Section 8.8, the Company may, at its option, upon notice as provided below, prepay at any time all, or from time to time any part of, the Notes, in an aggregate principal amount of the Notes not less than $1,000,000 with respect to each such prepayment (or such principal amount as shall then be outstanding), at 100% of the principal amount so prepaid.  The Company will give the Agent written notice of each optional prepayment under this Section 8.2 not less than 3 Business Days prior to the date fixed for such prepayment unless the Company, the Agent and the Required Holders agree to another time period.  Each such notice shall specify such date (which shall be a Business Day), the aggregate principal amount of the Notes to be prepaid on such date, the principal amount of each Note held by such Noteholder to be prepaid (determined in accordance with Section 8.5), and the interest to be paid on the prepayment date with respect to such principal amount being prepaid.

**Section 8.3.      [Reserved]**.

**Section 8.4.      [Reserved]**.

**Section 8.5.      Pro Rata Payments; Payments Generally**.

(a)      Each Note Party shall make each payment required to be made under this Agreement (whether of principal, interest or fees or otherwise) prior to 2:00 p.m., New York City time, on

the date when due, in immediately available funds, without setoff, recoupment or counterclaim. Any amounts received after such time on any date may, in the discretion of the Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Agent at the Agent's account designated by the Agent from time to time and except that payments pursuant to Sections 8.11, 14 and 22.3 shall be made directly to the Persons entitled thereto. The Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Unless otherwise provided for herein, if any payment under this Agreement shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day without including the additional days elapsed in the computation of the interest payable on such succeeding Business Day. All payments under this Agreement shall be made in Dollars.

(b)       If at any time insufficient funds are received by and available to the Agent to pay fully all amounts of principal, interest, fees and any other amounts then due under this Agreement, such funds shall be applied (i) first, towards the payment of fees, expenses and indemnities then owed to the Agents hereunder, (ii) second, toward the payment of interest and fees (other than the Exit Fee) ratably among the Noteholders in accordance with the amounts of interest and fees then due to the Noteholders, and (iii) third, towards payment of principal then due under this Agreement, ratably among the Noteholders entitled thereto in accordance with the amounts of principal then due to the Noteholders, and (iv) fourth, towards payment of the Exit Fee (if any) and any other amounts then due to the Noteholders under this Agreement, ratably among the Noteholders in accordance with the amounts then due to the Noteholders.

(c)       If, except as otherwise expressly provided herein, any Noteholder shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Notes resulting in such Noteholder receiving payment of a greater proportion of the aggregate amount of its Notes and accrued interest thereon than the proportion received by any other Noteholder, then the Noteholder receiving such greater proportion shall purchase (for cash at face value) the Notes of other Noteholders to the extent necessary so that the benefit of all such payments shall be shared by the Noteholders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Notes; provided that (i) if any such Notes are purchased and all or any portion of the payment giving rise thereto is recovered, such purchases shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Note Parties pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Noteholder as consideration for the assignment of or sale of any of its Notes, other than to the Note Parties or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Note Parties consent to the foregoing and agree, to the extent it may effectively do so under applicable law, that any Noteholder acquiring Notes pursuant to the foregoing arrangements may exercise against the Note Parties rights of setoff and counterclaim with respect to such Notes.

(d)       The Note Parties agree that each payment or prepayment of principal of the Notes and each payment of interest on the Notes, shall be allocated pro rata among the Noteholders in accordance with their respective principal amounts of their outstanding Notes and that they will not prepay or repay or issue any notice or make any offer to prepay or repay, any principal amount of the Notes unless concurrently therewith the Note Parties prepay or repay, as applicable, all of the Notes on a pro rata basis. Upon any prepayment of Notes pursuant to Section 8.1(f), 8.2, Section 8.9 or Section 9.21 the principal amount of the Notes so prepaid shall be allocated to all Notes at the time outstanding.

(e)       If a Vessel is subject to both a bareboat charter and a time charter, there shall be no double collections allowed under the applicable Security Documents and, in furtherance thereof, (i) if any freights, hire, earnings and other claims assigned as to both the bareboat charter and the time charter of

such Vessel are paid to the Collateral Agent by the bareboat charterer and the time charterer, respectively, and subsequently paid to the Noteholders, then the Noteholders shall immediately pay back to the bareboat charterer/time charter disponent owner the duplicative amount paid, and (ii) if any freights, hire, earnings and other claims assigned as to the time charter of such Vessel are paid to the Collateral Agent first by the time charterer, then the bareboat charterer shall not be required to pay to either the Collateral Agent or the Company such amount otherwise payable under the bareboat charter.

Section 8.6.    **Maturity; Surrender, Etc**.  In the case of each prepayment of Notes pursuant to Section 8.1 or Section 8.2, the principal amount of each Note (including any Specified Noteholder Fee) to be prepaid shall mature and become due and payable on the date fixed for such prepayment, together with interest on such principal amount accrued to such date (including any Specified Noteholder Fee) and the applicable Exit Fee, if any.  From and after such date, unless the Company shall fail to pay such principal amount (including any Specified Noteholder Fee) when so due and payable, together with the interest and Exit Fee, if any, as aforesaid, interest on such principal amount shall cease to accrue.  Any Note paid or prepaid in full shall be surrendered to the Company and cancelled and shall not be reissued, and no Note shall be issued in lieu of any prepaid principal amount of any Note.

Section 8.7.    **Purchase of Notes**.  The Company will not and will not permit any Affiliate to purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the outstanding Notes except upon the payment or prepayment of the Notes in accordance with the terms of this Agreement and the Notes.  The Company will promptly cancel all Notes acquired by it or any Affiliate pursuant to any payment or prepayment of Notes pursuant to any provision of this Agreement and no Notes may be issued in substitution or exchange for any such Notes.

Section 8.8.    **Exit Fee**.  The Company will pay on the first to occur of any of (i) the Maturity Date, (ii) refinancing or other prepayment or repayment of the remaining outstanding principal amount of the Notes by any Person including a non-Chouest Affiliate or any member of the Chouest family or (iii) acceleration of the Notes (the "**Repayment Date**"), to the Agent for the ratable benefit of the Noteholders, the Exit Fee. The Exit Fee shall be earned on the Closing Date and shall become due and payable in full in cash on the Repayment Date.

Section 8.9.    **Cash Sweep**.  On February 14, May 14, August 14, and November 14 in each year after the Closing Date (or, if any such date is not a Business Day, on the next succeeding Business Day), commencing on August 14, 2023, the Company shall pay to the Agent, for the benefit of the Noteholders, the Excess Cash Prepayment, with each such Excess Cash Prepayment being applied to the aggregate principal amount of the Notes.  The Company will give each of the Agent, AIG and Prudential written notice of any mandatory prepayment under this Section 8.9 not less than 3 Business Days prior to the applicable payment date (or such later time as agreed to by the Agent), which notice shall specify the applicable payment date and the aggregate principal amount of the Notes to be prepaid on such payment date.

Section 8.10.    **[Reserved]**.

Section 8.11.    **Taxes**.

(a)     *Payments Free of Taxes*.  Any and all payments by or on account of any obligation of any Note Party under any Note Documents shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant

Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Note Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 8.11) the applicable Noteholder receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)      *Payment of Other Taxes by the Note Party*.  The Note Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Noteholder timely reimburse it for the payment of, any Other Taxes.

(c)      *Evidence of Payment*. As soon as practicable after any payment of Taxes by the Note Party to a Governmental Authority pursuant to this Section 8.11, the Note Party shall deliver to the applicable Noteholder(s) and the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the applicable Noteholder(s) and the Agent.

(d)      *Indemnification by the Note Party*. The Note Parties shall indemnify the Agent, the Collateral Agent and each Noteholder, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 8.11) payable or paid by any Agent or such Noteholder or required to be withheld or deducted from a payment to any Agent or such Noteholder and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability (i) shall be delivered to the Note Party by a Noteholder or any Agent, as applicable, and (ii) shall be conclusive absent manifest error.

(e)      *Status of Noteholder*.

(i)      Any Noteholder that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Agent  and the Company, at the time or times reasonably requested by the Agent or the Company, such properly completed and executed documentation reasonably requested by the Agent or the Company as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Noteholder, if reasonably requested by the Company or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Company as will enable the Company or the Agent to determine whether or not such Noteholder is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 8.11(e)(ii)(A), (B) and (D) below) shall not be required if in the Noteholder's reasonable judgment such completion, execution or submission would subject such Noteholder to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Noteholder.

(ii)      Without limiting the generality of the foregoing, in the event the Company is a U.S. Person,

(A)      any Noteholder that is a U.S. Person shall deliver to the Company and the Agent on or prior to the date on which such Noteholder becomes a Noteholder under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Agent), executed copies of IRS Form

31

W-9 certifying that such Noteholder is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Noteholder shall, to the extent it is legally entitled to do so, deliver to the Company and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Noteholder becomes a Noteholder under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Noteholder claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Note Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Note Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    in the case of a Foreign Noteholder claiming that its extension of credit will generate U.S. effectively connected income, executed copies of IRS Form W-8ECI;

(3)    in the case of a Foreign Noteholder claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially to the effect that such Foreign Noteholder is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Note Party within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" related to the Note Parties described in Section 881(c)(3)(C) of the Code (a "**US. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN or IRS W-8BEN-E; or

(4)    to the extent a Foreign Noteholder is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS W-8BEN-E, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable;

(C)    any Foreign Noteholder shall, to the extent it is legally entitled to do so, deliver to the Company and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Noteholder becomes a Noteholder under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Note Party to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Noteholder under any Note Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Noteholder were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Noteholder shall deliver to the Company and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Note Party such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Company or the Agent as may be necessary for the Company and the Agent to comply with their respective obligations under FATCA and to determine that such Noteholder has complied with such Noteholder's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Noteholder agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Note Party in writing of its legal inability to do so.

(f)     *Treatment of Certain Refunds.*  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 8.11 (including by the payment of additional amounts pursuant to this Section 8.11), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 8.11 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)     *Indemnification by the Noteholders.*  Each Noteholder shall severally indemnify the Agent and Collateral Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Noteholder (but only to the extent that the Company has not already indemnified such Agent for such Indemnified Taxes and without limiting the obligation of the Company to do so) and (ii) any Excluded Taxes attributable to such Noteholder, in each case, that are payable or paid by such Agent in connection with any Note Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Noteholder by the Agent or Collateral Agent, as applicable, shall be conclusive absent manifest error.  Each Noteholder hereby authorizes the Agent and the Collateral Agent to set off and apply any and all amounts at any time owing to such Noteholder under any Note Document or otherwise payable by the Agent to the

Noteholder from any other source against any amount due to the Agent or the Collateral Agent under this paragraph (g).

(h)     *Survival*. Each party's obligations under this Section 8.11 shall survive any assignment of rights by, or the replacement of, a Noteholder, the termination of the Notes, the resignation or removal of the Agent or Collateral Agent and the repayment, satisfaction or discharge of all obligations under any Note Document.

## SECTION 9     AFFIRMATIVE COVENANTS.

The Note Parties covenant that so long as any of the Notes are outstanding:

**Section 9.1.     Compliance with Laws**. Without limiting Section 10.4, the Note Parties will, and will cause each of their Subsidiaries to, comply with all laws, ordinances or governmental rules or regulations to which each of them is subject, including, without limitation, ERISA, Environmental Laws, the USA PATRIOT Act and the other laws and regulations that are referred to in Section 5.16, and will obtain and maintain in effect all licenses, certificates, permits, franchises and other governmental authorizations necessary to the ownership of their respective properties or to the conduct of their respective businesses, in each case to the extent necessary to ensure that non-compliance with such laws, ordinances or governmental rules or regulations or failures to obtain or maintain in effect such licenses, certificates, permits, franchises and other governmental authorizations could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 9.2.     Insurance**.

(a)     The Note Parties will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurers, insurance with respect to their respective properties and businesses against such casualties and contingencies, of such types, on such terms and in such amounts (including deductibles, co-insurance and self-insurance, if adequate reserves are maintained with respect thereto) may be required under the Fleet Mortgage and the other Security Documents and, in any case, as is customary in the case of entities of established reputations engaged in the same or a similar business and similarly situated.

(b)     Without limiting the foregoing, the Note Parties will, without cost to the Noteholders, the Agent or the Collateral Agent, maintain or cause to be maintained insurance on the Mortgaged Vessels as specified below and, in addition, keep the Mortgaged Vessel insured against such further risks as may be commercially reasonable or reasonably specified by the Required Holders from time to time.  The Note Parties will maintain all such insurance in an amount in United States dollars.

(i)     (A)     The Company shall maintain or cause to be maintained on each Mortgaged Vessel:  (x) hull and machinery insurance (including increased value if required for amounts not to exceed 25% of the total insured value) covering marine risks and (subject to Section 9.2(b)(iii)(E) below) war risks, and breach of warranty coverage, with policy limits (1) with respect to such Mortgaged Vessel which shall not be less than 100% of the fair market value thereof, as set forth in the most recent Appraisal delivered pursuant to this Agreement from time to time and (2) with respect to all of the Mortgaged Vessels which shall not be less than the then 110% of the aggregate outstanding principal balance of the Notes; (y) protection and indemnity insurance, with policy limits not less than the greater of (1) the limits of the applicable protection and indemnity club, if any, or (2) $1,000,000,000; and (z) pollution risks insurance, including Water Quality Insurance Syndicate coverage, in an aggregate amount not less than $1,000,000,000.  Such policies

of insurance shall be under the most current acceptable forms (determined at the time of issuance of the policies in question) of policies approved by Required Holders insuring against the usual risks covered by such forms (including, at the option of the Note Parties, such amounts of increased value as are permitted by said hull insurance policies). The war risk hull and machinery coverage shall (x) include coverage for war, strikes, riots and civil commotions, malicious damage, terrorism, piracy and blocking and trapping cover, protection and indemnity and (y) be on the American Institute Hull War Risks and Strikes Clauses (CL A237) (December 1, 1977), including Addendum 1.4.84, policy form or other form acceptable to the Required Holders.

(B)     If any Mortgaged Vessel is to be laid up after the Closing Date, at the option of the Note Parties upon not less than 10 days prior written notice to the Collateral Agent and in lieu of hull and machinery and protection and indemnity insurance, port risk insurance under the most current forms (determined at the time of issuance of the policies in question) of policies approved by the Required Holders insuring the Mortgaged Vessel against hull and machinery and protection and indemnity risks.

(C)     The Collateral Agent shall be named as assignee and lender loss payee as its interest may appear in respect of all physical loss and damage policies (including war risk policies) subject to the issuance of standard market letters of undertaking and fleet lien waiver clauses by the insurance broker or insurer in accordance with usual practice. In addition, to the extent permitted, the Collateral Agent shall be listed as an additional insured in respect to all liability and protection and indemnity insurance (but without liability for payment of all premiums, club calls and other assessments), with its interest in each Mortgaged Vessel duly noted by any liability insurer and protection and indemnity club (where applicable) in which the Mortgaged Vessel is enrolled, and standard market letters of undertaking will be issued.

(ii)     To the extent applicable, Workers' Compensation and Employer's Liability Insurance, including statutory workers' compensation in compliance with the laws of the states in which employees of the Company conduct operations and the United States Longshore and Harbor Workers' Compensation Act, as extended by the Outer Continental Shelf Land Act. Such insurance shall further include voluntary compensation coverage, occupational disease coverage, maritime coverage "B" for employers' liability and amendment of coverage "B" to include claims under the Jones Act, claims under 33 U.S.C. §905(b) and claims for transportation, wages, maintenance and cure to the extent not covered under the protection and indemnity policy required above.

(iii)    (A)     The Company shall further on behalf and for the benefit of itself and the Collateral Agent maintain a Certificate of Financial Responsibility (Oil Pollution) issued by the United States pursuant to the Federal Water Pollution Control Act to the extent that same may be required by law or regulation and such other similar certificates as may be required in the course of the Mortgaged Vessel's operations pursuant to the International Convention on Civil Liability for Oil Pollution Damage of 1969, or other applicable government requirement.

(B)     All policies of insurance maintained under this Section 9.2 shall, except with respect to worker's compensation insurance, or liability insurance as provided in subsection (E) below, provide that, so long as the Note Obligations are

35

not fully satisfied, payment of all losses in excess of $2,000,000 (the "**Threshold Amount**") by all insurance underwriters with respect to any one accident, occurrence or event shall be made directly to the Collateral Agent, as lender loss payee, to be held by the Collateral Agent for its benefit and that of the Company as their respective interests may appear; provided, however, that after a Default or an Event of Default shall have occurred and is continuing, the Required Holders or the Collateral Agent, at the direction of the Required Holders, may direct such insurance underwriters to make remittance of all payments under such policies, regardless of amount, directly to and to the sole order of the Collateral Agent, including amounts payable with respect to claims made or accidents, events or occurrences transpiring prior to a Default.  Payment prior to a Default of all losses not in excess of the Threshold Amount shall be made to the Company or as the Company may otherwise direct, except as otherwise provided in the proviso to the foregoing sentence of this subsection (B).  Any such insurance recoveries to which the Collateral Agent shall be so entitled shall be applied as follows:

        (1)      In the event that insurance becomes payable under said policies on account of a Loss Event not resulting in an actual or constructive total loss or an agreed, arranged or compromised total loss of the Mortgaged Vessel, the Collateral Agent shall do the following: if a written request therefor shall have been made by the Company (together with a certificate executed by a Responsible Officer of the Company certifying that the applicable proceeds application is permitted under the Note Document (upon which the Collateral Agent shall be entitled to rely)) and, during the occurrence and continuation of an Event of Default, agreed to by the Required Holders, the Collateral Agent shall pay such insurance proceeds received by the Collateral Agent to the Company and the Company shall apply the proceeds of insurance to pay, or the Collateral Agent shall consent that the underwriters pay, directly for repairs, liabilities, salvage or other charges and expenses (including labor charges due or paid by the Company or applicable bareboat charterer), covered by the policies.  Repairs need not be completed in full before insurance payments or reimbursements are permitted.  If the Company shall have repaired the damage and paid the cost thereof or discharged or paid such liabilities, salvage claims or other charges and expenses, and certifies such payment in a certificate signed by a Responsible Officer of the Company (a "**Shipowner's Certificate**") delivered to the Collateral Agent (which the Noteholders hereby agree that the Collateral Agent may rely upon), accompanied by written confirmation by the underwriter, a surveyor, an adjuster or a marine insurance broker, the Collateral Agent shall pay such insurance proceeds received by the Collateral Agent to the Company and the Company apply the proceeds of insurance to pay directly, or reimburse, or the Collateral Agent shall consent that the underwriters reimburse, the Company in whole or in part for, such expenditures; provided that prior to undertaking any repair estimated to cost more than $2,000,000, whether or not an Event of Default has occurred and is continuing, the Company shall obtain the approval of the Required Holders, which shall not be unreasonably withheld or delayed.  After the repair of all known damage from a loss (unless the Company and the Collateral Agent (acting at the direction of the Required Holders) agree that the completion of such repair is not advisable), and all known costs, liabilities, salvage claims, charges

36

and expenses covered by the policies with respect to such loss shall have been discharged or paid, such fact shall be certified to the Collateral Agent by a Shipowner's Certificate delivered to the Collateral Agent, accompanied by written confirmation by the underwriter, a surveyor, an adjuster or a marine insurance broker.  All payments received and retained by the Collateral Agent hereunder shall be applied by the Collateral Agent for the purposes described in this Clause (1) above, with the balance, if any, applied in accordance with Section 8.5(b).

(2)     In the event of a Loss Event resulting in an actual or constructive loss or an agreed, arranged or compromised total loss of any Mortgaged Vessel, the Company shall forthwith deposit with the Collateral Agent any insurance moneys which the Company may receive on account thereof under policies of insurance required by this Section 9.2, and any insurance moneys received by the Collateral Agent (whether from the Company or any insurer or otherwise) shall be applied by the Collateral Agent to repay the Notes in accordance with Section 8.5(b).

(C)     In the event of a Loss Event resulting in a constructive total loss of any Mortgaged Vessel, the Required Holders shall have the right (but only with prior written consent of the Company, unless there is an existing Event of Default, in which event no such consent shall be necessary) to claim for a constructive total loss of such Mortgaged Vessel, and if (1) such claim is accepted by all underwriters under all policies then in force as to such Mortgaged Vessel under which payment is due for total loss and (2) payment in full is made in cash under said policies, then the Collateral Agent (acting at the direction of the Required Holders) shall have the right to abandon such Mortgaged Vessel to the underwriters under such policies, free from the lien of the Fleet Mortgage.

(D)     The Required Holders shall not have the right to enter into an agreement or compromise providing for an agreed, arranged or compromised total loss of the Mortgaged Vessel without the Company's prior consent unless there is an existing Event of Default.  If (1) the Company shall have given its prior consent thereto or (2) there is an existing Event of Default, the Required Holders shall have the right in their discretion to enter into an agreement or compromise providing for an agreed, arranged or compromised total loss of the Mortgaged Vessel.

(E)     All such insurance required in this Section 9.2 shall be by policies of insurance approved by the Required Holders as to form and amount (not to exceed a commercially reasonable amount) provided that (1) any approval of a policy under this subsection (E) shall be effective until 30 days after the Required Holders shall notify the Company of a desired change in the form and/or amount thereof, and (2) war risk hull and machinery or war risk indemnity insurance shall be required only as to those Mortgaged Vessels operating outside of the U.S. Gulf of Mexico.  Such policies may provide that, (i) if the Company shall not have incurred the loss, damage or expense in question, any loss under such insurance may be paid directly to the Person to whom any liability covered by such policies has been incurred (whether or not an Event of Default then exists), and (ii) if the Company shall have incurred the loss, damage or expense in question, any such loss shall be paid (x) to the Company in reimbursement if there is not an existing Default or Event of Default of which the underwriter has received written notice

37

from the Collateral Agent, or (y) to the Collateral Agent to be held and applied in the manner and order as set forth in Section 9.2(b)(iii)(B) if there is an existing Default or Event of Default of which the underwriter has received written notice from the Collateral Agent.  Any contractual liability insurance obtained by the Company with respect to its obligations under the Fleet Mortgage shall provide for payment directly to the Collateral Agent, and any amounts paid under such policy shall be applied in the manner and order as set forth in Section 9.2(b)(iii)(B), unless the Required Holders specify in writing.

(F)      In connection with its requiring, permitting or approving any insurance under this Section 9.2 (including the form and amount thereof and the insurer), the  Required Holders, if they shall so require, shall be furnished with at the Company's expense, and may rely upon, a certificate or opinion of the firm of marine insurance brokers acting for the Company in respect of the Mortgaged Vessels at the date of this Agreement, or such other firm of marine insurance brokers (who may be marine insurance brokers for the Company) selected by the Company and approved by the Required Holders (which approval shall not be unreasonably withheld or delayed), evidencing that such insurance exists and stating, in effect, that said insurance complies in all respects with applicable requirements contained in the Note Documents, including this Section 9.2, including the fact that there are no mortgagee endorsements, other than those in favor of the Collateral Agent, with respect to the Mortgaged Vessels, together with loss payable endorsements in favor of the Collateral Agent and additional insured endorsements in favor of the Collateral Agent, for the benefit of the Noteholders.

(G)      Unless otherwise consented to in writing, all insurance required under this Section 9.2 shall be placed and kept with first class American, British, Norwegian or other insurance companies, underwriters' associations, clubs or underwriting funds approved by the holders of a majority of the aggregate outstanding principal amount of the Notes, not to be unreasonably withheld.

(H)      All insurance required under this Section 9.2 shall be taken out in the name of the Company and the interest of the Collateral Agent as mortgagee shall be duly noted in accordance with Section 9.2(b)(i)(C).  The Collateral Agent shall be named as lender loss payee on all hull and machinery and war risk hull and machinery policies and, if applicable, as an additional insured under all other policies.  All policies for such insurance so taken out shall, unless otherwise consented to by the Collateral Agent, provide that (1) there shall be no recourse against the Collateral Agent for the payment of premiums or commissions, (2) if such policies provide for the payment of club calls, assessments or advances, there shall be no recourse against the Collateral Agent for the payment thereof, and (3) at least 30 days' prior written notice of any cancellation (and 10 days in the case of cancellation for non-payment of premium) or modification of any element of insurance coverage provided for herein shall be given to the Collateral Agent by the insurance underwriters.  All policies of insurance required hereunder shall contain a waiver of subrogation with respect to the Collateral Agent and its assigns. All such policies shall provide that they are primary insurance with respect to any insurance carried by the Collateral Agent or its assigns, and that any "Other Insurance Clause" contained in Company's insurance shall be inoperative as to the Collateral Agent and its assigns.  In addition, any policy shall not contain any

provision under which Company is a co-insurer, but may provide for reasonable deductibles acceptable to the Required Holders.

(I)     The Company shall not, without the prior written consent of the Required Holders, do any act, or voluntarily suffer or permit any act to be done, whereby any insurance required by this Section 9.2 shall or may be suspended, impaired or defeated, or suffer or permit any Mortgaged Vessel to engage in any voyage or operations, or to carry any cargo not permitted under the policies of insurance then in effect without procuring insurance satisfactory to the Required Holders covering such Mortgaged Vessel in all respects for such voyage or the carriage of such cargo.

(J)     In the event that any claim or Lien is asserted against any Mortgaged Vessel for loss, damage or expense which is covered by insurance hereunder, and it is necessary for the Company to obtain a bond or supply other security to prevent arrest of such Mortgaged Vessel or to obtain the release of such Mortgaged Vessel from arrest on account of said claim or Lien, the Collateral Agent, at the written request of the Company and with the consent of the Required Holders may, but it shall not be required to, assign all of its right, title and interest in and to said insurance covering such loss, damage or expense, to any Person, firm or corporation executing a surety or guaranty bond or other agreement to save or to release such Mortgaged Vessel from such arrest as collateral security to indemnify against liability under said bond or other agreement.

(K)     The Company shall deliver to the Noteholders and the Collateral Agent true and correct copies of the original policies evidencing insurance maintained under this Section 9.2.  The Noteholders or their respective agents (who may also be an agent of the insurer) shall at all times hold the policies delivered to them or it as aforesaid; provided that, if one or more of said policies is held by an agent of a Noteholder, the Company shall, upon request of such holder, deliver a duplicate or pro forma copy thereof to the Noteholder and provided further that, if the Company shall deliver to the Noteholders a written request (1) stating that delivery of any such policy to the insurer is necessary in connection with the collection, enforcement or settlement of any claim thereunder (including claims for return premiums and any other amounts payable by the insurer), (2) setting forth the name and address of the person to whom such policy is to be delivered or mailed for such purposes, and (3) directing the Noteholders to so deliver or mail the same, the Noteholders shall, at the expense of the Company, deliver or mail (by registered or certified mail, postage prepaid) such policy in accordance with such written request, accompanied by a written direction to the recipient to redeliver such policy directly to the applicable Noteholder when it has served the purpose for which so delivered.  The Company agrees that in case it shall at any time so direct the delivery or mailing of any policy to any Person as aforesaid, the Company will exercise its best efforts to cause such policy to be promptly redelivered to the applicable Noteholder as aforesaid.  The Noteholders shall have no duty to see to the redelivery of such policy.

(L)     Concurrently with the Closing and annually thereafter, the Company shall furnish, or cause to be furnished, to the Agent, at the Company's expense, either (1) a certificate of the Company's insurance brokers stating that there have been no changes with respect to the Company's policies of insurance

since the previous certificate or opinion delivered pursuant to this Section 9.2(b)(ii)(L) or (2) if any such changes have occurred, a report of Aon BankAssure or other detailed certificate or opinion (signed by a firm of marine insurance brokers qualifying under subsection (F) above) acceptable to the Required Holders as to the insurance maintained by the Company pursuant to this Section 9.2 specifying the respective policies of insurance covering the same and stating, in effect, that such insurance complies in all respects with the applicable requirements contained in the Note Documents, including this Section 9.2, including the fact that there are no mortgagee endorsements, other than those in favor of the Collateral Agent, with respect to the Mortgaged Vessels, together with lender loss payable endorsements in favor of the Collateral Agent and additional insured endorsements in favor of the Collateral Agent, for the benefit of the Noteholders. If the Company fails to maintain any such insurance, the Collateral Agent or the Noteholders may arrange for (at the Company's expense and without any responsibility on the Collateral Agent's or the holders' of Notes, as applicable, part for) obtaining the insurance.

Section 9.3.     **Maintenance of Properties**.  The Note Parties will, and will cause each of their Subsidiaries to, maintain and keep, or cause to be maintained and kept, their respective properties in good repair, working order and condition (other than ordinary wear and tear) and supplied with all necessary equipment, and shall cause to be made all necessary repairs, renewals, replacements and betterments thereof, so that the business carried on in connection therewith may be properly conducted at all times, provided that with respect to any property of any Note Party or any Subsidiary of a Note Party, this Section 9.3 shall not prevent the Note Parties or any Subsidiary of the Note Parties from discontinuing the operation and the maintenance of any of its properties if such discontinuance is desirable in the conduct of its business and the Note Parties has concluded that such discontinuance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 9.4.     **Payment of Taxes and Claims**.  The Note Parties will, and will cause each of their Subsidiaries to timely file all tax returns and reports required to be filed in any jurisdiction and to timely pay and discharge all Taxes required to have been paid by it, and all other claims for which sums have become due and payable that may become a Lien on properties or assets of the Note Parties or any Subsidiary of the Note Parties, provided that neither the Note Parties nor any Subsidiary of the Note Parties need pay any such Tax if (i) the amount, applicability or validity thereof is diligently contested by the Note Parties or such Subsidiary of the Note Parties on a timely basis in good faith and in appropriate proceedings, and the Note Parties or a Subsidiary of a Note Parties has established adequate reserves therefor in accordance with GAAP on the books of the Note Parties or such Subsidiary of the Note Parties or (ii) the nonpayment of all such Taxes could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  The Note Parties will procure that the Members reimburse it in an amount equal to all property tax payments made each year by the Note Parties, so long as the State of Louisiana provides tax credits to such Members for payment thereof.

Section 9.5.     **Existence, Etc**.  The Note Parties will at all times preserve and keep its existence as a limited liability company in full force and effect.  Subject to Section 10.12, the Note Parties will at all times (a) preserve and keep in full force and effect the applicable legal entity existence of each of its Subsidiaries (unless merged into a Note Party) and all rights, qualifications, licenses, permits, franchises, governmental authorizations and Intellectual Property rights of the Note Parties and their Subsidiaries unless, in the good faith judgment of the Note Parties, the termination of or failure to preserve and keep in full force and effect such legal entity existence, rights, qualifications, licenses, permits, franchises, governmental authorizations or Intellectual Property rights could not, individually or in the aggregate, have a Material Adverse Effect, (b) maintain all requisite authority to conduct its business in each jurisdiction in

which its business is conducted and (c) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

**Section 9.6.     Books and Records**.  The Note Parties will, and will cause each of its Subsidiaries to, maintain proper books of record and account in conformity with GAAP and all applicable requirements of any Governmental Authority having legal or regulatory jurisdiction over the Note Parties or such Subsidiary of the Note Parties, as the case may be.  The Note Parties will, and will cause each of their Subsidiaries to, keep books, records and accounts which, in reasonable detail, accurately reflect all transactions and dispositions of assets.  The Note Parties and their Subsidiaries have devised a system of internal accounting controls sufficient to provide reasonable assurances that their respective books, records, and accounts accurately reflect all transactions and dispositions of assets and the Note Parties will, and will cause each of their Subsidiaries to, continue to maintain such system. A Responsible Officer of the Note Parties acceptable to each Noteholder that is an Institutional Investor shall be required to meet with each Noteholder that is an Institutional Investor by telephone within five Business Days of the delivery (or the required date of delivery) of the quarterly reporting in Section 7.1(a), (c)(ii), (c)(iii), (x), (y) and (z) to discuss and present information on, amongst other things, the most recently delivered Projections, spot vessels and market dynamics.

**Section 9.7.     Operations**.  The Company shall maintain Dino Chouest, or any other individual Member or Members of the Company, as its manager or managers and otherwise substantially maintain its present executive and management personnel.  Further, the Company shall conduct its business affairs in a reasonable and prudent manner and in accordance with sound business practices of similarly situated companies.

**Section 9.8.     Further Assurances**.  The Note Parties will, from time to time, promptly execute and deliver any and all instruments of further assurance, including, without limitation, Supplements to the Fleet Mortgage, and do such further acts as may be necessary or proper to carry out more effectually the purposes of this Agreement, the Security Documents and the other Note Documents, including, without limitation, to make subject to the Lien of the Fleet Mortgage and other Security Documents any property agreed to be subjected thereto pursuant to the terms of this Agreement or any of the Security Documents or otherwise in writing by the Company, or as the Agent or the Required Holders may reasonably request including, without limitation, (a) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under this Agreement, any other Note Document, or any agreement or instrument contemplated hereby or thereby; (b) the filing, re-filing, recording, re-recording, or continuing of any document, financing statement, mortgage, assignment, notice, instrument of further assurance, or other instrument in any public office at any time or times.  So long as no Event of Default has occurred and is continuing, the Company shall not be required to obtain the consent of charterers as to the assignments of charters.

**Section 9.9.     ERISA Plan Assets; Prohibited Transactions.**  None of the Note Parties or any of the Subsidiaries of the Note Parties is or will be an entity deemed to hold "plan assets" (within the meaning of the ERISA Plan Asset Regulations) and neither the execution, delivery or performance of the transactions contemplated under this Agreement, including the issuance and exchange of the Notes hereunder, will give rise to a non-exempt prohibited transaction under Section 406(a) of ERISA or section 4975(c)(1)(A)-(D) of the Code.

**Section 9.10.     Classification of Vessels**.  The Note Parties shall maintain each Mortgaged Vessel such that at all times each Mortgaged Vessel shall remain in class with ABS or other similar classification society who is a member of the International Association of Classification Societies, to the extent such Mortgaged Vessel as a result of its operations is required to be in class.  To the extent required under the first sentence of this Section 9.10, each Mortgaged Vessel shall be in compliance with the requirements of

the ABS or any other similar classification society, for the highest classification for vessels of like age and type, free of all recommendations and notations of such classification society affecting class at all times and without any overdue surveys and, upon request of the Agent, AIG or Prudential, the Note Parties shall promptly provide to the Agent, AIG or Prudential, as applicable, a copy of a certificate duly issued by the ABS or other similar classification society, to the effect that such Mortgaged Vessels have been given the highest classification and rating for vessels of the same age and type free of all recommendations and notations of such classification society affecting class and without any overdue surveys.

Section 9.11.    **New Vessels**.  The Note Parties shall not purchase or acquire, directly or indirectly, any Vessel without the Required Holders' prior written consent.

Section 9.12.    **Citizenship**.  Each of the Note Parties shall, at all times, be and remain a "citizen of the United States" within the meaning of 46 U.S.C. Section 50501 et seq., and be in compliance with the citizenship requirements imposed under the Merchant Marine Act of 1920, as amended, the Merchant Marine Act of 1936, as amended, or any other applicable United States law for entities engaged in coastwise or foreign trade or eligible to receive subsidies or to participate in government programs of the nature participated in by the Company.

Section 9.13.    **Delivery of Vessel Certificates and Notices of Assignments of Insurance**.  As promptly as practicable, the Note Parties shall deliver or cause to be delivered to each Noteholder (i) all United States Coast Guard and ABS certificates and other documents specified in Sections 4.10(n), to the extent that such certificates and other documents were unavailable as of the Closing Date, and (ii) with respect to each Assignment of Insurances, notices of such assignment acknowledged by each insurance underwriter and broker in respect of each policy of insurance subject to such Assignment of Insurances.

Section 9.14.    **Covenant to Secure Notes Equally**.  Other than Liens permitted by the provisions of Section 10.5 hereof, the Note Parties will, if it or any Subsidiary shall create or assume any Lien upon any of its property or assets, whether now owned or hereafter acquired, make or cause to be made effective provision whereby the Note Obligations will be secured by such Lien equally and ratably with any and all other Indebtedness thereby secured so long as any such other Indebtedness shall be so secured, provided that the prior written consent to the creation or assumption thereof shall have been obtained pursuant to Section 17.1.

Section 9.15.    **Documentation of Affiliate Transactions**.  The Note Parties will and will cause their Subsidiaries to set forth in writing each transaction or series of transactions having a Fair Market Value of at least $5,000,000 between the Note Parties or any Subsidiary of the Note Parties on the one hand, and one or more Affiliates, on the other hand.

Section 9.16.    **Allocation of Indirect Operating Expenses**.  The Note Parties shall cause Galliano Marine Services or any other Chouest Affiliate to at all times allocate among the Note Parties and any Affiliates of the Note Parties or other Persons to whom Galliano Marine Services or such Chouest Affiliate provides administrative or other services the cost of all items constituting indirect operating expenses of the Note Parties and such Affiliates of the Note Parties or other Persons (except for certain Affiliates that own vessels flagged in Brazil), including monthly payroll expenses for administrative personnel and other overhead expenses, and such amounts allocated to the Note Parties and their Subsidiaries shall not be more than (a) $72,500 per month for the working 312' Vessels or AHTS Vessels, (b) $56,000 per month for the working 280' PSV Vessels, (c) $7,300 per month for working fast supply Vessels and (d) $20,000 per month for the Tug Vessel, with such amounts in clauses (a), (b), (c) and (d) above being subject to an annual adjustment on each anniversary of December 31 based on the Consumer Price Index (provided, that the adjustment is capped at 5% per annum); provided that if any working Vessels utilization is 75% or less in a given month, such working Vessel's allocation of expenses shall be prorated

by utilization during such month. The Note Parties shall not permit the allocation by Galliano Marine Services of any indirect operating expenses to the Note Parties or their Subsidiaries for any non-working Vessel.

Section 9.17.   **Compliance with Charter Agreement**. The Note Parties shall comply with its charters such that there will not be a Material Adverse Effect. The Note Parties shall not permit material changes to be made to any charter (including any addenda to such charter or any document related to such charter) without providing notice thereof to each Noteholder if, individually or in the aggregate with all other changes made to such charter during the preceding twelve months, such change would be a material adverse change to such charter, provided that if a copy of such charter has not been provided to such Noteholder, a copy together with all changes shall be provided.

Section 9.18.   **Restrictions on Charterers of Vessels**. The Company shall not bareboat or demise charter any Mortgaged Vessel to anyone that is not a Chouest Corporate Affiliate without the prior written consent of the Required Holders. The Company and its applicable Affiliates that have charters of Mortgaged Vessels with third party charterers (i) shall assign to the Collateral Agent pursuant to one or more Assignments of Charters and Hire all (x) third party charters having a duration of twelve (12) months or longer (including any automatic or agreed to extensions or renewals thereof), and (y) charters by the Company to a Chouest Corporate Affiliate, and (ii) shall (x) use commercially reasonable efforts to obtain the consent of any third party charterer with respect to such assignment under the preceding clause (i)(x), and (y) obtain the consent of each Chouest Corporate Affiliate with respect to such assignment under the preceding clause (i)(y).

Section 9.19.   **[Reserved]**.

Section 9.20.   **Manager's Undertakings**. The Note Parties shall furnish to the Collateral Agent for distribution to each Noteholder, promptly upon entry into any vessel management arrangement in respect of a Mortgaged Vessel, an undertaking by the vessel manager, including Galliano Marine Services and any other Chouest Affiliate that is a vessel manager of a Mortgaged Vessel, as contemplated by the Master Services Agreement in the form attached hereto as Exhibit J.

Section 9.21.   **Vessel Sales**.

(a)     *Required Sales*.

(i)     Prior to the Closing Date, the Company has entered into the Asset Sale Agreements to sell the PSV Vessels and related assets (the "**Vessel Sale**") to a Person that is not a Chouest Affiliate. If (A) any PSV Vessel is not sold pursuant to the Vessel Sale within 12 months after the Closing Date or (B) an Asset Sale Agreement is terminated (for reasons other than non-compliance by the Company or any Affiliate thereof), a Chouest Affiliate may purchase such PSV Vessels subject to the provisions of this Section 9.21. In the event that a Person that is not a Chouest Affiliate purchases some but not all six (6) of the PSV Vessels, a Chouest Affiliate may purchase all (but not less than all) of the remaining PSV Vessels for at least the Minimum Vessel Sale Proceeds for each PSV Vessel. All Net Cash Proceeds of the Vessel Sale or any other sale of the PSV Vessels described in this Section 9.21 shall be applied to the aggregate principal amount of the Notes in accordance with Section 8.1(d).

(ii)     As a condition to any sale of the PSV Vessels described in this Section 9.21 to a Chouest Affiliate, no PSV Vessel so purchased by a Chouest Affiliate (A) shall operate in oil and gas related marine transportation for the purposes of the carriage or

transport of merchandise or passengers in the coastwise trade of the United States of America within the meaning of 46 U.S.C. Chapter 551 and any successor thereto as amended from time to time, (B) shall be lengthened beyond its specifications on the Closing Date, (C) shall perform work for which there is an available 280' PSV Vessel owned by the Company and (D) to the extent any PSV Vessel so purchased by a Chouest Affiliate is subsequently sold, (x) any Net Cash Proceeds in excess of the initial purchase price from the Company shall be applied to the aggregate principal amount of the Notes in accordance with Section 8.1(d) and (y) to a non-Chouest Affiliate, the preceding limitations in clauses (A), (B) and (C) no longer shall apply (such limitations set forth in this paragraph (ii), the "**ECO 280 Limitations**").

(b)    *Additional Sales*.

(i)    The Company shall have the right to sell (i) the Tug Vessel for Net Cash Proceeds of not less than $3,500,000.00 and (ii) two (2) FSV Vessels for Net Cash Proceeds of not less than $1,000,000.00 in the aggregate, in each case, to one or more Persons who are not a Chouest Affiliate.  All such Net Cash Proceeds shall be applied to the aggregate principal amount of the Notes in accordance with Section 8.1(d).

(ii)    If the charter agreement of any of the Petrobras Vessels is terminated (for reasons other than non-compliance by the Company or any Affiliate thereof), a Chouest Affiliate may purchase any such Petrobras Vessel for Net Cash Proceeds of not less than $15,000,000 per Petrobras Vessel subject, in each case, to the ECO 280 Limitations.  All Net Cash Proceeds from the sale of such Petrobras Vessels shall be applied to the aggregate principal amount of the Notes in accordance with Section 8.1(d).

(c)    *Sales Allowed*.   For the avoidance of doubt, any Vessel sales referred to in subsections (a) and (b) to non-Chouest Affiliates shall be permitted to be consummated notwithstanding the existence of a Default or Event of Default other than a Default or Event of Default resulting from the breach of this Section 9.21, at the time of such sale (assuming the Collateral Agent has not begun foreclosure proceedings). In connection with the foregoing, the Collateral Agent is hereby directed by the Noteholders to release all Liens on the relevant Vessel sold and all Collateral related to that Vessel in accordance with Section 20.6, provided that the Collateral Agent shall not release the Liens on the proceeds of such Vessel sales and the Net Cash Proceeds thereof shall be applied in accordance with subsections (a) and (b).

(d)    *No Other Sales*.  No other Asset Sales shall be permitted without the prior written consent of the Required Holders except as permitted under Section 9.21 and Sections 10.12 and 10.14.

**Section 9.22.    Material Agreements**.  The Note Parties will, and will cause each of their Subsidiaries to, comply with their respective obligations under Material Agreements to which they are a party and to affirmatively enforce the obligations of the counterparties under such Material Agreement, except where failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**Section 9.23.    Anti-Corruption Policies**.  The Note Parties will maintain in effect and enforce policies and procedures designed to ensure compliance by the Note Parties, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Economic Sanctions.

**Section 9.24.    Material Contracts**. The Note Parties agree that they shall notify the Agent and the Noteholders of any proposal to amend, modify, supplement, waive, terminate or otherwise vary any of

44

the Support Agreements, Master Services Agreements, Asset Sale Agreement, Intellectual Property Agreements or any other material contract to which a Note Party is party to (the "Material Agreements") in writing not less than five (5) Business Days prior to the effectiveness or execution of any such amendment, modification, waiver, terminate or other variation (or such lesser time as agreed to by the Required Holders). The Note Parties agree that they will promptly notify the Agent and Noteholders of any material breach under any Material Agreement.   Neither the Note Parties nor any of their Subsidiaries may amend, restate, supplement, terminate, enter into waivers with respect to or otherwise modify the Material Agreements in a manner materially adverse to the Noteholders or a Note Party or its assets, without the prior written approval of the Required Holders of the terms thereof. For the avoidance of doubt, if the Required Holders refuse to grant approval for any amendment, restatement, supplement or waiver related to the Asset Sale Agreements that is requested by the buyer, and such refusal results in the termination of one or more of the Asset Sale Agreements, such termination will not be deemed as non-compliance by the Company or any Affiliate thereof with regard to such Asset Sale Agreements, unless the amendment, restatement, supplement or waiver (i) was the direct result of the Company's breach or non-compliance with the Asset Sale Agreement or (ii) sought to reduce or modify the purchase price of the Vessel subject to such Asset Sale Agreement.

## SECTION 10   NEGATIVE COVENANTS.

The Note Parties covenant that so long as any of the Notes are outstanding:

**Section 10.1.   Transactions with Chouest Affiliates**.   The Note Parties will not and will not permit any Subsidiary of the Note Parties, directly or indirectly, to enter into or permit to exist any transaction or group of related transactions (including without limitation the purchase, lease, sale or exchange of properties of any kind or the rendering of any service) with any Chouest Affiliate, except (a) in the ordinary course of and pursuant to the reasonable requirements of such Note Party's or such Subsidiary's business and upon fair and reasonable terms no less favorable to such Note Party or such Subsidiary than would be obtainable in a comparable arm's-length transaction with a Person not a Chouest Affiliate, (b)(i) with respect to a transaction or series of related transactions that has a Fair Market Value, or involves consideration, less than or equal to $5,000,000, the Company delivers a certificate of a Senior Financial Officer to the Noteholders certifying that such transaction or series of related transactions complies with clause (a) above, or (ii) with respect to a transaction or series of transactions that has a Fair Market Value, or involves consideration, in excess of $5,000,000, the Required Holders have consented; provided, that no delivery of a certificate of a Senior Financial Officer or Required Holder consent shall be required with respect to transactions consisting of (A) the provision of administrative services by Galliano Marine Services to any Note Party or any of their Subsidiaries, (B) the lease of remotely operated vehicles from C-Innovation, L.L.C., (C) the Master Services Agreement, (D) the Support Agreements, (E) the Intellectual Agreements or (F) transactions permitted by Section 9.21.

**Section 10.2.   Merger, Consolidation, Etc**.  The Note Parties will not, and will not permit any of their Subsidiaries to, consolidate with or merge with any other Person or convey, transfer or lease all or substantially all of its assets in a single transaction or series of transactions to any Person.

**Section 10.3.   Line of Business**.  The Note Parties will not and will not permit any Subsidiary to engage in any business if, as a result, the general nature of the business in which the Note Parties and their Subsidiaries, taken as a whole, would then be engaged would be substantially changed from the general nature of the business in which the Note Parties and their Subsidiaries, taken as a whole, are engaged on the date of this Agreement.

**Section 10.4.   Terrorism Sanctions Regulations**.  The Note Parties will not and will not permit any Controlled Entity or any vessel owned by the Note Parties or any Controlled Entity (a) to become

(including by virtue of being owned or controlled by a Blocked Person), own or control a Blocked Person, or (b) directly or indirectly to have any investment in or engage in any dealing or transaction (including, without limitation, any investment, dealing or transaction involving the proceeds of the Notes) with any person if such investment, dealing or transaction (i) would cause any Noteholder to be in violation of any law or regulation applicable to such Noteholder, or (ii) is prohibited by any Economic Sanctions, or (c) to engage in any activity that could cause such Person or any Noteholder to be in violation of Economic Sanctions.

Section 10.5.   Liens.   The Company will not, and will not permit any of its Subsidiaries to, directly or indirectly create, incur, assume or permit to exist (upon the happening of a contingency or otherwise) any Lien on or with respect to any property or asset (including, without limitation, any document or instrument in respect of goods or accounts receivable) of the Company or any such Subsidiary, whether now owned or held or hereafter acquired, or any income or profits therefrom, or assign or otherwise convey any right to receive income or profits, except:

(a)     Liens against the Collateral in favor of the Collateral Agent as security for the Note Obligations;

(b)     Liens for taxes, assessments or other governmental levies or charges which are not yet due or which are being diligently contested in good faith by the Company or the applicable Subsidiary for which adequate reserves have been taken in accordance with GAAP;

(c)     the Liens of any judgments that do not constitute an Event of Default under Section 11.1(i);

(d)     statutory Liens incidental to the normal conduct of business or the ownership of the property of the Company and its Subsidiaries (including Liens in connection with worker's compensation, unemployment insurance and other like laws (other than Liens imposed by ERISA), warehousemen's and mechanics' and materialmen's liens and statutory landlord's liens) which in each case are incurred in the ordinary course of business and not in connection with the borrowing of money, the obtaining of advances or credit or the payment of the deferred purchase price of property and which do not in any event materially impair the value or use of the property encumbered thereby in the operation of the businesses of the Company and their Subsidiaries, taken as a whole, or the value of such property for the purposes of such businesses; provided, in each case, that the obligation is being diligently contested by the Company or a Subsidiary on a timely basis in good faith and in appropriate proceedings, and the Company or a Subsidiary have established adequate reserves therefor on the books of the Company or such Subsidiary;

(e)     any seaman's liens (including those of masters) for wages, maintenance and cure, salvage and general average liens, stevedore's wages, tort liens (including personal injury and death), liens for necessaries and inchoate liens in favor of charterers of the Mortgaged Vessels, all of the foregoing liens which are either unclaimed or covered by insurance (other than, and after giving effect to, any deductibles that the Company may have on such insurance); provided, that, once any such lien is claimed, the Company shall be permitted to contest any such lien in good faith by appropriate legal proceedings promptly initiated and diligently conducted, if (i) such reserve as shall be required by GAAP shall be made therefor and (ii) the Company shall have arranged for a bond or insurance (other than, and after giving effect to, any deductibles that the Note Parties may have on such insurance) related to such lien in a manner that is satisfactory to the Collateral Agent (acting at the direction of the Required Holders) in accordance with law and (iii) such lien does not involve any risk of seizure, loss, sale or forfeiture of any of the vessels;

(f)      pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(g)      deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; and

(h)      easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Company or any Subsidiary;

provided that none of the foregoing shall include any Lien securing Indebtedness (other than under clause (a) above).

**Section 10.6.     Financial Covenants**.

(a)      Commencing on the last day of the first full fiscal quarter after the Closing Date, the Company will not permit the ratio of (x) EBITDA for the Test Period to (y) Interest Expense for such Test Period to be less than 1.10 to 1.00;

(b)      The Company will not permit, as of the last day of any period of four fiscal quarters ending on the dates set forth below, EBITDA to be less than the following for such period:

| Four Fiscal Quarters ending | EBITDA |
|---|---|
| June 30, 2023 | $49,335,000 |
| September 30, 2023 | $53,690,000 |
| December 31, 2023 | $54,925,000 |
| March 31, 2024 | $60,060,000 |
| June 30, 2024 | $58,175,000 |

(c)      The Company shall not permit, as of the last day of any period of four consecutive fiscal quarters ending on the dates set forth below, the ratio of (x) Net Funded Debt as of such last day to (y) EBITDA for such period to be greater than the following ratio for such period:

| Four Fiscal Quarters Ending | Ratio |
|---|---|
| September 30, 2024 through June 30, 2025 | 7.00 to 1.00 |
| September 30, 2025 through June 30, 2026 | 6.50 to 1.00 |
| September 30, 2026 | 5.75 to 1.00 |
| December 31, 2026 and thereafter | 5.00 to 1.00 |

**Section 10.7.     Indebtedness**.  The Note Parties will not, and will not permit any Subsidiary of any Note Party to, create, incur, suffer or permit to exist, or assume or guarantee, directly or indirectly, or

become or remain liable with respect to any Indebtedness, whether direct, indirect, absolute, contingent, or otherwise, except the Note Obligations.

**Section 10.8.    Issuance of Company Preferred Stock and Subsidiary Stock; Limitation on Subsidiary Assets**.  The Note Parties will not issue any Preferred Stock and will not permit any of its Subsidiaries to issue and Capital Stock to any Person other than the Company or Holdings.  The Note Parties will not permit any Subsidiary to have assets worth more than $1,000,000 at any time, and in no event shall the Company permit any Subsidiary to own or charter a vessel.

**Section 10.9.    Investments, Loans**.  The Note Parties will not, and will not permit any Subsidiary to, make or permit to remain outstanding, directly or indirectly, any Investment in or loan or advance to any Person, or make any commitment to make such loan, advance or Investment, except with respect to the Company:

(a)    Investments existing on the date of this Agreement and disclosed in Schedule 10.9 hereto (including, with respect to any such Investment consisting of a Guaranty by the Company or any Subsidiary of Indebtedness of others, such Guaranty as applicable to any extensions, renewals or refinancings of such Indebtedness guaranteed thereby, so long as the principal amount of such Indebtedness subject to such Guaranty is not increased in connection with such extension, renewal or refinancing; provided, that any payment made, on or after the date of this Agreement, by the Note Parties or any Subsidiary pursuant to or in respect of any such Guaranty shall be deemed an Investment not permitted by this clause (a));

(b)    Investments in certificates of deposit issued by any commercial bank organized under the laws of the United States of America or any State thereof and having capital, surplus and undivided profits aggregating at least $100,000,000, provided that such certificates of deposit mature within 365 days from the date of acquisition thereof;

(c)    Investments in commercial paper rated "A-1" by S&P or "P-1" by Moody's and maturing not more than 270 days from the date of creation thereof;

(d)    Investments in United States Governmental Securities, provided that such obligations mature within 365 days from the date of acquisition thereof; and

(e)    Investments in Repurchase Agreements.

**Section 10.10.   Acquisitions**.  The Note Parties will not, and will not permit any Subsidiary to make any acquisition, in a single transaction or in a series of related transactions, of the property (excluding capital expenditures or acquisitions of inventory or supplies in the ordinary course of business) of, or of a business unit or division of, another Person or a majority of the Voting Stock of another Person, in each case whether or not involving a merger or consolidation with such other Person and whether for cash, property, services, assumption of Indebtedness, securities or otherwise.

**Section 10.11.   Restricted Payments**.  The Note Parties will not, directly or indirectly, make or declare any Restricted Payment other than the distributions permitted under, and in accordance with Section 4.9.

**Section 10.12.   Asset Sales**.  The Note Parties will not, and will not permit any of its Subsidiaries to, directly or indirectly, engage in any Asset Sale, except the following:

(a)    Asset Sales from a Subsidiary to the Company;

(b)      except with respect to vessels, Asset Sales in the ordinary course of business of the Company and its Subsidiaries and consistent with past practice;

(c)      charters of vessels (bareboat, demise or otherwise) to customers of the Company or of any Subsidiary entered into in the ordinary course of business and consistent with past practice;

(d)      with respect to any vessel, any Asset Sale arising as a result of any actual or constructive total loss or an agreed or compromised total loss of such vessel; provided that any insurance proceeds received in connection with such actual or constructive total loss or an agreed or compromised total loss are applied in accordance with Section 9.2(b);

(e)      the sale of Vessels and related assets permitted under Section 9.21; and

(f)      Asset Sales permitted under Section 10.14.

**Section 10.13.  Sale and Lease-Back Transactions**.  The Note Parties will not, and will not permit any Subsidiary to, enter into any Sale and Lease-Back Transaction.

**Section 10.14.  Sales of Receivables; Pledge or Sale of Current Assets**.  The Note Parties will not, and will not permit any Subsidiary to:

(a)      sell with recourse, discount (other than to the extent of finance and interest charges included therein) or otherwise sell for less than face value thereof, any of its notes or accounts receivable, except notes or accounts receivable the collection of which is doubtful in accordance with GAAP; or

(b)      sell with recourse, discount (other than to the extent of finance and interest charges included therein) or otherwise sell for less than face value thereof, or pledge, grant a Lien upon or otherwise encumber, any property of the Company or any of its Subsidiaries that would be classified as a current asset under GAAP, except as otherwise permitted by (A) Section 10.14(a) or (B) Section 10.5(a).

**Section 10.15.  Limitation on Certain Restrictive Agreements**.  The Note Parties will not, and will not permit any Subsidiary to, enter into or suffer to exist any contractual obligation which in any way restricts the ability of any Subsidiary to (a) make any dividends, distributions or other payments or loans or advances (including, without limitation, repayments of loans and advances) to the Company or (b) transfer any of its property to the Company.

**Section 10.16.  ERISA Compliance**.  The Company will not, and will not permit any Subsidiary to:

(a)      at any time engage in any Prohibited Transaction with respect to a ERISA Plan which would reasonably be expected to result in any liability to the Company; or permit any ERISA Plan to be terminated in a manner which could result in the imposition of a Lien on any property of the Company or any of its Subsidiaries pursuant to ERISA;

(b)      engage in any transaction in connection with which the Company or any Subsidiary thereof would reasonably be expected to be subject to a tax or material civil penalty assessed pursuant to the provisions of section 502 of ERISA or Section 4975 of the Code;

(c)      terminate any ERISA Plan in a "distress termination" under section 4041 of ERISA, or take any other action which would reasonably be expected to result in a material liability of the Company or any Subsidiary thereof to the PBGC;

(d)      except where such failure or action would not reasonably be expected to result in a material liability to the Company, (i) fail to make payment when due of all amounts which, under the provisions of any ERISA Plan, the Company or any Subsidiary thereof is required to pay as contributions thereto, (ii) with respect to any ERISA Plan, fail to satisfy the minimum funding standard (as described in section 302 of ERISA and section 412 of the Code, whether or not waived, with respect thereto) or (iii) file an application for a waiver of the minimum funding standard with respect to any Plan pursuant to section 412 of the Code or Section 302 of ERISA;

(e)      adopt an amendment to a ERISA Plan which amendment would be restricted by section 436 of the Code;

(f)      without obtaining the prior consent of the Required Holders (which consent shall not be unreasonably withheld), engage in any transaction or enter into any agreement that would require the Company to establish, maintain, contribute to, or become liable (whether contingent or otherwise) to a Multiemployer ERISA Plan that, as of the date on which the Company engages in such transaction or enters into such agreement, has been determined by the Multiemployer ERISA Plan's actuary to be in "endangered" or "critical" status under section 432 of the Code; or

(g)      take any action, or omit to take any action which would give rise to a non-exempt prohibited transaction under Section 4975 of the Code or Section 406 of ERISA that would subject a Noteholder to any tax or penalty under Section 4975 of the Code or Section 502 of ERISA.

**Section 10.17.   Change of Flag and location of Mortgaged Vessels**.

(a)      The Company shall ensure that the registry and flag of each Mortgaged Vessel is the United States of America and shall not change the registry and flag of any Mortgaged Vessel without the prior written consent of the Collateral Agent and the Required Holders.

(b)      Upon the occurrence and during the continuance of an Event of Default, upon request by the Required Holders after consultation with the Company with respect to the present use and income of the applicable Mortgaged Vessel, the Company shall move (or cause to be moved) such Mortgaged Vessel that is not located in a Creditor Friendly Jurisdiction to a Creditor Friendly Jurisdiction within 15 days of such request.

**Section 10.18.   Compliance with Charter Agreements and other Material Contracts**.   The Company shall cause any Affiliate chartering a vessel from the Company or any of its Subsidiaries to comply in all respects with the provisions of any charter or any Note Document in effect with respect to such vessel and to enforce such charter or such Note Document in accordance with its terms.   No such charter or Note Document shall be amended, modified, waived or terminated in any manner (i) in conjunction with or relating to a transaction or series of transactions involving, directly or indirectly, the charterer and any other Affiliate of the Company or such Subsidiary or (ii) that, directly or indirectly, impairs or adversely affects the Collateral or the rights of the Collateral Agent and the Noteholders under this Agreement and the other Note Documents or (iii) that would otherwise be prohibited under the Assignments of Charter Hire.

**Section 10.19.   Restrictions on Charterers of Vessels**.   The Company shall not bareboat or demise charter any vessel for operation in the coastwise trade to any Person that is not a citizen of the United States within the meaning of 46 U.S.C. Section 50501 et seq.

**Section 10.20.   Deposit Accounts**.   The Company will not establish any additional deposit accounts (other than the Tax Account) for any purpose which are not listed on Schedule 10.20, unless such

additional deposit accounts are subject to Control Agreements or are otherwise subject to control in favor of the Collateral Agent. The Tax Account shall not be subject to any Control Agreement. Holdings will not have any deposit accounts.

**Section 10.21.   Most Favored Lender Status**.  The terms of this Agreement shall, without any further action on the part of the Note Parties or any of the Noteholders, be deemed to be amended automatically to include each Additional Covenant and each Additional Default contained in any agreement creating or evidencing any Indebtedness of the Company or its Subsidiaries in an amount exceeding $1,000,000, in each case as the same may be amended, modified, replaced or extended from time to time, including any refinancing.  The Company further covenants to promptly execute and deliver, at the expense of the Company (limited, in the case of legal expenses, to the reasonable fees and expenses of one counsel for all Noteholders), an amendment to this Agreement in form and substance satisfactory to the Required Holders evidencing the amendment of this Agreement to include such Additional Covenants and Additional Defaults, provided that (i) the execution and delivery of such amendment shall not be a precondition to the effectiveness of such amendment as provided for in this Section 10.21, but shall merely be for the convenience of the parties hereto and (ii) unless the Required Holders otherwise agree such amendment shall continue to be effective notwithstanding that (x) the agreement that contains such Additional Covenant or Additional Default ceases to be in effect, or (y) the agreement that contains such Additional Covenant or Additional Default is amended to remove or make less restrictive such Additional Covenant or Additional Default; and provided, further that if the Company shall pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee or otherwise, or grant any security or provide other credit support, to any lender or any holder of Indebtedness as consideration for or as an inducement to the entering into by such lender or holder of any such amendment, equal remuneration is concurrently paid, or security is concurrently granted or other credit support concurrently provided, on the same terms, ratably to each Noteholder.

**Section 10.22.   Use of Proceeds**.  The Notes are being issued in exchange for the Exchanged Debt.

**Section 10.23.   Repayments to Chouest Affiliates**.  The Note Parties will not, and will not permit any Subsidiary to, make any payment in respect of Indebtedness of the Note Parties or any Subsidiary owed to a Chouest Affiliate.

**Section 10.24.   Capital Expenditure**.  The Note Parties will not, and will not permit any Subsidiary to make, any Capital Expenditure, other than (a) any maintenance and related Capital Expenditures of the Company (other than any Capital Expenditure described in clause (b) below) and (b) any Capital Expenditure of the Company for retrofitting, refurbishment, conversion or modification of Vessels in an aggregate outstanding amount not to exceed $6,000,000 in each calendar year, subject to an annual adjustment based on the Consumer Price Index (provided that such adjustment is capped at 5% per annum), provided that such Capital Expenditures do not materially reduce the fair market value, utility or remaining useful life of such Vessels.

For the avoidance of doubt, any expenses incurred in connection with a Vessel Sale under the Asset Sale Agreements or any other sales of Mortgaged Vessels permitted hereunder is not a Capital Expenditure.

**Section 10.25.   Anti-Corruption Laws and Economic Sanctions**.  The Note Parties will not, and will not permit their Subsidiaries and their respective directors, officers, employees and agents to (a) make an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) fund, finance or facilitate any activities, business or transaction of or with or in any Blocked Person, except to the extent permitted for a Person required to comply with Economics Sanctions, or (c) engage in any activity that would result in the violation of any Economics Sanctions applicable to any party hereto.

Section 10.26.  **Passive Holding Company**.  In addition to the other covenants applicable to it pursuant to this Section 10, Holdings covenants and agrees that it will not create, incur, assume or suffer to exist any debt or Lien other than Liens securing the Note Obligations, nor will it engage at any time in any business or business activity other than (a) the ownership of equity interests in the Company, (b) performance of its obligations under and in connection with the Note Documents, (c) paying Taxes for which Holdings or the Company are legally liable, (d) holding directors' and members' meetings, preparing corporate and similar records and other activities (including the ability to incur fees, costs and expenses relating to such maintenance) required to maintain its corporate or other legal structure or to participate in tax, accounting or other administrative matters as a member of the consolidated group of Holdings, the Company and its Subsidiaries, (f) preparing reports to, and preparing and making notices to and filings with Governmental Authorities, to the Agent, Collateral Agent and Noteholders and to the holders of its equity interests, (g) providing indemnification to officers and directors, and (h) activities incidental to the business or activities described in each of the foregoing clauses of this Section 10.26.  Holdings shall at all times pledge all of the equity interest of the Company (and, if applicable, shall deliver original stock certificates evidencing the equity interests of the Company, together with appropriate undated stock powers endorsed in blank by Holdings for each such certificate to the Collateral Agent).

## SECTION 11   EVENTS OF DEFAULT.

Section 11.1.  **Events of Default**.  An "Event of Default" shall exist if any of the following conditions or events shall occur and be continuing:

(a)      the Company defaults in the payment of any principal or the Exit Fee, if any, on any Note when the same becomes due and payable or the amount required by Section 8.9, whether at maturity or at a date fixed for prepayment, repayment or by declaration or otherwise; or

(b)      the Company defaults in the payment of any interest on or any other amounts in respect of any Note for more than five Business Days after the same becomes due and payable; or

(c)      the Company defaults in the performance of or compliance with any term contained in Section 7.1(f), Section 8.9, Section 9.2, Section 9.11, Section 9.12, Section 9.18, Section 9.21, Section 9.24 or Section 10; or

(d)      the Company defaults in the performance of or compliance with any term contained herein (other than those referred to in Sections 11(a), (b) and (c)) or in any other Note Document and such default is not remedied within thirty (30) days (or, in respect of a default in the performance of or compliance with Section 7.1(u), seven (7) Business Days) after the earlier of (i) obtaining actual knowledge of such default and (ii) the Company receiving written notice of such default from the Agent or any Noteholder (and such written notice to be identified as a "notice of default" and to refer specifically to this Section 11.1(d)); or

(e)      any representation or warranty made in writing by or on behalf of the Company or by any officer of the Company in this Agreement, any other Note Document or in any writing furnished in connection with the transactions contemplated hereby proves to have been false or incorrect in any material respect when made or deemed to be made, or if already qualified by materiality or Material Adverse Effect, is incorrect in any respect when made or deemed to be made; or

(f)      (i) any Note Party or any Subsidiary is in default (as principal or as guarantor or other surety) in the payment of any principal of or premium or make-whole amount or interest or any amount on any Indebtedness that is outstanding in an aggregate principal amount of at least $1,000,000 beyond any period of grace provided with respect thereto, (ii) or any Note Party or any Subsidiary is in

default in the performance of or compliance with any term of any evidence of any Indebtedness in an aggregate outstanding principal amount of at least $1,000,000 or of any mortgage, indenture or other agreement relating thereto or any other condition exists, and as a consequence of such default or condition such Indebtedness has become, or has been declared (or one or more Persons are entitled to declare such Indebtedness to be), due and payable before its stated maturity or before its regularly scheduled dates of payment, or (iii) as a consequence of the occurrence or continuation of any event or condition (other than the passage of time or the right of the holder of Indebtedness to convert such Indebtedness into equity interests), (x) any Note Party or any Subsidiary has become obligated to purchase or repay Indebtedness before its regular maturity or before its regularly scheduled dates of payment in an aggregate outstanding principal amount of at least $1,000,000, or (y) one or more Persons have the right to require any Note Party or any Subsidiary to purchase or repay any such Indebtedness; or

(g)      any Note Party or any Subsidiary (i) is generally not paying, or admits in writing its inability to pay, its debts as they become due, (ii) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy, insolvency, reorganization, moratorium or other similar law of any jurisdiction, including under the Bankruptcy Code or any other Bankruptcy Law, or voluntarily commences any proceeding seeking reorganization, arrangement, recapitalization or adjustment or marshalling of its assets or liabilities, (iii) makes an assignment for the benefit of creditors, (iv) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to itself or with respect to any substantial part of its property, (v) is adjudicated as insolvent or is to be liquidated, or (vi) takes corporate or other equivalent action for the purpose of any of the foregoing; or

(h)      a court or other Governmental Authority of competent jurisdiction enters an order appointing, without consent by any Note Party or any Subsidiary of any Note Party, a custodian, receiver, trustee or other officer with similar powers with respect to a Note Party or any of their Subsidiaries or with respect to any substantial part of their property, or constituting an order for relief or approving a petition for relief or reorganization, arrangement, recapitalization or adjustment or marshalling of their assets or liabilities or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of any Note Party or any of their Subsidiaries, or any such petition shall be filed against any Note Party or any of their Subsidiaries and such petition shall not be dismissed within 60 days; or

(i)      one or more final judgments or orders for the payment of money aggregating in excess of $1,000,000, including, without limitation, any such final order enforcing a binding arbitration decision (in any case to the extent not adequately covered by insurance as to which an insurance company rated A- or better by AM Best Company, Inc. has acknowledged coverage), are rendered against one or more of the Note Parties and its Subsidiaries and which judgments are not, within 30 days after entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within 30 days after the expiration of such stay or any Note Party or any Subsidiary of any Note Party shall fail within 30 days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued; or

(j)      any order, judgment or decree is entered in any proceedings against any Note Party or any Subsidiary of any Note Party decreeing a split-up of any Note Party or any Subsidiary of any Note Party which requires the divestiture of assets representing 10% or more, or the divestiture of Capital Stock of a Subsidiary of any Note Party whose assets represent 10% or more, of Consolidated Tangible Total Assets or which requires the divestiture of assets, or Capital Stock of a Subsidiary of any Note Party, that shall have contributed 10% or more of Consolidated Net Earnings for any of the three fiscal years then most

53

recently ended, and such order, judgment or decree remains unstayed and in effect for more than 60 days; or

(k)     if (i) any ERISA Plan shall fail to satisfy the minimum funding standards of ERISA or the Code for any plan year or part thereof, whether or not waived in accordance with section 412(c) of the Code or section 302(c) of ERISA, or a waiver of such standards or extension of any amortization period is sought or granted under section 412 of the Code or section 302 of ERISA, (ii) a notice of intent to terminate any ERISA Plan shall have been or is reasonably expected to be filed with the PBGC or the PBGC shall have instituted proceedings under ERISA section 4042 to terminate or appoint a trustee to administer any ERISA Plan or the PBGC shall have notified the Company or any ERISA Affiliate that a ERISA Plan may become a subject of any such proceedings, (iii) the aggregate "amount of unfunded benefit liabilities" (within the meaning of section 4001(a)(18) of ERISA) under any ERISA Plan shall exceed zero, determined in accordance with Title IV of ERISA, (iv) the Company or any ERISA Affiliate shall have incurred or is reasonably expected to incur any liability pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans, (v) the Company or any ERISA Affiliate withdraws from any Multiemployer ERISA Plan, or (vi) the Company or any Subsidiary establishes or amends any employee welfare benefit plan that provides post-employment welfare benefits in a manner that would increase the liability of the Company or any Subsidiary thereunder; and any such event or events described in clauses (i) through (vi) above, either individually or together with any other such event or events, could reasonably be expected to have a Material Adverse Effect.  As used in this Section 11.1(k), the terms "employee benefit plan" and "employee welfare benefit plan" shall have the respective meanings assigned to such terms in section 3 of ERISA; or

(l)     any of the Security Documents, or any material provision thereof, shall for any reason cease to be, or shall be asserted by any Note Party or any Subsidiary of any Note Party or any Chouest Affiliate not to be, a legal, valid and binding obligation of such Note Party or any Subsidiary of any Note Party or, enforceable in accordance with its terms, or the Liens purported to be created by any of the Security Documents shall for any reason cease to be, or be asserted by any Note Party or any Subsidiary of any Note Party or any Chouest Affiliate not to be either a valid, first priority perfected Lien or, in the case of any Mortgaged Vessel, a first preferred mortgage lien (except as to all of the foregoing to the extent otherwise permitted under this Agreement or any of the Security Documents); or

(m)     an "Event of Default" under and as defined in the Fleet Mortgage shall have occurred and be continuing; or

(n)     there shall occur (i) any material damage to, or loss, theft or destruction of, any Collateral, or any Vessel (whether or not Collateral), whether or not insured, or (ii) any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which, in the case of either clause (i) or (ii), causes the cessation or substantial curtailment, for more than 30 consecutive days, of revenue-producing activities of any vessel or any facility of the Company or its Subsidiaries if such event or circumstance is not covered by business interruption insurance and could reasonably be expected to have a Material Adverse Effect, unless the Company within 30 days thereafter shall have provided and made subject to the Lien of this Agreement and the other Security Documents substitute Collateral of substantially equivalent value and otherwise reasonably satisfactory to the Required Holders; or

(o)     all or a substantial part of the property subject to the Liens of the Security Documents shall be condemned, seized or otherwise appropriated, or custody or control of such property shall be assumed or the operation thereof or production or revenues therefrom shall cease by or as a result of any action by any Governmental Authority or court of competent jurisdiction or at the insistence of any Governmental Authority, and such circumstance shall continue for a period of 45 days, unless the Company

54

within 30 days thereafter shall have provided and made subject to the Lien of the Security Documents substitute Collateral satisfactory to the Required Holders; or

(p)      any material provision of any Note Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any of the Company or its Subsidiaries or any Chouest Affiliate shall challenge the enforceability of any Note Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Note Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms) or if any of the of the Support Agreement, the Master Services Agreement or Intellectual Property Agreements are terminated by the counterparties thereto; or

(q)      a Change of Control shall have occurred and be continuing.

Section 11.2.    **Right to Cure**. Notwithstanding anything to the contrary in this Agreement, either (a) upon any failure by the Company to comply with Section 10.6 or (b) at the Company's election before the 15-month anniversary of the Closing Date, for the purposes of paying the Specified Prepayment Amount, the Company shall have the right (the "**Cure Right**")  (with respect to clause (a), at any time during such fiscal quarter or thereafter until the date that is five (5) Business Days after the date on which financial statements for such fiscal quarter are required to be delivered, and with respect to clause (b), at any time prior to the 15-month anniversary of the Closing Date) to issue Capital Stock or other equity (such other equity to be on terms reasonably acceptable to the Required Holders) for cash or otherwise receive cash contributions in respect of its Capital Stock or such other equity (the "**Cure Amount**"), and thereupon the Company's compliance with Section 10.6 or the application of Specified Noteholder Fee under Section 8.1(c), as applicable, shall be recalculated giving effect to a pro forma increase in the amount of EBITDA or the Specified Prepayment Amount by an amount equal to the Cure Amount solely for the purpose of determining compliance with Section 10.6 or calculating the Specified Noteholder Fee pursuant to Section 8.1(c), as applicable, as of the end of such fiscal quarter and for applicable subsequent periods that include such fiscal quarter.  Notwithstanding anything herein to the contrary:

(a)      during the term of this Agreement, the Cure Right shall not be exercised more than once for Section 10.6 and once for Section 8.1(c) with the Company notifying the Agent prior to such exercise of the Cure Amount whether the Cure Amount shall be used for purposes of Section 10.6 or Section 8.1(b),

(b)      the Cure Amount shall be no greater than the amount required for the purpose of complying with Section 10.6 if such Cure Amount will be applied for purposes of ensuring compliance with Section 10.6,

(c)      there shall be no pro forma or other reduction of the amount of Net Funded Debt by the amount of any Cure Amount for purposes of determining compliance with Section 10.6 for the fiscal quarter in respect of which the Cure Right was exercised (other than, with respect to any future period, to the extent of any portion of such Cure Amount that is actually applied to prepay or repay any Indebtedness (including by way of a discounted buyback or repurchase) that constitutes Net Funded Debt),

(d)      during any four consecutive fiscal quarter period in which any Cure Amount is included in the calculation of EBITDA as a result of any exercise of the Cure Right, such Cure Amount shall be disregarded for purposes of determining EBITDA for any other purpose, in each case, during each fiscal quarter in which the pro forma adjustment applies, and

(e)      The Cure Amount shall be mandatorily applied to repay the principal of the Notes.

## SECTION 12   REMEDIES ON DEFAULT, ETC.

### Section 12.1.   **Acceleration**.

(a)        If an Event of Default with respect to the Company described in Section 11.1(g) or (h) (other than an Event of Default described in clause (i) of Section 11.1(g) or described in clause (vi) of Section 11.1(g) by virtue of the fact that such clause encompasses clause (i) of Section 11.1(g)) has occurred, all the Notes then outstanding shall automatically become immediately due and payable.

(b)        If any other Event of Default has occurred and is continuing, the Agent at the direction of the Required Holders may at any time, by notice to the Company, declare all the Notes then outstanding to be immediately due and payable.

Upon any Notes becoming due and payable under this Section 12.1, whether automatically or by declaration, such Notes will forthwith mature and the entire unpaid principal amount of such Notes, plus (x) all accrued and unpaid interest thereon (including, but not limited to, interest accrued thereon at the Default Rate) and (y) the Exit Fee determined in respect of such principal amount, shall all be immediately due and payable, in each and every case without presentment, demand, protest or further notice, all of which are hereby waived.  The Company acknowledges, and the parties hereto agree, that each Noteholder has the right to maintain its investment in the Notes free from repayment by the Company (except as herein specifically provided for) and that the provision for payment of an Exit Fee by the Company in the event that the Notes are prepaid in full or are accelerated as a result of an Event of Default, is intended to provide compensation for the deprivation of such right under such circumstances.

### Section 12.2.   **Other Remedies**.   If any Default or Event of Default has occurred and is continuing, and irrespective of whether any Notes have become or have been declared immediately due and payable under Section 12.1, the Agent or the Collateral Agent, in each case at the direction of the Required Holders (or if the Agent or the Collateral Agent delays, the Required Holders), may proceed to protect and enforce the rights of the Noteholders, the Agent and/or the Collateral Agent, as the case may be, by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in any Note or any other Note Document, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise.  The Noteholders shall have the other remedies contained in the Security Documents.

### Section 12.3.   **Rescission**.   At any time after any Notes have been declared due and payable, the Required Holders, by written notice to the Agent and the Company, may rescind and annul any such declaration and its consequences if (a) the Company has paid all overdue interest on the Notes, all principal, if any, on any Notes that are due and payable and are unpaid other than by reason of such declaration, and all interest on such overdue principal and the Exit Fee and (to the extent permitted by applicable law) any overdue interest in respect of the Notes, at the Default Rate, (b) neither the Company nor any other Person shall have paid any amounts which have become due solely by reason of such declaration, (c) all Events of Default and Defaults, other than non- payment of amounts that have become due solely by reason of such declaration, have been cured or have been waived pursuant to Section 17, and (d) no judgment or decree has been entered for the payment of any monies due pursuant hereto or to the Notes.  No rescission and annulment under this Section 12.3 will extend to or affect any subsequent Event of Default or Default or impair any right consequent thereon.

### Section 12.4.   **No Waivers or Election of Remedies, Expenses, Etc**.   No course of dealing and no delay on the part of the Agent, the Collateral Agent or any Noteholder in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice the Agent's, the Collateral Agent's or such

Noteholder's rights, powers or remedies.  No right, power or remedy conferred by this Agreement or by any Note or any other Note Document upon the Agent, any Noteholder or the Collateral Agent shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise.  Without limiting the obligations of the Company under Section 15, the Company will pay to the Agent, the Collateral Agent or the Noteholders on demand such further amount as shall be sufficient to cover all costs and expenses of the Agent, the Collateral Agent or the Noteholders incurred in any enforcement or collection under this Section 12, including, without limitation, reasonable attorneys' fees, expenses and disbursements.

> **Section 12.5.    Application of Funds**.

> (a)    Any amounts received by the Agent or the Collateral Agent on account of the Notes, including any proceeds of Collateral, following acceleration or the occurrence and continuation of an Event of Default under 11.1(g) or (h) or upon the exercise of rights and remedies shall be applied in the following order:

>> (i)    First, to payment of that portion of the Note Obligations constituting fees, indemnities, expenses and other amounts payable to the Agent and the Collateral Agent in their capacities as such;

>> (ii)    Second, to payment of that portion of the Note Obligations constituting fees, indemnities and other amounts (other than principal, interest and the Specified Noteholder Fee and Exit Fees) payable to the Noteholders (including fees, charges and disbursements of counsel and financial advisors and/or consultants to the respective Noteholders, to the extent permitted hereunder), ratably among them in proportion to the respective amounts described in this clause Second payable to them;

>> (iii)    Third, to payment of that portion of the Note Obligations constituting accrued and unpaid interest on the Notes, ratably among the Noteholders in proportion to the respective amounts described in this clause Third payable to them;

>> (iv)    Fourth, to payment of that portion of the Note Obligations constituting unpaid principal of the Notes and the Specified Noteholder Fee ratably among the Noteholders in proportion to the respective amounts described in this clause Fourth held by them;

>> (v)    Fifth, to payment of that portion of the Note Obligations constituting the Exit Fee ratably among the Noteholders in proportion to the respective amounts described in this clause Fifth held by them; and

>> (vi)    Last, the balance, if any, after all of the Note Obligations have been indefeasibly paid in full in cash, to the Company or as otherwise required by law.

## SECTION 13   REGISTRATION; EXCHANGE; SUBSTITUTION OF NOTES.

**Section 13.1.    Registration of Notes**.  The Agent shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain at one of its offices in the United States a copy of each Assignment and Acceptance Agreement delivered to and accepted by it and a register for the recordation of the names and addresses of the Noteholders and the aggregate outstanding principal amount (and stated interest of the Notes) of each Noteholder from time to time (the "Register").  If any holder of one or more Notes is a nominee, then (a) the name and address of the beneficial owner of such Note or Notes, and the

amount of Notes beneficially owned by such beneficial owner, shall also be certified to the Company and the Agent by such nominee or beneficial owner (and, in the case of the latter, acknowledged by such nominee) and registered in the Register as an owner and holder thereof and (b) any amendment, waiver or consent under this Agreement shall be executed by the beneficial owner and not the nominee. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Company, the Agents and the Noteholders shall treat each Person whose name is recorded in the Register pursuant to the terms of this Agreement as a Noteholder under this Agreement for all purposes of this Agreement.  The Agent shall provide the Register to the Company, any Agent or any Noteholder at any reasonable time and from time to time upon reasonable prior notice.

Section 13.2.    **Transfer and Exchange of Notes**.  (a) Each Noteholder may assign to any assignee all or a portion of its rights and obligations under this Agreement (accompanied by the corresponding portion of its Notes) in the minimum amounts set forth in the third to last sentence of Section 13.2(b); provided, however, that the parties to each such assignment shall execute and deliver to the Agent an Assignment and Acceptance Agreement for its acceptance and recording in the Register, together with a processing and recordation fee of $3,500 (which may be waived or reduced in the sole discretion of the Agent) and the assignee, if it is not an existing Noteholder, shall deliver to the Agent (x) an Administrative Questionnaire, (y) any tax forms as may be required to be delivered to the Agent and the Company pursuant to Section 8.11(e) on or prior to the effective date of such Assignment and Acceptance Agreement and (z) all documentation and other information requested by the Agent under "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act.

Upon such execution, delivery, acceptance, payment and recording from and after the effective date specified in such Assignment and Acceptance Agreement, (x) the assignee thereunder shall be a party to this Agreement, and to the extent that rights and obligations under this Agreement have been assigned to it pursuant to such Assignment and Acceptance Agreement, have the rights and obligations of a Noteholder hereunder and (y) the assigning Noteholder shall, to the extent that rights and obligations have been assigned by it pursuant to such Assignment and Acceptance Agreement, relinquish such rights and be released from such obligations under this Agreement (and, in the case of an Assignment and Acceptance Agreement covering all or the remaining portion of an assigning Noteholder's rights and obligations under this Agreement, such Noteholder shall cease to be a party hereto).

Subject to acceptance and recording thereof by the Agent pursuant to Section 13.1, from and after the effective date specified in each Assignment and Acceptance Agreement, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Acceptance Agreement, have the rights and obligations of a Noteholder under this Agreement and the other Note Documents, and the assigning Noteholder thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance Agreement, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance Agreement covering all of the assigning Noteholder's rights and obligations under this Agreement, such Noteholder shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 8.11, 14 and 22.3 with respect to facts and circumstances occurring prior to the effective date of such assignment.

(b) In connection with any assignment of Notes under Section 13.2(a), the assigning Noteholder shall either (x) to the extent it has a physical Note, surrender its Note to the Company at the address and to the attention of the designated officer (all as specified in Section 17(iii)) (accompanied by an Assignment and Acceptance and accompanied by the relevant name, address and other information for notices of each transferee of such Note or part thereof) or (y) to the extent the assigning Noteholder does not have a physical Note, deliver an Assignment and Acceptance and accompanied by the relevant name, address and other information for notices of each transferee of such Note or part thereof and, in each case, within ten Business Days thereafter, the Company shall, to the extent requested by the assignee Noteholder, execute and deliver,

at the Company's expense (except as provided below), one or more new Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered Note, and shall provide the Agent with a copy thereof. Each such new Note shall be payable to such Person as such holder may request and shall be substantially in the form of Exhibit A. Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note or dated the date of the surrendered Note if no interest shall have been paid thereon. The Company may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of Notes. Notes shall not be transferred in denominations of less than $100,000, <u>provided</u> that if necessary to enable the registration of transfer by a holder of its entire holding of Notes, one Note may be in a denomination of less than $100,000. Any transferee, by its acceptance of a Note registered in its name (or the name of its nominee), shall be deemed to have made the representation set forth in Section 6.2. Notwithstanding anything to the contrary herein, a physical Note shall only be required to be delivered or exist to the extent requested by a Noteholder, in its sole discretion. Notwithstanding anything to the contrary herein, the holder of a Note shall for all purposes of this Agreement and the other Note Documents be the Person listed in the Register, regardless of whether a new Note has been issued to such Person under this Section 13.2(b).

(c)     SO LONG AS THE NOTES HAVE NOT MATURED (AT STATED MATURITY) OR HAVE BECOME OR DECLARED IMMEDIATELY DUE AND PAYABLE PURSUANT TO SECTION 12.1, NO REGISTERED OR BENEFICIAL NOTEHOLDER MAY TRANSFER A NOTE OR ANY INTEREST THEREIN TO ANY PERSON IT KNOWS TO BE A COMPETITOR. NOTEHOLDERS AND THE COMPANY SHALL BE ENTITLED TO RELY ON REPRESENTATIONS OF TRANSFEREES FOR PURPOSES OF DETERMINING WHETHER SUCH TRANSFEREE IS A COMPETITOR.

**Section 13.3.    Replacement of Notes**.  Upon receipt by the Company at the address and to the attention of the designated officer (all as specified in Section 17(iii)) of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note (which evidence shall be, in the case of an Institutional Investor, notice from such Institutional Investor of such ownership and such loss, theft, destruction or mutilation), and

(a)     in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it (<u>provided</u> that if the holder of such Note is, or is a nominee for, an original Noteholder or another Noteholder with a minimum net worth of at least $100,000,000 or a Qualified Institutional Buyer, such Person's own unsecured agreement of indemnity shall be deemed to be satisfactory), or

(b)     in the case of mutilation, upon surrender and cancellation thereof, within ten Business Days thereafter, the Company at its own expense shall execute and deliver, in lieu thereof, a new Note, dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed or mutilated Note or dated the date of such lost, stolen, destroyed or mutilated Note if no interest shall have been paid thereon and shall notify the Agent of such replacement for recordation in the register.

**Section 13.4.    Agent.**  Notwithstanding anything set forth herein or in any other Note Document, the Agent shall not act as, or be deemed to act as, transfer agent or registrar under Article 8 of the UCC or Section 17A(c) of the Exchange Act hereunder or under any other Note Document.

## SECTION 14   EXPENSES, ETC.

**Section 14.1.    Transaction Expenses**.  Whether or not the transactions contemplated hereby are consummated, the Company will pay (x) all costs and expenses including reasonable and documented out-of-pocket attorneys' fees of  one leading counsel, one local counsel in each applicable jurisdiction and one

maritime counsel for each of (i) the Agent and Collateral Agent, and (ii) the Consenting Creditors in connection with the negotiation, documentation and the preparation of the Note Documents; (y) all costs and expenses including reasonable and documented out-of-pocket attorneys' fees of one leading counsel, one local counsel in each applicable jurisdiction and one maritime counsel for (i) the Agent and the Collateral Agent and (ii) the Noteholders, taken as a whole, in connection with the administration of the Note Documents and, subject to clause (z), in connection with the negotiation and consummation of any amendments, waivers or consents under or in respect of this Agreement, the Notes or any other Note Document (whether or not the Note Documents, such amendment, waiver or consent becomes effective) and (z) the costs and expenses, including reasonable and documented financial advisors' and/or consultant's fees and the reasonable and documented fees, charges and disbursements of any counsel to the Agent, the Collateral Agent and each Noteholder incurred in connection with (i) the insolvency or bankruptcy of the Company any Note Party or any work-out or restructuring of the Notes and any other Note Document, (ii) the enforcement, defense or protection of any rights or remedies under the Note Documents (or determining whether or how to enforce, defend or protect any rights or remedies under the Note Documents), including, without limitation, in connection with the negotiation, documentation and preparation of any amendments, waiver or forbearances after the occurrence and during the continuation of an Event of Default (whether or not such amendments, waiver or forbearances become effective), (iii) the monitoring of the insolvency or bankruptcy of any of Alpha Marine Services, L.L.C., a Louisiana limited liability company, Bram Offshore Transportes Maritimos Ltda., a Brazil limited liability company, Nautical Ventures, L.L.C., a Louisiana limited liability company, and Offshore Service Vessels, L.L.C., a Louisiana limited liability company, or (iv) any review of the capital structure or business of the Company during the occurrence and continuation of an Event of Default.  In each case, in connection with the foregoing, any financial advisor or consultant of the Consenting Creditors shall have the right to visit and inspect the Company's or applicable Chouest Corporate Affiliate's properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Company and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Company, but in any event not to unreasonably interfere with the conduct of business (and nothing herein constitutes a waiver of any attorney-client privilege). The Company will pay all costs and expenses including reasonable and documented out-of-pocket attorney's fees incurred by the Agent, the Collateral Agent or the Consenting Creditors incurred in connection with (a) the initial filing of this Agreement and all related documents and financial information with the SVO provided, that such costs and expenses shall not exceed $7,500, (b) the costs and expenses of the Insurance Consultant in connection with its review of, consultation with respect to and/or certification of the Company and its Subsidiaries' insurance or any other insurance maintained in respect of the Mortgaged Vessels in relation to the insurance requirements in this Agreement and the other Note Documents, (c) verifying and maintaining the perfection of the Liens created by the Security Documents, including, without limitation, the costs and expenses of the Collateral Agent. The Company will pay all reasonable and documented costs and expenses including financial advisors' and/or consultants' fees and reasonable and documented attorney's fees of one leading counsel, one local counsel in each applicable jurisdiction and one maritime counsel for the Agent, the Collateral Agent, and the Noteholders taken as a whole incurred in responding to any subpoena or other legal process or informal investigative demand issued in connection with this Agreement, the Notes, or any other Note Document or by reason of being a Noteholder; except for such circumstances where any Noteholder is directly subpoenaed or directly named in such enforcement action or defending action then such named Noteholder is entitled to one leading counsel, one local in each applicable jurisdiction and one maritime counsel and the unnamed Noteholders shall collectively be entitled to one leading counsel, one local in each applicable jurisdiction and one maritime counsel.  Notwithstanding the foregoing, the Company shall be responsible for Appraisal costs only one time per year and each time a vessel becomes a Mortgaged Vessel, absent there being an Event of Default that has occurred and is continuing. The Company will pay, and will save the Agent, the Collateral Agent and each Noteholder harmless from, (i) all claims in respect of any fees, costs or expenses, if any, of brokers and finders (other than those, if any, retained by a Noteholder or other holder

in connection with the Notes) and (ii) any and all wire transfer fees that any bank deducts from any payment under this Agreement or such Note to an Agent or such Noteholder or otherwise charges to an Agent or a Noteholder with respect to a payment under such Note or this Agreement.

**Section 14.2.    Survival**.  The obligations of the Company under this Section 14 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Agreement, the Notes, or any other Note Document and the termination of this Agreement.

## SECTION 15   SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT.

All representations and warranties of the Company contained herein and in each other Note Document shall survive the execution and delivery of this Agreement, the Notes and the other Note Documents, the purchase or transfer by any Noteholder of any Note or portion thereof or interest therein and the payment of any Note, and may be relied upon by any subsequent Noteholder, regardless of any investigation made at any time by or on behalf of such Noteholder or any other Noteholder.   All representations and warranties of each Noteholder (in each case, as such and as a Noteholder) contained herein and in each other Note Document shall survive the execution and delivery of this Agreement, the Notes and the other Note Documents, the purchase or transfer by any Noteholder of any Note or portion thereof or interest therein and the payment of any Note, and may be relied upon by the Company, regardless of any investigation made at any time by or on behalf of the Company.  All statements contained in any certificate or other instrument delivered by or on behalf of the Company pursuant to this Agreement or any other Note Document shall be deemed representations and warranties of the Company, as applicable, under this Agreement.   Subject to the preceding sentence, this Agreement, the Notes and the other Note Documents embody the entire agreement and understanding between each Noteholder and the Company and supersede all prior agreements and understandings relating to the subject matter hereof.

## SECTION 16   AMENDMENT AND WAIVER.

**Section 16.1.    Requirements**.

(a)    This Agreement, the Notes and any other Note Document may be amended, supplemented (including to issue additional Notes hereunder) and the observance of any term hereof or of the Notes may be waived (either retroactively or prospectively), only with the written consent of the Required Holders and the Company, and acknowledged by the Agent, or by the applicable Note Party and the Agent with the consent of the Required Holders; provided that no such amendment or waiver shall:

(i)    reduce or forgive the principal amount of any Note or reduce the rate of interest thereon, or reduce or forgive any interest or fees payable hereunder, without the written consent of each Noteholder affected thereby (except that any amendment or modification of the financial covenants in Section 10.6 of this Agreement (or defined terms used in the financial covenants in Section 10.6 of this Agreement) shall not constitute a reduction in the rate of interest or fees for purposes of this clause (i));

(ii)    postpone any scheduled date of payment of the principal amount of any Note, or any date for the payment of any interest, fees or other Note Obligations payable hereunder, without the written consent of each Noteholder affected thereby;

(iii)    change Section 8.5 in a manner that would alter the manner in which payments are shared, without the written consent of each Noteholder;

(iv)    change any of the provisions of this Section or the definition of "Required Holders" or any other provision of any Note Document specifying the number or percentage of Noteholder required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Noteholder directly affected thereby;

(v)    exchange or permit the exchange of any of the Notes (whether pursuant to any refinancing, any "cashless exchange" or otherwise) for any other Indebtedness of the Note Parties, their Subsidiaries or any other Person, including any priming exchanged Indebtedness or new Indebtedness, unless the Note Parties, their Subsidiaries or such other Person shall have offered to exchange or refinance the Notes of each Noteholder on a pro rata basis based on their pro rata share on the same terms or with the written consent of each Noteholder;

(vi)    amend or waive any of the provisions of Section 8, Section 11.1(a), Section 11.1(b), Section 12 hereof, or any defined term (as is used therein), without the written consent of each Noteholder directly affected thereby;

(vii)    release all or substantially all of the guarantees of the Note Obligations (if any) or the Collateral, without the written consent of each Noteholder; or

(viii)    subordinate the Notes in contractual right of payment to any other Indebtedness or alter the priority of the Liens securing the Note Obligations without the written consent of each Noteholder.

provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent or the Collateral Agent hereunder without the prior written consent of the Agent or the Collateral Agent, as the case may be (and the Agent Fee Letter may be amended or modified, or the rights or privileges thereunder waived, in a writing executed only by the parties thereto); provided, further, that no such agreement to Section 19 hereof shall amend, modify or otherwise affect the rights or duties of any Noteholder thereunder without the prior written consent of such Noteholder.

(b)    The Noteholders hereby irrevocably authorize the Collateral Agent, at its option and in its sole discretion, to release any Liens granted to the Collateral Agent by the Note Parties on any Collateral (i) upon the payment in full of all Note Obligations in accordance with the terms hereof, (ii) as directed in Section 9.21(c), (iii) constituting property being sold or disposed of if the Note Parties certify to the Collateral Agent that the sale or disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on any such certificate, without further inquiry), (iv) constituting property leased to the Company under a lease which has expired or been terminated in a transaction permitted under this Agreement, (v) as required to effect any sale or other disposition of such Collateral in connection with any exercise of remedies of the Collateral Agent and the Required Holders permitted under the terms of this Agreement or (vi) as otherwise authorized under Section 20.6.  Except as provided in the preceding sentence, the Collateral Agent will not release any Liens on Collateral without the prior written authorization of the Required Holders.  Any such release shall not in any manner discharge, affect, or impair the Note Obligations or any Liens (other than those expressly being released) upon (or obligations of the Note Parties in respect of) all interests retained by the Note Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.  Any execution and delivery by the Collateral Agent of documents in connection with any such release shall be without recourse to or warranty by the Collateral Agent.

Section 16.2.    **Solicitation of Noteholders**.

(a)      *Solicitation*.   The Company will provide each Noteholder with sufficient information, sufficiently far in advance of the date a decision is required, to enable such holder to make an informed and considered decision with respect to any proposed amendment, waiver or consent in respect of any of the provisions hereof, of the Notes or of any other Note Document.  The Company will deliver executed or true and correct copies of each amendment, waiver or consent effected pursuant to the provisions of this Section 16 to each Noteholder promptly following the date on which it is executed and delivered by, or receives the consent or approval of, the requisite Noteholders.

(b)      *Payment*.  The Company will not directly or indirectly pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee or otherwise, or grant any security or provide other credit support, to any Noteholder as consideration for or as an inducement to the entering into by such holder of any waiver or amendment of any of the terms and provisions hereof, or of any Note or of any other Note Document unless such remuneration, security or other credit support is concurrently offered, on the same terms, ratably to each Noteholder.

(c)      *Consent in Contemplation of Transfer*.  Any consent given pursuant to this Section by a Noteholder that has transferred or has agreed to transfer its Notes to the Company, any Subsidiary or any Affiliate of the Company (pursuant to a waiver under Section 17.1(c) or subsequent to Section 8.7 having been amended pursuant to Section 17.1(c)) in connection with such consent shall be void and of no force or effect except solely as to such holder, and any amendments effected or waivers granted or to be effected or granted that would not have been or would not be so effected or granted but for such consent (and the consents of all other Noteholders that were acquired under the same or similar conditions) shall be void and of no force or effect except solely as to such holder.

**Section 16.3.   Binding Effect, etc**.  Any amendment or waiver consented to as provided in this Section 16 or any other Note Document applies equally to all Noteholders and is binding upon them and upon each future holder of any Note and upon the Company without regard to whether such Note has been marked to indicate such amendment or waiver.  No such amendment or waiver will extend to or affect any obligation, covenant, agreement, Default or Event of Default not expressly amended or waived or impair any right consequent thereon.  No course of dealing between the Company and any Noteholder nor any delay in exercising any rights hereunder or under any Note shall operate as a waiver of any rights of any holder of such Note.

**Section 16.4.   Notes Held by Company, etc**.  Solely for the purpose of determining whether the holders of the requisite percentage of the aggregate principal amount of Notes then outstanding approved or consented to any amendment, waiver or consent to be given under this Agreement, the Notes or any other Note Document, or have directed the taking of any action provided herein, in the Notes or in any other Note Document to be taken upon the direction of the holders of a specified percentage of the aggregate principal amount of Notes then outstanding, Notes directly or indirectly owned by the Company or any of its Affiliates shall be deemed not to be outstanding.

**SECTION 17   NOTICES.**

Except to the extent otherwise provided in Section 7.4, all notices and communications provided for hereunder shall be in writing and sent (a) by telecopy on a Business Day before 4:00 p.m. at the recipient's office if the sender on the same Business Day sends a confirming copy of such notice by an internationally recognized overnight delivery service for receipt the following Business Day (charges prepaid), or (b) by registered or certified mail with return receipt requested (postage prepaid), (c) by an internationally recognized overnight delivery service (with charges prepaid) for receipt the following Business Day or (d) by electronic mail.  Any such notice must be sent:

(i)      if to the Agent or the Collateral Agent at the address specified for such communications in <u>Schedule A</u>, or at such other address as the Agent or Collateral Agent shall have specified to the Company and Noteholders in writing,

(ii)     if to any Noteholder, to such Noteholder at the address specified in its Administrative Questionnaire, or at such other address as such Noteholder shall have specified to the Company and the Agent in writing (and the Agent shall maintain each such address current in the Register), or

(iii)    if to a Note Party, to the Company at 16201 East Main Street, Cut Off, Louisiana 70345 to the attention of Luke Newman (with a copy by email to legal@chouest.com, which copy shall not constitute official notice hereunder), or at such other address as the Company shall have specified to the holder of each Note and the Agent in writing.

Any notice given by delivery, mail, or courier under this Section 17 will be deemed given only when actually received.

## SECTION 18   REPRODUCTION OF DOCUMENTS.

This Agreement, the other Note Documents and all documents relating hereto and thereto, including, without limitation, (a) consents, waivers and modifications that may hereafter be executed, (b) documents received by any Noteholder at the Closing (except the Notes themselves), and (c) financial statements, certificates and other information previously or hereafter furnished to any Noteholder, may be reproduced by such Noteholder by any photographic, photostatic, electronic, digital, or other similar process and such Noteholder may destroy any original document so reproduced.  The Company agrees and stipulates that, to the extent permitted by applicable law, any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by such Noteholder in the regular course of business) and any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.  This Section 18 shall not prohibit the Company or any other Noteholder from contesting any such reproduction to the same extent that it could contest the original, or from introducing evidence to demonstrate the inaccuracy of any such reproduction.

## SECTION 19   CONFIDENTIAL INFORMATION.

For the purposes of this Section 19, "**Confidential Information**" means (i) information delivered to any Noteholder by or on behalf of the Note Parties or any Subsidiary in connection with the transactions contemplated by or otherwise pursuant to this Agreement that was clearly marked or labeled or otherwise adequately identified when received by such Noteholder as being confidential information of such Note Party or such Subsidiary, and (ii) whether or not marked confidential, financial statements, projections and other information as to the performance, prospects or plans for the Note Parties, their Subsidiaries and their other Affiliates, <u>provided</u> that such term does not include information that (a) was publicly known or otherwise known to such Noteholder prior to the time of such disclosure, (b) subsequently becomes publicly known other than as a result of a breach of this Section, (c) otherwise becomes known to such Noteholder other than through disclosure by either Note Party or any Subsidiary or (d) constitutes financial statements delivered to such Noteholder under Section 7.1 that are otherwise publicly available; provided, further, that the fact that financial statements or other Confidential Information are provided to other creditors or potential creditors, on a confidential basis, of the Note Parties and their Affiliates does not mean such

64

financial statements are publicly available.  Each Noteholder will maintain the confidentiality of such Confidential Information in accordance with procedures adopted by such Noteholder in good faith to protect confidential information of third parties delivered to such Noteholder, underlined provided that such Noteholder may deliver or disclose Confidential Information to (i) its directors, officers, employees, agents, attorneys, trustees and affiliates (to the extent such disclosure reasonably relates to the administration of the investment represented by its Notes), (ii) its auditors, financial advisors and other professional advisors who agree to hold confidential the Confidential Information substantially in accordance with the terms of this Section 19, (iii) any other holder of any Note, (iv) any Institutional Investor to which it sells or offers to sell such Note or any part thereof or any participation therein (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 19), (v) any Person from which it offers to purchase any Security of the Note Parties or any Subsidiary of such Note Party (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 19), (vi) any federal or state regulatory authority having jurisdiction over such Noteholder, (vii) the NAIC or the SVO or, in each case, any similar organization, or any nationally recognized rating agency that requires access to information about such Noteholder's investment portfolio, or (viii) any other Person to which such delivery or disclosure may be necessary or appropriate (w) to effect compliance with any law, rule, regulation or order applicable to such Noteholder, (x) in response to any subpoena or other legal process, (y) in connection with any litigation to which such Noteholder is a party or (z) if an Event of Default has occurred and is continuing, to the extent such Noteholder may reasonably determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under such Noteholder's Notes, this Agreement and the other Note Documents; underlined provided, that at least 2 Business Days prior written notice (unless prohibited by law, rule or regulation) shall be given to the Company prior to the disclosure of Confidential Information under clauses (vi), (viii)(w), (viii)(x) and (viii)(y) above.  Each Noteholder, by its acceptance of a Note, will be deemed to have agreed to be bound by and to be entitled to the benefits of this Section 19 as though it were a party to this Agreement.  On reasonable request by the Company in connection with the delivery to any Noteholder of information required to be delivered to such holder under this Agreement or requested by such holder (other than a holder that is a party to this Agreement or its nominee), such holder will enter into an agreement with the Company embodying the provisions of this Section 19.

In the event that as a condition to receiving access to information relating to the Company or its Subsidiaries or its other Affiliates in connection with the transactions contemplated by or otherwise pursuant to this Agreement, any Noteholder is required to agree to a confidentiality undertaking (whether through IntraLinks, another secure website, a secure virtual workspace or otherwise) which is different from the terms of this Section 19, the terms of this Section 19 shall not be amended thereby and, as between such Noteholder or such holder and the Company, the terms of this Section 19 shall supersede any such other confidentiality undertaking.

**SECTION 20   AGENTS**

      **Section 20.1.   Authorization and Action**.

      (a)     Each Noteholder, on behalf of itself and any of its Affiliates, hereby irrevocably appoints Wilmington Trust, National Association as Agent and as Collateral Agent and its successors and assigns to serve as the Agent and Collateral Agent, as applicable, under the Note Documents and each Noteholder authorizes each of the Agent and the Collateral Agent to take such actions as agent on its behalf and to exercise such powers under this Agreement and the other Note Documents as are delegated to the Agent and the Collateral Agent respectively under such agreements and to exercise such powers as are reasonably incidental thereto.  In addition, to the extent required under the laws of any jurisdiction other than within the United States, each Noteholder hereby grants to each of the Agent and the Collateral Agent any required powers of attorney to execute and enforce any Security Document governed by the laws of

such jurisdiction on such Noteholder's behalf.  Without limiting the foregoing, each Noteholder hereby authorizes each of the Agent and the Collateral Agent to execute and deliver, and to perform its obligations under, each of the Note Documents to which each of the Agent and the Collateral Agent is a party, to exercise all rights, powers and remedies that the Agent and the Collateral Agent, as applicable, may have under such Note Documents. Notwithstanding any provision of this Agreement or any other Note Document, in no event shall the Agent or Collateral Agent ever be required to take any action which exposes the Agent or the Collateral Agent to personal liability or which is contrary to any provision of any Note Document or applicable law.  Without limiting the generality of the foregoing, each of the Agent and the Collateral Agent is hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and the rights of the Noteholders with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents.

(b)     As to any matters not expressly provided for herein and in the other Note Documents (including enforcement or collection), neither the Agent nor the Collateral Agent shall be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Holders (or such other number or percentage of the Noteholders as shall be necessary, pursuant to the terms in the Note Documents), and, unless and until revoked in writing, such instructions shall be binding upon each Noteholder; provided, however, that neither the Agent nor the Collateral Agent shall be required to take any action that  in its opinion or in the opinion of its counsel (i) may expose it to liability or (ii) is contrary to this Agreement or any other Note Document or applicable law, including any action that may be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors; provided, further, that the Agent or the Collateral Agent may seek clarification or direction from the Required Holders prior to the exercise of any such instructed action and may refrain from acting until such clarification or direction has been provided.  Except as expressly set forth in the Note Documents, neither the Agent nor the Collateral Agent shall have any duty to disclose, and neither shall be liable for the failure to disclose, any information relating to the Note Parties, any Subsidiary or any Affiliate of any of the foregoing that is communicated to or obtained by the Person serving as Agent, the Collateral Agent or any of their Affiliates in any capacity.  Nothing in this Agreement shall require the Agent or the Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers.

(c)     In performing its functions and duties hereunder and under the other Note Documents, each of the Agent and the Collateral Agent is acting solely on behalf of the Noteholders and its duties are entirely mechanical and administrative in nature.  Without limiting the generality of the foregoing:

(i)     the Agent and the Collateral Agent does not assume and shall not be deemed to have assumed any obligation or duty or any other relationship as the agent, fiduciary or trustee of or for any Noteholder, any other holder of any other obligation, regardless of whether a Default or an Event of Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" (or any similar term) herein or in any other Note Document with reference to the Agent or the Collateral Agent is not intended to connote any fiduciary duty or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties); additionally, each Noteholder agrees that it will not assert any claim against the Agent or the Collateral Agent based on an alleged breach of fiduciary duty by the Agent or the Collateral Agent in connection with this Agreement and the transactions contemplated hereby; and

(ii)        nothing in this Agreement or any Note Document shall require the Agent or the Collateral Agent to account to any Noteholder for any sum or the profit element of any sum received by the Agent or the Collateral Agent for its own account;

(d)        Each of the Agent and the Collateral Agent may perform any of its duties and exercise its rights and powers hereunder or under any other Note Document by or through any one or more sub-agents appointed by the Agent or the Collateral Agent, as applicable.  The Agent, the Collateral Agent and any such sub-agent may perform any of their respective duties and exercise their respective rights and powers through their respective Related Parties.  The exculpatory provisions of this Section shall apply to any such sub-agent and to the Related Parties of the Agent, the Collateral Agent and any such sub-agent, and shall apply to their respective activities pursuant to this Agreement.  Neither the Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Agent or the Collateral Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

(e)        In case of the pendency of any proceeding with respect to the Note Parties under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, including under the Bankruptcy Code or any other Bankruptcy Law, the Agent (irrespective of whether the principal of any Indebtedness shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Note Parties) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(i)        to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Notes and all other Note Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Noteholders and the Agent allowed in such judicial proceeding; and

(ii)        to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Noteholder to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Noteholders, to pay to the Agent any amount due to it, in its capacity as the Agent, under the Note Documents.  Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Note Obligations or the rights of any Noteholder or to authorize the Agent to vote in respect of the claim of any Noteholder in any such proceeding.

(f)        The provisions of this Section are solely for the benefit of the Agent, the Collateral Agent and the Noteholders, and, except solely to the extent of the Note Parties' rights pursuant to and subject to the conditions set forth in this Section, none of the Note Parties or any Subsidiary, or any of their respective Affiliates, shall have any rights as a third party beneficiary under any such provisions.

### Section 20.2.    Agent's Reliance, Indemnification, Etc.

(a)        Neither the Agent, the Collateral Agent nor any of its Related Parties shall be (i) liable for any action taken or omitted to be taken by it (A) with the consent of or at the request of the Required Holders (or such other number or percentage of the Noteholders as shall be necessary, or as the Agent or the Collateral Agent shall believe in good faith to be necessary, under the circumstances as provided in the Note Documents) or (B) in the absence of its own gross negligence or willful misconduct

(such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and nonappealable judgment) or (ii) responsible in any manner to any of the Noteholder for any recitals, statements, representations or warranties made by the Note Parties or any officer thereof contained in this Agreement or any other Note Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent or the Collateral Agent under or in connection with, this Agreement or any other Note Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Note Document or for any failure of the Note Parties to perform their obligations hereunder or thereunder.

(b)     Neither the Agent nor the Collateral Agent shall be deemed to have knowledge of any Default unless and until written notice thereof (stating that it is a "notice of default") is given to a Trust Officer of the Agent or the Collateral Agent, as applicable, at its Corporate Trust Office by the Note Parties or a Noteholder, and the Agent and the Collateral Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Note Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Note Document or the occurrence of any Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of any Note Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article 4 or elsewhere in any Note Document, other than to confirm receipt of items expressly required to be delivered to the Agent or the Collateral Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Agent or the Collateral Agent, or (vi) the creation, perfection or priority of Liens on the Collateral or the sufficiency of the Collateral.

(c)     Without limiting the foregoing, the Agent and the Collateral Agent (i) may treat the payee of any promissory note as its holder until such promissory note has been assigned in accordance with Section 13, (ii) may rely on the Register to the extent set forth in Section 13, (iii) may consult with legal counsel (including counsel to the Note Parties), independent public accountants and other experts selected by it, and shall not be liable for any action taken or omitted to be taken by it in accordance with the advice of such counsel, accountants or experts, (iv) makes no warranty or representation to any Noteholder and shall not be responsible to any Noteholder for any statements, warranties or representations made by or on behalf of the Note Parties in connection with this Agreement or any other Note Document, (v) in determining compliance with any condition hereunder to the issuance of Notes that by its terms must be fulfilled to the satisfaction of a Noteholder, may presume that such condition is satisfactory to such Noteholder unless the Agent and the Collateral Agent shall have received notice to the contrary from such Noteholder sufficiently in advance of the issuance of such Note and (vi) shall be entitled to rely on, and shall incur no liability under or in respect of this Agreement or any other Note Document by acting upon, any notice, consent, certificate or other instrument or writing (which writing may be a fax, any electronic message, Internet or intranet website posting or other distribution) or any statement made to it orally or by telephone and believed by it to be genuine and signed or sent or otherwise authenticated by the proper party or parties (whether or not such Person in fact meets the requirements set forth in the Note Documents for being the maker thereof).

(d)     Each Agent shall be entitled to conclusively rely, and shall be fully protected in so relying, upon any notice (including notice by telephone), communication, direction, instruction, consent, certificate, order or decree of a court of competent jurisdiction or other instrument or writing (which may be by facsimile, and including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and signed or sent by the proper party or parties.

(e)     Each of the Agent and the Collateral Agent shall be fully justified in failing or refusing to take any action under any Note Document unless it shall first receive such written direction,

advice or concurrence of the Required Holders (or such other number or percentage of Noteholders as may be expressly required hereby in any instance) as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Noteholders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agent and Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Note Document in accordance with a written request, direction or consent of the Required Holders (or such other number or percentage of Noteholders as may be expressly required hereby or by any other Note Document in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Noteholders.

(f)      The Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Noteholder to whom payment was due but not made, shall be to recover from other Noteholders any payment in excess of the amount to which they are determined to be entitled (and such other Noteholders hereby agree to return to such Noteholder any such erroneous payments received by them).

(g)      Neither the Agent nor the Collateral Agent shall be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or any other Note Documents caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation, any act or provision of any present or future law or regulation or Governmental Authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(h)      Neither the Agent nor the Collateral Agent shall have any obligation for (a) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under this Agreement, any other Note Document, or any agreement or instrument contemplated hereby or thereby; (b) the filing, re-filing, recording, re-recording, or continuing of any document, financing statement, mortgage, assignment, notice, instrument of further assurance, or other instrument in any public office at any time or times; or (c) providing, maintaining, monitoring, or preserving insurance on or the payment of taxes with respect to any Collateral.

**Section 20.3.      Posting of Communications**.

(a)      The Note Parties agree that the Agent may, but shall not be obligated to, make any Communications available to the Noteholders by posting the Communications on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic system chosen by the Agent to be its electronic transmission system (the "*Approved Electronic Platform*").

(b)      Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Agent from time to time (including, as of the Restatement Date, a user ID/password authorization system) and the Approved Electronic Platform is secured through a per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Noteholders and the Note Parties acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Agent is not responsible for approving or vetting the representatives or contacts of any Noteholder that are added to the Approved Electronic Platform, and that there are confidentiality and other risks associated with such distribution.  Each of the Noteholders and the Note Parties hereby

approves distribution of the Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution.

(c)    THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE".  THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE APPROVED ELECTRONIC PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE APPROVED ELECTRONIC PLATFORM.  IN NO EVENT SHALL THE AGENT OR ANY OF ITS RELATED PARTIES (COLLECTIVELY, "*APPLICABLE PARTIES*") HAVE ANY LIABILITY TO THE NOTE PARTIES, ANY NOTEHOLDER, OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE NOTE PARTIES' OR THE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET OR THE APPROVED ELECTRONIC PLATFORM.

"*Communications*" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of the Note Parties pursuant to any Note Document or the transactions contemplated therein which is distributed by the Agent or any Noteholder by means of electronic communications pursuant to this Section, including through an Approved Electronic Platform.

(d)    Each Noteholder agrees that notice to it (as provided in the next sentence) specifying that Communications have been posted to the Approved Electronic Platform shall constitute effective delivery of the Communications to such Noteholder for purposes of the Note Documents.  Each Noteholder agrees (i) to notify the Agent in writing (which could be in the form of electronic communication) from time to time of such Noteholder's email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

(e)    Each of the Noteholders and the Note Parties agree that the Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Communications on the Approved Electronic Platform in accordance with the Agent's generally applicable document retention procedures and policies.

(f)    Nothing herein shall prejudice the right of the Agent or any Noteholder to give any notice or other communication pursuant to any Note Document in any other manner specified in such Note Document.

**Section 20.4.    Successor Agent and Collateral Agent**.

(a)    The Agent and the Collateral Agent may resign at any time by giving 30 days' prior written notice thereof to the Noteholders and the Note Parties, and may be removed at any time by the Required Holders by not less than 30 days written notice to the Agent or the Collateral Agent, whether or not a successor Agent or Collateral Agent, as the case may be, has been appointed.  Upon any such resignation or removal, the Required Holders shall have the right to appoint a successor Agent or Collateral Agent, as the case may be.  If no successor Agent or Collateral Agent, as the case may be, shall have been so appointed by the Required Holders, and shall have accepted such appointment, within thirty (30) days

after the retiring Agent's or Collateral Agent's, as the case may be, giving of notice of resignation or being given notice of removal, then the retiring or removed Agent or Collateral Agent, as the case may be, may, on behalf of the Noteholders, appoint a successor Agent or Collateral Agent, as the case may be, which shall be a bank with an office in New York, New York or an Affiliate of any such bank.  In either case, such appointment shall be subject to the prior written approval of the Note Parties (which approval may not be unreasonably withheld and shall not be required while an Event of Default has occurred and is continuing).  Upon the acceptance of any appointment as Agent or Collateral Agent, as the case may be, by a successor Agent or Collateral Agent, as the case may be, such successor Agent or Collateral Agent, as the case may be, shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring or removed Agent or Collateral Agent, as the case may be.  Upon the acceptance of appointment as Agent or Collateral Agent, as the case may be, by a successor Agent or Collateral Agent, as the case may be, the retiring or removed Agent or Collateral Agent, as the case may be, shall be discharged from its duties and obligations under this Agreement and the other Note Documents.  Prior to any retiring or removed Agent's or Collateral Agent's, as the case may be, resignation or removal hereunder as Agent or Collateral Agent, as the case may be, the retiring or removed Agent or Collateral Agent, as the case may be, shall take such action as may be reasonably necessary to assign to the successor Agent or Collateral Agent, as the case may be, its rights as Agent or Collateral Agent, as the case may be, under the Note Documents.

(b)        Notwithstanding paragraph (a) of this Section, in the event no successor Agent or Collateral Agent, as the case may be, shall have been so appointed and shall have accepted such appointment within thirty (30) days after the retiring or removed Agent or Collateral Agent, as the case may be, gives notice of its intent to resign or is given notice of its removal, the retiring or removed Agent or Collateral Agent, as the case may be, may give notice of the effectiveness of its resignation to the Noteholders and the Note Parties or, in the case of removal, its removal shall become effective, whereupon, on the date of effectiveness of such resignation or removal, (i) the retiring Agent or Collateral Agent, as the case may be, shall be discharged from its duties and obligations hereunder and under the other Note Documents; provided that, solely for purposes of maintaining any security interest granted to the Collateral Agent under any Security Document for the benefit of the Noteholders, the retiring or removed Collateral Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Noteholders, and continue to be entitled to the rights set forth in such Security Document and Note Document, and, in the case of any Collateral in the possession of the Collateral Agent, shall continue to hold such Collateral, in each case until such time as a successor Collateral Agent is appointed and accepts such appointment in accordance with this Section (it being understood and agreed that the retiring or removed Collateral Agent shall have no duty or obligation to take any further action under any Security Document, including any action required to maintain the perfection of any such security interest), and (ii) the Required Holders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Agent or Collateral Agent, as the case may be; provided that (A) all payments required to be made hereunder or under any other Note Document to the Agent for the account of any Person other than the Agent shall be made directly to such Person and (B) all notices and other communications required or contemplated to be given or made to the Agent shall directly be given or made to each Noteholder.  Following the effectiveness of the Agent's or the Collateral Agent's resignation or removal from its capacity as such, the provisions of this Article, Section 8.11, Section 14 and Section 22.3, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Note Document, shall continue in effect for the benefit of such retiring or removed Agent, Collateral Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent or Collateral Agent was acting as Agent or Collateral Agent and in respect of the matters referred to in the proviso under clause (a) above.

(c)        Any Person into which the Agent or the Collateral Agent, as applicable, may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or

substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any Person resulting from any such conversion, sale, merger, consolidation or transfer to which the Agent or the Collateral Agent, as applicable, is a party, will be and become the successor Agent or Collateral Agent, as applicable, under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

Section 20.5.    **Acknowledgment of Noteholders**.

(a)    Each Noteholder represents that it is engaged in acquiring or holding notes in the ordinary course of its business and that it has, independently and without reliance upon the Agent, the Collateral Agent or any other Noteholder, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Noteholder, and to acquire or hold Notes hereunder.  Each Noteholder also acknowledges that it will, independently and without reliance upon the Agent, the Collateral Agent or any other Noteholder, or any of the Related Parties of any of the foregoing, and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Note Parties and their Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Note Document or any related agreement or any document furnished hereunder or thereunder.

(b)    Each Noteholder, by delivering its signature page to this Agreement on the Closing Date, or delivering its signature page to an Assignment and Acceptance or any other Note Document pursuant to which it shall become a Noteholder hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Note Document and each other document required to be delivered to, or be approved by or satisfactory to, the Agent or the Noteholders on the Closing Date or the effective date of any such assignment or any other Note document pursuant to which it shall have become a Noteholder hereunder.

Section 20.6.    **Collateral Matters**.

(a)    The Noteholders hereby empower and authorize Wilmington Trust, National Association (in its separate capacities as the Agent or as the Collateral Agent) to execute and deliver the Security Documents, the Intellectual Property Agreements, Support Agreements, the Master Services Agreement and all related documents or instruments as shall be necessary or appropriate to effect the purposes of the Security Documents (including as related to the assignments of the Intellectual Property Agreements, Support Agreements and the Master Services Agreement if foreclosed on).

(b)    The Noteholders hereby irrevocably empower and authorize Wilmington Trust, National Association (in its separate capacities as the Agent or as the Collateral Agent) to execute and deliver on their behalf any agreements, documents or instruments as shall be necessary or appropriate to effect any releases of Liens on any Collateral (i) as required to effect any sale or other disposition of such Collateral in connection with any exercise of remedies of the Collateral Agent or (ii) which shall otherwise be permitted by the terms hereof or any other Note Document, including Sections 9.21(c) and 16.1(b) hereof.  The Noteholders hereby irrevocably empower and authorize Wilmington Trust, National Association in its capacity as the Agent to execute and deliver on their behalf any agreements, documents or instruments as shall be necessary or appropriate to effect any payment pursuant to Section 8 hereof. Except as provided in the preceding sentences (and in Section 9.21), Wilmington Trust, National Association (in its separate capacities as the Agent or as the Collateral Agent), will not release any Liens

on Collateral without the prior written authorization of the Required Holders; provided that it may release Liens on Collateral permitted to be sold hereunder.

Section 20.7.    **Credit Bidding**.  The Noteholders hereby irrevocably authorize the Agent, at the direction and authorization of the Required Holders, to credit bid all or any portion of the Note Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Note Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which the Note Parties are subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Note Obligations owed to the Noteholders shall be credit bid by the Agent at the direction of the Required Holders on a ratable basis (with Note Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid (i) the Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Noteholders' ratable interests in the Note Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Holders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Holders contained in Section 16 of this Agreement), (iv) the Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Noteholders, ratably on account of the relevant Note Obligations which were credit bid, interests, whether as equity, partnership, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Noteholder or acquisition vehicle to take any further action, and (v) to the extent that Note Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason, such Note Obligations shall automatically be reassigned to the Noteholders *pro rata* with their original interest in such Note Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Note Obligations shall automatically be cancelled, without the need for any Noteholder or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Note Obligations of each Noteholder are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Noteholder shall execute such documents and provide such information regarding the Noteholder (and/or any designee of the Noteholder which will receive interests in or debt instruments issued by such acquisition vehicle) as the Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

Section 20.8.    **Certain ERISA Matters**.

(a)    Each Noteholder (x) represents and warrants, as of the date such Person became a Noteholder party hereto, to, and (y) covenants, from the date such Person became a Noteholder party hereto to the date such Person ceases being a Noteholder party hereto, for the benefit of the Noteholders and their

respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Note Parties, that at least one of the following is and will be true:

(i)      such Noteholder is not using "plan assets" (within the meaning of the ERISA Plan Asset Regulations) of one or more "benefit plan investors" (within the meaning of Section 3(42) of ERISA) in connection with the exchange of the Notes,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Noteholder's entrance into, participation in, administration of and performance of the Notes and this Agreement, and the conditions for exemptive relief thereunder are and will continue to be satisfied in connection therewith,

(iii)      (A) such Noteholder is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Noteholder to enter into, participate in, administer and perform the Notes and this Agreement, (C) the entrance into, participation in, administration of and performance of the Notes and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Noteholder, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Noteholder's entrance into, participation in, administration of and performance of the Notes and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Agent in its sole discretion and such Noteholder.

In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Noteholder or (2) a Noteholder has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Noteholder further (x) represents and warrants for the benefit of, the Agent and not, for the avoidance of doubt, to or for the benefit of the Note Parties, as of the date such Person became a Noteholder party hereto, to, and (y) covenants, from the date such Person became a Noteholder party hereto to the date such Person ceases being a Noteholder party hereto, for the benefit of, the Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Note Party, that the Agent is not a fiduciary with respect to the assets of such Noteholder involved in such Noteholder's entrance into, participation in, administration of and performance of the Notes and this Agreement (including in connection with the reservation or exercise of any rights by the Agent under this Agreement, any Note Document or any documents related hereto or thereto).

Section 20.9.   Erroneous Payment.

(a)      Each Noteholder hereby agrees that (i) if the Agent notifies such Noteholder that the Agent has determined in its sole discretion that any funds received by such Noteholder from the Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Noteholder (whether or not known to such Noteholder) (whether as a payment,

prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "**Erroneous Payment**") and demands the return of such Erroneous Payment (or a portion thereof), such Noteholder shall promptly, but in no event later than one Business Day thereafter, return to the Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Noteholder to the date such amount is repaid to the Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Noteholder shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payments received, including, without limitation, waiver of any defense based on "discharge for value" or any similar theory or doctrine. A notice of the Agent to any Noteholder under this clause (a) shall be conclusive, absent manifest error.

(b) Without limiting immediately preceding clause (a), each Noteholder hereby further agrees that if it receives a payment from the Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Agent, (y) that was not preceded or accompanied by notice of payment, or (z) that such Noteholder otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each case, if an error has been made each such Noteholder is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment, and to the extent permitted by applicable law, such Noteholder shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar theory or doctrine. Each Noteholder agrees that, in each such case, it shall promptly (and, in all events, within three (3) Business Days of its knowledge (or deemed knowledge) of such error) notify the Agent of such occurrence and, upon demand from the Agent, it shall promptly, but in all events no later than three (3) Business Days thereafter, return to the Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Noteholder to the date such amount is repaid to the Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c) The Company hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Noteholder that has received such Erroneous Payment (or portion thereof) for any reason (and without limiting the Agent's rights and remedies under this Section 20.9), the Agent shall be subrogated to all the rights of such Noteholder with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Note Obligations owed by the Company or any other Note Party.

(d) In addition to any rights and remedies of the Agent provided by law, Agent shall have the right, without prior notice to any Noteholder, any such notice being expressly waived by such Noteholder to the extent permitted by applicable law, with respect to any Erroneous Payment for which a demand has been made in accordance with this Section 20.9 and which has not been returned to the Agent, to set off and appropriate and apply against such amount any and all amounts owing to or for the credit or the account of such Noteholder under the Note Documents. Agent agrees promptly to notify the Noteholder after any such setoff and application made by Agent; provided, that the failure to give such notice shall not affect the validity of such setoff and application.

(e)     Each party's obligations under this Section 20.9 shall survive the resignation or replacement of the Agent or the Collateral Agent or the repayment, satisfaction or discharge of all Note Obligations (or any portion thereof) under any Note Document.

Section 20.10.  **Indemnification of Agents.** Each Noteholder agrees to indemnify each of the Agent and the Collateral Agent and their respective Related Parties (collectively, the "**Agent Indemnitees**") (to the extent not reimbursed by the Company in accordance with Section 22.3 or otherwise), ratably according to the respective pro rata shares (determined as of the time that the applicable indemnity payment is sought (or, if such indemnity is sought after the date upon which the principal of the Notes shall have been paid in full, in accordance with such Noteholders' respective pro rata shares as in effect immediately prior to such date)), from and against any and all Indemnified Liabilities and regardless of whether any such Agent Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory, or sole negligence of any Agent Indemnitee; provided, that no Noteholder shall be liable for any portion of such Indemnified Liabilities resulting from such Agent Indemnitee's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable order; provided, further, that no action of the Agent or the Collateral Agent taken in accordance with the directions of the Required Holders (or such other number or percentage of the Noteholders as shall be necessary, or as the Agent or the Collateral Agent shall believe in good faith shall be necessary, under the circumstances as provided in the Note Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 20.10.   Without limitation of the foregoing, the Noteholders shall reimburse the Agent and the Collateral Agent (to the extent not reimbursed by the Company in accordance with Section 14 or otherwise) ratably according to their respective pro rata shares (determined as of the time that the applicable expense reimbursement is sought (or, if such reimbursement is sought after the date upon which the principal of the  Notes shall have been paid in full, in accordance with such Noteholders' pro rata shares as in effect immediately prior to such date)) for all costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by the Agent and the Collateral Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Note Document, or any document contemplated by or referred to herein.   Each Noteholder hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Noteholder under any Note Document or otherwise payable by the Agent or the Collateral Agent to such Noteholder from any source against any amount due to the Agent or the Collateral Agent or any of its Related Parties under this Section 20.10.     For purposes hereof, "*pro rata* share" shall mean, with respect to any Noteholder at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the aggregate outstanding principal amount of the Notes of such Noteholder at such time, and the denominator of which is the aggregate outstanding principal amount of the Notes of all Noteholders at such time. The agreements in this Section 20.10 shall survive the payment in full of the Notes, the resignation or removal of the Agent or the Collateral Agent, and the termination of this Agreement. All amounts due under this Section 20.10 shall be payable no later than ten (10) Business Days after demand therefor, to the extent not reimbursed by the Company in accordance with Section 22.3 or otherwise.

## SECTION 21   [RESERVED].

## SECTION 22   MISCELLANEOUS.

Section 22.1.    **Successors and Assigns**.  All covenants and other agreements contained in this Agreement by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and assigns (including, without limitation, any subsequent Noteholder) whether so expressed or not.  So long as the Notes have not matured (at stated maturity) or have become or declared immediately due and payable pursuant to Section 12.1, no Noteholder may assign a Note or any interest therein to a

Person it knows to be a Competitor.  Noteholders and the Company shall be entitled to rely on representations of transferees for purposes of determining whether such transferee is a competitor.

Section 22.2.    **Accounting Terms**.  All accounting terms used herein which are not expressly defined in this Agreement have the meanings respectively given to them in accordance with GAAP.  Except as otherwise specifically provided herein, (i) all computations made pursuant to this Agreement shall be made in accordance with GAAP, and (ii) all financial statements shall be prepared in accordance with GAAP.  For purposes of determining compliance with the financial covenants contained in this Agreement, (a) any election by the Company to measure any financial liability using fair value (as permitted by Accounting Standard Codification Topic No. 825-10-25 - Fair Value Option or any similar accounting standard) shall be disregarded and such determination shall be made as if such election had not been made and (b) no effect shall be given to any treatment of Indebtedness in respect of convertible debt instruments under Financial Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value at such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

Section 22.3.    **INDEMNIFICATION**.

(a)      THE NOTE PARTIES AGREE TO INDEMNIFY, DEFEND AND HOLD HARMLESS EACH INDEMNIFIED PARTY FROM AND AGAINST ALL CLAIMS ARISING OUT OF OR IN CONNECTION WITH (I) THE NOTE DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE NOTE DOCUMENTS, (II) THE ACTUAL OR PROPOSED USE OF THE PROCEEDS FROM THE ISSUANCE OF THE NOTES, (III) THE DIRECT OR INDIRECT RESULT OF THE VIOLATION BY ANY NOTE PARTY OF ANY ENVIRONMENTAL LAW, (IV) THE COMPANY'S GENERATION, MANUFACTURE, PRODUCTION, STORAGE, RELEASE, THREATENED RELEASE, DISCHARGE, DISPOSAL OR PRESENCE IN CONNECTION WITH ITS PROPERTIES OF HAZARDOUS MATERIALS (INCLUDING, WITHOUT LIMITATION, (1) ALL DAMAGES OF ANY USE, GENERATION, MANUFACTURE, PRODUCTION, STORAGE, RELEASE, THREATENED RELEASE, DISCHARGE, DISPOSAL OR PRESENCE, OR (2) THE COSTS OF ANY ENVIRONMENTAL INVESTIGATION, MONITORING, REPAIR, CLEANUP OR DETOXIFICATION AND THE PREPARATION AND IMPLEMENTATION OF ANY CLOSURE, REMEDIAL OR OTHER PLANS), (V) OWNERSHIP OR CONTROL BY THE AGENT, ANY NOTEHOLDER OR THE COLLATERAL AGENT OF ANY PROPERTY FOLLOWING FORECLOSURE UNDER THE SECURITY DOCUMENTS (OR DEED IN LIEU OF FORECLOSURE OR THE COLLATERAL AGENT OTHERWISE CONTROLLING THE APPLICABLE ASSET IN QUESTION), TO THE EXTENT SUCH CLAIMS ARISE OUT OF OR RESULT FROM ANY HAZARDOUS MATERIALS, LOCATED IN, ON OR UNDER SUCH PROPERTY PRIOR TO OR AT THE TIME OF SUCH FORECLOSURE (OR DEED IN LIEU OF FORECLOSURE OR THE COLLATERAL AGENT OTHERWISE CONTROLLING THE APPLICABLE ASSET IN QUESTION), INCLUDING CLAIMS WHICH ARE IMPOSED UPON PERSONS UNDER LAWS RELATING TO OR REGULATING HAZARDOUS MATERIALS SOLELY BY VIRTUE OF OWNERSHIP AND ARE NOT ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COLLATERAL AGENT AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NONAPPEALABLE JUDGMENT AND (VI) ANY NOTEHOLDER, THE AGENT OR THE COLLATERAL AGENT BEING DEEMED AN OPERATOR OF ANY SUCH PROPERTY BY A COURT OR OTHER REGULATORY OR ADMINISTRATIVE AGENCY OR TRIBUNAL OR OTHER THIRD PARTY, TO THE EXTENT SUCH CLAIMS ARISE OUT OF OR RESULT FROM ANY HAZARDOUS MATERIALS LOCATED IN, ON OR UNDER SUCH PROPERTY AT OR PRIOR TO ANY FORECLOSURE THEREON (OR DEED IN LIEU OF FORECLOSURE OR THE COLLATERAL AGENT OTHERWISE CONTROLLING THE APPLICABLE ASSET IN QUESTION) UNDER THE

SECURITY DOCUMENTS AND ARE NOT ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COLLATERAL AGENT AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NONAPPEALABLE JUDGMENT (ALL OF THE FOREGOING, COLLECTIVELY, THE "**INDEMNIFIED LIABILITIES**").

(b)    THE NOTE PARTIES AGREE NOT TO ASSERT ANY CLAIM AGAINST ANY INDEMNIFIED PARTY ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES ARISING OUT OF OR OTHERWISE RELATING TO THE NOTE DOCUMENTS, ANY OF THE TRANSACTIONS CONTEMPLATED BY THE NOTE DOCUMENTS OR THE ACTUAL OR PROPOSED USE OF THE PROCEEDS OF THE ISSUANCE OF THE NOTES. IN NO EVENT SHALL THE AGENT NOR THE COLLATERAL AGENT BE RESPONSIBLE OR LIABLE FOR SPECIAL, INDIRECT, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE OF ANY KIND WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFIT) IRRESPECTIVE OF WHETHER SUCH AGENT HAS BEEN ADVISED OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE AND REGARDLESS OF THE FORM OF ACTION.

(c)    EACH INDEMNIFIED PARTY SHALL BE INDEMNIFIED UNDER THIS SECTION 22.3 FOR ITS OWN ORDINARY NEGLIGENCE; HOWEVER, NO NOTE PARTY IS OBLIGATED TO INDEMNIFY ANY INDEMNIFIED PARTY UNDER THE NOTE DOCUMENTS TO THE EXTENT A CLAIM IS FOUND IN A FINAL, NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)    IN THE CASE OF AN INVESTIGATION OR LITIGATION TO WHICH THE INDEMNITY IN THIS SECTION 22.3 APPLIES, SUCH INDEMNITY SHALL BE EFFECTIVE WHETHER OR NOT (I) SUCH INVESTIGATION OR LITIGATION IS BROUGHT BY A NOTE PARTY, ITS DIRECTORS, MEMBERS OR CREDITORS, (II) AN INDEMNIFIED PARTY OR ANY OTHER PERSON OR ANY INDEMNIFIED PARTY IS OTHERWISE A PARTY THERETO, AND (III) THE TRANSACTIONS CONTEMPLATED BY THE NOTE DOCUMENTS ARE CONSUMMATED.

(e)    FOR PURPOSES OF THIS SECTION 22.3 (I) "**INDEMNIFIED PARTY**" MEANS EACH NOTEHOLDER, THE AGENT, THE COLLATERAL AGENT AND THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ADVISORS, SUCCESSORS AND ASSIGNS, AND (II) "**CLAIM**" MEANS ANY AND ALL CLAIMS, DAMAGES, LOSSES, LIABILITIES, PENALTIES, COSTS, OBLIGATIONS, ACTIONS, JUDGMENTS, LITIGATION, INVESTIGATIONS, AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' AND PARALEGAL FEES AND EXPENSES, WHETHER OR NOT SUIT IS FILED) INCURRED BY, ASSERTED AGAINST OR AWARDED AGAINST ANY INDEMNIFIED PARTY.

(f)    THE INDEMNITY SET OUT IN THIS SECTION 22.3 AND ITS TERMS AND PROVISIONS SHALL SURVIVE THE SATISFACTION AND PAYMENT OF THE OBLIGATIONS UNDER THE NOTE DOCUMENTS AND THE TERMINATION OF THIS AGREEMENT.

(g)    AMOUNTS PAYABLE UNDER THIS SECTION 22.3 SHALL BE A PART OF THE OBLIGATIONS UNDER THE NOTE DOCUMENTS AND, IF NOT PAID UPON DEMAND, SHALL BEAR INTEREST AT THE DEFAULT RATE APPLICABLE TO THE NOTES (WHETHER OR NOT THE NOTES ARE THEN OUTSTANDING) UNTIL PAID.

**Section 22.4.    Severability**.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 22.5.    Construction, etc**.  Each covenant contained herein shall be construed (absent express provision to the contrary) as being independent of each other covenant contained herein, so that compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with any other covenant.  Where any provision herein refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.

**Section 22.6.    Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.  Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.  The words "execution," "signed," "signature," and words of like import used in this Amendment will be deemed to include electronic signatures or the keeping of records in electronic form, each of which will be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**Section 22.7.    Governing Law**.  This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

**Section 22.8.    Jurisdiction and Process; Waiver of Jury Trial**.

(a)    The Note Parties irrevocably submit to the exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, and any appellate court therefrom, over any suit, action or proceeding arising out of or relating to this Agreement, the Notes or, except as otherwise required by applicable law, any other Note Document.  To the fullest extent permitted by applicable law, the Note Parties irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(b)    The Company consents to process being served by or on behalf of any Noteholder in any suit, action or proceeding of the nature referred to in Section 22.8(a) by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, return receipt requested, to it at its address specified in Section 17 or at such other address of which such holder shall then have been notified pursuant to said Section.  The Company agrees that such service upon receipt (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by applicable law, be taken and held to be valid personal service upon and personal delivery to it.  Notices hereunder shall be conclusively presumed received as evidenced by a delivery receipt furnished by the United States Postal Service or any reputable commercial delivery service.

(c)     Nothing in this Section 22.8 shall affect the right of any Noteholder to serve process in any manner permitted by law, or limit any right that any Noteholder may have to bring proceedings against the Company in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

(d)     THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THEREWITH.

**Section 22.9.    Press Release; Public Offering Materials**.  No Note Party shall, nor shall any Note Party permit any of its Affiliates to, disclose the name of the Collateral Agent, the Agent, the Noteholders, or any Noteholder, or use the name or logo "American International Group, Inc.", "AIG", "AIG Commercial Asset Finance" or any derivative of the foregoing, "Prudential", "Prudential Financial, Inc.", "Prudential Private Capital Group", "PGIM, Inc." or any derivative of the foregoing in any press release or in any prospectus, proxy statement or other materials filed with any governmental entity relating to a public offering of the Securities of the Company, except as may be required by law, subpoena or judicial or similar order.  Neither any Noteholder nor the Agent nor the Collateral Agent shall, nor shall the Agent, the Collateral Agent or any Noteholder permit any of its Affiliates to, issue any press release or other public publication in connection with this Agreement or the other Note Documents without the prior written approval of the Note Parties.

**Section 22.10.    Acknowledgment Regarding Any Supported QFCs**.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Contracts or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York or of the United States or any other state of the United States):

(a)     In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

(b)     As used in this Section 22, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following:

> (i)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b)

> (ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

> (iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

**Section 22.11.   Acknowledgment and Consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

> (a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an Affected Financial Institution; and

> (b)    the effects of any Bail-in Action on any such liability, including, if applicable:

> > (i)    a reduction in full or in part or cancellation of any such liability;

> > (ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

> > (iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

**Section 22.12.   Tax Treatment**.

> (a)    All parties hereto shall treat the Notes as debt for U.S. federal and applicable state and local income tax purposes and as contingent payment debt instruments ("**CPDI's**") and shall not take any inconsistent position.  The Company in consultation with the Noteholders will make a determination as to whether either the Exchanged Debt or the Notes are publicly traded and as such, whether the noncontingent bond method or the bifurcation method applies.

If either the Exchanged Debt or the Notes are treated as publicly traded and the noncontingent bond method applies, the Company in consultation with the Noteholders will determine the comparable yield of such

Notes and create a projected payment schedule that will be used to determine the Noteholder's interest accruals and adjustments. The Noteholders agree to report interest accruals and adjustments on the Notes in accordance with the Company's determination in accordance with this Section 22.12 of both the comparable yield and projected payment schedule for the notes and to be bound by the Company's application of the U.S. Treasury Regulations that govern CPDIs. For this purpose, the comparable yield and projected payment schedule for the Notes may be obtained by contacting the Company as set forth in Section 17 hereof,

(b)      If neither the Exchanged Debt nor the Notes are treated as publicly traded and the bifurcation method applies, the Notes will be treated as separate components (consisting of the noncontingent portion with an issue price equal to the stated principal amount of the Notes, and the contingent portions). The Noteholders may obtain information regarding the Company's reporting of the noncontingent and contingent portions by contacting the Company as set forth in Section 17 hereof.

(c)      The parties hereto acknowledge and agree that Holdings is a continuation of the Company for purposes of Section 708 of the Code and any comparable or analogous provision of state or local law, and the Note Parties shall not take any position inconsistent with such treatment.

If you are in agreement with the foregoing, please sign the form of agreement on a counterpart of this Agreement and return it to the Note Parties, whereupon this Agreement shall become a binding agreement between you and the Note Parties.

Very truly yours,

NAUTICAL SOLUTIONS, L.L.C.

By: _____
Name: _____
Title: _____

NAUTICAL SOLUTIONS HOLDINGS, LLC

By: _____
Name: _____
Title: _____

**AMERICAN HOME ASSURANCE COMPANY**, as Noteholder

By:_____
Name:
Title:

**CAPITAL ONE, NATIONAL ASSOCIATION**, as Noteholder

By: _____
Name:
Title:

**EAGLESTONE REINSURANCE COMPANY**, as Noteholder

By:_____
Name:
Title:

**JPMORGAN CHASE BANK, N.A.**, as Noteholder

By:_____
Name:
Title:

**PAR U HARTFORD LIFE & ANNUITY COMFORT TRUST**, as Noteholder
By: Prudential Arizona Reinsurance Universal Company, as grantor
By: PGIM, Inc., as investment manager

By:_____
Name:
Title:

SIGNATURE PAGE TO
NOTE EXCHANGE AGREEMENT

**PRUCO LIFE INSURANCE COMPANY**, as Noteholder
By: PGIM, Inc., as investment manager


By: _____
Name:
Title:


**PRUCO LIFE INSURANCE COMPANY OF NEW JERSEY**, as Noteholder
By: PGIM, Inc., as investment manager


By: _____
Name:
Title:


**PRUDENTIAL RETIREMENT GUARANTEED COST BUSINESS TRUST**, as Noteholder
By: The Prudential Insurance Company of America, as grantor
By: PGIM, Inc., as investment manager


By: _____
Name:
Title:


**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**, as Noteholder
By: PGIM, Inc., as investment manager


By: _____
Name:
Title:

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**, as Noteholder
By:  PGIM, Inc., as investment manager


By:_____
Name:
Title:


**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**, as Noteholder
By:  PGIM, Inc., as investment manager


By:_____
Name:
Title:


**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**, as Noteholder
By:  PGIM, Inc., as investment manager


By:_____
Name:
Title:


**THE UNITED STATES LIFE INSURANCE CO. IN THE CITY OF NY**, as Noteholder


By:_____
Name:
Title:


**THE VARIABLE ANNUITY LIFE INSURANCE COMPANY**, as Noteholder


By:_____
Name:
Title:

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Noteholder

By:_____
Name:
Title:

**BANK OF AMERICA, N.A.**, as Noteholder

By:_____
Name:
Title:

**CROSS OCEAN ESS III S.à r.l**, as Noteholder

By:_____
Name:
Title:

By:_____
Name:
Title:

**CROSS OCEAN ESS IV S.a.r.l.**, as Noteholder

By:_____
Name:
Title:

By:_____
Name:
Title:

**CROSS OCEAN GLOBAL SIF (H) S.a.r.l**,

By:_____
Name:
Title:

By:_____
Name:
Title:

**CROSS OCEAN GCD MASTER FUND I (A) LP**

By:_____
Name:
Title:

**CROSS OCEAN USSS MASTER FUND II (A) LP**

By:_____
Name:
Title:

**CROSS OCEAN GLOBAL SIF (A) L.P.**

By:_____
Name:
Title:

**CROSS OCEAN GSS MASTER FUND LP**

By:_____
Name:
Title:

**FIRST HORIZON BANK**, as Noteholder

By: _____
Name:
Title:

**MIDTOWN ACQUISITIONS L.P.**, as Noteholder
By: Midtown Acquisitions GP LLC, it's general
partner

By: _____
Name:
Title:

**HSBC BANK USA, NATIONAL ASSOCIATION**,
as Noteholder

By: _____
Name:
Title:

**SYNOVUS BANK**, as Noteholder

By: _____
Name:
Title:

**AIG BG HOLDINGS LLC**, as Noteholder

By: _____
Name:
Title:

**AIG PROPERTY CASUALTY COMPANY**, as Noteholder

By:_____
Name:
Title:

**AMERICAN GENERAL LIFE INSURANCE COMPANY**, as Noteholder

By:_____
Name:
Title:

**Wilmington Trust, National Association**, as Agent

By: _____

Name:

Title:

**Wilmington Trust, National Association**, as Collateral Agent

By: _____

Name:

Title:

Schedule A

INFORMATION RELATING TO NOTEHOLDERS

| Holder | Exchanged Series A Senior Notes Due 2023 | Exchanged Series B Senior Notes Due 2023 | Exchanged Credit Agreement Claims | New Notes Amount |
|---|---|---|---|---|
| PAR U HARTFORD LIFE & ANNUITY COMFORT TRUST | $2,644,472.06 | -- | -- | $2,090,297.19 |
| PRUDENTIAL RETIREMENT GUARANTEED COST BUSINESS TRUST | $733,768.37 | -- | -- | $580,000.06 |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA | $12,604,832.62 | $66,158,298.34 | $5,181,886.82 | $66,353,521.81 |
| PRUCO LIFE INSURANCE COMPANY OF NEW JERSEY | -- | $6,492,033.66 | -- | $5,131,564.78 |
| PRUCO LIFE INSURANCE COMPANY | -- | -- | $5,181,886.29 | $4,095,971.55 |
| AIG PROPERTY CASUALTY COMPANY | $10,897,549.75 | -- | -- | $8,613,862.07 |
| AMERICAN GENERAL LIFE INSURANCE COMPANY | $98,804,451.59 | -- | -- | $78,099,016.56 |
| AMERICAN HOME | $33,419,152.73 | -- | -- | $26,415,843.82 |

| | | | |
|---|---|---|---|
| ASSURANCE COMPANY | | | |
| EAGLESTONE REINSURANCE COMPANY | $14,530,066.42 | -- | -- | $11,485,149.50 |
| AIG BG HOLDINGS LLC | $29,060,132.86 | -- | -- | $22,970,299.02 |
| THE UNITED STATES LIFE INSURANCE CO. IN THE CITY OF NY | $18,889,086.34 | -- | -- | $14,930,694.35 |
| THE VARIABLE ANNUITY LIFE INSURANCE COMPANY | $69,017,815.44 | -- | -- | $54,554,460.09 |
| JPMORGAN BRANCH | -- | -- | $51,818,865.62 | $40,959,717.69 |
| Wells Fargo Bank, National Association | -- | -- | $51,818,865.56 | $40,959,717.65 |
| Bank of America, N.A. | -- | -- | $39,096,513.66 | $30,903,458.48 |
| MIDTOWN ACQUISITIONS L.P. | -- | -- | $36,509,378.43 | $28,858,482.64 |
| Capital One, National Association | -- | -- | $34,545,910.35 | $27,306,478.41 |
| CROSS OCEAN - Global SIF (A) LP | -- | -- | $29,854,189.96 | $23,597,953.72 |
| First Horizon Bank | -- | -- | $24,182,137.25 | $19,114,534.89 |
| CROSS OCEAN ESS III SARL | -- | -- | $23,649,556.08 | $18,693,561.29 |
| HSBC Bank USA, National Association | -- | -- | $17,272,955.18 | $13,653,239.21 |

Schedule A
(to Note Exchange Agreement)

| | | | | |
|---|---|---|---|---|
| SYNOVUS BANK | -- | -- | $17,272,955.18 | $13,653,239.21 |
| CROSS OCEAN ESS IV SARL | -- | -- | $14,473,442.87 | $11,440,391.97 |
| CROSS OCEAN GSS MASTER FUND LP | -- | -- | $13,474,860.12 | $10,651,071.96 |
| CROSS OCEAN GLBL SIF (H) SARL | -- | -- | $6,288,454.33 | $4,970,647.49 |
| COPM LP-CO GCD MST FD I (A) LP | -- | -- | $5,703,387.26 | $4,508,186.92 |
| COPM LP-Cross Ocean USSS Master Fund II (A) LP | -- | -- | $3,679,769.12 | $2,908,637.67 |
| **Aggregate** | $290,601,328.18 | $72,650,332.00 | $380,005,014.08 | $587,500,000.00 |

Schedule A
(to Note Exchange Agreement)

Claim Calculations

| Noteholders | Total Claim | % Claim |
|---|---|---|
| AIG PROPERTY CASUALTY COMPANY | $10,897,549.75 | 1.4662% |
| AMERICAN GENERAL LIFE INSURANCE COMPANY | $98,804,451.59 | 13.2934% |
| AMERICAN HOME ASSURANCE COMPANY | $33,419,152.73 | 4.4963% |
| EAGLESTONE REINSURANCE COMPANY | $14,530,066.42 | 1.9549% |
| AIG BG HOLDINGS LLC | $29,060,132.86 | 3.9098% |
| THE UNITED STATES LIFE INSURANCE CO. IN THE CITY OF NY | $18,889,086.34 | 2.5414% |
| THE VARIABLE ANNUITY LIFE INSURANCE COMPANY | $69,017,815.44 | 9.2859% |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA | $78,763,130.96 | 10.5970% |
| PAR U HARTFORD LIFE & ANNUITY COMFORT TRUST | $2,644,472.06 | 0.3558% |
| PRUDENTIAL RETIREMENT GUARANTEED COST BUSINESS TRUST | $733,768.37 | 0.0987% |

Schedule A
(to Note Exchange Agreement)

| PRUCO LIFE INSURANCE COMPANY OF NEW JERSEY | $6,492,033.66 | 0.8735% |
|---|---|---|
| Total | $363,251,660.18 | 48.8729% |

| Bank Debt | Total Claim | % Claim |
|---|---|---|
| JPMORGAN BRANCH | $51,818,865.62 | 6.9719% |
| Wells Fargo Bank, National Association | $51,818,865.56 | 6.9719% |
| Bank of America, N.A. | $39,096,513.66 | 5.2602% |
| DV KMP CP MGT LP - MIDTOWN ACQUISITIONS L.P. | $36,509,378.43 | 4.9121% |
| Capital One, National Association | $34,545,910.35 | 4.6479% |
| CROSS OCEAN - Global SIF (A) LP | $29,854,189.96 | 4.0167% |
| First Horizon Bank | $24,182,137.25 | 3.2535% |
| CROSS OCEAN ESS III SARL | $23,649,556.08 | 3.1819% |
| HSBC Bank USA, National Association | $17,272,955.18 | 2.3240% |
| SYNOVUS BANK | $17,272,955.18 | 2.3240% |
| CROSS OCEAN ESS IV SARL | $14,473,442.87 | 1.9473% |

Schedule A
(to Note Exchange Agreement)

| Bank Debt | Total Claim | % Claim |
|---|---|---|
| CROSS OCEAN GSS MASTER FUND LP | $13,474,860.12 | 1.8129% |
| CROSS OCEAN GLBL SIF (H) SARL | $6,288,454.33 | 0.8461% |
| COPM LP-CO GCD MST FD I (A) LP | $5,703,387.26 | 0.7674% |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA | $5,181,886.82 | 0.6972% |
| PRUCO LIFE INSURANCE COMPANY | $5,181,886.29 | 0.6972% |
| COPM LP-Cross Ocean USSS Master Fund II (A) LP | $3,679,769.12 | 0.4951% |
| Total | $380,005,014.08 | 51.1273% |

Schedule A
(to Note Exchange Agreement)

Collateral Agent Contact Information

Wilmington Trust, N.A.
Global Capital Markets - Project Finance
1100 North Market Street, 5th Fl
Wilmington, DE 19890
Attn:  Rafael Miranda
E-Mail: rmiranda1@wilmingtontrust.com
Tel. 845-717-8079

"

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

CK "DI "J qrf kpi u'NNE"

Kuuwgt<"P cwuecrn'Uqpwkqpu."NNE0'

**\*3+ All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**"

"
Vj g''Dcpn'qh'P gy ''[ qtn'O gnnp
**ABA #** 243/222/23:
Ceeqwpv'P wo dgt<'I NC333788"
Hqt 'Hwtvj gt 'Etgf kv'q<'AIG BG HOLDINGS LLC='Ceeqwpv'P q<'503840"
Tghgtgpeg<'**PPN and Prin.**<"&'_____=**Int.**<"&'_____"
"

**\*4+ Payment notices, audit confirmations and related correspondence to:**"

AIG BG Holdings LLC (503840)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas   77019-2155
Attn:  PCG Investment Portfolio Support
Email:  PPGIPS@aig.com

**\*5+ Duplicate payment notices (only) to:**"

Uco g''cu''cdqxg0'

**\*6+ Compliance reporting information to:**"

Uco g''cu''cdqxg0'

**\*7+** P qvg''vq''dg''kuuwgf ''kp''vj g''pgo g''pgg''pco g''qh<'CK "DK "J qrf kpi u'NNE **(Tax ID #:** 30-0578924)"

**\*8+** Vcz 'KF 0'P wo dgt 'hqt 'CK "DK "J qrf kpi u'NNE<'30-0578924"
"

**\*9+ Physical Delivery Instructions:**"
AIG BG Holdings LLC (503840)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas   77019-2155
Ceeqwpv'P co g<'DP [ O "Kpeqo g
Ceeqwpv'P wo dgt<'GLA111566

"                                   "

"

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

CO GT'ECP "I GP GT'CN'NKHG'KP UWTCP EG'EQO RCP [ "

"

Kuuwg<"P cwkecn'Uqnwkqpu."NNE0'

(3) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**"

"

Vj g"Dcpn'qh'P gy '[ qtn'O gnqp

**ABA #** 243/222/23:

Ceeqwpv'P wo dgt<1 NC333788"

Hqt "Hwtvj gt 'Etgf kv'vq<"AMERICAN GENERAL LIFE INS. CO. Physical<"Ceeqwpv'P q<"886623"

Tghgtgpeg<"**PPN and Prin.**<"&'_____"=**Int.**<"&'_____"

"

(4) **Payment notices, audit confirmations and related correspondence to:**"

American General Life Insurance Company (886623)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas   77019-2155
Attn:  PCG Investment Portfolio Support
Email:  PPGIPS@aig.com

(5) **Duplicate payment notices (only) to:**"

Uco g"cu"cdqxg0'

(6) **Compliance reporting information to:**"

Uco g"cu"cdqxg0'

(7) P qvg'vq'dg"kuuwgf 'kp'vj g'pqo kpgg'pco g'qh<'Co gtkecp'I gpgtcn'Nkhg'Kpuwtcpeg'Eqo rcp{ (**Tax ID #:** 25-0598210)"

"

(8) Vcz 'KF 0'P wo dgt'hqt 'Co gtkecp'I gpgtcn'Nkhg'Kpuwtcpeg'Eqo rcp{<25-0598210"

"

(9) **Physical Delivery Instructions:**"

American General Life Insurance Company (886623)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas   77019-2155
Ceeqwpv'Pco g<'DP[ O "Ipeqo g
Ceeqwpv'Pwo dgt<'GLA111566

"

"

"

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

CO GT'KECP "J QO G'CUUWTCP EG'EQO RCP [ "

"

Kuwgt<"P cwlecri'Ujnwkqpu.'NNE0'

(3) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:"**

Vj g"Dcpniqh'P gy '[ qtn'O grqp
**ABA #** 021-000-018
Ceeqwpv'P wo dgt<"GLA111566"
Hqt 'Hwtvj gt 'Etgf kv'vq<AMERICAN HOME ASSURANCE=**Account No:** 554933"
Tghgtgpeg<"**PPN and Prin.**<"&"_____ ="**Int.**<"&"_____ "

(4) **Payment notices, audit confirmations and related correspondence to:"**

American Home Assurance Company (554933)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas  77019-2155
Attn:  PCG Investment Portfolio Support
Email:  PPGIPS@aig.com

(5) **Duplicate payment notices (only) to:"**

Uco g"cu'cdqxg0'

(6) **Compliance reporting information to:"**

Uco g"cu'cdqxg0'

(7) P qvg'vq'dg'kuuwgf 'kp'vj g'pqmo kpgg'pco g'qh<Co gtlecp'J qo g'Cuuwtcpeg'Eqo rcp{ '"(**Tax ID #:** 13-5124990"
"

(8) Vcz "KF 0'P wo dgt 'hqt 'Co gtlecp'J qo g'Cuuwtcpeg'Eqo rcp{ <'13-5124990"
"

(9) **Physical Delivery Instructions:"**

American Home Assurance Company (554933)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas  77019-2155
"

Ceeqwpv'P co g<'BNY Income
Ceeqwpv'P wo dgt<'GLA111566

"
"

"

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

CK 'RTQRGTV[ 'ECUWCNV[ 'EQO RCP[ "

"

Kuuwgt <"P cwkecrl Uqnwkqpu. 'NNE0'

**(3) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**"

Vj g 'Dcpml ql P gy '[ qtn 'O gmqp
**ABA #** 243/222/23:
Ceeqwpv 'P co dgt <'I NC333788"
Hqt 'Hwt vj gt 'Etgf kv 'vq <'CK 'RTQRGTV[ 'ECUWCNV[ 'EQ <'Ceeqwpv 'P q <'776; 25"
Tghgtgpeg <'**PPN and Prin.** <'&'_____'='**Int.** <'&'_____"

**(4) Payment notices, audit confirmations and related correspondence to:**"

"   CK 'Rtqr gtv[ 'Ecuwcnv[ 'Eqo rcp[ '"776; 25+"
"   clq 'CK 'Cuugv 'O cpci go gpv"
"   4; 4; 'Cmgp 'Rctmy c{. 'C58/26"
"   J qwuqp. 'Vgzcu "9923; /4377"
"   Cvp <'REI 'Kpxguvo gpv 'Rqtvhqnq 'Uwr r qtv'
"   Go ckn <'RRI_RUB ckl @eqo "
"

**(5) Duplicate payment notices (only) to:**"

Uco g 'cu 'cdqxg0"

**(6) Compliance reporting information to:**"

Uco g 'cu 'cdqxg0"

**(7) P qvg 'vq 'dg 'kuuwgf 'kp 'vj g 'pqo kpgg 'pco g 'qh <'CK 'Rtqr gtv[ 'Ecuwcnv[ 'Eqo rcp[ (Tax ID #:** 47/333: 9; 3)"
"

**(8) Vcz 'KF 0 P wo dgt 'hqt 'CK 'Rtqr gtv[ 'Ecuwcnv[ 'Eqo rcp[ <'** 47/333: 9; 3"
"

**(9) Physical Delivery Instructions:**"
"
CK 'Rtqr gtv[ 'Ecuwcnv[ 'Eqo rcp[ '"776; 25+"
clq 'CK 'Cuugv 'O cpci go gpv"
4; 4; 'Cmgp 'Rctmy c{. 'C58/26"
J qwuqp. 'Vgzcu ''9923; /4377"

"
Ceeqwpv 'P co g <'DP 'O 'Kpeqo g
Ceeqwpv 'P wo dgt <'I NC333788"

"

"

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

GCI NGUVQP G'TGRP UWT CP EG'EQO RCP [ "

"

Kuuwgt <"P cwlecri'Uqnwkqpu. 'NNE0'

*3+ **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**"

"

Vj g"Dcpni'qh'P gy '[ qtn'O gmp

**ABA #** 243/222/23:

Ceeqwpv'P wo dgt <'I NC333788"

Hqt 'Hwt vj gt 'Etgf kv'q <'EAGLESTONE REINSURANCE ='Ceeqwpv'P q <'554920"

Tghgtgpeg <'**PPN and Prin.**<'&'_____ ='**Int.**<'&'_____ "

"

*4+ **Payment notices, audit confirmations and related correspondence to:**"

Eaglestone Reinsurance Company (554920)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas   77019-2155
Attn:  PCG Investment Portfolio Support
Email:  PPGIPS@aig.com

*5+ **Duplicate payment notices (only) to:**"

Uco g"cu"cdqxg0"

*6+ **Compliance reporting information to:**"

Uco g"cu"cdqxg0"

*7+ P qyg"vq'dg"kuuwgf 'kp 'j g'pqo kpgg 'pco g'qh <'Gci nguqpg 'Tgkpuwtcpeg'Eqo r cp{ (**Tax ID #:** 22-3423217)"

"

*8+ Vcz "KF 0'P wo dgt 'hqt 'Gci nguqpg 'Tgkpuwtcpeg 'Eqo r cp{ <'22-3423217"

"

*9+ **Physical Delivery Instructions:**"
Eaglestone Reinsurance Company (554920)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas   77019-2155
Ceeqwpv'co g <'DP [ O "Ipeqo g
Ceeqwpv'wo dgt <'GLA111566

"

"

# NAUTICAL SOLUTIONS, L.L.C

## INFORMATION RELATING TO NOTEHOLDERS

PCT"WJ CTVHQTF'NKHG'( "CP P WKV['"EQO HQT V'VTWUV"

Kuuwgt <"P cwvkecn'Uqnwvkqpu.'NNE0'

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

Vj g"Dcpm'qh'P gy [ qtm'O gmqp
P gy [ qtm'P [ "

**ABA #** 24322223:
Ceeqwpv'P wo dgt <'46: 5: 8: 622"
Hqt"Hwtvj gt'Etgfkv'vq <"]   _; **Account No:** ] _"
Tghgtgpeg <"**PPN and Prin.**<"&_____  =**Int.**<"&_____

**(2) Payment notices, audit confirmations and related correspondence to:**

RCT"WJ ctvhqtf'Nkhg'( "Cppwkv['Eqo hqtv'Vtwuv"
elq'Rtwfgpvkcn'Rtkxcvg'Ecr kcn'
877'Dtqcf 'Uvtggv'Hnqqt'38U."
P gy [ qtm'P L'29324"
Cwgpvkqp <"O cpci kpi 'Fktgevqt'ó'Eqtr qtcvg'cpf 'Rtqlgev'Y qtmqwu'
ee <'Xkeg'Rtgukf gpv'cpf 'Eqtr qtcvg'Eqwpugn'
er y B r twf gpvkcn.eqo "

cpf 'hqt"cm"pqvkegu'tgncvkpi "uqngn{"vq"uej gf wgf "r tkpekr cn'cpf "kpvgtguv'r c{ o gpvu"vq <

RCT"WJ ctvhqtf'Nkhg'( "Cppwkv['Eqo hqtv'Vtwuv"
elq'RI KO ."Kpe0'
Rtwf gpvkcn'Vqy gt"
877'Dtqcf 'Uvtggv'
38vj 'Hnqqt'/'Uqwvj "Vqy gt"
P gy [ qtm'P L'29324"
Cwgpvkqp <"RKO 'Rtkxcvg'Ceeqwpvkpi 'Rtqeguukpi 'Vgco "
Go ckn<"Rko (Rtkxcvg(Ceeqwpvkpi (Rtqeguukpi 0Vgco B r twf gpvkcn.eqo "

Gz vgtpcn'cwfkv'eqphkto cvkqpu'qh'rqcp'dcncpegu'hqt"vtcpucevkqpu'enqugf "d{ "RRE"uj qwrf "dg"ugpv'vq"vj g"cfftguu"gu+"
qwvrkpgf "dgrqy 0"

**Via e-mail (preferred):**
RRECwfkeqphkto uB r twf gpvkcn.eqo "

**By U.S. Mail:**
RI KO 'Rtkxcvg'Rrcego gpv'Qr gtcvkqpu"
877'Dtqcf 'Uvtggv.'36vj 'Hnqqt'Uqwvj "
O ckrlUvqr '%P L2: /36/97"
P gy [ qtm'P gy 'Lgtug{'29324/72; 8"
Cwp <"RRE'Cwfkv'Eqphkto cvkqp'Eqqtfkpcvqt"

"

"
"

*5+ **Duplicate payment notices (only) to:**"

Uco g'cu'cdqxg0"

*6+ **Compliance reporting information to:**"

Uco g'cu'cdqxg0"

*7+ Pqvg'vq'dg'kuuwgf'kp'vj g'pqmo kpgg'pco g'qh<RCT'WJ ctvhqtf 'Nkhg'( "'Cppwkv{'Eqo hqtv'Vtwuv'(**Tax ID #:** 67/4; 63783)"
"
*8+ Vcz'KF0Pwo dgt'hqt'RCT'WJ ctvhqtf 'Nkhg'( "'Cppwkv{'Eqo hqtv'Vtwuv<67/4; 63783"
"
*9+ **Physical Delivery Instructions:**"

Ugpf 'rj{ukecn'ugewtkv{'d{'pcvkqpy kf g'qxgtpki j v'f gnkxgt{'ugtxkeg'vq<"
"
RI  KO ."Kpe0"
877'Dtqcf 'Uvtggv'"
38\j 'Hnqqt'/"Uqwj "Vqy gt"
Pgy ctm"PL'29324"
Cwgpvkqp<"Vtcf g'O cpci go gpv'O cpci gt"

Ugpf 'eqr{'d{'go cknvq<"
"
Uvghcpkg0 tggtB rtwf gpkcneqo ""
"
cpf "

Rtkxcvg0Fkludtuo gpvuB Rtwf gpkcneqo ""
"
Ceeqwpv'Pco g<'RCT'WJ NCP 'Eqo hqtv'Vtwuv/Rtkxcvgu
Ceeqwpv'Pwo dgt<'46: 5: 8: 622"

"

## NAUTICAL SOLUTIONS, L.L.C

## INFORMATION RELATING TO NOTEHOLDERS

RTWEQ'NHG'KP UWTCP EG'EQO RCP[ 'QH'CO GTKEC"

"

Kuuwgt<'P cwwkecn'Uqnwvkqpu.'NNE0'

**(3)** **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**"

**For existing PPN 63909@AE8 and 63909@AF5**
**JPMorgan Chase Bank**

**ABA # 243222243**
Ceeqwpv'P wo dgt<'R: 83: : "
Hqt'Hwtvj gt'Etgf kv'vq<"]  _; Account No: ]  _"
Tghgtgpeg<"**PPN and Prin.**<"&'_____="**Int.**<"&'_____"

**For existing PPN 63909@AF5 and Sr. Bank Debt**
**JPMorgan Chase Bank**

**ABA # 243222243**
Ceeqwpv'P wo dgt<'R: 84: : '"'
Hqt'Hwtvj gt'Etgf kv'vq<"]  _; **and Bank No:** ]  _"
Tghgtgpeg<"**PPN and Prin.**<"&'_____="**Int.**<"&'_____"

**(4)** **Payment notices, audit confirmations and related correspondence to:**"

"       Vj g'Rtwf gpvkcn'Kpuwtcpeg'Eqo rcp{'qh'Co gtkec"
"       ekq'Rtwf gpvkcn'Rtkxcvg'Ecrkvcn'ó'ERY "
"       Vy q'Rtwf gpvkcn'Rnc| c"
"       3: 2'P 0Uvguvqp'Cxg0'Uwkvg'7822"
"       Ej keci q.'KN'82823"  "
"       Cwp<  O cpagi kpi 'F kgevqt"
"       Ee<'Xkeg'Rtgukf gpv'cpf 'Eqrr qtcvg'Eqwpugn"
"       G/o ckn<"er y B r twf gpvkcn0eqo "

cpf 'hqt'cnn'pqvkegu'tgncvkpi 'uqrgn{'vq'uej gf wngf 'r tkpekrcn'cpf 'kpvgtguv'r c{o gpvu'vq<"

"
Vj g'Rtwf gpvkcn'Kpuwtcpeg'Eqo rcp{'qh'Co gtkec"
ekq'RI KO ."Kpe0"
Rtwf gpvkcn'Vqy gt"
877'Dtqcf 'Uvtggv"
38vj 'Hnqqt'/'Uqwvj 'Vqy gt"
P gy ctm'P L'29324"
Cwgpvkqp<"RKO 'Rtkxcvg'Ceeqwpvkpi 'Rtqeguukpi 'Vgco "
Go ckn<Rko RtkxcvgCeeqwpvkpi Rtqeguukpi 0Vgco B r twf gpvkcn0eqo "

"
Gzrgtrcn'cwf kv'eqphkto cvkqpu' qh'qwt'cppwcn'dcncpegu'hqt'vtcpucevkqpu'enqugf 'd{ 'RRE'uj qwrf 'dg'ugpv'vq'vj g"
cf f tguu'ug+'qwvrkpgf 'dgnqy 0'
"

"

"                "

"

**Via e-mail (preferred):**"

[RREcwf kequphkto uB rtwfgpvkcrfeqo](#) "

                                                                                          "

**By U.S. Mail:**"
RI KO "Rtkxcvg'Rneego gpv'Qrtgtcvkqpu"
877"Dtqcf "Utgggv'36vj "Hnqqt'Uqwj "
O ckn'Uqr '%P L'2: /36/97"
P gy ctm'P gy 'Lgtug{'29324/72; 8"
Cwp<'RRE'C wf k'Eqphkto cvkqp'Eqqtf kpcvqt"

*5+ **Duplicate payment notices (only) to:**"

    Uco g'cu'cdqxg0'

*6+ **Compliance reporting information to:**"

    Uco g'cu'cdqxg0'

*7+ P qyg'vq'dg'kuuwgf 'kp'vj g'pqo kpgg'pco g'qh<'Vj g'Rtwfgpvkcrl'Kpuwtcpeg'Eqo r cp{ 'qh'Co gtkec **(Tax ID #:** 44/3433892)"
    "

*8+ Vcz'KF0P wo dgt'hqt'Vj g'Rtwfgpvkcrl'Kpuwtcpeg'Eqo r cp{ 'qh'Co gtkec<'44/3433892"

*9+ **Physical Delivery Instructions:**"

    Ugpf 'rj {ukecrl'ugewtkv{ 'd{ 'pcvkqpy kf g'qxgtpkj j v'f gnkxgt{ 'ugtxkeg'vq<"
    "
    RI KO ."Kpe0"
    877'Dtqcf "Utgggv"
    38vj 'Hnqqt'/"Uqwj "Vqy gt"
    P gy ctm'P L'29324"
    Cwgpvkqp<'Vtcf g'O cpci go gpv'O cpci gt"
    "
    Ugpf 'eqr {'d{ 'go ckn'vq<"
    "
    Uvghcpkg0Igtt B rtwfgpvkcrfeqo '"
    "
    cpf "
    "
    [Rtkxcvg0Fkxfwtugo gpvB Rtwfgpvkcrfeqo](#) '"
    "
    Hqt'Gzkuvkpi 'RRP '85; 2; B CG: 'cpf '85; 2; B CH7'"

    Ceeqwpv'P co g<'RRUO 'I gpgtcn
    Ceeqwpv'P wo dgt<'R: 83: : "

    Hqt'Gzkuvkpi 'RRP '85; 2; B CH7'cpf 'Ut0Dcpm'Fgdv"

    Ceeqwpv'P co g<'RRUO 'I gpgtcn
    Ceeqwpv'P wo dgt<'R: 84: : "

"                          "

"

## NAUTICAL SOLUTIONS, L.L.C

## INFORMATION RELATING TO NOTEHOLDERS

RTWEQ'NKIG'KPUWTCP EG'EQORCP[ 'QHP'P GY 'LGTUG[ "

"

Kuuwgt<"P cwkecn'Uqnwkqpu."NNE0'

**3+ All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**"

"

LRO qti cp'Ej cug'Dcpm'P C"

P gy '[ qtm'P [ "

**ABA #** 243222243

Ceeqwpv'P wo dgt<'R: 8424"

Hqt'Hwtyj gt'Etgfkv'kq<"]  _; **Account No:** ]  _"

Tghgtgpeg<"**PPN and Prin.**<"&__ =**Int.**<"&"

**4+ Payment notices, audit confirmations and related correspondence to:**"

Rtweq'NKhg'Kpuwtcpeg'Eqo r cp{'qh'P gy 'Lgtug{"

e kq'Rtwf gpvkcn'Rtkxcvg'Ecr kcn'

877'Dtqcf 'Utggv'Hnqqt'38U."

P gy ctm'P L'29324"

Cwgpvkqp<"O cpci kpi 'F kgtgvqt'ó'Eqtr qtcvg'cpf 'Rtqlgev'Y qtmqwu"

ee<'Xkeg'Rtgukf gpv'cpf 'Eqtr qtcvg'Eqwpugn'

e r y B r twf gpvkcn'eqo "

"

cpf 'hqt'cnn'pqvkegu'tgncvkpi 'uqrgn{'vq'uej wf wgf 'r tkpekr cn'cpf 'kpvgtguv'r c{ o gpu'vq<"

"

Rtweq'NKhg'Kpuwtcpeg'Eqo r cp{'P gy 'Lgtug{"

e kq'RI KO ."Kpe0'

Rtwf gpvkcn'Vqy gt"

877'Dtqcf 'Utggv'

38yj 'Hnqqt'/'Uqwvj 'Vqy gt"

P gy ctm'P L'29324"

Cwgpvkqp<"RKO 'Rtkxcvg'Ceeqwpvkpi 'Rtqeguukpi 'Vgco "

Go ckn<"RIM 0Rtkxcvg0Ceeqwpvkpi 0Rtqeguukpi 0Vgco B r twf gpvkcn0eqo "

"

Gzvgtpcncwf kv'eqphkto cvkqpu'qh'mjcp'dcncpeg'hqt'vtcpucevkqpu'enqugf 'd{ 'RRE'uj qwf 'dg'ugpv'vq'vj g'cf f tguu'#gu+'

qwvkpgf 'dgnqy 0'

"

**Via e-mail (preferred):**"

RREcwf keqphko to uB r twf gpvkcn0eqo "

"

**By U.S. Mail:**"

RI KO 'Rtkxcvg'Rncego gpv'Qr gtcvkqpu"

877'Dtqcf 'Utggv.'36yj 'Hnqqt'Uqwj "

O ckn'Uvqr '%P L'2: /36/97"

P gy ctm'P gy 'Lgtug{ '29324/72; 8"

Cwp<"RRE'Cwf kv'Eqphko cvkqp'Eqqtf kpcvqt"

"

"

**5+ Duplicate payment notices (only) to:**"

Uco g"cu"cdqxg0"

**6+ Compliance reporting information to:**"

Uco g"cu"cdqxg0"

**7+** P qvg"vq"dg"kuuwgf "kp"\j g"pqo kpgg"cco g"qh"Rtweq"Nkhg"Kpuwtcpeg"Eqo r cp{"qh"P gy "Lgtug{ **(Tax ID #:**
44/46482; 3)"
"

**8+** Vcz"KF 0"P wo dgt"hqt"\Rtweq"Nkhg"Kpuwtcpeg"Eqo r cp{"qh"P gy "Lgtug{ **:** 44/46482; 3"

**9+ Physical Delivery Instructions:**"

Ugpf "r j {ukecn"ugewtkv{"d{ "pcvkqpy kfg"qxgtpki j v"fgnkxgt{ "ugtxkeg"vq<"
"
RI  KO ."Kpe0"
877"Dtqcf "Uvtggv"
38vj "Hnqqt"/"Uqwvj "Vqy gt"
P gy ctm"P L"29324"
Cwgpvkqp<"Vtcf g"O cpci go gpv"O cpci gt"
"
Ugpf "eqr { "d{ "go ckn"vq<"
"
Uugfcpkg0 tggtB r twf gpvkcn0eqo  "
"
cpf "
"
Rtkxcvg0F kudwtugo gpvuB Rtwf gpvkcn0eqo  "
"
Ceeqwpv"P co g<"RTWEQ"Nkhg"qh"P gy "Lgtug{ "Rtkxcvg"Rncego gpv"
Ceeqwpv"P wo dgt<"R: 8424"

"

"                    "

## NAUTICAL SOLUTIONS, L.L.C

## INFORMATION RELATING TO NOTEHOLDERS

RTWF GP VKCN'T GVKTGO GP V'I WCTCP VGGF 'EQVU'DWUKP GUU'VT WUV'

Kuuvgr<'P cwVkccrn'Uqnwvkqpu.'NNE'0'

**(3)  All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:"**

IRO qti cp'Ej cug'Dcpm'P C"
P gy '[ qtm'P [ "

**ABA #** 243222243
Ceeqwpv'P wo dgr<'I 2; ; 88"
Hqt'Hwtvj gr'Etgf kv'q<"] _**; Account No:** ] _"
Tghgtgpeg<"**PPN and Prin.**<'&'_____=**Int.**<'&'_____"

**(4)  Payment notices, audit confirmations and related correspondence to:**

Rtwf gpvkcrn'Tgvktgo gpv'I wctcpvggf 'Equv'Dwukpguu'Vtwuv'
e kq'Rtwf gpvkcrn'Rtkxcvg'Ecr kcrn'
877'Dtqcf 'Uvtggv'Hnqqt'38U'
P gy ctm'P L'29324"
Cwgpvkqp<'O cpci kpi 'F kgevqr'ó'Eqtr qtcvg'cpf 'Rtqlgev'Y tmqwu'
ee<'Xkeg'Rtgukf gpv'cpf 'Eqtr qtcvg'Eqwpugn'
er y B rtwf gpvkcrneqo '

cpf 'hqt'cnn'pqvkegu'tgncvkpi 'uqmgn[ 'vq'uej wf wgf 'r tkpekr crn'cpf 'kpvgtguv'r c{o gpvu'vq<

Rtwf gpvkcrn'Tgvktgo gpv'I wctcpvggf 'Equv'Dwukpguu'Vtwuv'
e kq'RI O .'Kpe0'
Rtwf gpvkcrn'Vqy gr"
877'Dtqcf 'Uvtggv'
38vj 'Hnqqt'/'Uqwvj 'Vqy gr"
P gy ctm'P L'29324"
Cwgpvkqp<'RIO 'Rtkxcvg'Ceeqwpvkpi 'Rtqeguukpi 'Vgco '
Go ckn<Rko (Rtkxcvg(Ceeqwpvkpi (Rtqeguukpi (Vgco B rtwf gpvkcrneqo '

Gzvgtpcrn'cwf kv'eqphkto cvkqpu'qh'nqcp'dcncpegu'hqt'vtcpucevkqpu'enqugf 'd{ 'RRE'uj qwnf 'dg'ugpv'vq'vj g'cf f tguu'gu+'
qwvnkpgf 'dgnqy 0'

**Via e-mail (preferred):**
RREcwf keqphkto uB rtwf gpvkcrneqo '

**By U.S. Mail:**
RI O 'Rtkxcvg'Rncego gpv'Qr gtcvkqpu'
877'Dtqcf 'Uvtggv'36vj 'Hnqqt'Uqwvj '
O ckn'Uqr '%P L'2: /36/97'
P gy ctm'P gy 'Lgtug{ '29324/72; 8'
Cwp<'RRE'Cwf kv'Eqphkto cvkqp'Eqqtf kpcvqr'

"

"

**\*5+ Duplicate payment notices (only) to:**"

Uco g'cu'cdqxg0"

**\*6+ Compliance reporting information to:**"

Uco g'cu'cdqxg0'

\*7+ Pqyg'vq'dg'kuuwgf'kp'vjg'pqok pgg'pco g'qh<'Rtwf gpvkcn'Tgvktgo gpv'I wctcpvggf 'Equv'Dwukpguu'Vtwuv **(Tax ID #:** 28/3272256)"

"

\*8+ Vcz'KF 0'Pwo dgt'hqt'Rtwf gpvkcn'Tgvktgo gpv'I wctcpvggf 'Equv'Dwukpguu'Vtwuv<28/3272256"

**\*9+ Physical Delivery Instructions:**"

Ugpf 'rj {ukecn'ugewtkv{'d{'pcvkqpy kf g'qxgtpki jv'f gnkxgt{'ugtxkeg'vq<'

"

RI KO .'Kpe0'

877'Dtqcf 'Uvtggv'

38\j 'Hqqt'/'Uqwj 'Vqy gt'

Pgy ctm'PL'29324"

Cwgpvkqp<'Vtcf g'O cpci go gpv'O cpci gt"

"

Ugpf 'eqr {'d{ 'go ckn'vq<'

"

Ughcpkg0 tggtB rtwf gpvkcn0eqo '"

"

cpf '

"

Rtkxcvg0Fkudwtugo gpvuB Rtwf gpvkcn0eqo '"

"

Ceeqwpv'Pco g<'RTWI E'Vtwuv'Rtkxcvgu

Ceeqwpv'Pwo dgt<'I 2;;88"

"

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

VJ'G'RTWFGP VKCN'KP UWTCP EG'EQO RCP[  "

"

Kuuwgt<"P cwkicn'Uqnwkqpu."NNE0'

**(3)** **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**"

"
LRO qti cp'Ej cug'Dcpm'P C"
P gy '[ qtm'P [  "

**ABA #** 243222243
Ceeqwpv'P wo dgt<'R: 84: : "
Hqt'Hwtyj gt'Etgfkv'q<"]  _; **Account No:** ]  _"
Tghgtgpeg<"**PPN and Prin.**<"&'__=**Int.**<"&'

**(4)** **Payment notices, audit confirmations and related correspondence to:**"

Vj g'Rtwfgpvkcn'Kpuwtcpeg'Eqo rcp{'"
e1q'Rtwfgpvkcn'Rtkxcvg'Ecrkcn'
877'Dtqcf "Uvtggv'Hqqt'38U."
P gy ctm'P L'29324"
Cwgpvkqp<"O cpcikpi'Fktgevqt'ö'Eqtrqtcvg'cpf 'Rtqlgev'Y qtmqwu"
ee<"Xleg'Rtgukfgpv'cpf 'Eqtrqtcvg'Eqwpugn'
er y B  rtwfgpvkcn0eqo  "

"

cpf 'hqt'cnn'pqvkegu'tgncvkpi 'uqrgn'"q'uej gf wngf 'rtkpekrcn'cpf 'kpvgtguv'rc{o gpvu'"q<"

"

Vj g'Rtwfgpvkcn'Kpuwtcpeg'Eqo rcp{'"
e1q'RI  IO ."Kpe0'
Rtwfgpvkcn'Vqy gt"
877'Dtqcf "Uvtggv'
38yj "Hqqt'/"Uqwj 'Vqy gt"
P gy ctm'P L'29324"
Cwgpvkqp<"RIO 'Rtkxcvg'Ceeqwpvu 'Rtqeguukpi 'Vgco  "
Go ckn<"Rlo (Rtkxcvg(Ceeqwpvu (Rtqeguukpi 0Vgco B  rtwfgpvkcn0eqo  "

"

Gzvgtpcn'cwf kv'eqphko cvkqpu'qh'mqcp'dcncpegu'hqt'vtcpucevkqpu'enqugf 'd{'RRE 'uj qwf 'dg'ugpv'"q'"vj g'cf f tguu'gu+"
qwvkpgf 'dgmqy 0'

"

**Via e-mail (preferred):**"

RRE.cwf kceqphko u0uB  rtwfgpvkcn0eqo  "

"

**By U.S. Mail:**"

RI  IO 'Rtkxcvg'Rrcego gpv'Qr gtcvkqpu'
877'Dtqcf "Uvtggv'"36yj "Hqqt'Uqwj '
O ckn'Uqr '%P L'2: /36/97'
P gy ctm'P gy 'Lgtug{'29324/72; 8"
Cwp<"RRE 'Cwf kv'Eqphko cvkqp 'Eqqtf kpcvqt"

"

"

"

"

"

*5+ **Duplicate payment notices (only) to:**"

    Uco g"cu"cdqxg0"

*6+ **Compliance reporting information to:**"

    Uco g"cu"cdqxg0"

*7+ P qvg"vq"dg"kuuwgf "kp"\j g"pqo kpgg"pco g"qh-"Vj g"Rtwf gpvkcn"Kpuwtcpeg"Eqo r cp{"(**Tax ID #:** 44/
3433892)"
    "

*8+ Vcz"KF 0P wo dgt"hqt"Vj g"Rtwf gpvkcn"Kpuwtcpeg"Eqo r cp{<"44/3433892"
    "

*9+ **Physical Delivery Instructions:**"

    Ugpf "r j {ukecn"ugewtkv{"'d{"pcvkqpy kf g"qxgtpki j v"f gnkxgt{"ugtxkeg"vq<"
    "
    RI  KO ."Kpe0"
    877"Dtqcf "Uvtggv"
    38yj "Hqqt"/"Uqwj "Vqy gt"
    P gy ctm'P L'29324"
    C wgpvkqp<"Vtcf g"O cpci go gpv'O cpci gt"
    "
    Ugpf "eqr {"d{"go ckn'vq<"
    "
    Uygfcrpkg0 tggtB r twf gpvkcnfeqo ""
    "
    cpf "
    "
    <u>Rtkxcvg0F kudwtugo gpvuB Rtwf gpvkcnfeqo </u> ""
    Ceeqwpv'P co g<"RRUO "I gpgtcn
    Ceeqwpv'P wo dgt<'R: 84: : "

"

"               "

"

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

VJ G'WP KVGF "UVCVGU"NKHG'KP UWT CP EG'EQO RCP [ "KP "VJ G"EKV[ "QH'P GY "[ QTM"

"

Kuuwgt <"P cwkecn'Uqnwkqpu. "NNE0'

**⁋3+ All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**"

"

IRO qti cp'Ej cug'Dcpm'P C0'

**ABA #** 243/222/243

Ceeqwpv'P wo dgt <"780153941"

Hqt 'Hwtvj gt 'Etgfkv'vq <"THE U.S. LIFE INSURANCE CO.; Ceeqwpv'P q<'R'8: 645"

Tghgtgpeg <"**PPN and Prin.**<"&'_____='**Int.**<"&'_____"

"

**⁋4+ Payment notices, audit confirmations and related correspondence to:**"

The United States Life Insurance Company in the City of New York (P 68423)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas  77019-2155
Attn:  PCG Investment Portfolio Support
Email:  PPGIPS@aig.com

**⁋5+ Duplicate payment notices (only) to:**"

Uco g'cu'cdqxg0'

**⁋6+ Compliance reporting information to:**"

Uco g'cu'cdqxg0'

**⁋7+** P qvg'vq'dg'kuuwgf 'kp'vj g'pqo kpgg'pco g'qh<'The United States Life Insurance Company in the City of New York (**Tax ID #:**13-5459480)"

"

**⁋8+** Vcz 'KF 0'P wo dgt 'hqt 'The United States Life Insurance Company in the City of New York<'13-5459480"

**⁋9+ Physical Delivery Instructions:**"

The United States Life Insurance Company in the City of New York (P 68423)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas  77019-2155
Ceeqwpv'P co g<'AIG PHYSICAL WIRE ACCOUNT
Ceeqwpv'P wo dgt <'780153941

"                                         "

"

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

Vj g"XCTKCDNG"CP P WKV["NKHG"KP UWTCP EG"EQO RCP["

"

Kuuwgt<"Pcwiaecri"Uqnwiqpu."NNE0"

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**"

"

Vj g"Dcpmiqh"P gy "[ qtni"O gmqp
**ABA #** 243/222/23:
Ceeqwpv"P wo dgt<"1 NC333788"
Hqt "Hwtvj gt "Etgf kv"q<"VARIABLE ANNUITY LIFE INSURANCE CO.; Ceeqwpv"P q<"260735"
Tghgtgpeg<"**PPN and Prin.**<"&"_____=**Int.**<"&"
"

**(2) Payment notices, audit confirmations and related correspondence to:**"

The Variable Annuity Life Insurance Company (260735)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas  77019-2155
Attn:  PCG Investment Portfolio Support
Email:  PPGIPS@aig.com

**(3) Duplicate payment notices (only) to:**"

Uco g"cu"cdqxg0

**(4) Compliance reporting information to:**"

Uco g"cu"cdqxg0

**(5)** P qvg"vq"dg"kuuwgf "kp"vj g"pqo kpgg"pco g"qh<"The Variable Annuity Life Insurance Company (**Tax ID #:**74-1625348)"
"

**(6)** Vcz "KF 0P wo dgt "hqt "The Variable Annuity Life Insurance Company<74-1625348"
"

**(7) Physical Delivery Instructions:**"
The Variable Annuity Life Insurance Company (260735)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas  77019-2155
Ceeqwpv"P co g<"BNYM Income
Ceeqwpv"P wo dgt<"GLA111566

"

"

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

JPMORGAN CHASE BANK, N. A

Issuer:  Nautical Solutions, L.L.C.

(1) <u>**All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**</u>

**ABA #** 021000021
Account Number: 9008109962C3872
For Further Credit to:  [n/a]**; Account No:**  [n/a]
Reference:  **PPN and Prin.**: $_____; **Int.**: $_____

(2) <u>**Payment notices, audit confirmations and related correspondence to:**</u>

CLS Non Agented Servicing Team, Mail ID 12143076874@tls.ldsprod.com , Contact No -+91-806-790-5009, Fax- 121-4307-6874 – (To be used for sending Interest, Fees and Funding notices)

Kelsey R Box (kelsey.r.box@chase.com), Matthew H Massie( Matthew.Massie@jpmorgan.com) – (To be used for audit confirmations and related correspondence)

(3) <u>**Duplicate payment notices (only) to:**</u>

[n/a]

(4) <u>**Compliance reporting information to:**</u>

<u>**JPMorgan Chase NA, Credit contacts for**</u> Nautical Solutions, L.L.C as follows,

Kelsey R Box (kelsey.r.box@chase.com), Matthew H Massie( Matthew.Massie@jpmorgan.com)

(5) Note to be issued in the nominee name of:  [JPMorgan Chase Bank, N.A.] **(Tax ID #:**  13-4994650**)**

(6) Tax I.D. Number for [JPMorgan Chase Bank, N.A.]:  [13-4994650]

(7) <u>**Physical Delivery Instructions:**</u>

[Overnight delivery only FedEx / UPS – please email if more information needed – kelsey.r.box@chase.com]

JPMorgan Chase Bank, N.A.
Attn: Kelsey Box
201 St. Charles Ave, 28th Floor
New Orleans, LA 70170

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

Y gmu'Hcti q'Dcpm'P (C0'

Kuuwgt<"P cwlecri'Uqnwkqpu."NNC0'

**(1)** __All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:__ Wells Fargo Bank, National Association"

**Denver WLS**
**ABA #121000248**
Ceeqwpv'P wo dgt<**00029694050720**""
Hqt'Hwtvj gt'Etgf kv'\q<P cwlecri'Uqnwkqpu; **Account No:**  9: 4: : 7: 9: 3"
Tghgtgpeg<**PPN and Prin.**<"&'_____'"="**Int.**<"&'_____"

**(2)** __Payment notices, audit confirmations and related correspondence to:__"

O ctrgpg"Tkgd"
3922"Nkpeqrp"Uv"
F gpxgt"EQ"; 2425"
Hcz<: 88/48/ /: 553"
Go ckn<'F GP NP UXO go dgt P qvleguB y gmihcti q0eqo "

**(3)** __Duplicate payment notices (only) to:__"

O ctrgpg"Tkgd"
3922"Nkpeqrp"Uv"
F gpxgt"EQ"; 2425"
Hcz<: 88/48/ /: 553"
Go ckn<'F GP NP UXO go dgt P qvleguB y gmihcti q0eqo "

**(4)** __Compliance reporting information to:__"

O ctrgpg"Tkgd"
3922"Nkpeqrp"Uv"
F gpxgt"EQ"; 2425"
Hcz<: 88/48/ /: 553"
Go ckn<'F GP NP UXO go dgt P qvleguB y gmihcti q0eqo "

**(5)** P qvg'\q 'dg'kuuwgf 'kp 'vj g'pqo kpgg'pco g'qh<'Y gmi'Hcti q'Dcpm'P (C0'(**Tax ID #: 26-0741673**)"

**(6)** Vcz "KF 0P 0 wo dgt'hqt "Y gmi'Hcti q'Dcpm'P (C0**026-0741673**"

**(7)** __Physical Delivery Instructions:__'

3922"Nkpeqrp"Uv"
F gpxgt."EQ"; 2425"
Ceeqwpv'P co g<**Denver WLS**
Ceeqwpv'wo dgt<**00029694050720**"

## NAUTICAL SOLUTIONS, L.L.C

### INFORMATION RELATING TO NOTEHOLDERS

Bank of America, N.A.

Issuer:  Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

**Bank of America, N.A.**
**ABA # 026-009-593**
Account Number:  1366210627300
Beneficiary Customer: Credit Services
Reference:  **PPN and Prin.**: $_____; **Int.**: $_____

(2) **Payment notices, audit confirmations and related correspondence to:**

Firm: Bank of America, N.A.
Fax :704.409.0154
Email: cs-dailywork@bankofamerica.com

(3) **Duplicate payment notices (only) to:**

Same As Above

(4) **Compliance reporting information to:**

Name Information Manager ATTN: Peter Gross
Phone 980.386.0209
Fax 704.409.0768
Email Bas.infomanager@bankofamerica.com

(5) Note to be issued in the nominee name of:  Bank of America, N.A. **(Tax ID #:**  94-1687665**)**

(6) Tax I.D. Number for Bank of America, N.A.: 94-1687665

(7) **Physical Delivery Instructions:**

*No Physical Note Requested*

Gateway Village #900
900 West Trade St.
NC1-026-05-41 Charlotte, North
Carolina 28202 Attn: Charlotte
Servicing Team

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

**MIDTOWN ACQUISTITIONS L.P.**

Issuer:  Nautical Solutions, L.L.C.

(1) <u>**All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**</u>

    **USD:**
| | |
|---|---|
| Bank: | JPMorgan Chase |
| ABA #: | 021000021 |
| A/C: | J.P. Morgan Securities |
| LCDDA #: | 066001633 |
| F/F/C: | Midtown Acquisitions L.P. |
| F/F/C A/C #: | 102-28500-26 |

    Reference:  Nautical Solutions

(2) <u>**Payment notices, audit confirmations and related correspondence to:**</u>

    **Name:** Jennifer Donovan / Erica Vinson
    **Phone:** +1 212 446 4018 / + 1 646 282 5958
    **Email:** jdonovan@dkp.com / evinson@dkp.com

(3) <u>**Duplicate payment notices (only) to:**</u>

    **Name:** Liane McGay
    **Phone:** +1 646 282- 5947
    **Email:** bankdebt@dkp.com / dkconfirms@citco.com/ ptd@dkp.com

(4) <u>**Data Room Access:**</u> Docs-USCorps@dkp.com

(5) Note to be issued in the nominee name of:  Midtown Acquisitions L.P.  **(Tax ID #:** 13-3680692**)**

(6) Tax I.D. Number for Midtown Acquisitions L.P: 13-3680692

(7) <u>**Physical Delivery Instructions:**</u>

    *No Physical Note Requested*

    Midtown Acquisitions L.P.
    520 Madison Avenue, 30th Floor
    New York, NY 10022

## NAUTICAL SOLUTIONS, L.L.C

### INFORMATION RELATING TO NOTEHOLDERS

Capital One, N.A.
Issuer:  Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

**Capital One, N.A.**
**ABA #065000090**
Account Number:  **21100-14032301-38395**
For Further Credit to:  Nautical Solutions, LLC**; Account No: Nautical Solutions, LLC**
Reference:  **PPN and Prin.**: $_____; **Int.**: $_____

(2) **Payment notices, audit confirmations and related correspondence to:**

**14695223588@tls.ldsprod.com**

**lorena.dalianis@capitalone.com**

(3) **Duplicate payment notices (only) to:**

Lorena Dalianis
**lorena.dalianis@capitalone.com**

(4) **Compliance reporting information to:**

Robert Johnson Sr. Director, Special Assets

(P) (504) 232-2163

robert.johnson@capitalone.com

(5) Note to be issued in the nominee name of:  Capital One, N.A. **(Tax ID #:**  72-0210640**)**

(6) Tax I.D. Number for Capital One, N.A.:  **72-0210640**

(7) **Physical Delivery Instructions:**

Capital One, N.A.

1680 Capital One DriveMcLean, VA 22102

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

**FIRST HORIZON BANK**

Issuer:  Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

  **FIRST HORIZON BANK**
  **ABA # 084000026**
  Account Number:  **1141743913**
  For Further Credit to:  **Nautical Solutions LLC ; Account No:  84940952**
  Reference:  **PPN and Prin.**: $_____; **Int.**: $_____

(2) **Payment notices, audit confirmations and related correspondence to:**

  **FIRST HORIZON BANK**
  **Attn: Special Assets Dept., MO1A**
  **165 Madison Ave.**
  **Memphis, TN 38103**

(3) **Duplicate payment notices (only) to:**

  jmhennigan@firsthorizon.com

(4) **Compliance reporting information to:**

  jmhennigan@firsthorizon.com

(5) Note to be issued in the nominee name of:  **FIRST HORIZON BANK (Tax ID #:  62-0201385)**

(6) Tax I.D. Number for **FIRST HORIZON BANK**:  **62-0201385**

(7) **Physical Delivery Instructions:**

  FIRST HORIZON BANK
  Attn: Special Assets Dept., MO1A
  165 Madison Ave.
  Memphis, TN 38103

  Account Name:  Nautical Solutions LLC
  Account Number:  84940952

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

Cross Ocean ESS III Sarl

Issuer:  Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Northern Trust International Banking Corporation, New Jersey (CNORUS33)
**ABA #** 026001122
For Further Credit to:  Cross Ocean ESS III S.à r.l; **Account No:** 21016120010
Reference:  **PPN and Prin.:** $__; **Int.:** $_____

(2) **Payment notices, audit confirmations and related correspondence to:**

Ops@crossoceanpartners.com; mel@crossoceanpartners.com

(3) **Duplicate payment notices (only) to:**

ops@crossoceanpartners.com

(4) **Compliance reporting information to:**

ops@crossoceanpartners.com

(5) Note to be issued in the nominee name of: Cross Ocean ESS III Sarl **(Tax ID #:  98-1469902)**

(6) Tax I.D. Number for Cross Ocean ESS III Sarl: 98-1469902

(7) **Physical Delivery Instructions:**

7 avenue Gaston Diderich, L-1420 Luxembourg

Account Name: Cross Ocean ESS III Sarl

# NAUTICAL SOLUTIONS, L.L.C

## INFORMATION RELATING TO NOTEHOLDERS

J UDE'DCP M'WUC.'P 0C0'

"

Kuuwgt<'P cwkecn'Uqnwkqpu.'NNNE0'

**(3)** **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**"

J UDE'Dcpm'WUC.'P 0C0

**ABA #** 243/223/2: :

Ceeqwpv'P wo dgt<'935/22267/9'

Hqt'Hwvj gt'Etgf kv'q<'Eqo o gtekcn'Nqcp'Ugtxkegu''Ur gekcn'Etgf ku'Wpkv**; Account No:** P lC"

Tghgtgpeg<'**PPN:** 85; 32X'CC8 **and Prin.**<'&37.589.; 89077'**Int.**<'&3.94: .: ; 8()60"

**(4)** **Payment notices, audit confirmations and related correspondence to:**"

CI GP E[ 'F GRCTVO GP V'Cwgpvkqp<'Lci f guj 'VCTCEJ CP F '/'

[ctlany.loanadmin@us.hsbc.com](mailto:ctlany.loanadmin@us.hsbc.com)

**(5)** **Duplicate payment notices (only) to:**"

J UDE'DCP M'WUC.'P 0C0'Cwgpvkqp'Tkpq'Hcnuqpg.'XR.'424; "Y crf gp'Cxg0'Dwhhcnq.'P [ '36265"

**(6)** **Compliance reporting information to:**"

J UDE'DCP M'WUC.'P 0C0'Cwgpvkqp'Tkpq'Hcnuqpg.'XR.'424; "Y crf gp'Cxg0'Dwhhcnq.'P [ '36265"

**(7)** P qvg'vq'dg'kuuwgf 'kp'vj g'pqo kpgg'pco g'qh<'J UDE'DCP M'WUC.'P 0C0**(Tax ID #:** 42/3399463)"

"

**(8)** Vcz'KF 0P wo dgt'hqt'J UDE'DCP M'WUC.'P 0C0<'*42/3399463+'

"

**(9)** **Physical Delivery Instructions:**"

J UDE'DCP M'WUC.'P 0C0'Cwgpvkqp'Tkpq'Hcnuqpg.'XR.'424; "Y crf gp'Cxg0'Dwhhcnq.'P [ '36265"

"

Ceeqwpv'P co g<'P CWVKECN'UQNWVKQP U'NNE

Ceeqwpv'P wo dgt<'3: 9/249832'''

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

SYNOVUS BANK

Issuer:  Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

  [**ABA:** # 061100606
Account Number:  0558031-8888
Account Name:  Loan Control -  Nautical Solutions
For Further Credit to:  [●]**; Account No:**  [●]
Reference:  **PPN 63910V AA6 and Prin.**: $
                          **_____**; **Int.**: $**_____**

(2) **Payment notices, audit confirmations and related correspondence to:**

Syndications4@synovus.com

(3) **Duplicate payment notices (only) to:**

(4) **Compliance reporting information to:**

JohnQuarles@Synovus.com

(5) Note to be issued in the nominee name of:  SYNOVUS BANK **(Tax ID #:**  58-0201800**)**

(6) Tax I.D. Number for SYNOVUS BANK 58-0201800

(7) **Physical Delivery Instructions:**

SYNOVUS BANK
        ATTN: MARY ROBINSON
800 SHADES CREEK PKWY
BIRMINGHAM AL 35209

**NAUTICAL SOLUTIONS, L.L.C INFORMATION**

**RELATING TO NOTEHOLDERS**

Cross Ocean ESS IV Sarl

Issuer:  Nautical Solutions, L.L.C.

(1)  **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Norther Trust Company
**ABA #** 071000152
Beneficiary Bank BIC: CNORLULX
For Further Credit to: Cross Ocean ESS IV Lux**; Account No:**  5186061000
Reference:  **PPN and Prin.**: $_____; **Int.**: $_____

(2)  **Payment notices, audit confirmations and related correspondence to:**

 ops@crossoceanpartners.com; mel@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com;

(3)  **Duplicate payment notices (only) to:**

ops@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com

(4)  **Compliance reporting information to:**

ops@crossoceanpartners.com

(5)  Note to be issued in the nominee name of:  Cross Ocean ESS IV Sarl **(Tax ID #:  98-1600529)**

(6)  Tax I.D. Number for Cross Ocean ESS IV Sarl: 98-1600529

(7)  **Physical Delivery Instructions:**

7 avenue Gaston Diderich, L-1420 Luxembourg

Account Name:  Cross Ocean ESS IV Sarl

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

Cross Ocean GSS Master Fund LP

Issuer:  Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Bank of New York Mellon, New York
**ABA #** 021000018
Account Number:  8901323349
For Further Credit to:  COP GSS Master Fund LP **; Account No:**  4417918400
Reference:  **PPN and Prin.**: $_____; **Int.**: $_____

(2) **Payment notices, audit confirmations and related correspondence to:**

18178418857@tls.ldsprod.com; ops@crossoceanpartners.com; mel@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com

(3) **Duplicate payment notices (only) to:**

ops@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com

(4) **Compliance reporting information to:**

ops@crossoceanpartners.com

(5) Note to be issued in the nominee name of:  Cross Ocean GSS Master Fund LP
**(Tax ID #: 98-1457755)**

(6) Tax I.D. Number for Cross Ocean GSS Master Fund LP:  98-1457755

(7) **Physical Delivery Instructions:**

The Depository Trust Company, 570 Washington Street, Blvd- 5th floor, Jersey City, NJ 07310, Attn: BNY Mellon/Branch Deposit Department
Account Name:  Cross Ocean GSS Master Fund LP
Account Number:  4417918400

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

Cross Ocean Global SIF H Sarl

Issuer:  Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Bank of New York Mellon, New York
**ABA #** 021000018
Account Number:  8900487623
For Further Credit to:  Cross Ocean Global SIF H Sarl **; Account No:**  4147608400
Reference:  **PPN and Prin.**: $_____; **Int.**: $_____

(2) **Payment notices, audit confirmations and related correspondence to:**

18179896097@tls.ldsprod.com; ops@crossoceanpartners.com; mel@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com;

(3) **Duplicate payment notices (only) to:**
ops@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com

(4) **Compliance reporting information to:**
ops@crossoceanpartners.com;

(5) Note to be issued in the nominee name of:  Cross Ocean Global SIF H Sarl  **(Tax ID #** 2020 2470 492)

(6) Tax I.D. Number for Cross Ocean Global SIF H Sarl:  Lux TIN: 2020 2470 492

(7) **Physical Delivery Instructions:**

The Depository Trust Company, 570 Washington Street, Blvd- 5th floor, Jersey City, NJ 07310, Attn: BNY Mellon/Branch Deposit Department
Account Name:  Cross Ocean Global SIF H Sarl
Account Number:  4147608400

**NAUTICAL SOLUTIONS, L.L.C INFORMATION**

**RELATING TO NOTEHOLDERS**

Cross Ocean GCD Master Fund I (A) LP

Issuer:  Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

Cross Ocean GCD Master Fund I (A) LP
**ABA #** 021000018
Account Number: 8900487623
For Further Credit to:  Cross Ocean GCD Master Fund I A LP**; Account No:  8580168400**
Reference:  **PPN and Prin.**: $_____; **Int.**: $_____

(2) **Payment notices, audit confirmations and related correspondence to:**

ops@crossoceanpartners.com; mel@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com; 18173497860@tls.ldsprod.com

(3) **Duplicate payment notices (only) to:**

ops@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com

(4) **Compliance reporting information to:**

ops@crossoceanpartners.com

(5) Note to be issued in the nominee name of:  Cross Ocean GCD Master Fund I A LP **(Tax ID #: 98-1543893)**

(6) Tax I.D. Number for Cross Ocean GCD Master Fund I A LP : 98-1543893

(7) **Physical Delivery Instructions:**

The Depository Trust Company, 570 Washington Street, Blvd- 5th floor, Jersey City, NJ 07310, Attn: BNY Mellon/Branch Deposit Department
Account Name:  Cross Ocean GCD Master Fund I A LP
Account Number:  8580168400

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

Cross Ocean USSS Master Fund II (A) LP
Issuer:  Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

Bank of New York Mellon, New York
**ABA #** 021000018
Account Number:  8900487623
For Further Credit to:  Cross Ocean USSS Master Fund II A LP **; Account No:**  1644318400
Reference:  **PPN and Prin.**:          **Int.**: $

(2) **Payment notices, audit confirmations and related correspondence to:**

USSSII_ALP.notices@sscinc.com; ops@crossoceanpartners.com;
mel@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com;

(3) **Duplicate payment notices (only) to:**

ops@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com;

(4) **Compliance reporting information to:**

ops@crossoceanpartners.com

(5) Note to be issued in the nominee name of:  Cross Ocean USSS Master Fund II A LP **(Tax ID #: 98-1622959)**

(6) Tax I.D. Number for Cross Ocean USSS Master Fund II (A) LP: 98-1622959

(7) **Physical Delivery Instructions:**

The Depository Trust Company, 570 Washington Street, Blvd- 5th floor, Jersey City, NJ 07310, Attn: BNY Mellon/Branch Deposit Department
Account Name:  Cross Ocean USSS Master Fund II (A) LP
Account Number:  1644318400

Schedule B

DEFINED TERMS

**DEFINED TERMS**

As used herein, the following terms have the respective meanings set forth below or set forth in the Section hereof following such term:

"**280' PSV Vessels**" means the PSV Vessels and the Petrobras Vessels.

"**312' Vessels**" means the Avery Island (ON 1253395), the Brad Dartez (ON 1252257), the Cat Island (ON 1257750), the Dauphin Island (ON 1262978), the Deer Island (ON 1289730), the Grand Isle (ON 1250605), the Horn Island (ON 1255030), the Marsh Island (ON 1266925), the Paradise Island (ON 1262977), the Pecan Island (ON 1258532), the Pelican Island (ON 1261549), the Sanibel Island (ON 1257727), the Ship Island (ON 1252958), the Timbalier Island (ON 1251360) and the Wine Island (ON 1259152).

"**ABS**" means the American Bureau of Shipping.

"**Accrual End Date**" has the meaning assigned to such term in Section 8.1(c)

"**Actual Average EBITDA**" means, at any date, the average annual EBITDA for the 24 month period ending on the last full calendar month prior to such date most recently ended as calculated by the Company in good faith and delivered in reasonable detail to the Agent and the Noteholders; provided, that if the Exit Fee becomes payable one year or more prior to the Maturity Date, the Actual Average EBITDA will be the annual EBITDA for the previous 12 month period most recently ended; provided that in calculating Actual Average EBITDA, maintenance and related Capital Expenditures shall not exceed the highest annual amount of Capital Expenditures within the past five years preceding the calculation date (as adjusted to deduct from such high watermark, amounts for vessels no longer owned by the Company at the time of such measurement and subject to an adjustment based on the Consumer Price Index (provided, that the adjustment is capped at 5% per annum and is deemed to be zero if such adjustment is negative)).

"**Additional Covenants**" means any affirmative or negative covenant or similar restriction applicable to the Note Parties or any of their Subsidiaries (regardless of whether such provision is labeled or otherwise characterized as a covenant) contained in any document or instrument creating or evidencing Indebtedness of the Note Parties or any of their Subsidiaries, the subject matter of which either (i) is similar to that of any covenant in Section 9 or Section 10 of this Agreement, or related definitions in Schedule B of this Agreement, but contains one or more percentages, amounts or formulas that is more restrictive than those set forth herein or more beneficial to the holder or holders of the Indebtedness created or evidenced by the document in which such covenant or similar restriction is contained (and such covenant or similar restriction shall be deemed an Additional Covenant only to the extent that it is more restrictive or more beneficial) or (ii) is different from the subject matter of any covenant in Section 9 or Section 10 of this Agreement, or related definitions in Schedule B to this Agreement.

"**Additional Defaults**" means any provision contained in any document or instrument creating or evidencing Indebtedness of the Note Parties or any of their Subsidiaries which permits the holder or holders of Indebtedness to accelerate (with the passage of time or giving of notice or both) the maturity thereof or otherwise requires the Note Parties or any of their Subsidiaries to purchase such Indebtedness prior to the stated maturity thereof and which either (i) is similar to any Default or Event of Default contained in Section 11 of this Agreement, or related definitions in this Agreement, but contains one or more percentages, amounts or formulas that is more restrictive than those set forth herein or is more beneficial to the holders of such other Indebtedness (and such provision shall be deemed an Additional Default only to the extent that it is more restrictive, has a shorter grace period or is more beneficial) or (ii)

is different from the subject matter of any Default or Event of Default contained in Section 11 of this Agreement, or related definitions in <u>Schedule B</u> to this Agreement.

"**Administrative Questionnaire**" means an administrative questionnaire in a form supplied by the Agent or such other form as shall be approved by the Agent.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means, at any time, and with respect to any Person, (a) any other Person that at such time directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such first Person, (b) any Person beneficially owning or holding, directly or indirectly, 10% or more of any class of voting or equity interests of Holdings, the Company or any Subsidiary or any Person of which Holdings, the Company and its Subsidiaries beneficially own or hold, in the aggregate, directly or indirectly, more than 50% of any class of voting or equity interests, (c) any Person that at such time directly or indirectly through one or more intermediaries is Controlled by Gary Chouest or any of his Immediate Family, (d) any Person of which Gary Chouest or his Immediate Family beneficially own or hold, in the aggregate, directly or indirectly, more than 50% of any class of voting or equity interests, (e) any Person related by blood, adoption or marriage to any Person described in clauses (a), (b), (c) or (d), or (f) the estate of, or any foundation or trust for the benefit of, or a partnership, limited liability company or other business combination solely among any of the foregoing Persons listed in clauses (a), (b), (c), (d) or (e) of this definition. For purposes of the meaning of Affiliate, a Person is under common Control with another Person if one or more members of the Control Group individually or collectively Controls both such Persons.

"**Agent**" is defined in the preamble hereto.

"**Agent Fee Letter**" means that certain Agent Fee Letter, dated as of the Closing Date, among the Company, the Agent and Collateral Agent.

"**Agents**" means collectively the Agent and the Collateral Agent.

"**Agreement**" means this Agreement, including all Schedules and Exhibits attached to this Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**AHTS Vessels**" means the Dino Chouest (ON 1207856) and the Kirt Chouest (ON 1213707).

"**AIG**" means AIG Asset Management (U.S.), LLC and its successors.

"**Amended and Restated First Preferred Fleet Mortgage**" means that certain Amended and Restated First Preferred Fleet Mortgage, dated as of the Closing Date, between the Company and the Agent substantially in the form of <u>Exhibit P</u> hereto.

"**Anti-Corruption Laws**" is defined in Section 5.16(d)(1).

"**Anti-Money Laundering/Anti-Terrorism Laws**" is defined in Section 5.16(c).

"**Appraisal**" means an appraisal report setting forth the fair market and, if requested, orderly liquidation value (each in Dollars) of the vessels which are the subject of such report, as determined by an appraisal performed within 90 days prior to the date such report is required to be delivered pursuant to the

terms of any of the provisions of the Note Documents, issued by an independent marine appraiser of recognized standing selected by the Required Holders.

"**Asset Sale**" means any direct or indirect sale, conveyance, transfer, charter, lease or other disposition (including, without limitation, by way of merger or consolidation) by the Note Parties or any of their Subsidiaries to any Person, whether in one transaction or a series of related transactions, of (a) any Capital Stock of any of the Note Parties' Subsidiaries or (b) any other property of the Note Parties or their Subsidiaries.  An Asset Sale shall include the requisition of title to, seizure of or forfeiture of any vessel, or any actual or constructive total loss or an agreed or compromised total loss of any vessel (including, without limitation, in each case, Mortgaged Vessels).

"**Asset Sale Agreements**" means that certain Controlling Vessel Purchase Agreement between the Company and Hornbeck dated as of December 22, 2022, together with the related Coordinating Agreement between the Company and Hornbeck and six separate "Alternative 2" Vessel Purchase Agreements under and attached to the Controlling Vessel Purchase Agreement between the Company and Hornbeck related to the sale by the Company and the purchase by Hornbeck of the Celena Chouest (ON 1201702), the Dante (ON 1178758), the Gavea (ON 1211932), the Lyman Martin (ON 1227085), the Pao de Acucar (ON 1218372), and the Jackie Chouest (ON 1210979) and, in each case, related other assets.

"**Assignment and Acceptance Agreement**" means an assignment and acceptance agreement entered into by a Noteholder, a permitted assignee and the Agent, pursuant to which such assignee may become a party to this Agreement, in substantially the form of Exhibit N hereto or such other form as shall be approved by the Agent (including electronic documentation generated by ClearPar, Markitclear or another electronic platform).

"**Assignment of Charters and Hire**" means the Assignment of Charters and Hire from the Company or other Chouest Corporate Affiliate to the Collateral Agent, to be executed in substantially the forms of Exhibits B and C hereto, as applicable, as each may be amended, restated, supplemented or otherwise modified from time to time.

"**Assignment of Insurances**" means the Assignment of Insurances from the Company to the Collateral Agent, to be executed in substantially the form of Exhibit D hereto, as such instrument may be amended or supplemented from time to time pursuant to the provisions thereof.

"**Assignment of First Preferred Fleet Mortgage**" means the Assignment of First Preferred Fleet Mortgage from JPMorgan Chase Bank N.A. to the Collateral Agent, substantially in the form of Exhibit O hereto.

"**Bail-in Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliate (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532.

"**Bankruptcy Law**" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Blocked Person**" is (i) a Person or vessel whose name appears on the list of Specially Designated Nationals and Blocked Persons published by the Office of Foreign Assets Control, United States Department of the Treasury ("**OFAC**") (an "**OFAC Listed Person**") or (ii) an agent, department, or instrumentality of, or is otherwise 50% or more beneficially owned by, controlled by or acting on behalf of, directly or indirectly, (x) any OFAC Listed Person or OFAC Listed Persons or (y) any Person, entity, organization or regime that is the subject of any OFAC Sanctions Program or (iii) otherwise blocked or the subject of sanctions under other economic or financial sanctions or trade embargoes, including but not limited to, the Trading with the Enemy Act, the International Emergency Economic Powers Act, Comprehensive Iran Sanctions, Accountability and Divestment Act ("**CISADA**") or any similar law or regulation with respect to Iran or any other country, any OFAC Sanctions Program, or any economic sanctions regulations imposed, administered or enforced by the United States or any enabling legislation or executive order relating to any of the foregoing or the United Nations Security Council, the European Union, any European Union member state or His Majesty's Treasury of the United Kingdom or other relevant sanctions authority (collectively, "**Economic Sanctions**").

"**Board of Directors**" means the managers of Holdings, the Company, any Person performing similar functions on behalf of Holdings or the Company, or any duly authorized committee thereof.

"**Burdensome Restrictions**" means any consensual encumbrance or restriction of the type described in clause (a) or (b) of Section 10.15.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which commercial banks in New York, New York or New Orleans, Louisiana are required or authorized to be closed.

"**Capital Expenditure**" means, with respect to the Company and its Subsidiaries for any period, the aggregate amount, without duplication, of (x) all expenditures (whether paid in cash or accrued as liabilities or done on behalf of or for the benefit of the Company and its Subsidiaries by a third party and including in all events all amounts expended or capitalized in respect of Capitalized Lease Obligations) that would, in accordance with GAAP, be included as additions to property, plant and equipment, (y) other capital expenditures of such Person for such period (whether paid in cash or accrued as liabilities or done on behalf of or for the benefit of the Company and its Subsidiaries by a third party and including in all events all amounts expended or capitalized under capital leases) that are reported in the Company's consolidated statement of cash flows for such period and (z) other capital expenditures of such Person for such period (whether paid in cash or accrued as liabilities or done on behalf of or for the benefit of the Company and its Subsidiaries by a third party and including in all events all amounts expended or capitalized under in respect of Capitalized Lease Obligations, including, without limitation, any capitalized bonus payment).  Notwithstanding the foregoing, Capital Expenditures shall not include (i) insurance proceeds for the loss of property applied to the replacement of such property or (ii) necessary expenses for the Company to maintain the existing classification rating for Mortgaged Vessels or to reinstate classification after a Mortgaged Vessel is no longer "laid up"; in the case of paragraph (ii), solely to the

extent that such expenditures are expensed in the period in which they are incurred and not added to property, plant and equipment.

"**Capital Stock**" in any Person means any and all shares, interests, participations or other equivalents in the equity interest (however designated) in such Person and any rights (other than debt securities convertible into an equity interest, unless and until so converted), warrants or options to acquire an equity interest in such Person.

"**Capitalized Lease Obligation**" means any rental obligation with respect to a lease of property which in accordance with GAAP would be required to be capitalized on the lessee's balance sheet or for which the amount of the asset and liability thereunder as if so capitalized should be disclosed in a note to such balance sheet, taken at the amount thereof accounted for as indebtedness (net of interest expense) in accordance with GAAP.

"**Change of Control**" means an event or series of events by which any Person or Persons acting in concert (other than a member or members of the Control Group), together with Affiliates thereof, shall control or own (beneficially or otherwise) in the aggregate, directly or indirectly, more than 30% of the Voting Stock of Holdings or Holdings ceases to own 100% of the Company.

"**Chouest Affiliate**" means Holdings, the Company and its Subsidiaries and Affiliates and each member of a Relevant Group, including, for the avoidance of doubt, each member of the Control Group.

"**Chouest Corporate Affiliate**" means each Chouest Affiliate other than any Chouest Affiliate that is a natural person.

"**CISADA**" shall have the meaning specified for such term in the definition of "**Blocked Person.**"

"**Closing**" is defined in Section 3.

"**Closing Date**" is defined in Section 3.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

"**Collateral**" means all collateral and security as described in the Security Documents.

"**Collateral Agent**" means Wilmington Trust, National Association, the party serving as mortgagee, secured party or the like under the Security Documents.

"**Company**" means Nautical Solutions, L.L.C., a Louisiana corporation or any successor that becomes such in the manner prescribed in Section 10.2.

"**Competitor**" means any Person who primarily engages or whose Affiliate primarily engages in the business of owning or operating vessels in the offshore services industry; provided that no Person shall constitute a "Competitor" solely by virtue of any ownership of the Capital Stock or other assets (including vessels) of any Competitor as a result of any foreclosure, deed in lieu of foreclosure or other transfer pursuant to an exercise of remedies with respect to another Person or its assets.

"**Confidential Information**" is defined in Section 19.

"**Confirmation Order**" means that certain *Order (I) Approving the Debtors' Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization, (II) Confirming the Amended Joint Prepackaged Plan of Reorganization of Nautical Solutions, L.L.C. and its Debtor Affiliate Pursuant to Chapter 11 of the Bankruptcy Code, and (III) Granting Related Relief* entered by the Bankruptcy Court for the Southern District of Texas on February 16, 2023 Docket No. 204.

"**Consenting Creditors**" has the meaning set forth in the Restructuring Support Agreement.

"**Consenting Noteholders**" has the meaning set forth in the Restructuring Support Agreement

"**Consolidated Net Earnings**" means, with respect to Holdings, the Company and their Subsidiaries for any period, the aggregate net income (or deficit) of Holdings, the Company and their Subsidiaries for such period on a consolidated basis, after deduction of all expenses, taxes and other proper charges determined in accordance with GAAP, and after eliminating therefrom all extraordinary non-recurring items of income (or deficit).

"**Consolidated Tangible Total Assets**" of Holdings, the Company and their Subsidiaries means, as of any date, the total property of Holdings, the Company and their Subsidiaries on a consolidated basis at such date, as determined in accordance with GAAP, less the net book amount of all assets of Holdings, the Company and their Subsidiaries (after deducting any reserves applicable thereto) that would be shown as intangible assets on a consolidated balance sheet of Holdings, the Company and their Subsidiaries as of such date prepared in accordance with GAAP.

"**Consumer Price Index**" means the Consumer Price Index published from time to time by the Bureau of Labor Statistics of the United States Department of Labor, U.S. City Average, All Items and Major Group Figures for Urban Wage Earners and Clerical Workers, or any successor or substitute index promulgated by the Bureau of Labor Statistics of the United States Department of Labor.

"**Control**" in respect of a Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Control Agreements**" collectively means the deposit account, securities account or blocked account control agreements, in form and substance satisfactory to the Collateral Agent and the Required Holders, to be executed and delivered by and among the Collateral Agent, the Company and the applicable financial institutions serving as the depositary bank or securities intermediary, as applicable, with respect thereto, together with all modifications and/or replacements thereof which are approved in writing by the Collateral Agent and the Required Holders, for purposes of evidencing control by the Collateral Agent in one or more deposit accounts or securities accounts maintained by the Company with any such specified financial institution for purposes of perfection of the Collateral Agent's Lien in such accounts.

"**Control Group**" means (a) Dino Chouest, Dionne Chouest Austin, Damon Chouest and Ross Chouest (or, upon the death or incapacity of any of the foregoing Persons, his or her spouse), (b) their respective children or other lineal descendants and (c) the estate of, or any foundation or trust for the benefit of, or a partnership, limited liability company or other business combination solely among any of the foregoing Persons listed in (a) and (b) of this definition.

"**Controlled Entity**" means (i) any of the Subsidiaries of the Company and any of their or the Company's respective Controlled Affiliates and (ii) if the Company has a parent company, such parent company and its Controlled Affiliates. As used in this definition, "Control" means the possession, directly

B-6

or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Corporate Trust Office**" means the office of the Agent or the Collateral Agent, as applicable, at which at any particular time its corporate trust business shall be principally administered, which office at the date of the execution of this Agreement at is noted in <u>Section **Error! Reference source not found.**</u>, or such other address as the Agent or the Collateral Agent may designate from time to time by prior written notice to the other parties hereto, or the principal corporate trust office of any successor Agent or Collateral Agent (or such other address as such successor Agent or Collateral Agent, as applicable, may designate from time to time by written notice to the other parties hereto).

"**Creditor Friendly Jurisdiction**" means the United States of America and any other jurisdiction approved by the Required Holders in writing.

"**Cure Amount**" is defined in Section 11.2.

"**Cure Right**" is defined in Section 11.2.

"**Default**" means an event or condition the occurrence or existence of which would, with the lapse of time or the giving of notice or both, become an Event of Default.

"**Default Rate**" means, at any time, that rate of interest that is the greater of (i) 2.00% per annum plus the rate of interest applicable to the Notes at such time (which 2.00% increase shall be cash interest), and (ii) 2.00% over the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as reasonably determined by the Required Holders) or any similar release by the Federal Reserve Board (as reasonably determined by the Required Holders).

"**Disclosure Documents**" is defined in Section 5.3.

"**Dollar**," "**Dollars**" and the symbol "**$**" each means lawful money of the United States of America.

"**EBITDA**" means, with respect to the Company and its Subsidiaries for any period, Consolidated Net Earnings for such period, <u>plus</u> to the extent deducted from revenues or not included in determining Consolidated Net Earnings for such period, (a) Interest Expense, (b) income tax expense for taxes which have been provided for by the Company and its Subsidiaries to the Affiliate of the Company responsible for paying such income taxes, (c) depreciation and amortization expense, (d) documented fees and expenses in connection with the implementation of the restructuring contemplated by the Restructuring Support Agreement and Asset Sales permitted under Section 10.12, (e) the amount of any insurance proceeds of any warranty claims, (f) the amount of any tax claims related to the pending tax review in Guyana as at the date of Closing and (g) for any four consecutive fiscal quarter period which includes the fiscal quarter ending on or around March 31, 2023, the aggregate amount of the Equity Contribution actually made to the Company on the Closing Date, <u>less</u>, to the extent included in determining Consolidated Net Earnings for such period, (i) non-cash income (expense) related to equity in earnings of the Company's unconsolidated entities, (ii) non-cash income (expense) related to interest rate swaps, (iii) all other non-cash income (expense) items and (iv) other extraordinary income or expenses.

"**ECO 280 Limitations**" is defined in Section 9.26(a)(ii).

"**ECO Brazil**" means, at any specified date, the ECO Worldwide Companies that are (a) included in, and described as being part of, such group in the ECO Worldwide Annual Report, and (b) directly or indirectly engaged to provide services to the offshore energy industry through the operation of offshore service vessels in Brazilian waters.

"**ECO U.S. Ports**" means, at any specified date, the ECO Worldwide Companies that are (a) included in, and described as being part of, such group in the ECO Worldwide Annual Report, and (b) directly or indirectly engaged to operate port facilities to dock and supply marine vessels using heavy equipment, as well as sell fuel to vessels used in the Relevant Groups' operations and those owned by third parties.

"**ECO U.S. Shipyards**" means, at any specified date, the ECO Worldwide Companies that are (a) included in, and described as being part of, such group in the ECO Worldwide Annual Report, and (b) directly or indirectly engaged in constructing and repairing vessels used in the Relevant Groups' U.S. operations.

"**ECO U.S. Vessels**" means, at any specified date, the ECO Worldwide Companies that (a) are included in, and described as being part of, such group in the ECO Worldwide Annual Report, and (b) directly or indirectly engaged to provide services to the offshore energy industry.

"**ECO Worldwide Annual Report**" means the (a) consolidated and (b) consolidating report including balance sheet and related statements of operations, members equity and cash flows, with notes and disclosures previously produced and provided, as of the end of and for each fiscal year of ECO Worldwide Companies, setting forth in each case in comparative form the figures for the previous fiscal year, submitted by a Financial Officer of the ECO Worldwide Companies, based on the audited financial statement for Edison Chouest Offshore Worldwide. The consolidating report required pursuant to clause (b) of this definition shall include the combined accounts of the Relevant Groups.

"**ECO Worldwide Companies**" means, at any specified date, the Edison Chouest Offshore Worldwide companies that are majority owned by Gary Chouest and/or any combination of the Immediate Family, including, but not limited to, all Persons related by blood, adoption or marriage, and having total assets or Indebtedness in excess of $10,000,000.

"**Economic Sanctions**" shall have the meaning specified for such term in the definition of "**Blocked Person.**"

"**EEA Financial Institution**" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Environmental Laws**" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses,

agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any hazardous or toxic materials into the environment, including but not limited to those related to Hazardous Materials.

"**Equity Contribution**" has the meaning assigned to such term in Section 4.13.

"**Equity Value**" means, as of any date, the amount equal to (a)(i) 6.25 multiplied by (ii) the Actual Average EBITDA at such date less (b) Net Funded Debt at such date.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is treated as a single employer together with any Note Party or any of its subsidiaries under section 414 of the Code or Section 4001(14) of ERISA.

"**ERISA Plan**" means an "employee benefit plan" (as defined in section 3(3) of ERISA) subject to Title IV of ERISA that is, or, within the preceding five years, has been established or maintained, or to which contributions are, or, within the preceding five years, have been made or required to be made, by any Note Party or any ERISA Affiliate or with respect to which any Note Party or any ERISA Affiliate has any liability.

"**ERISA Plan Asset Regulations**" means 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA.

"**Erroneous Payment**" is defined in Section 20.9.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" is defined in Section 11.

"**Excess Cash Prepayment**" means an amount equal 100% of the unrestricted balance sheet cash as of the most recently completed fiscal quarter in excess of $30,000,000 (after the amortization payment required pursuant to Section 8.1(a)) to be paid by the Company on the payment dates in accordance with Section 8.9, and applied to the principal of the Note Obligations.

"**Exchange**" means the exchange of the Exchanged Debt for Notes pursuant to Section 2.1.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended and in effect from time to time.

"**Exchanged Debt**" is defined in Section 2.1.

"**Exchanged Series A Notes**" means the notes issued under the Series A Note Purchase Agreement, including any accrued and unpaid interest thereon and the *pro rata* portion of the Noteholder Non-Acceleration Settlement Amount related thereto.

"**Exchanged Series B Notes**" means the notes issued under the Series B Note Purchase Agreement, including any accrued and unpaid interest thereon and the *pro rata* portion of the Noteholder Non-Acceleration Settlement Amount related thereto.

"**Exchanged Term Loan**" means the "Loans" under, and defined in, the Existing Credit Agreement and any accrued and unpaid interest related thereto.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Noteholder or required to be withheld or deducted from a payment to a Noteholder, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Noteholder being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Noteholder with respect to an applicable interest in a Note pursuant to a law in effect on the date on which (i) such Noteholder acquired an interest in the Exchanged Debt or (ii) such Noteholder changes its lending office, except in each case to the extent that, pursuant to Section 8.11, amounts with respect to such Taxes were payable either to such Noteholder's assignor immediately before such Noteholder acquired the applicable interest in a Note or to such Noteholder immediately before it changed its lending office, (c) Taxes attributable to such Noteholder's failure to comply with Section 8.11(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Existing Credit Agreement**" means the First Amended and Restated Credit Agreement dated as of December 7, 2018 (as subsequently amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among the Company, the lenders party thereto, the issuing bank party thereto, the administrative agent party thereto, and the other parties thereto.

"**Exit Fee**" means, as to the date on which the Exit Fee becomes due and payable, (a) if the Actual Average EBITDA as of such date does not exceed the Forecasted Average EBITDA as of such date by 18%, zero, (b) if Actual Average EBITDA as of such date exceeds Forecasted Average EBITDA as of such date by 27%, 15% of Equity Value as of such date and (c) if Actual Average EBITDA as of such date exceeds Forecasted Average EBITDA as of such date in an amount between 18% and 27%, a percentage between 10% and 15% of Equity Value as of such date, on a linear basis[1]. The Exit Fee shall be determined by the Company in consultation with the Required Holders and notified to the Agent; <u>provided</u>, that for the purposes of calculating the Exit Fee, Actual Average EBITDA, shall exclude the amount of any expense for the reactivation or retrofit of the Petrobras Vessels in excess of the amount of the Equity Contributions.

---

[1] For purposes of illustration:

1. If Actual Average EBITDA is $110.25 million and Forecast Average EBITDA is $90.00 million, then the outperformance percentage is 22.5%.
2. The outperformance percentage is translated into the Exit Fee percentage as follows:
    o   If the outperformance percentage is less than 18.0%, then there is no exit fee
    o   If the outperformance percentage is greater than or equal to 18.0% and less than or equal to 27.0%, then the exit fee percentage is calculated as follows:
        10.0% + (outperformance percentage – 18.0%) * (5 / 9)
    o   If the outperformance percentage is greater than 27.0% then the exit fee percentage is 15.0%
    o   This hypothetical illustrative outperformance percentage translates to an Exit Fee percentage of 12.5%
3. Enterprise Value is calculated by multiplying Actual Average EBITDA by 6.25x, the agreed-to Enterprise Value EBITDA multiple
    o   The hypothetical, illustrative Actual Average EBITDA of $110.25 million multiplied by 6.25x implies a hypothetical, illustrative Enterprise Value of $689.06 million
4. The hypothetical, illustrative Enterprise value less hypothetical, illustrative net debt of $360.00 million implies a hypothetical, illustrative equity value of $329.06 million
5. Multiplying the hypothetical, illustrative Exit Fee percentage of 12.5% by the hypothetical, illustrative equity value of $329.06 million yields a hypothetical, illustrative Exit fee of $41.13 million.

"**Fair Market Value**" means the price at which the subject property would change hands between a willing buyer and a willing seller, where neither the buyer not the seller is under any compulsion to buy or sell, the buyer and seller are not Affiliates and both have reasonable knowledge of all relevant facts.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(l) of the Code.

"**Federal Funds Rate**" means, for any day, the greater of (a) the rate per annum calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate provided, (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average of the quotations for the day for such transactions received by the Agent from three commercial banks of recognized standing selected by it, and (b) 0%.

"**Fee Amount Rate**" is defined in Section 8.1(c).

"**Final Tax Liability Amount**" is defined in Section 4.9(c).

"**Financial Statement Compliance Certificate**" is defined in Section 7.2.

"**Fleet Mortgage**" means the Preferred Fleet Mortgage from the Company to the Collateral Agent, as mortgagee, to be executed in substantially the form of Exhibit E hereto, as such instrument may be amended or supplemented from time to time pursuant to the provisions thereof.

"**Forecasted Average EBITDA**" means, for any period the forecasted average annual EBITDA set forth in the forecast delivered pursuant to Section 4.10(c) for such period.

"**Foreign Noteholder**" means a Noteholder that is not a U.S. Person.

"**FSV Vessels**" means the Fast Tender (ON 1206390) and the Fast Track (ON 1208793).

"**Funded Debt**" means, with respect to any Person, without duplication, (a) all Indebtedness of such Person for borrowed money, (b) all purchase money Indebtedness of such Person, including without limitation the principal portion of all obligations of such Person under Capitalized Lease Obligations, (c) the maximum available amount of all standby letters of credit or acceptances issued or created for the account of such Person and (d) the principal balance outstanding under any Synthetic Lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product to which such Person is a party, where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease in accordance with GAAP. The Funded Debt of any Person shall include the Funded Debt of any partnership or joint venture in which such Person is a general partner or joint venturer, but only to the extent to which there is recourse to such Person for the payment of such Funded Debt.

"**GAAP**" means generally accepted accounting principles as in effect from time to time in the United States of America or in respect of financial statement for ECO Brazil only, generally accepted accounting principles as in effect from time to time in Brazil.

"**Galliano Marine Services**" means Galliano Marine Services, L.L.C., an Affiliate of the Company currently providing certain administrative and other services to the Company and certain of its Affiliates, or any successor to Galliano Marine Services, L.L.C. providing such services.

"**Governmental Authority**" means:

    (a)    the government of:

        (i)    the United States of America or any state or other political subdivision thereof, or

        (ii)    any other jurisdiction in which the Company or any Subsidiary conducts all or any part of its business, or which asserts jurisdiction over any properties of the Company or any Subsidiary, or

    (b)    any entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of, or pertaining to, any such government.

"**Governmental Official**" means any governmental official or employee, employee of any government-owned or government-controlled entity, political party, any official of a political party, candidate for political office, official of any public international organization or anyone else acting in an official capacity.

"**Guaranty**" means, with respect to any Person, any obligation (except the endorsement in the ordinary course of business of negotiable instruments for deposit or collection) of such Person guaranteeing or in effect guaranteeing any indebtedness, dividend or other obligation of any other Person in any manner, whether directly or indirectly, including (without limitation) obligations incurred through an agreement, contingent or otherwise, by such Person:

    (a)    to purchase such indebtedness or obligation or any property constituting security therefor;

    (b)    to advance or supply funds (i) for the purchase or payment of such indebtedness or obligation, or (ii) to maintain any working capital or other balance sheet condition or any income statement condition of any other Person or otherwise to advance or make available funds for the purchase or payment of such indebtedness or obligation;

    (c)    to lease properties or to purchase properties or services primarily for the purpose of assuring the owner of such indebtedness or obligation of the ability of any other Person to make payment of the indebtedness or obligation; or

    (d)    otherwise to assure the owner of such indebtedness or obligation against loss in respect thereof.

In any computation of the indebtedness or other liabilities of the obligor under any Guaranty, the indebtedness or other obligations that are the subject of such Guaranty shall be assumed to be direct obligations of such obligor.

"**Hazardous Materials**" means any and all material, pollutants, toxic or hazardous wastes or other substances that might pose a hazard to health and safety due to their hazardous or dangerous properties or characteristics, the removal of which may be required or the generation, manufacture, refining, production, processing, treatment, storage, handling, transportation, transfer, use, disposal, release, discharge, spillage, seepage or filtration of which is or shall be restricted, prohibited or penalized by any Environmental Law including, but not limited to, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum, petroleum products, petroleum related products, flammable, explosive, radioactive, freon gas, radon, pesticide or other agricultural-related products, lead based paint, radon gas or similar restricted, prohibited or penalized substances.

"**Holdings**" has the meaning set forth in the preamble to this Agreement.

"**Hornbeck**" means Hornbeck Offshore Services, LLC, a Delaware limited liability company.

"**Immediate Family**" means Carolyn Chouest, the descendants of Gary Chouest or any trust established for the benefit of Carolyn Chouest or any of the descendants of Gary Chouest.

"**Indebtedness**" with respect to any Person means, at any time, without duplication,

(a)     its liabilities for borrowed money and its redemption obligations in respect of mandatorily redeemable Preferred Stock;

(b)     its liabilities for the deferred purchase price of property acquired by such Person (excluding accounts payable arising in the ordinary course of business but including all liabilities created or arising under any conditional sale or other title retention agreement with respect to any such property);

(c)     (i) Capitalized Lease Obligations and (ii) all liabilities which would appear on its balance sheet in accordance with GAAP in respect of Synthetic Leases assuming such Synthetic Leases were accounted for as Capitalized Lease Obligations;

(d)     all liabilities for borrowed money secured by any Lien with respect to any property owned by such Person (whether or not it has assumed or otherwise become liable for such liabilities);

(e)     all its liabilities in respect of letters of credit or instruments serving a similar function issued or accepted for its account by banks and other financial institutions (whether or not representing obligations for borrowed money);

(f)     the aggregate Swap Termination Value of all Swap Contracts of such Person;

(g)     unfunded pension liabilities;

(h)     any Guaranty of such Person with respect to liabilities of a type described in any of clauses (a) through (g) hereof; and

(i)     all other items (excluding items of contingency reserves or of reserves for deferred income taxes, if applicable) which under GAAP are shown on the balance sheet as a liability (excluding trade accounts payable in the ordinary course of business and accrued expenses shown as current liabilities)

Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.  In addition, Indebtedness of any Person shall include all obligations of such Person of the character described in clauses (a) through (i) to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is deemed to be extinguished under GAAP.

"**Indemnified Liabilities**" is defined in Section 22.3.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Note Party under any Note Documents and (b) to the extent not otherwise described in (a), Other Taxes.

"**Institutional Investor**" means (a) any Noteholder, (b) any Noteholders holding (together with one or more of its affiliates) more than 5% of the aggregate principal amount of the Notes then outstanding, (c) any bank, trust company, savings and loan association or other financial institution, any pension plan, any investment company, any insurance company, any broker or dealer, or any other similar financial institution or entity, regardless of legal form, and (d) any Related Fund of any holder of any Note.

"**Insurance Consultant**" means Aon BankAssure, its successors and assigns or such other insurance consultant as shall be approved by the holders of a majority of the aggregate principal amount of the Notes then outstanding.

"**Intellectual Property**" means all U.S. and foreign (a) patents, patent applications, patent disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re- examinations, substitutions, and extensions thereof, (b) trademarks, service marks, trade names, domain names, logos, slogans, trade dress, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (c) copyrights and copyrightable subject matter, (d) rights of publicity, (e) moral rights and rights of attribution and integrity, (f) computer programs (whether in source code, object code, or other form), databases, compilations and data, technology supporting the foregoing, and all documentation, including user manuals and training materials, related to any of the foregoing, (g) trade secrets and all confidential information, know-how, inventions, proprietary processes, formulae, models, and methodologies, (h) all rights in the foregoing and in other similar intangible assets, (i) all applications and registrations for the foregoing, and (j) all rights and remedies against infringement, misappropriation, or other violation thereof.

"**Intellectual Property Agreements**" means the Know-How Agreement and the NAS License Agreement.

"**Interest Expense**" means, with respect to the Company and its Subsidiaries, for any period, total cash interest expense (excluding any amount that is capitalized), letter of credit fees and other fees and expenses incurred by such Person in connection with any Indebtedness (including but not limited to Indebtedness under this Agreement) for such period, whether paid or accrued (including that attributable to obligations which have been or should be, in accordance with GAAP, recorded as Capitalized Lease Obligations), including, without limitation, all commissions, discounts, and other fees and charges owed with respect to letters of credit and bankers' acceptance financing, fees owed with respect to the Note Obligations, and net costs under Swap Contracts entered into addressing interest rates, all as determined in conformity with GAAP. For the avoidance of doubt, "Interest Expense" shall not include any Specified Noteholder Fee.

"**Interest Payment Date**" means the last Business Day of March, June, September and December in each year after the Closing Date, and on the Maturity Date, until the principal amount of the Notes shall have become due and payable.

"**Investment**" means the purchase or other acquisition of any securities or Indebtedness of, or the making of any loan, advance, extension of credit or capital contribution to (or the transfer of property having the effect of any of the foregoing), or the incurring of any Guaranty, any Person (in each case other than accounts receivable, payable form parties other than Affiliates of the Company, arising in the ordinary course of business).

"**Jones Act**" means, collectively, the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d) and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices of enforcing, administering, and interpreting such laws, statutes, rules, and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S. flag vessels operating in the U.S. coastwise trade.

"**Know-How Agreement**" means the Non-Exclusive and Assignable Patent, Copyright and Know-How License Agreement in favor of the Company by Marine Technologies (as to patents, copyrights and know-how) substantially in the form of <u>Exhibit K-1</u> dated as of the Closing Date (which will be collaterally assigned as of the Closing Date to the Collateral Agent).

"**Lien**" means, with respect to any Person, any mortgage, lien, pledge, charge, security interest or other encumbrance, or any interest or title of any vendor, lessor, lender or other secured party to or of such Person under any conditional sale or other title retention agreement or Capitalized Lease Obligations, upon or with respect to any property or asset of such Person (including in the case of stock, stockholder agreements, voting trust agreements and all similar arrangements).

"**Loss Event**" means any accident, occurrence or event with respect to any Mortgaged Vessel pursuant to which insurance proceeds are payable as a result of such accident, occurrence or event.

"**Marine Technologies**" means Marine Technologies, L.L.C., a Louisiana limited liability company.

"**Master Services Agreement**" means the Master Services Agreement between the Company and Marine Technologies dated as of the Closing Date (which will be collaterally assigned as of the Closing Date to the Collateral Agent) substantially in the form of <u>Exhibit J</u> hereto, as permitted to be amended, restated, supplemented or otherwise modified from time to time.

"**Material**" means material in relation to the business, operations, affairs, financial condition, assets, properties, or prospects of the Note Parties and their Subsidiaries taken as a whole and, in any case, in an amount in excess of $1,000,000.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, prospects, operations, affairs, condition (financial or otherwise), assets or properties of either the Company individually or Holdings, or the Company and its Subsidiaries, taken as a whole, (b) the ability of Holdings or the Company to perform its obligations under this Agreement, the Security Documents and the Notes or the ability of Holdings or the Company to perform its obligations under the charters in effect with respect to the Mortgaged Vessels taken as a whole, (c) the Collateral, or the Collateral Agent's Liens under the Security Documents or (d) the validity or enforceability of this Agreement, the Notes or the Security Documents.

"**Material Agreements**" is defined in Section 9.24.

"**Maturity Date**" means February 24, 2028; provided that if such day is not a Business Day, then the next succeeding Business Day.

"**Members**" means any Person having a membership interest in the Company and/or Holdings and, for purposes of calculating the financial covenants set forth in Section 10.6 only, its consolidated Subsidiaries, whether or not such membership interest is evidenced by a certificate or other means.

"**Minimum Vessel Sale Proceeds**" means at least $15,000,000.00 Net Cash Proceeds per Vessel for each PSV Vessel.

"**Moody's**" means Moody's Investor Service, Inc.

"**Mortgaged Vessels**" means those vessels made subject to the Lien of the Fleet Mortgage concurrently with the execution and delivery thereof and any additional vessels made subject to the Lien of the Fleet Mortgage at any time and from time to time after the date hereof as required under the provisions hereof. The Mortgaged Vessels are set forth in Schedule C attached hereto. After the Lien of the Fleet Mortgage on any Mortgaged Vessel is released in accordance with the Note Documents, such vessel shall no longer be deemed to be a Mortgaged Vessel hereunder.

"**Multiemployer ERISA Plan**" means any ERISA Plan that is a "multiemployer plan" (as such term is defined in section 4001(a)(3) of ERISA).

"**Mutual Release**" means the Mutual Release Agreement by and among the Company, the Noteholders and the other parties thereto, dated as of the Closing Date, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**NAIC**" means the National Association of Insurance Commissioners or any successor thereto.

"**NAS License Agreement**" means the Non-Exclusive and Assignable Copyright License Agreement in favor of the Company by North American Shipbuilding (as to copyrights) substantially in the form of Exhibit K-2, dated as of the Closing Date (which will be collaterally assigned as of the Closing Date to the Collateral Agent).

"**Net Cash Proceeds**" means with respect to any Asset Sale, an amount equal to: (a) the sum of cash payments received by the Note Parties from such Asset Sale, minus (b) any bona fide costs and expenses (including, without limitation, legal, accounting and investment banking fees, and customary sales commissions) incurred in connection with such Asset Sale, and (c) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by any Note Party in connection with such Asset Sale; provided that upon release of any such reserve, the amount released shall be considered Net Cash Proceeds.

"**Net Funded Debt**" means Funded Debt of the Company less Unrestricted Cash in excess of $20,000,000.

"**North American Shipbuilding**" means North American Shipbuilding, L.L.C., a Louisiana limited liability company.

"**Note Documents**" means this Agreement, the Notes, the Security Documents, the Agent Fee Letter and all other instruments, certificates and other documents now or hereafter executed and delivered by or on behalf of Holdings and the Company pursuant to or in connection with any of the foregoing or any of the transactions contemplated hereby, and any and all amendments, supplements and other modifications to any of the foregoing.

"**Noteholders' Advisors**" means, collectively, (a)(i) Weil, Gotshal & Manges LLP; (ii) Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, as maritime counsel to the Noteholders; (iii) TRP Advisors, LLC, as financial advisors to the noteholders of the Series A Note Purchase Agreement and Series B Note Purchase Agreement; and (iv) Lazard Frères & Co. LLC, as investment banker to the Noteholders; and (b)(i) Simpson, Thacher & Bartlett, LLP, as counsel to the administrative agent under the Existing Credit Agreement, (ii) Jones Walker LLP, as maritime counsel to the administrative agent under the Existing Credit Agreement and (iii) CR3 Partners LLC, as financial advisors to the administrative agent under the Existing Credit Agreement.

"**Noteholders' Fees and Expenses**" means all reasonable and documented fees and expenses of the Noteholders' Advisors.

"**Noteholder**" or "**Noteholders**" means each Person listed on the signature pages hereto as a Noteholder and each Person who is deemed a "Noteholder" pursuant to Article IV.E.1  of the Plan notwithstanding such Person not executing and delivering a signature page hereto (such deemed Noteholders and Persons listed on the signature pages hereto as a Noteholder listed on Schedule A hereto) and any other Person that becomes a party hereto pursuant to Section 13.2; provided that, (i) any such Noteholder that ceases to be the registered holder of such Note as a result of a transfer shall cease to be included within the meaning of "Noteholder" of such Note for the purposes of this Agreement upon such transfer, (ii) if such Person is a nominee, then for the purposes of Sections 6, 7, 12, 16 and 17 and any related definitions in this Schedule B, "Noteholder" shall mean the beneficial owner of such Note identified in the Register pursuant to Section 13.1 of this Agreement and (iii) persons who are deemed to be Noteholders by virtue of Article IV.E.1 of the Plan shall be treated as Noteholders for purposes of the Register on and after such time as the Company has received notice of such person's name, address and ownership of Notes for purposes of the Register as contemplated in Section 13.1 of this Agreement.

"**Noteholder Non-Acceleration Settlement Amount**" means $11,696,000.

"**Note Obligations**" means all of the monetary obligations owed by the Company to the Agent, the Collateral Agent or any Noteholder under this Agreement, the Notes, the Security Documents or any other Note Document, and related agreements, documents, and instruments, including, without limitation (but for certainty without duplication), (a) the outstanding principal amount of, accrued and unpaid interest on (including any interest accrued prior to the Closing Date pursuant to Section 4.9(a), any unpaid Exit Fee due with respect to, the Notes and any interest accruing on or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Note Parties or any of their Subsidiaries (if any) as long as a claim for post-filing or post-petition interest is not disallowed in such proceeding), and (b) any other unpaid amounts (including amounts in respect of fees, expenses, indemnification and reimbursement) due from the Note Parties to the Agent, the Collateral Agent and the Noteholders and each of their Affiliates under this Agreement and any of the Notes, the Security Documents or any other Note Document.

"**Note Parties**" means, collectively, the Company, Holdings and any other Person who becomes a party to this Agreement as a guarantor or obligor.

"**Note Purchase Agreements**" means, collectively, the Series A Note Purchase Agreement and the Series B Note Purchase Agreement.

"**Notes**" is defined in Section 1.

"**NVDC**" means the United States Coast Guard, National Vessel Documentation Center, in Falling Waters, West Virginia.

"**OFAC**" shall have the meaning specified for such term in the definition of "Blocked Person."

"**OFAC Listed Person**" shall have the meaning specified for such term in the definition of "Blocked Person."

"**OFAC Sanctions Program**" means any economic or trade sanction that OFAC is responsible for administering and enforcing.   A list of OFAC Sanctions Programs may be found at http://www.treasury.gov/resource-center/sanctions/Programs/Pages/Programs.aspx.

"**Officer's Certificate**" means a certificate of a Senior Financial Officer, of the manager, or of any other officer of the Company whose responsibilities extend to the subject matter of such certificate.

"**Organizational Documents**" means, with respect to a corporation, the certificate of incorporation, articles of incorporation and bylaws of such corporation; with respect to a limited partnership, the limited partnership agreement and certificate of limited partnership of such limited partnership; with respect to a joint venture, the joint venture agreement establishing such joint venture; with respect to a limited liability company, the articles of organization or certificate of formation and regulations or limited liability company agreement of such limited liability company; and with respect to a trust, the instrument establishing such trust; in each case including any and all modifications thereof as of the date of the Note Document referring to such Organizational Document and any and all future modifications thereof.

"**Other Connection Taxes**" means, with respect to any Noteholder, Taxes imposed as a result of a present or former connection between such Noteholder and the jurisdiction imposing such tax (other than connections arising from such Noteholder having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Note Documents, or sold or assigned an interest in any Notes or Note Documents).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Note Documents, except any such Taxes that are Other Connection Taxes.

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA or any successor thereto.

"**Person**" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, business entity, Governmental Authority or other entity, whether acting in an individual, fiduciary or other capacity.

"**Petrobras Vessels**" means the Corcovado (ON 1215834), the Mr Sidney (ON 1216539) and the Ms Virgie (ON 1213714).

"**Plan**" means a chapter 11 plan (as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto), to be implemented in accordance with the Restructuring Support Agreement, to the extent set forth herein, through the commencement by the Notes Parties and certain of their Affiliates of pre-packaged bankruptcy cases under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas.

"**Pledge Agreement**" means the Pledge Agreement dated as of the Closing date by and among Holdings and the Collateral Agent, in the form attached hereto as Exhibit L, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Preferred Stock**" means any class of Capital Stock of a Person that is preferred over any other class of capital stock (or similar equity interests) of such Person as to the payment of dividends or the payment of any amount upon liquidation or dissolution of such Person.

"**Projections**" is defined in Section 7.1(v).

"**Prohibited Transaction**" means any non-exempt transaction set forth in Section 406 of ERISA or section 4975 of the Code.

"**property**" or "**properties**" means, unless otherwise specifically limited, any interest in any kind of property or asset, whether real or personal property of any kind, tangible or intangible, choate or inchoate.

"**PSV Vessels**" means the Celena Chouest (ON 1201702), the Gavea (ON 1211932), the Dante (ON 1178758), the Lyman Martin (ON 1227085), the Pao de Acucar (ON 1218372), and the Jackie Chouest (ex-Andrea Chouest) (ON 1210979).

"**PSV Vessel Sale Proceeds**" means the Net Sale Proceeds from the sale of the PSV Vessels.

"**PTE**" is defined in Section 6.2(a).

"**Prudential**" means The Prudential Insurance Company of America and its successors.

"**Qualified Institutional Buyer**" means any Person who is a "qualified institutional buyer" within the meaning of such term as set forth in Rule 144A(a)(1) under the Securities Act.

"**Register**" is defined in Section 13.1.

"**Related Fund**" means, with respect to any holder of any Note, any fund or entity that (i) invests in Securities or bank loans, and (ii) is advised or managed by such holder, the same investment advisor as such holder or by an affiliate of such holder or such investment advisor.

"**Related Parties**" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release and Reassignment**" means the Release and Reassignment of Interests in All Charters, Earnings, Insurances and Other Personal Property Collateral from JPMorgan Chase Bank N.A. to the Company, in form and substance reasonably satisfactory to the Agent.

"**Relevant Groups**" means each of the ECO U.S. Vessels, ECO U.S. Ports, ECO U.S. Shipyards and ECO Brazil.

"**Repurchase Agreement**" means any written agreement that (a) provides for (i) the transfer of one or more United States Governmental Securities in an aggregate principal amount at least equal to the amount of the Transfer Price (defined below) to the Company from an Acceptable Bank (defined below) or an Acceptable Broker-Dealer (defined below) against a transfer of funds (the "**Transfer Price**") by the Company to such Acceptable Bank or Acceptable Broker-Dealer, and (ii) a simultaneous agreement by the Company, in connection with such transfer of funds, to transfer to such Acceptable Bank or Acceptable Broker-Dealer the same or substantially similar United States Governmental Securities for a price not less than the Transfer Price plus a return thereon determined by the Company to be reasonable at a date certain not later than three days after such transfer of funds, (b) in respect of which the Company shall have the right, whether by contract or pursuant to applicable law, to liquidate such agreement upon the occurrence of any default thereunder, and (c) in connection with which the Company, or an agent thereof, shall have taken all action required by applicable law or regulations to perfect a first priority Lien in such United States Governmental Securities.  As used herein, "**Acceptable Bank**" means any bank or trust company (A) which is organized under the laws of the United States of America or any State thereof, (B) which (combined, in the case of Bank One, Louisiana, National Association only, with its Affiliates with common holding company ownership) has capital, surplus and undivided profits aggregating at least $500,000,000, and (C) whose long-term unsecured debt obligations (or the long-term unsecured debt obligations of the bank holding company owning all of the capital stock of such bank or trust company) shall have been given a rating of "**A**" or better by S&P, "**A2**" or better by Moody's or an equivalent rating by any other credit rating agency of recognized national standing.  As used herein, "**Acceptable Broker-Dealer**" means any Person other than a natural person (A) which is registered as a broker or dealer pursuant to the Exchange Act and (B) whose long-term unsecured debt obligations shall have been given a rating of "**A**" or better by S&P, "**A2**" or better by Moody's or an equivalent rating by any other credit rating agency of recognized national standing.

"**Required Holders**" means at any time on or after the Closing, the Noteholders holding at least 50.1% in principal amount of the Notes at the time outstanding (exclusive of Notes then owned by the Company or any of its Affiliates).

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" means, with respect to the Company, any Senior Financial Officer and any other Person with responsibility for the administration of the relevant portion of this Agreement or with the power to direct the management and policies of the Company including, the chief executive officer, chief operating officer, president, manager, chief financial officer, treasurer, controller, or general counsel (if any) of the Company or any entity of which the Company is a Subsidiary.

"**Restricted Payment**" means (a) the declaration or payment of any dividend on, or the making of any distribution in respect of, any Capital Stock of Holdings, the Company or any of their Subsidiaries, other than dividends or distributions payable solely in Capital Stock constituting the limited liability company equivalent of common stock of Holdings, the Company or, in the case of a Subsidiary, dividends or other payments or distributions in respect of its Capital Stock paid to the Company or Holdings, and other than payments to the Members of the Final Tax Liability Amount to the extent permitted by Section 4.9, (b) the purchase, redemption, retirement or other acquisition, whether direct or indirect, of any Capital Stock of Holdings, the Company or their Subsidiaries, (c) with respect to any amounts due from a Chouest Affiliate or Members of Holdings, any forgiveness, compromise or other modification thereto resulting in a reduction in the amount owed to Holdings or the Company, or (d) the payment of any premium by Holdings, the Company or any Subsidiary with respect to any life or disability insurance policy as to which Holdings, the Company or any Subsidiary is not a beneficiary.  For purposes of this definition and Section 10.11, dividends or distributions in respect of the Capital Stock of Holdings and the Company shall be

deemed to include all salaries, bonuses and other compensation paid by or on behalf of (including, without limitation, allocations by Galliano Marine Services) Holdings, the Company or any Subsidiary to any such owners of Capital Stock of Holdings or to any other individuals who are Chouest Affiliates.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement made and entered into as of September 6, 2022, by and among the Company, the consenting creditors party thereto and the consenting stakeholders party thereto, as amended by the Amendment and Joinder Agreement in Respect of Restructuring Support Agreement, dated as of February 14, 2023, and as it may be amended, restated, supplemented or otherwise modified from time to time.

"**S&P**" means Standard & Poor's Ratings Services.

"**Sale and Lease-Back Transaction**" means, with respect to any Person, any direct or indirect arrangement pursuant to which property is sold or transferred by such Person or a subsidiary of such Person and is thereafter leased back from the Noteholder or transferee thereof by such Person or one of its subsidiaries.

"**Sanctioned Country**" means, at any time, a country, region or territory which is itself the subject or target of any Economic Sanctions (at the time of this Agreement, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, the Crimea Region of Ukraine, Cuba, Iran, North Korea and Syria).

"**SEC**" means the Securities and Exchange Commission.

"**Securities**" or "**Security**" shall have the meaning specified in section 2(1) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Security Agreement**" means the Security Agreement dated as of the Closing Date, in substantially the form of Exhibit F, among the Company, Holdings and the Collateral Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Security Documents**" means the Security Agreement, the Pledge Agreement, all related financing statements and any and all other agreements, security agreements, pledge agreements, collateral assignments, Fleet Mortgages, Assignment of Insurances, ship mortgages, Assignments of Charters and Hire, Control Agreements, Intellectual Property Agreements, Assignment of First Preferred Fleet Mortgage, Amended and Restated First Preferred Fleet Mortgage, guaranties, assignments of income, standby agreements, subordination agreements, undertakings and other instruments and financing statements now or hereafter executed and delivered as security for the payment and performance of the Note Obligations, as any of them may from time to time be amended, modified, restated or supplemented.

"**Senior Financial Officer**" means the chief financial officer, principal accounting officer, treasurer or comptroller of the Company.

"**Series A Note Purchase Agreement**" means the Amended and Restated Note Purchase Agreement dated as of the December 7, 2018 (as subsequently amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among the Company and the Noteholders party thereto, relating to the Company's 7.50% Senior Secured Notes, Series A, due on the Maturity Date (as defined therein).

"**Series B Note Purchase Agreement**" means the Amended and Restated Note Purchase Agreement dated as of the December 7, 2018 (as subsequently amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among the Company and the Noteholders party thereto, relating to the Company's 7.50% Senior Secured Notes, Series B, due on the Maturity Date (as defined therein).

"**Shipowner's Certificate**" is defined in Section 9.2(b)(iii)(B)(1).

"**Solvent**" shall mean, with respect to any Person as of the date of any determination, that on such date (i) the fair value of the property of such Person (both at fair valuation and at present fair saleable value) is greater than the total amount of liabilities, including, without limitation, contingent or subordinated liabilities, of such Person, (ii) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute unreasonably small capital after giving due consideration to current and anticipated future capital requirements and current and anticipated future business conduct and the prevailing practice in the industry in which such Person is engaged.  In computing the amount of contingent liabilities at any time, such liabilities shall be computed at the amount which, in light of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability and (iii) such Person will not incur liabilities beyond its ability to pay such liabilities as they mature, taking into account the timing of and amounts of cash to be received by it and the timing of the amounts of cash to be payable on or in respect of its Indebtedness.

"**Specified Noteholder Fee**" has the meaning assigned to such term in Section 8.1(c).

"**Specified Noteholder Fee Amount**" has the meaning assigned to such term in Section 8.1(c).

"**Specified Prepayment Amount**" means an amount of not less than $84,000,000 from any PSV Vessel Sale Proceeds and any Cure Amount specifically to increase the Specified Prepayment Amount, in each case applied to reduce the aggregate principal amount of the Notes.

"**Subsidiary**" means, as to any Person, any other Person in which such first Person or one or more of its Subsidiaries or such first Person and one or more of its Subsidiaries owns sufficient equity or voting interests to enable it or them (as a group) ordinarily, in the absence of contingencies, to elect a majority of the Board of Directors of such second Person, and any partnership or joint venture if more than a 50% interest in the profits or capital thereof is owned by such first Person or one or more of its Subsidiaries or such first Person and one or more of its Subsidiaries (unless such partnership or joint venture can and does ordinarily take major business actions without the prior approval of such Person or one or more of its Subsidiaries).  Unless the context otherwise clearly requires, any reference to a "Subsidiary" is a reference to a Subsidiary of the Company.  Although the Company is a Subsidiary of Holdings, references herein to "Subsidiary" do not include the Company unless specified so.

"**Supplement to the Fleet Mortgage**" means a supplement to the Fleet Mortgage from the Company to the Collateral Agent, as mortgagee, to be executed in substantially the form of Exhibit G hereto.

"**Support Agreements**" means those certain Support Undertaking dated as of the Closing Date (which will be collaterally assigned as of the Closing Date to the Collateral Agent) substantially in the form of Exhibit I hereto.

"**SVO**" means the Securities Valuation Office of the NAIC or any successor to such Office.

"**Swap Contract**" means (a) any and all interest rate swap transactions, basis swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward foreign exchange transactions, cap transactions, floor transactions, currency options, spot contracts or any other similar transactions or any of the foregoing (including, without limitation, any options to enter into any of the foregoing), and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., or any International Foreign Exchange Master Agreement.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amounts(s) determined as the mark-to- market values(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts.

"**Synthetic Lease**" means, at any time, any lease (including leases that may be terminated by the lessee at any time) of any property (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor.

"**Tax Account**" is defined in Section 4.10(b).

"**Tax Liability Amount**" means the actual tax liability of the Members of the Company (i.e. the Members of Holdings after the Closing) payable with respect to any income from cancellation of debt arising solely from the exchange of the Exchanged Debt for the Notes pursuant to Section 2.1 of this Agreement (including with respect to gain recognized under Section 731(a)(1) of the Code from such cancellation of debt or from the cash distributable to Holdings and then by Holdings to its Members pursuant to Section 4.9(b) to pay such tax liability), calculated taking into account any suspended losses and other deductions or credits available to a Member from whatever source and treating the cash distributable to the Members pursuant to Section 4.9(b) as distributed in the same taxable year as the exchange of the Exchanged Debt for the Notes. For purposes of the Tax Liability Amount calculation, the Notes will be allocated among the Members under Section 752 of the Code in the same proportions as the Exchanged Debt without regard to the status of the debt as recourse or nonrecourse (with the only reduction of allocable liabilities for a Member under Section 752 of the Code resulting from a reduction in the amount of the Company's liabilities as a result of the exchange of the Exchanged Debt for Notes). Further, for purposes of determining whether a Member recognizes gain under Section 731(a)(1) of the Code from such cancellation of debt and the cash distributable pursuant to Section 4.9(b) any increase in the tax basis of a Member from such cancellation of debt will be deemed to be applied first against the amount deemed distributed to such Member under Section 752 of the Code and the cash distributable pursuant to Section 4.9(b). Any reduction of, use of or limitation on any suspended losses or deductions or credits of the Members of the Company (i.e. the Members of Holdings after the Closing) resulting from any transaction(s) engaged in, or allowed, by the Consenting Members (as defined in the Restructuring Support Agreement) and/or the Note Parties and their Subsidiaries outside the ordinary course and occurring on or after the Execution Date (as defined in the Restructuring Support Agreement) shall be disregarded and the applicable tax attributes shall be taken into account as if such transaction(s) had not occurred.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Test Period**" means, as of the last day of any fiscal quarter, any four consecutive fiscal quarters ended on such date; provided that, "Test Period" means (i) as of the last day of the first full fiscal quarter after the Closing Date, such first full fiscal quarter, (ii) as of the last day of the second full fiscal quarter after the Closing Date, such first two full fiscal quarters and (iii) as of the last day of the third full fiscal quarter after the Closing Date, such first three full fiscal quarters.

"**Threshold Amount**" is defined in Section 9.2(b)(iv)(B).

"**Total Assets**" shall mean all assets of the Company determined in accordance with GAAP.

"**Total Liabilities**" means, without duplication, the sum of (a) all liabilities of the Company determined in accordance with GAAP <u>plus</u> (b) all Indebtedness of the Company, whether or not so classified.

"**Trust Officer**" means, when used with respect to the Agent or the Collateral Agent, as applicable, any officer assigned to the Global Capital Markets – Project Finance Trust and Agency Services (or any successor division or unit) of the Agent or the Collateral Agent, as applicable, located at the Corporate Trust Office of the Agent or the Collateral Agent, as applicable, who shall have direct responsibility for the administration of the Note Documents to which the Agent or the Collateral Agent, as applicable, is party.

"**Tug Vessel**" means the Forte (ON 1223605).

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Uniform Commercial Code**" means the Uniform Commercial Code as in effect from time to time in the State of New York (or in any other applicable jurisdiction).

"**United States Governmental Security**" means any direct obligation of, or obligation fully guaranteed by, the United States of America, or any agency controlled or supervised by or acting as an instrumentality of the United States of America pursuant to authority granted by the Congress of the United States of America, so long as such obligation or guarantee shall have the benefit of the full faith and credit of the United States of America which shall have been pledged pursuant to authority granted by the Congress of the United States of America.

"**Unrestricted Cash**" means available cash of the Company on deposit in an account located in the United States that is subject to a Control Agreement, unencumbered (other than Liens in favor of the Collateral Agent as security for the Note Obligations or statutory Liens in favor of a depository bank) and not prohibited by law or any other contract or agreement (other than this Agreement and any other Note Document) from being applied to prepay Funded Debt.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" has the meaning assigned to such term in Section 8.3(e)(ii)(B)(3).

"**USA PATRIOT Act**" means United States Public Law 107-56, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Vessel Sale**" as defined at Section 9.21(a).

"**Vessels**" means the collective reference to the vessels identified on the Schedule C hereto, and any other vessel which becomes subject to the Lien of the Fleet Mortgage; provided, that if all Liens in favor of the Collateral Agent on any Vessel were to be released, then such Vessel shall no longer be a Vessel hereunder.

"**Voting Stock**" means, with respect to any Person, securities of any class or classes of Capital Stock in such Person entitling the holders thereof under ordinary circumstances to vote in the election of members of the board of directors (or Persons performing similar functions) of such Person (irrespective of whether at the time stock of any other class or classes shall have or might have voting power or rights by reason of the happening of any contingency).

"**Wholly-Owned Subsidiary**" means, at any time, any Subsidiary all of the equity interests (except directors' qualifying shares) and voting interests of which are owned by any one or more of the Company and the Company's other Wholly-Owned Subsidiaries at such time.

"**Withholding Agent**" means the Company and the Agent.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**Schedule 4.10(g)**

**Exchanged Debt**

1. Exchanged Term Loan

2. Exchanged Series A Notes

3. Exchanged Series B Notes

**Schedule 4.10(k)**

**Deposit Accounts Subject to Control Agreements**

**BANK – ACCOUNT #**

- Nautical Solutions, L.L.C. Operating Account at Chase – Account number ending in 4148

- Nautical Solutions, L.L.C. Guyana Operating Account at Chase – Account number ending in 7113

**Schedule 5.4**

**Note Parties; Subsidiaries; Affiliates; Directors and Senior Officers**

## NOTE PARTIES

| Entity Name | Jurisdiction | % of Shares/Capital Stock/Equity Interests Held |
|---|---|---|
| Nautical Solutions, L.L.C. | Louisiana | 100% |
| Nautical Solutions Holdings, LLC | Louisiana | 100% |

## SUBSIDIARIES

Nautical Solutions (Texas), LLC, a Texas limited liability company[1]

## AFFILIATES WITH NET EQUITY OF $20,000,000 OR MORE

- 4 Boats Holdings, LLC
- Alaska Ventures, LLC
- Benchmark Marine Services, LLC
- Bollinger Shipyards, LLC
- C-Innovation, LLC
- C-Lift Holdings, LLC
- C-Logistics, LLC
- C-Port 2, LLC
- C-Port 3, LLC
- C-Port, LLC
- C-Survey, LLC
- C-Terminal, LLC
- C and B Holdings of Louisiana, LLC
- Central Port, LLC
- Duh Boats 2 Partnership C.V.
- GCGK Investments, LLC
- GIS, LLC
- GIS Holdings, LLC
- Island Ventures II, LLC

---

[1] To be dissolved after 21 days after confirmation order.

- Leba Holdings, LLC
- Martin Holdings, LLC
- Nautical Solutions, LLC
- Nautical Ventures, LLC
- Offshore Support Services, LLC
- Plain Stim, LLC
- Reel Pipe, LLC
- Stim Star IV, LLC
- Team KGK Holdings, LLC
- Team KGK, LLC
- Young Guns Holdings, LLC
- Young Guns Holdings 2, LLC
- Bram Offshore, Ltda
- Bram USA, LLC
- Holiday, LLC
- Jack Russell, LLC
- Stim Tugs, LLC
- Team Marine, LLC
- Ted Juan, LLC
- Estaleiro Navship Ltda
- Duh Boats, B.V.
- Duh Boats Partnership, C.V.
- Offshore Service Vessels, LLC
- Alpha Marine Services, LLC
- Beta Marine Services, LLC
- Gamma Marine, LLC
- Island Drilling, LLC
- Mega Marine, LLC

**DIRECTORS AND KEY SENIOR OFFICERS**

Nautical Solutions, L.L.C.

- Dionne Austin, Dino Chouest, Damon Chouest and Ross Chouest – Managers

- This particular limited liability company has not officially appointed officers, but each of Gary Chouest, Dionne Austin, Dino Chouest, Damon Chouest and Ross Chouest are involved in the management and Charlie Comeaux is the equivalent of a chief financial officer for ECO companies.

Nautical Solutions Holdings, LLC

- Dionne Austin and Dino Chouest – Managers

- This particular limited liability company has not officially appointed officers, but each of Gary Chouest, Dionne Austin, Dino Chouest, Damon Chouest and Ross Chouest are involved in the management and Charlie Comeaux is the equivalent of a chief financial officer for ECO companies.

**Schedule 5.5**

**Financial Statements**

For the year ended December 31, 2021 audited financial statements prepared by Ernst & Young for Nautical Solutions, L.L.C.

Nautical Solutions, L.L.C. balance sheet and statement of cash flows as of September 30, 2022 and income statement for the nine months ending September 30, 2022, internally prepared by management of the Company.

**Schedule 5.15**

**Existing Indebtedness**

None.

**Schedule 5.27**

**Transactions with Affiliates**

**Nautical Solutions**
**Aggregate Payments to Affiliates > $5M**

| Affiliate | 2022[2] | 2021 | TOTAL | Description |
|---|---|---|---|---|
| Galliano Marine Service, LLC | 57,502,720 | 37,059,543 | 94,562,263 | Labor, Payroll Taxes, Health Insurance, Management |
| Galliano Marine Service International | 3,838,868 | 3,516,686 | 7,355,554 | Labor |
| North American Shipbuilding, LLC | 5,534,008 | 795,994 | 6,330,002 | Repairs, Reactivations, & Modifications |
| LaShip, LLC | 15,737,718 | 1,488,320 | 17,226,038 | Repairs, Reactivations, & Modifications |
| C-Innovation, LLC | 4,276,611 | 5,765,858 | 10,042,469 | ROV Rental Payments |
| Offshore Service Vessels, LLC | 3,435,624 | 2,890,454 | 6,326,078 | Vessel Insurance Reimbursements |
| C-Port/Stone, LLC | 3,182,423 | 3,283,083 | 6,465,506 | Fuel payments |
| Stim Tugs, LLC | 873,185 | 6,735,982 | 7,609,167 | Blue Orca bareboat charter payments (Charter ended) |

**Aggregate Payments from Affiliates > $5M**

| Affiliate | 2022 | 2021 | TOTAL | Description |
|---|---|---|---|---|
| C-Logistics, LLC | 103,473,052 | 89,410,222 | 192,883,274 | Bareboat charter hire |
| C-Innovation, LLC | 3,884,081 | 8,922,757 | 12,806,838 | Bareboat charter hire (Charter has now ended) |
| 5K LP, LLC | 20,861,834 | 19,537,949 | 40,399,783 | Payment of dividends made through G-Boats, Inc regarding charters of Nautical Solutions vessels in Guyana (conduit to reduce Guyana taxes) |

---

[2] Through 12/31/2022.

Schedule 5.27
(to Note Exchange Agreement)

**Schedule 10.9**

**Existing Investments**

None.

**Schedule 10.20**

**Deposit Accounts Not Subject to Control Agreements**

**BANK – ACCOUNT #**

- Nautical Solutions Holdings, LLC Tax Account at Chase – Account number ending in 5816

## EXHIBIT A

## NAUTICAL SOLUTIONS, L.L.C.

## [FORM OF] SENIOR SECURED NOTE, DUE FEBRUARY 24, 2028

No. [R][B]-[•]                                                    February 24, 2023

$[•]                                                    CUSIP Number: 63910V-AA6

FOR VALUE RECEIVED, the undersigned, NAUTICAL SOLUTIONS, L.L.C. (herein called the "**Company**"), a limited liability company organized and existing under the laws of the State of Louisiana, hereby promises to pay to [_____], or registered assigns, the principal sum of [___] DOLLARS, all interest, amounts, fees and premiums thereon and any other applicable Note Obligations owed to the holder of this Note to be paid under, and in accordance with the terms of, the Note Exchange Agreement until such time as the principal hereof has been repaid in full in cash.

Payments of principal of, interest on, and any Exit Fee with respect to this Note are to be made in lawful money of the United States of America to the account of the Agent (hereinafter defined) designated by written notice to the Company and the holder of this Note as provided in the Note Exchange Agreement referred to below.

This Note is one of a series of senior secured notes (herein called the "**Notes**") issued pursuant to the Note Exchange Agreement, dated as of [●], 2023 (as amended, restated, amended and restated, supplemented and/or modified from time to time, the "**Note Exchange Agreement**"), among the Company, Nautical Solutions Holdings, LLC, the respective Noteholders named therein and Wilmington Trust, National Association, as agent for the Noteholders (in such capacity, including its successors and assigns in such capacity, the "**Agent**") and as collateral agent for the Noteholders (including its successors and assigns in such capacity) and is entitled to the benefits thereof.  The holder of this Note will be deemed, by its acceptance hereof, to have agreed to the confidentiality provisions set forth in Section 20 of the Note Exchange Agreement.  Unless otherwise indicated, capitalized terms used in this Note shall have the respective meanings ascribed to such terms in the Note Exchange Agreement.

This Note is a registered Note and, as provided in and subject to the Note Exchange Agreement, upon surrender of this Note for registration of transfer accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note for a like principal amount will be issued to, and registered in the name of, the transferee. Prior to due presentment for registration of transfer, the Company may treat the person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Company will not be affected by any notice to the contrary.

The Company will make required prepayments of principal on the dates and in the amounts specified in the Note Exchange Agreement. This Note is also subject to optional prepayment, in whole or from time to time in part, at the times and on the terms specified in the Note Exchange Agreement, but not otherwise.

This Note is secured by the Security Documents.

If an Event of Default occurs and is continuing, the principal of this Note may be declared or otherwise become due and payable in the manner, at the price (including any applicable Exit Fee) and with the effect provided in the Note Exchange Agreement.

This Note shall be construed and enforced in accordance with, and the rights of the Company and the holder of this Note shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

Assignment of this Note is subject to the Note Exchange Agreement.

[Signature Page Follows]

NAUTICAL SOLUTIONS, L.L.C.

By_____
Name:
[Title]

**[FORM OF] ASSIGNMENT OF CHARTERS AND HIRE**

This ASSIGNMENT OF CHARTERS AND HIRE (this "*Assignment*") is made this [●] day of [●], 2023, by NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company (the "*Assignor*"), in favor of Wilmington Trust, National Association, in its capacity as collateral agent for the Secured Parties under and as defined in the Security Agreement (as such term is defined in the Note Exchange Agreement defined below), as required by the Note Exchange Agreement (together with its successors and permitted assigns, in such capacity, the "*Assignee*").

WITNESSETH:

WHEREAS, pursuant to the terms and conditions of that certain Note Exchange Agreement dated as of the date hereof (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Note Exchange Agreement*"), by and among the Assignor, Nautical Solutions Holdings, LLC, a Louisiana limited liability company, as the parent company of Assignor, and the financial institutions parties thereto, as noteholders, Wilmington Trust, National Association, as Agent and the Assignee, the Assignor has agreed to issue Senior Secured Notes due [●], 2028 in the amount set forth in the Note Exchange Agreement (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any notes delivered in substitution or exchange for any of the foregoing senior secured notes, the "*Senior Notes*");

WHEREAS, the Assignor has executed and delivered, or will execute and deliver, the Senior Notes to the respective noteholders thereof identified in the Note Exchange Agreement (collectively, together with such noteholders' successors and assigns, the "*Noteholders*"), such Senior Notes to be in the amount set forth in the Note Exchange Agreement and each to be due and payable in the amounts and upon the terms and conditions therein recited, with interest and other amounts as set forth in the Note Exchange Agreement;

WHEREAS, the Assignor is the sole legal and beneficial owner of the vessels more particularly described on Schedule 1 attached hereto and made a part hereof (collectively, subject to the terms and conditions of Section 17 hereof, the "*Vessels*" and each, a "*Vessel*");

WHEREAS, from time to time certain Vessels are (or will be) subject to certain charter agreements, contracts of affreightment or other similar agreements related to the use, operation and/or employment of the Vessels with the charterers identified in such agreements (collectively, the "*Charterers*" and individually, a "*Charterer*");

WHEREAS, any such agreement (as the same may be amended, restated, amended and restated, supplemented, extended or renewed from time to time) that (a) is entered into with a Chouest Affiliate, or (b) has an indicated duration of at least one (1) year (including any optional extensions or renewals) shall be referred to herein collectively as the "*Charters*" and each individually as a "*Charter*";

WHEREAS, it is a condition precedent to the exchange of the Exchanged Debt for the Senior Notes that the Assignor execute and deliver to the Assignee, as security for the full and timely payment and performance of any and all present and future indebtedness, obligations and liabilities of the Assignor to the Secured Parties, whether direct or indirect, absolute or contingent,

due or to become due, or now existing or hereafter incurred, which may arise under, out of or in connection with Note Documents to which the Assignor is a party, in each case whether on account of principal, interest (including, without limitation, as a result of increases to applicable interest rates), Specified Noteholder Fee (if any), Exit Fee (if any), Note Obligations, fees, indemnities, costs, expenses or otherwise, and including, without limitation, all fees and disbursements of counsel to the Assignee and the Noteholders that are required to be paid by the Assignor pursuant to the terms of any of the Note Documents (collectively, and including any and all renewals, modifications, amendments, extensions for any period, supplements and restatements of any of the foregoing, the "*Secured Obligations*"), an assignment of all of the Assignor's right, title and interest in and to (a) all of the Charters and all amounts payable by the Charterers to the Assignor thereunder, and (b) all earnings and requisition compensation of the Vessels; and

WHEREAS, the Assignor, in order to secure the full and timely repayment of the Secured Obligations and performance and observance of, and compliance with, the covenants, terms and conditions contained in the Note Exchange Agreement, this Assignment and the other Note Documents, has duly authorized the execution and delivery of this Assignment.

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby agrees as follows:

1.      <u>Defined Terms</u>.  Capitalized terms used herein and not otherwise defined are used herein as defined in the Note Exchange Agreement.

2.      <u>Grant of Security</u>.  As security for the full and timely payment and performance of the Secured Obligations, the Assignor does hereby sell, assign, transfer and set over unto the Assignee, and does hereby grant to the Assignee a continuing, first priority security interest in and to, all of its right, title and interest in and to: (a) all freights, hire, earnings and other moneys earned and to be earned, due or to become due, or paid or payable to, or for the account of, such Assignor, of whatsoever nature, arising out of or as a result of the use, operation, pooling or chartering by the  Assignor or its agents of the Vessels, including, without limitation, all rights arising out of the Assignor's lien on cargoes and subfreights thereunder, (b) each Charter, including, without limitation, within such assignment all freights, hire, earnings and other moneys earned and to be earned, due or to become due, or paid or payable to, or for the account of, the Assignor, of whatsoever nature, arising out of or as a result of such Charter, including, without limitation, all rights arising out of the owner's lien on and/or security interest in all cargoes and subfreights thereunder, and all rights of the Assignor to terminate such Charter, to perform thereunder and to compel performance of the terms thereof, (c) all rights, remedies, powers, privileges and claims for moneys due and to become due to the Assignor, and claims for moneys due and to become due to the Assignor, and all claims for damages, arising out of the breach of any and all present and future charter parties, including any and all Charters, pooling arrangements, bills of lading, contracts and other engagements of affreightment or for the carriage or transportation of cargo, and operations of every kind whatsoever of any Vessel and in and to any and all claims and causes of action for money, loss or damages that may accrue or belong to the Assignor, its successors or assigns, arising out of or in any way connected with the present or future use, operation, pooling, or chartering of any Vessel or arising out of or in any way connected with any and all present and future requisitions, charter parties (including all Charters), pooling arrangements, bills of lading,

contracts and other engagements of affreightment or for the carriage or transportation of cargo and other operations of any Vessel, (d) the right to give and receive all notices and other instruments or communications under a Charter, (e) the right to take such action, including the commencement, conduct and consummation of legal, administrative or other proceedings, as shall be permitted by a Charter, or by law, (f) all moneys and claims due and to become due to the Assignor, and all claims for damages and all insurances and other proceeds, in respect of the actual or constructive total loss or the agreed, arranged or compromised total loss of or requisition of use of or title to any Vessel, and (g) any proceeds of any of the foregoing and all interest and earnings from the investment of any of the foregoing and the proceeds and products thereof.  The security created by this Assignment shall be held by the Assignee as a continuing security for the full and timely payment and performance of the Secured Obligations.  The security so created shall not be satisfied by any intermediate payment or satisfaction of any part of the Secured Obligations, and such security shall be in addition to and shall not in any way be prejudiced or affected by any other collateral or security now or hereafter held by the Assignee.  The rights hereby assigned may be further assigned by the Assignee in connection with the transfer of the Secured Obligations or the enforcement of the pledge thereof.

3.      <u>Agreement and Consent to Assignment of Charter</u>.  The Assignor undertakes, immediately following the execution of this Assignment, to give written notice (substantially in the form set out in <u>Exhibit A</u>) to any Charterer under a Charter that is (a) a Chouest Affiliate, or (b) not a Chouest Affiliate with a Charter having an indicated duration of at least one (1) year (including  any optional extensions or renewals) of the assignment of such Charter pursuant to this Assignment, and to (i) procure the acknowledgement of such notice (in the form provided in the notice) by any Charterer that is a Chouest Affiliate, and (ii) use commercially reasonably efforts to procure the acknowledgement of such notice (in the form provided in the notice) by any Charterer that is not a Chouest Affiliate with a Charter having an indicated duration of at least one (1) year (including any optional extensions or renewals).

4.      <u>Representations and Warranties</u>.  The Assignor hereby represents and warrants to the Assignee, as an inducement to the Assignee to accept this Assignment, that neither the whole nor any part of the right, title and interest hereby assigned is the subject of any present assignment, security interest or pledge other than the one prior assignment previously executed in favor of JPMorgan Chase Bank, N.A., in its capacity as collateral agent and mortgagee for the Secured Parties party to that certain Credit Agreement dated as of November 14, 2013, as heretofore amended and supplemented from time to time that is being released substantially concurrently herewith.

5.      <u>Covenants</u>.  The Assignor hereby covenants to the Assignee that:

(a)      If an Event of Default has occurred and is continuing, and without derogation of the rights of the Assignee under <u>Section 8</u> hereof to issue instructions to a Charterer directly, upon request of the Assignee, the Assignor shall specifically authorize and direct each Charterer to make payment of all of the freights, hire, earnings and other moneys due and to become due, or payable to, on for the account of, the Assignor under any Charter hereby assigned directly to the Assignee in accordance with the Note Documents, and shall deliver to the Assignee the written acknowledgment from each Charterer of such instructions promptly after receipt thereof.  Notwithstanding anything to the contrary, the Assignor and the Assignee hereby agree

3

that so long as no Event of Default shall have occurred and be continuing, the Assignor shall be entitled to exercise its rights under each Charter as if this Assignment did not exist and otherwise to receive and retain any and all moneys assigned hereunder.

(b)     The Assignor shall notify the Assignee promptly of any and all time charter parties or series of successive voyage charter parties, contracts of affreightment or pooling arrangements entered into by the Assignor respecting any Vessel having an indicated duration of at least one (1) year (including any exercised optional extensions or renewals) and, upon the Assignee's request, any other charter party or any such other agreement.

(c)     So long as this Assignment is in effect, the Assignor shall not assign, grant a security interest in or pledge the whole or any part of the right, title and interest hereby assigned to anyone other than the Assignee without the prior written consent of the Noteholders in accordance with the respective Note Documents.

(d)     At any time and from time to time, upon the written request of the Assignee, the Assignor shall promptly and duly execute and deliver any and all such further instruments and documents as the Assignee may reasonably request in order to obtain the full benefits of this Assignment and of the rights and powers herein granted; provided, that no notices or requests shall be required to be sent (or shall be sent) to any Charterer (other than as set forth in Section 5(a) above) unless an Event of Default has occurred and is continuing.

(e)     Whenever requested by the Assignee, the Assignor shall promptly deliver letters to each of its agents and representatives into whose hands or control may come any freights, hire, earnings or other moneys hereby assigned, informing each such agent and representative of this Assignment, and if any Event of Default has occurred and is continuing, instructing such agent and representative to remit or deliver promptly to the Assignee all freights, subfreights, hire, earnings and other moneys hereby assigned which may come into such agents' and representatives' hands or control and to continue to make such remittances or delivery until such time as such agents and representatives may receive written notice or instructions to the contrary direct from the Assignee.  The Assignor shall copy the Assignee on each such correspondence and use its commercially best efforts to procure that each such agent and representative shall acknowledge directly to the Assignee receipt of the Assignor's letter of notification and instructions.

6.     Payment of Secured Obligations.  The Assignor will pay and perform the Secured Obligations as and when the same shall be due for payment or performance.

7.     Freedom of Assignee from Obligations.  It is hereby expressly agreed that anything herein contained to the contrary notwithstanding, (a) the Assignor shall at all times remain fully liable under each Charter to perform all of the obligations assumed by it thereunder, (b) the obligations of the Assignor under any Charter may be performed by the Assignee or its nominee without releasing the Assignor therefrom, and (c) the Assignee shall have no obligation or liability under any charter party (including any Charter), contract of affreightment or pooling arrangement by reason of or arising out of this Assignment, nor shall the Assignee be required or obligated in any manner to perform or to fulfill any obligations of the Assignor under or pursuant to any charter party (including any Charter), contract of affreightment or pooling arrangement nor to make any payment, nor to make any inquiry as to the nature or sufficiency of any payment received by the

Assignee or to present or to file any claim, or to take any other action to collect or to enforce the payment of any amounts which may have been assigned to it or which it may be entitled to hereunder at any time or times.

8.     <u>Payment Directions to Charterers; Power of Attorney; Financing Statements</u>.  Upon the occurrence and during the continuance of an Event of Default, the Assignee shall be entitled to direct any Charterer and any other obligors to pay all freights, hire, earnings and other moneys assigned hereunder to such bank account as the Assignee may from time to time designate.  Upon request of the Assignor, the Assignee shall furnish the Assignor with information from time to time as to the accounts into which all freights, hire, earnings and other moneys assigned hereunder are paid, the amounts and sources of such payments and the amounts and application of moneys withdrawn therefrom.  The Assignee is hereby constituted the lawful attorney of the Assignor, irrevocably, with full power of substitution (in the name of the Assignor or otherwise) upon the occurrence and during the continuance of an Event of Default, to take any action and to execute any instruments which the Assignee may deem necessary or advisable to accomplish the purposes hereof, including, without limitation, to ask, require, demand, receive, compound and give acquittance for any and all freights, hire, earnings, moneys, claims, property and rights hereby assigned, to endorse any checks or other instruments or orders in connection therewith and to file any claims or to take any action or to institute any proceedings which the Assignee may deem to be necessary or advisable in the premises.  Any action or proceeding brought by the Assignee pursuant to any of the provisions hereof or of any charter party (including any Charter), contract of affreightment, pooling arrangement or otherwise, and any claim made by the Assignee hereunder or under any charter party (including any Charter), contract of affreightment or pooling arrangement,  may be compromised, withdrawn or otherwise dealt with by the Assignee without any notice to, or approval of, the Assignor.  The Assignor hereby irrevocably authorizes the Assignee (or its designee) to file, at any time and from time to time, at the Assignor's sole cost and expense, such financing and continuation statements or papers of similar purpose or effect relating to this Assignment, without the Assignor's signature or authentication, as the Assignee at its sole option may deem appropriate and appoints the Assignee as the Assignor's attorney-in-fact (with full power of substitution) to execute or authenticate any such statements in the Assignor's name and to perform all other acts which the Assignee may deem necessary or appropriate to perfect and to continue the perfection and priority of any security interest conferred hereby.

9.     <u>Irrevocable Assignment</u>.  The powers and authority granted to the Assignee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with an interest and may not be amended or waived except by an instrument in writing signed by the party against whom such enforcement is sought.

10.     <u>Remedies Cumulative and Not Exclusive; No Waiver</u>.  Each and every right, power and remedy herein given to the Assignee shall be cumulative and shall be in addition to every other right, power and remedy of the Assignee now or hereafter existing at law, in equity, in admiralty or by statute, and each and every right, power and remedy, whether herein given or otherwise existing, may be exercised from time to time, in whole or in part, and as often and in such order as may be deemed expedient by the Assignee, and the exercise or the beginning of the exercise of any right, power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.  No delay or omission by the Assignee in the exercise of any right or power in the pursuance of any remedy accruing upon any breach or default

by any Person shall impair any such right, power or remedy or be construed to be a waiver of any such right, power or remedy or to be an acquiescence therein; nor shall the acceptance by the Assignee of any security or of any payment of or on account of the Secured Obligations be construed to be a waiver of any right to take advantage of any future breach or default or of any past breach or default not completely cured thereby.

11.     Invalidity.  If any provision of this Assignment shall at any time for any reason be declared invalid, void or otherwise inoperative by a court of competent jurisdiction, such declaration or decision shall not affect the continued validity of any other provision or provisions of this Assignment, or the validity of this Assignment as a whole.  In the event that it should transpire that by reason of any law or regulation, or by reason of a ruling of any court, or by any other reason whatsoever, the assignment herein contained is either wholly or partly defective, the Assignor hereby undertakes to furnish the Assignee with an alternative assignment or alternative security and/or to do all such other acts as, in the sole opinion of the Assignee, shall be necessary or required in order to ensure and give effect to the full intent of this Assignment.

12.     Governing Law; Waiver of Jury Trial.

(a)     This Assignment shall be construed in accordance with, and governed by, the laws of the State of New York, United States of America.  The Assignor hereby irrevocably submits itself to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County, Borough of Manhattan and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, for the purposes of (and solely for the purposes of) any suit, action or other proceeding arising out of, or relating to, this Assignment or any of the transactions contemplated hereby, hereby irrevocably agrees that all claims in respect of such suit, action or proceeding may be heard in such New York State or Federal court and hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason whatsoever, that such suit, action or proceeding is brought in an inconvenient forum, or that the venue of such suit, action or proceeding is improper, or that this Assignment or the subject matter hereof may not be enforced in or by such courts.  The Assignor irrevocably consents to the service of any and all process in any such suit, action or proceeding by the mailing of copies of such process to the Assignor at its address specified in Section 13 hereof.  The Assignor agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this paragraph shall affect the right of the Assignee to serve legal process in any other manner permitted by law or affect the right of the Assignee to bring any suit, action or proceeding against the Assignor or its property in the courts of any other jurisdiction.

(b)     BY ITS SIGNATURE BELOW WRITTEN THE ASSIGNOR HEREBY IRREVOCABLY WAIVES UNDER APPLICABLE LAW ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS ASSIGNMENT, THE NOTE EXCHANGE AGREEMENT, THAT CERTAIN PREFERRED FLEET MORTGAGE EFFECTIVE AS OF THE DATE HEREOF (AS MAY BE AMENDED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIMED TO TIME) OR THE OTHER

NOTE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

13.     <u>Notices</u>.  All notices or other communications required or permitted to be made or given hereunder shall be made in writing, in English, and sent to the Assignor or the Assignee as provided in the Note Exchange Agreement.

14.     <u>Waiver; Amendment</u>.  None of the terms and conditions of this Assignment may be changed, waived, modified or varied in any manner whatsoever unless in accordance with the Note Exchange Agreement and in writing duly signed by the Assignee (acting at the direction of the Required Holders) and the Assignor.

15.     <u>Termination</u>.  If the Assignor shall timely pay and discharge in full all of the Secured Obligations or is released therefrom in accordance with the terms thereof, all the right, title and interest herein assigned shall revert to the Assignor, and this Assignment shall terminate.

16.     <u>Headings</u>.  The division of this Assignment into sections and the insertion of headings are for convenience of reference only and shall not affect the interpretation or construction of this Assignment.

17.     <u>Vessels</u>.  Any vessel sold by the Assignor as permitted by the Note Exchange Agreement shall, upon consummation of said sale and distribution of the proceeds thereof as provided for under the Note Exchange Agreement, no longer be a "Vessel" hereunder.

[Remainder of Page Intentionally Left Blank.  Signatures on Following Pages]

IN WITNESS WHEREOF, the Assignor has caused this Assignment of Charters and Hire to be duly executed as of the date first above written.

ASSIGNOR:

NAUTICAL SOLUTIONS, L.L.C.

By:_____
    Name:
    Title:

The terms and conditions of this Assignment of Charters and Hire are hereby

ACCEPTED BY:

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent

By:_____
    Name:
    Title:

SCHEDULE 1

<u>VESSELS</u>

| **Vessel Name** | **Official No.** |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

EXHIBIT A
FORM OF CONSENT TO CHARTER ASSIGNMENT

**AGREEMENT AND CONSENT TO ASSIGNMENT OF CHARTERS AND HIRE**

To:         [CHARTERER]
Vessel:     [Vessel Name]

We refer to the [CHARTER] dated [DATE] (as amended, supplemented, extended or renewed from time to time, the *"Charter"),* made between us, NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company, as owner (the *"Assignor"),* and you, [CHARTERER], a [State of incorporation/organization] [type of entity], as charterer (together with its successors and assigns, the *"Charterer"),* by which we agreed to let, and you agreed to take on a charter for the period and on the terms and conditions set out in the Charter with respect to, the U.S. flag vessel [NAME], Official Number [NUMBER] (said vessel or any vessel hereafter substituted therefor under the Charter, the *"Vessel").*

We hereby give you notice of the following, and you, by your execution and delivery of this Agreement and Consent to Assignment of Charters and Hire, hereby agree to the following:

1.      By an Assignment of Charters and Hire dated [●], 2023, a copy of which is attached hereto (the *"Assignment";* the defined terms therein being used herein as therein defined) made between us and the Assignee referred to therein, we have sold, assigned, transferred and set over unto the Assignee all of our right, title and interest in and to, among other things, the Charter and in and to all freights, hire, earnings and other moneys and claims for moneys due and to become due to us thereunder (all as more fully described in the Assignment).

2.      You are hereby irrevocably authorized and instructed, upon your receipt of written notice from the Assignee, to pay, and agree that you will make payment of, all such freights, hire, earnings and other moneys due and to become due and payable by you to us under the Charter to such place as the Assignee alone may from time to time direct.

3.      We alone shall remain liable to perform all our obligations under the Charter and the Assignee shall not be under any obligation under the Charter, but should the Assignee exercise its right to perform, or cause performance by its designee of, our obligations under the Charter, you agree, without thereby releasing us from our obligations under the Charter, to accept such performance.

4.      You hereby consent to such assignment, and agree that, upon your receipt of written notice from the Assignee, you will make payment of all freights, hire, earnings and other moneys due and to become due under the Charter, without setoff or deduction in immediately available funds, direct to the account specified by the Assignee at such address or in such manner as the Assignee alone shall request in writing until receipt of written notice from the Assignee rescinding such request or otherwise stating that all obligations of the Assignor to the Assignee and other Secured Parties have been indefeasibly paid or otherwise satisfied in full.  You agree that you shall not seek the recovery of any payment actually made by you to the Assignee pursuant to this Agreement and Consent to Assignment of Charters and Hire once such payment has been made. You hereby waive the right to assert against the Assignee, any claim, defense, counterclaim or

setoff that you could assert against the Assignor under the Charter.  This provision shall not be construed to relieve the Assignor of any liability to the Charterer.

5.      You agree that the Assignee shall be entitled to exercise any and all rights and remedies of the Assignor under the Charter in accordance with the terms of the Assignment, and you shall comply in all respects with such exercise.  You agree that the Charter, including, without limitation, any of your liens thereunder or those that may arise by operation of law, shall be subject and subordinated in all respects to the lien of the Assignee under its preferred mortgage (as amended, supplemented or modified from time to time, the *"Mortgage")* over the whole of the Vessel and the rights of Assignee pursuant thereto, and, at the option of the Assignee, foreclosure under the Mortgage shall terminate such Charter and such liens and divest you and, if applicable and to the extent permitted pursuant to the Note Exchange Agreement, your subcharterers of all right, title and interest in and to the Vessel.  You agree that each subcharter, if any, of the Vessel shall be subject and subordinate in all respects to the lien of the Mortgage in favor of the Assignee and the rights of the Assignee pursuant thereto.

6.      You hereby further agree that, so long as the Secured Obligations shall be outstanding:

(a)      Upon the request of the Assignee from time to time, you shall provide to the Assignee such information as the Assignee may reasonably request regarding the Vessel, her location, use and employment, including, but not limited to, the terms of each subcharter thereof, if any, the subcharter party, the routes plied and to be plied by such Vessel and its scheduled arrival and departure from each port on such route.

(b)      You covenant and agree with the Assignee that you will (i) duly and timely perform and observe all of the terms and provisions of the Charter on your part to be performed or observed; and (ii) clearly record on your books and records notations of the Assignment.

(c)      At any time and from time to time, upon the written request of the Assignee, you shall promptly and duly execute and deliver any and all such further instruments and documents as the Assignee may reasonably request in order to obtain the full benefits of the Assignment and of the rights and powers herein granted.

(d)      Whenever requested by the Assignee, you shall promptly deliver letters to each of your agents and representatives into whose hands or control may come any freights, hire, earnings and other moneys assigned by the Assignment, informing each such agent and representative of such assignment, and if any Event of Default has occurred and is continuing, instructing such agent and/or representative to promptly remit or deliver directly to the Assignee all freights, hire, earnings and other moneys and property assigned which may come into such agents' or representatives'  hands or control and to continue to make such remittances or delivery until such time as such agents or representatives may receive written notice or instructions to the contrary direct from the Assignee.  You shall copy the Assignee on each such correspondence and use your commercially reasonable efforts to procure that each such agent and representative shall acknowledge directly to the Assignee receipt of your letter of notification and instructions

7.      Your acknowledgement and consent hereunder, and your agreements herein contained, are for the benefit of the Assignee and the Secured Parties and shall be enforceable by the Assignee for its benefit and the benefit of the Secured Parties.

8.      This Agreement and Consent to Assignment of Charters and Hire, and the obligations undertaken and incurred hereby, shall be subject to termination and release in accordance with the terms of the Assignment.

9.      The authorizations and instructions by us in this Agreement and Consent to Assignment of Charters and Hire cannot be revoked or varied by us without the Assignee's prior written consent.

For and on behalf of:                    NAUTICAL SOLUTIONS, L.L.C.


By:_____
        Name:
        Title:
        Dated:

To:               NAUTICAL SOLUTIONS, L.L.C.
Vessel:         [Vessel Name]

      In consideration of the Assignor's entry into the Charter described in the foregoing Agreement and Consent to Assignment of Charters and Hire, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, we hereby agree to the terms set out in the Agreement and Consent to Assignment of Charters and Hire and consent to, and agree to be bound by, the Assignment as defined therein.

  For and on behalf of:                 [CHARTERER]


                               By:_____
                                    Name:
                                    Title:
                                    Dated:

Exhibit C

## [FORM OF] ASSIGNMENT OF CHARTER AND HIRE
## (BAREBOAT CHARTERER)

This ASSIGNMENT OF CHARTER AND HIRE (this "*Assignment*") is made this [●] day of [●], 2023, by _____, a _____ (the "*Assignor*"), in favor of Wilmington Trust, National Association, in its capacity as collateral agent for the Secured Parties under and as defined in the Security Agreement (as such term is defined in the Note Exchange Agreement defined below), as required by the Note Exchange Agreement (together with its successors and permitted assigns, in such capacity, the "*Assignee*").

## WITNESSETH:

WHEREAS, pursuant to the terms and conditions of that certain Note Exchange Agreement dated as of the date hereof (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Note Exchange Agreement*"), by and among Nautical Solutions, L.L.C., a Louisiana limited liability company ("*Owner*"), Nautical Solutions Holdings, LLC, a Louisiana limited liability company, as the parent company of Owner, and the financial institutions parties thereto, as noteholders, Wilmington Trust, National Association, as Agent and the Assignee, Owner has agreed to issue Senior Secured Notes due [●], 2028 in the amount set forth in the Note Exchange Agreement (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any notes delivered in substitution or exchange for any of the foregoing senior secured notes, the "*Senior Notes*");

WHEREAS, Owner has executed and delivered, or will execute and deliver, the Senior Notes to the respective noteholders thereof identified in the Note Exchange Agreement (collectively, together with such noteholders' successors and assigns, the "*Noteholders*"), such Senior Notes to be in the amount set forth in the Note Exchange Agreement and each to be due and payable in the amounts and upon the terms and conditions therein recited, with interest and other amounts as set forth in the Note Exchange Agreement;

WHEREAS, pursuant to that certain bareboat charter agreement dated _____, 20__, between Owner, as owner, and the Assignor, as charterer, the Owner has bareboat chartered the vessel named "_____", Official No. _____ (the "*Vessel*") to the Assignor for a term of _____ (___) months;

WHEREAS, pursuant to that _____ dated _____, 20__, the Assignor has [time chartered the Vessel to] [entered into a long term contract of affreightment with] _____, a _____ (in such capacity, the "*Charterer*") for a term of _____ (___) months (the "*Charter*");[1]

WHEREAS, pursuant to Section 9.18 of the Note Exchange Agreement, as additional security for the full and timely payment and performance of any and all present and future

---

[1] If the Charter is a master agreement that has vessel call orders, then the master agreement will be included in the Charter, as so defined, only to the extent the master agreement is incorporated into the applicable vessel call order for the vessel in question.

indebtedness, obligations and liabilities of the Owner to the Secured Parties, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of or in connection with Note Documents to which the Owner is a party, in each case whether on account of principal, interest (including, without limitation, as a result of increases to applicable interest rates), Specific Noteholder Fee (if any), Exit Fee (if any), Note Obligations, fees, indemnities, costs, expenses or otherwise, and including, without limitation, all fees and disbursements of counsel to the Assignee and the Noteholders that are required to be paid by the Owner pursuant to the terms of any of the Note Documents (collectively, and including any and all renewals, modifications, amendments, extensions for any period, supplements and restatements of any of the foregoing, the "*Secured Obligations*"), the Assignor, being an affiliate of the Owner, is required (i) to assign to the Collateral Agent any third party charter entered into by it having a duration of twelve (12) months or longer (including any automatic or agreed to extensions or renewals thereof) and all freights, hire and other monies due and payable by the Charterer thereunder), and (ii) to use commercially reasonable efforts to obtain the consent of such charterer of the Vessel; and

WHEREAS, the Assignor, in order to secure the full and timely repayment by the Owner of the Secured Obligations and the performance and observance of, and compliance with, the covenants, terms and conditions contained in the Note Exchange Agreement and the other Note Documents to which the Owner is a party and in this Assignment by the Assignor, the Assignor has duly authorized the execution and delivery of this Assignment.

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby agrees as follows:

1.     <u>Defined Terms</u>.  Capitalized terms used herein and not otherwise defined are used herein as defined in the Note Exchange Agreement.

2.     <u>Grant of Security</u>.  As security for the full and timely payment and performance by the Owner of the Secured Obligations, the Assignor does hereby sell, assign, transfer and set over unto the Assignee, and does hereby grant to the Assignee a continuing, first priority security interest in and to, all of its right, title and interest in and to: (a) all freights, hire, earnings and other moneys earned and to be earned, due or to become due, or paid or payable to, or for the account of, the Assignor, of whatsoever nature, arising out of or as a result of the chartering by the Assignor to the Charterer of the Vessel, including, without limitation, all rights arising out of the Assignor's lien on all cargoes thereunder, (b) the Charter, including, without limitation, all rights of the Assignor to terminate the Charter, to perform thereunder and to compel performance of the terms thereof, (c) all rights, remedies, powers, privileges and claims for moneys due and to become due to the Assignor, and claims for moneys due and to become due to the Assignor, and all claims for damages, arising out of the breach by the Charterer of its obligations under the Charter, (d) the right to give and receive all notices and other instruments or communications under the Charter, (e) the right to take such action, including the commencement, conduct and consummation of legal, administrative or other proceedings, as shall be permitted by the Charter or by law, (f) all moneys and claims due and to become due to the Assignor, and all claims for damages and all insurances and other proceeds, in respect of the actual or constructive total loss or the agreed, arranged or compromised total loss of or requisition of use of or title to the Vessel, and (g) any proceeds of

any of the foregoing and all interest and earnings from the investment of any of the foregoing and the proceeds and products thereof.  The security created by this Assignment shall be held by the Assignee as a continuing security for the full and timely payment and performance of the Secured Obligations.  The security so created shall not be satisfied by any intermediate payment or satisfaction of any part of the Secured Obligations, and such security shall be in addition to and shall not in any way be prejudiced or affected by any other collateral or security now or hereafter held by the Assignee.  The rights hereby assigned may be further assigned by the Assignee in connection with the transfer of the Secured Obligations or the enforcement of the pledge thereof.

3.    Agreement and Consent to Assignment of the Charter.  The Assignor undertakes, immediately following the execution of this Assignment, to give written notice (substantially in the form set out in Exhibit A) to the Charterer of this Assignment and to use commercially reasonably efforts to procure the acknowledgement of such notice (in the form provided in the notice) by the Charterer.

4.    Representations and Warranties.  The Assignor hereby represents and warrants to the Assignee, as an inducement to the Assignee to accept this Assignment, that neither the whole nor any part of the right, title and interest hereby assigned is the subject of any present assignment, security interest or pledge. [2]

5.    Covenants.  The Assignor hereby covenants to the Assignee that:

(a)    If an Event of Default has occurred and is continuing, and without derogation of the rights of the Assignee under Section 8 hereof to issue instructions to the Charterer directly, upon request of the Assignee, the Assignor shall specifically authorize and direct the Charterer to make payment of all of the freights, hire, earnings and other moneys due and to become due, or payable to, on for the account of, the Assignor under the Charter directly to the Assignee in accordance with the Note Documents, and shall deliver to the Assignee the written acknowledgment from the Charterer of such instructions promptly after receipt thereof.  Notwithstanding anything to the contrary, the Assignor and the Assignee hereby agree that so long as no Event of Default shall have occurred and be continuing, the Assignor shall be entitled to exercise its rights under the Charter as if this Assignment did not exist and otherwise to receive and retain any and all moneys assigned hereunder.

(b)    So long as this Assignment is in effect, the Assignor shall not assign, grant a security interest in or pledge the whole or any part of the right, title and interest hereby assigned to anyone other than the Assignee without the prior written consent of the Noteholders in accordance with the respective Note Documents.[3]

(c)    At any time and from time to time, upon the written request of the Assignee, the Assignor shall promptly and duly execute and deliver any and all such further instruments and documents as the Assignee may reasonably request in order to obtain the full benefits of this

---

[2] If the Assignor has granted blanket liens on its assets, then it will not be able to make this statement.  Assignor to provide list of Chouest Corporate Affiliates where blanket liens have been granted.

[3] Please see Footnote 2.

3

Assignment and of the rights and powers herein granted; provided, that no notices or requests shall be required to be sent (or shall be sent) to the Charterer (other than as set forth in Section 5(a) above) unless an Event of Default has occurred and is continuing.

(d)     Whenever requested by the Assignee, the Assignor shall promptly deliver letters to each of its agents and representatives into whose hands or control may come any freights, hire, earnings or other moneys hereby assigned, informing each such agent and representative of this Assignment, and if any Event of Default has occurred and is continuing, instructing such agent and representative to remit or deliver promptly to the Assignee all freights, subfreights, hire, earnings and other moneys hereby assigned which may come into such agents' and representatives' hands or control and to continue to make such remittances or delivery until such time as such agents and representatives may receive written notice or instructions to the contrary direct from the Assignee.  The Assignor shall copy the Assignee on each such correspondence and use its commercially best efforts to procure that each such agent and representative shall acknowledge directly to the Assignee receipt of the Assignor's letter of notification and instructions.

6.     Freedom of Assignee from Obligations.  It is hereby expressly agreed that anything herein contained to the contrary notwithstanding, (a) the Assignor shall at all times remain fully liable under the Charter to perform all of the obligations assumed by it thereunder, (b) the obligations of the Assignor under the Charter may be performed by the Assignee or its nominee without releasing the Assignor therefrom, and (c) the Assignee shall have no obligation or liability under the Charter by reason of or arising out of this Assignment, nor shall the Assignee be required or obligated in any manner to perform or to fulfill any obligations of the Assignor under or pursuant to the Charter nor to make any payment, nor to make any inquiry as to the nature or sufficiency of any payment received by the Assignee or to present or to file any claim, or to take any other action to collect or to enforce the payment of any amounts which may have been assigned to it or which it may be entitled to hereunder at any time or times.

7.     Payment Directions to Charterer; Power of Attorney; Financing Statements.  Upon the occurrence and during the continuance of an Event of Default, the Assignee shall be entitled to direct the Charterer to pay all freights, hire, earnings and other moneys assigned hereunder to such bank account as the Assignee may from time to time designate.  Upon request of the Assignor, the Assignee shall furnish the Assignor with information from time to time as to the accounts into which all freights, hire, earnings and other moneys assigned hereunder are paid, the amounts and sources of such payments and the amounts and application of moneys withdrawn therefrom.  The Assignee is hereby constituted the lawful attorney of the Assignor, irrevocably, with full power of substitution (in the name of the Assignor or otherwise) upon the occurrence and during the continuance of an Event of Default, to take any action and to execute any instruments which the Assignee may deem necessary or advisable to accomplish the purposes hereof, including, without limitation, to ask, require, demand, receive, compound and give acquittance for any and all freights, hire, earnings, moneys, claims, property and rights hereby assigned, to endorse any checks or other instruments or orders in connection therewith and to file any claims or to take any action or to institute any proceedings which the Assignee may deem to be necessary or advisable in the premises.  Any action or proceeding brought by the Assignee pursuant to any of the provisions hereof, and any claim made by the Assignee hereunder, may be compromised, withdrawn or otherwise dealt with by the Assignee without any notice to, or approval of, the Assignor.  The Assignor hereby irrevocably authorizes the Assignee (or its designee) to file, at any time and from

time to time, at the Assignor's sole cost and expense, such financing and continuation statements or papers of similar purpose or effect relating to this Assignment, without the Assignor's signature or authentication, as the Assignee at its sole option may deem appropriate and appoints the Assignee as the Assignor's attorney-in-fact (with full power of substitution) to execute or authenticate any such statements in the Assignor's name and to perform all other acts which the Assignee may deem necessary or appropriate to perfect and to continue the perfection and priority of any security interest conferred hereby.

8.    <u>Irrevocable Assignment</u>.  The powers and authority granted to the Assignee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with an interest and may not be amended or waived except by an instrument in writing signed by the party against whom such enforcement is sought.

9.    <u>Remedies Cumulative and Not Exclusive; No Waiver</u>.  Each and every right, power and remedy herein given to the Assignee shall be cumulative and shall be in addition to every other right, power and remedy of the Assignee now or hereafter existing at law, in equity, in admiralty or by statute, and each and every right, power and remedy, whether herein given or otherwise existing, may be exercised from time to time, in whole or in part, and as often and in such order as may be deemed expedient by the Assignee, and the exercise or the beginning of the exercise of any right, power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy.  No delay or omission by the Assignee in the exercise of any right or power in the pursuance of any remedy accruing upon any breach or default by any Person shall impair any such right, power or remedy or be construed to be a waiver of any such right, power or remedy or to be an acquiescence therein; nor shall the acceptance by the Assignee of any security or of any payment of or on account of the Secured Obligations be construed to be a waiver of any right to take advantage of any future breach or default or of any past breach or default not completely cured thereby.

10.    <u>Invalidity</u>.  If any provision of this Assignment shall at any time for any reason be declared invalid, void or otherwise inoperative by a court of competent jurisdiction, such declaration or decision shall not affect the continued validity of any other provision or provisions of this Assignment, or the validity of this Assignment as a whole.  In the event that it should transpire that by reason of any law or regulation, or by reason of a ruling of any court, or by any other reason whatsoever, the assignment herein contained is either wholly or partly defective, the Assignor hereby undertakes to furnish the Assignee with an alternative assignment or alternative security and/or to do all such other acts as, in the sole opinion of the Assignee, shall be necessary or required in order to ensure and give effect to the full intent of this Assignment.

11.    <u>Governing Law; Waiver of Jury Trial</u>.

(a)    This Assignment shall be construed in accordance with, and governed by, the laws of the State of New York, United States of America.  The Assignor hereby irrevocably submits itself to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County, Borough of Manhattan and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, for the purposes of (and solely for the purposes of) any suit, action or other proceeding arising out of, or relating to, this Assignment or any of the transactions contemplated hereby, hereby irrevocably agrees that all

5

claims in respect of such suit, action or proceeding may be heard in such New York State or Federal court and hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason whatsoever, that such suit, action or proceeding is brought in an inconvenient forum, or that the venue of such suit, action or proceeding is improper, or that this Assignment or the subject matter hereof may not be enforced in or by such courts.  The Assignor irrevocably consents to the service of any and all process in any such suit, action or proceeding by the mailing of copies of such process to the Assignor at its address specified in <u>Section 12</u> hereof.  The Assignor agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this paragraph shall affect the right of the Assignee to serve legal process in any other manner permitted by law or affect the right of the Assignee to bring any suit, action or proceeding against the Assignor or its property in the courts of any other jurisdiction.

(b)     BY ITS SIGNATURE BELOW WRITTEN THE ASSIGNOR HEREBY IRREVOCABLY WAIVES UNDER APPLICABLE LAW ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ·OTHERWISE) ARISING OUT OF OR RELATING TO THIS ASSIGNMENT, THE NOTE EXCHANGE AGREEMENT, THAT CERTAIN PREFERRED FLEET MORTGAGE EFFECTIVE AS OF THE DATE HEREOF (AS MAY BE AMENDED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIMED TO TIME) OR THE OTHER NOTE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

12.     <u>Notices</u>.  All notices or other communications required or permitted to be made or given hereunder shall be made in writing, in English, and sent to the Assignor at its address at _____, _____, _____ (with a copy thereof by email to <u>legal@chouest.com</u>) or the Assignee as provided in the Note Exchange Agreement.

13.     <u>Waiver; Amendment</u>.  None of the terms and conditions of this Assignment may be changed, waived, modified or varied in any manner whatsoever unless in accordance with the Note Exchange Agreement and in writing duly signed by the Assignee (acting at the direction of the Required Holders) and the Assignor.

14.     <u>Termination</u>.  If the Owner shall timely pay and discharge in full all of the Secured Obligations or is released therefrom in accordance with the terms thereof, or if the Charter terminates, then (i) all the right, title and interest herein assigned shall revert to the Assignor, (ii) this Assignment shall terminate, and (iii) the Assignee shall authorize Assignor in writing to file applicable UCC-3 termination statements as to the collateral granted hereunder and rescind in writing all notices previously provided to the Charterer with respect to this Agreement.  In addition, should such Charter expire in accordance with its terms and not be further extended or renewed, then (i) this Assignment shall terminate, and (ii) Assignee shall authorize Assignor in writing to file applicable UCC-3 termination statements as to the collateral granted hereunder.

15.     <u>Headings</u>.   The division of this Assignment into sections and the insertion of headings are for convenience of reference only and shall not affect the interpretation or construction of this Assignment.

[Remainder of Page Intentionally Left Blank.  Signatures on Following Pages]

IN WITNESS WHEREOF, the Assignor has caused this Assignment of Charter and Hire to be duly executed as of the date first above written.

ASSIGNOR:

[                                                        ]


By:_____
     Name:
     Title:


The terms and conditions of this Assignment of Charter and Hire are hereby

ACCEPTED BY:

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent


By:_____
     Name:
     Title:

GZJ KDKV"C"

HQTO "QH'EQP UGP V"VQ "EJ CTVGT"CUUK P O GP V"

**AGREEMENT AND CONSENT TO ASSIGNMENT OF CHARTER AND HIRE**

Vq< ]EJ CTVGTGT"
Xguugn< ]Xguugn'P co g_"

Y g"tghgt"vq "yj g"]EJ CTVGTGT "dcvgf "]FCVG_"*cu"co gpf gf ."uwr r rgo gpvgf ."gzvgpf gf "qt" tgpgy gf "htqo "vko g"vq"vko g."yj g"*"*Charter),[1] o cf g"dgy ggp"wu."aaaaaaaaaaaaaaaaaaaaaa."c" aaaaaaaaaaaaaaaaaaaa."cu"f go ug"cy pgt"*"yj g"*"*Assignor"), cpf "[qw."]EJ CTVGTGT_ "c"]Ucvg"qh" kpeqtr qtcvkqp kqti cpk| cvkqp_"]v{r g"qh'gpvkv{_ ."cu"ej ctvgtgt"*"qi gyj gt"y kj "ku"uweeguuqtu"cpf "cuuki pu." yj g"*"*Charterer"), d{"y j kej "y g"ci tggf "vq "ngv."cpf "*"qw"ci tggf "vq "vcmg"qp"ej ctvgt'kng qpvcev"qh' chhtgki j vo gpv'hqt"yj g"r gtkqf "cpf "qp"yj g"vgto u'cpf "eqpf kvkqpu'ugv'qwv'kp"yj g"Ej ctvgt'y kyj "tgur gev'vq." yj g"WO.U'hrci "xguugn']P CO G_."Qfhkelcn'r w o dgt"]P WO DGT_ "*uckf "xguugn'qt'cp{"xguugn'j gtachvgt" uwdukwwgf "yj gtghqt"'wpf gt'yj g"Ej ctvgt."yj g"*"*Vessel")."

Y g"j gtgd {"i kxg"[qw"pqkveg"qh"yj g"hqmqy kpi ."cpf "[qw."d{"[qwt"gzgewkqp"cpf "f gnkxgt{"qh" yj ku"Ci tggo gpv'cpf "Eqpugpv'vq"Cuuki po gpv'qh"Ej ctvgt'cpf "J ktg."j gtgd {"ci tgg"vq "yj g"hqmqy kpi <

 30 D{"cp"Cuuki po gpv'qh'Ej ctvgt'cpf "J ktg'f cvgf "Hgdtwct{"46."4245.'c"eqr {"qh'y j kej "ku" cwcej gf "j gtgvq'*yj g"*"*Assignment"; yj g"]ghkpgf "vgto u'yj gtgkp"dgkpi "wugf "j gtgkp'cu'yj gtgkp gfhkpgf +" o cf g"dgy ggp"wu'cpf "yj g"Cuuki pgg"yghgttgf "vq"yj gtgkp."Y g'j cxg"uqnf ."cuuki pgf ."vtcpuhgttgf "cpf "ugv' qxgt"wpvq "yj g"Cuuki pgg'cnn'qh'qwt'tki j v.'vkwg.'cpf "kpvgtguv'kp'cpf "vq."qq qpi "qyj gt'yj kpi u."cnn'yj g"Ej ctvgt' cpf "kp'cpf "vq "cnn'htgki j u."yj ktg."gctpkpi u'cpf "qyj gt"o qpg{u'cpf "cmcko u"hqt"o qpg{u'f wg"cpf "vq " dgeqo g"f wg"vq "wu"yj gtgwpf gt"*cnn'cu'o qtg'hwm."f guetkdgf "kp"yj g"Cuuki po gpv+0'

 40 [ qw'ctg'j gtgd {"kttgxqecdn{"cwj qtk| gf "cpf "f kputtwevgf ."wr qp"*"qwt'tgegkr v'qh'y tkvvgp" pqvkeg'htqo "yj g"Cuuki pgg."*q"r c{.'cpf "ci tgg'y cv'*"qw'y kmi'o cmg'r c{o gpv'qh'cmi'uwej "htgki j u."j ktg." gctpkpi u'cpf "qyj gt"o qpg{u'vq "dg'f wg'qt'f wg'qr'*"f wg'qt'*"f cmg'f c.d{"[qw'vq "yj g"Cuuki pgg'vq " uwej "r ctceg''cu'yj g"Cuuki pgg'cmpcg''o c c'*"htqo "vko g'vq"vko g'f kgev0'

 50 Y g"cmpg"uj cmi'tgo ckp"ckcdng"vq"r gthqto "cnn'qwr'qdkci vkqpu'wpf gt"yj g"Ej ctvgt'cpf " yj g"Cuuki pgg"uj cmi'pqv'dg"wpf gt'cp{"qdnki cvkqp"wpf gr"yj g"Ej ctvgt."d{wkj j qwf "yj g"Cuuki pgg'gzgtekug" ku''tki j v'vq "r gthqto "."qt''ecwug'*"r gthqto cpeg'd{"ku'f guki pgg'qh"qwr'qdnki cvkqpu'wpf gr"yj g"Ej ctvgt." {qw'ci tgg."y kyj qw'y j gtgd {"tgngcukpi "wu'htqo "qwr'qdnki cvkqpu'wpf gr"yj g'Ej ctvgt."vq "ceegr v'uwej " r gthqto cpeg0'

 60 [ qw'j gtgd {"eqpugpv'vq'uwej "cuuki po gp v.'cpf "ci tgg'yj cv.'wr qp"*"qwr'tgegkr v'qh'y tkvvgp" pqvkeg'htqo "yj g"Cuuki pgg."*"qw'y kmi'o cng'r c{o gpv'qh'cnn'htgki j u'wpvkn'vko g."yj g"Cuuki pgg'tguekpf kpi " uwej "tgs wguv'qt'qyj gty kug."cnn'htgki j u'cpf "qyj gr"o qpg{u'wpf gr"yj g"Ej ctvgt."*"qw'ci tgg"*"uwej " r c{o gpv'cpge0'

 60 [ qw'j gtgd {"eqpugpv'vq'uwej "cuuki po gp v.'cpf "ci tgg'yj cv.'wr qp"*"qwr'tgegkr v'qh'y tkvvgp" pqvkeg'htqo "yj g"Cuuki pgg."*qw'y kmi'o cng'r c{o gp v'qh'cnn'htgki j u'cpf "qyj gr'o qpg{u'wpf gr"yj g" Cuuki pgg'cmpge'uj cmi'tgo ckp'tgur qpukdng'hqt'tkkdkp'*wpvkn'tgegkr v'qh'y tkvvgp'pqvkeg'htqo "yj g"Cuuki pgg'tgegkr t'hkpi " uwej "tgs wguv'qt'qyj gty kug.'uc'cuvkp'*wj cv'cnn'qdnki cvkqpu'qh"yj g"Cuuki pqt'*"vq "yj g"Cuuki pgg'cpf "qyj gr" Ugewtgf "Rctvkgu'j cxg'dggp'hpf ghgacukdn{'*r ckf "'qt'qyj gty kug'ucvkuhkgf "kp'hwm0'[ qw'ci tgg'yj cv'*"qw'uj cmi'

---

[1]'Rngcug'ugg'Hqqvpqvg'30'

Ex A-1

pqv"uggm'vj g"tgeqxgt{"qh"cp{"r c{o gpv"cewcm"o cf g"d{"{qw"vq"vj g"Cuuki pgg"r wtuwcpv"vq"vj ku"
Ci tggo gpv"cpf "Eqpugpv"vq"Cuuki po gpv"qh'Ej ctvgt"cpf "J ktg"qpeg"uwej "r c{o gpv"j cu"dggp"o cf g0"
[ qw'j gtgd{"y ckxg"yj g"tki j v"vq"cuugtv'ci ckpuv"yj g"Cuuki pgg. cp{"encko ."fghgpug."eqwpvgtencko "qt"
ugvqhh''yj cv'{qw'eqwrf "cuugtv'ci ckpuv'yj g"Cuuki pqt"wpfgt"yj g"Ej ctvgt0"Vj ku"r tqxkukqp'uj cm'pqv'dg"
eqpuvwef "vq'tgnkgxg'yj g"Cuuki pqt'qh'cp{"hkcdknkv{"vq'yj g"Ej ctvgtgt0'

70      [ qw'ci tgg"vj cv'yj g"Cuuki pgg"uj cm'dg"gpvkwgf "vq"gzgtekug"cp{"cpf "cm'tki j vu"cpf "
tgo gf keu'qh'yj g"Cuuki pqt"wpfgt"yj g"Ej ctvgt"kp{"ceeqtf cpeg"y kvj "yj g"vgto u'qh'yj g"Cuuki po gpv."cpf "
{qw'uj cm'eqo r m{"kp{"kp'cm'tgur geu'y kvj "uwej "gzgtekug0"[ qw'ci tgg"vj cv'yj g"Ej ctvgt. kpenwf kpi ."y kj qw'
nko kxcvkqp."cp{"qh'yj cm'hkgpu'vj gtvgwpf gt'qt'vj cv'j que'c{"ctkug"d{'qr gtcvkqp'qh'ncy ."uj cm'dg"uwdlgev'
cpf "uwdqtf kpcvgf "kp'cm'tgur geu'vq'vj g"nkgp'qh'vj g"Cuuki pgg"wpf gt'ku'r tghgttgf "o qtvi ci g'*cu'
co gpf gf ."uwr r no go gpvgf "qt'o qf hkkf "htqo "vko g'vq'vko g. yj g'*"<em>Mortgage</em>"<em>")</em> qxgt'yj g"y j qrg'qh'yj g"
Xguugn'cpf "yj g'tki j u'qh'Cuuki pgg'r wtuwcpv'yj gtgvq.'cpf ."vcv'yj g'qr wkqp'qh'yj g'Cuuki pgg. hqtgenquwtg'
wpf gt'yj g"O qtvi ci ci g"uj cm'vgto kpcvg'yj g"Ej ctvgt"cpf "wpej "nkgpu'qh'fkxguw'{qw'cpf ."kh'cr r nkecdng'
cpf ."vq'yj g"gzvgpv'r tgto kvvgf ."r wtuwcpv'vq'yj g"P qvg"Gzej cpi ci g"Ci tggo gpv."{qwt"uwdej ctvgtvgtu'qh'cm'
tki j v.'vkwng'cpf "kpvgtguv'kp'cpf "vq'yj g"Xguugn0"[ qw'ci tgg"vj cv'{qw'y km'pqv'uwdej ctvgt"yj g"Xguugn'vq"
cp{'qpg0'

80      [ qw'j gtgd{"hwtyj gt"ci tgg"vj cv."vq'"mgpi "cu'vj g"Ugewtgf "Qdnki cvkqpu"uj cm'dg"
qwuuvcpf kpi <'

*c+     [ qw'y km'*k+'fwn{"cpf "vko gn{'*cr rgm''tgrho'cpf "qdugtxg''cm'qh'vj g''vgto u'cpf "
r tqxkukqpu'qh'vj g''Ej ctvgt"qp'{qwt'r ctv'vq'dg''r gthqto "qt'qdugtxgf ="cpf "*kk+'engctn{'tgeqtf 'qp'{qwt'
dqqm''cpf "'tgeqtf u'pqvcvkqpu'qh'yj g''Cuuki po gpv0'

*d+     Cv'cp{''kko g'g'cpf 'htqo "kko g'vq'kko g. yr qp''yj g'y tkwgp'tgswguv'qh'yj g''Cuuki pgg.
{qw'uj cm'r tqo r wn''cpf 'fwn{''gzgewwg''cpf 'f gnkxgt''cp{''cpf 'cm''uwej ''htwtyj gt''kpuwtwo gpwu'cpf ''
fqew o gpwu'cu'yj g''Cuuki pgg''o c{''tgcuqpcdn{''tgswguv'kp''qtf gt'vq''qdvckp''yj g''hwm''dgpghkwu'qh''yj g''
Cuuki po gpv'cpf 'yj g''tki j v'uj cm'cpf ''rqy gtu'j gtgkp''i tcpvgf 0'

90      [ qwt''cenpqy ngf i co gpv''cpf ''eqpugpv''j gtgwpfgt. cpf ''{qwt''ci tggo gpv''j gtgkp''
eqpvckpgf .''ctg''hqt'yj g'dgpghkv'qh'yj g''Cuuki pgg''cpf ''yj g''Ugewtgf ''Rctvkgu'cpf ''uj cm'dg''hqt''
yj g''Cuuki pgg''hqt''ku''dgpghkv'cpf ''yj g''dgpghkv'qh''yj g''Ugewtgf ''Rctvkgu0'

: 0     Vj ku''Ci tggo gpv''cpf ''Eqpugpv''vq''Cuuki po gpv''qh''Ej ctvgt''cpf ''J ktg.''cpf ''yj g''
qdnki cvkqpu''wpfgtvcmgp''cpf ''kpewttgf ''j gtgd{. uj cm'dg''uwdlgev''vq''vgto kpcvkqp''cpf ''tgngcug''kp''
ceeqtf cpeg''y kj 'yj g''vgto u'qh'yj g''Cuuki po gpv0'

; 0     Vj g''cwj qtk{'cvkqpu''cpf ''kpuvwevkqpu''d{'"wu''kp''yj ku''Ci tggo gpv''cpf ''Eqpugpv''vq''
Cuuki po gpv'qh'Ej ctvgt''cpf ''J ktg''ecppqv''dg''tgxqmgf ''qt''xctkgf ''d{'"wu'y kj q''yj g''Cuuki pggu''r tkqt''
y tkwgp''eqpugpv0'

Hqt''cpf ''qp''dgj cm'qh<           ]"_____"

                                   D{<'_____

                                        P co g<'

                                        Vkng<'

                                        F cvgf <'

Vq:            ]"_____"

Xguugn:       ]Xguugn'P co g_"

Kp"eqpukfgtcvkqp"qh"vjg"Cuuki pqtøu"gpvt{"kpvq"vjg"Ejctvgt"fguetkdgf"kp"vjg"hqtgiqkpi"
Ci tggo gpv"cpf "Eqpugpv"vq"Cuuki po gpv"qh"Ejctvgt"cpf "J ktg."cpf "hqt"qvjgi qqf"cpf "xcncvcdrg"
eqpukfgtcvkqp."vjg"tgegkrv"cpf "uwhhkekgpe{"qh"y jkej "ctg"jgtgd{"cenpqy ngfi gf."y g"jgtgd{"ci tgg"vq"
vjg"vto u"tgv'qw'kp"vjg"Ci tggo gpv"cpf "Eqpugpv"vq"Cuuki po gpv'qh'Ejctvgt"cpf "J ktg"cpf "eqpugpv"vq."
cpf "ci tgg"vq"dg"dqwpf "d{.'vjg"Cuuki po gpv"cu'fghkpgf "vjgtgkp0'

Hqt"cpf "qp"dgj crh'qh:            ]EJ CTVGTGT_"

D{:_____
      P co g:
      Vkwg:
      F cvgf :

<div align="right">Exhibit D</div>

## [FORM OF] ASSIGNMENT OF INSURANCES

This ASSIGNMENT OF INSURANCES (this "*Assignment*") is made this [•], 2023, by NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company (the "*Assignor*"), in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent for the Secured Parties under and as defined in the Security Agreement (as such term is defined in the Note Exchange Agreement defined below), as required by the Note Exchange Agreement (together with its successors and permitted assigns in such capacity, the "*Assignee*").

<div align="center">WITNESSETH:</div>

WHEREAS, pursuant to the terms and conditions of that certain Note Exchange Agreement dated as of the date hereof (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Note Exchange Agreement*") by and among the Assignor, Nautical Solutions Holdings, LLC, a Louisiana limited liability company, as the parent holding company of Assignor, the financial institutions from time to time party thereto, as noteholders, Wilmington Trust, National Association, as Agent and the Assignee, the Assignor has agreed to issue Senior Secured Notes due [•], 2028 in the amount set forth in the Note Exchange Agreement (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any notes delivered in substitution or exchange for any of the foregoing senior secured notes, the "*Senior Notes*");

WHEREAS, the Assignor has executed and delivered, or will execute and deliver, the Senior Notes to the respective noteholders thereof identified in the Note Exchange Agreement (collectively, together with such noteholders' successors and assigns, the "*Noteholders*"), such Senior Notes to be in the amount set forth in the Note Exchange Agreement and to be due and payable in the amounts and upon the terms and conditions therein recited, with interest and other amounts as set forth in the Note Exchange Agreement;

WHEREAS, the Assignor is the sole legal and beneficial owner of the vessels more particularly described on Schedule 1 attached hereto and made a part hereof (collectively, subject to the terms and conditions of Section 15 hereof, the "*Vessels*" and each, a "*Vessel*");

WHEREAS, it is a condition precedent to the exchange of the Exchanged Debt for the Senior Notes that the Assignor execute and deliver to the Assignee, as security for the full and timely payment and performance of any and all present and future indebtedness, obligations and liabilities of the Assignor to the Secured Parties, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of or in connection with Note Documents to which the Assignor is a party, in each case whether on account of principal, interest, Specified Noteholder Fee (if any), Exit Fee (if any), Note Obligations, reimbursement obligations, fees, indemnities, costs, expenses or otherwise, and including, without limitation, all fees and disbursements of counsel to the Assignee and the Noteholders that are required to be paid by the Assignor pursuant to the terms of any of the Note Documents (collectively, and including any and all renewals, modifications, amendments, extensions for any period, supplements and restatements of any of the foregoing, the "*Secured Obligations*"), an assignment of any and all insurances from time to time taken out in respect of the Vessels; and

<div align="center">1</div>

WHEREAS, the Assignor, in order to secure the full and timely repayment of the Secured Obligations and the performance and observance of, and compliance with, the covenants, terms and conditions contained in the Note Exchange Agreement, this Assignment and the other Note Documents, has duly authorized the execution and delivery of this Assignment.

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby agrees as follows:

1.      <u>Defined Terms</u>. Capitalized terms used herein and not otherwise defined are used herein as defined in the Note Exchange Agreement.

2.      <u>Grant of Security</u>. As security for the full and timely payment and performance of the Secured Obligations, the Assignor does hereby sell, assign, transfer and set over unto the Assignee, and does hereby grant the Assignee a continuing, first priority security interest in and to, all of the right, title and interest of the Assignor in and to: (a) all insurances (including, without limitation, all insurances with respect to hull and machinery, war risk, hull and machinery, loss of earnings, protection and indemnity, pollution, requisition of title or otherwise) in respect of each Vessel, her hull, machinery, freights, disbursements, profits or otherwise, whether heretofore, now or hereafter effected, and all renewals of or replacements for the same, (b) all monies and claims for moneys due and to become due to the Assignor under said insurances with respect to the actual, constructive, agreed, arranged or compromised total loss or any other loss of or damage to any Vessel, or with respect to a claim arising out of the use or operation of any Vessel; (c) all returns of premium, (d) all other rights and benefits of the Assignor under or in respect of said insurances and (e) all cash and non-cash proceeds of the foregoing (all of which are herein collectively called, the "*Insurances*"). The security created by this Assignment shall be held by the Assignee as a continuing security for the timely payment and performance of the Secured Obligations. The security so created shall not be satisfied by any intermediate payment or satisfaction of any part of the Secured Obligations, and such security shall be in addition to and shall not in any way be prejudiced or affected by any other collateral or security now or hereafter held by the Assignee. The rights hereby assigned may be further assigned by the Assignee in connection with the transfer of the Secured Obligations or the enforcement of the pledge thereof.

3.      <u>Representations, Warranties and Covenants</u>.

(a)      The Assignor hereby warrants and represents that each of the Insurances is in full force and effect and that all premiums in connection therewith to the extent due and payable have been duly paid and that such Insurances are enforceable in accordance with their respective terms, and that the Assignor is not in default thereunder. The Assignor hereby further warrants and represents that it has not assigned, pledged or in any way created, or suffered to be created, any security interest in the whole or any part of the right, title and interest hereby assigned, except for the assignment to the Assignee. The Assignor hereby covenants that, without the prior written consent thereto of the Assignee (acting at the direction of the Required Holders), so long as this Assignment shall remain in effect, it will not assign or pledge the whole or any part of the right, title and interest hereby assigned to anyone other than the Assignee, its successors or assigns, and it will not take or omit to take any action, the taking or omission of which might result in an

2

alteration or impairment of the Insurances in any material respect, or of this Assignment or of any of the rights created by the Insurances or this Assignment.

(b)  <u>Notice of Assignment</u>. The Assignor hereby further covenants and agrees to, or to cause its insurance brokers to, duly give notice of this Assignment in the form attached hereto as <u>Exhibit A</u> (the "*Notice of Assignment*") to all underwriters and that where the consent of any underwriter is required pursuant to any of the Insurances assigned hereby, it shall be obtained and evidence thereof shall be given to the Assignee, or, in the alternative, that, in the case of protection and indemnity coverage, the Assignor shall obtain, with the Assignee's prior written approval (acting at the direction of the Required Holders), a letter of undertaking by the underwriters or clubs, and that there shall be duly endorsed upon all slips, cover notes, policies, certificates of entry or other instruments issued or to be issued in connection with the Insurances assigned hereby, such clauses as to named assured or loss payees as the Assignee may require or approve, including, without limitation, in the case of all hull and machinery and war risk hull and machinery policies, a loss payable clause substantially on the terms set forth in <u>Exhibit A-1</u> to the Notice of Assignment for each Vessel, and in the case of all protection and indemnity and liability and oil pollution liability insurances, a loss payable clause substantially on the terms set forth in <u>Exhibit A-2</u> to the Notice of Assignment for each U.S. flag Vessel. In all cases (except in the case of protection and indemnity coverage), unless otherwise agreed in writing by the Assignee (acting at the direction of the Required Holders), such slips, cover notes, notices, certificates of entry or other instruments shall show the Assignee as a lender loss payee as its interest may appear and named assured (as applicable) and shall provide that there will be no recourse against the Assignee for payment of premiums, calls or other assessments.

(c)  <u>Further Assurances</u>. The Assignor hereby agrees that at any time and from time to time, upon the written request of the Assignee, its successors and permitted assigns, the Assignor will promptly and duly execute and deliver any and all such further instruments and documents as the Assignee, its successors and permitted assigns may reasonably request in order to obtain the full benefits of this Assignment and of the rights and powers herein granted.

(d)  <u>Application of Proceeds</u>. Any payments made pursuant to the terms hereof shall be made to such account as may, from time to time, be designated by the Assignee. The Assignee shall apply any such payments in accordance with the terms of the Note Exchange Agreement.

4.  <u>Payment of Premiums; Performance of Obligations</u>. Notwithstanding the foregoing, the Assignor shall continue to remain liable under the Insurances to perform all of its obligations thereunder and the Assignee shall have no obligation or liability (including, without limitation, any obligation or liability with respect to the payment of premiums, calls or assessments or any other sums at any time due and are in respect of the Insurances) under said Insurances by reason of or arising out of this Assignment nor shall the Assignee be required or obligated in any manner to perform or fulfill any obligations of the Assignor under or pursuant to said Insurances or to make any payment or to make any inquiry as to the nature or sufficiency of any payment received by it or to present or to file any claim, or to take any other action to collect or to enforce the payment of any amounts which may have been assigned to it or to which it may be entitled hereunder at any time or times.

3

5.     Power of Attorney; Financing Statements. The Assignee, its successors and permitted assigns, are hereby constituted lawful attorneys, irrevocably, with full power of substitution (in the name of the Assignor or otherwise) upon the occurrence and during the continuance of an Event of Default to ask, require, demand, receive, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of the Insurances, to endorse any check or other instruments or orders in connection therewith and to file any claims or to take any action or to institute any proceedings which the Assignee may deem to be necessary or advisable in the premises. Any action or proceeding brought by the Assignee pursuant to any of the provisions hereof or of the Insurances or otherwise, and any claim made by the Assignee hereunder or under the Insurances, may be compromised, withdrawn or otherwise dealt with by the Assignee without any notice to, or approval of, the Assignor. The Assignor hereby irrevocably authorizes the Assignee, at the Assignor's sole cost and expense, to file, at any time and from time to time, such financing and continuation statements or papers of similar purpose or effect relating to this Assignment, without the Assignor's signature, as the Assignee at its option may deem appropriate and hereby appoints the Assignee as the Assignor's attorney-in-fact to execute any such statements in such Assignor's name and to perform all other acts which the Assignee may deem desirable or appropriate to perfect and continue the perfection and priority of the security interests conferred hereby.

6.     Irrevocable Assignment. The powers and authority granted to the Assignee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with an interest and may not be amended or waived except by an instrument in writing signed by the party against whom enforcement is sought.

7.     Conditions of Assignment. Subject to Section 9.2 of the Note Exchange Agreement and in the absence of an Event of Default thereunder, the Assignor shall be entitled to exercise all of its rights under the Insurances (subject to the provisions of this Assignment) in all respects as if this Assignment had not been made.

8.     Remedies Cumulative and Not Exclusive; No Waiver. Each and every right, power and remedy herein given to the Assignee shall be cumulative and shall be in addition to every other right, power and remedy of the Assignee now or hereafter existing at law, in equity, in admiralty or by statute, and each and every right, power and remedy, whether herein given or otherwise existing, may be exercised from time to time, in whole or in part, and as often and in such order as may be deemed expedient by the Assignee, and the exercise or the beginning of the exercise of any right, power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy. No delay or omission by the Assignee in the exercise of any right or power in the pursuance of any remedy accruing upon any breach or default by any Person shall impair any such right, power or remedy or be construed to be a waiver of any such right, power or remedy or to be an acquiescence therein; nor shall the acceptance by the Assignee of any security or of any payment of or on account of the Secured Obligations be construed to be a waiver of any right to take advantage of any future breach or default or of any past breach or default not completely cured thereby.

9.     Invalidity. If any provision of this Assignment shall at any time for any reason be declared invalid, void or otherwise inoperative by a court of competent jurisdiction, such declaration or decision shall not affect the validity of any other provision or provisions of this

4

Assignment, or the validity of this Assignment as a whole. In the event that it should transpire that by reason of any law or regulation, or by reason of a ruling of any court, or by any other reason whatsoever, the assignment herein contained is either wholly or partly defective, the Assignor hereby undertakes to furnish the Assignee with an alternative assignment or alternative security and/or to do all such other acts as, in the sole opinion of the Assignee, shall be required in order to ensure and give effect to the full intent of this Assignment.

10.   Governing Law.

(a)   The Assignor irrevocably submits to the exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Assignment or any of the transactions contemplated hereby.  To the fullest extent permitted by applicable law, the Assignor irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. The Assignor consents to process being served by or on behalf of the Assignee in any suit, action or proceeding of the nature referred to in this paragraph by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, return receipt requested, to it at its address specified in Section 11 hereof or at such other address of which such holder shall then have been notified pursuant to said Section.  The Assignor agrees that such service upon receipt (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by applicable law, be taken and held to be valid personal service upon and personal delivery to it.  Notices hereunder shall be conclusively presumed received as evidenced by a delivery receipt furnished by the United States Postal Service or any reputable commercial delivery service. Nothing in this paragraph shall affect the right of the Assignee to serve process in any manner permitted by law, or limit any right that the Assignee may have to bring proceedings against the Company in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

(b)   THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS ASSIGNMENT, THE NOTE EXCHANGE AGREEMENT OR THE OTHER NOTE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED IN CONNECTION HEREWITH OR THEREWITH.

11.   Notices.  All notices or other communications required or permitted to be made or given hereunder shall be made in writing, in English, and sent to the Assignor or the Assignee as provided in the Note Exchange Agreement.

12.   Waiver; Amendment. None of the terms and conditions of this Assignment may be changed, waived, modified or varied in any manner whatsoever unless in accordance with the Note Exchange Agreement and in writing duly signed by the Assignee and the Assignor.

13.     <u>Termination</u>. If the Assignor shall timely pay and discharge in full all of the Secured Obligations or is released therefrom in accordance with the terms thereof, all the right, title and interest herein assigned shall revert to the Assignor, and this Assignment shall terminate.

14.     <u>Headings</u>. The division of this Assignment into sections and the insertion of headings are for convenience of reference only and shall not affect the interpretation or construction of this Assignment.

15.     <u>Vessels</u>.  Any vessel sold by the Assignor as permitted by the Note Exchange Agreement no longer shall be a Vessel hereunder.

[Remainder of Page Intentionally Left Blank. Signatures on Following Pages]

IN WITNESS WHEREOF, the Assignor has caused this Assignment of Insurances to be duly executed as of the date first above written.

**ASSIGNOR:**

NAUTICAL SOLUTIONS, L.L.C.

By _____
Name: _____
Title: _____

The terms and conditions of this
Assignment of Insurances are hereby

ACCEPTED BY:

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent

By _____
Name:
Title:

SCHEDULE 1
<u>VESSELS</u>

| **<u>Vessel</u>** | **<u>Official No.</u>** |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

## EXHIBIT A

**NOTICE OF ASSIGNMENT**

[•], 2023

NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company (the "*Owner*"), owner of each United States flag vessel listed on Schedule 1 attached hereto (collectively, the "*Vessels*" and each, a "*Vessel*"), HEREBY GIVES NOTICE that pursuant to an Assignment of Insurances dated as of [•], 2023 (the "*Assignment*"; capitalized terms used herein and not otherwise defined are used herein as defined in the Assignment), made by the Owner in favor of Wilmington Trust, National Association, in its capacity as Collateral Agent for the benefit of the Secured Parties (together with its successors and permitted assigns, in such capacity, the "*Assignee*"), the Owner assigned to the Assignee all of the Owner's right, title and interest in and to (a) all insurances (including, without limitation, all insurances with respect to hull and machinery, war risk, hull and machinery, protection and indemnity, pollution, loss of earnings, requisition of title or otherwise) in respect of each Vessel, her hull, machinery, freights, subfreights, disbursements, profits or otherwise, whether heretofore, now or hereafter effected, and all renewals of or replacements for the same, (b) all monies and claims for moneys due and to become due to the Assignor under said insurances with respect to the actual, constructive, agreed, arranged or compromised total loss or any other loss of or damage to any Vessel, or with respect to a claim arising out of the use or operation of any Vessel; (c) all returns of premium, (d) all other rights and benefits of Assignor under or in respect of said insurances and (e) all cash and non-cash proceeds of the foregoing. This Notice and the Loss Payable Clauses attached hereto as Exhibit A-1 and Exhibit A-2 are to be endorsed on all policies and certificates of entry evidencing such insurances.

However, it is agreed that for claims that are less than US$2,000,000 per occurrence that such claims will be paid to the Owner or their appointed repairer, provided always that if an Event of Default has been declared by the Assignee, all funds will be paid to the Assignee.

[Remainder of Page Intentionally Left Blank. Signatures on Following Pages]

Ex. A

IN WITNESS WHEREOF, the Owner has caused this Notice of Assignment to be duly executed as of the date first above written.

**OWNER:**

NAUTICAL SOLUTIONS, L.L.C.

By          _____
Name:    _____
Title:      _____

EXHIBIT A-1
<u>LOSS PAYABLE CLAUSES</u>

Loss, if any, shall be payable to Wilmington Trust, National Association, as Collateral Agent for the benefit of the Secured Parties (in such capacity, the "*Collateral Agent*"), for distribution by it to itself and then to Nautical Solutions, L.L.C. (the "*Owner*"), as their respective interests may appear, or order, except that, unless an Event of Default has occurred and is continuing, or the underwriters or their brokers have been otherwise instructed by notice in writing from the Collateral Agent, in the case of any loss involving any damage to any Vessel or liability of any Vessel (not involving an actual or constructive loss or an agreed, arranged or compromised total loss of a Vessel), the underwriters may pay directly for the repair, salvage, liability or other charges involved or, if the Owner shall have fully or partially repaired the damage and paid the cost thereof, or discharged the liability or paid all of the salvage or other charges and duly furnished a Shipowners' Certificate to the Collateral Agent in accordance with Section 9.2 of the Note Exchange Agreement, then the underwriters may pay the Owner as reimbursement therefor; <u>provided</u>, <u>however</u>, that if such damage involves a loss in excess of $2,000,000 lawful money of the United States of America, or its equivalent, or an Event of Default has occurred and is ongoing, the underwriters shall make such payment to the Collateral Agent alone, unless otherwise directed in writing by the Collateral Agent.

In the event of an actual or constructive total loss or an agreed, compromised or arranged total loss or requisition of title, all insurance payments therefor shall be paid to the Collateral Agent alone to be held and applied in accordance with the Note Exchange Agreement, unless otherwise directed in writing by the Collateral Agent.

EXHIBIT A-2

<u>PROTECTION AND INDEMNITY LOSS PAYABLE CLAUSE</u>

Loss, if any, shall be payable directly to the person to whom the liability covered by this insurance has been incurred (the "*claimant*"), or if Nautical Solutions, L.L.C. (the "*Owner*") already has paid the claim of the claimant, then to Wilmington Trust, National Association, as Collateral Agent for the benefit of the Secured Parties (in such capacity, the "*Collateral Agent*"), for distribution by it to itself and then to the Owner, as their respective interests may appear, or order, except that, unless and until the underwriters have been otherwise instructed by notice in writing from the Collateral Agent, any loss the liability of which is covered by this insurance and is not to be paid directly to the claimant may be paid directly to the Owner to reimburse it for any loss, damage or expenses incurred by it and covered by this insurance, <u>provided</u> the underwriters shall have first received evidence that the liability insured against has been discharged by the Owner.

     Assignment of Insurances

<u>Exhibit E</u>

**[FORM OF] PREFERRED FLEET MORTGAGE**

given by

NAUTICAL SOLUTIONS, L.L.C.,

in favor of

WILMINGTON TRUST, NATIONAL ASSOCIATION,
in its capacity of Collateral Agent,
as mortgagee

Dated [•] and effective [•]

United States Flag Vessels

Avery Island
Brad Dartez
Cat Island
Celena Chouest
Corcovado
Dante
Dauphin Island
Deer Island
Dino Chouest
Fast Tender
Fast Track
Forte
Gavea
Grand Isle
Horn Island
Jackie Chouest
Kirt Chouest
Lyman Martin
Marsh Island
Mr Sidney
Ms Virgie
Pao de Acucar
Paradise Island
Pecan Island
Pelican Island
Sanibel Island
Ship Island
Timbalier Island
Wine Island

**SYNOPSIS OF MORTGAGE**

| Name of Vessels and Official Nos.: | Name | Official Number |
|---|---|---|
| | Avery Island | 1253395 |
| | Brad Dartez | 1252257 |
| | Cat Island | 1257750 |
| | Celena Chouest | 1201702 |
| | Corcovado | 1215834 |
| | Dante | 1178758 |
| | Dauphin Island | 1262978 |
| | Deer Island | 1289730 |
| | Dino Chouest | 1207856 |
| | Fast Tender | 1206390 |
| | Fast Track | 1208793 |
| | Forte | 1223605 |
| | Gavea | 1211932 |
| | Grand Isle | 1250605 |
| | Horn Island | 1255030 |
| | Jackie Chouest | 1210979 |
| | Kirt Chouest | 1213707 |
| | Lyman Martin | 1227085 |
| | Marsh Island | 1266925 |
| | Mr Sidney | 1216539 |
| | Ms Virgie | 1213714 |
| | Pao de Acucar | 1218372 |
| | Paradise Island | 1262977 |
| | Pecan Island | 1258532 |
| | Pelican Island | 1261549 |
| | Sanibel Island | 1257727 |
| | Ship Island | 1252958 |
| | Timbalier Island | 1251360 |
| | Wine Island | 1259152 |

Type of Instrument:        Preferred Fleet Mortgage

Effective Date of
Instrument:              _____, 2023

Name of Shipowner:       Nautical Solutions, L.L.C.

Percentage of            100%
Vessel owned:

| | |
|---|---|
| Address of Shipowner: | 16201 East Main Street<br>Cut Off, Louisiana  70345 |
| Name of Mortgagee: | _____ |
| Percentage of Vessel Mortgaged: | 100% |
| Address of Mortgagee: | _____<br>_____<br>Attention: _____ |
| Total Amount of Mortgage: | _____ United States Dollars ($_____), plus Specified Noteholder Fee (if any), Exit Fee (if any) or other premium (if any) and interest, fees, costs, expenses and performance of mortgage covenants. |

This PREFERRED FLEET MORTGAGE (this "*Mortgage*"), made this _____ day of _____, 2023 and effective as of the _____ day of _____, 2023, is given by NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company, with an address of 16201 East Main Street, Cut Off, Louisiana 70345 (the "*Shipowner*"), to and in favor of Wilmington Trust, National Association, with an address of 1100 North Market Street, Wilmington, DE 19890, in its capacity as collateral agent for the Secured Parties under and as defined in the Security Agreement (as such term is defined in the Note Exchange Agreement defined below), as required by the Note Exchange Agreement (in such capacity, together with its successors and assigns, the "*Mortgagee*").

<div align="center">WITNESSETH:</div>

WHEREAS, pursuant to the terms and conditions of that certain Note Exchange Agreement dated as of [•], 2023 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Note Exchange Agreement*", a copy of the unexecuted final version of the Note Exchange Agreement, with the final form of the Senior Notes (as defined below) attached as an exhibit thereto but without other exhibits or schedules (other than Schedule B (Defined Terms)) attached thereto, is attached hereto as Exhibit A and incorporated herein by reference) by and among the Shipowner, Nautical Solutions Holdings, LLC, a Louisiana limited liability company, as the parent company of the Shipowner, the financial institutions parties thereto, as noteholders, and Wilmington Trust, National Association, as Agent and the Mortgagee, the Shipowner has agreed to issue the amount set forth in the Note Exchange Agreement of Senior Secured Notes due on [•], 2028 (as defined in the Note Exchange Agreement) (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any notes delivered in substitution or exchange for any of the foregoing senior secured notes, the "*Senior Notes*");

WHEREAS, the Shipowner has executed and delivered, or will execute and deliver, the Senior Notes to the respective noteholders thereof identified in the Note Exchange Agreement (collectively, together with such noteholders' successors and assigns, the "*Noteholders*"), such Senior Notes to be in the amount set forth in the Note Exchange Agreement and each to be due and payable in the amounts and upon the terms and conditions therein recited, with interest and other amounts as set forth in the Note Exchange Agreement;

WHEREAS, the Shipowner is the sole legal and beneficial owner of the vessels more particularly described on Schedule 1 attached hereto and made a part hereof; and

WHEREAS, it is a condition precedent to the exchange of the Exchanged Debt for the Senior Notes that the Shipowner shall have executed and delivered this Mortgage to the Mortgagee to secure, among other things, the timely payment of the principal of, Specified Noteholder Fee (as defined in the Note Exchange Agreement) (if any), Exit Fee (as defined in the Note Exchange Agreement) (if any) and interest on all Senior Notes outstanding and to be outstanding under the Note Exchange Agreement and performance of all of the Shipowner's obligations under the Note Exchange Agreement and other Debt Documents (as hereinafter defined).

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to secure the

<div align="center">1</div>

<div align="right">Mortgage</div>

full and timely payment and performance of any and all present and future indebtedness, obligations and liabilities of the Shipowner, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of or in connection with, the Senior Notes, the Note Exchange Agreement, any other Note Documents (as defined in the Note Exchange Agreement), this Mortgage and the other Security Documents (collectively, the "*Debt Documents*") to which the Shipowner is a party, in each case whether on account of principal, Specified Noteholder Fee, Exit Fee (if any), interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise, and including, without limitation, all fees and disbursements of counsel to the Mortgagee and the Noteholders that are required to be paid by the Shipowner pursuant to the terms of any of the Debt Documents (collectively, and including any and all renewals, modifications, amendments, extensions for any period, supplements and restatements of any of the foregoing, the "*Secured Obligations*"), the Shipowner does, by these presents, grant, convey and mortgage and grant a continuing security interest in, to and in favor of the Mortgagee, and its successors and permitted assigns in such capacity, and to and for the benefit of the Mortgagee, its successors and permitted assigns in such capacity, the whole of the vessels described on Schedule 1 attached hereto, together with all their boilers, engines, machinery, auxiliaries, tackle, apparel, spares, fuel, consumable and other stores, navigational systems, electronic surveillance systems, computer equipment and software, anchors, cables, chains, equipment, cranes, welding machines and stations, cutting systems, pontoons, tensions, davits, dope stations, anchor wires, anchor buoys, generators, compressors, pumps, tools, implements, parts, supplies, and all other accessories, additions, appurtenances, improvements and replacements now or hereafter belonging thereto, whether or not removed therefrom, all of which shall be deemed to be included in the term "*Vessel*" and, collectively, "*Vessels*" herein.

TO HAVE AND TO HOLD all and singular the Vessels unto the Mortgagee and its successors and permitted assigns, to its and its successors' and permitted assigns' own use, benefit and behoof forever, for the enforcement of the payment of the Secured Obligations secured hereby and the performance and observance of and compliance with the covenants, terms and conditions in this Mortgage and other Debt Documents, subject to the rights of the Shipowner therein as herein provided.

PROVIDED, HOWEVER, and these presents are upon the condition that, if the Secured Obligations are paid and performed in full in accordance with the terms of the Note Exchange Agreement, this Mortgage and the other Debt Documents and the Senior Notes are satisfied and discharged in full, then this Mortgage shall cease; otherwise it shall remain in full force and effect. The Shipowner agrees to perform and to observe the terms, covenants and agreements contained in this Mortgage and in the other Debt Documents, and to hold the Vessels subject thereto.

IT IS HEREBY COVENANTED, DECLARED AND AGREED that each of the Vessels is to be held subject to the further covenants, conditions, provisions, terms and uses hereinafter set forth.

ARTICLE 1
REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SHIPOWNER

The Shipowner hereby represents, warrants, covenants and agrees with the Mortgagee as follows:

Section 1. 1    The Shipowner will pay when due all Secured Obligations from time to time payable by the Shipowner under the Note Exchange Agreement and the other Debt Documents and will observe, perform and comply with the covenants, terms and conditions herein and in the Note Exchange Agreement and the other Debt Documents on its part to be observed, performed or complied with.

Section 1.2    The Shipowner is and shall remain a "citizen of the United States of America" as described in 46 U.S.C. §50501 et seq. duly qualified to own, document, and mortgage each of the Vessels under the laws and regulations of the United States of America and to operate the Vessels in the coastwise trade of the United States.  Each Vessel is duly documented in the name of the Shipowner under the laws and flag of the United States of America qualified to engage in the coastwise and foreign trade of the United States.

Section 1.3    The Shipowner lawfully owns and is lawfully possessed of each of the Vessels free from any Lien (as defined in the Note Exchange Agreement), charge or encumbrance whatsoever (except for the existing First Preferred Fleet Mortgage dated November 11, 2013 and effective November 14, 2013, as heretofore amended and supplemented from time to time in favor of JPMorgan Chase Bank, N.A., in its capacity as collateral agent and mortgagee, as assigned to the Mortgagee on the date hereof, the "*Prior Mortgage*") this Mortgage and the Liens permitted to be created, incurred, assumed or permitted to exist pursuant to Section 10.5(a), (b) and (e) of the Note Exchange Agreement (collectively, the "*Permitted Maritime Liens*")), and will warrant and defend the title and possession thereto and to every part thereof for the benefit of the Mortgagee against the claims and demands of all persons whomsoever; *provided*, *however*, that notwithstanding anything herein to the contrary, no intention to subordinate the priority security interest and Lien granted in favor of the Mortgagee herein is to be hereby implied or expressed by the permitted existence of any Permitted Maritime Liens.

Section 1.4    The Shipowner has caused this Mortgage to be duly filed and will cause it to be duly recorded and will comply with and satisfy all of the provisions and requirements of Chapter 313 of Title 46 of the United States Code and the regulations in effect thereunder from time to time, as amended, in order to establish, perfect and maintain the perfection and priority of this Mortgage as a valid, enforceable and duly perfected preferred mortgage lien (subject only to the Prior Mortgage and other Permitted Maritime Liens) over the whole of each Vessel and upon all renewals, replacements and improvements made in or to the same for the amount of the Secured Obligations.

Section 1.5    For each Vessel, the Shipowner will not (a) cause or permit such Vessel to be operated in any manner contrary to applicable law, rule or regulation, (b) engage in any unlawful trade or operations or violate any law, (c) carry any cargo that will expose such Vessel to penalty, confiscation, forfeiture, capture or condemnation, or (d) do, or suffer or permit to be done, anything which can or may injuriously affect the registration or documentation of such Vessel under the laws and regulations of the United States. The Shipowner will at all times keep each Vessel duly documented in its name as an United States flag vessel under Chapter 121 of Title 46 of the United States Code, eligible for the trade of the United States in which each such Vessel is engaged from time to time.

Section 1.6    Neither the Shipowner, any charterer, the master of any Vessel nor any other person has or shall have any right, power or authority to create, incur or permit to be placed or imposed or continued upon such Vessel, her earnings, freights, profits or hire, any Lien, charge or encumbrance whatsoever, other than this Mortgage and other Permitted Maritime Liens.

Section 1.7    For each Vessel, the Shipowner will place, and at all times and place will retain, a properly certified copy of this Mortgage on board such Vessel with her papers and will cause such certified copy and such Vessel's marine document to be exhibited to any and all persons having business therewith which might give rise to any lien thereon other than Permitted Maritime Liens, and to any representative of the Mortgagee; and the Shipowner will place and keep prominently displayed in the chart room and in the master's cabin of such Vessel, or in the case of a rig, in a prominent place aboard the rig, or in such location as the rig's papers are kept, a framed printed notice in plain type reading as follows:

<div align="center">"NOTICE OF MORTGAGE</div>

This Vessel is covered by a Preferred Fleet Mortgage in favor of Wilmington Trust, National Association, as Collateral Agent. Under the terms of said Mortgage, neither the Shipowner, any charterer, the master of this Vessel nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any lien whatsoever other than Permitted Maritime Liens (as defined in the Preferred Fleet Mortgage)."

Section 1.8    Each Vessel is seaworthy and, to the extent classed, each such Vessel is in class without any recommendations or conditions affecting class and without any overdue surveys.

Section 1.9    Except for this Mortgage and the other Permitted Maritime Liens, for each Vessel, the Shipowner will not suffer to be continued any Lien, encumbrance or charge on such Vessel for longer than thirty (30) days, and in due course and in any event within sixty (60) days after the same becomes due and payable, the Shipowner will pay and discharge, or cause to be paid and discharged, or make adequate provision for the satisfaction or discharge of all claims or demands (except to the extent that the same shall concurrently be contested by the Shipowner in good faith by appropriate legal proceedings being diligently pursued and provided the Shipowner has established and maintained adequate reserves with respect thereto in accordance with GAAP (as defined in the Note Exchange Agreement), and the same shall not subject such Vessel, or any part thereof, to arrest, sale, forfeiture or loss), or will cause such Vessel to be released or discharged from any Lien, encumbrance or charge therefor.

Section 1.10    The Shipowner (i) has the full power and authority to execute and deliver this Mortgage and to perform all of its obligations hereunder, (ii) has duly executed and delivered this Mortgage, and (iii) has obtained all applicable consents, licenses, approvals and authorizations (including any approvals of the United States Coast Guard and the U.S. Maritime Administration) required for its entry into and performance, and the Mortgagee's enforcement of, this Mortgage.

Section 1.11    Except for the filing and recordation of this Mortgage with the United States Coast Guard, National Vessel Documentation Center ("*NVDC*"), it is not necessary for the legality,

validity or enforceability of the Mortgage that it be registered, filed, recorded or enrolled with any court or other authority in any relevant jurisdiction.

Section 1.12   This Mortgage constitutes the legal, valid and binding obligation of the Shipowner, enforceable in accordance with its terms, except to the extent such enforcement may be limited by any applicable bankruptcy, insolvency, moratorium or similar laws affecting the rights of creditors generally and by general principals of equity.

Section 1.13   For each Vessel:

(a)      if a libel or complaint be filed against such Vessel or such Vessel be otherwise attached, arrested, levied upon or taken into custody by any Governmental Authority (as defined in the Note Exchange Agreement) or any person that purports to be acting on behalf of a Governmental Authority for any cause whatsoever, the Shipowner will promptly notify the Mortgagee by facsimile, confirmed by letter, at its address as specified in this Mortgage, and within thirty (30) days will cause such Vessel to be released and all Liens thereon, other than this Mortgage and other Permitted Maritime Liens, to be discharged (except to the extent that the claim giving rise to such Lien shall concurrently be contested by the Shipowner in good faith by appropriate legal proceedings being diligently pursued and provided the Shipowner has established and maintained adequate reserves with respect thereto in accordance with GAAP, and the same shall not subject such Vessel, or any part thereof, to sale, forfeiture or loss) and will promptly notify the Mortgagee thereof in the manner aforesaid; and

(b)      if the Shipowner shall fail or neglect to furnish proper security or otherwise to release such Vessel from libel, arrest, levy, seizure or attachment within the time period required by Section 1.13(a) above, the Mortgagee or any person acting on behalf of the Mortgagee may furnish security to release such Vessel and by so doing shall not be deemed to cure the default of the Shipowner unless and until the Shipowner shall have reimbursed the Mortgagee from all costs and expenses (including reasonable attorney's fees) incurred by the Mortgagee or such third party acting at the direction of the Mortgagee in procuring such release, including for any security so furnished.

Section 1.14   For each Vessel:

(a)      except while such Vessel is undergoing repairs, maintenance or is in lay-up, the Shipowner will at all times and without cost or expense to the Mortgagee maintain and preserve, or cause to be maintained and preserved, such Vessel (i) in good running order and repair so that such Vessel shall be, insofar as due diligence can make her so, tight, staunch, strong and well and sufficiently tackled, apparelled, furnished, equipped and in every respect seaworthy and (ii) in at least as good a working order and condition as when this Mortgage was executed, ordinary wear and tear excepted; and will keep such Vessel, or cause her to be kept, in such condition as will entitle her to such classification rating with the American Bureau of Shipping or other classification society of like standing reasonably acceptable to the Mortgagee (each, a "*Classification Society*") that companies engaged in the operation of vessels of the same type, size, age and flag as such Vessel maintain respecting their vessels with such Classification Society. Notwithstanding the foregoing, if such Vessel is affected by any partial loss or damage of such Vessel or a portion or component thereof, the Shipowner shall make all necessary repairs and

replacements to such Vessel, except where the failure to do so could not reasonably be expected to materially change the value, utility or remaining usefulness life of such Vessel;

(b)      such Vessel shall, and the Shipowner covenants that it will, at all times comply with all applicable laws, rules and regulations to the extent set forth in the Note Exchange Agreement and this Mortgage, and such Vessel shall have on board as and when required thereby certificates showing compliance therewith;

(c)      the Shipowner will not make, or permit to be made, any substantial change in the structure, type or speed of such Vessel or change in the rig of such Vessel (i) to the extent such change would be in violation of the provisions of Section 10.24 of the Note Exchange Agreement, or (ii) if any such change could reasonably be expected to have a material adverse effect on (x) the rights or interest of the Shipowner or the Mortgagee to any insurance which is required under Section 9.2 of the Note Exchange Agreement, or (y) the value, utility or remaining useful life of such Vessel; and

(d)      the Shipowner may, in the ordinary course of maintenance, repair or overhaul of such Vessel, remove any item of property constituting a part of such Vessel, provided such item of property is replaced to the extent necessary to maintain such Vessel in the condition required herein or the Note Exchange Agreement. Any such replacement item of property shall, without necessity of further act hereunder, become part of such Vessel and subject to this Mortgage.

Section 1.15    The Shipowner will not transfer or change the flag or hailing port of any Vessel.

Section 1.16    The Shipowner will not sell, mortgage or transfer its interest in any Vessel except in accordance with the applicable provisions of the Note Exchange Agreement. The Shipowner will not charter any Vessel on a demise or bareboat basis except in accordance with the applicable provisions of the Note Exchange Agreement.  For any Vessel the Shipowner so charters, the Shipowner shall (a) provide Mortgagee a copy of any such charter and all related documents and (b) prior to its entry into any such charter, provide the Mortgagee with evidence that all insurances required to be in place will remain in place, and (c) grant and maintain in favor of Mortgagee a first priority, duly perfected security interest in and lien upon all hire and other earnings due and to become due under such charter agreement and all related rights and the proceeds thereof subject only to Permitted Maritime Liens.

Section 1.17    The Shipowner agrees that, if the Shipowner fails to (a) perform any of its covenants or obligations under this Mortgage, including, without limitation, its obligations with respect to insurance, the discharging of Liens, taxes, dues, assessments, governmental charges, fines, penalties lawfully imposed, repairs, reasonable attorneys' fees, and other obligations that are not Permitted Maritime Liens or (b) maintain insurance on each Vessel as required by the Debt Documents, the Mortgagee may, but shall not be obligated to, perform the Shipowner's obligations under this Mortgage or arrange for (at the Shipowner's own cost and expense and without any responsibility on the Mortgagee's part) the obtaining of the insurance under the Debt Documents, and any reasonable expenses incurred by the Mortgagee in performing the Shipowner's obligations shall be paid by the Shipowner to the Mortgagee within ten (10) Business Days of demand therefor.

Any such performance by the Mortgagee may be made by the Mortgagee in reasonable reliance on any statement, invoice or claim, without inquiry into the validity or accuracy thereof. The amount and nature of any expense of the Mortgagee hereunder shall be conclusively established by a certificate of any officer of the Mortgagee absent manifest error, and such amount shall be included in the Secured Obligations secured by this Mortgage.

Section 1.18   In the event that at any time and from time to time this Mortgage or any provisions hereof shall be deemed invalidated in whole or in part by reason of any present or future law or any decision of any Governmental Authority, then the Shipowner, forthwith upon the request of the Mortgagee, will execute such other and further assurances and documents as are reasonably requested by the Mortgagee to accomplish the purposes of this Mortgage. From time to time on the reasonable request of the Mortgagee, the Shipowner will furnish to the Mortgagee: (i) such favorable opinions of counsel, including United States legal opinions, in form and substance reasonably satisfactory to the Mortgagee, and (ii) such instruments executed by the Shipowner or on its behalf or by any or all officers, members, managers or directors of the Shipowner, in each case, relating to this Mortgage or any of the transactions contemplated hereby, as the Mortgagee may reasonably request.

Section 1.19   In the event of the requisition (whether of title or use), condemnation, sequestration, seizure or forfeiture of any Vessel by any Governmental Authority or by anyone else, the Shipowner will give prompt written notice thereof to the Mortgagee, and any payments in respect thereof shall be paid to the Shipowner, and the Shipowner shall cause any such payment to be applied to the Secured Obligations to the extent required, and in accordance with, the terms of the Note Exchange Agreement.

## ARTICLE 2
## EVENTS OF DEFAULT AND REMEDIES

Section 2.1   Upon the occurrence and during the continuation of an Event of Default (as defined in the Note Exchange Agreement), the Mortgagee shall have the right to:

(a)   declare immediately due and payable all of the Secured Obligations (in which case all of the same shall become immediately due), and bring suit at law, in equity or in admiralty, as it may be advised, to recover judgment for the Secured Obligations and to satisfy the same out of the Vessels;

(b)   exercise all of the rights and remedies in foreclosure with respect to any of the Vessels and otherwise given to mortgagees by the provisions of applicable law, including, but not limited to, the provisions of Chapter 313 of Title 46 of the United States Code and the regulations in effect thereunder from time to time, as amended;

(c)   take and enter into possession of any of the Vessels, at any time, wherever the same may be, without court decision or other legal process and without being responsible for loss or damage, and the Shipowner or other person in possession forthwith upon demand of the Mortgagee shall surrender to the Mortgagee possession of such Vessel or Vessels and the Mortgagee may, without being responsible for loss or damage (except to the extent caused by the Mortgagee's gross negligence or willful misconduct as determined by a court of competent

jurisdiction in a final and non-appealable judgment), hold, lay-up, lease, charter, operate or otherwise use such Vessel or Vessels for such time and upon such terms as it may deem to be for its best advantage, and demand, collect and retain all hire, freights, earnings, issues, revenues, income, profits, return premiums, salvage awards or recoveries, recoveries in general average, and all other sums due or to become due in respect of such Vessel or Vessels or in respect of any insurance thereon from any person whomsoever, accounting only for the net profits, if any, arising from such use of such Vessel or Vessels and charging upon all receipts from the use of such Vessel or Vessels or from the sale thereof by court proceedings or pursuant to Section 2.1(e) below, all costs, expenses, charges, damages or losses by reason of such use (including reasonable attorney's fees); and if at any time the Mortgagee shall avail itself of the right herein given it to take possession of such Vessel or Vessels, the Mortgagee shall have the right to dock such Vessel or Vessels for a reasonable time at any dock, pier or other premises of the Shipowner without charge, or to dock them at any other place at the cost and expense of the Shipowner, and the Mortgagee shall have the right to require the Shipowner to deliver, and the Shipowner shall on demand, at its own cost and expense, deliver to the Mortgagee such Vessel or Vessels as demanded; and the Shipowner hereby irrevocably instructs the masters of such Vessel or Vessels so long as this Mortgage is outstanding to deliver such Vessel or Vessels (as the case may be) to the Mortgagee as demanded;

(d)     inspect and make copies of all original class records held by the Classification Society relating to such Vessels; and/or

(e)     without being responsible for loss or damage, other than loss or damage due to its own gross negligence or willful misconduct, sell such Vessel or Vessels, at any place and at such time as the Mortgagee may specify and in such manner and such place (whether by public or private sale) as the Mortgagee may deem advisable (without necessity of bringing such Vessel or Vessels to the place designated for such sale), free from any claim by the Shipowner in admiralty, in equity, at law or by statute, after first giving notice of the time and place of any public sale with a general description of the property in the following manner:

(i)     by publishing such notice for ten (10) consecutive days in a daily newspaper of general circulation published in New York City;

(ii)     if the place of sale should not be New York City, then also by publication of a similar notice in a daily newspaper, if any, published at the place of sale; and

(iii)     by mailing a similar notice to the Shipowner at its last known address on the day of first publication;

and notice of the time and place of any private sale by mailing such notice to the Shipowner at its last known address.

Section 2.2     Any sale of any of the Vessels or any interest therein made by the Mortgagee after the occurrence and during the continuance of an Event of Default in pursuance of this Mortgage, whether under the power of sale hereby granted or any judicial proceedings, shall operate to divest all right, title and interest of any nature whatsoever of the Shipowner in and to such Vessel or Vessels or such interest therein sold, as the case may be, and shall bar any claim

Mortgage

from the Shipowner, its successors and assigns, and all persons claiming by, through or under them. Any sale may be conducted without bringing the Vessel or Vessels subject of such sale to the place designated for such sale and in such manner as the Mortgagee may deem to be for its best advantage. No purchaser shall be bound to inquire whether notice has been duly given, or whether any default has occurred, or as to the propriety of the sale, or as to the application of the proceeds thereof. In the case of any such sale, the Mortgagee shall be entitled, to apply the proceeds to the Secured Obligations in accordance with the Note Exchange Agreement. At any such sale, the Mortgagee may bid for and purchase such property and upon compliance with the terms of sale may hold, retain and dispose of such property without further accountability therefor.

Section 2.3  The Mortgagee is hereby appointed attorney-in-fact of the Shipowner to execute and deliver to any purchaser referred to in <u>Section 2.2</u>, and is hereby vested with full power and authority to make, after the occurrence and during the continuation of an Event of Default, in the name and on behalf of the Shipowner, a good conveyance of the title to such Vessel or Vessels so sold. In the event of any sale of any of the Vessels under any power herein contained, the Shipowner will, if and when required by the Mortgagee, execute such form of conveyance of any such Vessel or Vessels and other related documents as the Mortgagee may specify. The powers and authority granted to the Mortgagee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with an interest.

Section 2.4    The Mortgagee is hereby appointed attorney-in-fact of the Shipowner in the name of the Shipowner to, after the occurrence and during the continuation of an Event of Default, demand, collect, receive, compromise and sue for, so far as may be permitted by law, all freights, hire, earnings, issues, revenues, income and profits of each of the Vessels and all amounts due from underwriters under any insurance thereon as payments of losses or as return premiums or otherwise, salvage awards and recoveries of each of the Vessels, recoveries in general average or otherwise in respect of each of the Vessels, and all other sums in respect of each of the Vessels, due or to become due at the time of the occurrence and during the continuation of any Event of Default, or in respect of any insurance thereon, from any person whomsoever, and to make, give and execute in the name of the Shipowner acquittances, receipts, releases or other discharges for the same, whether under seal or otherwise, and to endorse and accept in the name of the Shipowner all checks, notes, drafts, warrants, agreements and other instruments in writing with respect to the foregoing. The powers and authority granted to the Mortgagee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with an interest.

Section 2.5    Whenever any right to enter and take possession of any Vessel accrues to the Mortgagee, it may require the Shipowner to deliver, and the Shipowner shall on demand, at its own cost and expense, deliver to the Mortgagee such Vessel as demanded. If any legal proceedings shall be taken to enforce any right under this Mortgage, the Mortgagee shall be entitled as a matter of right to the appointment of a receiver of such Vessel and of the freights, hire, earnings, issues, revenues, income and profits due or to become due and arising from the operation thereof.

Section 2.6    The Shipowner authorizes and empowers the Mortgagee or its appointees or any of them, after the occurrence and during the continuation of an Event of Default, to appear in the name of the Shipowner, its successors and assigns, in any court of any country or nation of the world where a suit is pending against any Vessel because of or on account of an alleged Lien against such Vessel from which such Vessel has not been released and to take such proceedings

as to such Vessel as it may deem necessary towards the defense of such suit and the purchase or discharge of such Lien, and all reasonable expenditures made or incurred by them or any of the Mortgagee or its appointees for the purpose of such defense or purchase or discharge shall be a debt due from the Shipowner, its successors and assigns, to the Mortgagee, and shall be secured by the lien of this Mortgage in like manner and extent as if the amount and description thereof were written herein.

Section 2.7    The Shipowner covenants that at any time that any Secured Obligations shall be due and payable (whether by acceleration or otherwise), the same shall be paid in accordance with the Note Exchange Agreement and the other Debt Documents; and in case the Shipowner shall fail to pay the same when due in accordance with the Note Exchange Agreement and the other Debt Documents, and that failure constitutes an Event of Default, the Mortgagee shall be entitled to recover judgment for the whole amount so due and unpaid, together with such further amounts as shall be provided by the Note Exchange Agreement, the other Debt Documents and applicable law. All moneys collected by the Mortgagee under this Section 2.7 shall be applied by the Mortgagee in accordance with the terms of the Note Exchange Agreement.

Section 2.8    Each and every right, power and remedy herein given to the Mortgagee shall be cumulative and shall be in addition to every other right, power and remedy herein given or now or hereafter existing at law, in equity, in admiralty, by statute or under any Debt Document or other agreement, and each and every right, power and remedy whether herein given or otherwise existing may be exercised from time to time and as often and in such order as may be deemed expedient by the Mortgagee, and the exercise or the beginning of the exercise of any right, power or remedy by the Mortgagee shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other power or remedy. No delay or omission by the Mortgagee in the exercise of any right or power or in the pursuance of any remedy accruing upon the occurrence and during the continuance of any Event of Default shall impair any such right, power or remedy or be construed to be a waiver of any such right, power or remedy; nor shall the acceptance by the Mortgagee of any security or of any payment of or on account of the Secured Obligations be construed to be a waiver of any right that the Mortgagee may have hereunder after the occurrence and during the continuance of such Event of Default or any other Event of Default, including any subsequent Event of Default of the same or a different nature.

Section 2.9    Reserved.

Section 2.10   In case the Mortgagee shall have proceeded to enforce any right, power or remedy under this Mortgage by foreclosure, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Mortgagee, then and in every such case the Shipowner and the Mortgagee shall be restored to their former positions and rights hereunder with respect to the property subject or intended to be subject to this Mortgage, and all rights, remedies and powers of the Mortgagee shall continue as if no such proceedings had been taken.

Section 2.11   Unless otherwise specified herein, any cash proceeds received by the Mortgagee from the sale of, collection of, or other realization upon any part of any of the Vessels or related collateral or any other amounts received by the Mortgagee hereunder, including the net earnings of any charter operation or other use of any of the Vessels by the Mortgagee under any

Mortgage

of the powers specified in <u>Article 1</u> and/or <u>Article 2</u>, may be, at the reasonable discretion of the Mortgagee (a) held by the Mortgagee in one or more cash collateral accounts as cash collateral for the Secured Obligations under the terms of the Security Agreement, or (b) applied to the Secured Obligations. Amounts applied to the Secured Obligations shall be applied to the payment of the Secured Obligations in the order set forth in the Note Exchange Agreement. Any surplus cash collateral or cash proceeds held by the Mortgagee after payment in full of the Secured Obligations shall be paid over to the Shipowner or to whomever may be lawfully entitled to receive such surplus.

Section 2.12   Unless and until one or more Event of Default shall occur and be continuing, the Shipowner (a) shall be suffered and permitted to retain actual possession and use of each of the Vessels and (b) to the extent permitted by the Note Exchange Agreement shall have the right, from time to time, in its discretion, and without application to the Mortgagee, and without obtaining a release thereof by the Mortgagee, to dispose of, free from the Lien hereof, any boilers, engines, generators, pumps and pumping equipment, machinery, masts, spars, sails, rigging, boats, anchors, cables, chains, tackle, outfit, apparel, furniture, fittings, equipment, spares, fuel, stores or any other appurtenances of each of the Vessels, <u>provided</u> such item of property is replaced and such Vessel is maintained in the condition required herein and in the Note Exchange Agreement, and such replacement item, if any, shall forthwith become subject to the Lien of this Mortgage as a preferred mortgage thereon.

<div align="center">

ARTICLE 3
<u>SUNDRY PROVISIONS</u>

</div>

Section 3.1   The maximum principal amount that may be outstanding under this Mortgage at any time is $_____ and for purposes of recording this Mortgage, the total amount of this Mortgage is $_____ plus Specified Noteholder Fee (if any) plus Exit Fee (if any) or other premium (if any) and interest, fees, costs, expenses and performance of mortgage covenants. There is no separate discharge amount.

Section 3.2   All of the covenants, promises, stipulations and agreements of the Shipowner in this Mortgage contained shall bind the Shipowner and its successors and permitted assigns and shall be binding on and inure to the benefit of the Mortgagee and its successors and permitted assigns. In the event of any assignment of this Mortgage by the Mortgagee in accordance with the applicable provisions of the Note Exchange Agreement, the term "*Mortgagee*" as used in this Mortgage shall be deemed to mean any such successor or permitted assignee.

Section 3.3   Wherever and whenever herein any right, power or authority is granted or given to the Mortgagee, such right, power or authority may be exercised in all cases by the Mortgagee or such agent or agents as it may appoint, and the act or acts of such agent or agents when taken shall constitute the act of the Mortgagee hereunder.

Section 3.4   In the event that any provision of this Mortgage or any of the documents or instruments which may from time to time be delivered hereunder or any provision hereof shall be deemed invalid or unenforceable by reason of any present or future law or any decision of any court of competent jurisdiction, the validity and enforceability of any other provision hereof, or of such documents or instruments, shall not be affected thereby. In any such case, the Shipowner

<div align="center">11</div>

covenants and agrees that, on demand, it will execute and deliver such other and further agreements and/or documents and/or instruments and do such things as the Mortgagee in its sole reasonable discretion may deem to be necessary to carry out the true intent of this Mortgage and such other documents or instruments. Any such invalidity or unenforceability of any provision of this Mortgage, or of such other documents or instruments, in any jurisdiction or nation shall not render such provision invalid or unenforceable under the laws of any other jurisdiction or nation.

Section 3.5    Anything herein to the contrary notwithstanding, it is intended that nothing herein shall waive the preferred status of this Mortgage and that, if any provision of this Mortgage or portion thereof shall be construed to waive the preferred status of this Mortgage, then such provision to such extent shall be void and of no effect and shall cease to be a part of this Mortgage, without affecting the remaining provisions hereof, which shall remain in full force and effect. Nothing herein shall be deemed or construed to subject to the lien hereof any property other than a vessel eligible for documentation as the term is used in 46 U.S.C. §12102, as amended.

Section 3.6    THIS MORTGAGE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE GENERAL MARITIME LAW OF THE UNITED STATES OF AMERICA. THE SHIPOWNER IRREVOCABLY SUBMITS ITSELF TO THE NON-EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, FOR THE PURPOSES OF (AND SOLELY FOR THE PURPOSES OF) ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF, OR RELATING TO, THIS MORTGAGE OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD IN SUCH NEW YORK STATE OR FEDERAL COURT AND HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE, OR OTHERWISE, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE ABOVE-NAMED COURTS FOR ANY REASON WHATSOEVER, THAT SUCH SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, OR THAT THE VENUE OF SUCH SUIT, ACTION OR PROCEEDING IS IMPROPER, OR THAT THIS MORTGAGE OR THE SUBJECT MATTER HEREOF MAY NOT BE ENFORCED IN OR BY SUCH COURTS. THE SHIPOWNER HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO THE SHIPOWNER AT ITS ADDRESS LISTED IN SECTION 3.11 HEREOF. THE SHIPOWNER AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS SECTION 3.6 SHALL AFFECT THE RIGHT OF THE MORTGAGEE TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE MORTGAGEE TO BRING ANY ACTION OR PROCEEDING AGAINST THE SHIPOWNER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

Mortgage

Section 3.7     Reserved.

Section 3.8     The term "*Dollars*" or the symbol "*$*" as used in this Mortgage shall mean Dollars in any coin or currency of the United States of America which at the time of payment shall be legal tender for public and private debts.

Section 3.9     Enforcement Expenses; Indemnification.

(a)     Costs and Expenses. The Shipowner shall reimburse the Mortgagee for any and all reasonable out-of-pocket expenses and fees (including reasonable attorneys', auditors' and accountants' fees), costs, expenses and charges (excluding time charges of attorneys who may be employees of the Mortgagee) incurred by the Mortgagee in connection with the preparation, execution, delivery, administration, collection and enforcement of this Mortgage and in the audit, analysis, administration, collection, preservation or sale of the Vessels (including the expenses and charges associated with any periodic or special audit of the Vessels) all in accordance with, and to the extent provided in, Section 14.1 of the Note Exchange Agreement. Any and all costs and expenses incurred by the Shipowner in the performance of actions required pursuant to the terms hereof shall be borne solely by the Shipowner.

(b)     INDEMNIFICATION BY THE SHIPOWNER. THE SHIPOWNER SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE MORTGAGEE (AND ANY SUB-AGENT THEREOF), THE NOTEHOLDERS AND THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ADVISORS, SUCCESSORS AND ASSIGNS (EACH SUCH PERSON BEING CALLED, AN "*INDEMNITEE*") AGAINST ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES (INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE) INCURRED BY ANY INDEMNITEE OR ASSERTED AGAINST ANY INDEMNITEE BY ANY THIRD PARTY OR BY THE SHIPOWNER OR ANY OTHER PARTY ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS MORTGAGE, ANY OTHER DEBT DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER, THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, OR, IN THE CASE OF THE MORTGAGEE (AND ANY SUB-AGENT THEREOF) AND ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ADVISORS, SUCCESSORS AND ASSIGNS ONLY, THE ADMINISTRATION OF THIS MORTGAGE AND THE OTHER SECURITY DOCUMENTS, (II) ANY SENIOR NOTE OR THE USE OR PROPOSED USE OF THE PROCEEDS THEREFROM, (III) ANY PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY ANY NOTE PARTY OR ANY OF THEIR SUBSIDIARIES, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO ANY NOTE PARTY OR OF THEIR SUBSIDIARIES, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, WHETHER BROUGHT BY A THIRD PARTY OR BY THE SHIPOWNER OR ANY OTHER NOTE PARTY, AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO,

IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES (X) ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR (Y) OTHER THAN IN THE CASE OF THE MORTGAGEE, THE AGENT AND THEIR RESPECTIVE RELATED INDEMNITEES, RESULT FROM A CLAIM BROUGHT BY THE SHIPOWNER OR ANY OTHER NOTE PARTY AGAINST AN INDEMNITEE FOR BREACH IN BAD FAITH OF SUCH INDEMNITEE'S OBLIGATIONS HEREUNDER OR UNDER ANY OTHER DEBT DOCUMENT, IF SUCH SHIPOWNER, SUCH NOTE PARTY HAS OBTAINED A FINAL AND NONAPPEALABLE JUDGMENT IN ITS FAVOR ON SUCH CLAIM AS DETERMINED BY A COURT OF COMPETENT JURISDICTION.

(c)     All amounts due under this <u>Section 3.9</u> shall be Secured Obligations and shall be payable not later than ten (10) Business Days after demand therefor. The agreements in this Section shall survive repayment of the other Secured Obligations and all other amounts payable under the other Debt Documents.

Section 3.10   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE OR ANY OTHER DEBT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS MORTGAGE AND THE OTHER DEBT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 3.11   <u>Notices</u>.  All notices or other communications required or permitted to be made or given hereunder shall be made in writing, in English, and sent to the Shipowner or the Mortgagee as provided in the Note Exchange Agreement.

Section 3.12   <u>Release of Mortgage, Etc.</u>  The liens, estate and rights hereby granted shall be subject to termination and release in accordance with the terms of the Note Exchange Agreement, and the parties hereto agree to take the actions required and execute all documents required pursuant to such provision to effectuate such termination and release.

Section 3.13   <u>Amendments</u>.  None of the terms or provisions of this Mortgage may be waived, amended, supplemented or otherwise modified except in writing signed by each of the parties hereto.

Mortgage

Section 3.14   <u>Waiver of Consequential Damages, Etc</u>. To the fullest extent permitted by applicable law, the Shipowner shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Mortgage, any other Debt Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Senior Note or the use of the proceeds thereof.

Section 3.15   <u>Conflict</u>.  In the event of a direct conflict between this Mortgage or the Note Exchange Agreement, the Note Exchange Agreement shall control; *provided*, *however*, the Shipowner understands and agrees that this Mortgage sets forth additional covenants, obligations and rights and the Shipowner will use all reasonable efforts to construe the provisions and covenants in this Mortgage as not being in direct conflict with Note Exchange Agreement.

Mortgage

IN WITNESS WHEREOF, the Shipowner has caused this Preferred Fleet Mortgage to be executed effective as of the day and year first above written.

WITNESSES:                                    NAUTICAL SOLUTIONS, L.L.C.

_____               By: _____
Printed Name:_____               Name: _____
                                              Title: _____


_____
Printed Name:_____

Signature Page                                                    Mortgage

ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF LAFOURCHE

BE IT KNOWN that on this [•], 2023, before me personally appeared:

_____

to me known, who, after being by me duly sworn, did depose and say:

That he/she is an Authorized Agent of Nautical Solutions, L.L.C., the limited liability company which is described in and which executed the within instrument, that he/she signed his name to the said instrument at the order of the Manager of the said limited liability company and acknowledged the within instrument to be the free act and deed of the said limited liability company.

IN TESTIMONY WHEREOF, I have hereto set my hand and seal on this day and year first above written.

_____
NOTARY PUBLIC
Name: _____
Notary ID/Bar Roll No. _____
My Commission Expires _____

SCHEDULE 1
VESSELS

| Vessel | Official No. |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

EXHIBIT A
NOTE EXCHANGE AGREEMENT

See Attached

## [FORM OF] SECURITY AGREEMENT

This SECURITY AGREEMENT (as it may be amended, restated, amended and restated, supplemented or modified from time to time, this "*Security Agreement*") is entered into as of [•], 2023 by and among NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company (the "*Company*"), NAUTICAL SOLUTIONS HOLDINGS, LLC, a Louisiana limited liability company ("*Holdings*" and together with the Company, collectively the "*Grantors*" and each individually the "*Grantor*") and Wilmington Trust, National Association, in its capacity and as collateral agent (in such capacity, together with any successors or assigns in such capacity, the "*Collateral Agent*") for the Secured Parties (as defined below); provided, however, that the Pledge Agreement (as defined in the Note Exchange Agreement, as hereinafter defined) shall govern the terms and conditions of Holdings' pledge of the Equity Interests in the Company and other collateral granted thereunder.

### PRELIMINARY STATEMENT

Pursuant to that certain Note Exchange Agreement, dated as of the date hereof (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Note Exchange Agreement*"), by and among the Grantors, the agent named therein, the Collateral Agent and the noteholders identified therein (the "*Noteholders*"), the Company is issuing and the Noteholders are acquiring the Company's Senior Secured Notes due 2028 in the aggregate original principal amount set forth in the Note Exchange Agreement (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any notes delivered in substitution or exchange for any of the foregoing senior secured notes, the "*Senior Notes*"). The Grantors are entering into this Security Agreement in order to induce the Noteholders to enter into the Note Exchange Agreement and exchange their Exchanged Debt (as defined in the Note Exchange Agreement) for the Senior Notes.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce the Noteholders to enter into the Note Exchange Agreement and to exchange their Exchanged Debt for the Senior Notes to be issued to the Noteholders thereunder on the date hereof, the Grantors agree, for the benefit of each Secured Party, as follows:

### ARTICLE 1.
### DEFINITIONS

1.1     Terms Defined in the UCC. All capitalized terms used herein and defined in the UCC that are not otherwise defined in this Security Agreement are used herein as defined in the UCC. Capitalized terms used herein and not defined herein or in the UCC shall have the meanings ascribed to them in the Note Exchange Agreement.

1.2     Definitions of Certain Terms Used Herein. As used in this Security Agreement, in addition to the terms defined in the preamble and the Preliminary Statement, the following terms shall have the following meanings:

"*Accounts*" has the meaning set forth in Article 9 of the UCC.

"*Affiliate*" has the meaning set forth for such term in the Note Exchange Agreement.

"*Agent*" has the meaning set forth for such term in the Note Exchange Agreement.

"*Appurtenances*" means all auxiliaries, tackle, apparel, accessories, appurtenances, anchors, cables, chains, equipment, cranes, welding machines and stations, cutting systems, pontoons, tensions, davits, dope stations, anchor wires, anchor buoys, generators, compressors, pumps, tools, implements, parts, supplies, and all other accessories, additions, improvements and replacements now or hereafter belonging to the Vessels, whether or not removed therefrom.

"*Chattel Paper*" has the meaning set forth in Article 9 of the UCC.

"*Closing Date*" means the date of Closing as set forth in the Note Exchange Agreement.

"*Collateral*" means all Accounts, Appurtenances, Chattel Paper, Commercial Tort Claims, Documents, Equipment (including Vessels and all component parts thereof and accessions and appurtenances thereto), Fixtures, Goods, General Intangibles, Instruments, Intellectual Property Collateral, Inventory, Investment Property, Deposit Accounts, Commodity Accounts, Securities Accounts, cash and cash equivalents, Vehicles, Letters of Credit, Letter-of-Credit Rights and Supporting Obligations, wherever located, in which each Grantor now has or hereafter acquires any right, title or interest, and the Proceeds (including Stock Rights), insurance proceeds and products thereof, together with all books and records, customer lists, credit files, computer files, programs, printouts, other computer materials and records, writings, databases, information and other records relating to, used or useful in connection with, evidencing, embodying, incorporating or referring to, any of the foregoing and all other personal property not otherwise described above; provided that Collateral shall exclude Excluded Assets.

"*Collateral Agent*" has the meaning set forth in the preamble.

"*Collateral Agent's Expenses*" means all of the reasonable fees, costs and expenses of the Collateral Agent (including, without limitation, the reasonable fees and disbursements of its counsel) (i) arising in connection with the preparation, execution, delivery, modification, restatement, amendment or termination of this Security Agreement and each Security Document, if not previously reimbursed, or the enforcement (whether in the context of a civil action (including matters involving admiralty jurisdiction), adversarial proceeding, in rem proceeding, workout or otherwise) of any of the provisions hereof or thereof, or (ii) incurred or required to be advanced in connection with the sale or other disposition or the custody, preservation or protection of the Collateral pursuant to any Security Document and the exercise or enforcement of the Collateral Agent's rights under this Security Agreement and in and to the Collateral.

"*Collateral Account*" means the collateral account established and maintained by the Collateral Agent pursuant to Section 7.

"*Commercial Tort Claims*" has the meaning set forth in Article 9 of the UCC and shall include those certain currently existing commercial tort claims of each Grantor, including each commercial tort claim specifically described in Exhibit I.

"*Commodity Account*" has the meaning set forth in Article 9 of the UCC.

"*Commodity Account Control Agreement*" means an agreement, in form and substance reasonably satisfactory to the Collateral Agent and the Required Holders, among the Grantors, a "commodity intermediary" (as defined in Article 9 of the UCC) holding such Grantor's assets, including funds and commodity contracts, and the Collateral Agent that provides for the Collateral Agent to have Control over all deposits, commodity contracts and other balances held in a commodity account maintained by such Grantor with such commodity intermediary.

"*Computer Hardware and Software Collateral*" means all of the Grantors' right, title and interest throughout the world in and to:

(a) all computer and other electronic data processing hardware, integrated computer systems, central processing units, memory units, display terminals, printers, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories and all peripheral devices and other related computer hardware, including all operating system software, utilities and application programs in whatsoever form;

(b) all software programs (including source code, object code and all related applications and data files), designed for use on the computers and electronic data processing hardware described in clause (a) above;

(c) all firmware associated therewith;

(d) all documentation (including flow charts, logic diagrams, manuals, guides, specifications, training materials, charts and pseudo codes) with respect to such hardware, software and firmware described in clauses (a) through (c) above;

(e) all licenses and other agreements for the grant by or to any Grantor of any right to use any items of the type referred to in clause (a) – (d) above (each, a "*Computer Hardware and Software License*"); and

(f) all rights with respect to all of the foregoing, including copyrights, licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications and any substitutions, replacements, improvements, error corrections, updates, additions or model conversions of any of the foregoing.

"*Computer Hardware and Software License*" is defined in clause (e) of the definition of "Computer Hardware and Software Collateral".

"*Control*" has the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"*Copyright*" is defined in clause (a) of the definition of "Copyright Collateral".

"*Copyright Collateral*" means all of the Grantors' right, title and interest throughout the world in and to:

(a)     all copyrights and works of authorship, registered or unregistered and whether published or unpublished, now or hereafter in force including copyrights registered in the United States Copyright Office and corresponding offices in other countries of the world, and registrations and recordings thereof and all applications for registration thereof, whether pending or in preparation and all extensions and renewals of the foregoing (collectively, "*Copyrights*");

(b)     all Copyright licenses and other agreements for the grant by or to any Grantor of any right to use any items of the type referred to in clause (a) above (each, a "*Copyright License*"), including the Copyright License listed on Exhibit B;

(c)     the right to sue for past, present and future infringements of any of the Copyrights owned by any Grantor, and for breach or enforcement of any Copyright License; and

(d)     all proceeds of, and rights associated with, the foregoing (including Proceeds, licenses, royalties, income, payments, claims, damages and proceeds of infringement suits).

"*Copyright License*" is defined in clause (b) of the definition of "*Copyright Collateral*".

"*Deposit Account Control Agreement*" means an agreement, in form and substance reasonably satisfactory to the Collateral Agent and the Required Holders, among the Grantors (as applicable), a banking institution holding such Grantor's funds, and the Collateral Agent that provides for the Collateral Agent to have Control over all deposits and balances held in a deposit account maintained by such Grantor with such banking institution.

"*Deposit Accounts*" has the meaning set forth in Article 9 of the UCC.

"*Documents*" has the meaning set forth in Article 9 of the UCC.

"*Domain Names*" is defined in the definition of "Domain Name Collateral".

"*Domain Name Collateral*" means all of the Grantors' right, title and interest throughout the world in and to Internet domain names ("*Domain Names*").

"*Equipment*" has the meaning set forth in Article 9 of the UCC.

"*Equity Interests*" has the meaning given to the term "Capital Stock" in the Note Exchange Agreement.

"*Excluded Assets*" means (a) any right or interest in any contract, lease, permit, license or license agreement (including any Copyright License, Patent License, Trademark License, Trade Secret License or Computer Hardware and Software License) with a non-Affiliate of a Grantor covering real or personal property or Intellectual Property Collateral of the Grantors if under the terms of such contract, lease, permit, license or license agreement, or applicable law

with respect thereto, the grant of a Lien therein is prohibited as a matter of law or under the terms of, or triggers a termination right or the abandonment, invalidation or unenforceability of, such contract, lease, permit, license, or license agreement and such prohibition, termination right or abandonment, invalidation or unenforceability has not been waived or the consent of the other party to such contract, lease, permit, license or license agreement has not been obtained, provided that none of the Support Agreements (as defined in the Note Exchange Agreement), Master Services Agreements (as defined in the Note Exchange Agreement), the Intellectual Property Agreements (as defined in the Note Exchange Agreement), the Asset Sale Agreements (as defined in the Note Exchange Agreement) or any agreements of any kind related thereto or proceeds thereof shall be Excluded Assets, (b) any "intent to use" Trademark applications for which a statement of use has not been filed with and accepted by the PTO, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use Trademark application, or any registration issuing therefrom, under applicable federal law, (c) any Trademarks or logos consisting of, incorporating, or relating to the "Edison Chouest Offshore" and "ECO" brand names not necessary in the operation of the Collateral or the Vessels, (d) the Tax Account and any balance in the Tax Account, (e) any payment made by the Company to Holdings or by Holdings to any of its members, in each case, in respect of the Tax Liability Amount and the Final Tax Liability Amount, and (f) Proceeds of the foregoing to the extent that the assets constituting such Proceeds are themselves subject to the exclusions set forth in clauses (a) through (e) above; provided that the exclusions set forth in clause (a) above shall in no way be construed to apply to the extent that any described prohibition is ineffective or unenforceable under Sections 9-406, 9-407, 9-408, or 9-409 of the UCC or other applicable law; provided further that (i) Excluded Assets shall not include and the security interest granted hereby shall attach at all times to all Proceeds of any such property excluded by clause (a) above, (ii) the security interest granted hereby shall attach to such property immediately and automatically (without need for any further grant or act) at such time as none of the conditions for exclusion described in clause (a) above shall exist and (iii) to the extent severable, the security interest granted hereby shall in any event attach to all rights in respect of such property that are not subject to any of the conditions for exclusion described in clauses (a) and (b) above. References herein to particular types of collateral, including without limitation "Collateral" and "Intellectual Property Collateral," shall not include any Excluded Assets.

"*Event of Default*" has the meaning set forth in the Note Exchange Agreement.

"*Fixtures*" has the meaning set forth in Article 9 of the UCC.

"*General Intangibles*" means all "general intangibles" and all "payment intangibles", each as defined in the UCC, and shall include all interest rate or currency protection or hedging arrangements, all tax refunds, all licenses, permits, concessions and authorizations and all Intellectual Property Collateral (in each case, regardless of whether characterized as general intangibles under the UCC); provided, that in the event of any conflict hereunder between provisions as to General Intangibles and provisions as to Intellectual Property Collateral, then the provisions as to Intellectual Property Collateral shall prevail.

"*Goods*" has the meaning set forth in Article 9 of the UCC.

"*Governmental Authority*" has the meaning set forth for such term in the Note Exchange Agreement.

"*Grantors*" has the meaning set forth in the preamble.

"*Instruments*" has the meaning set forth in Article 9 of the UCC.

"*Intellectual Property*" means Trademarks, Patents, Copyrights, Domain Names, Trade Secrets and all other similar types of intellectual property under any Legal Requirement in the United States or anywhere else in the world.

"*Intellectual Property Collateral*" means, collectively, the Computer Hardware and Software Collateral, the Copyright Collateral, the Patent Collateral, the Trademark Collateral, the Trade Secrets Collateral, the Domain Name Collateral, the IP Licenses and all of the Grantors' right, title and interest in and to all other similar types of intellectual property under any Legal Requirement in the United States or anywhere else in the world.

"*IP Licenses*" means all of the Grantors' right, title and interest throughout the world in and to any and all: (a) Patent Licenses, (b) Trade Secrets Licenses, (d) Copyright Licenses, (e) Trademark Licenses, and (f) Computer Hardware and Software Licenses.

"*Inventory*" has the meaning set forth in Article 9 of the UCC.

"*Investment Property*" has the meaning set forth in Article 9 of the UCC.

"*Legal Requirements*" means, as to any Person, the certificate of formation and operating agreement or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Letter of Credit*" has the meaning set forth in Section 5-102 of the UCC.

"*Letter-of- Credit Rights*" has the meaning set forth in Article 9 of the UCC.

"*Lien*" means, with respect to any asset of any Person, (a) any mortgage, pledge, charge, encumbrance, security interest, collateral assignment or other lien or restriction of any kind on such asset, whether based on common law, constitutional provision, statute or contract, (b) the interest of any vendor or a lessor under any conditional sale agreement, title retention agreement or capital lease relating to such asset, (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities, or (d) any other right of or arrangement with any creditor to have such creditor's claim satisfied out of such assets, or the proceeds therefrom, prior to the general creditors of such Person owning such assets.

"*Material Adverse Effect*" has the meaning set forth for such term in the Note Exchange Agreement.

"*Noteholders*" means Noteholders as defined in the Note Exchange Agreement.

"*Note Documents*" has the meaning given to such term in the Note Exchange Agreement.

"*Note Exchange Agreement*" has the meaning set forth in the recitals.

"*Organizational Documents*" has the meaning set forth for such term in the Note Exchange Agreement.

"*Patent*" is defined in clause (a) of the definition of "*Patent Collateral*".

"*Patent Collateral*" means all of the Grantors' right, title and interest throughout the world in and to:

(a)     all patents and patent applications throughout the world, including all patent disclosures and patent applications in preparation for filing, including all reissues, divisionals, continuations, continuations in part, substitutions, extensions, renewals and reexaminations of any of the foregoing (collectively, "*Patents*");

(b)     all Patent licenses, and other agreements for the grant by or to any Grantor of any right to use any items of the type referred to in clause (a) above (each, a "*Patent License*");

(c)     the right to sue third parties for past, present and future infringements of any Patent or Patent application, and for breach or enforcement of any Patent License; and

(d)     all proceeds of, and rights associated with, the foregoing (including Proceeds, licenses, royalties, income, payments, claims, damages and proceeds of infringement suits).

"*Patent License*" is defined in clause (b) of the definition of "*Patent Collateral*".

"*Person*" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, business entity or Governmental Authority.

"*Pledged Collateral*" has the meaning set forth in Section 3.10.

"*Proceeds*" has the meaning set forth in Article 9 of the UCC.

"*Property*" means any interest in any kind of property or asset, whether real, personal or mixed, tangible or intangible.

"*PTO*" means the United States Patent and Trademark Office and any substitute or successor entity.

"*Receivables*" means the Accounts, Chattel Paper, Documents, Instruments and any other rights or claims to receive money which are General Intangibles or which are otherwise included as Collateral.

"*Secured Obligations*" has the meaning given to the defined term "Note Obligations" in the Note Exchange Agreement.

"*Secured Party*" means, collectively, the Agent, the Noteholders and the Collateral Agent.

"*Securities Accounts*" has the meaning set forth in Article 8 of the UCC.

"*Securities Account Control Agreement*" means an agreement, in form and substance reasonably satisfactory to the Collateral Agent and the Required Holders, among the Grantors (as applicable), a securities intermediary holding such Grantor's assets, including funds, financial assets and securities, and the Collateral Agent that provides for the Collateral Agent to have Control over all deposits, securities and other balances held in a securities account maintained by such Grantor with such securities intermediary.

"*Security*" has the meaning set forth in Article 8 of the UCC.

"*Security Documents*" has the meaning given to such term in the Note Exchange Agreement.

"*Senior Notes*" has the meaning set forth in the recitals.

"*Stock Rights*" means any dividends or other distributions and any other right or property which any Grantor shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any Equity Interest constituting Collateral, any right to receive an Equity Interest constituting Collateral and any right to receive earnings, in which such Grantor now has or hereafter acquires any right, issued by an issuer of such Equity Interest constituting Collateral.

"*Supporting Obligation*" has the meaning set forth in Article 9 of the UCC.

"*Subsidiary*" has the meaning set forth for such term in the Note Exchange Agreement.

"*Tax Account*" has the meaning given to such term in the Note Exchange Agreement.

"*Termination Date*" means the date on which (i) all Secured Obligations (other than unasserted contingent indemnification obligations) owing to the Secured Parties have been paid in full in cash and all commitments have been terminated or have expired, and (ii) all Collateral Agent's Expenses shall have been paid in full in cash.

"*Trademark*" is defined in clause (a) of the definition of "*Trademark Collateral*".

"*Trademark Collateral*" means all of the Grantors' right, title and interest throughout the world in and to:

(a)    (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, certification marks, collective marks, logos and other source or business identifiers, and all goodwill of the business associated therewith, now existing or hereafter adopted or acquired, whether currently in use or not, all

registrations and recordings thereof and all applications in connection therewith, whether pending or in preparation for filing, including registrations, recordings and applications in the PTO and corresponding offices in other countries of the world, and all common law rights relating to the foregoing, and (ii) the right to obtain all reissues, extensions or renewals of the foregoing (collectively, "*Trademarks*");

(b)    all Trademark licenses and other agreements for the grant by or to any Grantor of any right to use any Trademark (each, a "*Trademark License*");

(c)    all of the goodwill of the business connected with the use of, and symbolized by the Trademarks described in clause (a) and, to the extent applicable, clause (b);

(d)    the right to sue third parties for past, present and future infringements or dilution of the Trademarks described in clause (a) and, to the extent applicable, clause (b) or for any injury to the goodwill associated with the use of any such Trademark or for breach or enforcement of any Trademark License; and

(e)    all proceeds of, and rights associated with, the foregoing (including Proceeds, licenses, royalties, income, payments, claims, damages and proceeds of infringement suits).

"*Trademark License*" is defined in clause (b) of the definition of "*Trademark Collateral*".

 "*Trade Secrets*" is defined in clause (a) of the definition of "*Trade Secret Collateral*".

"*Trade Secrets Collateral*" means all of the Grantors' right, title and interest throughout the world in and to:

(a)    all common law and statutory trade secrets and all other confidential information, know-how, inventions, proprietary processes, formulae, models, and methodologies (collectively, "*Trade Secrets*") obtained by or used in or contemplated at any time for use in the business of any Grantor, whether or not reduced to a writing or other tangible form that are protectable under applicable law, including all documents and things embodying, incorporating or referring in any way to the foregoing;

(b)    all Trade Secret licenses and other agreements for the grant by or to any Grantor of any right to use any Trade Secret (each a "*Trade Secret License*"), including the right to sue for and to enjoin and to collect damages for the actual or threatened misappropriation of any Trade Secret and for the breach or enforcement of any such Trade Secret License; and

(c)    all proceeds of, and rights associated with, the foregoing (including Proceeds, licenses, royalties, income, payments, claims, damages and proceeds of misappropriation suits).

"*Trade Secrets License*" is defined in clause (b) of the definition of "*Trade Secret Collateral*".

"*UCC*" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "*UCC*" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"*Vehicles*" means all cars, trucks and trailers owned by Grantor, together with all substitutions, repairs, replacements, non-severable appliances, tires, accessories, furnishings, other equipment, additions, parts and improvements from time to time, constituting a pert thereof and all accessions and appurtenances thereto.

"*Vessels*" has the same meaning as the term "Mortgaged Vessels" in the Note Exchange Agreement.

The foregoing definitions shall be equally applicable to both the singular and plural forms thereof.

## ARTICLE 2.
### *SECURITY INTEREST*

2.1    <u>Grant of Security Interest</u>. Each Grantor hereby pledges, assigns and grants to the Collateral Agent, on behalf of and for the benefit of itself and the other Secured Parties, a continuing security interest in all of such Grantor's right, title and interest, whether now owned or any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest, and wherever located, in and to the Collateral to secure the prompt and complete payment and performance of the Secured Obligations in accordance with their terms.

2.2    <u>Grantors Remain Liable</u>. Anything herein to the contrary notwithstanding:

2.2.1 the Grantors will remain liable under the contracts and agreements included in the Collateral to the extent set forth therein, and will remain liable under such contracts and agreements to the same extent as if this Security Agreement had not been executed;

2.2.2 the exercise by the Collateral Agent of any of its rights hereunder will not release the Grantors from any of its duties or obligations under any such contracts or agreements included in the Collateral; and

2.2.3 no Secured Party will have any obligation or liability under any contracts or agreements included in the Collateral by reason of this Security Agreement, nor will any Secured Party be obligated to perform any of the obligations or duties of the Grantors thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

2.3    [Reserved].

2.4    <u>Security Interest Absolute, etc</u>. This Security Agreement shall in all respects be a continuing, absolute, unconditional and irrevocable grant of security interest in the Collateral,

and shall remain in full force and effect until the Termination Date has occurred. All rights of the Secured Parties and the security interests in the Collateral granted to the Collateral Agent (for its benefit and the benefit of each other Secured Party) hereunder, and all obligations of the Grantors hereunder, shall, in each case, be absolute, unconditional and irrevocable irrespective of:

2.4.1 any lack of validity, legality or enforceability of any Note Document;

2.4.2 the failure of any Secured Party (a) to assert any claim or demand or to enforce any right or remedy against the Grantors or any other Person under the provisions of any Note Document or otherwise, or (b) to exercise any right or remedy against any other guarantor of, or collateral securing, any Secured Obligations;

2.4.3 any change in the time, manner or place of payment of, or in any other term of, all or any part of the Secured Obligations, or any other extension, compromise or renewal of any Secured Obligations;

2.4.4 any reduction, limitation, impairment or termination of any Secured Obligations for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and the Grantors hereby waives any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Secured Obligations or otherwise;

2.4.5 any amendment to, rescission, waiver or other modification of, or any consent to or departure from, any of the terms of any Note Document, in each case in accordance with the terms of such Note Document;

2.4.6 any addition, exchange or release of any collateral or of any Person that is (or will become) a guarantor of the Secured Obligations, or any surrender or non-perfection of any collateral, or any amendment to or waiver or release or addition to, or consent to or departure from, any other guaranty held by any Secured Party securing any of the Secured Obligations;

2.4.7 any change, restructuring or termination of the organizational structure or existence of the Grantors or any other Person; or

2.4.8 any other circumstance which might otherwise constitute a defense available to, or a legal or equitable discharge of, the Grantors, any surety or any guarantor (other than the defense of payment in full of the Secured Obligations).

ARTICLE 3.
REPRESENTATIONS AND WARRANTIES

In order to induce the Noteholders to enter into the Note Exchange Agreement and to exchange their Exchanged Debt for the Senior Notes to be issued to the Noteholders thereunder on the date hereof, each Grantor represents and warrants as to itself to the Collateral Agent and the other Secured Parties, that:

3.1     <u>Title, Authorization, Validity and Enforceability</u>. Each Grantor has good and valid rights in or the power to transfer the Collateral owned by it and title to the Collateral (and, in the case of the Vessels owned by it, a perpetual, non-exclusive, fully transferrable license, subject to the terms and conditions thereof, to use all Intellectual Property and computer hardware and software owned by others but used or required by such Grantor in order to operate and navigate such Vessels) with respect to which it has purported to grant a security interest hereunder, free and clear of all Liens except for Liens permitted under <u>Section 4.1.4</u> hereof, and has full corporate, limited liability company or partnership, as applicable, power and authority to grant to the Collateral Agent the security interest in such Collateral pursuant hereto. The execution and delivery by the Grantors of this Security Agreement has been duly authorized by proper limited liability company proceedings, and this Security Agreement constitutes a legal, valid and binding obligation of each of the Grantors and creates a security interest which is enforceable against each of the Grantors in all Collateral it now owns or hereafter acquires, except as enforceability may be limited by (i) bankruptcy, insolvency, fraudulent conveyances, reorganization or similar laws relating to or affecting the enforcement of creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law). When (a) financing statements have been filed in the appropriate office against each of the Grantors in the location listed on <u>Exhibit H</u>, and (b) if applicable, short form security agreement have been filed with and recorded by the PTO or the United States Copyright Office, the Collateral Agent will have a fully perfected first priority security interest (subject, as to priority, only to Liens permitted under <u>Section 4.1.4</u> to be prior to the Liens of the Collateral Agent) in the Collateral owned by each Grantor in which a security interest may be perfected by such filings.

3.2     <u>Conflicting Laws and Contracts</u>. Neither the execution and delivery by the Grantors of this Security Agreement, the creation and perfection of the security interest in the Collateral granted hereunder, nor compliance with the terms and provisions hereof will violate (a) any Legal Requirement binding on the Grantors, (b) each of the Grantors' Organizational Documents, or (c) the provisions of any material indenture, instrument or agreement to which the Grantors are a party or is subject, or by which it, or its Property may be bound or affected, or conflict with or constitute a default thereunder, or result in or require the creation or imposition of any Lien in, of or on the Property of the Grantors pursuant to the terms of any such material indenture, instrument or agreement (other than any Lien in favor of the Collateral Agent or Liens permitted under <u>Section 4.1.4</u> hereof).

3.3     <u>Principal Location</u>. As of the Closing Date, each of the Grantors' mailing address and the location of its place of business (if it has only one) or its chief executive office (if it has more than one place of business), is disclosed in <u>Exhibit A</u>. The Grantors shall not change their chief executive office or sole place of business unless the Collateral Agent shall have received prompt written notice (and in any event not more than thirty (30) days following such change. As of the Closing Date, the Grantors have no other places of business except those set forth in <u>Exhibit A</u>. Such location set forth on <u>Exhibit A</u> are the Grantors' location for the purposes of Section 9-301 and 9-307 of the UCC, and the Grantors have not had a different location for the purposes of Section 9-301 and 9-307 of the UCC during the past five years.

3.4     <u>Property Locations</u>. As of the Closing Date and other than the Vessels and certain Collateral located on the Vessels, the tangible Collateral of each Grantor is located solely at the locations of the Grantors described in <u>Exhibit A</u>. All of said locations are owned by the

Grantors except for locations (a) which are leased by the Grantors as lessee as designated in Part B of <u>Exhibit A</u> and (b) at which Inventory is held in a storage facility or terminal by the Grantors as designated in Part C of <u>Exhibit A</u>.

      3.5    <u>No Other Names; Corporate History</u>. Except as described in <u>Exhibit J</u>, (a) in the last four months the Grantors have not conducted business under any name except the name in which it has executed this Security Agreement, which is the exact name as it appears in each Grantor's Organizational Documents, as amended, and as filed with each Grantor's jurisdiction of organization as of the Closing Date, and (b) within the five years prior to the Closing Date the Grantors have not been the subject of any merger or other corporate reorganization or acquired the assets of any Person.

      3.6    <u>Accounts and Chattel Paper</u>. The names of the obligors, amounts owing, due dates and other information with respect to the Accounts and Chattel Paper owned by the Grantors are and will be correctly stated, in all material respects, in all records of the Grantors relating thereto and in all reports with respect thereto furnished to the Noteholders by the Grantors from time to time. As of the time when each Account or each item of Chattel Paper arises, the Grantors shall be deemed to have represented and warranted that such Account or Chattel Paper, as the case may be, and all records relating thereto, are genuine and in all material respects what they purport to be.

      3.7    <u>Filing Requirements</u>. None of the Collateral owned by each Grantor is covered by any certificate of title, except for motor vehicles. None of the Collateral owned by each Grantor is of a type for which Liens may be perfected by filing under any federal statute except for (a) the Vessels, aircraft, ships and railcars described in Part A of <u>Exhibit B</u> and (b) the Patents, Trademarks, Copyrights and exclusive Copyright Licenses (under which each Grantor is the licensee) held by each Grantor and described in Part B of <u>Exhibit B</u>. The location of any Fixtures owned by each Grantor is set forth in <u>Exhibit C</u> together with the name and address of the record owner of each such property.

      3.8    <u>No Financing Statements</u>. No financing statement describing all or any portion of the Collateral naming each Grantor as debtor has been filed in any jurisdiction except financing statements (a) previously or concurrently herewith terminated, (b) naming the Collateral Agent as the secured party and (c) permitted under <u>Section 4.1.4</u> hereof; provided, that nothing herein shall be deemed to constitute an agreement to subordinate any of the Liens of the Collateral Agent under the Note Documents to any Liens otherwise permitted under <u>Section 4.1.4</u> hereof.

      3.9    <u>Federal Employer Identification Number; State Organization Number; Jurisdiction of Organization</u>. Each Grantors' federal employer identification number is, and if such Grantor is a registered organization, the Grantor's state of organization, type of organization and state of organization identification number are set forth in <u>Exhibit D</u>.

      3.10    <u>Pledged Collateral</u>.

      3.10.1  <u>Exhibit E</u> sets forth a complete and accurate list of the Instruments, Securities and other Investment Property owned by each Grantor as of the Closing Date but shall not include any payment made by the Note Parties in respect of the Tax Liability Amount and the

Final Tax Liability Amount, as they are not collateral hereunder and are not subject to any limitations of this Security Agreement ("*Pledged Collateral*"). Each Grantor is the direct and beneficial owner of the Pledged Collateral listed on <u>Exhibit E</u> as being owned by it, free and clear of any Liens, except for Liens permitted under <u>Section 4.1.4</u> hereof. Each Grantor further represents and warrants that (a) all Pledged Collateral constituting Equity Interests have been (to the extent such concepts are relevant with respect to such Equity Interests) duly and validly issued, are fully paid and non-assessable and constitute the percentage of the issued and outstanding Equity Interests of the respective issuers thereof indicated on <u>Exhibit E</u> hereto and, in the case of corporations, business trusts, joint stock companies and similar Persons, are represented by a certificate and, in the case of limited liability companies and partnerships, are not represented by a certificate and have not provided that they securities governed by Article 8 of the UCC, (b) with respect to any certificates delivered to the Collateral Agent representing an Equity Interest, either such certificates are Securities as defined in Article 8 of the UCC as a result of actions by the issuer or otherwise, or, if such certificates are not Securities, each Grantor has so informed the Collateral Agent so that the Collateral Agent may take steps to perfect its security interest therein as a General Intangible, (c) all Pledged Collateral held by a securities intermediary is covered by a Securities Account Control Agreement, (d) to each Grantor's knowledge and except as otherwise disclosed to the Collateral Agent, all Pledged Collateral representing indebtedness owed to each Grantor has been duly authorized, authenticated or issued and delivered by the issuer of such indebtedness, is the legal, valid and binding obligation of such issuer and such issuer (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity) is not in default thereunder and (e) with respect to Securities constituting Collateral that are uncertificated (other than uncertificated Securities credited to a Securities Account) owned by each Grantor, each Grantor has caused the issuer thereof either to (i) register the Collateral Agent as the registered owner of such security or (ii) agree in an authenticated record with each Grantor and the Collateral Agent that such issuer will comply with instructions with respect to such security originated by the Collateral Agent without further consent of each Grantor.

3.10.2  As of the Closing Date (a) none of the Pledged Collateral owned by it has been issued or transferred in violation in any material respect of the securities registration, securities disclosure, or similar laws of any jurisdiction to which such issuance or transfer may be subject, (b) there are existing no options, warrants, calls, rights of first refusal or commitments of any character whatsoever relating to such Pledged Collateral and the ability of the Collateral Agent to transfer the such Pledged Collateral and (c) no consent, approval, authorization, or other action by, and no giving of notice, filing with, any Governmental Authority or any other Person is required for the pledge by each Grantor of such Pledged Collateral pursuant to this Security Agreement or for the execution, delivery and performance of this Security Agreement by each Grantor, or for the exercise by the Collateral Agent, of the voting or other rights provided for in this Security Agreement or for the remedies in respect of the Pledged Collateral pursuant to this Security Agreement (including transfer by foreclosure), except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally and those that have been obtained or made and are in full force and effect.

3.11  <u>Deposit Accounts, Commodity Accounts and Securities Accounts</u>. All of the Grantors' Deposit Accounts (other than the Tax Account), Commodity Accounts and Securities Accounts as of the Closing Date are listed on <u>Exhibit F</u>.

14

3.12    <u>Letter-of-Credit Rights and Chattel Paper</u>. <u>Exhibit G</u> lists all Letter-of-Credit Rights and Chattel Paper valued individually in excess of $200,000 of each Grantor as of the Closing Date. All action by each Grantor necessary to protect and perfect the Collateral Agent's Lien on each item listed on <u>Exhibit G</u> (including the delivery of all originals and the placement of a legend on all Chattel Paper as required hereunder) has been duly taken to the extent requested by the Collateral Agent. Upon taking of all such actions, the Collateral Agent will have a fully perfected first priority security interest in the Collateral listed on <u>Exhibit G</u>, subject, as to priority, only to Liens permitted under <u>Section 4.1.4</u> to be prior to the Liens of the Collateral Agent.

3.13    <u>Intellectual Property Collateral</u>.

3.13.1 In respect of the Intellectual Property Collateral:

(a)    Part B of <u>Exhibit B</u> lists a complete and accurate list of all issued and applied-for Patents owned by each Grantor, including those that have been issued by, or for which an application has been filed with, the PTO or corresponding offices in other countries of the world, and a complete and accurate list of all Patent Licenses under which each Grantor (i) is the exclusive licensee or (ii) grants an exclusive license to any third party;

(b)    Part B of <u>Exhibit B</u> lists a complete and accurate list of all registered and applied-for Trademarks owned by each Grantor, including those that are registered, or for which an application for registration has been filed, with the PTO or corresponding offices in other countries of the world, and a complete and accurate list of all Trademark Licenses under which each Grantor (i) is the exclusive licensee or (ii) grants an exclusive license to any third party; and

(c)    Part B of <u>Exhibit B</u> lists a complete and accurate list of all registered and applied-for Copyrights owned by each Grantor, including those that are registered, or for which an application for registration has been made, with the United States Copyright Office or corresponding offices in other countries of the world, and a complete and accurate list of all Copyright Licenses under which such Grantor (i) is the exclusive licensee or (ii)  grants an exclusive license to any third party.

(d)    Part B of <u>Exhibit B</u> lists a complete and accurate list of all Domain Names owned by each Grantor, including those that are registered with any domain name registrar.

(e)    Part B of <u>Exhibit B</u> lists a complete and accurate list of all Computer Hardware and Software Licenses that are used in the operation of the Vessels and under which each Grantor is the licensee.

(f)    Part B of <u>Exhibit B</u> lists a complete and accurate list of all Copyright Licenses that are used in the operation of the Vessels and under which each Grantor is the licensee.

3.13.2 Except as disclosed on <u>Exhibit B</u>, in respect of each Grantor:

(a)    each registration of its owned Intellectual Property Collateral is subsisting, unexpired, and duly registered, and its owned Intellectual Property Collateral has not been abandoned or adjudged invalid or unenforceable, in whole or in part;

(b)     each Grantor is the sole and exclusive owner of the entire and unencumbered right, title and interest in and to its owned Intellectual Property Collateral (except for Liens permitted by Section 10.5 of the Note Exchange Agreement and Liens constituting intellectual property licenses from each Grantor to any third party), and no written claim has been delivered to such Grantor in the past two (2) years stating that such Grantor is or may be, in conflict with, infringing, misappropriating, diluting, misusing or otherwise violating any Intellectual Property rights of any third party or that challenges the ownership, use, protectability, registerability, validity or enforceability of any Intellectual Property Collateral;

(c)     each Computer Hardware and Software License necessary or used in the operation of the Vessels to which each Grantor is a party and each Copyright License listed on Exhibit B is valid and binding and in full force and effect and such Grantor (i) has not received any notice of a breach of default under such license and (ii) is not in breach or default of any such license;

(d)     each Grantor has made all filings to maintain the registrations of the Trademark Collateral, and has paid all renewal, maintenance, and other fees and taxes required to maintain each and every registration and application of its owned Intellectual Property Collateral;

(e)     each Grantor has taken reasonable steps to safeguard its material Trade Secrets and to its knowledge (i) no employee, independent contractor or agent of each Grantor has misappropriated any Trade Secrets of any other Person, including any Grantor, in the course of the performance of his or her duties as an employee, independent contractor or agent of each Grantor; and (ii) no employee, independent contractor or agent of each Grantor is in default or breach of any term of any employment agreement, non-disclosure agreement, assignment of inventions agreement or similar agreement or contract relating in any way to the protection, ownership, development, use or transfer of each Grantor's owned Intellectual Property Collateral, except, in each of subsection (i) and (ii) above, as could not reasonably be expected to have a Material Adverse Effect;

(f)     no action by each Grantor is currently pending or threatened in writing which asserts that any third party is infringing, misappropriating, diluting, misusing or voiding any of its owned Intellectual Property Collateral;

(g)     no settlement or consents, covenants not to sue, nonassertion assurances, or releases have been entered into by each Grantor or to which each Grantor is bound that materially and adversely affects its rights to own or use any of its owned Intellectual Property Collateral;

(h)     except for the Liens permitted by Section 10.5 of the Note Exchange Agreement, each Grantor has not made a previous assignment, sale, transfer or agreement constituting a present or future assignment, sale or transfer of any of its owned Intellectual Property Collateral for purposes of granting a security interest or pledging as collateral that has not been terminated or released; and

(i)     all employees, independent contractors and agents who have contributed to the creation or development of any of its material owned Intellectual Property Collateral have been a party to an enforceable "work for hire" and/or assignment agreement with each Grantor,

according and granting exclusive ownership of such owned Intellectual Property Collateral to each Grantor.

3.14    Authorization, Approval, etc. Except as have been obtained or made and are in full force and effect, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or any other third party is required either:

3.14.1 for the grant by each Grantor of the security interest granted hereby in the Collateral or for the execution, delivery and performance of this Security Agreement by each Grantor;

3.14.2 for the perfection or maintenance of the security interests hereunder in the Collateral including the first priority nature of such security interest, subject, as to priority, only to Liens permitted under Section 4.1.4 to be prior to the Liens of the Collateral Agent (except with respect to the financing statements, any filings required under the Legal Requirements of any foreign jurisdiction or, with respect to owned Intellectual Property Collateral and exclusive Copyright Licenses to registered U.S. Copyrights owned by third parties, the recordation of any agreements with the PTO or the United States Copyright Office) or the exercise by the Collateral Agent of its rights and remedies hereunder; or

3.14.3 for the exercise by the Collateral Agent of the voting or other rights provided for in this Security Agreement, except any "change of control" or similar filings required by state licensing agencies.

ARTICLE 4.
COVENANTS

From the date of this Security Agreement until the Termination Date, each Grantor agrees:

4.1    General.

4.1.1    Records and Reports. Each Grantor shall keep and maintain complete, accurate and proper books and records with respect to the Collateral owned by each Grantor, and furnish to the Collateral Agent such information, reports and schedules relating to and further identifying the Collateral as the Collateral Agent shall from time to time reasonably request. Nothing herein constitutes a waiver of attorney-client privilege.

4.1.2    Financing Statements and Other Actions; Defense of Title. Each Grantor hereby authorizes the Collateral Agent (or its designee) to file all financing statements and other applicable documents describing the Collateral owned by each Grantor and take such other actions as may from time to time reasonably be requested by the Collateral Agent or the Required Holders in order to maintain a first perfected security interest in and, if applicable, Control of, the Collateral owned by each Grantor, subject to Liens permitted under Section 4.1.4 hereof. Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of Collateral that describes such Property in any other manner as the Collateral Agent or the Required Holders may determine, in its sole discretion, is necessary, advisable or prudent to ensure that the perfection of the security interest in the Collateral granted

to the Collateral Agent herein, including, without limitation, describing such property as "all assets" or "all personal property, whether now owned or hereafter acquired." Each Grantor hereby further authorizes the Collateral Agent (or its designee) to file a short form security agreement to secure the prompt and complete payment and performance of the Secured Obligations in accordance with their terms, in a form acceptable to the Collateral Agent (acting at the direction of the Required Holders), covering Collateral consisting of U.S. registered and pending applied-for Trademarks, U.S. issued and pending applied-for Patents, U.S. registered Copyrights, and exclusive licenses to U.S. registered Copyrights under which such Grantor is the licensee, with the PTO or the United States Copyright Office (or any successor office), as applicable, and such other documents as may be necessary or reasonably advisable for purposes of perfecting, confirming, continuing, enforcing or protecting the security interest in such Intellectual Property that is part of the Collateral granted by such Grantor hereunder (without the signature of such Grantor solely during the continuance of an Event of Default) and naming such Grantor, as debtor, and the Collateral Agent, as secured party.  Each Grantor will take any and all actions necessary to defend title to the Collateral owned by each Grantor against all persons and to defend the security interest of the Collateral Agent in such Collateral and the priority thereof against any Lien not expressly permitted under Section 4.1.4 hereof.

4.1.3   <u>Disposition of Collateral</u>. Each Grantor will not sell, lease or otherwise dispose of the Collateral owned by such Grantor except dispositions specifically permitted under Section 10.12 of the Note Exchange Agreement and other applicable provisions of the Note Exchange Agreement.

4.1.4   <u>Liens</u>. Each Grantor will not create, incur, or suffer to exist any Lien on the Collateral owned by such Grantor except Liens permitted under Section 10.5 of the Note Exchange Agreement; provided, that nothing herein shall be deemed to constitute an agreement to subordinate any of the Liens of the Collateral Agent under the Note Documents to any Liens permitted under Section 10.5 of the Note Exchange Agreement.

4.1.5   <u>Locations</u>. Each Grantor will not maintain any Collateral with a value in excess of $100,000 (other than Collateral in transit) or out for repair at a location other than a location specified in <u>Exhibit A</u> unless such Grantor shall have given the Collateral Agent not less than ten (10) Business Days' (or such lesser period as is acceptable to the Collateral Agent (acting at the direction of the Required Holders)) prior written notice of such event or occurrence.

4.1.6   <u>Other Financing Statements</u>. Each Grantor will not suffer to exist or authorize the filing of any financing statement naming it as debtor covering all or any portion of the Collateral owned by each Grantor, except any financing statement authorized under <u>Section 4.1.2</u> hereof and with respect to Liens permitted under <u>Section 4.1.4</u> hereof.

4.2   <u>Receivables</u>.

4.2.1   <u>Certain Agreements on Receivables</u>. Other than with respect to Instruments representing inter-company indebtedness between the Grantors and Affiliates permitted under the Note Exchange Agreement, each Grantor will not make or agree to make any discount, credit, rebate or other reduction in the original amount owing on a Receivable or accept in satisfaction of a Receivable less than the original amount thereof, except that, prior to the occurrence and

continuation of an Event of Default, such Grantor may (a) reduce the amount of Accounts arising from the sale of Inventory or the rendering of services in the ordinary course of business and consistent with past practice and (b) discount or package Accounts in accordance with past practice and in the ordinary course of its business.

4.2.2    Collection of Receivables. Except as otherwise provided above in Section 4.2.1, each Grantor will collect and enforce, at such Grantor's sole expense, all amounts due or hereafter due to such Grantor under the Receivables owned by each Grantor.

4.2.3    Delivery of Invoices. After the occurrence and during the continuance of an Event of Default, each Grantor will deliver to the Collateral Agent immediately upon its request duplicate invoices with respect to each Account owned by such Grantor bearing such language of assignment as the Collateral Agent shall specify.

4.3    Maintenance of Inventory and Equipment. Each Grantor will do all things necessary to maintain, preserve, protect and keep the Inventory and the Equipment owned by such Grantor in good repair, working order and saleable condition (ordinary wear and tear excepted), and make all necessary and proper repairs, renewals and replacements so that its business carried on in connection therewith may be properly conducted at all times.

4.4    Instruments, Securities, Chattel Paper and Documents. Each Grantor will (a) deliver to the Collateral Agent immediately upon execution of this Security Agreement the originals of all Chattel Paper, Securities and Instruments constituting Collateral (if any then exist), other than individual Chattel Paper, Securities and Instruments having a value less than $200,000, (b) hold in trust for the Collateral Agent upon receipt and immediately thereafter deliver (except as provided in Subsection 4.4(a) above) to the Collateral Agent any Chattel Paper, Securities and Instruments constituting Collateral, and (c) upon the Collateral Agent's request, deliver to the Collateral Agent (and thereafter hold in trust for the Collateral Agent upon receipt and immediately deliver to the Collateral Agent) any Document or any other Chattel Paper, Securities or Instruments evidencing or constituting Collateral.

4.5    Uncertificated Securities and Certain Other Investment Property. Each Grantor will cause the appropriate issuers (and, if held with a securities intermediary, such securities intermediary) of uncertificated securities or other types of Investment Property not represented by certificates which are Collateral owned by each Grantor to mark their books and records with the numbers and face amounts of all such uncertificated securities or other types of Investment Property not represented by certificates and all rollovers and replacements therefor to reflect the Lien of the Collateral Agent granted pursuant to this Security Agreement. With respect to any Pledged Collateral owned by it, upon the Collateral Agent's request, such Grantor will take any actions necessary to cause (a) the issuers of uncertificated securities which are Pledged Collateral and (b) any securities intermediary which is the holder of any such Pledged Collateral, to cause the Collateral Agent to have and retain Control over such Pledged Collateral. Without limiting the foregoing, each Grantor will, with respect to any such Pledged Collateral held with a securities intermediary, cause such securities intermediary to enter into a Securities Account Control Agreement with the Collateral Agent, giving the Collateral Agent Control.

4.6    Stock and Other Ownership Interests.

19

4.6.1   <u>Registration of Pledged Collateral</u>. Each Grantor will permit any registrable Collateral owned by such Grantor to be registered in the name of the Collateral Agent or its nominee at any time at the option of the Collateral Agent following the occurrence and during the continuance of an Event of Default and without any further consent of each Grantor.

4.6.2   <u>Exercise of Rights in Pledged Collateral</u>. Each Grantor will permit the Collateral Agent or its nominee at any time after an Event of Default has occurred and is continuing, without notice, to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Collateral owned by the Grantor or any part thereof, and to receive all dividends and interest in respect of such Collateral.

4.7   <u>Control Agreements</u>. Subject to Section 10.20 of the Note Exchange Agreement, each Grantor will provide to the Collateral Agent on the Closing Date (a) a Commodity Account Control Agreement duly executed on behalf of each commodities intermediary holding an exchange traded Commodity Account of such Grantor as set forth in the Security Agreement, (b) a Securities Account Control Agreement duly executed on behalf of each securities intermediary holding a Securities Account of such Grantor as set forth in the Security Agreement and (c) a Deposit Account Control Agreement duly executed on behalf of each financial institution holding a Deposit Account of such Grantor (other than with respect to the Tax Account and Deposit Accounts maintained for employee benefits and petty cash).

4.8   <u>Letter-of-Credit Rights</u>. Each Grantor will use commercially reasonable efforts to cause each issuer of a letter of credit having a face or stated amount in excess of $200,000, to consent to the assignment of proceeds of the letter of credit in order to give the Collateral Agent Control of the Letter-of-Credit Rights, with respect to such letter of credit.

4.9   <u>Federal, State or Municipal Claims</u>. Each Grantor will notify the Collateral Agent of any Collateral owned by such Grantor which constitutes a claim against the United States government or any state or local government or any instrumentality or agency thereof, the assignment of which claim is restricted by federal, state or municipal law at any time.

4.10   <u>Intellectual Property</u>.

4.10.1   If, after the date hereof, any Grantor (i) obtains rights to, or applies for or seeks registration of, any new issued and applied-for Patents, registered and applied-for Trademarks and registered and applied-for Copyrights owned by such Grantor in addition to the Intellectual Property Collateral described in Part B of Exhibit B, which are all of such issued, registered and applied-for Patents, Trademarks and Copyrights owned by each Grantor as of the Closing Date, or (ii) becomes party to a new exclusive Patent License, Trademark License, or Copyright License (as licensee or licensor) in addition to the exclusive Patent Licenses, Trademark Licenses and Copyright Licenses described in Part B of Exhibit B, which are all of such exclusive Patent Licenses, Trademark Licenses and Copyright Licenses under which each Grantor is the licensee or licensor, then such Grantor shall give the Collateral Agent notice thereof as part of the next compliance certificate provided to the Noteholders pursuant to the Note Exchange Agreement or within ninety (90) days of such acquisition or filing (except that for new Copyrights and exclusive Copyright Licenses, the period shall be within thirty (30) days), whichever is earlier. Each Grantor agrees to execute and deliver to the Collateral Agent, within ninety (90) days of such

acquisition or filing (except that for new Copyrights and exclusive Copyright Licenses, the period shall be within thirty (30) days) or, if earlier, promptly upon request by the Collateral Agent, any supplement to this Security Agreement or any other document (including any short form security agreement) reasonably requested by the Collateral Agent or the Required Holders to evidence such security interest in a form appropriate for recording in the applicable federal office and at such Grantor's expense. Such Patents, Trademarks and Copyrights shall (together with all other Intellectual Property Collateral that is owned by (but not licensed to) any Grantor) be deemed "owned Intellectual Property Collateral" hereunder, such exclusive IP Licenses (together with all other Intellectual Property Collateral) shall be deemed "Intellectual Property Collateral" hereunder and each Grantor also hereby authorizes the Collateral Agent to modify this Security Agreement unilaterally (a) by amending Part B of Exhibit B to include any such future owned Intellectual Property Collateral or Intellectual Property Collateral of which the Collateral Agent receives notification from such Grantor pursuant hereto and (b) by recording, in addition to and not in substitution for this Security Agreement, a duplicate original of this Security Agreement (or other short form security agreement) containing in Part B of Exhibit B a description of such future owned Intellectual Property Collateral and new exclusive Copyright Licenses to registered U.S. Copyrights under which any Grantor is the licensee.

4.10.2  Each Grantor shall promptly notify the Collateral Agent in writing if it knows or reasonably expects that any application or registration of any Patent, Trademark, Copyright or Domain Name (now or hereafter existing) included in the owned Intellectual Property Collateral may become abandoned or dedicated to the public, or of any determination or development (including the institution of, or any such determination or development in, any proceeding in the PTO, the United States Copyright Office, any similar office or agency or any court or tribunal, including in foreign jurisdictions) that may impair the validity or enforceability of such owned Intellectual Property Collateral or such Grantor's right to register the same, or its right to own, use, keep and maintain the same, except for dispositions permitted under the Note Exchange Agreement or office actions issued by the PTO in the ordinary course of examining pending Patent or Trademark applications.

4.10.3  If and to the extent each Grantor owns any applications or registrations for Intellectual Property Collateral, such Grantor shall take all actions necessary or reasonably requested by the Collateral Agent to maintain and pursue each application, to obtain the relevant registration and to maintain the registration of each of the material applications or registrations for Patents, Trademarks, Copyrights and Domain Names (now or hereafter existing) included in the owned Intellectual Property Collateral, except as permitted under the Note Exchange Agreement, including the filing of applications for renewal, affidavits of use, affidavits of noncontestability, and, if consistent with good business judgment, to initiate opposition and interference and cancellation proceedings against third parties.

4.10.4  Each Grantor shall promptly notify the Collateral Agent in writing of any infringement, misappropriation or other violation of material owned Intellectual Property Collateral of which it becomes aware and shall, if consistent with good business judgment, promptly sue for infringement, misappropriation or other violation, seek to recover any and all damages for such infringement, misappropriation or other violation, and take such other actions as are reasonable and appropriate under the circumstances to protect such Intellectual Property Collateral.

4.11   <u>Commercial Tort Claims</u>. If, after the date hereof, each Grantor identifies the existence of a Commercial Tort Claim belonging to such Grantor that has arisen in the course of such Grantor's business with a value in excess of $200,000 in addition to the Commercial Tort Claims described in <u>Exhibit I</u>, which are all of the Grantor's Commercial Tort Claims as of the date hereof, then such Grantor shall give the Collateral Agent prompt notice thereof, but in any event not less frequently than quarterly. Each Grantor agrees promptly to execute and deliver to the Collateral Agent any supplement to this Security Agreement or any other document reasonably requested by the Collateral Agent or the Required Holders to evidence the grant of a security interest in such Commercial Tort Claim in favor of the Collateral Agent.

4.12   <u>Reserved</u>.

4.13   <u>Change of Name, etc</u>. Each Grantor will not change its name or place of incorporation or organization or federal taxpayer identification number except upon 30 days' prior written notice to the Collateral Agent.

4.14   <u>Further Assurances, etc</u>. Each Grantor agrees that, from time to time at its own expense, it will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or that the Collateral Agent may reasonably request in writing, in order to perfect, preserve and protect any security interest granted or purported to be granted hereby or to enable the Collateral Agent to exercise and enforce the rights and remedies of the Secured Parties hereunder with respect to any Collateral. Without limiting the generality of the foregoing, each Grantor will:

(a)   from time to time upon the request of the Collateral Agent, promptly deliver to the Collateral Agent such stock powers, instruments and similar documents, reasonably satisfactory in form and substance to the Collateral Agent, with respect to such Collateral as the Collateral Agent may reasonably request and will, from time to time upon the request of the Collateral Agent, after the occurrence and during the continuance of any Event of Default, promptly transfer any securities constituting Collateral into the name of any nominee designated by the Collateral Agent;

(b)   file (and hereby authorize the Collateral Agent or its designee to file) such instruments or notices (including any assignment of claim form under or pursuant to the federal assignment of claims statute, 31 U.S.C. § 3726, any successor or amended version thereof or any regulation promulgated under or pursuant to any version thereof), as may be necessary or that the Collateral Agent may reasonably request in order to perfect and preserve the security interests and other rights granted or purported to be granted to the Collateral Agent hereby; and

(c)   furnish to the Collateral Agent, from time to time at the Collateral Agent's reasonable request, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Collateral Agent may request, all in reasonable detail.

With respect to the foregoing and the grant of the security interest hereunder, each Grantor hereby authorizes the Collateral Agent (or its designee) to make all relevant filings with the PTO, the United States Copyright Office and, after the occurrence and during the continuance

of an Event of Default, corresponding offices in other countries of the world in respect of the owned Intellectual Property Collateral (as well as IP Licenses, to the extent necessary in order to record and perfect the security interest of the Collateral Trustee in such IP Licenses).  Each Grantor agrees that a carbon, photographic or other reproduction of this Security Agreement or any UCC financing statement covering the Collateral or any part thereof shall be sufficient as a UCC financing statement where permitted by Legal Requirements.

<div align="center">

ARTICLE 5.
DEFAULT
</div>

5.1    <u>Remedies</u>.

5.1.1    Upon the occurrence and during the continuation of an Event of Default, the Collateral Agent may exercise any or all of the following rights and remedies:

(a)    Those rights and remedies provided in this Security Agreement, the Note Exchange Agreement or any other Note Document; provided that this <u>Section 5.1.1(a)</u> shall not be understood to limit any rights or remedies available to the Collateral Agent and the Secured Parties prior to an Event of Default.

(b)    Those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law (including, without limitation, any law governing the exercise of a bank's right of setoff or bankers' lien) when a debtor is in default under a security agreement.

(c)    Give notice of sole control or any other instruction under any Deposit Account Control Agreement, Commodity Account Control Agreement or Securities Account Control Agreement and take any action therein with respect to such Collateral.

(d)    Without notice (except as specifically provided in Section 8.1 hereof or elsewhere herein or in any IP License) sell, lease, assign, grant an option or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, on credit or for future delivery, and upon such other terms as the Collateral Agent may deem commercially reasonable.

(e)    With respect to applicable Intellectual Property Collateral: (i) act pursuant to a power of attorney granted by each Grantor to sign any document which may be required (x) by the PTO, the United States Copyright Office or any relevant registrar in any applicable foreign jurisdiction in order to effect an absolute assignment of all right, title and interest in each Patent, Trademark, Copyright and Domain Name owned by a Grantor, and each application for such registration, and (y) to effect an absolute assignment of all right, title and interest in each Patent License, Trademark License, and Copyright License (to the extent doing so does not violate the express terms between such Grantor and a third party, or gives such third party any right of acceleration, modification or cancellation therein unless such violation or acceleration, is ineffective or unenforceable under Sections 9-406, 9-407, 9-408, or 9-409 of the UCC or other applicable law) in each case, constituting Intellectual Property Collateral, and, if applicable, record the same; (ii) declare the entire right, title and interest of such Grantor in and to the Intellectual Property Collateral vested in the Collateral Agent for the benefit of the Secured Parties, in which

<div align="center">23</div>

event such rights, title and interest shall immediately vest, in the Collateral Agent for the benefit of the Secured Parties, and the Collateral Agent shall be entitled to exercise the power of attorney referred to in the foregoing clause (i) to execute, cause to be acknowledged and notarized and, if applicable, record said absolute assignment with the applicable agency or registrar; (iii) direct such Grantor to refrain, in which event such Grantor shall refrain, from using any Intellectual Property Collateral in any manner whatsoever, directly or indirectly; and (iv) assign or sell the owned Intellectual Property Collateral, as well as the goodwill of such Grantor's business symbolized by the Trademarks and Domain Names included therein and the right to carry on the business and use the assets of such Grantor in connection with which such Trademarks or Domain Names have been used.

       5.1.2   The Collateral Agent, on behalf of the Secured Parties, may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

       5.1.3   Upon the occurrence and during the continuation of an Event of Default, the Collateral Agent shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase for the benefit of the Collateral Agent and the other Secured Parties, the whole or any part of the Collateral so sold, free of any right of equity redemption, which equity redemption each Grantor hereby expressly releases.

       5.1.4   Upon the occurrence and during the continuation of an Event of Default, until the Collateral Agent is able to effect a sale, lease, or other disposition of Collateral, the Collateral Agent shall have the right to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Collateral Agent. The Collateral Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of the Collateral Agent's remedies (for the benefit of the Collateral Agent and the Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment.

       5.1.5   Notwithstanding the foregoing, except as required by applicable law, neither the Collateral Agent nor the other Secured Parties shall be required to (a) make any demand upon, or pursue or exhaust any of their rights or remedies against, each Grantor, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Secured Obligations or to pursue or exhaust any of their rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof, (b) marshal the Collateral or any guarantee of the Secured Obligations or to resort to the Collateral or any such guarantee in any particular order, or (c) effect a public sale of any Collateral.

       5.1.6   Each Grantor recognizes that the Collateral Agent may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof. Each Grantor also acknowledges that any private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private. The Collateral Agent shall be under no obligation to delay a sale of any of the Pledged Collateral for the period

of time necessary to permit such Grantor or the issuer of the Pledged Collateral to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if such Grantor and the issuer would agree to do so.

        5.2    <u>Grantors' Obligations Upon Default</u>. Upon the request of the Collateral Agent, if an Event of Default has occurred and is continuing, each Grantor will:

        5.2.1    <u>Assembly of Collateral</u>. Assemble and make available to the Collateral Agent the Collateral and all records relating thereto at any place or places specified by the Collateral Agent.

        5.2.2    <u>Secured Party Access</u>. Permit the Collateral Agent, by the Collateral Agent's representatives and agents, to enter any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral and to remove all or any part of the Collateral.

        5.2.3    <u>Counterparty Consent</u>. Use commercially reasonable efforts to obtain all consents and approvals necessary or appropriate for the assignment to or for the benefit of the Collateral Agent of any IP License held by such Grantor to enable the Collateral Agent to enforce the security interests granted hereunder.  To the extent required pursuant to any IP License pursuant to which Grantor is the licensee, each Grantor party to such IP License shall deliver to the licensor any notice of the grant of security interest thereunder (or such other notices required to be delivered thereunder) in order to permit the security interest created or permitted to be created hereunder pursuant to the terms of such IP License.

        5.3    <u>License</u>. The Collateral Agent is hereby granted an irrevocable (until the Termination Date), non-exclusive, fully transferable license or sublicense (as applicable), to use, access, license or sublicense, which shall automatically terminate on the Termination Date, effective upon the occurrence and during the continuance of an Event of Default, without charge, each Grantor's Intellectual Property, labels, advertising matter, and any Property of a similar nature, including all media in which any of the foregoing may be recorded or stored and all computer software and programs used for compilation or printout thereof, in each case whether now owned or hereafter acquired and wherever located, including to complete production of, advertise for sale, and sell any Collateral. Following the occurrence and during the continuance of an Event of Default, each Grantor's rights under all licenses and franchise agreements that constitute Collateral shall inure to the Collateral Agent's benefit in accordance with the terms and conditions thereof.  For the avoidance of doubt, this Section 5.3 does not apply to the Intellectual Property Agreements (as defined in the Note Exchange Agreement), the terms and conditions of which control notwithstanding the grant of a license to the Collateral Agent pursuant to this Section 5.3.  Any license, sublicense or other transaction entered into by the Collateral Agent in accordance with this Section 5.3 shall be binding upon each Grantor notwithstanding any subsequent cure of an Event of Default. All use of each Grantor's Trademarks shall be materially in accordance with such Grantor's trademark usage and quality control requirements and all goodwill associated therewith shall inure to the benefit of such Grantor. Without limiting the foregoing, all Collateral produced, advertised and sold under this <u>Section 5.3</u> shall materially conform to the quality of such Collateral produced, advertised and sold by each Grantor. In addition, each Grantor hereby irrevocably agrees that the Collateral Agent may, following the occurrence and during the

continuance of an Event of Default, sell any of the Grantors' Inventory directly to any person, including without limitation persons who have previously purchased the Grantors' Inventory from such Grantor and in connection with any such sale or other enforcement of the Collateral Agent's rights under this Security Agreement, may sell Inventory which bears any Trademark owned by or licensed to such Grantor and any Inventory that is covered by any Intellectual Property owned by or licensed to such Grantor and the Collateral Agent may finish any work in process and affix any Trademark owned by or licensed to such Grantor and sell such Inventory as provided herein.

## ARTICLE 6.
## WAIVERS, AMENDMENTS AND REMEDIES

No delay or omission of any Secured Party to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any default or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment or other variation of the terms, conditions or provisions of this Security Agreement whatsoever shall be valid unless in writing signed by the Collateral Agent and the Grantors, and then only to the extent in such writing specifically set forth; provided that none of the terms or provisions of this Security Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 16 of the Note Exchange Agreement. All rights and remedies contained in this Security Agreement or by law afforded shall be cumulative and all shall be available to the Secured Parties until the Termination Date.

## ARTICLE 7.
## PROCEEDS

7.1     Collateral Account. The Collateral Agent shall, at any time after the occurrence and during the continuation of an Event of Default, require all cash proceeds of the Collateral to be deposited in the Collateral Account maintained by the Collateral Agent under its sole dominion and control. The Grantors shall not have any control whatsoever over said Collateral Account. All cash proceeds while held by the Collateral Agent in a Collateral Account shall continue to be held as collateral security for all the Secured Obligations and shall not constitute payment thereof until applied as provided in Section 7.2.

7.2     Application of Proceeds. At any time after the occurrence and during the continuation of an Event of Default, the Collateral Agent may apply all or any part of the cash proceeds constituting Collateral, whether or not held in the Collateral Account or any other collateral account, and any Proceeds of any Note Document in respect of the Collateral, or otherwise received by the Collateral Agent in respect of the Collateral in accordance with Section 12.5 of the Note Exchange Agreement.

## ARTICLE 8.
## GENERAL PROVISIONS

8.1     Notice of Disposition of Collateral; Condition of Collateral. Each Grantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made. To the extent such notice

may not be waived under applicable law, any notice made shall be deemed reasonable if sent to the Grantors, addressed as set forth in Article IX, at least ten days prior to (a) the date of any such public sale or (b) the time after which any such private sale or other disposition may be made. To the maximum extent permitted by applicable law, each of the Grantor waives all claims, damages, and demands against the Collateral Agent and each other Secured Party arising out of the repossession, retention or sale of the Collateral, except to the extent such arise out of the gross negligence or willful misconduct of the Collateral Agent or such Secured Party (or any of their respective affiliates, officers, directors, employees, agents or representatives) as determined by a court of competent jurisdiction in a final and nonappealable judgment.

       8.2    Limitation on Collateral Agent's and Secured Parties' Duty with Respect to the Collateral. The Collateral Agent shall have no obligation to clean-up or otherwise prepare the Collateral for sale. The Collateral Agent and each Secured Party shall use reasonable care with respect to the Collateral in its possession or under its control; provided that the Collateral Agent and each Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral, if such Collateral is accorded treatment substantially equal to that which the Collateral Agent or such Secured Party accords its own property. Neither the Collateral Agent nor any other Secured Party shall have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Collateral Agent or such Secured Party other than to account for money received, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto. To the extent that applicable law imposes duties on the Collateral Agent to exercise remedies in a commercially reasonable manner, each of the Grantors acknowledge and agree that it is commercially reasonable for the Collateral Agent (a) to fail to incur expenses deemed significant by the Collateral Agent to prepare Collateral for disposition or otherwise to transform raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as the Grantors, for expressions of interest in acquiring all or any portion of such Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the, types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (k) to purchase insurance or credit enhancements to insure the Collateral Agent against risks of loss, collection or disposition of Collateral or to provide to the Collateral Agent a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Collateral Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Collateral Agent in the collection or disposition of any of the Collateral. Each of the Grantors acknowledge that the purpose of this Section 8.2 is to provide non-exhaustive indications of what

actions or omissions by the Collateral Agent would be commercially reasonable in the Collateral Agent's exercise of remedies against the Collateral and that other actions or omissions by the Collateral Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this <u>Section 8.2</u>. Without limitation upon the foregoing, nothing contained in this <u>Section 8.2</u> shall be construed to grant any rights to the Grantors or to impose any duties on the Collateral Agent that would not have been granted or imposed by this Security Agreement or by applicable law in the absence of this <u>Section 8.2</u>.

8.3     <u>Compromises and Collection of Collateral</u>. Each of the Grantors and the Collateral Agent recognize that setoffs, counterclaims, defenses and other claims may be asserted by obligors with respect to certain of the Receivables, that certain of the Receivables may be or become uncollectible in whole or in part and that the expense and probability of success in litigating a disputed Receivable may exceed the amount that reasonably may be expected to be recovered with respect to a Receivable. In view of the foregoing, the Grantors agree that the Collateral Agent may at any time and from time to time, if an Event of Default has occurred and is continuing, compromise with the obligor on any Receivable, accept in full payment of any Receivable such amount as the Collateral Agent shall determine or abandon any Receivable, and any such action by the Collateral Agent shall be commercially reasonable so long as the Collateral Agent acts in good faith based on information known to it at the time it takes any such action.

8.4     <u>Secured Party Performance of Grantors' Obligations</u>. The Collateral Agent may from time to time, at its option, perform any action which the Collateral Agent deems reasonably necessary for the maintenance, preservation or protection of any Collateral or of its security interest therein if the Grantors fail to perform such action within a reasonable time after being requested in writing to so perform (it being understood that no such request need be given after the occurrence and during the continuance of an Event of Default). Without having any obligation to do so, at any time when an Event of Default has occurred and is continuing, the Collateral Agent may perform or pay any obligation which the Grantors have agreed to perform or pay in this Security Agreement and the Grantors shall reimburse the Collateral Agent for any amounts paid by the Collateral Agent pursuant to this <u>Section 8.4</u>. The Grantors' obligation to reimburse the Collateral Agent pursuant to the preceding sentence shall be a Secured Obligation payable on demand.

8.5     <u>Authorization for Secured Party to Take Certain Action</u>. The Grantors irrevocably authorizes the Collateral Agent at any time and from time to time, and appoints the Collateral Agent as its attorney in fact, (a) to file financing statements necessary or desirable in the Collateral Agent's sole discretion to perfect and to maintain the perfection and priority of the Collateral Agent's security interest in the Collateral, (b) to indorse and collect any cash proceeds of the Collateral, (c) to file a carbon, photographic or other reproduction of this Security Agreement or any financing statement with respect to the Collateral as a financing statement and to file any other financing statement or amendment of a financing statement in such offices as the Collateral Agent in its sole discretion deems necessary or desirable to perfect and to maintain the perfection and priority of the Collateral Agent's security interest in the Collateral, (d) to contact and enter into one or more agreements with the issuers of uncertificated securities which are Collateral owned by each of the Grantors and which are Securities or with financial intermediaries holding other Investment Property which is Collateral as may be necessary or advisable to give the Collateral Agent Control over such Securities or other Investment Property, (e) after the

occurrence and during the continuation of an Event of Default, to enforce payment of the Instruments, Accounts and other Receivables in the name of the Collateral Agent or the Grantors, (f) to apply the proceeds of any Collateral received by the Collateral Agent to the Secured Obligations as provided in <u>Article VII</u> and (g) to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for such Liens permitted under <u>Section 4.1.4</u> hereof), and the Grantors agree to reimburse the Collateral Agent on demand for any payment made or any expense incurred by the Collateral Agent in connection therewith, provided that this authorization shall not relieve the Grantors of any of its obligations under this Security Agreement or under the Note Exchange Agreement.

8.6    <u>Specific Performance of Certain Covenants</u>. Each of the Grantors acknowledge and agree that a breach of any of the covenants contained in <u>Sections 4.1.3</u>, <u>4.1.4</u>, <u>4.4</u>, <u>4.5</u>, <u>4.6</u>, <u>4.7</u>, <u>4.8</u>, <u>4.9</u>, <u>4.10</u>, <u>4.11</u>, <u>5.2</u>, or <u>8.8</u> or in <u>Article VII</u> hereof will cause irreparable injury to the Collateral Agent and the Secured Parties, that the Collateral Agent and Secured Parties have no adequate remedy at law in respect of such breaches and therefore agrees, without limiting the right of the Collateral Agent or the Secured Parties to seek and obtain specific performance of other obligations of the Grantors contained in this Security Agreement, that the covenants of the Grantors contained in the Sections referred to in this <u>Section 8.6</u> shall be specifically enforceable against the Grantor.

8.7    <u>Reserved</u>.

8.8    <u>Dispositions Not Authorized</u>. The Grantors are not authorized to sell or otherwise dispose of the Collateral except as set forth in <u>Section 4.1.3</u> hereof and notwithstanding any course of dealing between the Grantors and the Collateral Agent or other conduct of the Collateral Agent, no authorization to sell or otherwise dispose of the Collateral (except as set forth in <u>Section 4.1.3</u> hereof) shall be binding upon the Collateral Agent or the Secured Parties unless such authorization is in writing signed by the Collateral Agent with the consent or at the direction of the Required Holders (but subject in all cases to the provisions of the Note Exchange Agreement).

8.9    <u>Benefit of Agreement</u>. The terms and provisions of this Security Agreement shall be binding upon and inure to the benefit of the Grantors, the Collateral Agent and the other Secured Parties and their respective successors and assigns (including all persons who become bound as a debtor to this Security Agreement), except that the Grantors shall not have the right to assign their rights or delegate their obligations under this Security Agreement or any interest herein, without the prior written consent of the Collateral Agent.

8.10    <u>Reinstatement</u>. Each of the Grantors agree that to the extent that, after payment in full of the Secured Obligations, such payment or any part thereof is subsequently invalidated, voided, declared to be fraudulent or preferential, set aside, recovered, rescinded or is required to be retained by or repaid to a trustee, receiver, or any other Person under any bankruptcy code, common law, or equitable cause, then the Lien and security interest in the Collateral created hereunder shall be revived, reinstated and continued in full force and effect, as if said payment had not been made. The Lien and security interest in the Collateral created hereunder shall not be released or discharged by any payment to any Secured Party from any source that is thereafter paid, returned or refunded in whole or in part by reason of the assertion of a claim of any kind

relating thereto, including, but not limited to, any claim for breach of contract, breach of warranty, preference, illegality, invalidity, or fraud asserted by any account debtor or by any other Person.

8.11    Survival of Representations. All representations and warranties of the Grantor contained in this Security Agreement shall survive the execution and delivery of this Security Agreement.

8.12    Taxes and Expenses. The Grantors shall reimburse the Collateral Agent for any and all reasonable out-of-pocket expenses and fees (including reasonable attorneys', auditors' and accountants' fees) and internal charges (excluding time charges of attorneys who may be employees of the Collateral Agent) paid or incurred by the Collateral Agent in connection with the preparation, execution, delivery, administration, collection and enforcement of this Security Agreement and in the audit, analysis, administration, collection, preservation or sale of the Collateral (including the expenses and charges associated with any periodic or special audit of the Collateral) all in accordance with, and to the extent provided in, Section 14.1of the Note Exchange Agreement. Any and all costs and expenses incurred by the Grantors in the performance of actions required pursuant to the terms hereof shall be borne solely by the Grantors.

8.13    Headings. The title of and section headings in this Security Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Security Agreement.

8.14    Termination. This Security Agreement shall continue in effect (notwithstanding the fact that from time to time there may be no Secured Obligations outstanding) until the Termination Date.

8.15    Entire Agreement. This Security Agreement, the Note Exchange Agreement and the other Note Documents embody the entire agreement and understanding between the Grantors and the Collateral Agent relating to the Collateral and supersedes all prior agreements and understandings between the Grantors and the Collateral Agent relating to the Collateral.

8.16    CHOICE OF LAW. THIS SECURITY AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK EXCLUDING CHOICE-OF-LAW PRINCIPLES THAT WOULD PERMIT THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

8.17    Collateral Releases. The Collateral Agent is authorized to, and shall release any Lien granted to or held by it upon any Collateral upon the occurrence of the Termination Date and otherwise in accordance with the Note Exchange Agreement; provided, that (i) any such release shall be at the sole expense of the Grantors and (ii) in the case of release of Collateral prior to the Termination Date, the Grantors shall have provided the Collateral Agent with a certificate of a Responsible Officer certifying that the release is permitted under the Note Documents (and the Secured Parties, by accepting the benefits hereof, hereby authorize the Collateral Agent to rely on such certificate in performing its obligations under this Section 8.17).

## ARTICLE 9.
## NOTICES

9.1 <u>Sending Notices</u>. All notices and other communications provided for herein shall be in writing, in English and shall be sent to the Collateral Agent or the Grantors as provided in the Note Exchange Agreement.

9.2 <u>Change in Address for Notices</u>. Each of the Grantors and the Collateral Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other party hereto.

## ARTICLE 10.
## THE COLLATERAL AGENT

Wilmington Trust, National Association has been appointed Collateral Agent for the Secured Parties hereunder pursuant to Section 20 of the Note Exchange Agreement. It is expressly understood and agreed by the parties to this Security Agreement that any authority conferred upon the Collateral Agent hereunder is subject to the terms of the delegation of authority made by the Noteholders to the Collateral Agent pursuant to the Note Exchange Agreement, and that the Collateral Agent has agreed to act (and any successor agent shall act) as such hereunder only on the express conditions contained in the Note Exchange Agreement with respect to the Secured Parties. The Collateral Agent shall be entitled to the rights, privileges, protections, indemnities and immunities set forth in the Note Exchange Agreement, all of which are incorporated herein by reference *mutatis mutandis*, in the performance of any of the transactions contemplated by this Agreement.  Any successor agent appointed pursuant to the Section 20 of the Note Exchange Agreement shall be entitled to all the rights, interests and benefits of each agent hereunder.

[Remainder of Page Intentionally Left Blank. Signatures on Following Pages]

IN WITNESS WHEREOF, the Grantors and the Collateral Agent have executed this Security Agreement as of the date first above written.

**GRANTORS:**

NAUTICAL SOLUTIONS, L.L.C.

By:     _____
Name:   _____
Title:  _____


NAUTICAL SOLUTIONS HOLDINGS, LLC

By:     _____
Name:   _____
Title:  _____

WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Collateral Agent

By: _____
Name:
Title:

Collateral Agent Signature Page

<u>EXHIBIT A</u>

Chief executive office and mailing address for the Grantors:

16201 East Main Street, Cut Off, LA 70345

Locations of Real Property, Inventory, Equipment and Fixtures: None.

<u>GZJKDKV'D"</u>

C0      Cktetchv'gpi kpgu."uj kr u."tcktrectu'cpf "qvj gt'xgj kengu'i qxgtpgf "d{'hgf gtcn'incvuug<

P qpg'qvj gt'vj cp'vj g'Xguugnu0'

D0'      *k+"      Rcvgpvu."Eqr {tki j vu."Vtcf go ctmu."Fqo cin'P co gu"

P qpg"

        *kk+      Gzenuukxg'Rcvgpv'Nkegpugu."Eqr {tki j v'Nkegpugu."Vtcf ctn'Nkegpugu'i tcpvgf "vq'cp{
vj ktf "r ctv{"qt"vpf gt'y j kej "cp{"I tcpvqt"ku'vj g"nkegpugg"

P qpg"

        *kkk+      Eqo r wgt'J ctf y ctg'cpf "Uqhy ctg'Nkegpugu<

P qp-Gzenuukxg'cpf "Cuuki pcdng'Rcvgpv'cpf "Mpqy /J qy "Nkegpug'Ci tggo gpv."f cvgf "cu'qh'Hgdtwct{"
46."4245."d{'cpf "co qpi "O ctkpg'Vgej pqnqi kgu."NNNE0"cu'Nkegpuqt."P cwtkecn'Uqnwkqpu."NNNE0"
cu'Nkegpugg."cpf "vj g'Eqmr cvgtn'Ci gpv'

        *kx+      Eqr {tki j v'Nkegpug

P qp-Gzenuukxg'cpf "Cuuki pcdng'Eqr {tki j v'Nkegpug'Ci tggo gpv."f cvgf "cu'qh'Hgdtwct{"46."4245."d{"
cpf "co qpi "P qt{j "Co gtkecp'Uj kr dwkf kpi ."NNNE0"cu'Nkegpuqt."P cwtkecn'Uqnwkqpu."NNNE0'cu"
Nkegpugg."cpf "vj g'Eqmcvgtcn'Ci gpv'

<u>EXHIBIT C</u>

Please refer to Exhibit A, Parts A & B.

None.

<u>EXHIBIT D</u>

Grantor Identification and Organizational Information

| **<u>GRANTOR</u>** | **<u>Federal Employer Identification Number</u>** | **<u>Type of Organization</u>** | **<u>State of Organization or Incorporation</u>** | **<u>State Organization Number</u>** |
|---|---|---|---|---|
| Nautical Solutions, L.L.C. | 26-0741673 | limited liability company | Louisiana | 36519394K |
| Nautical Solutions Holdings, LLC | 92-0440022 | limited liability company | Louisiana | 45098439K |

EXHIBIT E

List of Pledged Securities

| **Issuer** | **Holder** | **Certificate No.** | **No. Shares/Interest** | **% of Shares Issued and Outstanding** |
|---|---|---|---|---|
| Nautical Solutions, L.L.C. | Nautical Solutions Holdings, LLC | Uncertificated | 1,000 Units/100% | 100% |

<u>EXHIBIT F</u>

Deposit Accounts, Commodity Accounts, Securities Accounts

| Bank | Account Holder | Account Number | Purpose |
|---|---|---|---|
| JPMorgan Chase Bank, N.A. | Nautical Solutions, L.L.C. | #xxxxx4148 | Operating Account |
| JPMorgan Chase Bank, N.A. | Nautical Solutions, L.L.C. | #xxxxx7113 | Guyana Operations Account |

<u>EXHIBIT G</u>

Letter-of-Credit Rights and Chattel Paper

None.

<u>EXHIBIT H</u>

OFFICES IN WHICH FINANCING STATEMENTS MAY BE FILED

| **GRANTOR** | **State of Organization or Incorporation** |
| --- | --- |
| Nautical Solutions, L.L.C. | Louisiana |
| Nautical Solutions Holdings, LLC | Louisiana |

The Uniform Commercial Code records of any Parish Clerk of Court Office in the State of Louisiana.

<u>EXHIBIT I</u>

(See Definition of "*Commercial Tort Claims*")

COMMERCIAL TORT CLAIMS

None.

<u>EXHIBIT J</u>

Former Names of the Grantors

None.

**[FORM OF]**
**SUPPLEMENT NO. _____ TO PREFERRED FLEET MORTGAGE**

THIS SUPPLEMENT NO. _____ TO PREFERRED FLEET MORTGAGE (this "Supplement"), made this ___ day of _____, 202_ and effective as of the ___ day of _____, 202_, is given by NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company, with an address of 16201 East Main Street, Cut Off, Louisiana 70345 (the "*Shipowner*"), to and in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, with an address of 1100 North Market Street, Wilmington, DE 19890, in its capacity as collateral agent for the Secured Parties under and as defined in the Security Agreement (in such capacity, together with its successors and assigns, the "*Mortgagee*"). Unless otherwise defined herein, all capitalized terms used herein shall have the meanings assigned to them in the Mortgage.

WITNESSETH:

WHEREAS, the Shipowner has heretofore executed and delivered to the Mortgagee that certain Preferred Fleet Mortgage effective as of _____, 2023 (said mortgage as supplemented hereby and hereafter amended or supplemented, being hereinafter called the "*Mortgage*"), pursuant to which the Shipowner granted, conveyed and mortgaged, in favor of the Mortgagee, its successors and permitted assigns in such capacity, and granted the Mortgagee, its successors and permitted assigns in such capacity, a continuing security interest in, the Vessels described in the Mortgage to secure, among other things, the timely payment and performance of the Secured Obligations; the Mortgage having been recorded on ___, 2023, in the appropriate Office of the United States Coast Guard, National Vessel Documentation Center, in Book _____, Page _____, at _____ [a.m/p.m] ; and

WHEREAS, the Shipowner has agreed to execute and deliver to the Mortgagee this Supplement to add the vessel(s) described below to the list of Vessels on Schedule 1 to the Mortgage and to subject such vessel(s) to the terms and provisions of the Mortgage.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Shipowner hereby covenants and agrees that the terms and provisions set forth in the Mortgage be and they are hereby supplemented as follows:

1.    To secure the full and timely payment and performance of the Secured Obligations, the Shipowner does, by these presents, grant, convey and mortgage, and grant a continuing security interest in, unto Mortgagee, and to Mortgagee's successors and assigns in such capacity, the whole of the vessel(s) named and further described as follows (the "*Additional Vessel(s)*"):

| Vessel Name | Official Number |
|---|---|
| [Additional Vessel(s)] | [_____] |

together with all her/their boilers, engines, machinery, auxiliaries, tackle, apparel, spares, fuel, consumable and other stores, navigational systems, electronic surveillance systems, computer equipment and software, anchors, cables, chains, equipment, cranes, welding machines and stations, cutting systems, pontoons, tensions, davits, dope stations, anchor wires, anchor buoys,

generators, compressors, pumps, tools, implements, parts, supplies, and all other accessories, additions, appurtenances, improvements and replacements now or hereafter belonging thereto, whether or not removed therefrom, all of which shall be deemed to be included in the term "*Additional Vessel(s)*" herein.

2.     Any and all references in the Mortgage, as supplemented hereby, to the term "*Vessels*" (and individually, a "*Vessel*") shall hereafter include the Additional Vessel(s). The Vessels subject to the Mortgage, as supplemented hereby, are as follows:

| Vessel(s) Name | Official Number(s) |
| --- | --- |
| [●] | [●] |

For convenience, Schedule 1 attached hereto and made a part hereof also lists the Vessels subject to the Mortgage, as supplemented hereby, and shall replace in its entirety Schedule 1 attached to the Mortgage.

3.     As supplemented hereby, the Mortgage is in all respects ratified and confirmed, and all of the terms, provisions and conditions thereof shall be and remain in full force and effect. In particular, and without limiting the foregoing, the Vessels (including, without limitation, the Additional Vessel(s)) shall remain subject to the preferred lien of the Mortgage, as supplemented hereby, as security for the full and timely payment and performance of the Secured Obligations. All of the liens, privileges and priorities existing under the Mortgage are hereby renewed, extended and carried forward as security for the full and timely payment and performance of the Secured Obligations and all other sums due under the Mortgage, as supplemented hereby.

4.     Nothing contained herein shall be construed (a) as a novation of the Secured Obligations or the Mortgage, or (b) to release, cancel, terminate or otherwise impair the preferred status or priority of the preferred lien created by the Mortgage.

5.     Notwithstanding anything to the contrary in the Mortgage, the total amount of the Mortgage, as supplemented hereby, is $_____ plus Specified Noteholder Fee (if any), Exit Fee (if any) or other premium (if any) and interest, fees, costs, expenses and performance of the Mortgage covenants. The interest of Mortgagor in the Vessels (including, without limitation, the Additional Vessel(s)) is the entire 100% interest, and the interest mortgaged in the Mortgage and this Supplement covers the entire 100% interest in the Vessels (including, without limitation, the Additional Vessel(s)).

6.     THIS SUPPLEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE GENERAL MARITIME LAW OF THE UNITED STATES OF AMERICA. THE SHIPOWNER IRREVOCABLY SUBMITS ITSELF TO THE NON-EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, FOR THE PURPOSES OF (AND SOLELY FOR THE PURPOSES OF) ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF, OR RELATING TO, THIS SUPPLEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, HEREBY

IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD IN SUCH NEW YORK STATE OR FEDERAL COURT AND HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE, OR OTHERWISE, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE ABOVE-NAMED COURTS FOR ANY REASON WHATSOEVER, THAT SUCH SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, OR THAT THE VENUE OF SUCH SUIT, ACTION OR PROCEEDING IS IMPROPER, OR THAT THIS SUPPLEMENT OR THE SUBJECT MATTER HEREOF MAY NOT BE ENFORCED IN OR BY SUCH COURTS. THE SHIPOWNER HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO THE SHIPOWNER AT ITS ADDRESS LISTED IN SECTION 3.11 OF THE MORTGAGE. THE SHIPOWNER AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS SECTION 6 SHALL AFFECT THE RIGHT OF THE MORTGAGEE TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE MORTGAGEE TO BRING ANY ACTION OR PROCEEDING AGAINST THE SHIPOWNER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

[Remainder of Page Intentionally Left Blank. Signatures on Following Pages]

Form of Supplement

IN WITNESS WHEREOF, the Shipowner has caused this Supplement No. _____ to Preferred Fleet Mortgage to be executed effective as of the day and year first above written.

WITNESSES:                                    NAUTICAL SOLUTIONS, L.L.C.


_____        By:
                                             _____
Printed Name: _____   Name:
                                             _____
                                          Title:
                                             _____

_____
Printed Name: _____

IN WITNESS WHEREOF, the Mortgagee has caused this Supplement No. _____ to Preferred Fleet Mortgage to be executed effective as of the day and year first above written.

WITNESSES:

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent

_____

By: _____

Printed Name: _____

Name: _____

Title: _____

_____

Printed Name: _____

Mortgage Signature Page                    Form of Supplement

ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF [_____]

     BE IT KNOWN that on this \_\_\_\_\_ day of _____, before me personally appeared:

<p align="center">_____</p>

to me known, who, after being by me duly sworn, did depose and say:

     That he/she is an Authorized Agent of Nautical Solutions, L.L.C., the limited liability company which is described in and which executed the within instrument, that he/she signed his name to the said instrument at the order of the Manager of the said limited liability company and acknowledged the within instrument to be the free act and deed of the said limited liability company.

     IN TESTIMONY WHEREOF, I have hereto set my hand and seal on this day and year first above written.

<p align="center">_____<br>NOTARY PUBLIC</p>

Name: _____
Notary ID/Bar Roll No. _____
My Commission Expires _____

ACKNOWLEDGMENT

STATE OF [_____]

PARISH/COUNTY OF [_____]

     BE IT KNOWN that on this _____ day of _____, before me personally appeared:

_____

to me known, who, after being by me duly sworn, did depose and say:

     That he/she is the _____ of Wilmington Trust, National Association which is

described in and which executed the within instrument, that he/she signed his/her name to the said

instrument with full authorization of Wilmington Trust, National Association, and acknowledged

the within instrument to be the free act and deed of the said national banking association.

     IN TESTIMONY WHEREOF, I have hereto set my hand and seal on this day and year first above written.

_____
NOTARY PUBLIC
Name: _____
Notary ID/Bar Roll No. _____
My Commission Expires _____

SCHEDULE 1
VESSELS

| Vessel Name | Official Number |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

# EXHIBIT H

## FORM OF MONTHLY REPORTING

### CASH FLOW STATEMENT – [MONTH] [YEAR]

| Date on Charter | Hull No. | Vessel | [Month] C/F B/Debt | YTD C/F B/Debt | Note or Lease Amount | YTD Lease | YTD Interest | YTD Principal | Loan Balance | [Month] C/F | YTD C/F | Other Costs | Net Cash Flow |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |

Exhibit I

# EXHIBIT I

## [FORM OF] SUPPORT UNDERTAKING

To:     Wilmington Trust, National Association, as Collateral Agent
1100 North Market Street
Wilmington, DE 19890
Attn: Global Capital Markets – Project Finance – Rafael Miranda
Email: rmiranda1@wilmingtontrust.com
Tel: 845-717-8079

From:  The companies listed on Exhibit A attached hereto
16201 East Main Street
Cut Off, LA 70345

Date:   [_], 2023

Re:     Undertakings of The Vessels (hereinafter defined)

Dear Sirs

## 1.     BACKGROUND

1.1     We, the undersigned companies ("**we**", "**us**" or individually, each a "Contractor" and collectively, the "**Contractors**"), refer to (a) the Note Exchange Agreement dated as of even date herewith (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Note Exchange Agreement**") entered into by and among Nautical Solutions L.L.C. (the "**Owner**"), Nautical Solutions Holdings, LLC, the holders of the Senior Secured Notes due [_], 2028 issued thereunder (together with their successors and assigns, collectively, the "**Noteholders**"), Wilmington Trust, National Association, in its capacity as administrative agent (together with its successors and assigns in such capacity, the "**Agent**"), and Wilmington Trust, National Association, in its capacity as collateral agent (together with its successors and assigns in such capacity, the "**Collateral Agent**"), (b) the Master Services Agreement dated as of even date herewith (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Master Services Agreement**") entered into by and among the Owner and the Contractors and (c) the Collateral Assignment of Master Services Agreement dated as of even date herewith (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Collateral Assignment**") entered into by and among the Owner and the Collateral Agent.

1.2     We, the Contractors, have been advised by the Owner that we enter into this Support Undertaking (this "**Undertaking**") in favor and for the benefit of the Collateral Agent in respect of the respective Services (as defined in the Master Services Agreement) provided by each of us to the Owner in connection with the operation of the Vessels pursuant to the Master Services Agreement.

## 2.    INTERPRETATION

2.1    **Definitions.** Unless otherwise defined herein, terms used in this Undertaking have the meaning given such terms in the Note Exchange Agreement or Master Services Agreement. In this Undertaking,

"**Earnings**" means, in respect of a Vessel, all moneys whatsoever which are now, or later become, payable (actually or contingently) to the Owner and which arise out of the use or operation of such Vessel, including (but not limited to):

(a)    all freights, hire, earnings and other moneys earned and to be earned, due or to become due, or paid or payable to, or for the account of, the Owner, of whatsoever nature, arising out of or as a result of the use, operation, pooling or chartering by the Owner or its agents of such Vessel, including, without limitation, all rights arising out of the Owner's lien on cargoes and subfreights thereunder;

(b)    all rights, remedies, powers, privileges and claims, in each case for moneys due and to become due to the Owner, and all claims for damages, arising out of the breach of any and all present and future requisitions, drilling contracts, charter parties, pooling arrangements, bills of lading, contracts of affreightment and other engagements or for the carriage or transportation of cargo, and operations of every kind whatsoever of such Vessel and in and to any and all claims and causes of action for money, loss or damages that may accrue or belong to the Owner, its successors or assigns, arising out of or in any way connected with the present or future use, operation, pooling or chartering of such Vessel or arising out of or in any way connected with any and all present and future requisitions, drilling contracts, charter parties, pooling arrangements, bills of lading, contracts of affreightment and other engagements or for the carriage or transportation of cargo and other operations of every kind whatsoever of such Vessel;

(c)    all moneys and claims due and to become due to the Owner, and all claims for damages and all insurances and other proceeds, in respect of the actual or constructive total loss or the agreed, arranged or compromised total loss of or requisition of use of or title to such Vessel; and

(d)    any proceeds or products of any of the foregoing and all interest and earnings from the investment of any of the foregoing and the proceeds and products thereof.

"**Insurances**" means, in respect of a Vessel:

(a)    all insurance (including, without limitation, all insurance with respect to hull and machinery, war risk, loss of earnings, protection and indemnity, pollution, requisition of title or otherwise) in respect of such Vessel, her hull, machinery, freights, disbursements, profits or otherwise, whether heretofore, now or hereafter affected, and all renewals of or replacements for the same;

(b)    all monies and claims for moneys due and to become due to the Owner under said insurances with respect to the actual or constructive total loss or the agreed, arranged or compromised total loss or any other loss of or damage to such Vessel, or with respect to a claim arising out of the use or operation of such Vessel;

(c)      all returns of premium;

(d)      all other rights and benefits of the Owner under or in respect of said insurances; and

(e)      all cash and non-cash proceeds of the foregoing.

"**Secured Party**" means, collectively, the Agent, the Noteholders and the Collateral Agent.

"**Services**" has the meaning given to it in Section 1.1 of the Master Services Agreement.

"**Vessel Manager**" has the meaning given to it in Section 3.1 of the Master Services Agreement.

"**Vessels**" has the meaning given to it in the recitals of the Master Services Agreement.

## 3.      CONFIRMATIONS AND CONSENTS.

3.1      **Confirmation of Services**.  Each Contractor hereby confirms that it has agreed to provide, and it shall provide, the Services to the Owner in respect of the Vessels, on the terms of and as set forth in the Master Services Agreement, and that the Services encompass all of the services necessary for the Owner to operate the Vessels in the ordinary course of business and consistent with its past practice.

3.2      **Intellectual Property**. Each Contractor hereby confirms that the intellectual property licensed under the Intellectual Property Agreements is all the intellectual property owned by the Contractors that is reasonably necessary for the operation of the Vessels in the ordinary course of business and consistent with past practice. Each Contractor hereby warrants that to the best of its knowledge, no other intellectual property other than the intellectual property licensed under the Intellectual Property Agreements and rights under licenses to third party off-the-shelf software generally commercially available on standard terms is necessary for the operation of the Vessels in the ordinary course of business and consistent with past practice.

3.3      **Consent.** Each Contractor hereby consents to the terms of the Collateral Assignment for the benefit of the Collateral Agent. The Contractors acknowledge the terms and provisions of the Collateral Assignment which provides, among other things, that from and after the occurrence of an Event of Default under the Note Exchange Agreement and until such Event of Default is cured or waived, the Collateral Agent shall be authorized and empowered, in the Collateral Agent's sole discretion, to assert, either directly or on behalf of Owner, any of the rights and remedies which Owner may have from time to time under the terms of the Master Services Agreement and Collateral Agent shall be a third party beneficiary for the purposes of exercising such rights and remedies.

## 4.      ADDITIONAL UNDERTAKINGS

4.1      **Undertakings**.  In consideration of the Noteholders permitting our acting or continuing to act as a provider of the Services in respect of the Vessels (as set forth in the Master

Services Agreement), each Contractor irrevocably and unconditionally covenants and agrees as follows:

(a)     until the Note Obligations are paid in full in cash, such Contractor shall not, without the Collateral Agent's prior written consent (acting upon instructions of the Required Holders), supplement, modify, amend or waive the Master Services Agreement;

(b)     that such Contractor shall not, without the Collateral Agent's prior written consent (acting upon instructions of the Required Holders), extend any credit to the Owner or any of the Vessels other than in the ordinary course of business consistent with trade payables that would be extended by a reasonably prudent manager to the extent consistent with past practice prior to the date of this Undertaking, provided that any such credit extended to Owner shall not remain outstanding for a period greater than forty-five (45) calendar days;

(c)     until the Note Obligations are paid in full in cash, all claims or liens of whatsoever nature which such Contractor has or may have at any time after the date of this Undertaking against or in connection with any of the Vessels, the Earnings or the Insurances or against the Owner shall, subject to the terms and conditions of this Undertaking, rank after and be in all respect subject and subordinate to all of the Note Obligations and the lien of the mortgage given in favor of the Collateral Agent;

(d)     until the Note Obligations are paid in full in cash, such Contractor shall not take any step to exercise or to enforce any right or remedy which such Contractor now or at any later time have under any applicable law against any of the Vessels, the Earnings or the Insurances or against the Owner;

(e)     until the Note Obligations are paid in full in cash, such Contractor shall not institute any legal or administrative action or any quasi-legal proceedings under any applicable law at any time after the date of this Undertaking against any of the Vessels, the Earnings, the Insurances of or against the Owner in any capacity;

(f)     that such Contractor shall not compete with the Noteholders, the Agent or the Collateral Agent or its designee in (i) a liquidation or other winding-up or bankruptcy of the Owner or (ii) any legal or administration action or any quasi legal proceedings in connection with any of the Vessels, the Earnings or the Insurances;

(g)     that such Contractor shall, upon the Collateral Agent's first written request (acting upon instructions of the Required Holders), promptly deliver to the Collateral Agent, at the Owner's cost and expense, all documents of whatever nature which such Contractor holds in connection with the Owner, any of the Vessels, the Earnings or the Insurances; provided, that the original copies (as opposed to photocopies) of all vessel documentation required by law to remain on board the Vessels shall be so delivered in electronic format and nothing herein constitutes a waiver of attorney/client privilege;

(h)     that such Contractor shall not terminate the Master Services Agreement or its involvement thereunder without (i) giving the Collateral Agent at least 30 days' prior written notice of such Contractor's intention to do so, and (ii) ensuring that a replacement service provider reasonably capable of performing the applicable Services provided by such Contractor (at the same

standards required under the Master Services Agreement) to the reasonable satisfaction of the Collateral Agent (acting at the direction of the Required Holders), is engaged by Owner prior to the effectiveness of any such termination if the applicable Services remain necessary for the operation of the Vessels (and if such replacement service provider is an Affiliate (as defined in the Master Services Agreement and hereinafter referred to as an "**Affiliate**") of Owner, such Affiliate shall sign a joinder to the Master Services Agreement and this Undertaking); provided <u>that</u>, termination of such Contractor's involvement in the Master Services Agreement shall not terminate its obligations under this Undertaking;

(i)     that, upon giving us reasonable notice, such Contractor shall promptly sign any consent reasonably required by any insurance broker and/or underwriter and shall provide all documents, evidence and information and do all other things reasonably necessary so that the Collateral Agent or the Owner, as applicable, can collect or recover any moneys payable in respect of the Insurances of a Vessel in accordance with the Note Exchange Agreement;

(j)     that, to the extent such Contractor is or may be named as an assured under any Insurances of a Vessel, any deductible payable in respect of a claim under such Insurances shall be apportioned between such Contractor and every other named assured, other than the Collateral Agent, in proportion to the aggregate claims made or paid by each such party;

(k)     that (i) during (x) the continuance of an Event of Default or (y) any insolvency or bankruptcy proceeding of the Owner where the exercise of Collateral Agent's remedies in the Event of Default is stayed, and (ii) for a period of one (1) year following (A) the sale of a Vessel to a third-party purchaser not affiliated with the Contractors during or following an insolvency or bankruptcy proceedings of the Owner or by virtue of or in connection with the exercise by the Collateral Agent or the Agent of remedies following the occurrence of an Event of Default or (B) a Change of Control by virtue of a sale by or at the direction of the Collateral Agent or the Agent of the equity of the Owner (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title) or by virtue of an insolvency or bankruptcy proceeding of the Owner, as the case may be, such Contractor shall, to the extent any of the following services are provided or are capable of being provided by such Contractor in the normal course of such Contractor's business:

(x) continue to perform its obligations and provide the Services (as defined under the Master Services Agreement) under the Master Services Agreement, which the parties agree shall remain in full force and effect except as contemplated thereunder, and to perform and provide the Services thereunder;

(y) to the extent not already being provided by the manager of the Vessel(s) under the Master Services Agreement, provide appropriate services to support delivery of one or more of the Vessels to a U.S. port as directed by the Collateral Agent (acting at the direction of the Required Holders), to the third-party purchaser of the Vessel(s) or to the Owner (after giving effect to the Change of Control), as the case may be, and such support shall be considered a Service under the Master Services Agreement and treated consistently with other Services thereunder, including that such support shall be charged a Service Fee on the same terms as other Services;

(z) provide any necessary training and support services to allow the Collateral Agent (or a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title), a third-party purchaser or the Owner (after giving effect to the Change of Control), as the case may be, to properly transition the Services necessary to operate the Vessels and any intellectual property and technology that is embedded and/or used for the operation of the applicable Vessel or Vessels, including any intellectual property and technology licensed to the Owner pursuant to the Intellectual Property Agreements.

Notwithstanding the foregoing as to this subsection (k), each Contractor agrees that Vessels owned or operated by the Collateral Agent, its designees, third-party purchasers and Owner (after giving effect to the Change of Control), as the case may be, shall not be prioritized, nor shall such Vessels be disadvantaged, by such Contractor compared to other vessels owned by the Contractors or its affiliates that require the same or similar services, employees or parts, and the Contractors shall perform the Services in substantially the same manner as the Contractors perform such similar services for its own vessels or vessels of its affiliates.

(l)     that, each Contractor consents to the Collateral Agent's right to cure any breach of the Owner under the Master Services Agreement pursuant to Section 3 of the Collateral Assignment and agrees not to terminate the Master Services Agreement or otherwise seek remedies in respect of any breach by Owner during the forty-five (45) days following notice of such breach to the Collateral Agent (the "**Cure Period**"); and

(m)     that, to the extent Owner rejects the Master Services Agreement in any bankruptcy or insolvency proceeding, Contractor agrees to enter into a new master services agreement with a nominee of the Collateral Agent, which master services agreement will have a term of the earlier of one (1) year from (i) a change of control of the Owner or (ii) sale of the Owner to a third party and otherwise have terms and conditions comparable to the Master Services Agreement; provided that, notwithstanding the foregoing, as to the applicable Vessel Manager of a Vessel, such company's obligations to crew such Vessel shall terminate (A) one (1) year after transfer of title to such Vessel to the Agent or the Collateral Agent (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title) and (B) immediately upon transfer of title to such Vessel to a third-party purchaser not affiliated with such company during or following an insolvency or bankruptcy proceedings of the Owner or by virtue of or in connection with the exercise by the Collateral Agent or the Agent of remedies following the occurrence of an Event of Default.

Notwithstanding Section 4.1(h), upon the occurrence and during the continuation of an Event of Default and thereafter if the Agent or the Collateral Agent or its designee (or a special purpose entity or designee established for the purpose of the Agent or the Collateral Agent taking title) or a Vessel Buyer (as defined in the Master Services Agreement) takes over operations of or title to the Vessels, if the Contractor providing the applicable Services is not paid within thirty (30) days after presentment of invoices therefor not subject to a good faith Dispute (hereinafter defined in Section 5.2), then such Contractor may terminate the Master Services Agreement by providing (x) as to the Collateral Agent if applicable, at least forty-five (45) days prior written notice, and an opportunity to cure during such 45-day notice period, and (y) as to the applicable third-party

purchaser, at least fifteen (15) days prior written notice, and an opportunity to cure during such 15-day notice period.

Notwithstanding anything to the contrary herein, the Contractor may terminate the Master Services Agreement and this Undertaking (i) on or after the one-year anniversary of the consummation of a Change of Control by virtue of a sale by or at the direction of the Collateral Agent or the Agent of equity of the Owner (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title), or (ii) as to any given Vessel that is sold to a third-party purchaser not affiliated with the Contractor during or following an insolvency or bankruptcy proceedings of the Owner or by virtue of or in connection with the exercise by the Collateral Agent or the Agent of remedies following the occurrence of an Event of Default, on or after the one-year anniversary of the sale of such Vessel (as to the applicable Vessel Manager of a Vessel, such company's obligations to crew such Vessel shall terminate (A) one (1) year after transfer of title to such Vessel to the Agent or the Collateral Agent (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title) and (B) immediately upon transfer of title to such Vessel to a third-party purchaser not affiliated with such company following the occurrence of an Event of Default).

Each Contractor represents and warrants that as of the date hereof, it (i) is in the business of providing or is capable of providing the Services, and the other services described in clauses (x), (y) or (z) of Section 4.1(k), and (ii) has no intention of ceasing to provide such services (or Services), and shall not terminate or cease to provide such services (or Services), except to the extent such termination would be permitted with respect to such Service under the Master Services Agreement.

## 5.   MISCELLANEOUS

5.1   **Governing Law**. THIS UNDERTAKING SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK EXCLUDING CHOICE-OF-LAW PRINCIPLES THAT WOULD PERMIT THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

5.2   **Dispute Resolution**. Any claim, disagreement, or dispute between the parties arising out of or relating to this Undertaking (a "**Dispute**") shall be resolved in the manner provided in this Section 5.2. The parties shall attempt to resolve any Dispute by negotiating in good faith for a period of thirty (30) days after receipt by either party of a written notice of the Dispute from the other party (the "**Negotiation Period**"). The written notice shall identify, with reasonable particularity, each matter or issue that is the subject of the dispute, a summary of the basis for the party's position with respect to each such matter or issue and the relief being requested by the party. No party shall commence any claim, action, suit, inquiry, investigation, judicial or administrative proceeding, grievance, arbitration or other proceedings (an "Action") in respect of any Dispute (i) until the expiration of the Negotiation Period or (ii) if the other party has refused to participate or has not reasonably participated in the required negotiation process in good faith set forth in this Section 5.2. If the parties are unable to resolve the Dispute during the Negotiation Period, the Dispute shall be finally settled by binding arbitration conducted expeditiously in accordance with the Comprehensive Arbitration Rules & Procedures, including the Expedited

Procedures then followed by the Judicial Arbitration and Mediation Services, Inc. (JAMS) or any successor to the functions thereof ("**Rules**"), and judgment upon the award rendered by the arbitrator shall be entered by any court of competent jurisdiction.  One arbitrator shall be jointly selected by the parties.  If the parties are unable to jointly select an arbitrator, the arbitrator shall be appointed in accordance with the Rules.  The cost of the arbitrator shall be shared equally by the parties.  The location of the arbitration proceeding shall be New York, New York and the language of arbitration shall be English.  All arbitration proceedings are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and the applicable state rules of evidence. The dispute resolution provisions of this Section 5.2 shall not be construed to interfere with a party's other rights provided by this Undertaking, including the right to terminate this Undertaking in accordance with its terms. During the pendency of any such Dispute, all of the terms and conditions of this Undertaking shall remain in effect and the parties shall continue to perform all of their respective obligations hereunder.

5.3    **Consent to Jurisdiction.** For the purposes of entering judgment on any arbitration award, if necessary, the parties consent to the exclusive jurisdiction of a New York State court or federal court sitting in New York County, New York.   We irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any objection that we may now or hereafter have to the venue or forum of any such proceeding. To the extent any arbitral award needs to be submitted to a court for entering judgment thereon, in accordance with Section 5.2 and Section 5.3 of this Undertaking, such party may submit the quantum of such award to the court but shall not include any information relating to the matters that were arbitrated.  If either party fails to proceed with arbitration as provided in Section 5.2 of this Undertaking, or unsuccessfully seeks to stay arbitration, or fails to comply with the arbitration award, or is unsuccessful in vacating or modifying the award pursuant to a petition or application for judicial review, the other party shall be entitled to expenses paid or incurred in successfully compelling such arbitration or defending against the attempt to stay, vacate or modify such arbitration award and/or successfully defending or enforcing the award.

(a)    We irrevocably consent to the service of any and all process in any such action or proceeding by the mailing of copies of such process to our address at 16201 East Main Street, Cut Off, LA 70345, in accordance with Section 5.7. We also agree that service of process may be made on us by any other method of service provided for under the applicable laws in effect in the State of New York.

5.4    **Waiver of jury trial**.  WE IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS UNDERTAKING.

5.5    **Collateral Agent's rights unaffected**.  Nothing in this Clause 5 shall exclude or limit any right which the Collateral Agent may have (whether under the law of any country, an international convention or otherwise) with regard to the bringing of proceedings, the service of process, the recognition or enforcement of a judgment or any similar or related matter in any jurisdiction.

5.6    **Meaning of "proceedings"**.  In this paragraph "**proceedings**" means proceedings of any kind, including an application for a provisional or protective measure.

5.6.    **Amendments**.  This Undertaking may not be amended, waived, supplemented or otherwise modified without the prior written consent of the Collateral Agent (acting at the direction of the Required Holders) and the Contractors.

5.7    **Notices.** All notices or other communications required or permitted to be made or given hereunder shall be made in writing, in English, and personally delivered to an officer or other responsible employee of the addressee, or sent, by registered air mail, return receipt requested, postage prepaid to the applicable address set forth under such party's name below, or to such other address as any party hereto may from time to time designate to the others in such manner, in each case with a copy delivered by email (which copy shall not constitute official notice hereunder):

|  |  |
|---|---|
| If to the Collateral Agent: | Wilmington Trust, National Association |
| | 1100 North Market Street |
| | Wilmington, DE 19890 |
| | Attn: Global Capital Markets – Project Finance – Rafael Miranda |
| | Email: rmiranda1@wilmingtontrust.com |
| | Tel: 845-717-8079 |
| | |
| If to the Contractors: | 16201 East Main Street |
| | Cut Off, Louisiana 70345 |
| | Email: luke.newman@chouest.com |
| | Attention: Luke Newman |
| | |
| | (with a copy by email to legal@chouest.com) |

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received on a business day of the recipient before 3:00 p.m. local time, otherwise the next business day.

5.8    **Assignment.**  The terms and provisions of this Undertaking shall be binding upon and inure to the benefit of the Contractors, the Collateral Agent and the Secured Parties and their respective successors and assigns in accordance with the Note Exchange Agreement (including all persons who become bound as to this Undertaking by joinder), except that no Contractor shall have the right to assign its rights or delegate its obligations under this Undertaking or the Master Services Agreement, or any interest herein or therein, without the prior written consent of the Collateral Agent; provided, that the foregoing limitation as to the Contractors shall not apply to collateral assignments and any related exercise of remedies by the Secured Parties, provided such grant, or exercise of remedies by the third party, does not materially impair the Services.

5.9    **Specific Performance**.  The Contractors acknowledge and agree that, in addition to any other remedies that may be available to it, and since monetary damages may be inadequate with respect to breaches of this Undertaking by the Contractors, the Collateral Agent shall be entitled to seek specific performance of this Undertaking and Master Services Agreement.  Any such remedy shall not in any way affect any other rights or remedies of the parties under this Undertaking, and shall not be deemed to be the exclusive remedy for a breach of this Undertaking, but shall be in addition to all other remedies available at Law or equity to the Collateral Agent.

5.10 **Counterparts.** This Undertaking may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto. The words "execution," "signed," "signature," and words of like import used in this Undertaking will be deemed to include electronic signatures or the keeping of records in electronic form, each of which will be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

5.11 **Additional Contractors**. It is understood and agreed that to the extent other Affiliates of a Contractor provide material services to the Owner, have contributed or do contribute any intellectual property or technology to the Vessels, Licensed Products or Works (as defined in the Intellectual Property Agreements) or otherwise perform a Service in respect of the Vessels consistent with those described in the Master Services Agreement, such Affiliate shall be required to become a Contractor under the Master Services Agreement and this Undertaking, or a Licensor under the applicable Intellectual Property Agreement(s) by (x) executing a joinder agreement (for each of the Master Services Agreement, the applicable Intellectual Property Agreement(s) and this Undertaking) and delivering the same to each of the Collateral Agent and AIG and Prudential in form and substance reasonably satisfactory to the Required Holders, (y) delivering supplements to Exhibit A hereto as are necessary to cause such Exhibit to be complete and accurate with respect to such additional Contractor on such date and (z) taking all actions as specified in this Undertaking as would have been taken by such Contractor had it been an original party to this Undertaking, in each case with all documents required above to be delivered to the Collateral Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Collateral Agent (acting at the direction of the Required Holders). In the event that any Owner entity ceases to be an Affiliate of the other Owner entities, Owner shall use commercially reasonable efforts to ensure Services provided by such former Owner entity are performed by another Owner entity.

[Remainder of Page Intentionally Left Blank.  Signature Pages Follow.]

Very truly yours,

C-INNOVATION, L.L.C.
C-PORT, L.L.C.
C-PORT 2, L.L.C.
C-PORT 3, L.L.C.
C-TERMINAL, L.L.C.
EXPERT TRAVEL, LLC
FOURCHON HEAVY LIFT, L.L.C.
GALLIANO MARINE SERVICE, L.L.C.
GULF SHIP, L.L.C.
INTERNATIONAL MARINE SYSTEMS, L.L.C.
LASHIP, L.L.C.
MARINE TECHNOLOGIES, L.L.C.
MARTIN HOLDINGS, L.L.C.
NAUTICAL VENTURES, L.L.C.
NORTH AMERICAN SHIPBUILDING, L.L.C.
OFFSHORE SERVICE VESSELS, L.L.C.
OFFSHORE SUPPORT SERVICES, L.L.C.
SEALAND MECHANICAL, L.L.C.
TAMPA SHIP, L.L.C.

By: _____
    Name:
    Title:

The Manager of all of the aforementioned companies has executed this Agreement intending that all the companies named above are bound and to be bound by the one signature as if s/he had executed this Agreement separately for each company

BRAM OFFSHORE TRANSPORTES MARITIMOS LTDA.

By: _____
    Name: Ugo Fernandez
    Title: Executive Director

[Signatures continued on next page.]

GALLIANO MARINE SERVICE INTERNATIONAL

By: _____
    Name: Dionne Chouest Austin
    Title: Director

By: _____
    Name: Damon Chouest
    Title: Director

G-BOATS, INC.

By: _____
    Name: Greg Cheramie
    Title: Guyana Director

MARINE PROCUREMENT LTD.

By: _____
    Name: Richard Allinson
    Title: Managing Director

**EXHIBIT A**

**COMPANIES**

Schedule A(i)

| Services | Contractor |
|---|---|
| Arranging for and handling all matters relating to the crewing of each Vessel, the technical management of each Vessel, entry into various charter, contracts of affreightment and other similar commercial arrangements and entry into various purchasing arrangements for necessaries required for the operation of each Vessel, including:<br><br>• Executive oversight and management<br><br>• Coordination of services and personnel provided by affiliates<br><br>• Accounting systems and personnel<br><br>• Contracting processes and personnel<br><br>• Finance and banking administration and personnel<br><br>• Human resources processes and personnel<br><br>• Insurance management<br><br>• IT software and support<br><br>• Legal (internal)<br><br>• Logistics services for equipment and personnel<br><br>• Marketing and client management<br><br>• Port captains and field level management<br><br>• Port Fourchon shipyard and drydock access | Galliano Marine Service, L.L.C.<br>Galliano Marine Service International<br>G-Boats, Inc.<br>Bram Offshore Transportes Maritimos Ltda. |

| Services | Contractor |
|---|---|
| • Storage of stacked vessels<br><br>• Officing and utilities for all GMS personnel<br><br>• Other miscellaneous back office and administrative personnel and services | |

Schedule A(ii)

| Services | Contractor |
|---|---|
| Maintenance and repair of communications/broadband data and chart services | Marine Technologies, L.L.C. |
| Compliance with all U.S. Coast Guard rules and regulations relating to the ownership and operations of the Vessels, compliance with all classification society rules and requirements, arranging for all required surveys, arranging all insurances for the Vessels and handling of all claims related hereto, arranging for all required repairs and maintenance of the Vessels, ordering of all fuel, lube oils and other necessaries as required by the Vessel operations including Vessel certificates, licenses, and ABS requirements | Galliano Marine Service, L.L.C. Galliano Marine Service International G-Boats, Inc. Bram Offshore Transportes Maritimos Ltda. |
| Travel services, including booking airfare, lodging and ground transportation for vessel crews, support personnel and other associated persons | Expert Travel, LLC |
| Insurance premium payment to be reimbursed by the Company (Vessels, Commercial, Property, general, Environmental, etc.) | Offshore Service Vessels, L.L.C. |
| Hospital Insurance that is under a master insurance policy in the name of Galliano Marine Service LLC | Galliano Marine Service, L.L.C. |
| Maintenance and repair of Vessel electronics, including dynamic positioning | Marine Technologies, L.L.C. International Marine Systems, L.L.C. |
| Vessel maintenance and repair, including related regulatory drydocking | C-Port 2, L.L.C. Gulf Ship, L.L.C. LaShip, L.L.C. North American Shipbuilding, L.L.C. Tampa Ship, L.L.C. Sealand Mechanical, L.L.C. (limited to air conditioning) International Marine Systems, L.L.C. (limited to radio and radar) |
| International supplies | Nautical Ventures, L.L.C. Marine Procurement Ltd. G-Boats, Inc. Bram Offshore Transportes Maritimos Ltda. |
| Groceries | Martin Holdings, L.L.C. |

| Services | Contractor |
|---|---|
| | Nautical Ventures, L.L.C. |
| International Direct Payroll | Galliano Marine Service International<br>G-Boats, Inc.<br>Bram Offshore Transportes Maritimos Ltda. |
| Taxes | Galliano Marine Service, L.L.C. |
| Spare parts and supplies | Marine Procurement Ltd.<br>International Marine Systems, L.L.C.<br>Nautical Ventures, L.L.C.<br>G-Boats, Inc.<br>Galliano Marine Service, L.L.C.<br>North American Shipbuilding, L.L.C.<br>Gulf Ship, L.L.C.<br>LaShip, L.L.C.<br>Tampa Ship, L.L.C.<br>C-Port 2, L.L.C.<br>Sealand Mechanical, L.L.C.<br>International Marine Systems, L.L.C. (radio and radar<br>only)<br>Marine Technologies, L.L.C. (IT only) |
| Legal (external) | Galliano Marine Service, L.L.C. |
| Crew labor and benefits | Galliano Marine Service, L.L.C.<br>Galliano Marine Service International<br>G-Boats, Inc.<br>Bram Offshore Transportes Maritimos Ltda. |
| Shipyard and service technician labor for vessel retrofit, repair, and maintenance | North American Shipbuilding, L.L.C.<br>Gulf Ship, L.L.C.<br>LaShip, L.L.C.<br>Tampa Ship, L.L.C.<br>C-Port 2, L.L.C.<br>Sealand Mechanical, L.L.C.<br>International Marine Systems, L.L.C. (radio and radar only)<br>Marine Technologies, L.L.C. (IT only) |

Schedule A(iii)

| Services | Contractor |
|---|---|
| Food service | Martin Holdings, L.L.C.<br>Nautical Ventures, L.L.C. |
| ROV operations/rental | C-Innovation, L.L.C. |
| Vessel radio, radar and communication systems upgrade, repair and maintenance | International Marine Systems, L.L.C. |
| Port services for vessels including cargo loading and unloading and fueling | C-Port, L.L.C.<br>C-Port 2, L.L.C.<br>C-Port 3, L.L.C.<br>C-Terminal, L.L.C.<br>Fourchon Heavy Lift, L.L.C.<br>Martin Holdings, L.L.C.<br>Offshore Support Services, L.L.C. |
| Any services necessary to operate, upgrade, maintain, repair, replace, and support the systems (including IT systems), software, hardware, and/or equipment, that CONTRACTOR has manufactured for use on other otherwise placed on the Vessels listed on Exhibit B (including access to physical locations hosting such systems, software, hardware, and/or equipment, and including the IP licensed to Owner under (a) the Non-Exclusive and Assignable Patent, Copyright and Know-How License Agreement, dated [●], 2023, by and among Owner,  Marine Technologies, L.L.C., and Wilmington Trust, National Association, as Collateral Agent; and (b) the Non-Exclusive and Assignable Copyright License Agreement, dated [●], 2023, by and among Owner,  North American Shipbuilding, L.L.C. and Wilmington Trust, National Association, as Collateral Agent) | Marine Technologies, L.L.C.<br>North American Shipbuilding, L.L.C. |
| Vessel fabrication, retrofitting, upgrades and replacements | C-Port 2, L.L.C.<br>Gulf Ship, L.L.C.<br>LaShip, L.L.C.<br>North American Shipbuilding, L.L.C.<br>Tampa Ship, L.L.C.<br>Sealand Mechanical, L.L.C. (limited to air conditioning)<br>International Marine Systems, L.L.C. (limited to radio and radar) |

**EXHIBIT B**

**VESSELS**

| Vessel Name | Official Number |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

## [FORM OF] MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT (the "Agreement") is made and entered into as of **[_____], 2023** (the "Effective Date"), by and among **Nautical Solutions, L.L.C.**, a Louisiana limited liability company, (together with any successors and assigns, collectively herein after referred to as "COMPANY"), on the one hand, and each of the undersigned entities listed on Exhibit A (together with any successors and assigns, each being hereinafter referred to, whether individually or collectively, as "CONTRACTOR"), on the other hand.

### WITNESSETH:

WHEREAS, COMPANY is engaged in the marine transportation business, including the operation of the vessels owned by the Company and set forth on Schedule 2 hereto (the "Vessels"; provided, that if a vessel were to be sold by the Company in accordance with Section 9.21 of the NEA (hereinafter defined), or as otherwise permitted by the NEA, then such vessel no longer shall be a "Vessel" hereunder);

WHEREAS, COMPANY has entered into that certain Note Exchange Agreement, dated as of the Effective Date (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "NEA") among COMPANY, Nautical Solutions Holdings, LLC, the holders from time to time of the senior notes issued in exchange thereunder, and Wilmington Trust, National Association, as Agent (in such capacity, including its successors and assigns in such capacity, the "Agent") and as Collateral Agent (in such capacity, including its successors and assigns in such capacity, the "Collateral Agent"), pursuant to which the Parties are required to enter into this Agreement;

WHEREAS, CONTRACTOR, an Affiliate (as hereinafter defined in the NEA) of the Company, owns, possesses or contracts on behalf of the Company for, certain equipment, parts, spare parts, fuel, lube oils and other necessaries, and/or employs certain personnel necessary for and capable of performing certain services necessary for the normal course of operations of the Vessels, and has provided such services to COMPANY or for the Vessels prior to the Effective Date; and

WHEREAS, COMPANY and CONTRACTOR now desire to enter into this Agreement to set forth the terms and conditions pursuant to which CONTRACTOR shall continue to provide to the COMPANY such services.

NOW, THEREFORE, IN CONSIDERATION of the mutual promises, covenants, conditions, and agreements herein contained, and the specifications and special provisions set forth in Work Orders (defined further below) and other exhibits issued pursuant to this Agreement, all of which are incorporated by reference and made a part hereof, the parties hereto mutually agree as follows:

## 1.0   AGREEMENT AND TERM

1.1   Subject to the terms and conditions of this Agreement, CONTRACTOR shall provide to COMPANY services necessary for the operation and maintenance of the Vessels, including, as the case may be, (i) Vessel management, (ii) maintenance, repair,

replacement, and support services for the Vessels and for systems, software, hardware, and/or equipment that CONTRACTOR has manufactured for use on or otherwise placed on or used by the Vessels, and (iii) those services listed on Schedules 1(a), 1(b), and 1(c) hereto (collectively, the "Services"). For avoidance of doubt, (i) the Parties intend that the Services shall include all services and functions that a CONTRACTOR entity or any of its Affiliates performed for COMPANY with respect to the Vessels in the eighteen (18) months prior to the Effective Date (other than the Services identified on Schedule 3); (ii) COMPANY represents and warrants that the list of CONTRACTOR entities set forth in Exhibit A is a complete list of CONTRACTOR entities and its Affiliates that provided Services to COMPANY with respect to each Vessel in the eighteen (18) months prior to the Effective Date; and (iii) no CONTRACTOR shall be required to perform any Services that it does not perform or provide in the normal course of its business for itself or any other CONTRACTOR entity or Affiliate or any third party, or otherwise did not perform or provide in the eighteen (18) months prior to the Effective Date.  If at any time during the term of this Agreement, COMPANY identifies additional services that (a) COMPANY deems are reasonably necessary to the operation of the Vessels, and (b) CONTRACTOR or any Affiliate is reasonably capable of performing or providing in the same or similar manner as it does for other vessels owned by CONTRACTOR or its Affiliates (such services, the "Additional Services"), COMPANY may request that CONTRACTOR or such Affiliate provide such Additional Service, and upon COMPANY's written request, CONTRACTOR or such Affiliate shall use commercially reasonable efforts to provide the Additional Service, and in which case such Additional Service shall be deemed a Service under this Agreement (and any such applicable Affiliate shall become a CONTRACTOR hereunder as to such Additional Service, pursuant to Section 19.5 hereof).  As used in this Agreement, the term "Affiliate" has the meaning given to it in the NEA, except that the companies listed on Schedule 3 hereto shall not be Affiliates under this Agreement or the Support Undertaking (hereinafter defined).

1.2     Notwithstanding the obligations in Section 1.1 for CONTRACTOR to perform or provide the Services, CONTRACTOR shall have no obligation to perform any Services:  (a) for any Vessel which ceases to be owned or operated by COMPANY, but subject to the terms of Section 12.3 and that certain Support Undertaking, dated as of the Effective Date, between Collateral Agent and CONTRACTOR ("Support Undertaking"), (b) if the applicable materials, parts, equipment, and components are no longer manufactured by, or otherwise available from, CONTRACTOR or CONTRACTOR's Affiliates or critical vendors; or (c) for which CONTRACTOR ceases to be regularly engaged in the business of, or is no longer reasonably capable of, performing in substantially the same or similar manner as it would for other vessels owned by CONTRACTOR or its Affiliates (other than COMPANY) or for third parties; provided, that in the event of the foregoing (b) or (c), CONTRACTOR shall reasonably cooperate with COMPANY to find a suitable or comparable replacement or alternative for such Service or the applicable materials, parts, equipment, and components, including by another CONTRACTOR entity or an Affiliate or a third party service provider, to the extent reasonably practical.

1.3    This Agreement shall control and govern all applicable Services performed by CONTRACTOR for COMPANY under subsequent written work orders, to the extent issued by the COMPANY to CONTRACTOR with respect to Services to be performed ("Work Orders").  At such time as COMPANY desires CONTRACTOR to perform Services, COMPANY may (but need not) present to CONTRACTOR a Work Order in the form and/or with the elements of Exhibit B, and subject to the terms and conditions of this Agreement CONTRACTOR shall perform all Services reasonably requested therein; provided, that if the Collateral Agent or the Agent (or a designee) is the party requesting Services following the consummation of a Change of Control (as defined in the NEA and hereinafter referred to as a "NEA Change of Control"), or if COMPANY and CONTRACTOR cease to be Affiliates, then a Work Order is a requirement for the Services to be performed.  The terms and conditions of this Agreement shall be deemed incorporated by reference in such written Work Orders as though expressed in full therein and made a part thereof.  Any agreement or stipulations in any confirmation of such Work Orders, delivery ticket, rate schedule, bids, proposals, purchase orders, or any other instrument used by CONTRACTOR containing provisions contrary or inconsistent with the terms and conditions of this Agreement or such Work Orders are rejected and shall not be binding on COMPANY or form a part of any agreement between COMPANY and CONTRACTOR, unless signed by an officer of COMPANY.

## 2.0    LABOR, EQUIPMENT, MATERIALS, SUPPLIES AND SERVICES

2.1    Upon CONTRACTOR'S receipt of a Work Order, CONTRACTOR shall provide the Services, with sufficient personnel, equipment, and materials capable of efficiently performing the Services stipulated in such Work Order, and continue such operations diligently and without delay.  CONTRACTOR shall not unreasonably delay performance of the Services for COMPANY and shall exercise commercially reasonable efforts to respond to COMPANY's requests for Services in a timely manner, provided that CONTRACTOR's delay of a Work Order shall not be unreasonable if COMPANY owes any CONTRACTOR or any Affiliate any undisputed amounts that are more than thirty (30) days past due.

2.2    In the event CONTRACTOR performs any Services upon the request of COMPANY without a fully-executed Work Order, such performance shall be deemed to be (i) an agreement by CONTRACTOR to the terms, conditions, and provisions of this Agreement, and (ii) CONTRACTOR'S affirmative agreement that any such Services shall be performed pursuant and subject to this Agreement.  Following the full execution of any Work Order, COMPANY will have the right to request changes to the Work Order by written notice to CONTRACTOR (each such writing, a "Change Order"), including changes to drawings, designs, configurations, specifications, quantities, methods of shipment or packing and delivery schedules or locations of delivery.  No Change Order shall become effective without the written mutual agreement by CONTRACTOR.  Any and all terms, conditions and provisions of any Work Order that are unchanged by the Change Order shall remain in full force and effect.

2.3     CONTRACTOR warrants that its applicable Services shall be (i) free of defects in workmanship and materials, to the extent such materials are manufactured by CONTRACTOR, (ii) performed in a good and workmanlike manner consistent with applicable industry standards and practices and utilizing sound engineering and/or technical principles where applicable, (iii) performed with new, merchantable, and fit materials, (iv) in full accordance with this Agreement and the applicable Work Order, and (v) performed in substantially the same manner, and with at least the same skill, quality, level, volume, availability and scope as the Services (or similar services) were provided to the COMPANY or Vessels by CONTRACTOR or its Affiliates immediately prior to the Effective Date.  With respect to materials, equipment, goods, products, components or other elements or items incorporated into the Services, which are provided or manufactured by a third party ("Third Party Items"), CONTRACTOR's warranty as to such Third-Party Items shall be expressly limited to whatever warranty is afforded by such third party to the extent CONTRACTOR is permitted to assign such warranty to COMPANY.  **COMPANY ACKNOWLEDGES THAT THE WARRANTIES EXPRESSLY PROVIDED IN THIS AGREEMENT, INCLUDING WITHOUT LIMITATION SECTIONS 1.1 AND 2.3 ARE THE SOLE WARRANTIES PROVIDED WITH RESPECT TO THE SERVICES, SUCH WARRANTY BEING TO THE EXCLUSION OF ANY AND ALL OTHER WARRANTIES, INCLUDING, WITHOUT LIMITATION, THOSE THAT MAY BE IMPLIED UNDER THE LAW, ALL OF WHICH ARE DEEMED WAIVED, INCLUDING, WITHOUT LIMITATION, A WAIVER OF ALL LAWS OF REDHIBITION AND IMPLIED WARRANTIES PROVIDED BY LOUISIANA LAW, INCLUDING AS SUCH MAY APPEAR IN LA. C.C. ARTS. 2520-2548, OR THE LAWS OF ANY COUNTRY, PROVINCE, STATE, OR POLITICAL SUBDIVISION THEREOF.**

**FOR THE AVOIDANCE OF DOUBT, NO WARRANTIES UNDER THIS AGREEMENT OR OTHERWISE BY ANY CONTRACTOR AS TO ITS SERVICES, WHETHER EXPRESS OR IMPLIED, IS MADE OR DEEMED MADE BY ANY OTHER CONTRACTOR, AND NO SUCH OTHER CONTRACTOR IS LIABLE THEREFOR.**

CONTRACTOR's warranty on that specific portion of Services consisting of the sale of parts, equipment, components and other materials that are manufactured by CONTRACTOR to COMPANY shall apply for a period of twelve (12) months from the date of COMPANY's acceptance of such part, equipment, components or materials portion of Service, such acceptance not to be unreasonably delayed, withheld, or conditioned.  Except for the limited circumstances provided for in the preceding sentence, CONTRACTOR's warranty on all other Services shall apply for a period of one hundred eighty (180) days from the date of completion of any discernable portion of the Services, and any claim by COMPANY that CONTRACTOR's Services fails to satisfy this warranty must be made to CONTRACTOR in writing in accordance with Section 18 (Notices) within the applicable time period. All defects and deficiencies in the Services, including any breach of this warranty, shall be promptly repaired, replaced, re-performed, or otherwise corrected by CONTRACTOR within the applicable warranty period (collectively, "Remedial Efforts") to COMPANY's

4

satisfaction, provided that, without limiting Section 1.2, CONTRACTOR's obligations are expressly limited to such Remedial Efforts that CONTRACTOR may undertake with its own personnel physically working at CONTRACTOR's applicable place of business or other location where such CONTRACTOR had performed the applicable Service, (the "Contractor Location") or the Vessels.  CONTRACTOR will perform Remedial Efforts at locations other than the Contractor Location subject to mutual agreement prior to incurring costs on the additional costs and amounts to be paid by COMPANY to CONTRACTOR in respect thereof, including, without limitation, as pertains to travel, transportation, and shipping costs or expenses (including as to CONTRACTOR's personnel, property, materials, goods, parts, equipment, components, or items made subject of the Services), accommodations, meals, communications, and per diems, provided that all of the aforementioned are of quality and quantity comparable or better than standards and allocations typically enjoyed within western industrialized nations (all of the aforementioned being "Travel Expenses").

2.4     Delivery tickets covering any materials and/or supplies delivered to a location by CONTRACTOR or furnished by its vendors for which COMPANY is obligated to reimburse CONTRACTOR shall be delivered to COMPANY, as received by CONTRACTOR. The quantity, description, and condition of materials and/or supplies so furnished shall be verified and checked by CONTRACTOR, and the delivery thereof shall be properly certified as to receipt by CONTRACTOR's representative. Upon receipt of delivery tickets, a representative of COMPANY shall review such tickets and, if the materials and/or supplies are of satisfactory quantity, description and condition, approve them; provided, however, that such approval shall in no way relieve or release CONTRACTOR from any performance, warranty or other obligation hereunder with regard to such supplies and materials. If the quantity, description and condition of any materials and/or supplies covered by any delivery ticket are not satisfactory to such representative of COMPANY, CONTRACTOR agrees to promptly substitute the same with materials and/or supplies (as the case may be) acceptable to COMPANY.

2.5     CONTRACTOR shall make a thorough inspection of the work site and its surroundings before starting the Services to familiarize itself with all conditions relating to the Services. Unless CONTRACTOR provides COMPANY written notice to the contrary prior to the commencement of Services, upon commencement of Services, CONTRACTOR shall be deemed to have accepted the work site's condition as safe and suitable for performance of the Services. CONTRACTOR shall be solely responsible for obtaining all licenses and permits necessary for CONTRACTOR's performance of the Services, and CONTRACTOR further represents and warrants that prior to performance of such Services, CONTRACTOR has, or will have, all licenses and permits necessary for CONTRACTOR's performance of the Services.

2.6     If CONTRACTOR is required to provide engineering and design services for the Services, CONTRACTOR warrants those engineering and design services (the "Engineering/Design Services") rendered on the Services will be performed in accordance with the generally accepted standards and practices prevailing in the

engineering industry by individuals qualified in specific technical areas and in accordance with any applicable rules, regulations and requirements of the regulatory bodies and, when applicable, any classification society having jurisdiction. If any of the Engineering/Design Services fail to comply with the foregoing warranty, CONTRACTOR shall re-perform, without additional charge, all or any portion of the Engineering/Design Services originally performed in a faulty manner. COMPANY acknowledges that the Services are not to be deemed works made for hire and CONTRACTOR shall be considered the owner thereof under the copyright laws of the United States and therefore is deemed to be the exclusive owner of the copyrights in and to any such Services, its documentation and any work product created by CONTRACTOR relating to the Services.

2.7     Notwithstanding any other provision herein to the contrary, COMPANY acknowledges that it shall always be and remain responsible for any and all Travel Expenses incurred by CONTRACTOR in connection with CONTRACTOR's provision of Services, as well as the cost of CONTRACTOR's personnel during times when CONTRACTOR is waiting to provide, perform, progress, or continue Services, all to be mutually agreed upon.

2.8     When Services are required to be performed in the offices, worksite or other premises of COMPANY, COMPANY shall provide the employees of CONTRACTOR with reasonable access to such locations.

## 3.0     PAYMENT

3.1     In consideration for the provision of the Services, COMPANY shall pay CONTRACTOR a "Services Fee" calculated as follows:

(a)     For Services in Schedule 1(a), the amount governed by Section 9.16 of the NEA;

(b)     For Services in Schedule 1(b), the actual cost incurred by the CONTRACTOR entity performing the Service, calculated in a manner consistent with how such costs were passed through to COMPANY in the eighteen (18) months prior to the Effective Date; and

(c)     For Services in Schedule 1(c), at CONTRACTOR's then-prevailing rates charged to third parties for such Services or, if CONTRACTOR does not have such a prevailing rate for such Services, then at reasonable market rates charged by third parties for comparable Services; provided, that, with respect to the Services in Schedule 1(c), so long as CONTRACTOR and COMPANY are affiliates and COMPANY owns the Vessels (without there having been a NEA Change of Control), if a CONTRACTOR or its Affiliates provides any such Services to other CONTRACTOR entities or Affiliates at a rate less than such then-prevailing rates for such Services, then CONTRACTOR shall charge COMPANY for such Services based on such lesser rate.

For avoidance of doubt, upon (i) the consummation of a Change of Control (as defined in the NEA) by virtue of a sale by or at the direction of the Collateral Agent or the Agent of equity of COMPANY (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title), or (ii) sale of the Vessels to a third party purchaser not an Affiliate of CONTRACTOR during a bankruptcy or insolvency proceeding or by virtue of the exercise by the Collateral Agent or the Agent of remedies following the occurrence of an Event of Default (as defined in the NEA and hereinafter referred to as a "NEA Event of Default"), the Services Fees for the Services set forth on Schedule 1(a) hereto shall continue to be solely as set forth in Section 9.16 of the NEA. The Services Fee shall not include CONTRACTOR's allocated overhead costs associated with the provision of the applicable Service. "Vessel Manager" means, as to a given Vessel, the relevant CONTRACTOR in charge of crew and other technical management thereof.

3.2     CONTRACTOR shall invoice COMPANY at the end of each month for Services performed in such month with full supporting documentation evidencing CONTRACTOR's calculation of the Services Fees, including delivery tickets and daily time tickets signed by COMPANY's duly authorized representative, and such other documentation and back up as COMPANY shall request or require. COMPANY shall pay to CONTRACTOR the undisputed portion of such invoices within thirty (30) days of receipt; provided, however, that payment of any amount by COMPANY to CONTRACTOR shall not be deemed to constitute a waiver of any rights of COMPANY under this Agreement and all such rights are reserved and any payment obligation of COMPANY shall be subject to CONTRACTOR complying in full with its obligations, covenants, and agreements contained in this Agreement and the applicable Work Order and upon such Services being reasonably accepted by COMPANY as fully complying with all terms, conditions, specifications and requirements of this Agreement and the applicable Work Order. CONTRACTOR shall be entitled to recover interest at the rate of one percent (1%) per month on both undisputed amounts, and disputed amounts ultimately resolved in CONTRACTOR's favor. As to undisputed amounts which have not been received by CONTRACTOR, interest shall start to accrue thirty (30) days after receipt of CONTRACTOR's invoicing. As to disputed amounts, if resolved in favor of CONTRACTOR, then the interest thereon likewise shall have accrued back to the thirtieth (30th) day after COMPANY first received CONTRACTOR's invoicing therefor; provided that, for clarity, no interest shall be payable on disputed amounts resolved in favor of COMPANY.

3.3     CONTRACTOR shall keep and maintain complete and accurate records necessary to verify CONTRACTOR's costs of performing the Services and the applicable Services Fees due hereunder. COMPANY shall have the right, not more than once each year during the term of this Agreement, to have CONTRACTOR's independent, certified public accountants inspect CONTRACTOR's records for the purpose of determining the accuracy of the Services Fees for a period covering not more than one (1) year following the calendar to which they pertain. The independent, certified public accountant selected shall keep confidential any information obtained during such inspection and shall report to COMPANY only the amounts of Services Fees due and

payable.  Such audits may be exercised during normal business hours upon reasonable prior written notice to CONTRACTOR.  COMPANY shall bear the full cost of such audit unless such audit reveals an overpayment by COMPANY (or Services Fees amount invoiced to COMPANY) of more than five percent (5%) of the Services Fees or other payments due under this Agreement for the audited period, in which case, CONTRACTOR shall bear the cost of such audit and shall refund to COMPANY the amount of any overpayment within thirty (30) days following such audit.

## 4.0    REPORTS TO BE FURNISHED BY CONTRACTOR

4.1    The quantity, description and condition of the materials and supplies and/or Services furnished by CONTRACTOR shall be verified by CONTRACTOR, and all delivery tickets and daily service logs shall be properly certified as to receipt by the original signature of CONTRACTOR's representative.  CONTRACTOR must obtain approval of COMPANY's representative on location for materials and supplies for which CONTRACTOR is to be reimbursed by COMPANY.

4.2    CONTRACTOR shall orally report to COMPANY, as soon as practicable, followed by an appropriate written report, all accidents or occurrences resulting in job-related death, illness, or injuries to CONTRACTOR's employees or third parties, or damage to property of COMPANY, CONTRACTOR or third parties or the environment arising out of or during the course of its performance of such Services or any near misses, which could also have resulted in personal injury and/or other damage.  Upon COMPANY's request, CONTRACTOR shall give COMPANY copies of all reports of such accidents and occurrences prepared by or on behalf of CONTRACTOR, statements taken from witnesses and submissions to state and/or federal authorities.

## 5.0    INDEPENDENT CONTRACTOR RELATIONSHIP

5.1    In the performance of Services, CONTRACTOR shall be deemed to be an independent contractor, with the authority and right to direct and control all details of the performance of the Services.  However, all Services contemplated shall meet the approval of COMPANY, not to be unreasonably withheld, and shall be subjected to a general right of inspection, and shall in all events comply with the obligations in Section 2.  COMPANY shall have no right or authority to supervise or give instructions to the employees, agents, or representatives of CONTRACTOR, and such employees, agents or representatives at all times shall be under the direct and sole supervision and control of CONTRACTOR.  Any suggestions or directions given by COMPANY or its employees shall be given to the superintendent or other person in charge of CONTRACTOR's crew; provided, however, that in the event any employee or representative of COMPANY should give any suggestions or directions to the employees of CONTRACTOR (which employee or representative of COMPANY shall not in any event be authorized to do) and such suggestions or directions are not countermanded by CONTRACTOR's superintendent or other person in charge of CONTRACTOR's employees or crew, it shall be deemed that such suggestions or directions are the suggestions or directions of CONTRACTOR.  It is the understanding and intention of the parties hereto that no relationship of master and servant or principal

and agent shall exist between COMPANY and the employees, agents, or representatives of CONTRACTOR, whether by borrowed servant or any other legal theory. Notwithstanding the foregoing, COMPANY may at any time require CONTRACTOR to stop Services in the event that COMPANY determines that the manner of Services are progressing in a potentially unsafe manner.

5.2     CONTRACTOR shall retain direct supervision and control of the Services provided to COMPANY under this Agreement; provided, however, CONTRACTOR may coordinate the Services to be provided under this Agreement with any authorized COMPANY representative, provided that CONTRACTOR continues to comply with its obligations under Section 2.

**6.0     INSURANCE**

6.1     For the duration of this Agreement, without limiting the indemnity obligations or liabilities of CONTRACTOR or its insurer(s) under this Agreement and any Work Order, at any and all times during the term of this Agreement, CONTRACTOR shall, at CONTRACTOR's sole cost and expense, maintain, with an insurance company or companies authorized to do business in the location where the Services are to be performed, insurance coverages of the kind and in the minimum amounts set forth below and in a form and with such insurers acceptable to COMPANY. All such policies shall be "occurrence" as opposed to "claims made" policies unless consented to in writing by the COMPANY and except as to the policy referenced in Section 6.1(i). The limits specified shall be minimum limits only and all additional insureds (as such status is qualified and limited in this Agreement) shall be entitled to the full limits of all policies actually obtained. The limits of such policies shall in no way limit the indemnity or other obligations of CONTRACTOR under this Agreement or any Work Order unless required by applicable law. Failure to maintain all such insurance shall give COMPANY the right to immediately terminate this Agreement or any Work Order without prior notice to CONTRACTOR. To the extent of CONTRACTOR's liability assumed herein relative to COMPANY, CONTRACTOR shall be solely liable for and shall assume the costs of any deductible amounts of self-insured retentions and any liability of CONTRACTOR in excess of the insurance maintained. In the event any liabilities of CONTRACTOR are not covered by the insurance specified herein CONTRACTOR shall be deemed to be self-insured to that extent. The minimum insurance that CONTRACTOR is required to maintain is as follows:

(a)     worker's compensation insurance and employers' liability insurance complying with the applicable laws of the country or parish and state where the Services are performed, with employers' liability limits of not less than $1,000,000, covering all CONTRACTOR's employees performing Services, and with endorsements for voluntary compensation and alternate employer/borrowed servant coverage;

(b)     commercial general liability insurance, with combined limits for bodily injury and property damage of not less than $1,000,000 per accident or occurrence, and shall include endorsements for broad form property damage

9

coverage, broad form contractual liability coverage, owners and contractors protection for work let or sublet, premises and operations, products completed operations, "action over/indemnity buyback," cross liability and severability of interests, deletion of any provision which would have the effect of excluding coverage for additional insureds for injury or death to employees of CONTRACTOR on the grounds of an employment relationship, coverage for explosion, collapse, or underground property damage, and extension of territorial limits to include all areas of operations under this Agreement and any Work Order;

(c)      automobile liability insurance for owned, non-owned, and hired automobiles, with combined limits for bodily injury and property damage of not less than $500,000 per occurrence;

(d)      all risk physical damage insurance on CONTRACTOR's equipment and other property to the extent of its full replacement value;

(e)      aviation liability insurance to cover aircraft, if any, whether owned, non-owned, chartered, or hired by CONTRACTOR and used for or in connection with the performance of Services under this Agreement and any Work Order, with a combined bodily injury and property damage limit of not less than $3,000,000 per occurrence;

(f)      in the event operations are over or adjacent to water, (i) CONTRACTOR shall obtain endorsements to the statutory worker's compensation and employers' liability insurance policy required under Section 6.1(a) of this Agreement for the Longshoremen's and Harbor Workers' Compensation Act and Outer Continental Shelf Lands Act Extension, (ii) CONTRACTOR shall obtain a maritime employers' liability insurance policy including coverage for Jones Act, Death on the High Seas Act, and general maritime law claims, and wages, transportation, maintenance and cure, and extension of voluntary compensation to maritime operations, including coverage for employees of CONTRACTOR that may be considered members of a crew on Vessels or other vessels that are not owned by CONTRACTOR and (iii) the commercial general liability insurance policy specified in Section 6.1(b) of this Agreement shall be endorsed to delete any water craft exclusions throughout. All such policies shall be endorsed to provide that a claim "in rem" will be treated as a claim "in personam";

(g)      only if CONTRACTOR rents or charters vessels in performing Services, CONTRACTOR, in addition to all applicable insurance coverage provided in Sections 6.1(a), 6.1(b), 6.1(c), 6.1(d), 6.1(e), and 6.1(f) above, shall carry adequate hull and machinery and protection and indemnity insurance in such amounts and against such risks as COMPANY may require covering any vessel or vessels used and their equipment, including tower's liability coverage (with sistership clause unamended) if the vessel or vessels engage in towing operations and broad form wreck removal. The hull and

10

machinery and protection and indemnity insurance shall be endorsed to delete any "other than as owner" limitation of liability provisions therein and any "as owner" capacity limitations and shall insure the additional insureds as provided in <u>Section 6.2</u> herein in their capacities as owner, operator, charterer, or otherwise.  CONTRACTOR shall not use any vessel or marine equipment in the performance of Services for COMPANY at any time unless said vessel is adequately covered by insurance, as herein provided, and is operated within the navigation limits of the insurance policies;

(h)     excess liability insurance excess to the policies required in <u>Sections 6.1(a)</u>, <u>6.1(b)</u>, <u>6.1(c)</u>, <u>6.1(e)</u>, <u>6.1(f)</u>, and <u>6.1(g)</u> of this Agreement with corresponding extensions of coverages, and with minimum limits of not less than $10,000,000 per occurrence unless a different amount is specified in a written Work Order; and

(i)     if CONTRACTOR shall render any Design/Engineering Services, CONTRACTOR shall maintain professional liability insurance, including coverage for errors and omissions, with minimum limits of not less than $1,000,000 per occurrence.  Exclusions for care, custody, control, contractual, and pollution (if environmental services are to be provided) liability will be deleted.

6.2     CONTRACTOR shall obtain from its insurers full waivers of subrogation (whether direct, indirect, equitable, by loan receipt or otherwise) against COMPANY, its contractors and subcontractors (excluding CONTRACTOR) and their respective vessels, joint venturers, co-lessees, partners, parents, subsidiaries, Affiliates, and interrelated companies and their respective officers, directors, agents, employees, and representatives (all of the foregoing referred to as the "<u>COMPANY GROUP</u>", except that if and so long as COMPANY is the party in interest hereunder exercising its rights hereunder, and COMPANY and CONTRACTOR are Affiliates, then "<u>COMPANY GROUP</u>" does not include CONTRACTOR insofar as it is an Affiliate or interrelated company of COMPANY) in all of the insurance policies set forth in <u>Section 6.1</u> to the extent of the liability assumed by CONTRACTOR under this Agreement.

Further, the COMPANY GROUP shall be named as additional insureds in all insurance policies carried by CONTRACTOR required under <u>Section 6.1</u>, other than the worker's compensation and employers' liability insurance policies but only to the extent of the liabilities assumed by CONTRACTOR under this Agreement, including those under <u>Section 8.0</u> of this Agreement.  All such policies shall be endorsed to provide that they are primary to any coverages maintained or available to such additional insureds, regardless of any "excess" or "other insurance" clauses therein to the extent of the liability assumed by CONTRACTOR under this Agreement.  All such policies shall be endorsed to provide that additional insureds shall not be liable for premiums, commissions, or calls, and that COMPANY shall be given at least thirty (30) days' prior written notice of any cancellation, non-renewal, or material modifications of such policies.

All such insurances will provide for contractual liability coverage to fully cover the indemnity obligations of CONTRACTOR assumed in this Agreement.  All such policies shall have navigation or territorial limits adequate for the engagement contemplated herein.  All such policies shall be satisfactory in form and substance to COMPANY and shall not contain additional exclusions or deletions which adversely affect the coverage afforded by the policies in favor of the additional insureds required hereunder. All such policies shall be endorsed to provide that employees of one insured shall be treated as members of the public as to all other insureds.

6.3    In the event CONTRACTOR seeks to be a self-insurer and COMPANY has consented to CONTRACTOR being a self-insurer as to any one or more of the risks as to which coverage is herein required, evidence of such consent must be in writing and approved by a representative of COMPANY authorized to enter into such consent agreement.

6.4    The failure of CONTRACTOR to have in place and maintain the insurance coverages expressly required herein shall constitute a breach of contract.

## 7.0    UNDERTAKINGS APPLICABLE TO COLLATERAL AGENT

7.1    In accordance with the NEA and the Support Undertaking, the Parties acknowledge and agree that during (i) the continuance of a NEA Event of Default or any insolvency or bankruptcy proceeding of the COMPANY where the exercise of Collateral Agent's remedies in the NEA Event of Default is stayed, and (ii) for a period of one (1) year following (x) the sale of a Vessel to a third-party purchaser not affiliated with CONTRACTOR during a bankruptcy or insolvency proceeding or by virtue of the exercise by the Collateral Agent or the Agent of remedies (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title)following the occurrence of a NEA Event of Default or (y) a NEA Change of Control by virtue of a sale by or at the direction of the Collateral Agent or the Agent of equity of the COMPANY or by virtue of an insolvency or bankruptcy proceeding of the COMPANY, as the case may be, CONTRACTOR shall:

(a)    Continue to comply with its obligations under this Agreement and to perform the Services under this Agreement on an ongoing basis (whether to the third-party purchaser, COMPANY, or Collateral Agent or a special purpose entity or designee, as applicable) on the same terms and conditions as set forth herein, to the extent such person requests; and

(b)    Provide any necessary training and support services to allow the Collateral Agent (or a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title), a third-party purchaser or the COMPANY (after giving effect to the NEA Change of Control), as the case may be, to properly transition the Services necessary to operate the Vessels and any intellectual property and technology that is embedded and/or used for the operation of the applicable Vessel or Vessels, including any intellectual property and technology licensed to the Owner pursuant to the Non-Exclusive and Assignable Patent, Copyright and Know-How License

Agreement, dated [●], 2023, by and among Nautical Solutions, L.L.C., Marine Technologies, L.L.C., and the Collateral Agent; and (b) the Non-Exclusive and Assignable Copyright License Agreement, dated [●], 2023, by and among Nautical Solutions, L.L.C.,  North American Shipbuilding, L.L.C. and the Collateral Agent.

## 8.0   INDEMNITY

8.1   In order to allocate respective responsibilities of COMPANY and CONTRACTOR for liabilities arising out of personal injury or property damage and other risks, it is agreed between COMPANY and CONTRACTOR that certain responsibilities and liabilities arising out of the performance of this Agreement and any Work Order should be allocated between them in order to avoid litigation between COMPANY and CONTRACTOR and so that insurance may be arranged by each party as necessary to protect against exposures to loss. The following sets out the agreements between COMPANY and CONTRACTOR as to the allocation of responsibilities and liabilities in respect of Services provided under this Agreement. COMPANY and CONTRACTOR shall promptly notify the other of any claim, demand, or suit that may be presented to or served upon it which may give rise to an indemnifiable claim. THE FOLLOWING PROVISIONS SHALL BE APPLICABLE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW:

(a)   CONTRACTOR AGREES TO RELEASE, DEFEND, INDEMNIFY AND HOLD THE COMPANY GROUP (AS DEFINED IN SECTION 8.1(b) OF THIS AGREEMENT), THE VESSELS AND THEIR CREW HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, LIABILITY OR CAUSES OF ACTION FOR PERSONAL INJURY, DISEASE, ILLNESS, DEATH, OR PROPERTY DAMAGE OR LOSS OF ANY MEMBER OF CONTRACTOR GROUP, REGARDLESS OF CAUSE, AND EVEN IF CAUSED BY THE SOLE, JOINT, COMPARATIVE, CONTRIBUTORY OR CONCURRENT NEGLIGENCE, FAULT, STRICT LIABILITY (INCLUDING FOR UNSEAWORTHINESS) OR PRODUCT LIABILITY OF ANY MEMBER OF COMPANY GROUP.

(b)   COMPANY AGREES TO RELEASE, DEFEND, INDEMNIFY AND HOLD CONTRACTOR AND ITS RESPECTIVE OFFICERS, DIRECTORS, MEMBERS, MANAGERS, AGENTS, EMPLOYEES, AND REPRESENTATIVES (THE "CONTRACTOR GROUP", EXCEPT THAT IF AND SO LONG AS COMPANY IS THE PARTY IN INTEREST HEREUNDER EXERCISING ITS RIGHTS HEREUNDER, AND COMPANY AND CONTRACTOR ARE AFFILIATES, THEN "CONTRACTOR GROUP" DOES NOT INCLUDE COMPANY INSOFAR AS IT IS AN AFFILIATE OR INTERRELATED COMPANY OF CONTRACTOR) HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, LIABILITY OR CAUSES OF ACTION FOR PERSONAL INJURY, DISEASE, ILLNESS, DEATH OR PROPERTY DAMAGE (EXCEPTING PROPERTY THAT IS THE SUBJECT OF A

WORK ORDER) OR LOSS OF ANY MEMBER OF COMPANY GROUP, REGARDLESS OF CAUSE, AND EVEN IF CAUSED BY THE SOLE, JOINT, COMPARATIVE, CONTRIBUTORY OR CONCURRENT NEGLIGENCE, FAULT, STRICT LIABILITY (INCLUDING FOR UNSEAWORTHINESS) OR PRODUCT LIABILITY OF ANY MEMBER OF THE CONTRACTOR GROUP.

(c)     THE PARTIES INDEMNIFIED HEREIN SHALL HAVE THE RIGHT TO PARTICIPATE IN THE DEFENSE OF ANY INDEMNIFIABLE CLAIMS AT THEIR OWN EXPENSE.

(d)     IN AGREEING TO SO INDEMNIFY AND HOLD HARMLESS THE COMPANY GROUP, CONTRACTOR SPECIFICALLY AND EXPRESSLY WAIVES ANY IMMUNITY IT MIGHT OTHERWISE HAVE PURSUANT TO OR UNDER ANY APPLICABLE STATE AND/OR FEDERAL INDUSTRIAL INSURANCE ACT OR ANY APPLICABLE WORKER'S COMPENSATION ACT AND ASSUMES LIABILITY ON ACCOUNT OF ANY CLAIM, SUIT OR ACTION MADE OR BROUGHT AGAINST COMPANY GROUP FOR THE PERSONAL INJURY, DISEASE, ILLNESS OR THE DEATH TO PERSONS OR DAMAGE TO OR LOSS OF PROPERTY INVOLVING CONTRACTOR, OR ANY MEMBER OF THE CONTRACTOR GROUP, ARISING OUT OF AND IN CONNECTION WITH OR INCIDENT TO THE CONTRACTOR'S PERFORMANCE OF THIS AGREEMENT, ARISING FROM ANY CAUSE WHATSOEVER. CONTRACTOR SPECIFICALLY AGREES AND ACKNOWLEDGES THAT THIS AGREEMENT OF INDEMNIFICATION AND HOLD HARMLESS TOGETHER WITH CONTRACTOR'S WAIVER OF IMMUNITY UNDER THE APPLICABLE STATE AND/OR FEDERAL INDUSTRIAL INSURANCE OR ANY APPLICABLE WORKER'S COMPENSATION ACT, INCLUDING, BUT NOT LIMITED TO, THE LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT, 33 U.S.C. §901-950, AS AMENDED, WAS THE SUBJECT OF DISCUSSION AND NEGOTIATION BETWEEN CONTRACTOR AND COMPANY AND THAT CONTRACTOR'S PROMISES AND WAIVER HEREIN ARE A PART OF THE CONSIDERATION FOR COMPANY'S ENTERING INTO THIS AGREEMENT AND CONTRACTOR'S OBLIGATIONS AND WAIVER HEREIN WERE CONSIDERED BY CONTRACTOR WHEN ARRIVING AT A PRICE FOR WHICH CONTRACTOR AGREED TO DO THE SERVICES CONTEMPLATED BY THIS AGREEMENT.

IN AGREEING TO SO INDEMNIFY AND HOLD HARMLESS THE CONTRACTOR GROUP, COMPANY SPECIFICALLY AND EXPRESSLY WAIVES ANY IMMUNITY IT MIGHT OTHERWISE HAVE PURSUANT TO OR UNDER ANY APPLICABLE STATE AND/OR FEDERAL INDUSTRIAL INSURANCE ACT OR ANY

APPLICABLE WORKER'S COMPENSATION ACT, AND ASSUMES LIABILITY ON ACCOUNT OF ANY CLAIM, SUIT OR ACTION MADE OR BROUGHT AGAINST ANY MEMBER OF THE CONTRACTOR GROUP FOR THE PERSONAL INJURY, DISEASE, ILLNESS OR THE DEATH TO PERSONS OR DAMAGE TO OR LOSS OF PROPERTY INVOLVING COMPANY, OR ANY MEMBER OF THE COMPANY GROUP, ARISING OUT OF AND IN CONNECTION WITH OR INCIDENT TO THE COMPANY'S PERFORMANCE OF THIS AGREEMENT, ARISING FROM ANY CAUSE WHATSOEVER. COMPANY SPECIFICALLY AGREES AND ACKNOWLEDGES THAT THIS AGREEMENT OF INDEMNIFICATION AND HOLD HARMLESS TOGETHER WITH COMPANY'S WAIVER OF IMMUNITY UNDER THE APPLICABLE STATE AND/OR FEDERAL INDUSTRIAL INSURANCE OR ANY APPLICABLE WORKER'S COMPENSATION ACT, INCLUDING, BUT NOT LIMITED TO, THE LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT, 33 U.S.C. §901-950, AS AMENDED, WAS THE SUBJECT OF DISCUSSION AND NEGOTIATION BETWEEN COMPANY AND CONTRACTOR AND THAT COMPANY'S PROMISES AND WAIVER HEREIN ARE A PART OF THE CONSIDERATION FOR CONTRACTOR'S ENTERING INTO THIS AGREEMENT AND COMPANY'S OBLIGATIONS AND WAIVER HEREIN WERE CONSIDERED BY COMPANY WHEN ARRIVING AT A PRICE FOR WHICH CONTRACTOR AGREED TO DO THE SERVICES CONTEMPLATED BY THIS AGREEMENT.

8.2      (a)      IN THE EVENT THAT AN OTHERWISE INDEMNIFIABLE CLAIM UNDER THIS AGREEMENT IS SUBJECT TO THE INDEMNITY LIMITATIONS IN LA. REV. STAT. ANN, SECTION 9:2780(G), AS AMENDED, AND FOR SO LONG AS THAT ACT IS IN FORCE, THEN IT IS AGREED THAT THE ABOVE INDEMNITY OBLIGATIONS APPLICABLE TO SUCH INDEMNIFIABLE CLAIM ARE LIMITED TO THE EXTENT OF INDEMNITOR'S COMPARATIVE NEGLIGENCE, FAULT OR STRICT LIABILITY. IN THE EVENT THAT AN OTHERWISE INDEMNIFIABLE CLAIM UNDER THIS AGREEMENT IS SUBJECT TO THE INDEMNITY LIMITATIONS IN CHAPTER 127 OF THE TEXAS CIVIL PRACTICES AND REMEDIES CODE, AS AMENDED, AND SO LONG AS SUCH LIMITATIONS ARE IN FORCE, THEN TO THE EXTENT IN EACH CASE NECESSARY TO MAKE THE RECIPROCAL INDEMNITY OBLIGATIONS IN THIS AGREEMENT ENFORCEABLE IT IS AGREED THAT (1) SUCH INDEMNITY OBLIGATIONS SHALL INCLUDE AS INDEMNITEES THE RESPECTIVE CUSTOMERS AND/OR CONTRACTORS, AS SPECIFIED IN SECTION 8.1(a) HEREIN, OF THE INDEMNIFIED PARTIES AND (II) CONTRACTOR AND COMPANY COVENANT AND AGREE TO SUPPORT THEIR RESPECTIVE INDEMNITY AGREEMENTS BY LIABILITY INSURANCE COVERAGE IN THE

15

AMOUNTS AND WITH THE COVERAGES SET FORTH IN <u>SECTION 6.1</u> HEREOF AND COMPANY AGREES THAT IT SHALL CARRY AND MAINTAIN THE SAME TYPES OF COVERAGE AND WITH THE EQUAL LIMITS REQUIRED OF CONTRACTOR THEREUNDER. EXCEPT AS REQUIRED BY CHAPTER 127 OF THE TEXAS CIVIL PRACTICES AND REMEDIES CODE IN ORDER TO HAVE ENFORCEABLE RECIPROCAL INDEMNITIES, THE LIMITS OF SUCH POLICIES SHALL NOT LIMIT CONTRACTOR'S OR COMPANY'S INDEMNITY AND RELEASE OBLIGATIONS UNDER THIS AGREEMENT. TO THE EXTENT THAT THE RECIPROCAL INDEMNITY AND RELEASE OBLIGATIONS UNDER THIS AGREEMENT ARE OTHERWISE NOT ENFORCEABLE UNDER CHAPTER 127 OF THE TEXAS CIVIL PRACTICES AND REMEDIES CODE, IT IS AGREED THAT ANY SUCH INDEMNITY MAY BE ENFORCED BY THE INDEMNIFIED PARTY AS A UNILATERAL INDEMNITY.

(b)     IF IT IS JUDICIALLY DETERMINED THAT THE MONETARY LIMITS OR SCOPE OF COVERAGE OF THE INSURANCES REQUIRED UNDER THIS AGREEMENT OR OF THE INDEMNITIES VOLUNTARILY ASSUMED UNDER THIS SECTION EXCEED THE MAXIMUM MONETARY LIMITS OR SCOPE PERMITTED UNDER APPLICABLE LAW, IT IS AGREED THAT SAID INSURANCE REQUIREMENTS OR INDEMNITY SHALL AUTOMATICALLY BE AMENDED TO CONFORM TO THE MAXIMUM MONETARY LIMITS AND SCOPE PERMITTED UNDER SUCH LAW.

(c)     THE ALLOCATIONS OF RESPONSIBILITY, INDEMNITY OBLIGATIONS, AND EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH IN THIS AGREEMENT THAT APPLY TO AN EVENT OR CONDITION THAT OCCURS DURING THE PERFORMANCE OF THIS AGREEMENT SHALL SURVIVE AND NOT BE AFFECTED BY THE EXPIRATION OR TERMINATION OF A WORK ORDER OR THIS AGREEMENT.

**9.0     LIMITATION OF LIABILITY**

9.1     <u>Waiver of Consequential Damages</u>.  Without limiting, expanding or otherwise affecting the provisions of <u>Section 6</u> or <u>Section 8</u> of this Agreement, but otherwise notwithstanding any other provision of this Agreement to the contrary, neither COMPANY nor CONTRACTOR shall be liable to the other for any incidental, special, consequential or other indirect damages, or for punitive or exemplary damages, whether or not the parties were aware of the possibility of their occurrence, and regardless of cause, whether based on tort (including negligence), breach of contract, strict liability or otherwise.

9.2     The liabilities and obligations hereunder of each CONTRACTOR entity are joint and several; provided, that, for avoidance of doubt, (a) subject to Sections 1.1 and 1.2, no CONTRACTOR entity shall be obligated to perform a Service required to be performed under this Agreement by another CONTRACTOR entity or Affiliate to the extent such CONTRACTOR entity or Affiliate is not capable of performing such Service and not otherwise obligated to perform such Service under Section 1.1 or 1.2; (b) each CONTRACTOR entity shall be jointly and severally liable for any monetary damages payable to COMPANY (or Collateral Agent) as a result of a breach of this Agreement by other CONTRACTOR entities to the extent COMPANY is not able to recover such damages from the breaching CONTRACTOR entity; and (c) reference is made to Section 19.5 hereof for related provisions in the proviso to the first sentence thereof.

## 10.0    LIENS

10.1    Before interim or final payments are made by COMPANY to CONTRACTOR, CONTRACTOR, if required by COMPANY, shall furnish lien waivers and affidavits and/or other proof in form and substance satisfactory to COMPANY that there are no unsatisfied claims, suits, liens, or charges on COMPANY property for the payment of any sums due or to become due or otherwise owing to CONTRACTOR by COMPANY for the applicable Services provided and for which payment is due.

## 11.0    LAWS, RULES AND REGULATIONS

11.1    CONTRACTOR agrees to comply with all laws, rules, and regulations, which are now or may become applicable to the Services or operations covered by this Agreement or any Work Order or arising out of the performance of such operations and shall protect, defend, indemnify, and hold harmless the COMPANY GROUP from and against any liabilities, fines, or penalties asserted or assessed as a result of violation of or failure to so comply with applicable law, rules and regulation.

11.2    In the event any provision of this Agreement or any Work Order is determined to be void or contrary to any applicable law, rule, or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule, or regulation, and this Agreement and such Work Order as so modified shall remain in full force and effect.

11.3    CONTRACTOR shall abide by all quality, health, safety and environmental rules and procedures implemented by the COMPANY from time-to-time, and all applicable portions of the COMPANY's Safe Operations Manual, to the extent copies of such policies have been provided to CONTRACTOR in advance and accepted by CONTRACTOR.

11.4    COMPANY shall be entitled to conduct periodic audits of CONTRACTOR to ensure its compliance with all laws, regulations and policies made applicable by this Agreement, and CONTRACTOR shall maintain all records pertaining to Services

17

performed under this Agreement for a period of three (3) years following completion of the Services.

## 12.0    TERMINATION OF SERVICES

12.1    The term of this Agreement shall be ten (10) years from the Effective Date, unless otherwise terminated as provided for in this Section 12.  Thereafter, this Agreement shall be automatically renewed on its anniversary date for successive one-year terms, unless otherwise terminated as provided for in this Section 12.

12.2    COMPANY may, at any time, with the prior written consent of the Collateral Agent and with or without cause, terminate or suspend all or any Services (in whole or in part).  In the event of such termination by COMPANY, subject to COMPANY's rights and remedies provided for in Section 12.3 hereof, including the right to withhold or offset amounts owed to CONTRACTOR, CONTRACTOR shall be paid the applicable rates stipulated in a Work Order (or, for worked performed on a lump sum basis, a pro rata portion based upon the percentage of the Services completed) for Services performed up to the date of such termination or suspension, provided that (1) COMPANY shall be liable for any and all costs and expenses incurred by CONTRACTOR as a result of such termination or suspension and (2) any Services described as fixed, firm, non-cancellable or any similar expression shall be paid in lump sum in full.  Except as to such unavoidable amounts contemplated by the preceding sentence, CONTRACTOR shall not be entitled to be paid prospectively for Services unperformed by reason of such termination or suspension.  On notice of such termination, CONTRACTOR shall promptly remove its personnel, machinery, and equipment from the location and shall further cooperate with COMPANY or its designee to ensure an orderly and expeditious transition and completion of the Services.  If the Services are suspended by COMPANY, CONTRACTOR shall promptly resume performance of the Services upon notice from COMPANY subject to CONTRACTOR's entitlement to and receipt of any additional sums incurred by CONTRACTOR by virtue of COMPANY's suspension.

12.3    If CONTRACTOR (i) fails to fully and timely perform its obligations and undertakings under this Agreement or any Work Order, (ii) otherwise breaches any representation, warranty or other obligation to COMPANY, or (iii) shall become insolvent or make an assignment for the benefit of creditors or if a petition in bankruptcy shall be filed by or against CONTRACTOR, or if a receiver shall be appointed for CONTRACTOR or its properties then, in each case, COMPANY shall be entitled to terminate this Agreement or any Work Order as to such CONTRACTOR (with the prior written consent of the Collateral Agent) effective immediately upon notice to CONTRACTOR.  For the avoidance of doubt, in the event of such termination, COMPANY shall be entitled to have the Services completed by others or by COMPANY's own employees or, to the extent reasonably practical, another CONTRACTOR, subject in all respects to, and without limiting, the provisions of Section 1.1 and Section 1.2.  If the completion of the Services by others or COMPANY's employees costs more than was to be charged by CONTRACTOR for such Services, then CONTRACTOR shall reimburse COMPANY for the documented increase of the price for completion.

18

12.4   This Agreement may be terminated by CONTRACTOR (i) on or after the one-year anniversary of the consummation of a NEA Change of Control by virtue of a sale by or at the direction of the Collateral Agent or the Agent of equity of COMPANY, or (ii) as to any given Vessel that is sold to a third-party purchaser not affiliated with CONTRACTOR by virtue of the exercise by the Collateral Agent or the Agent of remedies following the occurrence of a NEA Event of Default (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title), on or after the one-year anniversary of the sale of such Vessel; provided, that (x) as to any Services underway as to any such Vessel, this Agreement nevertheless shall remain in effect, and CONTRACTOR shall perform such Services and COMPANY shall remain liable for the payment therefor, and (y) the obligations in Section 7.1(b) shall apply.  Notwithstanding the foregoing, as to the Vessel Manager of a Vessel, such company's obligations to crew such Vessel shall terminate (A) one (1) year after transfer of title to such Vessel to the Agent or the Collateral Agent (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title) and (B) immediately upon transfer of title to such Vessel to a third-party purchaser not affiliated with such company by virtue of the exercise by the Collateral Agent or the Agent of remedies following the occurrence of a NEA Event of Default. Notwithstanding the foregoing, upon the occurrence and during the continuance of a NEA Event of Default, if CONTRACTOR providing the applicable Services is not paid within thirty (30) days after presentment of invoices therefor not subject to a good faith Dispute (hereinafter defined in Section 15.1), then such CONTRACTOR may terminate this Agreement by providing (x) as to the Collateral Agent if applicable, at least forty-five (45) days prior written notice, and an opportunity to cure during such 45-day notice period, and (y) as to the applicable third-party purchaser, at least fifteen (15) days prior written notice, and an opportunity to cure during such 15-day notice period.

## 13.0   GIFTS AND GRATUITIES

13.1   It is deemed by COMPANY to be a conflict with the COMPANY's interests for its employees or any members of their immediate family to accept gifts, payments, extravagant entertainment, services, or loans in any form from anyone soliciting business, or who may already have established business relations with the COMPANY. If any employee of the COMPANY should solicit a gift or gratuity from the CONTRACTOR, CONTRACTOR hereby agrees to notify an officer of the COMPANY of such act. It is agreed that the COMPANY will hold such notification in confidence. It is further understood that failure by the CONTRACTOR to comply with the COMPANY's policies regarding gifts and gratuities may, at the COMPANY's option, result in the termination of this Agreement and/or any Work Order and may further preclude any future dealings between the parties. COMPANY shall have the right to audit CONTRACTOR's records at any time and up to three (3) years following the termination of this Agreement in order to ensure current or past compliance with this policy.

## 14.0   EXTENSION

14.1      As a part of the consideration for this Agreement. CONTRACTOR hereby agrees that the provisions of <u>Section 6</u> (Insurance), <u>Section 8</u> (Indemnity), <u>Section 9</u> (Limitation of Liability), <u>Section 10</u> (Liens), and <u>Section 19</u> (Miscellaneous Provisions) of this Agreement shall extend to and be enforceable by and for the benefit of the COMPANY GROUP.

## 15.0    DISPUTE RESOLUTION

15.1      Any claim, disagreement, or dispute between the Parties arising out of or relating to this Agreement (a "<u>Dispute</u>") shall be resolved in the manner provided in this <u>Section 15</u>. The Parties shall attempt to resolve any Dispute by negotiating in good faith for a period of thirty (30) days after receipt by either Party of a written notice of the Dispute from the other Party (the "<u>Negotiation Period</u>"). The written notice shall identify, with reasonable particularity, each matter or issue that is the subject of the dispute, a summary of the basis for the Party's position with respect to each such matter or issue and the relief being requested by the Party. No Party shall commence any claim, action, suit, inquiry, investigation, judicial or administrative proceeding, grievance, arbitration or other proceedings (an "<u>Action</u>") in respect of any Dispute (i) until the expiration of the Negotiation Period or (ii) if the other Party has refused to participate or has not reasonably participated in the required negotiation process in good faith set forth in this <u>Section 15</u>. If the Parties are unable to resolve the Dispute during the Negotiation Period, the Dispute shall be finally settled by binding arbitration conducted expeditiously in accordance with the Comprehensive Arbitration Rules & Procedures, including the Expedited Procedures then followed by the Judicial Arbitration and Mediation Services, Inc. (JAMS) or any successor to the functions thereof ("<u>Rules</u>"), and judgment upon the award rendered by the arbitrator shall be entered by any court of competent jurisdiction.  One arbitrator shall be jointly selected by the Parties.  If the Parties are unable to jointly select an arbitrator, the arbitrator shall be appointed in accordance with the Rules.  The cost of the arbitrator shall be shared equally by the Parties.  The location of the arbitration proceeding shall be New York, New York and the language of arbitration shall be English.  All arbitration proceedings are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and the applicable state rules of evidence. The dispute resolution provisions of this <u>Section 15.1</u> shall not be construed to interfere with a Party's other rights provided by this Agreement, including the right to terminate this Agreement in accordance with its terms. During the pendency of any such Dispute, all of the terms and conditions of this Agreement shall remain in effect and the Parties shall continue to perform all of their respective obligations hereunder.

## 16.0    GOVERNMENT REGULATIONS

16.1      The CONTRACTOR shall comply with the following regulations, as amended, where required by applicable law or by any other agreement to which COMPANY is a party, which are incorporated in this Agreement by reference as if fully set out:

        (a)      The Equal Opportunity Clause prescribed in 41 CFR 60_1.4;

     (b)     The Affirmative Action Clause prescribed in 41 CFR 60_250.4 regarding veterans and veterans of the Vietnam era;

     (c)     The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60741.4;

     (d)     The Certification of Compliance with Environmental Laws prescribed in 40 CFR 1S.20;

     (e)     The Americans with Disabilities Act;

     (f)     Research and Special Programs Administration (RSPA) and United States Coast Guard (USCG) Drug Testing Regulations as set forth in 49 CFR Part 199 and 46 CFR Part 16 and the Department of Transportation (DOT) Procedures for Transportation Workplace Drug Testing Programs as set forth in 49 CFR Part 40; and

     (g)     Section 202 of Executive Order 11246 of September 24, 1965 (30 F.R. 12,319) and any future amendments or revisions thereto.

## 17.0   SCHEDULES AND EXHIBITS

17.1    The following Schedules and Exhibits are attached hereto and made a part of this Agreement for all purposes:

Schedule 1(a), 1(b), and 1(c) – CONTRACTOR and Services listing

Schedule 2 – Vessel listing

Schedule 3 – Other Affiliates

Exhibit A – CONTRACTOR listing

Exhibit B – Work Order Form

Exhibit C - Non-Disclosure Agreement

In the event of conflict between such Schedules, Exhibits, or a Work Order on the one hand and this Agreement on the other, the terms and conditions of this Agreement shall control.

## 18.0   NOTICES

18.1    Any notices under this Agreement shall be in writing and shall be delivered by hand or sent by facsimile confirmed by mail, or email, as applicable, to the following addresses.

If to COMPANY:

Nautical Solutions, L.L.C.
16201 East Main Street
Cut Off, LA 70354
Attention:  Adrian Danos; Luke Newman
E-mail address:  adrian.danos@chouest.com; luke.newman@chouest.com
With a copy by email to legal@chouest.com (which copy shall not constitute official notice hereunder)

If to CONTRACTOR:

Sent via email only to luke.newman@chouest.com, legal@chouest.com
With a copy in the case of notices to Marine Technologies, L.L.C. that must also be sent to jan@mtllc.us
Notices shall be deemed effective on receipt if on a business day at the recipient's office before 3:00pm local time, otherwise the next business day

## 19.0   MISCELLANEOUS PROVISIONS

19.1   This Agreement is non-exclusive and COMPANY reserves the right to engage at any time other contractors for the Services contemplated by this Agreement or any portion thereof.

19.2   In all cases in which Services are performed in the State of Louisiana or within Louisiana territorial waters or the waters of the Outer Continental Shelf offshore therefrom where CONTRACTOR's employees (including CONTRACTOR's direct, borrowed, special or statutory employees) are covered by the Louisiana Workers' Compensation Act, La. R.S. 23:1021 et seq., the following shall apply: COMPANY and CONTRACTOR acknowledge and agree that the Services contracted for hereunder are an integral part of and essential to the ability of COMPANY to generate its goods, products and services for purposes of La. R.S. 23:1061(A). Furthermore, at all times acknowledging that CONTRACTOR is an independent contractor and that COMPANY is interested only in the results obtained, the parties agree and acknowledge that COMPANY is a statutory employer of CONTRACTOR's employees under La. R.S. 23:1061(A), as the same may be amended from time to time, for purposes of Services performed pursuant to this Agreement and a Work Order. The parties further agree that CONTRACTOR will remain responsible for all compensation benefits owed to its employees regardless of any status of those employees as either borrowed servants or statutory employees of COMPANY either under the Jones Act, the Longshoremen and Harbor Workers' Compensation Act, Louisiana Workers' Compensation Act, or similar laws. Further, CONTRACTOR agrees to defend, indemnify and hold COMPANY harmless from any and all claims for compensation benefits by CONTRACTOR's employees against the COMPANY, and hereby waives any right of CONTRACTOR or right of subrogation of CONTRACTOR's insurers to seek reimbursement of any compensation benefits owed or paid.

19.3   The Collateral Agent is a third party beneficiary for purposes of enforcing its rights hereunder.  When the Note Obligations (as defined in the NEA) are paid in full in cash,

then (i) the Collateral Agent no longer is a third party beneficiary and (ii) all references herein to the Collateral Agent, its designees and Vessel Buyers no longer shall be effective.

19.4   This Agreement is binding upon and inures to the benefit of the Parties and their respective successors and permitted assigns. Neither party may assign this Agreement, or its obligations under it, without the express consent of the other party; provided that, COMPANY and CONTRACTOR each shall be permitted to collaterally assign and grant a security interest in its rights under this Agreement pursuant to any of its third-party debt financing arrangements.  In accordance with the foregoing right as to COMPANY, this Agreement is subject to the terms and conditions of the Collateral Assignment of Master Services Agreement, dated as of the date hereof (the "Collateral Assignment"), between COMPANY and the Collateral Agent, and agreed to and acknowledged by CONTRACTOR.

19.5   It is understood and agreed that to the extent any other Affiliate of CONTRACTOR provides Services to COMPANY, such Affiliate shall be required to become a CONTRACTOR under this Agreement by (x) executing a joinder agreement and delivering the same to each of the Collateral Agent and AIG and Prudential in form and substance reasonably satisfactory to the Required Holders (as defined in the NEA and hereinafter referred to as the "NEA Required Holders"), (y) delivering supplements to Exhibit A hereto as are necessary to cause such Exhibit to be complete and accurate with respect to such additional Affiliate on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Company had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Collateral Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Collateral Agent (acting at the direction of the NEA Required Holders); provided, that if any such Affiliate executing such joinder agreement is not already a CONTRACTOR entity and is not 100% owned or controlled by Gary Chouest, his spouse Carolyn Chouest, their descendants and any trusts for the benefit of the foregoing, such Affiliate shall not be subject to the joint and several liability of other CONTRACTOR entities pursuant to Section 9.2.  In the event any CONTRACTOR ceases to be an Affiliate of the other CONTRACTOR entities, then another CONTRACTOR or Affiliate that performs such Services shall provide such Services to COMPANY thereafter, and if there is no such CONTRACTOR or other Affiliate that performs or is reasonably capable of performing such Service, and if the CONTRACTOR ceasing to be an Affiliate will continue to perform such Services, then such CONTRACTOR ceasing to be an Affiliate shall endeavor to enter into a new agreement with COMPANY for the performance of such Services thereafter on terms and conditions substantially similar to this Agreement.

19.6   If any provision of this Agreement or any Work Order shall be determined to be void, invalid or unenforceable, the scope of such void, invalid or unenforceable provision shall be deemed modified and diminished to the extent necessary to render such provision valid and enforceable. In any event, the validity or enforceability of any provision shall not affect any other provision of this Agreement or any Work Order,

and this Agreement and every Work Order shall be construed and enforced as if such void, invalid or unenforceable provision had not been included.

19.7   It is specifically agreed that time is of the essence in this Agreement and the Work Orders. It is specifically agreed that the use of captions and sub-captions in this Agreement is merely for the convenience of the parties hereto, and they shall not be used in interpreting any part of this Agreement or a Work Order. The covenants and agreements of the parties under this Agreement or the Work Orders shall be separate and independent.

19.8   THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES CONCERNING THIS SUBJECT MATTER, AND SUPERSEDES ALL PRIOR AGREEMENTS, PROMISES, CORRESPONDENCE, DISCUSSIONS, REPRESENTATIONS AND UNDERSTANDINGS, EXCEPT THOSE EXPRESSLY SET FORTH HEREIN. NO OTHER AGREEMENTS, PROMISES, CORRESPONDENCE, DISCUSSIONS, REPRESENTATIONS OR UNDERSTANDINGS, EITHER EXPRESS OR IMPLIED, UNLESS EXPRESSLY SET FORTH HEREIN, ARE BINDING BETWEEN THE PARTIES.

19.9   Neither this Agreement nor a written Work Order shall be amended, modified, or waived except in writing signed by an officer of the COMPANY and a duly authorized representative of CONTRACTOR, and provided, that any such amendment, modification, or waiver that is materially adverse to the Noteholders or a Note Party (each as defined in the NEA) or its assets, shall require the prior written consent of the Collateral Agent. Any amendment, waiver, or modification in violation of the foregoing shall be null and void.  Failure by COMPANY at any time or from time to time to enforce or require strict keeping and performance of any of the terms or conditions of this Agreement or any Work Order shall not constitute a waiver of such terms or conditions nor affect or impair the right of COMPANY at any time to avail itself of such remedies as it may have under this Agreement for any breach thereof.

19.10  Except as specifically provided by this Agreement to the contrary, neither this Agreement nor any Work Order shall be construed to confer any benefit on any third party not a party or otherwise referred to in this Agreement or any Work Order. Except as otherwise provided in <u>Section 19.3</u> above, neither this Agreement nor any Work Order shall provide any rights to such third parties to enforce its provisions.

19.11  This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

19.12  For purposes of entering judgment on any arbitral award, if necessary, the Parties consent to the exclusive jurisdiction of a New York State court or federal court sitting in New York County, New York.  The Parties irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any objection that it may now or hereafter have to the venue or forum of any such proceeding.  To the extent any arbitral award

24

needs to be submitted to a court for entering judgment thereon, in accordance with Section 15.1 and Section 19.12 of this Agreement, such party may submit the quantum of such award to the court but shall not include any information relating to the matters that were arbitrated. If either party fails to proceed with arbitration as provided in Section 15.1 of this Agreement, or unsuccessfully seeks to stay arbitration, or fails to comply with the arbitration award, or is unsuccessful in vacating or modifying the award pursuant to a petition or application for judicial review, the other party shall be entitled to expenses paid or incurred in successfully compelling such arbitration or defending against the attempt to stay, vacate or modify such arbitration award and/or successfully defending or enforcing the award.

19.13   The Parties irrevocably consent to the service of any and all process in any such action or proceeding by the mailing of copies of such process to our address at 16201 East Main Street, Cut Off, LA 70345, in accordance with Section 5.6. The Parties also agree that service of process may be made on them by any other method of service provided for under the applicable laws in effect in the State of New York.

19.14   THE PARTIES IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

19.15   Upon COMPANY's request, CONTRACTOR shall execute and enter into a Non-Disclosure Agreement substantially in the form of Exhibit C.

19.16   Subject to COMPANY's responsibility for Travel Expenses, including as set forth in Sections 2.3 and 2.7, CONTRACTOR shall be responsible for prompt cleanup of the Services site and removal of debris of any equipment, materials and/or supplies of any nature utilized by CONTRACTOR in the performance of the Services or transported by CONTRACTOR to any Services site. Such cleanup and removal shall occur promptly and shall be completed when CONTRACTOR has restored the Services site to the same material condition in which CONTRACTOR found it at the commencement of the Services.

19.17   This Agreement shall supersede, amend, and restate any prior Master Services Agreements between COMPANY and CONTRACTOR.

19.18   This Agreement may be executed in multiple counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument. Facsimile or electronic signatures of this Agreement by either or both of the parties shall have the effect of original signatures.

19.19   CONTRACTOR acknowledges and agrees that, in addition to any other remedies that may be available to it, and since monetary damages may be inadequate with respect to breaches of this Agreement by CONTRACTOR, the COMPANY shall be entitled to seek specific performance of this Agreement. Any such remedy shall not in any way affect any other rights or remedies of the Parties under this Agreement, and shall not

be deemed to be the exclusive remedy for a breach of this Agreement, but shall be in addition to all other remedies available at law or equity to the COMPANY.

19.20   It is expressly agreed between the parties that this is a personal contract and therefore neither CONTRACTOR nor COMPANY shall not have the benefit of any exemptions from, and limitations of, liability to which an owner or bareboat charterer of a Vessel is otherwise entitled to under the Limitation of Liability statutes of the United States.

19.21   This Agreement shall be interpreted as having been drafted jointly by the parties. Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the Party that drafted a particular provision is not applicable and is hereby waived. Provisions of this Agreement shall be interpreted in a reasonable manner to effect the purposes of the parties to this Agreement. In this Agreement, references to "includes," "including," "including but not limited to," "including without limitation" and words or phrases of similar import shall be deemed to have the same meaning and the words "include(s)" and "including" shall not be deemed to be terms of limitation but rather be deemed to be followed by the words "without limitation." The language in all parts of this Agreement shall be in all cases construed as a whole according to its meaning and not strictly for or against any particular Party. Each Party acknowledges that its respective representatives have read this entire Agreement, and that each Party fully understands its terms and effects. Each of the terms of this Agreement is contractual, not a mere recital, and is a result of negotiations between the parties.

[The rest of this page is intentionally blank.  Signature page follows.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement upon the date first above shown.

NAUTICAL SOLUTIONS, L.L.C.

By: _____
    Name:
    Title:

C-INNOVATION, L.L.C.
C-PORT, L.L.C.
C-PORT 2, L.L.C.
C-PORT 3, L.L.C.
C-TERMINAL, L.L.C.
EXPERT TRAVEL, LLC
FOURCHON HEAVY LIFT, L.L.C.
GALLIANO MARINE SERVICE, L.L.C.
GULF SHIP, L.L.C.
INTERNATIONAL MARINE SYSTEMS, L.L.C.
LASHIP, L.L.C.
MARINE TECHNOLOGIES, L.L.C.
MARTIN HOLDINGS, L.L.C.
NAUTICAL VENTURES, L.L.C.
NORTH AMERICAN SHIPBUILDING, L.L.C.
OFFSHORE SERVICE VESSELS, L.L.C.
OFFSHORE SUPPORT SERVICES, L.L.C.
SEALAND MECHANICAL, L.L.C.
TAMPA SHIP, L.L.C.

By: _____
    Name:
    Title:

The Manager of all of the aforementioned companies has executed this Agreement intending that all the companies named above are bound and to be bound by the one signature as if s/he had executed this Agreement separately for each company

BRAM OFFSHORE TRANSPORTES MARITIMOS LTDA.

By: _____
    Name: Ugo Fernandez
    Title: Executive Director

[Signatures continued on next page.]

[Master Services Agreement Signature Page]

GALLIANO MARINE SERVICE INTERNATIONAL

By: _____
    Name: Dionne Chouest Austin
    Title: Director

By: _____
    Name: Damon Chouest
    Title: Director

G-BOATS, INC.

By: _____
    Name: Greg Cheramie
    Title: Guyana Director

MARINE PROCUREMENT LTD.

By: _____
    Name: Richard Allinson
    Title: Managing Director

Schedule 1(a)

| Services | CONTRACTOR |
|---|---|
| Arranging for and handling all matters relating to the crewing of each Vessel, the technical management of each Vessel, entry into various charter, contracts of affreightment and other similar commercial arrangements and entry into various purchasing arrangements for necessaries required for the operation of each Vessel, including:<br><br>• Executive oversight and management<br><br>• Coordination of services and personnel provided by affiliates<br><br>• Accounting systems and personnel<br><br>• Contracting processes and personnel<br><br>• Finance and banking administration and personnel<br><br>• Human resources processes and personnel<br><br>• Insurance management<br><br>• IT software and support<br><br>• Legal (internal)<br><br>• Logistics services for equipment and personnel<br><br>• Marketing and client management<br><br>• Port captains and field level management | Galliano Marine Service, L.L.C.<br>Galliano Marine Service International<br>G-Boats, Inc.<br>Bram Offshore Transportes Maritimos Ltda. |

| Services | CONTRACTOR |
|---|---|
| <ul><li>Port Fourchon shipyard and drydock access</li><li>Storage of stacked vessels</li><li>Officing and utilities for all GMS personnel</li><li>Other miscellaneous back office and administrative personnel and services</li></ul> | |

Schedule 1(b)

| Services | CONTRACTOR |
|---|---|
| Maintenance and repair of communications/broadband data and chart services | Marine Technologies, L.L.C. |
| Compliance with all U.S. Coast Guard rules and regulations relating to the ownership and operations of the Vessels, compliance with all classification society rules and requirements, arranging for all required surveys, arranging all insurances for the Vessels and handling of all claims related hereto, arranging for all required repairs and maintenance of the Vessels, ordering of all fuel, lube oils and other necessaries as required by the Vessel operations including Vessel certificates, licenses, and ABS requirements | Galliano Marine Service, L.L.C. Galliano Marine Service International G-Boats, Inc. Bram Offshore Transportes Maritimos Ltda. |
| Travel services, including booking airfare, lodging and ground transportation for vessel crews, support personnel and other associated persons | Expert Travel, LLC |
| Insurance premium payment to be reimbursed by the Company (Vessels, Commercial, Property, general, Environmental, etc.) | Offshore Service Vessels, L.L.C. |
| Hospital Insurance that is under a master insurance policy in the name of Galliano Marine Service LLC | Galliano Marine Service, L.L.C. |
| Maintenance and repair of Vessel electronics, including dynamic positioning | Marine Technologies, L.L.C. International Marine Systems, L.L.C. |
| Vessel maintenance and repair, including related regulatory drydocking | C-Port 2, L.L.C. Gulf Ship, L.L.C. LaShip, L.L.C. North American Shipbuilding, L.L.C. Tampa Ship, L.L.C. Sealand Mechanical, L.L.C. (limited to air conditioning) International Marine Systems, L.L.C. (limited to radio and radar) |
| International supplies | Nautical Ventures, L.L.C. Marine Procurement Ltd. G-Boats, Inc. Bram Offshore Transportes Maritimos Ltda. |
| Groceries | Martin Holdings, L.L.C. Nautical Ventures, L.L.C. |
| International Direct Payroll | Galliano Marine Service International G-Boats, Inc. Bram Offshore Transportes Maritimos Ltda. |

| Services | CONTRACTOR |
|---|---|
| Taxes | Galliano Marine Service, L.L.C. |
| Spare parts and supplies | Marine Procurement Ltd.<br>International Marine Systems, L.L.C.<br>Nautical Ventures, L.L.C.<br>G-Boats, Inc.<br>Galliano Marine Service, L.L.C.<br>North American Shipbuilding, L.L.C.<br>Gulf Ship, L.L.C.<br>LaShip, L.L.C.<br>Tampa Ship, L.L.C.<br>C-Port 2, L.L.C.<br>Sealand Mechanical, L.L.C.<br>International Marine Systems, L.L.C. (radio and radar<br>only)<br>Marine Technologies, L.L.C. (IT only) |
| Legal (external) | Galliano Marine Service, L.L.C. |
| Crew labor and benefits | Galliano Marine Service, L.L.C.<br>Galliano Marine Service International<br>G-Boats, Inc.<br>Bram Offshore Transportes Maritimos Ltda. |
| Shipyard and service technician labor for vessel retrofit, repair, and maintenance | North American Shipbuilding, L.L.C.<br>Gulf Ship, L.L.C.<br>LaShip, L.L.C.<br>Tampa Ship, L.L.C.<br>C-Port 2, L.L.C.<br>Sealand Mechanical, L.L.C.<br>International Marine Systems, L.L.C. (radio and radar only)<br>Marine Technologies, L.L.C. (IT only) |

Schedule 1(c)

| Services | CONTRACTOR |
|---|---|
| Food service | Martin Holdings, L.L.C.<br>Nautical Ventures, L.L.C. |
| ROV operations/rental | C-Innovation, L.L.C. |
| Vessel radio, radar and communication systems upgrade, repair and maintenance | International Marine Systems, L.L.C. |
| Port services for vessels including cargo loading and unloading and fueling | C-Port, L.L.C.<br>C-Port 2, L.L.C.<br>C-Port 3, L.L.C.<br>C-Terminal, L.L.C.<br>Fourchon Heavy Lift, L.L.C.<br>Martin Holdings, L.L.C.<br>Offshore Support Services, L.L.C. |
| Any services necessary to operate, upgrade, maintain, repair, replace, and support the systems (including IT systems), software, hardware, and/or equipment, that CONTRACTOR has manufactured for use on other otherwise placed on the Vessels listed on Schedule 2 (including access to physical locations hosting such systems, software, hardware, and/or equipment, and including the IP licensed to COMPANY under (a) the Non-Exclusive and Assignable Patent, Copyright and Know-How License Agreement, dated February 24, 2023, by and among COMPANY,  Marine Technologies, L.L.C., and Wilmington Trust, National Association, as Collateral Agent; and (b) the Non-Exclusive and Assignable Copyright License Agreement, dated February 24, 2023, by and among COMPANY,  North American Shipbuilding, L.L.C. and Wilmington Trust, National Association, as Collateral Agent) | Marine Technologies, L.L.C.<br>North American Shipbuilding, L.L.C. |
| Vessel fabrication, retrofitting, upgrades and replacements | C-Port 2, L.L.C.<br>Gulf Ship, L.L.C.<br>LaShip, L.L.C.<br>North American Shipbuilding, L.L.C.<br>Tampa Ship, L.L.C.<br>Sealand Mechanical, L.L.C. (limited to air conditioning)<br>International Marine Systems, L.L.C. (limited to radio and radar) |

Schedule 2

| Vessel Name | Official Number |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

Schedule 3

| # | Affiliate Companies Not On MSA Schedule | Services Provided To Nautical Solutions | Comment | ECO Ownership |
|---|---|---|---|---|
| 1 | Alaska Ventures, LLC | None | Vessel Owning Company | 100% |
| 2 | Alpha Marine Services LLC | None | Vessel Owning Company | 100% |
| 3 | Benchmark Marine Service LLC | None | Vessel Owning Company | 83% |
| 4 | Blue Dolphin Frac LLC | None | Vessel Owning Company | 100% |
| 5 | Blue Orca LLC | None | Vessel Owning Company | 100% |
| 6 | Duh Boats Partnership CV | None | Vessel Owning Company | 100% |
| 7 | Duh Boats 2 Partnership CV | None | Vessel Owning Company | 100% |
| 8 | Fantasy Island LLC | None | Vessel Owning Company | 100% |
| 9 | Fast Boats LLC | None | Vessel Owning Company | 100% |
| 10 | Fast Vessels LLC | None | Vessel Owning Company.  Amount paid by NS to Fast Vessels was a pass through of charter hire from a NS vessel. | 100% |
| 11 | Holiday LLC | None | Vessel Owning Company | 100% |
| 12 | Island Ventures LLC | None | Vessel Owning Company | 75% |
| 13 | Island Ventures II LLC | None | Vessel Owning Company | 75% |
| 14 | Island Ventures 3 LLC | None | Vessel Owning Company | 90% |
| 15 | Island Ventures 4 LLC | None | Vessel Owning Company | 50% |
| 16 | Island Ventures 5 LLC | None | Vessel Owning Company | 75% |
| 17 | Island Ventures 6 LLC | None | Vessel Owning Company | 75% |
| 18 | Legacy Leader LLC | None | Vessel Owning Company | 100% |
| 19 | Reel Pipe LLC | None | Vessel Owning Company.  Amount paid by NS to Reel Pipe was for the purchase of fuel off a stacked vessel. | 100% |
| 20 | Stim Star IV LLC | None | Vessel Owning Company | 100% |
| 21 | Stim Tugs LLC | None | Vessel Owning Company.  Payments from Nautical Solutions are a pass through of bareboat payments for the Blue Orca, which is not a NS vessel.  The payment construct is due to tax structures that date to when NS previously owned the vessel. | 100% |
| 22 | Team Marine LLC | | Vessel Owning Company | 100% |
| 23 | 5K Lp LLC | None | Holding Company; no operations.  Amount paid by NS in 2021 was to fund a 2018 Guyana tax assessment. | 100% |
| 24 | AM Supply LLC | Company Sold | | |
| 25 | American Recovery LLC | Disposes of waste/used oil products | Commodity business provided by multiple businesses.  Amounts paid by NS of $33K in 2021 and $44K in 2022 are immaterial | 25% |
| 26 | Bollinger Shipyards LLC | None | Shipyard service provider.  Same offering as multiple Contractors on NS schedule.  Total NS remittances of $297K in 2021 and $363K in 2022 are immaterial relative to NS shipyard spend | 70% |
| 27 | C-Logistics LLC | None | Logistics company that works for third-party customers.  Amount paid to C-Logistics (Suriname) in 2022 was a payment made in error and reversed. | 100% |
| 28 | C-Port/Stone LLC | Fuel | Provides fuel to all vessels (ECO and competitors) accessing C-Port facilities.  C-Port slips, and the vessels that access fuel, water, etc, are controlled by the customer renting the slip, not ECO. | 50% |
| 29 | Clean Tank LLC | Cleans tanks below deck on vessels | Commodity business provided by multiple businesses.  Amounts paid by NS of $109K in 2021 and $134K in 2022 are immaterial | 33% |
| 30 | G Port Inc | Port facility in Guyana | Dock space in Guyana.  No strategic importance to location.  Other service providers in Guyana operate from elsewhere.  No amounts paid by NS in 2021 or 2022. | 49% |
| 31 | Grand Isle Shipyard Inc. | Miscellanous services | Provides labor and light fabrication to upstream, midstream and downstream energy facilities.  Amounts paid by NS ($40K combined for 2021 and 2022) are immaterial. | 51% |
| 32 | Total Waste Solutions LLC | Garbage collection | Commodity business provided by multiple businesses.  Amounts paid by NS ($800 combined for 2021 and 2022) are immaterial | 50% |
| 33 | Veracity Machine LLC | Machining of parts | Machine shop for minority owned riser storage and maintenance business.  Commodity machine shop applications.  Amount paid by NS of $57K in 2021 and $36K in 2022 are immaterial. | 50% |
| 34 | Westport LLC | None | Builds yachts. | 100% |

Exhibit A

| Affiliates |
|---|
| Bram Offshore Transportes Maritimos Ltda. |
| C-Innovation, L.L.C. |
| C-Port, L.L.C. |
| C-Port 2, L.L.C. |
| C-Port 3, L.L.C. |
| C-Terminal, L.L.C. |
| Expert Travel, LLC |
| Fourchon Heavy Lift, L.L.C. |
| Galliano Marine Service International |
| Galliano Marine Service L.L.C. |
| G-Boats, Inc. |
| Gulf Ship, L.L.C. |
| International Marine Systems, L.L.C. |
| LaShip, L.L.C. |
| Marine Procurement Ltd. |
| Marine Technologies, L.L.C. |
| Martin Holdings, L.L.C. |
| Nautical Ventures, L.L.C. |
| North American Shipbuilding, L.L.C. |
| Offshore Service Vessels, L.L.C. |
| Offshore Support Services, L.L.C. |
| Sealand Mechanical, L.L.C. |
| Tampa Ship, L.L.C. |

Exhibit B

## WORK ORDER

| | | | | |
|---|---|---|---|---|
| To: | "Vendor Name" | | Phone: | "Phone Number" |
| | Attention: | | | |
| | "Address" | | Fax: | "Fax Number" |
| | "Address" | | | |

Date: _____, 202___          Re:      "insert service provided"

Pursuant to the terms and conditions of that certain Master Services Agreement dated _____, 2023 by and between "Vendor Name" and Nautical Solutions, L.L.C., this is to evidence our understanding and agreement that "insert type or work performed" will be provided by you subject to the following:

1.    Date/Time of Delivery:
2.    Location of Delivery:
3.    Location of Redelivery:
4.    Day Rate:
5.    Shore Base and Dock:
6.    Approximate Term (Days):
7.    Proof of Citizenship for workers
8.    Special Provisions:


Please sign and date this Work Order in duplicate in acceptance of the foregoing and return it to

Nautical Solutions, L.L.C. at 16201 East Main Street, Cut Off, LA 70345.


**NAUTICAL SOLUTIONS, L.L.C.**

By:   _____

Printed Name: _____

Title: _____


**"VENDOR NAME"**

By:   _____
Printed Name: _____
Title: _____

<u>Exhibit C</u>

**MUTUAL NON-DISCLOSURE AGREEMENT**

This Mutual Non-Disclosure Agreement ("<u>Agreement</u>") is entered into as of the ____ day of _____, 2023 ("<u>Effective Date</u>"), by and between **[_]** and **NAUTICAL SOLUTIONS, L.L.C.** ("<u>NS</u>"). The terms "<u>Discloser</u>" and "<u>Recipient</u>" refer, respectively, to the party disclosing or receiving a specific item of Confidential Information, as that term is defined below. MT and NS may each individually be referred to herein as a "<u>Party</u>" or collectively as the "<u>Parties</u>".

1.      The Parties expect to engage in discussions and exchange information relating to certain services to be provided under certain Master Services Agreements (collectively, the "<u>Purpose</u>"). As used in this Agreement, "<u>Confidential Information</u>" means all information or materials as to the Discloser or any of its affiliates furnished to Recipient by or on behalf of the Discloser orally or in written or electronic form which is confidential, proprietary, or otherwise not generally available to the public, whether or not marked "confidential", and shall include, without limiting the foregoing, (i) business information including, financial information, business plans, bids, pricing information, vendor information, contracts, business records and employee information; (ii) technical information including vessel specifications, vessel system designs and concepts, CAD drawings, computerized design and construction models, manuals, know-how, show-how, sketches, drawings, working drawings, design and construction documentation, construction modeling, lofting, numerical code tapes, material lists, purchase specifications, correspondence with vendors, regulatory or classification authorities, photographs or other graphic depictions; (iii) Intellectual Property; and (iv) derivatives of any of the foregoing. "<u>Intellectual Property</u>" as used in this Agreement shall mean all Confidential Information, trade names, trademarks, service marks and other identifying names or source indicia of a Party (whether registered or unregistered, and including its associated goodwill and governmental applications), trade secrets, patents, copyrights, copyright registrations, design rights, patent applications (together with all divisions, renewals and continuations of any of the foregoing), uncommercialized inventions and concepts developed by a Party and disclosed by it.  The Parties agree not to share any information that should not be shared pursuant to any applicable antitrust laws.

2.      Recipient agrees that Recipient shall (i) protect and maintain confidential Discloser's Confidential Information; (ii) be responsible for any breach of this Agreement by itself, its affiliates, or any of its or its affiliates' employees, agents, attorneys, potential or actual financing sources, investment bankers, contractors or subcontractors (at any tier) ("<u>Representatives</u>"); (iii) shall disclose Confidential Information to Representatives only on a need to know basis and for the Purpose as set forth in Section 1 above; (iv) use the Confidential Information only for and in connection with the Purpose set forth in Section 1 above; and (v) promptly notify Discloser upon discovery of any unauthorized use or disclosure of the Confidential Information.

3.      Notwithstanding Section 1, Confidential Information does not include information that: (i) is now available or becomes available to the public without breach of this Agreement (it being acknowledged and agreed that disclosure by the Discloser and its affiliates of Confidential Information to creditors and potential creditors (and their Representatives) of Discloser and its affiliates, or to other third parties pursuant to confidentiality or non-disclosure agreements, does not mean such Confidential Information is available to the public); (ii) is explicitly approved for

release by written authorization of Discloser; (iii) is obtained from a third party or parties who obtain it lawfully or disclose it without a known duty of confidentiality; (iv) is independently discovered by or known to the Recipient; or (v) is required to be disclosed by a valid court order, provided that, to the extent permitted under the circumstances, Recipient has first given Discloser notice of such requirement to afford Discloser an opportunity to protect its Confidential Information by protective order or other means.

4.      The Parties agree that all Confidential Information disclosed hereunder shall remain the property of the Discloser and shall not be copied or reproduced without the express written permission of the Discloser, except for such copies as may be necessary for the Purpose contemplated hereunder. Upon Discloser's written request, Recipient shall either return all Confidential Information to Discloser along with all copies and portions thereof, or provide notice in writing that all such Confidential Information has been destroyed, provided, however, that Recipient may retain one archival copy of the Confidential Information, which may be used solely to demonstrate compliance with this Agreement. In that event, Recipient shall provide to Discloser a written log of each document retained for archival purposes and shall mark each as "Confidential subject to Confidentiality Agreement."

5.      No rights or obligations other than those expressly recited herein are implied by this Agreement. This Agreement does not require either Party to disclose any particular information or enter into any business relationship, nor does it grant the Recipient a license to any of the Discloser's Intellectual Property and except as expressly set forth in any separate, written agreement, all Intellectual Property shall remain the exclusive property of the Discloser. All Confidential Information disclosed hereunder is provided by Discloser on as "as is" basis without representation or warranty of any kind.

6.      This Agreement shall commence on the Effective Date and shall continue until either Party terminates it. Either Party may terminate it for any reason by giving thirty (30) days written notice to the other Party. Recipient's obligations regarding Confidential Information as stated in Sections 2 and 4, along with remedies stated in Section 7, shall survive termination for a period of ten years, except for the obligations in respect of Intellectual Property, which will survive permanently.

7.      Recipient agrees that a breach of this Agreement would give rise to irreparable injury to Discloser that will not be adequately compensated for by damages and, consequently, Discloser shall be entitled to seek, in addition to all other remedies available to it, injunctive and other equitable relief without the posting of a bond to prevent a breach of this Agreement and to secure the enforcement of this Agreement. This Agreement shall be interpreted and construed under the laws of the State of New York without regard to conflict of laws principles.

8.      This Agreement is the entire understanding among the Parties with respect to the subject matter contained herein and supersedes all prior or contemporaneous oral or written agreements concerning this subject matter. This Agreement may only be modified in a writing that has been signed by the Parties. This Agreement may not be assigned without the other Party's prior written consent. Any understanding between the Parties beyond the Purpose of this Agreement shall be set forth in a separate written agreement containing appropriate terms and conditions. This Agreement may be executed in one or more counterparts with the same effect as if the signatures hereto and thereto were upon the same instrument. A copy sent by email in PDF or similar format, whether executed manually or electronically, shall be sufficient to constitute an original.

Exhibit C– page 2

[The rest of this page is intentionally blank.  Signature
page follows.]

Exhibit C– page 3

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be signed by their duly authorizedrepresentatives.

**NAUTICAL SOLUTIONS, L.L.C.**                    **[CONTRACTOR]**

Signature                                          Signature
Print Name:                                        Print Name:
Its:                                               Its:

Exhibit C– page 4

**[FORM OF] NON-EXCLUSIVE AND ASSIGNABLE
PATENT, COPYRIGHT AND KNOW-HOW LICENSE AGREEMENT**

This NON-EXCLUSIVE AND ASSIGNABLE PATENT, COPYRIGHT AND KNOW-HOW LICENSE AGREEMENT (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of [●], 2023 (the "Effective Date"), is made by and among:

Marine Technologies, L.L.C., a Louisiana limited liability company with offices located at 16201 East Main Street, Cut Off, Louisiana 70345 ("Licensor");

Nautical Solutions, L.L.C., a Louisiana limited liability company ("Nautical Solutions" or "Licensee"); and

for the specified rights described herein, Wilmington Trust, National Association, a national banking association (as may be replaced from time to time by any successor collateral agent, the "Collateral Agent").

Licensor and Licensee (including any successor Licensee pursuant to Section 2.4) are referred to herein collectively as the "Parties," or each, individually, as a "Party".

RECITALS

WHEREAS, Licensor is the owner of all right, title, and interest in the Licensed IP (as defined below);

WHEREAS, Nautical Solutions is engaged in the marine transportation business;

WHEREAS, Nautical Solutions and the Collateral Agent are party to that certain Note Exchange Agreement, dated as of even date herewith (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Note Exchange Agreement"), together with Nautical Solutions Holdings, LLC, a Louisiana limited liability company, the Agent (as defined therein) and the noteholders identified therein (the "Noteholders"), with respect to the Vessels, pursuant to which, among other things, the Noteholders agreed to exchange certain debt obligations into the notes issued under the Note Exchange Agreement;

WHEREAS, the Vessels contain Licensor hardware and software that use or practice certain Licensed IP, in each case to the extent set forth on Exhibit A, and Licensee wishes to obtain from Licensor, and Licensor is willing to grant to Licensee, a license to the Licensed IP and the Licensed Products, subject to the terms and conditions set forth herein; and

WHEREAS, the Noteholders conditioned the exchange of their debt obligations and their entry into the Note Exchange Agreement on Licensor granting the Collateral Agent certain rights with respect to the Licensed IP and the Licensed Products so as to enable the Vessels, subject to the terms and conditions hereof, to continue operating with the benefit of the License notwithstanding a change of ownership of the Vessels in certain circumstances or a Change of Control of Licensee.

1

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties and the Collateral Agent (in the case of the Collateral Agent, solely with respect to Section 2.4) agree as follows:

1.　　Definitions. All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Note Exchange Agreement. For purposes of this Agreement, the following terms have the following meanings:

"Agreement" has the meaning set forth in the preamble.

"Business Day" means any day other than a Saturday, a Sunday or a day on which commercial banks in New Orleans, Louisiana or New York, New York are required or authorized to be closed.

"Confidential Information" means all information about a Party's business affairs, confidential intellectual property, trade secrets, third-party confidential information, and other sensitive or proprietary information, including business operations and strategies, marketing, creative elements, artwork, visual representations, research material and data, specifications, processes, and technological developments, in each case whether orally or in written, electronic, or other form or media, and in each case whether or not marked, designated, or otherwise identified as "confidential." Licensor's Confidential Information shall specifically include: (a) the Licensed Know-How; (b) Licensor's other unpatented inventions, ideas, methods, discoveries, know-how, trade secrets, unpublished patent applications, invention disclosures, invention summaries, and other confidential intellectual property; and (c) all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations, and other materials prepared by or for Licensee that contain, are based on, or otherwise reflect or are derived from any of the foregoing in whole or in part.

Confidential Information does not include information that, at the time of disclosure and as established by documentary evidence: (a) is or becomes generally available to and known by the public other than as a result of, directly or indirectly, any breach of Section 9 by Licensee; (b) is or becomes available to Licensee on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information; (c) was known by or in the possession of Licensee before being disclosed by or on behalf of Licensor; or (d) was or is independently developed by Licensee without reference to or use, in whole or in part, of any of Licensor's Confidential Information.

"Disclosing Party" means the Party who discloses or makes available to use its Confidential Information to the Receiving Party.

"Effective Date" has the meaning set forth in the preamble.

"Escrow Agreement" has the meaning set forth in Section 7.1.

"Escrowed Materials" has the meaning set forth in Section 7.1.

2

"Governmental Authority" means any federal, state, national, supranational, local, or other government, whether domestic or foreign, including any subdivision, department, agency, instrumentality, authority (including any regulatory authority), commission, board, or bureau thereof, or any court, tribunal, or arbitrator.

"Improvement" means any modification of or improvement or enhancement to any Licensed Product or Licensed IP.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any federal, state, local, or foreign government or political subdivision thereof, or any arbitrator, court, or tribunal of competent jurisdiction.

"License" has the meaning set forth in Section 2.1.

"Licensed Copyright(s)" means all copyrights (whether or not registered) owned or controlled by Licensor relating to the Licensed Products.

"Licensed IP" means, individually or collectively, the Licensed Copyrights, Licensed Know-How, and Licensed Patents.

"Licensed Know-How" means, as to each Vessel, any technical information, trade secrets, formulas, prototypes, specifications, directions, instructions, test protocols, procedures, results, studies, analyses, raw material sources, data, manufacturing data, formulation or production technology, conceptions, ideas, innovations, discoveries, inventions, processes, methods, materials, machines, devices, formulae, equipment, enhancements, modifications, technological developments, techniques, systems (including, but not limited to, all navigational and operating systems), tools, designs, drawings, plans, software, documentation, data, programs, and other knowledge, information, skills, and materials, in each case owned or controlled by Licensor and used in or necessary for the operation of the Vessels or the Licensed Products, including as identified in Exhibit A.

"Licensed Patent(s)" means, as to each Vessel, all patents and patent applications owned or controlled by Licensor and used in or necessary for the operation of the Vessels or Licensed Products, including those identified in Exhibit A as to such Vessel.

"Licensed Patent Challenge" has the meaning set forth in Section 6.

"Licensed Product(s)" means the apparatuses, devices, software (excluding third party off-the-shelf software generally commercially available on standard terms), hardware, technology, systems (including, but not limited to, all navigational and operating systems), and methods, in each case that have been provided, installed, or embedded by Licensor or its Affiliates in the Vessels or provided, installed, or embedded by Licensor or its Affiliates in an appurtenance to the Vessels.

"Licensee" has the meaning set forth in the preamble.

"Licensor" has the meaning set forth in the preamble.

3

"<u>Losses</u>" means all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder, and the cost of pursuing any insurance providers.

"<u>Party</u>" has the meaning set forth in the preamble.

"<u>Person(s)</u>" means an individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association, or other entity.

"<u>Receiving Party</u>" means the Party or the Collateral Agent who receives Confidential Information from the Disclosing Party.

"<u>Release Event</u>" has the meaning set forth in <u>Section 7.1</u>.

"<u>Representatives</u>" means a Party's personnel, employees, officers, directors, consultants, and legal advisors.

"<u>Term</u>" has the meaning set forth in <u>Section 14.1</u>.

"<u>Territory</u>" means worldwide.

"<u>Third Party Claim</u>" has the meaning set forth in <u>Section 12.1</u>.

"<u>Vessel</u>" and "<u>Vessels</u>" mean the vessels identified in <u>Exhibit A</u>, and none other; <u>provided</u>, that if any such Vessel were to be sold (i) by Licensee as permitted by Section 9.21 of the Note Exchange Agreement or (ii) by a Vessel Buyer (other than if such Vessel is sold through the exercise of remedies by the Collateral Agent subject to the one-time assignment condition of <u>Section 15.8</u>), then such vessel no longer shall be a Vessel hereunder and no longer shall be subject to this Agreement and the License.

"<u>Vessel Buyer</u>" has the meaning set forth in <u>Section 15.8</u>.

2.     <u>Grant</u>.

2.1     <u>IP License</u>. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee, and Collateral Agent (subject to <u>Section 2.4</u>), during the Term an irrevocable (except for termination pursuant to <u>Section 14.2</u> or <u>Section 14.3</u>), nontransferable (except as permitted in <u>Section 15.8</u>), non-sublicensable (except as set forth below), non-exclusive, royalty-free right and license under the applicable Licensed IP as necessary for the purposes of maintaining, repairing, servicing, modifying, providing technical support for, or otherwise operating the Vessels and Licensed Products in the Territory; <u>provided</u>, that (i) the right and license granted in this <u>Section 2.1</u> is expressly limited to the applicable Vessels and Licensed Products that are installed or embedded in or are an appurtenance to the applicable Vessel, as the same may be modified, supplemented or replaced by Licensor, and (ii) for the avoidance of doubt, (x) the foregoing license includes the right to maintain and to have others provide technical support to Licensee for Licensed Products already installed on, embedded in or appurtenant to the Vessels to

4

the extent applicable parts and components therefor are available, but otherwise no manufacturing or distribution rights are granted to Licensee hereunder and (y) no rights to Improvements are granted to Licensee hereunder except to the extent they are provided pursuant to <u>Section 4</u>. The foregoing is referred to as the "<u>License</u>".  Licensee may sublicense such License rights to an Affiliate or third party that is maintaining, repairing, servicing, modifying, providing technical support for, or otherwise operating, a Vessel (including rights under the Licensed IP) for or on behalf of Licensee (including, with respect to Collateral Agent, any third party engaged by Collateral Agent to operate such Vessel(s)).  Except as set forth in the prior sentence, the License is otherwise non-sublicensable.  The Parties intend and agree that, for purposes of Section 365(n) of the U.S. Bankruptcy Code (and any amendment thereto), the foregoing License shall be treated as a license to intellectual property (as defined in Section 101(35A) of the U.S. Bankruptcy Code).

2.2    <u>Licensor Reservation of Rights</u>. Licensor reserves the right to make, use, offer to sell, sell, and import Licensed Products in the Territory.

2.3    <u>Limited Grant</u>. Except for the rights and licenses granted by Licensor under this <u>Section 2</u>, this Agreement does not grant to Licensee or any other Person any right, title, or interest by implication, estoppel, or otherwise. Without limiting the foregoing, nothing in this Agreement grants by implication, estoppel, or otherwise, any right, title, or interest in, to, or under any patents owned or controlled by Licensor other than the Licensed Patents, and then only as to the applicable Vessels as specified on <u>Exhibit A</u> and none other. All rights, titles, and interests in and to the Licensed IP and the Licensed Products not specifically and expressly granted by Licensor hereunder are hereby reserved.

2.4    <u>Collateral Agent Exercise of License</u>. At any time following the occurrence and during the continuance of an Event of Default, without the need of notice to or consent by any Party other than as to notice as set forth in <u>Section 15.8</u>, the License and other rights granted to Licensee under this Agreement may be exercised by the Collateral Agent, a designee of the Collateral Agent and, as to each Vessel, any Vessel Buyer (and the Collateral Agent, any such designee and each Vessel Buyer that exercises such rights, as applicable, shall thereafter be considered a "Licensee" for all purposes of this Agreement and, for the avoidance of doubt, each Vessel Buyer shall be subject to the obligations of Licensee hereunder).  Notwithstanding anything to the contrary herein, and for the avoidance of doubt, the Collateral Agent hereby covenants and agrees to refrain from (a) exercising, and (b) permitting any designee of the Collateral Agent from exercising, the License rights granted to Licensee under <u>Section 2.1</u>, solely as it relates to the Collateral Agent, in each case unless and until the occurrence and during the continuance, of an Event of Default.

3.     <u>Transfer of Licensed Know-How</u>. Promptly after the Effective Date and throughout the Term, Licensor shall disclose the Licensed Know-How to Licensee in such form and media as may be reasonably requested by Licensee. For the avoidance of doubt, all Licensed Know-How disclosed to Licensee hereunder is the Confidential Information of Licensor and subject to the confidentiality and non-disclosure obligations under <u>Section 9</u>, and Licensee's use of any documentation, materials, or other information concerning the Licensed Know-How provided under this <u>Section 3</u> is subject to the terms and conditions of this Agreement, including the scope of the License granted under <u>Section 2</u>. Licensor shall also disclose the Licensed Know-How to Collateral Agent, a designee of the Collateral Agent, and any Vessel Buyer, reasonably requested by such Person at any time following the occurrence and during the continuance of an Event of Default.

4.     <u>Improvements</u>.  With respect to any Improvements developed or created by Licensor during the Term (including any Improvements made pursuant to the Master Services Agreement (defined below)), Licensor shall offer such Improvements to Licensee on the same or substantially similar terms as Licensor provides such Improvements (i) to other Affiliates of Licensor, so long as Licensor and Licensee are Affiliates, and (ii) to other third party licensees buying or licensing such Improvements from Licensor (or if there are none, then at comparable rates in the open market for comparable types of Improvements), if Licensor and Licensee are not Affiliates.  With respect to any Improvements developed by Licensee during the Term, Licensee shall and does hereby assign to Licensor all right, title, and interest in and to such Improvements; <u>provided</u>, that such Improvements shall from the date of conception or creation be treated as part of the Licensed IP and be subject to the License granted under this Agreement. Licensee shall disclose each Improvement to Licensor in writing within thirty (30) Business Days after its conception or creation by Licensee. Licensee's notice must include a summary of the subject matter of such Improvements in sufficient detail to enable Licensor to seek patent protection in its sole discretion.

5.     <u>Patent Prosecution and Maintenance</u>. For each patent and patent application included within the Licensed Patents, Licensor will be solely responsible for, and make all decisions concerning, the preparation, filing, prosecution, and maintenance thereof.

6.     <u>Challenges to Licensed Patents</u>. Licensee shall not institute or actively participate as an adverse party in, or otherwise provide material support to, any legal action or administrative proceeding in the Territory to invalidate or limit the scope of any Licensed Patent claim or obtain a ruling that any Licensed Patent claim is unenforceable or not patentable or that any Licensed Product does not infringe one or more claims of any Licensed Patent ("<u>Licensed Patent Challenge</u>") until the expiration of thirty (30) Business Days after Licensee serves on Licensor written notice of Licensee's intention to bring or participate in a Licensed Patent Challenge and except to the extent such challenge or invalidity claim is in defense of a claim of infringement of such Licensed Patent by Licensor. Licensee shall also provide to Licensor a complete written disclosure of each and every basis then known to Licensee for the Licensed Patent Challenge and shall provide Licensor with a copy of any document or publication that Licensee may use in connection with the Licensed Patent Challenge. Licensee's failure to comply with this provision will constitute a material breach of this Agreement.

7.     <u>Escrow and Release Obligations</u>.

7.1     Within thirty (30) days after the Effective Date, the Parties shall enter into a mutually agreeable escrow agreement (the "Escrow Agreement") with a reputable third party agent with expertise in software and technology escrow designated by Licensee (and reasonably acceptable to Licensor), pursuant to which Licensor shall deposit in escrow copies, on suitable magnetic or optical media, of all source code to any software included in the Licensed IP and related documentation and information, as is relevant to and reasonably necessary for Licensee to maintain, repair, service, modify, provide technical support for, or otherwise operate the Vessels and Licensed Products, and to otherwise continue to exercise the rights granted by Licensor to Licensee under this Agreement following a Release Event (the "Escrowed Materials"). Licensor hereby agrees that the Escrow Agreement shall provide that upon the occurrence of any of the following events during the Term (each, a "Release Event"), the Escrowed Materials shall be released to Licensee:

(a)     Licensor ceases, for any reason, to do business or to otherwise maintain, repair, service, modify, or provide technical support for the Vessels or Licensed Products;

(b)     Licensor or any Contractor (as defined in the Master Services Agreement) materially breaches its obligations under this Agreement, or the Master Services Agreement (defined below), as related to Licensee's ability to receive the benefit of the license to the Licensed IP, or the Services (as defined in the Master Services Agreement) relating to or using such Licensed IP, and fails to cure such material breach within forty-five (45) days of receiving written notice of such breach; or

(c)     Bankruptcy or insolvency of Licensor, including if Licensor (i) is dissolved or liquidated or takes any corporate action for such purpose; (ii) makes a general assignment for the benefit of creditors; or (iii) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

7.2     Licensor hereby grants to Licensee and Collateral Agent (subject to Section 2.4) a license to use the Escrowed Materials and any Licensed IP relating to the Escrowed Materials following the occurrence of a Release Event to the extent necessary for Licensee to continue to exercise its license rights on the same terms and subject to the same conditions as the License (including for Licensee to perform or have performed the applicable Services (as defined in the Master Services Agreement) provided by Licensor under the Master Services Agreement), and the Escrowed Materials shall be deemed Licensed IP for all purposes set forth herein.

8.     Enforcement; Third-Party Infringement Claims.

8.1     Notice of Infringement or Third-Party Claims. If (a) either Party believes that any Licensed IP is being infringed or misappropriated by a third party in the Territory, or (b) if a third party alleges that any Licensed Patent is invalid or unenforceable, or claims that a Licensed Product, or its use, development, manufacture, or sale infringes such third party's intellectual property rights in the Territory, the Party possessing such belief or awareness of such claims shall promptly provide written notice to the other Party and provide it with all details of such infringement or claim, as applicable, that are known by such Party.

8.2     Right to Bring Action or Defend.

(a)     Licensor has the sole right and discretion to bring an infringement or misappropriation action concerning any Licensed IP, defend any declaratory judgment action concerning any Licensed IP, and take any other lawful action reasonably necessary to protect, enforce, or defend any Licensed IP, and control the conduct thereof and attempt to resolve any claims relating to any Licensed IP, including by (a) prosecuting or defending any *inter partes* review, post-grant review, covered business method patent review, opposition, derivation, interference, declaratory judgment, federal district court, US Patent and Trademark Office, US International Trade Commission, or other proceeding of any kind, and (b) taking any other lawful action that Licensor, in its sole discretion, believes is reasonably necessary to protect, enforce, or defend any Licensed IP. Licensor has the right to prosecute or defend any such proceeding in Licensor's own name or, if required by applicable Law or otherwise necessary for such purposes, in the name of Licensee and may join Licensee as a party. Licensor shall bear its own costs and expenses in all such proceedings and have the right to control the conduct thereof and be represented by counsel of its own choice therein.

(b)     Licensee shall and hereby does irrevocably and unconditionally waive any objection to Licensor's joinder of Licensee to any proceeding described in Section 8.2(a) on any grounds whatsoever, including on the grounds of personal jurisdiction, venue, *or forum non conveniens*. If Licensor brings or defends any such proceeding, Licensee shall cooperate in all respects with Licensor in the conduct thereof, and assist in all reasonable ways, including having its employees testify when requested, and make available for discovery or trial exhibit any relevant records, papers, information, and the like, at Licensor's expense (but only upon prior written authorization by Licensor for such expenses, provided that such cooperation and assistance is subject to receipt of such prior written authorization).

8.3     Recovery and Settlement. If Licensor undertakes the enforcement or defense of any Licensed Patent:

(a)     any recovery, damages, or settlement derived from such suit, action, or other proceeding will be retained in its entirety by Licensor; and

(b)     Licensor may settle any such suit, action, or other proceeding, whether by consent order, settlement, or other voluntary final disposition, without the prior written approval of Licensee, provided that Licensor shall not settle any such suit, action, or other proceeding in a manner that adversely affects the rights of Licensee hereunder concerning the Licensed IP without Licensee's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

If any suit, action, or other proceeding alleging invalidity or non-infringement of any Licensed Patent is brought against Licensee, Licensor, at its option, will have the right to intervene and take over the sole defense of the suit, action, or other proceeding at its own expense.

9.     Confidentiality.

9.1     Confidentiality Obligations. The Receiving Party acknowledges that in connection with this Agreement it will gain access to Confidential Information of the Disclosing Party. As a condition to being provided with Confidential Information, the Receiving Party shall, during the Term and for three (3) years thereafter:

(a)     not use the Disclosing Party's Confidential Information other than as strictly necessary to perform its obligations under this Agreement;

(b)     maintain the Disclosing Party's Confidential Information in strict confidence and, subject to Section 9.2, not disclose the Disclosing Party's Confidential Information without the Disclosing Party's prior written consent: provided, that the Receiving Party may disclose the Confidential Information to its Representatives who:

(i)     have a need to know the Confidential Information for purposes of the Receiving Party's performance, or exercise of its rights concerning the Confidential Information, under this Agreement;

(ii)     have been apprised of this restriction; and

(iii)     are themselves bound by written nondisclosure agreements or professional obligations at least as restrictive as those set forth in this Section 9.1; provided, further, that the Receiving Party will be responsible for ensuring its Representatives' compliance with, and will be liable for any breach by its Representatives of, this Section 9.1.

The Receiving Party shall use reasonable care, and efforts at least as protective as the efforts it uses for its own confidential information of the same or similar nature, to safeguard the Disclosing Party's Confidential Information from use or disclosure other than as permitted hereby.

9.2     Exceptions. If the Receiving Party becomes legally compelled to disclose any Confidential Information, the Receiving Party shall:

(a)     provide prompt written notice to the Disclosing Party so that the Disclosing Party may seek a protective order or other appropriate remedy or waive its rights under this Section 9; and

(b)     disclose only the portion of Confidential Information that it is legally required to furnish.

If a protective order or other remedy is not obtained, or the Disclosing Party waives compliance under this Section 9, the Receiving Party shall, at the Disclosing Party's expense, use reasonable efforts to obtain assurance that confidential treatment will be afforded the Confidential Information.

10.     Representations and Warranties.

10.1    <u>Mutual Representations and Warranties</u>. Each Party represents and warrants to the other Party that as of the Effective Date:

(a)    it is duly organized, validly existing, and in good standing as a limited liability company as represented herein under the laws and regulations of its jurisdiction of incorporation, organization, or chartering;

(b)    it has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder;

(c)    the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary limited liability company actions of the Party; and

(d)    when executed and delivered by such Party, this Agreement will constitute the legal, valid, and binding obligation of such Party, enforceable against such Party in accordance with its terms.

10.2    <u>Licensor Representations and Warranties</u>. Licensor represents and warrants that as of the Effective Date: (a) Licensor is the sole and exclusive (even as to its Affiliates) legal and beneficial owner of the entire right, title, and interest in and to the Licensed IP and all Confidential Information of Licensor, in each case, disclosed to Licensee under this Agreement; (b) as to each applicable Vessel, to Licensor's knowledge, no intellectual property rights owned or controlled by any Person (other than Licensor), including any Affiliate of Licensor, are used in or necessary for the operation of such Vessel and Licensee's use of the Licensed Products (other than rights to third party off-the-shelf software generally commercially available on standard terms and applicable copyrights subject to the Non-exclusive and Assignable Copyright License Agreement, dated as of [●], 2023, by and among North American Shipbuilding, L.L.C., Licensee and Collateral Agent); (c) as to each applicable Vessel, (i) the Licensed IP set forth on <u>Exhibit A</u> and (ii) rights under licenses to third party off-the-shelf software generally commercially available on standard terms are all of the intellectual property rights that are necessary for maintaining, repairing, modifying, providing technical support for, or otherwise operating the Licensed Products; (d) Licensor has not granted to any third party any licenses or other rights under the Licensed IP that are in conflict with the terms and conditions of this Agreement; (e) Licensor has not received any written notice or threat of any claim, suit, action, or proceeding, and has no knowledge or reason to know of any information, that could: (i) invalidate or render unenforceable any claim of any Licensed Patent; (ii) prove that the Licensed Products are not covered by any claim of any Licensed Patent; or (iii) cause any claim of any Licensed Patent to fail to issue or be materially limited or restricted as compared with its currently pending scope; and (f) neither Licensor nor any Affiliate of Licensor owns, controls or has any right, title or interest in or to, or has contributed any Intellectual Property, software, or other technology used in the Vessels or Licensed Products, other than the Licensed IP, rights under licenses to third party off-the-shelf software generally commercially available on standard terms, and the copyrights subject to the Non-exclusive and Assignable Copyright License Agreement, dated as of [●], 2023, by and among North American Shipbuilding, L.L.C., Licensee and Collateral Agent.

10

10.3     Disclaimer. EXCEPT AS EXPRESSLY SET FORTH IN SECTION 10.2, LICENSOR EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, CONCERNING THE VALIDITY, ENFORCEABILITY, AND SCOPE OF THE LICENSED PATENTS, THE ACCURACY, COMPLETENESS, SAFETY, USEFULNESS FOR ANY PURPOSE, OR LIKELIHOOD OF SUCCESS (COMMERCIAL, REGULATORY OR OTHER) OF THE LICENSED PRODUCTS, THE LICENSED KNOW-HOW, AND ANY OTHER TECHNICAL INFORMATION, TECHNIQUES, MATERIALS, METHODS, PRODUCTS, PROCESSES, OR PRACTICES AT ANY TIME MADE AVAILABLE BY LICENSOR, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND WARRANTIES ARISING FROM A COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE, OR TRADE PRACTICE. WITHOUT LIMITATION TO THE FOREGOING, LICENSOR WILL HAVE NO LIABILITY WHATSOEVER TO LICENSEE OR ANY OTHER PERSON FOR OR ON ACCOUNT OF ANY INJURY, LOSS, OR DAMAGE, OF ANY KIND OR NATURE, SUSTAINED BY, OR ANY DAMAGE ASSESSED OR ASSERTED AGAINST, OR ANY OTHER LIABILITY INCURRED BY OR IMPOSED ON LICENSEE OR ANY OTHER PERSON, ARISING OUT OF OR IN CONNECTION WITH OR RESULTING FROM (A) THE USE OF OR ERRORS OR OMISSIONS IN A LICENSED PRODUCT, OR THE PRACTICE OF THE LICENSED PATENTS; OR (B) THE USE OF OR ANY ERRORS OR OMISSIONS IN ANY KNOW-HOW, TECHNICAL INFORMATION, TECHNIQUES, OR PRACTICES DISCLOSED BY LICENSOR TO LICENSEE PURSUANT TO THIS AGREEMENT.

11.     Exclusion of Consequential and Other Indirect Damages. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY WILL NOT BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INJURY TO OR LOSS OF GOODWILL, REPUTATION, BUSINESS, PRODUCTION, ANTICIPATED PROFITS, CONTRACTS, OR OPPORTUNITIES (REGARDLESS OF HOW THESE ARE CLASSIFIED AS DAMAGES), OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, PUNITIVE, OR ENHANCED DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, PRODUCT LIABILITY, OR OTHERWISE (INCLUDING THE ENTRY INTO, PERFORMANCE, OR BREACH OF THIS AGREEMENT), REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS FORESEEABLE OR THE PARTY AGAINST WHOM SUCH LIABILITY IS CLAIMED HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.   COLLATERAL AGENT SHALL NOT BE LIABLE TO LICENSOR OR ANY THIRD PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR ACTS, OMISSIONS, OR DAMAGES CAUSED BY NAUTICAL SOLUTIONS OR ANY PERMITTED ASSIGNEE AND LICENSOR SHALL NOT BRING ANY CLAIM AGAINST COLLATERAL AGENT FOR SUCH ACTS OR OMISSIONS BY NAUTICAL SOLUTIONS OR ANY PERMITTED ASSIGNEE, OR SEEK ANY DAMAGES OR RECOVERY FROM COLLATERAL AGENT FOR FINANCIAL OBLIGATIONS OF NAUTICAL SOLUTIONS OR ANY PERMITTED ASSIGNEE.

12.    Indemnification.

12.1    Licensee Indemnification. Licensee shall indemnify, defend, and hold harmless Licensor and its officers, directors, employees, agents, Affiliates, successors, assigns. attorneys, and licensees (each, an "Indemnified Party") from and against any losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers, arising out of or in connection with any third-party claim, suit, action, or proceeding (each, a "Third-Party Claim") relating to or arising, out of or resulting from: (a) Licensee's breach of any representation, warranty, covenant, or obligation under this Agreement, or (b) Licensee's use of Licensed IP or Licensed Products for products other than the Licensed Products. For purposes of this Section 12.1, for the avoidance of doubt, "Licensee" shall not include the Collateral Agent, and Collateral Agent shall have no obligation to any Indemnified Party under this Section 12.1, unless and until such time that Collateral Agent exercises its rights under the License pursuant to Section 2.4.

12.2    Licensor Indemnification. Licensor shall indemnify, defend, and hold harmless Licensee and its officers, directors, employees, agents, Affiliates, successors, permitted assigns, and attorneys (each an "Indemnified Party") from and against any Third-Party Claim relating to or arising out of or resulting from: (a) any breach by Licensor of its representations, warranties, covenants, or other obligations hereunder, or (b) any violation, misappropriation, or infringement upon the intellectual property rights of any third party arising from Licensee's authorized use of the applicable Licensed Products and/or its authorized exercise of the License with respect to the applicable Vessels.

12.3    Indemnification Procedure. The Indemnified Party shall notify the indemnifying Party in writing of any Third Party Claim and cooperate with the indemnifying Party at its sole cost and expense. Subject to Section 8, the indemnifying Party shall immediately take control of the defense and investigation of the Third Party Claim and shall employ counsel reasonably acceptable to the Indemnified Party to handle and defend the Third Party Claim, at its sole cost and expense. The indemnifying Party shall not settle any Third Party Claim in a manner that adversely affects the rights of the Indemnified Party without its prior written consent. The Indemnified Party's failure to perform any obligations under this Section 12.3 will not relieve the indemnifying Party of its obligation under this Section 12 except to the extent it can demonstrate that it has been materially prejudiced as a result of such failure. The Indemnified Party may participate in and observe the proceedings at its own cost and expense with counsel of its own choosing.

13.    Maintenance and Support. Reference is hereby made to that certain Master Services Agreement dated of even date herewith by and among, among others, Licensor and Licensee with respect to available maintenance and support to be provided to Licensee, Collateral Agent, its designees and Vessel Buyer, as the case may be, by Licensor (the "Master Services Agreement").

14.    Term and Termination.

14.1    Term. The term of this Agreement as to the applicable Licensed IP and Licensed Products for a particular Vessel commences as of the Effective Date and, unless

terminated earlier with the prior written consent of the Parties and (if the Note Obligations have not been paid in full in cash) the Collateral Agent (at the direction of the Required Holders) or as provided in <u>Section 14.2</u>, will remain in force until such time as none of Licensee, the Collateral Agent, a designee thereof or a Vessel Buyer are the owner or operator of the particular Vessel (the "<u>Term</u>").

14.2   <u>Termination for Cause</u>.   Licensor may terminate this Agreement as to all Vessels on written notice to Licensee and the Collateral Agent if Licensee materially breaches its obligations under this Agreement and such breach is not cured within forty-five (45) days from Licensor's written notice thereof to both Licensee and the Collateral Agent detailing such breach. Notwithstanding the foregoing, if Licensor terminates this Agreement in the event of such uncured breach by Nautical Solutions, Licensor shall only be entitled to terminate this Agreement as to Nautical Solutions, and this Agreement (and the License) shall otherwise remain in full force and effect with respect to the Collateral Agent, its designee or any Vessel Buyer, as applicable, each of whom retains the right to exercise the rights as a Licensee, subject to the terms and conditions hereof.

14.3   <u>Termination for Bankruptcy or Insolvency</u>.   As to any Vessel Buyer that becomes a Licensee, Licensor may terminate this Agreement by written notice to such Licensee if such Licensee: (a) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which as to any involuntary proceeding is not fully stayed within seven (7) Business Days or is not dismissed or vacated within forty-five (45) days after filing; (b) is dissolved or liquidated or takes any corporate action for such purpose; (c) makes a general assignment for the benefit of creditors; or (d) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

14.4   <u>Effect of Termination</u>.   Except as set forth in <u>Section 8</u> and <u>Section 14.2</u> above, upon the termination of this Agreement for any reason, all rights licensed under the License in this Agreement will revert immediately to Licensor, and Licensee shall immediately cease all activities concerning, including all practice and use of, the applicable Licensed IP and Licensed Products no longer subject to this Agreement.  After termination or expiration of this Agreement, within thirty (30) after the written request of the Disclosing Party, the Receiving Party shall:  (a) return to the Disclosing Party all documents and tangible materials and any copies thereof containing, reflecting, incorporating, or based on the Disclosing Party's Confidential Information; (b) permanently erase such Confidential Information from its computer systems; and (c) certify in writing to the Disclosing Party that it has complied with the requirements of this <u>Section 14.4</u>; <u>provided</u> that the Receiving Party may keep an archival copy for recordkeeping purposes on the condition that, except as otherwise required by applicable law, (i) personnel whose functions are not primarily information technology do not access such retained copies and (ii) personnel whose functions are primarily information technology in nature access such copies only as reasonably necessary for the performance of their information technology duties (e.g., for purposes of system recovery). Any Confidential Information retained will be held on the terms of <u>Section 9</u> of this Agreement.

14.5   <u>Survival</u>. The rights and obligations of the Parties as to each Vessel set forth in <u>Section 13</u> and <u>Section 1</u> (*Definitions*), <u>Section 6</u> (*Challenges to Licensed Patents*), <u>Section 9</u>

(*Confidentiality*), <u>Section 7</u> (*Escrow and Release Obligations*) <u>Section 10</u> (*Representations and Warranties*), <u>Section 12</u> (*Indemnification*), <u>Section 14.4</u> (*Effect of Termination*), and <u>Section 15</u> (*Miscellaneous*), and any right, obligation, or required performance of the Parties in this Agreement which, by its express terms or nature and context is intended to survive termination or expiration of this Agreement, will survive any such termination or expiration for two (2) years from the termination or expiration date as to such Vessel.

15.   <u>Miscellaneous</u>.

15.1   <u>Force Majeure</u>. Licensor will not be in default by reason of any failure or delay in the performance of its obligations hereunder where such failure or delay is due to any circumstance or cause beyond its reasonable control, including strikes, labor disputes, civil disturbances, riot, rebellion. invasion, epidemic, hostilities, war, terrorist attack, embargo, natural disaster, acts of God, flood, fire, sabotage, fluctuations or non-availability of electrical power, heat, light, air conditioning.

15.2   <u>Independent Contractors</u>. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement creates any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the parties, and neither Party has authority to contract for or bind the other party in any manner whatsoever.

15.3   <u>No Public Statements</u>. Neither Party may issue or release any announcement, statement, press release, or other publicity or marketing materials relating to this Agreement or, unless expressly permitted under this Agreement, otherwise use the other Party's, or such other Party's Affiliates', trademarks, service marks, trade names, logos, domain names, or other indicia of source, association, or sponsorship, in each case, without the prior written consent of the other Party.

15.4   <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (other than routine communications having no legal effect) must be in writing and sent to the respective Party at the addresses indicated below (or at such other address for a Party as may be specified in a notice given in accordance with this Section):

If to Licensor:         Marine Technologies, L.L.C.
                        16201 East Main Street
                        Cut Off, LA 70345
                        Attn: Dino Chouest

                        with a copy by email to legal@chouest.com (which copy shall not
                        constitute official notice to Licensor hereunder)

If to Licensee:         Nautical Solutions, L.L.C.
                        16201 East Main Street
                        Cut Off, LA 70345
                        Attn: Luke Newman

                        with a copy by email to legal@chouest.com (which copy shall not
                        constitute official notice to Licensee hereunder)

If to Collateral Agent: Wilmington Trust, National Association, as Collateral Agent
                        1100 North Market Street
                        Wilmington, DE 19890
                        Attn: Global Capital Markets – Project Finance – Rafael Miranda
                        Email: rmiranda1@wilmingtontrust.com
                        Tel: 845-717-8079

Notices sent in accordance with this Section 15.4 will be deemed effective: (a) when received on a Business Day, if delivered by hand (with written confirmation of receipt); (b) when received on a Business Day, if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email (in each case, with confirmation of transmission), if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3rd) Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.

15.5    Interpretation. For purposes of this Agreement: (a) the words "include," "includes," and "including" will be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Sections and Exhibits refer to the Sections of and Exhibits attached to this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

15.6    Headings. The headings in this Agreement are for reference only and do not affect the interpretation of this Agreement.

15.7    Entire Agreement. This Agreement, together with all Exhibits and any other documents incorporated herein by reference, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements both written and oral, with respect to such subject matter.

15.8    Assignment.

(a)    Licensee shall not assign or otherwise transfer any of its rights, or delegate or otherwise transfer any of its obligations or performance, under this Agreement, in each case, whether voluntarily, involuntarily, by operation of law, or otherwise, without Licensor's prior written consent, which consent Licensor may give or withhold in its sole discretion.  For purposes of the preceding sentence, and without limiting its generality, any merger, consolidation, or reorganization involving Licensee (where Licensee is not the surviving entity or in control of the surviving entity), or any sale or other title transfer of any of the Vessels, will be deemed to be a transfer of rights, obligations, or performance under this Agreement, for which Licensor's prior written consent is required. Notwithstanding the foregoing, (i) solely in connection with the sale or other title transfer by Licensee of a Vessel to an Affiliate of Licensee, with prior written notice by Licensee to Licensor, Licensee may assign to such Affiliate this Agreement as it relates to such Vessel and its applicable Licensed IP and Licensed Products, and (ii) upon the Collateral Agent's exercise of its rights and remedies following the occurrence and during the continuance of an Event of Default (including during a bankruptcy or insolvency proceeding of Licensee), the Collateral Agent may, with prior written notice to Licensor but without the consent of Licensor or Licensee, assign this Agreement, in whole or on a Vessel-by-Vessel basis, in connection with the direct or indirect sale or other title transfer of a Vessel to a third party (including to the Collateral Agent or a designee) or in connection with the sale or transfer of the equity of Nautical Solutions resulting in a Change of Control (such third party or Nautical Solutions after giving effect to the Change of Control being referred to in each case as a "Vessel Buyer"), and Licensor acknowledges and agrees that it has consented to assignment in accordance with this sentence, including for purposes of Section 365(c) of the U.S. Bankruptcy Code (and any amendments thereto); provided that, as to any Vessel, this Agreement may only be assigned once to a third-party Vessel Buyer; provided further, however, that, if the Vessel Buyer is the Collateral Agent or a designee, the Collateral Agent or designee may further assign this Agreement as to each Vessel on a one-time basis to another Vessel Buyer.  In the event of any assignment by Licensee or Collateral Agent of this Agreement as permitted pursuant to this Section 15.8, such permitted assignee (i.e., Licensee's Affiliate in accordance with clause (i) above or the Vessel Buyer in accordance with clause (ii) above) shall be deemed to be a "Licensee" under this Agreement (and if there are multiple Licensees hereunder, then this Agreement thereafter shall be deemed a separate agreement as to each Licensee).  Any purported assignment, delegation, or transfer in violation of this Section 15.8 is void.

(b)    Licensor may freely assign or otherwise transfer all or any of its rights, or delegate or otherwise transfer all or any of its obligations or performance, under this Agreement; provided, that Licensor shall provide written notice to Licensee and Collateral Agent of such transfer as soon as practicable. For the avoidance of doubt, (i) any assignee (including any Affiliate

of Licensor) of the Licensed IP and the Licensed Products takes them subject to Licensee's rights under this Agreement, including the license grant in <u>Section 2.1</u>, and (ii) in the event of an assignment or other transfer of the Licensed IP or Licensed Products, this Agreement and Licensee's and Collateral Agent's rights under this Agreement shall continue in full force and effect, and Licensor will notify such assignee or transferee of the foregoing (i) and (ii).

(c)     This Agreement is binding upon and inures to the benefit of Licensor and Licensee and their respective permitted successors and assigns.

15.9     <u>No Third Party Beneficiaries</u>. Other than with respect to the Collateral Agent, this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any third party any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement. The Collateral Agent is a third party beneficiary for purposes of enforcing its rights hereunder.  When the Note Obligations are paid in full in cash, then (i) the Collateral Agent no longer is a third party beneficiary and (ii) all references herein to the Collateral Agent, its designees and Vessel Buyers no longer shall be effective (but a Vessel Buyer shall retain all of its rights and obligations as a Licensee).

14.10     <u>Amendment: Modification; Waiver</u>.  No amendment or modification to this Agreement is effective unless it is in writing and signed by an authorized representative of each Party and (if the Note Obligations have not been paid in full in cash) the Collateral Agent (at the direction of Required Holders).  No waiver by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the Party so waiving and signed by the Collateral Agent (at the direction of Required Holders). Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, remedy, power, or privilege.

15.10     <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

15.11     <u>Dispute Resolution; Governing Law; Submission to Jurisdiction</u>.

(a)     Any claim, disagreement or dispute between the Parties arising out of or relating to this Agreement (a "<u>Dispute</u>") shall be resolved in the manner provided in this <u>Section 15.11</u>. The Parties shall attempt to resolve any Dispute by negotiating in good faith for a period of third (30) days after receipt by either Party of a written notice of the Dispute from the other Party (the "<u>Negotiation Period</u>"). The written notice shall identify, with reasonable particularity, each matter or issue that is the subject of the dispute, a summary of the basis for the Party's

position with respect to each such matter or issue and the relief being requested by the Party. No Party shall commence any Action in respect of any Dispute (i) until the expiration of the Negotiation Period or (ii) if the other Party has refused to participate or has not reasonably participated in the required negotiation process in good faith set forth in this <u>Section 15.11</u>. If the Parties are unable to resolve the Dispute during the Negotiation Period, the Dispute shall be finally settled by binding arbitration conducted expeditiously in accordance with the Comprehensive Arbitration Rules & Procedures, including the Expedited Procedures then followed by the Judicial Arbitration and Mediation Services, Inc. ("<u>JAMS</u>") or any successor to the functions thereof ("<u>Rules</u>"), and judgment upon the award rendered by the arbitrator shall be entered by any court of competent jurisdiction. One arbitrator shall be jointly selected by the Parties.  If the Parties are unable to jointly select an arbitrator, the arbitrator shall be appointed in accordance with the Rules.  The cost of the arbitrator shall be shared equally by the Parties. The location of the arbitration proceeding shall be New York, New York and the language of arbitration shall be English.  All arbitration proceedings are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and the applicable state rules of evidence. The dispute resolution provisions of this <u>Section 15.11(a)</u> shall not be construed to interfere with a Party's other rights provided by this Agreement, including the right to terminate this Agreement in accordance with its terms. During the pendency of any such Dispute, all of the terms and conditions of this Agreement shall remain in effect and the Parties shall continue to perform all of their respective obligations hereunder.

(b)     This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

(c)     The Parties irrevocably submit to the exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement, the Notes or, except as otherwise required by applicable law, any other Note Document. To the fullest extent permitted by applicable law, the Parties irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

15.12   <u>Waiver of Jury Trial</u>. Each Party irrevocably and unconditionally waives any right it may have to a trial by jury for any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

15.13   <u>Equitable Relief</u>. Each Party acknowledges that a breach by the other Party of this Agreement may cause the non-breaching Party irreparable harm, for which an award of damages would not be adequate compensation and, in the event of such a breach or threatened breach, the non-breaching Party will be entitled to seek equitable relief, including in the form of a restraining order, orders for preliminary or permanent injunction, specific performance, and any other relief that may be available from any court, and the Parties hereby waive any requirement for the securing or posting of any bond or the showing of actual monetary damages in connection

with such relief. These remedies are not the exclusive remedy for a breach of this Agreement but are in addition to all other remedies available at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary, and shall not in any way affect any other rights or remedies of the Parties under this Agreement.

15.14    Attorneys' Fees. In the event that any action, suit, or other legal or administrative proceeding is instituted or commenced by either Party against the other Party arising out of or related to this Agreement, the prevailing Party will be entitled to recover its reasonable attorneys' fees, expenses, and court costs from the non-prevailing Party.

15.15    Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. The words "execution," "signed," "signature," and words of like import used in this Amendment will be deemed to include electronic signatures or the keeping of records in electronic form, each of which will be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

15.16    Joinder. It is understood and agreed that to the extent any Affiliate of Licensor owns or controls or has contributed to the Vessels any intellectual property rights (including any software or technology) relating to the Licensed Products or Vessels, such Affiliate shall be deemed to be and required to become a "Licensor" under this Agreement by (x) executing a joinder agreement and delivering the same to each of the Collateral Agent and AIG and Prudential in form and substance reasonably satisfactory to the Required Holders (as defined in the NEA and hereinafter referred to as the "NEA Required Holders"), (y) delivering supplements to Exhibit A of this Agreement as are necessary to cause such Exhibit to be complete and accurate with respect to such additional Affiliate on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Affiliate had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Collateral Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Collateral Agent (acting at the direction of the NEA Required Holders).  In the event any added Licensor ceases to be an Affiliate of the other Licensor entities, then such Licensor ceasing to be an Affiliate shall endeavor to enter into a new agreement with Licensee granting Licensee the rights granted under this Agreement on terms and conditions substantially similar to this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties and the Collateral Agent have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

MARINE TECHNOLOGIES, L.L.C.

By:   _____

      Name:

      Title:


NAUTICAL SOLUTIONS, L.L.C.

By:   _____

      Name:

      Title:


WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent

By:   _____

      Name:

      Title:

**EXHIBIT A**

**See the following Exhibits A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8, A-9, A-10, A-11, A-12, A-13, A-14, A-15, A-16, A-17, A-18, A-19, A-20, A-21, A-22, A-23, A-24, A-25, A-26, A-27, A-28 and A-29.**

|  | **Vessel** | **Official Number** |
|---|---|---|
| A-1 | Avery Island | 1253395 |
| A-2 | Brad Dartez | 1252257 |
| A-3 | Cat Island | 1257750 |
| A-4 | Celena Chouest | 1201702 |
| A-5 | Corcovado | 1215834 |
| A-6 | Dante | 1178758 |
| A-7 | Dauphin Island | 1262978 |
| A-8 | Deer Island | 1289730 |
| A-9 | Dino Chouest | 1207856 |
| A-10 | Fast Tender | 1206390 |
| A-11 | Fast Track | 1208793 |
| A-12 | Forte | 1223605 |
| A-13 | Gavea | 1211932 |
| A-14 | Grand Isle | 1250605 |
| A-15 | Horn Island | 1255030 |
| A-16 | Jackie Chouest | 1210979 |
| A-17 | Kirt Chouest | 1213707 |
| A-18 | Lyman Martin | 1227085 |
| A-19 | Marsh Island | 1266925 |
| A-20 | Mr Sidney | 1216539 |
| A-21 | Ms Virgie | 1213714 |
| A-22 | Pao de Acucar | 1218372 |
| A-23 | Paradise Island | 1262977 |
| A-24 | Pecan Island | 1258532 |
| A-25 | Pelican Island | 1261549 |
| A-26 | Sanibel Island | 1257727 |
| A-27 | Ship Island | 1252958 |
| A-28 | Timbalier Island | 1251360 |
| A-29 | Wine Island | 1259152 |

**EXHIBIT A-1**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Avery Island (O.N. 1253395)

<u>Licensed Patents</u>

     None.

<u>Licensed Know-How</u>

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

     Applicable software object code as to the Licensed Know-How

**EXHIBIT A-2**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Brad Dartez (O.N. 1252257)

Licensed Patents

     None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

     Applicable software object code as to the Licensed Know-How

**EXHIBIT A-3**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Cat Island (O.N. 1257750)

Licensed Patents

     None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

     Applicable software object code as to the Licensed Know-How

**EXHIBIT A-4**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Celena Chouest (O.N. 1201702)

<u>Licensed Patents</u>

　　None.

<u>Licensed Know-How</u>

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

　　Applicable software object code as to the Licensed Know-How

**EXHIBIT A-5**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Corcovado (O.N. 1215834)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-6**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Dante (O.N. 1178758)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-7**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Dauphin Island (O.N. 1262978)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-8**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Deer Island (O.N. 1289730)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-9**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Dino Chouest (O.N. 1207856)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-10**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Fast Tender (O.N. 1206390)

Licensed Patents

    None.

Licensed Know-How

    Operations manuals, documentation, and use of the Dynamic Position Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-11**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Fast Track (O.N. 1208793)

Licensed Patents

     None.

Licensed Know-How

     Operations manuals, documentation, and use of the Dynamic Position Systems

Licensed Copyrights

     Applicable software object code as to the Licensed Know-How

**EXHIBIT A-12**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Forte (O.N. 1223605)

Licensed Patents

    None.

Licensed Know-How

    Operations manuals, documentation, and use of the Dynamic Position Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-13**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Gavea (O.N. 1211932)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-14**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Grand Isle (O.N. 1250605)

<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-15**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Horn Island (O.N. 1255030)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-16**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Jackie Chouest (O.N. 1210979)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-17**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Kirt Chouest (O.N. 1213707)

Licensed Patents

     None.

Licensed Know-How

     Operations manuals, documentation, and use of the Dynamic Position Systems

Licensed Copyrights

     Applicable software object code as to the Licensed Know-How

**EXHIBIT A-18**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Lyman Martin (O.N. 1227085)

Licensed Patents

>  None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

>  Applicable software object code as to the Licensed Know-How

**EXHIBIT A-19**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Marsh Island (O.N. 1266925)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-20**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Mr Sidney (O.N. 1216539)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-21**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Ms Virgie (O.N. 1213714)

<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-22**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Pao de Acucar (O.N. 1218372)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-23**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Paradise Island (O.N. 1262977)

Licensed Patents

　　　None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

　　　Applicable software object code as to the Licensed Know-How

44

**EXHIBIT A-24**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Pecan Island (O.N. 1258532)

<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

- Operations manuals, documentation, and use of the Dynamic Position Systems
- Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-25**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Pelican Island (O.N. 1261549)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-26**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Sanibel Island (O.N. 1257727)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-27**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Ship Island (O.N. 1252958)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-28**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Timbalier Island (O.N. 1251360)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-29**

**VESSEL; LICENSED IP**

Vessel Name and Official Number:  Wine Island (O.N. 1259152)


<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

## [FORM OF] NON-EXCLUSIVE AND ASSIGNABLE
## COPYRIGHT LICENSE AGREEMENT

This NON-EXCLUSIVE AND ASSIGNABLE COPYRIGHT LICENSE AGREEMENT (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of [●], 2023 (the "Effective Date"), is made by and among:

North American Shipbuilding, L.L.C., a Louisiana limited liability company with offices located at 800 Industrial Park Road, Larose, Louisiana 70373 ("Licensor");

Nautical Solutions, L.L.C., a Louisiana limited liability company ("Nautical Solutions" or "Licensee"); and

for the specified rights described herein, Wilmington Trust, National Association, a national banking association (as may be replaced from time to time by any successor collateral agent, the "Collateral Agent").

Licensor and Licensee (including any successor Licensee pursuant to Section 1.4) are referred to herein collectively as the "Parties," or each, individually, as a "Party".

RECITALS

WHEREAS, Licensor is the owner of all right, title, and interest in the Work and all copyrights related thereto (as defined below);

WHEREAS, Nautical Solutions is engaged in the marine transportation business;

WHEREAS, Nautical Solutions and the Collateral Agent are party to that certain Note Exchange Agreement, dated as of even date herewith (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Note Exchange Agreement"), together with Nautical Solutions Holdings, LLC, a Louisiana limited liability company, the Agent (as defined therein) and the noteholders identified therein (the "Noteholders"), with respect to the Vessels, pursuant to which, among other things, the Noteholders agreed to exchange certain debt obligations into the notes issued under the Note Exchange Agreement;

WHEREAS, Licensee wishes to obtain from Licensor, and Licensor is willing to grant to Licensee, a license to the Work and all copyright(s) (whether or not registered) owned or controlled by Licensor related to each Vessel, including the copyright(s) in the Work as necessary for maintaining, repairing, servicing, modifying, providing technical support for, or otherwise operating each Vessel, subject to the terms and conditions set forth herein;

WHEREAS, the Noteholders conditioned the exchange of their debt obligations and their entry into the Note Exchange Agreement on Licensor granting the Collateral Agent certain rights with respect to the Work so as to enable the Vessels, subject to the terms and conditions hereof, to continue operating with the benefit of the License notwithstanding a change of ownership of the Vessels in certain circumstances or a Change of Control of Licensee; and

WHEREAS, capitalized terms used herein without definition that are defined in the Note Exchange Agreement shall have the respective meanings given them in the Note Exchange Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties and the Collateral Agent (in the case of the Collateral Agent, solely with respect to Section 1.4) agree as follows:

1. License.

1.1    Grant of Rights. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee, and Collateral Agent (subject to Section 1.4), during the Term (as defined below) an irrevocable (except for termination as permitted in Section 6.2 and Section 6.3), non-exclusive, non-transferable (except as permitted in Section 8.4), worldwide, royalty-free license in and to all copyright(s) (whether or not registered) owned or controlled by Licensor related to each Vessel, including the copyright(s) in the Work as necessary for maintaining, repairing, servicing, modifying, providing technical support for, or otherwise operating each Vessel (the "License"). Licensee may sublicense such License rights to an Affiliate or third party that is maintaining, repairing, servicing, modifying, providing technical support for or to, or otherwise operating a Vessel for or on behalf of Licensee (including, with respect to the Collateral Agent, any third party engaged by Collateral Agent to operate such Vessel(s)) and solely for such purposes. Except as specifically set forth in the prior sentence, the License is otherwise non-sublicensable. The License is not for resale or distribution to others other than as set forth in Section 8.4 of this Agreement. The "Work" and each "Vessel" are defined as those works and the vessels identified in Exhibit A attached to this Agreement or any derivative works provided by Licensor or its Affiliates pursuant to the Master Services Agreement; provided, that if any such Vessel were to be sold (i) by Licensee as permitted by Section 9.21 of the Note Exchange Agreement, or (ii) by a Vessel Buyer (other than if such Vessel is sold through the exercise of remedies by the Collateral Agent, subject to the one-time assignment condition of Section 8.4), then such Vessel no longer shall be a Vessel hereunder and no longer shall be subject to this Agreement and the License. For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Work as to a particular Vessel shall not mean the Work as to any other Vessel. The Parties intend and agree that, for purposes of Section 365(n) of the U.S. Bankruptcy Code (and any amendment thereto), the foregoing License shall be treated as a license to intellectual property (as defined in Section 101(35A) of the U.S. Bankruptcy Code).

1.2    Third-Party Rights. Notwithstanding any other provisions of this Agreement to the contrary, nothing in this Agreement will be deemed to be a grant by Licensor of a license, sublicense, or other grant of a right to Licensee to use any third-party rights or any rights under any third-party license that cannot be licensed, sublicensed, or granted without the consent, approval, or agreement of another party which cannot be obtained following reasonable efforts by Licensor.

1.3    Reservation of Rights. Licensor reserves all rights not expressly granted to Licensee under this Agreement. No use by Licensor of the Work in any medium or manner will be deemed to interfere with the limited permissions made to Licensee by Licensor herein.

1.4     Collateral Agent Exercise of License. At any time following the occurrence and during the continuance of an Event of Default, without the need of notice to or consent by any Party other than as to notice as set forth in Section 8.4, the License and other rights granted to Licensee under this Agreement may be exercised by the Collateral Agent, a designee of the Collateral Agent and, as to each Vessel, any Vessel Buyer (and the Collateral Agent, any such designee and each Vessel Buyer that exercises such rights, as applicable, shall thereafter be considered a "Licensee" for all purposes of this Agreement and, for the avoidance of doubt, each Vessel Buyer shall be subject to the obligations of Licensee hereunder).  Notwithstanding anything to the contrary herein, and for the avoidance of doubt, the Collateral Agent hereby covenants and agrees to refrain from (a) exercising, and (b) permitting any designee of the Collateral Agent from exercising, the License rights granted to Licensee under Section 1.1, solely as it relates to the Collateral Agent, in each case unless and until the occurrence and during the continuance, of an Event of Default.

1.5     Maintenance and Support.   Reference is hereby made to that certain Master Services Agreement dated of even date herewith by and among, among others, Licensor and Licensee with respect to available maintenance and support to be provided to Licensee, Collateral Agent, its designees and Vessel Buyer, as the case may be, by Licensor (the "Master Services Agreement").

2.     Usage of the Work.  Notwithstanding any other provision to the contrary contained in this Agreement:

2.1     Copyright Notices.  Licensee shall ensure that all copies of the Work created by Licensee are marked with the appropriate copyright notices specified or pre-marked by Licensor in a prominent position in the order and manner provided by Licensor.  Licensee shall not use any copyright notices that conflict with, confuse, or negate the copyright notices Licensor provides and requires hereunder.

2.2     Modifications.  Without Licensor's prior written consent (which consent may not be unreasonably withheld, conditioned or delayed), Licensee shall not translate, recast, edit, alter, modify, or create any derivative works of the Work except to the extent necessary or required for the maintenance, repair, modification, technical support or operation of the applicable Vessel.

3.     Ownership and Protection.

3.1     Acknowledgment of Ownership. Except for the limited license expressly granted to Licensee in this Agreement, Licensee acknowledges that all right, title, and interest in and to the Work and any copyrights related thereto are owned by Licensor.  Licensee agrees not to dispute or challenge or assist any person or entity in disputing or challenging Licensor's rights in the Work and any copyrights related thereto.

3.2     Protection of the Work.

(a)     Notification. Licensee shall, at Licensee's sole expense, take commercially reasonable measures to safeguard the Work from access and reproduction by unauthorized third parties.  Licensee shall promptly notify Licensor in writing with reasonable detail of any: (i) actual, suspected, or threatened infringement of the Work by a third party of which Licensee may become

aware; (ii) actual, suspected, or threatened claim of a third party that Licensee's use of the Work infringes the rights of such third party; or (iii) any other actual, suspected, or threatened claim made by a third party against Licensee to which the Work may be subject.

(b)    Actions. With respect to any of the matters listed in Section 3.2(a): (i) Licensor shall have exclusive control over, and conduct of, all claims and proceedings; (ii) Licensee shall provide Licensor with reasonable cooperation and assistance at Licensor's expense but only upon prior written authorization by Licensor for such expenses (provided that such cooperation and assistance is subject to receipt of such prior written authorization) that Licensor may reasonably require in the conduct of any claims or proceedings; and (iii) Licensor shall bear the cost of any proceedings and will be entitled to retain all sums recovered in any action for its own account.

3.3    Confidentiality Obligations. As used in this Agreement, "Confidential Information" means all information about a Party's business affairs, confidential intellectual property, trade secrets, third-party confidential information, and other sensitive or proprietary information, including business operations and strategies, marketing, creative elements, artwork, visual representations, research material and data, specifications, processes, and technological developments, in each case whether orally or in written, electronic, or other form or media, and in each case whether or not marked, designated, or otherwise identified as "confidential." Licensor's Confidential Information shall specifically include the Work and all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations, and other materials prepared by or for Licensee that contain, are based on, or otherwise reflect or are derived from the Work in whole or in part; provided, that Confidential Information does not include information that, at the time of disclosure and as established by documentary evidence: (a) is or becomes generally available to and known by the public other than as a result of, directly or indirectly, any breach of this Section 3.3 by Licensee; (b) is or becomes available to Licensee on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information; (c) was known by or in the possession of Licensee before being disclosed by or on behalf of Licensor; or (d) was or is independently developed by Licensee without reference to or use, in whole or in part, of any of Licensor's Confidential Information.

(a)    The Party or the Collateral Agent receiving the Confidential Information (the "Receiving Party") acknowledges that in connection with this Agreement it will gain access to Confidential Information of a Party who discloses or makes available to use the Confidential Information to the Receiving Party (the "Disclosing Party"). As a condition to being provided with Confidential Information, the Receiving Party shall, during the Term and for three (3) years thereafter:

(i)    not use the Disclosing Party's Confidential Information other than as strictly necessary to perform its obligations under this Agreement;

(ii)    maintain the Disclosing Party's Confidential Information in strict confidence and, subject to Section 3.3(b), not disclose the Disclosing Party's Confidential Information without the Disclosing Party's prior written consent: provided, that the Receiving Party may disclose the Confidential Information to its personnel, employees, officers, directors,

consultants, and legal advisors ("Representatives") who:

> (A)     have a need to know the Confidential Information for purposes of the Receiving Party's performance, or exercise of its rights concerning the Confidential Information, under this Agreement;

> (B)     have been apprised of this restriction; and

> (C)     are themselves bound by written nondisclosure agreements or professional obligations at least as restrictive as those set forth in this Section 3.3; provided, further, that the Receiving Party will be responsible for ensuring its Representatives' compliance with, and will be liable for any breach by its Representatives of, this Section 3.3.

The Receiving Party shall use reasonable care, and efforts at least as protective as the efforts it uses for its own confidential information of the same or similar nature, to safeguard the Disclosing Party's Confidential Information from use or disclosure other than as permitted hereby.

(b)     Exceptions. If the Receiving Party becomes legally compelled to disclose any Confidential Information, the Receiving Party shall:

> (i)     provide prompt written notice to the Disclosing Party so that the Disclosing Party may seek a protective order or other appropriate remedy or waive its rights under this Section 3.3; and

> (ii)     disclose only the portion of Confidential Information that it is legally required to furnish.

If a protective order or other remedy is not obtained, or the Disclosing Party waives compliance under this Section 3.3, the Receiving Party shall, at the Disclosing Party's expense, use reasonable efforts to obtain assurance that confidential treatment will be afforded the Confidential Information.

4.     Representations and Warranties; Covenants.

4.1     Mutual Representations and Warranties. Each Party represents and warrants to the other Party that as of the Effective Date:

(a)     it is duly organized, validly existing, and in good standing as a limited liability company as represented herein under the laws and regulations of its jurisdiction of incorporation, organization, or chartering;

(b)     it has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder;

(c)      the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary limited liability company actions of the Party; and

(d)      when executed and delivered by such Party, this Agreement will constitute the legal, valid, and binding obligation of such Party, enforceable against such Party in accordance with its terms.

4.2      <u>Licensor's Representations and Warranties</u>.  Licensor represents and warrants that as of the Effective Date:  (a) Licensor is the sole and exclusive (even as to its Affiliates) legal and beneficial owner of the entire right, title, and interest in and to the Work and all copyrights related thereto and all Confidential Information of Licensor disclosed to Licensee under this Agreement; (b) as to each applicable Vessel, to Licensor's knowledge, no intellectual property rights owned or controlled by any Person (other than Licensor), including any Affiliate of Licensor are used in or necessary for the operation of such Vessel and Licensee's use of the Work (other than rights to third party off-the-shelf software generally commercially available on standard terms and applicable Licensed IP under and as defined in the Non-exclusive and Assignable Patent, Copyright and Know-How License Agreement dated as of [●], 2023, by and among Marine Technologies, L.L.C., Licensee and Collateral Agent); (c) as to each applicable Vessel, the Work and all related copyrights set forth on <u>Exhibit A</u> are all of the works and copyrights necessary for maintaining, repairing, servicing, modifying, providing technical support for, or otherwise operating, those portions of the Vessels to which the Work pertains; (d) Licensor has not granted to any third party any licenses or other rights under the Work and related copyrights that are in conflict with the terms and conditions of this Agreement; (e) Licensor has not received any written notice or threat of any claim, suit, action, or proceeding regarding to the infringement, misappropriation or violation of the intellectual property rights of any third party related to the Work or any related copyrights; and (f) neither Licensor nor any Affiliate of Licensor owns, controls or has any right, title or interest in or to, or has contributed any Intellectual Property, software, or other technology used in the Vessels other than the copyrights in the License, rights under licenses to off-the-shelf software generally commercially available on standard terms, and the Licensed IP under and as defined in the Non-exclusive and Assignable Patent, Copyright and Know-How License Agreement dated as of [●], 2023, by and among Marine Technologies, L.L.C., Licensee and Collateral Agent.

4.3      <u>Disclaimer of Representations and Warranties</u>. EXCEPT AS EXPRESSLY PROVIDED IN THIS <u>SECTION 4</u>, LICENSOR EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, CONCERNING THE VALIDITY, ENFORCEABILITY, AND SCOPE OF THE WORK, THE ACCURACY, COMPLETENESS, SAFETY, USEFULNESS FOR ANY PURPOSE, OR LIKELIHOOD OF SUCCESS (COMMERCIAL, REGULATORY OR OTHER) OF THE WORK AND ANY OTHER TECHNICAL INFORMATION, TECHNIQUES, MATERIALS, METHODS, PRODUCTS, PROCESSES, OR PRACTICES AT ANY TIME MADE AVAILABLE BY LICENSOR, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY, FITNESS FOR A PARTICULAR PURPOSE, AND WARRANTIES ARISING FROM A COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE, OR TRADE PRACTICE. WITHOUT LIMITATION TO THE FOREGOING, LICENSOR WILL HAVE NO LIABILITY

6

WHATSOEVER TO LICENSEE OR ANY OTHER PERSON FOR OR ON ACCOUNT OF ANY INJURY, LOSS, OR DAMAGE, OF ANY KIND OR NATURE, SUSTAINED BY, OR ANY DAMAGE ASSESSED OR ASSERTED AGAINST, OR ANY OTHER LIABILITY INCURRED BY OR IMPOSED ON LICENSEE OR ANY OTHER PERSON, ARISING OUT OF OR IN CONNECTION WITH OR RESULTING FROM (A) THE USE OF OR ERRORS IN THE WORK; OR (B) THE USE OF OR ANY ERRORS OR OMISSIONS IN ANY KNOW-HOW, TECHNICAL INFORMATION, TECHNIQUES, OR PRACTICES DISCLOSED BY LICENSOR TO LICENSEE PURSUANT TO THIS AGREEMENT.

5.    Indemnification.

    5.1    Licensee Indemnification. Licensee shall indemnify, defend, and hold harmless Licensor and its officers, directors, employees, agents, Affiliates, successors, assigns, attorneys, and licensees (each, an "Indemnified Party") from and against any losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers, arising out of or in connection with any third-party claim, suit, action, or proceeding (each, a "Third-Party Claim") relating to or arising out of or resulting from: (a) any breach by Licensee of its representations, warranties, covenants, or other obligations hereunder, or (b) any unauthorized use or disclosure by Licensee of the Work outside the permitted uses or disclosures under the License.  For purposes of this Section 5.1, for the avoidance of doubt, "Licensee" shall not include the Collateral Agent, and Collateral Agent shall have no obligation to any Indemnified Party under this Section 5.1, unless and until such time that Collateral Agent exercises its rights under the License pursuant to Section 1.4.

    5.2    Licensor Indemnification. Licensor shall indemnify, defend, and hold harmless Licensee and its officers, directors, employees, agents. Affiliates, successors, permitted assigns, attorneys, and permitted sub-licensees (each, an "Indemnified Party") from and against any Third-Party Claim relating to or arising out of or resulting from: (a) any breach by Licensor of its representations, warranties, covenants, or other obligations hereunder, or (b) any violation, misappropriation or infringement upon the copyrights, rights of publicity, trade secrets or intellectual property rights of any third party arising from Licensee's authorized use of the Work and its permitted uses or disclosures under the License.

    5.3    Indemnification Procedure. The Indemnified Party shall notify the indemnifying Party in writing of any Third Party Claim and cooperate with the indemnifying Party at its sole cost and expense. Subject to Section 3.2, the indemnifying Party shall immediately take control of the defense and investigation of the Third Party Claim and shall employ counsel reasonably acceptable to the Indemnified Party to handle and defend the Third Party Claim, at the indemnifying Party's sole cost and expense. The indemnifying Party shall not settle any Third Party Claim in a manner that adversely affects the rights of the Indemnified Party without its prior written consent. The Indemnified Party's failure to perform any obligations under this Section 5 will not relieve the indemnifying Party of its indemnification obligation under this Section 5 except to the extent the indemnifying Party can demonstrate that it has been materially prejudiced as a result of such failure. The Indemnified Party may participate in and observe the proceedings at its own cost and expense with counsel of its own choosing.

6.      Term and Termination.

6.1      Term. The term of this Agreement as to the applicable Work for a particular Vessel commences as of the Effective Date and, unless terminated earlier with the prior written consent of the Parties and (if the Note Obligations have not been paid in full in cash) the Collateral Agent (at the direction of the Required Holders) or as provided in Section 6.2, will remain in force until such time as none of Licensee, the Collateral Agent, a designee thereof or a Vessel Buyer are the owner or operator of the particular Vessel (the "Term").

6.2      Termination for Cause. Licensor may terminate this Agreement as to all Vessels on written notice to Licensee and the Collateral Agent if Licensee materially breaches its obligations under this Agreement and such breach is not cured within forty-five (45) days from Licensor's written notice thereof to both Licensee and Collateral Agent detailing such breach. Notwithstanding the foregoing, if Licensor terminates this Agreement in the event of such uncured breach by Nautical Solutions, Licensor shall only be entitled to terminate this Agreement as to Nautical Solutions, and this Agreement (and the License) shall otherwise remain in full force and effect with respect to the Collateral Agent, its designee or any Vessel Buyer, as applicable, each of whom retains the right to exercise the rights as a Licensee, subject to the terms and conditions hereof.

6.3      Termination for Bankruptcy or Insolvency.  As to any Vessel Buyer that by virtue of this Agreement becomes a Licensee, Licensor may terminate this Agreement as to such Vessel Buyer by written notice to such Licensee if such Licensee: (a) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which as to any involuntary proceeding is not fully stayed within seven (7) Business Days or is not dismissed or vacated within forty-five (45) days after filing; (b) is dissolved or liquidated or takes any corporate action for such purpose; (c) makes a general assignment for the benefit of creditors; or (d) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

6.4      Effect of Termination. Except as set forth in Section 6.2 above, upon the termination of this Agreement for any reason, all rights licensed under the License in this Agreement will revert immediately to Licensor, and Licensee shall immediately cease all activities concerning, including all practice and use of, the applicable Work(s) no longer subject to this Agreement.  After termination or expiration of this Agreement, within thirty (30) days after the written request of Licensor, the receiving party of any Confidential Information shall: (a) return to Licensor all documents and tangible materials and any copies thereof containing, reflecting, incorporating, or based on the Work; (b) permanently erase the copies of the Work from its computer systems; and (c) certify in writing to Licensor that it has complied with the requirements of this Section 6.4; provided that the receiving party of the Confidential Information may keep an archival copy for recordkeeping purposes on the condition that, except as otherwise required by applicable law, (i) personnel whose functions are not primarily information technology do not access such retained copies and (ii) personnel whose functions are primarily information technology access such copies only as reasonably necessary for the performance of their information technology duties (e.g., for purposes of system recovery).  Any Confidential Information retained will be held on the terms of Section 3.3 of this Agreement.

6.5     Surviving Rights. The rights and obligations of the Parties as to each Vessel and related to its Work set forth in this Section 6, Section 3 (*Ownership and Protection*), Section 4 (*Representations and Warranties; Covenants*), Section 5 (*Indemnification*), Section 6.4 (*Effect of Termination*), Section 7 (*Remedies*), and Section 8 (*General*), and any right, obligation, or required performance of the Parties in this Agreement which, by its express terms or nature and context is intended to survive termination or expiration of this Agreement, will survive any such termination or expiration for two (2) years from the termination or expiration date as to such Vessel and its Work.

7.     Remedies.

7.1     Equitable Relief. Licensee acknowledges that a breach by Licensee of this Agreement may cause Licensor irreparable damages, for which an award of damages would not be adequate compensation, and agrees that, in the event of such breach or threatened breach, Licensor will be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance, and any other relief that may be available from any court, in addition to any other remedy to which Licensor may be entitled at law or in equity. Such remedies are not the exclusive remedies for a breach of this Agreement but are in addition to all other remedies available at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary, and shall not in any way affect any other rights or remedies of the Parties under this Agreement.

7.2     Limitation of Liability. EACH PARTY WILL NOT BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, LIQUIDATED, SPECIAL, OR EXEMPLARY DAMAGES OR PENALTIES, INCLUDING LOSSES OF BUSINESS, REVENUE, OR ANTICIPATED PROFITS, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. COLLATERAL AGENT SHALL NOT BE LIABLE TO LICENSOR OR ANY THIRD PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR ACTS, OMISSIONS, OR DAMAGES CAUSED BY NAUTICAL SOLUTIONS OR ANY PERMITTED ASSIGNEE, AND LICENSOR SHALL NOT BRING ANY CLAIM AGAINST COLLATERAL AGENT FOR SUCH ACTS OR OMISSIONS BY NAUTICAL SOLUTIONS OR ANY PERMITTED ASSIGNEE, OR SEEK ANY DAMAGES OR RECOVERY FROM COLLATERAL AGENT FOR FINANCIAL OBLIGATIONS OF NAUTICAL SOLUTIONS OR ANY PERMITTED ASSIGNEE.

8.     General.

8.1     Interpretation. For purposes of this Agreement: (a) the words "include," "includes," and "including" are deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. This Agreement is intended to be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

8.2     <u>Entire Agreement</u>.  This Agreement, including and together with any related attachments, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

8.3     <u>Severability</u>.  If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon a determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

8.4     <u>Assignment</u>.

(a)     Licensee shall not assign or otherwise transfer any of its rights, or delegate or otherwise transfer any of its obligations or performance, under this Agreement, in each case whether voluntarily, involuntarily, by operation of law, or otherwise, without Licensor's prior written consent, which consent Licensor may give or withhold in its sole discretion.  For purposes of the preceding sentence, and without limiting its generality, any merger, consolidation, or reorganization involving Licensee (where Licensee is not the surviving entity or in control of the surviving entity), or any sale or other title transfer of any of the Vessels will be deemed to be a transfer of rights, obligations, or performance under this Agreement, for which Licensor's prior written consent is required.  Notwithstanding the foregoing, (i) solely in connection with the sale or other title transfer by Licensee of a Vessel to an Affiliate of Licensee, with prior written notice by Licensee to Licensor, Licensee may assign to such Affiliate this Agreement as it relates to such Vessel and its applicable Work, and (ii) upon the Collateral Agent's exercise of its rights and remedies following the occurrence and during the continuance of an Event of Default (including during a bankruptcy or insolvency proceeding of Licensee), the Collateral Agent may, with prior written notice to Licensor but without the consent of Licensor or Licensee, assign this Agreement in whole or on a Vessel-by-Vessel basis, in connection with the direct or indirect sale or other title transfer of a Vessel to a third party (including to the Collateral Agent or a designee) or in connection with the sale or transfer of the equity of Nautical Solutions resulting in a Change of Control (such third party or Nautical Solutions after giving effect to the Change of Control being referred to in each case as a "<u>Vessel Buyer</u>"), and Licensor acknowledges and agrees that it has consented to assignment in accordance with this sentence, including for purposes of Section 365(c) of the U.S. Bankruptcy Code (and any amendments thereto); <u>provided</u> that, as to any Vessel, this Agreement may only be assigned once to a third-party Vessel Buyer; <u>provided</u> further, however, that, if the Vessel Buyer is the Collateral Agent or a designee, the Collateral Agent or designee may further assign this Agreement as to each Vessel on a one-time basis to another Vessel Buyer. In the event of any assignment by Licensee or Collateral Agent of this Agreement as permitted pursuant to this <u>Section 8.4</u>, such permitted assignee (i.e., Licensee's Affiliate in accordance with clause (i) above or the Vessel Buyer in accordance with clause (ii) above) shall be deemed to be a "Licensee" under this Agreement (and if there are multiple Licensees hereunder, then this Agreement thereafter shall be deemed a separate agreement as to each Licensee).  Any purported

10

assignment, delegation, or transfer in violation of this <u>Section 8.4</u> is void.

(b)     Licensor may freely assign or otherwise transfer all or any of its rights, or delegate or otherwise transfer all or any of its obligations or performance, under this Agreement; <u>provided</u>, that Licensor shall provide written notice to Licensee and Collateral Agent of such transfer as soon as practicable. For the avoidance of doubt, (i) any assignee (including any Affiliate of Licensor) of the Work and all related copyrights takes them subject to Licensee's rights under this Agreement, including the license grant in <u>Section 1.1</u> and (ii) in the event of an assignment or other transfer of the Work, this Agreement and Licensee's and Collateral Agent's rights under this Agreement shall continue in full force and effect, and Licensor will notify such assignee or transferee of the foregoing (i) and (ii).

(c)     This Agreement is binding upon and inures to the benefit of Licensor and Licensee and their respective permitted successors and assigns.

8.5     <u>Headings</u>.  The headings in this Agreement are for reference only and do not affect the interpretation of this Agreement.

8.6     <u>Dispute Resolution; Choice of Law; Venue</u>.

(a)     Any claim, disagreement or dispute between the Parties arising out of or relating to this Agreement (a "<u>Dispute</u>") shall be resolved in the manner provided in this <u>Section 8.6</u>. The Parties shall attempt to resolve any Dispute by negotiating in good faith for a period of third (30) days after receipt by either Party of a written notice of the Dispute from the other Party (the "<u>Negotiation Period</u>"). The written notice shall identify, with reasonable particularity, each matter or issue that is the subject of the dispute, a summary of the basis for the Party's position with respect to each such matter or issue and the relief being requested by the Party. No Party shall commence any Action in respect of any Dispute (i) until the expiration of the Negotiation Period or (ii) if the other Party has refused to participate or has not reasonably participated in the required negotiation process in good faith set forth in this <u>Section 8.6</u>. If the Parties are unable to resolve the Dispute during the Negotiation Period, the Dispute shall be finally settled by binding arbitration conducted expeditiously in accordance with the Comprehensive Arbitration Rules & Procedures, including the Expedited Procedures then followed by the Judicial Arbitration and Mediation Services, Inc. ("JAMS") or any successor to the functions thereof ("Rules"), and judgment upon the award rendered by the arbitrator shall be entered by any court of competent jurisdiction. One arbitrator shall be jointly selected by the Parties. If the Parties are unable to jointly select an arbitrator, the arbitrator shall be appointed in accordance with the Rules. The cost of the arbitrator shall be shared equally by the Parties. The location of the arbitration proceeding shall be New York, New York and the language of arbitration shall be English. All arbitration proceedings are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and the applicable state rules of evidence. The dispute resolution provisions of this <u>Section 8.6(a)</u> shall not be construed to interfere with a Party's other rights provided by this Agreement, including the right to terminate this Agreement in accordance with its terms. During the pendency of any such Dispute, all of the terms and conditions of this Agreement shall remain in effect and the Parties shall continue to perform all of their respective obligations hereunder.

(b)     This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

(c)     The Parties irrevocably submit to the exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement, the Notes or, except as otherwise required by applicable law, any other Note Document. To the fullest extent permitted by applicable law, the Parties irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

8.7     <u>Relationship of the Parties</u>.   The relationship between the parties is that of independent contractors. Nothing contained in this Agreement will be construed as creating any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the Parties, and neither Party has authority to contract for nor bind the other Party in any manner whatsoever.

8.8     <u>No Third-Party Beneficiaries</u>. Other than with respect to the Collateral Agent, this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any third party any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement. The Collateral Agent is a third party beneficiary for purposes of enforcing its rights hereunder.  When the Note Obligations are paid in full in cash, then (i) the Collateral Agent no longer is a third party beneficiary and (ii) all references herein to the Collateral Agent, its designees and Vessel Buyers no longer shall be effective (but a Vessel Buyer shall retain all of its rights and obligations as a Licensee).

8.9     <u>Amendment and Modification</u>.  No amendment or modification to this Agreement is effective unless it is in writing and signed by an authorized representative of each Party and (if the Note Obligations have not been paid in full in cash) the Collateral Agent (at the direction of Required Holders).

8.10     <u>Waiver</u>.  No waiver by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the Party so waiving and signed by the Collateral Agent (at the direction of Required Holders).  Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, remedy, power, or privilege.

8.11     <u>Waiver of Jury Trial</u>. Each Party irrevocably and unconditionally waives any right it may have to a trial by jury for any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

8.12    Attorneys' Fees. In the event that any claim, suit, action, or proceeding is instituted or commenced by either Party hereto against the other Party arising out of or related to this Agreement, the prevailing Party will be entitled to recover its reasonable attorneys' fees and court costs from the non-prevailing Party.

8.13    Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (other than routine communications having no legal effect) must be in writing and sent to the respective Party at the addresses indicated below (or at such other address for a Party as may be specified in a notice given in accordance with this Section):

If to Licensor:        North American Shipbuilding, L.L.C.
                       16201 East Main Street
                       Cut Off, LA 70345
                       Attn: Dino Chouest

                       with a copy by email to legal@chouest.com (which copy shall not constitute official notice to Licensor hereunder)

If to Licensee:        Nautical Solutions, L.L.C.
                       16201 East Main Street
                       Cut Off, LA 70345
                       Attn: Luke Newman

                       with a copy by email to legal@chouest.com (which copy shall not constitute official notice to Licensee hereunder)

If to Collateral Agent: Wilmington Trust, National Association, as Collateral Agent
                       1100 North Market Street
                       Wilmington, DE 19890
                       Attn: Global Capital Markets – Project Finance – Rafael Miranda
                       Email: rmiranda1@wilmingtontrust.com
                       Tel: 845-717-8079

Notices sent in accordance with this Section 8.13 will be deemed effective: (a) when received on a business day, if delivered by hand (with written confirmation of receipt); (b) when received on a business day, if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email (in each case, with confirmation of transmission), if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third (3rd) business day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.

8.14    Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement. The words "execution," "signed," "signature," and words of like import used in this Amendment will be deemed to include electronic signatures or the keeping of records in electronic

form, each of which will be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

      8.15   <u>Joinder</u>. It is understood and agreed that to the extent any Affiliate of Licensor owns or controls or has contributed to the Vessels any copyrights (including any software or technology) relating to a Work or Vessels, such Affiliate shall be deemed to be and required to become a "Licensor" under this Agreement by (x) executing a joinder agreement and delivering the same to each of the Collateral Agent and AIG and Prudential in form and substance reasonably satisfactory to the Required Holders (as defined in the NEA and hereinafter referred to as the "NEA Required Holders"), (y) delivering supplements to Exhibit A of this Agreement as are necessary to cause such Exhibit to be complete and accurate with respect to such additional Affiliate on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Affiliate had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Collateral Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Collateral Agent (acting at the direction of the NEA Required Holders). In the event any added Licensor ceases to be an Affiliate of the other Licensor entities, then such Licensor ceasing to be an Affiliate shall endeavor to enter into a new agreement with Licensee granting Licensee the rights granted under this Agreement on terms and conditions substantially similar to this Agreement.

<p style="text-align:center">[SIGNATURE PAGE FOLLOWS]</p>

IN WITNESS WHEREOF, Licensor, Licensee and Collateral Agent have caused this Agreement to be executed as of the date first written above by their respective duly authorized officers.

NORTH AMERICAN SHIPBUILDING, L.L.C.

By:_____
Name: _____
Title: _____

NAUTICAL SOLUTIONS, L.L.C.

By:_____
Name: _____
Title: _____

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent

By:_____
Name: _____
Title: _____

EXHIBIT A

**A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8, A-9, A-10, A-11, A-12, A-13, A-14, A-15, A-16, A-17, A-18, A-19, A-20, A-21, A-22, A-23, A-24, A-25, A-26 and A-27.**

|      | **Vessel**       | **Official Number** |
|------|------------------|---------------------|
| A-1  | Avery Island     | 1253395             |
| A-2  | Brad Dartez      | 1252257             |
| A-3  | Cat Island       | 1257750             |
| A-4  | Celena Chouest   | 1201702             |
| A-5  | Corcovado        | 1215834             |
| A-6  | Dante            | 1178758             |
| A-7  | Dauphin Island   | 1262978             |
| A-8  | Deer Island      | 1289730             |
| A-9  | Dino Chouest     | 1207856             |
| A-10 | Forte            | 1223605             |
| A-11 | Gavea            | 1211932             |
| A-12 | Grand Isle       | 1250605             |
| A-13 | Horn Island      | 1255030             |
| A-14 | Jackie Chouest   | 1210979             |
| A-15 | Kirt Chouest     | 1213707             |
| A-16 | Lyman Martin     | 1227085             |
| A-17 | Marsh Island     | 1266925             |
| A-18 | Mr Sidney        | 1216539             |
| A-19 | Ms Virgie        | 1213714             |
| A-20 | Pao de Acucar    | 1218372             |
| A-21 | Paradise Island  | 1262977             |
| A-22 | Pecan Island     | 1258532             |
| A-23 | Pelican Island   | 1261549             |
| A-24 | Sanibel Island   | 1257727             |
| A-25 | Ship Island      | 1252958             |
| A-26 | Timbalier Island | 1251360             |
| A-27 | Wine Island      | 1259152             |

**EXHIBIT A-1**
**VESSEL; WORK**

Vessel Name and Official Number: Avery Island (O.N. 1253395)

**Work**

| HULL 288 AVERY ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | E1 | |
| D3 | TANK PLAN | C1 | USE HULL 290 SHIPISLAND |
| D4 | MIDSHIP SECTION | - | |
| D9 | INSULATION PLAN | B0 | |
| D10 | MACHINERY ARRANGEMENT | A2 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIPISLAND |
| D20 | FIRE AND SAFETY PLAN | B2 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | |
| D34 | DANGEROUS GOODS PLAN | - | |

| HULL 288 AVERY ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIPISLAND |
| S21 | MAST DETAIL | | USE HULL 290 SHIPISLAND |
| S47 | PROPULSION UNIT | A1 | USE HULL 290 SHIPISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | - | USE HULL 290 SHIPISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | - | USE HULL 290 SHIPISLAND |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIPISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | | USE HULL 290 SHIPISLAND |
| S59 | CARGO RAILS | A1 | USE HULL 290 SHIPISLAND |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIPISLAND |
| S63 | MAIN DECK HATCH | | USE HULL 290 SHIPISLAND |
| S66 | LOUVER ARRANGEMENT | A4 | USE HULL 290 SHIPISLAND |
| S68 | LIFERAFT CRADLE | | USE HULL 290 SHIPISLAND |
| S87 | TUGGER WINCH INSTALLATION | - | USE HULL 290 SHIPISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIPISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIPISLAND |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIPISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIPISLAND |
| S113 | GENERATOR FOUNDATION | | USE HULL 290 SHIPISLAND |
| S114 | FIRE MONITOR PUMP FOUNDATION | | USE HULL 290 SHIPISLAND |
| S115 | SEACHEST ARRANGEMENT | - | USE HULL 290 SHIPISLAND |
| S125 | ANCHOR ARRANGEMENT | - | USE HULL 290 SHIPISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | - | USE HULL 290 SHIPISLAND |

| HULL 288 AVERY ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIPISLAND |

## HULL 288 AVERY ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIPISLAND |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIPISLAND |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIPISLAND |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIPISLAND |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIPISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIPISLAND |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIPISLAND |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIPISLAND |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIPISLAND |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIPISLAND |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIPISLAND |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIPISLAND |
| O18 | HULL MARKINGS (DRAFT) | A1 | |
| O18YD | IMO NUMBERS | - | USE HULL 290 SHIPISLAND |
| O20 | GANGWAY | B1 | USE HULL 290 SHIPISLAND |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIPISLAND |
| O22 | JOINER CONNECTION DETAILS | | USE HULL 290 SHIPISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIPISLAND |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIPISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIPISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIPISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIPISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIPISLAND |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIPISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A1 | |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIPISLAND |
| O42 | HVAC SYSTEM MODELING | | USE HULL 290 SHIPISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIPISLAND |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIPISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIPISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A3 | |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIPISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIPISLAND |

## HULL 288 AVERY ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | |
| M2 | FUEL OIL SERVICE SYSTEM | - | |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | |
| M4 | LUBE OIL SERVICE SYSTEM | - | |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIPISLAND |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIPISLAND |
| M10 | BALLAST SYSTEM | B2 | USE HULL 290 SHIPISLAND |
| M11 | BILGE SYSTEM | A6 | USE HULL 290 SHIPISLAND |
| M12 | FIRE MAIN SYSTEM | A3 | USE HULL 290 SHIPISLAND |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIPISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIPISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIPISLAND |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIPISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIPISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIPISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIPISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIPISLAND |

| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIPISLAND |
| M29 | DRY BULK SYSTEM | A1 | USE HULL 290 SHIPISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | A4 | USE HULL 290 SHIPISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIPISLAND |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIPISLAND |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIPISLAND |
| M50 | HULL AND DECK PENETRATIONS | A1 | USE HULL 290 SHIPISLAND |
| M70 | CARGO FRESH WATER SYSTEM | B1 | USE HULL 290 SHIPISLAND |

## HULL 288 AVERY ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| **E** | **Electrical** | | |
| E2 | LV POWER ONE LINE | C0 | |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIPISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | D0 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | USE HULL 290 SHIPISLAND |
| E13 | GENERAL ALARM ONE LINE | A2 | USE HULL 290 SHIPISLAND |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIPISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | A5 | USE HULL 290 SHIPISLAND |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIPISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIPISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | USE HULL 290 SHIPISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIPISLAND |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIPISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIPISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIPISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIPISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIPISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIPISLAND |
| E53 | MV DISTRIBUTION ONE LINE | A2 | USE HULL 290 SHIPISLAND |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | USE HULL 290 SHIPISLAND |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIPISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIPISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIPISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIPISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIPISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIPISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | - | |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIPISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | USE HULL 290 SHIPISLAND |
| E128 | AUTOMATION I/O BOX ONE LINE | - | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIPISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIPISLAND |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIPISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIPISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIPISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIPISLAND |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | A0 | |

**EXHIBIT A-2**
**VESSEL; WORK**

Vessel Name and Official Number: Brad Dartez (O.N. 1252257)

**Work**

| HULL 286 BRAD DARTEZ DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 284 GRAND ISLE |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | F0 | |
| D3 | TANK PLAN | B0 | |
| D4 | MIDSHIP SECTION | A2 | USE HULL 284 GRAND ISLE |
| D9 | INSULATION PLAN | A7 | USE HULL 284 GRAND ISLE |
| D10 | MACHINERY ARRANGEMENT | A7 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A4 | |
| D20 | FIRE AND SAFETY PLAN | F0 | |
| D23 | DOCKING PLAN | A3 | |
| D26 | STATION BILL | A0 | |
| D34 | DANGEROUS GOODS PLAN | A0 | |

| HULL 286 BRAD DARTEZ DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | A2 | USE HULL 284 GRAND ISLE |
| S21 | MAST DETAIL | A5 | USE HULL 284 GRAND ISLE |
| S47 | PROPULSION UNIT | A2 | USE HULL 284 GRAND ISLE |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | - | |
| S54 | DROP DOWN THRUSTER INSTALLATION | A2 | USE HULL 284 GRAND ISLE |
| S56 | SIDEGATES | A1 | USE HULL 284 GRAND ISLE |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 284 GRAND ISLE |
| S59 | CARGO RAILS | A4 | USE HULL 284 GRAND ISLE |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 284 GRAND ISLE |
| S63 | MAIN DECK HATCH | A2 | USE HULL 284 GRAND ISLE |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 284 GRAND ISLE |
| S68 | LIFERAFT CRADLE | A1 | USE HULL 284 GRAND ISLE |
| S87 | TUGGER WINCH INSTALLATION | A2 | USE HULL 284 GRAND ISLE |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 284 GRAND ISLE |
| S99 | DECK EQUIPMENT ARRANGEMENT | A0 | USE HULL 284 GRAND ISLE |
| S107 | MAIN ENGINE FOUNDATION | - | |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| S113 | GENERATOR FOUNDATION | A1 | USE HULL 284 GRAND ISLE |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 284 GRAND ISLE |
| S115 | SEACHEST ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| S125 | ANCHOR ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| S126 | RESCUE LIFEBOAT DAVIT | A1 | |

| HULL 286 BRAD DARTEZ DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 284 GRAND ISLE |

## HULL 286 BRAD DARTEZ DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| O3 | INTERIOR DOORS | A10 | USE HULL 284 GRAND ISLE |
| O4 | EXTERIOR WT DOORS | A6 | USE HULL 284 GRAND ISLE |
| O5 | MANHOLES & HATCHES | A5 | USE HULL 284 GRAND ISLE |
| O6 | WINDOWS & SIDELIGHTS | A4 | USE HULL 284 GRAND ISLE |
| O6YD | WINDOWS (YARD) | A5 | USE HULL 284 GRAND ISLE |
| O7 | LADDERS & STAIRS | A7 | USE HULL 284 GRAND ISLE |
| O9 | MOORING ARRANGEMENT | A3 | USE HULL 284 GRAND ISLE |
| O10 | HANDRAILS | A5 | USE HULL 284 GRAND ISLE |
| O11 | FLOOR PLATING | A5 | USE HULL 284 GRAND ISLE |
| O12 | DECK BOARDS | A3 | USE HULL 284 GRAND ISLE |
| O13 | ROOM NUMBERS | A3 | USE HULL 284 GRAND ISLE |
| O14 | TRANSDUCER ARRANGEMENT | - | |
| O18 | HULL MARKINGS (DRAFT) | - | |
| O18YD | IMO NUMBERS | - | USE HULL 284 GRAND ISLE |
| O20 | GANGWAY | A1 | USE HULL 284 GRAND ISLE |
| O21 | JOINER WALL ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| O23 | JOINER CEILING ARRANGEMENT | A3 | USE HULL 284 GRAND ISLE |
| O26 | ANODE PLACEMENT | A1 | USE HULL 284 GRAND ISLE |
| O31 | NAVIGATION LIGHT ARRANGEMENT | - | USE HULL 284 GRAND ISLE |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 284 GRAND ISLE |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 284 GRAND ISLE |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 284 GRAND ISLE |
| O36 | GRABRAILS | A3 | USE HULL 284 GRAND ISLE |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A5 | USE HULL 284 GRAND ISLE |
| O38 | GALLEY LAYOUT | A2 | USE HULL 284 GRAND ISLE |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 284 GRAND ISLE |
| O46 | VENTILATION SYSTEM | A5 | USE HULL 284 GRAND ISLE |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A5 | USE HULL 284 GRAND ISLE |
| O50 | PILOT HOUSE TOP LAYOUT | A2 | USE HULL 284 GRAND ISLE |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 284 GRAND ISLE |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 284 GRAND ISLE |

## HULL 286 BRAD DARTEZ DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | - | |
| M2 | FUEL OIL SERVICE SYSTEM | A1 | |
| M3 | FUEL OIL TRANSFER SYSTEM | A1 | |
| M4 | LUBE OIL SERVICE SYSTEM | A1 | USE HULL 284 GRAND ISLE |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | - | |
| M6 | FRESH WATER COOLING SYSTEM | - | |
| M10 | BALLAST SYSTEM | A3 | |
| M11 | BILGE SYSTEM | B1 | |
| M12 | FIRE MAIN SYSTEM | A3 | USE HULL 284 GRAND ISLE |
| M13 | TANK SOUNDFAST SYSTEM | A2 | |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | B1 | |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | - | USE HULL 284 GRAND ISLE |
| M21 | POTABLE WATER SYSTEM | B0 | |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | |
| M25 | TANK AND MISC. VENT SYSTEM | A4 | |
| M26 | TANK LEVEL INDICATION SYSTEM | A2 | |
| M27 | WEATHER DECK DRAIN SYSTEM | - | USE HULL 284 GRAND ISLE |
| M29 | DRY BULK SYSTEM | A1 | USE HULL 284 GRAND ISLE |

## HULL 286 BRAD DARTEZ DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B0 | |
| M33 | FI-FI FIRE MONITOR SYSTEM | A2 | USE HULL 284 GRAND ISLE |
| M37 | WEATHER DECK PIPE PENETRATIONS | - | |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 284 GRAND ISLE |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 284 GRAND ISLE |
| M70 | CARGO FRESH WATER SYSTEM | A4 | USE HULL 284 GRAND ISLE |

## HULL 286 BRAD DARTEZ DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | D0 | |
| E3 | CABLEWAY LAYOUT | A3 | USE HULL 284 GRAND ISLE |
| E4 | 480VAC DISTRIBUTION ONE LINE | E1 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | C0 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | D0 | |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | C0 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | B0 | |
| E13 | GENERAL ALARM ONE LINE | D0 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 284 GRAND ISLE |
| E16 | CENTRAL COMMUNICATION ONE LINE | D0 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A7 | USE HULL 284 GRAND ISLE |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A1 | USE HULL 284 GRAND ISLE |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A4 | USE HULL 284 GRAND ISLE |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | B0 | |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 284 GRAND ISLE |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A6 | USE HULL 284 GRAND ISLE |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | A1 | USE HULL 284 GRAND ISLE |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A3 | USE HULL 284 GRAND ISLE |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 284 GRAND ISLE |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 284 GRAND ISLE |
| E53 | MV DISTRIBUTION ONE LINE | A2 | |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B1 | USE HULL 284 GRAND ISLE |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A6 | USE HULL 284 GRAND ISLE |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 284 GRAND ISLE |
| E62 | COMPUTER NETWORK DIAGRAM | - | USE HULL 284 GRAND ISLE |
| E65 | TV & ENTERTAINMENT SYSTEM | A4 | USE HULL 284 GRAND ISLE |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 284 GRAND ISLE |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 284 GRAND ISLE |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 284 GRAND ISLE |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | - | |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A5 | USE HULL 284 GRAND ISLE |
| E128 | AUTOMATION I/O BOX ONE LINE | A2 | |
| E129 | AUTOMATED FLOD AND DECK LIGHTS | B2 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 284 GRAND ISLE |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| E133 | HORN & LIGHT JUNCTION BOXES | A4 | USE HULL 284 GRAND ISLE |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | - | USE HULL 284 GRAND ISLE |

**EXHIBIT A-3**
**VESSEL; WORK**

Vessel Name and Official Number: Cat Island (O.N. 1257750)

**Work**

| HULL 293 CAT ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | D3 | |
| D3 | TANK PLAN | D0 | USE HULL 290 SHIP ISLAND |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP ISLAND |
| D9 | INSULATION PLAN | A7 | USE HULL 290 SHIP ISLAND |
| D10 | MACHINERY ARRANGEMENT | A1 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIP ISLAND |
| D20 | FIRE AND SAFETY PLAN | A1 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | USE HULL 290 SHIP ISLAND |
| D34 | DANGEROUS GOODS PLAN | - | |

| HULL 293 CAT ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP ISLAND |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP ISLAND |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP ISLAND |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S63 | MAIN DECK HATCH | - | USE HULL 290 SHIP ISLAND |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP ISLAND |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIP ISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP ISLAND |
| S113 | GENERATOR FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S115 | SEACHEST ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| S125 | ANCHOR ARRANGEMENT | A4 | USE HULL 290 SHIP ISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP ISLAND |

## HULL 293 CAT ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIP ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP ISLAND |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP ISLAND |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIP ISLAND |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP ISLAND |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP ISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP ISLAND |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP ISLAND |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP ISLAND |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP ISLAND |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A4 | USE HULL 290 SHIP ISLAND |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP ISLAND |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | USE HULL 290 SHIP ISLAND |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIP ISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP ISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP ISLAND |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP ISLAND |

## HULL 293 CAT ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIP ISLAND |
| M10 | BALLAST SYSTEM | B2 | USE HULL 290 SHIP ISLAND |
| M11 | BILGE SYSTEM | C0 | USE HULL 290 SHIP ISLAND |
| M12 | FIRE MAIN SYSTEM | B0 | USE HULL 290 SHIP ISLAND |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP ISLAND |

## HULL 293 CAT ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIP ISLAND |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIP ISLAND |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | D0 | USE HULL 290 SHIP ISLAND |

## HULL 293 CAT ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | B0 | |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIP ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | B0 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | USE HULL 290 SHIP ISLAND |
| E13 | GENERAL ALARM ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | A5 | USE HULL 290 SHIP ISLAND |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIP ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIP ISLAND |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIP ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 290 SHIP ISLAND |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIP ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E128 | AUTOMATION I/O BOX ONE LINE | A10 | USE HULL 290 SHIP ISLAND |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIP ISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIP ISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP ISLAND |

**EXHIBIT A-4**
**VESSEL; WORK**

Vessel Name and Official Number: Celena Chouest (O.N. 1201702)

**Work**

| HULL 236 CELENA CHOUEST DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | Lines Plan | B0 | USE HULL 225 DIONNE DRAWINGS |
| D2 | General Design Plan | D1 | |
| D3 | Tank Arrangement and Capacity Plan | A3 | |
| D5 | Profile and Decks | B1 | |
| D6 | Shell Expansion | A1 | |
| D6YD | Shell Expansion - Seam Location | A1 | |
| D8 | Fire Integrity (1,2) | - | |
| D9 | Insulation Plan (1,2,3,4) | A2 | |
| D9M | Mascoat Plan | - | |
| D10 | Machinery Arrangement (1,2,3,4) | A1 | |
| D12 | Shaft Arrangement (1,2,3) | A1 | |
| D15 | Underwater Inspection Marking Plan | B1 | |
| D16 | Typical Sections | B1 | |
| D20 | Fire and Safety Plan | A1 | |
| D23 | Docking Plan | B1 | |
| D26 | Station Bill | - | |

| HULL 236 CELENA CHOUEST DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | Crane Foundation | - | |
| S21 | Mast Detail (1,2,3,4) | A2 | |
| S40 | Swing Down Thruster Module | - | |
| S41 | Swing Down Thruster Installation | A2 | USE HULL 225 DIONNE |
| S50 | Rudder Arrangement (1,2,3,4) | A1 | |
| S52 | Rudder Stop | - | |
| S53A | Stern Tunnel Thruster Installation | - | |
| S53F | FWD Tunnel Thruster Installation | - | |
| S56 | Side Bulwark Gates | - | |
| S58 | Rub Rails Installation (Bumper Installation) | B1 | |
| S59 | Cargo Rails | B1 | |
| S61 | Bilge Keel Installation | - | |
| S63 | Main Deck Hatch | NA | |
| S66 | Louver Arrangement (1,2,3) | A1 | |
| S68 | Inflatable Liferaft Cradle | A1 | |
| S74 | Strut | - | |
| S87 | Tugger Winch Installation | - | |
| S107 | Main Engine Foundation | - | |
| S112 | Grid and Channel Cooler Arrangement | - | |
| S113 | Generator Foundation (1,2) | - | |
| S114 | Fire Monitor Pump Foundation | - | |
| S115 | Seachest Arrangement (1,2) | B1 | |
| S125 | Anchor Arrangement | - | |
| S126 | Rescue / Life Boat Davit (1,2) | - | |

## HULL 236 CELENA CHOUEST DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| **O** | **Outfits** | | |
| O3 | Interior Doors (Joiner Doors) | - | |
| O4 | Exterior / WT Doors | - | |
| O5 | Manholes and Hatches | A1 | |
| O6 | Window and Sidelights | - | |
| O6YD | Windows (Yard) | - | |
| O7 | Ladders and Stairs (1,2,3,4) | A1 | |
| O9 | Mooring Arrangement (1,2) | - | |
| O10 | Handrails (1,2) | A1 | |
| O11 | Flooring Plating (1,2,3) | B1 | |
| O12 | Deck Boards (1,2) | A1 | |
| O13 | Room Numbers | - | |
| O14 | Transducer Arrangement | - | |
| O18 | Hull Markings (Draft) | A1 | |
| O19 | Rope Guard | - | |
| O20 | Portable Gangway (1,2) | | |
| O21 | Joiner Wall Arrangement (1,2) | - | |
| O23 | Joiner Ceiling Arrangement (1,2) | - | |
| O26 | Anode Placement | A1 | |
| O31 | Navigation Light Arrangement | - | |
| O33 | Load Line Assignment | - | |
| O35 | Navigation Bridge Visibility | | |
| O36 | Grab Rails | - | |
| O40 | Galley Stove Exhaust System | A1 | |
| O41 | Supply Air Ducting (HVAC) | - | |
| O46 | Ventilation System Drawing | B3 | |
| O50 | Pilot House Top Layout | B1 | |
| O53 | Stack Logo Location | A1 | |
| O54 | Name Location | - | |

## HULL 236 CELENA CHOUEST DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| **M** | **Piping** | | |
| M1 | Exhaust Gas System (1,2) | - | |
| M2 | Fuel Oil Service System | - | |
| M3 | Fuel Oil Transfer System (1,2) | - | |
| M4 | Lube Oil Service System | - | |
| M5 | Lube, Hydraulic and Dirty Oil Transfer System | - | |
| M6 | Fresh Water Cooling System (1,2) | - | |
| M8 | Sea Water Cooling System | - | |
| M10 | Ballast System (1,2) | B1 | |
| M11 | Bilge System | C1 | |
| M12 | Fire Main System | - | |
| M13 | Tank Soundfast System | A1 | |
| M14 | Ships Service and Starting Air System (1,2) | A1 | |
| M16 | Central Hydraulic Oil System | - | |
| M18 | Steering Gear Hydraulic Oil System | - | |
| M21 | Potable Water System (1,2) | - | |
| M22 | Grey, Black and Sanitary Water System | - | |
| M24 | Fuel Oil Overflow System | - | |
| M25 | Tank and Misc. Vent System | A1 | |
| M26 | Tank Level Indication System (1,2) | - | |
| M27 | Weather Deck Drain System | | |

## HULL 236 CELENA CHOUEST DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M29 | Dry Bulk System | - | |
| M30 | Drilling Fluid System | A1 | |
| M31 | Liquid Mud Tank Cleaning System | - | |
| M33 | Fire Monitor/Water Spray System | - | |
| M35 | Methanol Transfer System | - | |
| M37 | Weather Deck Pipe Penetrations | A1 | |
| M40 | Misc. Piping System | - | |
| M41 | Vessel Frame Drawings | - | |
| M42 | USCG Transfer Drawings | - | |
| M51 | Engine Crankcase Ventilation System | - | |

## HULL 236 CELENA CHOUEST DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E1 | Electrical Load Analysis | A | USE HULL 225 DIONNE |
| E2 | Power One Line | A2 | |
| E3 | Cableway Layout (1,2) | A2 | |
| E4 | 480VAC Distribution 1 - Line | A2 | |
| E6 | 208 / 120 VAC Distribution 1 - Line | A3 | |
| E7 | 208/120 VAC Distribution Arrangement | A2 | |
| E8 | 24 VDC Distribution 1 - line | A4 | |
| E13 | General Alarm 1 - Line | A3 | |
| E14 | Fire Detectino and Alarm One Line | A3 | |
| E15 | Sound Power Phone 1 - Line | A2 | |
| E16 | Central Communication 1 - Line (1,2) | A3 | |
| E19 | Control Room Console Layout | - | USE HULL 225 DIONNE |
| E21 | Pilot House Console Layout (1,2,3,4) | A1 | |
| E34 | Hazardous Areas Plan | - | |
| E35 | Emergency Steering Procedures | - | USE HULL 225 DIONNE |
| E40 | CO2 Alarm System 1 - Line | A2 | |
| E47 | Methanol System Control one Line | A2 | |
| E53 | 6600 VAC Distribution 1-Line | - | USE HULL 225 DIONNE |
| E54 | Emergency Stop and Shutdown 1 - Line (1,2) | - | USE HULL 225 DIONNE |
| E55 | Bilge System Control 1-Line | - | USE HULL 225 DIONNE |
| E109 | Emergency Generator Switchboard Controls 1-Line | A2 | |
| E111 | Main Switchboard Controls 1-Line | A2 | |
| E112 | Main EngMedium Voltage Switchboard Controls 1-Line | - | USE HULL 225 DIONNE |
| E128 | Automation I/O Box One Line | A2 | |
| E130 | Automated Pilot House Wiper Controls | - | USE HULL 225 DIONNE |
| E131 | Pilot House Overhead Lighting Arrangement | - | USE HULL 225 DIONNE |
| E132 | Stereo Antenna One Line | - | USE HULL 225 DIONNE |

**EXHIBIT A-5**
**VESSEL; WORK**

Vessel Name and Official Number: Corcovado (O.N. 1215834)

**Work**

| HULL 251 CORCOVADO DRAWINGS | | | |
|---|---|---|---|
| 11/22/2022 | | | |
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D2 | General Design Plan | C0 | |
| D3 | Tank Arrangement and Capacity Plan | B0 | |
| D5 | Profile and Decks | - | FROM HULL 248 JACKIE CHOUEST |
| D6 | Shell Expansion | - | FROM HULL 248 JACKIE CHOUEST |
| D8 | Fire Integrity        (1,2) | - | |
| D9 | Insulation Plan        (1,2,3,4) | A4 | |
| D9M | Mascoat Plan | A1 | |
| D10 | Machinery Arrangement        (1,2,3,4) | A3 | |
| D12 | Shaft Arrangement (1,2,3) | - | |
| D15 | Underwater Inspection Marking Plan | B0 | |
| D16 | Typical Sections | - | FROM HULL 248 JACKIE CHOUEST |
| D20 | Fire and Safety Plan | C0 | |
| D23 | Docking Plan | A4 | |
| D26 | Station Bill | - | |
| D35 | Hazardous Cargo Arrangement | A0 | |
| D36 | Damage Control Plan | B0 | |

| HULL 251 CORCOVADO DRAWINGS | | | |
|---|---|---|---|
| 11/22/2022 | | | |
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | Crane Foundation | - | |
| S21 | Mast Detail | A3 | |
| S40 | Swing Down Thruster Module | - | |
| S41 | Swing Down Thruster Installation | - | |
| S50 | Rudder Arrangement | A2 | |
| S52 | Rudder Stop | - | |
| S53A | Aft Tunnel Thruster Installation | A1 | |
| S53F | Fwd Tunnel Thruster Installation | A1 | |
| S56 | Side Bulwark Gates | A1 | |
| S58 | Rub Rails Installation (Bumper Installation) | - | |
| S59 | Cargo Rails | A1 | |
| S61 | Bilge Keel Installation | - | |
| S63 | Main Deck Hatch | - | |
| S66 | Louver Arrangement | A1 | |
| S68 | Inflatable Liferaft Cradle | A2 | |
| S74 | Strut | A1 | |
| S87 | Tugger Winch Installation | A1 | |
| S107 | Main Engine Foundation | - | |
| S112 | Grid and Channel Cooler Arrangement | A3 | |
| S113 | Generator Foundation | - | |

## HULL 251 CORCOVADO DRAWINGS

**11/22/2022**

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| S114 | Fire Monitor Pump Foundation | A2 | |
| S115 | Seachest Arrangement | B0 | |
| S125 | Anchor Arrangement | A2 | |
| S126 | Rescue / Life Boat Davit | - | |

## HULL 251 CORCOVADO DRAWINGS

**11/22/2022**

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **O** | **Outfits** | | |
| O1 | Doors, Windows, Hatches and Manhole (Book) | A1 | |
| O3 | Interior Doors (Joiner Doors) | - | |
| O4 | Exterior / WT Doors | A1 | |
| O5 | Manholes and Hatches | D0 | |
| O6 | Window and Sidelights | A1 | |
| O6YD | Windows (Yard) | - | |
| O7 | Ladders and Stairs | B0 | |
| O9 | Mooring Arrangement | A1 | |
| O10 | Handrails | A3 | |
| O11 | Flooring Plating | A4 | |
| O12 | Deck Boards | A2 | |
| O13 | Room Numbers | - | |
| O14 | Transducer Arrangement | - | |
| O18 | Hull Markings (Draft) | A2 | |
| O19 | Rope Guard | A1 | |
| O20 | Portable Gangway | - | |
| O21 | Joiner Wall Arrangement | - | |
| O23 | Joiner Ceiling Arrangement   (1,2) | - | |
| O26 | Anode Placement | B0 | |
| O31 | Navigation Light Arrangement | A1 | |
| O33 | Load Line Assignment | - | |
| O34 | Bumper Tire Arrangement | - | |
| O35 | Navigation Bridge Visibility | - | |
| O36 | Grab Rails | A1 | |
| O46 | Ventilation System | A1 | |
| O50 | Pilot House Top Layout | B0 | |
| O53 | Stack Logo Location | A2 | |
| O54 | Name Location | A0 | |

## HULL 251 CORCOVADO DRAWINGS

**11/22/2022**

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **M** | **Piping** | | |
| M1 | Exhaust Gas System         (1,2) | - | |
| M2 | Fuel Oil Service System | - | |
| M3 | Fuel Oil Transfer System (1,2) | - | |
| M4 | Lube Oil Service System | - | |
| M5 | Lube, Hydraulic and Dirty Oil Transfer System | - | |
| M6 | Fresh Water Cooling System | A2 | |
| M8 | Sea Water Cooling System | A1 | |
| M10 | Ballast System | - | |
| M11 | Bilge System | A1 | |
| M12 | Fire Main System | - | |

## HULL 251 CORCOVADO DRAWINGS

**11/22/2022**

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M13 | Tank Soundfast System | - | |
| M14 | Ships Service and Starting Air System | A1 | |
| M16 | Central Hydraulic Oil System | B0 | |
| M18 | Steering Gear Hydraulic Oil System | - | |
| M21 | Potable Water System | A1 | |
| M22 | Grey, Black and Sanitary Water System | - | |
| M24 | Fuel Oil Overflow System | - | |
| M25 | Tank and Misc. Vent System | - | |
| M26 | Tank Level Indication System | - | |
| M27 | Weather Deck Drain System | - | |
| M29 | Dry Bulk System | - | |
| M30 | Drilling Fluid System | - | |
| M31 | Liquid Mud Tank Cleaning System | - | |
| M33 | Fire Monitor System | A2 | |
| M37 | Weather Deck Pipe Penetrations | - | |
| M41 | Vessel Frame Drawings | - | |
| M42 | USCG Transfer Drawings | - | |
| M51 | Engine Crankcase Ventilation System | - | |
| M61 | Water Mist System | - | |

## HULL 251 CORCOVADO DRAWINGS

**11/22/2022**

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| E | Electrical | | |
| E1 | Electrical Load Analysis | D0 | |
| E2 | Power One Line | E0 | |
| E3 | Cableway Layout | - | |
| E4 | 480VAC Distribution 1 - Line | B1 | |
| E6 | 208 / 120 VAC Distribution 1 - Line | B2 | |
| E7 | 208/120 VAC Distribution Layout | - | |
| E8 | 24 VDC Distribution 1 - line | C1 | |
| E11 | Junction and Control Box Schematic (Book) | - | |
| E13 | General Alarm 1 - Line | - | |
| E15 | Sound Power Phone 1 - Line | - | |
| E16 | Central Communication 1 - Line          (1,2) | A1 | |
| E19 | Control Room Console Layout | - | |
| E21 | Pilot House Console Layout  (1,2,3,4) | - | |
| E34 | Hazardous Area Plan | A1 | |
| E35 | EMERGENCY STEERING PROCEDURES | - | |
| E40 | CO2 Alarm System 1 - Line | - | |
| E43 | Steering Control 1 - Line | - | |
| E53 | 6600 VAC Distribution 1-Line | - | |
| E54 | Emergency Stop and Shutdown 1 - Line | C1 | |
| E55 | Bilge System Control 1-Line | A1 | |
| E60 | Watertight Door/Hatch One Line | - | |
| E68 | Engine Order Telegraph One Line | - | |
| E109 | Emergency Generator Switchboard Controls 1-Line | - | |
| E111 | Main Switchboard Controls 1-Line | - | |
| E112 | Main EngMedium Voltage Switchboard Controls 1-Line | - | |
| E117 | Bow and Stern Tunnel Thruster 1-Line | - | |
| E127 | Pilot House Wiring Console & Misc. Cable Pull List | - | |
| E128 | Automation I/O Box 1 - Line | A7 | |
| E129 | Automated Flood and Deck Lights | - | |

## HULL 251 CORCOVADO DRAWINGS

**11/22/2022**

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| E130 | Automated Pilot House Wiper Controls | - | |
| E131 | Pilot House Overhead Lighting Arrangement | - | |
| E132 | Stereo Antenna One Line | - | |
| E170 | Antenna Arrangement | A1 | |

**EXHIBIT A-6**
**VESSEL; WORK**

Vessel Name and Official Number: Dante (O.N. 1178758)

**Work**

| HULL 227 DANTE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | Lines Plan | B0 | USE HULL 225 DIONNE |
| D2 | General Design Plan | C3 | |
| D3 | Tank Arrangement and Capacity Plan | B1 | |
| D5 | Profile and Decks | A1 | USE HULL 225 DIONNE |
| D6 | Shell Expansion | - | USE HULL 225 DIONNE |
| D6YD | Shell Expansion - Seam Location | - | USE HULL 225 DIONNE |
| D8 | Fire Integrity (1,2) | A1 | USE HULL 225 DIONNE |
| D9 | Insulation Plan (1,2,3,4) | A3 | USE HULL 225 DIONNE |
| D9M | Mascoat Plan | - | USE HULL 225 DIONNE |
| D10 | Machinery Arrangement (1,2,3,4) | A2 | |
| D12 | Shaft Arrangement (1,2,3) | A2 | USE HULL 225 DIONNE |
| D15 | Underwater Inspection Marking Plan | A4 | USE HULL 225 DIONNE |
| D16 | Typical Sections | A1 | USE HULL 225 DIONNE |
| D20 | Fire and Safety Plan | B1 | |
| D26 | Station Bill | - | USE HULL 225 DIONNE |
| D34 | Dangerous Goods Plan | - | |

| HULL 227 DANTE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | Crane Foundation | A1 | USE HULL 225 DIONNE |
| S21 | Mast Detail (1,2,3,4) | A3 | USE HULL 225 DIONNE |
| S40 | Swing Down Thruster Module | A1 | USE HULL 225 DIONNE |
| S41 | Swing Down Thruster Installation | A2 | USE HULL 225 DIONNE |
| S50 | Rudder Arrangement (1,2,3,4) | A2 | USE HULL 225 DIONNE |
| S52 | Rudder Stop | A1 | USE HULL 225 DIONNE |
| S53A | Stern Tunnel Thruster Installation | A1 | USE HULL 225 DIONNE |
| S53F | FWD Tunnel Thruster Installation | A2 | USE HULL 225 DIONNE |
| S56 | Side Bulwark Gates | A1 | USE HULL 225 DIONNE |
| S58 | Rub Rails Installation (Bumper Installation) | A2 | USE HULL 225 DIONNE |
| S59 | Cargo Rails | A3 | USE HULL 225 DIONNE |
| S61 | Bilge Keel Installation | A1 | USE HULL 225 DIONNE |
| S63 | Main Deck Hatch | A1 | USE HULL 225 DIONNE |
| S66 | Louver Arrangement (1,2,3) | A1 | USE HULL 225 DIONNE |
| S68 | Inflatable Liferaft Cradle | A2 | USE HULL 225 DIONNE |
| S74 | Strut | A1 | USE HULL 225 DIONNE |
| S87 | Tugger Winch Installation | - | USE HULL 225 DIONNE |
| S107 | Main Engine Foundation | A2 | USE HULL 225 DIONNE |
| S112 | Grid and Channel Cooler Arrangement | A1 | USE HULL 225 DIONNE |
| S113 | Generator Foundation (1,2) | - | USE HULL 225 DIONNE |
| S115 | Seachest Arrangement (1,2) | A2 | USE HULL 225 DIONNE |
| S125 | Anchor Arrangement | A2 | USE HULL 225 DIONNE |

| HULL 227 DANTE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S126 | Rescue / Life Boat Davit (1,2) | A2 | USE HULL 225 DIONNE |

| HULL 227 DANTE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| O | Outfits | | |
| O3 | Interior Doors (Joiner Doors) | A3 | USE HULL 225 DIONNE |
| O4 | Exterior / WT Doors | A2 | USE HULL 225 DIONNE |
| O5 | Manholes and Hatches | A4 | USE HULL 225 DIONNE |
| O6 | Window and Sidelights | A2 | USE HULL 225 DIONNE |
| O6YD | Windows (Yard) | - | USE HULL 225 DIONNE |
| O7 | Ladders and Stairs  (1,2,3,4) | B1 | |
| O9 | Mooring Arrangement (1,2) | - | USE HULL 225 DIONNE |
| O10 | Handrails(1,2) | A1 | USE HULL 225 DIONNE |
| O11 | Flooring Plating (1,2,3) | A1 | |
| O12 | Deck Boards (1,2) | - | USE HULL 225 DIONNE |
| O13 | Room Numbers | - | USE HULL 225 DIONNE |
| O14 | Transducer Arrangement | A2 | USE HULL 225 DIONNE |
| O18 | Hull Markings (Draft) | - | USE HULL 225 DIONNE |
| O19 | Rope Guard | - | USE HULL 225 DIONNE |
| O20 | Portable Gangway  (1,2) | - | USE HULL 225 DIONNE |
| O21 | Joiner Wall Arrangement (1,2) | A1 | USE HULL 225 DIONNE |
| O23 | Joiner Ceiling Arrangement (1,2) | A1 | USE HULL 225 DIONNE |
| O26 | Anode Placement | A1 | USE HULL 225 DIONNE |
| O31 | Navigation Light Arrangement | A1 | USE HULL 225 DIONNE |
| O33 | Load Line Assignment | - | USE HULL 225 DIONNE |
| O35 | Navigation Bridge Visibility | - | USE HULL 225 DIONNE |
| O36 | Grab Rails | - | USE HULL 225 DIONNE |
| O40 | Galley Stove Exhaust System | A2 | USE HULL 225 DIONNE |
| O41 | Supply Air Ducting (HVAC) | A1 | USE HULL 225 DIONNE |
| O46 | Ventilation System Drawing | A2 | USE HULL 225 DIONNE |
| O50 | Pilot House Top Layout | B1 | |
| O53 | Stack Logo Location | - | USE HULL 225 DIONNE |
| O54 | Name Location | - | USE HULL 225 DIONNE |

| HULL 227 DANTE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| M | Piping | | |
| M1 | Exhaust Gas System (1,2) | A1 | |
| M2 | Fuel Oil Service System | B2 | |
| M3 | Fuel Oil Transfer System (1,2) | - | USE HULL 225 DIONNE |
| M4 | Lube Oil Service System | - | USE HULL 225 DIONNE |
| M5 | Lube, Hydraulic and Dirty Oil Transfer System | - | USE HULL 225 DIONNE |
| M6 | Fresh Water Cooling System (1,2) | - | USE HULL 225 DIONNE |
| M8 | Sea Water Cooling System | - | USE HULL 225 DIONNE |
| M10 | Ballast System (1,2) | - | USE HULL 225 DIONNE |
| M11 | Bilge System | B1 | USE HULL 225 DIONNE |
| M12 | Fire Main System | - | USE HULL 225 DIONNE |
| M13 | Tank Soundfast System | - | USE HULL 225 DIONNE |
| M14 | Ships Service and Starting Air System  (1,2) | - | USE HULL 225 DIONNE |
| M16 | Central Hydraulic Oil System | A1 | USE HULL 225 DIONNE |
| M18 | Steering Gear Hydraulic Oil System | - | USE HULL 225 DIONNE |
| M21 | Potable Water System (1,2) | - | USE HULL 225 DIONNE |
| M22 | Grey, Black and Sanitary Water System | - | USE HULL 225 DIONNE |

## HULL 227 DANTE DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M24 | Fuel Oil Overflow System | - | USE HULL 225 DIONNE |
| M25 | Tank and Misc. Vent System | - | USE HULL 225 DIONNE |
| M26 | Tank Level Indication System (1,2) | - | USE HULL 225 DIONNE |
| M27 | Weather Deck Drain System | - | USE HULL 225 DIONNE |
| M29 | Dry Bulk System | - | USE HULL 225 DIONNE |
| M30 | Drilling Fluid System | - | USE HULL 225 DIONNE |
| M31 | Liquid Mud Tank Cleaning System | A1 | |
| M35 | Methanol Transfer System | - | USE HULL 225 DIONNE |
| M37 | Weather Deck Pipe Penetrations | - | USE HULL 225 DIONNE |
| M40 | Misc. Piping System | - | USE HULL 225 DIONNE |
| M41 | Vessel Frame Drawings | - | USE HULL 225 DIONNE |
| M42 | USCG Transfer Drawings | - | USE HULL 225 DIONNE |
| M51 | Engine Crankcase Ventilation System | - | USE HULL 225 DIONNE |

## HULL 227 DANTE DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E1 | Electrical Load Analysis | A2 | |
| E2 | Power One Line | B3 | |
| E3 | Cableway Layout (1,2) | - | USE HULL 225 DIONNE |
| E4 | 480VAC Distribution 1 - Line | B1 | |
| E6 | 208 / 120 VAC Distribution 1 - Line | A3 | |
| E7 | 208/120 VAC Distribution Arrangement | - | USE HULL 225 DIONNE |
| E8 | 24 VDC Distribution 1 - line | B1 | |
| E13 | General Alarm 1 - Line | - | USE HULL 225 DIONNE |
| E15 | Sound Power Phone 1 - Line | - | USE HULL 225 DIONNE |
| E16 | Central Communication 1 - Line (1,2) | - | USE HULL 225 DIONNE |
| E19 | Control Room Console Layout | - | USE HULL 225 DIONNE |
| E21 | Pilot House Console Layout   (1,2,3,4) | - | USE HULL 225 DIONNE |
| E34 | Hazardous Areas Plan | - | USE HULL 225 DIONNE |
| E35 | Emergency Steering Procedures | - | USE HULL 225 DIONNE |
| E40 | CO2 Alarm System 1 - Line | - | USE HULL 225 DIONNE |
| E53 | 6600 VAC Distribution 1-Line | - | USE HULL 225 DIONNE |
| E54 | Emergency Stop and Shutdown 1 – Line (1,2) | B1 | |
| E55 | Bilge System Control 1-Line | - | USE HULL 225 DIONNE |
| E109 | Emergency Generator Switchboard Controls 1-Line | - | USE HULL 225 DIONNE |
| E111 | Main Switchboard Controls 1-Line | - | USE HULL 225 DIONNE |
| E112 | Main EngMedium Voltage Switchboard Controls 1-Line | - | USE HULL 225 DIONNE |
| E128 | Automation I/O Box One Line | A2 | |
| E129 | Automated Flood and Deck Lights | - | USE HULL 225 DIONNE |
| E130 | Automated Pilot House Wiper Controls | - | USE HULL 225 DIONNE |
| E131 | Pilot House Overhead Lighting Arrangement | - | USE HULL 225 DIONNE |
| E132 | Stereo Antenna One Line | - | USE HULL 225 DIONNE |

**EXHIBIT A-7**
**VESSEL; WORK**

Vessel Name and Official Number: Dauphin Island (O.N. 1262978)


**Work**


| HULL 297 DAUPHIN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | HULL 295 PELICAN ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | C0 | |
| D3 | TANK PLAN | A2 | |
| D4 | MIDSHIP SECTION | A2 | HULL 295 PELICAN ISLAND |
| D9 | INSULATION PLAN | A5 | HULL 295 PELICAN ISLAND |
| D10 | MACHINERY ARRANGEMENT | A2 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | Z1 | HULL 295 PELICAN ISLAND |
| D20 | FIRE AND SAFETY PLAN | C0 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | A1 | |
| D34 | DANGEROUS GOODS PLAN | A1 | |


| HULL 297 DAUPHIN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | HULL 295 PELICAN ISLAND |
| S21 | MAST DETAIL | A6 | HULL 295 PELICAN ISLAND |
| S47 | PROPULSION UNIT | A1 | HULL 295 PELICAN ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A3 | HULL 295 PELICAN ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | HULL 295 PELICAN ISLAND |
| S56 | SIDEGATES | A2 | HULL 295 PELICAN ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | - | HULL 295 PELICAN ISLAND |
| S59 | CARGO RAILS | - | |
| S61 | BILGE KEEL INSTALLATION | - | HULL 295 PELICAN ISLAND |
| S63 | MAIN DECK HATCH | - | HULL 295 PELICAN ISLAND |
| S66 | LOUVER ARRANGEMENT | A1 | HULL 295 PELICAN ISLAND |
| S68 | LIFERAFT CRADLE | B1 | HULL 295 PELICAN ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | HULL 295 PELICAN ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | HULL 295 PELICAN ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | A1 | HULL 295 PELICAN ISLAND |
| S107 | MAIN ENGINE FOUNDATION | - | HULL 295 PELICAN ISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A1 | HULL 295 PELICAN ISLAND |
| S113 | GENERATOR FOUNDATION | A2 | HULL 295 PELICAN ISLAND |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | HULL 295 PELICAN ISLAND |
| S115 | SEACHEST ARRANGEMENT | A1 | HULL 295 PELICAN ISLAND |
| S125 | ANCHOR ARRANGEMENT | A3 | HULL 295 PELICAN ISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | HULL 295 PELICAN ISLAND |

## HULL 297 DAUPHIN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | HULL 295 PELICAN ISLAND |
| O3 | INTERIOR DOORS | A3 | HULL 295 PELICAN ISLAND |
| O4 | EXTERIOR WT DOORS | - | HULL 295 PELICAN ISLAND |
| O5 | MANHOLES & HATCHES | C1 | HULL 295 PELICAN ISLAND |
| O6 | WINDOWS & SIDELIGHTS | A1 | HULL 295 PELICAN ISLAND |
| O6YD | WINDOWS (YARD) | - | HULL 295 PELICAN ISLAND |
| O7 | LADDERS & STAIRS | B1 | HULL 295 PELICAN ISLAND |
| O9 | MOORING ARRANGEMENT | A3 | HULL 295 PELICAN ISLAND |
| O10 | HANDRAILS | B1 | HULL 295 PELICAN ISLAND |
| O11 | FLOOR PLATING | A2 | HULL 295 PELICAN ISLAND |
| O12 | DECK BOARDS | B0 | |
| O13 | ROOM NUMBERS | - | HULL 295 PELICAN ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | - | HULL 295 PELICAN ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A2 | HULL 295 PELICAN ISLAND |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | HULL 295 PELICAN ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A3 | HULL 295 PELICAN ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A4 | HULL 295 PELICAN ISLAND |
| O26 | ANODE PLACEMENT | A1 | HULL 295 PELICAN ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | HULL 295 PELICAN ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | HULL 295 PELICAN ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | HULL 295 PELICAN ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | HULL 295 PELICAN ISLAND |
| O36 | GRABRAILS | - | HULL 295 PELICAN ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A1 | HULL 295 PELICAN ISLAND |
| O38 | GALLEY LAYOUT | A4 | HULL 295 PELICAN ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | HULL 295 PELICAN ISLAND |
| O46 | VENTILATION SYSTEM | B1 | |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A8 | |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | HULL 295 PELICAN ISLAND |
| O53 | STACK LOGO LOCATION | - | HULL 295 PELICAN ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | HULL 295 PELICAN ISLAND |

## HULL 297 DAUPHIN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | - | HULL 295 PELICAN ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | - | HULL 295 PELICAN ISLAND |
| M3 | FUEL OIL TRANSFER SYSTEM | A1 | HULL 295 PELICAN ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | HULL 295 PELICAN ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A1 | HULL 295 PELICAN ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | B1 | |
| M10 | BALLAST SYSTEM | A1 | |
| M11 | BILGE SYSTEM | B1 | HULL 295 PELICAN ISLAND |
| M12 | FIRE MAIN SYSTEM | C0 | HULL 295 PELICAN ISLAND |
| M13 | TANK SOUNDFAST SYSTEM | B1 | HULL 295 PELICAN ISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A1 | HULL 295 PELICAN ISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | B1 | |
| M21 | POTABLE WATER SYSTEM | A1 | HULL 295 PELICAN ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A1 | HULL 295 PELICAN ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | B1 | HULL 295 PELICAN ISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | HULL 295 PELICAN ISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | HULL 295 PELICAN ISLAND |

## HULL 297 DAUPHIN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M27 | WEATHER DECK DRAIN SYSTEM | A3 | HULL 295 PELICAN ISLAND |
| M29 | DRY BULK SYSTEM | B2 | HULL 295 PELICAN ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B3 | HULL 295 PELICAN ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A2 | HULL 295 PELICAN ISLAND |
| M35 | METHANOL TRANSFER SYSTEM | A4 | |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | HULL 295 PELICAN ISLAND |
| M40 | MISC. PIPING SYSTEM | - | HULL 295 PELICAN ISLAND |
| M44 | MISC. CHEMICAL SYSTEM | B1 | |
| M50 | HULL AND DECK PENETRATIONS | - | HULL 295 PELICAN ISLAND |
| M59 | CRUDE OIL SLOP SYSTEM | C0 | HULL 295 PELICAN ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | B3 | HULL 295 PELICAN ISLAND |

## HULL 297 DAUPHIN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | C0 | |
| E3 | CABLEWAY LAYOUT | A2 | HULL 295 PELICAN ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | B0 | |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | A0 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | - | HULL 295 PELICAN ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A0 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | HULL 295 PELICAN ISLAND |
| E13 | GENERAL ALARM ONE LINE | A1 | HULL 295 PELICAN ISLAND |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | - | HULL 295 PELICAN ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | A4 | HULL 295 PELICAN ISLAND |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A2 | HULL 295 PELICAN ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | HULL 295 PELICAN ISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A2 | HULL 295 PELICAN ISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | |
| E35 | EMERGENCY STEERING PROCEDURES | - | HULL 295 PELICAN ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A1 | HULL 295 PELICAN ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | HULL 295 PELICAN ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A2 | HULL 295 PELICAN ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | - | HULL 295 PELICAN ISLAND |
| E47 | METHANOL SYSTEM CONTROL ONE LINE | A1 | HULL 295 PELICAN ISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | | HULL 295 PELICAN ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | - | HULL 295 PELICAN ISLAND |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | A4 | HULL 295 PELICAN ISLAND |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A1 | HULL 295 PELICAN ISLAND |
| E60 | WT DOORS / HATCH ONE LINE | A1 | HULL 295 PELICAN ISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | - | HULL 295 PELICAN ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | - | HULL 295 PELICAN ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | HULL 295 PELICAN ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A1 | HULL 295 PELICAN ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A1 | HULL 295 PELICAN ISLAND |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A1 | HULL 295 PELICAN ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A2 | HULL 295 PELICAN ISLAND |
| E128 | AUTOMATION I/O BOX ONE LINE | A2 | |
| E129 | AUTOMATED FLOOD AND DECK LIGHTS | B2 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A1 | HULL 295 PELICAN ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | HULL 295 PELICAN ISLAND |

## HULL 297 DAUPHIN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E132 | STEREO ANTENNA ONE LINE | A1 | HULL 295 PELICAN ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A1 | HULL 295 PELICAN ISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A4 | HULL 295 PELICAN ISLAND |

**EXHIBIT A-8**
**VESSEL; WORK**

Vessel Name and Official Number: Deer Island (O.N. 1289730)

**Work**

## HULL 301 DEER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **D** | **Design** | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | G0 | |
| D3 | TANK PLAN | F0 | |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP ISLAND |
| D9 | INSULATION PLAN | F0 | |
| D10 | MACHINERY ARRANGEMENT | F0 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | F0 | |
| D20 | FIRE AND SAFETY PLAN | D0 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | USE HULL 290 SHIP ISLAND |
| D34 | DANGEROUS GOODS PLAN | - | |
| D36 | DAMAGE CONTROL PLAN | C0 | |

## HULL 301 DEER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **S** | **Structure** | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP ISLAND |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP ISLAND |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP ISLAND |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S63 | MAIN DECK HATCH | - | USE HULL 290 SHIP ISLAND |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP ISLAND |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIP ISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP ISLAND |
| S113 | GENERATOR FOUNDATION | - | USE HULL 290 SHIP ISLAND |

## HULL 301 DEER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| S114 | FIRE MONITOR PUMP FOUNDATION | A1 | |
| S115 | SEACHEST ARRANGEMENT | A1 | |
| S125 | ANCHOR ARRANGEMENT | A4 | USE HULL 290 SHIP ISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP ISLAND |

## HULL 301 DEER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIP ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP ISLAND |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP ISLAND |
| O5 | MANHOLES & HATCHES | F0 | |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP ISLAND |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP ISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP ISLAND |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP ISLAND |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP ISLAND |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP ISLAND |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A4 | USE HULL 290 SHIP ISLAND |
| O18YD | IMO NUMBERS | A1 | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP ISLAND |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | USE HULL 290 SHIP ISLAND |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIP ISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP ISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP ISLAND |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP ISLAND |

## HULL 301 DEER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | L1 | |
| M10 | BALLAST SYSTEM | F1 | |
| M11 | BILGE SYSTEM | F0 | |

## HULL 301 DEER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M12 | FIRE MAIN SYSTEM | B0 | USE HULL 290 SHIP ISLAND |
| M13 | TANK SOUNDFAST SYSTEM | F1 | |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A1 | |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | F0 | |
| M26 | TANK LEVEL INDICATION SYSTEM | F1 | |
| M27 | WEATHER DECK DRAIN SYSTEM | A0 | |
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIP ISLAND |
| M37 | WEATHER DECK PIPE PENETRATIONS | B2 | |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | D0 | USE HULL 290 SHIP ISLAND |

## HULL 301 DEER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **E** | **Electrical** | | |
| E2 | LV POWER ONE LINE | L2 | |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIP ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | H1 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | K1 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A1 | |
| E13 | GENERAL ALARM ONE LINE | K0 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | G0 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIP ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | F0 | |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | F0 | |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIP ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E47 | METHANOL SYSTEM CONTROL ONE LINE | G0 | |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | F0 | |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | F0 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | F0 | |
| E60 | WT DOORS / HATCH ONE LINE | F0 | |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 290 SHIP ISLAND |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIP ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | USE HULL 290 SHIP ISLAND |

| HULL 301 DEER ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| E128 | AUTOMATION I/O BOX ONE LINE | F0 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | F0 | |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | F0 | |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIP ISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP ISLAND |

**EXHIBIT A-9**
**VESSEL; WORK**

Vessel Name and Official Number: Dino Chouest (O.N. 1207856)

**Work**

| HULL 237 DINO CHOUEST DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D1 | - | LINES PLAN |
| D2 | G0 | GENERAL ARRANGEMENT |
| D3 | C1 | TANK CAPACITY PLAN |
| D5A | A2 | PROFILES & DECKS AFT |
| D5F | - | PROFILES & DECKS FWD |
| D5M | A2 | PROFILES & DECKS MID |
| D5S | - | PROFILES & DECKS SUPERSTRUCTURE |
| D6 | - | SHELL EXPANSION |
| D6YD | - | SHELL EXPANSION SEAM LOCATIONS |
| D8 | A1 | FIRE INTEGRITY |
| D9 | A2 | INSULATION PLAN |
| D9M | - | MASCOAT PLAN |
| D10 | A2 | MACHINERY ARRANGEMENT |
| D12 | A3 | SHAFT ARRANGEMENT |
| D15 | A2 | UNDERWATER INSPECTION MARKING PLAN |
| D16A | A2 | TYPICAL SECTIONS AFT |
| D16F | - | TYPICAL SECTIONS FWD |
| D16M | A2 | TYPICAL SECTIONS MID |
| D16S | - | DECK HOUSE TYPICAL SECTIONS |
| D20 | D0 | FIRE & SAFETY PLAN |
| D23 | - | DOCKING PLAN |
| D26 | - | STATION BILL |
| S14 | A1 | CRANE FOUNDATION |
| S15 | - | CHAIN GUIDE ROLLER |
| S21 | B1 | MAST DETAIL |
| S25 | - | CABLE ANCHOR POINT |
| S31 | A1 | MOON POOL |
| S41F | - | SWING DOWN THRUSTER INSTALLATION FWD |
| S49 | A1 | KORT NOZZLES |
| S50 | A3 | RUDDER ARRANGEMENT |
| S52 | - | RUDDER STOP |
| S53A | - | TUNNEL STERN THRUSTER INSTALLATION |
| S53F | - | FWD TUNNEL THRUSTER INSTALLATION |
| S56 | A1 | SIDEGATES |
| S59 | A2 | CARGO RAILS |
| S61 | - | BILGE KEEL INSTALLATION |
| S63 | - | MAIN DECK HATCH |
| S66 | A6 | LOUVER ARRANGEMENT |
| S67 | - | WINCH FOUNDATION |
| S68 | - | LIFERAFT CRADLE |
| S70 | - | SATCOM FOUNDATION |
| S72 | - | GEAR BOX FOUNDATION |
| S74 | A1 | STRUT |
| S77 | A1 | STORAGE REEL INSTALLATION |
| S77L | A1 | STORAGE REEL INSTALLATION LOWER |

## HULL 237 DINO CHOUEST DRAWING LIST

| Drawing | Rev | Drawing Title |
|---------|-----|---------------|
| S85 | C0 | ROV PLATFORM |
| S87 | A6 | TUGGER WINCH INSTALLATION |
| S88 | - | RECESSED TOW EYE |
| S99 | F0 | DECK EQUIPMENT ARRANGEMENT |
| S107 | - | MAIN ENGINE FOUNDATION |
| S112 | B0 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | - | GENERATOR FOUNDATION |
| S115 | A2 | SEACHEST ARRANGEMENT |
| S116 | A1 | TOWING WINCH PUMP FOUNDATION |
| S118 | - | SWING-DOWN THRUSTER ENGINE FOUNDATION |
| S125 | A1 | ANCHOR ARRANGEMENT |
| S126 | A1 | RESCUE LIFEBOAT DAVIT |
| S130 | A2 | STERN ROLLER |
| S131 | A2 | TOW PIN INSTALLATION |
| S132 | A1 | SHARK JAW INSTALLATION |
| S202 | - | SPOOLING SHEAVE |
| S299 | - | UNIT BREAKDOWN |
| S99CP | A2 | DECK EQUIPMENT ARRANGEMENT |
| S146 | A0 | MISC. ELEVATED PLATFORMS AND EQUIPM |
| O1 | A2 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
| O2 | - | DECK COVERINGS |
| O3 | A5 | INTERIOR DOORS |
| O4 | B2 | EXTERIOR WT DOORS |
| O5 | C1 | MANHOLES & HATCHES |
| O6 | A3 | WINDOWS & SIDELIGHTS |
| O6YD | A3 | WINDOWS (YARD) |
| O7 | A4 | LADDERS & STAIRS |
| O9 | D0 | MOORING ARRANGEMENT |
| O10 | A3 | HANDRAILS |
| O11 | A2 | FLOOR PLATING |
| O13 | A1 | ROOM NUMBERS |
| O14 | B1 | TRANSDUCER ARRANGEMENT |
| O14E | A1 | 3UTECH EXTERNAL TRANSDUCER ARRANGE |
| O18 | A1 | HULL MARKINGS |
| O19 | - | ROPE GUARD |
| O20 | - | GANGWAY |
| O21 | A3 | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | A1 | JOINER CEILING ARRANGEMENT |
| O26 | - | ANODE PLACEMENT |
| O31 | B1 | NAVIGATION LIGHT ARRANGEMENT |
| O33 | A1 | LOAD LINE ASSIGNMENT |
| O34 | - | BUMPER TIRE ARRANGEMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | - | GRABRAILS |
| O46 | A2 | VENTILATION SYSTEM |
| O46YD | - | VENTILATION SYSTEM (YARD) |
| O49 | - | TANK LABELING ARRANGEMENT |
| O50 | A5 | PILOT HOUSE TOP LAYOUT |
| O53 | - | STACK LOGO LOCATION |
| O54 | A1 | NAME LOCATION |
| O57 | - | HANGING SCAFFOLD ARRANGMENT |
| O46M | A2 | VENTILATION SYSTEM (MOD) |
| M1 | - | EXHAUST GAS SYSTEM |
| M2 | A1 | FUEL OIL SERVICE SYSTEM |
| M3 | D0 | FUEL OIL TRANSFER SYSTEM |

## HULL 237 DINO CHOUEST DRAWING LIST

| Drawing | Rev | Drawing Title |
|---------|-----|---------------|
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | A2 | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | C0 | FRESH WATER COOLING SYSTEM |
| M8 | B1 | SEAWATER COOLING SYSTEM |
| M10 | D0 | BALLAST SYSTEM |
| M11 | A3 | BILGE SYSTEM |
| M12 | A2 | FIREMAIN SYSTEM |
| M13 | D0 | TANK SOUNDFAST SYSTEM |
| M14 | A1 | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | - | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | A1 | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | A3 | POTABLE WATER SYSTEM |
| M22 | B2 | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | A1 | FUEL OIL OVERFLOW SYSTEM |
| M25 | D0 | TANK & MISC VENT SYSTEM |
| M26 | D0 | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M29 | A1 | DRY BULK SYSTEM |
| M30 | C0 | DRILLING FLUID SYSTEM |
| M31 | A1 | LIQUID MUD TANK CLEANING SYSTEM |
| M37 | D0 | WEATHER DECK PIPE PENETRATIONS |
| M40 | - | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M51 | - | ENGINE CRANKCASE VENTILATION |
| E1 | C0 | ELECTRICAL LOAD ANALYSIS |
| E2 | C0 | POWER ONE LINE |
| E3 | A3 | CABLEWAY LAYOUT |
| E4 | C0 | 480VAC DISTRIBUTION ONE LINE |
| E6 | C0 | 208/120VAC DISTRIBUTION ONE LINE |
| E7H | B1 | 208/120VAC HEATING ARRANGEMENT |
| E7L | B1 | 208/120VAC LIGHTING ARRANGEMENT |
| E7R | B0 | 208/120VAC RECEPTICLE ARRANGEMENT |
| E7YDT | - | 208/120VAC LIGHTING &RECEPTICLE CAB |
| E8 | B1 | 24VDC DISTRIBUTION ONE LINE |
| E11 | A2 | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E13 | C0 | GENERAL ALARM ONE LINE |
| E15 | A1 | SOUND-POWERED PHONE ONE LINE |
| E16 | C0 | CENTRAL COMMUNICATION ONE LINE |
| E19 | A1 | CONTROL ROOM CONSOLE LAYOUT |
| E21 | A1 | PILOT HOUSE CONSOLE LAYOUT |
| E22 | A1 | NAVIGATION LIGHT CONTROL SYSTEM ONE LINE |
| E37YD | - | HYDRAULIC WATERTIGHT DOOR ONE LINE |
| E40 | - | CO2 ALARM SYSTEM ONE LINE |
| E43 | A1 | STEERING CONTROL ONE LINE |
| E51 | A2 | VIDEO MONITORING SYSTEM ONE LINE |
| E53 | A3 | 6600VAC DISTRIBUTION ONE LINE |
| E54 | B2 | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | A4 | BILGE SYSTEM CONTROL ONE LINE |
| E60 | A3 | WATERTIGHT DOOR/HATCH CONTROL ONE LINE |
| E65 | - | TV & ENTERTAINMENT SYSTEM |
| E68 | - | ENGINE ORDER TELEGRAPH ONE LINE |
| E109 | - | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | A1 | MAIN SWITCHBOARD CABLE PULL LIST |
| E129 | | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | A1 | WIPER CONTROL ONE LINE |
| E131 | A3 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |

| HULL 237 DINO CHOUEST DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| E132 | - | STEREO ANTENNA ONE LINE |
| E133 | - | ASI VALVE ONE LINE |
| E134 | - | JRC ELECTRONICS ONE LINE |
| E137 | - | VDR ONE LINE |

**EXHIBIT A-10**
**VESSEL; WORK**

Vessel Name and Official Number: Forte (O.N. 1223605)


**Work**

| HULL 264 FORTE DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D1 | - | LINES PLAN |
| D2 | B0 | GENERAL ARRANGEMENT |
| D3 | A6 | TANK CAPACITY PLAN |
| D4 | - | MIDSHIP SECTION |
| D5 | A2 | PROFILES & DECKS |
| D6 | A1 | SHELL EXPANSION |
| D6YD | - | SHELL EXPANSION SEAM LOCATIONS |
| D8 | A2 | FIRE INTEGRITY |
| D9 | A3 | INSULATION PLAN |
| D9M | A3 | MASCOAT PLAN |
| D10 | A10 | MACHINERY ARRANGEMENT |
| D12 | A5 | SHAFT ARRANGEMENT |
| D15 | A3 | UNDERWATER INSPECTION MARKING PLAN |
| D16 | A2 | TYPICAL SECTIONS |
| D19 | A1 | LOADLINE REFERENCE |
| D20 | B0 | FIRE & SAFETY PLAN |
| D23 | A3 | DOCKING PLAN |
| D26 | | STATION BILL |
| D34 | A1 | DANGEROUS GOODS PLAN |
| D100 | | FIRE PROTECTION AREAS |
| S14 | A2 | CRANE FOUNDATION |
| S21 | A4 | MAST DETAIL |
| S47 | A1 | PROPULSION UNIT |
| S53A | A1 | TUNNEL STERN THRUSTER INSTALLATION |
| S56 | - | SIDEGATES |
| S57 | A2 | BITT DETAILS |
| S58 | A | RUB RAILS/BUMPER INSTALLATION |
| S61 | - | BILGE KEEL INSTALLATION |
| S64 | - | THRUSTER GUARD |
| S64D | - | THRUSTER GUARD |
| S66 | A1 | LOUVER ARRANGEMENT |
| S67 | - | WINCH FOUNDATION |
| S68 | A2 | LIFERAFT CRADLE |
| S87 | - | TUGGER WINCH INSTALLATION |
| S100 | - | SKEG |
| S107 | A1 | MAIN ENGINE FOUNDATION |
| S112 | A1 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | - | GENERATOR FOUNDATION |
| S114 | A2 | FIRE MONITOR PUMP FOUNDATION |
| S115 | - | SEACHEST ARRANGEMENT |
| S126 | A1 | RESCUE LIFEBOAT DAVIT |
| S130 | A1 | STERN ROLLER |
| S131 | A1 | TOW PIN INSTALLATION |
| S140 | - | FLOATING HOSE DEPLOYMENT INSPECTION |
| S160 | | SEWAGE TANKS |

## HULL 264 FORTE DRAWING LIST

| Drawing | Rev | Drawing Title |
|---|---|---|
| S161 | | SAFE WORKING LOAD |
| S299 | A1 | UNIT BREAKDOWN |
| O1 | - | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
| O3 | A3 | INTERIOR DOORS |
| O4 | A2 | EXTERIOR WT DOORS |
| O5 | A6 | MANHOLES & HATCHES |
| O6 | A2 | WINDOWS & SIDELIGHTS |
| O6YD | A2 | WINDOWS (YARD) |
| O7 | A2 | LADDERS & STAIRS |
| O9 | A1 | MOORING ARRANGEMENT |
| O10 | A2 | HANDRAILS |
| O11 | A1 | FLOOR PLATING |
| O13 | A1 | ROOM NUMBERS |
| O14 | - | TRANSDUCER ARRANGEMENT |
| O18 | A1 | HULL MARKINGS (DRAFT) |
| O20 | - | GANGWAY |
| O21 | A1 | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | - | JOINER CEILING ARRANGEMENT |
| O26 | A1 | ANODE PLACEMENT |
| O31 | A1 | NAVIGATION LIGHT ARRANGEMENT |
| O33 | - | LOAD LINE ASSIGNMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | - | GRABRAILS |
| O37 | A1 | CONTAINMENT BARRIER |
| O46 | C2 | VENTILATION SYSTEM |
| O50 | A4 | PILOT HOUSE TOP LAYOUT |
| O53 | A1 | STACK LOGO LOCATION |
| O54 | - | NAME LOCATION |
| O60 | A1 | FOAM DISPERSANT BOOM |
| O101 | - | ANCHOR DEPLOYMENT |
| M1 | A2 | EXHAUST GAS SYSTEM |
| M2 | - | FUEL OIL SERVICE SYSTEM |
| M3 | A1 | FUEL OIL TRANSFER SYSTEM |
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | - | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | - | FRESH WATER COOLING SYSTEM |
| M8 | - | SEAWATER COOLING SYSTEM |
| M10 | - | BALLAST SYSTEM |
| M11 | A2 | BILGE SYSTEM |
| M12 | - | FIREMAIN SYSTEM |
| M13 | - | TANK SOUNDFAST SYSTEM |
| M14 | - | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | - | CENTRAL HYDRAULIC OIL SYSTEM |
| M21 | A1 | POTABLE WATER SYSTEM |
| M22 | A1 | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | A1 | FUEL OIL OVERFLOW SYSTEM |
| M25 | | TANK & MISC VENT SYSTEM |
| M26 | - | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M33 | - | FIRE MONITOR SYSTEM |
| M37 | - | WEATHER DECK PIPE PENETRATIONS |
| M40 | - | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M42 | | USCG TRANSFER DRAWINGS |
| M44 | | DECK FOAM SYSTEM |

## HULL 264 FORTE DRAWING LIST

| Drawing | Rev | Drawing Title |
|---------|-----|---------------|
| M49 | - | TANK LABELING ARRANGEMENT |
| M51 | A1 | ENGINE CRANKCASE VENTILATION |
| M58 | A2 | RECOVERY OIL ARRANGEMENT |
| M50 | | HULL PENTERTRATIONS |
| E1 | A1 | ELECTRICAL LOAD ANALYSIS |
| E2 | A5 | POWER ONE LINE |
| E3 | A1 | CABLEWAY LAYOUT |
| E4 | A5 | 480VAC DISTRIBUTION ONE LINE |
| E6 | A2 | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | A5 | 208/120VAC DISTRIBUTION LAYOUT |
| E8 | A5 | 24VDC DISTRIBUTION ONE LINE |
| E11 | - | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E13 | A4 | GENERAL ALARM ONE LINE |
| E14 | - | FIRE DETECTION AND ALARM ONE LINE |
| E15 | A4 | SOUND-POWERED PHONE ONE LINE |
| E16 | A3 | CENTRAL COMMUNICATION ONE LINE |
| E19 | A1 | CONTROL ROOM CONSOLE LAYOUT |
| E21 | A1 | PILOT HOUSE CONSOLE LAYOUT |
| E34 | - | HAZARDOUS AREAS PLAN |
| E35 | - | EMERGENCY STEERING PROCEDURES |
| E36YD | | MISCELLANEOUS CONTROL PANELS |
| E40 | A5 | CO2 ALARM SYSTEM ONE LINE |
| E45 | A1 | VENTILATION SYSTEM CONTROL ONE LINE |
| E51 | - | VIDEO MONITORING SYSTEM ONE LINE |
| E54 | A6 | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E60 | A2 | WATERTIGHT DOOR/HATCH CONTROL ONE LINE |
| E68 | A1 | ENGINE ORDER TELEGRAPH ONE LINE |
| E109 | A2 | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | A1 | MAIN SWITCHBOARD CABLE PULL LIST |
| E130 | A1 | WIPER CONTROL ONE LINE |
| E131 | A4 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | - | STEREO ANTENNA ONE LINE |

**EXHIBIT A-11**
**VESSEL; WORK**

Vessel Name and Official Number: Gavea (O.N. 1211932)


**Work**

| HULL 249 GAVEA DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D1 | A0 | LINES PLAN |
| D2 | B0 | GENERAL ARRANGEMENT |
| D3 | A1 | TANK CAPACITY PLAN |
| D5 | | PROFILES & DECKS |
| D6 | A0 | SHELL EXPANSION |
| D8 | - | FIRE INTEGRITY |
| D9 | A3 | INSULATION PLAN |
| D9M | - | MASCOAT PLAN |
| D10 | A3 | MACHINERY ARRANGEMENT |
| D12 | - | SHAFT ARRANGEMENT |
| D15 | A1 | UNDERWATER INSPECTION MARKING PLAN |
| D16 | | TYPICAL SECTIONS |
| D20 | C0 | FIRE & SAFETY PLAN |
| D23 | A1 | DOCKING PLAN |
| D34 | - | DANGEROUS GOODS PLAN |
| S14 | - | CRANE FOUNDATION |
| S21 | A4 | MAST DETAIL |
| S40 | - | SWING DOWN THRUSTER MODULE |
| S41 | A1 | SWING DOWN THRUSTER INSTALLATION |
| S50 | - | RUDDER ARRANGEMENT |
| S52 | A1 | RUDDER STOP |
| S53A | - | TUNNEL STERN THRUSTER INSTALLATION |
| S53F | - | FWD TUNNEL THRUSTER INSTALLATION FWD |
| S56 | A2 | SIDEGATES |
| S58 | A1 | RUB RAILS/BUMPER INSTALLATION |
| S59 | A1 | CARGO RAILS |
| S61 | - | BILGE KEEL INSTALLATION |
| S63 | - | MAIN DECK HATCH |
| S66 | A1 | LOUVER ARRANGEMENT |
| S68 | A1 | LIFERAFT CRADLE |
| S74 | A1 | STRUT |
| S87 | - | TUGGER WINCH INSTALLATION |
| S99 | - | DECK EQUIPMENT ARRANGEMENT |
| S107 | A1 | MAIN ENGINE FOUNDATION |
| S112 | A4 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | A1 | GENERATOR FOUNDATION |
| S115 | A1 | SEACHEST ARRANGEMENT |
| S125 | A4 | ANCHOR ARRANGEMENT |
| S126 | - | RESCUE LIFEBOAT DAVIT |
| S299 | A1 | UNIT BREAKDOWN |
| O1 | A1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
| O3 | A3 | INTERIOR DOORS |
| O4 | B0 | EXTERIOR WT DOORS |
| O5 | A1 | MANHOLES & HATCHES |
| O6 | - | WINDOWS & SIDELIGHTS |

## HULL 249 GAVEA DRAWING LIST

| Drawing | Rev | Drawing Title |
|---------|-----|---------------|
| O6YD | - | WINDOWS (YARD) |
| O7 | A1 | LADDERS & STAIRS |
| O9 | A1 | MOORING ARRANGEMENT |
| O10 | A1 | HANDRAILS |
| O11 | A2 | FLOOR PLATING |
| O12 | A1 | DECK BOARDS |
| O13 | - | ROOM NUMBERS |
| O14 | - | TRANSDUCER ARRANGEMENT |
| O18 | B1 | HULL MARKINGS (DRAFT) |
| O19 | A1 | ROPE GUARD |
| O20 | - | GANGWAY |
| O21 | - | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | - | JOINER CEILING ARRANGEMENT |
| O26 | B1 | ANODE PLACEMENT |
| O31 | A0 | NAVIGATION LIGHT ARRANGEMENT |
| O33 | A1 | LOAD LINE ASSIGNMENT |
| O34 | A1 | BUMPER TIRE ARRANGEMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | - | GRABRAILS |
| O40 | A2 | GALLEY STOVE EXHAUST SYSTEM |
| O41 | - | HVAC SYSTEM |
| O46 | B0 | VENTILATION SYSTEM |
| O49 | - | TANK LABELING ARRANGEMENT |
| O50 | A2 | PILOT HOUSE TOP LAYOUT |
| O53 | B1 | STACK LOGO LOCATION |
| O54 | A1 | NAME LOCATION |
| M1 | - | EXHAUST GAS SYSTEM |
| M2 | - | FUEL OIL SERVICE SYSTEM |
| M3 | B0 | FUEL OIL TRANSFER SYSTEM |
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | A2 | FRESH WATER COOLING SYSTEM |
| M8 | A1 | SEAWATER COOLING SYSTEM |
| M10 | B0 | BALLAST SYSTEM |
| M11 | C0 | BILGE SYSTEM |
| M12 | B0 | FIREMAIN SYSTEM |
| M13 | A0 | TANK SOUNDFAST SYSTEM |
| M14 | A1 | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | - | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | - | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | A1 | POTABLE WATER SYSTEM |
| M22 | - | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | - | FUEL OIL OVERFLOW SYSTEM |
| M25 | A0 | TANK & MISC VENT SYSTEM |
| M26 | A0 | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M29 | - | DRY BULK SYSTEM |
| M30 | - | DRILLING FLUID SYSTEM |
| M31 | - | LIQUID MUD TANK CLEANING SYSTEM |
| M37 | A0 | WEATHER DECK PIPE PENETRATIONS |
| M40 | - | MISCELLANEOUS PIPING SYSTEM |
| M41 | A0 | VESSEL FRAME DRAWINGS |
| M42 | A0 | USCG TRANSFER DRAWINGS |
| M51 | - | ENGINE CRANKCASE VENTILATION |
| M61 | | WATER-BASED FLUID SYSTEM |

| HULL 249 GAVEA DRAWING LIST | | |
|:---:|:---:|:---|
| **Drawing** | **Rev** | **Drawing Title** |
| E2 | A1 | POWER ONE LINE |
| E3 | A1 | CABLEWAY LAYOUT |
| E4 | A1 | 480VAC DISTRIBUTION ONE LINE |
| E6 | A1 | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | A1 | 208/120VAC DISTRIBUTION LAYOUT |
| E8 | A1 | 24VDC DISTRIBUTION ONE LINE |
| E11 | | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E12 | | ELECTRICAL EQUIPMENT LAYOUT |
| E13 | A1 | GENERAL ALARM ONE LINE |
| E15 | A1 | SOUND-POWERED PHONE ONE LINE |
| E16 | A1 | CENTRAL COMMUNICATION ONE LINE |
| E19 | A1 | CONTROL ROOM CONSOLE LAYOUT |
| E21 | A1 | PILOT HOUSE CONSOLE LAYOUT |
| E34 | - | HAZARDOUS AREAS PLAN |
| E40 | A1 | CO2 ALARM SYSTEM ONE LINE |
| E43 | A1 | STEERING CONTROL ONE LINE |
| E53 | A1 | 6600VAC DISTRIBUTION ONE LINE |
| E54 | A1 | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | A1 | BILGE SYSTEM CONTROL ONE LINE |
| E109 | A1 | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | A1 | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | A1 | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | A1 | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | A1 | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | A1 | AUTOMATION I-O BOX ONE LINE |
| E129 | A1 | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | A1 | WIPER CONTROL ONE LINE |
| E131 | A1 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | A1 | STEREO ANTENNA ONE LINE |
| E14 | VOID | FIRE DETECTION AND ALARM ONE LINE |
| E35 | VOID | EMERGENCY STEERING PROCEDURES |
| E36YD | VOID | MISCELLANEOUS CONTROL PANELS |
| E68 | VOID | ENGINE ORDER TELEGRAPH ONE LINE |

**EXHIBIT A-12**
**VESSEL; WORK**

Vessel Name and Official Number: Grand Isle (O.N. 1250605)

**Work**

| HULL 284 GRAND ISLE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | B4 | |
| D3 | TANK PLAN | A2 | |
| D4 | MIDSHIP SECTION | A2 | |
| D9 | INSULATION PLAN | A7 | |
| D10 | MACHINERY ARRANGEMENT | A11 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A2 | |
| D20 | FIRE AND SAFETY PLAN | A5 | |
| D23 | DOCKING PLAN | A1 | |
| D26 | STATION BILL | - | |
| D34 | DANGEROUS GOODS PLAN | A1 | |

| HULL 284 GRAND ISLE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | A2 | |
| S21 | MAST DETAIL | A5 | |
| S47 | PROPULSION UNIT | A2 | |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A4 | |
| S54 | DROP DOWN THRUSTER INSTALLATION | A2 | |
| S56 | SIDEGATES | A1 | |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | |
| S59 | CARGO RAILS | A4 | |
| S61 | BILGE KEEL INSTALLATION | - | |
| S63 | MAIN DECK HATCH | A2 | |
| S66 | LOUVER ARRANGEMENT | A5 | |
| S68 | LIFERAFT CRADLE | A1 | |
| S87 | TUGGER WINCH INSTALLATION | A2 | |
| S89 | SIDE DOOR INSTALLATION | - | |
| S99 | DECK EQUIPMENT ARRANGEMENT | A0 | |
| S107 | MAIN ENGINE FOUNDATION | - | |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | |
| S113 | GENERATOR FOUNDATION | A1 | |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | |
| S115 | SEACHEST ARRANGEMENT | A2 | |
| S125 | ANCHOR ARRANGEMENT | A2 | |
| S126 | RESCUE LIFEBOAT DAVIT | - | |

| HULL 284 GRAND ISLE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| O | Outfits | | |

## HULL 284 GRAND ISLE DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | |
| O3 | INTERIOR DOORS | A10 | |
| O4 | EXTERIOR WT DOORS | A6 | |
| O5 | MANHOLES & HATCHES | A5 | |
| O6 | WINDOWS & SIDELIGHTS | A4 | |
| O6YD | WINDOWS (YARD) | A5 | |
| O7 | LADDERS & STAIRS | A7 | |
| O9 | MOORING ARRANGEMENT | A3 | |
| O10 | HANDRAILS | A5 | |
| O11 | FLOOR PLATING | A5 | |
| O12 | DECK BOARDS | A3 | |
| O13 | ROOM NUMBERS | A3 | |
| O14 | TRANSDUCER ARRANGEMENT | A2 | |
| O18 | HULL MARKINGS (DRAFT) | A3 | |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | A1 | |
| O21 | JOINER WALL ARRANGEMENT | A2 | |
| O23 | JOINER CEILING ARRANGEMENT | A3 | |
| O26 | ANODE PLACEMENT | A1 | |
| O31 | NAVIGATION LIGHT ARRANGEMENT | - | |
| O33 | LOAD LINE ASSIGNMENT | - | |
| O34 | BUMPER TIRE ARRANGEMENT | - | |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | |
| O36 | GRABRAILS | A3 | |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A5 | |
| O38 | GALLEY LAYOUT | A2 | |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | |
| O46 | VENTILATION SYSTEM | A5 | |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A5 | |
| O50 | PILOT HOUSE TOP LAYOUT | A2 | |
| O53 | STACK LOGO LOCATION | A1 | |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | |

## HULL 284 GRAND ISLE DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A5 | |
| M2 | FUEL OIL SERVICE SYSTEM | A4 | |
| M3 | FUEL OIL TRANSFER SYSTEM | A6 | |
| M4 | LUBE OIL SERVICE SYSTEM | A1 | |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A2 | |
| M6 | FRESH WATER COOLING SYSTEM | A3 | |
| M10 | BALLAST SYSTEM | A3 | |
| M11 | BILGE SYSTEM | A7 | |
| M12 | FIRE MAIN SYSTEM | A3 | |
| M13 | TANK SOUNDFAST SYSTEM | A2 | |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | - | |
| M21 | POTABLE WATER SYSTEM | A3 | |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | |
| M25 | TANK AND MISC. VENT SYSTEM | A5 | |
| M26 | TANK LEVEL INDICATION SYSTEM | A2 | |
| M27 | WEATHER DECK DRAIN SYSTEM | - | |

## HULL 284 GRAND ISLE DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M29 | DRY BULK SYSTEM | A1 | |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | A6 | |
| M33 | FI-FI FIRE MONITOR SYSTEM | A2 | |
| M37 | WEATHER DECK PIPE PENETRATIONS | A1 | |
| M40 | MISC. PIPING SYSTEM | - | |
| M50 | HULL AND DECK PENETRATIONS | - | |
| M70 | CARGO FRESH WATER SYSTEM | A4 | |

## HULL 284 GRAND ISLE DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | A12 | |
| E3 | CABLEWAY LAYOUT | A3 | |
| E4 | 480VAC DISTRIBUTION ONE LINE | B1 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | B1 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A2 | |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B0 | |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A4 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A5 | |
| E13 | GENERAL ALARM ONE LINE | A6 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | |
| E16 | CENTRAL COMMUNICATION ONE LINE | A7 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A7 | |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A1 | |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A4 | |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A6 | |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | A1 | |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A3 | |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | |
| E53 | MV DISTRIBUTION ONE LINE | A7 | |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B1 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A6 | |
| E60 | WT DOORS / HATCH ONE LINE | A1 | |
| E62 | COMPUTER NETWORK DIAGRAM | - | |
| E65 | TV & ENTERTAINMENT SYSTEM | A4 | |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A5 | |
| E128 | AUTOMATION I/O BOX ONE LINE | A2 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A2 | |
| E133 | HORN & LIGHT JUNCTION BOXES | A4 | |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | - | |

**EXHIBIT A-13**
**VESSEL; WORK**

Vessel Name and Official Number: Horn Island (O.N. 1255030)

**Work**

| HULL 291 HORN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | D3 | |
| D3 | TANK PLAN | D0 | USE HULL 290 SHIP ISLAND |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP ISLAND |
| D9 | INSULATION PLAN | A7 | USE HULL 290 SHIP ISLAND |
| D10 | MACHINERY ARRANGEMENT | A1 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIP ISLAND |
| D20 | FIRE AND SAFETY PLAN | A4 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | |
| D34 | DANGEROUS GOODS PLAN | - | |

| HULL 291 HORN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP ISLAND |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP ISLAND |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP ISLAND |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S63 | MAIN DECK HATCH | - | USE HULL 290 SHIP ISLAND |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP ISLAND |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIP ISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP ISLAND |
| S113 | GENERATOR FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S115 | SEACHEST ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| S125 | ANCHOR ARRANGEMENT | A4 | USE HULL 290 SHIP ISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP ISLAND |

| HULL 291 HORN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| O | Outfits | | |

## HULL 291 HORN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIP ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP ISLAND |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP ISLAND |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIP ISLAND |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP ISLAND |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP ISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP ISLAND |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP ISLAND |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP ISLAND |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP ISLAND |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A4 | USE HULL 290 SHIP ISLAND |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP ISLAND |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | USE HULL 290 SHIP ISLAND |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIP ISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP ISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP ISLAND |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP ISLAND |

## HULL 291 HORN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | A1 | |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIP ISLAND |
| M10 | BALLAST SYSTEM | B2 | USE HULL 290 SHIP ISLAND |
| M11 | BILGE SYSTEM | C0 | USE HULL 290 SHIP ISLAND |
| M12 | FIRE MAIN SYSTEM | B0 | USE HULL 290 SHIP ISLAND |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIP ISLAND |

## HULL 291 HORN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIP ISLAND |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIP ISLAND |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | D0 | USE HULL 290 SHIP ISLAND |

## HULL 291 HORN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | C0 | USE HULL 290 SHIP ISLAND |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIP ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | - | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | USE HULL 290 SHIP ISLAND |
| E13 | GENERAL ALARM ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | A5 | USE HULL 290 SHIP ISLAND |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIP ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIP ISLAND |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIP ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | USE HULL 290 SHIP ISLAND |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | - | |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIP ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E128 | AUTOMATION I/O BOX ONE LINE | A10 | USE HULL 290 SHIP ISLAND |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIP ISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIP ISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP ISLAND |

**EXHIBIT A-14**
**VESSEL; WORK**

Vessel Name and Official Number: Jackie Chouest (O.N. 1210979)

**Work**

| HULL 248 JACKIE CHOUEST DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D1 | A2 | LINES PLAN |
| D2 | D2 | GENERAL ARRANGEMENT |
| D3 | A2 | TANK CAPACITY PLAN |
| D5 | A1 | PROFILES & DECKS |
| D6 | A3 | SHELL EXPANSION |
| D6YD | A2 | SHELL EXPANSION SEAM LOCATIONS |
| D8 | A1 | FIRE INTEGRITY |
| D9 | A4 | INSULATION PLAN |
| D9M | A1 | MASCOAT PLAN |
| D10 | A2 | MACHINERY ARRANGEMENT |
| D12 | A2 | SHAFT ARRANGEMENT |
| D15 | B1 | UNDERWATER INSPECTION MARKING PLAN |
| D16 | A1 | TYPICAL SECTIONS |
| D16S | A1 | DECK HOUSE TYPICAL SECTIONS |
| D20 | F0 | FIRE & SAFETY PLAN |
| D23 | B1 | DOCKING PLAN |
| D26 | A1 | STATION BILL |
| D34 | A0 | DANGEROUS GOODS PLAN |
| S14 | A1 | CRANE FOUNDATION |
| S21 | A5 | MAST DETAIL |
| S41 | A1 | SWING DOWN THRUSTER INSTALLATION |
| S50 | A1 | RUDDER ARRANGEMENT |
| S52 | A2 | RUDDER STOP |
| S53A | A3 | TUNNEL STERN THRUSTER INSTALLATION |
| S53F | A2 | FWD TUNNEL THRUSTER INSTALLATION FWD |
| S56 | A1 | SIDEGATES |
| S58 | A2 | RUB RAILS/BUMPER INSTALLATION |
| S59 | A2 | CARGO RAILS |
| S61 | A1 | BILGE KEEL INSTALLATION |
| S63 | A1 | MAIN DECK HATCH |
| S66 | A2 | LOUVER ARRANGEMENT |
| S68 | A2 | LIFERAFT CRADLE |
| S74 | A2 | STRUT |
| S87 | A3 | TUGGER WINCH INSTALLATION |
| S99 | J0 | DECK EQUIPMENT ARRANGEMENT |
| S107 | A2 | MAIN ENGINE FOUNDATION |
| S112 | A4 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | A2 | GENERATOR FOUNDATION |
| S114 | A1 | FIRE MONITOR PUMP FOUNDATION |
| S115 | B1 | SEACHEST ARRANGEMENT |
| S125 | A4 | ANCHOR ARRANGEMENT |
| S126 | A1 | RESCUE LIFEBOAT DAVIT |
| S166 | A1 | INDEPENDENT TANK STAND ARRANGEMENT |
| S299 | A3 | UNIT BREAKDOWN |
| O1 | A1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |

## HULL 248 JACKIE CHOUEST DRAWING LIST

| Drawing | Rev | Drawing Title |
|---------|-----|---------------|
| O3 | A3 | INTERIOR DOORS |
| O4 | A3 | EXTERIOR WT DOORS |
| O5 | A2 | MANHOLES & HATCHES |
| O6 | A1 | WINDOWS & SIDELIGHTS |
| O6YD | A2 | WINDOWS (YARD) |
| O7 | A4 | LADDERS & STAIRS |
| O9 | A2 | MOORING ARRANGEMENT |
| O10 | A5 | HANDRAILS |
| O11 | B1 | FLOOR PLATING |
| O12 | A2 | DECK BOARDS |
| O13 | A2 | ROOM NUMBERS |
| O14 | A1 | TRANSDUCER ARRANGEMENT |
| O18 | A1 | HULL MARKINGS (DRAFT) |
| O19 | A3 | ROPE GUARD |
| O20 | A3 | GANGWAY |
| O21 | A1 | JOINER WALL ARRANGEMENT |
| O22 | A1 | JOINER CONNECTION DETAILS |
| O23 | A1 | JOINER CEILING ARRANGEMENT |
| O26 | A4 | ANODE PLACEMENT |
| O31 | A1 | NAVIGATION LIGHT ARRANGEMENT |
| O33 | A3 | LOAD LINE ASSIGNMENT |
| O34 | A2 | BUMPER TIRE ARRANGEMENT |
| O35 | A1 | NAVIGATION BRIDGE VISIBILITY |
| O36 | A3 | GRABRAILS |
| O40 | A3 | GALLEY STOVE EXHAUST SYSTEM |
| O41 | A2 | HVAC SYSTEM |
| O46 | B0 | VENTILATION SYSTEM |
| O46HA | B0 | VENTILATION SYSTEM |
| O49 | A1 | TANK LABELING ARRANGEMENT |
| O50 | B1 | PILOT HOUSE TOP LAYOUT |
| O53 | A2 | STACK LOGO LOCATION |
| O54 | B0 | NAME LOCATION |
| M1 | A1 | EXHAUST GAS SYSTEM |
| M2 | A4 | FUEL OIL SERVICE SYSTEM |
| M3 | A3 | FUEL OIL TRANSFER SYSTEM |
| M4 | A1 | LUBE OIL SERVICE SYSTEM |
| M5 | A1 | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | A2 | FRESH WATER COOLING SYSTEM |
| M8 | A1 | SEAWATER COOLING SYSTEM |
| M10 | A1 | BALLAST SYSTEM |
| M11 | A2 | BILGE SYSTEM |
| M12 | A1 | FIREMAIN SYSTEM |
| M13 | A2 | TANK SOUNDFAST SYSTEM |
| M14 | B1 | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | A1 | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | A3 | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | A1 | POTABLE WATER SYSTEM |
| M22 | A1 | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | A2 | FUEL OIL OVERFLOW SYSTEM |
| M25 | B1 | TANK & MISC VENT SYSTEM |
| M26 | A2 | TANK LEVEL INDICATION SYSTEM |
| M27 | A1 | WEATHER DECK DRAIN SYSTEM |
| M29 | A1 | DRY BULK SYSTEM |
| M30 | A1 | DRILLING FLUID SYSTEM |
| M31 | A1 | LIQUID MUD TANK CLEANING SYSTEM |
| M33 | - | FIRE MONITOR SYSTEM |

| HULL 248 JACKIE CHOUEST DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| M37 | B1 | WEATHER DECK PIPE PENETRATIONS |
| M40 | A1 | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M51 | A1 | ENGINE CRANKCASE VENTILATION |
| M61 | - | WATER-BASED FLUID SYSTEM |
| E1 | | ELECTRICAL LOAD ANALYSIS |
| E2 | A1 | POWER ONE LINE |
| E3 | - | CABLEWAY LAYOUT |
| E4 | A1 | 480VAC DISTRIBUTION ONE LINE |
| E6 | A0 | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | A0 | 208/120VAC DISTRIBUTION LAYOUT |
| E8 | A0 | 24VDC DISTRIBUTION ONE LINE |
| E11 | - | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E13 | A0 | GENERAL ALARM ONE LINE |
| E15 | - | SOUND-POWERED PHONE ONE LINE |
| E16 | A0 | CENTRAL COMMUNICATION ONE LINE |
| E19 | - | CONTROL ROOM CONSOLE LAYOUT |
| E21 | - | PILOT HOUSE CONSOLE LAYOUT |
| E34 | F0 | HAZARDOUS AREAS PLAN |
| E35 | - | EMERGENCY STEERING PROCEDURES |
| E36YD | - | MISCELLANEOUS CONTROL PANELS |
| E40 | - | CO2 ALARM SYSTEM ONE LINE |
| E43 | - | STEERING CONTROL ONE LINE |
| E53 | - | 6600VAC DISTRIBUTION ONE LINE |
| E54 | - | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | - | BILGE SYSTEM CONTROL ONE LINE |
| E109 | - | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | - | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | - | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | - | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | - | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | | AUTOMATION I-O BOX ONE LINE |
| E129 | - | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | - | WIPER CONTROL ONE LINE |
| E131 | - | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | - | STEREO ANTENNA ONE LINE |

**EXHIBIT A-15**
**VESSEL; WORK**

Vessel Name and Official Number: Kirt Chouest (O.N. 1213707)

**Work**

| HULL 239 KIRT CHOUEST DRAWING LIST | | |
|---|---|---|
| **Drawing** | **Rev** | **Drawing Title** |
| D2 | D0 | GENERAL ARRANGEMENT |
| D3 | A3 | TANK CAPACITY PLAN |
| D5A | - | PROFILES & DECKS AFT |
| D5F | - | PROFILES & DECKS FWD |
| D5M | - | PROFILES & DECKS MID |
| D5S | - | PROFILES & DECKS SUPERSTRUCTURE |
| D6 | | SHELL EXPANSION |
| D8 | A0 | FIRE INTEGRITY |
| D9 | A3 | INSULATION PLAN |
| D9LQ | A0 | INSULATION PLAN |
| D9M | - | MASCOAT PLAN |
| D9MLQ | A0 | THERMAL & ACOUSTIC COATING |
| D10 | A2 | MACHINERY ARRANGEMENT |
| D12 | A4 | SHAFT ARRANGEMENT |
| D15 | A1 | UNDERWATER INSPECTION MARKING PLAN |
| D16A | - | TYPICAL SECTIONS AFT |
| D16F | - | TYPICAL SECTIONS FWD |
| D16M | - | TYPICAL SECTIONS MID |
| D16S | - | DECK HOUSE TYPICAL SECTIONS |
| D20 | G0 | FIRE & SAFETY PLAN |
| D23 | A1 | DOCKING PLAN |
| S14 | A0 | CRANE FOUNDATION |
| S21 | - | MAST DETAIL |
| S41 | - | SWING DOWN THRUSTER INSTALLATION |
| S49 | - | KORT NOZZLES |
| S50 | - | RUDDER ARRANGEMENT |
| S53A | | TUNNEL STERN THRUSTER INSTALLATION |
| S55YD | - | REMOVABLE BULWARKS |
| S59 | A2 | CARGO RAILS |
| S66 | - | LOUVER ARRANGEMENT |
| S68 | A0 | LIFERAFT CRADLE |
| S74 | - | STRUT |
| S85 | B0 | ROV PLATFORM |
| S87 | - | TUGGER WINCH INSTALLATION |
| S99 | D0 | DECK EQUIPMENT ARRANGEMENT |
| S112 | A2 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | A1 | GENERATOR FOUNDATION |
| S115 | | SEACHEST ARRANGEMENT |
| S116 | A1 | TOWING WINCH PUMP FOUNDATION |
| S125 | - | ANCHOR ARRANGEMENT |
| S126 | | RESCUE LIFEBOAT DAVIT |
| S126A | | WORKBOAT DAVIT |
| S130 | A2 | STERN ROLLER |
| S299 | | UNIT BREAKDOWN |
| O1 | | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |

## HULL 239 KIRT CHOUEST DRAWING LIST

| Drawing | Rev | Drawing Title |
|---|---|---|
| O3 | - | INTERIOR DOORS |
| O3LQ | A0 | INTERIOR DOORS |
| O4 | A4 | EXTERIOR WT DOORS |
| O4LQ | A0 | EXTERIOR WT DOORS |
| O5 | - | MANHOLES & HATCHES |
| O6 | | WINDOWS & SIDELIGHTS |
| O6YD | | WINDOWS (YARD) |
| O7 | A2 | LADDERS & STAIRS |
| O9 | - | MOORING ARRANGEMENT |
| O10 | - | HANDRAILS |
| O10LQ | A0 | HANDRAILS |
| O11 | - | FLOOR PLATING |
| O12 | | DECK BOARDS |
| O13 | | ROOM NUMBERS |
| O13LQ | A0 | ROOM NUMBERS |
| O14 | A1 | TRANSDUCER ARRANGEMENT |
| O18 | - | HULL MARKINGS (DRAFT) |
| O19 | - | ROPE GUARD |
| O20 | A1 | GANGWAY |
| O21 | | JOINER WALL ARRANGEMENT |
| O21LQ | A0 | JOINER WALL ARRANGEMENT |
| O22 | | JOINER CONNECTION DETAILS |
| O23 | | JOINER CEILING ARRANGEMENT |
| O23LQ | A0 | JOINER CEILING ARRANGEMENT |
| O26 | | ANODE PLACEMENT |
| O28 | - | FIXED BALLAST INSTALLATION |
| O31 | - | NAVIGATION LIGHT ARRANGEMENT |
| O33 | | LOAD LINE ASSIGNMENT |
| O34 | | BUMPER TIRE ARRANGEMENT |
| O35 | | NAVIGATION BRIDGE VISIBILITY |
| O36 | | GRABRAILS |
| O40 | | GALLEY STOVE EXHAUST SYSTEM |
| O41 | | HVAC SYSTEM |
| O46 | - | VENTILATION SYSTEM |
| O49 | | TANK LABELING ARRANGEMENT |
| O50 | | PILOT HOUSE TOP LAYOUT |
| O50LQ | | PILOT HOUSE TOP LAYOUT |
| O53 | | STACK LOGO LOCATION |
| O54 | - | NAME LOCATION |
| M1 | - | EXHAUST GAS SYSTEM |
| M2 | A3 | FUEL OIL SERVICE SYSTEM |
| M3 | A2 | FUEL OIL TRANSFER SYSTEM |
| M4 | | LUBE OIL SERVICE SYSTEM |
| M5 | A2 | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | - | FRESH WATER COOLING SYSTEM |
| M8 | C0 | SEAWATER COOLING SYSTEM |
| M10 | A2 | BALLAST SYSTEM |
| M11 | A1 | BILGE SYSTEM |
| M12 | B0 | FIREMAIN SYSTEM |
| M13 | A1 | TANK SOUNDFAST SYSTEM |
| M14 | A1 | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M19 | A0 | AUXILIARY HYDRAULIC OIL SYSTEM |
| M21 | B0 | POTABLE WATER SYSTEM |
| M22 | C0 | GRAY, BLACK & SANITARY WATER SYSTEM |

## HULL 239 KIRT CHOUEST DRAWING LIST

| Drawing | Rev | Drawing Title |
|---------|-----|---------------|
| M24 | A1 | FUEL OIL OVERFLOW SYSTEM |
| M25 | B0 | TANK & MISC VENT SYSTEM |
| M26 | A1 | TANK LEVEL INDICATION SYSTEM |
| M27 | A2 | WEATHER DECK DRAIN SYSTEM |
| M29 | | DRY BULK SYSTEM |
| M30 | A1 | DRILLING FLUID SYSTEM |
| M31 | | LIQUID MUD TANK CLEANING SYSTEM |
| M35 | | METHANOL TRANSFER SYSTEM |
| M37 | A1 | WEATHER DECK PIPE PENETRATIONS |
| M40 | | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M42 | | USCG TRANSFER DRAWINGS |
| M51 | - | ENGINE CRANKCASE VENTILATION |
| E1 | D0 | ELECTRICAL LOAD ANALYSIS |
| E2 | D0 | POWER ONE LINE |
| E3 | A1 | CABLEWAY LAYOUT |
| E4 | D0 | 480VAC DISTRIBUTION ONE LINE |
| E6 | F0 | 208/120VAC DISTRIBUTION ONE LINE |
| E7H | B0 | 208 120VAC HEATING ARRANGEMENT |
| E7L | E0 | 208/120VAC LIGHTING ARRANGEMENT |
| E7R | B0 | 208/120VAC RECEPTICLE ARRANGEMENT |
| E8 | C0 | 24VDC DISTRIBUTION ONE LINE |
| E9 | - | CRANE / DECK TUGGER CONTROL ONE LINE |
| E11 | A1 | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E12 | | ELECTRICAL EQUIPMENT LAYOUT |
| E13 | D0 | GENERAL ALARM ONE LINE |
| E14 | | FIRE DETECTION AND ALARM ONE LINE |
| E15 | A1 | SOUND-POWERED PHONE ONE LINE |
| E16 | D0 | CENTRAL COMMUNICATION ONE LINE |
| E19 | A1 | CONTROL ROOM CONSOLE LAYOUT |
| E21 | A2 | PILOT HOUSE CONSOLE LAYOUT |
| E34 | D0 | HAZARDOUS AREAS PLAN |
| E35 | | EMERGENCY STEERING PROCEDURES |
| E36YD | | MISCELLANEOUS CONTROL PANELS |
| E37YD | A2 | HYDRAULIC WATERTIGHT DOOR ONE LINE |
| E40 | A2 | CO2 ALARM SYSTEM ONE LINE |
| E43 | A3 | STEERING CONTROL ONE LINE |
| E45 | A1 | VENTILATION SYSTEM CONTROL ONE LINE |
| E51 | B1 | VIDEO MONITORING SYSTEM ONE LINE |
| E54 | B0 | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | A2 | BILGE SYSTEM CONTROL ONE LINE |
| E60 | A4 | WATERTIGHT DOOR/HATCH CONTROL ONE LINE |
| E62 | A1 | COMPUTER NETWORK SYSTEM ONE LINE |
| E65 | A2 | TV & ENTERTAINMENT SYSTEM |
| E68 | A2 | ENGINE ORDER TELEGRAPH ONE LINE |
| E109 | A1 | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | A3 | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | A2 | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | | AUTOMATION I-O BOX ONE LINE |
| E129 | A4 | AUTOMATED FLOOD AND DECK LIGHTS |
| E129YD | A2 | FLOOD AND DECK LIGHTS |
| E130 | A2 | WIPER CONTROL ONE LINE |
| E131 | A2 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | A1 | STEREO ANTENNA ONE LINE |

| HULL 239 KIRT CHOUEST DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| E133 | A2 | ASI VALVE ONE LINE |
| E134 | A2 | JRC ELECTRONICS ONE LINE |
| E136 | A1 | CAPTAINS WATCH ONE LINE |
| E137 | A3 | VDR ONE LINE |

**EXHIBIT A-16**
**VESSEL; WORK**

Vessel Name and Official Number: Lyman Martin (O.N. 1227085)

**Work**

| HULL 269 LYMAN MARTIN DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D2 | A1 | GENERAL ARRANGEMENT |
| D3 | - | TANK CAPACITY PLAN |
| D6 | - | SHELL EXPANSION |
| D6YD | - | SHELL EXPANSION SEAM LOCATIONS |
| D8 | - | FIRE INTEGRITY |
| D9 | - | INSULATION PLAN |
| D9M | A1 | MASCOAT PLAN |
| D10 | A3 | MACHINERY ARRANGEMENT |
| D12 | - | SHAFT ARRANGEMENT |
| D15 | - | UNDERWATER INSPECTION MARKING PLAN |
| D20 | C0 | FIRE & SAFETY PLAN |
| D23 | - | DOCKING PLAN |
| D34 | | DANGEROUS GOODS PLAN |
| S14 | A1 | CRANE FOUNDATION |
| S21 | - | MAST DETAIL |
| S40 | - | SWING DOWN THRUSTER MODULE |
| S41 | A1 | SWING DOWN THRUSTER INSTALLATION |
| S50 | A1 | RUDDER ARRANGEMENT |
| S52 | - | RUDDER STOP |
| S53A | A2 | TUNNEL STERN THRUSTER INSTALLATION AFT |
| S53F | A2 | FWD TUNNEL THRUSTER INSTALLATION FWD |
| S56 | A1 | SIDEGATES |
| S58 | - | RUB RAILS/BUMPER INSTALLATION |
| S59 | - | CARGO RAILS |
| S61 | - | BILGE KEEL INSTALLATION |
| S63 | A1 | MAIN DECK HATCH |
| S66 | - | LOUVER ARRANGEMENT |
| S68 | - | LIFERAFT CRADLE |
| S72 | - | GEAR BOX FOUNDATION |
| S74 | - | STRUT |
| S87 | A1 | TUGGER WINCH INSTALLATION |
| S107 | - | MAIN ENGINE FOUNDATION |
| S112 | A1 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | A1 | GENERATOR FOUNDATION |
| S114 | - | FIRE MONITOR PUMP FOUNDATION |
| S115 | - | SEACHEST ARRANGEMENT |
| S125 | A1 | ANCHOR ARRANGEMENT |
| S126 | - | RESCUE LIFEBOAT DAVIT |
| S299 | - | UNIT BREAKDOWN |
| O1 | A1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
| O3 | - | INTERIOR DOORS |
| O4 | - | EXTERIOR WT DOORS |
| O5 | A1 | MANHOLES & HATCHES |
| O6 | - | WINDOWS & SIDELIGHTS |
| O6YD | - | WINDOWS (YARD) |

## HULL 269 LYMAN MARTIN DRAWING LIST

| Drawing | Rev | Drawing Title |
|---------|-----|---------------|
| O7 | - | LADDERS & STAIRS |
| O9 | A2 | MOORING ARRANGEMENT |
| O10 | A1 | HANDRAILS |
| O11 | A1 | FLOOR PLATING |
| O12 | A1 | DECK BOARDS |
| O13 | - | ROOM NUMBERS |
| O14 | A1 | TRANSDUCER ARRANGEMENT |
| O18 | - | HULL MARKINGS (DRAFT) |
| O19 | - | ROPE GUARD |
| O20 | - | GANGWAY |
| O21 | - | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | - | JOINER CEILING ARRANGEMENT |
| O26 | - | ANODE PLACEMENT |
| O31 | - | NAVIGATION LIGHT ARRANGEMENT |
| O33 | - | LOAD LINE ASSIGNMENT |
| O34 | - | BUMPER TIRE ARRANGEMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | A1 | GRABRAILS |
| O46 | A2 | VENTILATION SYSTEM |
| O50 | A1 | PILOT HOUSE TOP LAYOUT |
| O53 | - | STACK LOGO LOCATION |
| O54 | - | NAME LOCATION |
| M1 | - | EXHAUST GAS SYSTEM |
| M2 | A1 | FUEL OIL SERVICE SYSTEM |
| M3 | A1 | FUEL OIL TRANSFER SYSTEM |
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | - | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | A1 | FRESH WATER COOLING SYSTEM |
| M8 | - | SEAWATER COOLING SYSTEM |
| M10 | - | BALLAST SYSTEM |
| M11 | A1 | BILGE SYSTEM |
| M12 | A1 | FIREMAIN SYSTEM |
| M13 | - | TANK SOUNDFAST SYSTEM |
| M14 | - | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | - | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | - | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | - | POTABLE WATER SYSTEM |
| M22 | - | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | - | FUEL OIL OVERFLOW SYSTEM |
| M25 | - | TANK & MISC VENT SYSTEM |
| M26 | - | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M29 | - | DRY BULK SYSTEM |
| M30 | | DRILLING FLUID SYSTEM |
| M31 | - | LIQUID MUD TANK CLEANING SYSTEM |
| M33 | | FIRE MONITOR SYSTEM |
| M35 | | METHANOL TRANSFER SYSTEM |
| M37 | - | WEATHER DECK PIPE PENETRATIONS |
| M40 | - | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M42 | | USCG TRANSFER DRAWINGS |
| M49 | - | TANK LABELING ARRANGMENT |
| M50 | | HULL AND DECK PENETRATIONS |
| M51 | - | ENGINE CRANKCASE VENTILATION |
| M61 | - | WATER MIST FLUID SYSTEM |

| HULL 269 LYMAN MARTIN DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| E2 | A2 | POWER ONE LINE |
| E3 | - | CABLEWAY LAYOUT |
| E4 | A2 | 480VAC DISTRIBUTION ONE LINE |
| E6 | - | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | A1 | 208/120VAC DISTRIBUTION LAYOUT |
| E8 | A1 | 24VDC DISTRIBUTION ONE LINE |
| E11 | - | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E13 | - | GENERAL ALARM ONE LINE |
| E14 | - | FIRE DETECTION AND ALARM ONE LINE |
| E15 | A2 | SOUND-POWERED PHONE ONE LINE |
| E16 | A4 | CENTRAL COMMUNICATION ONE LINE |
| E19 | - | CONTROL ROOM CONSOLE LAYOUT |
| E21 | - | PILOT HOUSE CONSOLE LAYOUT |
| E35 | - | EMERGENCY STEERING PROCEDURES |
| E36YD | - | MISCELLANEOUS CONTROL PANELS |
| E40 | - | CO2 ALARM SYSTEM ONE LINE |
| E43 | - | STEERING CONTROL ONE LINE |
| E53 | - | 6600VAC DISTRIBUTION ONE LINE |
| E54 | - | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | A2 | BILGE SYSTEM CONTROL ONE LINE |
| E109 | - | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | - | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | - | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | - | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | - | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | - | AUTOMATION I-O BOX ONE LINE |
| E129 | A1 | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | A1 | WIPER CONTROL ONE LINE |
| E131 | - | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | - | STEREO ANTENNA ONE LINE |

**EXHIBIT A-17**
**VESSEL; WORK**

Vessel Name and Official Number: Marsh Island (O.N. 1266925)

**Work**

| HULL 302 MARSH ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | D3 | |
| D3 | TANK PLAN | D0 | USE HULL 290 SHIP ISLAND |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP ISLAND |
| D9 | INSULATION PLAN | A7 | USE HULL 290 SHIP ISLAND |
| D10 | MACHINERY ARRANGEMENT | - | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIP ISLAND |
| D20 | FIRE AND SAFETY PLAN | D0 | USE HULL 290 SHIP ISLAND |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | USE HULL 290 SHIP ISLAND |
| D34 | DANGEROUS GOODS PLAN | - | |

| HULL 302 MARSH ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP ISLAND |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP ISLAND |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP ISLAND |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S63 | MAIN DECK HATCH | - | USE HULL 290 SHIP ISLAND |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP ISLAND |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIP ISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP ISLAND |
| S113 | GENERATOR FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S115 | SEACHEST ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| S125 | ANCHOR ARRANGEMENT | A4 | USE HULL 290 SHIP ISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP ISLAND |

| HULL 302 MARSH ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| O | Outfits | | |

## HULL 302 MARSH ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIP ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP ISLAND |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP ISLAND |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIP ISLAND |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP ISLAND |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP ISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP ISLAND |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP ISLAND |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP ISLAND |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP ISLAND |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O18 | HULL MARKINGS (DRAFT) | - | |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP ISLAND |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | USE HULL 290 SHIP ISLAND |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIP ISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP ISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP ISLAND |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP ISLAND |
| O54 | NAME LOCATION | A1 | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP ISLAND |

## HULL 302 MARSH ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIP ISLAND |
| M10 | BALLAST SYSTEM | B2 | USE HULL 290 SHIP ISLAND |
| M11 | BILGE SYSTEM | C0 | USE HULL 290 SHIP ISLAND |
| M12 | FIRE MAIN SYSTEM | B0 | USE HULL 290 SHIP ISLAND |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIP ISLAND |

## HULL 302 MARSH ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIP ISLAND |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIP ISLAND |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | D0 | USE HULL 290 SHIP ISLAND |

## HULL 302 MARSH ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | C0 | USE HULL 290 SHIP ISLAND |
| E3 | CABLEWAY LAYOUT | A1 | |
| E4 | 480VAC DISTRIBUTION ONE LINE | - | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | A5 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | - | |
| E13 | GENERAL ALARM ONE LINE | - | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | - | |
| E16 | CENTRAL COMMUNICATION ONE LINE | A1 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIP ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A1 | |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIP ISLAND |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | - | |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | A1 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A1 | |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | - | |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | - | |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | - | |
| E128 | AUTOMATION I/O BOX ONE LINE | A1 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIP ISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIP ISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP ISLAND |

**EXHIBIT A-18**
**VESSEL; WORK**

Vessel Name and Official Number: Mr Sidney (O.N. 1216539)

**Work**

| HULL 252 MR SIDNEY DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D2 | B0 | GENERAL ARRANGEMENT |
| D3 | B0 | TANK CAPACITY PLAN |
| D5 | | PROFILES & DECKS |
| D8 | - | FIRE INTEGRITY |
| D9 | A5 | INSULATION PLAN |
| D9M | - | MASCOAT PLAN |
| D10 | A4 | MACHINERY ARRANGEMENT |
| D12 | - | SHAFT ARRANGEMENT |
| D15 | B0 | UNDERWATER INSPECTION MARKING PLAN |
| D16 | | TYPICAL SECTIONS |
| D20 | D0 | FIRE & SAFETY PLAN |
| D23 | A3 | DOCKING PLAN |
| D26 | | STATION BILL |
| D34 | - | DANGEROUS GOODS PLAN |
| D35 | A0 | HAZARDOUS CARGO ARRANGEMENT |
| D36 | B0 | DAMAGE CONTROL PLAN |
| S14 | - | CRANE FOUNDATION |
| S21 | A3 | MAST DETAIL |
| S40 | - | SWING DOWN THRUSTER MODULE |
| S41 | A1 | SWING DOWN THRUSTER INSTALLATION |
| S43 | A0 | OIL RECOVERY PLATFORM/EQUIPMENT ARRANGEMENT |
| S50 | B1 | RUDDER ARRANGEMENT |
| S52 | - | RUDDER STOP |
| S53A | A1 | TUNNEL STERN THRUSTER INSTALLATION |
| S53F | A1 | FWD TUNNEL THRUSTER INSTALLATION FWD |
| S55 | A0 | BULWARKS |
| S56 | - | SIDEGATES |
| S58 | - | RUB RAILS/BUMPER INSTALLATION |
| S59 | - | CARGO RAILS |
| S61 | - | BILGE KEEL INSTALLATION |
| S63 | - | MAIN DECK HATCH |
| S66 | A1 | LOUVER ARRANGEMENT |
| S68 | A2 | LIFERAFT CRADLE |
| S72 | - | GEAR BOX FOUNDATION |
| S74 | - | STRUT |
| S87 | A1 | TUGGER WINCH INSTALLATION |
| S99 | - | DECK EQUIPMENT ARRANGEMENT |
| S107 | - | MAIN ENGINE FOUNDATION |
| S112 | A1 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | A1 | GENERATOR FOUNDATION |
| S114 | A3 | FIRE MONITOR PUMP FOUNDATION |
| S115 | B0 | SEACHEST ARRANGEMENT |
| S125 | A2 | ANCHOR ARRANGEMENT |
| S126 | - | RESCUE LIFEBOAT DAVIT |
| S130 | | STERN ROLLER |

| HULL 252 MR SIDNEY DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| S299 | - | UNIT BREAKDOWN |
| O1 | A1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
| O3 | - | INTERIOR DOORS |
| O4 | A1 | EXTERIOR WT DOORS |
| O5 | D0 | MANHOLES & HATCHES |
| O6 | A1 | WINDOWS & SIDELIGHTS |
| O6YD | - | WINDOWS (YARD) |
| O7 | B0 | LADDERS & STAIRS |
| O9 | A2 | MOORING ARRANGEMENT |
| O10 | A2 | HANDRAILS |
| O11 | A2 | FLOOR PLATING |
| O12 | A3 | DECK BOARDS |
| O13 | A1 | ROOM NUMBERS |
| O14 | A1 | TRANSDUCER ARRANGEMENT |
| O18 | A3 | HULL MARKINGS (DRAFT) |
| O19 | A1 | ROPE GUARD |
| O20 | - | GANGWAY |
| O21 | - | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | - | JOINER CEILING ARRANGEMENT |
| O26 | B0 | ANODE PLACEMENT |
| O31 | - | NAVIGATION LIGHT ARRANGEMENT |
| O33 | - | LOAD LINE ASSIGNMENT |
| O34 | - | BUMPER TIRE ARRANGEMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | A1 | GRABRAILS |
| O46 | A1 | VENTILATION SYSTEM |
| O50 | B0 | PILOT HOUSE TOP LAYOUT |
| O53 | - | STACK LOGO LOCATION |
| O54 | A0 | NAME LOCATION |
| O60 | A0 | FOAM DISPERSANT BOOM |
| M1 | - | EXHAUST GAS SYSTEM |
| M2 | B0 | FUEL OIL SERVICE SYSTEM |
| M3 | C0 | FUEL OIL TRANSFER SYSTEM |
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | A0 | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | A0 | FRESH WATER COOLING SYSTEM |
| M8 | - | SEAWATER COOLING SYSTEM |
| M10 | A0 | BALLAST SYSTEM |
| M11 | A0 | BILGE SYSTEM |
| M12 | A0 | FIREMAIN SYSTEM |
| M13 | B0 | TANK SOUNDFAST SYSTEM |
| M14 | A0 | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | B0 | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | - | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | B0 | POTABLE WATER SYSTEM |
| M22 | - | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | A0 | FUEL OIL OVERFLOW SYSTEM |
| M25 | B0 | TANK & MISC VENT SYSTEM |
| M26 | B0 | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M28 | A0 | CARGO FUEL OIL SYSTEM |
| M29 | A1 | DRY BULK SYSTEM |
| M30 | CY1 | DRILLING FLUID SYSTEM |
| M31 | A0 | LIQUID MUD TANK CLEANING SYSTEM |
| M33 | - | FIRE MONITOR SYSTEM |

## HULL 252 MR SIDNEY DRAWING LIST

| Drawing | Rev | Drawing Title |
|---|---|---|
| M37 | B0 | WEATHER DECK PIPE PENETRATIONS |
| M40 | - | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M42 | | USCG TRANSFER DRAWINGS |
| M49 | A1 | TANK LABELING ARRANGEMENT |
| M51 | - | ENGINE CRANKCASE VENTILATION |
| M58 | A0 | RECOVERY OIL ARRANGEMENT |
| M61 | - | WATER-BASED FLUID SYSTEM |
| M72 | A0 | CARGO POTABLE WATER |
| E1 | B0 | ELECTRICAL LOAD ANALYSIS |
| E2 | C0 | POWER ONE LINE |
| E3 | - | CABLEWAY LAYOUT |
| E4 | B0 | 480VAC DISTRIBUTION ONE LINE |
| E6 | C1 | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | A0 | 208/120VAC DISTRIBUTION LAYOUT |
| E8 | C1 | 24VDC DISTRIBUTION ONE LINE |
| E11 | A1 | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E12 | - | ELECTRICAL EQUIPMENT LAYOUT |
| E13 | - | GENERAL ALARM ONE LINE |
| E14 | - | FIRE DETECTION AND ALARM ONE LINE |
| E15 | - | SOUND-POWERED PHONE ONE LINE |
| E16 | A1 | CENTRAL COMMUNICATION ONE LINE |
| E19 | A2 | CONTROL ROOM CONSOLE LAYOUT |
| E21 | A1 | PILOT HOUSE CONSOLE LAYOUT |
| E34 | A1 | HAZARDOUS AREAS PLAN |
| E35 | - | EMERGENCY STEERING PROCEDURES |
| E36YD | A3 | MISCELLANEOUS CONTROL PANELS |
| E40 | - | CO2 ALARM SYSTEM ONE LINE |
| E43 | - | STEERING CONTROL ONE LINE |
| E47 | - | METHANOL SYSTEM CONTROL ONE LINE |
| E49 | A1 | COMBUSTIBLE MATERIAL DETECTION ONE LINE |
| E53 | - | 6600VAC DISTRIBUTION ONE LINE |
| E54 | B0 | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | A1 | BILGE SYSTEM CONTROL ONE LINE |
| E109 | - | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | - | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | - | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | - | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | - | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | A5 | AUTOMATION I-O BOX ONE LINE |
| E129 | - | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | - | WIPER CONTROL ONE LINE |
| E131 | - | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | - | STEREO ANTENNA ONE LINE |
| E135 | A1 | MISC ELECTRONICS AND COMMUNICATIONS |

**EXHIBIT A-19**
**VESSEL; WORK**

Vessel Name and Official Number: Ms Virgie (O.N. 1213714)

**Work**

| HULL 250 MS VIRGIE DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D2 | B0 | GENERAL ARRANGEMENT |
| D3 | B0 | TANK CAPACITY PLAN |
| D5 | B0 | PROFILES & DECKS |
| D6 | - | SHELL EXPANSION |
| D6YD | - | SHELL EXPANSION SEAM LOCATIONS |
| D8 | - | FIRE INTEGRITY |
| D9 | A1 | INSULATION PLAN |
| D9M | - | MASCOAT PLAN |
| D10 | A6 | MACHINERY ARRANGEMENT |
| D12 | | SHAFT ARRANGEMENT |
| D15 | B0 | UNDERWATER INSPECTION MARKING PLAN |
| D16 | B0 | TYPICAL SECTIONS |
| D16/5 | Y3 | MODIFICATION SKETCH |
| D20 | D0 | FIRE & SAFETY PLAN |
| D23 | A3 | DOCKING PLAN |
| D26 | | STATION BILL |
| D34I | - | INDEPENDENT TANK HAZARDOUS AREAS PL |
| D34 | A0 | DANGEROUS GOODS PLAN |
| D35 | A0 | HAZARDOUS CARGO ARRANGEMENT |
| D36 | B0 | DAMAGE CONTROL PLAN |
| S14 | - | CRANE FOUNDATION |
| S21 | A3 | MAST DETAIL |
| S50 | A1 | RUDDER ARRANGEMENT |
| S52 | A1 | RUDDER STOP |
| S53A | A1 | TUNNEL STERN THRUSTER INSTALLATION AFT |
| S53F | A1 | FWD TUNNEL THRUSTER INSTALLATION FWD |
| S56 | - | SIDEGATES |
| S58 | A1 | RUB RAILS/BUMPER INSTALLATION |
| S59 | - | CARGO RAILS |
| S61 | - | BILGE KEEL INSTALLATION |
| S63 | - | MAIN DECK HATCH |
| S66 | A1 | LOUVER ARRANGEMENT |
| S68 | A3 | LIFERAFT CRADLE |
| S72 | - | GEAR BOX FOUNDATION |
| S74 | - | STRUT |
| S87 | - | TUGGER WINCH INSTALLATION |
| S107 | A1 | MAIN ENGINE FOUNDATION |
| S112 | B2 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | - | GENERATOR FOUNDATION |
| S114 | A3 | FIRE MONITOR PUMP FOUNDATION |
| S115 | B0 | SEACHEST ARRANGEMENT |
| S125 | A3 | ANCHOR ARRANGEMENT |
| S126 | - | RESCUE LIFEBOAT DAVIT |
| S130 | | STERN ROLLER |

| HULL 250 MS VIRGIE DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| O1 | - | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
| O3 | A2 | INTERIOR DOORS |
| O4 | A2 | EXTERIOR WT DOORS |
| O5 | D0 | MANHOLES & HATCHES |
| O6 | A1 | WINDOWS & SIDELIGHTS |
| O6YD | - | WINDOWS (YARD) |
| O7 | A2 | LADDERS & STAIRS |
| O9 | A1 | MOORING ARRANGEMENT |
| O10 | A2 | HANDRAILS |
| O11 | A2 | FLOOR PLATING |
| O12 | - | DECK BOARDS |
| O13 | - | ROOM NUMBERS |
| O14 | - | TRANSDUCER ARRANGEMENT |
| O18 | A2 | HULL MARKINGS (DRAFT) |
| O19 | - | ROPE GUARD |
| O20 | - | GANGWAY |
| O21 | - | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | - | JOINER CEILING ARRANGEMENT |
| O26 | B0 | ANODE PLACEMENT |
| O31 | - | NAVIGATION LIGHT ARRANGEMENT |
| O33 | - | LOAD LINE ASSIGNMENT |
| O34 | - | BUMPER TIRE ARRANGEMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | A1 | GRABRAILS |
| O40 | A1 | GALLEY STOVE EXHAUST SYSTEM |
| O41 | - | HVAC SYSTEM |
| O46 | B0 | VENTILATION SYSTEM |
| O49 | VOID | TANK LABELING ARRANGEMENT |
| O50 | B0 | PILOT HOUSE TOP LAYOUT |
| O53 | - | STACK LOGO LOCATION |
| O54 | A0 | NAME LOCATION |
| O60 | A0 | FOAM DISPERSANT BOOM |
| M1 | A1 | EXHAUST GAS SYSTEM |
| M2 | B0 | FUEL OIL SERVICE SYSTEM |
| M3 | B0 | FUEL OIL TRANSFER SYSTEM |
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | A1 | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | A1 | FRESH WATER COOLING SYSTEM |
| M8 | A1 | SEAWATER COOLING SYSTEM |
| M10 | B0 | BALLAST SYSTEM |
| M11 | C0 | BILGE SYSTEM |
| M12 | A0 | FIREMAIN SYSTEM |
| M13 | C0 | TANK SOUNDFAST SYSTEM |
| M14 | A3 | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | A0 | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | - | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | B0 | POTABLE WATER SYSTEM |
| M22 | C0 | GRAY, BLACK & SANITARY WATER SYSTEM |
| M25 | A2 | TANK & MISC VENT SYSTEM |
| M24 | - | FUEL OIL OVERFLOW SYSTEM |
| M26 | C0 | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M28 | A2 | CARGO OIL SYSTEM |

| HULL 250 MS VIRGIE DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| M29 | - | DRY BULK SYSTEM |
| M30 | - | DRILLING FLUID SYSTEM |
| M33 | A3 | FIRE MONITOR SYSTEM |
| M35 | - | METHANOL TRANSFER SYSTEM |
| M37 | A3 | WEATHER DECK PIPE PENETRATIONS |
| M41 | | VESSEL FRAME DRAWINGS |
| M42 | | USCG TRANSFER DRAWINGS |
| M49 | | TANK LABELING ARRANGMENT |
| M51 | A1 | ENGINE CRANKCASE VENTILATION |
| M61 | - | WATER-BASED FLUID SYSTEM |
| E1 | C0 | ELECTRICAL LOAD ANALYSIS |
| E2 | D1 | POWER ONE LINE |
| E3 | A1 | CABLEWAY LAYOUT |
| E4 | B0 | 480VAC DISTRIBUTION ONE LINE |
| E6 | B1 | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | B0 | 208/120VAC DISTRIBUTION LAYOUT |
| E8 | B1 | 24VDC DISTRIBUTION ONE LINE |
| E11 | - | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E13 | A2 | GENERAL ALARM ONE LINE |
| E14 | A2 | FIRE DETECTION AND ALARM ONE LINE |
| E16 | A2 | CENTRAL COMMUNICATION ONE LINE |
| E15 | A1 | SOUND-POWERED PHONE ONE LINE |
| E19 | A1 | CONTROL ROOM CONSOLE LAYOUT |
| E21 | A2 | PILOT HOUSE CONSOLE LAYOUT |
| E34 | - | HAZARDOUS AREAS PLAN |
| E34I | - | INDEPENDENT TANK HAZARDOUS AREAS PL |
| E36YD | A2 | MISCELLANEOUS CONTROL PANELS |
| E40 | A1 | CO2 ALARM SYSTEM ONE LINE |
| E43 | A1 | STEERING CONTROL ONE LINE |
| E53 | A1 | 6600VAC DISTRIBUTION ONE LINE |
| E54 | B0 | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | B1 | BILGE SYSTEM CONTROL ONE LINE |
| E109 | A1 | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | A1 | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | A1 | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | A1 | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | A1 | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | A3 | AUTOMATION I-O BOX ONE LINE |
| E129 | A1 | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | A1 | WIPER CONTROL ONE LINE |
| E131 | A1 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | A1 | STEREO ANTENNA ONE LINE |

**EXHIBIT A-20**
**VESSEL; WORK**

Vessel Name and Official Number: Pao de Acucar (O.N. 1218372)

**Work**

| HULL 253 PAO DE ACUCAR DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D2 | E1 | GENERAL ARRANGEMENT |
| D3 | A1 | TANK CAPACITY PLAN |
| D5 | - | PROFILES & DECKS |
| D8 | - | FIRE INTEGRITY |
| D9 | A2 | INSULATION PLAN |
| D9M | - | MASCOAT PLAN |
| D10 | A5 | MACHINERY ARRANGEMENT |
| D12 | - | SHAFT ARRANGEMENT |
| D15 | B0 | UNDERWATER INSPECTION MARKING PLAN |
| D16 | - | TYPICAL SECTIONS |
| D20 | B0 | FIRE & SAFETY PLAN |
| D23 | A1 | DOCKING PLAN |
| D26 | | STATION BILL |
| S14 | - | CRANE FOUNDATION |
| S21 | A1 | MAST DETAIL |
| S40 | - | SWING DOWN THRUSTER MODULE |
| S41 | A1 | SWING DOWN THRUSTER INSTALLATION |
| S50 | A2 | RUDDER ARRANGEMENT |
| S52 | - | RUDDER STOP |
| S53A | A1 | TUNNEL STERN THRUSTER INSTALLATION |
| S53F | A1 | FWD TUNNEL THRUSTER INSTALLATION FWD |
| S56 | A2 | SIDEGATES |
| S58 | A1 | RUB RAILS/BUMPER INSTALLATION |
| S59 | | CARGO RAILS |
| S61 | - | BILGE KEEL INSTALLATION |
| S63 | - | MAIN DECK HATCH |
| S66 | A1 | LOUVER ARRANGEMENT |
| S68 | A1 | LIFERAFT CRADLE |
| S72 | - | GEAR BOX FOUNDATION |
| S74 | - | STRUT |
| S85 | B2 | ROV PLATFORM |
| S87 | A1 | TUGGER WINCH INSTALLATION |
| S98 | | UNDER DECK STRUCTURE |
| S99 | D0 | DECK EQUIPMENT ARRANGEMENT |
| S107 | A1 | MAIN ENGINE FOUNDATION |
| S112 | A1 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | A1 | GENERATOR FOUNDATION |
| S114 | A2 | FIRE MONITOR PUMP FOUNDATION |
| D2 | E1 | GENERAL ARRANGEMENT |
| S115 | A1 | SEACHEST ARRANGEMENT |
| S125 | A2 | ANCHOR ARRANGEMENT |
| S126 | A3 | RESCUE LIFEBOAT DAVIT |
| S160 | - | CHEMICAL TANK STRUCTURE |
| S299 | - | UNIT BREAKDOWN |
| S190 | - | JIB CRANE FOUNDATION |

| O1 | - | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
|---|---|---|
| O3 | - | INTERIOR DOORS |
| O4 | A1 | EXTERIOR WT DOORS |
| O5 | B1 | MANHOLES & HATCHES |
| O6 | A1 | WINDOWS & SIDELIGHTS |
| O6YD | - | WINDOWS (YARD) |
| O7 | A1 | LADDERS & STAIRS |
| O9 | A1 | MOORING ARRANGEMENT |
| O10 | A2 | HANDRAILS |
| O11 | A1 | FLOOR PLATING |
| O12 | A2 | DECK BOARDS |
| O13 | A1 | ROOM NUMBERS |
| O14 | B1 | TRANSDUCER ARRANGEMENT |
| O18 | A1 | HULL MARKINGS (DRAFT) |
| O19 | - | ROPE GUARD |
| O20 | - | GANGWAY |
| O21 | - | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | - | JOINER CEILING ARRANGEMENT |
| O26 | - | ANODE PLACEMENT |
| O31 | - | NAVIGATION LIGHT ARRANGEMENT |
| O33 | - | LOAD LINE ASSIGNMENT |
| O34 | - | BUMPER TIRE ARRANGEMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | A1 | GRABRAILS |
| O46 | - | VENTILATION SYSTEM |
| O50 | A2 | PILOT HOUSE TOP LAYOUT |
| O53 | A1 | STACK LOGO LOCATION |
| O54 | - | NAME LOCATION |
| M1 | - | EXHAUST GAS SYSTEM |
| M2 | - | FUEL OIL SERVICE SYSTEM |
| D2 | E1 | GENERAL ARRANGEMENT |
| M3 | - | FUEL OIL TRANSFER SYSTEM |
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | - | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | - | FRESH WATER COOLING SYSTEM |
| M8 | A1 | SEAWATER COOLING SYSTEM |
| M10 | - | BALLAST SYSTEM |
| M11 | A2 | BILGE SYSTEM |
| M12 | - | FIREMAIN SYSTEM |
| M13 | - | TANK SOUNDFAST SYSTEM |
| M14 | - | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | - | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | - | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | - | POTABLE WATER SYSTEM |
| M22 | - | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | - | FUEL OIL OVERFLOW SYSTEM |
| M25 | | TANK & MISC VENT SYSTEM |
| M26 | - | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M29 | - | DRY BULK SYSTEM |
| M30 | - | DRILLING FLUID SYSTEM |
| M31 | - | LIQUID MUD TANK CLEANING SYSTEM |
| M33 | - | FIRE MONITOR SYSTEM |
| M35 | A1 | METHANOL TRANSFER SYSTEM |
| M37 | - | WEATHER DECK PIPE PENETRATIONS |
| M40 | - | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M42 | | USCG TRANSFER DRAWINGS |

| M49 | - | TANK LABELING ARRANGEMENT |
| M51 | - | ENGINE CRANKCASE VENTILATION |
| M60 | - | MISC CHEMICAL PIPING SYSTEM |
| M61 | - | WATER-BASED FLUID SYSTEM |
| E1 | A4 | ELECTRICAL LOAD ANALYSIS |
| E2 | A3 | POWER ONE LINE |
| E3 | - | CABLEWAY LAYOUT |
| E4 | A4 | 480VAC DISTRIBUTION ONE LINE |
| E6 | B1 | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | B0 | 208/120VAC DISTRIBUTION LAYOUT |
| D2 | E1 | GENERAL ARRANGEMENT |
| E8 | B0 | 24VDC DISTRIBUTION ONE LINE |
| E11 | | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E12 | | ELECTRICAL EQUIPMENT LAYOUT |
| E13 | B3 | GENERAL ALARM ONE LINE |
| E14 | B4 | FIRE DETECTION AND ALARM ONE LINE |
| E15 | - | SOUND-POWERED PHONE ONE LINE |
| E16 | B3 | CENTRAL COMMUNICATION ONE LINE |
| E19 | - | CONTROL ROOM CONSOLE LAYOUT |
| E21 | - | PILOT HOUSE CONSOLE LAYOUT |
| E34 | B0 | HAZARDOUS AREAS PLAN |
| E35 | | EMERGENCY STEERING PROCEDURES |
| E36YD | | MISCELLANEOUS CONTROL PANELS |
| E40 | - | CO2 ALARM SYSTEM ONE LINE |
| E43 | - | STEERING CONTROL ONE LINE |
| E53 | - | 6600VAC DISTRIBUTION ONE LINE |
| E54 | - | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | - | BILGE SYSTEM CONTROL ONE LINE |
| E109 | - | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | - | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | - | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | - | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | A2 | AUTOMATION I-O BOX ONE LINE |
| E129 | - | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | - | WIPER CONTROL ONE LINE |
| E131 | - | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | - | STEREO ANTENNA ONE LINE |

**EXHIBIT A-21**
**VESSEL; WORK**

Vessel Name and Official Number: Paradise Island (O.N. 1262977)


**Work**

| HULL 294 PARADISE ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | E2 | |
| D3 | TANK PLAN | D0 | USE HULL 290 SHIP ISLAND |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP ISLAND |
| D9 | INSULATION PLAN | A7 | USE HULL 290 SHIP ISLAND |
| D10 | MACHINERY ARRANGEMENT | A1 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIP ISLAND |
| D20 | FIRE AND SAFETY PLAN | D0 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | USE HULL 290 SHIP ISLAND |
| D34 | DANGEROUS GOODS PLAN | - | |

| HULL 294 PARADISE ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP ISLAND |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP ISLAND |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP ISLAND |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S63 | MAIN DECK HATCH | - | USE HULL 290 SHIP ISLAND |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP ISLAND |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIP ISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP ISLAND |
| S113 | GENERATOR FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S115 | SEACHEST ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| S125 | ANCHOR ARRANGEMENT | A4 | USE HULL 290 SHIP ISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP ISLAND |

| HULL 294 PARADISE ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIP ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP ISLAND |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP ISLAND |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIP ISLAND |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP ISLAND |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP ISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP ISLAND |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP ISLAND |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP ISLAND |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP ISLAND |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A4 | USE HULL 290 SHIP ISLAND |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP ISLAND |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | USE HULL 290 SHIP ISLAND |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIP ISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP ISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP ISLAND |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP ISLAND |

## HULL 294 PARADISE ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIP ISLAND |
| M10 | BALLAST SYSTEM | B2 | |
| M11 | BILGE SYSTEM | C0 | USE HULL 290 SHIP ISLAND |
| M12 | FIRE MAIN SYSTEM | B0 | USE HULL 290 SHIP ISLAND |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIP ISLAND |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIP ISLAND |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | A3 | |

## HULL 294 PARADISE ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | - | |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIP ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | - | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A1 | |
| E13 | GENERAL ALARM ONE LINE | B1 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | B1 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | B1 | |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A1 | |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIP ISLAND |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIP ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | USE HULL 290 SHIP ISLAND |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 290 SHIP ISLAND |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIP ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E128 | AUTOMATION I/O BOX ONE LINE | - | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIP ISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIP ISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP ISLAND |

**EXHIBIT A-22**
**VESSEL; WORK**

Vessel Name and Official Number: Pecan Island (O.N. 1258532)

**Work**

| HULL 289 PECAN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | D3 | |
| D3 | TANK PLAN | D0 | USE HULL 290 SHIP ISLAND |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP ISLAND |
| D9 | INSULATION PLAN | A7 | USE HULL 290 SHIP ISLAND |
| D10 | MACHINERY ARRANGEMENT | A4 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIP ISLAND |
| D20 | FIRE AND SAFETY PLAN | A2 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | USE HULL 290 SHIP ISLAND |
| D34 | DANGEROUS GOODS PLAN | - | |

| HULL 289 PECAN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP ISLAND |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP ISLAND |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | - | |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP ISLAND |
| S61 | BILGE KEEL INSTALLATION | - | |
| S63 | MAIN DECK HATCH | - | |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP ISLAND |
| S107 | MAIN ENGINE FOUNDATION | - | |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP ISLAND |
| S113 | GENERATOR FOUNDATION | - | |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S115 | SEACHEST ARRANGEMENT | - | |
| S125 | ANCHOR ARRANGEMENT | - | |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP ISLAND |

## HULL 289 PECAN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIP ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP ISLAND |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP ISLAND |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIP ISLAND |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP ISLAND |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP ISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP ISLAND |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP ISLAND |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP ISLAND |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP ISLAND |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A4 | USE HULL 290 SHIP ISLAND |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP ISLAND |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A1 | |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIP ISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP ISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP ISLAND |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP ISLAND |

## HULL 289 PECAN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIP ISLAND |
| M10 | BALLAST SYSTEM | B2 | USE HULL 290 SHIP ISLAND |
| M11 | BILGE SYSTEM | C0 | USE HULL 290 SHIP ISLAND |
| M12 | FIRE MAIN SYSTEM | A4 | |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A6 | |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIP ISLAND |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | D0 | USE HULL 290 SHIP ISLAND |

## HULL 289 PECAN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | B0 | |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIP ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | B0 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | - | |
| E13 | GENERAL ALARM ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | A5 | USE HULL 290 SHIP ISLAND |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIP ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIP ISLAND |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIP ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | - | |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | - | |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 290 SHIP ISLAND |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIP ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | - | |
| E128 | AUTOMATION I/O BOX ONE LINE | A10 | USE HULL 290 SHIP ISLAND |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIP ISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIP ISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP ISLAND |

**EXHIBIT A-23**
**VESSEL; WORK**

Vessel Name and Official Number: Pelican Island (O.N. 1261549)

**Work**

| HULL 295 PELICAN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| **Drawing** | **Title** | **Rev** | **Comments** |
| D | Design | | |
| D1 | LINES PLAN | - | |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | C1 | |
| D3 | TANK PLAN | C2 | |
| D4 | MIDSHIP SECTION | A2 | |
| D9 | INSULATION PLAN | A5 | |
| D10 | MACHINERY ARRANGEMENT | B1 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | Z1 | |
| D20 | FIRE AND SAFETY PLAN | B2 | |
| D23 | DOCKING PLAN | A1 | |
| D26 | STATION BILL | - | |
| D34 | DANGEROUS GOODS PLAN | A1 | |

| HULL 295 PELICAN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| **Drawing** | **Title** | **Rev** | **Comments** |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | |
| S21 | MAST DETAIL | A6 | |
| S47 | PROPULSION UNIT | A1 | |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A3 | |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | |
| S56 | SIDEGATES | A2 | |
| S58 | RUB RAILS/BUMPER INSTALLATION | - | |
| S59 | CARGO RAILS | A2 | |
| S61 | BILGE KEEL INSTALLATION | - | |
| S63 | MAIN DECK HATCH | - | |
| S66 | LOUVER ARRANGEMENT | A1 | |
| S68 | LIFERAFT CRADLE | B1 | |
| S87 | TUGGER WINCH INSTALLATION | A1 | |
| S89 | SIDE DOOR INSTALLATION | - | |
| S99 | DECK EQUIPMENT ARRANGEMENT | A1 | |
| S107 | MAIN ENGINE FOUNDATION | - | |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A1 | |
| S113 | GENERATOR FOUNDATION | A2 | |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | |
| S115 | SEACHEST ARRANGEMENT | A1 | |
| S125 | ANCHOR ARRANGEMENT | A3 | |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | |

## HULL 295 PELICAN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | |
| O3 | INTERIOR DOORS | A3 | |
| O4 | EXTERIOR WT DOORS | - | |
| O5 | MANHOLES & HATCHES | C1 | |
| O6 | WINDOWS & SIDELIGHTS | A1 | |
| O6YD | WINDOWS (YARD) | - | |
| O7 | LADDERS & STAIRS | B1 | |
| O9 | MOORING ARRANGEMENT | A3 | |
| O10 | HANDRAILS | B1 | |
| O11 | FLOOR PLATING | A2 | |
| O12 | DECK BOARDS | B1 | |
| O13 | ROOM NUMBERS | - | |
| O14 | TRANSDUCER ARRANGEMENT | - | |
| O18 | HULL MARKINGS (DRAFT) | A2 | |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | |
| O21 | JOINER WALL ARRANGEMENT | A3 | |
| O23 | JOINER CEILING ARRANGEMENT | A4 | |
| O26 | ANODE PLACEMENT | A1 | |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | |
| O33 | LOAD LINE ASSIGNMENT | - | |
| O34 | BUMPER TIRE ARRANGEMENT | - | |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | |
| O36 | GRABRAILS | - | |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A1 | |
| O38 | GALLEY LAYOUT | A4 | |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | |
| O46 | VENTILATION SYSTEM | A4 | |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A6 | |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | |
| O53 | STACK LOGO LOCATION | - | |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | |

## HULL 295 PELICAN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | - | |
| M2 | FUEL OIL SERVICE SYSTEM | - | |
| M3 | FUEL OIL TRANSFER SYSTEM | A1 | |
| M4 | LUBE OIL SERVICE SYSTEM | - | |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A1 | |
| M6 | FRESH WATER COOLING SYSTEM | A2 | |
| M10 | BALLAST SYSTEM | B1 | |
| M11 | BILGE SYSTEM | B1 | |
| M12 | FIRE MAIN SYSTEM | C0 | |
| M13 | TANK SOUNDFAST SYSTEM | B1 | |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A1 | |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | |
| M21 | POTABLE WATER SYSTEM | A1 | |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A1 | |
| M24 | FUEL OIL OVERFLOW SYSTEM | B1 | |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | |
| M27 | WEATHER DECK DRAIN SYSTEM | A3 | |
| M29 | DRY BULK SYSTEM | B2 | |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B3 | |
| M33 | FI-FI FIRE MONITOR SYSTEM | A2 | |
| M35 | METHANOL TRANSFER SYSTEM | B1 | |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | |
| M40 | MISC. PIPING SYSTEM | - | |
| M50 | HULL AND DECK PENETRATIONS | - | |
| M59 | CRUDE OIL SLOP SYSTEM | C0 | |
| M70 | CARGO FRESH WATER SYSTEM | B3 | |

## HULL 295 PELICAN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | A1 | |
| E3 | CABLEWAY LAYOUT | A2 | |
| E4 | 480VAC DISTRIBUTION ONE LINE | B1 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | A4 | |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | A5 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | - | |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A4 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | |
| E13 | GENERAL ALARM ONE LINE | A1 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | - | |
| E16 | CENTRAL COMMUNICATION ONE LINE | A4 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A2 | |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A2 | |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A3 | |
| E35 | EMERGENCY STEERING PROCEDURES | - | |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A1 | |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A2 | |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | - | |
| E47 | METHANOL SYSTEM CONTROL ONE LINE | A1 | |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | | |
| E53 | MV DISTRIBUTION ONE LINE | - | |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | A4 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A1 | |
| E60 | WT DOORS / HATCH ONE LINE | A1 | |
| E62 | COMPUTER NETWORK DIAGRAM | - | |
| E65 | TV & ENTERTAINMENT SYSTEM | - | |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A1 | |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A1 | |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A1 | |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A2 | |
| E128 | AUTOMATION I/O BOX ONE LINE | B1 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A1 | |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | |
| E132 | STEREO ANTENNA ONE LINE | A1 | |
| E133 | HORN & LIGHT JUNCTION BOXES | A1 | |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A4 | |

**EXHIBIT A-24**
**VESSEL; WORK**

Vessel Name and Official Number: Sanibel Island (O.N. 1257727)

**Work**

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **HULL 292 SANIBEL ISLAND DRAWING LIST** | | | |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | D3 | |
| D3 | TANK PLAN | D0 | USE HULL 290 SHIP ISLAND |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP ISLAND |
| D9 | INSULATION PLAN | A7 | USE HULL 290 SHIP ISLAND |
| D10 | MACHINERY ARRANGEMENT | A2 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIP ISLAND |
| D20 | FIRE AND SAFETY PLAN | A3 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | USE HULL 290 SHIP ISLAND |
| D34 | DANGEROUS GOODS PLAN | - | |

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **HULL 292 SANIBEL ISLAND DRAWING LIST** | | | |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP ISLAND |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP ISLAND |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP ISLAND |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S63 | MAIN DECK HATCH | - | USE HULL 290 SHIP ISLAND |
| S66 | LOUVER ARRANGEMENT | A3 | |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP ISLAND |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIP ISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP ISLAND |
| S113 | GENERATOR FOUNDATION | A1 | |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S115 | SEACHEST ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| S125 | ANCHOR ARRANGEMENT | A4 | USE HULL 290 SHIP ISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP ISLAND |

## HULL 292 SANIBEL ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIP ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP ISLAND |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP ISLAND |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIP ISLAND |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP ISLAND |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP ISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP ISLAND |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP ISLAND |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP ISLAND |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP ISLAND |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A4 | USE HULL 290 SHIP ISLAND |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP ISLAND |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | USE HULL 290 SHIP ISLAND |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| O46 | VENTILATION SYSTEM | A2 | |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP ISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP ISLAND |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP ISLAND |

## HULL 292 SANIBEL ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | A1 | |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIP ISLAND |
| M10 | BALLAST SYSTEM | B2 | USE HULL 290 SHIP ISLAND |
| M11 | BILGE SYSTEM | C0 | USE HULL 290 SHIP ISLAND |
| M12 | FIRE MAIN SYSTEM | B0 | USE HULL 290 SHIP ISLAND |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIP ISLAND |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIP ISLAND |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | D0 | USE HULL 290 SHIP ISLAND |

## HULL 292 SANIBEL ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | C0 | USE HULL 290 SHIP ISLAND |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIP ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | - | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | - | |
| E13 | GENERAL ALARM ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | A5 | USE HULL 290 SHIP ISLAND |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIP ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIP ISLAND |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIP ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | A2 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 290 SHIP ISLAND |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIP ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E128 | AUTOMATION I/O BOX ONE LINE | A10 | USE HULL 290 SHIP ISLAND |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIP ISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A1 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP ISLAND |

**EXHIBIT A-25**
**VESSEL; WORK**

Vessel Name and Official Number: Ship Island (O.N. 1252958)

**Work**

| HULL 290 SHIP ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | G0 | |
| D3 | TANK PLAN | D0 | |
| D4 | MIDSHIP SECTION | B3 | |
| D9 | INSULATION PLAN | A7 | |
| D10 | MACHINERY ARRANGEMENT | B1 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | |
| D20 | FIRE AND SAFETY PLAN | D0 | |
| D23 | DOCKING PLAN | A1 | |
| D26 | STATION BILL | - | |
| D34 | DANGEROUS GOODS PLAN | A1 | |

| HULL 290 SHIP ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | |
| S21 | MAST DETAIL | A7 | |
| S47 | PROPULSION UNIT | A2 | |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | |
| S56 | SIDEGATES | A1 | |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | |
| S59 | CARGO RAILS | A3 | |
| S61 | BILGE KEEL INSTALLATION | - | |
| S63 | MAIN DECK HATCH | - | |
| S66 | LOUVER ARRANGEMENT | A5 | |
| S68 | LIFERAFT CRADLE | B1 | |
| S87 | TUGGER WINCH INSTALLATION | A1 | |
| S89 | SIDE DOOR INSTALLATION | - | |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | |
| S107 | MAIN ENGINE FOUNDATION | A3 | |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | |
| S113 | GENERATOR FOUNDATION | - | |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | |
| S115 | SEACHEST ARRANGEMENT | A1 | |
| S125 | ANCHOR ARRANGEMENT | A4 | |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | |

## HULL 290 SHIP ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | |
| O3 | INTERIOR DOORS | A3 | |
| O4 | EXTERIOR WT DOORS | A1 | |
| O5 | MANHOLES & HATCHES | C1 | |
| O6 | WINDOWS & SIDELIGHTS | A2 | |
| O6YD | WINDOWS (YARD) | A4 | |
| O7 | LADDERS & STAIRS | B1 | |
| O9 | MOORING ARRANGEMENT | A5 | |
| O10 | HANDRAILS | B1 | |
| O11 | FLOOR PLATING | A3 | |
| O12 | DECK BOARDS | C2 | |
| O13 | ROOM NUMBERS | A1 | |
| O14 | TRANSDUCER ARRANGEMENT | A1 | |
| O18 | HULL MARKINGS (DRAFT) | A4 | |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | |
| O21 | JOINER WALL ARRANGEMENT | A7 | |
| O23 | JOINER CEILING ARRANGEMENT | A7 | |
| O26 | ANODE PLACEMENT | A2 | |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | |
| O33 | LOAD LINE ASSIGNMENT | - | |
| O34 | BUMPER TIRE ARRANGEMENT | - | |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | |
| O36 | GRABRAILS | A2 | |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | |
| O38 | GALLEY LAYOUT | A5 | |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | |
| O46 | VENTILATION SYSTEM | A8 | |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | |
| O53 | STACK LOGO LOCATION | A1 | |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | |

## HULL 290 SHIP ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | |
| M2 | FUEL OIL SERVICE SYSTEM | - | |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | |
| M4 | LUBE OIL SERVICE SYSTEM | - | |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | |
| M6 | FRESH WATER COOLING SYSTEM | A4 | |
| M10 | BALLAST SYSTEM | B2 | |
| M11 | BILGE SYSTEM | C0 | |
| M12 | FIRE MAIN SYSTEM | B0 | |
| M13 | TANK SOUNDFAST SYSTEM | B1 | |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | |
| M21 | POTABLE WATER SYSTEM | A2 | |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | |
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | |
| M29 | DRY BULK SYSTEM | B1 | |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | |
| M40 | MISC. PIPING SYSTEM | - | |
| M50 | HULL AND DECK PENETRATIONS | - | |
| M70 | CARGO FRESH WATER SYSTEM | D0 | |

## HULL 290 SHIP ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | C0 | |
| E3 | CABLEWAY LAYOUT | A1 | |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | C1 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | |
| E13 | GENERAL ALARM ONE LINE | A2 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | |
| E16 | CENTRAL COMMUNICATION ONE LINE | A5 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | |
| E53 | MV DISTRIBUTION ONE LINE | A2 | |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | |
| E60 | WT DOORS / HATCH ONE LINE | A1 | |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | |
| E128 | AUTOMATION I/O BOX ONE LINE | A10 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | |
| E132 | STEREO ANTENNA ONE LINE | A1 | |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | |

**EXHIBIT A-26**
**VESSEL; WORK**

Vessel Name and Official Number: Timbalier Island (O.N. 1251360)

**Work**

| HULL 285 TIMBALIER ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 284 GRAND ISLE |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | D0 | |
| D3 | TANK PLAN | A2 | USE HULL 284 GRAND ISLE |
| D4 | MIDSHIP SECTION | A2 | USE HULL 284 GRAND ISLE |
| D9 | INSULATION PLAN | A7 | USE HULL 284 GRAND ISLE |
| D10 | MACHINERY ARRANGEMENT | A2 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | B1 | |
| D20 | FIRE AND SAFETY PLAN | E0 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | USE HULL 284 GRAND ISLE |
| D34 | DANGEROUS GOODS PLAN | A0 | |

| HULL 285 TIMBALIER ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | A2 | USE HULL 284 GRAND ISLE |
| S21 | MAST DETAIL | A5 | USE HULL 284 GRAND ISLE |
| S47 | PROPULSION UNIT | A2 | USE HULL 284 GRAND ISLE |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A4 | USE HULL 284 GRAND ISLE |
| S54 | DROP DOWN THRUSTER INSTALLATION | A2 | USE HULL 284 GRAND ISLE |
| S56 | SIDEGATES | A1 | USE HULL 284 GRAND ISLE |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 284 GRAND ISLE |
| S59 | CARGO RAILS | A4 | USE HULL 284 GRAND ISLE |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 284 GRAND ISLE |
| S63 | MAIN DECK HATCH | A2 | USE HULL 284 GRAND ISLE |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 284 GRAND ISLE |
| S68 | LIFERAFT CRADLE | A1 | USE HULL 284 GRAND ISLE |
| S87 | TUGGER WINCH INSTALLATION | A2 | |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 284 GRAND ISLE |
| S99 | DECK EQUIPMENT ARRANGEMENT | A0 | USE HULL 284 GRAND ISLE |
| S107 | MAIN ENGINE FOUNDATION | - | USE HULL 284 GRAND ISLE |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| S113 | GENERATOR FOUNDATION | A1 | USE HULL 284 GRAND ISLE |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 284 GRAND ISLE |
| S115 | SEACHEST ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| S125 | ANCHOR ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| S126 | RESCUE LIFEBOAT DAVIT | - | |

## HULL 285 TIMBALIER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 284 GRAND ISLE |
| O3 | INTERIOR DOORS | A10 | USE HULL 284 GRAND ISLE |
| O4 | EXTERIOR WT DOORS | A6 | USE HULL 284 GRAND ISLE |
| O5 | MANHOLES & HATCHES | A5 | USE HULL 284 GRAND ISLE |
| O6 | WINDOWS & SIDELIGHTS | A4 | USE HULL 284 GRAND ISLE |
| O6YD | WINDOWS (YARD) | A5 | USE HULL 284 GRAND ISLE |
| O7 | LADDERS & STAIRS | A7 | USE HULL 284 GRAND ISLE |
| O9 | MOORING ARRANGEMENT | A3 | USE HULL 284 GRAND ISLE |
| O10 | HANDRAILS | A5 | USE HULL 284 GRAND ISLE |
| O11 | FLOOR PLATING | A5 | USE HULL 284 GRAND ISLE |
| O12 | DECK BOARDS | A3 | |
| O13 | ROOM NUMBERS | A3 | USE HULL 284 GRAND ISLE |
| O14 | TRANSDUCER ARRANGEMENT | B1 | |
| O18 | HULL MARKINGS (DRAFT) | - | |
| O18YD | IMO NUMBERS | - | USE HULL 284 GRAND ISLE |
| O20 | GANGWAY | A1 | USE HULL 284 GRAND ISLE |
| O21 | JOINER WALL ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| O23 | JOINER CEILING ARRANGEMENT | A3 | USE HULL 284 GRAND ISLE |
| O26 | ANODE PLACEMENT | A1 | USE HULL 284 GRAND ISLE |
| O31 | NAVIGATION LIGHT ARRANGEMENT | - | USE HULL 284 GRAND ISLE |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 284 GRAND ISLE |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 284 GRAND ISLE |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 284 GRAND ISLE |
| O36 | GRABRAILS | A3 | USE HULL 284 GRAND ISLE |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A5 | USE HULL 284 GRAND ISLE |
| O38 | GALLEY LAYOUT | A2 | USE HULL 284 GRAND ISLE |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 284 GRAND ISLE |
| O46 | VENTILATION SYSTEM | A5 | USE HULL 284 GRAND ISLE |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A5 | USE HULL 284 GRAND ISLE |
| O50 | PILOT HOUSE TOP LAYOUT | A3 | |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 284 GRAND ISLE |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 284 GRAND ISLE |

## HULL 285 TIMBALIER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A5 | USE HULL 284 GRAND ISLE |
| M2 | FUEL OIL SERVICE SYSTEM | A1 | |
| M3 | FUEL OIL TRANSFER SYSTEM | A1 | |
| M4 | LUBE OIL SERVICE SYSTEM | A1 | USE HULL 284 GRAND ISLE |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A2 | USE HULL 284 GRAND ISLE |
| M6 | FRESH WATER COOLING SYSTEM | A3 | USE HULL 284 GRAND ISLE |
| M8 | SEAWATER COOLING | A2 | |
| M10 | BALLAST SYSTEM | A3 | USE HULL 284 GRAND ISLE |
| M11 | BILGE SYSTEM | A1 | |
| M12 | FIRE MAIN SYSTEM | A3 | USE HULL 284 GRAND ISLE |
| M13 | TANK SOUNDFAST SYSTEM | A2 | USE HULL 284 GRAND ISLE |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 284 GRAND ISLE |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | - | USE HULL 284 GRAND ISLE |
| M21 | POTABLE WATER SYSTEM | A3 | USE HULL 284 GRAND ISLE |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 284 GRAND ISLE |
| M24 | FUEL OIL OVERFLOW SYSTEM | B1 | |
| M25 | TANK AND MISC. VENT SYSTEM | A5 | USE HULL 284 GRAND ISLE |
| M26 | TANK LEVEL INDICATION SYSTEM | A2 | USE HULL 284 GRAND ISLE |
| M27 | WEATHER DECK DRAIN SYSTEM | - | USE HULL 284 GRAND ISLE |
| M29 | DRY BULK SYSTEM | A1 | USE HULL 284 GRAND ISLE |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | A6 | USE HULL 284 GRAND ISLE |
| M33 | FI-FI FIRE MONITOR SYSTEM | A2 | USE HULL 284 GRAND ISLE |
| M37 | WEATHER DECK PIPE PENETRATIONS | A1 | USE HULL 284 GRAND ISLE |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 284 GRAND ISLE |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 284 GRAND ISLE |
| M70 | CARGO FRESH WATER SYSTEM | A4 | USE HULL 284 GRAND ISLE |

## HULL 285 TIMBALIER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | C0 | |
| E3 | CABLEWAY LAYOUT | A3 | USE HULL 284 GRAND ISLE |
| E4 | 480VAC DISTRIBUTION ONE LINE | E1 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | E0 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | D0 | |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | C0 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A5 | USE HULL 284 GRAND ISLE |
| E13 | GENERAL ALARM ONE LINE | C0 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 284 GRAND ISLE |
| E16 | CENTRAL COMMUNICATION ONE LINE | C0 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A7 | USE HULL 284 GRAND ISLE |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A1 | USE HULL 284 GRAND ISLE |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A4 | USE HULL 284 GRAND ISLE |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 284 GRAND ISLE |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 284 GRAND ISLE |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A6 | USE HULL 284 GRAND ISLE |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | A1 | USE HULL 284 GRAND ISLE |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A3 | USE HULL 284 GRAND ISLE |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 284 GRAND ISLE |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 284 GRAND ISLE |
| E53 | MV DISTRIBUTION ONE LINE | A7 | USE HULL 284 GRAND ISLE |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B1 | USE HULL 284 GRAND ISLE |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A6 | USE HULL 284 GRAND ISLE |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 284 GRAND ISLE |
| E62 | COMPUTER NETWORK DIAGRAM | - | USE HULL 284 GRAND ISLE |
| E65 | TV & ENTERTAINMENT SYSTEM | A4 | USE HULL 284 GRAND ISLE |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 284 GRAND ISLE |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 284 GRAND ISLE |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 284 GRAND ISLE |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 284 GRAND ISLE |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A5 | USE HULL 284 GRAND ISLE |
| E128 | AUTOMATION I/O BOX ONE LINE | A1 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 284 GRAND ISLE |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| E133 | HORN & LIGHT JUNCTION BOXES | A4 | USE HULL 284 GRAND ISLE |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | - | USE HULL 284 GRAND ISLE |

**EXHIBIT A-27**
**VESSEL; WORK**

Vessel Name and Official Number: Wine Island (O.N. 1259152)

**Work**

| HULL 299 WINE ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 295 PELICAN ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | A8 | |
| D3 | TANK PLAN | C2 | USE HULL 295 PELICAN ISLAND |
| D4 | MIDSHIP SECTION | A2 | USE HULL 295 PELICAN ISLAND |
| D9 | INSULATION PLAN | A5 | USE HULL 295 PELICAN ISLAND |
| D10 | MACHINERY ARRANGEMENT | A2 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | Z1 | USE HULL 295 PELICAN ISLAND |
| D20 | FIRE AND SAFETY PLAN | A3 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | |
| D34 | DANGEROUS GOODS PLAN | A1 | |

| HULL 299 WINE ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 295 PELICAN ISLAND |
| S21 | MAST DETAIL | A6 | USE HULL 295 PELICAN ISLAND |
| S47 | PROPULSION UNIT | A1 | USE HULL 295 PELICAN ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A3 | USE HULL 295 PELICAN ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 295 PELICAN ISLAND |
| S56 | SIDEGATES | A2 | USE HULL 295 PELICAN ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | - | USE HULL 295 PELICAN ISLAND |
| S59 | CARGO RAILS | A2 | USE HULL 295 PELICAN ISLAND |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 295 PELICAN ISLAND |
| S63 | MAIN DECK HATCH | - | USE HULL 295 PELICAN ISLAND |
| S66 | LOUVER ARRANGEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 295 PELICAN ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 295 PELICAN ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 295 PELICAN ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| S107 | MAIN ENGINE FOUNDATION | - | USE HULL 295 PELICAN ISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| S113 | GENERATOR FOUNDATION | A2 | USE HULL 295 PELICAN ISLAND |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 295 PELICAN ISLAND |
| S115 | SEACHEST ARRANGEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| S125 | ANCHOR ARRANGEMENT | A3 | USE HULL 295 PELICAN ISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 295 PELICAN ISLAND |

## HULL 299 WINE ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 295 PELICAN ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 295 PELICAN ISLAND |
| O4 | EXTERIOR WT DOORS | - | USE HULL 295 PELICAN ISLAND |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 295 PELICAN ISLAND |
| O6 | WINDOWS & SIDELIGHTS | A1 | USE HULL 295 PELICAN ISLAND |
| O6YD | WINDOWS (YARD) | - | USE HULL 295 PELICAN ISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 295 PELICAN ISLAND |
| O9 | MOORING ARRANGEMENT | A3 | USE HULL 295 PELICAN ISLAND |
| O10 | HANDRAILS | B1 | USE HULL 295 PELICAN ISLAND |
| O11 | FLOOR PLATING | A2 | USE HULL 295 PELICAN ISLAND |
| O12 | DECK BOARDS | B1 | USE HULL 295 PELICAN ISLAND |
| O13 | ROOM NUMBERS | - | USE HULL 295 PELICAN ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | - | USE HULL 295 PELICAN ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A2 | USE HULL 295 PELICAN ISLAND |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 295 PELICAN ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A3 | USE HULL 295 PELICAN ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A4 | USE HULL 295 PELICAN ISLAND |
| O26 | ANODE PLACEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 295 PELICAN ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 295 PELICAN ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 295 PELICAN ISLAND |
| O36 | GRABRAILS | - | USE HULL 295 PELICAN ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A1 | USE HULL 295 PELICAN ISLAND |
| O38 | GALLEY LAYOUT | A4 | USE HULL 295 PELICAN ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 295 PELICAN ISLAND |
| O46 | VENTILATION SYSTEM | A4 | USE HULL 295 PELICAN ISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A6 | USE HULL 295 PELICAN ISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 295 PELICAN ISLAND |
| O53 | STACK LOGO LOCATION | - | USE HULL 295 PELICAN ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 295 PELICAN ISLAND |

## HULL 299 WINE ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | - | USE HULL 295 PELICAN ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | - | USE HULL 295 PELICAN ISLAND |
| M3 | FUEL OIL TRANSFER SYSTEM | A1 | USE HULL 295 PELICAN ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 295 PELICAN ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A1 | USE HULL 295 PELICAN ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | A2 | USE HULL 295 PELICAN ISLAND |
| M10 | BALLAST SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M11 | BILGE SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M12 | FIRE MAIN SYSTEM | C0 | USE HULL 295 PELICAN ISLAND |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A1 | USE HULL 295 PELICAN ISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 295 PELICAN ISLAND |
| M21 | POTABLE WATER SYSTEM | A1 | USE HULL 295 PELICAN ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A1 | USE HULL 295 PELICAN ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M27 | WEATHER DECK DRAIN SYSTEM | A3 | USE HULL 295 PELICAN ISLAND |
| M29 | DRY BULK SYSTEM | B2 | USE HULL 295 PELICAN ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B3 | USE HULL 295 PELICAN ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A2 | USE HULL 295 PELICAN ISLAND |
| M35 | METHANOL TRANSFER SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 295 PELICAN ISLAND |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 295 PELICAN ISLAND |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 295 PELICAN ISLAND |
| M59 | CRUDE OIL SLOP SYSTEM | C0 | USE HULL 295 PELICAN ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | B3 | USE HULL 295 PELICAN ISLAND |

## HULL 299 WINE ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **E** | **Electrical** | | |
| E2 | LV POWER ONE LINE | A0 | |
| E3 | CABLEWAY LAYOUT | A2 | USE HULL 295 PELICAN ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | B0 | |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | A5 | USE HULL 295 PELICAN ISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | - | USE HULL 295 PELICAN ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A4 | USE HULL 295 PELICAN ISLAND |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | USE HULL 295 PELICAN ISLAND |
| E13 | GENERAL ALARM ONE LINE | A1 | USE HULL 295 PELICAN ISLAND |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | - | USE HULL 295 PELICAN ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | A4 | USE HULL 295 PELICAN ISLAND |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A2 | USE HULL 295 PELICAN ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 295 PELICAN ISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A2 | USE HULL 295 PELICAN ISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A3 | USE HULL 295 PELICAN ISLAND |
| E35 | EMERGENCY STEERING PROCEDURES | - | USE HULL 295 PELICAN ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A1 | USE HULL 295 PELICAN ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 295 PELICAN ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A2 | USE HULL 295 PELICAN ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | - | USE HULL 295 PELICAN ISLAND |
| E47 | METHANOL SYSTEM CONTROL ONE LINE | A1 | USE HULL 295 PELICAN ISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | | USE HULL 295 PELICAN ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | - | USE HULL 295 PELICAN ISLAND |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A1 | USE HULL 295 PELICAN ISLAND |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 295 PELICAN ISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | - | USE HULL 295 PELICAN ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | - | USE HULL 295 PELICAN ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 295 PELICAN ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A1 | USE HULL 295 PELICAN ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A1 | USE HULL 295 PELICAN ISLAND |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A1 | USE HULL 295 PELICAN ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A2 | USE HULL 295 PELICAN ISLAND |
| E128 | AUTOMATION I/O BOX ONE LINE | - | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A1 | USE HULL 295 PELICAN ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 295 PELICAN ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A1 | USE HULL 295 PELICAN ISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A4 | USE HULL 295 PELICAN ISLAND |

Exhibit L

**[FORM OF] PLEDGE AGREEMENT**

THIS PLEDGE AGREEMENT (as it may be amended, restated, amended and restated, supplemented or modified from time to time, this "Pledge Agreement") is entered into as of [•], 2023 by and among Nautical Solutions Holdings, LLC, a Louisiana limited liability company ("Holdings" or the "Grantor"), and Wilmington Trust, National Association, in its capacity as collateral agent (together with its successors and assigns in such capacity, the "Collateral Agent") for the benefit of the Noteholders and the other Secured Parties.

**PRELIMINARY STATEMENTS**

Pursuant to that certain Note Exchange Agreement, dated as of the date hereof (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Note Exchange Agreement"), by and among Nautical Solutions, L.L.C., a Louisiana limited liability company (the "Company"), Holdings, Wilmington Trust, National Association, in its capacity as administrative agent, the Collateral Agent and the noteholders identified therein (the "Noteholders"), the Company is issuing and the Noteholders are acquiring the Company's Senior Secured Notes due 2028 in the aggregate original principal amount set forth in the Note Exchange Agreement (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any notes delivered in substitution or exchange for any of the foregoing senior secured notes, the "Senior Notes"). The Grantor is entering into this Pledge Agreement in order to induce the Noteholders to enter into the Note Exchange Agreement and exchange their Exchanged Debt for the Senior Notes.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce the Noteholders to enter into the Note Exchange Agreement and to exchange their Exchanged Debt for the Senior Notes to be issued to the Noteholders thereunder on the date hereof, the Grantor agrees, for the benefit of each Secured Party, as follows:

**ARTICLE I**
**DEFINITIONS**

1.1     Terms Defined in Note Exchange Agreement.  All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Note Exchange Agreement.

1.2     Terms Defined in UCC.  Terms defined in the UCC which are not otherwise defined in this Pledge Agreement or the Note Exchange Agreement are used herein as defined in the UCC (even where capitalized herein and not capitalized in the UCC).

1.3     Definitions of Certain Terms Used Herein.  As used in this Pledge Agreement, in addition to the terms defined in the introductory paragraph hereto and in the Preliminary Statements, the following terms shall have the following meanings:

"Amendment" shall have the meaning set forth in Section 4.2.

"Article" means a numbered article of this Pledge Agreement, unless another document is specifically referenced.

"Assumption Agreement" has the meaning set forth in Section 4.7.

"Collateral" shall have the meaning set forth in Article II.

"Control" shall have the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"Equity Interests" of any person means any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity or ownership of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing, excluding any debt security that is convertible or exchangeable into any Equity Interests (provided that any instrument evidencing indebtedness convertible or exchangeable into Equity Interests, whether or not such debt securities include any right of participation with Equity Interests, shall not be deemed to be Equity Interests unless and until such instrument is so converted or exchanged).

"Exhibit" refers to a specific exhibit to this Pledge Agreement (unless another document is specifically referenced), as from time to time supplemented by any Assumption Agreement or an Amendment.

"General Intangibles" shall have the meaning set forth in Article 9 of the UCC.

"Pledged Collateral" means, in respect of the Grantor, all Equity Interests now owned or hereafter acquired by the Grantor including, without limitation, the Equity Interests set forth on Exhibit B hereto and any certificates, instruments or other documents representing such Equity Interests.

"Proceeds" shall have the meaning set forth in Article 9 of the UCC and, in any event shall include, without limitation all dividends or other income from the Pledged Collateral, collections thereon or distributions or payments with respect thereto

"Section" means a numbered section of this Pledge Agreement, unless another document is specifically referenced.

"Secured Parties" means the Collateral Agent, the Agent and the Noteholders.

"Secured Obligations" has the meaning given to the defined term "Note Obligations" in the Note Exchange Agreement.

"Security" has the meaning set forth in Article 8 of the UCC.

"Stock Rights" means all dividends (cash, stock or otherwise), cash, instruments, rights to subscribe, purchase or sell or other distributions and all other rights and property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing which Grantor shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for the Pledged Collateral, any right to receive an Equity Interest and any right to receive earnings, in which the Grantor now has or hereafter acquires any right, issued by an issuer of such Pledged Collateral.

"UCC" means the Uniform Commercial Code, as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the attachment, perfection or priority of, or remedies with respect to, the Collateral Agent's or any Secured Party's Lien on any Collateral.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms.

## ARTICLE II
## GRANT OF SECURITY INTEREST

To secure the prompt and complete payment and performance of the Secured Obligations, the Grantor hereby pledges, assigns and grants to the Collateral Agent, on behalf of and for the ratable benefit of the Secured Parties, a security interest in all of its right, title and interest in, to and under all of the following items, whether

now owned by or owing to, or hereafter acquired by or arising in favor of the Grantor (all of which will be collectively referred to as, the "Collateral"):

      (a)    all Pledged Collateral now owned or hereafter acquired by the Grantor or in which the Grantor now has or at any time in the future may acquire any right, title or interest and whether now existing or hereafter coming into existence;

      (b)    all rights, privileges, voting rights and benefits of the Grantor (but no duty or obligation) under all agreements, documents and instruments relating to the Pledged Collateral, including all rights under limited liability company, operating, management, partnership and stockholder agreements; and

      (c)    all accessions to, substitutions for and replacements, Proceeds (including Stock Rights), and products of the foregoing together with all books and records, other records, Accounts, General Intangibles and Investment Property related thereto;

provided, that any payment made by the Company to Grantor in respect of the Tax Liability Amount and the Final Tax Liability Amount is not collateral hereunder and is not subject to any limitations of this Pledge Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

As of the Closing Date, the Grantor represents and warrants to the Collateral Agent and the Secured Parties that:

3.1    Title, Perfection and Priority.  The representations and warranties of the Company and Holdings in the Note Exchange Agreement concerning the Grantor, this Pledge Agreement and the Collateral are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representation or warranty that already is qualified or modified by materiality in the text thereof). The Grantor has the corporate, limited liability company or partnership power, as applicable, to transfer the Collateral and title to the Collateral with respect to which it has purported to grant a security interest hereunder, free and clear of all Liens except for Liens permitted under Section 4.1(e) and has full power and authority to grant to the Collateral Agent the security interest in such Collateral pursuant hereto.  When financing statements in appropriate form have been filed in the appropriate offices against the Grantor in the locations listed on Exhibit C, the Collateral Agent will have a fully perfected first priority security interest in that Collateral of the Grantor in which a security interest may be perfected under the UCC by filing.

3.2    Type and Jurisdiction of Organization, Organizational and Identification Numbers.  The type of entity of the Grantor, its state of organization, the organizational number issued to it by its state of organization and its federal employer identification number are set forth on Exhibit A.

3.3    Principal Location.  The Grantor's mailing address and the location of its place of business (if it has only one) or its chief executive office (if it has more than one place of business), are disclosed in Exhibit A.  As of the Closing Date, the Grantor has no other place of business except as set forth in Exhibit A. Such location set forth on Exhibit A is the Grantor's location for the purposes of Section 9-301 and 9-307 of the UCC, and the Grantor has not had a different location for the purposes of Section 9-301 and 9-307 of the UCC during the past five years.

3.4    Exact Names.  The Grantor's name in which it has executed this Pledge Agreement is the exact name as it appears in the Grantor's organizational documents, as amended, as filed with the Grantor's jurisdiction of organization.  The Grantor has not, (a) in the last four months conducted business under any name except the name in which it has executed this Pledge Agreement, which is the exact name as it appears in the Grantor's

Organizational Documents, as amended, and as filed with the Grantor's jurisdiction of organization as of the Closing Date, and (b) during the past five years prior to its becoming a party hereto, been known by or used any other corporate or fictitious name, or been a party to any merger or consolidation, or been a party to any acquisition, other than the capital contributions of the Equity Interests in the Company to the Grantor concurrently herewith.

3.5     <u>No Financing Statements, Security Agreements</u>.  No financing statement or security agreement describing all or any portion of the Collateral naming the Grantor as debtor has been filed or is of record in any jurisdiction except (a) for financing statements or security agreements naming the Collateral Agent on behalf of the Secured Parties as the secured party and (b) as permitted by <u>Section 4.1(e)</u>; <i>provided</i>, that nothing herein shall be deemed to constitute an agreement to subordinate any of the Liens of the Collateral Agent under the Note Documents to any Liens otherwise permitted under Section 4.1(e) hereof.

3.6     <u>Pledged Collateral</u>.

(a)     <u>Exhibit B</u> sets forth a complete and accurate list of all Pledged Collateral owned by the Grantor.  The Grantor is the direct, sole beneficial owner and sole holder of record of the Pledged Collateral listed on <u>Exhibit B</u> as being owned by it, free and clear of any Liens, except as permitted by <u>Section 4.1(e)</u>.  The Grantor further represents and warrants that all Pledged Collateral owned by it constituting an Equity Interest has been (to the extent such concepts are relevant with respect to such Pledged Collateral) duly authorized, validly issued, are fully paid and non-assessable and constitute the percentage of the issued and outstanding Equity Interests of the respective issuers thereof indicated on Exhibit B hereto and, in the case of corporations, business trusts, joint stock companies and similar Persons, are represented by a certificate and, in the case of limited liability companies and partnerships, are not represented by a certificate and the organizational documents of the issuer have not provided that they constitute Securities governed by Article 8 of the UCC.

(b)     In addition, (i) none of the Pledged Collateral owned by it has been issued or transferred in violation  of the securities registration, securities disclosure or similar laws of any jurisdiction to which such issuance or transfer may be subject, (ii) the Pledged Collateral is and will continue to be freely transferable (subject to the restrictions set forth in this Pledge Agreement and the Note Exchange Agreement), (iii) there are existing no options, warrants, calls, rights of first refusal or commitments of any character whatsoever relating to such Pledged Collateral and the ability of the Collateral Agent to transfer the Pledged Collateral, and (iv) no consent, approval, authorization, or other action by, and no giving of notice to or filing with, any governmental authority or any other Person is required for the pledge by the Grantor of such Pledged Collateral pursuant to this Pledge Agreement or for the execution, delivery and performance of this Pledge Agreement by the Grantor, or for the exercise by the Collateral Agent of the voting or other rights provided for in this Pledge Agreement or for the remedies in respect of the Pledged Collateral pursuant to this Pledge Agreement (including transfer by foreclosure), except which has already been obtained or as may be required in connection with such disposition by laws affecting the offering and sale of securities generally.

<h2 style="text-align:center">ARTICLE IV<br>COVENANTS</h2>

From the date of this Pledge Agreement, and thereafter until this Pledge Agreement is terminated, the Grantor agrees that:

4.1     <u>General</u>.

(a)     <u>Collateral Records</u>.  The Grantor will maintain complete and accurate books and records with respect to the Collateral owned by it, and furnish to the Collateral Agent such information, reports and schedules relating to and further identifying such Collateral as the Collateral Agent shall from time to time reasonably request.

(b)      <u>Authorization to File Financing Statements; Ratification</u>.   The Grantor hereby authorizes the Collateral Agent (or its designee) to file, and if requested will deliver to the Collateral Agent, all financing statements and other documents and take such other actions as may from time to time be reasonably requested by the Collateral Agent or the Required Holders in order to maintain a perfected security interest in and, if applicable, Control of, the Collateral owned by the Grantor.   Any financing statement filed by the Collateral Agent (or its designee) may be filed in any filing office in any UCC jurisdiction and may (i) indicate the Grantor's Collateral by any description which reasonably approximates the description contained in this Pledge Agreement, and (ii) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the Grantor is an organization, the type of organization and any organization identification number issued to the Grantor. Notwithstanding the foregoing, the Grantor hereby authorizes the Collateral Agent (or its designee) to describe the Collateral on any financing statement by using words and phrases with respect to the Grantor similar to "all assets" or "all personal property, whether now owned or hereafter acquired."   The Grantor also agrees to furnish any such information to the Collateral Agent promptly upon reasonable request.

(c)      <u>Further Assurances</u>.   The Grantor will, if so requested by the Collateral Agent, furnish to the Collateral Agent, as often as the Collateral Agent reasonably requests, statements and schedules further identifying and describing the Collateral owned by it and such other reports and information in connection with its Collateral as the Collateral Agent may reasonably request, all in such detail as the Collateral Agent may reasonably specify.   Subject to <u>Section 4.6</u> hereof, the Grantor may from time to time update the Exhibits to this Pledge Agreement by delivering supplemental Exhibits in writing to the Collateral Agent.   The Grantor also agrees to take any and all actions necessary to defend title to the Collateral against all persons and to defend the security interest of the Collateral Agent in its Collateral and the priority thereof against any Lien not expressly permitted hereunder.

(d)      <u>Disposition of Collateral</u>.   The Grantor will not sell, lease or otherwise dispose of the Collateral.

(e)      <u>Liens</u>.   The Grantor will not create, incur, or suffer to exist any Lien on the Collateral owned by it except the security interest created by this Pledge Agreement.

(f)      <u>Other Financing Statements</u>.   The Grantor will not authorize the filing of any financing statement naming it as debtor covering all or any portion of the Collateral owned by it, other than in favor of the Collateral Agent.   The Grantor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement without the prior written consent of the Collateral Agent (acting at the direction of the Required Holders), subject to the Grantor's rights under Section 9-509(d)(2) of the UCC.

(g)      <u>Reserved</u>.

(h)      <u>Compliance with Terms</u>.   The Grantor will perform and comply with all of its obligations under (x) any Note Document and (y) all material agreements (other than the Note Documents) to which it is a party or by which it is bound relating to such Collateral.

4.2      <u>Delivery of Securities</u>.   The Grantor will (a) deliver to the Collateral Agent immediately upon execution of this Pledge Agreement, the originals of all Certificated Securities constituting Collateral owned by it (if any then exist) and, in the case of an instrument or certificate in registered form, accompanied by a stock or securities power in blank and accompanied by any required transfer tax stamps to effect the pledge of such Collateral to the Collateral Agent, (b) hold in trust for the Collateral Agent upon receipt and promptly thereafter deliver to the Collateral Agent any Certificated Securities constituting Collateral and (c) upon the Collateral Agent's request, deliver to the Collateral Agent a duly executed amendment to this Pledge Agreement, in the form of <u>Exhibit D</u> hereto (the "<u>Amendment</u>"), pursuant to which the Grantor will pledge such additional Collateral.

The Grantor hereby authorizes the Collateral Agent to attach each Amendment to this Pledge Agreement and agrees that all additional Collateral owned by it set forth in such Amendments shall be considered to be part of the Collateral.

4.3    <u>Uncertificated Pledged Collateral</u>.  The Grantor will permit the Collateral Agent from time to time to cause the appropriate issuers (and, if held with a securities intermediary, such securities intermediary) of uncertificated securities or other types of Pledged Collateral owned by it not represented by certificates to mark their books and records with the numbers and face amounts of all such uncertificated securities or other types of Pledged Collateral not represented by certificates and all rollovers and replacements therefor to reflect the Lien of the Collateral Agent granted pursuant to this Pledge Agreement.  With respect to any Pledged Collateral owned by it, upon the Collateral Agent's request, the Grantor will take any actions necessary and reasonably requested by the Collateral Agent to cause (a) the issuers of uncertificated securities which are Pledged Collateral and (b) any securities intermediary which is the holder of any such Pledged Collateral, to cause the Collateral Agent to have and retain Control (within the meaning of Article 8 of the UCC) over such Pledged Collateral.

4.4    <u>Pledged Collateral</u>.

(a)    <u>Changes in Capital Structure of Issuers</u>.  The Grantor will not (i) permit or suffer any issuer of an Equity Interest constituting Pledged Collateral owned by it to dissolve, merge, divide, liquidate or retire any such Equity Interests or other Securities evidencing ownership of Pledged Collateral, reduce its capital, sell or encumber all or substantially all of its assets or merge or consolidate with any other entity (except, in the case of each of the foregoing, in any manner not prohibited by the Note Exchange Agreement), or (ii) vote any such Pledged Collateral in favor of any of the foregoing.

(b)    <u>Registration of Pledged Collateral</u>.  The Grantor will permit any registerable Pledged Collateral owned by it to be registered in the name of the Collateral Agent or its nominee at any time during the continuance of an Event of Default at the option of the Required Holders.

(c)    <u>Rights in Pledged Collateral</u>.

(i)    Without in any way limiting the foregoing and subject to <u>clause (ii)</u> below, the Grantor shall have the right to exercise all voting rights or other rights relating to the Pledged Collateral owned by it for all purposes not inconsistent with this Pledge Agreement, the Note Exchange Agreement or any other Note Document; *provided however*, *that* no vote or other right shall be exercised or action taken which would have the effect of impairing or delaying the rights of the Collateral Agent in respect of such Pledged Collateral or which would, reasonably be likely to be inconsistent with, or violate any provision of this Pledge Agreement or the other Note Documents.

(ii)    The Grantor will permit the Collateral Agent or its nominee at any time during the continuance of an Event of Default and upon prior written notice to the Grantor  to exercise all voting rights or other rights relating to the Pledged Collateral owned by it, including, without limitation, exchange, subscription or any other rights, privileges, or options pertaining to any Equity Interest or Investment Property constituting such Pledged Collateral as if it were the absolute owner thereof.

(iii)    Subject to clause (iv) below, the Grantor shall be entitled to collect and receive for its own use all dividends, distributions, principal and interest paid in respect of the Pledged Collateral owned by it to the extent not in violation of the Note Exchange Agreement; *provided however, that* (A) until actually paid, all rights to such distributions, dividends, principal and interest shall remain subject to the Lien created by this Pledge Agreement and (B) distributions, dividends principal and interest constituting Collateral shall be subject to the terms of this Pledge Agreement; and

(iv)    At any time during the continuance of an Event of Default and upon prior written notice to the Grantor, all dividends, distributions, principal and interest in respect of any of the Pledged Collateral owned by the Grantor, whenever paid or made, shall be delivered to the Collateral Agent to hold as Pledged Collateral and shall, if received by the Grantor, be received in trust for the benefit of the Collateral Agent, be segregated from the other property or funds of the Grantor, and be forthwith delivered to the Collateral Agent as Pledged Collateral in the same form as so received (with any necessary endorsement).

4.5    <u>No Interference</u>.  The Grantor agrees that it will not interfere with any right, power and remedy of the Collateral Agent provided for in this Pledge Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by the Collateral Agent of any one or more of such rights, powers or remedies.

4.6    <u>Information regarding the Grantor</u>.  The Grantor shall provide prompt written notice (and in any event not more than thirty (30) days following such change (or such later date as the Collateral Agent (acting at the direction of the Required Holders) may agree in its sole discretion) of any change (i) in the Grantor's corporate name, (ii) in the location of the Grantor's chief executive office or principal place of business, (iii) in the Grantor's identity or corporate structure or in the jurisdiction in which the Grantor is incorporated or formed, (iv) in the Grantor's jurisdiction of organization or the Grantor's organizational identification number in such jurisdiction of organization, and (v) in Grantor's federal taxpayer identification number.

4.7    <u>Additional Grantors</u>.  The Grantor agrees to cause each Subsidiary that is required to become a party to this Pledge Agreement pursuant to the Note Exchange Agreement to become a Grantor for all purposes of this Pledge Agreement by execution and delivery by such Subsidiary of an Assumption Agreement in the form of <u>Annex 1</u> hereto (each, an "<u>Assumption Agreement</u>").

4.8    <u>Limited Liability Company and Partnership Interests</u>.

(a)    The Grantor shall at all times prevent each interest in any limited liability company or partnership controlled by the Grantor and constituting Pledged Collateral, pledged by it hereunder, from being a "security" within the meaning of Article 8 of the UCC (by preventing any such limited liability company or partnership from "opting in" under Article 8 of the UCC), and shall cause each such interest to be, at all times hereafter, General Intangibles under Article 9 of the UCC that is uncertificated unless and until the Pledgor complies with <u>Section 4.8(b)</u>.

(b)    With respect to any interest in any limited liability company or partnership controlled by a Grantor and constituting Pledged Collateral, pledged hereunder, the Grantor shall at no time issue any certificate representing such interest, unless prior to such issuance, the applicable Grantor provides notification to the Collateral Agent of such issuance and delivers, as applicable, any such certificate to the Collateral Agent pursuant to the terms hereof along with the other deliverables contemplated by <u>Section 4.2</u> (it being understood, for avoidance of doubt, that the Pledged Collateral shall only be certificated Article 8 "securities" to the extent contemplated by this <u>Section 4.8(b)</u>).

4.9    <u>Pledged Securities</u>.  The granting of the foregoing security interest in and of itself does not make the Collateral Agent or any Secured Party a successor to the Grantor as a partner or member in any issuer that is a partnership, limited partnership or limited liability company, as applicable, and neither the Collateral Agent, any Secured Party, nor any of their respective successors or assigns hereunder shall be deemed to have become a partner or member in any Person, as applicable, by accepting this Pledge Agreement or exercising any right granted herein unless and until such time, if any, when any such Person expressly becomes a partner or member in any Issuer, as applicable, and complies with any applicable transfer provisions set forth in the charter or organizational documents relating to an applicable Pledged Security after a foreclosure thereon or deed in lieu of foreclosure thereon.

## ARTICLE V
### DEFAULT AND REMEDIES

5.1     <u>Remedies</u>.

(a)     Upon the occurrence of and during the continuance of an Event of Default, the Collateral Agent may, or at the direction of the Required Holders, shall, exercise any or all of the following rights and remedies:

(i)     those rights and remedies provided in this Pledge Agreement, the Note Exchange Agreement, or any other Note Document; *provided that,* this <u>Section 5.1(a)</u> shall not be understood to limit any rights or remedies available to the Collateral Agent and the Secured Parties prior to an Event of Default;

(ii)     those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law (including, without limitation, any law governing the exercise of a bank's right of setoff or bankers' lien) when a debtor is in default under a security agreement;

(iii)     without notice (except as specifically provided in <u>Section 7.1</u> or elsewhere herein) sell, lease, assign, grant an option or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, on credit or for future delivery, and upon such other terms as the Collateral Agent may deem commercially reasonable;

(iv)     concurrently with delivery of written notice to the applicable Grantor, exercise the voting and all other rights as a holder of Pledged Collateral with respect thereto, to collect and receive all cash dividends, interest, principal and other distributions made thereon and to otherwise act with respect to the Pledged Collateral as though the Collateral Agent was the outright owner thereof; and

(v)     concurrently with delivery of written notice to the applicable Grantor, transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, to exchange certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller or larger denominations.

(b)     The Collateral Agent, on behalf of the Secured Parties, may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(c)     Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase for the benefit of the Collateral Agent and the other Secured Parties, the whole or any part of the Collateral so sold, free of any right of equity redemption, which equity redemption the Grantor hereby expressly releases.

(d)     Upon the occurrence and during the continuance of an Event of Default, until the Collateral Agent is able to effect a sale, lease, or other disposition of Collateral, the Collateral Agent shall have the right to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Collateral Agent.  The Collateral Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of the Collateral Agent's remedies (for the benefit of the Collateral Agent and the Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment.

9

(e)        Notwithstanding the foregoing, neither the Collateral Agent nor any Secured Party shall be required to (i) make any demand upon, or pursue or exhaust any of their rights or remedies against, the Grantor, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Secured Obligations or to pursue or exhaust any of their rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof, (ii) marshal the Collateral or any guarantee of the Secured Obligations or to resort to the Collateral or any such guarantee in any particular order, or (iii) effect a public sale of any Collateral.

(f)        The Grantor recognizes that the Collateral Agent may be unable to effect a public sale of any or all the Pledged Collateral under this <u>Article V</u> and may be compelled to resort to one or more private sales thereof in accordance with <u>clause (a)</u> above.  The Grantor also acknowledges that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private.  The Collateral Agent shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit the Grantor or the issuer of the Pledged Collateral to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if the applicable Grantor and the issuer would agree to do so.

5.2        <u>Grantor's Obligations Upon Default</u>.  Upon the request of the Collateral Agent, if an Event of Default has occurred and is continuing, the Grantor will:

(a)        make available to the Collateral Agent the Collateral and all books and records relating thereto at any place or places specified by the Collateral Agent, whether at a Grantor's premises or elsewhere;

(b)        permit the Collateral Agent, by the Collateral Agent's representatives and agents, to enter, occupy and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral or the books and records relating thereto, or both, to remove all or any part of the Collateral or the books and records relating thereto, or both, and to conduct sales of the Collateral, without any obligation to pay the Grantor for such use and occupancy; and

(c)        take, or cause an issuer of Pledged Collateral to take, any and all actions reasonably necessary to enable the Collateral Agent to consummate a sale or disposition of the Pledged Collateral (other than any action to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws).

## ARTICLE VI
## ATTORNEY IN FACT; PROXY

6.1        <u>Authorization for Secured Party to Take Certain Action</u>.

(a)        The Grantor irrevocably authorizes the Collateral Agent at any time and from time to time and appoints the Collateral Agent as its attorney in fact, in each case, for the purpose of carrying out the terms of this Pledge Agreement (i) to execute on behalf of the Grantor as debtor and to file financing statements necessary or desirable in the Collateral Agent's sole discretion to perfect and to maintain the perfection and priority of the Collateral Agent's security interest in the Collateral, (ii) to endorse and collect any cash proceeds of the Collateral, (iii) to file a carbon, photographic or other reproduction of this Pledge Agreement or any financing statement with respect to the Collateral as a financing statement and to file any other financing statement or amendment of a financing statement (which does not add new collateral or add a debtor) in such offices as the Collateral Agent in its sole discretion deems necessary or desirable to perfect and to maintain the perfection and priority of the Collateral Agent's security interest in the Collateral, (iv) to contact and enter into one or more agreements with the issuers of uncertificated securities which are Pledged Collateral or with

10

securities intermediaries holding Pledged Collateral as may be necessary or advisable to give the Collateral Agent Control over such Pledged Collateral, (v) to apply the proceeds of any Collateral received by the Collateral Agent to the Secured Obligations following an Event of Default, or prior to an Event of Default to the extent consistent with the Note Exchange Agreement, (vi) to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for such Liens as are specifically permitted hereunder), and (vii) to do all other acts and things necessary to carry out this Pledge Agreement; and the Grantor agrees to reimburse the Collateral Agent on demand for any payment made or any expense incurred by the Collateral Agent in connection with any of the foregoing; *provided that,* this authorization shall not relieve the Grantor of any of its obligations under this Pledge Agreement, the Note Exchange Agreement or under any other Note Document.

(b)      All acts of said attorney or designee are hereby ratified and approved.  The powers conferred on the Collateral Agent, for the benefit of the Collateral Agent and Secured Parties, under this <u>Section 6.1</u> are solely to protect the Collateral Agent's interests in the Collateral and shall not impose any duty upon the Collateral Agent or any Secured Party to exercise any such powers.

6.2      <u>Proxy</u>.  THE GRANTOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS THE COLLATERAL AGENT AS ITS PROXY AND ATTORNEY-IN-FACT (AS SET FORTH IN <u>SECTION 6.1</u> ABOVE) WITH RESPECT TO THE COLLATERAL, INCLUDING THE RIGHT TO VOTE THE PLEDGED COLLATERAL IN ACCORDANCE WITH THE TERMS HEREOF, WITH FULL POWER OF SUBSTITUTION TO DO SO.   IN ADDITION TO THE RIGHT TO VOTE ANY SUCH PLEDGED COLLATERAL, THE APPOINTMENT OF THE COLLATERAL AGENT AS PROXY AND ATTORNEY-IN-FACT SHALL INCLUDE THE RIGHT TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF SUCH PLEDGED COLLATERAL WOULD BE ENTITLED (INCLUDING GIVING OR WITHHOLDING WRITTEN CONSENTS OF MEMBERS OR SHAREHOLDERS, CALLING SPECIAL MEETINGS OF MEMBERS OR SHAREHOLDERS AND VOTING AT SUCH MEETINGS).   NOTWITHSTANDING THE FOREGOING, SUCH PROXY SHALL BE EFFECTIVE, AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY SUCH PLEDGED COLLATERAL ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY PERSON (INCLUDING THE ISSUER OF SUCH PLEDGED COLLATERAL OR ANY OFFICER OR AGENT THEREOF), ONLY UPON THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT.

6.3      <u>Nature of Appointment; Limitation of Duty</u>.  THE APPOINTMENT OF THE COLLATERAL AGENT AS PROXY AND ATTORNEY-IN-FACT IN THIS <u>ARTICLE VI</u> IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE DATE ON WHICH THIS PLEDGE AGREEMENT IS TERMINATED IN ACCORDANCE WITH <u>SECTION 7.13</u>.   NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NEITHER THE COLLATERAL AGENT, NOR ANY SECURED PARTY, NOR ANY OF THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE JUDGMENT; PROVIDED THAT, IN NO EVENT SHALL THEY BE LIABLE FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

**ARTICLE VII**
**GENERAL PROVISIONS**

7.1      <u>Waivers</u>.  The Grantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made.  To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to the Grantor, addressed as set forth in <u>Article VIII</u>, at least ten days prior to (a) the date of any such public sale or (b)

11

the time after which any such private sale or other disposition may be made.  To the maximum extent permitted by applicable law, the Grantor waives all claims, damages, and demands against the Collateral Agent or any Secured Party arising out of the repossession, retention or sale of the Collateral, except such as arise solely out of the gross negligence or willful misconduct of the Collateral Agent or such Secured Party as finally determined by a court of competent jurisdiction. To the extent it may lawfully do so, the Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Collateral Agent or any Secured Party, any valuation, stay, appraisal, extension, moratorium, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Pledge Agreement, or otherwise.  Except as otherwise specifically provided herein, the Grantor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Pledge Agreement or any Collateral.

    7.2    <u>Limitation on Collateral Agent's and any Secured Party's Duty with Respect to the Collateral</u>. Neither the Collateral Agent nor any Secured Party shall have any obligation to prepare the Collateral for sale. The Collateral Agent and each Secured Party shall use reasonable care with respect to the Collateral in its possession or under its control; provided that the Collateral Agent and each Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral, if such Collateral is accorded treatment substantially equal to that which the Collateral Agent or such Secured Party accords its own property.  Neither the Collateral Agent nor any Secured Party shall have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Collateral Agent or such Secured Party, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.  To the extent that applicable law imposes duties on the Collateral Agent to exercise remedies in a commercially reasonable manner, the Grantor acknowledges and agrees that it is commercially reasonable for the Collateral Agent (a) to fail to incur expenses deemed significant by the Collateral Agent to prepare Collateral for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as the Grantor, for expressions of interest in acquiring all or any portion of such Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, such as title or warranties, (k) to purchase insurance or credit enhancements to insure the Collateral Agent against risks of loss, collection or disposition of Collateral or to provide to the Collateral Agent a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Collateral Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Collateral Agent in the collection or disposition of any of the Collateral.  The Grantor acknowledges that the purpose of this <u>Section 7.2</u> is to provide non-exhaustive indications of what actions or omissions by the Collateral Agent would be commercially reasonable in the Collateral Agent's exercise of remedies against the Collateral and that other actions or omissions by the Collateral Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this <u>Section 7.2</u>.  Without limitation upon the foregoing, nothing contained in this <u>Section 7.2</u> shall be construed to grant any rights to the Grantor or to impose any duties on the Collateral Agent that would not have been granted or imposed by this Pledge Agreement or by applicable law in the absence of this <u>Section 7.2</u>.

    7.3    <u>Secured Party Performance of Debtor Obligations</u>.  Without having any obligation to do so, the Collateral Agent may perform or pay any obligation which the Grantor has agreed to perform or pay in this Pledge Agreement but the Grantor nevertheless has not paid when due.  The Grantor shall reimburse the Collateral Agent

for any amounts paid by the Collateral Agent pursuant to this <u>Section 7.3</u>.  The Grantor's obligation to reimburse the Collateral Agent pursuant to the preceding sentence shall be Secured Obligations payable on demand.

7.4     <u>Specific Performance of Certain Covenants</u>.  The Grantor acknowledges and agrees that any breach of <u>Sections 4.2</u> <u>4.3</u> or <u>4.8</u>  of this Pledge Agreement will cause irreparable injury to the Collateral Agent and the Secured Parties, that the Collateral Agent and Secured Parties have no adequate remedy at law in respect of such breaches and therefore agrees, without limiting the right of the Collateral Agent or the Secured Parties to seek and obtain specific performance of other obligations of the Grantor contained in this Pledge Agreement, that such <u>Sections 4.2</u> <u>4.3</u>, and <u>4.8</u> of this Pledge Agreement shall be specifically enforceable against the Grantor.

7.5     <u>Dispositions Not Authorized</u>.  No Grantor is authorized to sell or otherwise dispose of the Collateral except as otherwise set forth in the Note Exchange Agreement and notwithstanding any course of dealing between the Grantor and the Collateral Agent or other conduct of the Collateral Agent, no authorization to sell or otherwise dispose of the Collateral shall be binding upon the Collateral Agent or the Secured Parties unless such authorization is already in the Note Exchange Agreement or otherwise in writing signed by the Collateral Agent with the consent or at the direction of the Required Holders.

7.6     <u>No Waiver; Amendments; Cumulative Remedies</u>.  No delay or omission of the Collateral Agent or any Noteholder to exercise any right or remedy granted under this Pledge Agreement shall impair such right or remedy or be construed to be a waiver of any Event of Default or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy.  No waiver, amendment or other variation of the terms, conditions or provisions of this Pledge Agreement whatsoever shall be valid unless in writing signed by the Collateral Agent with the concurrence or at the direction of the Noteholders required under Section 16 of the Note Exchange Agreement and then only to the extent in such writing specifically set forth.  All rights and remedies contained in this Pledge Agreement or by law afforded shall be cumulative and all shall be available to the Collateral Agent and the Secured Parties until Payment in Full.

7.7     <u>Limitation by Law; Severability of Provisions</u>.  All rights, remedies and powers provided in this Pledge Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Pledge Agreement are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they shall not render this Pledge Agreement invalid, unenforceable or not entitled to be recorded or registered, in whole or in part.  Any provision in this Pledge Agreement that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of this Pledge Agreement are declared to be severable.

7.8     <u>Reinstatement</u>.  This Pledge Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Grantor for liquidation or reorganization, should the Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of the Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

7.9     <u>Benefit of Agreement</u>.  The terms and provisions of this Pledge Agreement shall be binding upon and inure to the benefit of the Grantor, the Collateral Agent and the Secured Parties and their respective successors and assigns (including all persons who become bound as a debtor to this Pledge Agreement), except that no Grantor shall have the right to assign its rights or delegate its obligations under this Pledge Agreement or

any interest herein, without the prior written consent of the Collateral Agent. No sales of participations, assignments, transfers, or other dispositions of any agreement governing the Secured Obligations or any portion thereof or interest therein shall in any manner impair the Lien granted to the Collateral Agent, for the benefit of the Collateral Agent and the Secured Parties, hereunder.

7.10    Survival of Representations. All representations and warranties of the Grantor contained in this Pledge Agreement shall survive the execution and delivery of this Pledge Agreement.

7.11    Taxes and Expenses. The Grantor shall reimburse the Collateral Agent for any and all reasonable out-of-pocket expenses and fees (including reasonable attorneys', auditors' and accountants' fees) and charges (excluding time charges of attorneys who may be employees of the Collateral Agent) incurred by the Collateral Agent in connection with the preparation, execution, delivery, administration, collection and enforcement of this Pledge Agreement and in the audit, analysis, administration, collection, preservation or sale of the Collateral (including the expenses and charges associated with any periodic or special audit of the Collateral) all in accordance with, and to the extent provided in, Section 14.1 of the Note Exchange Agreement. Any and all costs and expenses incurred by the Grantor in the performance of actions required pursuant to the terms hereof shall be borne solely by the Grantor.

7.12    Headings. The title of and section headings in this Pledge Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Pledge Agreement.

7.13    Termination. This Pledge Agreement shall continue in effect (notwithstanding the fact that from time to time there may be no Secured Obligations outstanding) until payment in full in cash of the Secured Obligations in accordance with the terms of the Note Exchange Agreement.

7.14    Release of Collateral. The grant of any Lien, pledge and security interest hereunder and all of rights, powers and remedies in connection herewith shall remain in full force and effect until released (in whole or in part) pursuant to Section 16.1 of the Note Exchange Agreement.

7.15    Entire Agreement. This Pledge Agreement, the Note Exchange Agreement and the other Note Documents embody the entire agreement and understanding between the Grantor and the Collateral Agent relating to the Collateral and supersedes all prior agreements and understandings between the Grantor and the Collateral Agent relating to the Collateral.

7.16    CHOICE OF LAW; CONSENT TO JURISDICTION; JURY TRIAL.

(a)    THIS PLEDGE AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK EXCLUDING CHOICE-OF-LAW PRINCIPLES THAT WOULD PERMIT THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

7.17    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto. The words "execution," "signed," "signature," and words of like import used in this Amendment will be deemed to include electronic signatures or the keeping of records in electronic form, each of which will be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

7.18    <u>Lien Absolute</u>.  All obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)    any extension, renewal, settlement, compromise, waiver or release in respect of any of the Secured Obligations, by operation of law or otherwise, or any obligation of any other guarantor of any of the Secured Obligations, or any default, failure or delay, willful or otherwise, in the payment or performance of the Secured Obligations;

(b)    any lack of validity or enforceability relating to or against the Company, any other obligor or any other guarantor of any of the Secured Obligations, for any reason related to the Note Exchange Agreement, any other Note Document or any other agreement or instrument governing or evidencing any Secured Obligations, or any Governmental Requirements purporting to prohibit the payment by the Company, any other obligor or any other guarantor of the Secured Obligations of the principal of or interest on the Secured Obligations;

(c)    any modification or amendment of or supplement to the Note Exchange Agreement or any other Note Document;

(d)    any change in the time, manner or place of payment of, or in any other term of, all or any part of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Note Exchange Agreement, any other Note Document or any other agreement or instrument governing or evidencing any Secured Obligations, including any increase or decrease in the rate of interest thereon;

(e)    any change in the corporate existence, structure or ownership of the Company, any other obligor, or any other guarantor of any of the Secured Obligations, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Company, any other obligor or any other guarantor of the Secured Obligations, or any of their assets or any resulting release of discharge of any obligation of the Company, any other obligor or any other guarantor or any of the Secured Obligations;

(f)    any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of any Note Document or the Secured Obligations;

(g)    any other setoff, defense or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) with respect to the Note Exchange Agreement, any other Note Document, any other agreement or instrument or the transactions contemplated thereby which might constitute a legal or equitable defense available to, or discharge of the Grantor; or

(h)    any other act or omission to act or delay of any kind by the Company, any other obligor, any other guarantor of the Secured Obligations, the Collateral Agent, any Noteholder or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the Grantor's obligations hereunder.

7.19    <u>Collateral Releases</u>.  The Collateral Agent is authorized to, and shall release any Lien granted to or held by it upon any Collateral upon the occurrence of the Termination Date and otherwise in accordance with the Note Exchange Agreement; <u>provided</u>, that (i) any such release shall be at the sole expense of the Grantors and (ii) in the case of a release of Collateral prior to the Termination Date, the Grantors shall have provided the Collateral Agent with a certificate of a Responsible Officer certifying that the release is permitted under the Note Documents (and the Secured Parties, by accepting the benefits hereof, hereby authorize the Collateral Agent to rely on such certificate in performing its obligations under this Section 7.19).

# ARTICLE VIII
## NOTICES

All notices and other communications provided for herein shall be in writing, in English, and sent to the Collateral Agent or the Grantor as provided in the Note Exchange Agreement.

# ARTICLE IX
## THE COLLATERAL AGENT

Wilmington Trust, National Association has been appointed Collateral Agent for the Secured Parties hereunder pursuant to Section 20 of the Note Exchange Agreement. It is expressly understood and agreed by the parties to this Pledge Agreement that any authority conferred upon the Collateral Agent hereunder is subject to the terms of the delegation of authority made by the Noteholders to the Collateral Agent pursuant to the Note Exchange Agreement, and that the Collateral Agent has agreed to act (and any successor agent shall act) as such hereunder only on the express conditions contained in the Note Exchange Agreement with respect to the Secured Parties. The Collateral Agent shall be entitled to the rights, privileges, protections, indemnities and immunities set forth in the Note Exchange Agreement, all of which are incorporated herein by reference *mutatis mutandis*, in the performance of any of the transactions contemplated by this Agreement.  Any successor agent appointed pursuant to the Section 20 of the Note Exchange Agreement shall be entitled to all the rights, interests and benefits of each agent hereunder.

[Signature Page Follows]

IN WITNESS WHEREOF, the Grantor and the Collateral Agent have executed this Pledge Agreement as of the date first above written.

**GRANTOR:**

NAUTICAL SOLUTIONS HOLDINGS, LLC

By: _____
Name: _____
Title: _____

The Grantor (by signing above) and the undersigned Company (i) consent and agree to the terms and conditions of this Pledge Agreement, notwithstanding any terms and conditions of the Company's articles of organization and operating agreement (the "organizational documents") to the contrary, and (ii) agree that (x) to the extent of any inconsistency between this Pledge Agreement and any agreement, document or instrument now or hereafter executed and delivered in connection with this Pledge Agreement (including without limitation proxies), on the one hand, and any of the organizational documents, on the other hand, the terms and conditions of this Pledge Agreement and such other agreements, documents and instruments will and shall prevail, and (y) each of them shall take all actions necessary to allow the Collateral Agent (or its successors and assigns) to exercise any and all remedies under this Pledge Agreement and such other agreements, documents and instruments and (z) evidence Grantor's consent as the sole member of the Company to the pledge of interests effected by this Pledge Agreement and to the admission into the Company as a member, of any Person who, through the exercise by Collateral Agent of its available rights or remedies under this Pledge Agreement, becomes an owner of any membership interest (or portion thereof) pledged to Collateral Agent pursuant to this Pledge Agreement.

NAUTICAL SOLUTIONS, L.L.C.

By: _____
Name: _____
Title: _____

[Signature Page to Pledge Agreement]

**COLLATERAL AGENT:**

WILMINGTON TRUST, NATIONAL ASSOCIATION

By:_____

Name: _____

Title: Authorized Officer

[Signature Page to Pledge Agreement]

**EXHIBIT A**
(See Sections 3.2, 3.3, 4.1 and 8.1 of Pledge Agreement)


PART I – GRANTOR INFORMATION:

NOTICE ADDRESS FOR GRANTOR

Nautical Solutions Holdings, LLC
16201 East Main Street
Cut Off, Louisiana 70345

| Name of Grantor | Jurisdiction of Organization and Type of Entity | Organizational Identification Number | Federal Identification Number | Chief Executive Office or Principal Place of Business | Former Names |
|---|---|---|---|---|---|
| Nautical Solutions Holdings, LLC | Louisiana limited liability company | 45098439K | 92-0440022 | 16201 East Main Street, Cut Off, LA 70345 | None |

A-1

**EXHIBIT B**
(See <u>Section 3.6</u> of Pledge Agreement and Definition of "Pledged Collateral")

LIST OF PLEDGED COLLATERAL

| Grantor | Issuer | Type of Organization | # of Shares Owned/ % of Equity Interests Owned | Total Shares Outstanding | Certificate Number |
|---------|--------|---------------------|----------------------------------------------|--------------------------|--------------------|
| Nautical Solutions Holdings, LLC | Nautical Solutions, L.L.C. | Limited Liability Company | 1,000 Units/100% | 1,000 Units | Uncertificated |

B-1

**EXHIBIT C**
(See <u>Section 3.1</u> of Pledge Agreement)

OFFICES IN WHICH FINANCING STATEMENTS MAY BE FILED

| Name of Grantor | Filing Office |
|---|---|
| Nautical Solutions Holdings, LLC | Clerk of Court of any Parish in the State of Louisiana |

**EXHIBIT D**
(See <u>Section 4.2</u> of Pledge Agreement)

AMENDMENT

This Amendment, dated _____, ___ is delivered pursuant to <u>Section 4.2</u> of the Pledge Agreement referred to below.  All defined terms herein shall have the meanings ascribed thereto or incorporated by reference in the Pledge Agreement.  The undersigned hereby certifies that the representations and warranties in <u>Article III</u> of the Pledge Agreement are and continue to be true and correct.  The undersigned further agrees that this Amendment may be attached to that certain Pledge Agreement, dated [•], 2023, between the undersigned, as the Grantor, and Wilmington Trust, National Association, as the Collateral Agent, (as amended, restated, amended and restated, supplemented or otherwise modified, the "<u>Pledge Agreement</u>") and that the Collateral listed on <u>Schedule I</u> to this Amendment shall be and become a part of the Collateral referred to in the Pledge Agreement and shall secure all Secured Obligations referred to in the Pledge Agreement.

_____

By:_____
Name:_____
Title:_____

## SCHEDULE I TO AMENDMENT

STOCKS AND OTHER EQUITY INTERESTS

| Name of Grantor | Issuer | Certificate Number(s) | Number of Shares | Class of Stock | Percentage of Outstanding Shares |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

*Annex 1 to*
*Pledge Agreement*

ASSUMPTION AGREEMENT, dated as of _____, 20___, by _____, a _____ (the "Additional Grantor"), in favor of Wilmington Trust, National Association, as Collateral Agent (together with its successors and assigns in such capacity, the "Collateral Agent") for the Secured Parties.  All capitalized terms not defined herein shall have the meaning ascribed to them in such Note Exchange Agreement.

## PRELIMINARY STATEMENTS

A.       Nautical Solutions, L.L.C., a Louisiana limited liability company, Nautical Solutions Holdings LLC, a Louisiana limited liability company (the "Company"), the Noteholders the agent thereunder and the Collateral Agent have entered into a Note Exchange Agreement, dated as of [•], 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Note Exchange Agreement").

B.       In connection with the Note Exchange Agreement, the Company entered into the Pledge Agreement, dated as of [•], 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Pledge Agreement"), in favor of the Collateral Agent for the benefit of the Secured Parties.

C.       The Note Exchange Agreement requires the Additional Grantor to become a party to the Pledge Agreement.

D.       The Additional Grantor has agreed to execute and deliver this Assumption Agreement in order to become a party to the Pledge Agreement.

ACCORDINGLY, IT IS AGREED:

1.       Pledge Agreement.  By executing and delivering this Assumption Agreement, the Additional Grantor, as provided in Section 4.7 of the Pledge Agreement, hereby becomes a party to the Pledge Agreement as a "Grantor" thereunder with the same force and effect as if originally named therein as a Grantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Grantor thereunder.  The information set forth in Annex 1-A hereto is hereby added to the information set forth in the appropriate Exhibits to the Pledge Agreement.  The Additional Grantor hereby represents and warrants that each of the representations and warranties contained in Article III of the Pledge Agreement is, as to itself, true and correct on and as the date hereof (after giving effect to this Assumption Agreement) as if made on and as of such date.

2.       GOVERNING LAW.  THIS PLEDGE AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS PLEDGE AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the undersigned has caused this Assumption Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL GRANTOR]

_____,

a _____


By:_____

Name:_____

Title:_____

**EXHIBIT M**

**FORM OF COMPLIANCE CERTIFICATE**

as of _____, _____

TO: Each holder of a Note that is an Institutional Investor

This Compliance Certificate is furnished pursuant to Section 7.2 of that certain Note Exchange Agreement dated as of ____, 2023 (as amended, restated, amended and restated, supplemented and/or modified from time to time, the "*Note Exchange Agreement*") among Nautical Solutions, L.L.C., a Louisiana limited liability company (the "*Company*"), Nautical Solutions Holdings, LLC, a Louisiana limited liability company, the respective Noteholders party thereto and Wilmington Trust, National Association, as agent for the Noteholders (including its successors and assigns in such capacity) and as collateral agent for the Noteholders (including its successors and assigns in such capacity). Unless otherwise defined herein, the terms used in this Compliance Certificate have the meanings given to them in the Note Exchange Agreement.

THE UNDERSIGNED SENIOR FINANCIAL OFFICER OF THE COMPANY HEREBY CERTIFIES TO THE APPLICABLE HOLDERS THAT:

1. I am the duly elected chief financial officer of the Company.

2. As required by Section 7.1 [(a)] [(b)] of the Note Exchange Agreement, financial statements of the Company for the [quarter] [year] ended _____, _____ (the "*Financial Statements*") prepared in accordance with GAAP are attached to this Compliance Certificate. The Financial Statements present fairly the financial position of the Note Parties as at the date thereof and the results of operations and cash flows of the Note Parties for the period covered thereby (subject only to normal recurring year-end adjustments).[1]

3. I have reviewed the terms of the Note Exchange Agreement, and have made, or caused to be made, a review of the transactions and conditions of the Company during the accounting period covered by the attached Financial Statements.

4. The Company has observed or performed all of its covenants and other agreements, and satisfied every condition contained in the Note Exchange Agreement and the other Note Documents to be observed, performed or satisfied by it, and the representations and warranties in the Note Exchange Agreement are true and correct as of the date hereof, except for such representations and warranties that relate to a specific date. The examinations described in

---

[1] For financial statements delivered pursuant to Section 7.1 (b), must be accompanied by an opinion thereon (without a "going concern" or similar qualification or exception and without any qualification or exception as to the scope of the audit on which such opinion is based) of independent public accountants of recognized national standing, which opinion shall state that such financial statements present fairly, in all material respects, the financial position of the companies being reported upon and their results of operations and cash flows and have been prepared in conformity with GAAP, and that the examination of such accountants in connection with such financial statements has been made in accordance with generally accepted auditing standards, and that such audit provides a reasonable basis for such opinion in the circumstances.

paragraph 3 did not disclose, and I have no knowledge of, the existence of any condition or event which constitutes a Default or an Event of Default during or at the end of the accounting period covered by the Financial Statements or as of the date of this Compliance Certificate[, except [describe any condition or event that constitutes a Default or Event of Default, specifying the nature and period of existence thereof and what action the Company has taken or proposes to take with respect thereto].

5.      The financial data and computations set forth in Schedule A hereto for determining compliance by the Company with the financial covenants contained in Section 10.6 of the Note Exchange Agreement are true, complete and correct as of the date hereof.[2]  The ratio of Funded Debt of the Company for the period of four consecutive fiscal quarters ended ___, 202_ to EBITDA for such period is ___ to 1.00 and the interest rate applicable to the Notes for quarter commencing ___, 202_ shall be [9.50][8.00][7.50]% in accordance with Section 8.1(b) of the Note Exchange Agreement.[3]

6.      Schedule B attached hereto sets forth a list of all the Mortgaged Vessels currently serving as Collateral for the Note Obligations together with the daily charter hire rate currently being earned by each such Mortgaged Vessel.

7.      Schedule C attached hereto sets forth the information (including detailed calculations) that are required in order to determine compliance by the Company with the requirements of Sections 10.7, 10.9, 10.11 and 10.12 of the Note Exchange Agreement during the period covered by the Financial Statements.

8.      [The organizational chart of all Chouest Affiliates last delivered pursuant to Section 7.1(s) of the Note Exchange Agreement remains true and correct as of the date hereof.] [Schedule D attached hereto sets forth a true and correct organizational chart of all Chouest Affiliates having assets of greater than $10,000,000 or Indebtedness of greater than $10,000,000.]

9.      Schedule [E] attached hereto sets forth (i) the total PSV Vessel Sale Proceeds received as of the date of the Financial Statement and the timing of receipt of such PSV Vessel Sale Proceeds and (ii) the total Specified Prepayment Amount received as of the date of the Financial Statement and the timing of receipt of such Specified Prepayment Amount, in each case, for the purposes of calculating any Specified Noteholder Fee pursuant to Section 8.1(c).

10.      The foregoing certifications, together with the computations set forth in Schedules A and C hereto, the Financial Statements delivered with this Compliance Certificate in support hereof, the information set forth on Schedules B, [D and E] hereto, are made and delivered as of the date first written above.

---

[2] The leverage ratio is to be delivered starting June 2023, though compliance for financial covenant purposes starts on September 2024.

[3] To be included commencing with the Compliance Certificate delivered for the fiscal quarter beginning on April 1, 2023.

NAUTICAL SOLUTIONS, L.L.C.

By: _____
Name: _____
Title:   Chief Financial Officer

SCHEDULE A
FINANCIAL COVENANTS

| 10.6(a) | Interest Coverage Ratio | |
|---|---|---|
| | MINIMUM REQUIRED: | 1.10 : 1.00 |
| | ACTUAL (Previous Test Period): | |
| | (i)    EBITDA | _____ |
| | (ii)   Interest Expense | _____ |
| | (iii)  Actual Interest Coverage Ratio: [Line (i) to (ii)] | _____ : 1.00 |
| | Compliance | [Yes][No] |
| 10.6(b) | EBITDA | |
| | MINIMUM REQUIRED: | $[●] |
| | ACTUAL EBITDA (Previous 4 fiscal quarters): | $[●] |
| | Compliance | [Yes][No] |
| 10.6(c) | Net Funded Debt to EBITDA Ratio | |
| | MAXIMUM PERMITTED | _____ : 1.00 |
| | ACTUAL (Previous 4 fiscal quarters): | |
| | (i)    Net Funded Debt | _____ |
| | (ii)   EBITDA | _____ |
| | (iii)  Actual Net Funded Debt to EBITDA Ratio: [Line (i) to (ii)] | _____ : 1.00 |
| | Compliance | [Yes][No] |

SCHEDULE B
<u>VESSELS AND CHARTER HIRE RATES</u>

| Vessel | Charterer | Day Rate | Charter Expiration |
|--------|-----------|----------|--------------------|
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |

SCHEDULE C
SECTIONS 10.7, 10.9, 10.11 and 10.12

[SCHEDULE D
ORGANIZATIONAL CHART OF APPLICABLE CHOUEST AFFILIATES]

SCHEDULE [E]
PSV VESSEL SALE PROCEEDS AND SPECIFIED PREPAYMENT AMOUNT

Total PSV Vessel Sale Proceeds: $[●]

Total Specified Prepayment Amount received: $[●]

Timing of receipt of Specified Prepayment Amounts: **[●]**

<u>Exhibit N</u>

<u>[FORM OF]</u>
**ASSIGNMENT AND ACCEPTANCE**

This Assignment and Acceptance (this "*Assignment and Acceptance*") is dated as of the Effective Date set forth below and is entered into by and between [Insert name of Assignor] (the "Assignor") and [Insert name of Assignee] (the "Assignee").  Capitalized terms used but not defined herein shall have the meanings given to them in the Note Exchange Agreement identified below (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Note Exchange Agreement*"), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in <u>Annex 1</u> attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Acceptance as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and accepts from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Note Exchange Agreement, as of the Effective Date inserted by the Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Noteholder under the Note Exchange Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount of and percentage interest in the Notes identified below of all such outstanding rights and obligations of the Assignor in its capacity as a Noteholder under the Note Exchange Agreement and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and other rights of the Assignor (in its capacity as a Noteholder) against any Person, whether known or unknown, arising under or in connection with the Note Exchange Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by the Assignor.

1.  Assignor: _____

2.  Assignee: _____
    [and is an Affiliate/Approved Fund of [identify Noteholder][1]

3.  Issuer: Nautical Solutions, L.L.C., as issuer of the Notes under the Note Exchange Agreement

4.  Agent: Wilmington Trust, National Association, as the administrative agent under the Note Exchange Agreement

---

[1] Select as applicable.

5.      Note Exchange Agreement:  The Note Exchange Agreement, dated as of [●], 2023, among Nautical Solutions, L.L.C., as issuer, Nautical Solutions Holdings, LLC, as Holdings, Wilmington Trust, National Association, as Agent, and the other parties thereto

6.      Notes:

| Aggregate Amount of Notes for all Noteholders | Amount of Notes Assigned | Percentage Assigned of Notes[2] |
|---|---|---|
| $ | $ | % |
| $ | $ | % |
| $ | $ | % |

Effective Date: _____ ___, 20___ [TO BE INSERTED BY THE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Agent a completed Administrative Questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Issuer, the Note Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including federal and state securities laws.

[Signature Pages to Follow]

---

[2] Set forth, to at least 9 decimals, as a percentage of the Notes of all Noteholder thereunder.

2

The terms set forth in this Assignment and Acceptance are hereby agreed to:

<u>ASSIGNOR</u>

[NAME OF ASSIGNOR]


By: _____
Name: _____
Title: _____


<u>ASSIGNEE</u>

[NAME OF ASSIGNEE]


By: _____
Name: _____
Title: _____


<u>NOMINEE</u>

[NAME OF NOMINEE]


By: _____
Name: _____
Title: _____

Accepted:

<u>Agent</u>

WILMINGTON TRUST, NATIONAL ASSOCIATION


By:_____

Name:_____

Title:_____

ANNEX 1 to
ASSIGNMENT AND ACCEPTANCE

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT AND ACCEPTANCE
1.    Representations and Warranties.

1.1    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Notes, (ii) the Notes are free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Note Exchange Agreement or any other Note Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Note Documents or any collateral thereunder, (iii) the financial condition of the Issuer, any Subsidiary or Affiliate or any other Person obligated in respect of any Note Document, (iv) any requirements under applicable law for the Assignee to become a Noteholder under the Note Exchange Agreement or any other Note Document or to charge interest at the rate set forth therein from time to time or (v) the performance or observance by the Issuer, any Subsidiary or Affiliate, or any other Person of any of their respective obligations under any Note Document.

1.2.    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Noteholder under the Note Exchange Agreement, (ii) it satisfies the requirements, if any, specified in the Note Exchange Agreement and under applicable law that are required to be satisfied by it in order to acquire the Notes and become a Noteholder, including, without limitation, that, to the extent so required under Section 13.2(c) of the Note Exchange Agreement, it is not a Competitor, (iii) from and after the Effective Date, it shall be bound by the provisions of the Note Exchange Agreement as a Noteholder thereunder and, to the extent of the Notes, shall have the obligations of a Noteholder thereunder, (iv) it has received a copy of the Note Exchange Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.5 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase the Notes on the basis of which it has made such analysis and decision independently and without reliance on the Agent, any arranger or any other Noteholder or their respective Related Parties, and (v) attached to the Assignment and Acceptance is any documentation required to be delivered by it pursuant to the terms of the Note Exchange Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Agent, any arranger, the Assignor or any other Noteholder or their respective Related Parties, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Note Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Note Documents are required to be performed by it as a Noteholder.

2.    Payments.  From and after the Effective Date, the Agent shall make all payments in respect of the Notes (including payments of principal, interest, fees and other amounts) to the

Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.    <u>General Provisions</u>.  This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument.  Acceptance and adoption of the terms of this Assignment and Acceptance by the Assignee and the Assignor by electronic signature or delivery of an executed counterpart of a signature page of this Assignment and Acceptance by any Approved Electronic Platform (as defined in the Note Exchange Agreement) shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.  This Assignment and Acceptance shall be governed by, and construed in accordance with, the law of the State of New York.

**[FORM OF] ASSIGNMENT OF FIRST PREFERRED FLEET MORTGAGE**

**From**

**JPMORGAN CHASE BANK N.A.,**
**in its capacity as Collateral Agent**
**and Mortgagee**

**To**

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
**in its capacity as Security Trustee**
**and Collateral Agent**

**[FORM OF] ASSIGNMENT OF FIRST PREFERRED FLEET MORTGAGE**

THIS ASSIGNMENT OF FIRST PREFERRED FLEET MORTGAGE (this "Assignment") effective as of this ____ day of _____, 2023, is executed by JPMORGAN CHASE BANK, N.A., a national banking association, with an address at 201 Saint Charles Avenue, Suite 2800, New Orleans, Louisiana 70170, in its capacity as collateral agent for the Secured Parties (as defined in said First Preferred Fleet Mortgage) ("Assignor") in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, with an address at 1100 North Market Street, Wilmington, DE 19890, in its capacity as security trustee and collateral agent for the Secured Parties (as such term is defined in that certain Note Exchange Agreement dated as of February 24, 2023 by and among, inter alia, Nautical Solutions, L.L.C., a Louisiana limited liability company (the "Shipowner") and financial institutions from time to time parties thereto, the "Note Agreement") ("Assignee").

RECITALS

WHEREAS, pursuant to the terms and conditions of that certain Credit Agreement, dated as of November 14, 2013, by and among the Shipowner, as borrower, the lenders from time to time parties thereto (collectively, the "Lenders"), and the Assignor, in its capacity as administrative agent and in its capacity as the collateral agent (as the same may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), the Lenders provided the Shipowner with a revolving credit facility in the amount of up to $550,000,000 (collectively, the "Loans"); and

WHEREAS, pursuant to the terms and conditions of substantially identical Note Purchase Agreements dated as of November 4, 2013, by and among the Shipowner and the financial institutions parties thereto (as the same may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time, collectively, the "Note Purchase Agreement"), the Shipowner issued the aggregate principal sum of $500,000,000 of its 5.75% Senior Secured Notes due 2023 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with all notes delivered in substitution or exchange for any of the foregoing senior secured notes, collectively, the "Existing Senior Notes"); and

WHEREAS, it was a condition precedent to the making of the Loans and issuance of the Existing Senior Notes that the Shipowner execute and deliver in favor of the Assignor, to secure its obligations under the Credit Agreement, the Note Agreement and the Existing Senior Notes, a first preferred fleet mortgage over the whole of the various U.S. flagged vessels listed therein, which mortgage was duly filed and recorded with the United Stated Coast Guard, National Vessel Documentation Center ("NVDC") on November 14, 2013 at 9:55 A.M. in Batch #15691200, Doc #3 (the "Original Fleet Mortgage"); and

WHEREAS, subsequent thereto, the parties agreed to supplement and amend the Original Fleet Mortgage to add various additional vessels thereto pursuant to fifteen separate supplements and two separate amendments, as follows:

- Supplement No. 1 to First Preferred Fleet Mortgage dated as of May 5, 2014 and recorded on May 8, 2014 with the NVDC at 9:10 A.M. in Batch #19443000, Doc #4 (the "First Supplement");

- Supplement No. 2 to First Preferred Fleet Mortgage dated as of June 6, 2014 and recorded on June 10, 2014 with the NVDC at 5:38 P.M. in Batch #20334100, Doc #3 (the "Second Supplement");

- Supplement No. 3 to First Preferred Fleet Mortgage dated as of July 22, 2014 and recorded on July 22, 2014 with the NVDC at 4:41 P.M. in Batch #21403800, Doc #3 (the "Third Supplement");

- Supplement No. 4 to First Preferred Fleet Mortgage dated as of October 31, 2014 and recorded on October 31, 2014 with the NVDC at 4:20 P.M. in Batch #23589100, Doc #2 (the "Fourth Supplement");

- Supplement No. 5 to First Preferred Fleet Mortgage dated as of February 4, 2015 and recorded on February 6, 2015 with the NVDC at 1:02 P.M. in Batch #25363500, Doc #2 (the "Fifth Supplement");

- Supplement No. 6 to First Preferred Fleet Mortgage dated as of March 20, 2015 and recorded on March 25, 2015 with the NVDC at 4:46 P.M. in Batch #26354000, Doc #2 (the "Sixth Supplement");

- Supplement No. 7 to First Preferred Fleet Mortgage dated as of March 31, 2015 and recorded on March 31, 2015 with the NVDC at 3:04 P.M. in Batch #26466700, Doc #2 (the "Seventh Supplement");

- Supplement No. 8 to First Preferred Fleet Mortgage dated as of April 17, 2015 and recorded on April 21, 2015 with the NVDC at 2:12 P.M. in Batch #26987700, Doc #2 (the "Eighth Supplement");

- Supplement No. 9 to First Preferred Fleet Mortgage dated as of June 16, 2015 and recorded on June 16, 2015 with the NVDC at 3:26 P.M. in Batch #29173700, Doc #4 (the "Ninth Supplement");

- Supplement No. 10 to First Preferred Fleet Mortgage dated as of September 8, 2015 and recorded on September 8, 2015 with the NVDC at 4:50 P.M. in Batch #30514900, Doc #3 (the "Tenth Supplement");

- Supplement No. 11 to First Preferred Fleet Mortgage dated as of January 25, 2016 and recorded on January 27, 2016 with the NVDC at 10:46 A.M. in Batch #33483700, Doc #4 (the "Eleventh Supplement");

- Supplement No. 12 to First Preferred Fleet Mortgage dated as of July 10, 2017 and recorded on July 10, 2017 with the NVDC at 6:32 P.M. in Batch #45998600, Doc #4 (the "Twelfth Supplement");

- Amendment No. 1 to First Preferred Fleet Mortgage dated as of November 13, 2017 and recorded on November 14, 2017 with the NVDC at 10:47 A.M. in Batch #48673600, Doc #3 (the "Amendment No. 1");

- Supplement No. 13 to First Preferred Fleet Mortgage dated as of January 12, 2018 and recorded on January 23, 2018 with the NVDC at 3:20 P.M. in Batch #50320300, Doc #3 (the "Thirteenth Supplement");

- Supplement No. 14 to First Preferred Fleet Mortgage dated as of February 22, 2018 and recorded on February 26, 2018 with the NVDC at 12:32 P.M. in Batch #50918900, Doc #3 (the "Fourteenth Supplement");

- Amendment No. 2 to First Preferred Fleet Mortgage dated as of December 7, 2018 and recorded on December 10, 2018 with the NVDC at 2:11 P.M. in Batch #58182500, Doc #4 (the "Amendment No. 2"); and

- Supplement No. 15 to First Preferred Fleet Mortgage dated as of January 17, 2019 and recorded on January 29, 2019 with the NVDC at 2:43 P.M. in Batch #59496200, Doc #3 (the "Fifteenth Supplement"); and

(said Original Mortgage, together with the First Supplement, the Second Supplement, the Third Supplement, the Fourth Supplement, the Fifth Supplement, the Sixth Supplement, the Seventh Supplement, the Eighth Supplement, the Ninth Supplement, the Tenth Supplement, the Eleventh Supplement, the Twelfth Supplement, the Amendment No. 1, the Thirteenth Supplement, the Fourteenth Supplement, the Amendment No. 2, and the Fifteenth Supplement, as so supplemented, amended or otherwise modified from time to time being hereinafter called the "Mortgage"); and

WHEREAS, after giving effect to the foregoing Supplements and Amendments and all partial releases granted, the vessels now covered by the Mortgage (collectively, the "Vessels") are set forth on Schedule 1 attached hereto and made a part hereof; and

WHEREAS, on the date hereof, the various financial institutions parties to the Credit Agreement and to the Note Agreement and the Shipowner have entered into a Note Exchange Agreement (the "Exchange Agreement"), pursuant to which the Exchange Agreement shall replace the Credit Agreement and the Note Agreement, and the Shipowner shall issue and transfer to such financial institutions $587,500,000 aggregate principal amount of its senior secured notes due 2028 (collectively, the "New Senior Notes") in exchange for and in replacement of the Loans and the Existing Senior Notes; and

WHEREAS, contemporaneously therewith and as a condition precedent thereto, Assignor has agreed to assign to Assignee all of its rights, title and interests in and to the Mortgage so that the Mortgage shall continue to secure the Shipowner's obligations under the Exchange Agreement and the New Senior Notes; and

WHEREAS, by this instrument, Assignor now wishes to assign to Assignee of record 100% of its rights, title and interests in and to the Mortgage and all rights and powers incident thereto.

NOW, THEREFORE, THIS ASSIGNMENT WITNESSETH:

That for the sum of One Dollar ($1.00) in hand paid, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Assignor does hereby sell, transfer and assign over unto Assignee all of Assignor's right, title and interests, as mortgagee, under the Mortgage identified above, as heretofore supplemented, amended, released (as to certain other vessels but not the Vessels) or otherwise modified, and in and to the Vessels now covered thereby.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns forever.

AND this Assignment is made without recourse to or any representation or warranty, express or implied, by Assignor.

AND Assignor further agrees to execute and deliver to Assignee any and all other documents and instruments and to do such other acts reasonably required by Assignee to continue to maintain the perfection and priority of the Mortgage as a preferred mortgage in favor of Assignee over the whole of the Vessels described therein to secure the Shipowner's obligations under the Exchange Agreement and the New Senior Notes and to carry out the terms hereof.

[Signature Page Follows]

IN WITNESS WHEREOF, Assignor has caused this Assignment to be executed and delivered by its duly authorized representative on the date indicated in the notarial acknowledgement below, to be effective as of the day and year first above stated.

WITNESS:                                      JPMORGAN CHASE BANK, N.A.,
                                              as Collateral Agent


_____          By: _____
                                              Name: Kelsey R. Box
                                              Title:  Authorized Officer



STATE OF LOUISIANA            )
                             ) SS:
PARISH OF ORLEANS             )

I HEREBY CERTIFY that, on this 16th day of February, 2023, before me, the undersigned officer, personally appeared Kelsey R. Box, who acknowledged himself/herself  to be an Authorized Officer of JPMorgan Chase Bank, N.A., the national banking association described in and which executed the within instrument, and that she as such Authorized Officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the Kelsey R. Box by himself/herself as such Authorized Officer as her free act and deed on behalf of said banking association.

IN WITNESS WHEREOF, I hereunto set my hand.


                                         _____
                                         Notary Public

My commission expires: _____.

Schedule 1

<u>Vessels</u>

| **Vessel** | **Official No.** |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

<u>Exhibit P</u>

**[FORM OF] AMENDED AND RESTATED**
**FIRST PREFERRED FLEET MORTGAGE**

**given by**

**NAUTICAL SOLUTIONS, L.L.C.,**
**as mortgagor**

**in favor of**

**WILMINGTON TRUST, NATIONAL ASSOCIATION**
**in its capacity of collateral agent,**
**as mortgagee**

**Dated _____, 2023 and effective _____, 2023**

**United States Flag Vessels**

**Avery Island**
**Brad Dartez**
**Cat Island**
**Celena Chouest**
**Corcovado**
**Dante**
**Dauphin Island**
**Deer Island**
**Dino Chouest**
**Fast Tender**
**Fast Track**
**Forte**
**Gavea**
**Grand Isle**
**Horn Island**
**Jackie Chouest**
**Kirt Chouest**
**Lyman Martin**
**Marsh Island**
**Mr Sidney**
**Ms Virgie**
**Pao de Acucar**
**Paradise Island**
**Pecan Island**
**Pelican Island**
**Sanibel Island**
**Ship Island**
**Timbalier Island**
**Wine Island**

/

This AMENDED AND RESTATED FIRST PREFERRED FLEET MORTGAGE (this "Mortgage"*)* dated as of _____, 2023 but effective as of _____, 2023, is executed by NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company, with an address of 16201 East Main Street, Cut Off, Louisiana 70345 (the "Shipowner"), to and in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, with an address of 1100 North Market Street, Wilmington, DE 19890, in its capacity as security trustee and collateral agent for the Secured Parties under and as defined in the Security Agreement (as such term is defined in the Exchange Agreement defined below), as required by the Exchange Agreement (in such capacity, together with its successors and assigns, the "Mortgagee"*).*

WITNESSETH:

WHEREAS, pursuant to the terms and conditions of that certain Credit Agreement, dated as of November 14, 2013 (as the same may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among the Shipowner, as borrower, the lenders from time to time parties thereto, and JPMorgan Chase Bank, N.A., in its capacity as administrative agent and in its capacity as the collateral agent and mortgagee (the "Original Mortgagee"), the Lenders provided the Shipowner with a revolving credit facility in the amount of up to $550,000,000 (collectively, the "Loans"); and

WHEREAS, pursuant to the terms and conditions of substantially identical Note Purchase Agreements dated as of November 14, 2013 (as the same may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time, collectively, the "Note Purchase Agreements"), by and among the Shipowner and the financial institutions parties thereto, the Shipowner issued the aggregate principal sum of $500,000,000 of its 5.75% Senior Secured Notes due 2023 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with all notes delivered in substitution or exchange for any of the foregoing senior secured notes, collectively, the "Existing Senior Notes"); and

WHEREAS, it was a condition precedent to the making of such Loans and issuance of such Existing Senior Notes that the Shipowner execute and deliver to and in favor of the Original Mortgagee, to secure the Shipowner's obligations under the Credit Agreement, the Note Agreements and the Existing Senior Notes, a first preferred fleet mortgage over the whole of the various U.S. flagged vessels listed therein, which mortgage was duly filed and recorded with the United Stated Coast Guard, National Vessel Documentation Center ("NVDC") on November 14, 2013 at 9:55 A.M. in Batch #15691200, Doc #3 (the "2013 Fleet Mortgage"); and

WHEREAS, subsequent thereto, the parties agreed to supplement and amend the Original Fleet Mortgage to add various additional vessels thereto pursuant to fifteen (15) separate supplements and two (2) separate amendments, as follows:

- Supplement No. 1 to First Preferred Fleet Mortgage dated as of May 5, 2014 and recorded on May 8, 2014 with the NVDC at 9:10 A.M. in Batch #19443000, Doc #4 (the "First Supplement");

- Supplement No. 2 to First Preferred Fleet Mortgage dated as of June 6, 2014 and recorded on June 10, 2014 with the NVDC at 5:38 P.M. in Batch #20334100, Doc #3 (the "Second Supplement");

- Supplement No. 3 to First Preferred Fleet Mortgage dated as of July 22, 2014 and recorded on July 22, 2014 with the NVDC at 4:41 P.M. in Batch #21403800, Doc #3 (the "Third Supplement");

- Supplement No. 4 to First Preferred Fleet Mortgage dated as of October 31, 2014 and recorded on October 31, 2014 with the NVDC at 4:20 P.M. in Batch #23589100, Doc #2 (the "Fourth Supplement");

- Supplement No. 5 to First Preferred Fleet Mortgage dated as of February 4, 2015 and recorded on February 6, 2015 with the NVDC at 1:02 P.M. in Batch #25363500, Doc #2 (the "Fifth Supplement");

- Supplement No. 6 to First Preferred Fleet Mortgage dated as of March 20, 2015 and recorded on March 25, 2015 with the NVDC at 4:46 P.M. in Batch #26354000, Doc #2 (the "Sixth Supplement");

- Supplement No. 7 to First Preferred Fleet Mortgage dated as of March 31, 2015 and recorded on March 31, 2015 with the NVDC at 3:04 P.M. in Batch #26466700, Doc #2 (the "Seventh Supplement");

- Supplement No. 8 to First Preferred Fleet Mortgage dated as of April 17, 2015 and recorded on April 21, 2015 with the NVDC at 2:12 P.M. in Batch #26987700, Doc #2 (the "Eighth Supplement");

- Supplement No. 9 to First Preferred Fleet Mortgage dated as of June 16, 2015 and recorded on June 16, 2015 with the NVDC at 3:26 P.M. in Batch #29173700, Doc #4 (the "Ninth Supplement");

- Supplement No. 10 to First Preferred Fleet Mortgage dated as of September 8, 2015 and recorded on September 8, 2015 with the NVDC at 4:50 P.M. in Batch #30514900, Doc #3 (the "Tenth Supplement");

- Supplement No. 11 to First Preferred Fleet Mortgage dated as of January 25, 2016 and recorded on January 27, 2016 with the NVDC at 10:46 A.M. in Batch #33483700, Doc #4 (the "Eleventh Supplement");

- Supplement No. 12 to First Preferred Fleet Mortgage dated as of July 10, 2017 and recorded on July 10, 2017 with the NVDC at 6:32 P.M. in Batch #45998600, Doc #4 (the "Twelfth Supplement");

- Amendment No. 1 to First Preferred Fleet Mortgage dated as of November 13, 2017 and recorded on November 14, 2017 with the NVDC at 10:47 A.M. in Batch #48673600, Doc #3 (the "Amendment No. 1");

- Supplement No. 13 to First Preferred Fleet Mortgage dated as of January 12, 2018 and recorded on January 23, 2018 with the NVDC at 3:20 P.M. in Batch #50320300, Doc #3 (the "Thirteenth Supplement");

- Supplement No. 14 to First Preferred Fleet Mortgage dated as of February 22, 2018 and recorded on February 26, 2018 with the NVDC at 12:32 P.M. in Batch #50918900, Doc #3 (the "Fourteenth Supplement");

- Amendment No. 2 to First Preferred Fleet Mortgage dated as of December 7, 2018 and recorded on December 10, 2018 with the NVDC at 2:11 P.M. in Batch #58182500, Doc #4 (the "Amendment No. 2"); and

- Supplement No. 15 to First Preferred Fleet Mortgage dated as of January 17, 2019 and recorded on January 29, 2019 with the NVDC at 2:43 P.M. in Batch #59496200, Doc #3 (the "Fifteenth Supplement"); and

(said 2013 Fleet Mortgage, together with the First Supplement, the Second Supplement, the Third Supplement, the Fourth Supplement, the Fifth Supplement, the Sixth Supplement, the Seventh Supplement, the Eighth Supplement, the Ninth Supplement, the Tenth Supplement, the Eleventh Supplement, the Twelfth Supplement, the Amendment No. 1, the Thirteenth Supplement, the Fourteenth Supplement, the Amendment No. 2, and the Fifteenth Supplement, as so supplemented, amended or otherwise modified from time to time being hereinafter called the "Original Mortgage"); and

WHEREAS, after giving effect to the foregoing Supplements and Amendments and all partial releases granted, the vessels still covered by the Original Mortgage (collectively, the "Vessels") are set forth on Schedule 1 attached hereto and made a part hereof; and

WHEREAS, on the date hereof, the various financial institutions parties to the Credit Agreement and to the Note Agreements (collectively, the "Lenders") and the Shipowner have entered into a Note Exchange Agreement (the "Exchange Agreement"), pursuant to which the parties agreed that the Exchange Agreement shall replace, but not constitute a novation of, the Credit Agreement and the Note Agreements, and the Shipowner shall issue and transfer to such Lenders $587,500,000 aggregate principal amount of its senior secured notes due 2028 (collectively, the "New Senior Notes") in exchange for, and in substitution and replacement but not a novation of, the Loans and the Existing Senior Notes; and

WHEREAS, contemporaneously therewith and as a condition precedent thereto, the Original Mortgagee has assigned to the Mortgagee all of its rights, title and interests in and to the Original Mortgage so that the Original Mortgage shall continue to secure the Shipowner's obligations under the Exchange Agreement and the New Senior Notes; and

WHEREAS, it is a condition precedent to the Lenders' entry into the Exchange Agreement and its acceptance of the New Senior Notes in exchange for and in substitution of the Existing Senior Notes that the Shipowner shall have executed and delivered this Mortgage to the Mortgagee to secure, among other things, the Obligations (as defined in the Exchange Agreement) and the payment of the principal of, Specified Noteholder Fee (if any) and Exit Fee (if any) (as such terms are defined in the Exchange Agreement) and interest on all New Senior Notes outstanding and to be outstanding under the Exchange Agreement.

WHEREAS, the Shipowner is the sole owner of the vessels described on Schedule 1 attached hereto and made a part hereof.

AGREEMENTS

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to secure the payment and performance of any and all present and future indebtedness, obligations and liabilities of the Shipowner, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of or in connection with, the Exchange Agreement, the New Senior Notes issued in connection with the Exchange Agreement or any other Note Document (as defined in the Exchange Agreement), this Mortgage and the other Security Documents (collectively, the "Debt Documents") to which the Shipowner is a party, in each case whether on account of principal, Specified Noteholder Fee (if any), Exit Fee (if any), interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise, including, without limitation, all fees and disbursements of counsel to the Mortgagee and the Noteholders that are required to be paid by the Shipowner pursuant to the terms of any of the Debt Documents (collectively, and including any and all renewals, modifications, amendments, extensions for any period, supplements and restatements of any of the foregoing, the "Secured Obligations"), the Shipowner does by these presents mortgage, convey, and grant a continuing security interest in and first

preferred mortgage lien on, unto Mortgagee, and to Mortgagee's successors and assigns in such capacity, the whole of the vessels described on Schedule 1 attached hereto, together with all auxiliaries, tackle, apparel, accessories, appurtenances, anchors, cables, chains, equipment, cranes, welding machines and stations, cutting systems, pontoons, tensions, davits, dope stations, anchor wires, anchor buoys, generators, compressors, pumps, tools, implements, parts, supplies, and all other accessories, additions, improvements and replacements now or hereafter belonging thereto, whether or not removed therefrom, all of which shall be deemed to be included in the term "Vessel" and, collectively, "Vessels" herein.

TO HAVE AND TO HOLD all and singular the Vessels unto the Mortgagee and its successors and permitted assigns, to its and its successors' and permitted assigns' own use, benefit and behoof forever, subject to the rights of the Shipowner therein as herein provided;

PROVIDED, HOWEVER, and these presents are upon the condition that, if the Secured Obligations are paid and performed in full in accordance with the terms of the Exchange Agreement, this Mortgage and the other Debt Documents, and the New Senior Notes issued under the Exchange Agreement are satisfied and discharged in full, then this Mortgage shall cease; otherwise it shall remain in full force and effect. The Shipowner agrees to perform and to observe the terms, covenants and agreements contained in this Mortgage and in the other Debt Documents, and to hold the Vessels subject thereto.

IT IS HEREBY COVENANTED, DECLARED AND AGREED that each of the Vessels is to be held subject to the further covenants, conditions, provisions, terms and uses hereinafter set forth.

ARTICLE 1
REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SHIPOWNER

The Shipowner hereby covenants and agrees with the Mortgagee as follows:

Section 1.1    The Shipowner will pay when due all Secured Obligations from time to time payable by the Shipowner under the Exchange Agreement and the other Debt Documents and will observe, perform and comply with the covenants, terms and conditions herein and in the Exchange Agreement and the other Debt Documents, on its part to be observed, performed or complied with.

Section 1.2    The Shipowner is, and shall remain, duly qualified to own, document, operate and mortgage each of the Vessels under the applicable laws and regulations of the United States endorsed for the respective trade in which each applicable Vessel is engaged from time to time. Each of the Vessels is duly documented in the name of the Shipowner as owner under the laws and flag of the United States.

Section 1.3    The Shipowner lawfully owns and is lawfully possessed of each of the Vessels free from any Lien (as defined in the Exchange Agreement), charge or encumbrance whatsoever (except for this Mortgage and the Liens permitted to be created, incurred, assumed or permitted to exist pursuant to Section 10.5(a), (b) and (e) of the Exchange Agreement (collectively, the "Permitted Maritime Liens")), and will warrant and defend the title and possession thereto and to every part thereof for the benefit of the Mortgagee against the claims and demands of all persons whomsoever; provided, however, that notwithstanding anything herein to the contrary, no intention to subordinate the first priority security interest and Lien intended to be granted in favor of the Mortgagee herein is to be hereby implied or expressed by the permitted existence of the Permitted Maritime Liens.

Section 1.4    The Shipowner has caused this Mortgage to be duly filed and will cause it to be duly recorded and will comply with and satisfy all of the provisions and requirements of Chapter 313 of Title 46 of the United States Code and the regulations in effect thereunder from time to time, as amended, in order to establish, perfect and maintain the perfection and priority of, this Mortgage as a valid,

enforceable and duly perfected preferred mortgage lien thereunder (subject only to Permitted Maritime Liens) upon each of the Vessels, with the intention that the preferred mortgage lien hereof be first in priority, and upon all renewals, replacements and improvements made in or to the same for the amount of the Secured Obligations.

Section 1.5     For each of the Vessels, the Shipowner will not (a) cause or permit such Vessel to be operated in any manner contrary to applicable law, rule or regulation, (b) engage in any unlawful trade or operations or violate any law, (c) carry any cargo that will expose such Vessel to penalty, confiscation, forfeiture, capture or condemnation, or (d) do, or suffer or permit to be done, anything which can or may injuriously affect the registration or enrollment of such Vessel under the laws and regulations of the United States. The Shipowner will at all times keep each of the Vessels duly documented as a United States flag vessel under Chapter 121 of Title 46 of the United States Code, eligible for the trade of the United States in which each applicable Vessel is engaged from time to time.

Section 1.6     Neither the Shipowner, any charterer, the master of any of the Vessels nor any other person has or shall have any right, power or authority to create, incur or permit to be placed or imposed or continued upon any of the Vessels, their respective freights, profits or hire, any Lien, charge or encumbrance whatsoever other than this Mortgage and other Permitted Maritime Liens.

Section 1.7     For each of the Vessels, the Shipowner will place, and at all times and places will retain, a properly certified copy of this Mortgage on board such Vessel with her papers and will cause such certified copy and such Vessel's marine document to be exhibited to any and all persons having business therewith which might give rise to any lien thereon other than Permitted Maritime Liens, and to any representative of the Mortgagee; and the Shipowner will place and keep prominently displayed in the chart room and in the master's cabin of such Vessel, or in the case of a rig, in a prominent place aboard the rig, or in such location as the rig's papers are kept, a framed printed notice in plain type reading as follows:

<u>"NOTICE OF MORTGAGE</u>

This Vessel is covered by an Amended and Restated First Preferred Fleet Mortgage in favor of Wilmington Trust, National Association, as collateral agent. Under the terms of said Mortgage, neither the Shipowner, any charterer, the master of this Vessel nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any lien whatsoever other than Permitted Maritime Liens (as defined in the Amended and Restated First Preferred Fleet Mortgage)."

Section 1.8     Except for this Mortgage and the other Permitted Maritime Liens, for each of the Vessels, the Shipowner will not suffer to be continued any Lien, encumbrance or charge on such Vessel for longer than thirty (30) days; and in due course and in any event within sixty (60) days after the same becomes due and payable, the Shipowner will pay or cause to be discharged or make adequate provision for the satisfaction or discharge of all claims or demands (except to the extent that the same shall concurrently be contested by the Shipowner in good faith by appropriate proceedings if the Shipowner has established and maintained adequate reserves with respect thereto in accordance with GAAP (as defined in the Exchange Agreement)), and the same shall not subject the relevant Vessel, or any part thereof, to sale, forfeiture or loss), or will cause such Vessel to be released or discharged from any Lien, encumbrance or charge therefor.

Section 1.9        For each of the Vessels:

(a)        if a libel or complaint be filed against such Vessel or such Vessel be otherwise attached, arrested, levied upon or taken into custody by any Governmental Authority (as defined in the Exchange Agreement) or any person that purports to be acting on behalf of a Governmental Authority for any cause whatsoever, the Shipowner will promptly notify the Mortgagee by facsimile, confirmed by letter, at its address as specified in this Mortgage, and within thirty (30) days will cause such Vessel to be released and all Liens thereon other than this Mortgage and other Permitted Maritime Liens to be discharged (except to the extent that the claim giving rise to such lien shall concurrently be contested by the Shipowner in good faith by appropriate proceedings if the Shipowner has established and maintained adequate reserves with respect thereto in accordance with GAAP, and the same shall not subject the relevant Vessel, or any part thereof, to sale, forfeiture or loss) and will promptly notify the Mortgagee thereof in the manner aforesaid; and

(b)        if the Shipowner shall fail or neglect to furnish proper security or otherwise to release such Vessel from libel, arrest, levy, seizure or attachment within the time period required by Section 1.9(a) above, the Mortgagee or any person acting on behalf of the Mortgagee may furnish security to release such Vessel and by so doing shall not be deemed to cure the default of the Shipowner unless and until the Shipowner shall have reimbursed the Mortgagee from all costs and expenses (including reasonable attorney's fees) incurred by the Mortgagee or such third party acting at the direction of the Mortgagee in procuring such release, including for any security so furnished.

Section 1.10       For each of the Vessels:

(a)        except while such Vessel is undergoing repairs, maintenance or is in lay- up, the Shipowner will at all times and without cost or expense to the Mortgagee maintain and preserve, or cause to be maintained and preserved, such Vessel (i) in good running order and repair so that such Vessel shall be, insofar as due diligence can make her so, tight, staunch, strong and well and sufficiently tackled, appareled, furnished, equipped and in every respect seaworthy and (ii) in at least as good a working order and condition as when this Mortgage was executed, ordinary wear and tear excepted; and will keep such Vessel, or cause her to be kept, in such condition as will entitle her to such classification rating with the American Bureau of Shipping or other classification society of like standing reasonably acceptable to the Mortgagee (each, a "Classification Society") that companies engaged in the operation of vessels of the same type, size, age and flag as such Vessel maintain respecting their vessels with such Classification Society. Notwithstanding the foregoing, if such Vessel is affected by any partial loss or damage of such Vessel or a portion or component thereof, the Shipowner shall make all necessary repairs and replacements to such Vessel, except where the failure to do so could not reasonably be expected to materially change the value or usefulness of such Vessel;

(b)        such Vessel shall, and the Shipowner covenants that it will, at all times comply with all applicable laws, rules and regulations to the extent set forth in the Exchange Agreement, and such Vessel shall have on board as and when required thereby certificates showing compliance therewith;

(c)        the Shipowner will not make, or permit to be made, any substantial change in the structure, type or speed of such Vessel or change in the rig of such Vessel (i) to the extent such change would be in violation of the provisions of Section 10.24 of the Exchange Agreement, or (ii) if any such change could reasonably be expected to have a material adverse effect on the rights or interest of the Shipowner or the Mortgagee to any insurance which is required under Section 9.2 of the Exchange Agreement; and

(d)      the Shipowner may, in the ordinary course of maintenance, repair or overhaul of such Vessel, remove any item of property constituting a part of such Vessel, provided such item of property is replaced to the extent necessary to maintain such Vessel in the condition required herein or in the Exchange Agreement. Any such replacement item of property shall, without necessity of further act hereunder, become part of such Vessel and subject to this Mortgage.

Section 1.11     The Shipowner will not transfer or change the flag or hailing port of any of the Vessels.

Section 1.12     The Shipowner will not sell, mortgage or transfer any of the Vessels except in accordance with the applicable provisions of the Exchange Agreement. The Shipowner will not charter any of the Vessels on a demise or bareboat basis except in accordance with the applicable provisions of the Exchange Agreement. For any of the Vessels the Shipowner so charters, the Shipowner shall (a) provide Mortgagee a copy of any such charter and all related documents and (b) maintain in favor of Mortgagee a first priority perfected security interest in and lien upon the earnings under the charter agreement and all related rights and the proceeds thereof subject to Permitted Maritime Liens.

Section 1.13     The Shipowner agrees that, if the Shipowner fails to (a) perform covenants or obligations under this Mortgage, including, without limitation, its obligations with respect to insurance, the discharging of Liens, taxes, dues, assessments, governmental charges, fines, penalties lawfully imposed, repairs, reasonable attorneys' fees, and other obligations that are not Permitted Maritime Liens or (b) maintain insurance on each of the Vessels as required by the Debt Documents, the Mortgagee may, but shall not be obligated to, perform the Shipowner's obligations under this Mortgage or arrange for (at the Shipowner's expense and without any responsibility on the Mortgagee's part) the obtaining of the insurance under the Debt Documents, and any reasonable expenses incurred by the Mortgagee in performing the Shipowner's obligations shall be paid by the Shipowner within ten (10) Business Days of demand. Any such performance by the Mortgagee may be made by the Mortgagee in reasonable reliance on any statement, invoice or claim, without inquiry into the validity or accuracy thereof. The amount and nature of any expense of the Mortgagee hereunder shall be conclusively established by a certificate of any officer of the Mortgagee absent manifest error, and such amount shall be included in the Secured Obligations, secured by this Mortgage.

Section 1.14     In the event that at any time and from time to time this Mortgage or any provisions hereof shall be deemed invalidated in whole or in part by reason of any present or future law or any decision of any Governmental Authority, then the Shipowner, forthwith upon the request of the Mortgagee, will execute such other and further assurances and documents as are reasonably requested by the Mortgagee to accomplish the purposes of this Mortgage. From time to time on the reasonable request of the Mortgagee, the Shipowner will furnish to the Mortgagee: (i) such favorable opinions of counsel, including United States legal opinions, in form and substance reasonably satisfactory to the Mortgagee and (ii) such instruments executed by the Shipowner or on its behalf or by any or all officers, members, managers or directors of the Shipowner, in each case, relating to this Mortgage or any of the transactions contemplated hereby, as the Mortgagee may reasonably request.

Section 1.15     In the event of the requisition (whether of title or use), condemnation, sequestration, seizure or forfeiture of any of the Vessels by any Governmental Authority or by anyone else, the Shipowner will give prompt written notice thereof to the Mortgagee, and any payments in respect thereof shall be paid to the Shipowner, and the Shipowner shall cause any such payment to be applied to the Secured Obligations to the extent required, and in accordance with, the terms of the Exchange Agreement.

ARTICLE 2
EVENTS OF DEFAULT AND REMEDIES

Section 2.1     Upon the occurrence and during the continuation of any Event of Default (as defined in the Exchange Agreement), the Mortgagee shall have the right to:

(a)     declare immediately due and payable all of the Secured Obligations (in which case all of the same shall be immediately due), and bring suit at law, in equity or in admiralty, as it may be advised, to recover judgment for the Secured Obligations and satisfy the same out of the Vessels; ·

(b)     exercise all of the rights and remedies in foreclosure with respect to any of the Vessels and otherwise given to mortgagees by the provisions of applicable law, including, but not limited to, the provisions of Chapter 313 of Title 46 of the United States Code and the regulations in effect thereunder from time to time, as amended;

(c)     take and enter into possession of any of the Vessels, at any time, wherever the same may be, without court decision or other legal process and without being responsible for loss or damage, and the Shipowner or other person in possession forthwith upon demand of the Mortgagee shall surrender to the Mortgagee possession of such Vessel or Vessels and the Mortgagee may, without being responsible for loss or damage (except to the extent caused by the Mortgagees gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable judgment), hold, lay-up, lease, charter, operate or otherwise use such Vessel or Vessels for such time and upon such terms as it may deem to be for its best advantage, and demand, collect and retain all hire, freights, earnings, issues, revenues, income, profits, return premiums, salvage awards or recoveries, recoveries in general average, and all other sums due or to become due in respect of such Vessel or Vessels or in respect of any insurance thereon from any person whomsoever, accounting only for the net profits, if any, arising from such use of such Vessel or Vessels and charging upon all receipts from the use of such Vessel or Vessels or from the sale thereof by court proceedings or pursuant to Section 2. 1(e) below, all costs, expenses, charges, damages or losses by reason of such use (including reasonable attorney's fees); and if at any time the Mortgagee shall avail itself of the right herein given it to take possession of such Vessel or Vessels, the Mortgagee shall have the right to dock such Vessel or Vessels for a reasonable time at any dock, pier or other premises of the Shipowner without charge; or to dock them at any other place at the cost and expense of the Shipowner, and the Mortgagee shall have the right to require the Shipowner to deliver, and the Shipowner shall on demand, at its own cost and expense, deliver to the Mortgagee such Vessel or Vessels as demanded; and the Shipowner hereby irrevocably instructs the masters of such Vessel or Vessels so long as this Mortgage is outstanding to deliver such Vessel or Vessels (as the case may be) to the Mortgagee as demanded;

(d)     inspect and make copies of all original class records held by the Classification Society relating to such Vessels; and/or

(e)     without being responsible for loss or damage, other than loss or damage due to its own gross negligence or willful misconduct, sell such Vessel or Vessels, at any place and at such time as the Mortgagee may specify and in such manner and such place (whether by public or private sale) as the Mortgagee may deem advisable (without necessity of bringing such Vessel or Vessels to the place designated for such sale), free from any claim by the Shipowner in admiralty, in equity, at law or by statute, after first giving notice of the time and place of any public sale with a general description of the property in the following manner:

(i)     by publishing such notice for ten (10) consecutive days in a daily newspaper of general circulation published in New York City;

(ii)      if the place of sale should not be New York City, then also by publication of a similar notice in a daily newspaper, if any, published at the place of sale; and

(iii)      by mailing a similar notice to the Shipowner at its last known address on the day of first publication;

(iv)      and notice of the time and place of any private sale by mailing such notice to the Shipowner at its last known address.

Section 2.2     Any sale of any of the Vessels or any interest therein made by the Mortgagee after the occurrence and during the continuance of an Event of Default in pursuance of this Mortgage, whether under the power of sale hereby granted or any judicial proceedings, shall operate to divest all right, title and interest of any nature whatsoever of the Shipowner in and to such Vessel or Vessels or such interest therein sold, as the case may be, and shall bar any claim from the Shipowner, its successors and assigns, and all persons claiming by, through or under them. Any sale may be conducted without bringing the Vessel or Vessels subject of such sale to the place designated for such sale and in such manner as the Mortgagee may deem to be for its best advantage. No purchaser shall be bound to inquire whether notice has been given, or whether any default has occurred, or as to the propriety of the sale, or as to the application of the proceeds thereof. In the case of any such sale, the Mortgagee shall be entitled, to apply the proceeds to the Secured Obligations in accordance with the Exchange Agreement. At any such sale, the Mortgagee may bid for and purchase such property and upon compliance with the terms of sale may hold, retain and dispose of such property without further accountability therefor.

Section 2.3     The Mortgagee is hereby appointed attorney-in-fact of the Shipowner to execute and deliver to any purchaser referred to in Section 2.2, and is hereby vested with full power and authority to make, after the occurrence and during the continuation of an Event of Default, in the name and on behalf of the Shipowner, a good conveyance of the title to such Vessel or Vessels so sold. In the event of any sale of any of the Vessels under any power herein contained, the Shipowner will, if and when required by the Mortgagee, execute such form of conveyance of any such Vessel or Vessels and other related documents as the Mortgagee may specify. The powers and authority granted to the Mortgagee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with no interest.

Section 2.4     The Mortgagee is hereby appointed attorney-in-fact of the Shipowner in the name of the Shipowner to, after the occurrence and during the continuation of an Event of Default, demand, collect, receive, compromise and sue for, so far as may be permitted by law, all freights, hire, earnings, issues, revenues, income and profits of each of the Vessels and all amounts due from underwriters under any insurance thereon as payments of losses or as return premiums or otherwise, salvage awards and recoveries of each of the Vessels, recoveries in general average or otherwise in respect of each of the Vessels, and all other sums in respect of each of the Vessels, due or to become due at the time of the occurrence and during the continuation of any Event of Default, or in respect of any insurance thereon, from any person whomsoever, and to make, give and execute in the name of the Shipowner acquittances, receipts, releases or other discharges for the same, whether under seal or otherwise, and to endorse and accept in the name of the Shipowner all checks, notes, drafts, warrants, agreements and other instruments in writing with respect to the foregoing. The powers and authority granted to the Mortgagee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with an interest.

Section 2.5     Whenever any right to enter and take possession of any of the Vessels accrues to the Mortgagee, it may require the Shipowner to deliver, and the Shipowner shall on demand, at its own cost and expense, deliver to the Mortgagee such Vessel or Vessels as demanded. If any legal proceedings shall be taken to enforce any right under this Mortgage, the Mortgagee shall be entitled as a matter of right to the

appointment of a receiver of such Vessel or Vessels and of the freights, hire, earnings, issues, revenues, income and profits due or to become due and arising from the operation thereof.

Section 2.6     The Shipowner authorizes and empowers the Mortgagee or its appointees or any of them to, after the occurrence and during the continuation of an Event of Default, appear in the name of the Shipowner, its successors and assigns, in any court of any country or nation of the world where a suit is pending against any of the Vessels because of or on account of an alleged Lien against such Vessel from which such Vessel has not been released and to take such proceedings as to them or any of them may deem necessary towards the defense of such suit and the purchase or discharge of such lien, and all reasonable expenditures made or incurred by them or any of them for the purpose of such defense or purchase or discharge shall be a debt due from the Shipowner, its successors and assigns, to the Mortgagee, and shall be secured by the lien of this Mortgage in like manner and extent as if the amount and description thereof were written herein.

Section 2.7     The Shipowner covenants that at any time that any Secured Obligations shall be due and payable (whether by acceleration or otherwise), the same shall be paid in accordance with the Exchange Agreement and the other Debt Documents; and in case the Shipowner shall fail to pay the same when due in accordance with the Exchange Agreement and the other Debt Documents, and that failure constitutes an Event of Default, the Mortgagee shall be entitled to recover judgment for the whole amount so due and unpaid, together with such further amounts as shall be provided by the Exchange Agreement, the other Debt Documents and applicable law. All moneys collected by the Mortgagee under this Section 2.7 shall be applied by the Mortgagee in accordance with the terms of the Exchange Agreement.

Section 2.8     Each and every power and remedy herein given to the Mortgagee shall be cumulative and shall be in addition to every other power and remedy herein given or now or hereafter existing at law, in equity, in admiralty, by statute or under any Debt Document or other agreement, and each and every power and remedy whether herein given or otherwise existing may be exercised from time to time and as often and in such order as may be deemed expedient by the Mortgagee, and the exercise or the beginning of the exercise of any power or remedy by the Mortgagee shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other power or remedy. No delay or omission by the Mortgagee in the exercise of any right or power or in the pursuance of any remedy accruing upon the occurrence and during the continuance of any Event of Default shall impair any such right, power or remedy or be construed to be a waiver of any such right, power or remedy; nor shall the acceptance by the Mortgagee of any security or of any payment of or on account of the Secured Obligations be construed to be a waiver of any right that the Mortgagee may have hereunder after the occurrence and during the continuance of such Event of Default or any other Event of Default; including any subsequent Event of Default of the same or a different nature.

Section 2.9     Reserved.

Section 2.10     In case the Mortgagee shall have proceeded to enforce any right, power or remedy under this Mortgage by foreclosure, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Mortgagee, then and in every such case the Shipowner and the Mortgagee shall be restored to their former positions and rights hereunder with respect to the property subject or intended to be subject to this Mortgage, and all rights, remedies and powers of the Mortgagee shall continue as if no such proceedings had been taken.

Section 2.11     Unless otherwise specified herein, any cash proceeds received by the Mortgagee from the sale of, collection of, or other realization upon, any part of any of the Vessels or related collateral or any other amounts received by the Mortgagee hereunder, including the net earnings of any charter operation or other use of any of the Vessels by the Mortgagee under any of the powers specified in Article

1 and/or Article 2, may be, at the reasonable discretion of the Mortgagee (a) held by the Mortgagee in one or more cash collateral accounts as cash collateral for the Secured Obligations under the terms of the Security Agreement or (b) applied to the Secured Obligations. Amounts applied to the Secured Obligations shall be applied to the payment of the Secured Obligations in the order set forth in the Exchange Agreement. Any surplus cash collateral or cash proceeds held by the Mortgagee after payment in full of the Secured Obligations shall be paid over to the Shipowner or to whomever may be lawfully entitled to receive such surplus.

Section 2.12    Unless and until one or more Events of Default shall occur and be continuing, the Shipowner (a) shall be suffered and permitted to retain actual possession and use of each of the Vessels and (b) to the extent permitted by the Exchange Agreement shall have the right, from time to time, in its discretion, and without application to the Mortgagee, and without obtaining a release thereof by the Mortgagee, to dispose of, free from the Lien hereof, any boilers, engines, generators, pumps and pumping equipment, machinery, masts, spars, sails, rigging, boats, anchors, cables, chains, tackle, outfit, apparel, furniture, fittings, equipment, spares, fuel, stores or any other appurtenances of each of the Vessels, provided such item of property is replaced and such Vessel is maintained in the condition required herein and in the Exchange Agreement, and such replacement item, if any, shall forthwith become subject to the lien of this Mortgage as a first preferred mortgage thereon.

ARTICLE 3
SUNDRY PROVISIONS

Section 3.1    The maximum principal amount that may be outstanding under this Mortgage at any time is US $587,500,000, and for purposes of recording this Mortgage, the total amount of this Mortgage is US $587,500,000, plus Specified Noteholder Fee (if any), Exit Fee (if any), fees, costs, expenses and performance of mortgage covenants. There is no separate discharge amount.

Section 3.2    All of the covenants, promises, stipulations and agreements of the Shipowner in this Mortgage contained shall bind the Shipowner and its successors and permitted assigns and shall be binding on and injure to the benefit of the Mortgagee and its successors and permitted assigns. In the event of any assignment of this Mortgage by the Mortgagee in accordance with the applicable provisions of the Exchange Agreement, the term "Mortgagee" as used in this Mortgage shall be deemed to mean any such successor or permitted assignee.

Section 3.3    Wherever and whenever herein any right, power or authority is granted or given to the Mortgagee, such right, power or authority may be exercised in all cases by the Mortgagee or such agent or agents as it may appoint, and the act or acts of such agent or agents when taken shall constitute the act of the Mortgagee hereunder.

Section 3.4    In the event that any provision of this Mortgage or any of the documents or instruments which may from time to time be delivered hereunder or any provision hereof shall be deemed invalid or unenforceable by reason of any present or future law or any decision of any court of competent jurisdiction, the validity and enforceability of any other provision hereof, or of such documents or instruments, shall not be affected thereby. In any such case, the Shipowner covenants and agrees that, on demand, it will execute and deliver such other and further agreements and/or documents and/or instruments and do such things as the Mortgagee in its sole reasonable discretion may deem to be necessary to carry out the true intent of this Mortgage and such other documents or instruments. Any such invalidity or unenforceability of any provision of this Mortgage, or of such other documents or instruments, in any jurisdiction or nation shall not render such provision invalid or unenforceable under the laws of any other jurisdiction or nation.

Section 3.5      Anything herein to the contrary notwithstanding, it is intended that nothing herein shall waive the preferred status of this Mortgage and that, if any provision of this Mortgage or portion thereof shall be construed to waive the preferred status of this Mortgage, then such provision to such extent shall be void and of no effect and shall cease to be a part of this Mortgage, without affecting the remaining provisions hereof, which shall remain in full force and effect. Nothing herein shall be deemed or construed to subject to the Lien hereof any property other than a vessel eligible for documentation as the term is used in 46 U.S.C. §12102, as amended.

Section 3.6      THIS MORTGAGE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE GENERAL MARITIME LAW OF THE ·UNITED STATES OF AMERICA. THE SHIPOWNER IRREVOCABLY SUBMITS ITSELF TO THE NON-EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, FOR THE PURPOSES OF (AND SOLELY FOR THE PURPOSES OF) ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF, OR RELATING TO, THIS MORTGAGE OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING. MAY BE HEARD IN SUCH NEW YORK STATE OR FEDERAL COURT AND HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE, OR OTHERWISE, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE ABOVE-NAMED COURTS FOR ANY REASON WHATSOEVER, THAT SUCH SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, OR THAT THE VENUE OF SUCH SUIT, ACTION OR PROCEEDING IS IMPROPER, OR THAT THIS MORTGAGE OR THE SUBJECT MATTER HEREOF MAY NOT BE ENFORCED IN OR BY SUCH COURTS. THE SHIPOWNER HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO THE SHIPOWNER AT ITS ADDRESS LISTED IN <u>SECTION 3.11</u> HEREOF. THE SHIPOWNER AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS <u>SECTION 3.6</u> SHALL AFFECT THE RIGHT OF THE MORTGAGEE TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE MORTGAGEE TO BRING ANY ACTION OR PROCEEDING AGAINST THE SHIPOWNER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

Section 3.7      Reserved.

Section 3.8      The term "<u>Dollars</u>" or the symbol "<u>$</u>" as used herein shall mean Dollars in any coin or currency of the United States of America which at the time of payment shall be legal tender for public and private debts.

Section 3.9      <u>Enforcement Expenses; Indemnification</u>.

(a)      <u>Costs and Expenses</u>.[1]  The Shipowner shall reimburse the Mortgagee for any and all reasonable out-of-pocket expenses and fees (including reasonable attorneys', auditors' and accountants' fees), costs, expenses and charges (excluding time charges of attorneys who may be employees of the Mortgagee) incurred by the Mortgagee in connection with the preparation, execution, delivery,

administration, collection and enforcement of this Mortgage and in the audit, analysis, administration, collection, preservation or sale of the Vessels (including the expenses and charges associated with any periodic or special audit of the Vessels) all in accordance with, and to the extent provided in, Section 14.1 of the Exchange Agreement. Any and all costs and expenses incurred by the Shipowner in the performance of actions required pursuant to the terms hereof shall be borne solely by the Shipowner.

(b)      INDEMNIFICATION BY SHIPOWNER. THE SHIPOWNER SHALL INDEMNIFY THE MORTGAGEE (AND ANY SUB-AGENT THEREOF), THE COLLATERAL AGENT, THE NOTEHOLDERS AND THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ADVISORS, SUCCESSORS AND ASSIGNS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES (INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE) INCURRED BY ANY INDEMNITEE OR ASSERTED AGAINST ANY INDEMNITEE BY ANY THIRD PARTY OR BY SHIPOWNER OR ANY OTHER NOTE PARTY ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS MORTGAGE, ANY OTHER DEBT DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER, THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, OR, IN THE CASE OF THE MORTGAGEE (AND ANY SUB-AGENT THEREOF) AND ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ADVISORS, SUCCESSORS AND ASSIGNS ONLY, THE ADMINISTRATION OF THIS MORTGAGE AND THE OTHER SECURITY DOCUMENTS, (II) ANY NEW SENIOR NOTE OR THE USE OR PROPOSED USE OF THE PROCEEDS THEREFROM, (III) ANY PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY ANY NOTE PARTY OR ANY OF THEIR SUBSIDIARIES, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO ANY NOTE PARTY OR OF THEIR SUBSIDIARIES, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, WHETHER BROUGHT BY A THIRD PARTY OR BY THE SHIPOWNER OR ANY OTHER NOTE PARTY, AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES (X) ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NON-APPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR (Y) OTHER THAN IN THE CASE OF THE MORTGAGEE, THE AGENT AND THEIR RESPECTIVE RELATED INDEMNITEES, RESULT FROM A CLAIM BROUGHT BY SHIPOWNER OR ANY OTHER NOTE PARTY AGAINST AN INDEMNITEE FOR BREACH IN BAD FAITH OF SUCH INDEMNITEE'S OBLIGATIONS HEREUNDER OR UNDER ANY OTHER DEBT DOCUMENT, IF SUCH SHIPOWNER, SUCH NOTE PARTY HAS OBTAINED A FINAL AND NON-APPEALABLE JUDGMENT IN ITS FAVOR ON SUCH CLAIM AS DETERMINED BY A COURT OF COMPETENT JURISDICTION.

(c)      All amounts due under this Section 3.9 shall be Secured Obligations and shall be payable not later than ten (10) Business Days after demand therefor. The agreements in this Section shall survive repayment of the other Secured Obligations and all other amounts payable under the Exchange Agreement and the other Debt Documents;

Section 3.10     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE OR ANY OTHER DEBT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS MORTGAGE AND THE OTHER DEBT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 3.11     Notices. [2]   All notices or other communications required or permitted to be made or given hereunder shall be made in writing, in English, and sent to the Shipowner or the Mortgagee as provided in the Exchange Agreement.

Section 3.12     Release of Mortgage, Etc.   The liens, estate and rights hereby granted shall be subject to termination and release in accordance with the terms of the Exchange Agreement, and the parties hereto agree to take the actions required and execute all documents required pursuant to such provision to effectuate such termination and release.

Section 3.13     Amendments.   None of the terms or provisions of this Mortgage may be waived, amended, supplemented or otherwise modified except in accordance with the Exchange Agreement.

Section 3.14     Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable law, the Shipowner shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Mortgage, any other Debt Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any New Senior Note or the use of the proceeds thereof.

Section 3.15     Conflict.   In the event of a direct conflict between this Mortgage and the Exchange Agreement, the Exchange Agreement shall control; provided, however, the Shipowner understands and agrees that this Mortgage sets forth additional covenants, obligations and rights and the Shipowner will use all reasonable efforts to construe the provisions and covenants in this Mortgage as not being in direct conflict with the Exchange Agreement.

Section 3.16     Mortgagee.   Wilmington Trust, National Association has been appointed Collateral Agent for the Secured Parties pursuant to Section 20 of the Exchange Agreement. It is expressly understood and agreed by the parties to this Mortgage that any authority conferred upon the Collateral Agent hereunder is subject to the terms of the delegation of authority made by the Noteholders to the Collateral Agent pursuant to the Exchange Agreement, and that the Collateral Agent has agreed to act (and any successor agent shall act) as such hereunder only on the express conditions contained in the Exchange Agreement with respect to the Secured Parties. The Collateral Agent shall be entitled to the rights, privileges, protections, indemnities and immunities set forth in the Exchange Agreement, all of which are incorporated herein by reference *mutatis mutandis*, in the performance of any of the transactions contemplated by this Mortgage.   Any

successor agent appointed pursuant to the Section 20 of the Exchange Agreement shall be entitled to all the rights, interests and benefits of each agent hereunder.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated First Preferred Fleet Mortgage to be executed effective as of the day and year first above written.

WITNESSES:                                    NAUTICAL SOLUTIONS, L.L.C.


_____       By:_____
Printed Name:_____             Name:
                                                     Title:

_____
Printed Name:_____




WITNESSES:                                    WILMINGTON TRUST, NATIONAL
                                                     ASSOCIATION, as Collateral Agent


_____       By:_____
Printed Name:_____             Name:
                                                     Title:

_____
Printed Name:_____

**ACKNOWLEDGMENT**

STATE OF LOUISIANA          )
                                          ) ss:
PARISH OF LAFOURCHE       )

      BE IT KNOWN that on this ___ day of _____, 2023, before me personally appeared:

                        _____

to me known, who, after being by me duly sworn, did depose and say:

      That he/she is an Authorized Agent of Nautical Solutions, L.L.C., the limited liability company which is described in and which executed the within instrument, that he/she signed his name to the said instrument at the order of the Manager of the said limited liability company and acknowledged the within instrument to be the free act and deed of the said limited liability company.

      IN TESTIMONY WHEREOF, I have hereto set my hand and seal on this day and year first above written.

                        _____

                                   NOTARY PUBLIC

                        Name: _____
                        NOTARY ID/BAR Roll No. _____
                        My Commission Expires_____

**ACKNOWLEDGMENT**

STATE OF _____                                    )
                                                       ) ss:
PARISH/COUNTY OF _____                                )

        BE IT KNOWN that on this ___ day of _____, 2023, before me personally appeared:

                _____

to me known, who, after being by me duly sworn, did depose and say:

        That he/she is an Authorized Agent of Wilmington Trust, National Association, the national banking association which is described in and which executed the within instrument, that he/she signed his name to the said instrument at the order of the _____ of the said national banking association and acknowledged the within instrument to be the free act and deed of the said national banking association.

        IN TESTIMONY WHEREOF, I have hereto set my hand and seal on this day and year first above written. ·

                _____
                            NOTARY PUBLIC

                Name: _____
                NOTARY ID/BAR Roll No. _____
                My Commission Expires_____

SCHEDULE 1
VESSELS

| **Vessel** | **Official No.** |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

## [FORM OF] COLLATERAL ASSIGNMENT OF
## MASTER SERVICES AGREEMENT

THIS COLLATERAL ASSIGNMENT OF MASTER SERVICES AGREEMENT (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, including all attachment and exhibits, this "Collateral Assignment") has been executed and delivered as of [___], 2023, by NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company ("Grantor"), in favor of Wilmington Trust, National Association, as Collateral Agent for itself and for the Noteholders (as defined in the Note Exchange Agreement (as defined below)) (together with its successors and permitted assigns, "Collateral Agent"):

A.      Grantor, on the one hand, and Marine Technologies, L.L.C. and each of the entities listed on Exhibit A of the Master Services Agreement (as defined below) (collectively, "Contractor") have entered into that certain Master Services Agreement dated as of even date hereof (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "Master Services Agreement"), whereby the parties thereto have agreed to certain business service arrangements, upon and subject to the terms and conditions thereof;

B.      Grantor, Nautical Solutions Holding LLC, a Louisiana limited liability company ("Holdings"), Collateral Agent, Wilmington Trust, National Association, in its capacity as administrative agent (together with its successors and permitted assigns, "Agent"), and the Noteholders have entered into that certain Note Exchange Agreement (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "Note Exchange Agreement") dated as of even date herewith; and

C.      As an inducement to the Noteholders to enter into the Note Exchange Agreement, Grantor has agreed to collaterally assign to Collateral Agent, for the benefit of itself and the Noteholders, all of Grantor's rights, title, benefits, and interests with respect to the Master Services Agreement and all products and proceeds thereunder, in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the facts set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor and Collateral Agent hereby agree as follows:

1.      Unless otherwise defined, all capitalized terms in this Collateral Assignment shall have the definition contained in the Note Exchange Agreement.

2.      As security for the full and timely payment and performance by Grantor of its obligations under the Note Exchange Agreement and other Note Documents, Grantor hereby collaterally assigns, pledges, transfers and grants to Collateral Agent a continuing, first priority security interest in and a general lien upon, (i) all of Grantor's now existing or hereafter arising rights, title, benefits, and interests in, to, under or with respect to, the Master Services Agreement, including claims for damages thereunder (collectively, the "Rights and Remedies"), (ii) all products and proceeds thereof, and (iii) all claims for damages thereunder; provided, that, except as provided in Section 3 below, Collateral Agent shall not exercise such Rights and Remedies

-1-

unless an Event of Default has occurred and is continuing. For the avoidance of doubt, Collateral Agent shall not assume any liabilities or obligations of Grantor under the Master Services Agreement unless the Collateral Agent exercises its Rights and Remedies by becoming a party to the Master Services Agreement.

3.     So long as no Event of Default under the Note Exchange Agreement has occurred and is continuing and the Collateral Agent has not exercised any applicable Rights and Remedies, Grantor will be entitled to exercise such Rights and Remedies diligently and in good faith, in accordance with its reasonable business judgment; provided that, whether prior to or following an Event of Default, the Collateral Agent shall have the option (but not the obligation) to remedy any breach by Grantor of the Master Services Agreement for a period of forty-five (45) days after the Collateral Agent has received notice of such breach (the "Cure Period").

4.     Effective from and after the occurrence of an Event of Default under the Note Exchange Agreement, and until such Event of Default is cured or waived, Grantor hereby irrevocably authorizes and empowers Collateral Agent, in Collateral Agent's sole discretion, to assert, as Collateral Agent may deem proper, either directly or on behalf of Grantor, any of the Rights and Remedies which Grantor may from time to time have under the terms of the Master Services Agreement.

5.     Grantor shall not waive, amend, alter, modify, or terminate the Master Services Agreement or excuse Contractor's non-performance of any material obligation, in each case without the prior written consent of the Collateral Agent (acting at the direction of the Required Holders).

6.     Upon the occurrence of and during the continuance of an Event of Default, Grantor hereby irrevocably constitutes and appoints Collateral Agent as its attorney-in-fact with full power of substitution (in its name or otherwise) to demand, receive and enforce Grantor's rights under the Master Services Agreement, to make payments under the Master Services Agreement, to give appropriate receipts, releases and satisfactions for, and on behalf of, Grantor or, at the option of Collateral Agent, in the name of Collateral Agent, and to do any and all acts in the name of Grantor or in the name of Collateral Agent with the same force and effect as if done by Grantor.

7.     Contractor shall be entitled to rely on written notice received by Contractor from Collateral Agent that there is an Event of Default or that an Event of Default no longer exists. Contractor shall not be charged with knowledge that an Event of Default exists or no longer exists, as the case may be, except upon receipt of written notice thereof from Collateral Agent sent to Contractor in accordance with Section 16.1 of the Master Services Agreement.  Contractor shall be a third party beneficiary of this Section 7.

8.     This Collateral Assignment shall continue in effect until the Note Obligations (other than any contingent indemnification obligations not then due and owing) have been indefeasibly paid and discharged in full and in cash.

9.     Notwithstanding the foregoing, Grantor expressly acknowledges and agrees that it shall remain liable under the Master Services Agreement to observe and perform all of the conditions and obligations in the Master Services Agreement which Grantor is bound to observe

and perform, and that neither this Collateral Assignment, nor any action taken pursuant hereto, shall cause Collateral Agent (or Agent or Noteholders) to be under any obligation or liability in any respect whatsoever to any observance or performance of any of the representations, warranties, conditions, covenants, agreements, or terms of the Master Services Agreement.

10.     This Collateral Assignment may be executed in any number of counterparts, each of which, when so executed and delivered, shall be deemed to be an original.  All of such counterparts shall constitute but one and the same agreement.  This Collateral Assignment shall become effective upon the execution of a counterpart of this Collateral Assignment by each of the parties hereto.

11.     The provisions regarding jury trial waiver, consent to jurisdiction and governing law in the Note Exchange Agreement are incorporated herein by reference and made a part hereof.

*   *   *

*[remainder of this page intentionally left blank]*

*   *   *

IN WITNESS WHEREOF, this Collateral Assignment has been executed and delivered as of the date first set forth above.

Grantor:

**NAUTICAL SOLUTIONS, L.L.C.**

By:_____
Name:
Title:

Collateral Agent:

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

By:_____
Name:
Title:

**EXHIBIT D-1**

**Redline to the New Senior Secured Notes Documents Filed on February 14, 2023**

NAUTICAL SOLUTIONS, L.L.C.

$[587,500,000.00]

Senior Secured Notes, due [•]February 24,
2028

_____

NOTE EXCHANGE AGREEMENT

Dated [•]February 24, 2023

The amount of Notes on the closing date will be $587,500,000 minus the cash sweep.

# TABLE OF CONTENTS

**Page**

**SECTION 1 AUTHORIZATION OF NOTES.** ................................................................1

**SECTION 2 EXCHANGE OF NOTES.** ....................................................................2
    Section 2.1.    Exchange of Notes ...............................................................2

**SECTION 3 CLOSING.** ...........................................................................................2

**SECTION 4 CONDITIONS TO CLOSING.** .............................................................2
    Section 4.1.    Representations and Warranties ...........................................2
    Section 4.2.    Performance; No Default; No Material Adverse Effect ......2
    Section 4.3.    Compliance Certificates .......................................................2
    Section 4.4.    Opinions of Counsel ............................................................3
    Section 4.5.    Exchange Permitted By Applicable Law, Etc ....................3
    Section 4.6.    Payment of Fees and Expenses ...........................................3
    Section 4.7.    Private Placement Number ...................................................3
    Section 4.8.    Changes in Corporate Structure ..........................................3
    Section 4.9.    Excess Cash Payment; Interest ...........................................3
    Section 4.10. Certain Documents ............................................................5
    Section 4.11. Bankruptcy Matters ..........................................................8
    Section 4.12. Possession of Consents, Permits, Licenses, Etc ...............8
    Section 4.13. Equity Contribution ..........................................................8
    Section 4.14. Proceedings and Documents .............................................8
    Section 4.15. Tax Status .........................................................................8

**SECTION 5 REPRESENTATIONS AND WARRANTIES OF THE NOTE PARTIES.** ....8
    Section 5.1.    Organization; Power and Authority .....................................8
    Section 5.2.    Authorization, Etc ...............................................................9
    Section 5.3.    Disclosure ............................................................................9
    Section 5.4.    Organization and Ownership of Shares of Subsidiaries; Affiliates ....9
    Section 5.5.    Financial Statements; Material Liabilities .........................10
    Section 5.6.    Compliance with Laws, Other Instruments, Etc ...............10
    Section 5.7.    Governmental Authorizations, Etc .....................................11
    Section 5.8.    Litigation; Observance of Agreements, Statutes and Orders ....11
    Section 5.9.    Taxes ..................................................................................11
    Section 5.10. Title to Property; Leases .................................................11
    Section 5.11. Intellectual Property; Licenses .......................................11
    Section 5.12. Compliance with ERISA .................................................12
    Section 5.13. Private Offering by the Company ....................................12
    Section 5.14. Use of Proceeds; Margin Regulations ............................13
    Section 5.15. Existing Indebtedness; Future Liens ..............................13
    Section 5.16. Foreign Assets Control Regulations, Etc ........................13
    Section 5.17. Status under Certain Statutes ..........................................14
    Section 5.18. Environmental Matters .....................................................14
    Section 5.19. Chief Executive Office ....................................................15
    Section 5.20. No Encumbrances ............................................................15
    Section 5.21. Validity of Security Documents ......................................15
    Section 5.22. Other Matters ..................................................................16

i

Section 5.23. Title to Mortgaged Vessels ................................................................16
Section 5.24. Fiscal Year .........................................................................................16
Section 5.25. Citizenship .........................................................................................16
Section 5.26. Solvency .............................................................................................16
Section 5.27. Transactions with Affiliates ...............................................................16
Section 5.28. Separate Legal Existence of the Note Parties .....................................17
Section 5.29. Charter Agreements, Etc ....................................................................17
Section 5.30. [Reserved] ..........................................................................................17
Section 5.31. Employment Matters ..........................................................................17
Section 5.32. Affected Financial Institutions ..........................................................17
Section 5.33. [Reserved] ..........................................................................................17
Section 5.34. No Burdensome Restrictions ..............................................................17
Section 5.35. Ownership of the Company .................................................................17

**SECTION 6 REPRESENTATIONS OF THE NOTEHOLDERS.** .......................**18**
Section 6.1.      Acquisition for Investment ...........................................................18
Section 6.2.      Exchanged Debt ..............................................................................18

**SECTION 7 INFORMATION AS TO COMPANY.** ...........................................**18**
Section 7.1.      Financial and Business Information ................................................18
Section 7.2.      Officer's Certificate ........................................................................24
Section 7.3.      Visitation .........................................................................................24
Section 7.4.      Electronic Delivery .........................................................................25

**SECTION 8 PAYMENT AND PREPAYMENT OF THE NOTES.** ....................**26**
Section 8.1.      Mandatory Payments and Prepayments; Interest; Fees .................26
Section 8.2.      Optional Prepayments .....................................................................28
Section 8.3.      [Reserved] .......................................................................................28
Section 8.4.      [Reserved] .......................................................................................28
Section 8.5.      Pro Rata Payments; Payments Generally ........................................29
Section 8.6.      Maturity; Surrender, Etc .................................................................30
Section 8.7.      Purchase of Notes ...........................................................................30
Section 8.8.      Exit Fee ...........................................................................................30
Section 8.9.      Cash Sweep ......................................................................................30
Section 8.10. [Reserved] ...........................................................................................30
Section 8.11. Taxes ...................................................................................................30

**SECTION 9 AFFIRMATIVE COVENANTS** ......................................................**34**
Section 9.1.      Compliance with Laws ....................................................................34
Section 9.2.      Insurance .........................................................................................34
Section 9.3.      Maintenance of Properties ..............................................................40
Section 9.4.      Payment of Taxes and Claims .........................................................40
Section 9.5.      Existence, Etc ..................................................................................40
Section 9.6.      Books and Records ..........................................................................41
Section 9.7.      Operations .......................................................................................41
Section 9.8.      Further Assurances ..........................................................................41
Section 9.9.      [Reserved] .......................................................................................41
Section 9.10. Classification of Vessels ......................................................................41
Section 9.11. New Vessels .........................................................................................42
Section 9.12. Citizenship ...........................................................................................42
Section 9.13. Delivery of Vessel Certificates and Notices of Assignments of Insurance .42

Section 9.14. Covenant to Secure Notes Equally................................................42
Section 9.15. Documentation of Affiliate Transactions......................................42
Section 9.16. Allocation of Indirect Operating Expenses...................................42
Section 9.17. Compliance with Charter Agreement............................................43
Section 9.18. Restrictions on Charterers of Vessels............................................43
Section 9.19. [Reserved].....................................................................................43
Section 9.20. Manager's Undertakings...............................................................43
Section 9.21. Vessel Sales..................................................................................43
Section 9.22. Material Agreements.....................................................................44
Section 9.23. Anti-Corruption Policies..............................................................44
Section 9.24. Material Contracts........................................................................44

**SECTION 10 NEGATIVE COVENANTS.**........................................................**45**
Section 10.1. Transactions with Chouest Affiliates...........................................45
Section 10.2. Merger, Consolidation, Etc..........................................................45
Section 10.3. Line of Business...........................................................................45
Section 10.4. Terrorism Sanctions Regulations.................................................45
Section 10.5. Liens.............................................................................................46
Section 10.6. Financial Covenants.....................................................................47
Section 10.7. Indebtedness.................................................................................47
Section 10.8. Issuance of Company Preferred Stock and Subsidiary Stock; Limitation
                     on Subsidiary Assets..................................................................48
Section 10.9. Investments, Loans.......................................................................48
Section 10.10. Acquisitions................................................................................48
Section 10.11. Restricted Payments...................................................................48
Section 10.12. Asset Sales..................................................................................48
Section 10.13. Sale and Lease-Back Transactions.............................................49
Section 10.14. Sales of Receivables; Pledge or Sale of Current Assets.............49
Section 10.15. Limitation on Certain Restrictive Agreements...........................49
Section 10.16. ERISA Compliance.....................................................................49
Section 10.17. Change of Flag and location of Mortgaged Vessels....................50
Section 10.18. Compliance with Charter Agreements and other Material Contracts.....50
Section 10.19. Restrictions on Charterers of Vessels.........................................50
Section 10.20. Deposit Accounts........................................................................50
Section 10.21. Most Favored Lender Status.......................................................51
Section 10.22. Use of Proceeds..........................................................................51
Section 10.23. Repayments to Chouest Affiliates...............................................51
Section 10.24. Capital Expenditure....................................................................51
Section 10.25. Anti-Corruption Laws and Economic Sanctions........................51
Section 10.26. Passive Holding Company..........................................................51

**SECTION 11 EVENTS OF DEFAULT**..............................................................**52**
Section 11.1. Events of Default..........................................................................52
Section 11.2. Right to Cure.................................................................................55

**SECTION 12 REMEDIES ON DEFAULT, ETC**..................................................**55**
Section 12.1. Acceleration..................................................................................55
Section 12.2. Other Remedies.............................................................................56
Section 12.3. Rescission.....................................................................................56
Section 12.4. No Waivers or Election of Remedies, Expenses, Etc...................56
Section 12.5. Application of Funds.....................................................................57

**SECTION 13 REGISTRATION; EXCHANGE; SUBSTITUTION OF NOTES.** ........ **57**
    Section 13.1. Registration of Notes ................................................................. 57
    Section 13.2. Transfer and Exchange of Notes ............................................. 57
    Section 13.3. Replacement of Notes ............................................................. 59
    Section 13.4. Agent ....................................................................................... 59

**SECTION 14 EXPENSES, ETC** ........................................................................ **59**
    Section 14.1. Transaction Expenses ............................................................. 59
    Section 14.2. Survival ................................................................................... 60

**SECTION 15 SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT.** ........................................................................ **60**

**SECTION 16 AMENDMENT AND WAIVER.** ................................................. **61**
    Section 16.1. Requirements ........................................................................... 61
    Section 16.2. Solicitation of Noteholders ..................................................... 62
    Section 16.3. Binding Effect, etc .................................................................. 63
    Section 16.4. Notes Held by Company, etc ................................................... 63

**SECTION 17 NOTICES.** ................................................................................... **63**

**SECTION 18 REPRODUCTION OF DOCUMENTS.** ...................................... **64**

**SECTION 19 CONFIDENTIAL INFORMATION** ........................................... **64**

**SECTION 20 AGENTS** ..................................................................................... **65**
    Section 20.1. Authorization and Action ........................................................ 65
    Section 20.2. Agent's Reliance, Indemnification, Etc ................................... 67
    Section 20.3. Posting of Communications ..................................................... 69
    Section 20.4. Successor Agent and Collateral Agent .................................... 70
    Section 20.5. Acknowledgment of Noteholders ........................................... 71
    Section 20.6. Collateral Matters ................................................................... 71
    Section 20.7. Credit Bidding ......................................................................... 72
    Section 20.8. Certain ERISA Matters ........................................................... 73
    Section 20.9. Erroneous Payment ................................................................. 74
    Section 20.10. Indemnification of Agents ..................................................... 75

**SECTION 21 [RESERVED].** ............................................................................. **76**

**SECTION 22 MISCELLANEOUS.** ................................................................... **76**
    Section 22.1. Successors and Assigns ........................................................... 76
    Section 22.2. Accounting Terms .................................................................... 76
    Section 22.3. INDEMNIFICATION ............................................................. 76
    Section 22.4. Severability ............................................................................. 78
    Section 22.5. Construction, etc ..................................................................... 78
    Section 22.6. Counterparts ............................................................................ 78
    Section 22.7. Governing Law ........................................................................ 78
    Section 22.8. Jurisdiction and Process; Waiver of Jury Trial ....................... 78
    Section 22.9. Press Release; Public Offering Materials ................................ 79
    Section 22.10. Acknowledgment Regarding Any Supported QFCs ............. 79

Section 22.11. Acknowledgment and Consent to Bail-In of Affected Financial
           Institutions .................................................................................. 80
      Section 22.12. Tax Treatment ................................................................... 80

| | |
|---|---|
| SCHEDULE A | INFORMATION RELATING TO NOTEHOLDERS |
| SCHEDULE B | DEFINED TERMS |
| SCHEDULE C | Mortgaged Vessels |
| SCHEDULE 4.10(g) | Exchanged Debt |
| SCHEDULE 4.10(k) | Deposit Accounts Subject to Control Agreements |
| SCHEDULE 5.4 | Note Parties; Subsidiaries; Affiliates; Directors and Senior Officers |
| SCHEDULE 5.5 | Financial Statements |
| SCHEDULE 5.15 | Existing Indebtedness |
| SCHEDULE 5.27 | Transactions with Affiliates |
| SCHEDULE 10.9 | Existing Investments |
| SCHEDULE 10.20 | Deposit Accounts Not Subject to Control Agreements |
| EXHIBIT A | Form of Senior Secured Note, due [•]February 24, 2028 |
| EXHIBIT B | Form of Assignment of Charters and Hire by the Company |
| EXHIBIT C | |
| EXHIBIT D | Form of Assignment of Charters and Hire by a Chouest Corporate Affiliate |
| EXHIBIT E | Form of Assignment of Insurances |
| EXHIBIT F | Form of Fleet Mortgage |
| | Form of Security Agreement |
| EXHIBIT G | |
| EXHIBIT H EXHIBIT I EXHIBIT J EXHIBIT K-1 | Form of Supplement to the Fleet Mortgage |
| EXHIBIT K-2 | Form of Monthly Reporting |
| | Form of Support Agreement |
| EXHIBIT L | |
| | Form of Master Services Agreement |
| | Form of Know-How Agreement |
| | Form of NAS License Agreement |
| | Form of Pledge Agreement (Holdings) |

EXHIBIT M                          Form of Financial Statement Compliance Certificate

EXHIBIT N                          Form of Assignment and Acceptance Agreement

EXHIBIT O              —           Form of Assignment of First Preferred Fleet Mortgage

EXHIBIT P                          Form of Amended and Restated First Preferred Fleet Mortgage

EXHIBIT Q                          Form of Collateral Assignment of Master Services Agreement

NAUTICAL SOLUTIONS, L.L.C.
16201 East Main St.
Cut Off, Louisiana 70345

Senior Secured Notes, due [——]February 24, 2028

[→]February 24, 2023

TO EACH OF THE NOTEHOLDERS LISTED IN
SCHEDULE A HERETO:

Ladies and Gentlemen:

Nautical Solutions, L.L.C., a Louisiana limited liability company (the "**Company**") and Nautical Solutions Holdings, LLC, a Louisiana limited liability company ("**Holdings**"), agree with each of the Noteholders and Wilmington Trust, National Association, as the administrative agent (in such capacity, together with its successors and permitted assigns in such capacity, the "**Agent**") and as Collateral Agent as follows:

**SECTION 1 AUTHORIZATION OF NOTES.**

Upon the terms and subject to the conditions set forth in (i) the Existing Credit Agreement, the Company amended and restated the Exchanged Term Loan on December 7, 2018 with the principal balance outstanding at such time of $502,225,010.68, (ii) the Series A Note Purchase Agreement, the Company amended and restated its Exchanged Series A Notes on December 7, 2018 with the principal balance outstanding at such time of $365,254,552.95, and (iii) the Series B Note Purchase Agreement, the Company amended and restated its Exchanged Series B Notes on December 7, 2018 with the principal balance outstanding at such time of $91,313,638.24.

Upon the terms and subject to the conditions set forth in this Agreement, the Company will acquire and will immediately, automatically and irrevocably cancel and extinguish all Exchanged Debt from the Noteholders in exchange for the Notes. Immediately following the effectiveness of this Agreement and the Closing, (i) all Obligations under, and as defined in, the Existing Credit Agreement, and all Note Obligations under, and as defined in, the Series A Note Purchase Agreement and Series B Note Purchase Agreement, as applicable, shall be deemed irrevocably satisfied and paid in full and (ii) the Existing Credit Agreement, the Series A Note Purchase Agreement and the Series B Note Purchase Agreement and all Loan Documents (as defined in the Existing Credit Agreement) and all Note Documents (as defined in the Series Note Purchase Agreement and the Series B Note Purchase Agreement) entered into pursuant thereto shall be automatically and irrevocably terminated; provided that, the Mortgage (as defined in the Existing Credit Agreement)/Fleet Mortgage (as defined in each of the Series A Note Purchase Agreement and the Series B Note Purchase Agreement) and any rights and obligations under the Existing Credit Agreement, the Series A Note Purchase Agreement, the Series B Note Purchase Agreement, all Loan Documents (as defined in the Existing Credit Agreement) and all Note Documents (as defined in the Series Note Purchase Agreement and the Series B Note Purchase Agreement) entered into pursuant thereto and each collateral document entered into pursuant thereto that, in each case, by its terms expressly survive the termination of such document shall remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the termination of the Existing Credit Agreement, the Series A Note Purchase Agreement, the Series B Note Purchase Agreement, or the entry into the Assignment of First Preferred Fleet

Mortgage and the Amended and Restated First Preferred Fleet Mortgage to be executed contemporaneously therewith.

The Company has authorized the issuance and transfer to the Noteholders of $[587,500,000] aggregate principal amount of its Senior Secured Notes, due on [•]February 24, 2028 under this Agreement (as amended, restated or otherwise modified from time to time pursuant to Section 16 and including any such notes issued in substitution therefor pursuant to Section 13, the "**Notes**"). The Notes shall be substantially in the form set out in Exhibit A hereto. Certain capitalized and other terms used in this Agreement are defined in Schedule B hereto; and references to a "Schedule" or an "Exhibit" are, unless otherwise specified, to a Schedule or an Exhibit attached to this Agreement. References to a "Section" are references to a Section of this Agreement unless otherwise specified.

## SECTION 2 EXCHANGE OF NOTES.

**Section 2.1.     Exchange of Notes**. Subject to the terms and conditions of this Agreement, on the Closing Date, the Noteholders hereby tender, severally and not jointly, their respective portion, as set forth on Schedule A, of (a) the Exchanged Term Loan, (b) the Exchanged Series A Notes and (c) the Exchanged Series B Notes (collectively, the "**Exchanged Debt**") to the Company for cancellation in exchange for the issuance and transfer by the Company to the Noteholders, at the Closing provided for in Section 3, of the Notes in the principal amount specified opposite such Noteholder's name in Schedule A (the "**Exchange**"). The Noteholders' obligations hereunder are several and not joint obligations and no Noteholder shall have any liability to any Person for the performance or non- performance of any obligation by any other Noteholder hereunder.

## SECTION 3 CLOSING.

The closing of the exchange described in Section 2.1 (the "**Closing**") shall occur on [•]February 24, 2023 (the "**Closing Date**"). At the Closing (a) each Noteholder shall deliver, cause to be delivered to the Company or shall have been deemed to deliver all right, title and interest in and to its Exchanged Debt free and clear of any Liens, together with any documents of conveyance or transfer that the Company may reasonably deem necessary or desirable to transfer to and confirm in the Company all right, title and interest in and to the Exchanged Debt, and (b) Company will deliver to each Noteholder the Notes to be issued and transferred to such Noteholder in the form of a single Note (or such greater number of Notes in denominations of at least $100,000 as such Noteholder may request) dated the Closing Date and registered in such Noteholder's name (or in the name of its nominee), in exchange for the Exchanged Debt of such Noteholder.

## SECTION 4 CONDITIONS TO CLOSING.

Each Noteholder's obligation to exchange the Exchanged Debt for the Notes to be received by such Noteholder hereunder at the Closing is subject to the fulfillment or waiver by the Required Consenting Creditors (as defined in the Restructuring Support Agreement), prior to or at the Closing, of the following conditions:

**Section 4.1.     Representations and Warranties**. The representations and warranties of the Note Parties in this Agreement and the other Note Documents shall be correct when made and at the time of the Closing.

**Section 4.2. Performance; No Default; No Material Adverse Effect**. Each Note Party has performed and complied with all agreements and conditions contained in this Agreement and the other Note Documents required to be performed or complied with by it prior to or at the Closing. Before and after

giving effect to the issue and transfer of the Notes (and the deemed application of the proceeds thereof as

contemplated by Section 5.14), no Default or Event of Default shall have occurred and be continuing. No Note Party nor any Subsidiary of the Company shall have entered into any transaction since December 31, 2021 that would have been prohibited by Section 10 had such Section applied since such date. Since the date of the Restructuring Support Agreement, there shall have been no change in the financial condition, operations, business or properties of Holdings, the Company and their Subsidiaries, taken as a whole, except changes that individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect.

Section 4.3.    **Compliance Certificates**.

(a)    *Officer's Certificate*. The Note Parties shall have delivered to the Agent an Officer's Certificate, dated the Closing Date, certifying that the conditions specified in Sections 4.1, 4.2, 4.8 and 4.10(g) and (s) have been fulfilled.

(b)    *Manager's Certificate*. Each Note Party shall have delivered to the Agents a certificate of its managers, dated the Closing Date, certifying as to (i) the resolutions attached thereto and other corporate (or similar) proceedings relating to the authorization, execution and delivery of, as applicable, the Notes, this Agreement and the other Note Documents, (ii) its Organizational Documents as then in effect and (iii) the names, titles and true signatures of the officers of such Note Party who are authorized and will be signing the Note Documents and any other documents to be delivered by such Note Party hereunder or in connection herewith in each case, as applicable.

Section 4.4.    **Opinions of Counsel**. The Agents and the Noteholders shall have received opinions in form and substance satisfactory to the Required Holders, dated the Closing Date (a) from Phelps Dunbar, L.L.P., special Louisiana counsel for the Note Parties, covering such matters incident to the transactions contemplated hereby as the Required Holders or their counsel may reasonably request (and the Note Parties hereby instruct their counsel to deliver such opinion to the Agent and the Noteholders) and (b) from Kirkland & Ellis LLP, special New York counsel for the Note Parties, covering such matters incident to the transactions contemplated hereby as the Agent, the Required Holders or their counsel may reasonably request (and the Note Parties hereby instruct their counsel to deliver such opinion to the Agent for the benefit of the Noteholders).

Section 4.5. **Exchange Permitted By Applicable Law, Etc**. On the Closing Date such Noteholder's acquisition of Notes shall (a) be permitted by the laws and regulations of each jurisdiction to which such Noteholder is subject, without recourse to provisions (such as section 1405(a)(8) of the New York Insurance Law) permitting limited investments by insurance companies without restriction as to the character of the particular investment, (b) not violate any applicable law or regulation (including, without limitation, Regulation T, U or X of the Board of Governors of the Federal Reserve System) and (c) not subject such Noteholder to any tax, penalty or liability under or pursuant to any applicable law or regulation, which law or regulation was not in effect on the date hereof. If requested by such Noteholder, such Noteholder shall have received an Officer's Certificate certifying as to such matters of fact as such Noteholder may reasonably specify to enable such Noteholder to determine whether such purchase is so permitted.

Section 4.6.    **Payment of Fees and Expenses**. Without limiting Section 14.1, the Company shall have paid all documented fees, charges and disbursements of each of the Noteholders party to the Restructuring Support Agreement as of the Closing Date, including all of such Noteholders' Fees and Expenses, the Agent and the Collateral Agent, as reflected in statements rendered to the Company at least one Business Day prior to the Closing.

**Section 4.7. Private Placement Number**. A Private Placement Number issued by Standard & Poor's CUSIP Service Bureau (in cooperation with the SVO) shall have been obtained for the Notes.

**Section 4.8.        Changes in Corporate Structure**. No Note Party shall have changed its jurisdiction of incorporation or formation, as applicable, or been a party to any merger or consolidation or succeeded to all or any substantial part of the liabilities of any other entity, at any time following the date of the most recent financial statements referred to in Schedule 5.5.

**Section 4.9.        Excess Cash Payment; Interest**.

(a)        ~~On the Closing Date, s~~Subject to Section 4.9(b), the Company shall pay directly to the Noteholders, (i) within one (1) Business Day of the Closing Date, an amount equal to the unrestricted balance sheet cash (including amounts received from the Equity Contribution) as of the Closing Date (after payment of or reduction for all agreed closing costs and fees, including the Tax Liability Amount) in excess of $25,000,000 which shall be applied to the principal of the Note Obligations, without premium or penalty and (ii) on the Closing Date, an amount equal to the accrued interest from September 1, 2022 until the Closing Date, pursuant to Section 8.1(b).

(b)        The Closing Date payment provided in Section 4.9(a) shall be determined taking into account an estimate of the Tax Liability Amount as provided in Section 4.9(c), which amount shall be held by ~~the Company~~Holdings in a segregated interest bearing account (the "**Tax Account**") until the determination of the Final Tax Liability Amount. Following the determination of the Final Tax Liability Amount, ~~the Company~~Holdings shall pay the excess (if any) of the amount in the Tax Account over the Final Tax Liability Amount to the Noteholders, pro rata, as a prepayment of principal on the Note Obligations without premium or penalty, and the remaining portion shall be distributed by ~~the Company to Holdings and then by~~ Holdings to the Members of Holdings to assist in the payment of each such Member's respective portion of the Final Tax Liability Amount; provided, if the Final Tax Liability Amount is greater than the amount in the Tax Account, all funds in the Tax Account shall be distributed by ~~the Company to Holdings and then by~~ Holdings to the Members of Holdings and, further, ~~the Company and then~~ Holdings shall be permitted to make additional distributions in amounts that, in total, equal the difference between the Final Tax Liability Amount and the amount in the Tax Account.

(c)        No later than ten (10) Business Days prior to the Closing Date, the Company shall provide the Noteholders with a written statement reflecting the Company's good faith estimate of the Tax Liability Amount, including reasonably detailed calculations and supporting workpapers. The Company shall incorporate and update the calculations for any reasonable comments from the Noteholders, provided that if the Company and the Required Holders are unable to resolve any dispute with respect to the estimated Tax Liability Amount, such dispute shall not delay or impede the Closing and the Company's estimate (taking into account any agreed changes) shall be used as the estimated Tax Liability Amount. After the end of the year in which the Closing Date occurs and no later than September 15th, the Company shall provide to the Noteholders a written statement setting forth an updated calculation of the Tax Liability Amount based on the actual items of income, gain, loss, deductions and credits of the Members, including reasonably detailed calculation and supporting workpapers (such Tax Liability Amount as finally determined in accordance with this Section 4.9(c), the "**Final Tax Liability Amount**"). The Noteholders shall provide any comments with respect to such calculations within twenty (20) days of the receipt of such statement. If the Company disputes such comments, the Company and Noteholders shall negotiate in good faith to resolve such dispute, and if such dispute cannot be resolved, then the matter shall be submitted to a nationally recognized accounting firm, mutually agreeable to the Company and the Required Holders, to resolve the dispute consistent with this Section 4.9. At or prior to such engagement, the Company and the disputing Noteholders shall submit to the accounting firm such party's computation of the proposed Final Tax Liability Amount. There shall be no ex parte communications with the accounting firm and all written communications to the accounting firm shall be made with copy to the other party, and the accounting firm

shall be directed by each party to copy each other party on any communications. The Final Tax Liability Amount determined by the accounting firm shall in no event be (i) greater than the Company's proposed Final Tax Liability Amount or (ii) less than the proposed Final Tax Liability Amount after taking into account the comments provided by the Noteholders. The decision of the accounting firm shall be final, conclusive and binding on the Parties, absent manifest error. The fees and expenses of the accounting firm shall be paid by the Note Parties.

(d)     The Note Parties shall cooperate with the Noteholders in connection with the determination of the estimated Tax Liability Amount and the Final Tax Liability Amount, including providing any assistance (including access to Company accountants and employees) and information (including documentation) reasonably requested by the Noteholders. For purposes of determining the estimated Tax Liability Amount and the Final Tax Liability Amount, each Member of the Company (or Holdings as a continuation of the Company) and any beneficiary or direct or indirect owner thereof as applicable shall cooperate with the Note Parties and the Noteholders in connection with the determination of such amounts.

**Section 4.10. Certain Documents**. The Agent, the Collateral Agent and/or the Required Holders, as applicable, or in the case of the Notes, each Noteholder, shall have received the following:

(a)     The Note(s) to be provided to each Noteholder pursuant to Section 2.1.

(b)     The Security Agreement and each other Security Document executed by the Note Parties, including the Pledge Agreement executed by Holdings with any certificates representing such equity interests and related stock powers executed in blank.

(c)     A forecast in form and substance reasonably satisfactory to the Required Holders, setting forth the Forecasted Average Annual EBITDA through the term of this Agreement.

(d)     The consent of each Chouest Corporate Affiliate charterer required under Section 9.18 under any applicable Assignment of Charters and Hire.

(e)     The Fleet Mortgage executed by the Company.

(f)     Certificates from the Secretary of State or other appropriate public official as to the continued existence and good standing of the Note Parties in their jurisdiction of formation, dated within five (5) days of the Closing Date.

(g)     Subject to Section 4.10(h), satisfactions or releases of mortgages, including the Release and Reassignment and UCC-3 termination statements and such other instruments as may be required or reasonably requested by the Agent or the Required Holders with respect to the Indebtedness listed on Schedule 4.10(g) in order to evidence the release of Liens and security interests thereunder, such that after giving effect the transactions contemplated by this Agreement, the Note Parties and their Subsidiaries shall have outstanding no Indebtedness other than (a) the Notes, and (b) other Indebtedness permitted pursuant to this Agreement to be incurred or outstanding on the Closing Date.

(h)     Evidence of all such actions as the Required Holders shall reasonably require to perfect the Liens created by the Security Documents, including (i) with respect to the Mortgaged Vessels, the Fleet Mortgage, the Assignment of First Preferred Fleet Mortgage and the Amended and Restated First Preferred Fleet Mortgage, each in proper forms for filing, registration and recording with NVDC, (ii) the delivery to the Collateral Agent of all property with respect to which possession is necessary or desirable for the purposes of perfecting such Liens, (iii) with respect to personal property collateral covered by the

Security Documents, appropriately completed and duly authorized Uniform Commercial Code financing statements in proper form for filing, registration or recording and (iv) to the extent applicable, with respect to Intellectual Property collateral covered by the Security Documents, the filing of appropriately completed and duly authorized filings with the U.S. Patent and Trademark Office and U.S. Copyright Office for the purposes of perfecting, enforcing, maintaining and protecting the Liens created pursuant to the Security Documents.

(i)     Evidence reasonably satisfactory to the Required Holders that the Liens created by the Security Documents constitute legal, valid, binding and enforceable first priority liens in the collateral covered thereby, including, without limitation, a first preferred mortgage lien over the whole of each Mortgaged Vessel and a first priority security interest in all earnings, insurances and requisition compensation of such Mortgaged Vessels and a first priority security interest in all rights under all policies of insurance taken out from time to time in respect thereof (except, in each case, for any liens expressly permitted in the Note Documents), including satisfactory Uniform Commercial Code or other applicable search reports and satisfactory authorizations to file releases of Liens or termination statements with respect to any existing prior liens to be released.

(j)     (i) Standard market letters of undertaking, including, without limitation, certificates of insurance satisfactory to the Required Holders in all respects evidencing the existence of all insurance required to be maintained by Holdings, the Company and its Subsidiaries pursuant to the Note Documents, including, without limitation, in respect of the Mortgaged Vessels, and the names of the companies issuing such insurance, the amounts of coverage, the stated deductibles and expiration dates of such insurance and the risks covered thereby and certificates or opinions of the issuers of such policies or their brokers or agents evidencing the existence of such policies, and that such insurance complies in all respect with the applicable requirements contained in the Note Documents, including Section 9.2, including the fact that there are no mortgagee endorsements, other than those in favor of the Collateral Agent, with respect to the Mortgaged Vessels, together with loss payable endorsements in favor of the Collateral Agent and additional insured endorsements in favor of the Collateral Agent, for the benefit of the Noteholders, and (ii) executed notices of assignment prepared for delivery to each insurance underwriter and broker in respect of each policy of insurance subject to the Assignment of Insurances.

(k)     Control Agreements with respect to each deposit account listed on Schedule 4.10(k), executed by the Collateral Agent, the Company and the applicable financial institution listed on such schedule.

(l)     Copies of each Certificate of Documentation (USCG Form CG- 1270) showing the due registration of each Mortgaged Vessel on the Closing Date in the name of the Company under the laws and the flag of the United States duly endorsed for operation in the United States coastwise or other applicable trade.

(m)     One or more United States Coast Guard Certified Abstracts of Title (USCG Form CG-1332A) and, if required, a Certificate of Ownership (USCG Form CG-1330) for each of the Mortgaged Vessels dated as of a recent date prior to the Closing Date, demonstrating that the Mortgaged Vessels are owned by the Company and that there are on record in the office of NVDC, no mortgages, liens or other encumbrances in respect of any Mortgaged Vessel, except for those mortgage liens securing Exchanged Debt that are being assigned simultaneously with the Closing.

(n)     To the extent available, (i) a Confirmation of Class issued by ABS and dated not more than ten (10) days prior to the Closing Date for each Mortgaged Vessel, indicating that such Mortgaged Vessel is in a class, free of outstanding recommendations or conditions affecting her class and without any overdue surveys, (ii) the most recent valid Certificate of Inspection (USCG Form CG-841) or

Load Line Certificate, as applicable, for each Mortgaged Vessel, indicating that such Mortgaged Vessel is in compliance with all Coast Guard requirements or load line requirements, as applicable, and (iii) the most recent valid ABS Summary Report of Class Survey for each Mortgaged Vessel.

(o)    Such other trading certificates relating to the Mortgaged Vessels or the operation thereof (including, without limitation, a certificate of financial responsibility for each Mortgaged Vessel with respect to which the Company is required under the Oil Pollution Act of 1990, as amended, to obtain such a certificate), as of the Closing Date as may be requested by the Collateral Agent or any Noteholder.

(p)    An Appraisal for each Mortgaged Vessel, which Appraisal shall be made at the sole expense of the Company, and shall be in form and substance reasonably acceptable to the Required Holders.

(q)    Fully executed copies of the Support Agreements which, in each case, shall be in form and substance satisfactory to the Required Holders, shall have become effective in accordance with their respective terms, and shall not have not been terminated, amended or otherwise modified without the approval of the Required Holders.

(r)    A fully executed copy of the Master Services Agreement which shall be in form and substance satisfactory to the Required Holders, shall have become effective in accordance with its terms and shall not have been terminated, amended or otherwise modified without the approval of the Required Holders.

(s)    Fully executed copies of the Asset Sale Agreements which, in each case, shall be in form and substance satisfactory to the Required Holders, shall have become effective in accordance with their respective terms, and shall not have been terminated, amended or otherwise modified without the approval of the Required Holders.

(t)    Fully executed copies of the Intellectual Property Agreements which, in each case, shall be in form and substance satisfactory to the Required Holders, shall have become effective in accordance with their terms, and shall not have been terminated, amended or otherwise modified without the approval of the Required Holders.

(u)    The Restructuring Support Agreement previously delivered to the Noteholders shall not have been terminated, amended or modified except in accordance with the terms thereof, other than termination as a result of the consummation of the transactions contemplated herein.

(v)    Evidence that the Mutual Release is in full force and effect and signed by holders of 100% of the aggregate outstanding principal amount of the loans outstanding under the Existing Credit Agreement, together with a fully executed copy thereof which shall be in form and substance satisfactory to the Required Holders, which has not been amended or otherwise modified without the approval of the Required Holders.

(w)    [Reserved].

(x)    Delivery of (i) documentation and other information as reasonably requested by the Agent, the Collateral Agent or any Noteholder requested at least five (5) Business Days prior to the Closing Date under "know your customer" and anti-money laundering rules and regulations in relation to each Note Party and each Subsidiary that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation and (ii) the Beneficial Ownership Certification in relation to the Company.

(y)     Delivery to the Agent of a duly executed W-9 (or such other applicable tax form) from each of the Note Parties.

(z)     Delivery to the Agents of the fully executed Agent Fee Letter.

**Section 4.11. Bankruptcy Matters**. To the extent this Agreement is effectuated pursuant to the Plan, the Confirmation Order shall be in full force and effect and no stay thereof shall be in effect and the Confirmation Order shall not have been reversed, modified, amended or vacated or any provision contained therein waived. All conditions precedent to the effectiveness of the Plan shall have been satisfied or waived (to the extent such waiver is not materially adverse to the Noteholders) and the effective date under the Plan shall have occurred.

**Section 4.12. Possession of Consents, Permits, Licenses, Etc**. The Note Parties (i) possess all consents, certificates, licenses, permits and other authorizations from governmental political subdivisions or regulatory authorities, and all patents, trademarks, service marks, trade names, copyrights, licenses, and all other rights, that are necessary in any material respect for the ownership, maintenance and operation of their businesses (including the operation of the Mortgaged Vessels), and the Note Parties are not in violation of any such certificates, licenses, permits or other authorizations in any material respect and (ii) have executed and delivered to the Collateral Agent all documentation required to own, maintain and operate the Note Parties' businesses and the Collateral, in each case, in form and substance satisfactory to the Required Holders and consistent with past practice and in the ordinary course in the event of a foreclosure by the Noteholders (and any subsequent third party sale related thereto) in accordance with the terms of this Agreement or the other Note Documents.

**Section 4.13. Equity Contribution**. The contribution of new cash equity investments in the Company in an aggregate amount of net proceeds not less than $10,000,000 from the Company's Affiliates (the "**Equity Contribution**") shall have been consummated.

**Section 4.14. Proceedings and Documents**. All corporate and other proceedings in connection with the transactions contemplated by this Agreement and all documents and instruments incident to such transactions shall be satisfactory to the Required Holders and their counsel, and the Agent, the Required Holders and their counsel shall have received all such counterpart originals or certified or other copies of such documents as the Agent, the Required Holders or their counsel may reasonably request.

**Section 4.15. Tax Status**. (i) Holdings is properly classified as a partnership and treated as a continuation of the Company for U.S. federal and applicable state and local income tax purposes, and (ii) the Company is a wholly owned subsidiary of Holdings classified as an entity disregarded as separate from Holdings for U.S. federal income tax purposes.

**SECTION 5 REPRESENTATIONS AND WARRANTIES OF THE NOTE PARTIES.**

The Note Parties represent and warrant (each as to itself) to each Noteholder on the Closing Date that:

**Section 5.1.     Organization; Power and Authority**. Each Note Party is a limited liability company duly organized or formed, validly existing and in good standing under the laws of the State of Louisiana. Each of the Note Parties is duly qualified as a foreign limited liability company and is in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Note Parties have the limited liability company power and authority to own or hold under lease the properties they own or hold under lease, to

transact the business they transact and propose to transact, to execute and deliver this Agreement, the Notes and the other Note Documents to which they are party and to perform the provisions hereof and thereof and to consummate the Exchange.

Section 5.2.    **Authorization, Etc**. This Agreement, the Notes and the other Note Documents to which a Note Party is a party have been duly authorized by all necessary limited liability company actions on the part of such Note Party, and this Agreement constitutes, and upon execution and delivery thereof each Note and each other Note Document to which such Note Party is a party will constitute, a legal, valid and binding obligation of such Note Party enforceable against such Note Party in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 5.3.    **Disclosure**.

(a)    As of the Closing Date, this Agreement and the documents, certificates or other writings delivered to the Agent, the Collateral Agent or the Noteholders by or on behalf of the Note Parties in connection with the transactions contemplated hereby, and the financial statements listed in Schedule 5.5 herein and delivered to the Agent, the Collateral Agent or any Noteholder prior to the Closing Date (collectively, the "**Disclosure Documents**"), taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading in light of the circumstances under which they were made; provided that any forecast, projections and pro forma financial information contained in such materials are based upon good faith estimates and reasonable assumptions believed by such Note Party to be reasonable at the time made, it being recognized by the Noteholders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results. Except as disclosed in the Disclosure Documents, since December 31, 2021, there has been no change in the financial condition, operations, business, properties or prospects of any Note Party or their Subsidiaries except changes that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. As of the Closing Date, there is no fact known to a Note Party that could reasonably be expected to have a Material Adverse Effect that has not been set forth herein or in the Disclosure Documents.

(b)    Neither Holdings, the Company nor or any Subsidiary is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (a) any material agreement to which it is a party or (b) any agreement or instrument evidencing or governing Indebtedness.

Section 5.4.    **Organization and Ownership of Shares of Subsidiaries; Affiliates**.

(a)    Schedule 5.4 herein contains (except as noted therein) complete and correct lists at the Closing Date of (i) the Note Parties or any of the Note Parties' Subsidiaries, showing, as to each Subsidiary, the name thereof, the jurisdiction of its organization, and the percentage of shares of each class of its capital stock or similar equity interests outstanding owned by the Note Parties and each other Subsidiary, (ii) the Company's Affiliates having net equity of $20,000,000 or more, and (iii) the Note Parties' directors and senior officers.

(b)    All of the outstanding shares of Capital Stock of each Subsidiary shown in Schedule 5.4 herein as being owned by the Note Parties and their Subsidiaries have been validly issued, are

fully paid and nonassessable and are owned by the Company, Holdings or another Subsidiary free and clear of any Lien, except for Liens granted pursuant to the Security Documents.

(c)  Each Subsidiary is a corporation or other legal entity duly organized, validly existing and, where applicable, in good standing under the laws of its jurisdiction of organization, and is duly qualified as a foreign corporation or other legal entity and, where applicable, is in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each such Subsidiary has the corporate or other power and authority to own or hold under lease the properties it purports to own or hold under lease, to transact the business it transacts and proposes to transact, to execute and deliver the Note Documents to which it is a party and to perform the provisions thereof.

(d)  No Subsidiary is party to, or otherwise subject to any legal, regulatory, contractual or other restriction (other than this Agreement, and the agreements listed on Schedule 5.4 herein and customary limitations imposed by corporate law or similar statutes) restricting the ability of such Subsidiary to pay dividends out of profits or make any other similar distributions of profits to a Note Party or any of its Subsidiaries that owns outstanding shares of capital stock or similar equity interests of such Subsidiary.

Section 5.5.  **Financial Statements; Material Liabilities**. The Note Parties have delivered to the Noteholders copies of the financial statements of the Note Parties and their Subsidiaries listed on Schedule 5.5 herein (it being understood that only the financial statements of the Company are available on the Closing Date). All of such financial statements (including in each case the related schedules and notes) fairly present in all material respects the consolidated financial position of the Note Parties and their Subsidiaries as of the respective dates specified in such Schedule and the consolidated results of their operations and cash flows for the respective periods so specified and have been prepared in accordance with GAAP consistently applied throughout the periods involved except as set forth in the notes thereto (subject, in the case of any interim financial statements, to normal year-end adjustments and other adjustments taking into account entering into this Agreement and related transactions). As of the Closing, the Note Parties and their Subsidiaries do not have any Material liabilities that are not disclosed on such financial statements or otherwise disclosed in the Disclosure Documents.

Section 5.6.  **Compliance with Laws, Other Instruments, Etc**. The execution, delivery and performance by the Note Parties of this Agreement, the Notes and the other Note Documents to which it is a party, will not (i) contravene, result in any breach of, or constitute a default under, or result in the creation of any Lien (except as contemplated by the Security Documents) in respect of any property of the Note Parties or any Subsidiary under, any indenture, mortgage, deed of trust, loan, purchase or credit agreement, lease, charter, Organizational Document, or any other agreement or instrument to which the Note Parties or any Subsidiary is bound or by which the Note Parties or any Subsidiary or any of their respective properties may be bound or affected; provided, that consents of the applicable charterers would be required under any Assignment of Charters and Hire, all of which (to the extent required under Section 9.18) have been received as of the date hereof, (ii) conflict with or result in a breach of any of the terms, conditions or provisions of any order, judgment, decree, or ruling of any court, arbitrator or Governmental Authority applicable to any Note Party or any Subsidiary or (iii) violate any provision of any law, statute or other rule or regulation of any Governmental Authority applicable to any Note Party or any Subsidiary.

Section 5.7.  **Governmental Authorizations, Etc**. Except for filings to perfect or to continue the perfection of the Liens created by the Security Documents, no consent, approval or authorization of, or registration, filing or declaration with, any Governmental Authority is required in connection with the execution, delivery or performance by the Note Parties of this Agreement, the Notes or any other Note Document.

**Section 5.8.**     **Litigation; Observance of Agreements, Statutes and Orders**.

(a)     There are no actions, suits, investigations or proceedings pending or, to the knowledge of the Note Parties, threatened against or affecting a Note Party or any Subsidiary or any property of any Note Party or any Subsidiary in any court or before any arbitrator of any kind or before or by any Governmental Authority that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     No Note Party nor any Subsidiary is (i) in default under any term of any agreement or instrument to which it is a party or by which it is bound, (ii) in violation of any order, judgment, decree or ruling of any court, arbitrator or Governmental Authority or (iii) in violation of any applicable law, ordinance, rule or regulation of any Governmental Authority (including, without limitation, Environmental Laws, the USA PATRIOT Act or any of the other laws and regulations that are referred to in Section 5.16), which default or violation could, individually or in the aggregate for all matters addressed by clauses (i) - (iii) above, reasonably be expected to have a Material Adverse Effect.

**Section 5.9.**     **Taxes**. Each Note Party and their Subsidiaries have timely filed all tax returns and reports that are required to have been filed in any jurisdiction, and have timely paid all Taxes required to have been paid by it, except for any Taxes (i) the amount of which is not, individually or in the aggregate, Material or (ii) the amount, applicability or validity of which is currently being diligently contested in good faith by appropriate proceedings and with respect to which the Note Parties or their Subsidiaries, as the case may be, have established adequate reserves in accordance with GAAP on the books of the applicable Note Party or Subsidiary. The charges, accruals and reserves on the books of the Note Parties and their Subsidiaries in respect of Taxes for all fiscal periods are adequate.

**Section 5.10. Title to Property; Leases**. The Note Parties and their Subsidiaries have good and sufficient title to their respective properties that individually or in the aggregate are Material, including all such properties reflected in the most recent audited balance sheet referred to in Section 5.5 herein or purported to have been acquired by the Note Parties or any of their Subsidiaries after such date (except as sold or otherwise disposed of in the ordinary course of business), in each case free and clear of Liens prohibited by this Agreement. All leases that individually or in the aggregate are Material are valid and subsisting and are in full force and effect in all material respects.

**Section 5.11. Intellectual Property; Licenses**.

(a)     The Note Parties and their Subsidiaries own or possess all licenses, permits, franchises, authorizations, patents, copyrights, proprietary software, service marks, trademarks, trade names and other Intellectual Property used in or necessary for the conduct of their respective businesses as currently conducted, and rights thereto, that individually or in the aggregate are Material, in each case without known conflict with the rights of others and free and clear of any Liens except for Liens granted under the Security Documents. All such licenses, permits, franchises, authorizations and Intellectual Property are valid and subsisting and are in full force and effect and are subject to the Intellectual Property Agreements to the extent licensed or serviced by an Affiliate of the Note Parties.

(b)     To the knowledge of the Note Parties, the conduct of the respective businesses (including the products and services) of the Note Parties or any of their Subsidiaries as currently conducted does not, in any Material respect, infringe, misappropriate or otherwise violate any patent, copyright, proprietary software, service mark, trademark, trade name or other Intellectual Property, or rights thereto, owned by any other Person.

(c)     To the knowledge of the Note Parties, there is no Material violation by any Person of any right of the Note Parties or any of their Subsidiaries with respect to any patent, copyright, proprietary software, service mark, trademark, trade name or other Intellectual Property, or rights thereto, owned or used by the Note Parties or any of their Subsidiaries.

(d)     No Chouest Affiliate owns, controls or has any right, title or interest in or to, or has contributed, any Intellectual Property, software, or other technology used in or necessary for the operation of the Vessels, other than the Intellectual Property, technology, and systems licensed to Company pursuant to the Intellectual Property Agreements.

### Section 5.12. Compliance with ERISA.

(a)     The Note Parties and each ERISA Affiliate have operated and administered each ERISA Plan, and each ERISA Plan is, in compliance with all applicable laws except for such instances of noncompliance as have not resulted in and could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. None of the Note Parties nor any ERISA Affiliate have incurred any liability pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans (as defined in section 3 of ERISA), and no event, transaction or condition has occurred or exists that could, individually or in the aggregate, reasonably be expected to result in the incurrence of any such liability by any Note Party or any ERISA Affiliate, or in the imposition of any Lien on any of the rights, properties or assets of any Note Party or any ERISA Affiliate, in either case pursuant to Title I or IV of ERISA or to section 430(k) of the Code or to any such penalty or excise tax provisions under the Code or federal law or section 4068 of ERISA or by the granting of a security interest in connection with the amendment of an ERISA Plan, other than such liabilities or Liens as would not be individually or in the aggregate Material.

(b)     The present value of the aggregate benefit liabilities under each of the ERISA Plans (other than Multiemployer ERISA Plans), determined as of the end of such ERISA Plan's most recently ended plan year on the basis of the actuarial assumptions specified for funding purposes in such ERISA Plan's most recent actuarial valuation report, did not exceed the aggregate current value of the assets of such ERISA Plan allocable to such benefit liabilities. The term "**benefit liabilities**" has the meaning specified in section 4001 of ERISA and the terms "**current value**" and "**present value**" have the meaning specified in section 3 of ERISA.

(c)     The Note Parties and their ERISA Affiliates have not incurred withdrawal liabilities (and are not subject to contingent withdrawal liabilities) under section 4201 or 4204 of ERISA in respect of Multiemployer ERISA Plans that individually or in the aggregate are Material.

(d)     [Reserved].

(e)     The expected postretirement benefit obligation (determined as of the last day of the Note Parties' most recently ended fiscal year in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 715-60, without regard to liabilities attributable to continuation coverage mandated by section 4980B of the Code) of Note Parties and their subsidiaries individually or in the aggregate is not Material.

### Section 5.13. Private Offering by the Company. Neither the Company nor anyone acting on the Company's behalf has offered the Notes or any similar Securities for sale to, or solicited any offer to buy any of the same from, or otherwise approached or negotiated in respect thereof with, any Person other than the Noteholders, each of which has been transferred the Notes at a private sale for investment. No Note Party nor anyone acting on their behalf has taken, or will take, any action that would subject the

issuance, transfer or sale of the Notes to the registration requirements of section 5 of the Securities Act or to the registration requirements of any Securities or blue sky laws of any applicable jurisdiction.

**Section 5.14. Use of Proceeds; Margin Regulations**. The Company will exchange the Notes for the Exchanged Debt on a cashless basis. The Note Parties are not engaged and will not engage, principally or as one of their important activities, in the business of buying or carrying margin stock or extending credit for the purpose of buying or carrying margin stock, and no part of the proceeds from the transfer of or exchange for the Notes hereunder will be used, directly or indirectly, for the purpose of buying or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System (12 CFR 221), or for the purpose of buying or carrying or trading in any Securities under such circumstances as to involve the Note Parties in a violation of Regulation X of said Board (12 CFR 224) or to involve any broker or dealer in a violation of Regulation T of said Board (12 CFR 220). Margin stock does not constitute more than 2% of the value of the consolidated assets of the Note Parties and their Subsidiaries and the Note Parties do not have any present intention that margin stock will constitute more than 2% of the value of such assets. As used in this Section, the terms "margin stock" and "purpose of buying or carrying" shall have the meanings assigned to them in said Regulation U.

**Section 5.15. Existing Indebtedness; Future Liens**.

(a)     Other than as to the Note Obligations, Schedule 5.15 herein sets forth a complete and correct list of all outstanding Indebtedness of the Note Parties and their Subsidiaries as of the Closing Date (after giving effect to the exchange of the Exchanged Debt) (including descriptions of the obligors and obligees, principal amount outstanding, any collateral therefor and any Guaranties thereof). Other than as to the Exchanged Debt which is to be discharged concurrently with Closing, neither the Note Parties nor any Subsidiary of the Note Parties is in default and no waiver of default is currently in effect, in the payment of any principal or interest on any Indebtedness of the Note Parties or their Subsidiaries, and no event or condition exists with respect to any Indebtedness of the Note Parties nor any Subsidiary of the Note Parties that would permit (or that with notice or the lapse of time, or both, would permit) one or more Persons to cause such Indebtedness to become due and payable before its stated maturity or before its regularly scheduled dates of payment.

(b)     Neither the Note Parties nor any Subsidiary of the Note Parties has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien not permitted by Section 10.5.

(c)     On the Closing Date, neither the Note Parties nor any Subsidiary of the Note Parties is a party to, or otherwise subject to any provision contained in, any instrument evidencing Indebtedness of the Note Parties or any Subsidiary of the Note Parties, any agreement relating thereto or any other agreement (including, but not limited to, its charter or any other organizational document) which limits the amount of, or otherwise imposes restrictions on the incurring of, Indebtedness of the Note Parties, except as disclosed in Schedule 5.15 herein.

**Section 5.16. Foreign Assets Control Regulations, Etc**.

(a)     None of the Note Parties, any Controlled Entity, or any director, officer, or (to the Note Parties' knowledge) employee of the Note Parties or any Controlled Entity, or any vessel owned by the Note Parties or Controlled Entity or, to the knowledge of the Note Parties or any Subsidiary of the Note Parties, any agent of the Note Parties or any Subsidiary of the Note Parties that will act in any capacity in connection with or benefit from the Notes established hereby, is a Blocked Person. Neither the Notes Parties nor any Controlled Entity has been notified that its name or the name of any vessel owned by it appears or may in the future appear on an official list of Persons or vessels that engage in investment or

other commercial activities (i) in Iran or with any Sanctioned Country; (2) with any Blocked Persons; or (iii) otherwise in violation of Economic Sanctions.

(b)      No part of the deemed proceeds from the Exchange for the Notes hereunder constitutes or will constitute funds obtained on behalf of any Blocked Person or will otherwise be used by the Note Parties or any Controlled Entity, directly or knowingly indirectly, (i) in connection with any investment in, or any transactions or dealings with, any Blocked Person or Sanctioned Country in violation of applicable Economic Sanctions, or (ii) otherwise in violation of Economic Sanctions or Anti-Corruption Laws (as defined below).

(c)      Neither the Note Parties nor any Controlled Entity (i) is, or in the last five years has been in material violation of, or is charged with, or convicted of money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes under the Currency and Foreign Transaction Reporting Act of 1970 (otherwise known as the Bank Secrecy Act), the USA PATRIOT Act, any Economic Sanctions, any other United States law or regulation governing such activities or under any other similar laws of any other jurisdiction governing such activities (collectively, "**Anti-Money Laundering/Anti-Terrorism Laws**") or (ii) to the Note Parties' knowledge after making due inquiry, is under investigation by any Governmental Authority for possible violation of Anti-Money Laundering/Anti-Terrorism Laws;

(d)      Neither the Notes Parties nor any Controlled Entity (i) is in material violation of or charged with bribery or any other anti-corruption related activity under any applicable laws, rules or regulation in a U.S. or any non-U.S. country or jurisdiction, including but not limited to, the U.S. Foreign Corrupt Practices Act and the U.K. Bribery Act 2010 (collectively, "**Anti-Corruption Laws**") or (ii) to the Note Parties' knowledge after making due inquiry, is under investigation by any U.S. or non-U.S. Governmental Authority for possible violation of Anti-Corruption Laws;

(e)      No part of the deemed proceeds from the transfer of and exchange for the Notes hereunder will be used, directly or knowingly indirectly, for any improper payments, including bribes, to any Governmental Official or commercial counterparty in order to obtain, retain or direct business or obtain any improper advantage, in each case which would be in violation of, or cause any Noteholder to be in violation of, any applicable Anti-Corruption Laws;

(f)      The Note Parties have implemented and maintains in effect policies and procedures designed to ensure compliance by the Note Parties, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Economic Sanctions, and the Company, its Subsidiaries and their respective officers and directors and, to the knowledge of the Note Parties, their employees and agents (in their capacity as such) are in compliance with applicable Economic Sanctions and not knowingly engaged in any activity that would reasonably be expected to result in the Note Parties being designated as a Blocked Person.

**Section 5.17. Status under Certain Statutes**. Neither the Note Parties nor any Subsidiary of the Note Parties is subject to regulation under the Investment Company Act of 1940, as amended, the Public Utility Holding Company Act of 2005, as amended, the ICC Termination Act of 1995, as amended, or the Federal Power Act, as amended.

**Section 5.18. Environmental Matters**.

(a)      Neither the Note Parties nor any Subsidiary of the Note Parties have knowledge of any claim or has received any notice of any claim, and no ongoing proceeding has been instituted asserting any claim against the Note Parties or any Subsidiary of the Note Parties or any of their respective real

properties now or formerly owned, leased or operated by any of them, alleging any damage to the environment or violation of any Environmental Laws, except, in each case, such as could not reasonably be expected to result in a Material Adverse Effect.

(b)     There is no unresolved claim, public or private, of violation of Environmental Laws or damage to the environment emanating from, occurring on or in any way related to real properties now or formerly owned, leased or operated by any of the Note Parties or any Subsidiary of the Note Parties, except, in each case, such as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(c)     Neither the Note Parties nor any Subsidiary of the Note Parties have stored any Hazardous Materials on real properties now or formerly owned, leased or operated by any of them in a manner which is contrary to any Environmental Law.

(d)     Neither the Note Parties nor any Subsidiary of the Note Parties have disposed of any Hazardous Materials in a manner which is contrary to any Environmental Law.

(e)     All Mortgaged Vessels and other vessels owned or chartered by the Note Parties or any of their Subsidiaries, and all buildings on all real properties now owned, leased or operated by the Note Parties or any of their Subsidiaries are in compliance with applicable Environmental Laws, except where failure to comply could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(f)     The Note Parties and their Subsidiaries have obtained all permits, licenses and other authorizations and have made all filings, registrations and other submittals which are required of them under all Environmental Laws except to the extent the failure to have any such permits, licenses or authorizations or to have made any such filings, registrations or submittals individually and in the aggregate could not reasonably be expected to have a Material Adverse Effect.

Section 5.19. **Chief Executive Office**. The chief executive office and sole principal place of business of the Note Parties and the office where they maintain their records relating to the transactions contemplated by this Agreement and the other Note Documents is located at 16201 East Main Street, Cut Off, Louisiana 70345.

Section 5.20. **No Encumbrances**. The Mortgaged Vessels are free from all encumbrances and liens, maritime or otherwise, or any other debts whatsoever, other than Liens in favor of the Collateral Agent under the Fleet Mortgage and the other Security Documents and liens or other encumbrances that are being released contemporaneously with the Closing and Liens otherwise permitted under Section 10.5.

Section 5.21. **Validity of Security Documents**. Each of the Security Documents creates in favor of the Collateral Agent, for the benefit of the Agents and the Noteholders, a legal, valid and enforceable preferred mortgage lien or security interest in the Mortgaged Vessels and other Collateral described therein provided that consent of (i) the applicable charterer would be required under any Assignment of Charters and Hire (reference being made to Section 5.6 for a related representation and warranty as to consents), (ii) the relevant parties party to the Support Agreement and the Master Services Agreement would be required as to such agreements, which consents have been received, (iii) North American Shipbuilding, L.L.C. would be required as to the NSA License Agreement, which consent has been received and (iv) Marine Technologies would be required to as to the Know-How Agreement, which consent has been received. Upon the filing of the Fleet Mortgage, the Assignment of First Preferred Fleet Mortgage and the Amended and Restated First Preferred Fleet Mortgage with the NVDC, the Uniform

Commercial Code financing statements in the appropriate governmental offices, and (if applicable) Intellectual Property security

agreements with the U.S. Patent and Trademark Office and U.S. Copyright Office, and the giving of the notices contemplated by the Assignment of Insurances, such Liens and security interests on the Collateral granted thereby that may be perfected by such aforementioned filings or recordings shall constitute fully perfected Liens on and security interests in, all right, title and interest of the Company in the Mortgaged Vessels and such other Collateral, in each case prior and superior in right to any Person (subject, as to priority, only to Liens permitted under Section 10.5 that, as a matter of law, would be prior to the Liens of the Collateral Agent), and no further recordings or filings are or will be required in connection with the creation, perfection or enforcement of such security interests and Liens, other than (a) the filing of Supplements to the Fleet Mortgage and the Amended and Restated First Preferred Fleet Mortgage with respect to Mortgaged Vessels acquired after the Closing Date and (b) the filing of continuation statements in accordance with applicable law.

Section 5.22. **Other Matters**. (i) No loss, constructive loss, or requisitioning for use by any Governmental Authority of any of the Mortgaged Vessels has occurred; (ii) no change has occurred in applicable law or regulations thereunder or in interpretations thereof by any regulatory authority which would make it illegal for the Note Parties to enter into any of the transactions contemplated in or by any such document or which would subject the Note Parties to any penalty or other liability as a result of any of the transactions contemplated in or by any such document; (iii) no material adverse change has occurred in the physical condition of the Mortgaged Vessels and each of the Mortgaged Vessels is tight, staunch, strong and well and sufficiently tackled, appareled, furnished and equipped and in every respect seaworthy, in accordance with the specifications, in good working order, condition and repair (normal wear and tear excepted) and without defect in condition, design, operation or fitness for use; and (iv) no default by the Note Parties or any Subsidiary of the Note Parties under any charter of any Mortgaged Vessel has occurred and is continuing.

Section 5.23. **Title to Mortgaged Vessels**. The Company is the sole legal and beneficial owner of each of the Mortgaged Vessels and all of their component parts, and each such Mortgaged Vessel is duly documented in the name of the Company with NVDC, under the laws and flag of the United States, and with a certificate of documentation endorsed to evidence such Mortgaged Vessel's qualification to engage in the United States coastwise or other applicable trades in which it engages.

Section 5.24. **Fiscal Year**. The Note Parties' fiscal year is the twelve months ending December 31 of each year.

Section 5.25. **Citizenship**. The Company is a "citizen of the United States" within the meaning of 46 U.S.C. Section 50501 et seq. eligible to own and document the Mortgaged Vessels in its own name. The Company is also in compliance with the citizenship requirements imposed under the Merchant Marine Act of 1920, as amended, the Merchant Marine Act of 1936, as amended and all other applicable United States laws, qualified to operate the Mortgaged Vessels in the U.S. coastwise trade, to participate in the government programs of the nature participated in by the Company and to receive subsidies.

Section 5.26. **Solvency**. As of the date of Closing, and after giving effect to the transactions contemplated by the Note Documents, the Note Parties and their Subsidiaries, on a consolidated basis, are Solvent.

Section 5.27. **Transactions with Affiliates**. Each transaction between a Note Party, any Subsidiary of the Note Parties, and one or more of their Affiliates complies with the "arm's length" requirements of Section 10.1. As of the Closing Date, there are no transactions or series of related transactions within the last eighteen months preceding the Closing Date between a Note Party or any Subsidiary of the Note Parties, on the one hand, and one or more of their Affiliates, on the other hand, which in the aggregate, have a Fair Market Value of $5,000,000, except as identified on Schedule 5.27.

**Section 5.28. Separate Legal Existence of the Note Parties**. Each Note Party and their Subsidiaries maintain their financial and other records and books of account separate from those of their Affiliates and maintains their assets in a manner that facilitates their identification and segregation from those of their Affiliates. Each Note Party and their Subsidiaries observe all requisite limited liability company or corporate formalities in their dealings with its Affiliates and do not commingle their funds or other assets with those of their Affiliates or maintain joint bank accounts with their Affiliates. Each Note Party and their Subsidiaries do not hold themselves out, or permit themselves to be held out, as having agreed to pay or be liable for the Indebtedness of any Affiliate except pursuant to written Guaranties executed by each Note Party and their Subsidiaries from time to time for the furtherance of their own business objectives.

**Section 5.29. Charter Agreements, Etc**. Each of the charters, contracts of affreightment and other contracts (if applicable) with respect to each Mortgaged Vessel (including each bareboat charter to an Affiliate of the Note Parties and each third-party charter between any Affiliate of the Note Parties and unaffiliated charterers with respect to a Mortgaged Vessel) is in full force and effect and both the Note Parties and the other party or parties to each such charters, contracts of affreightment or other contracts are in full compliance with their respective obligations thereunder, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.30. [Reserved]**.

**Section 5.31. Employment Matters**. As of the Closing Date, there are no strikes, lockouts or slowdowns against the Note Parties, any Subsidiary of the Note Parties or any Relevant Group member pending or, to the knowledge of the Note Parties, threatened. The hours worked by and payments made to employees of the Note Parties, Subsidiaries of the Note Parties and Relevant Group members have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters. All payments due from the Note Parties, any Subsidiary of the Note Parties or any Relevant Group member, or for which any claim may be made against the Note Parties, any Subsidiary of the Note Parties or any Relevant Group member on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Note Parties, such Subsidiary of the Note Parties or such Relevant Group member.

**Section 5.32. Affected Financial Institutions**. No Note Party is an Affected Financial Institution.

**Section 5.33. [Reserved]**.

**Section 5.34. No Burdensome Restrictions**. No Note Party is subject to any Burdensome Restriction except Burdensome Restrictions permitted under Section 10.15.

**Section 5.35. Ownership of the Company**. Gary Chouest and his Immediate Family legally or beneficially own not less than 70% of the ownership interests of Holdings and as of the Closing Date not less than 100% of the ownership interests of Holdings.

**SECTION 6 REPRESENTATIONS OF THE NOTEHOLDERS.**

**Section 6.1.     Acquisition for Investment**.

(a)     Each Noteholder severally represents that it is receiving the Notes for its own account or for one or more separate accounts maintained by such Noteholder or for the account of one or more pension or trust funds and not with a view to the distribution thereof, provided that the disposition of

such Noteholder's or their property shall at all times be within such Noteholder's or their control. Each Noteholder understands that the Notes have not been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Company is not required to register the Notes.

(b)     At the time such Noteholder was offered the Exchange, it was, and at the date hereof it is, either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) not a U.S. person (as defined in Regulation S of the Securities Act), or (iii) an "accredited investor" as defined in Rule 501(a) under the Securities Act.

**Section 6.2.     Exchanged Debt**. Each Noteholder severally represents that it is the sole legal and beneficial owner of the Exchanged Debt being exchanged for the Notes. Such Noteholder has good, valid and marketable title to its Exchanged Debt, free and clear of any Liens (other than pledges or security interests that such Noteholder may have created in favor of a prime broker under and in accordance with its prime brokerage agreement with such broker). Such Noteholder has not, in whole or in part, except as described in the preceding sentence, (a) assigned, transferred, hypothecated, pledged, exchanged or otherwise disposed of any of its Exchanged Debt or its rights in its Exchanged Debt, or (b) given any Person or entity any transfer order, power of attorney or other authority of any nature whatsoever with respect to its Exchanged Debt. Upon such Noteholder's delivery of its Exchanged Debt pursuant to the terms of the Restructuring Support Agreement, such Exchanged Debt shall be free and clear of all Liens created by such Noteholder.

# SECTION 7 INFORMATION AS TO COMPANY.

**Section 7.1.     Financial and Business Information**. The Note Parties shall deliver to each of (i) the Agent for distribution to each Noteholder, (ii) AIG and (iii) Prudential:

(a)     *Quarterly Statements* — within 60 days (or, in respect of last quarterly fiscal period of each fiscal year, 90 days) after the end of each quarterly fiscal period in each fiscal year of the Company, commencing with the quarterly fiscal period ending December 31, 2022 copies of:

(i)     a consolidated balance sheet of the Note Parties and their Subsidiaries as at the end of such quarter, and

(ii)     consolidated statements of income, changes in members' equity and cash flows of the Note Parties and their Subsidiaries, for such quarter and (in the case of the second and third quarters) for the portion of the fiscal year ending with such quarter,

setting forth in each case in comparative form the figures for the corresponding periods in the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP applicable to quarterly financial statements generally, and certified by a Senior Financial Officer as fairly presenting, in all material respects, the financial position of the companies being reported on and their results of operations and cash flows, subject to changes resulting from year-end adjustments;

(b)     *Annual Statements* — within 150 days after the end of each fiscal year of the Company beginning with fiscal year ending December 31, 2022, copies of:

(i)     a consolidated balance sheet of the Note Parties and their Subsidiaries as at the end of such year, and

(ii)     consolidated statements of income, changes in members' equity and cash flows of the Note Parties and their Subsidiaries for such year,

setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP, and accompanied by an opinion thereon (without a "going concern" or similar qualification or exception and without any qualification or exception as to the scope of the audit on which such opinion is based, except this qualification shall not apply for the issuance of an audit in a year of maturity of the Notes) of independent public accountants of recognized national standing, which opinion shall state that such financial statements present fairly, in all material respects, the financial position of the companies being reported upon and their results of operations and cash flows and have been prepared in conformity with GAAP, and that the examination of such accountants in connection with such financial statements has been made in accordance with generally accepted auditing standards, and that such audit provides a reasonable basis for such opinion in the circumstances;

(c)     Information related to Affiliates —

(i)     within 180 days after the end of each fiscal year of (x) Edison Chouest Offshore Worldwide, the ECO Worldwide Annual Report, for which the delivery of an opinion shall not be required, submitted by a financial officer of the ECO Worldwide Companies and (y) each Relevant Group, copies of a balance sheet of each of the Relevant Groups as of the end of such year and the prior fiscal year and statements of comprehensive income, changes in members' equity and cash flows of each of the Relevant Groups for the year then ended, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP (as to the extent required or permitted by GAAP, on a combined or consolidated basis, as applicable), submitted by a financial officer of the ECO Worldwide Companies; provided that if any audited statements of any of the foregoing are available, such audited statements shall be provided; and

(ii)     within 90 days after the end of each fiscal quarter (including the fourth fiscal quarter) of Edison Chouest Offshore Worldwide, a balance sheet and income statement of Edison Chouest Offshore Worldwide as at the end of such quarter, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP (and to the extent required or permitted by GAAP, on a combined or consolidated basis, as applicable); and

(iii)     within 90 days after the end of each fiscal quarter (including the fourth fiscal quarter but within 90 days after that quarter) of each Relevant Group, a balance sheet and income statement of each Relevant Group (on a consolidated basis) as at the end of such quarter, prepared in accordance with GAAP; and

(iv)     within 45 days after the end of each calendar month a monthly utilization report for all vessels owned by Chouest Corporate Affiliates, substantially in the form attached hereto as Exhibit H; and

(v)     within 10 Business Days of any written request by the Required Holders:

(1)     the most recent annual statements of income, balance sheet and, if available, members' equity and cash flows, setting forth in each case in comparative form the figures for the previous fiscal year, all

in reasonable detail, prepared in accordance with GAAP (as to the extent required or permitted by GAAP, on a combined or consolidated basis, as applicable), of any Relevant Group Member or any Chouest Corporate Affiliate which has assets of greater than $10,000,000 or Indebtedness of greater than $10,000,000 submitted by a Senior Financial Officer; provided that if any audited statements of any of the foregoing are available, such audited statements shall be provided; and

(2)      the most recent quarterly statements of income and balance sheet as of the end of the applicable quarter prepared in accordance with GAAP of any Chouest Corporate Affiliate which has assets of greater than $10,000,000 or Indebtedness of greater than $10,000,000 and which is not included in the quarterly reporting provided pursuant to paragraphs (ii) or (iii) above or Section 7.1(a),

in each case as may be reasonably requested by the Agent or any Noteholder; provided, that (y) each such request shall name the specific Relevant Group Member or Chouest Corporate Affiliate(s) and whether annual or quarterly financial statements, or both, are required.

(vi)      within five (5) Business Days of delivery to any agent or lender of a Chouest Corporate Affiliate, each certificate delivered by such Chouest Corporate Affiliate to any such agent or lender during or in respect of any fiscal year or quarter establishing whether such Chouest Corporate Affiliate is or is not in compliance with the requirements set forth in the documents governing the Indebtedness of such Chouest Corporate Affiliate to which such agent or lender is a party; and

(vii) within 90 days after the end of each fiscal year, an updated complete and correct list of Relevant Groups as of the end of such fiscal year.

(d)      *Other Reports* — promptly upon their becoming available, one copy of (i) each financial statement, report, notice or proxy statement sent by the Note Parties or any Subsidiary of the Note Parties to its principal lending banks as a whole, if any (excluding information sent to such banks in the ordinary course of administration of a bank facility such as information relating to pricing and borrowing availability) and (ii) all press releases and other statements made available generally by the Note Parties to the public concerning developments that are Material;

(e)      *Annual Budget* — on or prior to January 30 of each fiscal year of the Company, a management-prepared budget of the Note Parties and their Subsidiaries for (i) such fiscal year with a projected consolidated balance sheet, income statement and cash flow statement for such fiscal year along with projected calculation of financial covenants for such fiscal year, in each case broken out by fiscal quarter, and (ii) the following three years with a projected income statement for such three fiscal years;

(f)      *Notice of Default or Event of Default* — promptly, and in any event within five days after a Responsible Officer of the Note Parties becoming aware (i) of the existence of any Default or Event of Default or that any Person has given any notice or taken any action with respect to a claimed default hereunder, (ii) that any Person has given any notice or taken any action with respect to a claimed default of the type referred to in Section 11.1(f), and (iii) of the existence of any default or event of default under any charter with respect to a Mortgaged Vessel, the Support Agreements, the Master Services Agreement, the Asset Sale Agreement or the Intellectual Property Agreement or that any Person has given any notice or taken any action with respect to a claimed default thereunder, a written notice specifying the

nature and period of existence thereof and what action the Note Parties are taking or propose to take with respect thereto;

(g)  *ERISA Matters* — promptly, and in any event within five days after a Responsible Officer of the Note Parties or any of their Subsidiaries becoming aware of any of the following, a written notice setting forth the nature thereof and the action, if any, that the Note Parties or an ERISA Affiliate proposes to take with respect thereto:

(i)  with respect to any Plan, any reportable event, as defined in section 4043(c) of ERISA and the regulations thereunder, for which notice thereof has not been waived pursuant to such regulations as in effect on the date hereof; or

(ii)  the taking by the PBGC of steps to institute, or the threatening by the PBGC of the institution of, proceedings under section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by the Note Parties or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by the PBGC with respect to such Multiemployer Plan; or

(iii)  any event, transaction or condition that could result in the incurrence of any liability by the Note Parties or any ERISA Affiliate pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans, or in the imposition of any Lien on any of the rights, properties or assets of the Note Parties or any ERISA Affiliate pursuant to Title I or IV of ERISA or such penalty or excise tax provisions, if such liability or Lien, taken together with any other such liabilities or Liens then existing, could reasonably be expected to have a Material Adverse Effect;

(h)  *Notices from Governmental Authority* — promptly, and in any event within 30 days of receipt thereof, copies of any notice to the Note Parties or any Subsidiary of such Note Party from any federal or state Governmental Authority relating to any order, ruling, statute or other law or regulation that could reasonably be expected to have a Material Adverse Effect;

(i)  *Resignation or Replacement of Auditors* — within ten days following the date on which any Note Party's auditors resign or any Note Party elects to change auditors, as the case may be, notification thereof, together with such supporting information as the Required Holders may request;

(j)  *Information Required by Rule 144A* — upon the request of the Agent or any Noteholder (and shall deliver to any qualified institutional buyer designated by such Noteholder), such financial and other information as the Agent or such Noteholder may reasonably determine to be necessary in order to permit compliance with the information requirements of Rule 144A(d)(4) under the Securities Act (or any successor rule) in connection with the resale of Notes, except at such times as such Note Party is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act (for the purpose of this Section 7.1(k), the term "qualified institutional buyer" shall have the meaning specified in Rule 144A under the Securities Act);

(k)  *Private Letter Rating from NRSRO* — at the sole expense of the Company, (x) on or prior to the date which is 45 days after the Closing Date delivery of a private letter rating of the Notes and (y) thereafter on or prior to December 31 of each fiscal year of the Company commencing in 2023, satisfactory evidence from a Rating Agency of a review and re-certification of the private letter rating of the Notes;

(l)      *Appraisals* — on or before November 30th of each calendar year starting with November 30, 2023, an Appraisal with respect to the Mortgaged Vessels; provided that if an Event of Default has occurred and is continuing, the Note Parties shall cause to be delivered to the Agent such additional Appraisals as the Agent or Required Holders may request; provided further that all such Appraisals shall be arranged by, and made at the sole expense of, the Note Parties. Not later than 120 days prior to the required delivery date for an annual Appraisal referenced in the preceding sentence, the Note Parties shall coordinate with the Required Holders regarding the form, substance and basis for such Appraisal;

(m)      *Information Related to Appraisal Value* — together with the delivery of financial statements pursuant to Section 7.1(a) and Section 7.1(b), the Note Parties shall provide documentation, in form and substance satisfactory to the Required Holders, as to the current fair market value based on the most recent Appraisal delivered pursuant to this Agreement, of the Mortgaged Vessels that are secured by a first priority Lien pursuant to the Fleet Mortgage in favor of the Collateral Agent, not subject to any superior charterer Liens as recognized in the 5th Circuit under Mr. Dean (including by way of subordination provision built into the underlying charter)

(n)      *Information Related to Mortgaged Vessels* — promptly after the filing or receiving thereof, (i) copies of all material reports and notices with respect to the Mortgaged Vessels which the Note Parties or any Subsidiary of the Note Parties files with the United States Coast Guard or the United States Maritime Administration or which the Note Parties or any Subsidiary of the Note Parties receives from either of the foregoing entities, (ii) no later than 30 days prior to the date of expiration of any existing insurance policy, updated certificates of insurance, containing the information and endorsements described in Section 4.10(m), (iii) together with the delivery of financial statements pursuant to Sections 7.1(a) and (b), a report listing each Mortgaged Vessel by name and hull number, the general location of such Mortgaged Vessel, the charter customer to whom such Mortgaged Vessel is chartered, a description of the charter (including, if applicable, the schedule number to any master charter agreement) under which such Mortgaged Vessel is currently chartered, the expiration date of each such current charter or schedule and a copy of each such charter or schedule, to the extent not previously delivered to the Agent or Collateral Agent and (iv) any communications related to the amendment, modification or proposed amendment or modification of any of the Support Agreements, Master Services Agreements, Asset Sale Agreement or Intellectual Property Agreement including with respect to the potential inability to perform any of such agreements;

(o)      *Information Related to Laborers, Subcontractors and Materialmen* — upon request of the Agent or any of the Noteholders at any time, and from time to time, affidavits listing all laborers, subcontractors, materialmen, and any other Persons who might or could claim statutory or common law liens, and who are furnishing or have furnished labor or material in connection with the Vessels, or any part thereof, in each case in excess of $100,000 and in the aggregate in excess of $250,000, together with affidavits or other evidence satisfactory to the Required Holders, showing that such parties have been paid all amounts then due for labor and materials furnished. The Note Parties shall furnish to the Agent, at any time and from time to time upon demand by the Agent or any Noteholder, lien waivers bearing a then current date and prepared on a form satisfactory to the Agent or any Noteholder from any such subcontractors or materialmen to whom amounts equal to or exceeding $100,000 are owed, in each case, and $250,000 in the aggregate, as the Agent or the Noteholders may request;

(p)      *Information Related to Sale of Vessels* — upon request by the Agent or any Noteholder at any time, and from time to time, any information or communications relating to any Asset Sale, including sale of Vessels under the Asset Sale Agreement, the PSV Vessel Sale Proceeds and the status of any sales of Vessels to any Affiliates of the Note Parties.

(q)     *Requested Information* — with reasonable promptness, such other data and information relating to the business, operations, affairs, financial condition, assets or properties of the Note Parties or any of their Subsidiaries or their Affiliates relating to the ability of the Note Parties to perform their obligations hereunder, under any Note Document and under the Notes as from time to time may be reasonably requested by any such Noteholder or the Agent;

(r)     *Galliano Marine Indirect Operating Expenses* – within (x) 45 days after the end of each calendar month if such calendar month is neither the end of a fiscal year or fiscal quarter, (y) 60 days after the end of each fiscal quarter which is not the end of a fiscal year and (z) 90 days after the end of each fiscal year, as applicable, (i) a break-down of the amount of indirect operating expenses allocated to the Note Parties or any of their Subsidiaries in accordance with Section 9.16 and to each other Person to which operating expenses are allocated or services provided in such calendar month, including a description of how allocated and calculation of daily rates and (ii) a schedule of the total Indebtedness or other amounts owing by the Note Parties to any Chouest Affiliate or any other Person in connection with such operating expenses;

(s)     *Organizational chart* – at the time of delivery of each Officer's Certificate in accordance with Section 7.2, (i) an updated organizational chart of all Chouest Affiliates, in each case regardless of whether such entity is included in any financial statements of the Relevant Groups but which has assets of greater than $10,000,000 or Indebtedness of greater than $10,000,000, in form and substance satisfactory to the Required Holders, with written certification in such Officer's Certificate that the chart is true and correct or (ii) confirmation in such Officer's Certificate that the organizational chart last delivered pursuant hereto remains true and correct or otherwise certifying the applicable changes;

(t)     *Information on Mortgaged Vessels and vessels* – within (x) 45 days after the end of each calendar month, and promptly upon request at any time by the Agent or any Noteholder, a report listing the jurisdiction in which each Mortgaged Vessel and any other vessel owned by the Note Parties or their Subsidiaries is located, together with the working status of such vessel and any customer, day rate, contract start and end date associated with such vessel, copies of any new charters entered into as well as the other information required to be provided pursuant to Section 9.19 hereof to the extent not previously provided, and such other information as the Agent or any Noteholder requires;

(u)     *Defaults in relation to Affiliate Indebtedness* - promptly, and in any event within five days of a Responsible Officer of the Note Parties becoming aware, notice of the existence of any default (howsoever described) related to payments due and owing, insolvency, bankruptcy events or covenants or any event of default (howsoever described), in each case, in relation to Indebtedness of any Chouest Corporate Affiliate in an amount exceeding $1,000,000;

(v)     *Plan and Forecast* – as soon as available, but in any event no later than 60 days after the end of each fiscal quarter of the Company, a copy of the plan and forecast (including a projected consolidated balance sheet, income statement and cash flow statement and projected calculation of financial covenants) of the Company for each quarter of the upcoming twelve month period (the "**Projections**") in form reasonably satisfactory to the Required Holders;

(w)     *Intercompany Balances* – as soon as available, but in any event no later than 60 days after the end of each fiscal quarter of the Note Parties, a listing of the intercompany balances between (i) a Note Party and each Relevant Group Member and (ii) a Note Party and each Affiliate with balances over $1,000,000 as at the end of such quarter;

(x)     *Accounting Practices* – notice of any material change in accounting or financial reporting practices by the Note Parties or any Subsidiary of any Note Party; and

(y)     *Beneficial Ownership Certification* – notice of any change in the information provided in the Beneficial Ownership Certification delivered to any Noteholder that would result in a change to the list of beneficial owners identified in such certification.

**Section 7.2.     Officer's Certificate**. Each set of financial statements delivered pursuant to Section 7.1(a) or Section 7.1(b) shall be accompanied by a certificate of a Senior Financial Officer substantially in the form of Exhibit M (a "**Financial Statement Compliance Certificate**"):

(a)     *Covenant Compliance* — calculating the ratios of Funded Debt to EBITDA for purposes of determination of the applicable interest rate under Section 8.1(b), and setting forth the information (including detailed certified calculations) that is required to determine whether the Note Parties were in compliance with the requirements of Sections 10.6, 10.7, 10.9, 10.11 and 10.12 during the quarterly or annual period covered by the statements then being furnished (including with respect to such Section, where applicable, certified calculations of the maximum or minimum amount, ratio or percentage, as the case may be, permissible under the terms of such Section, and the certified calculation of the amount, ratio or percentage then in existence). In the event that the Note Parties or any Subsidiary of such Note Party has made an election to measure any financial liability using fair value (which election is being disregarded for purposes of determining compliance with this Agreement pursuant to Section 22.1) as to the period covered by any such financial statement, such Senior Financial Officer's certificate as to such period shall include a reconciliation from GAAP with respect to such election; and

(b)     *Event of Default* — certifying that such Senior Financial Officer has reviewed the relevant terms hereof and has made, or caused to be made, under his or her supervision, a review of the transactions and conditions of the Note Parties and their Subsidiaries from the beginning of the quarterly or annual period covered by the statements then being furnished to the date of the certificate and that such review shall not have disclosed the existence during such period of any condition or event that constitutes a Default or an Event of Default or, if any such condition or event existed or exists (including, without limitation, any such event or condition resulting from the failure of the Note Parties or any Subsidiary of such Note Party to comply with any Environmental Law), specifying the nature and period of existence thereof and what action the Company shall have taken or proposes to take with respect thereto.

(c)     *PSV Vessel Sale Proceeds* — certifying the total PSV Vessel Sale Proceeds received as of the date of such financial statement and the timing of receipt of such PSV Vessel Sale Proceeds for the purposes of calculating the Specified Noteholder Fee pursuant to Section 8.01(c).

**Section 7.3.     Visitation**. The Note Parties shall permit the representatives of each Noteholder:

(a)     *No Default* — if no Default or Event of Default then exists, at the expense of the Note Parties for any such visits not to exceed one per year, of the Agent, the Collateral Agent or any Noteholder, and upon reasonable prior notice to the Note Parties, to visit the principal executive office of the Note Parties, to discuss the affairs, finances and accounts of the Note Parties and their Subsidiaries with the Note Parties' officers, and its independent public accountants, and (with the consent of the Company, which consent will not be unreasonably withheld) to inspect the Collateral (provided that any such inspections of the Collateral are not to unreasonably interfere with the conduct of business) and to visit the other offices and properties of the Note Parties and each Subsidiary or the Affiliates of any Note Party, all at such reasonable times; provided, that with respect to the Affiliates of any Note Party, any visit or discussions required under the foregoing sentence shall be limited to items reasonably related to the business and affairs of the Note Parties or the Collateral; and

(b)     *Default* — if a Default or Event of Default then exists, at the expense of the Note Parties to visit and inspect any of the offices, the Collateral (provided that any such inspections of the

Collateral are not to unreasonably interfere with the conduct of business) or properties of the Note Parties or any Subsidiary or the Affiliates of any Note Party, to examine all their respective books of account, records, reports and other papers, to make copies and extracts therefrom, and to discuss their respective affairs, finances and accounts with their respective officers and independent public accountants (and by this provision the Note Parties authorize said accountants to discuss the affairs, finances and accounts of the Note Parties, its Subsidiaries and the Affiliates of such Note Party), all at such times and as often as may be requested; provided, that with respect to the Affiliates of the Note Parties, any visits, inspections or discussions required under the foregoing sentence shall be limited to items reasonably related to the business and affairs of the Note Parties or the Collateral; and

(c)     *Meeting with Management* — to meet in person or by telephone a Responsible Officer of the Company acceptable to the Required Holders at least once each calendar month and more often if requested by the Agent or any Noteholder to discuss the Company's relationships and negotiations with its customers and the Company's current or new business opportunities. The Agent and any requesting Noteholder and the Company shall coordinate with one another to schedule any such meeting.

Nothing herein constitutes a waiver of attorney-client privilege.

**Section 7.4.    Electronic Delivery**. Financial statements, opinions of independent certified public accountants, other information and Officer's Certificates that are required to be delivered by the Note Parties pursuant to Sections 7.1(a), (b) or (c) and Section 7.2 shall be deemed to have been delivered if the Note Parties satisfies either of the following requirements with respect thereto:

(i)     such financial statements satisfying the requirements of Section 7.1(a) or (b) and related Officer's Certificate satisfying the requirements of Section 7.2 are delivered to the Agent by e-mail or posted by or on behalf of the Note Parties on IntraLinks or any other similar website to which the Agent has free access (provided that the Agent shall promptly make such statements and certificates available to the Noteholders in electronic form via e-mail or IntraLinks or other similar website to which each Noteholder has free access);

provided however, that the Note Parties shall have given the Agent and each Noteholder prior written notice, which may be by e-mail or in accordance with Section 17, of such posting in connection with each delivery, provided further, that upon request of any Noteholder to receive paper copies of such forms, financial statements and Officer's Certificates or to receive them by e-mail, the Note Parties will promptly e-mail them or deliver such paper copies, as the case may be, to such Noteholder.

**SECTION 8 PAYMENT AND PREPAYMENT OF THE NOTES.**

**Section 8.1. Mandatory Payments and Prepayments; Interest; Fees**

(a)     *Amortization*. Commencing on the last Business Day of the first full fiscal quarter after the Closing Date, on the last Business Day of each December, March, June and September prior to the Maturity Date, the Company will repay $2,000,000 in principal amount (or such lesser principal amount as shall then be outstanding) of the Notes at par.

(b)     *Interest*. Accrued interest on each Note shall be payable in arrears on each Interest Payment Date and on the Maturity Date at a rate per annum equal to 9.50% per annum, commencing the Closing Date; provided, that interest shall begin to accrue on each Note at a rate of 8.50% per annum, commencing September 1, 2022, regardless of the Closing Date, and all interest that accrued from September 1, 2022 until the Closing shall be due and payable on the Closing Date to the Noteholders;

<u>provided further that</u>, commencing with the quarter beginning on April 1, 2023 and for each quarter ending thereafter, the interest rate per annum applicable to the Notes for the period from the beginning of such quarter to the next Interest Payment Date shall be the rate set forth across from the ratio of (x) Funded Debt of the Company for the most recently ended period of four consecutive fiscal quarters for which a Financial Statement Compliance Certificate has been delivered to the Agent to (y) EBITDA for such period, as set forth in the Financial Statement Compliance Certificate then most recently delivered to the Agent prior to the commencement of such quarter:

| Ratio of Funded Debt to EBITDA | Rate |
|---|---|
| Greater than or equal to 4.00 to 1.00 | 9.50% |
| Less than 4.00 to 1.00 and greater than or equal to 2.75 | 8.00% |
| Less than 2.75 to 1.00 | 7.50% |

Notwithstanding anything to the contrary contained above in this Section 8.1(b) or elsewhere in this Agreement, if it is subsequently determined that the ratio set forth in any Financial Statement Compliance Certificate delivered to the Agent pursuant to Section 7.2 is inaccurate for any reason and the result thereof is that the Noteholders received interest for any period based on an interest rate that is less than that which would have been applicable had the ratio above been accurately determined, then, for all purposes of this Agreement, the interest rate for any day occurring within the period covered by such Financial Statement Compliance Certificate shall retroactively be deemed to be the relevant percentage as based upon the accurately determined ratio for such period, and any shortfall in the interest or fees theretofore paid by the Company for the relevant period pursuant to this Section 8.1(b) as a result of the miscalculation of the ratio shall be deemed to be (and shall be) due and payable under the relevant provisions of this Section 8.1(b) at the time the interest for such period were required to be paid pursuant to this Section (and shall remain due and payable until paid in full, together with all amounts owing under Section 8.1, in accordance with the terms of this Agreement); provided that, notwithstanding the foregoing, so long as an Event of Default described in Section 11(g) or (h) has not occurred with respect to any Note Party, such shortfall shall be due and payable ten (10) Business Days following the determination described above; provided, further, that to the extent the Financial Statement Compliance Certificate has not been delivered, the Ratio of Funded Debt to EBITDA shall be deemed to be the highest rate set forth above until the Business Day following receipt by the Agent of the applicable Financial Statement Compliance Certificate.

(c)      *Specified Noteholder Fee.* As additional yield to the Noteholders on the Notes and in consideration for the Noteholders exchanging the Exchanged Debt hereunder for the Notes, on the Maturity Date (or such earlier date that the aggregate outstanding principal amount of the Notes is prepaid in full (together with all accrued interest thereon and other outstanding Note Obligations)), the Company shall pay to the Noteholders a fee (the "**Specified Noteholder Fee**") in an amount equal to the Specified Noteholder Fee Amount. The Company will give the Agent written notice of the Accrual End Date not later than one (1) Business Day after the occurrence of clause (i) of the definition of Accrual End Date, which notice shall include the Specified Prepayment Amount and date on which the Specified Prepayment Amount was applied to repay the principal of the Notes.

For purposes of this Section 8.1(c), the following terms shall have the following meanings:

"**Accrual End Date**" means the earlier of (i) the date on which the Specified Prepayment Amount (but no less than the Specified Prepayment Amount) has been applied to reduce the aggregate principal

amount of the Notes and (ii) the Maturity Date (or such earlier or later date on which either the aggregate outstanding principal amount of the Notes is prepaid or repaid in full in cash).

"***Specified Noteholder Fee Amount***" means an amount equal to the amount of interest that would have accrued on the Notes from the Closing Date through and including the Accrual End Date as if interest had been accruing at the Fee Amount Rate and assuming on each Interest Payment Date from the Closing Date through and including the Accrual End Date such interest had been added to the principal of the Notes; provided, however, that if (x) the Specified Prepayment Amount is equal to or greater than $90,000,000, and such Specified Prepayment Amount is applied to repay the principal amount of the Notes on or before the 13-month anniversary of the Closing Date or (y) the aggregate outstanding principal amount of the Notes is prepaid in full (together with all accrued interest thereon and other outstanding Note Obligations) before the 13-month anniversary of the Closing Date, the Specified Noteholder Fee Amount shall be $0.

For the purposes of this agreement, the "***Fee Amount Rate***" shall be equal to 3.00% per annum; provided, however, that if the Specified Prepayment Amount is (a) equal to or greater than $84,000,000 but less than $90,000,000 and (b) such Specified Prepayment Amount is applied to repay the principal amount of the Notes on or before the 15-month anniversary of the Closing Date, the Fee Amount Rate will be adjusted to the lowest applicable percentage per annum set forth in the chart below retroactively from the Closing Date and the Fee Rate Amount for purposes of calculating the Specified Noteholder Fee Amount will be recalculated accordingly:

| | Specified Prepayment Amount | | |
|---|---|---|---|
| **Months from Closing Date** | **Equal to or above $84 million and below $87 million** | **Equal to or above $87 million and below $90 million** | **Equal to or above $90 million** |
| **After 14 months and on or before 15-month anniversary** | 2.50% | 2.00% | 1.50% |
| **After 13 months and on or before 14-month anniversary** | 2.00% | 1.50% | 1.00% |
| **On or before 13-month anniversary** | 1.50% | 1.00% | 0.00% |

As provided in the Notes, (i) the entire unpaid principal balance of the Notes shall be due and payable in cash on the Maturity Date, (ii) all accrued and unpaid interest pursuant to Section 8.1(b) on the principal amount of the Notes prepaid or repaid shall be payable in cash on the date of any prepayment of the principal amount of any Note, including on the Maturity Date and (iii) the Specified Noteholder Fee shall be payable on the Maturity Date (or such earlier date that the aggregate outstanding principal amount of the Notes is prepaid in full (together with all accrued interest thereon and other outstanding Note Obligations)).

(d)       *Vessel Sales*. Promptly upon (and in any event not later than 2 Business Days after) the receipt thereof of Net Cash Proceeds of the Vessel Sale or any other sale of the PSV Vessels described in Section 9.21(a) or any additional Vessel sales as described in Section 9.21(b), the Company will prepay the aggregate principal amount of the Notes in an amount equal to the Net Cash Proceeds of such sale. The Company will give each of the Agent, AIG and Prudential written notice of any mandatory prepayment under this Section 8.1(d) not less than 3 Business Days prior to the date of such prepayment (or such later time as agreed to by the Agent), which notice shall specify the date of such prepayment (which shall be a Business Day) and the aggregate principal amount of the Notes to be prepaid on such date.

(e)     *Default Interest.* Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, the principal amount of all Notes outstanding, and to the extent permitted by applicable law, any due and unpaid interest payments on the Notes or any other unpaid amounts hereunder (other than default interest accruing under this Section 8.1(e)), shall, commencing on the date of the occurrence of such Event of Default, bear interest (including post-petition interest in any proceeding under the bankruptcy code or other applicable bankruptcy laws whether or not allowed in such proceeding) payable in cash on demand at the Default Rate with respect to the Notes to the date of payment to the Agent. Payment or acceptance of the increased rates under this Section 8.1(e) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Agent or any Noteholder.

(f)     *Insurance Proceeds.* No later than five (5) Business Days following the date of receipt by any Note Party or any of its Subsidiaries of any net proceeds in respect of any insurance proceeds received in connection with a Loss Event the Company will prepay the outstanding principal amount of the Notes; provided that so long as no Event of Default shall have occurred and be continuing, if the insurance proceeds received in connection with such Loss Event will be applied as described in Section 9.2(b)(iii)(B)(1) to pay for repairs, liabilities, salvage or other charges and expenses covered by the relevant insurance policies, the Company shall not be required or permitted to prepay the Notes. The Company will give each of the Agent, AIG and Prudential written notice of any mandatory prepayment under this Section 8.1(f) not less than 3 Business Days prior to the date of such prepayment (or such later time as agreed to by the Agent), which notice shall specify the date of such prepayment (which shall be a Business Day), the aggregate principal amount of the Notes to be prepaid on such date, and the interest to be paid on the prepayment date with respect to such principal amount being prepaid.

(g)     *Fees.* The Company shall pay to the Agent and the Collateral Agent for their own account the fees and expenses set forth in the Agent Fee Letter in the amounts and at the times specified therein.

(h)     *Computations of Interest.* All computations of interest for the Notes shall be made on the basis of a year of three hundred sixty-five (365) or three hundred sixty-six (366) days, as the case may be, and actual days elapsed.

**Section 8.2.     Optional Prepayments**. Subject to Section 8.8, the Company may, at its option, upon notice as provided below, prepay at any time all, or from time to time any part of, the Notes, in an aggregate principal amount of the Notes not less than $1,000,000 with respect to each such prepayment (or such principal amount as shall then be outstanding), at 100% of the principal amount so prepaid. The Company will give the Agent written notice of each optional prepayment under this Section 8.2 not less than 3 Business Days prior to the date fixed for such prepayment unless the Company, the Agent and the Required Holders agree to another time period. Each such notice shall specify such date (which shall be a Business Day), the aggregate principal amount of the Notes to be prepaid on such date, the principal amount of each Note held by such Noteholder to be prepaid (determined in accordance with Section 8.5), and the interest to be paid on the prepayment date with respect to such principal amount being prepaid.

**Section 8.3.     [Reserved]**.

**Section 8.4.     [Reserved]**.

**Section 8.5. Pro Rata Payments; Payments Generally**.

(a)     Each Note Party shall make each payment required to be made under this Agreement (whether of principal, interest or fees or otherwise) prior to 2:00 p.m., New York City time, on

the date when due, in immediately available funds, without setoff, recoupment or counterclaim. Any amounts received after such time on any date may, in the discretion of the Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Agent at the Agent's account designated by the Agent from time to time and except that payments pursuant to Sections 8.11, 14 and 22.3 shall be made directly to the Persons entitled thereto. The Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Unless otherwise provided for herein, if any payment under this Agreement shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day without including the additional days elapsed in the computation of the interest payable on such succeeding Business Day. All payments under this Agreement shall be made in Dollars.

(b)     If at any time insufficient funds are received by and available to the Agent to pay fully all amounts of principal, interest, fees and any other amounts then due under this Agreement, such funds shall be applied (i) first, towards the payment of fees, expenses and indemnities then owed to the Agents hereunder, (ii) second, toward the payment of interest and fees (other than the Exit Fee) ratably among the Noteholders in accordance with the amounts of interest and fees then due to the Noteholders, and (iii) third, towards payment of principal then due under this Agreement, ratably among the Noteholders entitled thereto in accordance with the amounts of principal then due to the Noteholders, and (iv) fourth, towards payment of the Exit Fee (if any) and any other amounts then due to the Noteholders under this Agreement, ratably among the Noteholders in accordance with the amounts then due to the Noteholders.

(c)     If, except as otherwise expressly provided herein, any Noteholder shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Notes resulting in such Noteholder receiving payment of a greater proportion of the aggregate amount of its Notes and accrued interest thereon than the proportion received by any other Noteholder, then the Noteholder receiving such greater proportion shall purchase (for cash at face value) the Notes of other Noteholders to the extent necessary so that the benefit of all such payments shall be shared by the Noteholders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Notes; provided that (i) if any such Notes are purchased and all or any portion of the payment giving rise thereto is recovered, such purchases shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Note Parties pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Noteholder as consideration for the assignment of or sale of any of its Notes, other than to the Note Parties or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). The Note Parties consent to the foregoing and agree, to the extent it may effectively do so under applicable law, that any Noteholder acquiring Notes pursuant to the foregoing arrangements may exercise against the Note Parties rights of setoff and counterclaim with respect to such Notes.

(d)     The Note Parties agree that each payment or prepayment of principal of the Notes and each payment of interest on the Notes, shall be allocated pro rata among the Noteholders in accordance with their respective principal amounts of their outstanding Notes and that they will not prepay or repay or issue any notice or make any offer to prepay or repay, any principal amount of the Notes unless concurrently therewith the Note Parties prepay or repay, as applicable, all of the Notes on a pro rata basis. Upon any prepayment of Notes pursuant to Section 8.1(f), 8.2, Section 8.9 or Section 9.21 the principal amount of the Notes so prepaid shall be allocated to all Notes at the time outstanding.

(e)     If a Vessel is subject to both a bareboat charter and a time charter, there shall be no double collections allowed under the applicable Security Documents and, in furtherance thereof, (i) if

any freights, hire, earnings and other claims assigned as to both the bareboat charter and the time charter of

such Vessel are paid to the Collateral Agent by the bareboat charterer and the time charterer, respectively, and subsequently paid to the Noteholders, then the Noteholders shall immediately pay back to the bareboat charterer/time charter disponent owner the duplicative amount paid, and (ii) if any freights, hire, earnings and other claims assigned as to the time charter of such Vessel are paid to the Collateral Agent first by the time charterer, then the bareboat charterer shall not be required to pay to either the Collateral Agent or the Company such amount otherwise payable under the bareboat charter.

Section 8.6.    **Maturity; Surrender, Etc**. In the case of each prepayment of Notes pursuant to Section 8.1 or Section 8.2, the principal amount of each Note (including any Specified Noteholder Fee) to be prepaid shall mature and become due and payable on the date fixed for such prepayment, together with interest on such principal amount accrued to such date (including any Specified Noteholder Fee) and the applicable Exit Fee, if any. From and after such date, unless the Company shall fail to pay such principal amount (including any Specified Noteholder Fee) when so due and payable, together with the interest and Exit Fee, if any, as aforesaid, interest on such principal amount shall cease to accrue. Any Note paid or prepaid in full shall be surrendered to the Company and cancelled and shall not be reissued, and no Note shall be issued in lieu of any prepaid principal amount of any Note.

Section 8.7.    **Purchase of Notes**. The Company will not and will not permit any Affiliate to purchase, redeem, prepay or otherwise acquire, directly or indirectly, any of the outstanding Notes except upon the payment or prepayment of the Notes in accordance with the terms of this Agreement and the Notes. The Company will promptly cancel all Notes acquired by it or any Affiliate pursuant to any payment or prepayment of Notes pursuant to any provision of this Agreement and no Notes may be issued in substitution or exchange for any such Notes.

Section 8.8.    **Exit Fee**. The Company will pay on the first to occur of any of (i) the Maturity Date, (ii) refinancing or other prepayment or repayment of the remaining outstanding principal amount of the Notes by any Person including a non-Chouest Affiliate or any member of the Chouest family or (iii) acceleration of the Notes (the "**Repayment Date**"), to the Agent for the ratable benefit of the Noteholders, the Exit Fee. The Exit Fee shall be earned on the Closing Date and shall become due and payable in full in cash on the Repayment Date.

Section 8.9. **Cash Sweep**. On February 14, May 14, August 14, and November 14 in each year after the Closing Date (or, if any such date is not a Business Day, on the next succeeding Business Day), commencing on August 14, 2023[2], the Company shall pay to the Agent, for the benefit of the Noteholders, the Excess Cash Prepayment, with each such Excess Cash Prepayment being applied to the aggregate principal amount of the Notes. The Company will give each of the Agent, AIG and Prudential written notice of any mandatory prepayment under this Section 8.9 not less than 3 Business Days prior to the applicable payment date (or such later time as agreed to by the Agent), which notice shall specify the applicable payment date and the aggregate principal amount of the Notes to be prepaid on such payment date.

Section 8.10. **[Reserved]**.

Section 8.11. **Taxes**.

(a)    *Payments Free of Taxes*. Any and all payments by or on account of any obligation of any Note Party under any Note Documents shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith

---

[2]    ~~First cash sweep occurs after the first full quarter.~~

discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant

Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Note Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 8.11) the applicable Noteholder receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)      *Payment of Other Taxes by the Note Party*. The Note Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Noteholder timely reimburse it for the payment of, any Other Taxes.

(c)      *Evidence of Payment*. As soon as practicable after any payment of Taxes by the Note Party to a Governmental Authority pursuant to this Section 8.11, the Note Party shall deliver to the applicable Noteholder(s) and the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the applicable Noteholder(s) and the Agent.

(d)      *Indemnification by the Note Party*. The Note Parties shall indemnify the Agent, the Collateral Agent and each Noteholder, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 8.11) payable or paid by any Agent or such Noteholder or required to be withheld or deducted from a payment to any Agent or such Noteholder and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability (i) shall be delivered to the Note Party by a Noteholder or any Agent, as applicable, and (ii) shall be conclusive absent manifest error.

(e)      *Status of Noteholder.*

(i)      Any Noteholder that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Agent and the Company, at the time or times reasonably requested by the Agent or the Company, such properly completed and executed documentation reasonably requested by the Agent or the Company as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Noteholder, if reasonably requested by the Company or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Company as will enable the Company or the Agent to determine whether or not such Noteholder is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 8.11(e)(ii)(A), (B) and (D) below) shall not be required if in the Noteholder's reasonable judgment such completion, execution or submission would subject such Noteholder to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Noteholder.

(ii)      Without limiting the generality of the foregoing, in the event the Company is a U.S. Person,

(A)       any Noteholder that is a U.S. Person shall deliver to the Company and the Agent on or prior to the date on which such Noteholder becomes a Noteholder under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Agent), executed copies of IRS Form

W-9 certifying that such Noteholder is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Noteholder shall, to the extent it is legally entitled to do so, deliver to the Company and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Noteholder becomes a Noteholder under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Noteholder claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Note Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Note Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     in the case of a Foreign Noteholder claiming that its extension of credit will generate U.S. effectively connected income, executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Noteholder claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially to the effect that such Foreign Noteholder is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Note Party within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" related to the Note Parties described in Section 881(c)(3)(C) of the Code (a "**US. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN or IRS W-8BEN-E; or

(4)     to the extent a Foreign Noteholder is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS W-8BEN-E, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable;

(C)     any Foreign Noteholder shall, to the extent it is legally entitled to do so, deliver to the Company and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Noteholder becomes a Noteholder under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed,

together with such supplementary documentation as may be prescribed by applicable law to permit the Note Party to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Noteholder under any Note Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Noteholder were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Noteholder shall deliver to the Company and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Note Party such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Company or the Agent as may be necessary for the Company and the Agent to comply with their respective obligations under FATCA and to determine that such Noteholder has complied with such Noteholder's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Noteholder agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Note Party in writing of its legal inability to do so.

(f)      *Treatment of Certain Refunds.* If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 8.11 (including by the payment of additional amounts pursuant to this Section 8.11), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 8.11 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)      *Indemnification by the Noteholders*. Each Noteholder shall severally indemnify the Agent and Collateral Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Noteholder (but only to the extent that the Company has not already indemnified such Agent for such Indemnified Taxes and without limiting the obligation of the Company to do so) and (ii) any Excluded Taxes attributable to such Noteholder, in each case, that are payable or paid by such Agent in connection with any Note Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any

Noteholder by the Agent or Collateral Agent, as applicable, shall be conclusive absent manifest error. Each Noteholder hereby authorizes the Agent and the Collateral Agent to set off and apply any and all amounts at any time owing to such Noteholder under any Note Document or otherwise payable by the Agent to the

Noteholder from any other source against any amount due to the Agent or the Collateral Agent under this paragraph (g).

(h)     *Survival*. Each party's obligations under this Section 8.11 shall survive any assignment of rights by, or the replacement of, a Noteholder, the termination of the Notes, the resignation or removal of the Agent or Collateral Agent and the repayment, satisfaction or discharge of all obligations under any Note Document.

## SECTION 9 AFFIRMATIVE COVENANTS.

The Note Parties covenant that so long as any of the Notes are outstanding:

**Section 9.1.     Compliance with Laws**. Without limiting Section 10.4, the Note Parties will, and will cause each of their Subsidiaries to, comply with all laws, ordinances or governmental rules or regulations to which each of them is subject, including, without limitation, ERISA, Environmental Laws, the USA PATRIOT Act and the other laws and regulations that are referred to in Section 5.16, and will obtain and maintain in effect all licenses, certificates, permits, franchises and other governmental authorizations necessary to the ownership of their respective properties or to the conduct of their respective businesses, in each case to the extent necessary to ensure that non-compliance with such laws, ordinances or governmental rules or regulations or failures to obtain or maintain in effect such licenses, certificates, permits, franchises and other governmental authorizations could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 9.2.     Insurance**.

(a)     The Note Parties will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurers, insurance with respect to their respective properties and businesses against such casualties and contingencies, of such types, on such terms and in such amounts (including deductibles, co-insurance and self-insurance, if adequate reserves are maintained with respect thereto) may be required under the Fleet Mortgage and the other Security Documents and, in any case, as is customary in the case of entities of established reputations engaged in the same or a similar business and similarly situated.

(b)     Without limiting the foregoing, the Note Parties will, without cost to the Noteholders, the Agent or the Collateral Agent, maintain or cause to be maintained insurance on the Mortgaged Vessels as specified below and, in addition, keep the Mortgaged Vessel insured against such further risks as may be commercially reasonable or reasonably specified by the Required Holders from time to time. The Note Parties will maintain all such insurance in an amount in United States dollars.

(i)     (A)     The Company shall maintain or cause to be maintained on each Mortgaged Vessel: (x) hull and machinery insurance (including increased value if required for amounts not to exceed 25% of the total insured value) covering marine risks and (subject to Section 9.2(b)(iii)(E) below) war risks, and breach of warranty coverage, with policy limits (1) with respect to such Mortgaged Vessel which shall not be less than 100% of the fair market value thereof, as set forth in the most recent Appraisal delivered pursuant to this Agreement from time to time and (2) with respect to all of the Mortgaged Vessels which shall not be less than the then 110% of the aggregate outstanding principal balance of the Notes; (y) protection and indemnity insurance, with policy limits not less than the

greater of (1) the limits of the applicable protection and indemnity club, if any, or (2) $1,000,000,000; and (z) pollution risks insurance, including Water Quality Insurance Syndicate coverage, in an aggregate amount not less than $1,000,000,000. Such policies

of insurance shall be under the most current acceptable forms (determined at the time of issuance of the policies in question) of policies approved by Required Holders insuring against the usual risks covered by such forms (including, at the option of the Note Parties, such amounts of increased value as are permitted by said hull insurance policies). The war risk hull and machinery coverage shall (x) include coverage for war, strikes, riots and civil commotions, malicious damage, terrorism, piracy and blocking and trapping cover, protection and indemnity and (y) be on the American Institute Hull War Risks and Strikes Clauses (CL A237) (December 1, 1977), including Addendum 1.4.84, policy form or other form acceptable to the Required Holders.

(B)  If any Mortgaged Vessel is to be laid up after the Closing Date, at the option of the Note Parties upon not less than 10 days prior written notice to the Collateral Agent and in lieu of hull and machinery and protection and indemnity insurance, port risk insurance under the most current forms (determined at the time of issuance of the policies in question) of policies approved by the Required Holders insuring the Mortgaged Vessel against hull and machinery and protection and indemnity risks.

(C)  The Collateral Agent shall be named as assignee and lender loss payee as its interest may appear in respect of all physical loss and damage policies (including war risk policies) subject to the issuance of standard market letters of undertaking and fleet lien waiver clauses by the insurance broker or insurer in accordance with usual practice. In addition, to the extent permitted, the Collateral Agent shall be listed as an additional insured in respect to all liability and protection and indemnity insurance (but without liability for payment of all premiums, club calls and other assessments), with its interest in each Mortgaged Vessel duly noted by any liability insurer and protection and indemnity club (where applicable) in which the Mortgaged Vessel is enrolled, and standard market letters of undertaking will be issued.

(ii)  To the extent applicable, Workers' Compensation and Employer's Liability Insurance, including statutory workers' compensation in compliance with the laws of the states in which employees of the Company conduct operations and the United States Longshore and Harbor Workers' Compensation Act, as extended by the Outer Continental Shelf Land Act. Such insurance shall further include voluntary compensation coverage, occupational disease coverage, maritime coverage "B" for employers' liability and amendment of coverage "B" to include claims under the Jones Act, claims under 33 U.S.C. §905(b) and claims for transportation, wages, maintenance and cure to the extent not covered under the protection and indemnity policy required above.

(iii)  (A)  The Company shall further on behalf and for the benefit of itself and the Collateral Agent maintain a Certificate of Financial Responsibility (Oil Pollution) issued by the United States pursuant to the Federal Water Pollution Control Act to the extent that same may be required by law or regulation and such other similar certificates as may be required in the course of the Mortgaged Vessel's operations pursuant to the International Convention on Civil Liability for Oil Pollution Damage of 1969, or other applicable government requirement.

(B)      All policies of insurance maintained under this Section 9.2 shall, except with respect to worker's compensation insurance, or liability insurance as provided in subsection (E) below, provide that, so long as the Note Obligations are

not fully satisfied, payment of all losses in excess of $2,000,000 (the "**Threshold Amount**") by all insurance underwriters with respect to any one accident, occurrence or event shall be made directly to the Collateral Agent, as lender loss payee, to be held by the Collateral Agent for its benefit and that of the Company as their respective interests may appear; provided, however, that after a Default or an Event of Default shall have occurred and is continuing, the Required Holders or the Collateral Agent, at the direction of the Required Holders, may direct such insurance underwriters to make remittance of all payments under such policies, regardless of amount, directly to and to the sole order of the Collateral Agent, including amounts payable with respect to claims made or accidents, events or occurrences transpiring prior to a Default. Payment prior to a Default of all losses not in excess of the Threshold Amount shall be made to the Company or as the Company may otherwise direct, except as otherwise provided in the proviso to the foregoing sentence of this subsection (B). Any such insurance recoveries to which the Collateral Agent shall be so entitled shall be applied as follows:

(1)        In the event that insurance becomes payable under said

policies on account of a Loss Event not resulting in an actual or constructive total loss or an agreed, arranged or compromised total loss of the Mortgaged Vessel, the Collateral Agent shall do the following: if a written request therefor shall have been made by the Company (together with a certificate executed by a Responsible Officer of the Company certifying that the applicable proceeds application is permitted under the Note Document (upon which the Collateral Agent shall be entitled to rely)) and, during the occurrence and continuation of an Event of Default, agreed to by the Required Holders, the Collateral Agent shall pay such insurance proceeds received by the Collateral Agent to the Company and the Company shall apply the proceeds of insurance to pay, or the Collateral Agent shall consent that the underwriters pay, directly for repairs, liabilities, salvage or other charges and expenses (including labor charges due or paid by the Company or applicable bareboat charterer), covered by the policies. Repairs need not be completed in full before insurance payments or reimbursements are permitted. If the Company shall have repaired the damage and paid the cost thereof or discharged or paid such liabilities, salvage claims or other charges and expenses, and certifies such payment in a certificate signed by a Responsible Officer of the Company (a "**Shipowner's Certificate**") delivered to the Collateral Agent (which the Noteholders hereby agree that the Collateral Agent may rely upon), accompanied by written confirmation by the underwriter, a surveyor, an adjuster or a marine insurance broker, the Collateral Agent shall pay such insurance proceeds received by the Collateral Agent to the Company and the Company apply the proceeds of insurance to pay directly, or reimburse, or the Collateral Agent shall consent that the underwriters reimburse, the Company in whole or in part for, such expenditures; provided that prior to undertaking any repair estimated to cost more than $2,000,000, whether or not an Event of Default has occurred and is continuing, the Company shall obtain the approval of the Required Holders, which shall not be unreasonably withheld or delayed. After the repair of all known damage

from a loss (unless the Company and the Collateral Agent (acting at the direction of the Required Holders) agree that the completion of such repair is not advisable), and all known costs, liabilities, salvage claims, charges

and expenses covered by the policies with respect to such loss shall have been discharged or paid, such fact shall be certified to the Collateral Agent by a Shipowner's Certificate delivered to the Collateral Agent, accompanied by written confirmation by the underwriter, a surveyor, an adjuster or a marine insurance broker. All payments received and retained by the Collateral Agent hereunder shall be applied by the Collateral Agent for the purposes described in this Clause (1) above, with the balance, if any, applied in accordance with Section 8.5(b).

(2)     In the event of a Loss Event resulting in an actual or constructive loss or an agreed, arranged or compromised total loss of any Mortgaged Vessel, the Company shall forthwith deposit with the Collateral Agent any insurance moneys which the Company may receive on account thereof under policies of insurance required by this Section 9.2, and any insurance moneys received by the Collateral Agent (whether from the Company or any insurer or otherwise) shall be applied by the Collateral Agent to repay the Notes in accordance with Section 8.5(b).

(C)     In the event of a Loss Event resulting in a constructive total loss of any Mortgaged Vessel, the Required Holders shall have the right (but only with prior written consent of the Company, unless there is an existing Event of Default, in which event no such consent shall be necessary) to claim for a constructive total loss of such Mortgaged Vessel, and if (1) such claim is accepted by all underwriters under all policies then in force as to such Mortgaged Vessel under which payment is due for total loss and (2) payment in full is made in cash under said policies, then the Collateral Agent (acting at the direction of the Required Holders) shall have the right to abandon such Mortgaged Vessel to the underwriters under such policies, free from the lien of the Fleet Mortgage.

(D)     The Required Holders shall not have the right to enter into an agreement or compromise providing for an agreed, arranged or compromised total loss of the Mortgaged Vessel without the Company's prior consent unless there is an existing Event of Default. If (1) the Company shall have given its prior consent thereto or (2) there is an existing Event of Default, the Required Holders shall have the right in their discretion to enter into an agreement or compromise providing for an agreed, arranged or compromised total loss of the Mortgaged Vessel.

(E)     All such insurance required in this Section 9.2 shall be by policies of insurance approved by the Required Holders as to form and amount (not to exceed a commercially reasonable amount) provided that (1) any approval of a policy under this subsection (E) shall be effective until 30 days after the Required Holders shall notify the Company of a desired change in the form and/or amount thereof, and (2) war risk hull and machinery or war risk indemnity insurance shall be required only as to those Mortgaged Vessels operating outside of the U.S. Gulf of Mexico. Such policies may provide that, (i) if the Company shall not have incurred the loss, damage or expense in question, any loss under such insurance may be paid directly to the Person to whom any liability covered by such policies has been incurred (whether or not an Event of Default then exists), and (ii) if the

Company shall have incurred the loss, damage or expense in question, any such loss shall be paid (x) to the Company in reimbursement if there is not an

existing Default or Event of Default of which the underwriter has received written notice

from the Collateral Agent, or (y) to the Collateral Agent to be held and applied in the manner and order as set forth in Section 9.2(b)(iii)(B) if there is an existing Default or Event of Default of which the underwriter has received written notice from the Collateral Agent. Any contractual liability insurance obtained by the Company with respect to its obligations under the Fleet Mortgage shall provide for payment directly to the Collateral Agent, and any amounts paid under such policy shall be applied in the manner and order as set forth in Section 9.2(b)(iii)(B), unless the Required Holders specify in writing.

(F)    In connection with its requiring, permitting or approving any insurance under this Section 9.2 (including the form and amount thereof and the insurer), the Required Holders, if they shall so require, shall be furnished with at the Company's expense, and may rely upon, a certificate or opinion of the firm of marine insurance brokers acting for the Company in respect of the Mortgaged Vessels at the date of this Agreement, or such other firm of marine insurance brokers (who may be marine insurance brokers for the Company) selected by the Company and approved by the Required Holders (which approval shall not be unreasonably withheld or delayed), evidencing that such insurance exists and stating, in effect, that said insurance complies in all respects with applicable requirements contained in the Note Documents, including this Section 9.2, including the fact that there are no mortgagee endorsements, other than those in favor of the Collateral Agent, with respect to the Mortgaged Vessels, together with loss payable endorsements in favor of the Collateral Agent and additional insured endorsements in favor of the Collateral Agent, for the benefit of the Noteholders.

(G)    Unless otherwise consented to in writing, all insurance required under this Section 9.2 shall be placed and kept with first class American, British, Norwegian or other insurance companies, underwriters' associations, clubs or underwriting funds approved by the holders of a majority of the aggregate outstanding principal amount of the Notes, not to be unreasonably withheld.

(H)    All insurance required under this Section 9.2 shall be taken out in the name of the Company and the interest of the Collateral Agent as mortgagee shall be duly noted in accordance with Section 9.2(b)(i)(C). The Collateral Agent shall be named as lender loss payee on all hull and machinery and war risk hull and machinery policies and, if applicable, as an additional insured under all other policies. All policies for such insurance so taken out shall, unless otherwise consented to by the Collateral Agent, provide that (1) there shall be no recourse against the Collateral Agent for the payment of premiums or commissions, (2) if such policies provide for the payment of club calls, assessments or advances, there shall be no recourse against the Collateral Agent for the payment thereof, and (3) at least 30 days' prior written notice of any cancellation (and 10 days in the case of cancellation for non-payment of premium) or modification of any element of insurance coverage provided for herein shall be given to the Collateral Agent by the insurance underwriters. All policies of insurance required hereunder shall contain a waiver of subrogation with respect to the Collateral Agent and its assigns. All such policies shall provide that they are primary insurance with respect to any insurance carried by the Collateral Agent or its assigns, and that any "Other

Insurance Clause" contained in Company's insurance shall be inoperative as to the Collateral Agent and its assigns. In addition, any policy shall not contain any

provision under which Company is a co-insurer, but may provide for reasonable deductibles acceptable to the Required Holders.

(I)     The Company shall not, without the prior written consent of the Required Holders, do any act, or voluntarily suffer or permit any act to be done, whereby any insurance required by this Section 9.2 shall or may be suspended, impaired or defeated, or suffer or permit any Mortgaged Vessel to engage in any voyage or operations, or to carry any cargo not permitted under the policies of insurance then in effect without procuring insurance satisfactory to the Required Holders covering such Mortgaged Vessel in all respects for such voyage or the carriage of such cargo.

(J)     In the event that any claim or Lien is asserted against any Mortgaged Vessel for loss, damage or expense which is covered by insurance hereunder, and it is necessary for the Company to obtain a bond or supply other security to prevent arrest of such Mortgaged Vessel or to obtain the release of such Mortgaged Vessel from arrest on account of said claim or Lien, the Collateral Agent, at the written request of the Company and with the consent of the Required Holders may, but it shall not be required to, assign all of its right, title and interest in and to said insurance covering such loss, damage or expense, to any Person, firm or corporation executing a surety or guaranty bond or other agreement to save or to release such Mortgaged Vessel from such arrest as collateral security to indemnify against liability under said bond or other agreement.

(K)     The Company shall deliver to the Noteholders and the Collateral Agent true and correct copies of the original policies evidencing insurance maintained under this Section 9.2. The Noteholders or their respective agents (who may also be an agent of the insurer) shall at all times hold the policies delivered to them or it as aforesaid; provided that, if one or more of said policies is held by an agent of a Noteholder, the Company shall, upon request of such holder, deliver a duplicate or pro forma copy thereof to the Noteholder and provided further that, if the Company shall deliver to the Noteholders a written request (1) stating that delivery of any such policy to the insurer is necessary in connection with the collection, enforcement or settlement of any claim thereunder (including claims for return premiums and any other amounts payable by the insurer), (2) setting forth the name and address of the person to whom such policy is to be delivered or mailed for such purposes, and (3) directing the Noteholders to so deliver or mail the same, the Noteholders shall, at the expense of the Company, deliver or mail (by registered or certified mail, postage prepaid) such policy in accordance with such written request, accompanied by a written direction to the recipient to redeliver such policy directly to the applicable Noteholder when it has served the purpose for which so delivered. The Company agrees that in case it shall at any time so direct the delivery or mailing of any policy to any Person as aforesaid, the Company will exercise its best efforts to cause such policy to be promptly redelivered to the applicable Noteholder as aforesaid. The Noteholders shall have no duty to see to the redelivery of such policy.

(L)     Concurrently with the Closing and annually thereafter, the Company shall furnish, or cause to be furnished, to the Agent, at the Company's

expense, either (1) a certificate of the Company's insurance brokers stating that there have been no changes with respect to the Company's policies of insurance

since the previous certificate or opinion delivered pursuant to this Section 9.2(b)(ii)(L) or (2) if any such changes have occurred, a report of Aon BankAssure or other detailed certificate or opinion (signed by a firm of marine insurance brokers qualifying under subsection (F) above) acceptable to the Required Holders as to the insurance maintained by the Company pursuant to this Section 9.2 specifying the respective policies of insurance covering the same and stating, in effect, that such insurance complies in all respects with the applicable requirements contained in the Note Documents, including this Section 9.2, including the fact that there are no mortgagee endorsements, other than those in favor of the Collateral Agent, with respect to the Mortgaged Vessels, together with lender loss payable endorsements in favor of the Collateral Agent and additional insured endorsements in favor of the Collateral Agent, for the benefit of the Noteholders. If the Company fails to maintain any such insurance, the Collateral Agent or the Noteholders may arrange for (at the Company's expense and without any responsibility on the Collateral Agent's or the holders' of Notes, as applicable, part for) obtaining the insurance.

Section 9.3.    **Maintenance of Properties**. The Note Parties will, and will cause each of their Subsidiaries to, maintain and keep, or cause to be maintained and kept, their respective properties in good repair, working order and condition (other than ordinary wear and tear) and supplied with all necessary equipment, and shall cause to be made all necessary repairs, renewals, replacements and betterments thereof, so that the business carried on in connection therewith may be properly conducted at all times, provided that with respect to any property of any Note Party or any Subsidiary of a Note Party, this Section 9.3 shall not prevent the Note Parties or any Subsidiary of the Note Parties from discontinuing the operation and the maintenance of any of its properties if such discontinuance is desirable in the conduct of its business and the Note Parties has concluded that such discontinuance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 9.4.    **Payment of Taxes and Claims**. The Note Parties will, and will cause each of their Subsidiaries to timely file all tax returns and reports required to be filed in any jurisdiction and to timely pay and discharge all Taxes required to have been paid by it, and all other claims for which sums have become due and payable that may become a Lien on properties or assets of the Note Parties or any Subsidiary of the Note Parties, provided that neither the Note Parties nor any Subsidiary of the Note Parties need pay any such Tax if (i) the amount, applicability or validity thereof is diligently contested by the Note Parties or such Subsidiary of the Note Parties on a timely basis in good faith and in appropriate proceedings, and the Note Parties or a Subsidiary of a Note Parties has established adequate reserves therefor in accordance with GAAP on the books of the Note Parties or such Subsidiary of the Note Parties or (ii) the nonpayment of all such Taxes could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Note Parties will procure that the Members reimburse it in an amount equal to all property tax payments made each year by the Note Parties, so long as the State of Louisiana provides tax credits to such Members for payment thereof.

Section 9.5.    **Existence, Etc**. The Note Parties will at all times preserve and keep its existence as a limited liability company in full force and effect. Subject to Section 10.12, the Note Parties will at all times (a) preserve and keep in full force and effect the applicable legal entity existence of each of its Subsidiaries (unless merged into a Note Party) and all rights, qualifications, licenses, permits, franchises, governmental authorizations and Intellectual Property rights of the Note Parties and their Subsidiaries unless, in the good faith judgment of the Note Parties, the termination of or failure to preserve and keep in full force and effect such legal entity existence, rights, qualifications, licenses, permits, franchises,

governmental authorizations or Intellectual Property rights could not, individually or in the aggregate, have a Material Adverse Effect, (b) maintain all requisite authority to conduct its business in each jurisdiction in

which its business is conducted and (c) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

**Section 9.6.     Books and Records**. The Note Parties will, and will cause each of its Subsidiaries to, maintain proper books of record and account in conformity with GAAP and all applicable requirements of any Governmental Authority having legal or regulatory jurisdiction over the Note Parties or such Subsidiary of the Note Parties, as the case may be. The Note Parties will, and will cause each of their Subsidiaries to, keep books, records and accounts which, in reasonable detail, accurately reflect all transactions and dispositions of assets. The Note Parties and their Subsidiaries have devised a system of internal accounting controls sufficient to provide reasonable assurances that their respective books, records, and accounts accurately reflect all transactions and dispositions of assets and the Note Parties will, and will cause each of their Subsidiaries to, continue to maintain such system. A Responsible Officer of the Note Parties acceptable to each Noteholder that is an Institutional Investor shall be required to meet with each Noteholder that is an Institutional Investor by telephone within five Business Days of the delivery (or the required date of delivery) of the quarterly reporting in Section 7.1(a), (c)(ii), (c)(iii), (x), (y) and (z) to discuss and present information on, amongst other things, the most recently delivered Projections, spot vessels and market dynamics.

**Section 9.7.     Operations**. The Company shall maintain Dino Chouest, or any other individual Member or Members of the Company, as its manager or managers and otherwise substantially maintain its present executive and management personnel. Further, the Company shall conduct its business affairs in a reasonable and prudent manner and in accordance with sound business practices of similarly situated companies.

**Section 9.8.     Further Assurances**. The Note Parties will, from time to time, promptly execute and deliver any and all instruments of further assurance, including, without limitation, Supplements to the Fleet Mortgage, and do such further acts as may be necessary or proper to carry out more effectually the purposes of this Agreement, the Security Documents and the other Note Documents, including, without limitation, to make subject to the Lien of the Fleet Mortgage and other Security Documents any property agreed to be subjected thereto pursuant to the terms of this Agreement or any of the Security Documents or otherwise in writing by the Company, or as the Agent or the Required Holders may reasonably request including, without limitation, (a) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under this Agreement, any other Note Document, or any agreement or instrument contemplated hereby or thereby; (b) the filing, re-filing, recording, re-recording, or continuing of any document, financing statement, mortgage, assignment, notice, instrument of further assurance, or other instrument in any public office at any time or times. So long as no Event of Default has occurred and is continuing, the Company shall not be required to obtain the consent of charterers as to the assignments of charters.

**Section 9.9.     ERISA Plan Assets; Prohibited Transactions.** None of the Note Parties or any of the Subsidiaries of the Note Parties is or will be an entity deemed to hold "plan assets" (within the meaning of the ERISA Plan Asset Regulations) and neither the execution, delivery or performance of the transactions contemplated under this Agreement, including the issuance and exchange of the Notes hereunder, will give rise to a non-exempt prohibited transaction under Section 406(a) of ERISA or section 4975(c)(1)(A)-(D) of the Code.

**Section 9.10. Classification of Vessels**. The Note Parties shall maintain each Mortgaged Vessel such that at all times each Mortgaged Vessel shall remain in class with ABS or other similar classification society who is a member of the International Association of Classification Societies, to the extent such

Mortgaged Vessel as a result of its operations is required to be in class. To the extent required under the first sentence of this Section 9.10, each Mortgaged Vessel shall be in compliance with the requirements of

the ABS or any other similar classification society, for the highest classification for vessels of like age and type, free of all recommendations and notations of such classification society affecting class at all times and without any overdue surveys and, upon request of the Agent, AIG or Prudential, the Note Parties shall promptly provide to the Agent, AIG or Prudential, as applicable, a copy of a certificate duly issued by the ABS or other similar classification society, to the effect that such Mortgaged Vessels have been given the highest classification and rating for vessels of the same age and type free of all recommendations and notations of such classification society affecting class and without any overdue surveys.

Section 9.11. **New Vessels**. The Note Parties shall not purchase or acquire, directly or indirectly, any Vessel without the Required Holders' prior written consent.

Section 9.12. **Citizenship**. Each of the Note Parties shall, at all times, be and remain a "citizen of the United States" within the meaning of 46 U.S.C. Section 50501 et seq., and be in compliance with the citizenship requirements imposed under the Merchant Marine Act of 1920, as amended, the Merchant Marine Act of 1936, as amended, or any other applicable United States law for entities engaged in coastwise or foreign trade or eligible to receive subsidies or to participate in government programs of the nature participated in by the Company.

Section 9.13. **Delivery of Vessel Certificates and Notices of Assignments of Insurance**. As promptly as practicable, the Note Parties shall deliver or cause to be delivered to each Noteholder (i) all United States Coast Guard and ABS certificates and other documents specified in Sections 4.10(n), to the extent that such certificates and other documents were unavailable as of the Closing Date, and (ii) with respect to each Assignment of Insurances, notices of such assignment acknowledged by each insurance underwriter and broker in respect of each policy of insurance subject to such Assignment of Insurances.

Section 9.14. **Covenant to Secure Notes Equally**. Other than Liens permitted by the provisions of Section 10.5 hereof, the Note Parties will, if it or any Subsidiary shall create or assume any Lien upon any of its property or assets, whether now owned or hereafter acquired, make or cause to be made effective provision whereby the Note Obligations will be secured by such Lien equally and ratably with any and all other Indebtedness thereby secured so long as any such other Indebtedness shall be so secured, provided that the prior written consent to the creation or assumption thereof shall have been obtained pursuant to Section 17.1.

Section 9.15. **Documentation of Affiliate Transactions**. The Note Parties will and will cause their Subsidiaries to set forth in writing each transaction or series of transactions having a Fair Market Value of at least $5,000,000 between the Note Parties or any Subsidiary of the Note Parties on the one hand, and one or more Affiliates, on the other hand.

Section 9.16. **Allocation of Indirect Operating Expenses**. The Note Parties shall cause Galliano Marine Services or any other Chouest Affiliate to at all times allocate among the Note Parties and any Affiliates of the Note Parties or other Persons to whom Galliano Marine Services or such Chouest Affiliate provides administrative or other services the cost of all items constituting indirect operating expenses of the Note Parties and such Affiliates of the Note Parties or other Persons (except for certain Affiliates that own vessels flagged in Brazil), including monthly payroll expenses for administrative personnel and other overhead expenses, and such amounts allocated to the Note Parties and their Subsidiaries shall not be more than (a) $72,500 per month for the working 312' Vessels or AHTS Vessels, (b) $56,000 per month for the working 280' PSV Vessels, (c) $7,300 per month for working fast supply Vessels and (d) $20,000 per month for the Tug Vessel, with such amounts in clauses (a), (b), (c) and (d) above being subject to an annual adjustment on each anniversary of December 31 based on the Consumer

Price Index (provided, that the adjustment is capped at 5% per annum); provided that if any working Vessels utilization is 75% or less in a given month, such working Vessel's allocation of expenses shall be prorated

by utilization during such month. The Note Parties shall not permit the allocation by Galliano Marine Services of any indirect operating expenses to the Note Parties or their Subsidiaries for any non-working Vessel.

**Section 9.17. Compliance with Charter Agreement**. The Note Parties shall comply with its charters such that there will not be a Material Adverse Effect. The Note Parties shall not permit material changes to be made to any charter (including any addenda to such charter or any document related to such charter) without providing notice thereof to each Noteholder if, individually or in the aggregate with all other changes made to such charter during the preceding twelve months, such change would be a material adverse change to such charter, provided that if a copy of such charter has not been provided to such Noteholder, a copy together with all changes shall be provided.

**Section 9.18. Restrictions on Charterers of Vessels**. The Company shall not bareboat or demise charter any Mortgaged Vessel to anyone that is not a Chouest Corporate Affiliate without the prior written consent of the Required Holders. The Company and its applicable Affiliates that have charters of Mortgaged Vessels with third party charterers (i) shall assign to the Collateral Agent pursuant to one or more Assignments of Charters and Hire all (x) third party charters having a duration of twelve (12) months or longer (including any automatic or agreed to extensions or renewals thereof), and (y) charters by the Company to a Chouest Corporate Affiliate, and (ii) shall (x) use commercially reasonable efforts to obtain the consent of any third party charterer with respect to such assignment under the preceding clause (i)(x), and (y) obtain the consent of each Chouest Corporate Affiliate with respect to such assignment under the preceding clause (i)(y).

**Section 9.19. [Reserved]**.

**Section 9.20. Manager's Undertakings**. The Note Parties shall furnish to the Collateral Agent for distribution to each Noteholder, promptly upon entry into any vessel management arrangement in respect of a Mortgaged Vessel, an undertaking by the vessel manager, including Galliano Marine Services and any other Chouest Affiliate that is a vessel manager of a Mortgaged Vessel, as contemplated by the Master Services Agreement in the form attached hereto as Exhibit J.

**Section 9.21. Vessel Sales**.

(a)    *Required Sales*.

(i)    Prior to the Closing Date, the Company has entered into the Asset Sale Agreements to sell the PSV Vessels and related assets (the "**Vessel Sale**") to a Person that is not a Chouest Affiliate. If (A) any PSV Vessel is not sold pursuant to the Vessel Sale within 12 months after the Closing Date or (B) an Asset Sale Agreement is terminated (for reasons other than non-compliance by the Company or any Affiliate thereof), a Chouest Affiliate may purchase such PSV Vessels subject to the provisions of this Section 9.21. In the event that a Person that is not a Chouest Affiliate purchases some but not all six (6) of the PSV Vessels, a Chouest Affiliate may purchase all (but not less than all) of the remaining PSV Vessels for at least the Minimum Vessel Sale Proceeds for each PSV Vessel. All Net Cash Proceeds of the Vessel Sale or any other sale of the PSV Vessels described in this Section 9.21 shall be applied to the aggregate principal amount of the Notes in accordance with Section 8.1(d).

(ii)     As a condition to any sale of the PSV Vessels described in this Section 9.21 to a Chouest Affiliate, no PSV Vessel so purchased by a Chouest Affiliate (A) shall operate in oil and gas related marine transportation for the purposes of the carriage or

transport of merchandise or passengers in the coastwise trade of the United States of America within the meaning of 46 U.S.C. Chapter 551 and any successor thereto as amended from time to time, (B) shall be lengthened beyond its specifications on the Closing Date, (C) shall perform work for which there is an available 280' PSV Vessel owned by the Company and (D) to the extent any PSV Vessel so purchased by a Chouest Affiliate is subsequently sold, (x) any Net Cash Proceeds in excess of the initial purchase price from the Company shall be applied to the aggregate principal amount of the Notes in accordance with Section 8.1(d) and (y) to a non-Chouest Affiliate, the preceding limitations in clauses (A), (B) and (C) no longer shall apply (such limitations set forth in this paragraph (ii), the "**ECO 280 Limitations**").

(b)     *Additional Sales.*

(i)     The Company shall have the right to sell (i) the Tug Vessel for Net Cash Proceeds of not less than $3,500,000.00 and (ii) two (2) FSV Vessels for Net Cash Proceeds of not less than $1,000,000.00 in the aggregate, in each case, to one or more Persons who are not a Chouest Affiliate. All such Net Cash Proceeds shall be applied to the aggregate principal amount of the Notes in accordance with Section 8.1(d).

(ii)     If the charter agreement of any of the Petrobras Vessels is terminated (for reasons other than non-compliance by the Company or any Affiliate thereof), a Chouest Affiliate may purchase any such Petrobras Vessel for Net Cash Proceeds of not less than $15,000,000 per Petrobras Vessel subject, in each case, to the ECO 280 Limitations. All Net Cash Proceeds from the sale of such Petrobras Vessels shall be applied to the aggregate principal amount of the Notes in accordance with Section 8.1(d).

(c)     *Sales Allowed.* For the avoidance of doubt, any Vessel sales referred to in subsections (a) and (b) to non-Chouest Affiliates shall be permitted to be consummated notwithstanding the existence of a Default or Event of Default other than a Default or Event of Default resulting from the breach of this Section 9.21, at the time of such sale (assuming the Collateral Agent has not begun foreclosure proceedings). In connection with the foregoing, the Collateral Agent is hereby directed by the Noteholders to release all Liens on the relevant Vessel sold and all Collateral related to that Vessel in accordance with Section 20.6, provided that the Collateral Agent shall not release the Liens on the proceeds of such Vessel sales and the Net Cash Proceeds thereof shall be applied in accordance with subsections (a) and (b).

(d)     *No Other Sales.* No other Asset Sales shall be permitted without the prior written consent of the Required Holders except as permitted under Section 9.21 and Sections 10.12 and 10.14.

**Section 9.22. Material Agreements**. The Note Parties will, and will cause each of their Subsidiaries to, comply with their respective obligations under Material Agreements to which they are a party and to affirmatively enforce the obligations of the counterparties under such Material Agreement, except where failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**Section 9.23. Anti-Corruption Policies**. The Note Parties will maintain in effect and enforce policies and procedures designed to ensure compliance by the Note Parties, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Economic Sanctions.

**Section 9.24. Material Contracts**. The Note Parties agree that they shall notify the Agent and the Noteholders of any proposal to amend, modify, supplement, waive, terminate or otherwise vary any of

the Support Agreements, Master Services Agreements, Asset Sale Agreement, Intellectual Property Agreements or any other material contract to which a Note Party is party to (the "Material Agreements") in writing not less than five (5) Business Days prior to the effectiveness or execution of any such amendment, modification, waiver, terminate or other variation (or such lesser time as agreed to by the Required Holders). The Note Parties agree that they will promptly notify the Agent and Noteholders of any material breach under any Material Agreement. Neither the Note Parties nor any of their Subsidiaries may amend, restate, supplement, terminate, enter into waivers with respect to or otherwise modify the Material Agreements in a manner materially adverse to the Noteholders or a Note Party or its assets, without the prior written approval of the Required Holders of the terms thereof. For the avoidance of doubt, if the Required Holders refuse to grant approval for any amendment, restatement, supplement or waiver related to the Asset Sale Agreements that is requested by the buyer, and such refusal results in the termination of one or more of the Asset Sale Agreements, such termination will not be deemed as non-compliance by the Company or any Affiliate thereof with regard to such Asset Sale Agreements, unless the amendment, restatement, supplement or waiver (i) was the direct result of the Company's breach or non-compliance with the Asset Sale Agreement or (ii) sought to reduce or modify the purchase price of the Vessel subject to such Asset Sale Agreement.

## SECTION 10 NEGATIVE COVENANTS.

The Note Parties covenant that so long as any of the Notes are outstanding:

**Section 10.1. Transactions with Chouest Affiliates**. The Note Parties will not and will not permit any Subsidiary of the Note Parties, directly or indirectly, to enter into or permit to exist any transaction or group of related transactions (including without limitation the purchase, lease, sale or exchange of properties of any kind or the rendering of any service) with any Chouest Affiliate, except (a) in the ordinary course of and pursuant to the reasonable requirements of such Note Party's or such Subsidiary's business and upon fair and reasonable terms no less favorable to such Note Party or such Subsidiary than would be obtainable in a comparable arm's-length transaction with a Person not a Chouest Affiliate, (b)(i) with respect to a transaction or series of related transactions that has a Fair Market Value, or involves consideration, less than or equal to $5,000,000, the Company delivers a certificate of a Senior Financial Officer to the Noteholders certifying that such transaction or series of related transactions complies with clause (a) above, or (ii) with respect to a transaction or series of transactions that has a Fair Market Value, or involves consideration, in excess of $5,000,000, the Required Holders have consented; provided, that no delivery of a certificate of a Senior Financial Officer or Required Holder consent shall be required with respect to transactions consisting of (A) the provision of administrative services by Galliano Marine Services to any Note Party or any of their Subsidiaries, (B) the lease of remotely operated vehicles from C-Innovation, L.L.C., (C) the Master Services Agreement, (D) the Support Agreements, (E) the Intellectual Agreements or (F) transactions permitted by Section 9.21.

**Section 10.2. Merger, Consolidation, Etc**. The Note Parties will not, and will not permit any of their Subsidiaries to, consolidate with or merge with any other Person or convey, transfer or lease all or substantially all of its assets in a single transaction or series of transactions to any Person.

**Section 10.3. Line of Business**. The Note Parties will not and will not permit any Subsidiary to engage in any business if, as a result, the general nature of the business in which the Note Parties and their Subsidiaries, taken as a whole, would then be engaged would be substantially changed from the general nature of the business in which the Note Parties and their Subsidiaries, taken as a whole, are engaged on the date of this Agreement.

**Section 10.4. Terrorism Sanctions Regulations**. The Note Parties will not and will not permit any Controlled Entity or any vessel owned by the Note Parties or any Controlled Entity (a) to become

(including by virtue of being owned or controlled by a Blocked Person), own or control a Blocked Person, or (b) directly or indirectly to have any investment in or engage in any dealing or transaction (including, without limitation, any investment, dealing or transaction involving the proceeds of the Notes) with any person if such investment, dealing or transaction (i) would cause any Noteholder to be in violation of any law or regulation applicable to such Noteholder, or (ii) is prohibited by any Economic Sanctions, or (c) to engage in any activity that could cause such Person or any Noteholder to be in violation of Economic Sanctions.

**Section 10.5. Liens**. The Company will not, and will not permit any of its Subsidiaries to, directly or indirectly create, incur, assume or permit to exist (upon the happening of a contingency or otherwise) any Lien on or with respect to any property or asset (including, without limitation, any document or instrument in respect of goods or accounts receivable) of the Company or any such Subsidiary, whether now owned or held or hereafter acquired, or any income or profits therefrom, or assign or otherwise convey any right to receive income or profits, except:

(a)      Liens against the Collateral in favor of the Collateral Agent as security for the Note Obligations;

(b)      Liens for taxes, assessments or other governmental levies or charges which are not yet due or which are being diligently contested in good faith by the Company or the applicable Subsidiary for which adequate reserves have been taken in accordance with GAAP;

(c)      the Liens of any judgments that do not constitute an Event of Default under Section 11.1(i);

(d)      statutory Liens incidental to the normal conduct of business or the ownership of the property of the Company and its Subsidiaries (including Liens in connection with worker's compensation, unemployment insurance and other like laws (other than Liens imposed by ERISA), warehousemen's and mechanics' and materialmen's liens and statutory landlord's liens) which in each case are incurred in the ordinary course of business and not in connection with the borrowing of money, the obtaining of advances or credit or the payment of the deferred purchase price of property and which do not in any event materially impair the value or use of the property encumbered thereby in the operation of the businesses of the Company and their Subsidiaries, taken as a whole, or the value of such property for the purposes of such businesses; provided, in each case, that the obligation is being diligently contested by the Company or a Subsidiary on a timely basis in good faith and in appropriate proceedings, and the Company or a Subsidiary have established adequate reserves therefor on the books of the Company or such Subsidiary;

(e)      any seaman's liens (including those of masters) for wages, maintenance and cure, salvage and general average liens, stevedore's wages, tort liens (including personal injury and death), liens for necessaries and inchoate liens in favor of charterers of the Mortgaged Vessels, all of the foregoing liens which are either unclaimed or covered by insurance (other than, and after giving effect to, any deductibles that the Company may have on such insurance); provided, that, once any such lien is claimed, the Company shall be permitted to contest any such lien in good faith by appropriate legal proceedings promptly initiated and diligently conducted, if (i) such reserve as shall be required by GAAP shall be made therefor and (ii) the Company shall have arranged for a bond or insurance (other than, and after giving effect to, any deductibles that the Note Parties may have on such insurance) related to such lien in a manner that is satisfactory to the Collateral Agent (acting at the direction of the Required Holders) in accordance with law and (iii) such lien does not involve any risk of seizure, loss, sale or forfeiture of any of the vessels;

(f)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(g)     deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; and

(h)     easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Company or any Subsidiary;

provided that none of the foregoing shall include any Lien securing Indebtedness (other than under clause (a) above).

**Section 10.6. Financial Covenants**.

(a)     Commencing on the last day of the first full fiscal quarter after the Closing Date, the Company will not permit the ratio of (x) EBITDA for the Test Period to (y) Interest Expense for such Test Period to be less than 1.10 to 1.00;

(b)     The Company will not permit, as of the last day of any period of four fiscal quarters ending on the dates set forth below, EBITDA to be less than the following for such period:

| Four Fiscal Quarters ending | EBITDA |
| --- | --- |
| June 30, 2023 | $49,335,000 |
| September 30, 2023 | $53,690,000 |
| December 31, 2023 | $54,925,000 |
| March 31, 2024 | $60,060,000 |
| June 30, 2024 | $58,175,000 |

(c)     The Company shall not permit, as of the last day of any period of four consecutive fiscal quarters ending on the dates set forth below, the ratio of (x) Net Funded Debt as of such last day to (y) EBITDA for such period to be greater than the following ratio for such period:

| Four Fiscal Quarters Ending | Ratio |
| --- | --- |
| September 30, 2024 through June 30, 2025 | 7.00 to 1.00 |
| September 30, 2025 through June 30, 2026 | 6.50 to 1.00 |
| September 30, 2026 | 5.75 to 1.00 |
| December 31, 2026 and thereafter | 5.00 to 1.00 |

**Section 10.7. Indebtedness**. The Note Parties will not, and will not permit any Subsidiary of any Note Party to, create, incur, suffer or permit to exist, or assume or guarantee, directly or indirectly, or

become or remain liable with respect to any Indebtedness, whether direct, indirect, absolute, contingent, or otherwise, except the Note Obligations.

**Section 10.8. Issuance of Company Preferred Stock and Subsidiary Stock; Limitation on Subsidiary Assets**. The Note Parties will not issue any Preferred Stock and will not permit any of its Subsidiaries to issue and Capital Stock to any Person other than the Company or Holdings. The Note Parties will not permit any Subsidiary to have assets worth more than $1,000,000 at any time, and in no event shall the Company permit any Subsidiary to own or charter a vessel.

**Section 10.9. Investments, Loans**. The Note Parties will not, and will not permit any Subsidiary to, make or permit to remain outstanding, directly or indirectly, any Investment in or loan or advance to any Person, or make any commitment to make such loan, advance or Investment, except with respect to the Company:

(a)     Investments existing on the date of this Agreement and disclosed in Schedule 10.9  hereto (including, with respect to any such Investment consisting of a Guaranty by the Company or any Subsidiary of Indebtedness of others, such Guaranty as applicable to any extensions, renewals or refinancings of such Indebtedness guaranteed thereby, so long as the principal amount of such Indebtedness subject to such Guaranty is not increased in connection with such extension, renewal or refinancing; provided, that any payment made, on or after the date of this Agreement, by the Note Parties or any Subsidiary pursuant to or in respect of any such Guaranty shall be deemed an Investment not permitted by this clause (a));

(b)     Investments in certificates of deposit issued by any commercial bank organized under the laws of the United States of America or any State thereof and having capital, surplus and undivided profits aggregating at least $100,000,000, provided that such certificates of deposit mature within 365 days from the date of acquisition thereof;

(c)     Investments in commercial paper rated "A-1" by S&P or "P-1" by Moody's and maturing not more than 270 days from the date of creation thereof;

(d)     Investments in United States Governmental Securities, provided that such obligations mature within 365 days from the date of acquisition thereof; and

(e)     Investments in Repurchase Agreements.

**Section 10.10. Acquisitions**. The Note Parties will not, and will not permit any Subsidiary to make any acquisition, in a single transaction or in a series of related transactions, of the property (excluding capital expenditures or acquisitions of inventory or supplies in the ordinary course of business) of, or of a business unit or division of, another Person or a majority of the Voting Stock of another Person, in each case whether or not involving a merger or consolidation with such other Person and whether for cash, property, services, assumption of Indebtedness, securities or otherwise.

**Section 10.11. Restricted Payments**. The Note Parties will not, directly or indirectly, make or declare any Restricted Payment other than the distributions permitted under, and in accordance with Section 4.9.

**Section 10.12. Asset Sales**. The Note Parties will not, and will not permit any of its Subsidiaries to, directly or indirectly, engage in any Asset Sale, except the following:

(a)     Asset Sales from a Subsidiary to the Company;

(b)      except with respect to vessels, Asset Sales in the ordinary course of business of the Company and its Subsidiaries and consistent with past practice;

(c)      charters of vessels (bareboat, demise or otherwise) to customers of the Company or of any Subsidiary entered into in the ordinary course of business and consistent with past practice;

(d)      with respect to any vessel, any Asset Sale arising as a result of any actual or constructive total loss or an agreed or compromised total loss of such vessel; provided that any insurance proceeds received in connection with such actual or constructive total loss or an agreed or compromised total loss are applied in accordance with Section 9.2(b);

(e)      the sale of Vessels and related assets permitted under Section 9.21; and

(f)      Asset Sales permitted under Section 10.14.

**Section 10.13. Sale and Lease-Back Transactions**. The Note Parties will not, and will not permit any Subsidiary to, enter into any Sale and Lease-Back Transaction.

**Section 10.14. Sales of Receivables; Pledge or Sale of Current Assets**. The Note Parties will not, and will not permit any Subsidiary to:

(a)      sell with recourse, discount (other than to the extent of finance and interest charges included therein) or otherwise sell for less than face value thereof, any of its notes or accounts receivable, except notes or accounts receivable the collection of which is doubtful in accordance with GAAP; or

(b)      sell with recourse, discount (other than to the extent of finance and interest charges included therein) or otherwise sell for less than face value thereof, or pledge, grant a Lien upon or otherwise encumber, any property of the Company or any of its Subsidiaries that would be classified as a current asset under GAAP, except as otherwise permitted by (A) Section 10.14(a) or (B) Section 10.5(a).

**Section 10.15. Limitation on Certain Restrictive Agreements**. The Note Parties will not, and will not permit any Subsidiary to, enter into or suffer to exist any contractual obligation which in any way restricts the ability of any Subsidiary to (a) make any dividends, distributions or other payments or loans or advances (including, without limitation, repayments of loans and advances) to the Company or (b) transfer any of its property to the Company.

**Section 10.16. ERISA Compliance**. The Company will not, and will not permit any Subsidiary to:

(a)      at any time engage in any Prohibited Transaction with respect to a ERISA Plan which would reasonably be expected to result in any liability to the Company; or permit any ERISA Plan to be terminated in a manner which could result in the imposition of a Lien on any property of the Company or any of its Subsidiaries pursuant to ERISA;

(b)      engage in any transaction in connection with which the Company or any Subsidiary thereof would reasonably be expected to be subject to a tax or material civil penalty assessed pursuant to the provisions of section 502 of ERISA or Section 4975 of the Code;

(c)      terminate any ERISA Plan in a "distress termination" under section 4041 of ERISA, or take any other action which would reasonably be expected to result in a material liability of the Company or any Subsidiary thereof to the PBGC;

(d)        except where such failure or action would not reasonably be expected to result in a material liability to the Company, (i) fail to make payment when due of all amounts which, under the provisions of any ERISA Plan, the Company or any Subsidiary thereof is required to pay as contributions thereto, (ii) with respect to any ERISA Plan, fail to satisfy the minimum funding standard (as described in section 302 of ERISA and section 412 of the Code, whether or not waived, with respect thereto) or (iii) file an application for a waiver of the minimum funding standard with respect to any Plan pursuant to section 412 of the Code or Section 302 of ERISA;

(e)        adopt an amendment to a ERISA Plan which amendment would be restricted by section 436 of the Code;

(f)        without obtaining the prior consent of the Required Holders (which consent shall not be unreasonably withheld), engage in any transaction or enter into any agreement that would require the Company to establish, maintain, contribute to, or become liable (whether contingent or otherwise) to a Multiemployer ERISA Plan that, as of the date on which the Company engages in such transaction or enters into such agreement, has been determined by the Multiemployer ERISA Plan's actuary to be in "endangered" or "critical" status under section 432 of the Code; or

(g)        take any action, or omit to take any action which would give rise to a non-exempt prohibited transaction under Section 4975 of the Code or Section 406 of ERISA that would subject a Noteholder to any tax or penalty under Section 4975 of the Code or Section 502 of ERISA.

**Section 10.17. Change of Flag and location of Mortgaged Vessels**.

(a)        The Company shall ensure that the registry and flag of each Mortgaged Vessel is the United States of America and shall not change the registry and flag of any Mortgaged Vessel without the prior written consent of the Collateral Agent and the Required Holders.

(b)        Upon the occurrence and during the continuance of an Event of Default, upon request by the Required Holders after consultation with the Company with respect to the present use and income of the applicable Mortgaged Vessel, the Company shall move (or cause to be moved) such Mortgaged Vessel that is not located in a Creditor Friendly Jurisdiction to a Creditor Friendly Jurisdiction within 15 days of such request.

**Section 10.18. Compliance with Charter Agreements and other Material Contracts**. The Company shall cause any Affiliate chartering a vessel from the Company or any of its Subsidiaries to comply in all respects with the provisions of any charter or any Note Document in effect with respect to such vessel and to enforce such charter or such Note Document in accordance with its terms. No such charter or Note Document shall be amended, modified, waived or terminated in any manner (i) in conjunction with or relating to a transaction or series of transactions involving, directly or indirectly, the charterer and any other Affiliate of the Company or such Subsidiary or (ii) that, directly or indirectly, impairs or adversely affects the Collateral or the rights of the Collateral Agent and the Noteholders under this Agreement and the other Note Documents or (iii) that would otherwise be prohibited under the Assignments of Charter Hire.

**Section 10.19. Restrictions on Charterers of Vessels**. The Company shall not bareboat or demise charter any vessel for operation in the coastwise trade to any Person that is not a citizen of the United States within the meaning of 46 U.S.C. Section 50501 et seq.

**Section 10.20. Deposit Accounts**. The Company will not establish any additional deposit accounts (other than the Tax Account) for any purpose which are not listed on Schedule 10.20, unless such

additional deposit accounts are subject to Control Agreements or are otherwise subject to control in favor of the Collateral Agent. The Tax Account shall not be subject to any Control Agreement. Holdings will not have any deposit accounts.

**Section 10.21. Most Favored Lender Status**. The terms of this Agreement shall, without any further action on the part of the Note Parties or any of the Noteholders, be deemed to be amended automatically to include each Additional Covenant and each Additional Default contained in any agreement creating or evidencing any Indebtedness of the Company or its Subsidiaries in an amount exceeding $1,000,000, in each case as the same may be amended, modified, replaced or extended from time to time, including any refinancing. The Company further covenants to promptly execute and deliver, at the expense of the Company (limited, in the case of legal expenses, to the reasonable fees and expenses of one counsel for all Noteholders), an amendment to this Agreement in form and substance satisfactory to the Required Holders evidencing the amendment of this Agreement to include such Additional Covenants and Additional Defaults, provided that (i) the execution and delivery of such amendment shall not be a precondition to the effectiveness of such amendment as provided for in this Section 10.21, but shall merely be for the convenience of the parties hereto and (ii) unless the Required Holders otherwise agree such amendment shall continue to be effective notwithstanding that (x) the agreement that contains such Additional Covenant or Additional Default ceases to be in effect, or (y) the agreement that contains such Additional Covenant or Additional Default is amended to remove or make less restrictive such Additional Covenant or Additional Default; and provided, further that if the Company shall pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee or otherwise, or grant any security or provide other credit support, to any lender or any holder of Indebtedness as consideration for or as an inducement to the entering into by such lender or holder of any such amendment, equal remuneration is concurrently paid, or security is concurrently granted or other credit support concurrently provided, on the same terms, ratably to each Noteholder.

**Section 10.22. Use of Proceeds**. The Notes are being issued in exchange for the Exchanged Debt.

**Section 10.23. Repayments to Chouest Affiliates**. The Note Parties will not, and will not permit any Subsidiary to, make any payment in respect of Indebtedness of the Note Parties or any Subsidiary owed to a Chouest Affiliate.

**Section 10.24. Capital Expenditure**. The Note Parties will not, and will not permit any Subsidiary to make, any Capital Expenditure, other than (a) any maintenance and related Capital Expenditures of the Company (other than any Capital Expenditure described in clause (b) below) and (b) any Capital Expenditure of the Company for retrofitting, refurbishment, conversion or modification of Vessels in an aggregate outstanding amount not to exceed $6,000,000 in each calendar year, subject to an annual adjustment based on the Consumer Price Index (provided that such adjustment is capped at 5% per annum), provided that such Capital Expenditures do not materially reduce the fair market value, utility or remaining useful life of such Vessels.

For the avoidance of doubt, any expenses incurred in connection with a Vessel Sale under the Asset Sale Agreements or any other sales of Mortgaged Vessels permitted hereunder is not a Capital Expenditure.

**Section 10.25. Anti-Corruption Laws and Economic Sanctions**. The Note Parties will not, and will not permit their Subsidiaries and their respective directors, officers, employees and agents to (a) make an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) fund, finance or facilitate any activities, business or transaction of or with or in any Blocked Person, except to the extent permitted for a Person required to comply with Economics Sanctions, or (c) engage in any activity that would result in the violation of any Economics Sanctions applicable to any party hereto.

**Section 10.26. Passive Holding Company**. In addition to the other covenants applicable to it pursuant to this Section 10, Holdings covenants and agrees that it will not create, incur, assume or suffer to exist any debt or Lien other than Liens securing the Note Obligations, nor will it engage at any time in any business or business activity other than (a) the ownership of equity interests in the Company, (b) performance of its obligations under and in connection with the Note Documents, (c) paying Taxes for which Holdings or the Company are legally liable, (d) holding directors' and members' meetings, preparing corporate and similar records and other activities (including the ability to incur fees, costs and expenses relating to such maintenance) required to maintain its corporate or other legal structure or to participate in tax, accounting or other administrative matters as a member of the consolidated group of Holdings, the Company and its Subsidiaries, (f) preparing reports to, and preparing and making notices to and filings with Governmental Authorities, to the Agent, Collateral Agent and Noteholders and to the holders of its equity interests, (g) providing indemnification to officers and directors, and (h) activities incidental to the business or activities described in each of the foregoing clauses of this Section 10.26. Holdings shall at all times pledge all of the equity interest of the Company (and, if applicable, shall deliver original stock certificates evidencing the equity interests of the Company, together with appropriate undated stock powers endorsed in blank by Holdings for each such certificate to the Collateral Agent).

## SECTION 11 EVENTS OF DEFAULT.

**Section 11.1. Events of Default**. An "Event of Default" shall exist if any of the following conditions or events shall occur and be continuing:

      (a)    the Company defaults in the payment of any principal or the Exit Fee, if any, on any Note when the same becomes due and payable or the amount required by Section 8.9, whether at maturity or at a date fixed for prepayment, repayment or by declaration or otherwise; or

      (b)    the Company defaults in the payment of any interest on or any other amounts in respect of any Note for more than five Business Days after the same becomes due and payable; or

      (c)    the Company defaults in the performance of or compliance with any term contained in Section 7.1(f), Section 8.9, Section 9.2, Section 9.11, Section 9.12, Section 9.18, Section 9.21, Section 9.24 or Section 10; or

      (d)    the Company defaults in the performance of or compliance with any term contained herein (other than those referred to in Sections 11(a), (b) and (c)) or in any other Note Document and such default is not remedied within thirty (30) days (or, in respect of a default in the performance or compliance with Section 7.1(u), seven (7) Business Days) after the earlier of (i) obtaining actual knowledge of such default and (ii) the Company receiving written notice of such default from the Agent or any Noteholder (and such written notice to be identified as a "notice of default" and to refer specifically to this Section 11.1(d)); or

      (e)    any representation or warranty made in writing by or on behalf of the Company or by any officer of the Company in this Agreement, any other Note Document or in any writing furnished in connection with the transactions contemplated hereby proves to have been false or incorrect in any material respect when made or deemed to be made, or if already qualified by materiality or Material Adverse Effect, is incorrect in any respect when made or deemed to be made; or

      (f)    (i) any Note Party or any Subsidiary is in default (as principal or as guarantor or other surety) in the payment of any principal of or premium or make-whole amount or interest or any amount on any Indebtedness that is outstanding in an aggregate principal amount of at least $1,000,000 beyond any period of grace provided with respect thereto, (ii) or any Note Party or any Subsidiary is in

default in the performance of or compliance with any term of any evidence of any Indebtedness in an aggregate outstanding principal amount of at least $1,000,000 or of any mortgage, indenture or other agreement relating thereto or any other condition exists, and as a consequence of such default or condition such Indebtedness has become, or has been declared (or one or more Persons are entitled to declare such Indebtedness to be), due and payable before its stated maturity or before its regularly scheduled dates of payment, or (iii) as a consequence of the occurrence or continuation of any event or condition (other than the passage of time or the right of the holder of Indebtedness to convert such Indebtedness into equity interests), (x) any Note Party or any Subsidiary has become obligated to purchase or repay Indebtedness before its regular maturity or before its regularly scheduled dates of payment in an aggregate outstanding principal amount of at least $1,000,000, or (y) one or more Persons have the right to require any Note Party or any Subsidiary to purchase or repay any such Indebtedness; or

(g)        any Note Party or any Subsidiary (i) is generally not paying, or admits in writing its inability to pay, its debts as they become due, (ii) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy, insolvency, reorganization, moratorium or other similar law of any jurisdiction, including under the Bankruptcy Code or any other Bankruptcy Law, or voluntarily commences any proceeding seeking reorganization, arrangement, recapitalization or adjustment or marshalling of its assets or liabilities, (iii) makes an assignment for the benefit of creditors, (iv) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to itself or with respect to any substantial part of its property, (v) is adjudicated as insolvent or is to be liquidated, or (vi) takes corporate or other equivalent action for the purpose of any of the foregoing; or

(h)        a court or other Governmental Authority of competent jurisdiction enters an order appointing, without consent by any Note Party or any Subsidiary of any Note Party, a custodian, receiver, trustee or other officer with similar powers with respect to a Note Party or any of their Subsidiaries or with respect to any substantial part of their property, or constituting an order for relief or approving a petition for relief or reorganization, arrangement, recapitalization or adjustment or marshalling of their assets or liabilities or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of any Note Party or any of their Subsidiaries, or any such petition shall be filed against any Note Party or any of their Subsidiaries and such petition shall not be dismissed within 60 days; or

(i)        one or more final judgments or orders for the payment of money aggregating in excess of $1,000,000, including, without limitation, any such final order enforcing a binding arbitration decision (in any case to the extent not adequately covered by insurance as to which an insurance company rated A- or better by AM Best Company, Inc. has acknowledged coverage), are rendered against one or more of the Note Parties and its Subsidiaries and which judgments are not, within 30 days after entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within 30 days after the expiration of such stay or any Note Party or any Subsidiary of any Note Party shall fail within 30 days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued; or

(j)        any order, judgment or decree is entered in any proceedings against any Note Party or any Subsidiary of any Note Party decreeing a split-up of any Note Party or any Subsidiary of any Note Party which requires the divestiture of assets representing 10% or more, or the divestiture of Capital Stock of a Subsidiary of any Note Party whose assets represent 10% or more, of Consolidated Tangible Total Assets or which requires the divestiture of assets, or Capital Stock of a Subsidiary of any Note Party, that shall have contributed 10% or more of Consolidated Net Earnings for any of the three fiscal years then most

recently ended, and such order, judgment or decree remains unstayed and in effect for more than 60 days; or

(k)     if (i) any ERISA Plan shall fail to satisfy the minimum funding standards of ERISA or the Code for any plan year or part thereof, whether or not waived in accordance with section 412(c) of the Code or section 302(c) of ERISA, or a waiver of such standards or extension of any amortization period is sought or granted under section 412 of the Code or section 302 of ERISA, (ii) a notice of intent to terminate any ERISA Plan shall have been or is reasonably expected to be filed with the PBGC or the PBGC shall have instituted proceedings under ERISA section 4042 to terminate or appoint a trustee to administer any ERISA Plan or the PBGC shall have notified the Company or any ERISA Affiliate that a ERISA Plan may become a subject of any such proceedings, (iii) the aggregate "amount of unfunded benefit liabilities" (within the meaning of section 4001(a)(18) of ERISA) under any ERISA Plan shall exceed zero, determined in accordance with Title IV of ERISA, (iv) the Company or any ERISA Affiliate shall have incurred or is reasonably expected to incur any liability pursuant to Title I or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans, (v) the Company or any ERISA Affiliate withdraws from any Multiemployer ERISA Plan, or (vi) the Company or any Subsidiary establishes or amends any employee welfare benefit plan that provides post-employment welfare benefits in a manner that would increase the liability of the Company or any Subsidiary thereunder; and any such event or events described in clauses (i) through (vi) above, either individually or together with any other such event or events, could reasonably be expected to have a Material Adverse Effect. As used in this Section 11.1(k), the terms "employee benefit plan" and "employee welfare benefit plan" shall have the respective meanings assigned to such terms in section 3 of ERISA; or

(l)     any of the Security Documents, or any material provision thereof, shall for any reason cease to be, or shall be asserted by any Note Party or any Subsidiary of any Note Party or any Chouest Affiliate not to be, a legal, valid and binding obligation of such Note Party or any Subsidiary of any Note Party or, enforceable in accordance with its terms, or the Liens purported to be created by any of the Security Documents shall for any reason cease to be, or be asserted by any Note Party or any Subsidiary of any Note Party or any Chouest Affiliate not to be either a valid, first priority perfected Lien or, in the case of any Mortgaged Vessel, a first preferred mortgage lien (except as to all of the foregoing to the extent otherwise permitted under this Agreement or any of the Security Documents); or

(m)     an "Event of Default" under and as defined in the Fleet Mortgage shall have occurred and be continuing; or

(n)     there shall occur (i) any material damage to, or loss, theft or destruction of, any Collateral, or any Vessel (whether or not Collateral), whether or not insured, or (ii) any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which, in the case of either clause (i) or (ii), causes the cessation or substantial curtailment, for more than 30 consecutive days, of revenue-producing activities of any vessel or any facility of the Company or its Subsidiaries if such event or circumstance is not covered by business interruption insurance and could reasonably be expected to have a Material Adverse Effect, unless the Company within 30 days thereafter shall have provided and made subject to the Lien of this Agreement and the other Security Documents substitute Collateral of substantially equivalent value and otherwise reasonably satisfactory to the Required Holders; or

(o)     all or a substantial part of the property subject to the Liens of the Security Documents shall be condemned, seized or otherwise appropriated, or custody or control of such property shall be assumed by or the operation thereof or production or revenues therefrom shall cease by or as a result of any action by any Governmental Authority or court of competent jurisdiction or at the insistence of any Governmental Authority, and such circumstance shall continue for a period of 45 days, unless the Company

within 30 days thereafter shall have provided and made subject to the Lien of the Security Documents substitute Collateral satisfactory to the Required Holders; or

(p)     any material provision of any Note Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any of the Company or its Subsidiaries or any Chouest Affiliate shall challenge the enforceability of any Note Document or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Note Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms) or if any of the of the Support Agreement, the Master Services Agreement or Intellectual Property Agreements are terminated by the counterparties thereto; or

(q)     a Change of Control shall have occurred and be continuing.

**Section 11.2. Right to Cure**. Notwithstanding anything to the contrary in this Agreement, either (a) upon any failure by the Company to comply with Section 10.6 or (b) at the Company's election before the 15-month anniversary of the Closing Date, for the purposes of paying the Specified Prepayment Amount, the Company shall have the right (the "**Cure Right**") (with respect to clause (a), at any time during such fiscal quarter or thereafter until the date that is five (5) Business Days after the date on which financial statements for such fiscal quarter are required to be delivered, and with respect to clause (b), at any time prior to the 15-month anniversary of the Closing Date) to issue Capital Stock or other equity (such other equity to be on terms reasonably acceptable to the Required Holders) for cash or otherwise receive cash contributions in respect of its Capital Stock or such other equity (the "**Cure Amount**"), and thereupon the Company's compliance with Section 10.6 or the application of Specified Noteholder Fee under Section 8.1(c), as applicable, shall be recalculated giving effect to a pro forma increase in the amount of EBITDA or the Specified Prepayment Amount by an amount equal to the Cure Amount solely for the purpose of determining compliance with Section 10.6 or calculating the Specified Noteholder Fee pursuant to Section 8.1(c), as applicable, as of the end of such fiscal quarter and for applicable subsequent periods that include such fiscal quarter. Notwithstanding anything herein to the contrary:

(a)     during the term of this Agreement, the Cure Right shall not be exercised more than once for Section 10.6 and once for Section 8.1(c) with the Company notifying the Agent prior to such exercise of the Cure Amount whether the Cure Amount shall be used for purposes of Section 10.6 or Section 8.1(b),

(b)     the Cure Amount shall be no greater than the amount required for the purpose of complying with Section 10.6 if such Cure Amount will be applied for purposes of ensuring compliance with Section 10.6,

(c)     there shall be no pro forma or other reduction of the amount of Net Funded Debt by the amount of any Cure Amount for purposes of determining compliance with Section 10.6 for the fiscal quarter in respect of which the Cure Right was exercised (other than, with respect to any future period, to the extent of any portion of such Cure Amount that is actually applied to prepay or repay any Indebtedness (including by way of a discounted buyback or repurchase) that constitutes Net Funded Debt),

(d)     during any four consecutive fiscal quarter period in which any Cure Amount is included in the calculation of EBITDA as a result of any exercise of the Cure Right, such Cure Amount shall be disregarded for purposes of determining EBITDA for any other purpose, in each case, during each fiscal quarter in which the pro forma adjustment applies, and

(e)     The Cure Amount shall be mandatorily applied to repay the principal of the Notes.

**SECTION 12 REMEDIES ON DEFAULT, ETC.**

**Section 12.1. Acceleration**.

(a)    If an Event of Default with respect to the Company described in Section 11.1(g) or (h) (other than an Event of Default described in clause (i) of Section 11.1(g) or described in clause (vi) of Section 11.1(g) by virtue of the fact that such clause encompasses clause (i) of Section 11.1(g)) has occurred, all the Notes then outstanding shall automatically become immediately due and payable.

(b)    If any other Event of Default has occurred and is continuing, the Agent at the direction of the Required Holders may at any time, by notice to the Company, declare all the Notes then outstanding to be immediately due and payable.

Upon any Notes becoming due and payable under this Section 12.1, whether automatically or by declaration, such Notes will forthwith mature and the entire unpaid principal amount of such Notes, plus (x) all accrued and unpaid interest thereon (including, but not limited to, interest accrued thereon at the Default Rate) and (y) the Exit Fee determined in respect of such principal amount, shall all be immediately due and payable, in each and every case without presentment, demand, protest or further notice, all of which are hereby waived. The Company acknowledges, and the parties hereto agree, that each Noteholder has the right to maintain its investment in the Notes free from repayment by the Company (except as herein specifically provided for) and that the provision for payment of an Exit Fee by the Company in the event that the Notes are prepaid in full or are accelerated as a result of an Event of Default, is intended to provide compensation for the deprivation of such right under such circumstances.

**Section 12.2. Other Remedies**. If any Default or Event of Default has occurred and is continuing, and irrespective of whether any Notes have become or have been declared immediately due and payable under Section 12.1, the Agent or the Collateral Agent, in each case at the direction of the Required Holders (or if the Agent or the Collateral Agent delays, the Required Holders), may proceed to protect and enforce the rights of the Noteholders, the Agent and/or the Collateral Agent, as the case may be, by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in any Note or any other Note Document, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise. The Noteholders shall have the other remedies contained in the Security Documents.

**Section 12.3. Rescission**. At any time after any Notes have been declared due and payable, the Required Holders, by written notice to the Agent and the Company, may rescind and annul any such declaration and its consequences if (a) the Company has paid all overdue interest on the Notes, all principal, if any, on any Notes that are due and payable and are unpaid other than by reason of such declaration, and all interest on such overdue principal and the Exit Fee and (to the extent permitted by applicable law) any overdue interest in respect of the Notes, at the Default Rate, (b) neither the Company nor any other Person shall have paid any amounts which have become due solely by reason of such declaration, (c) all Events of Default and Defaults, other than non- payment of amounts that have become due solely by reason of such declaration, have been cured or have been waived pursuant to Section 17, and (d) no judgment or decree has been entered for the payment of any monies due pursuant hereto or to the Notes. No rescission and annulment under this Section 12.3 will extend to or affect any subsequent Event of Default or Default or impair any right consequent thereon.

**Section 12.4. No Waivers or Election of Remedies, Expenses, Etc**. No course of dealing and no delay on the part of the Agent, the Collateral Agent or any Noteholder in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice the Agent's, the Collateral Agent's or such

Noteholder's rights, powers or remedies. No right, power or remedy conferred by this Agreement or by any Note or any other Note Document upon the Agent, any Noteholder or the Collateral Agent shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise. Without limiting the obligations of the Company under Section 15, the Company will pay to the Agent, the Collateral Agent or the Noteholders on demand such further amount as shall be sufficient to cover all costs and expenses of the Agent, the Collateral Agent or the Noteholders incurred in any enforcement or collection under this Section 12, including, without limitation, reasonable attorneys' fees, expenses and disbursements.

**Section 12.5. Application of Funds**.

(a)    Any amounts received by the Agent or the Collateral Agent on account of the Notes, including any proceeds of Collateral, following acceleration or the occurrence and continuation of an Event of Default under 11.1(g) or (h) or upon the exercise of rights and remedies shall be applied in the following order:

(i)    First, to payment of that portion of the Note Obligations constituting fees, indemnities, expenses and other amounts payable to the Agent and the Collateral Agent in their capacities as such;

(ii)    Second, to payment of that portion of the Note Obligations constituting fees, indemnities and other amounts (other than principal, interest and the Specified Noteholder Fee and Exit Fees) payable to the Noteholders (including fees, charges and disbursements of counsel and financial advisors and/or consultants to the respective Noteholders, to the extent permitted hereunder), ratably among them in proportion to the respective amounts described in this clause Second payable to them;

(iii)    Third, to payment of that portion of the Note Obligations constituting accrued and unpaid interest on the Notes, ratably among the Noteholders in proportion to the respective amounts described in this clause Third payable to them;

(iv)    Fourth, to payment of that portion of the Note Obligations constituting unpaid principal of the Notes and the Specified Noteholder Fee ratably among the Noteholders in proportion to the respective amounts described in this clause Fourth held by them;

(v)    Fifth, to payment of that portion of the Note Obligations constituting the Exit Fee ratably among the Noteholders in proportion to the respective amounts described in this clause Fifth held by them; and

(vi)    Last, the balance, if any, after all of the Note Obligations have been indefeasibly paid in full in cash, to the Company or as otherwise required by law.

## SECTION 13 REGISTRATION; EXCHANGE; SUBSTITUTION OF NOTES.

**Section 13.1. Registration of Notes**. The Agent shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain at one of its offices in the United States a copy of each Assignment and Acceptance Agreement delivered to and accepted by it and a register for the recordation of the names and addresses of the Noteholders and the aggregate outstanding principal amount (and stated interest of the Notes) of each Noteholder from time to time (the "Register"). If any holder of one or more Notes is a nominee, then (a) the name and address of the beneficial owner of such Note or Notes, and the

amount of Notes beneficially owned by such beneficial owner, shall also be certified to the Company and the Agent by such nominee or beneficial owner (and, in the case of the latter, acknowledged by such nominee) and registered in the Register as an owner and holder thereof and (b) any amendment, waiver or consent under this Agreement shall be executed by the beneficial owner and not the nominee. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Company, the Agents and the Noteholders shall treat each Person whose name is recorded in the Register pursuant to the terms of this Agreement as a Noteholder under this Agreement for all purposes of this Agreement. The Agent shall provide the Register to the Company, any Agent or any Noteholder at any reasonable time and from time to time upon reasonable prior notice.

**Section 13.2. Transfer and Exchange of Notes**. (a) Each Noteholder may assign to any assignee all or a portion of its rights and obligations under this Agreement (accompanied by the corresponding portion of its Notes) in the minimum amounts set forth in the third to last sentence of Section 13.2(b); provided, however, that the parties to each such assignment shall execute and deliver to the Agent an Assignment and Acceptance Agreement for its acceptance and recording in the Register, together with a processing and recordation fee of $3,500 (which may be waived or reduced in the sole discretion of the Agent) and the assignee, if it is not an existing Noteholder, shall deliver to the Agent (x) an Administrative Questionnaire, (y) any tax forms as may be required to be delivered to the Agent and the Company pursuant to Section 8.11(e) on or prior to the effective date of such Assignment and Acceptance Agreement and (z) all documentation and other information requested by the Agent under "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act.

Upon such execution, delivery, acceptance, payment and recording from and after the effective date specified in such Assignment and Acceptance Agreement, (x) the assignee thereunder shall be a party to this Agreement, and to the extent that rights and obligations under this Agreement have been assigned to it pursuant to such Assignment and Acceptance Agreement, have the rights and obligations of a Noteholder hereunder and (y) the assigning Noteholder shall, to the extent that rights and obligations have been assigned by it pursuant to such Assignment and Acceptance Agreement, relinquish such rights and be released from such obligations under this Agreement (and, in the case of an Assignment and Acceptance Agreement covering all or the remaining portion of an assigning Noteholder's rights and obligations under this Agreement, such Noteholder shall cease to be a party hereto).

Subject to acceptance and recording thereof by the Agent pursuant to Section 13.1, from and after the effective date specified in each Assignment and Acceptance Agreement, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Acceptance Agreement, have the rights and obligations of a Noteholder under this Agreement and the other Note Documents, and the assigning Noteholder thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance Agreement, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance Agreement covering all of the assigning Noteholder's rights and obligations under this Agreement, such Noteholder shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 8.11, 14 and 22.3 with respect to facts and circumstances occurring prior to the effective date of such assignment.

(b) In connection with any assignment of Notes under Section 13.2(a), the assigning Noteholder shall either (x) to the extent it has a physical Note, surrender its Note to the Company at the address and to the attention of the designated officer (all as specified in Section 17(iii)) (accompanied by an Assignment and Acceptance and accompanied by the relevant name, address and other information for notices of each transferee of such Note or part thereof) or (y) to the extent the assigning Noteholder does not have a physical Note, deliver an Assignment and Acceptance and accompanied by the relevant name, address and other information for notices of each transferee of such Note or part thereof and, in each case, within ten Business Days thereafter, the Company shall, to the extent requested by the assignee Noteholder, execute and deliver,

at the Company's expense (except as provided below), one or more new Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered Note, and shall provide the Agent with a copy thereof. Each such new Note shall be payable to such Person as such holder may request and shall be substantially in the form of Exhibit A. Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note or dated the date of the surrendered Note if no interest shall have been paid thereon. The Company may require payment of a sum sufficient to cover any stamp tax or governmental charge imposed in respect of any such transfer of Notes. Notes shall not be transferred in denominations of less than $100,000, provided that if necessary to enable the registration of transfer by a holder of its entire holding of Notes, one Note may be in a denomination of less than $100,000. Any transferee, by its acceptance of a Note registered in its name (or the name of its nominee), shall be deemed to have made the representation set forth in Section 6.2. Notwithstanding anything to the contrary herein, a physical Note shall only be required to be delivered or exist to the extent requested by a Noteholder, in its sole discretion. Notwithstanding anything to the contrary herein, the holder of a Note shall for all purposes of this Agreement and the other Note Documents be the Person listed in the Register, regardless of whether a new Note has been issued to such Person under this Section 13.2(b).

(c)     SO LONG AS THE NOTES HAVE NOT MATURED (AT STATED MATURITY) OR HAVE BECOME OR DECLARED IMMEDIATELY DUE AND PAYABLE PURSUANT TO SECTION 12.1, NO REGISTERED OR BENEFICIAL NOTEHOLDER MAY TRANSFER A NOTE OR ANY INTEREST THEREIN TO ANY PERSON IT KNOWS TO BE A COMPETITOR. NOTEHOLDERS AND THE COMPANY SHALL BE ENTITLED TO RELY ON REPRESENTATIONS OF TRANSFEREES FOR PURPOSES OF DETERMINING WHETHER SUCH TRANSFEREE IS A COMPETITOR.

**Section 13.3. Replacement of Notes**. Upon receipt by the Company at the address and to the attention of the designated officer (all as specified in Section 17(iii)) of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note (which evidence shall be, in the case of an Institutional Investor, notice from such Institutional Investor of such ownership and such loss, theft, destruction or mutilation), and

(a)     in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it (provided that if the holder of such Note is, or is a nominee for, an original Noteholder or another Noteholder with a minimum net worth of at least $100,000,000 or a Qualified Institutional Buyer, such Person's own unsecured agreement of indemnity shall be deemed to be satisfactory), or

(b)     in the case of mutilation, upon surrender and cancellation thereof, within ten Business Days thereafter, the Company at its own expense shall execute and deliver, in lieu thereof, a new Note, dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed or mutilated Note or dated the date of such lost, stolen, destroyed or mutilated Note if no interest shall have been paid thereon and shall notify the Agent of such replacement for recordation in the register.

**Section 13.4. Agent.** Notwithstanding anything set forth herein or in any other Note Document, the Agent shall not act as, or be deemed to act as, transfer agent or registrar under Article 8 of the UCC or Section 17A(c) of the Exchange Act hereunder or under any other Note Document.

## SECTION 14 EXPENSES, ETC.

**Section 14.1. Transaction Expenses**. Whether or not the transactions contemplated hereby are consummated, the Company will pay (x) all costs and expenses including reasonable and documented out-of-pocket attorneys' fees of one leading counsel, one local counsel in each applicable jurisdiction and one

maritime counsel for each of (i) the Agent and Collateral Agent, and (ii) the Consenting Creditors in connection with the negotiation, documentation and the preparation of the Note Documents; (y) all costs and expenses including reasonable and documented out-of-pocket attorneys' fees of one leading counsel, one local counsel in each applicable jurisdiction and one maritime counsel for (i) the Agent and the Collateral Agent and (ii) the Noteholders, taken as a whole, in connection with the administration of the Note Documents and, subject to clause (z), in connection with the negotiation and consummation of any amendments, waivers or consents under or in respect of this Agreement, the Notes or any other Note Document (whether or not the Note Documents, such amendment, waiver or consent becomes effective) and (z) the costs and expenses, including reasonable and documented financial advisors' and/or consultant's fees and the reasonable and documented fees, charges and disbursements of any counsel to the Agent, the Collateral Agent and each Noteholder incurred in connection with (i) the insolvency or bankruptcy of the Company any Note Party or any work-out or restructuring of the Notes and any other Note Document, (ii) the enforcement, defense or protection of any rights or remedies under the Note Documents (or determining whether or how to enforce, defend or protect any rights or remedies under the Note Documents), including, without limitation, in connection with the negotiation, documentation and preparation of any amendments, waiver or forbearances after the occurrence and during the continuation of an Event of Default (whether or not such amendments, waiver or forbearances become effective), (iii) the monitoring of the insolvency or bankruptcy of any of Alpha Marine Services, L.L.C., a Louisiana limited liability company, Bram Offshore Transportes Maritimos Ltda., a Brazil limited liability company, Nautical Ventures, L.L.C., a Louisiana limited liability company, and Offshore Service Vessels, L.L.C., a Louisiana limited liability company, or (iv) any review of the capital structure or business of the Company during the occurrence and continuation of an Event of Default. In each case, in connection with the foregoing, any financial advisor or consultant of the Consenting Creditors shall have the right to visit and inspect the Company's or applicable Chouest Corporate Affiliate's properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Company and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Company, but in any event not to unreasonably interfere with the conduct of business (and nothing herein constitutes a waiver of any attorney-client privilege). The Company will pay all costs and expenses including reasonable and documented out-of-pocket attorney's fees incurred by the Agent, the Collateral Agent or the Consenting Creditors incurred in connection with (a) the initial filing of this Agreement and all related documents and financial information with the SVO provided, that such costs and expenses shall not exceed $7,500, (b) the costs and expenses of the Insurance Consultant in connection with its review of, consultation with respect to and/or certification of the Company and its Subsidiaries' insurance or any other insurance maintained in respect of the Mortgaged Vessels in relation to the insurance requirements in this Agreement and the other Note Documents, (c) verifying and maintaining the perfection of the Liens created by the Security Documents, including, without limitation, the costs and expenses of the Collateral Agent. The Company will pay all reasonable and documented costs and expenses including financial advisors' and/or consultants' fees and reasonable and documented attorney's fees of one leading counsel, one local counsel in each applicable jurisdiction and one maritime counsel for the Agent, the Collateral Agent, and the Noteholders taken as a whole incurred in responding to any subpoena or other legal process or informal investigative demand issued in connection with this Agreement, the Notes, or any other Note Document or by reason of being a Noteholder; except for such circumstances where any Noteholder is directly subpoenaed or directly named in such enforcement action or defending action then such named Noteholder is entitled to one leading counsel, one local in each applicable jurisdiction and one maritime counsel and the unnamed Noteholders shall collectively be entitled to one leading counsel, one local in each applicable jurisdiction and one maritime counsel. Notwithstanding the foregoing, the Company shall be responsible for Appraisal costs only one time per year and each time a vessel becomes a Mortgaged Vessel, absent there being an Event of Default that has occurred and is continuing. The Company will pay, and will save the Agent, the Collateral Agent and each Noteholder harmless from, (i) all claims in respect of any fees, costs or expenses, if any, of brokers and finders (other than those, if any, retained by a Noteholder or other holder

in connection with the Notes) and (ii) any and all wire transfer fees that any bank deducts from any payment under this Agreement or such Note to an Agent or such Noteholder or otherwise charges to an Agent or a Noteholder with respect to a payment under such Note or this Agreement.

**Section 14.2. Survival**. The obligations of the Company under this Section 14 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Agreement, the Notes, or any other Note Document and the termination of this Agreement.

## SECTION 15 SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT.

All representations and warranties of the Company contained herein and in each other Note Document shall survive the execution and delivery of this Agreement, the Notes and the other Note Documents, the purchase or transfer by any Noteholder of any Note or portion thereof or interest therein and the payment of any Note, and may be relied upon by any subsequent Noteholder, regardless of any investigation made at any time by or on behalf of such Noteholder or any other Noteholder. All representations and warranties of each Noteholder (in each case, as such and as a Noteholder) contained herein and in each other Note Document shall survive the execution and delivery of this Agreement, the Notes and the other Note Documents, the purchase or transfer by any Noteholder of any Note or portion thereof or interest therein and the payment of any Note, and may be relied upon by the Company, regardless of any investigation made at any time by or on behalf of the Company. All statements contained in any certificate or other instrument delivered by or on behalf of the Company pursuant to this Agreement or any other Note Document shall be deemed representations and warranties of the Company, as applicable, under this Agreement. Subject to the preceding sentence, this Agreement, the Notes and the other Note Documents embody the entire agreement and understanding between each Noteholder and the Company and supersede all prior agreements and understandings relating to the subject matter hereof.

## SECTION 16 AMENDMENT AND WAIVER.

**Section 16.1. Requirements**.

(a)     This Agreement, the Notes and any other Note Document may be amended, supplemented (including to issue additional Notes hereunder) and the observance of any term hereof or of the Notes may be waived (either retroactively or prospectively), only with the written consent of the Required Holders and the Company, and acknowledged by the Agent, or by the applicable Note Party and the Agent with the consent of the Required Holders; provided that no such amendment or waiver shall:

(i)     reduce or forgive the principal amount of any Note or reduce the rate of interest thereon, or reduce or forgive any interest or fees payable hereunder, without the written consent of each Noteholder affected thereby (except that any amendment or modification of the financial covenants in Section 10.6 of this Agreement (or defined terms used in the financial covenants in Section 10.6 of this Agreement) shall not constitute a reduction in the rate of interest or fees for purposes of this clause (i));

(ii)     postpone any scheduled date of payment of the principal amount of any Note, or any date for the payment of any interest, fees or other Note Obligations payable

hereunder, without the written consent of each Noteholder affected thereby;

(iii)     change Section 8.5 in a manner that would alter the manner in which payments are shared, without the written consent of each Noteholder;

(iv)   change any of the provisions of this Section or the definition of "Required Holders" or any other provision of any Note Document specifying the number or percentage of Noteholder required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Noteholder directly affected thereby;

(v)   exchange or permit the exchange of any of the Notes (whether pursuant to any refinancing, any "cashless exchange" or otherwise) for any other Indebtedness of the Note Parties, their Subsidiaries or any other Person, including any priming exchanged Indebtedness or new Indebtedness, unless the Note Parties, their Subsidiaries or such other Person shall have offered to exchange or refinance the Notes of each Noteholder on a pro rata basis based on their pro rata share on the same terms or with the written consent of each Noteholder;

(vi)   amend or waive any of the provisions of Section 8, Section 11.1(a), Section 11.1(b), Section 12 hereof, or any defined term (as is used therein), without the written consent of each Noteholder directly affected thereby;

(vii)   release all or substantially all of the guarantees of the Note Obligations (if any) or the Collateral, without the written consent of each Noteholder; or

(viii)   subordinate the Notes in contractual right of payment to any other Indebtedness or alter the priority of the Liens securing the Note Obligations without the written consent of each Noteholder.

provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent or the Collateral Agent hereunder without the prior written consent of the Agent or the Collateral Agent, as the case may be (and the Agent Fee Letter may be amended or modified, or the rights or privileges thereunder waived, in a writing executed only by the parties thereto); provided, further, that no such agreement to Section 19 hereof shall amend, modify or otherwise affect the rights or duties of any Noteholder thereunder without the prior written consent of such Noteholder.

(b)   The Noteholders hereby irrevocably authorize the Collateral Agent, at its option and in its sole discretion, to release any Liens granted to the Collateral Agent by the Note Parties on any Collateral (i) upon the payment in full of all Note Obligations in accordance with the terms hereof, (ii) as directed in Section 9.21(c), (iii) constituting property being sold or disposed of if the Note Parties certify to the Collateral Agent that the sale or disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on any such certificate, without further inquiry), (iv) constituting property leased to the Company under a lease which has expired or been terminated in a transaction permitted under this Agreement, (v) as required to effect any sale or other disposition of such Collateral in connection with any exercise of remedies of the Collateral Agent and the Required Holders permitted under the terms of this Agreement or (vi) as otherwise authorized under Section 20.6. Except as provided in the preceding sentence, the Collateral Agent will not release any Liens on Collateral without the prior written authorization of the Required Holders. Any such release shall not in any manner discharge, affect, or impair the Note Obligations or any Liens (other than those expressly being released) upon (or obligations of the Note Parties in respect of) all interests retained by the Note Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral. Any execution and delivery by the Collateral Agent of documents in connection with any such release shall be without recourse to or warranty by the Collateral Agent.

**Section 16.2. Solicitation of Noteholders**.

(a) *Solicitation*. The Company will provide each Noteholder with sufficient information, sufficiently far in advance of the date a decision is required, to enable such holder to make an informed and considered decision with respect to any proposed amendment, waiver or consent in respect of any of the provisions hereof, of the Notes or of any other Note Document. The Company will deliver executed or true and correct copies of each amendment, waiver or consent effected pursuant to the provisions of this Section 16 to each Noteholder promptly following the date on which it is executed and delivered by, or receives the consent or approval of, the requisite Noteholders.

(b) *Payment*. The Company will not directly or indirectly pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee or otherwise, or grant any security or provide other credit support, to any Noteholder as consideration for or as an inducement to the entering into by such holder of any waiver or amendment of any of the terms and provisions hereof, or of any Note or of any other Note Document unless such remuneration, security or other credit support is concurrently offered, on the same terms, ratably to each Noteholder.

(c) *Consent in Contemplation of Transfer*. Any consent given pursuant to this Section by a Noteholder that has transferred or has agreed to transfer its Notes to the Company, any Subsidiary or any Affiliate of the Company (pursuant to a waiver under Section 17.1(c) or subsequent to Section 8.7 having been amended pursuant to Section 17.1(c)) in connection with such consent shall be void and of no force or effect except solely as to such holder, and any amendments effected or waivers granted or to be effected or granted that would not have been or would not be so effected or granted but for such consent (and the consents of all other Noteholders that were acquired under the same or similar conditions) shall be void and of no force or effect except solely as to such holder.

**Section 16.3. Binding Effect, etc**. Any amendment or waiver consented to as provided in this Section 16 or any other Note Document applies equally to all Noteholders and is binding upon them and upon each future holder of any Note and upon the Company without regard to whether such Note has been marked to indicate such amendment or waiver. No such amendment or waiver will extend to or affect any obligation, covenant, agreement, Default or Event of Default not expressly amended or waived or impair any right consequent thereon. No course of dealing between the Company and any Noteholder nor any delay in exercising any rights hereunder or under any Note shall operate as a waiver of any rights of any holder of such Note.

**Section 16.4. Notes Held by Company, etc**. Solely for the purpose of determining whether the holders of the requisite percentage of the aggregate principal amount of Notes then outstanding approved or consented to any amendment, waiver or consent to be given under this Agreement, the Notes or any other Note Document, or have directed the taking of any action provided herein, in the Notes or in any other Note Document to be taken upon the direction of the holders of a specified percentage of the aggregate principal amount of Notes then outstanding, Notes directly or indirectly owned by the Company or any of its Affiliates shall be deemed not to be outstanding.

**SECTION 17 NOTICES.**

Except to the extent otherwise provided in Section 7.4, all notices and communications provided for hereunder shall be in writing and sent (a) by telecopy on a Business Day before 4:00 p.m. at the recipient's office if the sender on the same Business Day sends a confirming copy of such notice by an internationally recognized overnight delivery service for receipt the following Business Day (charges prepaid), or (b) by registered or certified mail with return receipt requested (postage prepaid), (c) by an internationally recognized overnight delivery service (with charges prepaid) for receipt the following Business Day or (d) by electronic mail. Any such notice must be sent:

(i) if to the Agent or the Collateral Agent at the address specified for such communications in Schedule A, or at such other address as the Agent or Collateral Agent shall have specified to the Company and Noteholders in writing,

(ii) if to any Noteholder, to such Noteholder at the address specified in its Administrative Questionnaire, or at such other address as such Noteholder shall have specified to the Company and the Agent in writing (and the Agent shall maintain each such address current in the Register), or

(iii) if to a Note Party, to the Company at 16201 East Main Street, Cut Off, Louisiana 70345 to the attention of Luke Newman (with a copy by email to legal@chouest.com, which copy shall not constitute official notice hereunder), or at such other address as the Company shall have specified to the holder of each Note and the Agent in writing.

Any notice given by delivery, mail, or courier under this Section 17 will be deemed given only when actually received.

## SECTION 18 REPRODUCTION OF DOCUMENTS.

This Agreement, the other Note Documents and all documents relating hereto and thereto, including, without limitation, (a) consents, waivers and modifications that may hereafter be executed, (b) documents received by any Noteholder at the Closing (except the Notes themselves), and (c) financial statements, certificates and other information previously or hereafter furnished to any Noteholder, may be reproduced by such Noteholder by any photographic, photostatic, electronic, digital, or other similar process and such Noteholder may destroy any original document so reproduced. The Company agrees and stipulates that, to the extent permitted by applicable law, any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by such Noteholder in the regular course of business) and any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence. This Section 18 shall not prohibit the Company or any other Noteholder from contesting any such reproduction to the same extent that it could contest the original, or from introducing evidence to demonstrate the inaccuracy of any such reproduction.

## SECTION 19 CONFIDENTIAL INFORMATION.

For the purposes of this Section 19, "**Confidential Information**" means (i) information delivered to any Noteholder by or on behalf of the Note Parties or any Subsidiary in connection with the transactions contemplated by or otherwise pursuant to this Agreement that was clearly marked or labeled or otherwise adequately identified when received by such Noteholder as being confidential information of such Note Party or such Subsidiary, and (ii) whether or not marked confidential, financial statements, projections and other information as to the performance, prospects or plans for the Note Parties, their Subsidiaries and their other Affiliates, provided that such term does not include information that (a) was publicly known or otherwise known to such Noteholder prior to the time of such disclosure, (b) subsequently becomes publicly known other than as a result of a breach of this Section, (c) otherwise becomes known to such Noteholder other than through disclosure by either Note Party or any Subsidiary or (d) constitutes financial statements delivered to such Noteholder under Section 7.1 that are otherwise publicly available; provided, further, that the fact that financial statements or other Confidential Information are provided to other creditors or potential creditors, on a confidential basis, of the Note Parties and their Affiliates does not mean such

financial statements are publicly available. Each Noteholder will maintain the confidentiality of such Confidential Information in accordance with procedures adopted by such Noteholder in good faith to protect confidential information of third parties delivered to such Noteholder, provided that such Noteholder may deliver or disclose Confidential Information to (i) its directors, officers, employees, agents, attorneys, trustees and affiliates (to the extent such disclosure reasonably relates to the administration of the investment represented by its Notes), (ii) its auditors, financial advisors and other professional advisors who agree to hold confidential the Confidential Information substantially in accordance with the terms of this Section 19, (iii) any other holder of any Note, (iv) any Institutional Investor to which it sells or offers to sell such Note or any part thereof or any participation therein (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 19), (v) any Person from which it offers to purchase any Security of the Note Parties or any Subsidiary of such Note Party (if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 19), (vi) any federal or state regulatory authority having jurisdiction over such Noteholder, (vii) the NAIC or the SVO or, in each case, any similar organization, or any nationally recognized rating agency that requires access to information about such Noteholder's investment portfolio, or (viii) any other Person to which such delivery or disclosure may be necessary or appropriate (w) to effect compliance with any law, rule, regulation or order applicable to such Noteholder, (x) in response to any subpoena or other legal process, (y) in connection with any litigation to which such Noteholder is a party or (z) if an Event of Default has occurred and is continuing, to the extent such Noteholder may reasonably determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under such Noteholder's Notes, this Agreement and the other Note Documents; provided, that at least 2 Business Days prior written notice (unless prohibited by law, rule or regulation) shall be given to the Company prior to the disclosure of Confidential Information under clauses (vi), (viii)(w), (viii)(x) and (viii)(y) above. Each Noteholder, by its acceptance of a Note, will be deemed to have agreed to be bound by and to be entitled to the benefits of this Section 19 as though it were a party to this Agreement. On reasonable request by the Company in connection with the delivery to any Noteholder of information required to be delivered to such holder under this Agreement or requested by such holder (other than a holder that is a party to this Agreement or its nominee), such holder will enter into an agreement with the Company embodying the provisions of this Section 19.

In the event that as a condition to receiving access to information relating to the Company or its Subsidiaries or its other Affiliates in connection with the transactions contemplated by or otherwise pursuant to this Agreement, any Noteholder is required to agree to a confidentiality undertaking (whether through IntraLinks, another secure website, a secure virtual workspace or otherwise) which is different from the terms of this Section 19, the terms of this Section 19 shall not be amended thereby and, as between such Noteholder or such holder and the Company, the terms of this Section 19 shall supersede any such other confidentiality undertaking.

## SECTION 20 AGENTS

### Section 20.1. Authorization and Action.

(a)        Each Noteholder, on behalf of itself and any of its Affiliates, hereby irrevocably appoints Wilmington Trust, National Association as Agent and as Collateral Agent and its successors and assigns to serve as the Agent and Collateral Agent, as applicable, under the Note Documents and each Noteholder authorizes each of the Agent and the Collateral Agent to take such actions as agent on its behalf and to exercise such powers under this Agreement and the other Note Documents as are delegated to the Agent and the Collateral Agent respectively under such agreements and to exercise such powers as are reasonably incidental thereto. In addition, to the extent required under the laws of any jurisdiction other than within the United States, each Noteholder hereby grants to each of the Agent and the Collateral Agent any required powers of attorney to execute and enforce any Security Document governed by the laws of

such jurisdiction on such Noteholder's behalf. Without limiting the foregoing, each Noteholder hereby authorizes each of the Agent and the Collateral Agent to execute and deliver, and to perform its obligations under, each of the Note Documents to which each of the Agent and the Collateral Agent is a party, to exercise all rights, powers and remedies that the Agent and the Collateral Agent, as applicable, may have under such Note Documents. Notwithstanding any provision of this Agreement or any other Note Document, in no event shall the Agent or Collateral Agent ever be required to take any action which exposes the Agent or the Collateral Agent to personal liability or which is contrary to any provision of any Note Document or applicable law. Without limiting the generality of the foregoing, each of the Agent and the Collateral Agent is hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and the rights of the Noteholders with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents.

(b)     As to any matters not expressly provided for herein and in the other Note Documents (including enforcement or collection), neither the Agent nor the Collateral Agent shall be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Holders (or such other number or percentage of the Noteholders as shall be necessary, pursuant to the terms in the Note Documents), and, unless and until revoked in writing, such instructions shall be binding upon each Noteholder; provided, however, that neither the Agent nor the Collateral Agent shall be required to take any action that in its opinion or in the opinion of its counsel (i) may expose it to liability or (ii) is contrary to this Agreement or any other Note Document or applicable law, including any action that may be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency or reorganization or relief of debtors; provided, further, that the Agent or the Collateral Agent may seek clarification or direction from the Required Holders prior to the exercise of any such instructed action and may refrain from acting until such clarification or direction has been provided. Except as expressly set forth in the Note Documents, neither the Agent nor the Collateral Agent shall have any duty to disclose, and neither shall be liable for the failure to disclose, any information relating to the Note Parties, any Subsidiary or any Affiliate of any of the foregoing that is communicated to or obtained by the Person serving as Agent, the Collateral Agent or any of their Affiliates in any capacity. Nothing in this Agreement shall require the Agent or the Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers.

(c)     In performing its functions and duties hereunder and under the other Note Documents, each of the Agent and the Collateral Agent is acting solely on behalf of the Noteholders and its duties are entirely mechanical and administrative in nature. Without limiting the generality of the foregoing:

(i)     the Agent and the Collateral Agent does not assume and shall not be deemed to have assumed any obligation or duty or any other relationship as the agent, fiduciary or trustee of or for any Noteholder, any other holder of any other obligation, regardless of whether a Default or an Event of Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" (or any similar term) herein or in any other Note Document with reference to the Agent or the Collateral Agent is not intended to connote any fiduciary duty or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties); additionally, each Noteholder agrees that it will not assert any claim against the Agent or the Collateral Agent based on an alleged breach of fiduciary duty by the Agent or the Collateral Agent in connection with this Agreement and the transactions contemplated hereby; and

(ii)        nothing in this Agreement or any Note Document shall require the Agent or the Collateral Agent to account to any Noteholder for any sum or the profit element of any sum received by the Agent or the Collateral Agent for its own account;

(d)        Each of the Agent and the Collateral Agent may perform any of its duties and exercise its rights and powers hereunder or under any other Note Document by or through any one or more sub-agents appointed by the Agent or the Collateral Agent, as applicable. The Agent, the Collateral Agent and any such sub-agent may perform any of their respective duties and exercise their respective rights and powers through their respective Related Parties. The exculpatory provisions of this Section shall apply to any such sub-agent and to the Related Parties of the Agent, the Collateral Agent and any such sub-agent, and shall apply to their respective activities pursuant to this Agreement. Neither the Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any sub-agent except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Agent or the Collateral Agent acted with gross negligence or willful misconduct in the selection of such sub-agent.

(e)        In case of the pendency of any proceeding with respect to the Note Parties under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, including the Bankruptcy Code or any other Bankruptcy Law, the Agent (irrespective of whether the principal of any Indebtedness shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Note Parties) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(i)        to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Notes and all other Note Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Noteholders and the Agent allowed in such judicial proceeding; and

(ii)        to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Noteholder to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Noteholders, to pay to the Agent any amount due to it, in its capacity as the Agent, under the Note Documents. Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Note Obligations or the rights of any Noteholder or to authorize the Agent to vote in respect of the claim of any Noteholder in any such proceeding.

(f)        The provisions of this Section are solely for the benefit of the Agent, the Collateral Agent and the Noteholders, and, except solely to the extent of the Note Parties' rights pursuant to and subject to the conditions set forth in this Section, none of the Note Parties or any Subsidiary, or any of their respective Affiliates, shall have any rights as a third party beneficiary under any such provisions.

**Section 20.2. Agent's Reliance, Indemnification, Etc.**

(a)        Neither the Agent, the Collateral Agent nor any of its Related Parties shall be (i) liable for any action taken or omitted to be taken by it (A) with the consent of or at the request of the Required Holders (or such other number or percentage of the Noteholders as shall be necessary, or as the Agent or the Collateral Agent shall believe in good faith to be necessary, under the circumstances as provided in the Note Documents) or (B) in the absence of its own gross negligence or willful misconduct

(such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and nonappealable judgment) or (ii) responsible in any manner to any of the Noteholder for any recitals, statements, representations or warranties made by the Note Parties or any officer thereof contained in this Agreement or any other Note Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent or the Collateral Agent under or in connection with, this Agreement or any other Note Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Note Document or for any failure of the Note Parties to perform their obligations hereunder or thereunder.

(b)      Neither the Agent nor the Collateral Agent shall be deemed to have knowledge of any Default unless and until written notice thereof (stating that it is a "notice of default") is given to a Trust Officer of the Agent or the Collateral Agent, as applicable, at its Corporate Trust Office by the Note Parties or a Noteholder, and the Agent and the Collateral Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Note Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Note Document or the occurrence of any Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of any Note Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article 4 or elsewhere in any Note Document, other than to confirm receipt of items expressly required to be delivered to the Agent or the Collateral Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Agent or the Collateral Agent, or (vi) the creation, perfection or priority of Liens on the Collateral or the sufficiency of the Collateral.

(c)      Without limiting the foregoing, the Agent and the Collateral Agent (i) may treat the payee of any promissory note as its holder until such promissory note has been assigned in accordance with Section 13, (ii) may rely on the Register to the extent set forth in Section 13, (iii) may consult with legal counsel (including counsel to the Note Parties), independent public accountants and other experts selected by it, and shall not be liable for any action taken or omitted to be taken by it in accordance with the advice of such counsel, accountants or experts, (iv) makes no warranty or representation to any Noteholder and shall not be responsible to any Noteholder for any statements, warranties or representations made by or on behalf of the Note Parties in connection with this Agreement or any other Note Document, (v) in determining compliance with any condition hereunder to the issuance of Notes that by its terms must be fulfilled to the satisfaction of a Noteholder, may presume that such condition is satisfactory to such Noteholder unless the Agent and the Collateral Agent shall have received notice to the contrary from such Noteholder sufficiently in advance of the issuance of such Note and (vi) shall be entitled to rely on, and shall incur no liability under or in respect of this Agreement or any other Note Document by acting upon, any notice, consent, certificate or other instrument or writing (which writing may be a fax, any electronic message, Internet or intranet website posting or other distribution) or any statement made to it orally or by telephone and believed by it to be genuine and signed or sent or otherwise authenticated by the proper party or parties (whether or not such Person in fact meets the requirements set forth in the Note Documents for being the maker thereof).

(d)      Each Agent shall be entitled to conclusively rely, and shall be fully protected in so relying, upon any notice (including notice by telephone), communication, direction, instruction, consent, certificate, order or decree of a court of competent jurisdiction or other instrument or writing (which may be by facsimile, and including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and signed or sent by the proper party or parties.

(e)      Each of the Agent and the Collateral Agent shall be fully justified in failing or refusing to take any action under any Note Document unless it shall first receive such written direction,

advice or concurrence of the Required Holders (or such other number or percentage of Noteholders as may be expressly required hereby in any instance) as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Noteholders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agent and Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Note Document in accordance with a written request, direction or consent of the Required Holders (or such other number or percentage of Noteholders as may be expressly required hereby or by any other Note Document in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Noteholders.

(f)        The Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Noteholder to whom payment was due but not made, shall be to recover from other Noteholders any payment in excess of the amount to which they are determined to be entitled (and such other Noteholders hereby agree to return to such Noteholder any such erroneous payments received by them).

(g)        Neither the Agent nor the Collateral Agent shall be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or any other Note Documents caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation, any act or provision of any present or future law or regulation or Governmental Authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(h)        Neither the Agent nor the Collateral Agent shall have any obligation for (a) perfecting, maintaining, monitoring, preserving or protecting the security interest or Lien granted under this Agreement, any other Note Document, or any agreement or instrument contemplated hereby or thereby; (b) the filing, re-filing, recording, re-recording, or continuing of any document, financing statement, mortgage, assignment, notice, instrument of further assurance, or other instrument in any public office at any time or times; or (c) providing, maintaining, monitoring, or preserving insurance on or the payment of taxes with respect to any Collateral.

**Section 20.3. Posting of Communications**.

(a)        The Note Parties agree that the Agent may, but shall not be obligated to, make any Communications available to the Noteholders by posting the Communications on IntraLinksTM, DebtDomain, SyndTrak, ClearPar or any other electronic system chosen by the Agent to be its electronic transmission system (the "*Approved Electronic Platform*").

(b)        Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Agent from time to time (including, as of the Restatement Date, a user ID/password authorization system) and the Approved Electronic Platform is secured through a per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Noteholders and the Note Parties acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure, that the Agent is not responsible for approving or vetting the representatives or contacts of any Noteholder that are added to the Approved Electronic Platform, and that there are confidentiality and other risks associated with such distribution. Each of the Noteholders and the Note Parties hereby

approves distribution of the Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution.

(c) THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE". THE APPLICABLE PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE APPROVED ELECTRONIC PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE APPROVED ELECTRONIC PLATFORM AND THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE APPLICABLE PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE APPROVED ELECTRONIC PLATFORM. IN NO EVENT SHALL THE AGENT OR ANY OF ITS RELATED PARTIES (COLLECTIVELY, "*APPLICABLE PARTIES*") HAVE ANY LIABILITY TO THE NOTE PARTIES, ANY NOTEHOLDER, OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE NOTE PARTIES' OR THE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET OR THE APPROVED ELECTRONIC PLATFORM.

"*Communications*" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of the Note Parties pursuant to any Note Document or the transactions contemplated therein which is distributed by the Agent or any Noteholder by means of electronic communications pursuant to this Section, including through an Approved Electronic Platform.

(d) Each Noteholder agrees that notice to it (as provided in the next sentence) specifying that Communications have been posted to the Approved Electronic Platform shall constitute effective delivery of the Communications to such Noteholder for purposes of the Note Documents. Each Noteholder agrees (i) to notify the Agent in writing (which could be in the form of electronic communication) from time to time of such Noteholder's email address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such email address.

(e) Each of the Noteholders and the Note Parties agree that the Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Communications on the Approved Electronic Platform in accordance with the Agent's generally applicable document retention procedures and policies.

(f) Nothing herein shall prejudice the right of the Agent or any Noteholder to give any notice or other communication pursuant to any Note Document in any other manner specified in such Note Document.

**Section 20.4. Successor Agent and Collateral Agent**.

(a) The Agent and the Collateral Agent may resign at any time by giving 30 days' prior written notice thereof to the Noteholders and the Note Parties, and may be removed at any time by the Required Holders by not less than 30 days written notice to the Agent or the Collateral Agent, whether or not a successor Agent or Collateral Agent, as the case may be, has been appointed. Upon any such resignation or removal, the Required Holders shall have the right to appoint a successor Agent or Collateral Agent, as the case may be. If no successor Agent or Collateral Agent, as the case may be, shall have been so appointed by the Required Holders, and shall have accepted such appointment, within thirty (30) days

after the retiring Agent's or Collateral Agent's, as the case may be, giving of notice of resignation or being given notice of removal, then the retiring or removed Agent or Collateral Agent, as the case may be, may, on behalf of the Noteholders, appoint a successor Agent or Collateral Agent, as the case may be, which shall be a bank with an office in New York, New York or an Affiliate of any such bank. In either case, such appointment shall be subject to the prior written approval of the Note Parties (which approval may not be unreasonably withheld and shall not be required while an Event of Default has occurred and is continuing). Upon the acceptance of any appointment as Agent or Collateral Agent, as the case may be, by a successor Agent or Collateral Agent, as the case may be, such successor Agent or Collateral Agent, as the case may be, shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring or removed Agent or Collateral Agent, as the case may be. Upon the acceptance of appointment as Agent or Collateral Agent, as the case may be, by a successor Agent or Collateral Agent, as the case may be, the retiring or removed Agent or Collateral Agent, as the case may be, shall be discharged from its duties and obligations under this Agreement and the other Note Documents. Prior to any retiring or removed Agent's or Collateral Agent's, as the case may be, resignation or removal hereunder as Agent or Collateral Agent, as the case may be, the retiring or removed Agent or Collateral Agent, as the case may be, shall take such action as may be reasonably necessary to assign to the successor Agent or Collateral Agent, as the case may be, its rights as Agent or Collateral Agent, as the case may be, under the Note Documents.

(b)     Notwithstanding paragraph (a) of this Section, in the event no successor Agent or Collateral Agent, as the case may be, shall have been so appointed and shall have accepted such appointment within thirty (30) days after the retiring or removed Agent or Collateral Agent, as the case may be, gives notice of its intent to resign or is given notice of its removal, the retiring or removed Agent or Collateral Agent, as the case may be, may give notice of the effectiveness of its resignation to the Noteholders and the Note Parties or, in the case of removal, its removal shall become effective, whereupon, on the date of effectiveness of such resignation or removal, (i) the retiring Agent or Collateral Agent, as the case may be, shall be discharged from its duties and obligations hereunder and under the other Note Documents; provided that, solely for purposes of maintaining any security interest granted to the Collateral Agent under any Security Document for the benefit of the Noteholders, the retiring or removed Collateral Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Noteholders, and continue to be entitled to the rights set forth in such Security Document and Note Document, and, in the case of any Collateral in the possession of the Collateral Agent, shall continue to hold such Collateral, in each case until such time as a successor Collateral Agent is appointed and accepts such appointment in accordance with this Section (it being understood and agreed that the retiring or removed Collateral Agent shall have no duty or obligation to take any further action under any Security Document, including any action required to maintain the perfection of any such security interest), and (ii) the Required Holders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Agent or Collateral Agent, as the case may be; provided that (A) all payments required to be made hereunder or under any other Note Document to the Agent for the account of any Person other than the Agent shall be made directly to such Person and (B) all notices and other communications required or contemplated to be given or made to the Agent shall directly be given or made to each Noteholder. Following the effectiveness of the Agent's or the Collateral Agent's resignation or removal from its capacity as such, the provisions of this Article, Section 8.11, Section 14 and Section 22.3, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Note Document, shall continue in effect for the benefit of such retiring or removed Agent, Collateral Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent or Collateral Agent was acting as Agent or Collateral Agent and in respect of the matters referred to in the proviso under clause (a) above.

(c)     Any Person into which the Agent or the Collateral Agent, as applicable, may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or

substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any Person resulting from any such conversion, sale, merger, consolidation or transfer to which the Agent or the Collateral Agent, as applicable, is a party, will be and become the successor Agent or Collateral Agent, as applicable, under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

**Section 20.5. Acknowledgment of Noteholders**.

(a)     Each Noteholder represents that it is engaged in acquiring or holding notes in the ordinary course of its business and that it has, independently and without reliance upon the Agent, the Collateral Agent or any other Noteholder, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement as a Noteholder, and to acquire or hold Notes hereunder. Each Noteholder also acknowledges that it will, independently and without reliance upon the Agent, the Collateral Agent or any other Noteholder, or any of the Related Parties of any of the foregoing, and based on such documents and information (which may contain material, non-public information within the meaning of the United States securities laws concerning the Note Parties and their Affiliates) as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Note Document or any related agreement or any document furnished hereunder or thereunder.

(b)     Each Noteholder, by delivering its signature page to this Agreement on the Closing Date, or delivering its signature page to an Assignment and Acceptance or any other Note Document pursuant to which it shall become a Noteholder hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Note Document and each other document required to be delivered to, or be approved by or satisfactory to, the Agent or the Noteholders on the Closing Date or the effective date of any such assignment or any other Note document pursuant to which it shall have become a Noteholder hereunder.

**Section 20.6. Collateral Matters**.

(a)     The Noteholders hereby empower and authorize Wilmington Trust, National Association (in its separate capacities as the Agent or as the Collateral Agent) to execute and deliver the Security Documents, the Intellectual Property Agreements, Support Agreements, the Master Services Agreement and all related documents or instruments as shall be necessary or appropriate to effect the purposes of the Security Documents (including as related to the assignments of the Intellectual Property Agreements, Support Agreements and the Master Services Agreement if foreclosed on).

(b)     The Noteholders hereby irrevocably empower and authorize Wilmington Trust, National Association (in its separate capacities as the Agent or as the Collateral Agent) to execute and deliver on their behalf any agreements, documents or instruments as shall be necessary or appropriate to effect any releases of Liens on any Collateral (i) as required to effect any sale or other disposition of such Collateral in connection with any exercise of remedies of the Collateral Agent or (ii) which shall otherwise be permitted by the terms hereof or any other Note Document, including Sections 9.21(c) and 16.1(b) hereof. The Noteholders hereby irrevocably empower and authorize Wilmington Trust, National Association in its capacity as the Agent to execute and deliver on their behalf any agreements, documents or instruments as shall be necessary or appropriate to effect any payment pursuant to Section 8 hereof. Except as provided in the preceding sentences (and in Section 9.21), Wilmington Trust, National Association (in its separate capacities as the Agent or as the Collateral Agent), will not release any Liens

on Collateral without the prior written authorization of the Required Holders; provided that it may release Liens on Collateral permitted to be sold hereunder.

**Section 20.7. Credit Bidding**. The Noteholders hereby irrevocably authorize the Agent, at the direction and authorization of the Required Holders, to credit bid all or any portion of the Note Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Note Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which the Note Parties are subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Note Obligations owed to the Noteholders shall be credit bid by the Agent at the direction of the Required Holders on a ratable basis (with Note Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid (i) the Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Noteholders' ratable interests in the Note Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Holders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Holders contained in Section 16 of this Agreement), (iv) the Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Noteholders, ratably on account of the relevant Note Obligations which were credit bid, interests, whether as equity, partnership, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Noteholder or acquisition vehicle to take any further action, and (v) to the extent that Note Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason, such Note Obligations shall automatically be reassigned to the Noteholders *pro rata* with their original interest in such Note Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Note Obligations shall automatically be cancelled, without the need for any Noteholder or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Note Obligations of each Noteholder are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Noteholder shall execute such documents and provide such information regarding the Noteholder (and/or any designee of the Noteholder which will receive interests in or debt instruments issued by such acquisition vehicle) as the Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

**Section 20.8. Certain ERISA Matters**.

(a)    Each Noteholder (x) represents and warrants, as of the date such Person became a Noteholder party hereto, to, and (y) covenants, from the date such Person became a Noteholder party hereto to the date such Person ceases being a Noteholder party hereto, for the benefit of the Noteholders and their

respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Note Parties, that at least one of the following is and will be true:

     (i)    such Noteholder is not using "plan assets" (within the meaning of the ERISA Plan Asset Regulations) of one or more "benefit plan investors" (within the meaning of Section 3(42) of ERISA) in connection with the exchange of the Notes,

     (ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Noteholder's entrance into, participation in, administration of and performance of the Notes and this Agreement, and the conditions for exemptive relief thereunder are and will continue to be satisfied in connection therewith,

     (iii)    (A) such Noteholder is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Noteholder to enter into, participate in, administer and perform the Notes and this Agreement, (C) the entrance into, participation in, administration of and performance of the Notes and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Noteholder, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Noteholder's entrance into, participation in, administration of and performance of the Notes and this Agreement, or

     (iv)    such other representation, warranty and covenant as may be agreed in writing between the Agent in its sole discretion and such Noteholder.

In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Noteholder or (2) a Noteholder has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Noteholder further (x) represents and warrants for the benefit of, the Agent and not, for the avoidance of doubt, to or for the benefit of the Note Parties, as of the date such Person became a Noteholder party hereto, to, and (y) covenants, from the date such Person became a Noteholder party hereto to the date such Person ceases being a Noteholder party hereto, for the benefit of, the Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Note Party, that the Agent is not a fiduciary with respect to the assets of such Noteholder involved in such Noteholder's entrance into, participation in, administration of and performance of the Notes and this Agreement (including in connection with the reservation or exercise of any rights by the Agent under this Agreement, any Note Document or any documents related hereto or thereto).

     **Section 20.9. Erroneous Payment.**

     (a)    Each Noteholder hereby agrees that (i) if the Agent notifies such Noteholder that the Agent has determined in its sole discretion that any funds received by such Noteholder from the Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Noteholder (whether or not known to such Noteholder) (whether as a payment,

prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "**Erroneous Payment**") and demands the return of such Erroneous Payment (or a portion thereof), such Noteholder shall promptly, but in no event later than one Business Day thereafter, return to the Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Noteholder to the date such amount is repaid to the Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Noteholder shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payments received, including, without limitation, waiver of any defense based on "discharge for value" or any similar theory or doctrine. A notice of the Agent to any Noteholder under this clause (a) shall be conclusive, absent manifest error.

(b)     Without limiting immediately preceding clause (a), each Noteholder hereby further agrees that if it receives a payment from the Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Agent, (y) that was not preceded or accompanied by notice of payment, or (z) that such Noteholder otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each case, if an error has been made each such Noteholder is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment, and to the extent permitted by applicable law, such Noteholder shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar theory or doctrine. Each Noteholder agrees that, in each such case, it shall promptly (and, in all events, within three (3) Business Days of its knowledge (or deemed knowledge) of such error) notify the Agent of such occurrence and, upon demand from the Agent, it shall promptly, but in all events no later than three (3) Business Days thereafter, return to the Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Noteholder to the date such amount is repaid to the Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)     The Company hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Noteholder that has received such Erroneous Payment (or portion thereof) for any reason (and without limiting the Agent's rights and remedies under this Section 20.9), the Agent shall be subrogated to all the rights of such Noteholder with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Note Obligations owed by the Company or any other Note Party.

(d)     In addition to any rights and remedies of the Agent provided by law, Agent shall have the right, without prior notice to any Noteholder, any such notice being expressly waived by such Noteholder to the extent permitted by applicable law, with respect to any Erroneous Payment for which a demand has been made in accordance with this Section 20.9 and which has not been returned to the Agent, to set off and appropriate and apply against such amount any and all amounts owing to or for the credit or the account of such Noteholder under the Note Documents. Agent agrees promptly to notify the Noteholder after any such setoff and application made by Agent; provided, that the failure to give such notice shall not affect the validity of such setoff and application.

(e)        Each party's obligations under this Section 20.9 shall survive the resignation or replacement of the Agent or the Collateral Agent or the repayment, satisfaction or discharge of all Note Obligations (or any portion thereof) under any Note Document.

Section 20.10. **Indemnification of Agents.** Each Noteholder agrees to indemnify each of the Agent and the Collateral Agent and their respective Related Parties (collectively, the "**Agent Indemnitees**") (to the extent not reimbursed by the Company in accordance with Section 22.3 or otherwise), ratably according to the respective pro rata shares (determined as of the time that the applicable indemnity payment is sought (or, if such indemnity is sought after the date upon which the principal of the Notes shall have been paid in full, in accordance with such Noteholders' respective pro rata shares as in effect immediately prior to such date)), from and against any and all Indemnified Liabilities and regardless of whether any such Agent Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory, or sole negligence of any Agent Indemnitee; provided, that no Noteholder shall be liable for any portion of such Indemnified Liabilities resulting from such Agent Indemnitee's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable order; provided, further, that no action of the Agent or the Collateral Agent taken in accordance with the directions of the Required Holders (or such other number or percentage of the Noteholders as shall be necessary, or as the Agent or the Collateral Agent shall believe in good faith shall be necessary, under the circumstances as provided in the Note Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 20.10. Without limitation of the foregoing, the Noteholders shall reimburse the Agent and the Collateral Agent (to the extent not reimbursed by the Company in accordance with Section 14 or otherwise) ratably according to their respective pro rata shares (determined as of the time that the applicable expense reimbursement is sought (or, if such reimbursement is sought after the date upon which the principal of the Notes shall have been paid in full, in accordance with such Noteholders' pro rata shares as in effect immediately prior to such date)) for all costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by the Agent and the Collateral Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Note Document, or any document contemplated by or referred to herein. Each Noteholder hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Noteholder under any Note Document or otherwise payable by the Agent or the Collateral Agent to such Noteholder from any source against any amount due to the Agent or the Collateral Agent or any of its Related Parties under this Section 20.10. For purposes hereof, "pro rata share" shall mean, with respect to any Noteholder at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the aggregate outstanding principal amount of the Notes of such Noteholder at such time, and the denominator of which is the aggregate outstanding principal amount of the Notes of all Noteholders at such time. The agreements in this Section 20.10 shall survive the payment in full of the Notes, the resignation or removal of the Agent or the Collateral Agent, and the termination of this Agreement. All amounts due under this Section 20.10 shall be payable no later than ten (10) Business Days after demand therefor, to the extent not reimbursed by the Company in accordance with Section 22.3 or otherwise.

## SECTION 21 [RESERVED].

## SECTION 22 MISCELLANEOUS.

Section 22.1. **Successors and Assigns**. All covenants and other agreements contained in this Agreement by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and assigns (including, without limitation, any subsequent Noteholder) whether so expressed or not. So long as the Notes have not matured (at stated maturity) or have become or declared immediately due and payable pursuant to Section 12.1, no Noteholder may assign a Note or any interest therein to a

Person it knows to be a Competitor. Noteholders and the Company shall be entitled to rely on representations of transferees for purposes of determining whether such transferee is a competitor.

**Section 22.2. Accounting Terms**. All accounting terms used herein which are not expressly defined in this Agreement have the meanings respectively given to them in accordance with GAAP. Except as otherwise specifically provided herein, (i) all computations made pursuant to this Agreement shall be made in accordance with GAAP, and (ii) all financial statements shall be prepared in accordance with GAAP. For purposes of determining compliance with the financial covenants contained in this Agreement, (a) any election by the Company to measure any financial liability using fair value (as permitted by Accounting Standard Codification Topic No. 825-10-25 - Fair Value Option or any similar accounting standard) shall be disregarded and such determination shall be made as if such election had not been made and (b) no effect shall be given to any treatment of Indebtedness in respect of convertible debt instruments under Financial Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value at such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

**Section 22.3. INDEMNIFICATION**.

(a) THE NOTE PARTIES AGREE TO INDEMNIFY, DEFEND AND HOLD HARMLESS EACH INDEMNIFIED PARTY FROM AND AGAINST ALL CLAIMS ARISING OUT OF OR IN CONNECTION WITH (I) THE NOTE DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE NOTE DOCUMENTS, (II) THE ACTUAL OR PROPOSED USE OF THE PROCEEDS FROM THE ISSUANCE OF THE NOTES, (III) THE DIRECT OR INDIRECT RESULT OF THE VIOLATION BY ANY NOTE PARTY OF ANY ENVIRONMENTAL LAW, (IV) THE COMPANY'S GENERATION, MANUFACTURE, PRODUCTION, STORAGE, RELEASE, THREATENED RELEASE, DISCHARGE, DISPOSAL OR PRESENCE IN CONNECTION WITH ITS PROPERTIES OF HAZARDOUS MATERIALS (INCLUDING, WITHOUT LIMITATION, (1) ALL DAMAGES OF ANY USE, GENERATION, MANUFACTURE, PRODUCTION, STORAGE, RELEASE, THREATENED RELEASE, DISCHARGE, DISPOSAL OR PRESENCE, OR (2) THE COSTS OF ANY ENVIRONMENTAL INVESTIGATION, MONITORING, REPAIR, CLEANUP OR DETOXIFICATION AND THE PREPARATION AND IMPLEMENTATION OF ANY CLOSURE, REMEDIAL OR OTHER PLANS), (V) OWNERSHIP OR CONTROL BY THE AGENT, ANY NOTEHOLDER OR THE COLLATERAL AGENT OF ANY PROPERTY FOLLOWING FORECLOSURE UNDER THE SECURITY DOCUMENTS (OR DEED IN LIEU OF FORECLOSURE OR THE COLLATERAL AGENT OTHERWISE CONTROLLING THE APPLICABLE ASSET IN QUESTION), TO THE EXTENT SUCH CLAIMS ARISE OUT OF OR RESULT FROM ANY HAZARDOUS MATERIALS, LOCATED IN, ON OR UNDER SUCH PROPERTY PRIOR TO OR AT THE TIME OF SUCH FORECLOSURE (OR DEED IN LIEU OF FORECLOSURE OR THE COLLATERAL AGENT OTHERWISE CONTROLLING THE APPLICABLE ASSET IN QUESTION), INCLUDING CLAIMS WHICH ARE IMPOSED UPON PERSONS UNDER LAWS RELATING TO OR REGULATING HAZARDOUS MATERIALS SOLELY BY VIRTUE OF OWNERSHIP AND ARE NOT ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COLLATERAL AGENT AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NONAPPEALABLE JUDGMENT AND (VI) ANY NOTEHOLDER, THE AGENT OR THE COLLATERAL AGENT BEING DEEMED AN OPERATOR OF ANY SUCH PROPERTY BY A COURT OR OTHER REGULATORY OR ADMINISTRATIVE AGENCY OR TRIBUNAL OR OTHER THIRD PARTY, TO THE EXTENT SUCH CLAIMS ARISE OUT OF OR RESULT FROM ANY HAZARDOUS MATERIALS LOCATED IN, ON OR UNDER SUCH PROPERTY AT OR PRIOR TO ANY FORECLOSURE THEREON (OR DEED IN LIEU OF FORECLOSURE OR THE COLLATERAL AGENT OTHERWISE CONTROLLING THE APPLICABLE ASSET IN QUESTION) UNDER THE

SECURITY DOCUMENTS AND ARE NOT ATTRIBUTABLE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF COLLATERAL AGENT AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NONAPPEALABLE JUDGMENT (ALL OF THE FOREGOING, COLLECTIVELY, THE "**INDEMNIFIED LIABILITIES**").

(b) THE NOTE PARTIES AGREE NOT TO ASSERT ANY CLAIM AGAINST ANY INDEMNIFIED PARTY ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES ARISING OUT OF OR OTHERWISE RELATING TO THE NOTE DOCUMENTS, ANY OF THE TRANSACTIONS CONTEMPLATED BY THE NOTE DOCUMENTS OR THE ACTUAL OR PROPOSED USE OF THE PROCEEDS OF THE ISSUANCE OF THE NOTES. IN NO EVENT SHALL ~~EITHER~~THE AGENT NOR THE COLLATERAL AGENT BE RESPONSIBLE OR LIABLE FOR SPECIAL, INDIRECT, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE OF ANY KIND WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFIT) IRRESPECTIVE OF WHETHER SUCH AGENT HAS BEEN ADVISED OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE AND REGARDLESS OF THE FORM OF ACTION.

(c) EACH INDEMNIFIED PARTY SHALL BE INDEMNIFIED UNDER THIS SECTION 22.3 FOR ITS OWN ORDINARY NEGLIGENCE; HOWEVER, NO NOTE PARTY IS OBLIGATED TO INDEMNIFY ANY INDEMNIFIED PARTY UNDER THE NOTE DOCUMENTS TO THE EXTENT A CLAIM IS FOUND IN A FINAL, NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d) IN THE CASE OF AN INVESTIGATION OR LITIGATION TO WHICH THE INDEMNITY IN THIS SECTION 22.3 APPLIES, SUCH INDEMNITY SHALL BE EFFECTIVE WHETHER OR NOT (I) SUCH INVESTIGATION OR LITIGATION IS BROUGHT BY A NOTE PARTY, ITS DIRECTORS, MEMBERS OR CREDITORS, (II) AN INDEMNIFIED PARTY OR ANY OTHER PERSON OR ANY INDEMNIFIED PARTY IS OTHERWISE A PARTY THERETO, AND (III) THE TRANSACTIONS CONTEMPLATED BY THE NOTE DOCUMENTS ARE CONSUMMATED.

(e) FOR PURPOSES OF THIS SECTION 22.3 (I) "**INDEMNIFIED PARTY**" MEANS EACH NOTEHOLDER, THE AGENT, THE COLLATERAL AGENT AND THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ADVISORS, SUCCESSORS AND ASSIGNS, AND (II) "**CLAIM**" MEANS ANY AND ALL CLAIMS, DAMAGES, LOSSES, LIABILITIES, PENALTIES, COSTS, OBLIGATIONS, ACTIONS, JUDGMENTS, LITIGATION, INVESTIGATIONS, AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' AND PARALEGAL FEES AND EXPENSES, WHETHER OR NOT SUIT IS FILED) INCURRED BY, ASSERTED AGAINST OR AWARDED AGAINST ANY INDEMNIFIED PARTY.

(f) THE INDEMNITY SET OUT IN THIS SECTION 22.3 AND ITS TERMS AND PROVISIONS SHALL SURVIVE THE SATISFACTION AND PAYMENT OF THE OBLIGATIONS UNDER THE NOTE DOCUMENTS AND THE TERMINATION OF THIS AGREEMENT.

(g) AMOUNTS PAYABLE UNDER THIS SECTION 22.3 SHALL BE A PART OF THE OBLIGATIONS UNDER THE NOTE DOCUMENTS AND, IF NOT PAID UPON DEMAND, SHALL BEAR INTEREST AT THE DEFAULT RATE APPLICABLE TO THE NOTES (WHETHER OR NOT THE NOTES ARE THEN OUTSTANDING) UNTIL PAID.

**Section 22.4. Severability**. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or

unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 22.5. Construction, etc**. Each covenant contained herein shall be construed (absent express provision to the contrary) as being independent of each other covenant contained herein, so that compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with any other covenant. Where any provision herein refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.

**Section 22.6. Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto. The words "execution," "signed," "signature," and words of like import used in this Amendment will be deemed to include electronic signatures or the keeping of records in electronic form, each of which will be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**Section 22.7. Governing Law**. This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

**Section 22.8. Jurisdiction and Process; Waiver of Jury Trial**.

(a)     The Note Parties irrevocably submit to the exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, and any appellate court therefrom, over any suit, action or proceeding arising out of or relating to this Agreement, the Notes or, except as otherwise required by applicable law, any other Note Document. To the fullest extent permitted by applicable law, the Note Parties irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(b)     The Company consents to process being served by or on behalf of any Noteholder in any suit, action or proceeding of the nature referred to in Section 22.8(a) by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, return receipt requested, to it at its address specified in Section 17 or at such other address of which such holder shall then have been notified pursuant to said Section. The Company agrees that such service upon receipt (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by applicable law, be taken and held to be valid personal service upon and personal delivery to it. Notices hereunder shall be conclusively presumed received as evidenced by a delivery receipt furnished by the United States Postal Service or any reputable commercial delivery service.

(c)     Nothing in this Section 22.8 shall affect the right of any Noteholder to serve process in any manner permitted by law, or limit any right that any Noteholder may have to bring proceedings against the Company in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

(d) THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THEREWITH.

**Section 22.9. Press Release; Public Offering Materials**. No Note Party shall, nor shall any Note Party permit any of its Affiliates to, disclose the name of the Collateral Agent, the Agent, the Noteholders, or any Noteholder, or use the name or logo "American International Group, Inc.", "AIG", "AIG Commercial Asset Finance" or any derivative of the foregoing, "Prudential", "Prudential Financial, Inc.", "Prudential Private Capital Group", "PGIM, Inc." or any derivative of the foregoing in any press release or in any prospectus, proxy statement or other materials filed with any governmental entity relating to a public offering of the Securities of the Company, except as may be required by law, subpoena or judicial or similar order. Neither any Noteholder nor the Agent nor the Collateral Agent shall, nor shall the Agent, the Collateral Agent or any Noteholder permit any of its Affiliates to, issue any press release or other public publication in connection with this Agreement or the other Note Documents without the prior written approval of the Note Parties.

**Section 22.10. Acknowledgment Regarding Any Supported QFCs**. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Contracts or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York or of the United States or any other state of the United States):

(a)     In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

(b)     As used in this Section 22, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following:

> (i)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b)

> (ii)   a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

> (iii)  a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

**Section 22.11. Acknowledgment and Consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

> (a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an Affected Financial Institution; and

> (b)    the effects of any Bail-in Action on any such liability, including, if applicable:

> > (i)    a reduction in full or in part or cancellation of any such liability;

> > (ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

> > (iii)  the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

**Section 22.12. Tax Treatment**.

> (a)    All parties hereto shall treat the Notes as debt for U.S. federal and applicable state and local income tax purposes and as contingent payment debt instruments ("**CPDI's**") and shall not take any inconsistent position. The Company in consultation with the Noteholders will make a determination as to whether either the Exchanged Debt or the Notes are publicly traded and as such, whether the noncontingent bond method or the bifurcation method applies.

If either the Exchanged Debt or the Notes are treated as publicly traded and the noncontingent bond method applies, the Company in consultation with the Noteholders will determine the comparable yield of such

Notes and create a projected payment schedule that will be used to determine the Noteholder's interest accruals and adjustments. The Noteholders agree to report interest accruals and adjustments on the Notes in accordance with the Company's determination in accordance with this Section 22.12 of both the comparable yield and projected payment schedule for the notes and to be bound by the Company's application of the U.S. Treasury Regulations that govern CPDIs. For this purpose, the comparable yield and projected payment schedule for the Notes may be obtained by contacting the Company as set forth in Section 17 hereof,

(b)     If neither the Exchanged Debt nor the Notes are treated as publicly traded and the bifurcation method applies, the Notes will be treated as separate components (consisting of the noncontingent portion with an issue price equal to the stated principal amount of the Notes, and the contingent portions). The Noteholders may obtain information regarding the Company's reporting of the noncontingent and contingent portions by contacting the Company as set forth in Section 17 hereof.

(c)     The parties hereto acknowledge and agree that Holdings is a continuation of the Company for purposes of Section 708 of the Code and any comparable or analogous provision of state or local law, and the Note Parties shall not take any position inconsistent with such treatment.

If you are in agreement with the foregoing, please sign the form of agreement on a counterpart of this Agreement and return it to the Note Parties, whereupon this Agreement shall become a binding agreement between you and the Note Parties.

Very truly yours,

NAUTICAL SOLUTIONS, L.L.C.

By: _____
Name: _____
Title: _____

NAUTICAL SOLUTIONS HOLDINGS, LLC

By: _____
Name: _____
Title: _____

**AMERICAN HOME ASSURANCE COMPANY**, as Noteholder

[•]

By: AIG Asset Management (U.S.), LLC, investment adviser

By:
Name:
Title:

[•]

By: [•],**CAPITAL ONE, NATIONAL ASSOCIATION**, as Noteholder

By:
Name:
Title:

**EAGLESTONE REINSURANCE COMPANY**, as Noteholder

[•]By:
Name:
Title:

**JPMORGAN CHASE BANK, N.A.**, as Noteholder

By:
Name:
Title:

By:
Name:

Title:**PAR U HARTFORD LIFE & ANNUITY COMFORT TRUST**, as Noteholder
By: Prudential Arizona Reinsurance Universal

Company, as grantor
By: PGIM, Inc., as investment manager

By:

Name:

Title:



**SIGNATURE PAGE TO**
**NOTE EXCHANGE AGREEMENT**

**PRUCO LIFE INSURANCE COMPANY**, as Noteholder
By: PGIM, Inc., as investment manager

By:
Name:
Title:

**PRUCO LIFE INSURANCE COMPANY OF NEW JERSEY**, as Noteholder
By: PGIM, Inc., as investment manager

By:
Name:
Title:

**PRUDENTIAL RETIREMENT GUARANTEED COST BUSINESS TRUST**, as Noteholder
By: The Prudential Insurance Company of America, as grantor
By: PGIM, Inc., as investment manager

By:
Name:
Title:

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**, as Noteholder
By: PGIM, Inc., as investment manager

By:
Name:

Title:

SIGNATURE PAGE TO
NOTE EXCHANGE AGREEMENT

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**, as Noteholder
By: PGIM, Inc., as investment manager

By:
Name:
Title:

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**, as Noteholder
By: PGIM, Inc., as investment manager

By:
Name:
Title:

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**, as Noteholder
By: PGIM, Inc., as investment manager

By:
Name:
Title:

**THE UNITED STATES LIFE INSURANCE CO. IN THE CITY OF NY**, as Noteholder

By:
Name:
Title:

**THE VARIABLE ANNUITY LIFE INSURANCE COMPANY**, as Noteholder

By:
Name:

Title:

**SIGNATURE PAGE TO
NOTE EXCHANGE AGREEMENT**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Noteholder

By:
Name:
Title:

**BANK OF AMERICA, N.A.**, as Noteholder

By:
Name:
Title:

**CROSS OCEAN ESS III S.à r.l**, as Noteholder

By:
Name:
Title:

By:
Name:
Title:

**CROSS OCEAN ESS IV S.a.r.l.**, as Noteholder

By:
Name:
Title:

By:
Name:
Title:
By:
Name:
Title:

**CROSS OCEAN GLOBAL SIF (H) S.a.r.l.**

SIGNATURE PAGE TO
NOTE EXCHANGE AGREEMENT

By:
Name:
Title:

**CROSS OCEAN GCD MASTER FUND I (A) LP**

By:
Name:
Title:

**CROSS OCEAN USSS MASTER FUND II (A) LP**

By:
Name:
Title:

**CROSS OCEAN GLOBAL SIF (A) L.P.**

By:
Name:
Title:

**CROSS OCEAN GSS MASTER FUND LP**

By:
Name:

Title:
**Signature Page to
Note Exchange Agreement**

**FIRST HORIZON BANK,** as Noteholder

By:
Name:
Title:

**MIDTOWN ACQUISITIONS L.P.,** as Noteholder
By: Midtown Acquisitions GP LLC, it's general partner

By:
Name:
Title:

**HSBC BANK USA, NATIONAL ASSOCIATION,** as Noteholder

By:
Name:
Title:

**SYNOVUS BANK,** as Noteholder

By:
Name:
Title:

**AIG BG HOLDINGS LLC,** as Noteholder

By:
Name:
Title:

**SIGNATURE PAGE TO**

**NOTE EXCHANGE AGREEMENT**

**AIG PROPERTY CASUALTY COMPANY**, as Noteholder

By:
Name:
Title:

**AMERICAN GENERAL LIFE INSURANCE COMPANY**, as Noteholder

By:
Name:
Title:

~~By:~~ **Wilmington Trust, National Association**, as Agent

By: _____
Name:
Title:

[•]

~~By:~~ **Wilmington Trust, National Association**, as Collateral Agent

By: _____
Name:

Title:

Schedule A

INFORMATION RELATING TO NOTEHOLDERS

| Holder | Exchanged Series A Senior Notes Due ~~Due~~ 2023 | Exchanged Series B Senior Notes Due 2023 | Exchanged Credit Agreement Claims | New Notes Amount[1] |
|---|---|---|---|---|
| PAR U HARTFORD LIFE & ANNUITY COMFORT | $2,63~~44,472.0~~,240.416 | -- | -- | $2,090,~~48~~297.519 |
| PRUDENTIAL RETIREMENT GUARANTEED COST BUSINESS TRUST | $7~~29~~33,76~~8~~19.437 | -- | -- | $580,05~~3~~00.4406 |
| THE PRUDENTIAL INSURANCE COMPANY | $12,~~5~~604,832.6~~,997.7~~02 | $66,15~~,802,25~~698.8534 | $5,15~~381,071~~886.8~~8~~2 | $66,35~~83,89~~521.841 |
| PRUCO LIFE INSURANCE COMPANY OF NEW JERSEY | -- | $6,45~~79~~2,09~~5~~33.7466 | -- | $5,13~~2,037.1~~4,564.78 |
| PRUCO LIFE INSURANCE COMPANY ~~OF AMERICA~~ | -- | -- | $5,15~~381,071~~886.36~~29~~ | $4,095,6~~1~~971.17~~5~~5 |
| AIG PROPERTY CASUALTY COMPANY | $10,83~~897,549~~02.847~~5~~ | -- | -- | $8,61~~4,654.9~~3,862.07 |
| AMERICAN GENERAL LIFE INSURANCE COMPANY | $98,~~272~~804,74~~5~~19.59 | -- | -- | $78,~~106~~99,20~~5~~16.0856 |
| AMERICAN HOME | $33,419,152.73 | -- | -- | $26,415,843.82 |

~~¹ The New Notes' amounts will be reduced pro rata on the Closing Date after taking into consideration the cash sweep, if any. These numbers assume a 12/9/2022 petition date.~~

| | | | | |
|---|---|---|---|---|
| ~~IN~~ASSURANCE COMPANY | | | | |
| ~~AMERICAN HOME~~ EAGLESTONE ~~AS~~REINSURANCE COMPANY | $~~33~~14,~~239,5~~30~~2.2,~~066.42 | -- | -- | $~~26~~11,4~~18,~~275,14~~9.23~~50 |
| AIG BG ~~EAGLESTONE REINSURANCE COMPANY~~HOLDINGS LLC | $~~14,451,870.53~~29,06 0,132.86 | -- | -- | $~~11~~22,4~~86~~970,29 ~~9.06.63~~2 |
| ~~AIG BG HOLDINGS LLC~~ | ~~$28,903,741.08~~ | ~~--~~ | ~~--~~ | ~~$22,972,413.28~~ |
| THE UNITED STATES LIFE INSURANCE CO. IN THE CITY OF NY | $18,~~787~~89,086.3~~4~~31. 69 | -- | -- | 14,93~~2,0,6~~894.6 ~~2~~35 |
| THE VARIABLE ANNUITY LIFE INSURANCE COMPANY | $69,~~017,~~8,~~646,38~~15.0 0~~44 | -- | -- | 54,55~~9~~4,48~~1~~60.4 ~~8~~09 |
| JPMORGAN BRANCH | -- | -- | $51,~~818,865~~30,7 ~~1,~~6.2~~1 | $40,959~~,717.6,~~11 ~~3.81~~9 |
| Wells Fargo Bank, National ~~WELLS FARGO BANK, NATIONAL ASS~~Association | -- | -- | $51,~~818,865~~30,7 ~~1.~~56.17 | $40,959~~,717.6,~~11 ~~3.78~~5 |
| ~~BANC OF AMERICA CREDIT PRODUCTS~~Bank of America, N.A. | -- | -- | $38,~~879,~~109,~~6,~~51 3.66 | $30,90~~03,~~739~~458. 42~~8 |
| ~~DV KMP CP MGT LP ~~MIDTOWN ACQUISITIONS L.P. | -- | -- | $36,~~350~~69,36~~078 .57~~43 | $28,855~~8,94~~382.5 0~~64 |
| ~~CAPITAL ONE, NATL~~ | | | $34,~~353~~45,8~~9~~10. | $27,306~~,4,07~~58.8 |

| | | | | |
|---|---|---|---|---|
| ASSOCCapital One, National Association | -- | -- | 7635 | 41 |
| CROSS OCEAN - Global SIF (A) LP | -- | -- | $29,68854,1789.963 | $23,5977,95,83.77.442 |

| | | | | |
|---|---|---|---|---|
| FST HORIZON BKFirst Horizon Bank | -- | -- | $24,047182,6613 7.253 | $19,1124,8534.08 9 |
| CROSS OCEAN ESS III SARL | -- | -- | $23,649,5156.08. 047.89 | $18,693,561,.291 6.53 |
| HSBC BKBank USA NATL ASSOC, National Association | -- | -- | $17,12762,9055. 3918 | $13,6532,0379.9 21 |
| SYNOVUS BANK | -- | -- | $17,12762,9055. | $13,6532,0379.9 |
| CROSS OCEAN ESS IV SARL | -- | -- | $14,4739,442,96 0.3387 | $11,440,39,3851. 3897 |
| CROSS OCEAN GSS MASTER FUND LP | -- | -- | $13,399474,9386 0.412 | $10,6510,7134.8 296 |
| CROSS OCEAN GLBL SIF (H) SARL | -- | -- | $6,25388,48654. 0933 | $4,970,210647.14 9 |
| COPM LP-CO GCD MST FD I (A) LP | -- | -- | $5,671,672.415,7 03,387.26 | $4,5078,7186.90. 26 |
| COPM LP-Cross Ocean USSS Master Fund II (A) LP | -- | -- | $3,6579,30769.0 12 | $2,908,63817.675 |
| **Aggregate** | $289,037,410.52290, 601,328.18 | $72,26590,3532.59 00 | $377,891,918.54 380,005,014.08 | $$587,500,000.00 |

Schedule A

Claim Calculations

| Noteholders[2] | Total Claim | % Claim |
|---|---|---|
| AIG PROPERTY CASUALTY COMPANY | $10,83~~897,549~~8902.~~8~~475 | 1.466~~3~~2% |
| AMERICAN GENERAL LIFE INSURANCE COMPANY | $98,~~272,~~804,745~~1~~9.59 | 13.29~~3~~47% |
| AMERICAN HOME ASSURANCE COMPANY | $33,~~23,~~419,~~30~~152.~~20~~73 | 4.496~~7~~3% |
| EAGLESTONE REINSURANCE COMPANY | $14,~~451,870.~~530,066.42 | 1.955~~1~~149% |
| AIG BG HOLDINGS LLC | $~~28,903,741.08~~29,060,132.86 | 3.9~~10~~298% |
| THE UNITED STATES LIFE INSURANCE CO. IN THE CITY OF NY | $18,~~787~~789,086.34~~31.69~~ | 2.541~~6~~64% |
| THE VARIABLE ANNUITY LIFE INSURANCE COMPANY | $69,017,8,~~646,38~~15.~~00~~44 | 9.286~~7~~59% |
| THE PRUDENTIAL INSURANCE COMPANY OF | $78,763,130.9,~~254.55~~6 | 10.598~~7~~70% |
| PAR U HARTFORD LIFE & ANNUITY COMFORT TRUST | $2,6~~34~~44,472.~~0,~~240.~~41~~6 | 0.3558% |
| PRUDENTIAL RETIREMENT GUARANTEED ~~COST BUSINESS TRUST~~ | $7~~29~~33,768~~19.4~~37 | 0.0987% |

Schedule A

¹   ~~To be confirmed.~~

| COST BUSINESS TRUST | | |
|---|---|---|
| PRUCO LIFE INSURANCE COMPANY OF NEW JERSEY | $6,45792,09533.7466 | 0.8735% |
| Total | $363,2511,296,7630.108 | 48.877529% |

| Bank Debt | Total Claim | % Claim |
|---|---|---|
| JPMORGAN BRANCH | $51,818,86530,71,6.21 | 6.97139% |
| WELLS FARGO BANK, NATIONAL ASSWells Fargo Bank, National Association | $51,818,86530,71,56.17 | 6.97139% |
| Bank of BANC OF AMERICA CREDIT PRODUCTSAmerica, N.A. | $38,8799,1096,513.66 | 5.2597602% |
| DV KMP CP MGT LP - MIDTOWN ACQUISITIONS L.P. | $36,35069,36078.5743 | 4.91216% |
| CAPITAL ONE, NATL ASSOCCapital One, National Association | $34,35345,8910.357 | 4.64759% |
| CROSS OCEAN - Global SIF (A) LP | $29,68854,1789.963 | 4.01637% |
| FST HORIZON BKFirst Horizon Bank | $24,047182,66137.253 | 3.25335% |
| CROSS OCEAN ESS III SARL | $23,649,5156.08.047.89 | 3.18169% |
| HSBC | $17,12762,9055.39 | |

Schedule A

| | | |
|---|---|---|
| ~~BK~~__Bank__ USA ~~NATL ASSOC~~, __National Association__ | __18__ | 2.32~~38~~__40__% |
| SYNOVUS BANK | $17,~~126~~__27__2,9~~0~~__0__55.~~39~~__18__ | 2.32~~38~~__40__% |
| CROSS OCEAN ESS IV SARL | $14,~~473~~__9,44__2,~~960.3~~__387__ | 1.947~~1~~__3__% |

| Bank Debt | Total Claim | % Claim |
|---|---|---|
| CROSS OCEAN GSS MASTER FUND LP | $13,~~399~~474,~~93~~860.~~41~~2 | 1.812~~89~~% |
| CROSS OCEAN GLBL SIF (H) SARL | $6,2~~53~~88,~~486~~54.~~09~~33 | 0.846~~0~~1% |
| COPM LP-CO GCD MST FD I (A) LP | $~~5,671,672.41~~5,703,387.26 | 0.767~~34~~% |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA | $5,1~~53~~81,~~071~~886.8~~8~~2 | 0.697~~1~~2% |
| PRUCO LIFE INSURANCE COMPANY ~~OF AMERICA~~ | $5,1~~53~~81,~~071~~886.3~~6~~29 | 0.697~~1~~2% |
| COPM LP-Cross Ocean USSS Master Fund II (A) LP | $3,6~~5~~79,~~307~~69.~~0~~12 | 0.495~~0~~1% |
| Total | $~~377,891,918.54~~380,005,014.08 | 51.12~~25~~73% |

Collateral Agent Contact Information

Wilmington Trust, N.A.
Global Capital Markets - Project Finance
1100 North Market Street, 5th Fl
Wilmington, DE 19890
Attn: Rafael Miranda
E-Mail: rmiranda1@wilmingtontrust.com
Tel. 845-717-8079

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

AIG BG Holdings LLC

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Bank of New York Mellon
~~Schedule~~ **ABA #** 021-000-018
Account Number: GLA111566
For Further Credit to: AIG BG HOLDINGS LLC; Account No: 503840
Reference: **PPN and Prin.:** $ _____ ; **Int.:** $ _____

**(2) Payment notices, audit confirmations and related correspondence to:**

AIG BG Holdings LLC (503840)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas 77019-2155
Attn: PCG Investment Portfolio Support
Email: PPGIPS@aig.com

**(3) Duplicate payment notices (only) to:**

Same as above.

**(4) Compliance reporting information to:**

Same as above.

**(5) Note to be issued in the nominee name of: AIG BIG Holdings LLC (Tax ID #: 30-0578924)**

**(6) Tax I.D. Number for AIG BIG Holdings LLC: 30-0578924**

**(7) Physical Delivery Instructions:**
AIG BG Holdings LLC (503840)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas 77019-2155
Account Name: BNYM Income
Account Number: GLA111566

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**


AMERICAN GENERAL LIFE INSURANCE COMPANY

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Bank of New York Mellon
**ABA #** 021-000-018
Account Number: GLA111566
For Further Credit to: AMERICAN GENERAL LIFE INS. CO. Physical; Account No: 886623
Reference: **PPN and Prin.:** $_____; **Int.:** $_____

**(2) Payment notices, audit confirmations and related correspondence to:**

American General Life Insurance Company (886623)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas 77019-2155
Attn: PCG Investment Portfolio Support
Email: PPGIPS@aig.com

**(3) Duplicate payment notices (only) to:**

Same as above.

**(4) Compliance reporting information to:**

Same as above.

(5) Note to be issued in the nominee name of: American General Life Insurance Company (**Tax ID #:** 25-0598210)

(6) Tan I.D. Number for American General Life Insurance Company: 25-0598210

**(7) Physical Delivery Instructions:**
American General Life Insurance Company (886623)


c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas 77019-2155
Account Name: BNYM Income
Account Number: GLA111566

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

AMERICAN HOME ASSURANCE COMPANY

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Bank of New York Melon
**ABA #** 021-000-018
Account Number: GLA111566
For Further Credit to: AMERICAN HOME ASSURANCE; **Account No:** 554933
Reference: **PPN and Prin.:** $ _____ ; **Int.:** $ _____

**(2) Payment notices, audit confirmations and related correspondence to:**

American Home Assurance Company (554933)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas 77019-2155
Attn: PCG Investment Portfolio Support
Email: PPGIPS@aig.com

**(3) Duplicate payment notices (only) to:**

Same as above.

**(4) Compliance reporting information to:**

Same as above.

(5) Note to be issued in the nominee name of: American Home Assurance Company (**Tax ID #:** 13-5124990

(6) Tan I.D. Number for American Home Assurance Company: 13-5124990

**(7) Physical Delivery Instructions:**

American Home Assurance Company (554933)


c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas 77019-2155
Account Name: BNYM Income
Account Number: GLA111566

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

AIG PROPERTY CASUALTY COMPANY

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Bank of New York Mellon
**ABA # 021-000-018**
Account Number: GLA111566
For Further Credit to: AIG PROPERTY CASUALTY CO; Account No: 554903
Reference: **PPN and Prin.**: $_____; **Int.**: $_____

**(2) Payment notices, audit confirmations and related correspondence to:**

AIG Property Casualty Company (554903)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas 77019-2155
Attn: PCG Investment Portfolio Support
Email: PPGIPS@aig.com

**(3) Duplicate payment notices (only) to:**

Same as above.

**(4) Compliance reporting information to:**

Same as above.

(5) Note to be issued in the nominee name of: AIG Property Casualty Company **(Tax ID #:** 25-1118791)

(6) Tax I.D. Number for AIG Property Casualty Company: 25-1118791

**(7) Physical Delivery Instructions:**

AIG Property Casualty Company (554903)

c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas 77019-2155
Account Name: BNYM Income
Account Number: GLA111566

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

EAGLESTONE REINSURANCE COMPANY

Issuer: Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Bank of New York Mellon
**ABA #** 021-000-018
Account Number: GLA111566
For Further Credit to: EAGLESTONE REINSURANCE; Account No: 554920
Reference: **PPN and Prin.:** $_____ ; **Int.:** $_____

(2) **Payment notices, audit confirmations and related correspondence to:**

Eaglestone Reinsurance Company (554920)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas 77019-2155
Attn: PCG Investment Portfolio Support
Email: PPGIPS@aig.com

(3) **Duplicate payment notices (only) to:**

Same as above.

(4) **Compliance reporting information to:**

Same as above.

(5) Note to be issued in the nominee name of: Eaglestone Reinsurance Company (**Tax ID #:** 22-3423217)

(6) Tan I.D. Number for Eaglestone Reinsurance Company: 22-3423217

(7) **Physical Delivery Instructions:**
Eaglestone Reinsurance Company (554920)


c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas 77019-2155
Account Name: BNYM Income
Account Number: GLA111566

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**


PAR U HARTFORD LIFE & ANNUITY COMFORT TRUST

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Bank of New York Mellon
New York, NY

**ABA #** 021000018
Account Number: 2483868400
For Further Credit to: [9]**; Account No:** [9]
Reference: **PPN and Prin.**: $_____; **Int.**: $_____

**(2) Payment notices, audit confirmations and related correspondence to:**

PAR U Hartford Life & Annuity Comfort Trust
c/o Prudential Private Capital
655 Broad Street, Floor 16S,
Newark, NJ 07102
Attention: Managing Director - Corporate and Project Workouts
cc: Vice President and Corporate Counsel
cpw@prudential.com


and for all notices relating solely to scheduled principal and interest payments to:

PAR U Hartford Life & Annuity Comfort Trust
c/o PGIM, Inc.
Prudential Tower
655 Broad Street
16th Floor - South Tower
Newark, NJ 07102
Attention: PIM Private Accounting Processing Team
Email: Pim.Private.Accounting.Processing.Team@prudential.com


External audit confirmations of loan balances for transactions closed by PPC should be sent to the address(es) outlined below.

**Via e-mail (preferred):**
PPCauditconfirms@prudential.com

**By U.S. Mail:**
PGIM Private Placement Operations
655 Broad Street, 14th Floor South
Mail Stop # NJ 08-14-75
Newark, New Jersey 07102-5096
Attn: PPC Audit Confirmation Coordinator

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

**(3) Duplicate payment notices (only) to:**

Same as above.

**(4) Compliance reporting information to:**

Same as above.

(5) Note to be issued in the nominee name of: PAR U Hartford Life & Annuity Comfort Trust **(Tax ID #: 45-2941561)**

(6) Tax I.D. Number for PAR U Hartford Life & Annuity Comfort Trust: 45-2941561

**(7) Physical Delivery Instructions:**

Send physical security by nationwide overnight delivery service to:

PGIM, Inc.
655 Broad Street
16th Floor - South Tower
Newark, NJ 07102
Attention: Trade Management Manager

Send copy by email to:

Stefanie.greer@prudential.com

and

Private.Disbursements@Prudential.com

Account Name: PAR U HLAN Comfort Trust Privates
Account Number: 2483868400

PRUCO LIFE INSURANCE COMPANY OF AMERICA

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

**For existing PPN 63909@AE8 and 63909@AF5**
**JPMorgan Chase Bank**

**ABA #** 021000021
Account Number: P86188
For Further Credit to: [9]**; Account No:** [9]
Reference: **PPN and Prin.:** $ _____ ; **Int.:** $ _____

**For existing PPN 63909@AF5 and Sr. Bank Debt**
**JPMorgan Chase Bank**

**ABA #** 021000021
Account Number: P86288
For Further Credit to: [9]**; Account No:** [9]
Reference: **PPN and Prin.:** $ _____ ; **Int.:** $ _____

**(2) Payment notices, audit confirmations and related correspondence to:**

The Prudential Insurance Company of America
c/o Prudential Private Capital - CPW
Two Prudential Plaza
180 N. Stetson Ave., Suite 5600
Chicago, IL 60601
Attn: Managing Director
Cc: Vice President and Corporate Counsel
E-mail: cpw@prudential.com

and for all notices relating solely to scheduled principal and interest payments to:

The Prudential Insurance Company of America
c/o PGIM, Inc.
Prudential Tower
655 Broad Street
16th Floor - South Tower
Newark, NJ 07102
Attention: PIM Private Accounting Processing Team
Email: Pim.Private.Accounting.Processing.Team@prudential.com

External audit confirmations of loan balances for transactions closed by PPC should be sent to the address(es) outlined below.

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

**Via e-mail (preferred):**
PPCauditconfirms@prudential.com

**By U.S. Mail:**
PGIM Private Placement Operations
655 Broad Street, 14th Floor South
Mail Stop # NJ 08-14-75
Newark, New Jersey 07102-5096
Attn: PPC Audit Confirmation Coordinator

(3) **Duplicate payment notices (only) to:**

Same as above.

(4) **Compliance reporting information to:**

Same as above.

(5) Note to be issued in the nominee name of: The Prudential Insurance Company of America (**Tax ID #: 22-1211670)**

(6) Tax I.D. Number for The Prudential Insurance Company of America: 22-1211670

(7) **Physical Delivery Instructions:**

Send physical security by nationwide overnight delivery service to:

PGIM, Inc.
655 Broad Street
16th Floor - South Tower
Newark, NJ 07102
Attention: Trade Management Manager

Send copy by email to:

Stefanie.greer@prudential.com

and

Private.Disbursements@Prudential.com

For Existing PPN 63909@AE8 and 63909@AF5

Account Name: PPSM General
Account Number: P86188

For Existing PPN 63909@AF5 and Sr. Bank Debt

Account Name: PPSM General
Account Number: P86288

PRUCO LIFE INSURANCE COMPANY OF NEW JERSEY

Issuer: Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

JPMorgan Chase Bank, NA
New York, NY

**ABA #** 021000021
Account Number: P86202
For Further Credit to: [9]**; Account No:** [9]
Reference: **PPN and Prin.**: $ ; **Int.**: $

(2) **Payment notices, audit confirmations and related correspondence to:**

Pruco Life Insurance Company of New Jersey
c/o Prudential Private Capital
655 Broad Street, Floor 16S,
Newark, NJ 07102
Attention: Managing Director - Corporate and Project Workouts
cc: Vice President and Corporate Counsel
cpw@prudential.com

and for all notices relating solely to scheduled principal and interest payments to:

Pruco Life Insurance Company of New Jersey
c/o PGIM, Inc.
Prudential Tower
655 Broad Street
16th Floor - South Tower
Newark, NJ 07102
Attention: PIM Private Accounting Processing Team
Email: Pim.Private.Accounting.Processing.Team@prudential.com

External audit confirmations of loan balances for transactions closed by PPC should be sent to the address(es) outlined below.

**Via e-mail (preferred):**
PPCauditconfirms@prudential.com

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

(5) Note to be issued in the nominee name of: Pruco Life Insurance Company of New Jersey **(Tax ID #: 22-2426091)**

(6) Tan I.D. Number for: Pruco Life Insurance Company of New Jersey: 22-2426091

(7) **Physical Delivery Instructions:**

Send physical security by nationwide overnight delivery service to:

PGIM, Inc.
655 Broad Street
16th Floor - South Tower
Newark, NJ 07102
Attention: Trade Management Manager

Send copy by email to:

Stefanie.greer@prudential.com

and

Private.Disbursements@Prudential.com

Account Name: PRUCO Life of New Jersey Private Placement
Account Number: P86202

**By U.S. Mail:**
PGIM Private Placement Operations
655 Broad Street, 14th Floor South
Mail Stop # NJ 08-14-75
Newark, New Jersey 07102-5096
Attn: PPC Audit Confirmation Coordinator

(3) **Duplicate payment notices (only) to:**
Same as above.
Case 23-90002   Document 212   Filed in TXSB on 02/24/23   Page 718 of 1203
(4) **Compliance reporting information to:**
Same as above.

PRUDENTIAL RETIREMENT GUARANTEED COST BUSINESS TRUST

Issuer: Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

JPMorgan Chase Bank, NA
New York, NY

**ABA #** 021000021
Account Number: G09966
For Further Credit to: [9]**; Account No:** [9]
Reference: **PPN and Prin.:** $_____; **Int.:** $_____

(2) **Payment notices, audit confirmations and related correspondence to:**

Prudential Retirement Guaranteed Cost Business Trust
c/o Prudential Private Capital
655 Broad Street, Floor 16S,
Newark, NJ 07102
Attention: Managing Director - Corporate and Project Workouts
cc: Vice President and Corporate Counsel
cpw@prudential.com

and for all notices relating solely to scheduled principal and interest payments to:

Prudential Retirement Guaranteed Cost Business Trust
c/o PGIM, Inc.
Prudential Tower
655 Broad Street
16th Floor - South Tower
Newark, NJ 07102
Attention: PIM Private Accounting Processing Team
Email: Pim.Private.Accounting.Processing.Team@prudential.com

External audit confirmations of loan balances for transactions closed by PPC should be sent to the address(es) outlined below.

**Via e-mail (preferred):**
PPCauditconfirms@prudential.com

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

(5) Note to be issued in the nominee name of: Prudential Retirement Guaranteed Cost Business Trust **(Tax ID #:** 06-1050034)

(6) Tax I.D. Number for Prudential Retirement Guaranteed Cost Business Trust: 06-1050034

(7) **Physical Delivery Instructions:**

Send physical security by nationwide overnight delivery service to:

PGIM, Inc.
655 Broad Street
16th Floor - South Tower
Newark, NJ 07102
Attention: Trade Management Manager

Send copy by email to:

Stefanie.greer@prudential.com

and

Private.Disbursements@Prudential.com

Account Name: PRU GC Trust Privates
Account Number: G09966

**By U.S. Mail:**
PGIM Private Placement Operations
655 Broad Street, 14th Floor South
Mail Stop # NJ 08-14-75
Newark, New Jersey 07102-5096
Attn: PPC Audit Confirmation Coordinator

**(3) Duplicate payment notices (only) to:**

Same as above.

**(4) Compliance reporting information to:**

Same as above.


THE PRUDENTIAL INSURANCE COMPANY

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

JPMorgan Chase Bank, NA
New York, NY

**ABA #** 021000021
Account Number: P86288
For Further Credit to: [9]**; Account No:** [9]
Reference: **PPN and Prin.**: $ ; **Int.**: $

**(2) Payment notices, audit confirmations and related correspondence to:**

The Prudential Insurance Company
c/o Prudential Private Capital
655 Broad Street, Floor 16S,
Newark, NJ 07102
Attention: Managing Director - Corporate and Project Workouts
cc: Vice President and Corporate Counsel
cpw@prudential.com


and for all notices relating solely to scheduled principal and interest payments to:

The Prudential Insurance Company
c/o PGIM, Inc.
Prudential Tower
655 Broad Street
16th Floor - South Tower
Newark, NJ 07102
Attention: PIM Private Accounting Processing Team
Email: Pim.Private.Accounting.Processing.Team@prudential.com


External audit confirmations of loan balances for transactions closed by PPC should be sent to the address(es) outlined below.

**Via e-mail (preferred):**
PPCauditconfirms@prudential.com

(5) Note to be issued in the nominee name of: The Prudential Insurance Company (**Tax ID #:** 22-1211670)

(6) Tax I.D. Number for The Prudential Insurance Company: 22-1211670

**(7) Physical Delivery Instructions:**

Send physical security by nationwide overnight delivery service to:

PGIM, Inc.
655 Broad Street
16th Floor - South Tower
Newark, NJ 07102
Attention: Trade Management Manager

Send copy by email to:

Stefanie.greer@,prudential.com

and

Private.Disbursements@,Prudential.com
Account Name: PPSM General
Account Number: P86288

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

THE UNITED STATES LIFE INSURANCE COMPANY IN THE CITY OF NEW YORK

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

JPMorgan Chase Bank, N.A.
**ABA #** 021-000-021
Account Number: 780153941
For Further Credit to: THE U.S. LIFE INSURANCE CO.: Account No: P 68423
Reference: **PPN and Prin.**: $_____ ; **Int.**: $_____

**(2) Payment notices, audit confirmations and related correspondence to:**

The United States Life Insurance Company in the City of New York (P 68423)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas 77019-2155
Attn: PCG Investment Portfolio Support
Email: PPGIPS@aig.com

**(3) Duplicate payment notices (only) to:**

Same as above.

**(4) Compliance reporting information to:**

Same as above.

(5) Note to be issued in the nominee name of: The United States Life Insurance Company in the City of New York **(Tax ID #:**13-5459480)

(6) Tan I.D. Number for The United States Life Insurance Company in the City of New York: 13-5459480

**(7) Physical Delivery Instructions:**
The United States Life Insurance Company in the City of New York (P 68423)
c/o AIG Asset Management
2929 Allen Parkway, A36-04
Houston, Texas 77019-2155
Account Name: AIG PHYSICAL WIRE ACCOUNT
Account Number: 780153941

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

THE VARIABLE ANNUITY LIFE INSURANCE COMPANY

Issuer: Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

    The Bank of New York Mellon
    **ABA #** 021-000-018
    Account Number: GLA111566
    For Further Credit to: VARIABLE ANNUITY LIFE INSURANCE CO.; Account No: 260735
    Reference: **PPN and Prin.**: $_____; **Int.**: $_____

(2) **Payment notices, audit confirmations and related correspondence to:**

    The Variable Annuity Life Insurance Company (260735)
    c/o AIG Asset Management
    2929 Allen Parkway, A36-04
    Houston, Texas 77019-2155
    Attn: PCG Investment Portfolio Support
    Email: PPGIPS@aig.com

(3) **Duplicate payment notices (only) to:**

    Same as above.

(4) **Compliance reporting information to:**

    Same as above.

(5) Note to be issued in the nominee name of: The Variable Annuity Life Insurance Company **(Tax ID #:**74-1625348**)**

(6) Tax I.D. Number for The Variable Annuity Life Insurance Company: 74-1625348

(7) **Physical Delivery Instructions:**
    The Variable Annuity Life Insurance Company (260735)
    c/o AIG Asset Management
    2929 Allen Parkway, A36-04
    Houston, Texas 77019-2155
    Account Name: BNYM Income
    Account Number: GLA111566

**NAUTICAL SOLUTIONS, L.L.C.
INFORMATION RELATING TO NOTEHOLDERS**

## JPMORGAN CHASE BANK, N. A

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

**ABA #** 021000021
Account Number: 9008109962C3872
For Further Credit to: [n/a]**; Account No:** [n/a]
Reference: **PPN and Prin.**: $                ; **Int.**: $

**(2) Payment notices, audit confirmations and related correspondence to:**

CLS Non Agented Servicing Team, Mail ID 12143076874@tls.ldsprod.com , Contact No -+91-806-790-5009, Fax- 121-4307-6874 – (To be used for sending Interest, Fees and Funding notices)

Kelsey R Box (kelsey.r.box@chase.com), Matthew H Massie( Matthew.Massie@jpmorgan.com) – (To be used for audit confirmations and related correspondence)

**(3) Duplicate payment notices (only) to:**

[n/a]

**(4) Compliance reporting information to:**

**JPMorgan Chase NA, Credit contacts for** Nautical Solutions, L.L.C as follows,

Kelsey R Box (kelsey.r.box@chase.com), Matthew H Massie( Matthew.Massie@jpmorgan.com)

(5) Note to be issued in the nominee name of: [JPMorgan Chase Bank, N.A.] **(Tax ID #:** 13-4994650)

(6) Tax I.D. Number for [JPMorgan Chase Bank, N.A.]: [13-4994650]

**(7) Physical Delivery Instructions:**

[Overnight delivery only FedEx / UPS – please email if more information needed – kelsey.r.box@chase.com]

JPMorgan Chase Bank, N.A.
Attn: Kelsey Box
201 St. Charles Ave, 28th Floor
New Orleans, LA 70170

**NAUTICAL SOLUTIONS, L.L.C.**
**INFORMATION RELATING TO NOTEHOLDERS**


Wells Fargo Bank, N.A.


Issuer: Nautical Solutions, L.L.C.


**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to: Wells Fargo Bank, National Association**


**Denver WLS**
**ABA #121000248**
Account Number: **00029694050720**
For Further Credit to: Nautical Solutions**; Account No:** 7828858781
Reference: **PPN and Prin.**: $_____ ; **Int.**: $_____


**(2) Payment notices, audit confirmations and related correspondence to:**

Marlene Rieb
1700 Lincoln St
Denver CO 80203
Fax: 866-269-8331
Email: DENLNSVMemberNotices@wellsfargo.com


**(3) Duplicate payment notices (only) to:**

Marlene Rieb
1700 Lincoln St
Denver CO 80203
Fax: 866-269-8331
Email: DENLNSVMemberNotices@wellsfargo.com


**(4) Compliance reporting information to:**

Marlene Rieb
1700 Lincoln St
Denver CO 80203
Fax: 866-269-8331
Email: DENLNSVMemberNotices@wellsfargo.com


(5) Note to be issued in the nominee name of: Wells Fargo Bank, N.A. **(Tax ID #: 26-0741673)**

(6) Tax I.D. Number for Wells Fargo Bank, N.A. **26-0741673**

**(7) Physical Delivery Instructions:**

1700 Lincoln St
Denver, CO 80203
Account Name: **Denver WLS**
Account Number: **00029694050720**

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

Bank of America, N.A.

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

**Bank of America, N.A.**
**ABA # 026-009-593**
Account Number: 1366210627300
Beneficiary Customer: Credit Services
Reference: **PPN and Prin.:** $              ; **Int.:** $

**(2) Payment notices, audit confirmations and related correspondence to:**

Firm: Bank of America, N.A.
Fax :704.409.0154
Email: cs-dailywork@bankofamerica.com

**(3) Duplicate payment notices (only) to:**

Same As Above

**(4) Compliance reporting information to:**

Name Information Manager ATTN: Peter Gross
Phone 980.386.0209
Fax 704.409.0768
Email Bas.infomanager@bankofamerica.com

(5) Note to be issued in the nominee name of: Bank of America, N.A. **(Tax ID #:** 94-1687665)

(6) Tax I.D. Number for Bank of America, N.A.: 94-1687665

**(7) Physical Delivery Instructions:**

*No Physical Note Requested*

Gateway Village #900
900 West Trade St.
NC1-026-05-41 Charlotte, North
Carolina 28202 Attn: Charlotte
Servicing Team

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

**MIDTOWN ACQUISTITIONS L.P.**

Issuer: Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

> **USD:**
> Bank:              JPMorgan Chase
> ABA #:            021000021
> A/C:               J.P. Morgan Securities
> LCDDA #:        066001633
> F/F/C:             Midtown Acquisitions L.P.
> F/F/C A/C #: 102-28500-26
> Reference: Nautical Solutions

(2) **Payment notices, audit confirmations and related correspondence to:**

> **Name:** Jennifer Donovan / Erica Vinson
> **Phone:** +1 212 446 4018 / + 1 646 282 5958
> **Email:** jdonovan@dkp.com / evinson@dkp.com

(3) **Duplicate payment notices (only) to:**

> **Name:** Liane McGay
> **Phone:** +1 646 282- 5947
> **Email:** bankdebt@dkp.com / dkconfirms@citco.com/ ptd@dkp.com

(4) **Data Room Access:** Docs-USCorps@dkp.com

(5) Note to be issued in the nominee name of: Midtown Acquisitions L.P. (**Tax ID #:** 13-3680692)

(6) Tax I.D. Number for Midtown Acquisitions L.P: 13-3680692

(7) **Physical Delivery Instructions:**

> **\*No Physical Note Requested\***

> Midtown Acquisitions L.P.
> 520 Madison Avenue, 30th Floor
> New York, NY 10022

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

Capital One, N.A.
Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

**Capital One, N.A.**
**ABA #065000090**
Account Number: **21100-14032301-38395**
For Further Credit to: Nautical Solutions, LLC**; Account No: Nautical Solutions, LLC**
Reference: **PPN and Prin.**: $_____; **Int.**: $_____

**(2) Payment notices, audit confirmations and related correspondence to:**

**14695223588@tls.ldsprod.com**

**lorena.dalianis@capitalone.com**

**(3) Duplicate payment notices (only) to:**

Lorena Dalianis
**lorena.dalianis@capitalone.com**

**(4) Compliance reporting information to:**

Robert Johnson Sr. Director, Special Assets

(P) (504) 232-2163

robert.johnson@capitalone.com

(5) Note to be issued in the nominee name of: Capital One, N.A. **(Tax ID #:** 72-0210640)

(6) Tax I.D. Number for Capital One, N.A.: **72-0210640**

**(7) Physical Delivery Instructions:**

Capital One, N.A.

1680 Capital One DriveMcLean, VA 22102

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**


**FIRST HORIZON BANK**

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

**FIRST HORIZON BANK**
**ABA # 084000026**
Account Number: **1141743913**
For Further Credit to: **Nautical Solutions LLC ; Account No: 84940952**
Reference: **PPN and Prin.**: $_____ ; **Int.**: $_____

**(2) Payment notices, audit confirmations and related correspondence to:**

**FIRST HORIZON BANK**
**Attn: Special Assets Dept., MO1A**
**165 Madison Ave.**
**Memphis, TN 38103**

**(3) Duplicate payment notices (only) to:**

jmhennigan@firsthorizon.com

**(4) Compliance reporting information to:**

jmhennigan@firsthorizon.com

**(5)** Note to be issued in the nominee name of: **FIRST HORIZON BANK (Tax ID #: 62-0201385)**

**(6)** Tax I.D. Number for **FIRST HORIZON BANK**: 62-0201385

**(7) Physical Delivery Instructions:**

FIRST HORIZON BANK
Attn: Special Assets Dept., MO1A
165 Madison Ave.
Memphis, TN 38103

Account Name: Nautical Solutions LLC
Account Number: 84940952

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

Cross Ocean ESS III Sarl

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Northern Trust International Banking Corporation, New Jersey (CNORUS33)
**ABA #** 026001122
For Further Credit to: Cross Ocean ESS III S.à r.l**; Account No:** 21016120010
Reference: **PPN and Prin.**: $ ; **Int.**: $ _____

**(2) Payment notices, audit confirmations and related correspondence to:**

Ops@crossoceanpartners.com; mel@crossoceanpartners.com

**(3) Duplicate payment notices (only) to:**

ops@crossoceanpartners.com

**(4) Compliance reporting information to:**

ops@crossoceanpartners.com

(5) Note to be issued in the nominee name of: Cross Ocean ESS III Sarl (**Tax ID #: 98-1469902**)

(6) Tax I.D. Number for Cross Ocean ESS III Sarl: 98-1469902

**(7) Physical Delivery Instructions:**

7 avenue Gaston Diderich, L-1420 Luxembourg

Account Name: Cross Ocean ESS III Sarl

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

HSBC BANK USA, N.A.

Issuer: Nautical Solutions, L.L.C.

(1) **All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

HSBC Bank USA, N.A.
**ABA #** 021-001-088
Account Number: 713-00045-7
For Further Credit to: Commercial Loan Services- Special Credits Unit**; Account No:** N/A
Reference: **PPN:** 63910V AA6 **and Prin.:** $15,367,967.55 **Int.:** $ 1,728,896.34.

(2) **Payment notices, audit confirmations and related correspondence to:**

AGENCY DEPARTMENT Attention: Jagdesh TARACHAND - **ctlany.loanadmin@us.hsbc.com**

(3) **Duplicate payment notices (only) to:**

HSBC BANK USA, N.A., Attention Rino Falsone, VP, 2029 Walden Ave., Buffalo, NY 14043

(4) **Compliance reporting information to:**

HSBC BANK USA, N.A., Attention Rino Falsone, VP, 2029 Walden Ave., Buffalo, NY 14043

(5) Note to be issued in the nominee name of: HSBC BANK USA, N.A. **(Tax ID #:** 20-1177241)

(6) Tax I.D. Number for HSBC BANK USA, N.A. : (20-1177241)

(7) **Physical Delivery Instructions:**

HSBC BANK USA, N.A., Attention Rino Falsone, VP, 2029 Walden Ave., Buffalo, NY 14043

Account Name: NAUTICAL SOLUTIONS LLC
Account Number: 187-027610

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

SYNOVUS BANK

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

    [**ABA: #** 061100606
Account Number: 0558031-8888
Account Name: Loan Control - Nautical Solutions
For Further Credit to: [   ]**; Account No:** [   ]
Reference: **PPN 63910V AA6 and Prin.**: $
                                ; **Int.**: $

**(2) Payment notices, audit confirmations and related correspondence to:**

    Syndications4@synovus.com

**(3) Duplicate payment notices (only) to:**

**(4) Compliance reporting information to:**

    JohnQuarles@Synovus.com

    (5) Note to be issued in the nominee name of: SYNOVUS BANK **(Tax ID #:** 58-0201800)

(6) Tax I.D. Number for SYNOVUS BANK 58-0201800

**(7) Physical Delivery Instructions:**

    SYNOVUS BANK
          ATTN: MARY ROBINSON
    800 SHADES CREEK PKWY
    BIRMINGHAM AL 35209

## NAUTICAL SOLUTIONS, L.L.C INFORMATION

## RELATING TO NOTEHOLDERS

Cross Ocean ESS IV Sarl

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Norther Trust Company
**ABA #** 071000152
Beneficiary Bank BIC: CNORLULX
For Further Credit to: Cross Ocean ESS IV Lux**; Account No:** 5186061000
Reference: **PPN and Prin.**: $ _____ ; **Int.**: $ _____

**(2) Payment notices, audit confirmations and related correspondence to:**

ops@crossoceanpartners.com; mel@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com;

**(3) Duplicate payment notices (only) to:**

ops@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com

**(4) Compliance reporting information to:**

ops@crossoceanpartners.com

(5) Note to be issued in the nominee name of: Cross Ocean ESS IV Sarl **(Tax ID #: 98-1600529)**

(6) Tax I.D. Number for Cross Ocean ESS IV Sarl: 98-1600529

**(7) Physical Delivery Instructions:**

7 avenue Gaston Diderich, L-1420 Luxembourg

Account Name: Cross Ocean ESS IV Sarl

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

Cross Ocean GSS Master Fund LP

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Bank of New York Mellon, New York
**ABA #** 021000018
Account Number: 8901323349
For Further Credit to: COP GSS Master Fund LP **; Account No:** 4417918400
Reference: **PPN and Prin.**: $                  ; **Int.**: $

**(2) Payment notices, audit confirmations and related correspondence to:**

18178418857@tls.ldsprod.com; ops@crossoceanpartners.com; mel@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com

**(3) Duplicate payment notices (only) to:**

ops@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com

**(4) Compliance reporting information to:**

ops@crossoceanpartners.com

**(5) Note to be issued in the nominee name of: Cross Ocean GSS Master Fund LP (Tax ID #: 98-1457755)**

**(6) Tax I.D. Number for Cross Ocean GSS Master Fund LP: 98-1457755**

**(7) Physical Delivery Instructions:**

The Depository Trust Company, 570 Washington Street, Blvd- 5th floor, Jersey City, NJ 07310, Attn: BNY Mellon/Branch Deposit Department
Account Name: Cross Ocean GSS Master Fund LP
Account Number: 4417918400

**NAUTICAL SOLUTIONS, L.L.C**
**INFORMATION RELATING TO NOTEHOLDERS**

Cross Ocean Global SIF H Sarl

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

The Bank of New York Mellon, New York
**ABA #** 021000018
Account Number: 8900487623
For Further Credit to: Cross Ocean Global SIF H Sarl **; Account No:** 4147608400
Reference: **PPN and Prin.**: $_____ ; **Int.**: $ _____

**(2) Payment notices, audit confirmations and related correspondence to:**

18179896097@tls.ldsprod.com; ops@crossoceanpartners.com; mel@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com;

**(3) Duplicate payment notices (only) to:**
ops@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com

**(4) Compliance reporting information to:**
ops@crossoceanpartners.com;

(5) Note to be issued in the nominee name of: Cross Ocean Global SIF H Sarl (**Tax ID #** 2020 2470 492)

(6) Tax I.D. Number for Cross Ocean Global SIF H Sarl: Lux TIN: 2020 2470 492

**(7) Physical Delivery Instructions:**

The Depository Trust Company, 570 Washington Street, Blvd- 5th floor, Jersey City, NJ 07310, Attn: BNY Mellon/Branch Deposit Department
Account Name: Cross Ocean Global SIF H Sarl
Account Number: 4147608400

**NAUTICAL SOLUTIONS, L.L.C INFORMATION**

**RELATING TO NOTEHOLDERS**

Cross Ocean GCD Master Fund I (A) LP

Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

Cross Ocean GCD Master Fund I (A) LP
**ABA #** 021000018
Account Number: 8900487623
For Further Credit to: Cross Ocean GCD Master Fund I A LP**; Account No:** 8580168400
Reference: **PPN and Prin.**: $            ; **Int.**: $           

**(2) Payment notices, audit confirmations and related correspondence to:**

ops@crossoceanpartners.com; mel@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com; 18173497860@tls.ldsprod.com

**(3) Duplicate payment notices (only) to:**

ops@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com

**(4) Compliance reporting information to:**

ops@crossoceanpartners.com

**(5)** Note to be issued in the nominee name of: Cross Ocean GCD Master Fund I A LP **(Tax ID #: 98-1543893)**

**(6)** Tax I.D. Number for Cross Ocean GCD Master Fund I A LP : 98-1543893

**(7) Physical Delivery Instructions:**

The Depository Trust Company, 570 Washington Street, Blvd- 5th floor, Jersey City, NJ 07310, Attn: BNY Mellon/Branch Deposit Department
Account Name: Cross Ocean GCD Master Fund I A LP
Account Number: 8580168400

**NAUTICAL SOLUTIONS, L.L.C**

**INFORMATION RELATING TO NOTEHOLDERS**

Cross Ocean USSS Master Fund II (A) LP
Issuer: Nautical Solutions, L.L.C.

**(1) All payments to be by wire transfer of immediately available funds, with sufficient information (including PPN #, interest rate, maturity date, interest amount, principal amount and premium amount, if applicable) to identify the source and application of such funds, to:**

Bank of New York Mellon, New York
**ABA #** 021000018
Account Number: 8900487623
For Further Credit to: Cross Ocean USSS Master Fund II A LP **; Account No:** 1644318400
Reference: **PPN and Prin.**:          **Int.:** $

**(2) Payment notices, audit confirmations and related correspondence to:**

USSSII_ALP.notices@sscinc.com; ops@crossoceanpartners.com;
mel@crossoceanpartners.com; cop_bd@intertrustgroup.com;
crossocean.loans@sscinc.com;

**(3) Duplicate payment notices (only) to:**

ops@crossoceanpartners.com; cop_bd@intertrustgroup.com; crossocean.loans@sscinc.com;

**(4) Compliance reporting information to:**

ops@crossoceanpartners.com

**(5)** Note to be issued in the nominee name of: Cross Ocean USSS Master Fund II A LP **(Tax ID #: 98-1622959)**

**(6)** Tax I.D. Number for Cross Ocean USSS Master Fund II (A) LP: 98-1622959

**(7) Physical Delivery Instructions:**

The Depository Trust Company, 570 Washington Street, Blvd- 5th floor, Jersey City, NJ 07310,
Attn: BNY Mellon/Branch Deposit Department
Account Name: Cross Ocean USSS Master Fund II (A) LP
Account Number: 1644318400

Schedule B

DEFINED TERMS

## DEFINED TERMS

As used herein, the following terms have the respective meanings set forth below or set forth in the Section hereof following such term:

"**280' PSV Vessels**" means the PSV Vessels and the Petrobras Vessels.

"**312' Vessels**" means the Avery Island (ON 1253395), the Brad Dartez (ON 1252257), the Cat Island (ON 1257750), the Dauphin Island (ON 1262978), the Deer Island (ON 1289730), the Grand Isle (ON 1250605), the Horn Island (ON 1255030), the Marsh Island (ON 1266925), the Paradise Island (ON 1262977), the Pecan Island (ON 1258532), the Pelican Island (ON 1261549), the Sanibel Island (ON 1257727), the Ship Island (ON 1252958), the Timbalier Island (ON 1251360) and the Wine Island (ON 1259152).

"**ABS**" means the American Bureau of Shipping.

"**Accrual End Date**" has the meaning assigned to such term in Section 8.1(c)

"**Actual Average EBITDA**" means, at any date, the average annual EBITDA for the 24 month period ending on the last full calendar month prior to such date most recently ended as calculated by the Company in good faith and delivered in reasonable detail to the Agent and the Noteholders; provided, that if the Exit Fee becomes payable one year or more prior to the Maturity Date, the Actual Average EBITDA will be the annual EBITDA for the previous 12 month period most recently ended; provided that in calculating Actual Average EBITDA, maintenance and related Capital Expenditures shall not exceed the highest annual amount of Capital Expenditures within the past five years preceding the calculation date (as adjusted to deduct from such high watermark, amounts for vessels no longer owned by the Company at the time of such measurement and subject to an adjustment based on the Consumer Price Index (provided, that the adjustment is capped at 5% per annum and is deemed to be zero if such adjustment is negative)).

"**Additional Covenants**" means any affirmative or negative covenant or similar restriction applicable to the Note Parties or any of their Subsidiaries (regardless of whether such provision is labeled or otherwise characterized as a covenant) contained in any document or instrument creating or evidencing Indebtedness of the Note Parties or any of their Subsidiaries, the subject matter of which either (i) is similar to that of any covenant in Section 9 or Section 10 of this Agreement, or related definitions in Schedule B  of this Agreement, but contains one or more percentages, amounts or formulas that is more restrictive than those set forth herein or more beneficial to the holder or holders of the Indebtedness created or evidenced by the document in which such covenant or similar restriction is contained (and such covenant or similar restriction shall be deemed an Additional Covenant only to the extent that it is more restrictive or more beneficial) or (ii) is different from the subject matter of any covenant in Section 9 or Section 10 of this Agreement, or related definitions in Schedule B to this Agreement.

"**Additional Defaults**" means any provision contained in any document or instrument creating or evidencing Indebtedness of the Note Parties or any of their Subsidiaries which permits the holder or holders of Indebtedness to accelerate (with the passage of time or giving of notice or both) the maturity thereof or otherwise requires the Note Parties or any of their Subsidiaries to purchase such Indebtedness prior to the stated maturity thereof and which either (i) is similar to any Default or Event of Default contained in Section 11 of this Agreement, or related definitions in this Agreement, but contains one or more percentages, amounts or formulas that is more restrictive or has a shorter grace period than those set forth herein or is more beneficial to the holders of such other Indebtedness (and such provision shall be deemed an Additional Default only to the extent that it is more restrictive, has a shorter grace period or is more beneficial) or (ii)

*[Link-to-previous setting changed from off in original to on in modified.].*

is different from the subject matter of any Default or Event of Default contained in Section 11 of this Agreement, or related definitions in <u>Schedule B</u> to this Agreement.

"**Administrative Questionnaire**" means an administrative questionnaire in a form supplied by the Agent or such other form as shall be approved by the Agent.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means, at any time, and with respect to any Person, (a) any other Person that at such time directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such first Person, (b) any Person beneficially owning or holding, directly or indirectly, 10% or more of any class of voting or equity interests of Holdings, the Company or any Subsidiary or any Person of which Holdings, the Company and its Subsidiaries beneficially own or hold, in the aggregate, directly or indirectly, more than 50% of any class of voting or equity interests, (c) any Person that at such time directly or indirectly through one or more intermediaries is Controlled by Gary Chouest or any of his Immediate Family, (d) any Person of which Gary Chouest or his Immediate Family beneficially own or hold, in the aggregate, directly or indirectly, more than 50% of any class of voting or equity interests, (e) any Person related by blood, adoption or marriage to any Person described in clauses (a), (b), (c) or (d), or (f) the estate of, or any foundation or trust for the benefit of, or a partnership, limited liability company or other business combination solely among any of the foregoing Persons listed in clauses (a), (b), (c), (d) or (e) of this definition. For purposes of the meaning of Affiliate, a Person is under common Control with another Person if one or more members of the Control Group individually or collectively Controls both such Persons.

"**Agent**" is defined in the preamble hereto.

"**Agent Fee Letter**" means that certain Agent Fee Letter, dated as of the Closing Date, among the Company, the Agent and Collateral Agent.

"**Agents**" means collectively the Agent and the Collateral Agent.

"**Agreement**" means this Agreement, including all Schedules and Exhibits attached to this Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**AHTS Vessels**" means the Dino Chouest (ON 1207856) and the Kirt Chouest (ON 1213707).

"**AIG**" means AIG Asset Management (U.S.), LLC and its successors.

"**Amended and Restated First Preferred Fleet Mortgage**" means that certain Amended and Restated First Preferred Fleet Mortgage, dated as of the Closing Date, between the Company and the Agent substantially in the form of <u>Exhibit P</u> hereto.

"**Anti-Corruption Laws**" is defined in Section 5.16(d)(1).

"**Anti-Money Laundering/Anti-Terrorism Laws**" is defined in Section 5.16(c).

"**Appraisal**" means an appraisal report setting forth the fair market and, if requested, orderly liquidation value (each in Dollars) of the vessels which are the subject of such report, as determined by an appraisal performed within 90 days prior to the date such report is required to be delivered pursuant to the

terms of any of the provisions of the Note Documents, issued by an independent marine appraiser of recognized standing selected by the Required Holders.

"**Asset Sale**" means any direct or indirect sale, conveyance, transfer, charter, lease or other disposition (including, without limitation, by way of merger or consolidation) by the Note Parties or any of their Subsidiaries to any Person, whether in one transaction or a series of related transactions, of (a) any Capital Stock of any of the Note Parties' Subsidiaries or (b) any other property of the Note Parties or their Subsidiaries. An Asset Sale shall include the requisition of title to, seizure of or forfeiture of any vessel, or any actual or constructive total loss or an agreed or compromised total loss of any vessel (including, without limitation, in each case, Mortgaged Vessels).

"**Asset Sale Agreements**" means that certain Controlling Vessel Purchase Agreement between the Company and Hornbeck dated as of December 22, 2022, together with the related Coordinating Agreement between the Company to Hornbeck and six separate "Alternative 2" Vessel Purchase Agreements under and attached to the Controlling Vessel Purchase Agreement between the Company and Hornbeck related to the sale by the Company and the purchase by Hornbeck of the Celena Chouest (ON 1201702), the Dante (ON 1178758), the Gavea (ON 1211932), the Lyman Martin (ON 1227085), the Pao de Acucar (ON 1218372), and the Jackie Chouest (ON 1210979) and, in each case, related other assets.

"**Assignment and Acceptance Agreement**" means an assignment and acceptance agreement entered into by a Noteholder, a permitted assignee and the Agent, pursuant to which such assignee may become a party to this Agreement, in substantially the form of Exhibit N hereto or such other form as shall be approved by the Agent (including electronic documentation generated by ClearPar, Markitclear or another electronic platform).

"**Assignment of Charters and Hire**" means the Assignment of Charters and Hire from the Company or other Chouest Corporate Affiliate to the Collateral Agent, to be executed in substantially the forms of Exhibits B and C hereto, as applicable, as each may be amended, restated, supplemented or otherwise modified from time to time.

"**Assignment of Insurances**" means the Assignment of Insurances from the Company to the Collateral Agent, to be executed in substantially the form of Exhibit D hereto, as such instrument may be amended or supplemented from time to time pursuant to the provisions thereof.

"**Assignment of First Preferred Fleet Mortgage**" means the Assignment of First Preferred Fleet Mortgage from JPMorgan Chase Bank N.A. to the Collateral Agent, substantially in the form of Exhibit O hereto.

"**Bail-in Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time as that is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliate (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532.

"**Bankruptcy Law**" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Blocked Person**" is (i) a Person or vessel whose name appears on the list of Specially Designated Nationals and Blocked Persons published by the Office of Foreign Assets Control, United States Department of the Treasury ("**OFAC**") (an "**OFAC Listed Person**") or (ii) an agent, department, or instrumentality of, or is otherwise 50% or more beneficially owned by, controlled by or acting on behalf of, directly or indirectly, (x) any OFAC Listed Person or OFAC Listed Persons or (y) any Person, entity, organization or regime that is the subject of any OFAC Sanctions Program or (iii) otherwise blocked or the subject of sanctions under other economic or financial sanctions or trade embargoes, including but not limited to, the Trading with the Enemy Act, the International Emergency Economic Powers Act, Comprehensive Iran Sanctions, Accountability and Divestment Act ("**CISADA**") or any similar law or regulation with respect to Iran or any other country, any OFAC Sanctions Program, or any economic sanctions regulations imposed, administered or enforced by the United States or any enabling legislation or executive order relating to any of the foregoing or the United Nations Security Council, the European Union, any European Union member state or His Majesty's Treasury of the United Kingdom or other relevant sanctions authority (collectively, "**Economic Sanctions**").

"**Board of Directors**" means the managers of Holdings, the Company, any Person performing similar functions on behalf of Holdings or the Company, or any duly authorized committee thereof.

"**Burdensome Restrictions**" means any consensual encumbrance or restriction of the type described in clause (a) or (b) of Section 10.15.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which commercial banks in New York, New York or New Orleans, Louisiana are required or authorized to be closed.

"**Capital Expenditure**" means, with respect to the Company and its Subsidiaries for any period, the aggregate amount, without duplication, of (x) all expenditures (whether paid in cash or accrued as liabilities or done on behalf of or for the benefit of the Company and its Subsidiaries by a third party and including in all events all amounts expended or capitalized in respect of Capitalized Lease Obligations) that would, in accordance with GAAP, be included as additions to property, plant and equipment, (y) other capital expenditures of such Person for such period (whether paid in cash or accrued as liabilities or done on behalf of or for the benefit of the Company and its Subsidiaries by a third party and including in all events all amounts expended or capitalized under capital leases) that are reported in the Company's consolidated statement of cash flows for such period and (z) other capital expenditures of such Person for such period (whether paid in cash or accrued as liabilities or done on behalf of or for the benefit of the Company and its Subsidiaries by a third party and including in all events all amounts expended or capitalized under in respect of Capitalized Lease Obligations, including, without limitation, any capitalized bonus payment). Notwithstanding the foregoing, Capital Expenditures shall not include (i) insurance proceeds for the loss of property applied to the replacement of such property or (ii) necessary expenses for the Company to maintain the existing classification rating for Mortgaged Vessels or to reinstate classification after a Mortgaged Vessel is no longer "laid up"; in the case of paragraph (ii), solely to the

extent that such expenditures are expensed in the period in which they are incurred and not added to property, plant and equipment.

"**Capital Stock**" in any Person means any and all shares, interests, participations or other equivalents in the equity interest (however designated) in such Person and any rights (other than debt securities convertible into an equity interest, unless and until so converted), warrants or options to acquire an equity interest in such Person.

"**Capitalized Lease Obligation**" means any rental obligation with respect to a lease of property which in accordance with GAAP would be required to be capitalized on the lessee's balance sheet or for which the amount of the asset and liability thereunder as if so capitalized should be disclosed in a note to such balance sheet, taken at the amount thereof accounted for as indebtedness (net of interest expense) in accordance with GAAP.

"**Change of Control**" means an event or series of events by which any Person or Persons acting in concert (other than a member or members of the Control Group), together with Affiliates thereof, shall control or own (beneficially or otherwise) in the aggregate, directly or indirectly, more than 30% of the Voting Stock of Holdings or Holdings ceases to own 100% of the Company.

"**Chouest Affiliate**" means Holdings, the Company and its Subsidiaries and Affiliates and each member of a Relevant Group, including, for the avoidance of doubt, each member of the Control Group.

"**Chouest Corporate Affiliate**" means each Chouest Affiliate other than any Chouest Affiliate that is a natural person.

"**CISADA**" shall have the meaning specified for such term in the definition of "**Blocked Person.**"

"**Closing**" is defined in Section 3.

"**Closing Date**" is defined in Section 3.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

"**Collateral**" means all collateral and security as described in the Security Documents.

"**Collateral Agent**" means Wilmington Trust, National Association, the party serving as mortgagee, secured party or the like under the Security Documents.

"**Company**" means Nautical Solutions, L.L.C., a Louisiana corporation or any successor that becomes such in the manner prescribed in Section 10.2.

"**Competitor**" means any Person who primarily engages or whose Affiliate primarily engages in the business of owning or operating vessels in the offshore services industry; <u>provided</u> that no Person shall constitute a "Competitor" solely by virtue of any ownership of the Capital Stock or other assets (including vessels) of any Competitor as a result of any foreclosure, deed in lieu of foreclosure or other transfer pursuant to an exercise of remedies with respect to another Person or its assets.

"**Confidential Information**" is defined in Section 19.

"**Confirmation Order**" means a final non appealable [•].

"**Confirmation Order**" means that certain *Order (I) Approving the Debtors' Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization, (II) Confirming the Amended Joint Prepackaged Plan of Reorganization of Nautical Solutions, L.L.C. and its Debtor Affiliate Pursuant to Chapter 11 of the Bankruptcy Code, and (III) Granting Related Relief* entered by the Bankruptcy Court for the Southern District of Texas on February 16, 2023 Docket No. 204.

"**Consenting Creditors**" has the meaning set forth in the Restructuring Support Agreement.

"**Consenting Noteholders**" has the meaning set forth in the Restructuring Support Agreement

"**Consolidated Net Earnings**" means, with respect to Holdings, the Company and their Subsidiaries for any period, the aggregate net income (or deficit) of Holdings, the Company and their Subsidiaries for such period on a consolidated basis, after deduction of all expenses, taxes and other proper charges determined in accordance with GAAP, and after eliminating therefrom all extraordinary nonrecurring items of income (or deficit).

"**Consolidated Tangible Total Assets**" of Holdings, the Company and their Subsidiaries means, as of any date, the total property of Holdings, the Company and their Subsidiaries on a consolidated basis at such date, as determined in accordance with GAAP, less the net book amount of all assets of Holdings, the Company and their Subsidiaries (after deducting any reserves applicable thereto) that would be shown as intangible assets on a consolidated balance sheet of Holdings, the Company and their Subsidiaries as of such date prepared in accordance with GAAP.

"**Consumer Price Index**" means the Consumer Price Index published from time to time by the Bureau of Labor Statistics of the United States Department of Labor, U.S. City Average, All Items and Major Group Figures for Urban Wage Earners and Clerical Workers, or any successor or substitute index promulgated by the Bureau of Labor Statistics of the United States Department of Labor.

"**Control**" in respect of a Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Control Agreements**" collectively means the deposit account, securities account or blocked account control agreements, in form and substance satisfactory to the Collateral Agent and the Required Holders, to be executed and delivered by and among the Collateral Agent, the Company and the applicable financial institutions serving as the depositary bank or securities intermediary, as applicable, with respect thereto, together with all modifications and/or replacements thereof which are approved in writing by the Collateral Agent and the Required Holders, for purposes of evidencing control by the Collateral Agent in one or more deposit accounts or securities accounts maintained by the Company with any such specified financial institution for purposes of perfection of the Collateral Agent's Lien in such accounts.

"**Control Group**" means (a) Dino Chouest, Dionne Chouest Austin, Damon Chouest and Ross Chouest (or, upon the death or incapacity of any of the foregoing Persons, his or her spouse), (b) their respective children or other lineal descendants and (c) the estate of, or any foundation or trust for the benefit of, or a partnership, limited liability company or other business combination solely among any of the foregoing Persons listed in (a) and (b) of this definition.

"**Controlled Entity**" means (i) any of the Subsidiaries of the Company and any of their or the Company's respective Controlled Affiliates and (ii) if the Company has a parent company, such parent company and its Controlled Affiliates. As used in this definition, "Control" means the possession, directly

or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Corporate Trust Office**" means the office of the Agent or the Collateral Agent, as applicable, at which at any particular time its corporate trust business shall be principally administered, which office at the date of the execution of this Agreement at is noted in <u>Section</u> **Error! Reference source not found.**, or such other address as the Agent or the Collateral Agent may designate from time to time by prior written

notice to the other parties hereto, or the principal corporate trust office of any successor Agent or Collateral Agent (or such other address as such successor Agent or Collateral Agent, as applicable, may designate from time to time by written notice to the other parties hereto).

"**Creditor Friendly Jurisdiction**" means the United States of America and any other jurisdiction approved by the Required Holders in writing.

"**Cure Amount**" is defined in Section 11.2.

"**Cure Right**" is defined in Section 11.2.

"**Default**" means an event or condition the occurrence or existence of which would, with the lapse of time or the giving of notice or both, become an Event of Default.

"**Default Rate**" means, at any time, that rate of interest that is the greater of (i) 2.00% per annum plus the rate of interest applicable to the Notes at such time (which 2.00% increase shall be cash interest), and (ii) 2.00% over the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as reasonably determined by the Required Holders) or any similar release by the Federal Reserve Board (as reasonably determined by the Required Holders).

"**Disclosure Documents**" is defined in Section 5.3.

"**Dollar**," "**Dollars**" and the symbol "**$**" each means lawful money of the United States of America.

"**EBITDA**" means, with respect to the Company and its Subsidiaries for any period, Consolidated Net Earnings for such period, plus to the extent deducted from revenues or not included in determining Consolidated Net Earnings for such period, (a) Interest Expense, (b) income tax expense for taxes which have been provided for by the Company and its Subsidiaries to the Affiliate of the Company responsible for paying such income taxes, (c) depreciation and amortization expense, (d) documented fees and expenses in connection with the implementation of the restructuring contemplated by the Restructuring Support Agreement and Asset Sales permitted under Section 10.12, (e) the amount of any insurance proceeds of any warranty claims, (f) the amount of any tax claims related to the pending tax review in Guyana as at the date of Closing and (g) for any four consecutive fiscal quarter period which includes the fiscal quarter ending on or around March 31, 2023, the aggregate amount of the Equity Contribution actually made to the Company on the Closing Date, less, to the extent included in determining Consolidated Net Earnings for such period, (i) non-cash income (expense) related to equity in earnings of the Company's unconsolidated entities, (ii) non-cash income (expense) related to interest rate swaps, (iii) all other non-cash income (expense) items and (iv) other extraordinary income or expenses.

"**ECO 280 Limitations**" is defined in Section 9.26(a)(ii).

**"ECO Brazil"** means, at any specified date, the ECO Worldwide Companies that are (a) included in, and described as being part of, such group in the ECO Worldwide Annual Report, and (b) directly or indirectly engaged to provide services to the offshore energy industry through the operation of offshore service vessels in Brazilian waters.

**"ECO U.S. Ports"** means, at any specified date, the ECO Worldwide Companies that are (a) included in, and described as being part of, such group in the ECO Worldwide Annual Report, and (b)

directly or indirectly engaged to operate port facilities to dock and supply marine vessels using heavy equipment, as well as sell fuel to vessels used in the Relevant Groups' operations and those owned by third parties.

"**ECO U.S. Shipyards**" means, at any specified date, the ECO Worldwide Companies that are (a) included in, and described as being part of, such group in the ECO Worldwide Annual Report, and (b) directly or indirectly engaged in constructing and repairing vessels used in the Relevant Groups' U.S. operations.

"**ECO U.S. Vessels**" means, at any specified date, the ECO Worldwide Companies that (a) are included in, and described as being part of, such group in the ECO Worldwide Annual Report, and (b) directly or indirectly engaged to provide services to the offshore energy industry.

"**ECO Worldwide Annual Report**" means the (a) consolidated and (b) consolidating report including balance sheet and related statements of operations, members equity and cash flows, with notes and disclosures previously produced and provided, as of the end of and for each fiscal year of ECO Worldwide Companies, setting forth in each case in comparative form the figures for the previous fiscal year, submitted by a Financial Officer of the ECO Worldwide Companies, based on the audited financial statement for Edison Chouest Offshore Worldwide. The consolidating report required pursuant to clause (b) of this definition shall include the combined accounts of the Relevant Groups.

"**ECO Worldwide Companies**" means, at any specified date, the Edison Chouest Offshore Worldwide companies that are majority owned by Gary Chouest and/or any combination of the Immediate Family, including, but not limited to, all Persons related by blood, adoption or marriage, and having total assets or Indebtedness in excess of $10,000,000.

"**Economic Sanctions**" shall have the meaning specified for such term in the definition of "**Blocked Person.**"

"**EEA Financial Institution**" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Environmental Laws**" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses,

agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any hazardous or toxic materials into the environment, including but not limited to those related to Hazardous Materials.

"**Equity Contribution**" has the meaning assigned to such term in Section 4.13.

"**Equity Value**" means, as of any date, the amount equal to (a)(i) 6.25 multiplied by (ii) the Actual Average EBITDA at such date less (b) Net Funded Debt at such date.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is treated as a single employer together with any Note Party or any of its subsidiaries under section 414 of the Code or Section 4001(14) of ERISA.

"**ERISA Plan**" means an "employee benefit plan" (as defined in section 3(3) of ERISA) subject to Title IV of ERISA that is, or, within the preceding five years, has been established or maintained, or to which contributions are, or, within the preceding five years, have been made or required to be made, by any Note Party or any ERISA Affiliate or with respect to which any Note Party or any ERISA Affiliate has any liability.

"**ERISA Plan Asset Regulations**" means 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA.

"**Erroneous Payment**" is defined in Section 20.9.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" is defined in Section 11.

"**Excess Cash Prepayment**" means an amount equal 100% of the unrestricted balance sheet cash as of the most recently completed fiscal quarter in excess of $30,000,000 (after the amortization payment required pursuant to Section 8.1(a)) to be paid by the Company on the payment dates in accordance with Section 8.9, and applied to the principal of the Note Obligations.

"**Exchange**" means the exchange of the Exchanged Debt for Notes pursuant to Section 2.1.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended and in effect from time to time.

"**Exchanged Debt**" is defined in Section 2.1.

"**Exchanged Series A Notes**" means the notes issued under the Series A Note Purchase Agreement, including any accrued and unpaid interest thereon and the *pro rata* portion of the Noteholder Non-Acceleration Settlement Amount related thereto.

"**Exchanged Series B Notes**" means the notes issued under the Series B Note Purchase Agreement, including any accrued and unpaid interest thereon and the *pro rata* portion of the Noteholder Non-Acceleration Settlement Amount related thereto.

"**Exchanged Term Loan**" means the "Loans" under, and defined in, the Existing Credit Agreement and any accrued and unpaid interest related thereto.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Noteholder or required to be withheld or deducted from a payment to a Noteholder, (a) Taxes imposed on or measured

by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Noteholder being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Noteholder with respect to an applicable interest in a Note pursuant to a law in effect on the date on which (i) such Noteholder acquired an interest in the Exchanged Debt or (ii) such Noteholder changes its lending office, except in each case to the extent that, pursuant to Section 8.11, amounts with respect to such Taxes were payable either to such Noteholder's assignor immediately before such Noteholder acquired the applicable interest in a Note or to such Noteholder immediately before it changed its lending office, (c) Taxes attributable to such Noteholder's failure to comply with Section 8.11(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Existing Credit Agreement**" means the First Amended and Restated Credit Agreement dated as of December 7, 2018 (as subsequently amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among the Company, the lenders party thereto, the issuing bank party thereto, the administrative agent party thereto, and the other parties thereto.

"**Exit Fee**" means, as to the date on which the Exit Fee becomes due and payable, (a) if the Actual Average EBITDA as of such date does not exceed the Forecasted Average EBITDA as of such date by 18%, zero, (b) if Actual Average EBITDA as of such date exceeds Forecasted Average EBITDA as of such date by 27%, 15% of Equity Value as of such date and (c) if Actual Average EBITDA as of such date exceeds Forecasted Average EBITDA as of such date in an amount between 18% and 27%, a percentage between 10% and 15% of Equity Value as of such date, on a linear basis[3][1]. The Exit Fee shall be determined by the Company in consultation with the Required Holders and notified to the Agent; provided, that for the purposes of calculating the Exit Fee, Actual Average EBITDA, shall exclude the amount of any expense for the reactivation or retrofit of the Petrobras Vessels in excess of the amount of the Equity Contributions.

"~~**Fair Market Value**~~" ~~means the price at which the subject property would change hands between a willing buyer and a willing seller, where neither the buyer not the seller is under any compulsion to buy or sell, the buyer and seller are not Affiliates and both have reasonable knowledge of all relevant facts.~~

"~~**FATCA**~~" ~~means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to~~

~~a~~[1] For purposes of illustration:

1. If Actual Average EBITDA is $110.25 million and Forecast Average EBITDA is $90.00 million, then the outperformance percentage is 22.5%.
2. The outperformance percentage is translated into the Exit Fee percentage as follows:
    - If the outperformance percentage is less than 18.0%, then there is no exit fee
    - If the outperformance percentage is greater than or equal to 18.0% and less than or equal to 27.0%, then the

        exit fee percentage is calculated as follows:
        $$10.0\% + [(\text{outperformance percentage} - 18.0\%) * (5/9)]$$
    - If the outperformance percentage is greater than 27.0% then the exit fee percentage is 15.0%
        - This hypothetical illustrative outperformance percentage translates to an Exit Fee percentage of 12.5%
3. Enterprise Value is calculated by multiplying Actual Average EBITDA by 6.25x, the agreed-to Enterprise Value EBITDA multiple
    - The hypothetical, illustrative Actual Average EBITDA of $110.25 million multiplied by 6.25x implies a hypothetical, illustrative Enterprise Value of $689.06 million
4. The hypothetical, illustrative Enterprise value less hypothetical, illustrative net debt of $360.00 million implies a hypothetical, illustrative equity value of $329.06 million
5. Multiplying the hypothetical, illustrative Exit Fee percentage of 12.5% by the hypothetical, illustrative equity value of $329.06 million yields a hypothetical, illustrative Exit fee of $41.13 million.

"**Fair Market Value**" means the price at which the subject property would change hands between a willing buyer and a willing seller, where neither the buyer not the seller is under any compulsion to buy or sell, the buyer and seller are not Affiliates and both have reasonable knowledge of all relevant facts.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(l) of the Code.

"**Federal Funds Rate**" means, for any day, the greater of (a) the rate per annum calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate <u>provided</u>, (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average of the quotations for the day for such transactions received by the Agent from three commercial banks of recognized standing selected by it, and (b) 0%.

"**Fee Amount Rate**" is defined in Section 8.1(c).

"**Final Tax Liability Amount**" is defined in Section 4.9(c).

"**Financial Statement Compliance Certificate**" is defined in Section 7.2.

"**Fleet Mortgage**" means the Preferred Fleet Mortgage from the Company to the Collateral Agent, as mortgagee, to be executed in substantially the form of <u>Exhibit E</u> hereto, as such instrument may be amended or supplemented from time to time pursuant to the provisions thereof.

"**Forecasted Average EBITDA**" means, for any period the forecasted average annual EBITDA set forth in the forecast delivered pursuant to Section 4.10(c) for such period.

"**Foreign Noteholder**" means a Noteholder that is not a U.S. Person.

"**FSV Vessels**" means the Fast Tender (ON 1206390) and the Fast Track (ON 1208793).

"**Funded Debt**" means, with respect to any Person, without duplication, (a) all Indebtedness of such Person for borrowed money, (b) all purchase money Indebtedness of such Person, including without limitation the principal portion of all obligations of such Person under Capitalized Lease Obligations, (c) the maximum available amount of all standby letters of credit or acceptances issued or created for the account of such Person and (d) the principal balance outstanding under any Synthetic Lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product to which such Person is a party, where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease in accordance with GAAP. The Funded Debt of any Person shall include the Funded Debt of any partnership or joint venture in which such Person is a general partner or joint venturer, but only to the extent to which there is recourse to such Person for the payment of such Funded Debt.

"**GAAP**" means generally accepted accounting principles as in effect from time to time in the United States of America or in respect of financial statement for ECO Brazil only, generally accepted accounting principles as in effect from time to time in Brazil.

"**Galliano Marine Services**" means Galliano Marine Services, L.L.C., an Affiliate of the Company currently providing certain administrative and other services to the Company and certain of its Affiliates, or any successor to Galliano Marine Services, L.L.C. providing such services.

"**Governmental Authority**" means:

      (a)      the government of:

            (i)      the United States of America or any state or other political subdivision thereof, or

            (ii)      any other jurisdiction in which the Company or any Subsidiary conducts all or any part of its business, or which asserts jurisdiction over any properties of the Company or any Subsidiary, or

      (b)      any entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of, or pertaining to, any such government.

"**Governmental Official**" means any governmental official or employee, employee of any government-owned or government-controlled entity, political party, any official of a political party, candidate for political office, official of any public international organization or anyone else acting in an official capacity.

"**Guaranty**" means, with respect to any Person, any obligation (except the endorsement in the ordinary course of business of negotiable instruments for deposit or collection) of such Person guaranteeing or in effect guaranteeing any indebtedness, dividend or other obligation of any other Person in any manner, whether directly or indirectly, including (without limitation) obligations incurred through an agreement, contingent or otherwise, by such Person:

      (a)      to purchase such indebtedness or obligation or any property constituting security therefor;

      (b)      to advance or supply funds (i) for the purchase or payment of such indebtedness or obligation, or (ii) to maintain any working capital or other balance sheet condition or any income statement condition of any other Person or otherwise to advance or make available funds for the purchase or payment of such indebtedness or obligation;

      (c)      to lease properties or to purchase properties or services primarily for the purpose of assuring the owner of such indebtedness or obligation of the ability of any other Person to make payment of the indebtedness or obligation; or

      (d)      otherwise to assure the owner of such indebtedness or obligation against loss in respect thereof.

In any computation of the indebtedness or other liabilities of the obligor under any Guaranty, the indebtedness or other obligations that are the subject of such Guaranty shall be assumed to be direct obligations of such obligor.

"**Hazardous Materials**" means any and all material, pollutants, toxic or hazardous wastes or other substances that might pose a hazard to health and safety due to their hazardous or dangerous properties or characteristics, the removal of which may be required or the generation, manufacture, refining, production, processing, treatment, storage, handling, transportation, transfer, use, disposal, release, discharge, spillage, seepage or filtration of which is or shall be restricted, prohibited or penalized by any Environmental Law including, but not limited to, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum, petroleum products, petroleum related products, flammable, explosive, radioactive, freon gas,

radon, pesticide or other agricultural-related products, lead based paint, radon gas or similar restricted, prohibited or penalized substances.

"**Holdings**" has the meaning set forth in the preamble to this Agreement.

"**Hornbeck**" means Hornbeck Offshore Services, LLC, a Delaware limited liability company.

"**Immediate Family**" means Carolyn Chouest, the descendants of Gary Chouest or any trust established for the benefit of Carolyn Chouest or any of the descendants of Gary Chouest.

"**Indebtedness**" with respect to any Person means, at any time, without duplication,

(a)     its liabilities for borrowed money and its redemption obligations in respect of mandatorily redeemable Preferred Stock;

(b)     its liabilities for the deferred purchase price of property acquired by such Person (excluding accounts payable arising in the ordinary course of business but including all liabilities created or arising under any conditional sale or other title retention agreement with respect to any such property);

(c)     (i) Capitalized Lease Obligations and (ii) all liabilities which would appear on its balance sheet in accordance with GAAP in respect of Synthetic Leases assuming such Synthetic Leases were accounted for as Capitalized Lease Obligations;

(d)     all liabilities for borrowed money secured by any Lien with respect to any property owned by such Person (whether or not it has assumed or otherwise become liable for such liabilities);

(e)     all its liabilities in respect of letters of credit or instruments serving a similar function issued or accepted for its account by banks and other financial institutions (whether or not representing obligations for borrowed money);

(f)     the aggregate Swap Termination Value of all Swap Contracts of such Person;

(g)     unfunded pension liabilities;

(h)     any Guaranty of such Person with respect to liabilities of a type described in any of clauses (a) through (g) hereof; and

(i)     all other items (excluding items of contingency reserves or of reserves for deferred income taxes, if applicable) which under GAAP are shown on the balance sheet as a liability (excluding trade accounts payable in the ordinary course of business and accrued expenses shown as current liabilities)

Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. In addition, Indebtedness of any Person shall include all obligations of such Person of the character described in clauses (a) through (i) to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is deemed to be extinguished under GAAP.

"**Indemnified Liabilities**" is defined in Section 22.3.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Note Party under any Note Documents and (b) to the extent not otherwise described in (a), Other Taxes.

"**Institutional Investor**" means (a) any Noteholder, (b) any Noteholders holding (together with one or more of its affiliates) more than 5% of the aggregate principal amount of the Notes then outstanding, (c) any bank, trust company, savings and loan association or other financial institution, any pension plan, any investment company, any insurance company, any broker or dealer, or any other similar financial institution or entity, regardless of legal form, and (d) any Related Fund of any holder of any Note.

"**Insurance Consultant**" means Aon BankAssure, its successors and assigns or such other insurance consultant as shall be approved by the holders of a majority of the aggregate principal amount of the Notes then outstanding.

"**Intellectual Property**" means all U.S. and foreign (a) patents, patent applications, patent disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re- examinations, substitutions, and extensions thereof, (b) trademarks, service marks, trade names, domain names, logos, slogans, trade dress, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (c) copyrights and copyrightable subject matter, (d) rights of publicity, (e) moral rights and rights of attribution and integrity, (f) computer programs (whether in source code, object code, or other form), databases, compilations and data, technology supporting the foregoing, and all documentation, including user manuals and training materials, related to any of the foregoing, (g) trade secrets and all confidential information, know-how, inventions, proprietary processes, formulae, models, and methodologies, (h) all rights in the foregoing and in other similar intangible assets, (i) all applications and registrations for the foregoing, and (j) all rights and remedies against infringement, misappropriation, or other violation thereof.

"**Intellectual Property Agreements**" means the Know-How Agreement and the NAS License Agreement.

"**Interest Expense**" means, with respect to the Company and its Subsidiaries, for any period, total cash interest expense (excluding any amount that is capitalized), letter of credit fees and other fees and expenses incurred by such Person in connection with any Indebtedness (including but not limited to Indebtedness under this Agreement) for such period, whether paid or accrued (including that attributable to obligations which have been or should be, in accordance with GAAP, recorded as Capitalized Lease Obligations), including, without limitation, all commissions, discounts, and other fees and charges owed with respect to letters of credit and bankers' acceptance financing, fees owed with respect to the Note Obligations, and net costs under Swap Contracts entered into addressing interest rates, all as determined in conformity with GAAP. For the avoidance of doubt, "Interest Expense" shall not include any Specified Noteholder Fee.

"**Interest Payment Date**" means the last Business Day of March, June, September and December in each year after the Closing Date, and on the Maturity Date, until the principal amount of the Notes shall have become due and payable.

"**Investment**" means the purchase or other acquisition of any securities or Indebtedness of, or the making of any loan, advance, extension of credit or capital contribution to (or the transfer of property having the effect of any of the foregoing), or the incurring of any Guaranty, any Person (in each case other than

accounts receivable, payable form parties other than Affiliates of the Company, arising in the ordinary course of business).

"**Jones Act**" means, collectively, the U.S. citizenship and cabotage laws principally contained in 46 U.S.C. § 50501(a), (b) and (d) and 46 U.S.C. Chapters 121 and 551 and any successor statutes thereto, together with the rules and regulations promulgated thereunder by the U.S. Coast Guard and the U.S. Maritime Administration and their practices of enforcing, administering, and interpreting such laws, statutes, rules, and regulations, in each case as amended or supplemented from time to time, relating to the ownership and operation of U.S. flag vessels operating in the U.S. coastwise trade.

"**Know-How Agreement**" means the Non-Exclusive and Assignable Patent, Copyright and Know-How License Agreement in favor of the Company by Marine Technologies (as to patents, copyrights and know-how) substantially in the form of Exhibit K-1  dated as of the Closing Date (which will be collaterally assigned as of the Closing Date to the Collateral Agent).

"**Lien**" means, with respect to any Person, any mortgage, lien, pledge, charge, security interest or other encumbrance, or any interest or title of any vendor, lessor, lender or other secured party to or of such Person under any conditional sale or other title retention agreement or Capitalized Lease Obligations, upon or with respect to any property or asset of such Person (including in the case of stock, stockholder agreements, voting trust agreements and all similar arrangements).

"**Loss Event**" means any accident, occurrence or event with respect to any Mortgaged Vessel pursuant to which insurance proceeds are payable as a result of such accident, occurrence or event.

"**Marine Technologies**" means Marine Technologies, L.L.C., a Louisiana limited liability company.

"**Master Services Agreement**" means the Master Services Agreement between the Company and Marine Technologies dated as of the Closing Date (which will be collaterally assigned as of the Closing Date to the Collateral Agent) substantially in the form of Exhibit J hereto, as permitted to be amended, restated, supplemented or otherwise modified from time to time.

"**Material**" means material in relation to the business, operations, affairs, financial condition, assets, properties, or prospects of the Note Parties and their Subsidiaries taken as a whole and, in any case, in an amount in excess of $1,000,000.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, prospects, operations, affairs, condition (financial or otherwise), assets or properties of either the Company individually or Holdings, or the Company and its Subsidiaries, taken as a whole, (b) the ability of Holdings or the Company to perform its obligations under this Agreement, the Security Documents and the Notes or the ability of Holdings or the Company to perform its obligations under the charters in effect with respect to the Mortgaged Vessels taken as a whole, (c) the Collateral, or the Collateral Agent's Liens under the Security Documents or (d) the validity or enforceability of this Agreement, the Notes or the Security Documents.

"**Material Agreements**" is defined in Section 9.24.

"**Maturity Date**" means ~~[___]~~February 24, 2028; provided that if such day is not a Business Day, then the next succeeding Business Day.[4]

"**Members**" means any Person having a membership interest in the Company and/or Holdings and, for purposes of calculating the financial covenants set forth in Section 10.6 only, its consolidated Subsidiaries, whether or not such membership interest is evidenced by a certificate or other means.

"**Minimum Vessel Sale Proceeds**" means at least $15,000,000.00 Net Cash Proceeds per Vessel for each PSV Vessel.

"**Moody's**" means Moody's Investor Service, Inc.

"**Mortgaged Vessels**" means those vessels made subject to the Lien of the Fleet Mortgage concurrently with the execution and delivery thereof and any additional vessels made subject to the Lien of the Fleet Mortgage at any time and from time to time after the date hereof as required under the provisions hereof. The Mortgaged Vessels are set forth in Schedule C attached hereto. After the Lien of the Fleet Mortgage on any Mortgaged Vessel is released in accordance with the Note Documents, such vessel shall no longer be deemed to be a Mortgaged Vessel hereunder.

"**Multiemployer ERISA Plan**" means any ERISA Plan that is a "multiemployer plan" (as such term is defined in section 4001(a)(3) of ERISA).

"**Mutual Release**" means the Mutual Release Agreement by and among the Company, the Noteholders and the other parties thereto, dated as of the Closing Date, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**NAIC**" means the National Association of Insurance Commissioners or any successor thereto.

"**NAS License Agreement**" means the Non-Exclusive and Assignable Copyright License Agreement in favor of the Company by North American Shipbuilding (as to copyrights) substantially in the form of Exhibit K-2, dated as of the Closing Date (which will be collaterally assigned as of the Closing Date to the Collateral Agent).

"**Net Cash Proceeds**" means with respect to any Asset Sale, an amount equal to: (a) the sum of cash payments received by the Note Parties from such Asset Sale, minus (b) any bona fide costs and expenses (including, without limitation, legal, accounting and investment banking fees, and customary sales commissions) incurred in connection with such Asset Sale, and (c) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by any Note Party in connection with such Asset Sale; provided that upon release of any such reserve, the amount released shall be considered Net Cash Proceeds.

"**Net Funded Debt**" means Funded Debt of the Company less Unrestricted Cash in excess of $20,000,000.

"**North American Shipbuilding**" means North American Shipbuilding, L.L.C., a Louisiana limited liability company.

---

[4]     ~~Maturity Date is to be 5 years from the date of Closing.~~

"**Note Documents**" means this Agreement, the Notes, the Security Documents, the Agent Fee Letter and all other instruments, certificates and other documents now or hereafter executed and delivered by or on behalf of Holdings and the Company pursuant to or in connection with any of the foregoing or any of the transactions contemplated hereby, and any and all amendments, supplements and other modifications to any of the foregoing.

"**Noteholders' Advisors**" means, collectively, (a)(i) Weil, Gotshal & Manges LLP; (ii) Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, as maritime counsel to the Noteholders; (iii) TRP Advisors, LLC, as financial advisors to the noteholders of the Series A Note Purchase Agreement and Series B Note Purchase Agreement; and (iv) Lazard Frères & Co. LLC, as investment banker to the Noteholders; and (b)(i) Simpson, Thacher & Bartlett, LLP, as counsel to the administrative agent under the Existing Credit Agreement, (ii) Jones Walker LLP, as maritime counsel to the administrative agent under the Existing Credit Agreement and (iii) CR3 Partners LLC, as financial advisors to the administrative agent under the Existing Credit Agreement.

"**Noteholders' Fees and Expenses**" means all reasonable and documented fees and expenses of the Noteholders' Advisors.

"**Noteholder**" or "**Noteholders**" means each Person listed on the signature pages hereto as a Noteholder and each Person who is deemed a "Noteholder" pursuant to Article IV.E.1 of the Plan notwithstanding such Person not executing and delivering a signature page hereto (such deemed Noteholders and Persons listed on the signature pages hereto as a Noteholder listed on Schedule A hereto) and any other Person that becomes a party hereto pursuant to Section 13.2; provided that, (i) any such Noteholder that ceases to be the registered holder of such Note as a result of a transfer shall cease to be included within the meaning of "Noteholder" of such Note for the purposes of this Agreement upon such transfer, (ii) if such Person is a nominee, then for the purposes of Sections 6, 7, 12, 16 and 17 and any related definitions in this Schedule B, "Noteholder" shall mean the beneficial owner of such Note identified in the Register pursuant to Section 13.1 of this Agreement and (iii) persons who are deemed to be Noteholders by virtue of Article IV.E.1 of the Plan shall be treated as Noteholders for purposes of the Register on and after such time as the Company has received notice of such person's name, address and ownership of Notes for purposes of the Register as contemplated in Section 13.1 of this Agreement.

"**Noteholder Non-Acceleration Settlement Amount**" means $11,696,000.

"**Note Obligations**" means all of the monetary obligations owed by the Company to the Agent, the Collateral Agent or any Noteholder under this Agreement, the Notes, the Security Documents or any other Note Document, and related agreements, documents, and instruments, including, without limitation (but for certainty without duplication), (a) the outstanding principal amount of, accrued and unpaid interest on (including any interest accrued prior to the Closing Date pursuant to Section 4.9(a), any unpaid Exit Fee due with respect to, the Notes and any interest accruing on or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Note Parties or any of their Subsidiaries (if any) as long as a claim for post-filing or post-petition interest is not disallowed in such proceeding), and (b) any other unpaid amounts (including amounts in respect of fees, expenses, indemnification and reimbursement) due from the Note Parties to the Agent, the Collateral Agent and the Noteholders and each of their Affiliates under this Agreement and any of the Notes, the Security Documents or any other Note Document.

"**Note Parties**" means, collectively, the Company, Holdings and any other Person who becomes a party to this Agreement as a guarantor or obligor.

"**Note Purchase Agreements**" means, collectively, the Series A Note Purchase Agreement and the Series B Note Purchase Agreement.

"**Notes**" is defined in Section 1.

"**NVDC**" means the United States Coast Guard, National Vessel Documentation Center, in Falling Waters, West Virginia.

"**OFAC**" shall have the meaning specified for such term in the definition of "Blocked Person."

"**OFAC Listed Person**" shall have the meaning specified for such term in the definition of "Blocked Person."

"**OFAC Sanctions Program**" means any economic or trade sanction that OFAC is responsible for administering and enforcing.                    A list of OFAC Sanctions Programs may be found at http://www.treasury.gov/resource-center/sanctions/Programs/Pages/Programs.aspx.

"**Officer's Certificate**" means a certificate of a Senior Financial Officer, of the manager, or of any other officer of the Company whose responsibilities extend to the subject matter of such certificate.

"**Organizational Documents**" means, with respect to a corporation, the certificate of incorporation, articles of incorporation and bylaws of such corporation; with respect to a limited partnership, the limited partnership agreement and certificate of limited partnership of such limited partnership; with respect to a joint venture, the joint venture agreement establishing such joint venture; with respect to a limited liability company, the articles of organization or certificate of formation and regulations or limited liability company agreement of such limited liability company; and with respect to a trust, the instrument establishing such trust; in each case including any and all modifications thereof as of the date of the Note Document referring to such Organizational Document and any and all future modifications thereof.

"**Other Connection Taxes**" means, with respect to any Noteholder, Taxes imposed as a result of a present or former connection between such Noteholder and the jurisdiction imposing such tax (other than connections arising from such Noteholder having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Note Documents, or sold or assigned an interest in any Notes or Note Documents).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Note Documents, except any such Taxes that are Other Connection Taxes.

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA or any successor thereto.

"**Person**" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, business entity, Governmental Authority or other entity, whether acting in an individual, fiduciary or other capacity.

"**Petrobras Vessels**" means the Corcovado (ON 1215834), the Mr Sidney (ON 1216539) and the Ms Virgie (ON 1213714).

"**Plan**" means a chapter 11 plan (as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto), to be implemented in accordance with the Restructuring Support Agreement, to the extent set forth herein, through the commencement by the Notes Parties and certain of their Affiliates of pre-packaged bankruptcy cases under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas.

"**Pledge Agreement**" means the Pledge Agreement dated as of the Closing date by and among Holdings and the Collateral Agent, in the form attached hereto as Exhibit L, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Preferred Stock**" means any class of Capital Stock of a Person that is preferred over any other class of capital stock (or similar equity interests) of such Person as to the payment of dividends or the payment of any amount upon liquidation or dissolution of such Person.

"**Projections**" is defined in Section 7.1(v).

"**Prohibited Transaction**" means any non-exempt transaction set forth in Section 406 of ERISA or section 4975 of the Code.

"**property**" or "**properties**" means, unless otherwise specifically limited, any interest in any kind of property or asset, whether real or personal property of any kind, tangible or intangible, choate or inchoate.

"**PSV Vessels**" means the Celena Chouest (ON 1201702), the Gavea (ON 1211932), the Dante (ON 1178758), the Lyman Martin (ON 1227085), the Pao de Acucar (ON 1218372), and the Jackie Chouest (ex-Andrea Chouest) (ON 1210979).

"**PSV Vessel Sale Proceeds**" means the Net Sale Proceeds from the sale of the PSV Vessels.

"**PTE**" is defined in Section 6.2(a).

"**Prudential**" means The Prudential Insurance Company of America and its successors.

"**Qualified Institutional Buyer**" means any Person who is a "qualified institutional buyer" within the meaning of such term as set forth in Rule 144A(a)(1) under the Securities Act.

"**Register**" is defined in Section 13.1.

"**Related Fund**" means, with respect to any holder of any Note, any fund or entity that (i) invests in Securities or bank loans, and (ii) is advised or managed by such holder, the same investment advisor as such holder or by an affiliate of such holder or such investment advisor.

"**Related Parties**" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release and Reassignment**" means the Release and Reassignment of Interests in All Charters, Earnings, Insurances and Other Personal Property Collateral from JPMorgan Chase Bank N.A. to the Company, in form and substance reasonably satisfactory to the Agent.

"**Relevant Groups**" means each of the ECO U.S. Vessels, ECO U.S. Ports, ECO U.S. Shipyards and ECO Brazil.

"**Repurchase Agreement**" means any written agreement that (a) provides for (i) the transfer of one or more United States Governmental Securities in an aggregate principal amount at least equal to the amount of the Transfer Price (defined below) to the Company from an Acceptable Bank (defined below) or an Acceptable Broker-Dealer (defined below) against a transfer of funds (the "**Transfer Price**") by the Company to such Acceptable Bank or Acceptable Broker-Dealer, and (ii) a simultaneous agreement by the Company, in connection with such transfer of funds, to transfer to such Acceptable Bank or Acceptable Broker-Dealer the same or substantially similar United States Governmental Securities for a price not less than the Transfer Price plus a return thereon determined by the Company to be reasonable at a date certain not later than three days after such transfer of funds, (b) in respect of which the Company shall have the right, whether by contract or pursuant to applicable law, to liquidate such agreement upon the occurrence of any default thereunder, and (c) in connection with which the Company, or an agent thereof, shall have taken all action required by applicable law or regulations to perfect a first priority Lien in such United States Governmental Securities. As used herein, "**Acceptable Bank**" means any bank or trust company (A) which is organized under the laws of the United States of America or any State thereof, (B) which (combined, in the case of Bank One, Louisiana, National Association only, with its Affiliates with common holding company ownership) has capital, surplus and undivided profits aggregating at least $500,000,000, and (C) whose long-term unsecured debt obligations (or the long-term unsecured debt obligations of the bank holding company owning all of the capital stock of such bank or trust company) shall have been given a rating of "**A**" or better by S&P, "**A2**" or better by Moody's or an equivalent rating by any other credit rating agency of recognized national standing. As used herein, "**Acceptable Broker-Dealer**" means any Person other than a natural person (A) which is registered as a broker or dealer pursuant to the Exchange Act and (B) whose long-term unsecured debt obligations shall have been given a rating of "**A**" or better by S&P, "**A2**" or better by Moody's or an equivalent rating by any other credit rating agency of recognized national standing.

"**Required Holders**" means at any time on or after the Closing, the Noteholders holding at least 50.1% in principal amount of the Notes at the time outstanding (exclusive of Notes then owned by the Company or any of its Affiliates).

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" means, with respect to the Company, any Senior Financial Officer and any other Person with responsibility for the administration of the relevant portion of this Agreement or with the power to direct the management and policies of the Company including, the chief executive officer, chief operating officer, president, manager, chief financial officer, treasurer, controller, or general counsel (if any) of the Company or any entity of which the Company is a Subsidiary.

"**Restricted Payment**" means (a) the declaration or payment of any dividend on, or the making of any distribution in respect of, any Capital Stock of Holdings, the Company or any of their Subsidiaries, other than dividends or distributions payable solely in Capital Stock constituting the limited liability company equivalent of common stock of Holdings, the Company or, in the case of a Subsidiary, dividends or other payments or distributions in respect of its Capital Stock paid to the Company or Holdings, and other than payments to the Members of the Final Tax Liability Amount to the extent permitted by Section  4.9, (b) the purchase, redemption, retirement or other acquisition, whether direct or indirect, of any Capital Stock of Holdings, the Company or their Subsidiaries, (c) with respect to any amounts due from a Chouest Affiliate or Members of Holdings, any forgiveness, compromise or other modification thereto resulting in a reduction in the amount owed to Holdings or the Company, or (d) the payment of any premium by Holdings, the Company or any Subsidiary with respect to any life or disability insurance policy as to which Holdings, the Company or any Subsidiary is not a beneficiary. For purposes of this definition and Section 10.11, dividends or distributions in respect of the Capital Stock of Holdings and the Company shall be

deemed to include all salaries, bonuses and other compensation paid by or on behalf of (including, without limitation, allocations by Galliano Marine Services) Holdings, the Company or any Subsidiary to any such owners of Capital Stock of Holdings or to any other individuals who are Chouest Affiliates.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement made and entered into as of September 6, 2022, by and among the Company, the consenting creditors party thereto and the consenting stakeholders party thereto, as amended by the Amendment and Joinder Agreement in Respect of Restructuring Support Agreement, dated as of February [—]14, 2023, and as it may be amended, restated, supplemented or otherwise modified from time to time.

"**S&P**" means Standard & Poor's Ratings Services.

"**Sale and Lease-Back Transaction**" means, with respect to any Person, any direct or indirect arrangement pursuant to which property is sold or transferred by such Person or a subsidiary of such Person and is thereafter leased back from the Noteholder or transferee thereof by such Person or one of its subsidiaries.

"**Sanctioned Country**" means, at any time, a country, region or territory which is itself the subject or target of any Economic Sanctions (at the time of this Agreement, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, the Crimea Region of Ukraine, Cuba, Iran, North Korea and Syria).

"**SEC**" means the Securities and Exchange Commission.

"**Securities**" or "**Security**" shall have the meaning specified in section 2(1) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Security Agreement**" means the Security Agreement dated as of the Closing Date, in substantially the form of Exhibit F, among the Company, Holdings and the Collateral Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Security Documents**" means the Security Agreement, the Pledge Agreement, all related financing statements and any and all other agreements, security agreements, pledge agreements, collateral assignments, Fleet Mortgages, Assignment of Insurances, ship mortgages, Assignments of Charters and Hire, Control Agreements, Intellectual Property Agreements, Assignment of First Preferred Fleet Mortgage, Amended and Restated First Preferred Fleet Mortgage, guaranties, assignments of income, standby agreements, subordination agreements, undertakings and other instruments and financing statements now or hereafter executed and delivered as security for the payment and performance of the Note Obligations, as any of them may from time to time be amended, modified, restated or supplemented.

"**Senior Financial Officer**" means the chief financial officer, principal accounting officer, treasurer or comptroller of the Company.

"**Series A Note Purchase Agreement**" means the Amended and Restated Note Purchase Agreement dated as of the December 7, 2018 (as subsequently amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among the Company and the Noteholders party thereto, relating to the Company's 7.50% Senior Secured Notes, Series A, due on the Maturity Date (as defined therein).

"**Series B Note Purchase Agreement**" means the Amended and Restated Note Purchase Agreement dated as of the December 7, 2018 (as subsequently amended, restated, supplemented or otherwise modified from time to time in accordance with its terms), by and among the Company and the Noteholders party thereto, relating to the Company's 7.50% Senior Secured Notes, Series B, due on the Maturity Date (as defined therein).

"**Shipowner's Certificate**" is defined in Section 9.2(b)(iii)(B)(1).

"**Solvent**" shall mean, with respect to any Person as of the date of any determination, that on such date (i) the fair value of the property of such Person (both at fair valuation and at present fair saleable value) is greater than the total amount of liabilities, including, without limitation, contingent or subordinated liabilities, of such Person, (ii) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute unreasonably small capital after giving due consideration to current and anticipated future capital requirements and current and anticipated future business conduct and the prevailing practice in the industry in which such Person is engaged. In computing the amount of contingent liabilities at any time, such liabilities shall be computed at the amount which, in light of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability and (iii) such Person will not incur liabilities beyond its ability to pay such liabilities as they mature, taking into account the timing of and amounts of cash to be received by it and the timing of the amounts of cash to be payable on or in respect of its Indebtedness.

"**Specified Noteholder Fee**" has the meaning assigned to such term in Section 8.1(c).

"**Specified Noteholder Fee Amount**" has the meaning assigned to such term in Section 8.1(c).

"**Specified Prepayment Amount**" means an amount of not less than $84,000,000 from any PSV Vessel Sale Proceeds and any Cure Amount specifically to increase the Specified Prepayment Amount, in each case applied to reduce the aggregate principal amount of the Notes.

"**Subsidiary**" means, as to any Person, any other Person in which such first Person or one or more of its Subsidiaries or such first Person and one or more of its Subsidiaries owns sufficient equity or voting interests to enable it or them (as a group) ordinarily, in the absence of contingencies, to elect a majority of the Board of Directors of such second Person, and any partnership or joint venture if more than a 50% interest in the profits or capital thereof is owned by such first Person or one or more of its Subsidiaries or such first Person and one or more of its Subsidiaries (unless such partnership or joint venture can and does ordinarily take major business actions without the prior approval of such Person or one or more of its Subsidiaries). Unless the context otherwise clearly requires, any reference to a "Subsidiary" is a reference to a Subsidiary of the Company. Although the Company is a Subsidiary of Holdings, references herein to "Subsidiary" do not include the Company unless specified so.

"**Supplement to the Fleet Mortgage**" means a supplement to the Fleet Mortgage from the Company to the Collateral Agent, as mortgagee, to be executed in substantially the form of Exhibit G hereto.

"**Support Agreements**" means those certain Support Undertaking dated as of the Closing Date (which will be collaterally assigned as of the Closing Date to the Collateral Agent) substantially in the form of Exhibit I hereto.

"**SVO**" means the Securities Valuation Office of the NAIC or any successor to such Office.

"**Swap Contract**" means (a) any and all interest rate swap transactions, basis swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward foreign exchange transactions, cap transactions, floor transactions, currency options, spot contracts or any other similar transactions or any of the foregoing (including, without limitation, any options to enter into any of the foregoing), and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., or any International Foreign Exchange Master Agreement.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amounts(s) determined as the mark-to- market values(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts.

"**Synthetic Lease**" means, at any time, any lease (including leases that may be terminated by the lessee at any time) of any property (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor.

"**Tax Account**" is defined in Section 4.10(b).

"**Tax Liability Amount**" means the actual tax liability of the Members of the Company (i.e. the Members of Holdings after the Closing) payable with respect to any income from cancellation of debt arising solely from the exchange of the Exchanged Debt for the Notes pursuant to Section 2.1 of this Agreement (including with respect to gain recognized under Section 731(a)(1) of the Code from such cancellation of debt or from the cash distributable to Holdings and then by Holdings to its Members pursuant to Section 4.9(b) to pay such tax liability), calculated taking into account any suspended losses and other deductions or credits available to a Member from whatever source and treating the cash distributable to the Members pursuant to Section 4.9(b) as distributed in the same taxable year as the exchange of the Exchanged Debt for the Notes. For purposes of the Tax Liability Amount calculation, the Notes will be allocated among the Members under Section 752 of the Code in the same proportions as the Exchanged Debt without regard to the status of the debt as recourse or nonrecourse (with the only reduction of allocable liabilities for a Member under Section 752 of the Code resulting from a reduction in the amount of the Company's liabilities as a result of the exchange of the Exchanged Debt for Notes). Further, for purposes of determining whether a Member recognizes gain under Section 731(a)(1) of the Code from such cancellation of debt and the cash distributable pursuant to Section 4.9(b) any increase in the tax basis of a Member from such cancellation of debt will be deemed to be applied first against the amount deemed distributed to such Member under Section 752 of the Code and the cash distributable pursuant to Section 4.9(b). Any reduction of, use of or limitation on any suspended losses or deductions or credits of the Members of the Company (i.e. the Members of Holdings after the Closing) resulting from any transaction(s) engaged in, or allowed, by the Consenting Members (as defined in the Restructuring Support Agreement) and/or the Note Parties and their Subsidiaries outside the ordinary course and occurring on or after the Execution Date (as defined in the Restructuring Support Agreement) shall be disregarded and the applicable tax attributes shall be taken into account as if such transaction(s) had not occurred.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Test Period**" means, as of the last day of any fiscal quarter, any four consecutive fiscal quarters ended on such date; provided that, "Test Period" means (i) as of the last day of the first full fiscal quarter after the Closing Date, such first full fiscal quarter, (ii) as of the last day of the second full fiscal quarter after the Closing Date, such first two full fiscal quarters and (iii) as of the last day of the third full fiscal quarter after the Closing Date, such first three full fiscal quarters.

"**Threshold Amount**" is defined in Section 9.2(b)(iv)(B).

"**Total Assets**" shall mean all assets of the Company determined in accordance with GAAP.

"**Total Liabilities**" means, without duplication, the sum of (a) all liabilities of the Company determined in accordance with GAAP plus (b) all Indebtedness of the Company, whether or not so classified.

"**Trust Officer**" means, when used with respect to the Agent or the Collateral Agent, as applicable, any officer assigned to the Global Capital Markets – Project Finance Trust and Agency Services (or any successor division or unit) of the Agent or the Collateral Agent, as applicable, located at the Corporate Trust Office of the Agent or the Collateral Agent, as applicable, who shall have direct responsibility for the administration of the Note Documents to which the Agent or the Collateral Agent, as applicable, is party.

"**Tug Vessel**" means the Forte (ON 1223605).

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Uniform Commercial Code**" means the Uniform Commercial Code as in effect from time to time in the State of New York (or in any other applicable jurisdiction).

"**United States Governmental Security**" means any direct obligation of, or obligation fully guaranteed by, the United States of America, or any agency controlled or supervised by or acting as an instrumentality of the United States of America pursuant to authority granted by the Congress of the United States of America, so long as such obligation or guarantee shall have the benefit of the full faith and credit of the United States of America which shall have been pledged pursuant to authority granted by the Congress of the United States of America.

"**Unrestricted Cash**" means available cash of the Company on deposit in an account located in the United States that is subject to a Control Agreement, unencumbered (other than Liens in favor of the Collateral Agent as security for the Note Obligations or statutory Liens in favor of a depository bank) and not prohibited by law or any other contract or agreement (other than this Agreement and any other Note Document) from being applied to prepay Funded Debt.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" has the meaning assigned to such term in Section 8.3(e)(ii)(B)(3).

"**USA PATRIOT Act**" means United States Public Law 107-56, Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Vessel Sale**" as defined at Section 9.21(a).

"**Vessels**" means the collective reference to the vessels identified on the <u>Schedule C</u> hereto, and any other vessel which becomes subject to the Lien of the Fleet Mortgage; <u>provided</u>, that if all Liens in favor of the Collateral Agent on any Vessel were to be released, then such Vessel shall no longer be a Vessel hereunder.

"**Voting Stock**" means, with respect to any Person, securities of any class or classes of Capital Stock in such Person entitling the holders thereof under ordinary circumstances to vote in the election of members of the board of directors (or Persons performing similar functions) of such Person (irrespective of whether at the time stock of any other class or classes shall have or might have voting power or rights by reason of the happening of any contingency).

"**Wholly-Owned Subsidiary**" means, at any time, any Subsidiary all of the equity interests (except directors' qualifying shares) and voting interests of which are owned by any one or more of the Company and the Company's other Wholly-Owned Subsidiaries at such time.

"**Withholding Agent**" means the Company and the Agent.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

# Schedule C

**Mortgaged Vessels**

| | Vessel | O.N. |
|---|---|---|
| 1. | Avery Island | 1253395 |
| 2. | Brad Dartez | 1252257 |
| 3. | Cat Island | 1257750 |
| 4. | Celena Chouest | 1201702 |
| 5. | Corcovado | 1215834 |
| 6. | Dante | 1178758 |
| 7. | Dauphin Island | 1262978 |
| 8. | Deer Island | 1289730 |
| 9. | Dino Chouest | 1207856 |
| 10. | Fast Tender | 1206390 |
| 11. | Fast Track | 1208793 |
| 12. | Forte | 1223605 |
| 13. | Gavea | 1211932 |
| 14. | Grand Isle | 1250605 |
| 15. | Horn Island | 1255030 |
| 16. | Jackie Chouest | 1210979 |
| 17. | Kirt Chouest | 1213707 |
| 18. | Lyman Martin | 1227085 |
| 19. | Marsh Island | 1266925 |
| 20. | Mr Sidney | 1216539 |
| 21. | Ms Virgie | 1213714 |
| 22. | Pao de Acucar | 1218372 |
| 23. | Paradise Island | 1262977 |
| 24. | Pecan Island | 1258532 |
| 25. | Pelican Island | 1261549 |
| 26. | Sanibel Island | 1257727 |
| 27. | Ship Island | 1252958 |
| 28. | Timbalier Island | 1251360 |
| 29. | Wine Island | 1259152 |

Schedule C

(to Note Exchange Agreement)

**~~Schedule~~ 4.10(g)**

**Exchanged Debt**

1. Exchanged Term Loan

2. Exchanged Series A Notes

3. Exchanged Series B Notes

Schedule 4.10(g)

(to Note Exchange

**Schedule 4.10(k)**

**Deposit Accounts Subject to Control Agreements**

**BANK – ACCOUNT #**

- Nautical Solutions, L.L.C. Operating Account at Chase – Account number ending in 4148

- Nautical Solutions, L.L.C. Guyana Operating Account at Chase – Account number ending in 7113

Schedule 4.11(k)

(to Note Exchange

**Schedule 5.4**

**Note Parties; Subsidiaries; Affiliates; Directors and Senior Officers**

**NOTE PARTIES**

| Entity Name | Jurisdiction | % of Shares/Capital Stock/Equity Interests Held |
|---|---|---|
| Nautical Solutions, L.L.C. | Louisiana | 100% |
| Nautical Solutions Holdings, LLC | Louisiana | 100% |

**SUBSIDIARIES**

Nautical Solutions (Texas), LLC, a Texas limited liability company[3]

**AFFILIATES WITH NET EQUITY OF $20,000,000 OR MORE**

- 4 Boats Holdings, LLC
- Alaska Ventures, LLC
- Benchmark Marine Services, LLC
- Bollinger Shipyards, LLC
- C-Innovation, LLC
- C-Lift Holdings, LLC
- C-Logistics, LLC
- C-Port 2, LLC
- C-Port 3, LLC
- C-Port, LLC
- C-Survey, LLC
- C-Terminal, LLC
- C and B Holdings of Louisiana, LLC
- Central Port, LLC
- Duh Boats 2 Partnership C.V.
- GCGK Investments, LLC
- GIS, LLC
- GIS Holdings, LLC
- Island Ventures II, LLC

[3] To be dissolved after 21 days after confirmation order.

Schedule 5.4

- Leba Holdings, LLC
- Martin Holdings, LLC
- Nautical Solutions, LLC
- Nautical Ventures, LLC
- Offshore Support Services, LLC
- Plain Stim, LLC
- Reel Pipe, LLC
- Stim Star IV, LLC
- Team KGK Holdings, LLC
- Team KGK, LLC
- Young Guns Holdings, LLC
- Young Guns Holdings 2, LLC
- Bram Offshore, Ltda
- Bram USA, LLC
- Holiday, LLC
- Jack Russell, LLC
- Stim Tugs, LLC
- Team Marine, LLC
- Ted Juan, LLC
- Estaleiro Navship Ltda
- Duh Boats, B.V.
- Duh Boats Partnership, C.V.
- Offshore Service Vessels, LLC
- Alpha Marine Services, LLC
- Beta Marine Services, LLC
- Gamma Marine, LLC
- Island Drilling, LLC
- Mega Marine, LLC

## DIRECTORS AND KEY SENIOR OFFICERS

Nautical Solutions, L.L.C.

- Dionne Austin, Dino Chouest, Damon Chouest and Ross Chouest – Managers

- This particular limited liability company has not officially appointed officers, but each of Gary Chouest, Dionne Austin, Dino Chouest, Damon Chouest and Ross Chouest are involved in the management and Charlie Comeaux is the equivalent of a chief financial officer for ECO companies.

Nautical Solutions Holdings, LLC

- Dionne Austin and Dino Chouest – Managers

Schedule 5.4

- This particular limited liability company has not officially appointed officers, but each of Gary Chouest, Dionne Austin, Dino Chouest, Damon Chouest and Ross Chouest are involved in the management and Charlie Comeaux is the equivalent of a chief financial officer for ECO companies.

Schedule 5.4

**Schedule 5.5**

**Financial Statements**

      For the year ended December 31, 2021 audited financial statements prepared by Ernst & Young for Nautical Solutions, L.L.C.

      Nautical Solutions, L.L.C. balance sheet and statement of cash flows as of September 30, 2022 and income statement for the nine months ending September 30, 2022, internally prepared by management of the Company.

(to Note Exchange

**Schedule 5.15**

**Existing Indebtedness**

None.

**Schedule 5.27**

Schedule 5.27
**Transactions with Affiliates**

**Nautical Solutions**
**Aggregate Payments to Affiliates > $5M**



| | 2024 | | | Description |
|---|---|---|---|---|
| Galliano Marine Service, LLC | 57,502,720 | 37,059,543 | 94,562,263 | Labor, Payroll Taxes, Health Insurance, Management |
| | $4 | $37, | $78, | Insurance, Management |
| Galliano Marine Service International | $3,176,570 | $3,516,686 | $6,693,256 | Labor |
| | 3, | 3.51 | 7.3 | |
| North American Shipbuilding, LLC | 5,534,008 | | 6,330,002 | Vessels repairs, reactivations, & modifications |
| LaShip, LLC | $4,758,354 15,737,718 | $795,994 1,488,320 | $5,554,348 17,226,038 | |
| LaShip, | $1 | $1,4 | $17, | Vessels repairs, reactivations, & ROV rental payments |
| C-Innovation, LLC | $3,401, | $5,765,858 | $9,167,820 | |

Description (blue column, right):
- Labor, Payroll Taxes, Health Insurance, Management
- Labor
- Repairs, Reactivations, & Modifications
- Repairs, Reactivations, & Modifications
- ROV Rental Payments
- Vessel Insurance Reimbursements
- Fuel payments

(to Note Exchange



| Affiliate | 2022 | 2021 | TOTAL | Description |
|---|---|---|---|---|
| | 96 ~~24~~ 2,766,11 | | 10,042,469 | |
| Offshore Service Vessels, LLC | ~~$23,499,365,024~~ | $2,890,454 | ~~$56,392,6044~~ 78 | Vessels insurance reimbursements |
| C-Port/Stone, LLC | $3,178,242,331 ~~3,331~~ | $3,283,083 | $6,465,506,44 4 | Fuel payments |
| Stim Tugs, LLC | $6,873,185,981 | ~~$86,735,198~~ 52 | $7,609,166,7 | Blue Orca bareboat charter payments (charter is now ended) |

**Aggregate Payments from Affiliates > $5M**

**Aggregate Payments from Affiliates > $5M**

| Affilia | 2022 | 2 | TOTAL | Description |
|---|---|---|---|---|
| C-Logistics, LLC | ~~$97~~ 10 3,4173, 052 9 | $89,410,222 | ~~$186~~ 9 2,883,2 7,7514 | Bareboat charter hire |
| C-Innov | | | | Bareboat charter hire (charter is |

Descriptions:
- Bareboat charter hire
- Bareboat charter hire (Charter has now ended)
- Payment of dividends made through G-Boats, Inc regarding charters of Nautical Solutions vessels in Guyana (conduit to reduce Guyana taxes)

(to Note Exchange

| | | | | |
|---|---|---|---|---|
| ation, LLC | ~~$1,30 5,909~~ <u>3,884,0 81</u> | $8,9 22,7 57 | <u>$12,8</u>0 6,2~~2~~8, ~~666~~<u>38</u> | ~~now ended)~~ |
| 5K LP, LLC | ~~$17,3 39,65 2~~<u>20,86</u> <u>1,834</u> | $19, 537, 949 | ~~$36,8 77,60 1~~<u>40,39</u> <u>9,783</u> | ~~Payment of dividends made through G-Boats, Inc. regarding charters of Nautical Solutions vessels in Guyana (conduit to reduce Guyana taxes)~~ |

<u>:</u> Through ~~October 31,~~ <u>12/31/</u>2022<u>.</u>

Schedule 5.27

**Schedule 10.9**

**Existing Investments**

None.

Schedule 10.9

**Schedule 10.20**

**Deposit Accounts Not Subject to Control Agreements**

**BANK – ACCOUNT #**

- Nautical Solutions Holdings, LLC L.L.C. Tax Account at [Chase] – Account number ending in [     ]5816

Schedule 10.20

(to Note Exchange

Exhibit A

**EXHIBIT A**

**NAUTICAL SOLUTIONS, L.L.C.**

**[FORM OF] SENIOR SECURED NOTE, DUE [•]FEBRUARY 24, 2028**

No. [R][B]-[•]                                                         February 24, 2023
$[•]                                                         CUSIP Number: 63910V-AA6

FOR VALUE RECEIVED, the undersigned, NAUTICAL SOLUTIONS, L.L.C. (herein called the "**Company**"), a limited liability company organized and existing under the laws of the State of Louisiana, hereby promises to pay to [                          ], or registered assigns, the principal sum of [ ] DOLLARS, all interest, amounts, fees and premiums thereon and any other applicable Note Obligations owed to the holder of this Note to be paid under, and in accordance with the terms of, the Note Exchange Agreement until such time as the principal hereof has been repaid in full in cash.

Payments of principal of, interest on, and any Exit Fee with respect to this Note are to be made in lawful money of the United States of America to the account of the Agent (hereinafter defined) designated by written notice to the Company and the holder of this Note as provided in the Note Exchange Agreement referred to below.

This Note is one of a series of senior secured notes (herein called the "**Notes**") issued pursuant to the Note Exchange Agreement, dated as of [ ], 2023 (as amended, restated, amended and restated, supplemented and/or modified from time to time, the "**Note Exchange Agreement**"), among the Company, Nautical Solutions Holdings, LLC, the respective Noteholders named therein and Wilmington Trust, National Association, as agent for the Noteholders (in such capacity, including its successors and assigns in such capacity, the "**Agent**") and as collateral agent for the Noteholders (including its successors and assigns in such capacity) and is entitled to the benefits thereof. The holder of this Note will be deemed, by its acceptance hereof, to have agreed to the confidentiality provisions set forth in Section 20 of the Note Exchange Agreement. Unless otherwise indicated, capitalized terms used in this Note shall have the respective meanings ascribed to such terms in the Note Exchange Agreement.

This Note is a registered Note and, as provided in and subject to the Note Exchange Agreement, upon surrender of this Note for registration of transfer accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note for a like principal amount will be issued to, and registered in the name of, the transferee. Prior to due presentment for registration of transfer, the Company may treat the person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Company will not be affected by any notice to the contrary.

The Company will make required prepayments of principal on the dates and in the amounts specified in the Note Exchange Agreement. This Note is also subject to optional prepayment, in whole or from time to time in part, at the times and on the terms specified in the ~~Note Exchange Agreement, but not otherwise.~~
This Note is secured by the Security Documents.
Note Exchange Agreement, but not otherwise.

Exhibit A

If an Event of Default occurs and is continuing, the principal of this Note may be declared or otherwise become due and payable in the manner, at the price (including any applicable Exit Fee) and with the effect provided in the Note Exchange Agreement.

This Note shall be construed and enforced in accordance with, and the rights of the Company and the holder of this Note shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

Assignment of this Note is subject to the Note Exchange Agreement.

[Signature Page Follows]

NAUTICAL SOLUTIONS, L.L.C.

By_____
Name:
[Title]

**[FORM OF] ASSIGNMENT OF CHARTERS AND HIRE**

This ASSIGNMENT OF CHARTERS AND HIRE (this "*Assignment*") is made this [9] day of [9], 2023, by NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company (the "*Assignor*"), in favor of Wilmington Trust, National Association, in its capacity as collateral agent for the Secured Parties under and as defined in the Security Agreement (as such term is defined in the Note Exchange Agreement defined below), as required by the Note Exchange Agreement (together with its successors and permitted assigns, in such capacity, the "*Assignee*").

WITNESSETH:

WHEREAS, pursuant to the terms and conditions of that certain Note Exchange Agreement dated as of the date hereof (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Note Exchange Agreement*"), by and among the Assignor, Nautical Solutions Holdings, LLC, a Louisiana limited liability company, as the parent company of Assignor, and the financial institutions parties thereto, as noteholders, Wilmington Trust, National Association, as Agent and the Assignee, the Assignor has agreed to issue Senior Secured Notes due [9], 2028 in the amount set forth in the Note Exchange Agreement (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any notes delivered in substitution or exchange for any of the foregoing senior secured notes, the "*Senior Notes*");

WHEREAS, the Assignor has executed and delivered, or will execute and deliver, the Senior Notes to the respective noteholders thereof identified in the Note Exchange Agreement (collectively, together with such noteholders' successors and assigns, the "*Noteholders*"), such Senior Notes to be in the amount set forth in the Note Exchange Agreement and each to be due and payable in the amounts and upon the terms and conditions therein recited, with interest and other amounts as set forth in the Note Exchange Agreement;

WHEREAS, the Assignor is the sole legal and beneficial owner of the vessels more particularly described on Schedule 1 attached hereto and made a part hereof (collectively, subject to the terms and conditions of Section 17 hereof, the "*Vessels*" and each, a "*Vessel*");

WHEREAS, from time to time certain Vessels are (or will be) subject to certain charter agreements, contracts of affreightment or other similar agreements related to the use, operation and/or employment of the Vessels with the charterers identified in such agreements (collectively, the "*Charterers*" and individually, a "*Charterer*");

WHEREAS, any such agreement (as the same may be amended, restated, amended and restated, supplemented, extended or renewed from time to time) that (a) is entered into with a Chouest Affiliate, or (b) has an indicated duration of at least one (1) year (including any optional extensions or renewals) shall be referred to herein collectively as the "*Charters*" and each individually as a "*Charter*";

WHEREAS, it is a condition precedent to the exchange of the Exchanged Debt for the Senior Notes that the Assignor execute and deliver to the Assignee, as security for the full and timely payment and performance of any and all present and future indebtedness, obligations and liabilities of the Assignor to the Secured Parties, whether direct or indirect, absolute or contingent,

due to or to become due, or now existing or hereafter incurred, which may arise under, out of or in connection with Note Documents to which the Assignor is a party, in each case whether on account of principal, interest (including, without limitation, as a result of increases to applicable interest rates), Specified Noteholder Fee (if any), Exit Fee (if any), Note Obligations, fees, indemnities, costs, expenses or otherwise, and including, without limitation, all fees and disbursements of counsel to the Assignee and the Noteholders that are required to be paid by the Assignor pursuant to the terms of any of the Note Documents (collectively, and including any and all renewals, modifications, amendments, extensions for any period, supplements and restatements of any of the foregoing, the "*Secured Obligations*"), an assignment of all of the Assignor's right, title and interest in and to (a) all of the Charters and all amounts payable by the Charterers to the Assignor thereunder, and (b) all earnings and requisition compensation of the Vessels; and

WHEREAS, the Assignor, in order to secure the full and timely repayment of the Secured Obligations and performance and observance of, and compliance with, the covenants, terms and conditions contained in the Note Exchange Agreement, this Assignment and the other Note Documents, has duly authorized the execution and delivery of this Assignment.

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby agrees as follows:

1.      Defined Terms. Capitalized terms used herein and not otherwise defined are used herein as defined in the Note Exchange Agreement.

2.      Grant of Security. As security for the full and timely payment and performance of the Secured Obligations, the Assignor does hereby sell, assign, transfer and set over unto the Assignee, and does hereby grant to the Assignee a continuing, first priority security interest in and to, all of its right, title and interest in and to: (a) all freights, hire, earnings and other moneys earned and to be earned, due or to become due, or paid or payable to, or for the account of, such Assignor, of whatsoever nature, arising out of or as a result of the use, operation, pooling or chartering by the Assignor or its agents of the Vessels, including, without limitation, all rights arising out of the Assignor's lien on cargoes and subfreights thereunder, (b) each Charter, including, without limitation, within such assignment all freights, hire, earnings and other moneys earned and to be earned, due or to become due, or paid or payable to, or for the account of, the Assignor, of whatsoever nature, arising out of or as a result of such Charter, including, without limitation, all rights arising out of the owner's lien on and/or security interest in all cargoes and subfreights thereunder, and all rights of the Assignor to terminate such Charter, to perform thereunder and to compel performance of the terms thereof, (c) all rights, remedies, powers, privileges and claims for moneys due and to become due to the Assignor, and claims for moneys due and to become due to the Assignor, and all claims for damages, arising out of the breach of any and all present and future charter parties, including any and all Charters, pooling arrangements, bills of lading, contracts and other engagements of affreightment or for the carriage or transportation of cargo, and operations of every kind whatsoever of any Vessel and in and to any and all claims and causes of action for money, loss or damages that may accrue or belong to the Assignor, its successors or assigns, arising out of or in any way connected with the present or future use, operation, pooling, or chartering of any Vessel or arising out of or in any way connected with any and all present and future requisitions, charter parties (including all Charters), pooling arrangements, bills of lading,

contracts and other engagements of affreightment or for the carriage or transportation of cargo and other operations of any Vessel, (d) the right to give and receive all notices and other instruments or communications under a Charter, (e) the right to take such action, including the commencement, conduct and consummation of legal, administrative or other proceedings, as shall be permitted by a Charter, or by law, (f) all moneys and claims due and to become due to the Assignor, and all claims for damages and all insurances and other proceeds, in respect of the actual or constructive total loss or the agreed, arranged or compromised total loss of or requisition of use of or title to any Vessel, and (g) any proceeds of any of the foregoing and all interest and earnings from the investment of any of the foregoing and the proceeds and products thereof. The security created by this Assignment shall be held by the Assignee as a continuing security for the full and timely payment and performance of the Secured Obligations. The security so created shall not be satisfied by any intermediate payment or satisfaction of any part of the Secured Obligations, and such security shall be in addition to and shall not in any way be prejudiced or affected by any other collateral or security now or hereafter held by the Assignee. The rights hereby assigned may be further assigned by the Assignee in connection with the transfer of the Secured Obligations or the enforcement of the pledge thereof.

3.    <u>Agreement and Consent to Assignment of Charter</u>. The Assignor undertakes, immediately following the execution of this Assignment, to give written notice (substantially in the form set out in <u>Exhibit A</u>) to any Charterer under a Charter that is (a) a Chouest Affiliate, or (b) not a Chouest Affiliate with a Charter having an indicated duration of at least one (1) year (including any optional extensions or renewals) of the assignment of such Charter pursuant to this Assignment, and to (i) procure the acknowledgement of such notice (in the form provided in the notice) by any Charterer that is a Chouest Affiliate, and (ii) use commercially reasonably efforts to procure the acknowledgement of such notice (in the form provided in the notice) by any Charterer that is not a Chouest Affiliate with a Charter having an indicated duration of at least one (1) year (including any optional extensions or renewals).

4.    <u>Representations and Warranties</u>. The Assignor hereby represents and warrants to the Assignee, as an inducement to the Assignee to accept this Assignment, that neither the whole nor any part of the right, title and interest hereby assigned is the subject of any present assignment, security interest or pledge other than the one prior assignment previously executed in favor of JPMorgan Chase Bank, N.A., in its capacity as collateral agent and mortgagee for the Secured Parties party to that certain Credit Agreement dated as of November 14, 2013, as heretofore amended and supplemented from time to time that is being released substantially concurrently herewith.

5.    <u>Covenants</u>. The Assignor hereby covenants to the Assignee that:

(a)    If an Event of Default has occurred and is continuing, and without derogation of the rights of the Assignee under <u>Section 8</u> hereof to issue instructions to a Charterer directly, upon request of the Assignee, the Assignor shall specifically authorize and direct each Charterer to make payment of all of the freights, hire, earnings and other moneys due and to become due, or payable to, on for the account of, the Assignor under any Charter hereby assigned directly to the Assignee in accordance with the Note Documents, and shall deliver to the Assignee the written acknowledgment from each Charterer of such instructions promptly after receipt thereof. Notwithstanding anything to the contrary, the Assignor and the Assignee hereby agree

that so long as no Event of Default shall have occurred and be continuing, the Assignor shall be entitled to exercise its rights under each Charter as if this Assignment did not exist and otherwise to receive and retain any and all moneys assigned hereunder.

(b)     The Assignor shall notify the Assignee promptly of any and all time charter parties or series of successive voyage charter parties, contracts of affreightment or pooling arrangements entered into by the Assignor respecting any Vessel having an indicated duration of at least one (1) year (including any exercised optional extensions or renewals) and, upon the Assignee's request, any other charter party or any such other agreement.

(c)     So long as this Assignment is in effect, the Assignor shall not assign, grant a security interest in or pledge the whole or any part of the right, title and interest hereby assigned to anyone other than the Assignee without the prior written consent of the Noteholders in accordance with the respective Note Documents.

(d)     At any time and from time to time, upon the written request of the Assignee, the Assignor shall promptly and duly execute and deliver any and all such further instruments and documents as the Assignee may reasonably request in order to obtain the full benefits of this Assignment and of the rights and powers herein granted; provided, that no notices or requests shall be required to be sent (or shall be sent) to any Charterer (other than as set forth in Section 5(a)  above) unless an Event of Default has occurred and is continuing.

(e)     Whenever requested by the Assignee, the Assignor shall promptly deliver letters to each of its agents and representatives into whose hands or control may come any freights, hire, earnings or other moneys hereby assigned, informing each such agent and representative of this Assignment, and if any Event of Default has occurred and is continuing, instructing such agent and representative to remit or deliver promptly to the Assignee all freights, subfreights, hire, earnings and other moneys hereby assigned which may come into such agents' and representatives' hands or control and to continue to make such remittances or delivery until such time as such agents and representatives may receive written notice or instructions to the contrary direct from the Assignee. The Assignor shall copy the Assignee on each such correspondence and use its commercially best efforts to procure that each such agent and representative shall acknowledge directly to the Assignee receipt of the Assignor's letter of notification and instructions.

6.     Payment of Secured Obligations. The Assignor will pay and perform the Secured Obligations as and when the same shall be due for payment or performance.

7.     Freedom of Assignee from Obligations. It is hereby expressly agreed that anything herein contained to the contrary notwithstanding, (a) the Assignor shall at all times remain fully liable under each Charter to perform all of the obligations assumed by it thereunder, (b) the obligations of the Assignor under any Charter may be performed by the Assignee or its nominee without releasing the Assignor therefrom, and (c) the Assignee shall have no obligation or liability under any charter party (including any Charter), contract of affreightment or pooling arrangement by reason of or arising out of this Assignment, nor shall the Assignee be required or obligated in any manner to perform or to fulfill any obligations of the Assignor under or pursuant to any charter party (including any Charter), contract of affreightment or pooling arrangement nor to make any payment, nor to make any inquiry as to the nature or sufficiency of any payment received by the

Assignee or to present or to file any claim, or to take any other action to collect or to enforce the payment of any amounts which may have been assigned to it or which it may be entitled to hereunder at any time or times.

8.      Payment Directions to Charterers; Power of Attorney; Financing Statements. Upon the occurrence and during the continuance of an Event of Default, the Assignee shall be entitled to direct any Charterer and any other obligors to pay all freights, hire, earnings and other moneys assigned hereunder to such bank account as the Assignee may from time to time designate. Upon request of the Assignor, the Assignee shall furnish the Assignor with information from time to time as to the accounts into which all freights, hire, earnings and other moneys assigned hereunder are paid, the amounts and sources of such payments and the amounts and application of moneys withdrawn therefrom. The Assignee is hereby constituted the lawful attorney of the Assignor, irrevocably, with full power of substitution (in the name of the Assignor or otherwise) upon the occurrence and during the continuance of an Event of Default, to take any action and to execute any instruments which the Assignee may deem necessary or advisable to accomplish the purposes hereof, including, without limitation, to ask, require, demand, receive, compound and give acquittance for any and all freights, hire, earnings, moneys, claims, property and rights hereby assigned, to endorse any checks or other instruments or orders in connection therewith and to file any claims or to take any action or to institute any proceedings which the Assignee may deem to be necessary or advisable in the premises. Any action or proceeding brought by the Assignee pursuant to any of the provisions hereof or of any charter party (including any Charter), contract of affreightment, pooling arrangement or otherwise, and any claim made by the Assignee hereunder or under any charter party (including any Charter), contract of affreightment or pooling arrangement, may be compromised, withdrawn or otherwise dealt with by the Assignee without any notice to, or approval of, the Assignor. The Assignor hereby irrevocably authorizes the Assignee (or its designee) to file, at any time and from time to time, at the Assignor's sole cost and expense, such financing and continuation statements or papers of similar purpose or effect relating to this Assignment, without the Assignor's signature or authentication, as the Assignee at its sole option may deem appropriate and appoints the Assignee as the Assignor's attorney-in-fact (with full power of substitution) to execute or authenticate any such statements in the Assignor's name and to perform all other acts which the Assignee may deem necessary or appropriate to perfect and to continue the perfection and priority of any security interest conferred hereby.

9.      Irrevocable Assignment. The powers and authority granted to the Assignee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with an interest and may not be amended or waived except by an instrument in writing signed by the party against whom such enforcement is sought.

10.      Remedies Cumulative and Not Exclusive; No Waiver. Each and every right, power and remedy herein given to the Assignee shall be cumulative and shall be in addition to every other right, power and remedy of the Assignee now or hereafter existing at law, in equity, in admiralty or by statute, and each and every right, power and remedy, whether herein given or otherwise existing, may be exercised from time to time, in whole or in part, and as often and in such order as may be deemed expedient by the Assignee, and the exercise or the beginning of the exercise of any right, power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy. No delay or omission by the Assignee in the exercise of any right or power in the pursuance of any remedy accruing upon any breach or default

by any Person shall impair any such right, power or remedy or be construed to be a waiver of any such right, power or remedy or to be an acquiescence therein; nor shall the acceptance by the Assignee of any security or of any payment of or on account of the Secured Obligations be construed to be a waiver of any right to take advantage of any future breach or default or of any past breach or default not completely cured thereby.

       11.    <u>Invalidity</u>. If any provision of this Assignment shall at any time for any reason be declared invalid, void or otherwise inoperative by a court of competent jurisdiction, such declaration or decision shall not affect the continued validity of any other provision or provisions of this Assignment, or the validity of this Assignment as a whole. In the event that it should transpire that by reason of any law or regulation, or by reason of a ruling of any court, or by any other reason whatsoever, the assignment herein contained is either wholly or partly defective, the Assignor hereby undertakes to furnish the Assignee with an alternative assignment or alternative security and/or to do all such other acts as, in the sole opinion of the Assignee, shall be necessary or required in order to ensure and give effect to the full intent of this Assignment.

       12.    <u>Governing Law; Waiver of Jury Trial</u>.

       (a)    This Assignment shall be construed in accordance with, and governed by, the laws of the State of New York, United States of America. The Assignor hereby irrevocably submits itself to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County, Borough of Manhattan and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, for the purposes of (and solely for the purposes of) any suit, action or other proceeding arising out of, or relating to, this Assignment or any of the transactions contemplated hereby, hereby irrevocably agrees that all claims in respect of such suit, action or proceeding may be heard in such New York State or Federal court and hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason whatsoever, that such suit, action or proceeding is brought in an inconvenient forum, or that the venue of such suit, action or proceeding is improper, or that this Assignment or the subject matter hereof may not be enforced in or by such courts. The Assignor irrevocably consents to the service of any and all process in any such suit, action or proceeding by the mailing of copies of such process to the Assignor at its address specified in <u>Section 13</u> hereof. The Assignor agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this paragraph shall affect the right of the Assignee to serve legal process in any other manner permitted by law or affect the right of the Assignee to bring any suit, action or proceeding against the Assignor or its property in the courts of any other jurisdiction.

       (b)    BY ITS SIGNATURE BELOW WRITTEN THE ASSIGNOR HEREBY IRREVOCABLY WAIVES UNDER APPLICABLE LAW ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ̇OTHERWISE) ARISING OUT OF OR RELATING TO THIS ASSIGNMENT, THE NOTE EXCHANGE AGREEMENT, THAT CERTAIN PREFERRED FLEET MORTGAGE EFFECTIVE AS OF THE DATE HEREOF (AS MAY BE AMENDED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIMED TO TIME) OR THE OTHER

NOTE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

13.     <u>Notices</u>. All notices or other communications required or permitted to be made or given hereunder shall be made in writing, in English, and sent to the Assignor or the Assignee as provided in the Note Exchange Agreement.

14.     <u>Waiver; Amendment</u>. None of the terms and conditions of this Assignment may be changed, waived, modified or varied in any manner whatsoever unless in accordance with the Note Exchange Agreement and in writing duly signed by the Assignee (acting at the direction of the Required Holders) and the Assignor.

15.     <u>Termination</u>. If the Assignor shall timely pay and discharge in full all of the Secured Obligations or is released therefrom in accordance with the terms thereof, all the right, title and interest herein assigned shall revert to the Assignor, and this Assignment shall terminate.

16.     <u>Headings</u>. The division of this Assignment into sections and the insertion of headings are for convenience of reference only and shall not affect the interpretation or construction of this Assignment.

17.     <u>Vessels</u>. Any vessel sold by the Assignor as permitted by the Note Exchange Agreement shall, upon consummation of said sale and distribution of the proceeds thereof as provided for under the Note Exchange Agreement, no longer be a "Vessel" hereunder.

[Remainder of Page Intentionally Left Blank. Signatures on Following Pages]

IN WITNESS WHEREOF, the Assignor has caused this Assignment of Charters and Hire to be duly executed as of the date first above written.

ASSIGNOR:

NAUTICAL SOLUTIONS, L.L.C.

By:_____
    Name:
    Title:

The terms and conditions of this Assignment of Charters and Hire are hereby

ACCEPTED BY:

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent

By:_____
    Name:
    Title:

SCHEDULE 1

<u>VESSELS</u>

| **Vessel Name** | **Official No.** |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

EXHIBIT A
FORM OF CONSENT TO CHARTER ASSIGNMENT

**AGREEMENT AND CONSENT TO ASSIGNMENT OF CHARTERS AND HIRE**

To:          [CHARTERER]
Vessel:     [Vessel Name]

We refer to the [CHARTER] dated [DATE] (as amended, supplemented, extended or renewed from time to time, the *"Charter"),* made between us, NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company, as owner (the *"Assignor"),* and you, [CHARTERER], a [State of incorporation/organization] [type of entity], as charterer (together with its successors and assigns, the *"Charterer"),* by which we agreed to let, and you agreed to take on a charter for the period and on the terms and conditions set out in the Charter with respect to, the U.S. flag vessel [NAME], Official Number [NUMBER] (said vessel or any vessel hereafter substituted therefor under the Charter, the *"Vessel").*

We hereby give you notice of the following, and you, by your execution and delivery of this Agreement and Consent to Assignment of Charters and Hire, hereby agree to the following:

1.     By an Assignment of Charters and Hire dated [ ], 2023, a copy of which is attached hereto (the *"Assignment"*; the defined terms therein being used herein as therein defined) made between us and the Assignee referred to therein, we have sold, assigned, transferred and set over unto the Assignee all of our right, title and interest in and to, among other things, the Charter and in and to all freights, hire, earnings and other moneys and claims for moneys due and to become due to us thereunder (all as more fully described in the Assignment).

2.     You are hereby irrevocably authorized and instructed, upon your receipt of written notice from the Assignee, to pay, and agree that you will make payment of, all such freights, hire, earnings and other moneys due and to become due and payable by you to us under the Charter to such place as the Assignee alone may from time to time direct.

3.     We alone shall remain liable to perform all our obligations under the Charter and the Assignee shall not be under any obligation under the Charter, but should the Assignee exercise its right to perform, or cause performance by its designee of, our obligations under the Charter, you agree, without thereby releasing us from our obligations under the Charter, to accept such performance.

4.     You hereby consent to such assignment, and agree that, upon your receipt of written notice from the Assignee, you will make payment of all freights, hire, earnings and other moneys due and to become due under the Charter, without setoff or deduction in immediately available funds, direct to the account specified by the Assignee at such address or in such manner as the Assignee alone shall request in writing until receipt of written notice from the Assignee rescinding such request or otherwise stating that all obligations of the Assignor to the Assignee and other Secured Parties have been indefeasibly paid or otherwise satisfied in full. You agree that you shall not seek the recovery of any payment actually made by you to the Assignee pursuant to this Agreement and Consent to Assignment of Charters and Hire once such payment has been made. You hereby waive the right to assert against the Assignee, any claim, defense, counterclaim or

Ex. A-2

setoff that you could assert against the Assignor under the Charter. This provision shall not be construed to relieve the Assignor of any liability to the Charterer.

5.      You agree that the Assignee shall be entitled to exercise any and all rights and remedies of the Assignor under the Charter in accordance with the terms of the Assignment, and you shall comply in all respects with such exercise. You agree that the Charter, including, without limitation, any of your liens thereunder or those that may arise by operation of law, shall be subject and subordinated in all respects to the lien of the Assignee under its preferred mortgage (as amended, supplemented or modified from time to time, the *"Mortgage")* over the whole of the Vessel and the rights of Assignee pursuant thereto, and, at the option of the Assignee, foreclosure under the Mortgage shall terminate such Charter and such liens and divest you and, if applicable and to the extent permitted pursuant to the Note Exchange Agreement, your subcharterers of all right, title and interest in and to the Vessel. You agree that each subcharter, if any, of the Vessel shall be subject and subordinate in all respects to the lien of the Mortgage in favor of the Assignee and the rights of the Assignee pursuant thereto.

6.      You hereby further agree that, so long as the Secured Obligations shall be outstanding:

        (a)      Upon the request of the Assignee from time to time, you shall provide to the Assignee such information as the Assignee may reasonably request regarding the Vessel, her location, use and employment, including, but not limited to, the terms of each subcharter thereof, if any, the subcharter party, the routes plied and to be plied by such Vessel and its scheduled arrival and departure from each port on such route.

        (b)      You covenant and agree with the Assignee that you will (i) duly and timely perform and observe all of the terms and provisions of the Charter on your part to be performed or observed; and (ii) clearly record on your books and records notations of the Assignment.

        (c)      At any time and from time to time, upon the written request of the Assignee, you shall promptly and duly execute and deliver any and all such further instruments and documents as the Assignee may reasonably request in order to obtain the full benefits of the Assignment and of the rights and powers herein granted.

        (d)      Whenever requested by the Assignee, you shall promptly deliver letters to each of your agents and representatives into whose hands or control may come any freights, hire, earnings and other moneys assigned by the Assignment, informing each such agent and representative of such assignment, and if any Event of Default has occurred and is continuing, instructing such agent and/or representative to promptly remit or deliver directly to the Assignee all freights, hire, earnings and other moneys and property assigned which may come into such agents' or representatives' hands or control and to continue to make such remittances or delivery until such time as such agents or representatives may receive written notice or instructions to the contrary direct from the Assignee. You shall copy the Assignee on each such correspondence and use your commercially reasonable efforts to procure that each such agent and representative shall acknowledge directly to the Assignee receipt of your letter of notification and instructions

7.      Your acknowledgement and consent hereunder, and your agreements herein contained, are for the benefit of the Assignee and the Secured Parties and shall be enforceable by the Assignee for its benefit and the benefit of the Secured Parties.

8.      This Agreement and Consent to Assignment of Charters and Hire, and the obligations undertaken and incurred hereby, shall be subject to termination and release in accordance with the terms of the Assignment.

9.      The authorizations and instructions by us in this Agreement and Consent to Assignment of Charters and Hire cannot be revoked or varied by us without the Assignee's prior written consent.

For and on behalf of:                   NAUTICAL SOLUTIONS, L.L.C.


By:_____
        Name:
        Title:
        Dated:

Ex A-

To:          NAUTICAL SOLUTIONS, L.L.C.
Vessel:      [Vessel Name]

      In consideration of the Assignor's entry into the Charter described in the foregoing Agreement and Consent to Assignment of Charters and Hire, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, we hereby agree to the terms set out in the Agreement and Consent to Assignment of Charters and Hire and consent to, and agree to be bound by, the Assignment as defined therein.

For and on behalf of:          [CHARTERER]


          By:_____
              Name:
              Title:
              Dated:

Exhibit C

# [FORM OF] ASSIGNMENT OF CHARTER AND HIRE
## (BAREBOAT CHARTERER)

This ASSIGNMENT OF CHARTER AND HIRE (this "*Assignment*") is made this [9] day of [9], 2023, by _____, a _____ (the "*Assignor*"), in favor of Wilmington Trust, National Association, in its capacity as collateral agent for the Secured Parties under and as defined in the Security Agreement (as such term is defined in the Note Exchange Agreement defined below), as required by the Note Exchange Agreement (together with its successors and permitted assigns, in such capacity, the "*Assignee*").

WITNESSETH:

WHEREAS, pursuant to the terms and conditions of that certain Note Exchange Agreement dated as of the date hereof (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Note Exchange Agreement*"), by and among Nautical Solutions, L.L.C., a Louisiana limited liability company ("*Owner*"), Nautical Solutions Holdings, LLC, a Louisiana limited liability company, as the parent company of Owner, and the financial institutions parties thereto, as noteholders, Wilmington Trust, National Association, as Agent and the Assignee, Owner has agreed to issue Senior Secured Notes due [9], 2028 in the amount set forth in the Note Exchange Agreement (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any notes delivered in substitution or exchange for any of the foregoing senior secured notes, the "*Senior Notes*");

WHEREAS, Owner has executed and delivered, or will execute and deliver, the Senior Notes to the respective noteholders thereof identified in the Note Exchange Agreement (collectively, together with such noteholders' successors and assigns, the "*Noteholders*"), such Senior Notes to be in the amount set forth in the Note Exchange Agreement and each to be due and payable in the amounts and upon the terms and conditions therein recited, with interest and other amounts as set forth in the Note Exchange Agreement;

WHEREAS, pursuant to that certain bareboat charter agreement dated_____, 20__, between Owner, as owner, and the Assignor, as charterer, the Owner has bareboat chartered the vessel named "_____", Official No._____(the "*Vessel*") to the Assignor for a term of_____(____) months;

WHEREAS, pursuant to that_____dated_____, 20__, the Assignor has [time chartered the Vessel to] [entered into a long term contract of affreightment with]_____, a_____(in such capacity, the "*Charterer*") for a term of_____(____) months (the "*Charter*");[1]

WHEREAS, pursuant to Section 9.198 of the Note Exchange Agreement, as additional security for the full and timely payment and performance of any and all present and future

---

[1] If the Charter is a master agreement that has vessel call orders, then the master agreement will be included in the Charter, as so defined, only to the extent the master agreement is incorporated into the applicable vessel call order for the vessel in question.

indebtedness, obligations and liabilities of the Owner to the Secured Parties, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of or in connection with Note Documents to which the Owner is a party, in each case whether on account of principal, interest (including, without limitation, as a result of increases to applicable interest rates), Specific Noteholder Fee (if any), Exit Fee (if any), Note Obligations, fees, indemnities, costs, expenses or otherwise, and including, without limitation, all fees and disbursements of counsel to the Assignee and the Noteholders that are required to be paid by the Owner pursuant to the terms of any of the Note Documents (collectively, and including any and all renewals, modifications, amendments, extensions for any period, supplements and restatements of any of the foregoing, the "*Secured Obligations*"), the Assignor, being an affiliate of the Owner, is required (i) to assign to the Collateral Agent any third party charter entered into by it having a duration of twelve (12) months or longer (including any automatic or agreed to extensions or renewals thereof) and all freights, hire and other monies due and payable by the Charterer thereunder), and (ii) to use commercially reasonable efforts to obtain the consent of such charterer of the Vessel; and

WHEREAS, the Assignor, in order to secure the full and timely repayment by the Owner of the Secured Obligations and the performance and observance of, and compliance with, the covenants, terms and conditions contained in the Note Exchange Agreement and the other Note Documents to which the Owner is a party and in this Assignment by the Assignor, the Assignor has duly authorized the execution and delivery of this Assignment.

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor hereby agrees as follows:

1.      <u>Defined Terms</u>. Capitalized terms used herein and not otherwise defined are used herein as defined in the Note Exchange Agreement.

2.      <u>Grant of Security</u>. As security for the full and timely payment and performance by the Owner of the Secured Obligations, the Assignor does hereby sell, assign, transfer and set over unto the Assignee, and does hereby grant to the Assignee a continuing, first priority security interest in and to, all of its right, title and interest in and to: (a) all freights, hire, earnings and other moneys earned and to be earned, due or to become due, or paid or payable to, or for the account of, the Assignor, of whatsoever nature, arising out of or as a result of the chartering by the Assignor to the Charterer of the Vessel, including, without limitation, all rights arising out of the Assignor's lien on all cargoes thereunder, (b) the Charter, including, without limitation, all rights of the Assignor to terminate the Charter, to perform thereunder and to compel performance of the terms thereof, (c) all rights, remedies, powers, privileges and claims for moneys due and to become due to the Assignor, and claims for moneys due and to become due to the Assignor, and all claims for damages, arising out of the breach by the Charterer of its obligations under the Charter, (d) the right to give and receive all notices and other instruments or communications under the Charter, (e) the right to take such action, including the commencement, conduct and consummation of legal, administrative or other proceedings, as shall be permitted by the Charter or by law, (f) all moneys and claims due and to become due to the Assignor, and all claims for damages and all insurances and other proceeds, in respect of the actual or constructive total loss of or the agreed, arranged or compromised total loss of or requisition of use of or title to the Vessel, and (g) any proceeds of

any of the foregoing and all interest and earnings from the investment of any of the foregoing and the proceeds and products thereof. The security created by this Assignment shall be held by the Assignee as a continuing security for the full and timely payment and performance of the Secured Obligations. The security so created shall not be satisfied by any intermediate payment or satisfaction of any part of the Secured Obligations, and such security shall be in addition to and shall not in any way be prejudiced or affected by any other collateral or security now or hereafter held by the Assignee. The rights hereby assigned may be further assigned by the Assignee in connection with the transfer of the Secured Obligations or the enforcement of the pledge thereof.

3.     <u>Agreement and Consent to Assignment of the Charter</u>. The Assignor undertakes, immediately following the execution of this Assignment, to give written notice (substantially in the form set out in <u>Exhibit A</u>) to the Charterer of this Assignment and to use commercially reasonably efforts to procure the acknowledgement of such notice (in the form provided in the notice) by the Charterer.

4.     <u>Representations and Warranties</u>. The Assignor hereby represents and warrants to the Assignee, as an inducement to the Assignee to accept this Assignment, that neither the whole nor any part of the right, title and interest hereby assigned is the subject of any present assignment, security interest or pledge. [2]

5.     <u>Covenants</u>. The Assignor hereby covenants to the Assignee that:

(a)     If an Event of Default has occurred and is continuing, and without derogation of the rights of the Assignee under <u>Section 8</u> hereof to issue instructions to the Charterer directly, upon request of the Assignee, the Assignor shall specifically authorize and direct the Charterer to make payment of all of the freights, hire, earnings and other moneys due and to become due, or payable to, on for the account of, the Assignor under the Charter directly to the Assignee in accordance with the Note Documents, and shall deliver to the Assignee the written acknowledgment from the Charterer of such instructions promptly after receipt thereof. Notwithstanding anything to the contrary, the Assignor and the Assignee hereby agree that so long as no Event of Default shall have occurred and be continuing, the Assignor shall be entitled to exercise its rights under the Charter as if this Assignment did not exist and otherwise to receive and retain any and all moneys assigned hereunder.

(b)     So long as this Assignment is in effect, the Assignor shall not assign, grant a security interest in or pledge the whole or any part of the right, title and interest hereby assigned to anyone other than the Assignee without the prior written consent of the Noteholders in accordance with the respective Note Documents.[3]

(c)     At any time and from time to time, upon the written request of the Assignee, the Assignor shall promptly and duly execute and deliver any and all such further <u>instruments and documents as</u> the Assignee may reasonably request in order to obtain the full benefits of this

---

[2] If the Assignor has granted blanket liens on its assets, then it will not be able to make this statement. Assignor to provide list of Chouest Corporate Affiliates where blanket liens have been granted.

[3] Please see Footnote 2.

Assignment and of the rights and powers herein granted; <u>provided</u>, that no notices or requests shall be required to be sent (or shall be sent) to the Charterer (other than as set forth in <u>Section 5(a)</u> above) unless an Event of Default has occurred and is continuing.

        (d)     Whenever requested by the Assignee, the Assignor shall promptly deliver letters to each of its agents and representatives into whose hands or control may come any freights, hire, earnings or other moneys hereby assigned, informing each such agent and representative of this Assignment, and if any Event of Default has occurred and is continuing, instructing such agent and representative to remit or deliver promptly to the Assignee all freights, subfreights, hire, earnings and other moneys hereby assigned which may come into such agents' and representatives' hands or control and to continue to make such remittances or delivery until such time as such agents and representatives may receive written notice or instructions to the contrary direct from the Assignee. The Assignor shall copy the Assignee on each such correspondence and use its commercially best efforts to procure that each such agent and representative shall acknowledge directly to the Assignee receipt of the Assignor's letter of notification and instructions.

        6.     <u>Freedom of Assignee from Obligations</u>. It is hereby expressly agreed that anything herein contained to the contrary notwithstanding, (a) the Assignor shall at all times remain fully liable under the Charter to perform all of the obligations assumed by it thereunder, (b) the obligations of the Assignor under the Charter may be performed by the Assignee or its nominee without releasing the Assignor therefrom, and (c) the Assignee shall have no obligation or liability under the Charter by reason of or arising out of this Assignment, nor shall the Assignee be required or obligated in any manner to perform or to fulfill any obligations of the Assignor under or pursuant to the Charter nor to make any payment, nor to make any inquiry as to the nature or sufficiency of any payment received by the Assignee or to present or to file any claim, or to take any other action to collect or to enforce the payment of any amounts which may have been assigned to it or which it may be entitled to hereunder at any time or times.

        7.     <u>Payment Directions to Charterer; Power of Attorney; Financing Statements</u>. Upon the occurrence and during the continuance of an Event of Default, the Assignee shall be entitled to direct the Charterer to pay all freights, hire, earnings and other moneys assigned hereunder to such bank account as the Assignee may from time to time designate. Upon request of the Assignor, the Assignee shall furnish the Assignor with information from time to time as to the accounts into which all freights, hire, earnings and other moneys assigned hereunder are paid, the amounts and sources of such payments and the amounts and application of moneys withdrawn therefrom. The Assignee is hereby constituted the lawful attorney of the Assignor, irrevocably, with full power of substitution (in the name of the Assignor or otherwise) upon the occurrence and during the continuance of an Event of Default, to take any action and to execute any instruments which the Assignee may deem necessary or advisable to accomplish the purposes hereof, including, without limitation, to ask, require, demand, receive, compound and give acquittance for any and all freights, hire, earnings, moneys, claims, property and rights hereby assigned, to endorse any checks or other instruments or orders in connection therewith and to file any claims or to take any action or to institute any proceedings which the Assignee may deem to be necessary or advisable in the premises. Any action or proceeding brought by the Assignee pursuant to any of the provisions hereof, and any claim made by the Assignee hereunder, may be compromised, withdrawn or otherwise dealt with by the Assignee without any notice to, or approval of, the Assignor. The Assignor hereby irrevocably authorizes the Assignee (or its designee) to file, at any time and from

time to time, at the Assignor's sole cost and expense, such financing and continuation statements or papers of similar purpose or effect relating to this Assignment, without the Assignor's signature or authentication, as the Assignee at its sole option may deem appropriate and appoints the Assignee as the Assignor's attorney-in-fact (with full power of substitution) to execute or authenticate any such statements in the Assignor's name and to perform all other acts which the Assignee may deem necessary or appropriate to perfect and to continue the perfection and priority of any security interest conferred hereby.

8.     Irrevocable Assignment. The powers and authority granted to the Assignee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with an interest and may not be amended or waived except by an instrument in writing signed by the party against whom such enforcement is sought.

9.     Remedies Cumulative and Not Exclusive; No Waiver. Each and every right, power and remedy herein given to the Assignee shall be cumulative and shall be in addition to every other right, power and remedy of the Assignee now or hereafter existing at law, in equity, in admiralty or by statute, and each and every right, power and remedy, whether herein given or otherwise existing, may be exercised from time to time, in whole or in part, and as often and in such order as may be deemed expedient by the Assignee, and the exercise or the beginning of the exercise of any right, power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy. No delay or omission by the Assignee in the exercise of any right or power in the pursuance of any remedy accruing upon any breach or default by any Person shall impair any such right, power or remedy or be construed to be a waiver of any such right, power or remedy or to be an acquiescence therein; nor shall the acceptance by the Assignee of any security or of any payment of or on account of the Secured Obligations be construed to be a waiver of any right to take advantage of any future breach or default or of any past breach or default not completely cured thereby.

10.     Invalidity. If any provision of this Assignment shall at any time for any reason be declared invalid, void or otherwise inoperative by a court of competent jurisdiction, such declaration or decision shall not affect the continued validity of any other provision or provisions of this Assignment, or the validity of this Assignment as a whole. In the event that it should transpire that by reason of any law or regulation, or by reason of a ruling of any court, or by any other reason whatsoever, the assignment herein contained is either wholly or partly defective, the Assignor hereby undertakes to furnish the Assignee with an alternative assignment or alternative security and/or to do all such other acts as, in the sole opinion of the Assignee, shall be necessary or required in order to ensure and give effect to the full intent of this Assignment.

11.     Governing Law; Waiver of Jury Trial.

(a)     This Assignment shall be construed in accordance with, and governed by, the laws of the State of New York, United States of America. The Assignor hereby irrevocably submits itself to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County, Borough of Manhattan and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, for the purposes of (and solely for the purposes of) any suit, action or other proceeding arising out of, or relating to, this Assignment or any of the transactions contemplated hereby, hereby irrevocably agrees that all

claims in respect of such suit, action or proceeding may be heard in such New York State or Federal court and hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason whatsoever, that such suit, action or proceeding is brought in an inconvenient forum, or that the venue of such suit, action or proceeding is improper, or that this Assignment or the subject matter hereof may not be enforced in or by such courts. The Assignor irrevocably consents to the service of any and all process in any such suit, action or proceeding by the mailing of copies of such process to the Assignor at its address specified in <u>Section 12</u> hereof. The Assignor agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this paragraph shall affect the right of the Assignee to serve legal process in any other manner permitted by law or affect the right of the Assignee to bring any suit, action or proceeding against the Assignor or its property in the courts of any other jurisdiction.

(b)     BY ITS SIGNATURE BELOW WRITTEN THE ASSIGNOR HEREBY IRREVOCABLY WAIVES UNDER APPLICABLE LAW ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS ASSIGNMENT, THE NOTE EXCHANGE AGREEMENT, THAT CERTAIN PREFERRED FLEET MORTGAGE EFFECTIVE AS OF THE DATE HEREOF (AS MAY BE AMENDED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIMED TO TIME) OR THE OTHER NOTE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

12.     <u>Notices</u>. All notices or other communications required or permitted to be made or given hereunder shall be made in writing, in English, and sent to the Assignor at its address at _____, _____, _____ (with a copy thereof by email to legal@chouest.com) or the Assignee as provided in the Note Exchange Agreement.

13.     <u>Waiver; Amendment</u>. None of the terms and conditions of this Assignment may be changed, waived, modified or varied in any manner whatsoever unless in accordance with the Note Exchange Agreement and in writing duly signed by the Assignee (acting at the direction of the Required Holders) and the Assignor.

14.     <u>Termination</u>. If the Owner shall timely pay and discharge in full all of the Secured Obligations or is released therefrom in accordance with the terms thereof, or if the Charter terminates, then (i) all the right, title and interest herein assigned shall revert to the Assignor, (ii) this Assignment shall terminate, and (iii) the Assignee shall authorize Assignor in writing to file applicable UCC-3 termination statements as to the collateral granted hereunder and rescind in writing all notices previously provided to the Charterer with respect to this Agreement. In addition, should such Charter expire in accordance with its terms and not be further extended or renewed, then (i) this Assignment shall terminate, and (ii) Assignee shall authorize Assignor in writing to file applicable UCC-3 termination statements as to the collateral granted hereunder.

15.         <u>Headings</u>. The division of this Assignment into sections and the insertion of headings are for convenience of reference only and shall not affect the interpretation or construction of this Assignment.

[Remainder of Page Intentionally Left Blank. Signatures on Following Pages]

IN WITNESS WHEREOF, the Assignor has caused this Assignment of Charter and Hire to be duly executed as of the date first above written.

ASSIGNOR:

[_____]

By:_____
    Name:
    Title:

The terms and conditions of this Assignment of Charter and Hire are hereby

ACCEPTED BY:

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent

By:_____
    Name:
    Title:

EXHIBIT A
FORM OF CONSENT TO CHARTER ASSIGNMENT

**AGREEMENT AND CONSENT TO ASSIGNMENT OF CHARTER AND HIRE**

To:          [CHARTERER]
Vessel:    [Vessel Name]

We refer to the [CHARTER] dated [DATE] (as amended, supplemented, extended or renewed from time to time, the *"Charter"),*[1] made between us, aBBBBBBBBBBBBBBBBBBBBBB, a BBBBBBBBBBBBBBBBBB, as demise owner (the *"Assignor")*, and you, [CHARTERER], a [State of incorporation/organization] [type of entity], as charterer (together with its successors and assigns, the *"Charterer")*, by which we agreed to let, and you agreed to take on a charter/contract of affreightment for the period and on the terms and conditions set out in the Charter with respect to, the U.S. flag vessel [NAME], Official Number [NUMBER] (said vessel or any vessel hereafter substituted therefor under the Charter, the *"Vessel")*.

We hereby give you notice of the following, and you, by your execution and delivery of this Agreement and Consent to Assignment of Charter and Hire, hereby agree to the following:

1.      By an Assignment of Charter and Hire dated February 24, 2023, a copy of which is attached hereto (the *"Assignment"*; the defined terms therein being used herein as therein defined) made between us and the Assignee referred to therein, we have sold, assigned, transferred and set over unto the Assignee all of our right, title and interest in and to, among other things, the Charter and in and to all freights, hire, earnings and other moneys and claims for moneys due and to become due to us thereunder (all as more fully described in the Assignment).

2.      You are hereby irrevocably authorized and instructed, upon your receipt of written notice from the Assignee, to pay, and agree that you will make payment of, all such freights, hire, earnings and other moneys due and to become due and payable by you to us under the Charter to such place as the Assignee alone may from time to time direct.

3.      We alone shall remain liable to perform all our obligations under the Charter and the Assignee shall not be under any obligation under the Charter, but should the Assignee exercise its right to perform, or cause performance by its designee of, our obligations under the Charter, you agree, without thereby releasing us from our obligations under the Charter, to accept such performance.

4.      You hereby consent to such assignment, and agree that, upon your receipt of written notice from the Assignee, you will make payment of all freights, hire, earnings and other moneys due and to become due under the Charter, without setoff or deduction in immediately available funds, direct to the account specified by the Assignee at such address or in such manner as the Assignee alone shall request in writing until receipt of written notice from the Assignee rescinding such request or otherwise stating that all obligations of the Assignor to the Assignee and other Secured Parties have been indefeasibly paid or otherwise satisfied in full. You agree that you shall

---

[1] Please see Footnote 1.

*[Link-to-previous setting changed from on in original to off in modified.].*

Ex A-

not seek the recovery of any payment actually made by you to the Assignee pursuant to this Agreement and Consent to Assignment of Charter and Hire once such payment has been made. You hereby waive the right to assert against the Assignee, any claim, defense, counterclaim or setoff that you could assert against the Assignor under the Charter. This provision shall not be construed to relieve the Assignor of any liability to the Charterer.

5.      You agree that the Assignee shall be entitled to exercise any and all rights and remedies of the Assignor under the Charter in accordance with the terms of the Assignment, and you shall comply in all respects with such exercise. You agree that the Charter, including, without limitation, any of your liens thereunder or those that may arise by operation of law, shall be subject and subordinated in all respects to the lien of the Assignee under its preferred mortgage (as amended, supplemented or modified from time to time, the *"Mortgage"*) over the whole of the Vessel and the rights of Assignee pursuant thereto, and, at the option of the Assignee, foreclosure under the Mortgage shall terminate the Charter and such liens and divest you and, if applicable and to the extent permitted pursuant to the Note Exchange Agreement, your subcharterers of all right, title and interest in and to the Vessel. You agree that you will not subcharter the Vessel to anyone.

6.      You hereby further agree that, so long as the Secured Obligations shall be outstanding:

(a)      You will (i) duly and timely perform and observe all of the terms and provisions of the Charter on your part to be performed or observed; and (ii) clearly record on your books and records notations of the Assignment.

(b)      At any time and from time to time, upon the written request of the Assignee, you shall promptly and duly execute and deliver any and all such further instruments and documents as the Assignee may reasonably request in order to obtain the full benefits of the Assignment and of the rights and powers herein granted.

7.      Your acknowledgement and consent hereunder, and your agreements herein contained, are for the benefit of the Assignee and the Secured Parties and shall be enforceable by the Assignee for its benefit and the benefit of the Secured Parties.

8.      This Agreement and Consent to Assignment of Charter and Hire, and the obligations undertaken and incurred hereby, shall be subject to termination and release in accordance with the terms of the Assignment.

9.      The authorizations and instructions by us in this Agreement and Consent to Assignment of Charter and Hire cannot be revoked or varied by us without the Assignee's prior written consent.

For and on behalf of:                    [≥_____]@

                                    By:_____
                                         Name:
                                         Title:

~~For and on behalf of:~~                    [_____]
                                                             Dated:

To:              [                                    ]
Vessel:        [Vessel Name]

In consideration of the Assignor's entry into the Charter described in the foregoing Agreement and Consent to Assignment of Charter and Hire, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, we hereby agree to the terms set out in the Agreement and Consent to Assignment of Charter and Hire and consent to, and agree to be bound by, the Assignment as defined therein.

For and on behalf of:                    [CHARTERER]


By:_____
       Name:
       Title:
       Dated:

Exhibit
D

# ~~EXHIBIT D~~

## ~~FORM OF ASSIGNMENT OF INSURANCES~~

## [FORM OF] ASSIGNMENT OF INSURANCES

This ASSIGNMENT OF INSURANCES (this "*Assignment*") is made this [•], 2023, by NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company (the "*Assignor*"), in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent for the Secured Parties under and as defined in the Security Agreement (as such term is defined in the Note Exchange Agreement defined below), as required by the Note Exchange Agreement (together with its successors and permitted assigns in such capacity, the "*Assignee*").

### WITNESSETH:

WHEREAS, pursuant to the terms and conditions of that certain Note Exchange Agreement dated as of the date hereof (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Note Exchange Agreement*") by and among the Assignor, Nautical Solutions Holdings, LLC, a Louisiana limited liability company, as the parent holding company of Assignor, the financial institutions from time to time party thereto, as noteholders, Wilmington Trust, National Association, as Agent and the Assignee, the Assignor has agreed to issue Senior Secured Notes due [•], 2028 in the amount set forth in the Note Exchange Agreement (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any notes delivered in substitution or exchange for any of the foregoing senior secured notes, the "*Senior Notes*");

WHEREAS, the Assignor has executed and delivered, or will execute and deliver, the Senior Notes to the respective noteholders thereof identified in the Note Exchange Agreement (collectively, together with such noteholders' successors and assigns, the "*Noteholders*"), such Senior Notes to be in the amount set forth in the Note Exchange Agreement and to be due and payable in the amounts and upon the terms and conditions therein recited, with interest and other amounts as set forth in the Note Exchange Agreement;

WHEREAS, the Assignor is the sole legal and beneficial owner of the vessels more particularly described on Schedule 1 attached hereto and made a part hereof (collectively, subject to the terms and conditions of Section 15 hereof, the "*Vessels*" and each, a "*Vessel*");

WHEREAS, it is a condition precedent to the exchange of the Exchanged Debt for the Senior Notes that the Assignor execute and deliver to the Assignee, as security for the full and timely payment and performance of any and all present and future indebtedness, obligations and liabilities of the Assignor to the Secured Parties, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of or in connection with Note Documents to which the Assignor is a party, in each case whether on account of principal, interest, Specified Noteholder Fee (if any), Exit Fee (if any), Note Obligations, reimbursement obligations, fees, indemnities, costs, expenses or otherwise, and including, without limitation, all fees and disbursements of counsel to the Assignee and the Noteholders that are required to be paid by the Assignor pursuant to the terms of any of the Note Documents (collectively, and including any and all renewals, modifications, amendments, extensions for any period, supplements and restatements of any of the foregoing, the "*Secured Obligations*"), an assignment of any and all insurances from time to time taken out in respect of the Vessels; and

WHEREAS, the Assignor, in order to secure the full and timely repayment of the Secured Obligations and the performance and observance of, and compliance with, the covenants, terms and conditions contained in the Note Exchange Agreement, this Assignment and the other Note Documents, has duly authorized the execution and delivery of this Assignment.

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby agrees as follows:

1.      Defined Terms. Capitalized terms used herein and not otherwise defined are used herein as defined in the Note Exchange Agreement.

2.      Grant of Security. As security for the full and timely payment and performance of the Secured Obligations, the Assignor does hereby sell, assign, transfer and set over unto the Assignee, and does hereby grant the Assignee a continuing, first priority security interest in and to, all of the right, title and interest of the Assignor in and to: (a) all insurances (including, without limitation, all insurances with respect to hull and machinery, war risk, hull and machinery, loss of earnings, protection and indemnity, pollution, requisition of title or otherwise) in respect of each Vessel, her hull, machinery, freights, disbursements, profits or otherwise, whether heretofore, now or hereafter effected, and all renewals of or replacements for the same, (b) all monies and claims for moneys due and to become due to the Assignor under said insurances with respect to the actual, constructive, agreed, arranged or compromised total loss or any other loss of or damage to any Vessel, or with respect to a claim arising out of the use or operation of any Vessel; (c) all returns of premium, (d) all other rights and benefits of the Assignor under or in respect of said insurances and (e) all cash and non-cash proceeds of the foregoing (all of which are herein collectively called, the "*Insurances*"). The security created by this Assignment shall be held by the Assignee as a continuing security for the timely payment and performance of the Secured Obligations. The security so created shall not be satisfied by any intermediate payment or satisfaction of any part of the Secured Obligations, and such security shall be in addition to and shall not in any way be prejudiced or affected by any other collateral or security now or hereafter held by the Assignee. The rights hereby assigned may be further assigned by the Assignee in connection with the transfer of the Secured Obligations or the enforcement of the pledge thereof.

3.      Representations, Warranties and Covenants.

(a)      The Assignor hereby warrants and represents that each of the Insurances is in full force and effect and that all premiums in connection therewith to the extent due and payable have been duly paid and that such Insurances are enforceable in accordance with their respective terms, and that the Assignor is not in default thereunder. The Assignor hereby further warrants and represents that it has not assigned, pledged or in any way created, or suffered to be created, any security interest in the whole or any part of the right, title and interest hereby assigned, except for the assignment to the Assignee. The Assignor hereby covenants that, without the prior written consent thereto of the Assignee (acting at the direction of the Required Holders), so long as this Assignment shall remain in effect, it will not assign or pledge the whole or any part of the right, title and interest hereby assigned to anyone other than the Assignee, its successors or assigns, and it will not take or omit to take any action, the taking or omission of which might result in an

alteration or impairment of the Insurances in any material respect, or of this Assignment or of any of the rights created by the Insurances or this Assignment.

        (b)     <u>Notice of Assignment</u>. The Assignor hereby further covenants and agrees to, or to cause its insurance brokers to, duly give notice of this Assignment in the form attached hereto as <u>Exhibit A</u> (the "*Notice of Assignment*") to all underwriters and that where the consent of any underwriter is required pursuant to any of the Insurances assigned hereby, it shall be obtained and evidence thereof shall be given to the Assignee, or, in the alternative, that, in the case of protection and indemnity coverage, the Assignor shall obtain, with the Assignee's prior written approval (acting at the direction of the Required Holders), a letter of undertaking by the underwriters or clubs, and that there shall be duly endorsed upon all slips, cover notes, policies, certificates of entry or other instruments issued or to be issued in connection with the Insurances assigned hereby, such clauses as to named assured or loss payees as the Assignee may require or approve, including, without limitation, in the case of all hull and machinery and war risk hull and machinery policies, a loss payable clause substantially on the terms set forth in <u>Exhibit A-1</u> to the Notice of Assignment for each Vessel, and in the case of all protection and indemnity and liability and oil pollution liability insurances, a loss payable clause substantially on the terms set forth in <u>Exhibit A-2</u> to the Notice of Assignment for each U.S. flag Vessel. In all cases (except in the case of protection and indemnity coverage), unless otherwise agreed in writing by the Assignee (acting at the direction of the Required Holders), such slips, cover notes, notices, certificates of entry or other instruments shall show the Assignee as a lender loss payee as its interest may appear and named assured (as applicable) and shall provide that there will be no recourse against the Assignee for payment of premiums, calls or other assessments.

        (c)     <u>Further Assurances</u>. The Assignor hereby agrees that at any time and from time to time, upon the written request of the Assignee, its successors and permitted assigns, the Assignor will promptly and duly execute and deliver any and all such further instruments and documents as the Assignee, its successors and permitted assigns may reasonably request in order to obtain the full benefits of this Assignment and of the rights and powers herein granted.

        (d)     <u>Application of Proceeds</u>. Any payments made pursuant to the terms hereof shall be made to such account as may, from time to time, be designated by the Assignee. The Assignee shall apply any such payments in accordance with the terms of the Note Exchange Agreement.

        4.     <u>Payment of Premiums; Performance of Obligations</u>. Notwithstanding the foregoing, the Assignor shall continue to remain liable under the Insurances to perform all of its obligations thereunder and the Assignee shall have no obligation or liability (including, without limitation, any obligation or liability with respect to the payment of premiums, calls or assessments or any other sums at any time due and are in respect of the Insurances) under said Insurances by reason of or arising out of this Assignment nor shall the Assignee be required or obligated in any manner to perform or fulfill any obligations of the Assignor under or pursuant to said Insurances or to make any payment or to make any inquiry as to the nature or sufficiency of any payment received by it or to present or to file any claim, or to take any other action to collect or to enforce the payment of any amounts which may have been assigned to it or to which it may be entitled hereunder at any time or times.

5.      <u>Power of Attorney; Financing Statements</u>. The Assignee, its successors and permitted assigns, are hereby constituted lawful attorneys, irrevocably, with full power of substitution (in the name of the Assignor or otherwise) upon the occurrence and during the continuance of an Event of Default to ask, require, demand, receive, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of the Insurances, to endorse any check or other instruments or orders in connection therewith and to file any claims or to take any action or to institute any proceedings which the Assignee may deem to be necessary or advisable in the premises. Any action or proceeding brought by the Assignee pursuant to any of the provisions hereof or of the Insurances or otherwise, and any claim made by the Assignee hereunder or under the Insurances, may be compromised, withdrawn or otherwise dealt with by the Assignee without any notice to, or approval of, the Assignor. The Assignor hereby irrevocably authorizes the Assignee, at the Assignor's sole cost and expense, to file, at any time and from time to time, such financing and continuation statements or papers of similar purpose or effect relating to this Assignment, without the Assignor's signature, as the Assignee at its option may deem appropriate and hereby appoints the Assignee as the Assignor's attorney-in-fact to execute any such statements in such Assignor's name and to perform all other acts which the Assignee may deem desirable or appropriate to perfect and continue the perfection and priority of the security interests conferred hereby.

6.      <u>Irrevocable Assignment</u>. The powers and authority granted to the Assignee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with an interest and may not be amended or waived except by an instrument in writing signed by the party against whom enforcement is sought.

7.      <u>Conditions of Assignment</u>. Subject to Section 9.2 of the Note Exchange Agreement and in the absence of an Event of Default thereunder, the Assignor shall be entitled to exercise all of its rights under the Insurances (subject to the provisions of this Assignment) in all respects as if this Assignment had not been made.

8.      <u>Remedies Cumulative and Not Exclusive; No Waiver</u>. Each and every right, power and remedy herein given to the Assignee shall be cumulative and shall be in addition to every other right, power and remedy of the Assignee now or hereafter existing at law, in equity, in admiralty or by statute, and each and every right, power and remedy, whether herein given or otherwise existing, may be exercised from time to time, in whole or in part, and as often and in such order as may be deemed expedient by the Assignee, and the exercise or the beginning of the exercise of any right, power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy. No delay or omission by the Assignee in the exercise of any right or power in the pursuance of any remedy accruing upon any breach or default by any Person shall impair any such right, power or remedy or be construed to be a waiver of any such right, power or remedy or to be an acquiescence therein; nor shall the acceptance by the Assignee of any security or of any payment of or on account of the Secured Obligations be construed to be a waiver of any right to take advantage of any future breach or default or of any past breach or default not completely cured thereby.

9.      <u>Invalidity</u>. If any provision of this Assignment shall at any time for any reason be declared invalid, void or otherwise inoperative by a court of competent jurisdiction, such declaration or decision shall not affect the validity of any other provision or provisions of this

Assignment, or the validity of this Assignment as a whole. In the event that it should transpire that by reason of any law or regulation, or by reason of a ruling of any court, or by any other reason whatsoever, the assignment herein contained is either wholly or partly defective, the Assignor hereby undertakes to furnish the Assignee with an alternative assignment or alternative security and/or to do all such other acts as, in the sole opinion of the Assignee, shall be required in order to ensure and give effect to the full intent of this Assignment.

      10.    Governing Law.

      (a)    The Assignor irrevocably submits to the exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Assignment or any of the transactions contemplated hereby. To the fullest extent permitted by applicable law, the Assignor irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. The Assignor consents to process being served by or on behalf of the Assignee in any suit, action or proceeding of the nature referred to in this paragraph by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, return receipt requested, to it at its address specified in Section 11 hereof or at such other address of which such holder shall then have been notified pursuant to said Section. The Assignor agrees that such service upon receipt (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by applicable law, be taken and held to be valid personal service upon and personal delivery to it. Notices hereunder shall be conclusively presumed received as evidenced by a delivery receipt furnished by the United States Postal Service or any reputable commercial delivery service. Nothing in this paragraph shall affect the right of the Assignee to serve process in any manner permitted by law, or limit any right that the Assignee may have to bring proceedings against the Company in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

      (b)    THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS ASSIGNMENT, THE NOTE EXCHANGE AGREEMENT OR THE OTHER NOTE DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED IN CONNECTION HEREWITH OR THEREWITH.

      11.    Notices. All notices or other communications required or permitted to be made or given hereunder shall be made in writing, in English, and sent to the Assignor or the Assignee as provided in the Note Exchange Agreement.

      12.    Waiver; Amendment. None of the terms and conditions of this Assignment may be changed, waived, modified or varied in any manner whatsoever unless in accordance with the Note Exchange Agreement and in writing duly signed by the Assignee and the Assignor.

13.     <u>Termination</u>. If the Assignor shall timely pay and discharge in full all of the Secured Obligations or is released therefrom in accordance with the terms thereof, all the right, title and interest herein assigned shall revert to the Assignor, and this Assignment shall terminate.

14.     <u>Headings</u>. The division of this Assignment into sections and the insertion of headings are for convenience of reference only and shall not affect the interpretation or construction of this Assignment.

15.     <u>Vessels</u>. Any vessel sold by the Assignor as permitted by the Note Exchange Agreement no longer shall be a Vessel hereunder.

[Remainder of Page Intentionally Left Blank. Signatures on Following Pages]

IN WITNESS WHEREOF, the Assignor has caused this Assignment of Insurances to be duly executed as of the date first above written.

**ASSIGNOR:**

NAUTICAL SOLUTIONS, L.L.C.

By _____

Name: _____

Title: _____

The terms and conditions of this
Assignment of Insurances are hereby

ACCEPTED BY:

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent

_____

By

Name:

Title:

SCHEDULE 1
VESSELS

| Vessel | Official No. |
|---|---|
| | |
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

**<u>EXHIBIT A</u>**

**NOTICE OF ASSIGNMENT**

[•], 2023

NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company (the "*Owner*"), owner of each United States flag vessel listed on <u>Schedule 1</u> attached hereto (collectively, the "*Vessels*" and each, a "*Vessel*"), HEREBY GIVES NOTICE that pursuant to an Assignment of Insurances dated as of [•], 2023 (the "*Assignment*"; capitalized terms used herein and not otherwise defined are used herein as defined in the Assignment), made by the Owner in favor of Wilmington Trust, National Association, in its capacity as Collateral Agent for the benefit of the Secured Parties (together with its successors and permitted assigns, in such capacity, the "*Assignee*"), the Owner assigned to the Assignee all of the Owner's right, title and interest in and to (a) all insurances (including, without limitation, all insurances with respect to hull and machinery, war risk, hull and machinery, protection and indemnity, pollution, loss of earnings, requisition of title or otherwise) in respect of each Vessel, her hull, machinery, freights, subfreights, disbursements, profits or otherwise, whether heretofore, now or hereafter effected, and all renewals of or replacements for the same, (b) all monies and claims for moneys due and to become due to the Assignor under said insurances with respect to the actual, constructive, agreed, arranged or compromised total loss or any other loss of or damage to any Vessel, or with respect to a claim arising out of the use or operation of any Vessel; (c) all returns of premium, (d) all other rights and benefits of Assignor under or in respect of said insurances and (e) all cash and non-cash proceeds of the foregoing. This Notice and the Loss Payable Clauses attached hereto as <u>Exhibit A-1</u> and <u>Exhibit A-2</u> are to be endorsed on all policies and certificates of entry evidencing such insurances.

However, it is agreed that for claims that are less than [US$2,000,000] per occurrence that such claims will be paid to the Owner or their appointed repairer, provided always that if an Event of Default has been declared by the Assignee, all funds will be paid to the Assignee.

[Remainder of Page Intentionally Left Blank. Signatures on Following Pages]

IN WITNESS WHEREOF, the Owner has caused this Notice of Assignment to be duly executed as of the date first above written.

**OWNER:**

NAUTICAL SOLUTIONS, L.L.C.

By _____
Name: _____
Title: _____

EXHIBIT A-
<u>LOSS PAYABLE CLAUSES</u>

Loss, if any, shall be payable to Wilmington Trust, National Association, as Collateral Agent for the benefit of the Secured Parties (in such capacity, the "*Collateral Agent*"), for distribution by it to itself and then to Nautical Solutions, L.L.C. (the "*Owner*"), as their respective interests may appear, or order, except that, unless an Event of Default has occurred and is continuing, or the underwriters or their brokers have been otherwise instructed by notice in writing from the Collateral Agent, in the case of any loss involving any damage to any Vessel or liability of any Vessel (not involving an actual or constructive loss or an agreed, arranged or compromised total loss of a Vessel), the underwriters may pay directly for the repair, salvage, liability or other charges involved or, if the Owner shall have fully or partially repaired the damage and paid the cost thereof, or discharged the liability or paid all of the salvage or other charges and duly furnished a Shipowners' Certificate to the Collateral Agent in accordance with Section 9.2 of the Note Exchange Agreement, then the underwriters may pay the Owner as reimbursement therefor; <u>provided</u>, <u>however</u>, that if such damage involves a loss in excess of $[2,000,000] lawful money of the United States of America, or its equivalent, or an Event of Default has occurred and is ongoing, the underwriters shall make such payment to the Collateral Agent alone, unless otherwise directed in writing by the Collateral Agent.

In the event of an actual or constructive total loss or an agreed, compromised or arranged total loss or requisition of title, all insurance payments therefor shall be paid to the Collateral Agent alone to be held and applied in accordance with the Note Exchange Agreement, unless otherwise directed in writing by the Collateral Agent.

EXHIBIT A-

PROTECTION AND INDEMNITY LOSS PAYABLE CLAUSE

Loss, if any, shall be payable directly to the person to whom the liability covered by this insurance has been incurred (the "*claimant*"), or if Nautical Solutions, L.L.C. (the "*Owner*") already has paid the claim of the claimant, then to Wilmington Trust, National Association, as Collateral Agent for the benefit of the Secured Parties (in such capacity, the "*Collateral Agent*"), for distribution by it to itself and then to the Owner, as their respective interests may appear, or order, except that, unless and until the underwriters have been otherwise instructed by notice in writing from the Collateral Agent, any loss the liability of which is covered by this insurance and is not to be paid directly to the claimant may be paid directly to the Owner to reimburse it for any loss, damage or expenses incurred by it and covered by this insurance, provided the underwriters shall have first received evidence that the liability insured against has been discharged by the Owner.

**EXHIBIT E**

*[Link-to-pr
evious
setting
changed
from on in
original to
off in
modified.].*

# FORM OF FLEET MORTGAGE

Exhibit E
(to Note Exchange Agreement)

# [FORM OF] PREFERRED FLEET MORTGAGE

given by

## NAUTICAL SOLUTIONS, L.L.C.,

in favor of

## WILMINGTON TRUST, NATIONAL ASSOCIATION,
in its capacity of Collateral Agent,
as mortgagee

Dated [•] and effective [•]

United States Flag Vessels

Avery Island
Brad Dartez
Cat Island
Celena Chouest
Corcovado
Dante
Dauphin Island
Deer Island
Dino Chouest
Fast Tender
Fast Track
Forte
Gavea
Grand Isle
Horn Island
Jackie Chouest
Kirt Chouest
Lyman Martin
Marsh Island
Mr Sidney
Ms Virgie
Pao de Acucar
Paradise Island
Pecan Island
Pelican Island
Sanibel Island
Ship Island
Timbalier Island
Wine Island

*[Link-to-previous setting changed from off in original to on in modified.].*

## SYNOPSIS OF MORTGAGE

Name of Vessels and
Official Nos.:

| Name | Official Number |
|------|-----------------|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

Type of Instrument:          Preferred Fleet Mortgage

Effective Date of
Instrument:                               , 2023

Name of Shipowner:          Nautical Solutions, L.L.C.

Percentage of                 100%
Vessel owned:

Mortgage

Address of Shipowner:    16201 East Main Street
Cut Off, Louisiana 70345

Name of Mortgagee:    _____

Percentage of Vessel
Mortgaged:    100%

Address of Mortgagee:    _____
_____
Attention:_____

Total Amount of
Mortgage:    United      States      Dollars
($_____), plus Specified Noteholder Fee (if any), Exit Fee (if any) or other premium (if any) and interest, fees, costs, expenses and performance of mortgage covenants.

This PREFERRED FLEET MORTGAGE (this "*Mortgage*"), made this _____ day of _____, 2023 and effective as of the _____ day of _____, 2023, is given by NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company, with an address of 16201 East Main Street, Cut Off, Louisiana 70345 (the "*Shipowner*"), to and in favor of Wilmington Trust, National Association, with an address of 1100 North Market Street, Wilmington, DE 19890, in its capacity as collateral agent for the Secured Parties under and as defined in the Security Agreement (as such term is defined in the Note Exchange Agreement defined below), as required by the Note Exchange Agreement (in such capacity, together with its successors and assigns, the "*Mortgagee*").

<p align="center">WITNESSETH:</p>

WHEREAS, pursuant to the terms and conditions of that certain Note Exchange Agreement dated as of [•], 2023 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Note Exchange Agreement*", a copy of the unexecuted final version of the Note Exchange Agreement, with the final form of the Senior Notes (as defined below) attached as an exhibit thereto but without other exhibits or schedules (other than Schedule B (Defined Terms)) attached thereto, is attached hereto as Exhibit A and incorporated herein by reference) by and among the Shipowner, Nautical Solutions Holdings, LLC, a Louisiana limited liability company, as the parent company of the Shipowner, the financial institutions parties thereto, as noteholders, and Wilmington Trust, National Association, as Agent and the Mortgagee, the Shipowner has agreed to issue the amount set forth in the Note Exchange Agreement of Senior Secured Notes due on [•], 2028 (as defined in the Note Exchange Agreement) (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any notes delivered in substitution or exchange for any of the foregoing senior secured notes, the "*Senior Notes*");

WHEREAS, the Shipowner has executed and delivered, or will execute and deliver, the Senior Notes to the respective noteholders thereof identified in the Note Exchange Agreement (collectively, together with such noteholders' successors and assigns, the "*Noteholders*"), such Senior Notes to be in the amount set forth in the Note Exchange Agreement and each to be due and payable in the amounts and upon the terms and conditions therein recited, with interest and other amounts as set forth in the Note Exchange Agreement;

WHEREAS, the Shipowner is the sole legal and beneficial owner of the vessels more particularly described on Schedule 1 attached hereto and made a part hereof; and

WHEREAS, it is a condition precedent to the exchange of the Exchanged Debt for the Senior Notes that the Shipowner shall have executed and delivered this Mortgage to the Mortgagee to secure, among other things, the timely payment of the principal of, Specified Noteholder Fee (as defined in the Note Exchange Agreement) (if any), Exit Fee (as defined in the Note Exchange Agreement) (if any) and interest on all Senior Notes outstanding and to be outstanding under the Note Exchange Agreement and performance of all of the Shipowner's obligations under the Note Exchange Agreement and other Debt Documents (as hereinafter defined).

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to secure the

full and timely payment and performance of any and all present and future indebtedness, obligations and liabilities of the Shipowner, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of or in connection with, the Senior Notes, the Note Exchange Agreement, any other Note Documents (as defined in the Note Exchange Agreement), this Mortgage and the other Security Documents (collectively, the "*Debt Documents*") to which the Shipowner is a party, in each case whether on account of principal, Specified Noteholder Fee, Exit Fee (if any), interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise, and including, without limitation, all fees and disbursements of counsel to the Mortgagee and the Noteholders that are required to be paid by the Shipowner pursuant to the terms of any of the Debt Documents (collectively, and including any and all renewals, modifications, amendments, extensions for any period, supplements and restatements of any of the foregoing, the "*Secured Obligations*"), the Shipowner does, by these presents, grant, convey and mortgage and grant a continuing security interest in, to and in favor of the Mortgagee, and its successors and permitted assigns in such capacity, and to and for the benefit of the Mortgagee, its successors and permitted assigns in such capacity, the whole of the vessels described on <u>Schedule 1</u> attached hereto, together with all their boilers, engines, machinery, auxiliaries, tackle, apparel, spares, fuel, consumable and other stores, navigational systems, electronic surveillance systems, computer equipment and software, anchors, cables, chains, equipment, cranes, welding machines and stations, cutting systems, pontoons, tensions, davits, dope stations, anchor wires, anchor buoys, generators, compressors, pumps, tools, implements, parts, supplies, and all other accessories, additions, appurtenances, improvements and replacements now or hereafter belonging thereto, whether or not removed therefrom, all of which shall be deemed to be included in the term "*Vessel*" and, collectively, "*Vessels*" herein.

TO HAVE AND TO HOLD all and singular the Vessels unto the Mortgagee and its successors and permitted assigns, to its and its successors' and permitted assigns' own use, benefit and behoof forever, for the enforcement of the payment of the Secured Obligations secured hereby and the performance and observance of and compliance with the covenants, terms and conditions in this Mortgage and other Debt Documents, subject to the rights of the Shipowner therein as herein provided.

PROVIDED, HOWEVER, and these presents are upon the condition that, if the Secured Obligations are paid and performed in full in accordance with the terms of the Note Exchange Agreement, this Mortgage and the other Debt Documents and the Senior Notes are satisfied and discharged in full, then this Mortgage shall cease; otherwise it shall remain in full force and effect. The Shipowner agrees to perform and to observe the terms, covenants and agreements contained in this Mortgage and in the other Debt Documents, and to hold the Vessels subject thereto.

IT IS HEREBY COVENANTED, DECLARED AND AGREED that each of the Vessels is to be held subject to the further covenants, conditions, provisions, terms and uses hereinafter set forth.

## ARTICLE 1
## <u>REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SHIPOWNER</u>

The Shipowner hereby represents, warrants, covenants and agrees with the Mortgagee as follows:

Section 1. 1 The Shipowner will pay when due all Secured Obligations from time to time payable by the Shipowner under the Note Exchange Agreement and the other Debt Documents and will observe, perform and comply with the covenants, terms and conditions herein and in the Note Exchange Agreement and the other Debt Documents on its part to be observed, performed or complied with.

Section 1.2 The Shipowner is and shall remain a "citizen of the United States of America" as described in 46 U.S.C. §50501 et seq. duly qualified to own, document, and mortgage each of the Vessels under the laws and regulations of the United States of America and to operate the Vessels in the coastwise trade of the United States. Each Vessel is duly documented in the name of the Shipowner under the laws and flag of the United States of America qualified to engage in the coastwise and foreign trade of the United States.

Section 1.3 The Shipowner lawfully owns and is lawfully possessed of each of the Vessels free from any Lien (as defined in the Note Exchange Agreement), charge or encumbrance whatsoever (except for the existing First Preferred Fleet Mortgage dated November 11, 2013 and effective November 14, 2013, as heretofore amended and supplemented from time to time in favor of JPMorgan Chase Bank, N.A., in its capacity as collateral agent and mortgagee, as assigned to the Mortgagee on the date hereof, the "*Prior Mortgage*") this Mortgage and the Liens permitted to be created, incurred, assumed or permitted to exist pursuant to Section 10.5(a), (b) and (e) of the Note Exchange Agreement (collectively, the "*Permitted Maritime Liens*")), and will warrant and defend the title and possession thereto and to every part thereof for the benefit of the Mortgagee against the claims and demands of all persons whomsoever; *provided*, *however*, that notwithstanding anything herein to the contrary, no intention to subordinate the priority security interest and Lien granted in favor of the Mortgagee herein is to be hereby implied or expressed by the permitted existence of any Permitted Maritime Liens.

Section 1.4 The Shipowner has caused this Mortgage to be duly filed and will cause it to be duly recorded and will comply with and satisfy all of the provisions and requirements of Chapter 313 of Title 46 of the United States Code and the regulations in effect thereunder from time to time, as amended, in order to establish, perfect and maintain the perfection and priority of this Mortgage as a valid, enforceable and duly perfected preferred mortgage lien (subject only to the Prior Mortgage and other Permitted Maritime Liens) over the whole of each Vessel and upon all renewals, replacements and improvements made in or to the same for the amount of the Secured Obligations.

Section 1.5 For each Vessel, the Shipowner will not (a) cause or permit such Vessel to be operated in any manner contrary to applicable law, rule or regulation, (b) engage in any unlawful trade or operations or violate any law, (c) carry any cargo that will expose such Vessel to penalty, confiscation, forfeiture, capture or condemnation, or (d) do, or suffer or permit to be done, anything which can or may injuriously affect the registration or documentation of such Vessel under the laws and regulations of the United States. The Shipowner will at all times keep each Vessel duly documented in its name as an United States flag vessel under Chapter 121 of Title 46 of the United States Code, eligible for the trade of the United States in which each such Vessel is engaged from time to time.

Section 1.6 Neither the Shipowner, any charterer, the master of any Vessel nor any other person has or shall have any right, power or authority to create, incur or permit to be placed or imposed or continued upon such Vessel, her earnings, freights, profits or hire, any Lien, charge or encumbrance whatsoever, other than this Mortgage and other Permitted Maritime Liens.

Section 1.7 For each Vessel, the Shipowner will place, and at all times and place will retain, a properly certified copy of this Mortgage on board such Vessel with her papers and will cause such certified copy and such Vessel's marine document to be exhibited to any and all persons having business therewith which might give rise to any lien thereon other than Permitted Maritime Liens, and to any representative of the Mortgagee; and the Shipowner will place and keep prominently displayed in the chart room and in the master's cabin of such Vessel, or in the case of a rig, in a prominent place aboard the rig, or in such location as the rig's papers are kept, a framed printed notice in plain type reading as follows:

"NOTICE OF MORTGAGE

This Vessel is covered by a Preferred Fleet Mortgage in favor of Wilmington Trust, National Association, as Collateral Agent. Under the terms of said Mortgage, neither the Shipowner, any charterer, the master of this Vessel nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any lien whatsoever other than Permitted Maritime Liens (as defined in the Preferred Fleet Mortgage)."

Section 1.8      Each Vessel is seaworthy and, to the extent classed, each such Vessel is in class without any recommendations or conditions affecting class and without any overdue surveys.

Section 1.9 Except for this Mortgage and the other Permitted Maritime Liens, for each Vessel, the Shipowner will not suffer to be continued any Lien, encumbrance or charge on such Vessel for longer than thirty (30) days, and in due course and in any event within sixty (60) days after the same becomes due and payable, the Shipowner will pay and discharge, or cause to be paid and discharged, or make adequate provision for the satisfaction or discharge of all claims or demands (except to the extent that the same shall concurrently be contested by the Shipowner in good faith by appropriate legal proceedings being diligently pursued and provided the Shipowner has established and maintained adequate reserves with respect thereto in accordance with GAAP (as defined in the Note Exchange Agreement), and the same shall not subject such Vessel, or any part thereof, to arrest, sale, forfeiture or loss), or will cause such Vessel to be released or discharged from any Lien, encumbrance or charge therefor.

Section 1.10 The Shipowner (i) has the full power and authority to execute and deliver this Mortgage and to perform all of its obligations hereunder, (ii) has duly executed and delivered this Mortgage, and (iii) has obtained all applicable consents, licenses, approvals and authorizations (including any approvals of the United States Coast Guard and the U.S. Maritime Administration) required for its entry into and performance, and the Mortgagee's enforcement of, this Mortgage.

Section 1.11 Except for the filing and recordation of this Mortgage with the United States Coast Guard, National Vessel Documentation Center ("*NVDC*"), it is not necessary for the legality,

validity or enforceability of the Mortgage that it be registered, filed, recorded or enrolled with any court or other authority in any relevant jurisdiction.

Section 1.12 This Mortgage constitutes the legal, valid and binding obligation of the Shipowner, enforceable in accordance with its terms, except to the extent such enforcement may be limited by any applicable bankruptcy, insolvency, moratorium or similar laws affecting the rights of creditors generally and by general principals of equity.

Section 1.13 For each Vessel:

(a)     if a libel or complaint be filed against such Vessel or such Vessel be otherwise attached, arrested, levied upon or taken into custody by any Governmental Authority (as defined in the Note Exchange Agreement) or any person that purports to be acting on behalf of a Governmental Authority for any cause whatsoever, the Shipowner will promptly notify the Mortgagee by facsimile, confirmed by letter, at its address as specified in this Mortgage, and within thirty (30) days will cause such Vessel to be released and all Liens thereon, other than this Mortgage and other Permitted Maritime Liens, to be discharged (except to the extent that the claim giving rise to such Lien shall concurrently be contested by the Shipowner in good faith by appropriate legal proceedings being diligently pursued and provided the Shipowner has established and maintained adequate reserves with respect thereto in accordance with GAAP, and the same shall not subject such Vessel, or any part thereof, to sale, forfeiture or loss) and will promptly notify the Mortgagee thereof in the manner aforesaid; and

(b)     if the Shipowner shall fail or neglect to furnish proper security or otherwise to release such Vessel from libel, arrest, levy, seizure or attachment within the time period required by Section 1.13(a) above, the Mortgagee or any person acting on behalf of the Mortgagee may furnish security to release such Vessel and by so doing shall not be deemed to cure the default of the Shipowner unless and until the Shipowner shall have reimbursed the Mortgagee from all costs and expenses (including reasonable attorney's fees) incurred by the Mortgagee or such third party acting at the direction of the Mortgagee in procuring such release, including for any security so furnished.

Section 1.14 For each Vessel:

(a)     except while such Vessel is undergoing repairs, maintenance or is in lay-up, the Shipowner will at all times and without cost or expense to the Mortgagee maintain and preserve, or cause to be maintained and preserved, such Vessel (i) in good running order and repair so that such Vessel shall be, insofar as due diligence can make her so, tight, staunch, strong and well and sufficiently tackled, apparelled, furnished, equipped and in every respect seaworthy and (ii) in at least as good a working order and condition as when this Mortgage was executed, ordinary wear and tear excepted; and will keep such Vessel, or cause her to be kept, in such condition as will entitle her to such classification rating with the American Bureau of Shipping or other classification society of like standing reasonably acceptable to the Mortgagee (each, a "*Classification Society*") that companies engaged in the operation of vessels of the same type, size, age and flag as such Vessel maintain respecting their vessels with such Classification Society. Notwithstanding the foregoing, if such Vessel is affected by any partial loss or damage of such Vessel or a portion or component thereof, the Shipowner shall make all necessary repairs and

replacements to such Vessel, except where the failure to do so could not reasonably be expected to materially change the value, utility or remaining usefulness life of such Vessel;

       (b)    such Vessel shall, and the Shipowner covenants that it will, at all times comply with all applicable laws, rules and regulations to the extent set forth in the Note Exchange Agreement and this Mortgage, and such Vessel shall have on board as and when required thereby certificates showing compliance therewith;

       (c)    the Shipowner will not make, or permit to be made, any substantial change in the structure, type or speed of such Vessel or change in the rig of such Vessel (i) to the extent such change would be in violation of the provisions of Section 10.24 of the Note Exchange Agreement, or (ii) if any such change could reasonably be expected to have a material adverse effect on (x) the rights or interest of the Shipowner or the Mortgagee to any insurance which is required under Section 9.2 of the Note Exchange Agreement, or (y) the value, utility or remaining useful life of such Vessel; and

       (d)    the Shipowner may, in the ordinary course of maintenance, repair or overhaul of such Vessel, remove any item of property constituting a part of such Vessel, provided such item of property is replaced to the extent necessary to maintain such Vessel in the condition required herein or the Note Exchange Agreement. Any such replacement item of property shall, without necessity of further act hereunder, become part of such Vessel and subject to this Mortgage.

       Section 1.15 The Shipowner will not transfer or change the flag or hailing port of any Vessel.

       Section 1.16 The Shipowner will not sell, mortgage or transfer its interest in any Vessel except in accordance with the applicable provisions of the Note Exchange Agreement. The Shipowner will not charter any Vessel on a demise or bareboat basis except in accordance with the applicable provisions of the Note Exchange Agreement. For any Vessel the Shipowner so charters, the Shipowner shall (a) provide Mortgagee a copy of any such charter and all related documents and (b) prior to its entry into any such charter, provide the Mortgagee with evidence that all insurances required to be in place will remain in place, and (c) grant and maintain in favor of Mortgagee a first priority, duly perfected security interest in and lien upon all hire and other earnings due and to become due under such charter agreement and all related rights and the proceeds thereof subject only to Permitted Maritime Liens.

       Section 1.17 The Shipowner agrees that, if the Shipowner fails to (a) perform any of its covenants or obligations under this Mortgage, including, without limitation, its obligations with respect to insurance, the discharging of Liens, taxes, dues, assessments, governmental charges, fines, penalties lawfully imposed, repairs, reasonable attorneys' fees, and other obligations that are not Permitted Maritime Liens or (b) maintain insurance on each Vessel as required by the Debt Documents, the Mortgagee may, but shall not be obligated to, perform the Shipowner's obligations under this Mortgage or arrange for (at the Shipowner's own cost and expense and without any responsibility on the Mortgagee's part) the obtaining of the insurance under the Debt Documents, and any reasonable expenses incurred by the Mortgagee in performing the Shipowner's obligations shall be paid by the Shipowner to the Mortgagee within ten (10) Business Days of demand therefor.

Any such performance by the Mortgagee may be made by the Mortgagee in reasonable reliance on any statement, invoice or claim, without inquiry into the validity or accuracy thereof. The amount and nature of any expense of the Mortgagee hereunder shall be conclusively established by a certificate of any officer of the Mortgagee absent manifest error, and such amount shall be included in the Secured Obligations secured by this Mortgage.

Section 1.18 In the event that at any time and from time to time this Mortgage or any provisions hereof shall be deemed invalidated in whole or in part by reason of any present or future law or any decision of any Governmental Authority, then the Shipowner, forthwith upon the request of the Mortgagee, will execute such other and further assurances and documents as are reasonably requested by the Mortgagee to accomplish the purposes of this Mortgage. From time to time on the reasonable request of the Mortgagee, the Shipowner will furnish to the Mortgagee: (i) such favorable opinions of counsel, including United States legal opinions, in form and substance reasonably satisfactory to the Mortgagee, and (ii) such instruments executed by the Shipowner or on its behalf or by any or all officers, members, managers or directors of the Shipowner, in each case, relating to this Mortgage or any of the transactions contemplated hereby, as the Mortgagee may reasonably request.

Section 1.19 In the event of the requisition (whether of title or use), condemnation, sequestration, seizure or forfeiture of any Vessel by any Governmental Authority or by anyone else, the Shipowner will give prompt written notice thereof to the Mortgagee, and any payments in respect thereof shall be paid to the Shipowner, and the Shipowner shall cause any such payment to be applied to the Secured Obligations to the extent required, and in accordance with, the terms of the Note Exchange Agreement.

<div align="center">

ARTICLE 2
EVENTS OF DEFAULT AND REMEDIES

</div>

Section 2.1 Upon the occurrence and during the continuation of an Event of Default (as defined in the Note Exchange Agreement), the Mortgagee shall have the right to:

(a)     declare immediately due and payable all of the Secured Obligations (in which case all of the same shall become immediately due), and bring suit at law, in equity or in admiralty, as it may be advised, to recover judgment for the Secured Obligations and to satisfy the same out of the Vessels;

(b)     exercise all of the rights and remedies in foreclosure with respect to any of the Vessels and otherwise given to mortgagees by the provisions of applicable law, including, but not limited to, the provisions of Chapter 313 of Title 46 of the United States Code and the regulations in effect thereunder from time to time, as amended;

(c)     take and enter into possession of any of the Vessels, at any time, wherever the same may be, without court decision or other legal process and without being responsible for loss or damage, and the Shipowner or other person in possession forthwith upon demand of the Mortgagee shall surrender to the Mortgagee possession of such Vessel or Vessels and the Mortgagee may, without being responsible for loss or damage (except to the extent caused by the Mortgagee's gross negligence or willful misconduct as determined by a court of competent

jurisdiction in a final and non-appealable judgment), hold, lay-up, lease, charter, operate or otherwise use such Vessel or Vessels for such time and upon such terms as it may deem to be for its best advantage, and demand, collect and retain all hire, freights, earnings, issues, revenues, income, profits, return premiums, salvage awards or recoveries, recoveries in general average, and all other sums due or to become due in respect of such Vessel or Vessels or in respect of any insurance thereon from any person whomsoever, accounting only for the net profits, if any, arising from such use of such Vessel or Vessels and charging upon all receipts from the use of such Vessel or Vessels or from the sale thereof by court proceedings or pursuant to Section 2.1(e) below, all costs, expenses, charges, damages or losses by reason of such use (including reasonable attorney's fees); and if at any time the Mortgagee shall avail itself of the right herein given it to take possession of such Vessel or Vessels, the Mortgagee shall have the right to dock such Vessel or Vessels for a reasonable time at any dock, pier or other premises of the Shipowner without charge, or to dock them at any other place at the cost and expense of the Shipowner, and the Mortgagee shall have the right to require the Shipowner to deliver, and the Shipowner shall on demand, at its own cost and expense, deliver to the Mortgagee such Vessel or Vessels as demanded; and the Shipowner hereby irrevocably instructs the masters of such Vessel or Vessels so long as this Mortgage is outstanding to deliver such Vessel or Vessels (as the case may be) to the Mortgagee as demanded;

(d)     inspect and make copies of all original class records held by the Classification Society relating to such Vessels; and/or

(e)     without being responsible for loss or damage, other than loss or damage due to its own gross negligence or willful misconduct, sell such Vessel or Vessels, at any place and at such time as the Mortgagee may specify and in such manner and such place (whether by public or private sale) as the Mortgagee may deem advisable (without necessity of bringing such Vessel or Vessels to the place designated for such sale), free from any claim by the Shipowner in admiralty, in equity, at law or by statute, after first giving notice of the time and place of any public sale with a general description of the property in the following manner:

(i)     by publishing such notice for ten (10) consecutive days in a daily newspaper of general circulation published in New York City;

(ii)     if the place of sale should not be New York City, then also by publication of a similar notice in a daily newspaper, if any, published at the place of sale; and

(iii) by mailing a similar notice to the Shipowner at its last known address on the day of first publication;

and notice of the time and place of any private sale by mailing such notice to the Shipowner at its last known address.

Section 2.2 Any sale of any of the Vessels or any interest therein made by the Mortgagee after the occurrence and during the continuance of an Event of Default in pursuance of this Mortgage, whether under the power of sale hereby granted or any judicial proceedings, shall operate to divest all right, title and interest of any nature whatsoever of the Shipowner in and to such Vessel or Vessels or such interest therein sold, as the case may be, and shall bar any claim

from the Shipowner, its successors and assigns, and all persons claiming by, through or under them. Any sale may be conducted without bringing the Vessel or Vessels subject of such sale to the place designated for such sale and in such manner as the Mortgagee may deem to be for its best advantage. No purchaser shall be bound to inquire whether notice has been duly given, or whether any default has occurred, or as to the propriety of the sale, or as to the application of the proceeds thereof. In the case of any such sale, the Mortgagee shall be entitled, to apply the proceeds to the Secured Obligations in accordance with the Note Exchange Agreement. At any such sale, the Mortgagee may bid for and purchase such property and upon compliance with the terms of sale may hold, retain and dispose of such property without further accountability therefor.

Section 2.3 The Mortgagee is hereby appointed attorney-in-fact of the Shipowner to execute and deliver to any purchaser referred to in <u>Section 2.2</u>, and is hereby vested with full power and authority to make, after the occurrence and during the continuation of an Event of Default, in the name and on behalf of the Shipowner, a good conveyance of the title to such Vessel or Vessels so sold. In the event of any sale of any of the Vessels under any power herein contained, the Shipowner will, if and when required by the Mortgagee, execute such form of conveyance of any such Vessel or Vessels and other related documents as the Mortgagee may specify. The powers and authority granted to the Mortgagee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with an interest.

Section 2.4 The Mortgagee is hereby appointed attorney-in-fact of the Shipowner in the name of the Shipowner to, after the occurrence and during the continuation of an Event of Default, demand, collect, receive, compromise and sue for, so far as may be permitted by law, all freights, hire, earnings, issues, revenues, income and profits of each of the Vessels and all amounts due from underwriters under any insurance thereon as payments of losses or as return premiums or otherwise, salvage awards and recoveries of each of the Vessels, recoveries in general average or otherwise in respect of each of the Vessels, and all other sums in respect of each of the Vessels, due or to become due at the time of the occurrence and during the continuation of any Event of Default, or in respect of any insurance thereon, from any person whomsoever, and to make, give and execute in the name of the Shipowner acquittances, receipts, releases or other discharges for the same, whether under seal or otherwise, and to endorse and accept in the name of the Shipowner all checks, notes, drafts, warrants, agreements and other instruments in writing with respect to the foregoing. The powers and authority granted to the Mortgagee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with an interest.

Section 2.5 Whenever any right to enter and take possession of any Vessel accrues to the Mortgagee, it may require the Shipowner to deliver, and the Shipowner shall on demand, at its own cost and expense, deliver to the Mortgagee such Vessel as demanded. If any legal proceedings shall be taken to enforce any right under this Mortgage, the Mortgagee shall be entitled as a matter of right to the appointment of a receiver of such Vessel and of the freights, hire, earnings, issues, revenues, income and profits due or to become due and arising from the operation thereof.

Section 2.6 The Shipowner authorizes and empowers the Mortgagee or its appointees or any of them, after the occurrence and during the continuation of an Event of Default, to appear in the name of the Shipowner, its successors and assigns, in any court of any country or nation of the world where a suit is pending against any Vessel because of or on account of an alleged Lien against such Vessel from which such Vessel has not been released and to take such proceedings

as to such Vessel as it may deem necessary towards the defense of such suit and the purchase or discharge of such Lien, and all reasonable expenditures made or incurred by them or any of the Mortgagee or its appointees for the purpose of such defense or purchase or discharge shall be a debt due from the Shipowner, its successors and assigns, to the Mortgagee, and shall be secured by the lien of this Mortgage in like manner and extent as if the amount and description thereof were written herein.

Section 2.7 The Shipowner covenants that at any time that any Secured Obligations shall be due and payable (whether by acceleration or otherwise), the same shall be paid in accordance with the Note Exchange Agreement and the other Debt Documents; and in case the Shipowner shall fail to pay the same when due in accordance with the Note Exchange Agreement and the other Debt Documents, and that failure constitutes an Event of Default, the Mortgagee shall be entitled to recover judgment for the whole amount so due and unpaid, together with such further amounts as shall be provided by the Note Exchange Agreement, the other Debt Documents and applicable law. All moneys collected by the Mortgagee under this <u>Section 2.7</u> shall be applied by the Mortgagee in accordance with the terms of the Note Exchange Agreement.

Section 2.8 Each and every right, power and remedy herein given to the Mortgagee shall be cumulative and shall be in addition to every other right, power and remedy herein given or now or hereafter existing at law, in equity, in admiralty, by statute or under any Debt Document or other agreement, and each and every right, power and remedy whether herein given or otherwise existing may be exercised from time to time and as often and in such order as may be deemed expedient by the Mortgagee, and the exercise or the beginning of the exercise of any right, power or remedy by the Mortgagee shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other power or remedy. No delay or omission by the Mortgagee in the exercise of any right or power or in the pursuance of any remedy accruing upon the occurrence and during the continuance of any Event of Default shall impair any such right, power or remedy or be construed to be a waiver of any such right, power or remedy; nor shall the acceptance by the Mortgagee of any security or of any payment of or on account of the Secured Obligations be construed to be a waiver of any right that the Mortgagee may have hereunder after the occurrence and during the continuance of such Event of Default or any other Event of Default, including any subsequent Event of Default of the same or a different nature.

Section 2.9      Reserved.

Section 2.10 In case the Mortgagee shall have proceeded to enforce any right, power or remedy under this Mortgage by foreclosure, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Mortgagee, then and in every such case the Shipowner and the Mortgagee shall be restored to their former positions and rights hereunder with respect to the property subject or intended to be subject to this Mortgage, and all rights, remedies and powers of the Mortgagee shall continue as if no such proceedings had been taken.

Section 2.11 Unless otherwise specified herein, any cash proceeds received by the Mortgagee from the sale of, collection of, or other realization upon any part of any of the Vessels or related collateral or any other amounts received by the Mortgagee hereunder, including the net earnings of any charter operation or other use of any of the Vessels by the Mortgagee under any

of the powers specified in <u>Article 1</u> and/or <u>Article 2</u>, may be, at the reasonable discretion of the Mortgagee (a) held by the Mortgagee in one or more cash collateral accounts as cash collateral for the Secured Obligations under the terms of the Security Agreement, or (b) applied to the Secured Obligations. Amounts applied to the Secured Obligations shall be applied to the payment of the Secured Obligations in the order set forth in the Note Exchange Agreement. Any surplus cash collateral or cash proceeds held by the Mortgagee after payment in full of the Secured Obligations shall be paid over to the Shipowner or to whomever may be lawfully entitled to receive such surplus.

Section 2.12 Unless and until one or more Event of Default shall occur and be continuing, the Shipowner (a) shall be suffered and permitted to retain actual possession and use of each of the Vessels and (b) to the extent permitted by the Note Exchange Agreement shall have the right, from time to time, in its discretion, and without application to the Mortgagee, and without obtaining a release thereof by the Mortgagee, to dispose of, free from the Lien hereof, any boilers, engines, generators, pumps and pumping equipment, machinery, masts, spars, sails, rigging, boats, anchors, cables, chains, tackle, outfit, apparel, furniture, fittings, equipment, spares, fuel, stores or any other appurtenances of each of the Vessels, <u>provided</u> such item of property is replaced and such Vessel is maintained in the condition required herein and in the Note Exchange Agreement, and such replacement item, if any, shall forthwith become subject to the Lien of this Mortgage as a preferred mortgage thereon.

<div align="center">

ARTICLE 3
<u>SUNDRY PROVISIONS</u>

</div>

Section 3.1 The maximum principal amount that may be outstanding under this Mortgage at any time is $_____and for purposes of recording this Mortgage, the total amount of this Mortgage is $_____plus Specified Noteholder Fee (if any) plus Exit Fee (if any) or other premium (if any) and interest, fees, costs, expenses and performance of mortgage covenants. There is no separate discharge amount.

Section 3.2 All of the covenants, promises, stipulations and agreements of the Shipowner in this Mortgage contained shall bind the Shipowner and its successors and permitted assigns and shall be binding on and inure to the benefit of the Mortgagee and its successors and permitted assigns. In the event of any assignment of this Mortgage by the Mortgagee in accordance with the applicable provisions of the Note Exchange Agreement, the term "*Mortgagee*" as used in this Mortgage shall be deemed to mean any such successor or permitted assignee.

Section 3.3 Wherever and whenever herein any right, power or authority is granted or given to the Mortgagee, such right, power or authority may be exercised in all cases by the Mortgagee or such agent or agents as it may appoint, and the act or acts of such agent or agents when taken shall constitute the act of the Mortgagee hereunder.

Section 3.4 In the event that any provision of this Mortgage or any of the documents or instruments which may from time to time be delivered hereunder or any provision hereof shall be deemed invalid or unenforceable by reason of any present or future law or any decision of any court of competent jurisdiction, the validity and enforceability of any other provision hereof, or of such documents or instruments, shall not be affected thereby. In any such case, the Shipowner

covenants and agrees that, on demand, it will execute and deliver such other and further agreements and/or documents and/or instruments and do such things as the Mortgagee in its sole reasonable discretion may deem to be necessary to carry out the true intent of this Mortgage and such other documents or instruments. Any such invalidity or unenforceability of any provision of this Mortgage, or of such other documents or instruments, in any jurisdiction or nation shall not render such provision invalid or unenforceable under the laws of any other jurisdiction or nation.

Section 3.5 Anything herein to the contrary notwithstanding, it is intended that nothing herein shall waive the preferred status of this Mortgage and that, if any provision of this Mortgage or portion thereof shall be construed to waive the preferred status of this Mortgage, then such provision to such extent shall be void and of no effect and shall cease to be a part of this Mortgage, without affecting the remaining provisions hereof, which shall remain in full force and effect. Nothing herein shall be deemed or construed to subject to the lien hereof any property other than a vessel eligible for documentation as the term is used in 46 U.S.C. §12102, as amended.

Section 3.6 THIS MORTGAGE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE GENERAL MARITIME LAW OF THE UNITED STATES OF AMERICA. THE SHIPOWNER IRREVOCABLY SUBMITS ITSELF TO THE NON-EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, FOR THE PURPOSES OF (AND SOLELY FOR THE PURPOSES OF) ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF, OR RELATING TO, THIS MORTGAGE OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD IN SUCH NEW YORK STATE OR FEDERAL COURT AND HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE, OR OTHERWISE, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE ABOVE-NAMED COURTS FOR ANY REASON WHATSOEVER, THAT SUCH SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, OR THAT THE VENUE OF SUCH SUIT, ACTION OR PROCEEDING IS IMPROPER, OR THAT THIS MORTGAGE OR THE SUBJECT MATTER HEREOF MAY NOT BE ENFORCED IN OR BY SUCH COURTS. THE SHIPOWNER HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO THE SHIPOWNER AT ITS ADDRESS LISTED IN SECTION 3.11 HEREOF. THE SHIPOWNER AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS SECTION 3.6 SHALL AFFECT THE RIGHT OF THE MORTGAGEE TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE MORTGAGEE TO BRING ANY ACTION OR PROCEEDING AGAINST THE SHIPOWNER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

Section 3.7      Reserved.

Section 3.8 The term "*Dollars*" or the symbol "*$*" as used in this Mortgage shall mean Dollars in any coin or currency of the United States of America which at the time of payment shall be legal tender for public and private debts.

Section 3.9 <u>Enforcement Expenses; Indemnification</u>.

(a)      <u>Costs and Expenses</u>. The Shipowner shall reimburse the Mortgagee for any and all reasonable out-of-pocket expenses and fees (including reasonable attorneys', auditors' and accountants' fees), costs, expenses and charges (excluding time charges of attorneys who may be employees of the Mortgagee) incurred by the Mortgagee in connection with the preparation, execution, delivery, administration, collection and enforcement of this Mortgage and in the audit, analysis, administration, collection, preservation or sale of the Vessels (including the expenses and charges associated with any periodic or special audit of the Vessels) all in accordance with, and to the extent provided in, Section 14.1 of the Note Exchange Agreement. Any and all costs and expenses incurred by the Shipowner in the performance of actions required pursuant to the terms hereof shall be borne solely by the Shipowner.

(b) <u>INDEMNIFICATION BY THE SHIPOWNER</u>. THE SHIPOWNER SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE MORTGAGEE (AND ANY SUB-AGENT THEREOF), THE NOTEHOLDERS AND THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ADVISORS, SUCCESSORS AND ASSIGNS (EACH SUCH PERSON BEING CALLED, AN "*INDEMNITEE*") AGAINST ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES (INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE) INCURRED BY ANY INDEMNITEE OR ASSERTED AGAINST ANY INDEMNITEE BY ANY THIRD PARTY OR BY THE SHIPOWNER OR ANY OTHER PARTY ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS MORTGAGE, ANY OTHER DEBT DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER, THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, OR, IN THE CASE OF THE MORTGAGEE (AND ANY SUB-AGENT THEREOF) AND ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ADVISORS, SUCCESSORS AND ASSIGNS ONLY, THE ADMINISTRATION OF THIS MORTGAGE AND THE OTHER SECURITY DOCUMENTS, (II) ANY SENIOR NOTE OR THE USE OR PROPOSED USE OF THE PROCEEDS THEREFROM, (III) ANY PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY ANY NOTE PARTY OR ANY OF THEIR SUBSIDIARIES, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO ANY NOTE PARTY OR OF THEIR SUBSIDIARIES, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, WHETHER BROUGHT BY A THIRD PARTY OR BY THE SHIPOWNER OR ANY OTHER NOTE PARTY, AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO,

IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE; PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES (X) ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR (Y) OTHER THAN IN THE CASE OF THE MORTGAGEE, THE AGENT AND THEIR RESPECTIVE RELATED INDEMNITEES, RESULT FROM A CLAIM BROUGHT BY THE SHIPOWNER OR ANY OTHER NOTE PARTY AGAINST AN INDEMNITEE FOR BREACH IN BAD FAITH OF SUCH INDEMNITEE'S OBLIGATIONS HEREUNDER OR UNDER ANY OTHER DEBT DOCUMENT, IF SUCH SHIPOWNER, SUCH NOTE PARTY HAS OBTAINED A FINAL AND NONAPPEALABLE JUDGMENT IN ITS FAVOR ON SUCH CLAIM AS DETERMINED BY A COURT OF COMPETENT JURISDICTION.

(c)     All amounts due under this <u>Section 3.9</u> shall be Secured Obligations and shall be payable not later than ten (10) Business Days after demand therefor. The agreements in this Section shall survive repayment of the other Secured Obligations and all other amounts payable under the other Debt Documents.

Section 3.10 EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE OR ANY OTHER DEBT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS MORTGAGE AND THE OTHER DEBT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 3.11 <u>Notices</u>. All notices or other communications required or permitted to be made or given hereunder shall be made in writing, in English, and sent to the Shipowner or the Mortgagee as provided in the Note Exchange Agreement.

Section 3.12 <u>Release of Mortgage, Etc.</u> The liens, estate and rights hereby granted shall be subject to termination and release in accordance with the terms of the Note Exchange Agreement, and the parties hereto agree to take the actions required and execute all documents required pursuant to such provision to effectuate such termination and release.

Section 3.13 <u>Amendments</u>. None of the terms or provisions of this Mortgage may be waived, amended, supplemented or otherwise modified except in writing signed by each of the parties hereto.

Section 3.14 <u>Waiver of Consequential Damages, Etc</u>. To the fullest extent permitted by applicable law, the Shipowner shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Mortgage, any other Debt Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Senior Note or the use of the proceeds thereof.

Section 3.15 <u>Conflict</u>. In the event of a direct conflict between this Mortgage or the Note Exchange Agreement, the Note Exchange Agreement shall control; *provided*, *however*, the Shipowner understands and agrees that this Mortgage sets forth additional covenants, obligations and rights and the Shipowner will use all reasonable efforts to construe the provisions and covenants in this Mortgage as not being in direct conflict with Note Exchange Agreement.

IN WITNESS WHEREOF, the Shipowner has caused this Preferred Fleet Mortgage to be executed effective as of the day and year first above written.

WITNESSES:                                          NAUTICAL SOLUTIONS, L.L.C.

                                                    By:
Printed Name: _____             Name: _____
                                                    Title: _____

_____
Printed Name: _____

ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF LAFOURCHE

BE IT KNOWN that on this [•], 2023, before me personally appeared:

_____

to me known, who, after being by me duly sworn, did depose and say:

That he/she is an Authorized Agent of Nautical Solutions, L.L.C., the limited liability company which is described in and which executed the within instrument, that he/she signed his name to the said instrument at the order of the Manager of the said limited liability company and acknowledged the within instrument to be the free act and deed of the said limited liability company.

IN TESTIMONY WHEREOF, I have hereto set my hand and seal on this day and year first above written.

_____
NOTARY PUBLIC
Name:_____
Notary ID/Bar Roll No._____
My Commission Expires_____

SCHEDULE 1
VESSELS

| Vessel | Official No. |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

EXHIBIT A
NOTE EXCHANGE AGREEMENT

See Attached

Exhibit F

## [FORM OF] SECURITY AGREEMENT

This SECURITY AGREEMENT (as it may be amended, restated, amended and restated, supplemented or modified from time to time, this "*Security Agreement*") is entered into as of [•], 2023 by and among NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company (the "*Company*"), NAUTICAL SOLUTIONS HOLDINGS, LLC, a Louisiana limited liability company ("*Holdings*" and together with the Company, collectively the "*Grantors*" and each individually the "*Grantor*") and Wilmington Trust, National Association, in its capacity and as collateral agent (in such capacity, together with any successors or assigns in such capacity, the "*Collateral Agent*") for the Secured Parties (as defined below); provided, however, that the Pledge Agreement (as defined in the Note Exchange Agreement, as hereinafter defined) shall govern the terms and conditions of Holdings' pledge of the Equity Interests in the Company and other collateral granted thereunder.

PRELIMINARY STATEMENT

Pursuant to that certain Note Exchange Agreement, dated as of the date hereof (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Note Exchange Agreement*"), by and among the Grantors, the agent named therein, the Collateral Agent and the noteholders identified therein (the "*Noteholders*"), the Company is issuing and the Noteholders are acquiring the Company's Senior Secured Notes due 2028 in the aggregate original principal amount set forth in the Note Exchange Agreement (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any notes delivered in substitution or exchange for any of the foregoing senior secured notes, the "*Senior Notes*"). The Grantors are entering into this Security Agreement in order to induce the Noteholders to enter into the Note Exchange Agreement and exchange their Exchanged Debt (as defined in the Note Exchange Agreement) for the Senior Notes.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce the Noteholders to enter into the Note Exchange Agreement and to exchange their Exchanged Debt for the Senior Notes to be issued to the Noteholders thereunder on the date hereof, the Grantors agree, for the benefit of each Secured Party, as follows:

ARTICLE 1.
DEFINITIONS

1.1     Terms Defined in the UCC. All capitalized terms used herein and defined in the UCC that are not otherwise defined in this Security Agreement are used herein as defined in the UCC. Capitalized terms used herein and not defined herein or in the UCC shall have the meanings ascribed to them in the Note Exchange Agreement.

1.2     Definitions of Certain Terms Used Herein. As used in this Security Agreement, in addition to the terms defined in the preamble and the Preliminary Statement, the following terms shall have the following meanings:

"*Accounts*" has the meaning set forth in Article 9 of the UCC.

"*Affiliate*" has the meaning set forth for such term in the Note Exchange Agreement.

"*Agent*" has the meaning set forth for such term in the Note Exchange Agreement.

"*Appurtenances*" means all auxiliaries, tackle, apparel, accessories, appurtenances, anchors, cables, chains, equipment, cranes, welding machines and stations, cutting systems, pontoons, tensions, davits, dope stations, anchor wires, anchor buoys, generators, compressors, pumps, tools, implements, parts, supplies, and all other accessories, additions, improvements and replacements now or hereafter belonging to the Vessels, whether or not removed therefrom.

"*Chattel Paper*" has the meaning set forth in Article 9 of the UCC.

"*Closing Date*" means the date of Closing as set forth in the Note Exchange Agreement.

"*Collateral*" means all Accounts, Appurtenances, Chattel Paper, Commercial Tort Claims, Documents, Equipment (including Vessels and all component parts thereof and accessions and appurtenances thereto), Fixtures, Goods, General Intangibles, Instruments, Intellectual Property Collateral, Inventory, Investment Property, Deposit Accounts, Commodity Accounts, Securities Accounts, cash and cash equivalents, Vehicles, Letters of Credit, Letter-of-Credit Rights and Supporting Obligations, wherever located, in which each Grantor now has or hereafter acquires any right, title or interest, and the Proceeds (including Stock Rights), insurance proceeds and products thereof, together with all books and records, customer lists, credit files, computer files, programs, printouts, other computer materials and records, writings, databases, information and other records relating to, used or useful in connection with, evidencing, embodying, incorporating or referring to, any of the foregoing and all other personal property not otherwise described above; provided that Collateral shall exclude Excluded Assets.

"*Collateral Agent*" has the meaning set forth in the preamble.

"*Collateral Agent's Expenses*" means all of the reasonable fees, costs and expenses of the Collateral Agent (including, without limitation, the reasonable fees and disbursements of its counsel) (i) arising in connection with the preparation, execution, delivery, modification, restatement, amendment or termination of this Security Agreement and each Security Document, if not previously reimbursed, or the enforcement (whether in the context of a civil action (including matters involving admiralty jurisdiction), adversarial proceeding, in rem proceeding, workout or otherwise) of any of the provisions hereof or thereof, or (ii) incurred or required to be advanced in connection with the sale or other disposition or the custody, preservation or protection of the Collateral pursuant to any Security Document and the exercise or enforcement of the Collateral Agent's rights under this Security Agreement and in and to the Collateral.

"*Collateral Account*" means the collateral account established and maintained by the Collateral Agent pursuant to Section 7.

"*Commercial Tort Claims*" has the meaning set forth in Article 9 of the UCC and shall include those certain currently existing commercial tort claims of each Grantor, including each commercial tort claim specifically described in Exhibit I.

"*Commodity Account*" has the meaning set forth in Article 9 of the UCC.

"*Commodity Account Control Agreement*" means an agreement, in form and substance reasonably satisfactory to the Collateral Agent and the Required Holders, among the Grantors, a "commodity intermediary" (as defined in Article 9 of the UCC) holding such Grantor's assets, including funds and commodity contracts, and the Collateral Agent that provides for the Collateral Agent to have Control over all deposits, commodity contracts and other balances held in a commodity account maintained by such Grantor with such commodity intermediary.

"*Computer Hardware and Software Collateral*" means all of the Grantors' right, title and interest throughout the world in and to:

(a)     all computer and other electronic data processing hardware, integrated computer systems, central processing units, memory units, display terminals, printers, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories and all peripheral devices and other related computer hardware, including all operating system software, utilities and application programs in whatsoever form;

(b)     all software programs (including source code, object code and all related applications and data files), designed for use on the computers and electronic data processing hardware described in clause (a) above;

(c)     all firmware associated therewith;

(d)     all documentation (including flow charts, logic diagrams, manuals, guides, specifications, training materials, charts and pseudo codes) with respect to such hardware, software and firmware described in clauses (a) through (c) above;

(e)     all licenses and other agreements for the grant by or to any Grantor of any right to use any items of the type referred to in clause (a) – (d) above (each, a "*Computer Hardware and Software License*"); and

(f)     all rights with respect to all of the foregoing, including copyrights, licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications and any substitutions, replacements, improvements, error corrections, updates, additions or model conversions of any of the foregoing.

"*Computer Hardware and Software License*" is defined in clause (e) of the definition of "Computer Hardware and Software Collateral".

"*Control*" has the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"*Copyright*" is defined in clause (a) of the definition of "Copyright Collateral".

"*Copyright Collateral*" means all of the Grantors' right, title and interest throughout the world in and to:

(a)     all copyrights and works of authorship, registered or unregistered and whether published or unpublished, now or hereafter in force including copyrights registered in the United States Copyright Office and corresponding offices in other countries of the world, and registrations and recordings thereof and all applications for registration thereof, whether pending or in preparation and all extensions and renewals of the foregoing (collectively, "*Copyrights*");

(b)     all Copyright licenses and other agreements for the grant by or to any Grantor of any right to use any items of the type referred to in clause (a) above (each, a "*Copyright License*"), including the Copyright License listed on Exhibit B;

(c)     the right to sue for past, present and future infringements of any of the Copyrights owned by any Grantor, and for breach or enforcement of any Copyright License; and

(d)     all proceeds of, and rights associated with, the foregoing (including Proceeds, licenses, royalties, income, payments, claims, damages and proceeds of infringement suits).

"*Copyright License*" is defined in clause (b) of the definition of "*Copyright Collateral*".

"*Deposit Account Control Agreement*" means an agreement, in form and substance reasonably satisfactory to the Collateral Agent and the Required Holders, among the Grantors (as applicable), a banking institution holding such Grantor's funds, and the Collateral Agent that provides for the Collateral Agent to have Control over all deposits and balances held in a deposit account maintained by such Grantor with such banking institution.

"*Deposit Accounts*" has the meaning set forth in Article 9 of the UCC.

"*Documents*" has the meaning set forth in Article 9 of the UCC.

"*Domain Names*" is defined in the definition of "Domain Name Collateral".

"*Domain Name Collateral*" means all of the Grantors' right, title and interest throughout the world in and to Internet domain names ("*Domain Names*").

"*Equipment*" has the meaning set forth in Article 9 of the UCC.

"*Equity Interests*" has the meaning given to the term "Capital Stock" in the Note Exchange Agreement.

"*Excluded Assets*" means (a) any right or interest in any contract, lease, permit, license or license agreement (including any Copyright License, Patent License, Trademark License, Trade Secret License or Computer Hardware and Software License) with a non-Affiliate of a Grantor covering real or personal property or Intellectual Property Collateral of the Grantors if under the terms of such contract, lease, permit, license or license agreement, or applicable law

with respect thereto, the grant of a Lien therein is prohibited as a matter of law or under the terms of, or triggers a termination right or the abandonment, invalidation or unenforceability of, such contract, lease, permit, license, or license agreement and such prohibition, termination right or abandonment, invalidation or unenforceability has not been waived or the consent of the other party to such contract, lease, permit, license or license agreement has not been obtained, provided that none of the Support Agreements (as defined in the Note Exchange Agreement), Master Services Agreements (as defined in the Note Exchange Agreement), the Intellectual Property Agreements (as defined in the Note Exchange Agreement), the Asset Sale Agreements (as defined in the Note Exchange Agreement) or any agreements of any kind related thereto or proceeds thereof shall be Excluded Assets, (b) any "intent to use" Trademark applications for which a statement of use has not been filed with and accepted by the PTO, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use Trademark application, or any registration issuing therefrom, under applicable federal law, (c) any Trademarks or logos consisting of, incorporating, or relating to the "Edison Chouest Offshore" and "ECO" brand names not necessary in the operation of the Collateral or the Vessels, (d) the Tax Account and any balance in the Tax Account, (e) any payment made by the Company to Holdings or by Holdings to any of its members, in each case, in respect of the Tax Liability Amount and the Final Tax Liability Amount, and (f) Proceeds of the foregoing to the extent that the assets constituting such Proceeds are themselves subject to the exclusions set forth in clauses (a) through (e) above; provided that the exclusions set forth in clause (a) above shall in no way be construed to apply to the extent that any described prohibition is ineffective or unenforceable under Sections 9-406, 9-407, 9-408, or 9-409 of the UCC or other applicable law; provided further that (i) Excluded Assets shall not include and the security interest granted hereby shall attach at all times to all Proceeds of any such property excluded by clause (a) above, (ii) the security interest granted hereby shall attach to such property immediately and automatically (without need for any further grant or act) at such time as none of the conditions for exclusion described in clause (a) above shall exist and (iii) to the extent severable, the security interest granted hereby shall in any event attach to all rights in respect of such property that are not subject to any of the conditions for exclusion described in clauses (a) and (b) above. References herein to particular types of collateral, including without limitation "Collateral" and "Intellectual Property Collateral," shall not include any Excluded Assets.

"*Event of Default*" has the meaning set forth in the Note Exchange Agreement.

"*Fixtures*" has the meaning set forth in Article 9 of the UCC.

"*General Intangibles*" means all "general intangibles" and all "payment intangibles", each as defined in the UCC, and shall include all interest rate or currency protection or hedging arrangements, all tax refunds, all licenses, permits, concessions and authorizations and all Intellectual Property Collateral (in each case, regardless of whether characterized as general intangibles under the UCC); provided, that in the event of any conflict hereunder between provisions as to General Intangibles and provisions as to Intellectual Property Collateral, then the provisions as to Intellectual Property Collateral shall prevail.

"*Goods*" has the meaning set forth in Article 9 of the UCC.

"*Governmental Authority*" has the meaning set forth for such term in the Note Exchange Agreement.

"*Grantors*" has the meaning set forth in the preamble.

"*Instruments*" has the meaning set forth in Article 9 of the UCC.

"*Intellectual Property*" means Trademarks, Patents, Copyrights, Domain Names, Trade Secrets and all other similar types of intellectual property under any Legal Requirement in the United States or anywhere else in the world.

"*Intellectual Property Collateral*" means, collectively, the Computer Hardware and Software Collateral, the Copyright Collateral, the Patent Collateral, the Trademark Collateral, the Trade Secrets Collateral, the Domain Name Collateral, the IP Licenses and all of the Grantors' right, title and interest in and to all other similar types of intellectual property under any Legal Requirement in the United States or anywhere else in the world.

"*IP Licenses*" means all of the Grantors' right, title and interest throughout the world in and to any and all: (a) Patent Licenses, (b) Trade Secrets Licenses, (d) Copyright Licenses, (e) Trademark Licenses, and (f) Computer Hardware and Software Licenses.

"*Inventory*" has the meaning set forth in Article 9 of the UCC.

"*Investment Property*" has the meaning set forth in Article 9 of the UCC.

"*Legal Requirements*" means, as to any Person, the certificate of formation and operating agreement or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Letter of Credit*" has the meaning set forth in Section 5-102 of the UCC.

"*Letter-of- Credit Rights*" has the meaning set forth in Article 9 of the UCC.

"*Lien*" means, with respect to any asset of any Person, (a) any mortgage, pledge, charge, encumbrance, security interest, collateral assignment or other lien or restriction of any kind on such asset, whether based on common law, constitutional provision, statute or contract, (b) the interest of any vendor or a lessor under any conditional sale agreement, title retention agreement or capital lease relating to such asset, (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities, or (d) any other right of or arrangement with any creditor to have such creditor's claim satisfied out of such assets, or the proceeds therefrom, prior to the general creditors of such Person owning such assets.

"*Material Adverse Effect*" has the meaning set forth for such term in the Note Exchange Agreement.

"*Noteholders*" means Noteholders as defined in the Note Exchange Agreement.

"*Note Documents*" has the meaning given to such term in the Note Exchange Agreement.

"*Note Exchange Agreement*" has the meaning set forth in the recitals.

"*Organizational Documents*" has the meaning set forth for such term in the Note Exchange Agreement.

"*Patent*" is defined in clause (a) of the definition of "*Patent Collateral*".

"*Patent Collateral*" means all of the Grantors' right, title and interest throughout the world in and to:

(a)      all patents and patent applications throughout the world, including all patent disclosures and patent applications in preparation for filing, including all reissues, divisionals, continuations, continuations in part, substitutions, extensions, renewals and reexaminations of any of the foregoing (collectively, "*Patents*");

(b)      all Patent licenses, and other agreements for the grant by or to any Grantor of any right to use any items of the type referred to in clause (a) above (each, a "*Patent License*");

(c)      the right to sue third parties for past, present and future infringements of any Patent or Patent application, and for breach or enforcement of any Patent License; and

(d)      all proceeds of, and rights associated with, the foregoing (including Proceeds, licenses, royalties, income, payments, claims, damages and proceeds of infringement suits).

"*Patent License*" is defined in clause (b) of the definition of "*Patent Collateral*".

"*Person*" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, business entity or Governmental Authority.

"*Pledged Collateral*" has the meaning set forth in <u>Section 3.10</u>.

"*Proceeds*" has the meaning set forth in Article 9 of the UCC.

"*Property*" means any interest in any kind of property or asset, whether real, personal or mixed, tangible or intangible.

"*PTO*" means the United States Patent and Trademark Office and any substitute or successor entity.

"*Receivables*" means the Accounts, Chattel Paper, Documents, Instruments and any other rights or claims to receive money which are General Intangibles or which are otherwise included as Collateral.

"*Secured Obligations*" has the meaning given to the defined term "Note Obligations" in the Note Exchange Agreement.

"*Secured Party*" means, collectively, the Agent, the Noteholders and the Collateral Agent.

"*Securities Accounts*" has the meaning set forth in Article 8 of the UCC.

"*Securities Account Control Agreement*" means an agreement, in form and substance reasonably satisfactory to the Collateral Agent and the Required Holders, among the Grantors (as applicable), a securities intermediary holding such Grantor's assets, including funds, financial assets and securities, and the Collateral Agent that provides for the Collateral Agent to have Control over all deposits, securities and other balances held in a securities account maintained by such Grantor with such securities intermediary.

"*Security*" has the meaning set forth in Article 8 of the UCC.

"*Security Documents*" has the meaning given to such term in the Note Exchange Agreement.

"*Senior Notes*" has the meaning set forth in the recitals.

"*Stock Rights*" means any dividends or other distributions and any other right or property which any Grantor shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any Equity Interest constituting Collateral, any right to receive an Equity Interest constituting Collateral and any right to receive earnings, in which such Grantor now has or hereafter acquires any right, issued by an issuer of such Equity Interest constituting Collateral.

"*Supporting Obligation*" has the meaning set forth in Article 9 of the UCC.

"*Subsidiary*" has the meaning set forth for such term in the Note Exchange Agreement.

"*Tax Account*" has the meaning given to such term in the Note Exchange Agreement.

"*Termination Date*" means the date on which (i) all Secured Obligations (other than unasserted contingent indemnification obligations) owing to the Secured Parties have been paid in full in cash and all commitments have been terminated or have expired, and (ii) all Collateral Agent's Expenses shall have been paid in full in cash.

"*Trademark*" is defined in clause (a) of the definition of "*Trademark Collateral*".

"*Trademark Collateral*" means all of the Grantors' right, title and interest throughout the world in and to:

(a)      (i) all trademarks, trade names, corporate names, company names, business

names, fictitious business names, trade styles, service marks, certification marks, collective marks, logos and other source or business identifiers, and all goodwill of the business associated therewith, now existing or hereafter adopted or acquired, whether currently in use or not, all

registrations and recordings thereof and all applications in connection therewith, whether pending or in preparation for filing, including registrations, recordings and applications in the PTO and corresponding offices in other countries of the world, and all common law rights relating to the foregoing, and (ii) the right to obtain all reissues, extensions or renewals of the foregoing (collectively, "*Trademarks*");

   (b) all Trademark licenses and other agreements for the grant by or to any Grantor of any right to use any Trademark (each, a "*Trademark License*");

   (c) all of the goodwill of the business connected with the use of, and symbolized by the Trademarks described in clause (a) and, to the extent applicable, clause (b);

   (d) the right to sue third parties for past, present and future infringements or dilution of the Trademarks described in clause (a) and, to the extent applicable, clause (b) or for any injury to the goodwill associated with the use of any such Trademark or for breach or enforcement of any Trademark License; and

   (e) all proceeds of, and rights associated with, the foregoing (including Proceeds, licenses, royalties, income, payments, claims, damages and proceeds of infringement suits).

   "*Trademark License*" is defined in clause (b) of the definition of "*Trademark Collateral*".

   "*Trade Secrets*" is defined in clause (a) of the definition of "*Trade Secret Collateral*".

   "*Trade Secrets Collateral*" means all of the Grantors' right, title and interest throughout the world in and to:

   (a) all common law and statutory trade secrets and all other confidential information, know-how, inventions, proprietary processes, formulae, models, and methodologies (collectively, "*Trade Secrets*") obtained by or used in or contemplated at any time for use in the business of any Grantor, whether or not reduced to a writing or other tangible form that are protectable under applicable law, including all documents and things embodying, incorporating or referring in any way to the foregoing;

   (b) all Trade Secret licenses and other agreements for the grant by or to any Grantor of any right to use any Trade Secret (each a "*Trade Secret License*"), including the right to sue for and to enjoin and to collect damages for the actual or threatened misappropriation of any Trade Secret and for the breach or enforcement of any such Trade Secret License; and

   (c) all proceeds of, and rights associated with, the foregoing (including Proceeds, licenses, royalties, income, payments, claims, damages and proceeds of misappropriation suits).

   "*Trade Secrets License*" is defined in clause (b) of the definition of "*Trade Secret Collateral*".

"*UCC*" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "*UCC*" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"*Vehicles*" means all cars, trucks and trailers owned by Grantor, together with all substitutions, repairs, replacements, non-severable appliances, tires, accessories, furnishings, other equipment, additions, parts and improvements from time to time, constituting a pert thereof and all accessions and appurtenances thereto.

"*Vessels*" has the same meaning as the term "Mortgaged Vessels" in the Note Exchange Agreement.

The foregoing definitions shall be equally applicable to both the singular and plural forms thereof.

## ARTICLE 2.
### *SECURITY INTEREST*

2.1     <u>Grant of Security Interest</u>. Each Grantor hereby pledges, assigns and grants to the Collateral Agent, on behalf of and for the benefit of itself and the other Secured Parties, a continuing security interest in all of such Grantor's right, title and interest, whether now owned or any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest, and wherever located, in and to the Collateral to secure the prompt and complete payment and performance of the Secured Obligations in accordance with their terms.

2.2     <u>Grantors Remain Liable</u>. Anything herein to the contrary notwithstanding:

2.2.1 the Grantors will remain liable under the contracts and agreements included in the Collateral to the extent set forth therein, and will remain liable under such contracts and agreements to the same extent as if this Security Agreement had not been executed;

2.2.2 the exercise by the Collateral Agent of any of its rights hereunder will not release the Grantors from any of its duties or obligations under any such contracts or agreements included in the Collateral; and

2.2.3 no Secured Party will have any obligation or liability under any contracts or agreements included in the Collateral by reason of this Security Agreement, nor will any Secured Party be obligated to perform any of the obligations or duties of the Grantors thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

2.3     [Reserved].

2.4     <u>Security Interest Absolute, etc</u>. This Security Agreement shall in all respects be a continuing, absolute, unconditional and irrevocable grant of security interest in the Collateral,

and shall remain in full force and effect until the Termination Date has occurred. All rights of the Secured Parties and the security interests in the Collateral granted to the Collateral Agent (for its benefit and the benefit of each other Secured Party) hereunder, and all obligations of the Grantors hereunder, shall, in each case, be absolute, unconditional and irrevocable irrespective of:

2.4.1 any lack of validity, legality or enforceability of any Note Document;

2.4.2 the failure of any Secured Party (a) to assert any claim or demand or to enforce any right or remedy against the Grantors or any other Person under the provisions of any Note Document or otherwise, or (b) to exercise any right or remedy against any other guarantor of, or collateral securing, any Secured Obligations;

2.4.3 any change in the time, manner or place of payment of, or in any other term of, all or any part of the Secured Obligations, or any other extension, compromise or renewal of any Secured Obligations;

2.4.4 any reduction, limitation, impairment or termination of any Secured Obligations for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and the Grantors hereby waives any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Secured Obligations or otherwise;

2.4.5 any amendment to, rescission, waiver or other modification of, or any consent to or departure from, any of the terms of any Note Document, in each case in accordance with the terms of such Note Document;

2.4.6 any addition, exchange or release of any collateral or of any Person that is (or will become) a guarantor of the Secured Obligations, or any surrender or non-perfection of any collateral, or any amendment to or waiver or release or addition to, or consent to or departure from, any other guaranty held by any Secured Party securing any of the Secured Obligations;

2.4.7 any change, restructuring or termination of the organizational structure or existence of the Grantors or any other Person; or

2.4.8 any other circumstance which might otherwise constitute a defense available to, or a legal or equitable discharge of, the Grantors, any surety or any guarantor (other than the defense of payment in full of the Secured Obligations).

ARTICLE 3.
<u>REPRESENTATIONS AND WARRANTIES</u>

In order to induce the Noteholders to enter into the Note Exchange Agreement and to exchange their Exchanged Debt for the Senior Notes to be issued to the Noteholders thereunder on the date hereof, each Grantor represents and warrants as to itself to the Collateral Agent and the other Secured Parties, that:

3.1    <u>Title, Authorization, Validity and Enforceability</u>. Each Grantor has good and valid rights in or the power to transfer the Collateral owned by it and title to the Collateral (and, in the case of the Vessels owned by it, a perpetual, non-exclusive, fully transferrable license, subject to the terms and conditions thereof, to use all Intellectual Property and computer hardware and software owned by others but used or required by such Grantor in order to operate and navigate such Vessels) with respect to which it has purported to grant a security interest hereunder, free and clear of all Liens except for Liens permitted under <u>Section 4.1.4</u> hereof, and has full corporate, limited liability company or partnership, as applicable, power and authority to grant to the Collateral Agent the security interest in such Collateral pursuant hereto. The execution and delivery by the Grantors of this Security Agreement has been duly authorized by proper limited liability company proceedings, and this Security Agreement constitutes a legal, valid and binding obligation of each of the Grantors and creates a security interest which is enforceable against each of the Grantors in all Collateral it now owns or hereafter acquires, except as enforceability may be limited by (i) bankruptcy, insolvency, fraudulent conveyances, reorganization or similar laws relating to or affecting the enforcement of creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law). When (a) financing statements have been filed in the appropriate office against each of the Grantors in the location listed on <u>Exhibit H</u>, and (b) if applicable, short form security agreement have been filed with and recorded by the PTO or the United States Copyright Office, the Collateral Agent will have a fully perfected first priority security interest (subject, as to priority, only to Liens permitted under <u>Section 4.1.4</u> to be prior to the Liens of the Collateral Agent) in the Collateral owned by each Grantor in which a security interest may be perfected by such filings.

3.2    <u>Conflicting Laws and Contracts</u>. Neither the execution and delivery by the Grantors of this Security Agreement, the creation and perfection of the security interest in the Collateral granted hereunder, nor compliance with the terms and provisions hereof will violate (a) any Legal Requirement binding on the Grantors, (b) each of the Grantors' Organizational Documents, or (c) the provisions of any material indenture, instrument or agreement to which the Grantors are a party or is subject, or by which it, or its Property may be bound or affected, or conflict with or constitute a default thereunder, or result in or require the creation or imposition of any Lien in, of or on the Property of the Grantors pursuant to the terms of any such material indenture, instrument or agreement (other than any Lien in favor of the Collateral Agent or Liens permitted under <u>Section 4.1.4</u> hereof).

3.3    <u>Principal Location</u>. As of the Closing Date, each of the Grantors' mailing address and the location of its place of business (if it has only one) or its chief executive office (if it has more than one place of business), is disclosed in <u>Exhibit A</u>. The Grantors shall not change their chief executive office or sole place of business unless the Collateral Agent shall have received prompt written notice (and in any event not more than thirty (30) days following such change). As of the Closing Date, the Grantors have no other places of business except those set forth in <u>Exhibit A</u>. Such location set forth on <u>Exhibit A</u> are the Grantors' location for the purposes of Section 9301 and 9-307 of the UCC, and the Grantors have not had a different location for the purposes of Section 9-301 and 9-307 of the UCC during the past five years.

3.4    <u>Property Locations</u>. As of the Closing Date and other than the Vessels and certain Collateral located on the Vessels, the tangible Collateral of each Grantor is located solely at the locations of the Grantors described in <u>Exhibit A</u>. All of said locations are owned by the

Grantors except for locations (a) which are leased by the Grantors as lessee as designated in Part B of <u>Exhibit A</u> and (b) at which Inventory is held in a storage facility or terminal by the Grantors as designated in Part C of <u>Exhibit A</u>.

   3.5 <u>No Other Names; Corporate History</u>. Except as described in <u>Exhibit J</u>, (a) in the last four months the Grantors have not conducted business under any name except the name in which it has executed this Security Agreement, which is the exact name as it appears in each Grantor's Organizational Documents, as amended, and as filed with each Grantor's jurisdiction of organization as of the Closing Date, and (b) within the five years prior to the Closing Date the Grantors have not been the subject of any merger or other corporate reorganization or acquired the assets of any Person.

   3.6 <u>Accounts and Chattel Paper</u>. The names of the obligors, amounts owing, due dates and other information with respect to the Accounts and Chattel Paper owned by the Grantors are and will be correctly stated, in all material respects, in all records of the Grantors relating thereto and in all reports with respect thereto furnished to the Noteholders by the Grantors from time to time. As of the time when each Account or each item of Chattel Paper arises, the Grantors shall be deemed to have represented and warranted that such Account or Chattel Paper, as the case may be, and all records relating thereto, are genuine and in all material respects what they purport to be.

   3.7 <u>Filing Requirements</u>. None of the Collateral owned by each Grantor is covered by any certificate of title, except for motor vehicles. None of the Collateral owned by each Grantor is of a type for which Liens may be perfected by filing under any federal statute except for (a) the Vessels, aircraft, ships and railcars described in Part A of <u>Exhibit B</u> and (b) the Patents, Trademarks, Copyrights and exclusive Copyright Licenses (under which each Grantor is the licensee) held by each Grantor and described in Part B of <u>Exhibit B</u>. The location of any Fixtures owned by each Grantor is set forth in <u>Exhibit C</u> together with the name and address of the record owner of each such property.

   3.8 <u>No Financing Statements</u>. No financing statement describing all or any portion of the Collateral naming each Grantor as debtor has been filed in any jurisdiction except financing statements (a) previously or concurrently herewith terminated, (b) naming the Collateral Agent as the secured party and (c) permitted under <u>Section 4.1.4</u> hereof; provided, that nothing herein shall be deemed to constitute an agreement to subordinate any of the Liens of the Collateral Agent under the Note Documents to any Liens otherwise permitted under <u>Section 4.1.4</u> hereof.

   3.9 <u>Federal Employer Identification Number; State Organization Number; Jurisdiction of Organization</u>. Each Grantors' federal employer identification number is, and if such Grantor is a registered organization, the Grantor's state of organization, type of organization and state of organization identification number are set forth in <u>Exhibit D</u>.

   3. 10 <u>Pledged Collateral</u>.

   3.10.1 <u>Exhibit E</u> sets forth a complete and accurate list of the Instruments, Securities and other Investment Property owned by each Grantor as of the Closing Date but shall not include any payment made by the Note Parties in respect of the Tax Liability Amount and the

Final Tax Liability Amount, as they are not collateral hereunder and are not subject to any limitations of this Security Agreement ("*Pledged Collateral*"). Each Grantor is the direct and beneficial owner of the Pledged Collateral listed on Exhibit E as being owned by it, free and clear of any Liens, except for Liens permitted under Section 4.1.4 hereof. Each Grantor further represents and warrants that (a) all Pledged Collateral constituting Equity Interests have been (to the extent such concepts are relevant with respect to such Equity Interests) duly and validly issued, are fully paid and non-assessable and constitute the percentage of the issued and outstanding Equity Interests of the respective issuers thereof indicated on Exhibit E hereto and, in the case of corporations, business trusts, joint stock companies and similar Persons, are represented by a certificate and, in the case of limited liability companies and partnerships, are not represented by a certificate and have not provided that they securities governed by Article 8 of the UCC, (b) with respect to any certificates delivered to the Collateral Agent representing an Equity Interest, either such certificates are Securities as defined in Article 8 of the UCC as a result of actions by the issuer or otherwise, or, if such certificates are not Securities, each Grantor has so informed the Collateral Agent so that the Collateral Agent may take steps to perfect its security interest therein as a General Intangible, (c) all Pledged Collateral held by a securities intermediary is covered by a Securities Account Control Agreement, (d) to each Grantor's knowledge and except as otherwise disclosed to the Collateral Agent, all Pledged Collateral representing indebtedness owed to each Grantor has been duly authorized, authenticated or issued and delivered by the issuer of such indebtedness, is the legal, valid and binding obligation of such issuer and such issuer (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity) is not in default thereunder and (e) with respect to Securities constituting Collateral that are uncertificated (other than uncertificated Securities credited to a Securities Account) owned by each Grantor, each Grantor has caused the issuer thereof either to (i) register the Collateral Agent as the registered owner of such security or (ii) agree in an authenticated record with each Grantor and the Collateral Agent that such issuer will comply with instructions with respect to such security originated by the Collateral Agent without further consent of each Grantor.

        3.10.2 As of the Closing Date (a) none of the Pledged Collateral owned by it has been issued or transferred in violation in any material respect of the securities registration, securities disclosure, or similar laws of any jurisdiction to which such issuance or transfer may be subject, (b) there are existing no options, warrants, calls, rights of first refusal or commitments of any character whatsoever relating to such Pledged Collateral and the ability of the Collateral Agent to transfer the such Pledged Collateral and (c) no consent, approval, authorization, or other action by, and no giving of notice, filing with, any Governmental Authority or any other Person is required for the pledge by each Grantor of such Pledged Collateral pursuant to this Security Agreement or for the execution, delivery and performance of this Security Agreement by each Grantor, or for the exercise by the Collateral Agent, of the voting or other rights provided for in this Security Agreement or for the remedies in respect of the Pledged Collateral pursuant to this Security Agreement (including transfer by foreclosure), except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally and those that have been obtained or made and are in full force and effect.

        3.11 Deposit Accounts, Commodity Accounts and Securities Accounts. All of the Grantors' Deposit Accounts (other than the Tax Account), Commodity Accounts and Securities Accounts as of the Closing Date are listed on Exhibit F.

3.12 <u>Letter-of-Credit Rights and Chattel Paper</u>. <u>Exhibit G</u> lists all Letter-of-Credit Rights and Chattel Paper valued individually in excess of $200,000 of each Grantor as of the Closing Date. All action by each Grantor necessary to protect and perfect the Collateral Agent's Lien on each item listed on <u>Exhibit G</u> (including the delivery of all originals and the placement of a legend on all Chattel Paper as required hereunder) has been duly taken to the extent requested by the Collateral Agent. Upon taking of all such actions, the Collateral Agent will have a fully perfected first priority security interest in the Collateral listed on <u>Exhibit G</u>, subject, as to priority, only to Liens permitted under <u>Section 4.1.4</u> to be prior to the Liens of the Collateral Agent.

3.13 <u>Intellectual Property Collateral</u>.

3.13.1 In respect of the Intellectual Property Collateral:

(a)      Part B of <u>Exhibit B</u> lists a complete and accurate list of all issued and applied-for Patents owned by each Grantor, including those that have been issued by, or for which an application has been filed with, the PTO or corresponding offices in other countries of the world, and a complete and accurate list of all Patent Licenses under which each Grantor (i) is the exclusive licensee or (ii) grants an exclusive license to any third party;

(b)      Part B of <u>Exhibit B</u> lists a complete and accurate list of all registered and applied-for Trademarks owned by each Grantor, including those that are registered, or for which an application for registration has been filed, with the PTO or corresponding offices in other countries of the world, and a complete and accurate list of all Trademark Licenses under which each Grantor (i) is the exclusive licensee or (ii) grants an exclusive license to any third party; and

(c)      Part B of <u>Exhibit B</u> lists a complete and accurate list of all registered and applied-for Copyrights owned by each Grantor, including those that are registered, or for which an application for registration has been made, with the United States Copyright Office or corresponding offices in other countries of the world, and a complete and accurate list of all Copyright Licenses under which such Grantor (i) is the exclusive licensee or (ii) grants an exclusive license to any third party.

(d)      Part B of <u>Exhibit B</u> lists a complete and accurate list of all Domain Names owned by each Grantor, including those that are registered with any domain name registrar.

(e)      Part B of <u>Exhibit B</u> lists a complete and accurate list of all Computer Hardware and Software Licenses that are used in the operation of the Vessels and under which each Grantor is the licensee.

(f)      Part B of <u>Exhibit B</u> lists a complete and accurate list of all Copyright Licenses that are used in the operation of the Vessels and under which each Grantor is the licensee.

3.13.2 Except as disclosed on <u>Exhibit B</u>, in respect of each Grantor:

(a)      each registration of its owned Intellectual Property Collateral is subsisting, unexpired, and duly registered, and its owned Intellectual Property Collateral has not been abandoned or adjudged invalid or unenforceable, in whole or in part;

(b)      each Grantor is the sole and exclusive owner of the entire and unencumbered right, title and interest in and to its owned Intellectual Property Collateral (except for Liens permitted by Section 10.5 of the Note Exchange Agreement and Liens constituting intellectual property licenses from each Grantor to any third party), and no written claim has been delivered to such Grantor in the past two (2) years stating that such Grantor is or may be, in conflict with, infringing, misappropriating, diluting, misusing or otherwise violating any Intellectual Property rights of any third party or that challenges the ownership, use, protectability, registerability, validity or enforceability of any Intellectual Property Collateral;

(c)      each Computer Hardware and Software License necessary or used in the operation of the Vessels to which each Grantor is a party and each Copyright License listed on Exhibit B is valid and binding and in full force and effect and such Grantor (i) has not received any notice of a breach of default under such license and (ii) is not in breach or default of any such license;

(d)      each Grantor has made all filings to maintain the registrations of the Trademark Collateral, and has paid all renewal, maintenance, and other fees and taxes required to maintain each and every registration and application of its owned Intellectual Property Collateral;

(e)      each Grantor has taken reasonable steps to safeguard its material Trade Secrets and to its knowledge (i) no employee, independent contractor or agent of each Grantor has misappropriated any Trade Secrets of any other Person, including any Grantor, in the course of the performance of his or her duties as an employee, independent contractor or agent of each Grantor; and (ii) no employee, independent contractor or agent of each Grantor is in default or breach of any term of any employment agreement, non-disclosure agreement, assignment of inventions agreement or similar agreement or contract relating in any way to the protection, ownership, development, use or transfer of each Grantor's owned Intellectual Property Collateral, except, in each of subsection (i) and (ii) above, as could not reasonably be expected to have a Material Adverse Effect;

(f)      no action by each Grantor is currently pending or threatened in writing which asserts that any third party is infringing, misappropriating, diluting, misusing or voiding any of its owned Intellectual Property Collateral;

(g)      no settlement or consents, covenants not to sue, nonassertion assurances, or releases have been entered into by each Grantor or to which each Grantor is bound that materially and adversely affects its rights to own or use any of its owned Intellectual Property Collateral;

(h)      except for the Liens permitted by Section 10.5 of the Note Exchange Agreement, each Grantor has not made a previous assignment, sale, transfer or agreement constituting a present or future assignment, sale or transfer of any of its owned Intellectual Property Collateral for purposes of granting a security interest or pledging as collateral that has not been terminated or released; and

(i)      all employees, independent contractors and agents who have contributed to the creation or development of any of its material owned Intellectual Property Collateral have been a party to an enforceable "work for hire" and/or assignment agreement with each Grantor,

according and granting exclusive ownership of such owned Intellectual Property Collateral to each Grantor.

3.14 <u>Authorization, Approval, etc</u>. Except as have been obtained or made and are in full force and effect, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or any other third party is required either:

3.14.1 for the grant by each Grantor of the security interest granted hereby in the Collateral or for the execution, delivery and performance of this Security Agreement by each Grantor;

3.14.2 for the perfection or maintenance of the security interests hereunder in the Collateral including the first priority nature of such security interest, subject, as to priority, only to Liens permitted under <u>Section 4.1.4</u> to be prior to the Liens of the Collateral Agent (except with respect to the financing statements, any filings required under the Legal Requirements of any foreign jurisdiction or, with respect to owned Intellectual Property Collateral and exclusive Copyright Licenses to registered U.S. Copyrights owned by third parties, the recordation of any agreements with the PTO or the United States Copyright Office) or the exercise by the Collateral Agent of its rights and remedies hereunder; or

3.14.3 for the exercise by the Collateral Agent of the voting or other rights provided for in this Security Agreement, except any "change of control" or similar filings required by state licensing agencies.

<div align="center">

ARTICLE 4.
<u>COVENANTS</u>

</div>

From the date of this Security Agreement until the Termination Date, each Grantor agrees:

4.1 <u>General</u>.

4.1.1 <u>Records and Reports</u>. Each Grantor shall keep and maintain complete, accurate and proper books and records with respect to the Collateral owned by each Grantor, and furnish to the Collateral Agent such information, reports and schedules relating to and further identifying the Collateral as the Collateral Agent shall from time to time reasonably request. Nothing herein constitutes a waiver of attorney-client privilege.

4.1.2 <u>Financing Statements and Other Actions; Defense of Title</u>. Each Grantor hereby authorizes the Collateral Agent (or its designee) to file all financing statements and other applicable documents describing the Collateral owned by each Grantor and take such other actions as may from time to time reasonably be requested by the Collateral Agent or the Required Holders in order to maintain a first perfected security interest in and, if applicable, Control of, the Collateral owned by each Grantor, subject to Liens permitted under Section 4.1.4 hereof. Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of Collateral that describes such Property in any other manner as the Collateral Agent or the Required Holders may determine, in its sole discretion, is necessary, advisable or prudent to ensure that the perfection of the security interest in the Collateral granted

to the Collateral Agent herein, including, without limitation, describing such property as "all assets" or "all personal property, whether now owned or hereafter acquired." Each Grantor hereby further authorizes the Collateral Agent (or its designee) to file a short form security agreement to secure the prompt and complete payment and performance of the Secured Obligations in accordance with their terms, in a form acceptable to the Collateral Agent (acting at the direction of the Required Holders), covering Collateral consisting of U.S. registered and pending applied-for Trademarks, U.S. issued and pending applied-for Patents, U.S. registered Copyrights, and exclusive licenses to U.S. registered Copyrights under which such Grantor is the licensee, with the PTO or the United States Copyright Office (or any successor office), as applicable, and such other documents as may be necessary or reasonably advisable for purposes of perfecting, confirming, continuing, enforcing or protecting the security interest in such Intellectual Property that is part of the Collateral granted by such Grantor hereunder (without the signature of such Grantor solely during the continuance of an Event of Default) and naming such Grantor, as debtor, and the Collateral Agent, as secured party. Each Grantor will take any and all actions necessary to defend title to the Collateral owned by each Grantor against all persons and to defend the security interest of the Collateral Agent in such Collateral and the priority thereof against any Lien not expressly permitted under Section 4.1.4 hereof.

4.1.3 <u>Disposition of Collateral</u>. Each Grantor will not sell, lease or otherwise dispose of the Collateral owned by such Grantor except dispositions specifically permitted under Section 10.12 of the Note Exchange Agreement and other applicable provisions of the Note Exchange Agreement.

4.1.4 <u>Liens</u>. Each Grantor will not create, incur, or suffer to exist any Lien on the Collateral owned by such Grantor except Liens permitted under Section 10.5 of the Note Exchange Agreement; provided, that nothing herein shall be deemed to constitute an agreement to subordinate any of the Liens of the Collateral Agent under the Note Documents to any Liens permitted under Section 10.5 of the Note Exchange Agreement.

4.1.5 <u>Locations</u>. Each Grantor will not maintain any Collateral with a value in excess of $100,000 (other than Collateral in transit) or out for repair at a location other than a location specified in <u>Exhibit A</u> unless such Grantor shall have given the Collateral Agent not less than ten (10) Business Days' (or such lesser period as is acceptable to the Collateral Agent (acting at the direction of the Required Holders)) prior written notice of such event or occurrence.

4.1.6 <u>Other Financing Statements</u>. Each Grantor will not suffer to exist or authorize the filing of any financing statement naming it as debtor covering all or any portion of the Collateral owned by each Grantor, except any financing statement authorized under <u>Section 4.1.2</u> hereof and with respect to Liens permitted under <u>Section 4.1.4</u> hereof.

4.2     <u>Receivables</u>.

4.2.1 <u>Certain Agreements on Receivables</u>. Other than with respect to Instruments representing inter-company indebtedness between the Grantors and Affiliates permitted under the Note Exchange Agreement, each Grantor will not make or agree to make any discount, credit, rebate or other reduction in the original amount owing on a Receivable or accept in satisfaction of a Receivable less than the original amount thereof, except that, prior to the occurrence and

continuation of an Event of Default, such Grantor may (a) reduce the amount of Accounts arising from the sale of Inventory or the rendering of services in the ordinary course of business and consistent with past practice and (b) discount or package Accounts in accordance with past practice and in the ordinary course of its business.

        4.2.2 <u>Collection of Receivables</u>. Except as otherwise provided above in Section 4.2.1, each Grantor will collect and enforce, at such Grantor's sole expense, all amounts due or hereafter due to such Grantor under the Receivables owned by each Grantor.

        4.2.3 <u>Delivery of Invoices</u>. After the occurrence and during the continuance of an Event of Default, each Grantor will deliver to the Collateral Agent immediately upon its request duplicate invoices with respect to each Account owned by such Grantor bearing such language of assignment as the Collateral Agent shall specify.

        4.3    <u>Maintenance of Inventory and Equipment</u>. Each Grantor will do all things necessary to maintain, preserve, protect and keep the Inventory and the Equipment owned by such Grantor in good repair, working order and saleable condition (ordinary wear and tear excepted), and make all necessary and proper repairs, renewals and replacements so that its business carried on in connection therewith may be properly conducted at all times.

        4.4    <u>Instruments, Securities, Chattel Paper and Documents</u>. Each Grantor will (a) deliver to the Collateral Agent immediately upon execution of this Security Agreement the originals of all Chattel Paper, Securities and Instruments constituting Collateral (if any then exist), other than individual Chattel Paper, Securities and Instruments having a value less than $200,000, (b) hold in trust for the Collateral Agent upon receipt and immediately thereafter deliver (except as provided in <u>Subsection 4.4(a)</u> above) to the Collateral Agent any Chattel Paper, Securities and Instruments constituting Collateral, and (c) upon the Collateral Agent's request, deliver to the Collateral Agent (and thereafter hold in trust for the Collateral Agent upon receipt and immediately deliver to the Collateral Agent) any Document or any other Chattel Paper, Securities or Instruments evidencing or constituting Collateral.

        4.5    <u>Uncertificated Securities and Certain Other Investment Property</u>. Each Grantor will cause the appropriate issuers (and, if held with a securities intermediary, such securities intermediary) of uncertificated securities or other types of Investment Property not represented by certificates which are Collateral owned by each Grantor to mark their books and records with the numbers and face amounts of all such uncertificated securities or other types of Investment Property not represented by certificates and all rollovers and replacements therefor to reflect the Lien of the Collateral Agent granted pursuant to this Security Agreement. With respect to any Pledged Collateral owned by it, upon the Collateral Agent's request, such Grantor will take any actions necessary to cause (a) the issuers of uncertificated securities which are Pledged Collateral and (b) any securities intermediary which is the holder of any such Pledged Collateral, to cause the Collateral Agent to have and retain Control over such Pledged Collateral. Without limiting the foregoing, each Grantor will, with respect to any such Pledged Collateral held with a securities intermediary, cause such securities intermediary to enter into a Securities Account Control Agreement with the Collateral Agent, giving the Collateral Agent Control.

        4.6    <u>Stock and Other Ownership Interests</u>.

4.6.1 <u>Registration of Pledged Collateral</u>. Each Grantor will permit any registrable Collateral owned by such Grantor to be registered in the name of the Collateral Agent or its nominee at any time at the option of the Collateral Agent following the occurrence and during the continuance of an Event of Default and without any further consent of each Grantor.

4.6.2 <u>Exercise of Rights in Pledged Collateral</u>. Each Grantor will permit the Collateral Agent or its nominee at any time after an Event of Default has occurred and is continuing, without notice, to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Collateral owned by the Grantor or any part thereof, and to receive all dividends and interest in respect of such Collateral.

4.7    <u>Control Agreements</u>. Subject to Section 10.20 of the Note Exchange Agreement, each Grantor will provide to the Collateral Agent on the Closing Date (a) a Commodity Account Control Agreement duly executed on behalf of each commodities intermediary holding an exchange traded Commodity Account of such Grantor as set forth in the Security Agreement, (b) a Securities Account Control Agreement duly executed on behalf of each securities intermediary holding a Securities Account of such Grantor as set forth in the Security Agreement and (c) a Deposit Account Control Agreement duly executed on behalf of each financial institution holding a Deposit Account of such Grantor (other than with respect to the Tax Account and Deposit Accounts maintained for employee benefits and petty cash).

4.8    <u>Letter-of-Credit Rights</u>. Each Grantor will use commercially reasonable efforts to cause each issuer of a letter of credit having a face or stated amount in excess of $200,000, to consent to the assignment of proceeds of the letter of credit in order to give the Collateral Agent Control of the Letter-of-Credit Rights, with respect to such letter of credit.

4.9    <u>Federal, State or Municipal Claims</u>. Each Grantor will notify the Collateral Agent of any Collateral owned by such Grantor which constitutes a claim against the United States government or any state or local government or any instrumentality or agency thereof, the assignment of which claim is restricted by federal, state or municipal law at any time.

4.10  <u>Intellectual Property</u>.

4.10.1 If, after the date hereof, any Grantor (i) obtains rights to, or applies for or seeks registration of, any new issued and applied-for Patents, registered and applied-for Trademarks and registered and applied-for Copyrights owned by such Grantor in addition to the Intellectual Property Collateral described in Part B of Exhibit B, which are all of such issued, registered and applied-for Patents, Trademarks and Copyrights owned by each Grantor as of the Closing Date, or (ii) becomes party to a new exclusive Patent License, Trademark License, or Copyright License (as licensee or licensor) in addition to the exclusive Patent Licenses, Trademark Licenses and Copyright Licenses described in Part B of Exhibit B, which are all of such exclusive Patent Licenses, Trademark Licenses and Copyright Licenses under which each Grantor is the licensee or licensor, then such Grantor shall give the Collateral Agent notice thereof as part of the next compliance certificate provided to the Noteholders pursuant to the Note Exchange Agreement or within ninety (90) days of such acquisition or filing (except that for new Copyrights and exclusive Copyright Licenses, the period shall be within thirty (30) days), whichever is earlier. Each Grantor agrees to execute and deliver to the Collateral Agent, within ninety (90) days of such

acquisition or filing (except that for new Copyrights and exclusive Copyright Licenses, the period shall be within thirty (30) days) or, if earlier, promptly upon request by the Collateral Agent, any supplement to this Security Agreement or any other document (including any short form security agreement) reasonably requested by the Collateral Agent or the Required Holders to evidence such security interest in a form appropriate for recording in the applicable federal office and at such Grantor's expense. Such Patents, Trademarks and Copyrights shall (together with all other Intellectual Property Collateral that is owned by (but not licensed to) any Grantor) be deemed "owned Intellectual Property Collateral" hereunder, such exclusive IP Licenses (together with all other Intellectual Property Collateral) shall be deemed "Intellectual Property Collateral" hereunder and each Grantor also hereby authorizes the Collateral Agent to modify this Security Agreement unilaterally (a) by amending Part B of Exhibit B to include any such future owned Intellectual Property Collateral or Intellectual Property Collateral of which the Collateral Agent receives notification from such Grantor pursuant hereto and (b) by recording, in addition to and not in substitution for this Security Agreement, a duplicate original of this Security Agreement (or other short form security agreement) containing in Part B of Exhibit B a description of such future owned Intellectual Property Collateral and new exclusive Copyright Licenses to registered U.S. Copyrights under which any Grantor is the licensee.

4.10.2 Each Grantor shall promptly notify the Collateral Agent in writing if it knows or reasonably expects that any application or registration of any Patent, Trademark, Copyright or Domain Name (now or hereafter existing) included in the owned Intellectual Property Collateral may become abandoned or dedicated to the public, or of any determination or development (including the institution of, or any such determination or development in, any proceeding in the PTO, the United States Copyright Office, any similar office or agency or any court or tribunal, including in foreign jurisdictions) that may impair the validity or enforceability of such owned Intellectual Property Collateral or such Grantor's right to register the same, or its right to own, use, keep and maintain the same, except for dispositions permitted under the Note Exchange Agreement or office actions issued by the PTO in the ordinary course of examining pending Patent or Trademark applications.

4.10.3 If and to the extent each Grantor owns any applications or registrations for Intellectual Property Collateral, such Grantor shall take all actions necessary or reasonably requested by the Collateral Agent to maintain and pursue each application, to obtain the relevant registration and to maintain the registration of each of the material applications or registrations for Patents, Trademarks, Copyrights and Domain Names (now or hereafter existing) included in the owned Intellectual Property Collateral, except as permitted under the Note Exchange Agreement, including the filing of applications for renewal, affidavits of use, affidavits of noncontestability, and, if consistent with good business judgment, to initiate opposition and interference and cancellation proceedings against third parties.

4.10.4 Each Grantor shall promptly notify the Collateral Agent in writing of any infringement, misappropriation or other violation of material owned Intellectual Property Collateral of which it becomes aware and shall, if consistent with good business judgment, promptly sue for infringement, misappropriation or other violation, seek to recover any and all damages for such infringement, misappropriation or other violation, and take such other actions as are reasonable and appropriate under the circumstances to protect such Intellectual Property Collateral.

4.11 <u>Commercial Tort Claims</u>. If, after the date hereof, each Grantor identifies the existence of a Commercial Tort Claim belonging to such Grantor that has arisen in the course of such Grantor's business with a value in excess of $200,000 in addition to the Commercial Tort Claims described in <u>Exhibit I</u>, which are all of the Grantor's Commercial Tort Claims as of the date hereof, then such Grantor shall give the Collateral Agent prompt notice thereof, but in any event not less frequently than quarterly. Each Grantor agrees promptly to execute and deliver to the Collateral Agent any supplement to this Security Agreement or any other document reasonably requested by the Collateral Agent or the Required Holders to evidence the grant of a security interest in such Commercial Tort Claim in favor of the Collateral Agent.

4.12 <u>Reserved</u>.

4.13 <u>Change of Name, etc</u>. Each Grantor will not change its name or place of incorporation or organization or federal taxpayer identification number except upon 30 days' prior written notice to the Collateral Agent.

4.14 <u>Further Assurances, etc</u>. Each Grantor agrees that, from time to time at its own expense, it will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or that the Collateral Agent may reasonably request in writing, in order to perfect, preserve and protect any security interest granted or purported to be granted hereby or to enable the Collateral Agent to exercise and enforce the rights and remedies of the Secured Parties hereunder with respect to any Collateral. Without limiting the generality of the foregoing, each Grantor will:

(a) from time to time upon the request of the Collateral Agent, promptly deliver to the Collateral Agent such stock powers, instruments and similar documents, reasonably satisfactory in form and substance to the Collateral Agent, with respect to such Collateral as the Collateral Agent may reasonably request and will, from time to time upon the request of the Collateral Agent, after the occurrence and during the continuance of any Event of Default, promptly transfer any securities constituting Collateral into the name of any nominee designated by the Collateral Agent;

(b) file (and hereby authorize the Collateral Agent or its designee to file) such instruments or notices (including any assignment of claim form under or pursuant to the federal assignment of claims statute, 31 U.S.C. § 3726, any successor or amended version thereof or any regulation promulgated under or pursuant to any version thereof), as may be necessary or that the Collateral Agent may reasonably request in order to perfect and preserve the security interests and other rights granted or purported to be granted to the Collateral Agent hereby; and

(c) furnish to the Collateral Agent, from time to time at the Collateral Agent's reasonable request, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Collateral Agent may request, all in reasonable detail.

With respect to the foregoing and the grant of the security interest hereunder, each Grantor hereby authorizes the Collateral Agent (or its designee) to make all relevant filings with the PTO, the United States Copyright Office and, after the occurrence and during the continuance

of an Event of Default, corresponding offices in other countries of the world in respect of the owned Intellectual Property Collateral (as well as IP Licenses, to the extent necessary in order to record and perfect the security interest of the Collateral Trustee in such IP Licenses). Each Grantor agrees that a carbon, photographic or other reproduction of this Security Agreement or any UCC financing statement covering the Collateral or any part thereof shall be sufficient as a UCC financing statement where permitted by Legal Requirements.

<div align="center">

ARTICLE 5.
DEFAULT

</div>

5.1     Remedies.

5.1.1 Upon the occurrence and during the continuation of an Event of Default, the Collateral Agent may exercise any or all of the following rights and remedies:

(a)     Those rights and remedies provided in this Security Agreement, the Note Exchange Agreement or any other Note Document; provided that this Section 5.1.1(a) shall not be understood to limit any rights or remedies available to the Collateral Agent and the Secured Parties prior to an Event of Default.

(b)     Those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law (including, without limitation, any law governing the exercise of a bank's right of setoff or bankers' lien) when a debtor is in default under a security agreement.

(c)     Give notice of sole control or any other instruction under any Deposit Account Control Agreement, Commodity Account Control Agreement or Securities Account Control Agreement and take any action therein with respect to such Collateral.

(d)     Without notice (except as specifically provided in Section 8.1 hereof or elsewhere herein or in any IP License) sell, lease, assign, grant an option or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, on credit or for future delivery, and upon such other terms as the Collateral Agent may deem commercially reasonable.

(e)     With respect to applicable Intellectual Property Collateral: (i) act pursuant to a power of attorney granted by each Grantor to sign any document which may be required (x) by the PTO, the United States Copyright Office or any relevant registrar in any applicable foreign jurisdiction in order to effect an absolute assignment of all right, title and interest in each Patent, Trademark, Copyright and Domain Name owned by a Grantor, and each application for such registration, and (y) to effect an absolute assignment of all right, title and interest in each Patent License, Trademark License, and Copyright License (to the extent doing so does not violate the express terms between such Grantor and a third party, or gives such third party any right of acceleration, modification or cancellation therein unless such violation or acceleration, is ineffective or unenforceable under Sections 9-406, 9-407, 9-408, or 9-409 of the UCC or other applicable law) in each case, constituting Intellectual Property Collateral, and, if applicable, record the same; (ii) declare the entire right, title and interest of such Grantor in and to the Intellectual Property Collateral vested in the Collateral Agent for the benefit of the Secured Parties, in which

event such rights, title and interest shall immediately vest, in the Collateral Agent for the benefit of the Secured Parties, and the Collateral Agent shall be entitled to exercise the power of attorney referred to in the foregoing clause (i) to execute, cause to be acknowledged and notarized and, if applicable, record said absolute assignment with the applicable agency or registrar; (iii) direct such Grantor to refrain, in which event such Grantor shall refrain, from using any Intellectual Property Collateral in any manner whatsoever, directly or indirectly; and (iv) assign or sell the owned Intellectual Property Collateral, as well as the goodwill of such Grantor's business symbolized by the Trademarks and Domain Names included therein and the right to carry on the business and use the assets of such Grantor in connection with which such Trademarks or Domain Names have been used.

5.1.2 The Collateral Agent, on behalf of the Secured Parties, may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

5.1.3 Upon the occurrence and during the continuation of an Event of Default, the Collateral Agent shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase for the benefit of the Collateral Agent and the other Secured Parties, the whole or any part of the Collateral so sold, free of any right of equity redemption, which equity redemption each Grantor hereby expressly releases.

5.1.4 Upon the occurrence and during the continuation of an Event of Default, until the Collateral Agent is able to effect a sale, lease, or other disposition of Collateral, the Collateral Agent shall have the right to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Collateral Agent. The Collateral Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of the Collateral Agent's remedies (for the benefit of the Collateral Agent and the Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment.

5.1.5 Notwithstanding the foregoing, except as required by applicable law, neither the Collateral Agent nor the other Secured Parties shall be required to (a) make any demand upon, or pursue or exhaust any of their rights or remedies against, each Grantor, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Secured Obligations or to pursue or exhaust any of their rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof, (b) marshal the Collateral or any guarantee of the Secured Obligations or to resort to the Collateral or any such guarantee in any particular order, or (c) effect a public sale of any Collateral.

5.1.6 Each Grantor recognizes that the Collateral Agent may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof. Each Grantor also acknowledges that any private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private. The Collateral Agent shall be under no obligation to delay a sale of any of the Pledged Collateral for the period

of time necessary to permit such Grantor or the issuer of the Pledged Collateral to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if such Grantor and the issuer would agree to do so.

        5.2      Grantors' Obligations Upon Default. Upon the request of the Collateral Agent, if an Event of Default has occurred and is continuing, each Grantor will:

        5.2.1 Assembly of Collateral. Assemble and make available to the Collateral Agent the Collateral and all records relating thereto at any place or places specified by the Collateral Agent.

        5.2.2 Secured Party Access. Permit the Collateral Agent, by the Collateral Agent's representatives and agents, to enter any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral and to remove all or any part of the Collateral.

        5.2.3 Counterparty Consent. Use commercially reasonable efforts to obtain all consents and approvals necessary or appropriate for the assignment to or for the benefit of the Collateral Agent of any IP License held by such Grantor to enable the Collateral Agent to enforce the security interests granted hereunder. To the extent required pursuant to any IP License pursuant to which Grantor is the licensee, each Grantor party to such IP License shall deliver to the licensor any notice of the grant of security interest thereunder (or such other notices required to be delivered thereunder) in order to permit the security interest created or permitted to be created hereunder pursuant to the terms of such IP License.

        5.3      License. The Collateral Agent is hereby granted an irrevocable (until the Termination Date), non-exclusive, fully transferable license or sublicense (as applicable), to use, access, license or sublicense, which shall automatically terminate on the Termination Date, effective upon the occurrence and during the continuance of an Event of Default, without charge, each Grantor's Intellectual Property, labels, advertising matter, and any Property of a similar nature, including all media in which any of the foregoing may be recorded or stored and all computer software and programs used for compilation or printout thereof, in each case whether now owned or hereafter acquired and wherever located, including to complete production of, advertise for sale, and sell any Collateral. Following the occurrence and during the continuance of an Event of Default, each Grantor's rights under all licenses and franchise agreements that constitute Collateral shall inure to the Collateral Agent's benefit in accordance with the terms and conditions thereof. For the avoidance of doubt, this Section 5.3 does not apply to the Intellectual Property Agreements (as defined in the Note Exchange Agreement), the terms and conditions of which control notwithstanding the grant of a license to the Collateral Agent pursuant to this Section 5.3. Any license, sublicense or other transaction entered into by the Collateral Agent in accordance with this Section 5.3 shall be binding upon each Grantor notwithstanding any subsequent cure of an Event of Default. All use of each Grantor's Trademarks shall be materially in accordance with such Grantor's trademark usage and quality control requirements and all goodwill associated therewith shall inure to the benefit of such Grantor. Without limiting the foregoing, all Collateral produced, advertised and sold under this Section 5.3 shall materially conform to the quality of such Collateral produced, advertised and sold by each Grantor. In addition, each Grantor hereby irrevocably agrees that the Collateral Agent may, following the occurrence and during the

continuance of an Event of Default, sell any of the Grantors' Inventory directly to any person, including without limitation persons who have previously purchased the Grantors' Inventory from such Grantor and in connection with any such sale or other enforcement of the Collateral Agent's rights under this Security Agreement, may sell Inventory which bears any Trademark owned by or licensed to such Grantor and any Inventory that is covered by any Intellectual Property owned by or licensed to such Grantor and the Collateral Agent may finish any work in process and affix any Trademark owned by or licensed to such Grantor and sell such Inventory as provided herein.

ARTICLE 6.
WAIVERS, AMENDMENTS AND REMEDIES

No delay or omission of any Secured Party to exercise any right or remedy granted under this Security Agreement shall impair such right or remedy or be construed to be a waiver of any default or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment or other variation of the terms, conditions or provisions of this Security Agreement whatsoever shall be valid unless in writing signed by the Collateral Agent and the Grantors, and then only to the extent in such writing specifically set forth; provided that none of the terms or provisions of this Security Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 16 of the Note Exchange Agreement. All rights and remedies contained in this Security Agreement or by law afforded shall be cumulative and all shall be available to the Secured Parties until the Termination Date.

ARTICLE 7.
PROCEEDS

7.1    Collateral Account. The Collateral Agent shall, at any time after the occurrence and during the continuation of an Event of Default, require all cash proceeds of the Collateral to be deposited in the Collateral Account maintained by the Collateral Agent under its sole dominion and control. The Grantors shall not have any control whatsoever over said Collateral Account. All cash proceeds while held by the Collateral Agent in a Collateral Account shall continue to be held as collateral security for all the Secured Obligations and shall not constitute payment thereof until applied as provided in Section 7.2.

7.2    Application of Proceeds. At any time after the occurrence and during the continuation of an Event of Default, the Collateral Agent may apply all or any part of the cash proceeds constituting Collateral, whether or not held in the Collateral Account or any other collateral account, and any Proceeds of any Note Document in respect of the Collateral, or otherwise received by the Collateral Agent in respect of the Collateral in accordance with Section 12.5 of the Note Exchange Agreement.

ARTICLE 8.
GENERAL PROVISIONS

8.1    Notice of Disposition of Collateral; Condition of Collateral. Each Grantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made. To the extent such notice

may not be waived under applicable law, any notice made shall be deemed reasonable if sent to the Grantors, addressed as set forth in Article IX, at least ten days prior to (a) the date of any such public sale or (b) the time after which any such private sale or other disposition may be made. To the maximum extent permitted by applicable law, each of the Grantor waives all claims, damages, and demands against the Collateral Agent and each other Secured Party arising out of the repossession, retention or sale of the Collateral, except to the extent such arise out of the gross negligence or willful misconduct of the Collateral Agent or such Secured Party (or any of their respective affiliates, officers, directors, employees, agents or representatives) as determined by a court of competent jurisdiction in a final and nonappealable judgment.

8.2     Limitation on Collateral Agent's and Secured Parties' Duty with Respect to the Collateral. The Collateral Agent shall have no obligation to clean-up or otherwise prepare the Collateral for sale. The Collateral Agent and each Secured Party shall use reasonable care with respect to the Collateral in its possession or under its control; provided that the Collateral Agent and each Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral, if such Collateral is accorded treatment substantially equal to that which the Collateral Agent or such Secured Party accords its own property. Neither the Collateral Agent nor any other Secured Party shall have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Collateral Agent or such Secured Party other than to account for money received, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto. To the extent that applicable law imposes duties on the Collateral Agent to exercise remedies in a commercially reasonable manner, each of the Grantors acknowledge and agree that it is commercially reasonable for the Collateral Agent (a) to fail to incur expenses deemed significant by the Collateral Agent to prepare Collateral for disposition or otherwise to transform raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as the Grantors, for expressions of interest in acquiring all or any portion of such Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the, types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (k) to purchase insurance or credit enhancements to insure the Collateral Agent against risks of loss, collection or disposition of Collateral or to provide to the Collateral Agent a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Collateral Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Collateral Agent in the collection or disposition of any of the Collateral. Each of the Grantors acknowledge that the purpose of this Section 8.2 is to provide non-exhaustive indications of what

actions or omissions by the Collateral Agent would be commercially reasonable in the Collateral Agent's exercise of remedies against the Collateral and that other actions or omissions by the Collateral Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this <u>Section 8.2</u>. Without limitation upon the foregoing, nothing contained in this <u>Section 8.2</u> shall be construed to grant any rights to the Grantors or to impose any duties on the Collateral Agent that would not have been granted or imposed by this Security Agreement or by applicable law in the absence of this <u>Section 8.2</u>.

8.3     <u>Compromises and Collection of Collateral</u>. Each of the Grantors and the Collateral Agent recognize that setoffs, counterclaims, defenses and other claims may be asserted by obligors with respect to certain of the Receivables, that certain of the Receivables may be or become uncollectible in whole or in part and that the expense and probability of success in litigating a disputed Receivable may exceed the amount that reasonably may be expected to be recovered with respect to a Receivable. In view of the foregoing, the Grantors agree that the Collateral Agent may at any time and from time to time, if an Event of Default has occurred and is continuing, compromise with the obligor on any Receivable, accept in full payment of any Receivable such amount as the Collateral Agent shall determine or abandon any Receivable, and any such action by the Collateral Agent shall be commercially reasonable so long as the Collateral Agent acts in good faith based on information known to it at the time it takes any such action.

8.4     <u>Secured Party Performance of Grantors' Obligations</u>. The Collateral Agent may from time to time, at its option, perform any action which the Collateral Agent deems reasonably necessary for the maintenance, preservation or protection of any Collateral or of its security interest therein if the Grantors fail to perform such action within a reasonable time after being requested in writing to so perform (it being understood that no such request need be given after the occurrence and during the continuance of an Event of Default). Without having any obligation to do so, at any time when an Event of Default has occurred and is continuing, the Collateral Agent may perform or pay any obligation which the Grantors have agreed to perform or pay in this Security Agreement and the Grantors shall reimburse the Collateral Agent for any amounts paid by the Collateral Agent pursuant to this <u>Section 8.4</u>. The Grantors' obligation to reimburse the Collateral Agent pursuant to the preceding sentence shall be a Secured Obligation payable on demand.

8.5     <u>Authorization for Secured Party to Take Certain Action</u>. The Grantors irrevocably authorizes the Collateral Agent at any time and from time to time, and appoints the Collateral Agent as its attorney in fact, (a) to file financing statements necessary or desirable in the Collateral Agent's sole discretion to perfect and to maintain the perfection and priority of the Collateral Agent's security interest in the Collateral, (b) to indorse and collect any cash proceeds of the Collateral, (c) to file a carbon, photographic or other reproduction of this Security Agreement or any financing statement with respect to the Collateral as a financing statement and to file any other financing statement or amendment of a financing statement in such offices as the Collateral Agent in its sole discretion deems necessary or desirable to perfect and to maintain the perfection and priority of the Collateral Agent's security interest in the Collateral, (d) to contact and enter into one or more agreements with the issuers of uncertificated securities which are Collateral owned by each of the Grantors and which are Securities or with financial intermediaries holding other Investment Property which is Collateral as may be necessary or advisable to give the Collateral Agent Control over such Securities or other Investment Property, (e) after the

occurrence and during the continuation of an Event of Default, to enforce payment of the Instruments, Accounts and other Receivables in the name of the Collateral Agent or the Grantors, (f) to apply the proceeds of any Collateral received by the Collateral Agent to the Secured Obligations as provided in Article VII and (g) to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for such Liens permitted under Section 4.1.4 hereof), and the Grantors agree to reimburse the Collateral Agent on demand for any payment made or any expense incurred by the Collateral Agent in connection therewith, provided that this authorization shall not relieve the Grantors of any of its obligations under this Security Agreement or under the Note Exchange Agreement.

        8.6    Specific Performance of Certain Covenants. Each of the Grantors acknowledge and agree that a breach of any of the covenants contained in Sections 4.1.3, 4.1.4, 4.4, 4.5, 4.6, 4.7, 4.8, 4.9, 4.10, 4.11, 5.2, or 8.8 or in Article VII hereof will cause irreparable injury to the Collateral Agent and the Secured Parties, that the Collateral Agent and Secured Parties have no adequate remedy at law in respect of such breaches and therefore agrees, without limiting the right of the Collateral Agent or the Secured Parties to seek and obtain specific performance of other obligations of the Grantors contained in this Security Agreement, that the covenants of the Grantors contained in the Sections referred to in this Section 8.6 shall be specifically enforceable against the Grantor.

        8.7    Reserved.

        8.8    Dispositions Not Authorized. The Grantors are not authorized to sell or otherwise dispose of the Collateral except as set forth in Section 4.1.3 hereof and notwithstanding any course of dealing between the Grantors and the Collateral Agent or other conduct of the Collateral Agent, no authorization to sell or otherwise dispose of the Collateral (except as set forth in Section 4.1.3 hereof) shall be binding upon the Collateral Agent or the Secured Parties unless such authorization is in writing signed by the Collateral Agent with the consent or at the direction of the Required Holders (but subject in all cases to the provisions of the Note Exchange Agreement).

        8.9    Benefit of Agreement. The terms and provisions of this Security Agreement shall be binding upon and inure to the benefit of the Grantors, the Collateral Agent and the other Secured Parties and their respective successors and assigns (including all persons who become bound as a debtor to this Security Agreement), except that the Grantors shall not have the right to assign their rights or delegate their obligations under this Security Agreement or any interest herein, without the prior written consent of the Collateral Agent.

        8.10 Reinstatement. Each of the Grantors agree that to the extent that, after payment in full of the Secured Obligations, such payment or any part thereof is subsequently invalidated, voided, declared to be fraudulent or preferential, set aside, recovered, rescinded or is required to be retained by or repaid to a trustee, receiver, or any other Person under any bankruptcy code, common law, or equitable cause, then the Lien and security interest in the Collateral created hereunder shall be revived, reinstated and continued in full force and effect, as if said payment had not been made. The Lien and security interest in the Collateral created hereunder shall not be released or discharged by any payment to any Secured Party from any source that is thereafter paid, returned or refunded in whole or in part by reason of the assertion of a claim of any kind

relating thereto, including, but not limited to, any claim for breach of contract, breach of warranty, preference, illegality, invalidity, or fraud asserted by any account debtor or by any other Person.

8.11 Survival of Representations. All representations and warranties of the Grantor contained in this Security Agreement shall survive the execution and delivery of this Security Agreement.

8.12 Taxes and Expenses. The Grantors shall reimburse the Collateral Agent for any and all reasonable out-of-pocket expenses and fees (including reasonable attorneys', auditors' and accountants' fees) and internal charges (excluding time charges of attorneys who may be employees of the Collateral Agent) paid or incurred by the Collateral Agent in connection with the preparation, execution, delivery, administration, collection and enforcement of this Security Agreement and in the audit, analysis, administration, collection, preservation or sale of the Collateral (including the expenses and charges associated with any periodic or special audit of the Collateral) all in accordance with, and to the extent provided in, Section 14.1of the Note Exchange Agreement. Any and all costs and expenses incurred by the Grantors in the performance of actions required pursuant to the terms hereof shall be borne solely by the Grantors.

8.13 Headings. The title of and section headings in this Security Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Security Agreement.

8.14 Termination. This Security Agreement shall continue in effect (notwithstanding the fact that from time to time there may be no Secured Obligations outstanding) until the Termination Date.

8.15 Entire Agreement. This Security Agreement, the Note Exchange Agreement and the other Note Documents embody the entire agreement and understanding between the Grantors and the Collateral Agent relating to the Collateral and supersedes all prior agreements and understandings between the Grantors and the Collateral Agent relating to the Collateral.

8.16 CHOICE OF LAW. THIS SECURITY AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK EXCLUDING CHOICE-OF-LAW PRINCIPLES THAT WOULD PERMIT THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

8.17 Collateral Releases. The Collateral Agent is authorized to, and shall release any Lien granted to or held by it upon any Collateral upon the occurrence of the Termination Date and otherwise in accordance with the Note Exchange Agreement; provided, that (i) any such release shall be at the sole expense of the Grantors and (ii) in the case of release of Collateral prior to the Termination Date, the Grantors shall have provided the Collateral Agent with a certificate of a Responsible Officer certifying that the release is permitted under the Note Documents (and the Secured Parties, by accepting the benefits hereof, hereby authorize the Collateral Agent to rely on such certificate in performing its obligations under this Section 8.17).

ARTICLE 9.
NOTICES

9.1     Sending Notices. All notices and other communications provided for herein shall be in writing, in English and shall be sent to the Collateral Agent or the Grantors as provided in the Note Exchange Agreement.

9.2     Change in Address for Notices. Each of the Grantors and the Collateral Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other party hereto.

ARTICLE 10.
THE COLLATERAL AGENT

Wilmington Trust, National Association has been appointed Collateral Agent for the Secured Parties hereunder pursuant to Section 20 of the Note Exchange Agreement. It is expressly understood and agreed by the parties to this Security Agreement that any authority conferred upon the Collateral Agent hereunder is subject to the terms of the delegation of authority made by the Noteholders to the Collateral Agent pursuant to the Note Exchange Agreement, and that the Collateral Agent has agreed to act (and any successor agent shall act) as such hereunder only on the express conditions contained in the Note Exchange Agreement with respect to the Secured Parties. The Collateral Agent shall be entitled to the rights, privileges, protections, indemnities and immunities set forth in the Note Exchange Agreement, all of which are incorporated herein by reference *mutatis mutandis*, in the performance of any of the transactions contemplated by this Agreement. Any successor agent appointed pursuant to the Section 20 of the Note Exchange Agreement shall be entitled to all the rights, interests and benefits of each agent hereunder.

[Remainder of Page Intentionally Left Blank. Signatures on Following Pages]

IN WITNESS WHEREOF, the Grantors and the Collateral Agent have executed this Security Agreement as of the date first above written.

**GRANTORS:**

NAUTICAL SOLUTIONS, L.L.C.

By: _____
Name:_____
Title: _____

NAUTICAL SOLUTIONS HOLDINGS, LLC

By: _____
Name:_____
Title:

Company Signature Page

WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Collateral Agent

By: _____
Name:
Title:

<u>EXHIBIT A</u>

Chief executive office and mailing address for the Grantors:

16201 East Main Street, Cut Off, LA 70345

Locations of Real Property, Inventory, Equipment and Fixtures: None.

## EXHIBIT B

A.    Aircraft engines, ships, railcars and other vehicles governed by federal statute:

None other than the Vessels.

B.         (i)    Patents, Copyrights, Trademarks, Domain Names

None

    (ii)    Exclusive Patent Licenses, Copyright Licenses, Trademark Licenses granted to any third party or under which any Grantor is the licensee

None

(iii) Computer Hardware and
Software Licenses:

Non-Exclusive and Assignable Patent and Know-How License Agreement, dated as of
[--]February 24, 2023, by and among Marine Technologies, L.L.C., as Licensor, Nautical
Solutions, L.L.C.[, as Licensee, and the Collateral Agent]

(iv) Copyright License

Non-Exclusive and Assignable Copyright License Agreement, dated as of [--]February 24, 2023,
by and among North American Shipbuilding, L.L.C., as Licensor, Nautical Solutions, L.L.C. as
Licensee, and the Collateral Agent

Ex. B-1

<u>EXHIBIT C</u>

Please refer to Exhibit A, Parts A &
B.

None.

<u>EXHIBIT D</u>

Grantor Identification and Organizational Information

| GRANTOR | **Federal Employer Identification Number** | **Type of Organization** | **State of Organization or Incorporation** | **State Organization Number** |
|---|---|---|---|---|
| Nautical Solutions, L.L.C. | 26-0741673 | limited liability company | Louisiana | 36519394K |
| Nautical Solutions Holdings, LLC | 92-0440022 | limited liability company | Louisiana | 45098439K |

EXHIBIT E

List of Pledged Securities

| Issuer | Holder | Certificate No. | No.<br>Shares/Interest | % of Shares<br>Issued and<br>Outstanding |
|--------|--------|-----------------|------------------------|------------------------------------------|
|  |  |  |  |  |
| Nautical Solutions, L.L.C. | Nautical Solutions Holdings, LLC | Uncertificated | 1,000 Units/100% | 100% |

## EXHIBIT F

Deposit Accounts, Commodity Accounts, Securities Accounts

| Bank | Account Holder | Account Number | Purpose |
|------|----------------|----------------|---------|
| JPMorgan Chase Bank, N.A. | Nautical Solutions, L.L.C. | #xxxxx4148 | Operating Account |
| JPMorgan Chase Bank, N.A. | Nautical Solutions, L.L.C. | #xxxxx7113 | Guyana Operations Account |

<u>EXHIBIT G</u>

Letter-of-Credit Rights and Chattel Paper

None.

<u>EXHIBIT H</u>

OFFICES IN WHICH FINANCING STATEMENTS MAY BE FILED

| **GRANTOR** | **State of Organization or Incorporation** |
| --- | --- |
| | |
| Nautical Solutions, L.L.C. | Louisiana |
| Nautical Solutions Holdings, LLC | Louisiana |

The Uniform Commercial Code records of any Parish Clerk of Court Office in the State of Louisiana.

<u>EXHIBIT I</u>

(See Definition of "*Commercial Tort Claims*")

COMMERCIAL TORT CLAIMS

None.

<u>EXHIBIT J</u>

Former Names of the Grantors

None.

Exhibit G

# EXHIBIT G

## FORM OF SUPPLEMENT TO THE FLEET MORTGAGE

_____

**[FORM OF]**
**SUPPLEMENT NO. _____ TO PREFERRED FLEET MORTGAGE**

THIS SUPPLEMENT NO. _____ TO PREFERRED FLEET MORTGAGE (this "Supplement"), made this ___ day of_____, 202_ and effective as of the ___ day of _____, 202_, is given by NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company, with an address of 16201 East Main Street, Cut Off, Louisiana 70345 (the "*Shipowner*"), to and in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, with an address of 1100 North Market Street, Wilmington, DE 19890, in its capacity as collateral agent for the Secured Parties under and as defined in the Security Agreement (in such capacity, together with its successors and assigns, the "*Mortgagee*"). Unless otherwise defined herein, all capitalized terms used herein shall have the meanings assigned to them in the Mortgage.

WITNESSETH:

WHEREAS, the Shipowner has heretofore executed and delivered to the Mortgagee that certain Preferred Fleet Mortgage effective as of _____, 2023 (said mortgage as supplemented hereby and hereafter amended or supplemented, being hereinafter called the "*Mortgage*"), pursuant to which the Shipowner granted, conveyed and mortgaged, in favor of the Mortgagee, its successors and permitted assigns in such capacity, and granted the Mortgagee, its successors and permitted assigns in such capacity, a continuing security interest in, the Vessels described in the Mortgage to secure, among other things, the timely payment and performance of the Secured Obligations; the Mortgage having been recorded on ___, 2023, in the appropriate Office of the United States Coast Guard, National Vessel Documentation Center, in Book _____, Page_____, at_____ [a.m/p.m] ; and

WHEREAS, the Shipowner has agreed to execute and deliver to the Mortgagee this Supplement to add the vessel(s) described below to the list of Vessels on Schedule 1 to the Mortgage and to subject such vessel(s) to the terms and provisions of the Mortgage.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Shipowner hereby covenants and agrees that the terms and provisions set forth in the Mortgage be and they are hereby supplemented as follows:

1.      To secure the full and timely payment and performance of the Secured Obligations, the Shipowner does, by these presents, grant, convey and mortgage, and grant a continuing security interest in, unto Mortgagee, and to Mortgagee's successors and assigns in such capacity, the whole of the vessel(s) named and further described as follows (the "*Additional Vessel(s)*"):

Vessel Name_____ Official Number

[Additional Vessel(s)]                                    [_____]

together with all her/their boilers, engines, machinery, auxiliaries, tackle, apparel, spares, fuel, consumable and other stores, navigational systems, electronic surveillance systems, computer equipment and software, anchors, cables, chains, equipment, cranes, welding machines and stations, cutting systems, pontoons, tensions, davits, dope stations, anchor wires, anchor buoys,

generators, compressors, pumps, tools, implements, parts, supplies, and all other accessories, additions, appurtenances, improvements and replacements now or hereafter belonging thereto, whether or not removed therefrom, all of which shall be deemed to be included in the term "*Additional Vessel(s)*" herein.

2.     Any and all references in the Mortgage, as supplemented hereby, to the term "*Vessels*" (and individually, a "*Vessel*") shall hereafter include the Additional Vessel(s). The Vessels subject to the Mortgage, as supplemented hereby, are as follows:

| Vessel(s) Name | Official Number(s) |
|---|---|
| 1.1 | 1.1 |

For convenience, <u>Schedule 1</u> attached hereto and made a part hereof also lists the Vessels subject to the Mortgage, as supplemented hereby, and shall replace in its entirety <u>Schedule 1</u> attached to the Mortgage.

3.     As supplemented hereby, the Mortgage is in all respects ratified and confirmed, and all of the terms, provisions and conditions thereof shall be and remain in full force and effect. In particular, and without limiting the foregoing, the Vessels (including, without limitation, the Additional Vessel(s)) shall remain subject to the preferred lien of the Mortgage, as supplemented hereby, as security for the full and timely payment and performance of the Secured Obligations. All of the liens, privileges and priorities existing under the Mortgage are hereby renewed, extended and carried forward as security for the full and timely payment and performance of the Secured Obligations and all other sums due under the Mortgage, as supplemented hereby.

4.     Nothing contained herein shall be construed (a) as a novation of the Secured Obligations or the Mortgage, or (b) to release, cancel, terminate or otherwise impair the preferred status or priority of the preferred lien created by the Mortgage.

5.     Notwithstanding anything to the contrary in the Mortgage, the total amount of the Mortgage, as supplemented hereby, is $_____plus Specified Noteholder Fee (if any), Exit Fee (if any) or other premium (if any) and interest, fees, costs, expenses and performance of the Mortgage covenants. The interest of Mortgagor in the Vessels (including, without limitation, the Additional Vessel(s)) is the entire 100% interest, and the interest mortgaged in the Mortgage and this Supplement covers the entire 100% interest in the Vessels (including, without limitation, the Additional Vessel(s)).

6.     THIS SUPPLEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE GENERAL MARITIME LAW OF THE UNITED STATES OF AMERICA. THE SHIPOWNER IRREVOCABLY SUBMITS ITSELF TO THE NON-EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, FOR THE PURPOSES OF (AND SOLELY FOR THE PURPOSES OF) ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF, OR RELATING TO, THIS SUPPLEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, HEREBY

IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD IN SUCH NEW YORK STATE OR FEDERAL COURT AND HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE, OR OTHERWISE, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE ABOVE-NAMED COURTS FOR ANY REASON WHATSOEVER, THAT SUCH SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, OR THAT THE VENUE OF SUCH SUIT, ACTION OR PROCEEDING IS IMPROPER, OR THAT THIS SUPPLEMENT OR THE SUBJECT MATTER HEREOF MAY NOT BE ENFORCED IN OR BY SUCH COURTS. THE SHIPOWNER HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO THE SHIPOWNER AT ITS ADDRESS LISTED IN SECTION 3.11 OF THE MORTGAGE. THE SHIPOWNER AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS SECTION 6 SHALL AFFECT THE RIGHT OF THE MORTGAGEE TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE MORTGAGEE TO BRING ANY ACTION OR PROCEEDING AGAINST THE SHIPOWNER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

[Remainder of Page Intentionally Left Blank. Signatures on Following Pages]

IN WITNESS WHEREOF, the Shipowner has caused this Supplement No. _____ to Preferred Fleet Mortgage to be executed effective as of the day and year first above written.

WITNESSES:                                              NAUTICAL SOLUTIONS, L.L.C.


_____  By: 
                                                        _____
Printed Name:                                          Name: 
                                                        _____
                                                        Title: 
                                                        _____

_____
Printed Name:

IN WITNESS WHEREOF, the Mortgagee has caused this Supplement No. _____ to Preferred Fleet Mortgage to be executed effective as of the day and year first above written.

WITNESSES:                         WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Collateral Agent

_____  By: _____

Printed Name:                     Name: _____

                                  Title: _____

_____

Printed Name:

ACKNOWLEDGMENT

STATE OF LOUISIANA

PARISH OF [_____]

      BE IT KNOWN that on this _____ day of_____, before me personally appeared:

_____

to me known, who, after being by me duly sworn, did depose and say:

      That he/she is an Authorized Agent of Nautical Solutions, L.L.C., the limited liability

company which is described in and which executed the within instrument, that he/she signed his

name to the said instrument at the order of the Manager of the said limited liability company and

acknowledged the within instrument to be the free act and deed of the said limited liability

company.

      IN TESTIMONY WHEREOF, I have hereto set my hand and seal on this day and year first above written.

_____NOTARY PUBLIC_____

Name:_____

Notary ID/Bar Roll No._____

My Commission Expires_____

ACKNOWLEDGMENT

STATE OF [                    ]

PARISH/COUNTY OF [                    ]

      BE IT KNOWN that on this _____ day of_____, before me personally appeared:

_____

to me known, who, after being by me duly sworn, did depose and say:

      That he/she is the_____of Wilmington Trust, National Association which is

described in and which executed the within instrument, that he/she signed his/her name to the said

instrument with full authorization of Wilmington Trust, National Association, and acknowledged

the within instrument to be the free act and deed of the said national banking association.

      IN TESTIMONY WHEREOF, I have hereto set my hand and seal on this day and year first above written.

_____
NOTARY PUBLIC
Name:_____
Notary ID/Bar Roll No._____
My Commission Expires_____

Mortgagee Acknowledgment                Form of Supplement

SCHEDULE 1
VESSELS

~~Vessel Name~~                              ~~Official Number~~

| Vessel Name | Official Number |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

1.1          1.1

# EXHIBIT H
## FORM OF MONTHLY REPORTING

### CASH FLOW STATEMENT – [MONTH] [YEAR]

| Date on Charter | Hull No. | Vessel | [Month] C/F B/Debt | YTD C/F B/Debt | Note or Lease Amount | YTD Leas | YTD Interes t | YTD Principal | Loan Balance | [Month] C/F | YTD C/F | Other Costs | Net C as |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Exhibit H
(to Note Exchange Agreement)

Exhibit I

**EXHIBIT I**

**[FORM OF] SUPPORT UNDERTAKING**

To:    Wilmington Trust, National Association, as Collateral Agent
      1100 North Market Street
      Wilmington, DE 19890
      Attn: Global Capital Markets – Project Finance – Rafael Miranda
      Email: rmiranda1@wilmingtontrust.com
      Tel: 845-717-8079

From: The companies listed on Exhibit A attached hereto
      16201 East Main Street
      Cut Off, LA 70345

Date: [_], 2023

Re:    Undertakings of The Vessels (hereinafter defined)

Dear Sirs

## 1. BACKGROUND

1.1    We, the undersigned companies ("**we**", "**us**" or individually, each a "Contractor" and collectively, the "**Contractors**"), refer to (a) the Note Exchange Agreement dated as of even date herewith (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Note Exchange Agreement**") entered into by and among Nautical Solutions L.L.C. (the "**Owner**"), Nautical Solutions Holdings, LLC, the holders of the Senior Secured Notes due [_], 2028 issued thereunder (together with their successors and assigns, collectively, the "**Noteholders**"), Wilmington Trust, National Association, in its capacity as administrative agent (together with its successors and assigns in such capacity, the "**Agent**"), and Wilmington Trust, National Association, in its capacity as collateral agent (together with its successors and assigns in such capacity, the "**Collateral Agent**"), (b) the Master Services Agreement dated as of even date herewith (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Master Services Agreement**") entered into by and among the Owner and the Contractors and (c) the Collateral Assignment of Master Services Agreement dated as of even date herewith (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Collateral Assignment**") entered into by and among the Owner and the Collateral Agent.

1.2    We, the Contractors, have been advised by the Owner that we enter into this Support Undertaking (this "**Undertaking**") in favor and for the benefit of the Collateral Agent in respect of the respective Services (as defined in the Master Services Agreement) provided by each of us to the Owner in connection with the operation of the Vessels pursuant to the Master Services Agreement.

## 2. INTERPRETATION

2.1     **Definitions.** Unless otherwise defined herein, terms used in this Undertaking have the meaning given such terms in the Note Exchange Agreement or Master Services Agreement. In this Undertaking,

"**Earnings**" means, in respect of a Vessel, all moneys whatsoever which are now, or later become, payable (actually or contingently) to the Owner and which arise out of the use or operation of such Vessel, including (but not limited to):

(a)     all freights, hire, earnings and other moneys earned and to be earned, due or to become due, or paid or payable to, or for the account of, the Owner, of whatsoever nature, arising out of or as a result of the use, operation, pooling or chartering by the Owner or its agents of such Vessel, including, without limitation, all rights arising out of the Owner's lien on cargoes and subfreights thereunder;

(b)     all rights, remedies, powers, privileges and claims, in each case for moneys due and to become due to the Owner, and all claims for damages, arising out of the breach of any and all present and future requisitions, drilling contracts, charter parties, pooling arrangements, bills of lading, contracts of affreightment and other engagements or for the carriage or transportation of cargo, and operations of every kind whatsoever of such Vessel and in and to any and all claims and causes of action for money, loss or damages that may accrue or belong to the Owner, its successors or assigns, arising out of or in any way connected with the present or future use, operation, pooling or chartering of such Vessel or arising out of or in any way connected with any and all present and future requisitions, drilling contracts, charter parties, pooling arrangements, bills of lading, contracts of affreightment and other engagements or for the carriage or transportation of cargo and other operations of every kind whatsoever of such Vessel;

(c)     all moneys and claims due and to become due to the Owner, and all claims for damages and all insurances and other proceeds, in respect of the actual or constructive total loss or the agreed, arranged or compromised total loss of or requisition of use of or title to such Vessel; and

(d)     any proceeds or products of any of the foregoing and all interest and earnings from the investment of any of the foregoing and the proceeds and products thereof.

"**Insurances**" means, in respect of a Vessel:

(a)     all insurance (including, without limitation, all insurance with respect to hull and machinery, war risk, loss of earnings, protection and indemnity, pollution, requisition of title or otherwise) in respect of such Vessel, her hull, machinery, freights, disbursements, profits or otherwise, whether heretofore, now or hereafter affected, and all renewals of or replacements for the same;

(b)     all monies and claims for moneys due and to become due to the Owner under said insurances with respect to the actual or constructive total loss or the agreed, arranged or compromised total loss or any other loss of or damage to such Vessel, or with respect to a claim arising out of the use or operation of such Vessel;

(c)     all returns of premium;

(d)     all other rights and benefits of the Owner under or in respect of said insurances; and

(e)     all cash and non-cash proceeds of the foregoing.

"**Secured Party**" means, collectively, the Agent, the Noteholders and the Collateral Agent.

"**Services**" has the meaning given to it in Section 1.1 of the Master Services Agreement.

"**Vessel Manager**" has the meaning given to it in Section 3.1 of the Master Services Agreement.

"**Vessels**" has the meaning given to it in the recitals of the Master Services Agreement.

## 3.    CONFIRMATIONS AND CONSENTS.

3.1    **Confirmation of Services**. Each Contractor hereby confirms that it has agreed to provide, and it shall provide, the Services to the Owner in respect of the Vessels, on the terms of and as set forth in the Master Services Agreement, and that the Services encompass all of the services necessary for the Owner to operate the Vessels in the ordinary course of business and consistent with its past practice.

3.2    **Intellectual Property**. Each Contractor hereby confirms that the intellectual property licensed under the Intellectual Property Agreements is all the intellectual property owned by the Contractors that is reasonably necessary for the operation of the Vessels in the ordinary course of business and consistent with past practice. Each Contractor hereby warrants that to the best of its knowledge, no other intellectual property other than the intellectual property licensed under the Intellectual Property Agreements and rights under licenses to third party off-the-shelf software generally commercially available on standard terms is necessary for the operation of the Vessels in the ordinary course of business and consistent with past practice.

3.3    **Consent.** Each Contractor hereby consents to the terms of the Collateral Assignment for the benefit of the Collateral Agent. The Contractors acknowledge the terms and provisions of the Collateral Assignment which provides, among other things, that from and after the occurrence of an Event of Default under the Note Exchange Agreement and until such Event of Default is cured or waived, the Collateral Agent shall be authorized and empowered, in the Collateral Agent's sole discretion, to assert, either directly or on behalf of Owner, any of the rights and remedies which Owner may have from time to time under the terms of the Master Services Agreement and Collateral Agent shall be a third party beneficiary for the purposes of exercising such rights and remedies.

## 4.    ADDITIONAL UNDERTAKINGS

4.1    **Undertakings**. In consideration of the Noteholders permitting our acting or continuing to act as a provider of the Services in respect of the Vessels (as set forth in the Master

Services Agreement), each Contractor irrevocably and unconditionally covenants and agrees as follows:

(a)     until the Note Obligations are paid in full in cash, such Contractor shall not, without the Collateral Agent's prior written consent (acting upon instructions of the Required Holders), supplement, modify, amend or waive the Master Services Agreement;

(b)     that such Contractor shall not, without the Collateral Agent's prior written consent (acting upon instructions of the Required Holders), extend any credit to the Owner or any of the Vessels other than in the ordinary course of business consistent with trade payables that would be extended by a reasonably prudent manager to the extent consistent with past practice prior to the date of this Undertaking, provided that any such credit extended to Owner shall not remain outstanding for a period greater than forty-five (45) calendar days;

(c)     until the Note Obligations are paid in full in cash, all claims or liens of whatsoever nature which such Contractor has or may have at any time after the date of this Undertaking against or in connection with any of the Vessels, the Earnings or the Insurances or against the Owner shall, subject to the terms and conditions of this Undertaking, rank after and be in all respect subject and subordinate to all of the Note Obligations and the lien of the mortgage given in favor of the Collateral Agent;

(d)     until the Note Obligations are paid in full in cash, such Contractor shall not take any step to exercise or to enforce any right or remedy which such Contractor now or at any later time have under any applicable law against any of the Vessels, the Earnings or the Insurances or against the Owner;

(e)     until the Note Obligations are paid in full in cash, such Contractor shall not institute any legal or administrative action or any quasi-legal proceedings under any applicable law at any time after the date of this Undertaking against any of the Vessels, the Earnings, the Insurances of or against the Owner in any capacity;

(f)     that such Contractor shall not compete with the Noteholders, the Agent or the Collateral Agent or its designee in (i) a liquidation or other winding-up or bankruptcy of the Owner or (ii) any legal or administration action or any quasi legal proceedings in connection with any of the Vessels, the Earnings or the Insurances;

(g)     that such Contractor shall, upon the Collateral Agent's first written request (acting upon instructions of the Required Holders), promptly deliver to the Collateral Agent, at the Owner's cost and expense, all documents of whatever nature which such Contractor holds in connection with the Owner, any of the Vessels, the Earnings or the Insurances; provided, that the original copies (as opposed to photocopies) of all vessel documentation required by law to remain on board the Vessels shall be so delivered in electronic format and nothing herein constitutes a waiver of attorney/client privilege;

(h)     that such Contractor shall not terminate the Master Services Agreement or its involvement thereunder without (i) giving the Collateral Agent at least 30 days' prior written notice of such Contractor's intention to do so, and (ii) ensuring that a replacement service provider reasonably capable of performing the applicable Services provided by such Contractor (at the same

standards required under the Master Services Agreement) to the reasonable satisfaction of the Collateral Agent (acting at the direction of the Required Holders), is engaged by Owner prior to the effectiveness of any such termination if the applicable Services remain necessary for the operation of the Vessels (and if such replacement service provider is an Affiliate (as defined in the Master Services Agreement and hereinafter referred to as an "**Affiliate**") of Owner, such Affiliate shall sign a joinder to the Master Services Agreement and this Undertaking); provided <u>that</u>, termination of such Contractor's involvement in the Master Services Agreement shall not terminate its obligations under this Undertaking;

(i)      that, upon giving us reasonable notice, such Contractor shall promptly sign any consent reasonably required by any insurance broker and/or underwriter and shall provide all documents, evidence and information and do all other things reasonably necessary so that the Collateral Agent or the Owner, as applicable, can collect or recover any moneys payable in respect of the Insurances of a Vessel in accordance with the Note Exchange Agreement;

(j)      that, to the extent such Contractor is or may be named as an assured under any Insurances of a Vessel, any deductible payable in respect of a claim under such Insurances shall be apportioned between such Contractor and every other named assured, other than the Collateral Agent, in proportion to the aggregate claims made or paid by each such party;

(k)      that (i) during (x) the continuance of an Event of Default or (y) any insolvency or bankruptcy proceeding of the Owner where the exercise of Collateral Agent's remedies in the Event of Default is stayed, and (ii) for a period of one (1) year following (A) the sale of a Vessel to a third-party purchaser not affiliated with the Contractors during or following an insolvency or bankruptcy proceedings of the Owner or by virtue of or in connection with the exercise by the Collateral Agent or the Agent of remedies following the occurrence of an Event of Default or (B) a Change of Control by virtue of a sale by or at the direction of the Collateral Agent or the Agent of the equity of the Owner (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title) or by virtue of an insolvency or bankruptcy proceeding of the Owner, as the case may be, such Contractor shall, to the extent any of the following services are provided or are capable of being provided by such Contractor in the normal course of such Contractor's business:

(x) continue to perform its obligations and provide the Services (as defined under the Master Services Agreement) under the Master Services Agreement, which the parties agree shall remain in full force and effect except as contemplated thereunder, and to perform and provide the Services thereunder;

(y) to the extent not already being provided by the manager of the Vessel(s) under the Master Services Agreement, provide appropriate services to support delivery of one or more of the Vessels to a U.S. port as directed by the Collateral Agent (acting at the direction of the Required Holders), to the third-party purchaser of the Vessel(s) or to the Owner (after giving effect to the Change of Control), as the case may be, and such support shall be considered a Service under the Master Services Agreement and treated consistently with other Services thereunder, including that such support shall be charged a Service Fee on the same terms as other Services;

(z) provide any necessary training and support services to allow the Collateral Agent (or a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title), a third-party purchaser or the Owner (after giving effect to the Change of Control), as the case may be, to properly transition the Services necessary to operate the Vessels and any intellectual property and technology that is embedded and/or used for the operation of the applicable Vessel or Vessels, including any intellectual property and technology licensed to the Owner pursuant to the Intellectual Property Agreements.

Notwithstanding the foregoing as to this subsection (k), each Contractor agrees that Vessels owned or operated by the Collateral Agent, its designees, third-party purchasers and Owner (after giving effect to the Change of Control), as the case may be, shall not be prioritized, nor shall such Vessels be disadvantaged, by such Contractor compared to other vessels owned by the Contractors or its affiliates that require the same or similar services, employees or parts, and the Contractors shall perform the Services in substantially the same manner as the Contractors perform such similar services for its own vessels or vessels of its affiliates.

(l)      that, each Contractor consents to the Collateral Agent's right to cure any breach of the Owner under the Master Services Agreement pursuant to Section 3 of the Collateral Assignment and agrees not to terminate the Master Services Agreement or otherwise seek remedies in respect of any breach by Owner during the forty-five (45) days following notice of such breach to the Collateral Agent (the "**Cure Period**"); and

(m)      that, to the extent Owner rejects the Master Services Agreement in any bankruptcy or insolvency proceeding, Contractor agrees to enter into a new master services agreement with a nominee of the Collateral Agent, which master services agreement will have a term of the earlier of one (1) year from (i) a change of control of the Owner or (ii) sale of the Owner to a third party and otherwise have terms and conditions comparable to the Master Services Agreement; provided that, notwithstanding the foregoing, as to the applicable Vessel Manager of a Vessel, such company's obligations to crew such Vessel shall terminate (A) one (1) year after transfer of title to such Vessel to the Agent or the Collateral Agent (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title) and (B) immediately upon transfer of title to such Vessel to a third-party purchaser not affiliated with such company during or following an insolvency or bankruptcy proceedings of the Owner or by virtue of or in connection with the exercise by the Collateral Agent or the Agent of remedies following the occurrence of an Event of Default.

Notwithstanding Section 4.1(h), upon the occurrence and during the continuation of an Event of Default and thereafter if the Agent or the Collateral Agent or its designee (or a special purpose entity or designee established for the purpose of the Agent or the Collateral Agent taking title) or a Vessel Buyer (as defined in the Master Services Agreement) takes over operations of or title to the Vessels, if the Contractor providing the applicable Services is not paid within thirty (30) days after presentment of invoices therefor not subject to a good faith Dispute (hereinafter defined in Section 5.2), then such Contractor may terminate the Master Services Agreement by providing (x) as to the Collateral Agent if applicable, at least forty-five (45) days prior written notice, and an opportunity to cure during such 45-day notice period, and (y) as to the applicable third-party

purchaser, at least fifteen (15) days prior written notice, and an opportunity to cure during such 15-day notice period.

Notwithstanding anything to the contrary herein, the Contractor may terminate the Master Services Agreement and this Undertaking (i) on or after the one-year anniversary of the consummation of a Change of Control by virtue of a sale by or at the direction of the Collateral Agent or the Agent of equity of the Owner (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title), or (ii) as to any given Vessel that is sold to a third-party purchaser not affiliated with the Contractor during or following an insolvency or bankruptcy proceedings of the Owner or by virtue of or in connection with the exercise by the Collateral Agent or the Agent of remedies following the occurrence of an Event of Default, on or after the one-year anniversary of the sale of such Vessel (as to the applicable Vessel Manager of a Vessel, such company's obligations to crew such Vessel shall terminate (A) one (1) year after transfer of title to such Vessel to the Agent or the Collateral Agent (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title) and (B) immediately upon transfer of title to such Vessel to a third-party purchaser not affiliated with such company following the occurrence of an Event of Default).

Each Contractor represents and warrants that as of the date hereof, it (i) is in the business of providing or is capable of providing the Services, and the other services described in clauses (x), (y) or (z) of Section 4.1(k), and (ii) has no intention of ceasing to provide such services (or Services), and shall not terminate or cease to provide such services (or Services), except to the extent such termination would be permitted with respect to such Service under the Master Services Agreement.

## 5. MISCELLANEOUS

5.1 **Governing Law**. THIS UNDERTAKING SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK EXCLUDING CHOICE-OF-LAW PRINCIPLES THAT WOULD PERMIT THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

5.2 **Dispute Resolution**. Any claim, disagreement, or dispute between the parties arising out of or relating to this Undertaking (a "**Dispute**") shall be resolved in the manner provided in this Section 5.2. The parties shall attempt to resolve any Dispute by negotiating in good faith for a period of thirty (30) days after receipt by either party of a written notice of the Dispute from the other party (the "**Negotiation Period**"). The written notice shall identify, with reasonable particularity, each matter or issue that is the subject of the dispute, a summary of the basis for the party's position with respect to each such matter or issue and the relief being requested by the party. No party shall commence any claim, action, suit, inquiry, investigation, judicial or administrative proceeding, grievance, arbitration or other proceedings (an "Action") in respect of any Dispute (i) until the expiration of the Negotiation Period or (ii) if the other party has refused to participate or has not reasonably participated in the required negotiation process in good faith set forth in this Section 5.2. If the parties are unable to resolve the Dispute during the Negotiation Period, the Dispute shall be finally settled by binding arbitration conducted expeditiously in accordance with the Comprehensive Arbitration Rules & Procedures, including the Expedited

Procedures then followed by the Judicial Arbitration and Mediation Services, Inc. (JAMS) or any successor to the functions thereof ("**Rules**"), and judgment upon the award rendered by the arbitrator shall be entered by any court of competent jurisdiction. One arbitrator shall be jointly selected by the parties. If the parties are unable to jointly select an arbitrator, the arbitrator shall be appointed in accordance with the Rules. The cost of the arbitrator shall be shared equally by the parties. The location of the arbitration proceeding shall be New York, New York and the language of arbitration shall be English. All arbitration proceedings are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and the applicable state rules of evidence. The dispute resolution provisions of this <u>Section 5.2</u> shall not be construed to interfere with a party's other rights provided by this Undertaking, including the right to terminate this Undertaking in accordance with its terms. During the pendency of any such Dispute, all of the terms and conditions of this Undertaking shall remain in effect and the parties shall continue to perform all of their respective obligations hereunder.

5.3      **Consent to Jurisdiction.** For the purposes of entering judgment on any arbitration award, if necessary, the parties consent to the exclusive jurisdiction of a New York State court or federal court sitting in New York County, New York. We irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any objection that we may now or hereafter have to the venue or forum of any such proceeding. To the extent any arbitral award needs to be submitted to a court for entering judgment thereon, in accordance with <u>Section 5.2</u> and <u>Section 5.3</u> of this Undertaking, such party may submit the quantum of such award to the court but shall not include any information relating to the matters that were arbitrated. If either party fails to proceed with arbitration as provided in <u>Section 5.2</u> of this Undertaking, or unsuccessfully seeks to stay arbitration, or fails to comply with the arbitration award, or is unsuccessful in vacating or modifying the award pursuant to a petition or application for judicial review, the other party shall be entitled to expenses paid or incurred in successfully compelling such arbitration or defending against the attempt to stay, vacate or modify such arbitration award and/or successfully defending or enforcing the award.

(a)      We irrevocably consent to the service of any and all process in any such action or proceeding by the mailing of copies of such process to our address at 16201 East Main Street, Cut Off, LA 70345, in accordance with <u>Section 5.7</u>. We also agree that service of process may be made on us by any other method of service provided for under the applicable laws in effect in the State of New York.

5.4      **Waiver of jury trial**. WE IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS UNDERTAKING.

5.5      **Collateral Agent's rights unaffected**. Nothing in this Clause 5 shall exclude or limit any right which the Collateral Agent may have (whether under the law of any country, an international convention or otherwise) with regard to the bringing of proceedings, the service of process, the recognition or enforcement of a judgment or any similar or related matter in any jurisdiction.

5.6      **Meaning of "proceedings"**. In this paragraph "**proceedings**" means proceedings of any kind, including an application for a provisional or protective measure.

5.6. **Amendments**. This Undertaking may not be amended, waived, supplemented or otherwise modified without the prior written consent of the Collateral Agent (acting at the direction of the Required Holders) and the Contractors.

5.7    **Notices.** All notices or other communications required or permitted to be made or given hereunder shall be made in writing, in English, and personally delivered to an officer or other responsible employee of the addressee, or sent, by registered air mail, return receipt requested, postage prepaid to the applicable address set forth under such party's name below, or to such other address as any party hereto may from time to time designate to the others in such manner, in each case with a copy delivered by email (which copy shall not constitute official notice hereunder):

<div style="margin-left:2em;">

If to the Collateral Agent:    Wilmington Trust, National Association
1100 North Market Street
Wilmington, DE 19890
Attn: Global Capital Markets – Project Finance –
Rafael Miranda
Email: rmiranda1@wilmingtontrust.com
Tel: 845-717-8079

If to the Contractors:    16201 East Main Street
Cut Off, Louisiana 70345
Email: luke.newman@chouest.com
Attention: Luke Newman

(with a copy by email to legal@chouest.com)

</div>

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received on a business day of the recipient before 3:00 p.m. local time, otherwise the next business day.

5.8    **Assignment.** The terms and provisions of this Undertaking shall be binding upon and inure to the benefit of the Contractors, the Collateral Agent and the Secured Parties and their respective successors and assigns in accordance with the Note Exchange Agreement (including all persons who become bound as to this Undertaking by joinder), except that no Contractor shall have the right to assign its rights or delegate its obligations under this Undertaking or the Master Services Agreement, or any interest herein or therein, without the prior written consent of the Collateral Agent; provided, that the foregoing limitation as to the Contractors shall not apply to collateral assignments and any related exercise of remedies by the Secured Parties, provided such grant, or exercise of remedies by the third party, does not materially impair the Services.

5.9    **Specific Performance**. The Contractors acknowledge and agree that, in addition to any other remedies that may be available to it, and since monetary damages may be inadequate with respect to breaches of this Undertaking by the Contractors, the Collateral Agent shall be entitled to seek specific performance of this Undertaking and Master Services Agreement. Any such remedy shall not in any way affect any other rights or remedies of the parties under this Undertaking, and shall not be deemed to be the exclusive remedy for a breach of this Undertaking, but shall be in addition to all other remedies available at Law or equity to the Collateral Agent.

5.10 **Counterparts.** This Undertaking may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto. The words "execution," "signed," "signature," and words of like import used in this Undertaking will be deemed to include electronic signatures or the keeping of records in electronic form, each of which will be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

5.11 **Additional Contractors**. It is understood and agreed that to the extent other Affiliates of a Contractor provide material services to the Owner, have contributed or do contribute any intellectual property or technology to the Vessels, Licensed Products or Works (as defined in the Intellectual Property Agreements) or otherwise perform a Service in respect of the Vessels consistent with those described in the Master Services Agreement, such Affiliate shall be required to become a Contractor under the Master Services Agreement and this Undertaking, or a Licensor under the applicable Intellectual Property Agreement(s) by (x) executing a joinder agreement (for each of the Master Services Agreement, the applicable Intellectual Property Agreement(s) and this Undertaking) and delivering the same to each of the Collateral Agent and AIG and Prudential in form and substance reasonably satisfactory to the Required Holders, (y) delivering supplements to Exhibit A hereto as are necessary to cause such Exhibit to be complete and accurate with respect to such additional Contractor on such date and (z) taking all actions as specified in this Undertaking as would have been taken by such Contractor had it been an original party to this Undertaking, in each case with all documents required above to be delivered to the Collateral Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Collateral Agent (acting at the direction of the Required Holders). In the event that any Owner entity ceases to be an Affiliate of the other Owner entities, Owner shall use commercially reasonable efforts to ensure Services provided by such former Owner entity are performed by another Owner entity.

[Remainder of Page Intentionally Left Blank. Signature Pages Follow.]

Very truly yours,

C-INNOVATION, L.L.C.
C-PORT, L.L.C.
C-PORT 2, L.L.C.
C-PORT 3, L.L.C.
C-TERMINAL, L.L.C.
EXPERT TRAVEL, LLC
FOURCHON HEAVY LIFT, L.L.C.
GALLIANO MARINE SERVICE, L.L.C.
GULF SHIP, L.L.C.
INTERNATIONAL MARINE SYSTEMS, L.L.C.
LASHIP, L.L.C.
MARINE TECHNOLOGIES, L.L.C.
MARTIN HOLDINGS, L.L.C.
NAUTICAL VENTURES, L.L.C.
NORTH AMERICAN SHIPBUILDING, L.L.C.
OFFSHORE SERVICE VESSELS, L.L.C.
OFFSHORE SUPPORT SERVICES, L.L.C.
SEALAND MECHANICAL, L.L.C.
TAMPA SHIP, L.L.C.

By:
   Name:
   Title:

The Manager of all of the aforementioned companies has executed this Agreement intending that all the companies named above are bound and to be bound by the one signature as if s/he had executed this Agreement separately for each company

BRAM OFFSHORE TRANSPORTES MARITIMOS LTDA.

By:
   Name: Ugo Fernandez
   Title: Executive Director
   ~~Title:~~

[Signatures continued on next page.]

GALLIANO MARINE SERVICE INTERNATIONAL

By:

    Name: Dionne Chouest Austin
    Title: Director

By:

    Name: Damon Chouest
    Title: Director

G-BOATS, INC.

By:

By:

    Name: Greg Cheramie
    Title: Guyana Director

MARINE PROCUREMENT LTD.

By:

    Name: Richard Allinson
    Title: Managing Director
    Title:

[Support Undertaking Signature Page]

# EXHIBIT A

## COMPANIES

### Schedule A(i)

| Services | Contractor |
|---|---|
| Arranging for and handling all matters relating to the crewing of each Vessel, the technical management of each Vessel, entry into various charter, contracts of affreightment and other similar commercial arrangements and entry into various purchasing arrangements for Vessel, including:<br><br>• Executive oversight and management<br><br>• Coordination of services and personnel provided by affiliates<br><br>• Accounting systems and personnel<br><br>• Contracting processes and personnel<br><br>• Finance and banking administration and personnel<br><br>• Human resources processes and personnel<br><br>• Insurance management<br><br>• IT software and support<br><br>• Legal (internal)<br><br>• Logistics services for equipment and personnel<br><br>• Marketing and client management<br><br>• Port captains and field level management<br><br>• Port Fourchon shipyard and drydock | Galliano Marine Service, L.L.C.<br>Galliano Marine Service International<br>G-Boats, Inc.<br>Bram Offshore Transportes Maritimos Ltda. |

| Services | Contractor |
|---|---|
| <ul><li>Storage of stacked vessels</li><li>Officing and utilities for all GMS personnel</li><li>Other miscellaneous back office and administrative personnel and services</li></ul> | |

Schedule A(ii)

| Services | Contractor |
|---|---|
| Maintenance and repair of communications/broadband data and chart services | Marine Technologies, L.L.C. |
| Compliance with all U.S. Coast Guard rules and regulations relating to the ownership and operations of the Vessels, compliance with all classification society rules and requirements, arranging for all required surveys, arranging all insurances for the Vessels and handling of all claims related hereto, arranging for all required repairs and maintenance of the Vessels, ordering of all fuel, lube oils and other necessaries as required by the Vessel operations including Vessel certificates, licenses, and ABS | Galliano Marine Service, L.L.C. Galliano Marine Service International G-Boats, Inc. Bram Offshore Transportes Maritimos Ltda. |
| Travel services, including booking airfare, lodging and ground transportation for vessel crews, support personnel and other | Expert Travel, LLC |
| Insurance premium payment to be reimbursed by the Company (Vessels, Commercial, Property, general, Environmental, etc.) | Offshore Service Vessels, L.L.C. |
| Hospital Insurance that is under a master insurance policy in the name of Galliano Marine Service LLC | Galliano Marine Service, L.L.C. |
| Maintenance and repair of Vessel electronics, including dynamic positioning | Marine Technologies, L.L.C. International Marine Systems, L.L.C. |
| Vessel maintenance and repair, including related regulatory drydocking | C-Port 2, L.L.C. Gulf Ship, L.L.C. LaShip, L.L.C. North American Shipbuilding, L.L.C. Tampa Ship, L.L.C. Sealand Mechanical, L.L.C. (limited to air conditioning) International Marine Systems, L.L.C. (limited to radio and radar) |
| International supplies | Nautical Ventures, L.L.C. Marine Procurement Ltd. G-Boats, Inc. Bram Offshore Transportes Maritimos Ltda. |
| Groceries | Martin Holdings, L.L.C. |

| Services | Contractor |
|---|---|
| | Nautical Ventures, L.L.C. |
| International Direct Payroll | Galliano Marine Service International<br>G-Boats, Inc.<br>Bram Offshore Transportes Maritimos Ltda. |
| Taxes | Galliano Marine Service, L.L.C. |
| Spare parts and supplies | Marine Procurement Ltd.<br>International Marine Systems, L.L.C.<br>Nautical Ventures, L.L.C.<br>G-Boats, Inc.<br>Galliano Marine Service, L.L.C.<br>North American Shipbuilding, L.L.C.<br>Gulf Ship, L.L.C.<br>LaShip, L.L.C.<br>Tampa Ship, L.L.C.<br>C-Port 2, L.L.C.<br>Sealand Mechanical, L.L.C.<br>International Marine Systems, L.L.C. (radio and radar<br>only)<br>Marine Technologies, L.L.C. (IT only) |
| Legal (external) | Galliano Marine Service, L.L.C. |
| Crew labor and benefits | Galliano Marine Service, L.L.C.<br>Galliano Marine Service International<br>G-Boats, Inc.<br>Bram Offshore Transportes Maritimos Ltda. |
| Shipyard and service technician labor for vessel retrofit, repair, and maintenance | North American Shipbuilding, L.L.C.<br>Gulf Ship, L.L.C.<br>LaShip, L.L.C.<br>Tampa Ship, L.L.C.<br>C-Port 2, L.L.C.<br>Sealand Mechanical, L.L.C.<br>International Marine Systems, L.L.C. (radio and radar only)<br>Marine Technologies, L.L.C. (IT only) |

Schedule A(iii)

| Services | Contractor |
|---|---|
| Food service | Martin Holdings, L.L.C. Nautical Ventures, L.L.C. |
| ROV operations/rental | C-Innovation, L.L.C. |
| Vessel radio, radar and communication systems upgrade, repair and maintenance | International Marine Systems, L.L.C. |
| Port services for vessels including cargo loading and unloading and fueling | C-Port, L.L.C. C-Port 2, L.L.C. C-Port 3, L.L.C. C-Terminal, L.L.C. Fourchon Heavy Lift, L.L.C. Martin Holdings, L.L.C. Offshore Support Services, L.L.C. |
| | Any services necessary to operate, upgrade, maintain, repair, replace, and support the systems (including IT systems), software, hardware, and/or equipment, that CONTRACTOR has manufactured for use on other otherwise placed on the Vessels listed on Exhibit B (including access to physical locations hosting such systems, software, hardware, and/or equipment, and including the IP licensed to Owner under (a) the Non-Exclusive and Assignable Patent, Copyright and Know-How License Agreement, dated [9], 2023, by and among Owner, Marine Technologies, L.L.C., and Wilmington Trust, National Association, as Collateral Agent; and (b) the Non-Exclusive and Assignable Copyright License Agreement, dated [9], 2023, by and among Owner, North American Shipbuilding, L.L.C. and Wilmington Trust, National Association, as Collateral Agent) |
| | Vessel fabrication, retrofitting, upgrades and replacements |

Marine Technologies, L.L.C.
North American Shipbuilding, L.L.C.

C-Port 2, L.L.C.
Gulf Ship, L.L.C.
LaShip, L.L.C.
North American Shipbuilding, L.L.C.
Tampa Ship, L.L.C.
Sealand Mechanical, L.L.C. (limited to air
conditioning)
International Marine Systems, L.L.C.
(limited to radio and radar)

**EXHIBIT B**
**VESSELS**

| Vessel Name | Official Number |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

# [FORM OF] MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT (the "Agreement") is made and entered into as of [_____], 2023 (the "Effective Date"), by and among **Nautical Solutions, L.L.C.**, a Louisiana limited liability company, (together with any successors and assigns, collectively herein after referred to as "COMPANY"), on the one hand, and each of the undersigned entities listed on Exhibit A (together with any successors and assigns, each being hereinafter referred to, whether individually or collectively, as "CONTRACTOR"), on the other hand.

## WITNESSETH:

**WHEREAS**, COMPANY is engaged in the marine transportation business, including the operation of the vessels owned by the Company and set forth on Schedule 2 hereto (the "Vessels"; provided, that if a vessel were to be sold by the Company in accordance with Section 9.21 of the NEA (hereinafter defined), or as otherwise permitted by the NEA, then such vessel no longer shall be a "Vessel" hereunder);

**WHEREAS**, COMPANY has entered into that certain Note Exchange Agreement, dated as of the Effective Date (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "NEA") among COMPANY, Nautical Solutions Holdings, LLC, the holders from time to time of the senior notes issued in exchange thereunder, and Wilmington Trust, National Association, as Agent (in such capacity, including its successors and assigns in such capacity, the "Agent") and as Collateral Agent (in such capacity, including its successors and assigns in such capacity, the "Collateral Agent"), pursuant to which the Parties are required to enter into this Agreement;

**WHEREAS,** CONTRACTOR, an Affiliate (as hereinafter defined in the NEA) of the Company, owns, possesses or contracts on behalf of the Company for, certain equipment, parts, spare parts, fuel, lube oils and other necessaries, and/or employs certain personnel necessary for and capable of performing certain services necessary for the normal course of operations of the Vessels, and has provided such services to COMPANY or for the Vessels prior to the Effective Date; and

**WHEREAS**, COMPANY and CONTRACTOR now desire to enter into this Agreement to set forth the terms and conditions pursuant to which CONTRACTOR shall continue to provide to the COMPANY such services.

**NOW, THEREFORE, IN CONSIDERATION** of the mutual promises, covenants, conditions, and agreements herein contained, and the specifications and special provisions set forth in Work Orders (defined further below) and other exhibits issued pursuant to this Agreement, all of which are incorporated by reference and made a part hereof, the parties hereto mutually agree as follows:

## 1.0    AGREEMENT AND TERM

1.1    Subject to the terms and conditions of this Agreement, CONTRACTOR shall provide to COMPANY services necessary for the operation and maintenance of the Vessels, including, as the case may be, (i) Vessel management, (ii) maintenance, repair,

replacement, and support services for the Vessels and for systems, software, hardware, and/or equipment that CONTRACTOR has manufactured for use on or otherwise placed on or used by the Vessels, and (iii) those services listed on Schedules 1(a), 1(b), and 1(c) hereto (collectively, the "Services"). For avoidance of doubt, (i) the Parties intend that the Services shall include all services and functions that a CONTRACTOR entity or any of its Affiliates performed for COMPANY with respect to the Vessels in the eighteen (18) months prior to the Effective Date (other than the Services identified on Schedule 3); (ii) COMPANY represents and warrants that the list of CONTRACTOR entities set forth in Exhibit A is a complete list of CONTRACTOR entities and its Affiliates that provided Services to COMPANY with respect to each Vessel in the eighteen (18) months prior to the Effective Date; and (iii) no CONTRACTOR shall be required to perform any Services that it does not perform or provide in the normal course of its business for itself or any other CONTRACTOR entity or Affiliate or any third party, or otherwise did not perform or provide in the eighteen (18) months prior to the Effective Date. If at any time during the term of this Agreement, COMPANY identifies additional services that (a) COMPANY deems are reasonably necessary to the operation of the Vessels, and (b) CONTRACTOR or any Affiliate is reasonably capable of performing or providing in the same or similar manner as it does for other vessels owned by CONTRACTOR or its Affiliates (such services, the "Additional Services"), COMPANY may request that CONTRACTOR or such Affiliate provide such Additional Service, and upon COMPANY's written request, CONTRACTOR or such Affiliate shall use commercially reasonable efforts to provide the Additional Service, and in which case such Additional Service shall be deemed a Service under this Agreement (and any such applicable Affiliate shall become a CONTRACTOR hereunder as to such Additional Service, pursuant to Section 19.5 hereof). As used in this Agreement, the term "Affiliate" has the meaning given to it in the NEA, except that the companies listed on Schedule 3 hereto shall not be Affiliates under this Agreement or the Support Undertaking (hereinafter defined).

1.2     Notwithstanding the obligations in Section 1.1 for CONTRACTOR to perform or provide the Services, CONTRACTOR shall have no obligation to perform any Services: (a) for any Vessel which ceases to be owned or operated by COMPANY, but subject to the terms of Section 12.3 and that certain Support Undertaking, dated as of the Effective Date, between Collateral Agent and CONTRACTOR ("Support Undertaking"), (b) if the applicable materials, parts, equipment, and components are no longer manufactured by, or otherwise available from, CONTRACTOR or CONTRACTOR's Affiliates or critical vendors; or (c) for which CONTRACTOR ceases to be regularly engaged in the business of, or is no longer reasonably capable of, performing in substantially the same or similar manner as it would for other vessels owned by CONTRACTOR or its Affiliates (other than COMPANY) or for third parties; provided, that in the event of the foregoing (b) or (c), CONTRACTOR shall reasonably cooperate with COMPANY to find a suitable or comparable replacement or alternative for such Service or the applicable materials, parts, equipment, and components, including by another CONTRACTOR entity or an Affiliate or a third party service provider, to the extent reasonably practical.

1.3 This Agreement shall control and govern all applicable Services performed by CONTRACTOR for COMPANY under subsequent written work orders, to the extent issued by the COMPANY to CONTRACTOR with respect to Services to be performed ("Work Orders"). At such time as COMPANY desires CONTRACTOR to perform Services, COMPANY may (but need not) present to CONTRACTOR a Work Order in the form and/or with the elements of Exhibit B, and subject to the terms and conditions of this Agreement CONTRACTOR shall perform all Services reasonably requested therein; provided, that if the Collateral Agent or the Agent (or a designee) is the party requesting Services following the consummation of a Change of Control (as defined in the NEA and hereinafter referred to as a "NEA Change of Control"), or if COMPANY and CONTRACTOR cease to be Affiliates, then a Work Order is a requirement for the Services to be performed. The terms and conditions of this Agreement shall be deemed incorporated by reference in such written Work Orders as though expressed in full therein and made a part thereof. Any agreement or stipulations in any confirmation of such Work Orders, delivery ticket, rate schedule, bids, proposals, purchase orders, or any other instrument used by CONTRACTOR containing provisions contrary or inconsistent with the terms and conditions of this Agreement or such Work Orders are rejected and shall not be binding on COMPANY or form a part of any agreement between COMPANY and CONTRACTOR, unless signed by an officer of COMPANY.

## 2.0 LABOR, EQUIPMENT, MATERIALS, SUPPLIES AND SERVICES

2.1 Upon CONTRACTOR'S receipt of a Work Order, CONTRACTOR shall provide the Services, with sufficient personnel, equipment, and materials capable of efficiently performing the Services stipulated in such Work Order, and continue such operations diligently and without delay. CONTRACTOR shall not unreasonably delay performance of the Services for COMPANY and shall exercise commercially reasonable efforts to respond to COMPANY's requests for Services in a timely manner, provided that CONTRACTOR's delay of a Work Order shall not be unreasonable if COMPANY owes any CONTRACTOR or any Affiliate any undisputed amounts that are more than thirty (30) days past due.

2.2 In the event CONTRACTOR performs any Services upon the request of COMPANY without a fully-executed Work Order, such performance shall be deemed to be (i) an agreement by CONTRACTOR to the terms, conditions, and provisions of this Agreement, and (ii) CONTRACTOR'S affirmative agreement that any such Services shall be performed pursuant and subject to this Agreement. Following the full execution of any Work Order, COMPANY will have the right to request changes to the Work Order by written notice to CONTRACTOR (each such writing, a "Change Order"), including changes to drawings, designs, configurations, specifications, quantities, methods of shipment or packing and delivery schedules or locations of delivery. No Change Order shall become effective without the written mutual agreement by CONTRACTOR. Any and all terms, conditions and provisions of any Work Order that are unchanged by the Change Order shall remain in full force and effect.

2.3         CONTRACTOR warrants that its applicable Services shall be (i) free of defects in workmanship and materials, to the extent such materials are manufactured by CONTRACTOR, (ii) performed in a good and workmanlike manner consistent with applicable industry standards and practices and utilizing sound engineering and/or technical principles where applicable, (iii) performed with new, merchantable, and fit materials, (iv) in full accordance with this Agreement and the applicable Work Order, and (v) performed in substantially the same manner, and with at least the same skill, quality, level, volume, availability and scope as the Services (or similar services) were provided to the COMPANY or Vessels by CONTRACTOR or its Affiliates immediately prior to the Effective Date. With respect to materials, equipment, goods, products, components or other elements or items incorporated into the Services, which are provided or manufactured by a third party ("Third Party Items"), CONTRACTOR's warranty as to such Third-Party Items shall be expressly limited to whatever warranty is afforded by such third party to the extent CONTRACTOR is permitted to assign such warranty to COMPANY. **COMPANY ACKNOWLEDGES THAT THE WARRANTIES EXPRESSLY PROVIDED IN THIS AGREEMENT, INCLUDING WITHOUT LIMITATION SECTIONS 1.1 AND 2.3 ARE THE SOLE WARRANTIES PROVIDED WITH RESPECT TO THE SERVICES, SUCH WARRANTY BEING TO THE EXCLUSION OF ANY AND ALL OTHER WARRANTIES, INCLUDING, WITHOUT LIMITATION, THOSE THAT MAY BE IMPLIED UNDER THE LAW, ALL OF WHICH ARE DEEMED WAIVED, INCLUDING, WITHOUT LIMITATION, A WAIVER OF ALL LAWS OF REDHIBITION AND IMPLIED WARRANTIES PROVIDED BY LOUISIANA LAW, INCLUDING AS SUCH MAY APPEAR IN LA. C.C. ARTS. 2520-2548, OR THE LAWS OF ANY COUNTRY, PROVINCE, STATE, OR POLITICAL SUBDIVISION THEREOF.**

**FOR THE AVOIDANCE OF DOUBT, NO WARRANTIES UNDER THIS AGREEMENT OR OTHERWISE BY ANY CONTRACTOR AS TO ITS SERVICES, WHETHER EXPRESS OR IMPLIED, IS MADE OR DEEMED MADE BY ANY OTHER CONTRACTOR, AND NO SUCH OTHER CONTRACTOR IS LIABLE THEREFOR.**

CONTRACTOR's warranty on that specific portion of Services consisting of the sale of parts, equipment, components and other materials that are manufactured by CONTRACTOR to COMPANY shall apply for a period of twelve (12) months from the date of COMPANY's acceptance of such part, equipment, components or materials portion of Service, such acceptance not to be unreasonably delayed, withheld, or conditioned. Except for the limited circumstances provided for in the preceding sentence, CONTRACTOR's warranty on all other Services shall apply for a period of one hundred eighty (180) days from the date of completion of any discernable portion of the Services, and any claim by COMPANY that CONTRACTOR's Services fails to satisfy this warranty must be made to CONTRACTOR in writing in accordance with Section 18 (Notices) within the applicable time period. All defects and deficiencies in the Services, including any breach of this warranty, shall be promptly repaired, replaced, re-performed, or otherwise corrected by CONTRACTOR within the applicable warranty period (collectively, "Remedial Efforts") to COMPANY's

satisfaction, provided that, without limiting <u>Section 1.2</u>, CONTRACTOR's obligations are expressly limited to such Remedial Efforts that CONTRACTOR may undertake with its own personnel physically working at CONTRACTOR's applicable place of business or other location where such CONTRACTOR had performed the applicable Service, (the "<u>Contractor Location</u>") or the Vessels. CONTRACTOR will perform Remedial Efforts at locations other than the Contractor Location subject to mutual agreement prior to incurring costs on the additional costs and amounts to be paid by COMPANY to CONTRACTOR in respect thereof, including, without limitation, as pertains to travel, transportation, and shipping costs or expenses (including as to CONTRACTOR's personnel, property, materials, goods, parts, equipment, components, or items made subject of the Services), accommodations, meals, communications, and per diems, provided that all of the aforementioned are of quality and quantity comparable or better than standards and allocations typically enjoyed within western industrialized nations (all of the aforementioned being "<u>Travel Expenses</u>").

2.4    Delivery tickets covering any materials and/or supplies delivered to a location by CONTRACTOR or furnished by its vendors for which COMPANY is obligated to reimburse CONTRACTOR shall be delivered to COMPANY, as received by CONTRACTOR. The quantity, description, and condition of materials and/or supplies so furnished shall be verified and checked by CONTRACTOR, and the delivery thereof shall be properly certified as to receipt by CONTRACTOR's representative. Upon receipt of delivery tickets, a representative of COMPANY shall review such tickets and, if the materials and/or supplies are of satisfactory quantity, description and condition, approve them; <u>provided</u>, <u>however</u>, that such approval shall in no way relieve or release CONTRACTOR from any performance, warranty or other obligation hereunder with regard to such supplies and materials. If the quantity, description and condition of any materials and/or supplies covered by any delivery ticket are not satisfactory to such representative of COMPANY, CONTRACTOR agrees to promptly substitute the same with materials and/or supplies (as the case may be) acceptable to COMPANY.

2.5    CONTRACTOR shall make a thorough inspection of the work site and its surroundings before starting the Services to familiarize itself with all conditions relating to the Services. Unless CONTRACTOR provides COMPANY written notice to the contrary prior to the commencement of Services, upon commencement of Services, CONTRACTOR shall be deemed to have accepted the work site's condition as safe and suitable for performance of the Services. CONTRACTOR shall be solely responsible for obtaining all licenses and permits necessary for CONTRACTOR's performance of the Services, and CONTRACTOR further represents and warrants that prior to performance of such Services, CONTRACTOR has, or will have, all licenses and permits necessary for CONTRACTOR's performance of the Services.

2.6    If CONTRACTOR is required to provide engineering and design services for the Services, CONTRACTOR warrants those engineering and design services (the "<u>Engineering/Design Services</u>") rendered on the Services will be performed in accordance with the generally accepted standards and practices prevailing in the

engineering industry by individuals qualified in specific technical areas and in accordance with any applicable rules, regulations and requirements of the regulatory bodies and, when applicable, any classification society having jurisdiction. If any of the Engineering/Design Services fail to comply with the foregoing warranty, CONTRACTOR shall re-perform, without additional charge, all or any portion of the Engineering/Design Services originally performed in a faulty manner. COMPANY acknowledges that the Services are not to be deemed works made for hire and CONTRACTOR shall be considered the owner thereof under the copyright laws of the United States and therefore is deemed to be the exclusive owner of the copyrights in and to any such Services, its documentation and any work product created by CONTRACTOR relating to the Services.

2.7     Notwithstanding any other provision herein to the contrary, COMPANY acknowledges that it shall always be and remain responsible for any and all Travel Expenses incurred by CONTRACTOR in connection with CONTRACTOR's provision of Services, as well as the cost of CONTRACTOR's personnel during times when CONTRACTOR is waiting to provide, perform, progress, or continue Services, all to be mutually agreed upon.

2.8     When Services are required to be performed in the offices, worksite or other premises of COMPANY, COMPANY shall provide the employees of CONTRACTOR with reasonable access to such locations.

## 3.0 PAYMENT

3.1     In consideration for the provision of the Services, COMPANY shall pay CONTRACTOR a "Services Fee" calculated as follows:

    (a)     For Services in Schedule 1(a), the amount governed by Section 9.16 of the NEA;

    (b)     For Services in Schedule 1(b), the actual cost incurred by the CONTRACTOR entity performing the Service, calculated in a manner consistent with how such costs were passed through to COMPANY in the eighteen (18) months prior to the Effective Date; and

    (c)     For Services in Schedule 1(c), at CONTRACTOR's then-prevailing rates charged to third parties for such Services or, if CONTRACTOR does not have such a prevailing rate for such Services, then at reasonable market rates charged by third parties for comparable Services; provided, that, with respect to the Services in Schedule 1(c), so long as CONTRACTOR and COMPANY are affiliates and COMPANY owns the Vessels (without there having been a NEA Change of Control), if a CONTRACTOR or its Affiliates provides any such Services to other CONTRACTOR entities or Affiliates at a rate less than such then-prevailing rates for such Services, then CONTRACTOR shall charge COMPANY for such Services based on such lesser rate.

For avoidance of doubt, upon (i) the consummation of a Change of Control (as defined in the NEA) by virtue of a sale by or at the direction of the Collateral Agent or the Agent of equity of COMPANY (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title), or (ii) sale of the Vessels to a third party purchaser not an Affiliate of CONTRACTOR during a bankruptcy or insolvency proceeding or by virtue of the exercise by the Collateral Agent or the Agent of remedies following the occurrence of an Event of Default (as defined in the NEA and hereinafter referred to as a "NEA Event of Default"), the Services Fees for the Services set forth on Schedule 1(a) hereto shall continue to be solely as set forth in Section 9.16 of the NEA. The Services Fee shall not include CONTRACTOR's allocated overhead costs associated with the provision of the applicable Service. "Vessel Manager" means, as to a given Vessel, the relevant CONTRACTOR in charge of crew and other technical management thereof.

3.2     CONTRACTOR shall invoice COMPANY at the end of each month for Services performed in such month with full supporting documentation evidencing CONTRACTOR's calculation of the Services Fees, including delivery tickets and daily time tickets signed by COMPANY's duly authorized representative, and such other documentation and back up as COMPANY shall request or require. COMPANY shall pay to CONTRACTOR the undisputed portion of such invoices within thirty (30) days of receipt; provided, however, that payment of any amount by COMPANY to CONTRACTOR shall not be deemed to constitute a waiver of any rights of COMPANY under this Agreement and all such rights are reserved and any payment obligation of COMPANY shall be subject to CONTRACTOR complying in full with its obligations, covenants, and agreements contained in this Agreement and the applicable Work Order and upon such Services being reasonably accepted by COMPANY as fully complying with all terms, conditions, specifications and requirements of this Agreement and the applicable Work Order. CONTRACTOR shall be entitled to recover interest at the rate of one percent (1%) per month on both undisputed amounts, and disputed amounts ultimately resolved in CONTRACTOR's favor. As to undisputed amounts which have not been received by CONTRACTOR, interest shall start to accrue thirty (30) days after receipt of CONTRACTOR's invoicing. As to disputed amounts, if resolved in favor of CONTRACTOR, then the interest thereon likewise shall have accrued back to the thirtieth (30th) day after COMPANY first received CONTRACTOR's invoicing therefor; provided that, for clarity, no interest shall be payable on disputed amounts resolved in favor of COMPANY.

3.3     CONTRACTOR shall keep and maintain complete and accurate records necessary to verify CONTRACTOR's costs of performing the Services and the applicable Services Fees due hereunder. COMPANY shall have the right, not more than once each year during the term of this Agreement, to have CONTRACTOR's independent, certified public accountants inspect CONTRACTOR's records for the purpose of determining the accuracy of the Services Fees for a period covering not more than one (1) year following the calendar to which they pertain. The independent, certified public accountant selected shall keep confidential any information obtained during such inspection and shall report to COMPANY only the amounts of Services Fees due and

payable. Such audits may be exercised during normal business hours upon reasonable prior written notice to CONTRACTOR. COMPANY shall bear the full cost of such audit unless such audit reveals an overpayment by COMPANY (or Services Fees amount invoiced to COMPANY) of more than five percent (5%) of the Services Fees or other payments due under this Agreement for the audited period, in which case, CONTRACTOR shall bear the cost of such audit and shall refund to COMPANY the amount of any overpayment within thirty (30) days following such audit.

## 4.0   REPORTS TO BE FURNISHED BY CONTRACTOR

4.1   The quantity, description and condition of the materials and supplies and/or Services furnished by CONTRACTOR shall be verified by CONTRACTOR, and all delivery tickets and daily service logs shall be properly certified as to receipt by the original signature of CONTRACTOR's representative. CONTRACTOR must obtain approval of COMPANY's representative on location for materials and supplies for which CONTRACTOR is to be reimbursed by COMPANY.

4.2   CONTRACTOR shall orally report to COMPANY, as soon as practicable, followed by an appropriate written report, all accidents or occurrences resulting in job-related death, illness, or injuries to CONTRACTOR's employees or third parties, or damage to property of COMPANY, CONTRACTOR or third parties or the environment arising out of or during the course of its performance of such Services or any near misses, which could also have resulted in personal injury and/or other damage. Upon COMPANY's request, CONTRACTOR shall give COMPANY copies of all reports of such accidents and occurrences prepared by or on behalf of CONTRACTOR, statements taken from witnesses and submissions to state and/or federal authorities.

## 5.0   INDEPENDENT CONTRACTOR RELATIONSHIP

5.1   In the performance of Services, CONTRACTOR shall be deemed to be an independent contractor, with the authority and right to direct and control all details of the performance of the Services. However, all Services contemplated shall meet the approval of COMPANY, not to be unreasonably withheld, and shall be subjected to a general right of inspection, and shall in all events comply with the obligations in Section 2. COMPANY shall have no right or authority to supervise or give instructions to the employees, agents, or representatives of CONTRACTOR, and such employees, agents or representatives at all times shall be under the direct and sole supervision and control of CONTRACTOR. Any suggestions or directions given by COMPANY or its employees shall be given to the superintendent or other person in charge of CONTRACTOR's crew; provided, however, that in the event any employee or representative of COMPANY should give any suggestions or directions to the employees of CONTRACTOR (which employee or representative of COMPANY shall not in any event be authorized to do) and such suggestions or directions are not countermanded by CONTRACTOR's superintendent or other person in charge of CONTRACTOR's employees or crew, it shall be deemed that such suggestions or directions are the suggestions or directions of CONTRACTOR. It is the understanding and intention of the parties hereto that no relationship of master and servant or principal

and agent shall exist between COMPANY and the employees, agents, or representatives of CONTRACTOR, whether by borrowed servant or any other legal theory. Notwithstanding the foregoing, COMPANY may at any time require CONTRACTOR to stop Services in the event that COMPANY determines that the manner of Services are progressing in a potentially unsafe manner.

5.2     CONTRACTOR shall retain direct supervision and control of the Services provided to

COMPANY under this Agreement; provided, however, CONTRACTOR may coordinate the Services to be provided under this Agreement with any authorized COMPANY representative, provided that CONTRACTOR continues to comply with its obligations under Section 2.

## 6.0 INSURANCE

6.1     For the duration of this Agreement, without limiting the indemnity obligations or liabilities of CONTRACTOR or its insurer(s) under this Agreement and any Work Order, at any and all times during the term of this Agreement, CONTRACTOR shall, at CONTRACTOR's sole cost and expense, maintain, with an insurance company or companies authorized to do business in the location where the Services are to be performed, insurance coverages of the kind and in the minimum amounts set forth below and in a form and with such insurers acceptable to COMPANY. All such policies shall be "occurrence" as opposed to "claims made" policies unless consented to in writing by the COMPANY and except as to the policy referenced in Section 6.1(i). The limits specified shall be minimum limits only and all additional insureds (as such status is qualified and limited in this Agreement) shall be entitled to the full limits of all policies actually obtained. The limits of such policies shall in no way limit the indemnity or other obligations of CONTRACTOR under this Agreement or any Work Order unless required by applicable law. Failure to maintain all such insurance shall give COMPANY the right to immediately terminate this Agreement or any Work Order without prior notice to CONTRACTOR. To the extent of CONTRACTOR's liability assumed herein relative to COMPANY, CONTRACTOR shall be solely liable for and shall assume the costs of any deductible amounts of self-insured retentions and any liability of CONTRACTOR in excess of the insurance maintained. In the event any liabilities of CONTRACTOR are not covered by the insurance specified herein CONTRACTOR shall be deemed to be self-insured to that extent. The minimum insurance that CONTRACTOR is required to maintain is as follows:

(a)     worker's compensation insurance and employers' liability insurance complying with the applicable laws of the country or parish and state where the Services are performed, with employers' liability limits of not less than $1,000,000, covering all CONTRACTOR's employees performing Services, and with endorsements for voluntary compensation and alternate employer/borrowed servant coverage;

(b)     commercial general liability insurance, with combined limits for bodily injury and property damage of not less than $1,000,000 per accident or occurrence, and shall include endorsements for broad form property damage

coverage, broad form contractual liability coverage, owners and contractors protection for work let or sublet, premises and operations, products completed operations, "action over/indemnity buyback," cross liability and severability of interests, deletion of any provision which would have the effect of excluding coverage for additional insureds for injury or death to employees of CONTRACTOR on the grounds of an employment relationship, coverage for explosion, collapse, or underground property damage, and extension of territorial limits to include all areas of operations under this Agreement and any Work Order;

(c)     automobile liability insurance for owned, non-owned, and hired automobiles, with combined limits for bodily injury and property damage of not less than $500,000 per occurrence;

(d)     all risk physical damage insurance on CONTRACTOR's equipment and other property to the extent of its full replacement value;

(e)     aviation liability insurance to cover aircraft, if any, whether owned, non-owned, chartered, or hired by CONTRACTOR and used for or in connection with the performance of Services under this Agreement and any Work Order, with a combined bodily injury and property damage limit of not less than $3,000,000 per occurrence;

(f)     in the event operations are over or adjacent to water, (i) CONTRACTOR shall obtain endorsements to the statutory worker's compensation and employers' liability insurance policy required under Section 6.1(a) of this Agreement for the Longshoremen's and Harbor Workers' Compensation Act and Outer Continental Shelf Lands Act Extension, (ii) CONTRACTOR shall obtain a maritime employers' liability insurance policy including coverage for Jones Act, Death on the High Seas Act, and general maritime law claims, and wages, transportation, maintenance and cure, and extension of voluntary compensation to maritime operations, including coverage for employees of CONTRACTOR that may be considered members of a crew on Vessels or other vessels that are not owned by CONTRACTOR and (iii) the commercial general liability insurance policy specified in Section 6.1(b) of this Agreement shall be endorsed to delete any water craft exclusions throughout. All such policies shall be endorsed to provide that a claim "in rem" will be treated as a claim "in personam";

(g)     only if CONTRACTOR rents or charters vessels in performing Services, CONTRACTOR, in addition to all applicable insurance coverage provided in Sections 6.1(a), 6.1(b), 6.1(c), 6.1(d), 6.1(e), and 6.1(f) above, shall carry adequate hull and machinery and protection and indemnity insurance in such amounts and against such risks as COMPANY may require covering any vessel or vessels used and their equipment, including tower's liability coverage (with sistership clause unamended) if the vessel or vessels engage in towing operations and broad form wreck removal. The hull and

machinery and protection and indemnity insurance shall be endorsed to delete any "other than as owner" limitation of liability provisions therein and any "as owner" capacity limitations and shall insure the additional insureds as provided in <u>Section 6.2</u> herein in their capacities as owner, operator, charterer, or otherwise. CONTRACTOR shall not use any vessel or marine equipment in the performance of Services for COMPANY at any time unless said vessel is adequately covered by insurance, as herein provided, and is operated within the navigation limits of the insurance policies;

(h)     excess liability insurance excess to the policies required in <u>Sections 6.1(a)</u>, <u>6.1(b)</u>, <u>6.1(c)</u>, <u>6.1(e)</u>, <u>6.1(f)</u>, and <u>6.1(g)</u> of this Agreement with corresponding extensions of coverages, and with minimum limits of not less than $10,000,000 per occurrence unless a different amount is specified in a written Work Order; and

(i)     if CONTRACTOR shall render any Design/Engineering Services, CONTRACTOR shall maintain professional liability insurance, including coverage for errors and omissions, with minimum limits of not less than $1,000,000 per occurrence. Exclusions for care, custody, control, contractual, and pollution (if environmental services are to be provided) liability will be deleted.

6.2     CONTRACTOR shall obtain from its insurers full waivers of subrogation (whether direct, indirect, equitable, by loan receipt or otherwise) against COMPANY, its contractors and subcontractors (excluding CONTRACTOR) and their respective vessels, joint venturers, co-lessees, partners, parents, subsidiaries, Affiliates, and interrelated companies and their respective officers, directors, agents, employees, and representatives (all of the foregoing referred to as the "<u>COMPANY GROUP</u>", except that if and so long as COMPANY is the party in interest hereunder exercising its rights hereunder, and COMPANY and CONTRACTOR are Affiliates, then "<u>COMPANY GROUP</u>" does not include CONTRACTOR insofar as it is an Affiliate or interrelated company of COMPANY) in all of the insurance policies set forth in <u>Section 6.1</u> to the extent of the liability assumed by CONTRACTOR under this Agreement.

Further, the COMPANY GROUP shall be named as additional insureds in all insurance policies carried by CONTRACTOR required under <u>Section 6.1</u>, other than the worker's compensation and employers' liability insurance policies but only to the extent of the liabilities assumed by CONTRACTOR under this Agreement, including those under <u>Section 8.0</u> of this Agreement. All such policies shall be endorsed to provide that they are primary to any coverages maintained or available to such additional insureds, regardless of any "excess" or "other insurance" clauses therein to the extent of the liability assumed by CONTRACTOR under this Agreement. All such policies shall be endorsed to provide that additional insureds shall not be liable for premiums, commissions, or calls, and that COMPANY shall be given at least thirty (30) days' prior written notice of any cancellation, non-renewal, or material modifications of such policies.

All such insurances will provide for contractual liability coverage to fully cover the indemnity obligations of CONTRACTOR assumed in this Agreement. All such policies shall have navigation or territorial limits adequate for the engagement contemplated herein. All such policies shall be satisfactory in form and substance to COMPANY and shall not contain additional exclusions or deletions which adversely affect the coverage afforded by the policies in favor of the additional insureds required hereunder. All such policies shall be endorsed to provide that employees of one insured shall be treated as members of the public as to all other insureds.

6.3     In the event CONTRACTOR seeks to be a self-insurer and COMPANY has consented to CONTRACTOR being a self-insurer as to any one or more of the risks as to which coverage is herein required, evidence of such consent must be in writing and approved by a representative of COMPANY authorized to enter into such consent agreement.

6.4     The failure of CONTRACTOR to have in place and maintain the insurance coverages expressly required herein shall constitute a breach of contract.

## 7.0     UNDERTAKINGS APPLICABLE TO COLLATERAL AGENT

7.1     In accordance with the NEA and the Support Undertaking, the Parties acknowledge and agree that during (i) the continuance of a NEA Event of Default or any insolvency or bankruptcy proceeding of the COMPANY where the exercise of Collateral Agent's remedies in the NEA Event of Default is stayed, and (ii) for a period of one (1) year following (x) the sale of a Vessel to a third-party purchaser not affiliated with CONTRACTOR during a bankruptcy or insolvency proceeding or by virtue of the exercise by the Collateral Agent or the Agent of remedies (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title)following the occurrence of a NEA Event of Default or (y) a NEA Change of Control by virtue of a sale by or at the direction of the Collateral Agent or the Agent of equity of the COMPANY or by virtue of an insolvency or bankruptcy proceeding of the COMPANY, as the case may be, CONTRACTOR shall:

(a)     Continue to comply with its obligations under this Agreement and to perform the Services under this Agreement on an ongoing basis (whether to the third-party purchaser, COMPANY, or Collateral Agent or a special purpose entity or designee, as applicable) on the same terms and conditions as set forth herein, to the extent such person requests; and

(b)     Provide any necessary training and support services to allow the Collateral Agent (or a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title), a third-party purchaser or the COMPANY (after giving effect to the NEA Change of Control), as the case may be, to properly transition the Services necessary to operate the Vessels and any intellectual property and technology that is embedded and/or used for the operation of the applicable Vessel or Vessels, including any intellectual property and technology licensed to the Owner pursuant to the Non-Exclusive and Assignable Patent, Copyright and Know-How License

Agreement, dated [9], 2023, by and among Nautical Solutions, L.L.C., Marine Technologies, L.L.C., and the Collateral Agent; and (b) the Non-Exclusive and Assignable Copyright License Agreement, dated [9], 2023, by and among Nautical Solutions, L.L.C., North American Shipbuilding, L.L.C. and the Collateral Agent.

## 8.0 INDEMNITY

8.1    In order to allocate respective responsibilities of COMPANY and CONTRACTOR for liabilities arising out of personal injury or property damage and other risks, it is agreed between COMPANY and CONTRACTOR that certain responsibilities and liabilities arising out of the performance of this Agreement and any Work Order should be allocated between them in order to avoid litigation between COMPANY and CONTRACTOR and so that insurance may be arranged by each party as necessary to protect against exposures to loss. The following sets out the agreements between COMPANY and CONTRACTOR as to the allocation of responsibilities and liabilities in respect of Services provided under this Agreement. COMPANY and CONTRACTOR shall promptly notify the other of any claim, demand, or suit that may be presented to or served upon it which may give rise to an indemnifiable claim. THE FOLLOWING PROVISIONS SHALL BE APPLICABLE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW:

(a)    CONTRACTOR AGREES TO RELEASE, DEFEND, INDEMNIFY AND HOLD THE COMPANY GROUP (AS DEFINED IN SECTION 8.1(b) OF THIS AGREEMENT), THE VESSELS AND THEIR CREW HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, LIABILITY OR CAUSES OF ACTION FOR PERSONAL INJURY, DISEASE, ILLNESS, DEATH, OR PROPERTY DAMAGE OR LOSS OF ANY MEMBER OF CONTRACTOR GROUP, REGARDLESS OF CAUSE, AND EVEN IF CAUSED BY THE SOLE, JOINT, COMPARATIVE, CONTRIBUTORY OR CONCURRENT NEGLIGENCE, FAULT, STRICT LIABILITY (INCLUDING FOR UNSEAWORTHINESS) OR PRODUCT LIABILITY OF ANY MEMBER OF COMPANY GROUP.

(b) COMPANY AGREES TO RELEASE, DEFEND, INDEMNIFY AND HOLD CONTRACTOR AND ITS RESPECTIVE OFFICERS, DIRECTORS, MEMBERS, MANAGERS, AGENTS, EMPLOYEES, AND REPRESENTATIVES (THE "CONTRACTOR GROUP", EXCEPT THAT IF AND SO LONG AS COMPANY IS THE PARTY IN INTEREST HEREUNDER EXERCISING ITS RIGHTS HEREUNDER, AND COMPANY AND CONTRACTOR ARE AFFILIATES, THEN "CONTRACTOR GROUP" DOES NOT INCLUDE COMPANY INSOFAR AS IT IS AN AFFILIATE OR INTERRELATED COMPANY OF CONTRACTOR) HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, LIABILITY OR CAUSES OF ACTION FOR PERSONAL INJURY, DISEASE, ILLNESS, DEATH OR PROPERTY DAMAGE (EXCEPTING PROPERTY THAT IS THE SUBJECT OF A

WORK ORDER) OR LOSS OF ANY MEMBER OF COMPANY GROUP, REGARDLESS OF CAUSE, AND EVEN IF CAUSED BY THE SOLE, JOINT, COMPARATIVE, CONTRIBUTORY OR CONCURRENT NEGLIGENCE, FAULT, STRICT LIABILITY (INCLUDING FOR UNSEAWORTHINESS) OR PRODUCT LIABILITY OF ANY MEMBER OF THE CONTRACTOR GROUP.

(c)     THE PARTIES INDEMNIFIED HEREIN SHALL HAVE THE RIGHT TO PARTICIPATE IN THE DEFENSE OF ANY INDEMNIFIABLE CLAIMS AT THEIR OWN EXPENSE.

(d)     IN AGREEING TO SO INDEMNIFY AND HOLD HARMLESS THE COMPANY GROUP, CONTRACTOR SPECIFICALLY AND EXPRESSLY WAIVES ANY IMMUNITY IT MIGHT OTHERWISE HAVE PURSUANT TO OR UNDER ANY APPLICABLE STATE AND/OR FEDERAL INDUSTRIAL INSURANCE ACT OR ANY APPLICABLE WORKER'S COMPENSATION ACT AND ASSUMES LIABILITY ON ACCOUNT OF ANY CLAIM, SUIT OR ACTION MADE OR BROUGHT AGAINST COMPANY GROUP FOR THE PERSONAL INJURY, DISEASE, ILLNESS OR THE DEATH TO PERSONS OR DAMAGE TO OR LOSS OF PROPERTY INVOLVING CONTRACTOR, OR ANY MEMBER OF THE CONTRACTOR GROUP, ARISING OUT OF AND IN CONNECTION WITH OR INCIDENT TO THE CONTRACTOR'S PERFORMANCE OF THIS AGREEMENT, ARISING FROM ANY CAUSE WHATSOEVER. CONTRACTOR SPECIFICALLY AGREES AND ACKNOWLEDGES THAT THIS AGREEMENT OF INDEMNIFICATION AND HOLD HARMLESS TOGETHER WITH CONTRACTOR'S WAIVER OF IMMUNITY UNDER THE APPLICABLE STATE AND/OR FEDERAL INDUSTRIAL INSURANCE OR ANY APPLICABLE WORKER'S COMPENSATION ACT, INCLUDING, BUT NOT LIMITED TO, THE LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT, 33 U.S.C. §901-950, AS AMENDED, WAS THE SUBJECT OF DISCUSSION AND NEGOTIATION BETWEEN CONTRACTOR AND COMPANY AND THAT CONTRACTOR'S PROMISES AND WAIVER HEREIN ARE A PART OF THE CONSIDERATION FOR COMPANY'S ENTERING INTO THIS AGREEMENT AND CONTRACTOR'S OBLIGATIONS AND WAIVER HEREIN WERE CONSIDERED BY CONTRACTOR WHEN ARRIVING AT A PRICE FOR WHICH CONTRACTOR AGREED TO DO THE SERVICES CONTEMPLATED BY THIS AGREEMENT.

IN AGREEING TO SO INDEMNIFY AND HOLD HARMLESS THE CONTRACTOR GROUP, COMPANY SPECIFICALLY AND EXPRESSLY WAIVES ANY IMMUNITY IT MIGHT OTHERWISE HAVE PURSUANT TO OR UNDER ANY APPLICABLE STATE AND/OR FEDERAL INDUSTRIAL INSURANCE ACT OR ANY

APPLICABLE WORKER'S COMPENSATION ACT, AND ASSUMES LIABILITY ON ACCOUNT OF ANY CLAIM, SUIT OR ACTION MADE OR BROUGHT AGAINST ANY MEMBER OF THE CONTRACTOR GROUP FOR THE PERSONAL INJURY, DISEASE, ILLNESS OR THE DEATH TO PERSONS OR DAMAGE TO OR LOSS OF PROPERTY INVOLVING COMPANY, OR ANY MEMBER OF THE COMPANY GROUP, ARISING OUT OF AND IN CONNECTION WITH OR INCIDENT TO THE COMPANY'S PERFORMANCE OF THIS AGREEMENT, ARISING FROM ANY CAUSE WHATSOEVER. COMPANY SPECIFICALLY AGREES AND ACKNOWLEDGES THAT THIS AGREEMENT OF INDEMNIFICATION AND HOLD HARMLESS TOGETHER WITH COMPANY'S WAIVER OF IMMUNITY UNDER THE APPLICABLE STATE AND/OR FEDERAL INDUSTRIAL INSURANCE OR ANY APPLICABLE WORKER'S COMPENSATION ACT, INCLUDING, BUT NOT LIMITED TO, THE LONGSHORE AND HARBOR WORKERS' COMPENSATION ACT, 33 U.S.C. §901-950, AS AMENDED, WAS THE SUBJECT OF DISCUSSION AND NEGOTIATION BETWEEN COMPANY AND CONTRACTOR AND THAT COMPANY'S PROMISES AND WAIVER HEREIN ARE A PART OF THE CONSIDERATION FOR CONTRACTOR'S ENTERING INTO THIS AGREEMENT AND COMPANY'S OBLIGATIONS AND WAIVER HEREIN WERE CONSIDERED BY COMPANY WHEN ARRIVING AT A PRICE FOR WHICH CONTRACTOR AGREED TO DO THE SERVICES CONTEMPLATED BY THIS AGREEMENT.

8.2        (a) IN THE EVENT THAT AN OTHERWISE INDEMNIFIABLE CLAIM UNDER THIS AGREEMENT IS SUBJECT TO THE INDEMNITY LIMITATIONS IN LA. REV. STAT. ANN, SECTION 9:2780(G), AS AMENDED, AND FOR SO LONG AS THAT ACT IS IN FORCE, THEN IT IS AGREED THAT THE ABOVE INDEMNITY OBLIGATIONS APPLICABLE TO SUCH INDEMNIFIABLE CLAIM ARE LIMITED TO THE EXTENT OF INDEMNITOR'S COMPARATIVE NEGLIGENCE, FAULT OR STRICT LIABILITY. IN THE EVENT THAT AN OTHERWISE INDEMNIFIABLE CLAIM UNDER THIS AGREEMENT IS SUBJECT TO THE INDEMNITY LIMITATIONS IN CHAPTER 127 OF THE TEXAS CIVIL PRACTICES AND REMEDIES CODE, AS AMENDED, AND SO LONG AS SUCH LIMITATIONS ARE IN FORCE, THEN TO THE EXTENT IN EACH CASE NECESSARY TO MAKE THE RECIPROCAL INDEMNITY OBLIGATIONS IN THIS AGREEMENT ENFORCEABLE IT IS AGREED THAT (1) SUCH INDEMNITY OBLIGATIONS SHALL INCLUDE AS INDEMNITEES THE RESPECTIVE CUSTOMERS AND/OR CONTRACTORS, AS SPECIFIED IN SECTION 8.1(a) HEREIN, OF THE INDEMNIFIED PARTIES AND (II) CONTRACTOR AND COMPANY COVENANT AND AGREE TO SUPPORT THEIR RESPECTIVE INDEMNITY AGREEMENTS BY LIABILITY INSURANCE COVERAGE IN THE

AMOUNTS AND WITH THE COVERAGES SET FORTH IN <u>SECTION 6.1</u> HEREOF AND COMPANY AGREES THAT IT SHALL CARRY AND MAINTAIN THE SAME TYPES OF COVERAGE AND WITH THE EQUAL LIMITS REQUIRED OF CONTRACTOR THEREUNDER. EXCEPT AS REQUIRED BY CHAPTER 127 OF THE TEXAS CIVIL PRACTICES AND REMEDIES CODE IN ORDER TO HAVE ENFORCEABLE RECIPROCAL INDEMNITIES, THE LIMITS OF SUCH POLICIES SHALL NOT LIMIT CONTRACTOR'S OR COMPANY'S INDEMNITY AND RELEASE OBLIGATIONS UNDER THIS AGREEMENT. TO THE EXTENT THAT THE RECIPROCAL INDEMNITY AND RELEASE OBLIGATIONS UNDER THIS AGREEMENT ARE OTHERWISE NOT ENFORCEABLE UNDER CHAPTER 127 OF THE TEXAS CIVIL PRACTICES AND REMEDIES CODE, IT IS AGREED THAT ANY SUCH INDEMNITY MAY BE ENFORCED BY THE INDEMNIFIED PARTY AS A UNILATERAL INDEMNITY.

(b) IF IT IS JUDICIALLY DETERMINED THAT THE MONETARY LIMITS OR SCOPE OF COVERAGE OF THE INSURANCES REQUIRED UNDER THIS AGREEMENT OR OF THE INDEMNITIES VOLUNTARILY ASSUMED UNDER THIS SECTION EXCEED THE MAXIMUM MONETARY LIMITS OR SCOPE PERMITTED UNDER APPLICABLE LAW, IT IS AGREED THAT SAID INSURANCE REQUIREMENTS OR INDEMNITY SHALL AUTOMATICALLY BE AMENDED TO CONFORM TO THE MAXIMUM MONETARY LIMITS AND SCOPE PERMITTED UNDER SUCH LAW.

(c) THE ALLOCATIONS OF RESPONSIBILITY, INDEMNITY OBLIGATIONS, AND EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH IN THIS AGREEMENT THAT APPLY TO AN EVENT OR CONDITION THAT OCCURS DURING THE PERFORMANCE OF THIS AGREEMENT SHALL SURVIVE AND NOT BE AFFECTED BY THE EXPIRATION OR TERMINATION OF A WORK ORDER OR THIS AGREEMENT.

## 9.0   LIMITATION OF LIABILITY

9.1   <u>Waiver of Consequential Damages</u>. Without limiting, expanding or otherwise affecting the provisions of <u>Section 6</u> or <u>Section 8</u> of this Agreement, but otherwise notwithstanding any other provision of this Agreement to the contrary, neither COMPANY nor CONTRACTOR shall be liable to the other for any incidental, special, consequential or other indirect damages, or for punitive or exemplary damages, whether or not the parties were aware of the possibility of their occurrence, and regardless of cause, whether based on tort (including negligence), breach of contract, strict liability or otherwise.

9.2     The liabilities and obligations hereunder of each CONTRACTOR entity are joint and several; provided, that, for avoidance of doubt, (a) subject to Sections 1.1 and 1.2, no CONTRACTOR entity shall be obligated to perform a Service required to be performed under this Agreement by another CONTRACTOR entity or Affiliate to the extent such CONTRACTOR entity or Affiliate is not capable of performing such Service and not otherwise obligated to perform such Service under Section 1.1 or 1.2; (b) each CONTRACTOR entity shall be jointly and severally liable for any monetary damages payable to COMPANY (or Collateral Agent) as a result of a breach of this Agreement by other CONTRACTOR entities to the extent COMPANY is not able to recover such damages from the breaching CONTRACTOR entity; and (c) reference is made to Section 19.5 hereof for related provisions in the proviso to the first sentence thereof.

## 10.0 LIENS

10.1 Before interim or final payments are made by COMPANY to CONTRACTOR, CONTRACTOR, if required by COMPANY, shall furnish lien waivers and affidavits and/or other proof in form and substance satisfactory to COMPANY that there are no unsatisfied claims, suits, liens, or charges on COMPANY property for the payment of any sums due or to become due or otherwise owing to CONTRACTOR by COMPANY for the applicable Services provided and for which payment is due.

## 11.0 LAWS, RULES AND REGULATIONS

11.1 CONTRACTOR agrees to comply with all laws, rules, and regulations, which are now or may become applicable to the Services or operations covered by this Agreement or any Work Order or arising out of the performance of such operations and shall protect, defend, indemnify, and hold harmless the COMPANY GROUP from and against any liabilities, fines, or penalties asserted or assessed as a result of violation of or failure to so comply with applicable law, rules and regulation.

11.2 In the event any provision of this Agreement or any Work Order is determined to be void or contrary to any applicable law, rule, or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule, or regulation, and this Agreement and such Work Order as so modified shall remain in full force and effect.

11.3 CONTRACTOR shall abide by all quality, health, safety and environmental rules and procedures implemented by the COMPANY from time-to-time, and all applicable portions of the COMPANY's Safe Operations Manual, to the extent copies of such policies have been provided to CONTRACTOR in advance and accepted by CONTRACTOR.

11.4 COMPANY shall be entitled to conduct periodic audits of CONTRACTOR to ensure its compliance with all laws, regulations and policies made applicable by this Agreement, and CONTRACTOR shall maintain all records pertaining to Services

performed under this Agreement for a period of three (3) years following completion of the Services.

## 12.0 TERMINATION OF SERVICES

12.1 The term of this Agreement shall be ten (10) years from the Effective Date, unless otherwise terminated as provided for in this <u>Section 12</u>. Thereafter, this Agreement shall be automatically renewed on its anniversary date for successive one-year terms, unless otherwise terminated as provided for in this <u>Section 12</u>.

12.2 COMPANY may, at any time, with the prior written consent of the Collateral Agent and with or without cause, terminate or suspend all or any Services (in whole or in part). In the event of such termination by COMPANY, subject to COMPANY's rights and remedies provided for in <u>Section 12.3</u> hereof, including the right to withhold or offset amounts owed to CONTRACTOR, CONTRACTOR shall be paid the applicable rates stipulated in a Work Order (or, for worked performed on a lump sum basis, a pro rata portion based upon the percentage of the Services completed) for Services performed up to the date of such termination or suspension, <u>provided</u> that (1) COMPANY shall be liable for any and all costs and expenses incurred by CONTRACTOR as a result of such termination or suspension and (2) any Services described as fixed, firm, non-cancellable or any similar expression shall be paid in lump sum in full. Except as to such unavoidable amounts contemplated by the preceding sentence, CONTRACTOR shall not be entitled to be paid prospectively for Services unperformed by reason of such termination or suspension. On notice of such termination, CONTRACTOR shall promptly remove its personnel, machinery, and equipment from the location and shall further cooperate with COMPANY or its designee to ensure an orderly and expeditious transition and completion of the Services. If the Services are suspended by COMPANY, CONTRACTOR shall promptly resume performance of the Services upon notice from COMPANY subject to CONTRACTOR's entitlement to and receipt of any additional sums incurred by CONTRACTOR by virtue of COMPANY's suspension.

12.3 If CONTRACTOR (i) fails to fully and timely perform its obligations and undertakings under this Agreement or any Work Order, (ii) otherwise breaches any representation, warranty or other obligation to COMPANY, or (iii) shall become insolvent or make an assignment for the benefit of creditors or if a petition in bankruptcy shall be filed by or against CONTRACTOR, or if a receiver shall be appointed for CONTRACTOR or its properties then, in each case, COMPANY shall be entitled to terminate this Agreement or any Work Order as to such CONTRACTOR (with the prior written consent of the Collateral Agent) effective immediately upon notice to CONTRACTOR. For the avoidance of doubt, in the event of such termination, COMPANY shall be entitled to have the Services completed by others or by COMPANY's own employees or, to the extent reasonably practical, another CONTRACTOR, subject in all respects to, and without limiting, the provisions of <u>Section 1.1</u> and <u>Section 1.2</u>. If the completion of the Services by others or COMPANY's employees costs more than was to be charged by CONTRACTOR for such Services, then CONTRACTOR shall reimburse COMPANY for the documented increase of the price for completion.

12.4 This Agreement may be terminated by CONTRACTOR (i) on or after the one-year anniversary of the consummation of a NEA Change of Control by virtue of a sale by or at the direction of the Collateral Agent or the Agent of equity of COMPANY, or (ii) as to any given Vessel that is sold to a third-party purchaser not affiliated with CONTRACTOR by virtue of the exercise by the Collateral Agent or the Agent of remedies following the occurrence of a NEA Event of Default (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title), on or after the one-year anniversary of the sale of such Vessel; provided, that (x) as to any Services underway as to any such Vessel, this Agreement nevertheless shall remain in effect, and CONTRACTOR shall perform such Services and COMPANY shall remain liable for the payment therefor, and (y) the obligations in Section 7.1(b) shall apply. Notwithstanding the foregoing, as to the Vessel Manager of a Vessel, such company's obligations to crew such Vessel shall terminate (A) one (1) year after transfer of title to such Vessel to the Agent or the Collateral Agent (or to a special purpose entity or designee established for the purpose of the Agent or Collateral Agent taking title) and (B) immediately upon transfer of title to such Vessel to a third-party purchaser not affiliated with such company by virtue of the exercise by the Collateral Agent or the Agent of remedies following the occurrence of a NEA Event of Default. Notwithstanding the foregoing, upon the occurrence and during the continuance of a NEA Event of Default, if CONTRACTOR providing the applicable Services is not paid within thirty (30) days after presentment of invoices therefor not subject to a good faith Dispute (hereinafter defined in Section 15.1), then such CONTRACTOR may terminate this Agreement by providing (x) as to the Collateral Agent if applicable, at least forty-five (45) days prior written notice, and an opportunity to cure during such 45-day notice period, and (y) as to the applicable third-party purchaser, at least fifteen (15) days prior written notice, and an opportunity to cure during such 15-day notice period.

## 13.0 GIFTS AND GRATUITIES

13.1 It is deemed by COMPANY to be a conflict with the COMPANY's interests for its employees or any members of their immediate family to accept gifts, payments, extravagant entertainment, services, or loans in any form from anyone soliciting business, or who may already have established business relations with the COMPANY. If any employee of the COMPANY should solicit a gift or gratuity from the CONTRACTOR, CONTRACTOR hereby agrees to notify an officer of the COMPANY of such act. It is agreed that the COMPANY will hold such notification in confidence. It is further understood that failure by the CONTRACTOR to comply with the COMPANY's policies regarding gifts and gratuities may, at the COMPANY's option, result in the termination of this Agreement and/or any Work Order and may further preclude any future dealings between the parties. COMPANY shall have the right to audit CONTRACTOR's records at any time and up to three (3) years following the termination of this Agreement in order to ensure current or past compliance with this policy.

## 14.0 EXTENSION

14.1 As a part of the consideration for this Agreement. CONTRACTOR hereby agrees that the provisions of <u>Section 6</u> (Insurance), <u>Section 8</u> (Indemnity), <u>Section 9</u> (Limitation of Liability), <u>Section 10</u> (Liens), and <u>Section 19</u> (Miscellaneous Provisions) of this Agreement shall extend to and be enforceable by and for the benefit of the COMPANY GROUP.

## 15.0 DISPUTE RESOLUTION

15.1 Any claim, disagreement, or dispute between the Parties arising out of or relating to this Agreement (a "<u>Dispute</u>") shall be resolved in the manner provided in this <u>Section 15</u>. The Parties shall attempt to resolve any Dispute by negotiating in good faith for a period of thirty (30) days after receipt by either Party of a written notice of the Dispute from the other Party (the "<u>Negotiation Period</u>"). The written notice shall identify, with reasonable particularity, each matter or issue that is the subject of the dispute, a summary of the basis for the Party's position with respect to each such matter or issue and the relief being requested by the Party. No Party shall commence any claim, action, suit, inquiry, investigation, judicial or administrative proceeding, grievance, arbitration or other proceedings (an "<u>Action</u>") in respect of any Dispute (i) until the expiration of the Negotiation Period or (ii) if the other Party has refused to participate or has not reasonably participated in the required negotiation process in good faith set forth in this <u>Section 15</u>. If the Parties are unable to resolve the Dispute during the Negotiation Period, the Dispute shall be finally settled by binding arbitration conducted expeditiously in accordance with the Comprehensive Arbitration Rules & Procedures, including the Expedited Procedures then followed by the Judicial Arbitration and Mediation Services, Inc. (JAMS) or any successor to the functions thereof ("<u>Rules</u>"), and judgment upon the award rendered by the arbitrator shall be entered by any court of competent jurisdiction. One arbitrator shall be jointly selected by the Parties. If the Parties are unable to jointly select an arbitrator, the arbitrator shall be appointed in accordance with the Rules. The cost of the arbitrator shall be shared equally by the Parties. The location of the arbitration proceeding shall be New York, New York and the language of arbitration shall be English. All arbitration proceedings are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and the applicable state rules of evidence. The dispute resolution provisions of this <u>Section 15.1</u> shall not be construed to interfere with a Party's other rights provided by this Agreement, including the right to terminate this Agreement in accordance with its terms. During the pendency of any such Dispute, all of the terms and conditions of this Agreement shall remain in effect and the Parties shall continue to perform all of their respective obligations hereunder.

## 16.0 GOVERNMENT REGULATIONS

16.1 The CONTRACTOR shall comply with the following regulations, as amended, where required by applicable law or by any other agreement to which COMPANY is a party, which are incorporated in this Agreement by reference as if fully set out:

   (a)    The Equal Opportunity Clause prescribed in 41 CFR 60_1.4;

(b)     The Affirmative Action Clause prescribed in 41 CFR 60_250.4 regarding veterans and veterans of the Vietnam era;

(c)     The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60741.4;

(d)     The Certification of Compliance with Environmental Laws prescribed in 40 CFR 1S.20;

(e)     The Americans with Disabilities Act;

(f)     Research and Special Programs Administration (RSPA) and United States Coast Guard (USCG) Drug Testing Regulations as set forth in 49 CFR Part 199 and 46 CFR Part 16 and the Department of Transportation (DOT) Procedures for Transportation Workplace Drug Testing Programs as set forth in 49 CFR Part 40; and

(g)     Section 202 of Executive Order 11246 of September 24, 1965 (30 F.R. 12,319) and any future amendments or revisions thereto.

## 17.0 SCHEDULES AND EXHIBITS

17.1 The following Schedules and Exhibits are attached hereto and made a part of this Agreement for all purposes:

Schedule 1(a), 1(b), and 1(c) – CONTRACTOR and Services listing

Schedule 2 – Vessel listing

Schedule 3 – Other Affiliates

Exhibit A – CONTRACTOR listing

Exhibit B – Work Order Form

Exhibit C - Non-Disclosure Agreement

In the event of conflict between such Schedules, Exhibits, or a Work Order on the one hand and this Agreement on the other, the terms and conditions of this Agreement shall control.

## 18.0 NOTICES

18.1 Any notices under this Agreement shall be in writing and shall be delivered by hand or sent by facsimile confirmed by mail, or email, as applicable, to the following addresses.

If to COMPANY:

Nautical Solutions, L.L.C.
16201 East Main Street
Cut Off, LA 70354
Attention: Adrian Danos; Luke Newman
E-mail address: adrian.danos@chouest.com; luke.newman@chouest.com
With a copy by email to legal@chouest.com (which copy shall not constitute official notice hereunder)

If to CONTRACTOR:

Sent via email only to luke.newman@chouest.com, legal@chouest.com
With a copy in the case of notices to Marine Technologies, L.L.C. that must also be sent to jan@mtllc.us
Notices shall be deemed effective on receipt if on a business day at the recipient's office before 3:00pm local time, otherwise the next business day

## 19.0 MISCELLANEOUS PROVISIONS

19.1 This Agreement is non-exclusive and COMPANY reserves the right to engage at any time other contractors for the Services contemplated by this Agreement or any portion thereof.

19.2 In all cases in which Services are performed in the State of Louisiana or within Louisiana territorial waters or the waters of the Outer Continental Shelf offshore therefrom where CONTRACTOR's employees (including CONTRACTOR's direct, borrowed, special or statutory employees) are covered by the Louisiana Workers' Compensation Act, La. R.S. 23:1021 et seq., the following shall apply: COMPANY and CONTRACTOR acknowledge and agree that the Services contracted for hereunder are an integral part of and essential to the ability of COMPANY to generate its goods, products and services for purposes of La. R.S. 23:1061(A). Furthermore, at all times acknowledging that CONTRACTOR is an independent contractor and that COMPANY is interested only in the results obtained, the parties agree and acknowledge that COMPANY is a statutory employer of CONTRACTOR's employees under La. R.S. 23:1061(A), as the same may be amended from time to time, for purposes of Services performed pursuant to this Agreement and a Work Order. The parties further agree that CONTRACTOR will remain responsible for all compensation benefits owed to its employees regardless of any status of those employees as either borrowed servants or statutory employees of COMPANY either under the Jones Act, the Longshoremen and Harbor Workers' Compensation Act, Louisiana Workers' Compensation Act, or similar laws. Further, CONTRACTOR agrees to defend, indemnify and hold COMPANY harmless from any and all claims for compensation benefits by CONTRACTOR's employees against the COMPANY, and hereby waives any right of CONTRACTOR or right of subrogation of CONTRACTOR's insurers to seek reimbursement of any compensation benefits owed or paid.

19.3 The Collateral Agent is a third party beneficiary for purposes of enforcing its rights hereunder. When the Note Obligations (as defined in the NEA) are paid in full in cash,

then (i) the Collateral Agent no longer is a third party beneficiary and (ii) all references herein to the Collateral Agent, its designees and Vessel Buyers no longer shall be effective.

19.4 This Agreement is binding upon and inures to the benefit of the Parties and their respective successors and permitted assigns. Neither party may assign this Agreement, or its obligations under it, without the express consent of the other party; provided that, COMPANY and CONTRACTOR each shall be permitted to collaterally assign and grant a security interest in its rights under this Agreement pursuant to any of its third-party debt financing arrangements. In accordance with the foregoing right as to COMPANY, this Agreement is subject to the terms and conditions of the Collateral Assignment of Master Services Agreement, dated as of the date hereof (the "Collateral Assignment"), between COMPANY and the Collateral Agent, and agreed to and acknowledged by CONTRACTOR.

19.5 It is understood and agreed that to the extent any other Affiliate of CONTRACTOR provides Services to COMPANY, such Affiliate shall be required to become a CONTRACTOR under this Agreement by (x) executing a joinder agreement and delivering the same to each of the Collateral Agent and AIG and Prudential in form and substance reasonably satisfactory to the Required Holders (as defined in the NEA and hereinafter referred to as the "NEA Required Holders"), (y) delivering supplements to Exhibit A hereto as are necessary to cause such Exhibit to be complete and accurate with respect to such additional Affiliate on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Company had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Collateral Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Collateral Agent (acting at the direction of the NEA Required Holders); provided, that if any such Affiliate executing such joinder agreement is not already a CONTRACTOR entity and is not 100% owned or controlled by Gary Chouest, his spouse Carolyn Chouest, their descendants and any trusts for the benefit of the foregoing, such Affiliate shall not be subject to the joint and several liability of other CONTRACTOR entities pursuant to Section 9.2. In the event any CONTRACTOR ceases to be an Affiliate of the other CONTRACTOR entities, then another CONTRACTOR or Affiliate that performs such Services shall provide such Services to COMPANY thereafter, and if there is no such CONTRACTOR or other Affiliate that performs or is reasonably capable of performing such Service, and if the CONTRACTOR ceasing to be an Affiliate will continue to perform such Services, then such CONTRACTOR ceasing to be an Affiliate shall endeavor to enter into a new agreement with COMPANY for the performance of such Services thereafter on terms and conditions substantially similar to this Agreement.

19.6 If any provision of this Agreement or any Work Order shall be determined to be void, invalid or unenforceable, the scope of such void, invalid or unenforceable provision shall be deemed modified and diminished to the extent necessary to render such provision valid and enforceable. In any event, the validity or enforceability of any provision shall not affect any other provision of this Agreement or any Work Order,

and this Agreement and every Work Order shall be construed and enforced as if such void, invalid or unenforceable provision had not been included.

19.7 It is specifically agreed that time is of the essence in this Agreement and the Work Orders. It is specifically agreed that the use of captions and sub-captions in this Agreement is merely for the convenience of the parties hereto, and they shall not be used in interpreting any part of this Agreement or a Work Order. The covenants and agreements of the parties under this Agreement or the Work Orders shall be separate and independent.

19.8 THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES CONCERNING THIS SUBJECT MATTER, AND SUPERSEDES ALL PRIOR AGREEMENTS, PROMISES, CORRESPONDENCE, DISCUSSIONS, REPRESENTATIONS AND UNDERSTANDINGS, EXCEPT THOSE EXPRESSLY SET FORTH HEREIN. NO OTHER AGREEMENTS, PROMISES, CORRESPONDENCE, DISCUSSIONS, REPRESENTATIONS OR UNDERSTANDINGS, EITHER EXPRESS OR IMPLIED, UNLESS EXPRESSLY SET FORTH HEREIN, ARE BINDING BETWEEN THE PARTIES.

19.9 Neither this Agreement nor a written Work Order shall be amended, modified, or waived except in writing signed by an officer of the COMPANY and a duly authorized representative of CONTRACTOR, and provided, that any such amendment, modification, or waiver that is materially adverse to the Noteholders or a Note Party (each as defined in the NEA) or its assets, shall require the prior written consent of the Collateral Agent. Any amendment, waiver, or modification in violation of the foregoing shall be null and void. Failure by COMPANY at any time or from time to time to enforce or require strict keeping and performance of any of the terms or conditions of this Agreement or any Work Order shall not constitute a waiver of such terms or conditions nor affect or impair the right of COMPANY at any time to avail itself of such remedies as it may have under this Agreement for any breach thereof.

19.10 Except as specifically provided by this Agreement to the contrary, neither this Agreement nor any Work Order shall be construed to confer any benefit on any third party not a party or otherwise referred to in this Agreement or any Work Order. Except as otherwise provided in Section 19.3 above, neither this Agreement nor any Work Order shall provide any rights to such third parties to enforce its provisions.

19.11 This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

19.12 For purposes of entering judgment on any arbitral award, if necessary, the Parties consent to the exclusive jurisdiction of a New York State court or federal court sitting in New York County, New York. The Parties irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any objection that it may now or hereafter have to the venue or forum of any such proceeding. To the extent any arbitral award

needs to be submitted to a court for entering judgment thereon, in accordance with Section 15.1 and Section 19.12 of this Agreement, such party may submit the quantum of such award to the court but shall not include any information relating to the matters that were arbitrated. If either party fails to proceed with arbitration as provided in Section 15.1 of this Agreement, or unsuccessfully seeks to stay arbitration, or fails to comply with the arbitration award, or is unsuccessful in vacating or modifying the award pursuant to a petition or application for judicial review, the other party shall be entitled to expenses paid or incurred in successfully compelling such arbitration or defending against the attempt to stay, vacate or modify such arbitration award and/or successfully defending or enforcing the award.

19.13 The Parties irrevocably consent to the service of any and all process in any such action or proceeding by the mailing of copies of such process to our address at 16201 East Main Street, Cut Off, LA 70345, in accordance with Section 5.6. The Parties also agree that service of process may be made on them by any other method of service provided for under the applicable laws in effect in the State of New York.

19.14 THE PARTIES IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

19.15 Upon COMPANY's request, CONTRACTOR shall execute and enter into a Non-Disclosure Agreement substantially in the form of Exhibit C.

19.16 Subject to COMPANY's responsibility for Travel Expenses, including as set forth in Sections 2.3 and 2.7, CONTRACTOR shall be responsible for prompt cleanup of the Services site and removal of debris of any equipment, materials and/or supplies of any nature utilized by CONTRACTOR in the performance of the Services or transported by CONTRACTOR to any Services site. Such cleanup and removal shall occur promptly and shall be completed when CONTRACTOR has restored the Services site to the same material condition in which CONTRACTOR found it at the commencement of the Services.

19.17 This Agreement shall supersede, amend, and restate any prior Master Services Agreements between COMPANY and CONTRACTOR.

19.18 This Agreement may be executed in multiple counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument. Facsimile or electronic signatures of this Agreement by either or both of the parties shall have the effect of original signatures.

19.19 CONTRACTOR acknowledges and agrees that, in addition to any other remedies that may be available to it, and since monetary damages may be inadequate with respect to breaches of this Agreement by CONTRACTOR, the COMPANY shall be entitled to seek specific performance of this Agreement. Any such remedy shall not in any way affect any other rights or remedies of the Parties under this Agreement, and shall not

be deemed to be the exclusive remedy for a breach of this Agreement, but shall be in addition to all other remedies available at law or equity to the COMPANY.

19.20 It is expressly agreed between the parties that this is a personal contract and therefore neither CONTRACTOR nor COMPANY shall not have the benefit of any exemptions from, and limitations of, liability to which an owner or bareboat charterer of a Vessel is otherwise entitled to under the Limitation of Liability statutes of the United States.

19.21 This Agreement shall be interpreted as having been drafted jointly by the parties. Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the Party that drafted a particular provision is not applicable and is hereby waived. Provisions of this Agreement shall be interpreted in a reasonable manner to effect the purposes of the parties to this Agreement. In this Agreement, references to "includes," "including," "including but not limited to," "including without limitation" and words or phrases of similar import shall be deemed to have the same meaning and the words "include(s)" and "including" shall not be deemed to be terms of limitation but rather be deemed to be followed by the words "without limitation." The language in all parts of this Agreement shall be in all cases construed as a whole according to its meaning and not strictly for or against any particular Party. Each Party acknowledges that its respective representatives have read this entire Agreement, and that each Party fully understands its terms and effects. Each of the terms of this Agreement is contractual, not a mere recital, and is a result of negotiations between the parties.

[The rest of this page is intentionally blank. Signature page follows.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement upon the date first above shown.

NAUTICAL SOLUTIONS, L.L.C.

By:
    Name:
    Title:

C-INNOVATION, L.L.C.
C-PORT, L.L.C.
C-PORT 2, L.L.C.
C-PORT 3, L.L.C.
C-TERMINAL, L.L.C.
EXPERT TRAVEL, LLC
FOURCHON HEAVY LIFT, L.L.C.
GALLIANO MARINE SERVICE, L.L.C.
GULF SHIP, L.L.C.
INTERNATIONAL MARINE SYSTEMS, L.L.C.
LASHIP, L.L.C.
MARINE TECHNOLOGIES, L.L.C.
MARTIN HOLDINGS, L.L.C.
NAUTICAL VENTURES, L.L.C.
NORTH AMERICAN SHIPBUILDING, L.L.C.
OFFSHORE SERVICE VESSELS, L.L.C.
OFFSHORE SUPPORT SERVICES, L.L.C.
SEALAND MECHANICAL, L.L.C.
TAMPA SHIP, L.L.C.

By:
    Name:
    Title:

The Manager of all of the aforementioned companies has executed this Agreement intending that all the companies named above are bound and to be bound by the one signature as if s/he had executed this Agreement separately for each company

BRAM OFFSHORE TRANSPORTES MARITIMOS LTDA.

By:
    Name: Ugo Fernandez
    Title: Executive Director
    Title:

[Signatures continued on next page.]

[Master Services Agreement Signature Page]

Schedule

GALLIANO MARINE SERVICE INTERNATIONAL

By:
    Name: Dionne Chouest Austin
    Title: Director


By:
    Name: Damon Chouest
    Title: Director


G-BOATS, INC.

By:

By:
    Name: Greg Cheramie
    Title: Guyana Director


MARINE PROCUREMENT LTD.

By:
    Name: Richard Allinson
    Title: Managing Director
    Title:

28

| Services | NAUTICAL CONTRACTOR L.L.C. |
|---|---|
| Arranging for and handling all matters relating to the crewing of each Vessel, the technical management of each Vessel, entry into various charter, contracts of affreightment and other similar commercial arrangements and entry into various purchasing arrangements for necessaries required for the operation of each Vessel, including:<br><br>• Executive oversight and management<br><br>• Coordination of services and personnel provided by affiliates<br><br>• Accounting systems and personnel<br><br>• Contracting processes and personnel<br><br>• Finance and banking administration and personnel<br><br>• Human resources processes and personnel<br><br>• Insurance management<br><br>• IT software and support<br><br>• Legal (internal)<br><br>• Logistics services for equipment and personnel<br><br>• Marketing and client management<br><br>• Port captains and field level | Galliano Marine Service, L.L.C.<br>Galliano Marine Service International<br>G-Boats, Inc.<br>Bram Offshore Transportes Maritimos Ltda. |

Schedule

| Services | CONTRACTOR |
|---|---|
| • Port Fourchon shipyard and drydock access | |
| • Storage of stacked vessels | |
| • Officing and utilities for all GMS personnel | |
| • Other miscellaneous back office and administrative personnel and services | |

| Services | CONTRACTOR |
|---|---|
| Maintenance and repair of communications/broadband data and chart services | Marine Technologies, L.L.C. |
| Compliance with all U.S. Coast Guard rules and regulations relating to the ownership and operations of the Vessels, compliance with all classification society rules and requirements, arranging for all required surveys, arranging all insurances for the Vessels and handling of all claims related hereto, arranging for all required repairs and maintenance of the Vessels, ordering of all fuel, lube oils and other necessaries as required by the Vessel operations including Vessel certificates, licenses, and ABS requirements | Galliano Marine Service, L.L.C. Galliano Marine Service International G-Boats, Inc. Bram Offshore Transportes Maritimos Ltda. |
| Travel services, including booking airfare, lodging and ground transportation for vessel crews, support personnel and other associated persons | Expert Travel, LLC |
| Insurance premium payment to be reimbursed by the Company (Vessels, Commercial, Property, general, | Offshore Service Vessels, L.L.C. |
| Hospital Insurance that is under a master insurance policy in the name of Galliano Marine Service LLC | Galliano Marine Service, L.L.C. |
| Maintenance and repair of Vessel electronics, including dynamic positioning | Marine Technologies, L.L.C. International Marine Systems, |
| Vessel maintenance and repair, including related regulatory drydocking | C-Port 2, L.L.C. Gulf Ship, L.L.C. LaShip, L.L.C. North American Shipbuilding, L.L.C. Tampa Ship, L.L.C. Sealand Mechanical, L.L.C. (limited to air conditioning) International Marine Systems, L.L.C. (limited to radio and radar) |
| International supplies | Nautical Ventures, L.L.C. Marine Procurement Ltd. G-Boats, Inc. Bram Offshore Transportes Maritimos Ltda. |
| Groceries | Martin Holdings, L.L.C. Nautical Ventures, L.L.C. |
| International Direct Payroll | Galliano Marine Service International G-Boats, Inc. Bram Offshore Transportes Maritimos Ltda. |

*[Link-to-previous setting changed from on in original to off in modified.].*

Schedule 1(c)

| Services | CONTRACTOR |
|---|---|
| Taxes | Galliano Marine Service, L.L.C. |
| Spare parts and supplies | Marine Procurement Ltd.<br>International Marine Systems, L.L.C.<br>Nautical Ventures, L.L.C.<br>G-Boats, Inc.<br>Galliano Marine Service, L.L.C.<br>North American Shipbuilding, L.L.C.<br>Gulf Ship, L.L.C.<br>LaShip, L.L.C.<br>Tampa Ship, L.L.C.<br>C-Port 2, L.L.C.<br>Sealand Mechanical, L.L.C.<br>International Marine Systems, L.L.C. (radio and radar<br>only)<br>Marine Technologies, L.L.C. (IT only) |
| Legal (external) | Galliano Marine Service, L.L.C. |
| Crew labor and benefits | Galliano Marine Service, L.L.C.<br>Galliano Marine Service International<br>G-Boats, Inc.<br>Bram Offshore Transportes Maritimos Ltda. |
| Shipyard and service technician labor for vessel retrofit, repair, and maintenance | North American Shipbuilding, L.L.C.<br>Gulf Ship, L.L.C.<br>LaShip, L.L.C.<br>Tampa Ship, L.L.C.<br>C-Port 2, L.L.C.<br>Sealand Mechanical, L.L.C.<br>International Marine Systems, L.L.C. (radio and radar only)<br>Marine Technologies, L.L.C. (IT only) |

| Services | CONTRACTOR |
|---|---|
| Food service | Martin Holdings, L.L.C. Nautical Ventures, L.L.C. |
| ROV operations/rental | C-Innovation, L.L.C. |
| Vessel radio, radar and communication systems upgrade, repair and maintenance | International Marine Systems, L.L.C. |
| Port services for vessels including cargo loading and unloading and fueling | C-Port, L.L.C. C-Port 2, L.L.C. C-Port 3, L.L.C. C-Terminal, L.L.C. Fourchon Heavy Lift, L.L.C. Martin Holdings, L.L.C. Offshore Support Services, L.L.C. |
| Any services necessary to operate, upgrade, maintain, repair, replace, and support the systems (including IT systems), software, hardware, and/or equipment, that CONTRACTOR has manufactured for use on other otherwise placed on the Vessels listed on Schedule 2 (including access to physical locations hosting such systems, software, hardware, and/or equipment, and including the IP licensed to COMPANY under (a) the Non-Exclusive and Assignable Patent, Copyright and Know-How License Agreement, dated [9], 2023, by and among COMPANY, Marine Technologies, L.L.C., and Wilmington Trust, National Association, as Collateral Agent; and (b) the Non-Exclusive and Assignable Copyright License Agreement, dated [9], 2023, by and among COMPANY, North American Shipbuilding, L.L.C. and Wilmington Trust, National | Marine Technologies, L.L.C. North American Shipbuilding, L.L.C. |
| Vessel fabrication, retrofitting, upgrades and replacements | C-Port 2, L.L.C. Gulf Ship, L.L.C. LaShip, L.L.C. North American Shipbuilding, L.L.C. |

Schedule (c)

Schedule 1(b) – page 2

| Services | CONTRACTOR |
|---|---|
| Food service | Martin Holdings, L.L.C.<br>Nautical Ventures, L.L.C. |
| ROV operations/rental | C-Innovation, L.L.C. |
| Vessel radio, radar and communication systems upgrade, repair and | International Marine Systems, L.L.C. |
| Port services for vessels including cargo loading and unloading and fueling | C-Port, L.L.C.<br>C-Port 2, L.L.C.<br>C-Port 3, L.L.C.<br>C-Terminal, L.L.C.<br>Fourchon Heavy Lift, L.L.C.<br>Martin Holdings, L.L.C.<br>Offshore Support Services, L.L.C. |
| Any services necessary to operate, upgrade, maintain, repair, replace, and support the systems (including IT systems), software, hardware, and/or equipment, that CONTRACTOR has manufactured for use on other otherwise placed on the Vessels listed on Schedule 2 (including access to physical locations hosting such systems, software, hardware, and/or equipment, and including the IP licensed to COMPANY under (a) the Non-Exclusive and Assignable Patent, Copyright and Know-How License Agreement, dated February 24, 2023, by and among COMPANY, Marine Technologies, L.L.C., and Wilmington Trust, National Association, as Collateral Agent; and (b) the Non-Exclusive and Assignable Copyright License Agreement, dated February 24, 2023, by and among COMPANY, North American Shipbuilding, L.L.C. and Wilmington | Marine Technologies, L.L.C.<br>North American Shipbuilding, L.L.C. |
| Vessel fabrication, retrofitting, upgrades and replacements | C-Port 2, L.L.C.<br>~~Tampa~~Gulf Ship, L.L.C.<br>LaShip, L.L.C.<br>North American Shipbuilding, L.L.C.<br>Tampa Ship, L.L.C.<br>Sealand Mechanical, L.L.C. (limited to air conditioning)<br>International Marine Systems, L.L.C. (limited to radio and radar) |

Schedule 1(c)

Schedule 1(b) – page 2

Schedule 2

| Vessel Name | Official Number |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

# NAUTICAL SOLUTIONS, L.L.C.

~~Schedule 3~~   <u>Schedule 3</u>

(Deleted graphics)

| Affiliate Com | Affiliate Companies Not On USA Schedule | Services Provided To Nautical Solutions | Comment | EC |
|---|---|---|---|---|
| 1 Alaska Ventures, LLC | 1 Alaska Ventures. LLC | None | Vessel Owning Company | 100% |
| 2 Alpha Marine Services | 2 Alpha Alpha Marine% Services LLC | None | Vessel Owning Company | 100% |
| 3 Benchmark Marine S | 3 Benchmark Marine Service LLC | None | Vessel Owning Company | 63% |
| 4 Blue Dolphin Frac LLC | 4 Blue Dolph., Frac LLC | None | Vessel Owning Company | 100% |
| 5 Blue Orca LLC | 5 Blue Orca LLC | None | Vessel Owning Company | 100% |
| 6 Dub Boats Partnership | 6 Dub Boats Partnership CV | None | Vessel Owning Company | 80% |
| 7 Dub Boats 2 Partnership | 7 Dub Boats 2 Partnership CV | None | Vessel Owning Company | 80% |
| 8 Fantasy Island LLC | 8 Fantasy Island LLC | None | Vessel Owning Company | 100% |
| 9 Fast Boats LLC | 9 Fast Boats LLC | None | Vessel Owning Company | 100% |
| 10 Fast Vessels LLC | 10 Fast Vessels LLC | None | Vessel Owning Company. Amount paid by NS to Fast Vessels was a pass through of charter hire from a NS vessel. | 100% |
| 11 Holiday LLC | 11 Holiday LLC | None | Vessel Owning Company | 100% | 100% |
| 12 Island Ventures LLC | 12 Island Ventures LLC | None | Vessel Owning Company | 75% | 100% |
| 13 Island Ventures II LLC | 13 Island Ventures II LLC | None | Vessel Owning Company | 75% |
| 14 Island Ventures 3 LLC | 14 Island Ventures 3 LLC | None | Vessel Owning Company | 75% |
| 15 Island Ventures 4 LLC | 15 Island Ventures 4 LLC | None | Vessel Owning Company | 50% |
| 16 Island Ventures 5 LLC | 16 Island Ventures 5 LLC | None | Vessel Owning Company | 75% |
| 17 Island Ventures 6 LLC | 17 Island Ventures 8 LLC | None | Vessel Owning Company | 75% |
| 18 Legacy Leader LLC | 18 Legacy Leader LLC | None | Vessel Owning Company | 75% |
| 19 Reel Pipe LLC | 19 Reel Pipe LLC | None | Vessel Owning Company. Amount paid by NS to Reel Pipe was for the purchase of fuel off a stacked vessel. | 100% |
| 20 Stim Star IV LLC | 20 Stim Star IV LW | None | Vessel Owning Company | 100% |
| | 21 Sam Tugs LLC | | Vessel Owning Company. Payments from Nautical Solutions are a pass through of bareboat payments for the Blue Orca, which is not a NS vessel. The payment construct is due to tax structures that date to when NS previously owned the vessel. | 100% |
| 22 Team Marine LLC | 22 Team Marine LLC | None | Vessel Owning Company | 100% |
| | 23SK Lp LLC | None | Holding Company: no operations. Amount paid by NS in 2021 was to fund a 2018 Guyana tax assessment. | 100% |
| 24 AM Supply LLC | 24 AM Supply LLC | Company Sold | | 25% |
| | 25 American Recovery LLC | | of 533K in 2021 and 544K in 2022 are immaterial ness. Amounts paid by NS | |
| 28 Bollinger Shipyards LLC | 28 Bollinger Shipyards LLC | None | Shipyard service provider. Sane offering as multiple Contractors on NS schedule. Total NS remittances of $297K in 2021 and $383K in 2022 are immaterial relative to NS shipyard wend Multiple Contractors on NS 3383K in 2022 are | 17% |
| 27 C-Logistics LLC | 27 C-Logistics LLC | None | Logistics company that works for third-party customers. Amount paid to C-Logistics (Surname) in 2022 was a payment made in error and reversed. ustomers. Amount paid 100% | 100% |
| | 4 Blue Dolph Fro LLC | | | |
| 28 C-Port/Stone LLC | 28 C-Port/Stone LLC | Fuel | Provides fuel to al vessels (ECO and competitors) accessing C-Port facilities. C-Port slips. and the vessels that access fuel. water. etc. are controlled by the customer rentine the slip, not ECO. essing C-Port facilities ter. etc. are controlled by | |
| 29 Clean Tank LLC | 29 Clean Tank | Cleans tanks below deck on vessels | Commodity business provided by multiple businesses. Amounts paid by NS of $109K in 2021 and $134K in 2022 are immaterial esses. Amounts paid 33% | 33% |
| 30 G Port Inc | 30 G Port Inc | | Dock space in Guyana. No strategic importance to location. Other service providers in Guyana operate from elsewhere. No amounts paid by NS in 2021 or 2022. | 49% |
| 31 Grand Isle Shipyard Inc | 30 G Port Inc | Misceanous services | Provides labor and light fabrication to upstream. midstream and downstream energy facities. Amounts paid by NS (540K combined for 2021 and 2022) are immaterial of 3109K in 2021 and 3134K in 2022 are immaterial | 51% |
| 32 Total Waste Solutions LLC | 32 Total Waste Solutions LLC | Garbage collection | Commodity business provided by multiple businesses. Amounts paid by NS ntion. Other service ned for 2021 and 20221 are immaterial 50% | 50% |
| 33 Veracity Machine LLC | 3 Fast Boats 33 Veracity Machine LLC | Machining of parts | Machine shop for mnority owned riser storage and maintenance business. Commodity machine shop applications. Amount paid by NS of 557K in 2021 and 538K in 2022 are immaterial. enance business. NS of 557K in 2021 and | 50% |
| 34 Westport LLC | | None | Builds yachts. st Vessels was a pa 100% | 100% |

Exhibit A

| Affiliates |
| --- |
| Bram Offshore Transportes Maritimos Ltda. |
| C-Innovation, L.L.C. |
| C-Port, L.L.C. |
| C-Port 2, L.L.C. |
| C-Port 3, L.L.C. |
| C-Terminal, L.L.C. |
| Expert Travel, LLC |
| Fourchon Heavy Lift, L.L.C. |
| Galliano Marine Service International |
| Galliano Marine Service L.L.C. |
| G-Boats, Inc. |
| Gulf Ship, L.L.C. |
| International Marine Systems, L.L.C. |
| LaShip, L.L.C. |
| Marine Procurement Ltd. |
| Marine Technologies, L.L.C. |
| Martin Holdings, L.L.C. |
| Nautical Ventures, L.L.C. |
| North American Shipbuilding, L.L.C. |
| Offshore Service Vessels, L.L.C. |
| Offshore Support Services, L.L.C. |
| Sealand Mechanical, L.L.C. |
| Tampa Ship, L.L.C. |

Exhibit B

**WORK ORDER**

To:    "Vendor Name"            Phone: "Phone Number"
        Attention:
        "Address"              Fax:    "Fax Number"
        "Address"

Date: _____, 202___          Re:    "insert service provided"

Pursuant to the terms and conditions of that certain Master Services Agreement dated_____, 2023 by and between "Vendor Name" and Nautical Solutions, L.L.C., this is to evidence our understanding and agreement that "insert type or work performed" will be provided by you subject to the following:

1.     Date/Time of Delivery:
2.     Location of Delivery:
3.     Location of Redelivery:
4.     Day Rate:
5.     Shore Base and Dock:
6.     Approximate Term (Days):
7.     Proof of Citizenship for workers
8.     Special Provisions:

Please sign and date this Work Order in duplicate in acceptance of the foregoing and return it to

Nautical Solutions, L.L.C. at 16201 East Main Street, Cut Off, LA 70345.

**NAUTICAL SOLUTIONS, L.L.C.**

By:

Printed Name: _____

<u>Exhibit C</u>

**MUTUAL NON-DISCLOSURE AGREEMENT**

This Mutual Non-Disclosure Agreement ("<u>Agreement</u>") is entered into as of the ____ day of _____, 2023 ("<u>Effective Date</u>"), by and between **[_]** and **NAUTICAL SOLUTIONS, L.L.C.** ("<u>NS</u>"). The terms "<u>Discloser</u>" and "<u>Recipient</u>" refer, respectively, to the party disclosing or receiving a specific item of Confidential Information, as that term is defined below. MT and NS may each individually be referred to herein as a "<u>Party</u>" or collectively as the "<u>Parties</u>".

1.    The Parties expect to engage in discussions and exchange information relating to certain services to be provided under certain Master Services Agreements (collectively, the "<u>Purpose</u>"). As used in this Agreement, "<u>Confidential Information</u>" means all information or materials as to the Discloser or any of its affiliates furnished to Recipient by or on behalf of the Discloser orally or in written or electronic form which is confidential, proprietary, or otherwise not generally available to the public, whether or not marked "confidential", and shall include, without limiting the foregoing, (i) business information including, financial information, business plans, bids, pricing information, vendor information, contracts, business records and employee information; (ii) technical information including vessel specifications, vessel system designs and concepts, CAD drawings, computerized design and construction models, manuals, know-how, show-how, sketches, drawings, working drawings, design and construction documentation, construction modeling, lofting, numerical code tapes, material lists, purchase specifications, correspondence with vendors, regulatory or classification authorities, photographs or other graphic depictions; (iii) Intellectual Property; and (iv) derivatives of any of the foregoing. "<u>Intellectual Property</u>" as used in this Agreement shall mean all Confidential Information, trade names, trademarks, service marks and other identifying names or source indicia of a Party (whether registered or unregistered, and including its associated goodwill and governmental applications), trade secrets, patents, copyrights, copyright registrations, design rights, patent applications (together with all divisions, renewals and continuations of any of the foregoing), uncommercialized inventions and concepts developed by a Party and disclosed by it. The Parties agree not to share any information that should not be shared pursuant to any applicable antitrust laws.

2.    Recipient agrees that Recipient shall (i) protect and maintain confidential Discloser's Confidential Information; (ii) be responsible for any breach of this Agreement by itself, its affiliates, or any of its or its affiliates' employees, agents, attorneys, potential or actual financing sources, investment bankers, contractors or subcontractors (at any tier) ("<u>Representatives</u>"); (iii) shall disclose Confidential Information to Representatives only on a need to know basis and for the Purpose as set forth in Section 1 above; (iv) use the Confidential Information only for and in connection with the Purpose set forth in Section 1 above; and (v) promptly notify Discloser upon discovery of any unauthorized use or disclosure of the Confidential Information.

3.    Notwithstanding Section 1, Confidential Information does not include information that: (i) is now available or becomes available to the public without breach of this Agreement (it being acknowledged and agreed that disclosure by the Discloser and its affiliates of Confidential Information to creditors and potential creditors (and their Representatives) of Discloser and its affiliates, or to other third parties pursuant to confidentiality or non-disclosure agreements, does not mean such Confidential Information is available to the public); (ii) is explicitly approved for

release by written authorization of Discloser; (iii) is obtained from a third party or parties who obtain it lawfully or disclose it without a known duty of confidentiality; (iv) is independently discovered by or known to the Recipient; or (v) is required to be disclosed by a valid court order, provided that, to the extent permitted under the circumstances, Recipient has first given Discloser notice of such requirement to afford Discloser an opportunity to protect its Confidential Information by protective order or other means.

4.    The Parties agree that all Confidential Information disclosed hereunder shall remain the property of the Discloser and shall not be copied or reproduced without the express written permission of the Discloser, except for such copies as may be necessary for the Purpose contemplated hereunder. Upon Discloser's written request, Recipient shall either return all Confidential Information to Discloser along with all copies and portions thereof, or provide notice in writing that all such Confidential Information has been destroyed, provided, however, that Recipient may retain one archival copy of the Confidential Information, which may be used solely to demonstrate compliance with this Agreement. In that event, Recipient shall provide to Discloser a written log of each document retained for archival purposes and shall mark each as "Confidential subject to Confidentiality Agreement."

5.    No rights or obligations other than those expressly recited herein are implied by this Agreement. This Agreement does not require either Party to disclose any particular information or enter into any business relationship, nor does it grant the Recipient a license to any of the Discloser's Intellectual Property and except as expressly set forth in any separate, written agreement, all Intellectual Property shall remain the exclusive property of the Discloser. All Confidential Information disclosed hereunder is provided by Discloser on as "as is" basis without representation or warranty of any kind.

6.    This Agreement shall commence on the Effective Date and shall continue until either Party terminates it. Either Party may terminate it for any reason by giving thirty (30) days written notice to the other Party. Recipient's obligations regarding Confidential Information as stated in Sections 2 and 4, along with remedies stated in Section 7, shall survive termination for a period of ten years, except for the obligations in respect of Intellectual Property, which will survive permanently.

7.    Recipient agrees that a breach of this Agreement would give rise to irreparable injury to Discloser that will not be adequately compensated for by damages and, consequently, Discloser shall be entitled to seek, in addition to all other remedies available to it, injunctive and other equitable relief without the posting of a bond to prevent a breach of this Agreement and to secure the enforcement of this Agreement. This Agreement shall be interpreted and construed under the laws of the State of New York without regard to conflict of laws principles.

8.    This Agreement is the entire understanding among the Parties with respect to the subject matter contained herein and supersedes all prior or contemporaneous oral or written agreements concerning this subject matter. This Agreement may only be modified in a writing that has been signed by the Parties. This Agreement may not be assigned without the other Party's prior written consent. Any understanding between the Parties beyond the Purpose of this Agreement shall be set forth in a separate written agreement containing appropriate terms and conditions. This Agreement may be executed in one or more counterparts with the same effect as if the signatures hereto and thereto were upon the same instrument. A copy sent by email in PDF or similar format, whether executed manually or electronically, shall be sufficient to constitute an original.

Exhibit C– page

[The rest of this page is intentionally blank. Signature page follows.]

Exhibit C– page

---

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be signed by their duly authorized representatives.


**NAUTICAL SOLUTIONS, L.L.C.**                    **[CONTRACTOR]**

                                                  _____

Signature                                         Signature
Print Name:                                       Print Name:
Its:                                              Its:

Exhibit C– page

**[FORM OF] NON-EXCLUSIVE AND ASSIGNABLE
PATENT, COPYRIGHT AND KNOW-HOW LICENSE AGREEMENT**

This NON-EXCLUSIVE AND ASSIGNABLE PATENT, COPYRIGHT AND KNOW-HOW LICENSE AGREEMENT (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of [  ], 2023 (the "Effective Date"), is made by and among:

Marine Technologies, L.L.C., a Louisiana limited liability company with offices located at 16201 East Main Street, Cut Off, Louisiana 70345 ("Licensor");

Nautical Solutions, L.L.C., a Louisiana limited liability company ("Nautical Solutions" or "Licensee"); and

for the specified rights described herein, Wilmington Trust, National Association, a national banking association (as may be replaced from time to time by any successor collateral agent, the "Collateral Agent").

Licensor and Licensee (including any successor Licensee pursuant to Section 2.4) are referred to herein collectively as the "Parties," or each, individually, as a "Party".

RECITALS

WHEREAS, Licensor is the owner of all right, title, and interest in the Licensed IP (as defined below);

WHEREAS, Nautical Solutions is engaged in the marine transportation business;

WHEREAS, Nautical Solutions and the Collateral Agent are party to that certain Note Exchange Agreement, dated as of even date herewith (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Note Exchange Agreement"), together with Nautical Solutions Holdings, LLC, a Louisiana limited liability company, the Agent (as defined therein) and the noteholders identified therein (the "Noteholders"), with respect to the Vessels, pursuant to which, among other things, the Noteholders agreed to exchange certain debt obligations into the notes issued under the Note Exchange Agreement;

WHEREAS, the Vessels contain Licensor hardware and software that use or practice certain Licensed IP, in each case to the extent set forth on Exhibit A, and Licensee wishes to obtain from Licensor, and Licensor is willing to grant to Licensee, a license to the Licensed IP and the Licensed Products, subject to the terms and conditions set forth herein; and

WHEREAS, the Noteholders conditioned the exchange of their debt obligations and their entry into the Note Exchange Agreement on Licensor granting the Collateral Agent certain rights with respect to the Licensed IP and the Licensed Products so as to enable the Vessels, subject to the terms and conditions hereof, to continue operating with the benefit of the License notwithstanding a change of ownership of the Vessels in certain circumstances or a Change of Control of Licensee.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties and the Collateral Agent (in the case of the Collateral Agent, solely with respect to Section 2.4) agree as follows:

1.      Definitions. All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Note Exchange Agreement. For purposes of this Agreement, the following terms have the following meanings:

"Agreement" has the meaning set forth in the preamble.

"Business Day" means any day other than a Saturday, a Sunday or a day on which commercial banks in New Orleans, Louisiana or New York, New York are required or authorized to be closed.

"Confidential Information" means all information about a Party's business affairs, confidential intellectual property, trade secrets, third-party confidential information, and other sensitive or proprietary information, including business operations and strategies, marketing, creative elements, artwork, visual representations, research material and data, specifications, processes, and technological developments, in each case whether orally or in written, electronic, or other form or media, and in each case whether or not marked, designated, or otherwise identified as "confidential." Licensor's Confidential Information shall specifically include: (a) the Licensed Know-How; (b) Licensor's other unpatented inventions, ideas, methods, discoveries, know-how, trade secrets, unpublished patent applications, invention disclosures, invention summaries, and other confidential intellectual property; and (c) all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations, and other materials prepared by or for Licensee that contain, are based on, or otherwise reflect or are derived from any of the foregoing in whole or in part.

Confidential Information does not include information that, at the time of disclosure and as established by documentary evidence: (a) is or becomes generally available to and known by the public other than as a result of, directly or indirectly, any breach of Section 9 by Licensee; (b) is or becomes available to Licensee on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information; (c) was known by or in the possession of Licensee before being disclosed by or on behalf of Licensor; or (d) was or is independently developed by Licensee without reference to or use, in whole or in part, of any of Licensor's Confidential Information.

"Disclosing Party" means the Party who discloses or makes available to use its Confidential Information to the Receiving Party.

"Effective Date" has the meaning set forth in the preamble.

"Escrow Agreement" has the meaning set forth in Section 7.1.

"Escrowed Materials" has the meaning set forth in Section 7.1.

"<u>Governmental Authority</u>" means any federal, state, national, supranational, local, or other government, whether domestic or foreign, including any subdivision, department, agency, instrumentality, authority (including any regulatory authority), commission, board, or bureau thereof, or any court, tribunal, or arbitrator.

"<u>Improvement</u>" means any modification of or improvement or enhancement to any Licensed Product or Licensed IP.

"<u>Law</u>" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any federal, state, local, or foreign government or political subdivision thereof, or any arbitrator, court, or tribunal of competent jurisdiction.

"<u>License</u>" has the meaning set forth in <u>Section 2.1</u>.

"<u>Licensed Copyright(s)</u>" means all copyrights (whether or not registered) owned or controlled by Licensor relating to the Licensed Products.

"<u>Licensed IP</u>" means, individually or collectively, the Licensed Copyrights, Licensed Know-How, and Licensed Patents.

"<u>Licensed Know-How</u>" means, as to each Vessel, any technical information, trade secrets, formulas, prototypes, specifications, directions, instructions, test protocols, procedures, results, studies, analyses, raw material sources, data, manufacturing data, formulation or production technology, conceptions, ideas, innovations, discoveries, inventions, processes, methods, materials, machines, devices, formulae, equipment, enhancements, modifications, technological developments, techniques, systems (including, but not limited to, all navigational and operating systems), tools, designs, drawings, plans, software, documentation, data, programs, and other knowledge, information, skills, and materials, in each case owned or controlled by Licensor and used in or necessary for the operation of the Vessels or the Licensed Products, including as identified in <u>Exhibit A</u>.

"<u>Licensed Patent(s)</u>" means, as to each Vessel, all patents and patent applications owned or controlled by Licensor and used in or necessary for the operation of the Vessels or Licensed Products, including those identified in <u>Exhibit A</u> as to such Vessel.

"<u>Licensed Patent Challenge</u>" has the meaning set forth in <u>Section 6</u>.

"<u>Licensed Product(s)</u>" means the apparatuses, devices, software (excluding third party off-the-shelf software generally commercially available on standard terms), hardware, technology, systems (including, but not limited to, all navigational and operating systems), and methods, in each case that have been provided, installed, or embedded by Licensor or its Affiliates in the Vessels or provided, installed, or embedded by Licensor or its Affiliates in an appurtenance to the Vessels.

"<u>Licensee</u>" has the meaning set forth in the preamble.

"<u>Licensor</u>" has the meaning set forth in the preamble.

"Losses" means all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder, and the cost of pursuing any insurance providers.

"Party" has the meaning set forth in the preamble.

"Person(s)" means an individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association, or other entity.

"Receiving Party" means the Party or the Collateral Agent who receives Confidential Information from the Disclosing Party.

"Release Event" has the meaning set forth in Section 7.1.

"Representatives" means a Party's personnel, employees, officers, directors, consultants, and legal advisors.

"Term" has the meaning set forth in Section 14.1.

"Territory" means worldwide.

"Third Party Claim" has the meaning set forth in Section 12.1.

"Vessel" and "Vessels" mean the vessels identified in Exhibit A, and none other; provided, that if any such Vessel were to be sold (i) by Licensee as permitted by Section 9.21 of the Note Exchange Agreement or (ii) by a Vessel Buyer (other than if such Vessel is sold through the exercise of remedies by the Collateral Agent subject to the one-time assignment condition of Section 15.8), then such vessel no longer shall be a Vessel hereunder and no longer shall be subject to this Agreement and the License.

"Vessel Buyer" has the meaning set forth in Section 15.8.

2.    Grant.

2.1    IP License. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee, and Collateral Agent (subject to Section 2.4), during the Term an irrevocable (except for termination pursuant to Section 14.2 or Section 14.3), nontransferable (except as permitted in Section 15.8), non-sublicensable (except as set forth below), non-exclusive, royalty-free right and license under the applicable Licensed IP as necessary for the purposes of maintaining, repairing, servicing, modifying, providing technical support for, or otherwise operating the Vessels and Licensed Products in the Territory; provided, that (i) the right and license granted in this Section 2.1 is expressly limited to the applicable Vessels and Licensed Products that are installed or embedded in or are an appurtenance to the applicable Vessel, as the same may be modified, supplemented or replaced by Licensor, and (ii) for the avoidance of doubt, (x) the foregoing license includes the right to maintain and to have others provide technical support to Licensee for Licensed Products already installed on, embedded in or appurtenant to the Vessels to

the extent applicable parts and components therefor are available, but otherwise no manufacturing or distribution rights are granted to Licensee hereunder and (y) no rights to Improvements are granted to Licensee hereunder except to the extent they are provided pursuant to <u>Section 4</u>. The foregoing is referred to as the "<u>License</u>". Licensee may sublicense such License rights to an Affiliate or third party that is maintaining, repairing, servicing, modifying, providing technical support for, or otherwise operating, a Vessel (including rights under the Licensed IP) for or on behalf of Licensee (including, with respect to Collateral Agent, any third party engaged by Collateral Agent to operate such Vessel(s)). Except as set forth in the prior sentence, the License is otherwise non-sublicensable. The Parties intend and agree that, for purposes of Section 365(n) of the U.S. Bankruptcy Code (and any amendment thereto), the foregoing License shall be treated as a license to intellectual property (as defined in Section 101(35A) of the U.S. Bankruptcy Code).

2.2    <u>Licensor Reservation of Rights</u>. Licensor reserves the right to make, use, offer to sell, sell, and import Licensed Products in the Territory.

2.3    <u>Limited Grant</u>. Except for the rights and licenses granted by Licensor under this <u>Section 2</u>, this Agreement does not grant to Licensee or any other Person any right, title, or interest by implication, estoppel, or otherwise. Without limiting the foregoing, nothing in this Agreement grants by implication, estoppel, or otherwise, any right, title, or interest in, to, or under any patents owned or controlled by Licensor other than the Licensed Patents, and then only as to the applicable Vessels as specified on <u>Exhibit A</u> and none other. All rights, titles, and interests in and to the Licensed IP and the Licensed Products not specifically and expressly granted by Licensor hereunder are hereby reserved.

2.4    <u>Collateral Agent Exercise of License</u>. At any time following the occurrence and during the continuance of an Event of Default, without the need of notice to or consent by any Party other than as to notice as set forth in <u>Section 15.8</u>, the License and other rights granted to Licensee under this Agreement may be exercised by the Collateral Agent, a designee of the Collateral Agent and, as to each Vessel, any Vessel Buyer (and the Collateral Agent, any such designee and each Vessel Buyer that exercises such rights, as applicable, shall thereafter be considered a "Licensee" for all purposes of this Agreement and, for the avoidance of doubt, each Vessel Buyer shall be subject to the obligations of Licensee hereunder). Notwithstanding anything to the contrary herein, and for the avoidance of doubt, the Collateral Agent hereby covenants and agrees to refrain from (a) exercising, and (b) permitting any designee of the Collateral Agent from exercising, the License rights granted to Licensee under <u>Section 2.1</u>, solely as it relates to the Collateral Agent, in each case unless and until the occurrence and during the continuance, of an Event of Default.

3.      <u>Transfer of Licensed Know-How</u>. Promptly after the Effective Date and throughout the Term, Licensor shall disclose the Licensed Know-How to Licensee in such form and media as may be reasonably requested by Licensee. For the avoidance of doubt, all Licensed Know-How disclosed to Licensee hereunder is the Confidential Information of Licensor and subject to the confidentiality and non-disclosure obligations under <u>Section 9</u>, and Licensee's use of any documentation, materials, or other information concerning the Licensed Know-How provided under this <u>Section 3</u> is subject to the terms and conditions of this Agreement, including the scope of the License granted under <u>Section 2</u>. Licensor shall also disclose the Licensed Know-How to Collateral Agent, a designee of the Collateral Agent, and any Vessel Buyer, reasonably requested by such Person at any time following the occurrence and during the continuance of an Event of Default.

4.      <u>Improvements</u>. With respect to any Improvements developed or created by Licensor during the Term (including any Improvements made pursuant to the Master Services Agreement (defined below)), Licensor shall offer such Improvements to Licensee on the same or substantially similar terms as Licensor provides such Improvements (i) to other Affiliates of Licensor, so long as Licensor and Licensee are Affiliates, and (ii) to other third party licensees buying or licensing such Improvements from Licensor (or if there are none, then at comparable rates in the open market for comparable types of Improvements), if Licensor and Licensee are not Affiliates. With respect to any Improvements developed by Licensee during the Term, Licensee shall and does hereby assign to Licensor all right, title, and interest in and to such Improvements; <u>provided</u>, that such Improvements shall from the date of conception or creation be treated as part of the Licensed IP and be subject to the License granted under this Agreement. Licensee shall disclose each Improvement to Licensor in writing within thirty (30) Business Days after its conception or creation by Licensee. Licensee's notice must include a summary of the subject matter of such Improvements in sufficient detail to enable Licensor to seek patent protection in its sole discretion.

5.      <u>Patent Prosecution and Maintenance</u>. For each patent and patent application included within the Licensed Patents, Licensor will be solely responsible for, and make all decisions concerning, the preparation, filing, prosecution, and maintenance thereof.

6.      <u>Challenges to Licensed Patents</u>. Licensee shall not institute or actively participate as an adverse party in, or otherwise provide material support to, any legal action or administrative proceeding in the Territory to invalidate or limit the scope of any Licensed Patent claim or obtain a ruling that any Licensed Patent claim is unenforceable or not patentable or that any Licensed Product does not infringe one or more claims of any Licensed Patent ("<u>Licensed Patent Challenge</u>") until the expiration of thirty (30) Business Days after Licensee serves on Licensor written notice of Licensee's intention to bring or participate in a Licensed Patent Challenge and except to the extent such challenge or invalidity claim is in defense of a claim of infringement of such Licensed Patent by Licensor. Licensee shall also provide to Licensor a complete written disclosure of each and every basis then known to Licensee for the Licensed Patent Challenge and shall provide Licensor with a copy of any document or publication that Licensee may use in connection with the Licensed Patent Challenge. Licensee's failure to comply with this provision will constitute a material breach of this Agreement.

7.      <u>Escrow and Release Obligations</u>.

7.1     Within thirty (30) days after the Effective Date, the Parties shall enter into a mutually agreeable escrow agreement (the "Escrow Agreement") with a reputable third party agent with expertise in software and technology escrow designated by Licensee (and reasonably acceptable to Licensor), pursuant to which Licensor shall deposit in escrow copies, on suitable magnetic or optical media, of all source code to any software included in the Licensed IP and related documentation and information, as is relevant to and reasonably necessary for Licensee to maintain, repair, service, modify, provide technical support for, or otherwise operate the Vessels and Licensed Products, and to otherwise continue to exercise the rights granted by Licensor to Licensee under this Agreement following a Release Event (the "Escrowed Materials"). Licensor hereby agrees that the Escrow Agreement shall provide that upon the occurrence of any of the following events during the Term (each, a "Release Event"), the Escrowed Materials shall be released to Licensee:

(a)     Licensor ceases, for any reason, to do business or to otherwise maintain, repair, service, modify, or provide technical support for the Vessels or Licensed Products;

(b)     Licensor or any Contractor (as defined in the Master Services Agreement) materially breaches its obligations under this Agreement, or the Master Services Agreement (defined below), as related to Licensee's ability to receive the benefit of the license to the Licensed IP, or the Services (as defined in the Master Services Agreement) relating to or using such Licensed IP, and fails to cure such material breach within forty-five (45) days of receiving written notice of such breach; or

(c)     Bankruptcy or insolvency of Licensor, including if Licensor (i) is dissolved or liquidated or takes any corporate action for such purpose; (ii) makes a general assignment for the benefit of creditors; or (iii) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

7.2     Licensor hereby grants to Licensee and Collateral Agent (subject to Section 2.4) a license to use the Escrowed Materials and any Licensed IP relating to the Escrowed Materials following the occurrence of a Release Event to the extent necessary for Licensee to continue to exercise its license rights on the same terms and subject to the same conditions as the License (including for Licensee to perform or have performed the applicable Services (as defined in the Master Services Agreement) provided by Licensor under the Master Services Agreement), and the Escrowed Materials shall be deemed Licensed IP for all purposes set forth herein.

8.     Enforcement; Third-Party Infringement Claims.

8.1     Notice of Infringement or Third-Party Claims. If (a) either Party believes that any Licensed IP is being infringed or misappropriated by a third party in the Territory, or (b) if a third party alleges that any Licensed Patent is invalid or unenforceable, or claims that a Licensed Product, or its use, development, manufacture, or sale infringes such third party's intellectual property rights in the Territory, the Party possessing such belief or awareness of such claims shall promptly provide written notice to the other Party and provide it with all details of such infringement or claim, as applicable, that are known by such Party.

8.2   <u>Right to Bring Action or Defend</u>.

(a)   Licensor has the sole right and discretion to bring an infringement or misappropriation action concerning any Licensed IP, defend any declaratory judgment action concerning any Licensed IP, and take any other lawful action reasonably necessary to protect, enforce, or defend any Licensed IP, and control the conduct thereof and attempt to resolve any claims relating to any Licensed IP, including by (a) prosecuting or defending any *inter partes* review, post-grant review, covered business method patent review, opposition, derivation, interference, declaratory judgment, federal district court, US Patent and Trademark Office, US International Trade Commission, or other proceeding of any kind, and (b) taking any other lawful action that Licensor, in its sole discretion, believes is reasonably necessary to protect, enforce, or defend any Licensed IP. Licensor has the right to prosecute or defend any such proceeding in Licensor's own name or, if required by applicable Law or otherwise necessary for such purposes, in the name of Licensee and may join Licensee as a party. Licensor shall bear its own costs and expenses in all such proceedings and have the right to control the conduct thereof and be represented by counsel of its own choice therein.

(b)   Licensee shall and hereby does irrevocably and unconditionally waive any objection to Licensor's joinder of Licensee to any proceeding described in <u>Section 8.2(a)</u> on any grounds whatsoever, including on the grounds of personal jurisdiction, venue, *or forum non conveniens.* If Licensor brings or defends any such proceeding, Licensee shall cooperate in all respects with Licensor in the conduct thereof, and assist in all reasonable ways, including having its employees testify when requested, and make available for discovery or trial exhibit any relevant records, papers, information, and the like, at Licensor's expense (but only upon prior written authorization by Licensor for such expenses, <u>provided</u> that such cooperation and assistance is subject to receipt of such prior written authorization).

8.3   <u>Recovery and Settlement</u>. If Licensor undertakes the enforcement or defense of any Licensed Patent:

(a)   any recovery, damages, or settlement derived from such suit, action, or other proceeding will be retained in its entirety by Licensor; and

(b)   Licensor may settle any such suit, action, or other proceeding, whether by consent order, settlement, or other voluntary final disposition, without the prior written approval of Licensee, <u>provided</u> that Licensor shall not settle any such suit, action, or other proceeding in a manner that adversely affects the rights of Licensee hereunder concerning the Licensed IP without Licensee's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

If any suit, action, or other proceeding alleging invalidity or non-infringement of any Licensed Patent is brought against Licensee, Licensor, at its option, will have the right to intervene and take over the sole defense of the suit, action, or other proceeding at its own expense.

9.   <u>Confidentiality</u>.

9.1     <u>Confidentiality Obligations</u>. The Receiving Party acknowledges that in connection with this Agreement it will gain access to Confidential Information of the Disclosing Party. As a condition to being provided with Confidential Information, the Receiving Party shall, during the Term and for three (3) years thereafter:

(a)     not use the Disclosing Party's Confidential Information other than as strictly necessary to perform its obligations under this Agreement;

(b)     maintain the Disclosing Party's Confidential Information in strict confidence and, subject to <u>Section 9.2</u>, not disclose the Disclosing Party's Confidential Information without the Disclosing Party's prior written consent: <u>provided</u>, that the Receiving Party may disclose the Confidential Information to its Representatives who:

(i)     have a need to know the Confidential Information for purposes of the Receiving Party's performance, or exercise of its rights concerning the Confidential Information, under this Agreement;

(ii)    have been apprised of this restriction; and

(iii)   are themselves bound by written nondisclosure agreements or professional obligations at least as restrictive as those set forth in this <u>Section 9.1</u>; <u>provided</u>, <u>further</u>, that the Receiving Party will be responsible for ensuring its Representatives' compliance with, and will be liable for any breach by its Representatives of, this <u>Section 9.1</u>.

The Receiving Party shall use reasonable care, and efforts at least as protective as the efforts it uses for its own confidential information of the same or similar nature, to safeguard the Disclosing Party's Confidential Information from use or disclosure other than as permitted hereby.

9.2     <u>Exceptions</u>. If the Receiving Party becomes legally compelled to disclose any Confidential Information, the Receiving Party shall:

(a)     provide prompt written notice to the Disclosing Party so that the Disclosing Party may seek a protective order or other appropriate remedy or waive its rights under this <u>Section 9</u>; and

(b)     disclose only the portion of Confidential Information that it is legally required to furnish.

If a protective order or other remedy is not obtained, or the Disclosing Party waives compliance under this <u>Section 9</u>, the Receiving Party shall, at the Disclosing Party's expense, use reasonable efforts to obtain assurance that confidential treatment will be afforded the Confidential Information.

10.     <u>Representations and Warranties</u>.

10.1 <u>Mutual Representations and Warranties</u>. Each Party represents and warrants to the other Party that as of the Effective Date:

      (a)     it is duly organized, validly existing, and in good standing as a limited liability company as represented herein under the laws and regulations of its jurisdiction of incorporation, organization, or chartering;

      (b)     it has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder;

      (c)     the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary limited liability company actions of the Party; and

      (d)     when executed and delivered by such Party, this Agreement will constitute the legal, valid, and binding obligation of such Party, enforceable against such Party in accordance with its terms.

10.2 <u>Licensor Representations and Warranties</u>. Licensor represents and warrants that as of the Effective Date: (a) Licensor is the sole and exclusive (even as to its Affiliates) legal and beneficial owner of the entire right, title, and interest in and to the Licensed IP and all Confidential Information of Licensor, in each case, disclosed to Licensee under this Agreement; (b) as to each applicable Vessel, to Licensor's knowledge, no intellectual property rights owned or controlled by any Person (other than Licensor), including any Affiliate of Licensor, are used in or necessary for the operation of such Vessel and Licensee's use of the Licensed Products (other than rights to third party off-the-shelf software generally commercially available on standard terms and applicable copyrights subject to the Non-exclusive and Assignable Copyright License Agreement, dated as of [9], 2023, by and among North American Shipbuilding, L.L.C., Licensee and Collateral Agent); (c) as to each applicable Vessel, (i) the Licensed IP set forth on <u>Exhibit A</u> and (ii) rights under licenses to third party off-the-shelf software generally commercially available on standard terms are all of the intellectual property rights that are necessary for maintaining, repairing, modifying, providing technical support for, or otherwise operating the Licensed Products; (d) Licensor has not granted to any third party any licenses or other rights under the Licensed IP that are in conflict with the terms and conditions of this Agreement; (e) Licensor has not received any written notice or threat of any claim, suit, action, or proceeding, and has no knowledge or reason to know of any information, that could: (i) invalidate or render unenforceable any claim of any Licensed Patent; (ii) prove that the Licensed Products are not covered by any claim of any Licensed Patent; or (iii) cause any claim of any Licensed Patent to fail to issue or be materially limited or restricted as compared with its currently pending scope; and (f) neither Licensor nor any Affiliate of Licensor owns, controls or has any right, title or interest in or to, or has contributed any Intellectual Property, software, or other technology used in the Vessels or Licensed Products, other than the Licensed IP, rights under licenses to third party off-the-shelf software generally commercially available on standard terms, and the copyrights subject to the Non-exclusive and Assignable Copyright License Agreement, dated as of [9], 2023, by and among North American Shipbuilding, L.L.C., Licensee and Collateral Agent.

10.3 <u>Disclaimer</u>. EXCEPT AS EXPRESSLY SET FORTH IN <u>SECTION 10.2</u>, LICENSOR EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, CONCERNING THE VALIDITY, ENFORCEABILITY, AND SCOPE OF THE LICENSED PATENTS, THE ACCURACY, COMPLETENESS, SAFETY, USEFULNESS FOR ANY PURPOSE, OR LIKELIHOOD OF SUCCESS (COMMERCIAL, REGULATORY OR OTHER) OF THE LICENSED PRODUCTS, THE LICENSED KNOW-HOW, AND ANY OTHER TECHNICAL INFORMATION, TECHNIQUES, MATERIALS, METHODS, PRODUCTS, PROCESSES, OR PRACTICES AT ANY TIME MADE AVAILABLE BY LICENSOR, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND WARRANTIES ARISING FROM A COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE, OR TRADE PRACTICE. WITHOUT LIMITATION TO THE FOREGOING, LICENSOR WILL HAVE NO LIABILITY WHATSOEVER TO LICENSEE OR ANY OTHER PERSON FOR OR ON ACCOUNT OF ANY INJURY, LOSS, OR DAMAGE, OF ANY KIND OR NATURE, SUSTAINED BY, OR ANY DAMAGE ASSESSED OR ASSERTED AGAINST, OR ANY OTHER LIABILITY INCURRED BY OR IMPOSED ON LICENSEE OR ANY OTHER PERSON, ARISING OUT OF OR IN CONNECTION WITH OR RESULTING FROM (A) THE USE OF OR ERRORS OR OMISSIONS IN A LICENSED PRODUCT, OR THE PRACTICE OF THE LICENSED PATENTS; OR (B) THE USE OF OR ANY ERRORS OR OMISSIONS IN ANY KNOW-HOW, TECHNICAL INFORMATION, TECHNIQUES, OR PRACTICES DISCLOSED BY LICENSOR TO LICENSEE PURSUANT TO THIS AGREEMENT.

11.     <u>Exclusion of Consequential and Other Indirect Damages</u>. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY WILL NOT BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INJURY TO OR LOSS OF GOODWILL, REPUTATION, BUSINESS, PRODUCTION, ANTICIPATED PROFITS, CONTRACTS, OR OPPORTUNITIES (REGARDLESS OF HOW THESE ARE CLASSIFIED AS DAMAGES), OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, PUNITIVE, OR ENHANCED DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, PRODUCT LIABILITY, OR OTHERWISE (INCLUDING THE ENTRY INTO, PERFORMANCE, OR BREACH OF THIS AGREEMENT), REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS FORESEEABLE OR THE PARTY AGAINST WHOM SUCH LIABILITY IS CLAIMED HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE. COLLATERAL AGENT SHALL NOT BE LIABLE TO LICENSOR OR ANY THIRD PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR ACTS, OMISSIONS, OR DAMAGES CAUSED BY NAUTICAL SOLUTIONS OR ANY PERMITTED ASSIGNEE AND LICENSOR SHALL NOT BRING ANY CLAIM AGAINST COLLATERAL AGENT FOR SUCH ACTS OR OMISSIONS BY NAUTICAL SOLUTIONS OR ANY PERMITTED ASSIGNEE, OR SEEK ANY DAMAGES OR RECOVERY FROM COLLATERAL AGENT FOR FINANCIAL OBLIGATIONS OF NAUTICAL SOLUTIONS OR ANY PERMITTED ASSIGNEE.

12. <u>Indemnification</u>.

12.1 <u>Licensee Indemnification</u>. Licensee shall indemnify, defend, and hold harmless Licensor and its officers, directors, employees, agents, Affiliates, successors, assigns. attorneys, and licensees (each, an "<u>Indemnified Party</u>") from and against any losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers, arising out of or in connection with any third-party claim, suit, action, or proceeding (each, a "<u>Third-Party Claim</u>") relating to or arising, out of or resulting from: (a) Licensee's breach of any representation, warranty, covenant, or obligation under this Agreement, or (b) Licensee's use of Licensed IP or Licensed Products for products other than the Licensed Products. For purposes of this <u>Section 12.1</u>, for the avoidance of doubt, "Licensee" shall not include the Collateral Agent, and Collateral Agent shall have no obligation to any Indemnified Party under this <u>Section 12.1</u>, unless and until such time that Collateral Agent exercises its rights under the License pursuant to <u>Section 2.4</u>.

12.2 <u>Licensor Indemnification</u>. Licensor shall indemnify, defend, and hold harmless Licensee and its officers, directors, employees, agents, Affiliates, successors, permitted assigns, and attorneys (each an "<u>Indemnified Party</u>") from and against any Third-Party Claim relating to or arising out of or resulting from: (a) any breach by Licensor of its representations, warranties, covenants, or other obligations hereunder, or (b) any violation, misappropriation, or infringement upon the intellectual property rights of any third party arising from Licensee's authorized use of the applicable Licensed Products and/or its authorized exercise of the License with respect to the applicable Vessels.

12.3 <u>Indemnification Procedure</u>. The Indemnified Party shall notify the indemnifying Party in writing of any Third Party Claim and cooperate with the indemnifying Party at its sole cost and expense. Subject to <u>Section 8</u>, the indemnifying Party shall immediately take control of the defense and investigation of the Third Party Claim and shall employ counsel reasonably acceptable to the Indemnified Party to handle and defend the Third Party Claim, at its sole cost and expense. The indemnifying Party shall not settle any Third Party Claim in a manner that adversely affects the rights of the Indemnified Party without its prior written consent. The Indemnified Party's failure to perform any obligations under this <u>Section 12.3</u> will not relieve the indemnifying Party of its obligation under this <u>Section 12</u> except to the extent it can demonstrate that it has been materially prejudiced as a result of such failure. The Indemnified Party may participate in and observe the proceedings at its own cost and expense with counsel of its own choosing.

13. <u>Maintenance and Support</u>. Reference is hereby made to that certain Master Services Agreement dated of even date herewith by and among, among others, Licensor and Licensee with respect to available maintenance and support to be provided to Licensee, Collateral Agent, its designees and Vessel Buyer, as the case may be, by Licensor (the "<u>Master Services Agreement</u>").

14. <u>Term and Termination</u>.

14.1 <u>Term</u>. The term of this Agreement as to the applicable Licensed IP and Licensed Products for a particular Vessel commences as of the Effective Date and, unless

terminated earlier with the prior written consent of the Parties and (if the Note Obligations have not been paid in full in cash) the Collateral Agent (at the direction of the Required Holders) or as provided in Section 14.2, will remain in force until such time as none of Licensee, the Collateral Agent, a designee thereof or a Vessel Buyer are the owner or operator of the particular Vessel (the "Term").

14.2    Termination for Cause. Licensor may terminate this Agreement as to all Vessels on written notice to Licensee and the Collateral Agent if Licensee materially breaches its obligations under this Agreement and such breach is not cured within forty-five (45) days from Licensor's written notice thereof to both Licensee and the Collateral Agent detailing such breach. Notwithstanding the foregoing, if Licensor terminates this Agreement in the event of such uncured breach by Nautical Solutions, Licensor shall only be entitled to terminate this Agreement as to Nautical Solutions, and this Agreement (and the License) shall otherwise remain in full force and effect with respect to the Collateral Agent, its designee or any Vessel Buyer, as applicable, each of whom retains the right to exercise the rights as a Licensee, subject to the terms and conditions hereof.

14.3    Termination for Bankruptcy or Insolvency. As to any Vessel Buyer that becomes a Licensee, Licensor may terminate this Agreement by written notice to such Licensee if such Licensee: (a) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which as to any involuntary proceeding is not fully stayed within seven (7) Business Days or is not dismissed or vacated within forty-five (45) days after filing; (b) is dissolved or liquidated or takes any corporate action for such purpose; (c) makes a general assignment for the benefit of creditors; or (d) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

14.4    Effect of Termination. Except as set forth in Section 8 and Section 14.2 above, upon the termination of this Agreement for any reason, all rights licensed under the License in this Agreement will revert immediately to Licensor, and Licensee shall immediately cease all activities concerning, including all practice and use of, the applicable Licensed IP and Licensed Products no longer subject to this Agreement. After termination or expiration of this Agreement, within thirty (30) after the written request of the Disclosing Party, the Receiving Party shall: (a) return to the Disclosing Party all documents and tangible materials and any copies thereof containing, reflecting, incorporating, or based on the Disclosing Party's Confidential Information; (b) permanently erase such Confidential Information from its computer systems; and (c) certify in writing to the Disclosing Party that it has complied with the requirements of this Section 14.4; provided that the Receiving Party may keep an archival copy for recordkeeping purposes on the condition that, except as otherwise required by applicable law, (i) personnel whose functions are not primarily information technology do not access such retained copies and (ii) personnel whose functions are primarily information technology in nature access such copies only as reasonably necessary for the performance of their information technology duties (e.g., for purposes of system recovery). Any Confidential Information retained will be held on the terms of Section 9 of this Agreement.

14.5 Survival. The rights and obligations of the Parties as to each Vessel set forth in Section 13 and Section 1 (*Definitions*), Section 6 (*Challenges to Licensed Patents*), Section 9

(*Confidentiality*), Section 7 (*Escrow and Release Obligations*) Section 10 (*Representations and Warranties*), Section 12 (*Indemnification*), Section 14.4 (*Effect of Termination*), and Section 15 (*Miscellaneous*), and any right, obligation, or required performance of the Parties in this Agreement which, by its express terms or nature and context is intended to survive termination or expiration of this Agreement, will survive any such termination or expiration for two (2) years from the termination or expiration date as to such Vessel.

15.    Miscellaneous.

15.1 Force Majeure. Licensor will not be in default by reason of any failure or delay in the performance of its obligations hereunder where such failure or delay is due to any circumstance or cause beyond its reasonable control, including strikes, labor disputes, civil disturbances, riot, rebellion. invasion, epidemic, hostilities, war, terrorist attack, embargo, natural disaster, acts of God, flood, fire, sabotage, fluctuations or non-availability of electrical power, heat, light, air conditioning.

15.2 Independent Contractors. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement creates any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the parties, and neither Party has authority to contract for or bind the other party in any manner whatsoever.

15.3 No Public Statements. Neither Party may issue or release any announcement, statement, press release, or other publicity or marketing materials relating to this Agreement or, unless expressly permitted under this Agreement, otherwise use the other Party's, or such other Party's Affiliates', trademarks, service marks, trade names, logos, domain names, or other indicia of source, association, or sponsorship, in each case, without the prior written consent of the other Party.

15.4 Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (other than routine communications having no legal effect) must be in writing and sent to the respective Party at the addresses indicated below (or at such other address for a Party as may be specified in a notice given in accordance with this Section):

| | |
|---|---|
| If to Licensor: | Marine Technologies, L.L.C.<br>16201 East Main Street<br>Cut Off, LA 70345<br>Attn: Dino Chouest<br><br>with a copy by email to legal@chouest.com (which copy shall not constitute official notice to Licensor hereunder) |
| If to Licensee: | Nautical Solutions, L.L.C.<br>16201 East Main Street<br>Cut Off, LA 70345<br>Attn: Luke Newman<br><br>with a copy by email to legal@chouest.com (which copy shall not constitute official notice to Licensee hereunder) |
| If to Collateral Agent: | Wilmington Trust, National Association, as Collateral Agent<br>1100 North Market Street<br>Wilmington, DE 19890<br>Attn: Global Capital Markets – Project Finance – Rafael Miranda<br>Email: rmiranda1@wilmingtontrust.com<br>Tel: 845-717-8079 |

Notices sent in accordance with this <u>Section 15.4</u> will be deemed effective: (a) when received on a Business Day, if delivered by hand (with written confirmation of receipt); (b) when received on a Business Day, if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email (in each case, with confirmation of transmission), if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3rd) Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.

15.5 <u>Interpretation</u>. For purposes of this Agreement: (a) the words "include," "includes," and "including" will be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Sections and Exhibits refer to the Sections of and Exhibits attached to this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

15.6 <u>Headings</u>. The headings in this Agreement are for reference only and do not affect the interpretation of this Agreement.

15.7 <u>Entire Agreement</u>. This Agreement, together with all Exhibits and any other documents incorporated herein by reference, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements both written and oral, with respect to such subject matter.

15.8 <u>Assignment</u>.

(a)      Licensee shall not assign or otherwise transfer any of its rights, or delegate or otherwise transfer any of its obligations or performance, under this Agreement, in each case, whether voluntarily, involuntarily, by operation of law, or otherwise, without Licensor's prior written consent, which consent Licensor may give or withhold in its sole discretion. For purposes of the preceding sentence, and without limiting its generality, any merger, consolidation, or reorganization involving Licensee (where Licensee is not the surviving entity or in control of the surviving entity), or any sale or other title transfer of any of the Vessels, will be deemed to be a transfer of rights, obligations, or performance under this Agreement, for which Licensor's prior written consent is required. Notwithstanding the foregoing, (i) solely in connection with the sale or other title transfer by Licensee of a Vessel to an Affiliate of Licensee, with prior written notice by Licensee to Licensor, Licensee may assign to such Affiliate this Agreement as it relates to such Vessel and its applicable Licensed IP and Licensed Products, and (ii) upon the Collateral Agent's exercise of its rights and remedies following the occurrence and during the continuance of an Event of Default (including during a bankruptcy or insolvency proceeding of Licensee), the Collateral Agent may, with prior written notice to Licensor but without the consent of Licensor or Licensee, assign this Agreement, in whole or on a Vessel-by-Vessel basis, in connection with the direct or indirect sale or other title transfer of a Vessel to a third party (including to the Collateral Agent or a designee) or in connection with the sale or transfer of the equity of Nautical Solutions resulting in a Change of Control (such third party or Nautical Solutions after giving effect to the Change of Control being referred to in each case as a "<u>Vessel Buyer</u>"), and Licensor acknowledges and agrees that it has consented to assignment in accordance with this sentence, including for purposes of Section 365(c) of the U.S. Bankruptcy Code (and any amendments thereto); provided that, as to any Vessel, this Agreement may only be assigned once to a third-party Vessel Buyer; provided further, however, that, if the Vessel Buyer is the Collateral Agent or a designee, the Collateral Agent or designee may further assign this Agreement as to each Vessel on a one-time basis to another Vessel Buyer. In the event of any assignment by Licensee or Collateral Agent of this Agreement as permitted pursuant to this <u>Section 15.8</u>, such permitted assignee (i.e., Licensee's Affiliate in accordance with clause (i) above or the Vessel Buyer in accordance with clause (ii) above) shall be deemed to be a "Licensee" under this Agreement (and if there are multiple Licensees hereunder, then this Agreement thereafter shall be deemed a separate agreement as to each Licensee). Any purported assignment, delegation, or transfer in violation of this <u>Section 15.8</u> is void.

(b)      Licensor may freely assign or otherwise transfer all or any of its rights, or delegate or otherwise transfer all or any of its obligations or performance, under this Agreement; <u>provided</u>, that Licensor shall provide written notice to Licensee and Collateral Agent of such transfer as soon as practicable. For the avoidance of doubt, (i) any assignee (including any Affiliate

of Licensor) of the Licensed IP and the Licensed Products takes them subject to Licensee's rights under this Agreement, including the license grant in <u>Section 2.1</u>, and (ii) in the event of an assignment or other transfer of the Licensed IP or Licensed Products, this Agreement and Licensee's and Collateral Agent's rights under this Agreement shall continue in full force and effect, and Licensor will notify such assignee or transferee of the foregoing (i) and (ii).

      (c)    This Agreement is binding upon and inures to the benefit of Licensor and Licensee and their respective permitted successors and assigns.

      15.9 <u>No Third Party Beneficiaries</u>. Other than with respect to the Collateral Agent, this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any third party any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement. The Collateral Agent is a third party beneficiary for purposes of enforcing its rights hereunder. When the Note Obligations are paid in full in cash, then (i) the Collateral Agent no longer is a third party beneficiary and (ii) all references herein to the Collateral Agent, its designees and Vessel Buyers no longer shall be effective (but a Vessel Buyer shall retain all of its rights and obligations as a Licensee).

      14.10 <u>Amendment: Modification; Waiver</u>. No amendment or modification to this Agreement is effective unless it is in writing and signed by an authorized representative of each Party and (if the Note Obligations have not been paid in full in cash) the Collateral Agent (at the direction of Required Holders). No waiver by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the Party so waiving and signed by the Collateral Agent (at the direction of Required Holders). Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, remedy, power, or privilege.

      15.10 <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

      15.11 <u>Dispute Resolution; Governing Law; Submission to Jurisdiction</u>.

      (a)    Any claim, disagreement or dispute between the Parties arising out of or relating to this Agreement (a "<u>Dispute</u>") shall be resolved in the manner provided in this <u>Section 15.11</u>. The Parties shall attempt to resolve any Dispute by negotiating in good faith for a period of third (30) days after receipt by either Party of a written notice of the Dispute from the other Party (the "<u>Negotiation Period</u>"). The written notice shall identify, with reasonable particularity, each matter or issue that is the subject of the dispute, a summary of the basis for the Party's

position with respect to each such matter or issue and the relief being requested by the Party. No Party shall commence any Action in respect of any Dispute (i) until the expiration of the Negotiation Period or (ii) if the other Party has refused to participate or has not reasonably participated in the required negotiation process in good faith set forth in this Section 15.11. If the Parties are unable to resolve the Dispute during the Negotiation Period, the Dispute shall be finally settled by binding arbitration conducted expeditiously in accordance with the Comprehensive Arbitration Rules & Procedures, including the Expedited Procedures then followed by the Judicial Arbitration and Mediation Services, Inc. ("JAMS") or any successor to the functions thereof ("Rules"), and judgment upon the award rendered by the arbitrator shall be entered by any court of competent jurisdiction. One arbitrator shall be jointly selected by the Parties. If the Parties are unable to jointly select an arbitrator, the arbitrator shall be appointed in accordance with the Rules. The cost of the arbitrator shall be shared equally by the Parties. The location of the arbitration proceeding shall be New York, New York and the language of arbitration shall be English. All arbitration proceedings are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and the applicable state rules of evidence. The dispute resolution provisions of this Section 15.11(a) shall not be construed to interfere with a Party's other rights provided by this Agreement, including the right to terminate this Agreement in accordance with its terms. During the pendency of any such Dispute, all of the terms and conditions of this Agreement shall remain in effect and the Parties shall continue to perform all of their respective obligations hereunder.

(b) This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

(c)       The Parties irrevocably submit to the exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement, the Notes or, except as otherwise required by applicable law, any other Note Document. To the fullest extent permitted by applicable law, the Parties irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

15.12 Waiver of Jury Trial. Each Party irrevocably and unconditionally waives any right it may have to a trial by jury for any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

15.13 Equitable Relief. Each Party acknowledges that a breach by the other Party of this Agreement may cause the non-breaching Party irreparable harm, for which an award of damages would not be adequate compensation and, in the event of such a breach or threatened breach, the non-breaching Party will be entitled to seek equitable relief, including in the form of a restraining order, orders for preliminary or permanent injunction, specific performance, and any other relief that may be available from any court, and the Parties hereby waive any requirement for the securing or posting of any bond or the showing of actual monetary damages in connection

with such relief. These remedies are not the exclusive remedy for a breach of this Agreement but are in addition to all other remedies available at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary, and shall not in any way affect any other rights or remedies of the Parties under this Agreement.

      15.14 <u>Attorneys' Fees</u>. In the event that any action, suit, or other legal or administrative proceeding is instituted or commenced by either Party against the other Party arising out of or related to this Agreement, the prevailing Party will be entitled to recover its reasonable attorneys' fees, expenses, and court costs from the non-prevailing Party.

      15.15 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. The words "execution," "signed," "signature," and words of like import used in this Amendment will be deemed to include electronic signatures or the keeping of records in electronic form, each of which will be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

      15.16 <u>Joinder</u>. It is understood and agreed that to the extent any Affiliate of Licensor owns or controls or has contributed to the Vessels any intellectual property rights (including any software or technology) relating to the Licensed Products or Vessels, such Affiliate shall be deemed to be and required to become a "Licensor" under this Agreement by (x) executing a joinder agreement and delivering the same to each of the Collateral Agent and AIG and Prudential in form and substance reasonably satisfactory to the Required Holders (as defined in the NEA and hereinafter referred to as the "<u>NEA Required Holders</u>"), (y) delivering supplements to Exhibit A of this Agreement as are necessary to cause such Exhibit to be complete and accurate with respect to such additional Affiliate on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Affiliate had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Collateral Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Collateral Agent (acting at the direction of the NEA Required Holders). In the event any added Licensor ceases to be an Affiliate of the other Licensor entities, then such Licensor ceasing to be an Affiliate shall endeavor to enter into a new agreement with Licensee granting Licensee the rights granted under this Agreement on terms and conditions substantially similar to this Agreement.

<div align="center">[SIGNATURE PAGE FOLLOWS]</div>

IN WITNESS WHEREOF, the Parties and the Collateral Agent have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

MARINE TECHNOLOGIES, L.L.C.

By: _____
     Name:
     Title:


NAUTICAL SOLUTIONS, L.L.C.

By: _____
     Name:
     Title:


WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent

By: _____
     Name:
     Title:

**EXHIBIT A**

**See the following Exhibits A-1, A-2, A-3, A-4,     A-5, A-6, A-7, A-8,     A-10     A-11, A-12, 13, A-14, A-15, A-16, A-17, A-18, A-19, A-20,     A-21, A-22, A-23,     A-25     A-26, A-27, 28 and A-29.**

|      | **Vessel** | **Official Number** |
|------|------------|---------------------|
| A-1  | Avery Island | 1253395 |
| A-2  | Brad Dartez | 1252257 |
| A-3  | Cat Island | 1257750 |
| A-4  | Celena Chouest | 1201702 |
| A-5  | Corcovado | 1215834 |
| A-6  | Dante | 1178758 |
| A-7  | Dauphin Island | 1262978 |
| A-8  | Deer Island | 1289730 |
| A-9  | Dino Chouest | 1207856 |
| A-10 | Fast Tender | 1206390 |
| A-11 | Fast Track | 1208793 |
| A-12 | Forte | 1223605 |
| A-13 | Gavea | 1211932 |
| A-14 | Grand Isle | 1250605 |
| A-15 | Horn Island | 1255030 |
| A-16 | Jackie Chouest | 1210979 |
| A-17 | Kirt Chouest | 1213707 |
| A-18 | Lyman Martin | 1227085 |
| A-19 | Marsh Island | 1266925 |
| A-20 | Mr Sidney | 1216539 |
| A-21 | Ms Virgie | 1213714 |
| A-22 | Pao de Acucar | 1218372 |
| A-23 | Paradise Island | 1262977 |
| A-24 | Pecan Island | 1258532 |
| A-25 | Pelican Island | 1261549 |
| A-26 | Sanibel Island | 1257727 |
| A-27 | Ship Island | 1252958 |
| A-28 | Timbalier Island | 1251360 |
| A-29 | Wine Island | 1259152 |

**EXHIBIT A-1**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Avery Island (O.N. 1253395)

Licensed Patents

    None.

Licensed Know-How

•     Operations manuals, documentation, and use of the Dynamic Position Systems

•     Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-2**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Brad Dartez (O.N. 1252257)

<u>Licensed Patents</u>

None.

<u>Licensed Know-How</u>

•      Operations manuals, documentation, and use of the Dynamic Position Systems

•      Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

Applicable software object code as to the Licensed Know-How

**EXHIBIT A-3**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Cat Island (O.N. 1257750)

<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

•    Operations manuals, documentation, and use of the Dynamic Position Systems

•    Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-4**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Celena Chouest (O.N. 1201702)

Licensed Patents

    None.

Licensed Know-How

•     Operations manuals, documentation, and use of the Dynamic Position Systems

•     Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-5**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Corcovado (O.N. 1215834)

Licensed Patents

    None.

Licensed Know-How

•       Operations manuals, documentation, and use of the Dynamic Position Systems

•       Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-6**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Dante (O.N. 1178758)

<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

•     Operations manuals, documentation, and use of the Dynamic Position Systems

•     Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-7**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Dauphin Island (O.N. 1262978)

<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

•     Operations manuals, documentation, and use of the Dynamic Position Systems

•     Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-8**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Deer Island (O.N. 1289730)

<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

•    Operations manuals, documentation, and use of the Dynamic Position Systems

•    Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-9**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Dino Chouest (O.N. 1207856)

Licensed Patents

    None.

Licensed Know-How

-     Operations manuals, documentation, and use of the Dynamic Position Systems

-     Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-10**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Fast Tender (O.N. 1206390)

<u>Licensed Patents</u>

None.

<u>Licensed Know-How</u>

Operations manuals, documentation, and use of the Dynamic Position Systems

<u>Licensed Copyrights</u>

Applicable software object code as to the Licensed Know-How

**EXHIBIT A-11**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Fast Track (O.N. 1208793)

<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

    Operations manuals, documentation, and use of the Dynamic Position Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-12**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Forte (O.N. 1223605)

<u>Licensed Patents</u>

  None.

<u>Licensed Know-How</u>

  Operations manuals, documentation, and use of the Dynamic Position Systems

<u>Licensed Copyrights</u>

  Applicable software object code as to the Licensed Know-How

**EXHIBIT A-13**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Gavea (O.N. 1211932)

Licensed Patents

    None.

Licensed Know-How

•    Operations manuals, documentation, and use of the Dynamic Position Systems

•    Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-14**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Grand Isle (O.N. 1250605)

<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-15**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Horn Island (O.N. 1255030)

<u>Licensed Patents</u>

None.

<u>Licensed Know-How</u>

• Operations manuals, documentation, and use of the Dynamic Position Systems

• Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

Applicable software object code as to the Licensed Know-How

**EXHIBIT A-16**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Jackie Chouest (O.N. 1210979)

<u>Licensed Patents</u>

   None.

<u>Licensed Know-How</u>

•      Operations manuals, documentation, and use of the Dynamic Position Systems

•      Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

   Applicable software object code as to the Licensed Know-How

**EXHIBIT A-17**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Kirt Chouest (O.N. 1213707)

<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

    Operations manuals, documentation, and use of the Dynamic Position Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-18**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Lyman Martin (O.N. 1227085)

<u>Licensed Patents</u>

> None.

<u>Licensed Know-How</u>

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

> Applicable software object code as to the Licensed Know-How

**EXHIBIT A-19**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Marsh Island (O.N. 1266925)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-20**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Mr Sidney (O.N. 1216539)

<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

•    Operations manuals, documentation, and use of the Dynamic Position Systems

•    Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-21**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Ms Virgie (O.N. 1213714)

<u>Licensed Patents</u>

None.

<u>Licensed Know-How</u>

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

Applicable software object code as to the Licensed Know-How

**EXHIBIT A-22**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Pao de Acucar (O.N. 1218372)

Licensed Patents

    None.

Licensed Know-How

•    Operations manuals, documentation, and use of the Dynamic Position Systems

•    Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-23**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Paradise Island (O.N. 1262977)

<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-24**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Pecan Island (O.N. 1258532)

Licensed Patents

    None.

Licensed Know-How

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-25**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Pelican Island (O.N. 1261549)

<u>Licensed Patents</u>

None.

<u>Licensed Know-How</u>

•       Operations manuals, documentation, and use of the Dynamic Position Systems

•       Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

Applicable software object code as to the Licensed Know-How

**EXHIBIT A-26**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Sanibel Island (O.N. 1257727)

<u>Licensed Patents</u>

     None.

<u>Licensed Know-How</u>

- Operations manuals, documentation, and use of the Dynamic Position Systems

- Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

     Applicable software object code as to the Licensed Know-How

**EXHIBIT A-27**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Ship Island (O.N. 1252958)

<u>Licensed Patents</u>

    None.

<u>Licensed Know-How</u>

•    Operations manuals, documentation, and use of the Dynamic Position Systems

•    Operations manuals, documentation, and use of the Bridge Control Systems

<u>Licensed Copyrights</u>

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-28**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Timbalier Island (O.N. 1251360)

Licensed Patents

    None.

Licensed Know-How

•    Operations manuals, documentation, and use of the Dynamic Position Systems

•    Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

    Applicable software object code as to the Licensed Know-How

**EXHIBIT A-29**

**VESSEL; LICENSED IP**

Vessel Name and Official Number: Wine Island (O.N. 1259152)

Licensed Patents

   None.

Licensed Know-How

•   Operations manuals, documentation, and use of the Dynamic Position Systems

•   Operations manuals, documentation, and use of the Bridge Control Systems

Licensed Copyrights

   Applicable software object code as to the Licensed Know-How

## [FORM OF] NON-EXCLUSIVE AND ASSIGNABLE
## COPYRIGHT LICENSE AGREEMENT

This NON-EXCLUSIVE AND ASSIGNABLE COPYRIGHT LICENSE AGREEMENT (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), dated as of [   ], 2023 (the "Effective Date"), is made by and among:

North American Shipbuilding, L.L.C., a Louisiana limited liability company with offices located at 800 Industrial Park Road, Larose, Louisiana 70373 ("Licensor");

Nautical Solutions, L.L.C., a Louisiana limited liability company ("Nautical Solutions" or "Licensee"); and

for the specified rights described herein, Wilmington Trust, National Association, a national banking association (as may be replaced from time to time by any successor collateral agent, the "Collateral Agent").

Licensor and Licensee (including any successor Licensee pursuant to Section 1.4) are referred to herein collectively as the "Parties," or each, individually, as a "Party".

RECITALS

WHEREAS, Licensor is the owner of all right, title, and interest in the Work and all copyrights related thereto (as defined below);

WHEREAS, Nautical Solutions is engaged in the marine transportation business;

WHEREAS, Nautical Solutions and the Collateral Agent are party to that certain Note Exchange Agreement, dated as of even date herewith (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Note Exchange Agreement"), together with Nautical Solutions Holdings, LLC, a Louisiana limited liability company, the Agent (as defined therein) and the noteholders identified therein (the "Noteholders"), with respect to the Vessels, pursuant to which, among other things, the Noteholders agreed to exchange certain debt obligations into the notes issued under the Note Exchange Agreement;

WHEREAS, Licensee wishes to obtain from Licensor, and Licensor is willing to grant to Licensee, a license to the Work and all copyright(s) (whether or not registered) owned or controlled by Licensor related to each Vessel, including the copyright(s) in the Work as necessary for maintaining, repairing, servicing, modifying, providing technical support for, or otherwise operating each Vessel, subject to the terms and conditions set forth herein;

WHEREAS, the Noteholders conditioned the exchange of their debt obligations and their entry into the Note Exchange Agreement on Licensor granting the Collateral Agent certain rights with respect to the Work so as to enable the Vessels, subject to the terms and conditions hereof, to continue operating with the benefit of the License notwithstanding a change of ownership of the Vessels in certain circumstances or a Change of Control of Licensee; and

WHEREAS, capitalized terms used herein without definition that are defined in the Note Exchange Agreement shall have the respective meanings given them in the Note Exchange Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties and the Collateral Agent (in the case of the Collateral Agent, solely with respect to Section 1.4) agree as follows:

1.      License.

1.1      Grant of Rights. Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee, and Collateral Agent (subject to Section 1.4), during the Term (as defined below) an irrevocable (except for termination as permitted in Section 6.2 and Section 6.3), non-exclusive, non-transferable (except as permitted in Section 8.4), worldwide, royalty-free license in and to all copyright(s) (whether or not registered) owned or controlled by Licensor related to each Vessel, including the copyright(s) in the Work as necessary for maintaining, repairing, servicing, modifying, providing technical support for, or otherwise operating each Vessel (the "License"). Licensee may sublicense such License rights to an Affiliate or third party that is maintaining, repairing, servicing, modifying, providing technical support for or to, or otherwise operating a Vessel for or on behalf of Licensee (including, with respect to the Collateral Agent, any third party engaged by Collateral Agent to operate such Vessel(s)) and solely for such purposes. Except as specifically set forth in the prior sentence, the License is otherwise non-sublicensable. The License is not for resale or distribution to others other than as set forth in Section 8.4 of this Agreement. The "Work" and each "Vessel" are defined as those works and the vessels identified in Exhibit A attached to this Agreement or any derivative works provided by Licensor or its Affiliates pursuant to the Master Services Agreement; provided, that if any such Vessel were to be sold (i) by Licensee as permitted by Section 9.21 of the Note Exchange Agreement, or (ii) by a Vessel Buyer (other than if such Vessel is sold through the exercise of remedies by the Collateral Agent, subject to the one-time assignment condition of Section 8.4), then such Vessel no longer shall be a Vessel hereunder and no longer shall be subject to this Agreement and the License. For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Work as to a particular Vessel shall not mean the Work as to any other Vessel. The Parties intend and agree that, for purposes of Section 365(n) of the U.S. Bankruptcy Code (and any amendment thereto), the foregoing License shall be treated as a license to intellectual property (as defined in Section 101(35A) of the U.S. Bankruptcy Code).

1.2      Third-Party Rights. Notwithstanding any other provisions of this Agreement to the contrary, nothing in this Agreement will be deemed to be a grant by Licensor of a license, sublicense, or other grant of a right to Licensee to use any third-party rights or any rights under any third-party license that cannot be licensed, sublicensed, or granted without the consent, approval, or agreement of another party which cannot be obtained following reasonable efforts by Licensor.

1.3      Reservation of Rights. Licensor reserves all rights not expressly granted to Licensee under this Agreement. No use by Licensor of the Work in any medium or manner will be deemed to interfere with the limited permissions made to Licensee by Licensor herein.

1.4     Collateral Agent Exercise of License. At any time following the occurrence and during the continuance of an Event of Default, without the need of notice to or consent by any Party other than as to notice as set forth in Section 8.4, the License and other rights granted to Licensee under this Agreement may be exercised by the Collateral Agent, a designee of the Collateral Agent and, as to each Vessel, any Vessel Buyer (and the Collateral Agent, any such designee and each Vessel Buyer that exercises such rights, as applicable, shall thereafter be considered a "Licensee" for all purposes of this Agreement and, for the avoidance of doubt, each Vessel Buyer shall be subject to the obligations of Licensee hereunder). Notwithstanding anything to the contrary herein, and for the avoidance of doubt, the Collateral Agent hereby covenants and agrees to refrain from (a) exercising, and (b) permitting any designee of the Collateral Agent from exercising, the License rights granted to Licensee under Section 1.1, solely as it relates to the Collateral Agent, in each case unless and until the occurrence and during the continuance, of an Event of Default.

1.5     Maintenance and Support. Reference is hereby made to that certain Master Services Agreement dated of even date herewith by and among, among others, Licensor and Licensee with respect to available maintenance and support to be provided to Licensee, Collateral Agent, its designees and Vessel Buyer, as the case may be, by Licensor (the "Master Services Agreement").

2.     Usage of the Work. Notwithstanding any other provision to the contrary contained in this Agreement:

2.1     Copyright Notices. Licensee shall ensure that all copies of the Work created by Licensee are marked with the appropriate copyright notices specified or pre-marked by Licensor in a prominent position in the order and manner provided by Licensor. Licensee shall not use any copyright notices that conflict with, confuse, or negate the copyright notices Licensor provides and requires hereunder.

2.2     Modifications. Without Licensor's prior written consent (which consent may not be unreasonably withheld, conditioned or delayed), Licensee shall not translate, recast, edit, alter, modify, or create any derivative works of the Work except to the extent necessary or required for the maintenance, repair, modification, technical support or operation of the applicable Vessel.

3.     Ownership and Protection.

3.1     Acknowledgment of Ownership. Except for the limited license expressly granted to Licensee in this Agreement, Licensee acknowledges that all right, title, and interest in and to the Work and any copyrights related thereto are owned by Licensor. Licensee agrees not to dispute or challenge or assist any person or entity in disputing or challenging Licensor's rights in the Work and any copyrights related thereto.

3.2     Protection of the Work.

(a)     Notification. Licensee shall, at Licensee's sole expense, take commercially reasonable measures to safeguard the Work from access and reproduction by unauthorized third parties. Licensee shall promptly notify Licensor in writing with reasonable detail of any: (i) actual, suspected, or threatened infringement of the Work by a third party of which Licensee may become

aware; (ii) actual, suspected, or threatened claim of a third party that Licensee's use of the Work infringes the rights of such third party; or (iii) any other actual, suspected, or threatened claim made by a third party against Licensee to which the Work may be subject.

(b)     Actions. With respect to any of the matters listed in <u>Section 3.2(a)</u>: (i) Licensor shall have exclusive control over, and conduct of, all claims and proceedings; (ii) Licensee shall provide Licensor with reasonable cooperation and assistance at Licensor's expense but only upon prior written authorization by Licensor for such expenses (<u>provided</u> that such cooperation and assistance is subject to receipt of such prior written authorization) that Licensor may reasonably require in the conduct of any claims or proceedings; and (iii) Licensor shall bear the cost of any proceedings and will be entitled to retain all sums recovered in any action for its own account.

3.3     <u>Confidentiality Obligations</u>. As used in this Agreement, "<u>Confidential Information</u>" means all information about a Party's business affairs, confidential intellectual property, trade secrets, third-party confidential information, and other sensitive or proprietary information, including business operations and strategies, marketing, creative elements, artwork, visual representations, research material and data, specifications, processes, and technological developments, in each case whether orally or in written, electronic, or other form or media, and in each case whether or not marked, designated, or otherwise identified as "confidential." Licensor's Confidential Information shall specifically include the Work and all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations, and other materials prepared by or for Licensee that contain, are based on, or otherwise reflect or are derived from the Work in whole or in part; provided, that Confidential Information does not include information that, at the time of disclosure and as established by documentary evidence: (a) is or becomes generally available to and known by the public other than as a result of, directly or indirectly, any breach of this <u>Section 3.3</u> by Licensee; (b) is or becomes available to Licensee on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information; (c) was known by or in the possession of Licensee before being disclosed by or on behalf of Licensor; or (d) was or is independently developed by Licensee without reference to or use, in whole or in part, of any of Licensor's Confidential Information.

(a)     The Party or the Collateral Agent receiving the Confidential Information (the "<u>Receiving Party</u>") acknowledges that in connection with this Agreement it will gain access to Confidential Information of a Party who discloses or makes available to use the Confidential Information to the Receiving Party (the "<u>Disclosing Party</u>"). As a condition to being provided with Confidential Information, the Receiving Party shall, during the Term and for three (3) years thereafter:

(i)     not use the Disclosing Party's Confidential Information other than as strictly necessary to perform its obligations under this Agreement;

(ii) maintain the Disclosing Party's Confidential Information in strict confidence and, subject to <u>Section 3.3(b)</u>, not disclose the Disclosing Party's Confidential Information without the Disclosing Party's prior written consent: <u>provided</u>, that the Receiving Party may disclose the Confidential Information to its personnel, employees, officers, directors,

consultants, and legal advisors ("Representatives") who:

(A) have a need to know the Confidential Information for purposes of the Receiving Party's performance, or exercise of its rights concerning the Confidential Information, under this Agreement;

(B)　have been apprised of this restriction; and

(C)　are themselves bound by written nondisclosure agreements or professional obligations at least as restrictive as those set forth in this Section 3.3; provided, further, that the Receiving Party will be responsible for ensuring its Representatives' compliance with, and will be liable for any breach by its Representatives of, this Section 3.3.

The Receiving Party shall use reasonable care, and efforts at least as protective as the efforts it uses for its own confidential information of the same or similar nature, to safeguard the Disclosing Party's Confidential Information from use or disclosure other than as permitted hereby.

(b)　Exceptions. If the Receiving Party becomes legally compelled to disclose any Confidential Information, the Receiving Party shall:

(i) provide prompt written notice to the Disclosing Party so that the Disclosing Party may seek a protective order or other appropriate remedy or waive its rights under this Section 3.3; and

(ii) disclose only the portion of Confidential Information that it is legally required to furnish.

If a protective order or other remedy is not obtained, or the Disclosing Party waives compliance under this Section 3.3, the Receiving Party shall, at the Disclosing Party's expense, use reasonable efforts to obtain assurance that confidential treatment will be afforded the Confidential Information.

4.　Representations and Warranties; Covenants.

4.1　Mutual Representations and Warranties. Each Party represents and warrants to the other Party that as of the Effective Date:

(a)　it is duly organized, validly existing, and in good standing as a limited liability company as represented herein under the laws and regulations of its jurisdiction of incorporation, organization, or chartering;

(b)　it has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder;

(c)      the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary limited liability company actions of the Party; and

(d)      when executed and delivered by such Party, this Agreement will constitute the legal, valid, and binding obligation of such Party, enforceable against such Party in accordance with its terms.

4.2      <u>Licensor's Representations and Warranties</u>. Licensor represents and warrants that as of the Effective Date: (a) Licensor is the sole and exclusive (even as to its Affiliates) legal and beneficial owner of the entire right, title, and interest in and to the Work and all copyrights related thereto and all Confidential Information of Licensor disclosed to Licensee under this Agreement; (b) as to each applicable Vessel, to Licensor's knowledge, no intellectual property rights owned or controlled by any Person (other than Licensor), including any Affiliate of Licensor are used in or necessary for the operation of such Vessel and Licensee's use of the Work (other than rights to third party off-the-shelf software generally commercially available on standard terms and applicable Licensed IP under and as defined in the Non-exclusive and Assignable Patent, Copyright and Know-How License Agreement dated as of [●], 2023, by and among Marine Technologies, L.L.C., Licensee and Collateral Agent); (c) as to each applicable Vessel, the Work and all related copyrights set forth on <u>Exhibit A</u> are all of the works and copyrights necessary for maintaining, repairing, servicing, modifying, providing technical support for, or otherwise operating, those portions of the Vessels to which the Work pertains; (d) Licensor has not granted to any third party any licenses or other rights under the Work and related copyrights that are in conflict with the terms and conditions of this Agreement; (e) Licensor has not received any written notice or threat of any claim, suit, action, or proceeding regarding to the infringement, misappropriation or violation of the intellectual property rights of any third party related to the Work or any related copyrights; and (f) neither Licensor nor any Affiliate of Licensor owns, controls or has any right, title or interest in or to, or has contributed any Intellectual Property, software, or other technology used in the Vessels other than the copyrights in the License, rights under licenses to off-the-shelf software generally commercially available on standard terms, and the Licensed IP under and as defined in the Non-exclusive and Assignable Patent, Copyright and Know-How License Agreement dated as of [●], 2023, by and among Marine Technologies, L.L.C., Licensee and Collateral Agent.

4.3      <u>Disclaimer of Representations and Warranties</u>. EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 4, LICENSOR EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, CONCERNING THE VALIDITY, ENFORCEABILITY, AND SCOPE OF THE WORK, THE ACCURACY, COMPLETENESS, SAFETY, USEFULNESS FOR ANY PURPOSE, OR LIKELIHOOD OF SUCCESS (COMMERCIAL, REGULATORY OR OTHER) OF THE WORK AND ANY OTHER TECHNICAL INFORMATION, TECHNIQUES, MATERIALS, METHODS, PRODUCTS, PROCESSES, OR PRACTICES AT ANY TIME MADE AVAILABLE BY LICENSOR, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY, FITNESS FOR A PARTICULAR PURPOSE, AND WARRANTIES ARISING FROM A COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE, OR TRADE PRACTICE. WITHOUT LIMITATION TO THE FOREGOING, LICENSOR WILL HAVE NO LIABILITY

WHATSOEVER TO LICENSEE OR ANY OTHER PERSON FOR OR ON ACCOUNT OF ANY INJURY, LOSS, OR DAMAGE, OF ANY KIND OR NATURE, SUSTAINED BY, OR ANY DAMAGE ASSESSED OR ASSERTED AGAINST, OR ANY OTHER LIABILITY INCURRED BY OR IMPOSED ON LICENSEE OR ANY OTHER PERSON, ARISING OUT OF OR IN CONNECTION WITH OR RESULTING FROM (A) THE USE OF OR ERRORS IN THE WORK; OR (B) THE USE OF OR ANY ERRORS OR OMISSIONS IN ANY KNOW-HOW, TECHNICAL INFORMATION, TECHNIQUES, OR PRACTICES DISCLOSED BY LICENSOR TO LICENSEE PURSUANT TO THIS AGREEMENT.

5.   Indemnification.

5.1   Licensee Indemnification. Licensee shall indemnify, defend, and hold harmless Licensor and its officers, directors, employees, agents, Affiliates, successors, assigns, attorneys, and licensees (each, an "Indemnified Party") from and against any losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers, arising out of or in connection with any third-party claim, suit, action, or proceeding (each, a "Third-Party Claim") relating to or arising out of or resulting from: (a) any breach by Licensee of its representations, warranties, covenants, or other obligations hereunder, or (b) any unauthorized use or disclosure by Licensee of the Work outside the permitted uses or disclosures under the License. For purposes of this Section 5.1, for the avoidance of doubt, "Licensee" shall not include the Collateral Agent, and Collateral Agent shall have no obligation to any Indemnified Party under this Section 5.1, unless and until such time that Collateral Agent exercises its rights under the License pursuant to Section 1.4.

5.2   Licensor Indemnification. Licensor shall indemnify, defend, and hold harmless Licensee and its officers, directors, employees, agents. Affiliates, successors, permitted assigns, attorneys, and permitted sub-licensees (each, an "Indemnified Party") from and against any Third-Party Claim relating to or arising out of or resulting from: (a) any breach by Licensor of its representations, warranties, covenants, or other obligations hereunder, or (b) any violation, misappropriation or infringement upon the copyrights, rights of publicity, trade secrets or intellectual property rights of any third party arising from Licensee's authorized use of the Work and its permitted uses or disclosures under the License.

5.3   Indemnification Procedure. The Indemnified Party shall notify the indemnifying Party in writing of any Third Party Claim and cooperate with the indemnifying Party at its sole cost and expense. Subject to Section 3.2, the indemnifying Party shall immediately take control of the defense and investigation of the Third Party Claim and shall employ counsel reasonably acceptable to the Indemnified Party to handle and defend the Third Party Claim, at the indemnifying Party's sole cost and expense. The indemnifying Party shall not settle any Third Party Claim in a manner that adversely affects the rights of the Indemnified Party without its prior written consent. The Indemnified Party's failure to perform any obligations under this Section 5 will not relieve the indemnifying Party of its indemnification obligation under this Section 5 except to the extent the indemnifying Party can demonstrate that it has been materially prejudiced as a result of such failure. The Indemnified Party may participate in and observe the proceedings at its own cost and expense with counsel of its own choosing.

6.      Term and Termination.

6.1      Term. The term of this Agreement as to the applicable Work for a particular Vessel commences as of the Effective Date and, unless terminated earlier with the prior written consent of the Parties and (if the Note Obligations have not been paid in full in cash) the Collateral Agent (at the direction of the Required Holders) or as provided in Section 6.2, will remain in force until such time as none of Licensee, the Collateral Agent, a designee thereof or a Vessel Buyer are the owner or operator of the particular Vessel (the "Term").

6.2      Termination for Cause. Licensor may terminate this Agreement as to all Vessels on written notice to Licensee and the Collateral Agent if Licensee materially breaches its obligations under this Agreement and such breach is not cured within forty-five (45) days from Licensor's written notice thereof to both Licensee and Collateral Agent detailing such breach. Notwithstanding the foregoing, if Licensor terminates this Agreement in the event of such uncured breach by Nautical Solutions, Licensor shall only be entitled to terminate this Agreement as to Nautical Solutions, and this Agreement (and the License) shall otherwise remain in full force and effect with respect to the Collateral Agent, its designee or any Vessel Buyer, as applicable, each of whom retains the right to exercise the rights as a Licensee, subject to the terms and conditions hereof.

6.3      Termination for Bankruptcy or Insolvency. As to any Vessel Buyer that by virtue of this Agreement becomes a Licensee, Licensor may terminate this Agreement as to such Vessel Buyer by written notice to such Licensee if such Licensee: (a) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which as to any involuntary proceeding is not fully stayed within seven (7) Business Days or is not dismissed or vacated within forty-five (45) days after filing; (b) is dissolved or liquidated or takes any corporate action for such purpose; (c) makes a general assignment for the benefit of creditors; or (d) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

6.4      Effect of Termination. Except as set forth in Section 6.2 above, upon the termination of this Agreement for any reason, all rights licensed under the License in this Agreement will revert immediately to Licensor, and Licensee shall immediately cease all activities concerning, including all practice and use of, the applicable Work(s) no longer subject to this Agreement. After termination or expiration of this Agreement, within thirty (30) days after the written request of Licensor, the receiving party of any Confidential Information shall: (a) return to Licensor all documents and tangible materials and any copies thereof containing, reflecting, incorporating, or based on the Work; (b) permanently erase the copies of the Work from its computer systems; and (c) certify in writing to Licensor that it has complied with the requirements of this Section 6.4; provided that the receiving party of the Confidential Information may keep an archival copy for recordkeeping purposes on the condition that, except as otherwise required by applicable law, (i) personnel whose functions are not primarily information technology do not access such retained copies and (ii) personnel whose functions are primarily information technology access such copies only as reasonably necessary for the performance of their information technology duties (e.g., for purposes of system recovery). Any Confidential Information retained will be held on the terms of Section 3.3 of this Agreement.

6.5     <u>Surviving Rights</u>. The rights and obligations of the Parties as to each Vessel and related to its Work set forth in this <u>Section 6</u>, <u>Section 3</u> (*Ownership and Protection*), <u>Section 4</u> (*Representations and Warranties; Covenants*), <u>Section 5</u> (*Indemnification*), <u>Section 6.4</u> (*Effect of Termination*), <u>Section 7</u> (*Remedies*), and <u>Section 8</u> (*General*), and any right, obligation, or required performance of the Parties in this Agreement which, by its express terms or nature and context is intended to survive termination or expiration of this Agreement, will survive any such termination or expiration for two (2) years from the termination or expiration date as to such Vessel and its Work.

7.     <u>R e m e d i e s</u>.

7.1     <u>Equitable Relief</u>. Licensee acknowledges that a breach by Licensee of this Agreement may cause Licensor irreparable damages, for which an award of damages would not be adequate compensation, and agrees that, in the event of such breach or threatened breach, Licensor will be entitled to seek equitable relief, including a restraining order, injunctive relief, specific performance, and any other relief that may be available from any court, in addition to any other remedy to which Licensor may be entitled at law or in equity. Such remedies are not the exclusive remedies for a breach of this Agreement but are in addition to all other remedies available at law or in equity, subject to any express exclusions or limitations in this Agreement to the contrary, and shall not in any way affect any other rights or remedies of the Parties under this Agreement.

7.2     <u>Limitation of Liability</u>. EACH PARTY WILL NOT BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, LIQUIDATED, SPECIAL, OR EXEMPLARY DAMAGES OR PENALTIES, INCLUDING LOSSES OF BUSINESS, REVENUE, OR ANTICIPATED PROFITS, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. COLLATERAL AGENT SHALL NOT BE LIABLE TO LICENSOR OR ANY THIRD PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT FOR ACTS, OMISSIONS, OR DAMAGES CAUSED BY NAUTICAL SOLUTIONS OR ANY PERMITTED ASSIGNEE, AND LICENSOR SHALL NOT BRING ANY CLAIM AGAINST COLLATERAL AGENT FOR SUCH ACTS OR OMISSIONS BY NAUTICAL SOLUTIONS OR ANY PERMITTED ASSIGNEE, OR SEEK ANY DAMAGES OR RECOVERY FROM COLLATERAL AGENT FOR FINANCIAL OBLIGATIONS OF NAUTICAL SOLUTIONS OR ANY PERMITTED ASSIGNEE.

8.     <u>G e n e r a l</u>.

8.1     <u>Interpretation</u>. For purposes of this Agreement: (a) the words "include," "includes," and "including" are deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. This Agreement is intended to be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

8.2     <u>Entire Agreement</u>. This Agreement, including and together with any related attachments, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

8.3     <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

8.4     <u>Assignment</u>.

(a)     Licensee shall not assign or otherwise transfer any of its rights, or delegate or otherwise transfer any of its obligations or performance, under this Agreement, in each case whether voluntarily, involuntarily, by operation of law, or otherwise, without Licensor's prior written consent, which consent Licensor may give or withhold in its sole discretion. For purposes of the preceding sentence, and without limiting its generality, any merger, consolidation, or reorganization involving Licensee (where Licensee is not the surviving entity or in control of the surviving entity), or any sale or other title transfer of any of the Vessels will be deemed to be a transfer of rights, obligations, or performance under this Agreement, for which Licensor's prior written consent is required. Notwithstanding the foregoing, (i) solely in connection with the sale or other title transfer by Licensee of a Vessel to an Affiliate of Licensee, with prior written notice by Licensee to Licensor, Licensee may assign to such Affiliate this Agreement as it relates to such Vessel and its applicable Work, and (ii) upon the Collateral Agent's exercise of its rights and remedies following the occurrence and during the continuance of an Event of Default (including during a bankruptcy or insolvency proceeding of Licensee), the Collateral Agent may, with prior written notice to Licensor but without the consent of Licensor or Licensee, assign this Agreement in whole or on a Vessel-by-Vessel basis, in connection with the direct or indirect sale or other title transfer of a Vessel to a third party (including to the Collateral Agent or a designee) or in connection with the sale or transfer of the equity of Nautical Solutions resulting in a Change of Control (such third party or Nautical Solutions after giving effect to the Change of Control being referred to in each case as a "<u>Vessel Buyer</u>"), and Licensor acknowledges and agrees that it has consented to assignment in accordance with this sentence, including for purposes of Section 365(c) of the U.S. Bankruptcy Code (and any amendments thereto); <u>provided</u> that, as to any Vessel, this Agreement may only be assigned once to a third-party Vessel Buyer; <u>provided</u> further, however, that, if the Vessel Buyer is the Collateral Agent or a designee, the Collateral Agent or designee may further assign this Agreement as to each Vessel on a one-time basis to another Vessel Buyer. In the event of any assignment by Licensee or Collateral Agent of this Agreement as permitted pursuant to this <u>Section 8.4</u>, such permitted assignee (i.e., Licensee's Affiliate in accordance with clause (i) above or the Vessel Buyer in accordance with clause (ii) above) shall be deemed to be a "Licensee" under this Agreement (and if there are multiple Licensees hereunder, then this Agreement thereafter shall be deemed a separate agreement as to each Licensee). Any purported

assignment, delegation, or transfer in violation of this <u>Section 8.4</u> is void.

(b)     Licensor may freely assign or otherwise transfer all or any of its rights, or delegate or otherwise transfer all or any of its obligations or performance, under this Agreement; <u>provided</u>, that Licensor shall provide written notice to Licensee and Collateral Agent of such transfer as soon as practicable. For the avoidance of doubt, (i) any assignee (including any Affiliate of Licensor) of the Work and all related copyrights takes them subject to Licensee's rights under this Agreement, including the license grant in <u>Section 1.1</u> and (ii) in the event of an assignment or other transfer of the Work, this Agreement and Licensee's and Collateral Agent's rights under this Agreement shall continue in full force and effect, and Licensor will notify such assignee or transferee of the foregoing (i) and (ii).

(c)     This Agreement is binding upon and inures to the benefit of Licensor and Licensee and their respective permitted successors and assigns.

8.5     <u>Headings</u>. The headings in this Agreement are for reference only and do not affect the interpretation of this Agreement.

8.6     <u>Dispute Resolution; Choice of Law; Venue</u>.

(a)     Any claim, disagreement or dispute between the Parties arising out of or relating to this Agreement (a "<u>Dispute</u>") shall be resolved in the manner provided in this <u>Section 8.6</u>. The Parties shall attempt to resolve any Dispute by negotiating in good faith for a period of third (30) days after receipt by either Party of a written notice of the Dispute from the other Party (the "<u>Negotiation Period</u>"). The written notice shall identify, with reasonable particularity, each matter or issue that is the subject of the dispute, a summary of the basis for the Party's position with respect to each such matter or issue and the relief being requested by the Party. No Party shall commence any Action in respect of any Dispute (i) until the expiration of the Negotiation Period or (ii) if the other Party has refused to participate or has not reasonably participated in the required negotiation process in good faith set forth in this <u>Section 8.6</u>. If the Parties are unable to resolve the Dispute during the Negotiation Period, the Dispute shall be finally settled by binding arbitration conducted expeditiously in accordance with the Comprehensive Arbitration Rules & Procedures, including the Expedited Procedures then followed by the Judicial Arbitration and Mediation Services, Inc. ("JAMS") or any successor to the functions thereof ("Rules"), and judgment upon the award rendered by the arbitrator shall be entered by any court of competent jurisdiction. One arbitrator shall be jointly selected by the Parties. If the Parties are unable to jointly select an arbitrator, the arbitrator shall be appointed in accordance with the Rules. The cost of the arbitrator shall be shared equally by the Parties. The location of the arbitration proceeding shall be New York, New York and the language of arbitration shall be English. All arbitration proceedings are confidential and shall be treated as compromise and settlement negotiations for purposes of the Federal Rules of Evidence and the applicable state rules of evidence. The dispute resolution provisions of this <u>Section 8.6(a)</u> shall not be construed to interfere with a Party's other rights provided by this Agreement, including the right to terminate this Agreement in accordance with its terms. During the pendency of any such Dispute, all of the terms and conditions of this Agreement shall remain in effect and the Parties shall continue to perform all of their respective obligations hereunder.

(b)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

(c)    The Parties irrevocably submit to the exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement, the Notes or, except as otherwise required by applicable law, any other Note Document. To the fullest extent permitted by applicable law, the Parties irrevocably waive and agree not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

8.7    <u>Relationship of the Parties</u>. The relationship between the parties is that of independent contractors. Nothing contained in this Agreement will be construed as creating any agency, partnership, joint venture, or other form of joint enterprise, employment, or fiduciary relationship between the Parties, and neither Party has authority to contract for nor bind the other Party in any manner whatsoever.

8.8    <u>No Third-Party Beneficiaries</u>. Other than with respect to the Collateral Agent, this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any third party any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement. The Collateral Agent is a third party beneficiary for purposes of enforcing its rights hereunder. When the Note Obligations are paid in full in cash, then (i) the Collateral Agent no longer is a third party beneficiary and (ii) all references herein to the Collateral Agent, its designees and Vessel Buyers no longer shall be effective (but a Vessel Buyer shall retain all of its rights and obligations as a Licensee).

8.9    <u>Amendment and Modification</u>. No amendment or modification to this Agreement is effective unless it is in writing and signed by an authorized representative of each Party and (if the Note Obligations have not been paid in full in cash) the Collateral Agent (at the direction of Required Holders).

8.10    <u>Waiver</u>. No waiver by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the Party so waiving and signed by the Collateral Agent (at the direction of Required Holders). Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, remedy, power, or privilege.

8.11    <u>Waiver of Jury Trial</u>. Each Party irrevocably and unconditionally waives any right it may have to a trial by jury for any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

8.12 <u>Attorneys' Fees</u>. In the event that any claim, suit, action, or proceeding is instituted or commenced by either Party hereto against the other Party arising out of or related to this Agreement, the prevailing Party will be entitled to recover its reasonable attorneys' fees and court costs from the non-prevailing Party.

8.13 <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (other than routine communications having no legal effect) must be in writing and sent to the respective Party at the addresses indicated below (or at such other address for a Party as may be specified in a notice given in accordance with this Section):

If to Licensor:    North American Shipbuilding, L.L.C.
16201 East Main Street
Cut Off, LA 70345
Attn: Dino Chouest

with a copy by email to legal@chouest.com (which copy shall not constitute official notice to Licensor hereunder)

If to Licensee:    Nautical Solutions, L.L.C.
16201 East Main Street
Cut Off, LA 70345
Attn: Luke Newman

with a copy by email to legal@chouest.com (which copy shall not constitute official notice to Licensee hereunder)

If to Collateral Agent: Wilmington Trust, National Association, as Collateral Agent
1100 North Market Street
Wilmington, DE 19890
Attn: Global Capital Markets – Project Finance – Rafael Miranda
Email: rmiranda1@wilmingtontrust.com
Tel: 845-717-8079

Notices sent in accordance with this <u>Section 8.13</u> will be deemed effective: (a) when received on a business day, if delivered by hand (with written confirmation of receipt); (b) when received on a business day, if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email (in each case, with confirmation of transmission), if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third (3rd) business day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.

8.14 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement. The words "execution," "signed," "signature," and words of like import used in this Amendment will be deemed to include electronic signatures or the keeping of records in electronic

form, each of which will be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

       8.15 <u>Joinder</u>. It is understood and agreed that to the extent any Affiliate of Licensor owns or controls or has contributed to the Vessels any copyrights (including any software or technology) relating to a Work or Vessels, such Affiliate shall be deemed to be and required to become a "Licensor" under this Agreement by (x) executing a joinder agreement and delivering the same to each of the Collateral Agent and AIG and Prudential in form and substance reasonably satisfactory to the Required Holders (as defined in the NEA and hereinafter referred to as the "NEA Required Holders"), (y) delivering supplements to Exhibit A of this Agreement as are necessary to cause such Exhibit to be complete and accurate with respect to such additional Affiliate on such date and (z) taking all actions as specified in this Agreement as would have been taken by such Affiliate had it been an original party to this Agreement, in each case with all documents required above to be delivered to the Collateral Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Collateral Agent (acting at the direction of the NEA Required Holders). In the event any added Licensor ceases to be an Affiliate of the other Licensor entities, then such Licensor ceasing to be an Affiliate shall endeavor to enter into a new agreement with Licensee granting Licensee the rights granted under this Agreement on terms and conditions substantially similar to this Agreement.

<div align="center">[SIGNATURE PAGE FOLLOWS]</div>

IN WITNESS WHEREOF, Licensor, Licensee and Collateral Agent have caused this Agreement to be executed as of the date first written above by their respective duly authorized officers.

NORTH AMERICAN SHIPBUILDING, L.L.C.

By:
Name:
Title:


NAUTICAL SOLUTIONS, L.L.C.

By:
Name:
Title:


WILMINGTON TRUST, NATIONAL ASSOCIATION, as Collateral Agent

By:
Name:
Title:

EXHIBIT A

**A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8, A-9, A-10, A-11, A-12, A-13, A-14, A-15, A-16, A-17, A-18, A-19, A-20, A-21, A-22, A-23, A-24, A-25, A-26 and A-27.**

|      | **Vessel**      | **Official Number** |
|------|-----------------|---------------------|
| A-1  | Avery Island    | 1253395             |
| A-2  | Brad Dartez     | 1252257             |
| A-3  | Cat Island      | 1257750             |
| A-4  | Celena Chouest  | 1201702             |
| A-5  | Corcovado       | 1215834             |
| A-6  | Dante           | 1178758             |
| A-7  | Dauphin Island  | 1262978             |
| A-8  | Deer Island     | 1289730             |
| A-9  | Dino Chouest    | 1207856             |
| A-10 | Forte           | 1223605             |
| A-11 | Gavea           | 1211932             |
| A-12 | Grand Isle      | 1250605             |
| A-13 | Horn Island     | 1255030             |
| A-14 | Jackie Chouest  | 1210979             |
| A-15 | Kirt Chouest    | 1213707             |
| A-16 | Lyman Martin    | 1227085             |
| A-17 | Marsh Island    | 1266925             |
| A-18 | Mr. Sidney      | 1216539             |
| A-19 | Ms. Virgie      | 1213714             |
| A-20 | Pao de Acucar   | 1218372             |
| A-21 | Paradise Island | 1262977             |
| A-22 | Pecan Island    | 1258532             |
| A-23 | Pelican Island  | 1261549             |
| A-24 | Sanibel Island  | 1257727             |
| A-25 | Ship Island     | 1252958             |
| A-26 | Timbalier Island| 1251360             |
| A-27 | Wine Island     | 1259152             |

**EXHIBIT A-1**
**VESSEL; WORK**

Vessel Name and Official Number: Avery Island (O.N. 1253395)

**Work**

## HULL 288 AVERY ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| D | Design | | |
| D1 | LINES PLAN | - | |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | E1 | |
| D3 | TANK PLAN | C1 | USE HULL 290 SHIPISLAND |
| D4 | MIDSHIP SECTION | - | |
| D9 | INSULATION PLAN | B0 | |
| D10 | MACHINERY ARRANGEMENT | A2 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIPISLAND |
| D20 | FIRE AND SAFETY PLAN | B2 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | |
| D34 | DANGEROUS GOODS PLAN | - | |

## HULL 288 AVERY ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIPISLAND |
| S21 | MAST DETAIL | | USE HULL 290 SHIPISLAND |
| S47 | PROPULSION UNIT | A1 | USE HULL 290 SHIPISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | - | USE HULL 290 SHIPISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | - | USE HULL 290 SHIPISLAND |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIPISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | | USE HULL 290 SHIPISLAND |
| S59 | CARGO RAILS | A1 | USE HULL 290 SHIPISLAND |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIPISLAND |
| S63 | MAIN DECK HATCH | - | USE HULL 290 SHIPISLAND |
| S66 | LOUVER ARRANGEMENT | A4 | USE HULL 290 SHIPISLAND |
| S68 | LIFERAFT CRADLE | | USE HULL 290 SHIPISLAND |
| S87 | TUGGER WINCH INSTALLATION | - | USE HULL 290 SHIPISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIPISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIPISLAND |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIPISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIPISLAND |
| S113 | GENERATOR FOUNDATION | | USE HULL 290 SHIPISLAND |
| S114 | FIRE MONITOR PUMP FOUNDATION | | USE HULL 290 SHIPISLAND |
| S115 | SEACHEST ARRANGEMENT | - | USE HULL 290 SHIPISLAND |
| S125 | ANCHOR ARRANGEMENT | - | USE HULL 290 SHIPISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | - | USE HULL 290 SHIPISLAND |

## HULL 288 AVERY ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE | - | USE HULL 290 SHIPISLAND |

## HULL 288 AVERY ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIPISLAND |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIPISLAND |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIPISLAND |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIPISLAND |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIPISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIPISLAND |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIPISLAND |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIPISLAND |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIPISLAND |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIPISLAND |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIPISLAND |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIPISLAND |
| O18 | HULL MARKINGS (DRAFT) | A1 | |
| O18YD | IMO NUMBERS | - | USE HULL 290 SHIPISLAND |
| O20 | GANGWAY | B1 | USE HULL 290 SHIPISLAND |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIPISLAND |
| O22 | JOINER CONNECTION DETAILS | | USE HULL 290 SHIPISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIPISLAND |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIPISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIPISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIPISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIPISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIPISLAND |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIPISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A1 | |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIPISLAND |
| O42 | HVAC SYSTEM MODELING | | USE HULL 290 SHIPISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIPISLAND |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIPISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIPISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A3 | |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIPISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIPISLAND |

## HULL 288 AVERY ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **M** | **PIPING** | | |
| M1 | EXHAUST GAS SYSTEM | A1 | |
| M2 | FUEL OIL SERVICE SYSTEM | - | |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | |
| M4 | LUBE OIL SERVICE SYSTEM | - | |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIPISLAND |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIPISLAND |
| M10 | BALLAST SYSTEM | B2 | USE HULL 290 SHIPISLAND |
| M11 | BILGE SYSTEM | A6 | USE HULL 290 SHIPISLAND |
| M12 | FIRE MAIN SYSTEM | A3 | USE HULL 290 SHIPISLAND |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIPISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIPISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIPISLAND |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIPISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIPISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIPISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIPISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIPISLAND |

| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIPISLAND |
|-----|---------------------------|-----|-------------------------|
| M29 | DRY BULK SYSTEM | A1 | USE HULL 290 SHIPISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | A4 | USE HULL 290 SHIPISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIPISLAND |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIPISLAND |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIPISLAND |
| M50 | HULL AND DECK PENETRATIONS | A1 | USE HULL 290 SHIPISLAND |
| M70 | CARGO FRESH WATER SYSTEM | B1 | USE HULL 290 SHIPISLAND |

## HULL 288 AVERY ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | C0 | |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIPISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | D0 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | USE HULL 290 SHIPISLAND |
| E13 | GENERAL ALARM ONE LINE | A2 | USE HULL 290 SHIPISLAND |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIPISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | A5 | USE HULL 290 SHIPISLAND |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIPISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIPISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | USE HULL 290 SHIPISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIPISLAND |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIPISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIPISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIPISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIPISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIPISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIPISLAND |
| E53 | MV DISTRIBUTION ONE LINE | A2 | USE HULL 290 SHIPISLAND |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | USE HULL 290 SHIPISLAND |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIPISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIPISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIPISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIPISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIPISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIPISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | - | |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIPISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | USE HULL 290 SHIPISLAND |
| E128 | AUTOMATION I/O BOX ONE LINE | - | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIPISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIPISLAND |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIPISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIPISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIPISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIPISLAND |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | A0 | |

**EXHIBIT A-2**
**VESSEL; WORK**

Vessel Name and Official Number: Brad Dartez (O.N. 1252257)

**Work**

| HULL 286 BRAD DARTEZ DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 284 GRAND ISLE |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | F0 | |
| D3 | TANK PLAN | B0 | |
| D4 | MIDSHIP SECTION | A2 | USE HULL 284 GRAND ISLE |
| D9 | INSULATION PLAN | A7 | USE HULL 284 GRAND ISLE |
| D10 | MACHINERY ARRANGEMENT | A7 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A4 | |
| D20 | FIRE AND SAFETY PLAN | F0 | |
| D23 | DOCKING PLAN | A3 | |
| D26 | STATION BILL | A0 | |
| D34 | DANGEROUS GOODS PLAN | A0 | |

| HULL 286 BRAD DARTEZ DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | A2 | USE HULL 284 GRAND ISLE |
| S21 | MAST DETAIL | A5 | USE HULL 284 GRAND ISLE |
| S47 | PROPULSION UNIT | A2 | USE HULL 284 GRAND ISLE |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | - | |
| S54 | DROP DOWN THRUSTER INSTALLATION | A2 | USE HULL 284 GRAND ISLE |
| S56 | SIDEGATES | A1 | USE HULL 284 GRAND ISLE |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 284 GRAND ISLE |
| S59 | CARGO RAILS | A4 | USE HULL 284 GRAND ISLE |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 284 GRAND ISLE |
| S63 | MAIN DECK HATCH | A2 | USE HULL 284 GRAND ISLE |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 284 GRAND ISLE |
| S68 | LIFERAFT CRADLE | A1 | USE HULL 284 GRAND ISLE |
| S87 | TUGGER WINCH INSTALLATION | A2 | USE HULL 284 GRAND ISLE |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 284 GRAND ISLE |
| S99 | DECK EQUIPMENT ARRANGEMENT | A0 | USE HULL 284 GRAND ISLE |
| S107 | MAIN ENGINE FOUNDATION | - | |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| S113 | GENERATOR FOUNDATION | A1 | USE HULL 284 GRAND ISLE |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 284 GRAND ISLE |
| S115 | SEACHEST ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| S125 | ANCHOR ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| S126 | RESCUE LIFEBOAT DAVIT | A1 | |

| HULL 286 BRAD DARTEZ DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE | - | USE HULL 284 GRAND ISLE |

## HULL 286 BRAD DARTEZ DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| O3 | INTERIOR DOORS | A10 | USE HULL 284 GRAND ISLE |
| O4 | EXTERIOR WT DOORS | A6 | USE HULL 284 GRAND ISLE |
| O5 | MANHOLES & HATCHES | A5 | USE HULL 284 GRAND ISLE |
| O6 | WINDOWS & SIDELIGHTS | A4 | USE HULL 284 GRAND ISLE |
| O6YD | WINDOWS (YARD) | A5 | USE HULL 284 GRAND ISLE |
| O7 | LADDERS & STAIRS | A7 | USE HULL 284 GRAND ISLE |
| O9 | MOORING ARRANGEMENT | A3 | USE HULL 284 GRAND ISLE |
| O10 | HANDRAILS | A5 | USE HULL 284 GRAND ISLE |
| O11 | FLOOR PLATING | A5 | USE HULL 284 GRAND ISLE |
| O12 | DECK BOARDS | A3 | USE HULL 284 GRAND ISLE |
| O13 | ROOM NUMBERS | A3 | USE HULL 284 GRAND ISLE |
| O14 | TRANSDUCER ARRANGEMENT | - | |
| O18 | HULL MARKINGS (DRAFT) | - | |
| O18YD | IMO NUMBERS | - | USE HULL 284 GRAND ISLE |
| O20 | GANGWAY | A1 | USE HULL 284 GRAND ISLE |
| O21 | JOINER WALL ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| O23 | JOINER CEILING ARRANGEMENT | A3 | USE HULL 284 GRAND ISLE |
| O26 | ANODE PLACEMENT | A1 | USE HULL 284 GRAND ISLE |
| O31 | NAVIGATION LIGHT ARRANGEMENT | - | USE HULL 284 GRAND ISLE |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 284 GRAND ISLE |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 284 GRAND ISLE |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 284 GRAND ISLE |
| O36 | GRABRAILS | A3 | USE HULL 284 GRAND ISLE |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A5 | USE HULL 284 GRAND ISLE |
| O38 | GALLEY LAYOUT | A2 | USE HULL 284 GRAND ISLE |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 284 GRAND ISLE |
| O46 | VENTILATION SYSTEM | A5 | USE HULL 284 GRAND ISLE |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A5 | USE HULL 284 GRAND ISLE |
| O50 | PILOT HOUSE TOP LAYOUT | A2 | USE HULL 284 GRAND ISLE |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 284 GRAND ISLE |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 284 GRAND ISLE |

## HULL 286 BRAD DARTEZ DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | - | |
| M2 | FUEL OIL SERVICE SYSTEM | A1 | |
| M3 | FUEL OIL TRANSFER SYSTEM | A1 | |
| M4 | LUBE OIL SERVICE SYSTEM | A1 | USE HULL 284 GRAND ISLE |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | - | |
| M6 | FRESH WATER COOLING SYSTEM | - | |
| M10 | BALLAST SYSTEM | A3 | |
| M11 | BILGE SYSTEM | B1 | |
| M12 | FIRE MAIN SYSTEM | A3 | USE HULL 284 GRAND ISLE |
| M13 | TANK SOUNDFAST SYSTEM | A2 | |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | B1 | |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | - | USE HULL 284 GRAND ISLE |
| M21 | POTABLE WATER SYSTEM | B0 | |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | |
| M25 | TANK AND MISC. VENT SYSTEM | A4 | |
| M26 | TANK LEVEL INDICATION SYSTEM | A2 | |
| M27 | WEATHER DECK DRAIN SYSTEM | - | USE HULL 284 GRAND ISLE |
| M29 | DRY BULK SYSTEM | A1 | USE HULL 284 GRAND ISLE |

## HULL 286 BRAD DARTEZ DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B0 | |
| M33 | FI-FI FIRE MONITOR SYSTEM | A2 | USE HULL 284 GRAND ISLE |
| M37 | WEATHER DECK PIPE PENETRATIONS | - | |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 284 GRAND ISLE |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 284 GRAND ISLE |
| M70 | CARGO FRESH WATER SYSTEM | A4 | USE HULL 284 GRAND ISLE |

## HULL 286 BRAD DARTEZ DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | D0 | |
| E3 | CABLEWAY LAYOUT | A3 | USE HULL 284 GRAND ISLE |
| E4 | 480VAC DISTRIBUTION ONE LINE | E1 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | C0 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | D0 | |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | C0 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | B0 | |
| E13 | GENERAL ALARM ONE LINE | D0 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 284 GRAND ISLE |
| E16 | CENTRAL COMMUNICATION ONE LINE | D0 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A7 | USE HULL 284 GRAND ISLE |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A1 | USE HULL 284 GRAND ISLE |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A4 | USE HULL 284 GRAND ISLE |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | B0 | |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 284 GRAND ISLE |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A6 | USE HULL 284 GRAND ISLE |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | A1 | USE HULL 284 GRAND ISLE |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A3 | USE HULL 284 GRAND ISLE |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 284 GRAND ISLE |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 284 GRAND ISLE |
| E53 | MV DISTRIBUTION ONE LINE | A2 | |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B1 | USE HULL 284 GRAND ISLE |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A6 | USE HULL 284 GRAND ISLE |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 284 GRAND ISLE |
| E62 | COMPUTER NETWORK DIAGRAM | - | USE HULL 284 GRAND ISLE |
| E65 | TV & ENTERTAINMENT SYSTEM | A4 | USE HULL 284 GRAND ISLE |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 284 GRAND ISLE |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 284 GRAND ISLE |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 284 GRAND ISLE |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | - | |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A5 | USE HULL 284 GRAND ISLE |
| E128 | AUTOMATION I/O BOX ONE LINE | A2 | |
| E129 | AUTOMATED FLOD AND DECK LIGHTS | B2 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 284 GRAND ISLE |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| E133 | HORN & LIGHT JUNCTION BOXES | A4 | USE HULL 284 GRAND ISLE |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | - | USE HULL 284 GRAND ISLE |

**EXHIBIT A-3**
**VESSEL; WORK**

Vessel Name and Official Number: Cat Island (O.N. 1257750)

**Work**

| HULL 293 CAT ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | D3 | |
| D3 | TANK PLAN | D0 | USE HULL 290 SHIP ISLAND |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP ISLAND |
| D9 | INSULATION PLAN | A7 | USE HULL 290 SHIP ISLAND |
| D10 | MACHINERY ARRANGEMENT | A1 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIP ISLAND |
| D20 | FIRE AND SAFETY PLAN | A1 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | USE HULL 290 SHIP ISLAND |
| D34 | DANGEROUS GOODS PLAN | - | |

| HULL 293 CAT ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP ISLAND |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP ISLAND |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP ISLAND |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S63 | MAIN DECK HATCH | - | USE HULL 290 SHIP ISLAND |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP ISLAND |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIP ISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP ISLAND |
| S113 | GENERATOR FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S115 | SEACHEST ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| S125 | ANCHOR ARRANGEMENT | A4 | USE HULL 290 SHIP ISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP ISLAND |

## HULL 293 CAT ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| **O** | **Outfits** | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIP ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP ISLAND |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP ISLAND |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIP ISLAND |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP ISLAND |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP ISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP ISLAND |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP ISLAND |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP ISLAND |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP ISLAND |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A4 | USE HULL 290 SHIP ISLAND |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP ISLAND |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | USE HULL 290 SHIP ISLAND |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIP ISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP ISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP ISLAND |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP ISLAND |

## HULL 293 CAT ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| **M** | **PIPING** | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIP ISLAND |
| M10 | BALLAST SYSTEM | B2 | USE HULL 290 SHIP ISLAND |
| M11 | BILGE SYSTEM | C0 | USE HULL 290 SHIP ISLAND |
| M12 | FIRE MAIN SYSTEM | B0 | USE HULL 290 SHIP ISLAND |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP ISLAND |

## HULL 293 CAT ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIP ISLAND |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIP ISLAND |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | D0 | USE HULL 290 SHIP ISLAND |

## HULL 293 CAT ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | B0 | |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIP ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | B0 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | USE HULL 290 SHIP ISLAND |
| E13 | GENERAL ALARM ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | A5 | USE HULL 290 SHIP ISLAND |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIP ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIP ISLAND |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIP ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 290 SHIP ISLAND |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIP ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E128 | AUTOMATION I/O BOX ONE LINE | A10 | USE HULL 290 SHIP ISLAND |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIP ISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIP ISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP ISLAND |

**EXHIBIT A-4**
**VESSEL; WORK**

Vessel Name and Official Number: Celena Chouest (O.N. 1201702)

**Work**

| HULL 236 CELENA CHOUEST DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| **D** | **Design** | | |
| D1 | Lines Plan | B0 | USE HULL 225 DIONNE DRAWINGS |
| D2 | General Design Plan | D1 | |
| D3 | Tank Arrangement and Capacity Plan | A3 | |
| D5 | Profile and Decks | B1 | |
| D6 | Shell Expansion | A1 | |
| D6YD | Shell Expansion - Seam Location | A1 | |
| D8 | Fire Integrity (1,2) | - | |
| D9 | Insulation Plan (1,2,3,4) | A2 | |
| D9M | Mascoat Plan | - | |
| D10 | Machinery Arrangement (1,2,3,4) | A1 | |
| D12 | Shaft Arrangement (1,2,3) | A1 | |
| D15 | Underwater Inspection Marking Plan | B1 | |
| D16 | Typical Sections | B1 | |
| D20 | Fire and Safety Plan | A1 | |
| D23 | Docking Plan | B1 | |
| D26 | Station Bill | - | |

| HULL 236 CELENA CHOUEST DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| **S** | **Structure** | | |
| S14 | Crane Foundation | - | |
| S21 | Mast Detail (1,2,3,4) | A2 | |
| S40 | Swing Down Thruster Module | - | |
| S41 | Swing Down Thruster Installation | A2 | USE HULL 225 DIONNE |
| S50 | Rudder Arrangement (1,2,3,4) | A1 | |
| S52 | Rudder Stop | - | |
| S53A | Stern Tunnel Thruster Installation | - | |
| S53F | FWD Tunnel Thruster Installation | - | |
| S56 | Side Bulwark Gates | - | |
| S58 | Rub Rails Installation (Bumper Installation) | B1 | |
| S59 | Cargo Rails | B1 | |
| S61 | Bilge Keel Installation | - | |
| S63 | Main Deck Hatch | NA | |
| S66 | Louver Arrangement (1,2,3) | A1 | |
| S68 | Inflatable Liferaft Cradle | A1 | |
| S74 | Strut | - | |
| S87 | Tugger Winch Installation | - | |
| S107 | Main Engine Foundation | - | |
| S112 | Grid and Channel Cooler Arrangement | - | |
| S113 | Generator Foundation (1,2) | - | |
| S114 | Fire Monitor Pump Foundation | - | |
| S115 | Seachest Arrangement (1,2) | B1 | |
| S125 | Anchor Arrangement | - | |
| S126 | Rescue / Life Boat Davit (1,2) | - | |

## HULL 236 CELENA CHOUEST DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **O** | **Outfits** | | |
| O3 | Interior Doors (Joiner Doors) | - | |
| O4 | Exterior / WT Doors | - | |
| O5 | Manholes and Hatches | A1 | |
| O6 | Window and Sidelights | - | |
| O6YD | Windows (Yard) | - | |
| O7 | Ladders and Stairs (1,2,3,4) | A1 | |
| O9 | Mooring Arrangement (1,2) | - | |
| O10 | Handrails (1,2) | A1 | |
| O11 | Flooring Plating (1,2,3) | B1 | |
| O12 | Deck Boards (1,2) | A1 | |
| O13 | Room Numbers | - | |
| O14 | Transducer Arrangement | - | |
| O18 | Hull Markings (Draft) | A1 | |
| O19 | Rope Guard | - | |
| O20 | Portable Gangway (1,2) | | |
| O21 | Joiner Wall Arrangement (1,2) | - | |
| O23 | Joiner Ceiling Arrangement (1,2) | - | |
| O26 | Anode Placement | A1 | |
| O31 | Navigation Light Arrangement | - | |
| O33 | Load Line Assignment | - | |
| O35 | Navigation Bridge Visibility | | |
| O36 | Grab Rails | - | |
| O40 | Galley Stove Exhaust System | A1 | |
| O41 | Supply Air Ducting (HVAC) | - | |
| O46 | Ventilation System Drawing | B3 | |
| O50 | Pilot House Top Layout | B1 | |
| O53 | Stack Logo Location | A1 | |
| O54 | Name Location | - | |

## HULL 236 CELENA CHOUEST DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **M** | **Piping** | | |
| M1 | Exhaust Gas System (1,2) | - | |
| M2 | Fuel Oil Service System | - | |
| M3 | Fuel Oil Transfer System (1,2) | - | |
| M4 | Lube Oil Service System | - | |
| M5 | Lube, Hydraulic and Dirty Oil Transfer System | - | |
| M6 | Fresh Water Cooling System (1,2) | - | |
| M8 | Sea Water Cooling System | - | |
| M10 | Ballast System (1,2) | B1 | |
| M11 | Bilge System | C1 | |
| M12 | Fire Main System | - | |
| M13 | Tank Soundfast System | A1 | |
| M14 | Ships Service and Starting Air System (1,2) | A1 | |
| M16 | Central Hydraulic Oil System | - | |
| M18 | Steering Gear Hydraulic Oil System | - | |
| M21 | Potable Water System (1,2) | - | |
| M22 | Grey, Black and Sanitary Water System | - | |
| M24 | Fuel Oil Overflow System | - | |
| M25 | Tank and Misc. Vent System | A1 | |
| M26 | Tank Level Indication System (1,2) | - | |
| M27 | Weather Deck Drain System | | |

## HULL 236 CELENA CHOUEST DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M29 | Dry Bulk System | - | |
| M30 | Drilling Fluid System | A1 | |
| M31 | Liquid Mud Tank Cleaning System | - | |
| M33 | Fire Monitor/Water Spray System | - | |
| M35 | Methanol Transfer System | - | |
| M37 | Weather Deck Pipe Penetrations | A1 | |
| M40 | Misc. Piping System | - | |
| M41 | Vessel Frame Drawings | - | |
| M42 | USCG Transfer Drawings | - | |
| M51 | Engine Crankcase Ventilation System | - | |

## HULL 236 CELENA CHOUEST DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| E | Electrical | | |
| E1 | Electrical Load Analysis | A | USE HULL 225 DIONNE |
| E2 | Power One Line | A2 | |
| E3 | Cableway Layout (1,2) | A2 | |
| E4 | 480VAC Distribution 1 - Line | A2 | |
| E6 | 208 / 120 VAC Distribution 1 - Line | A3 | |
| E7 | 208/120 VAC Distribution Arrangement | A2 | |
| E8 | 24 VDC Distribution 1 - line | A4 | |
| E13 | General Alarm 1 - Line | A3 | |
| E14 | Fire Detectino and Alarm One Line | A3 | |
| E15 | Sound Power Phone 1 - Line | A2 | |
| E16 | Central Communication 1 - Line (1,2) | A3 | |
| E19 | Control Room Console Layout | - | USE HULL 225 DIONNE |
| E21 | Pilot House Console Layout (1,2,3,4) | A1 | |
| E34 | Hazardous Areas Plan | - | |
| E35 | Emergency Steering Procedures | - | USE HULL 225 DIONNE |
| E40 | CO2 Alarm System 1 - Line | A2 | |
| E47 | Methanol System Control one Line | A2 | |
| E53 | 6600 VAC Distribution 1-Line | - | USE HULL 225 DIONNE |
| E54 | Emergency Stop and Shutdown 1 - Line (1,2) | - | USE HULL 225 DIONNE |
| E55 | Bilge System Control 1-Line | - | USE HULL 225 DIONNE |
| E109 | Emergency Generator Switchboard Controls 1-Line | A2 | |
| E111 | Main Switchboard Controls 1-Line | A2 | |
| E112 | Main EngMedium Voltage Switchboard Controls 1-Line | - | USE HULL 225 DIONNE |
| E128 | Automation I/O Box One Line | A2 | |
| E130 | Automated Pilot House Wiper Controls | - | USE HULL 225 DIONNE |
| E131 | Pilot House Overhead Lighting Arrangement | - | USE HULL 225 DIONNE |
| E132 | Stereo Antenna One Line | - | USE HULL 225 DIONNE |

**EXHIBIT A-5**
**VESSEL; WORK**

Vessel Name and Official Number: Corcovado (O.N. 1215834)


**Work**

| HULL 251 CORCOVADO DRAWINGS | | | |
|---|---|---|---|
| **11/22/2022** | | | |
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D2 | General Design Plan | C0 | |
| D3 | Tank Arrangement and Capacity Plan | B0 | |
| D5 | Profile and Decks | - | FROM HULL 248 JACKIE CHOUEST |
| D6 | Shell Expansion | - | FROM HULL 248 JACKIE CHOUEST |
| D8 | Fire Integrity          (1,2) | - | |
| D9 | Insulation Plan          (1,2,3,4) | A4 | |
| D9M | Mascoat Plan | A1 | |
| D10 | Machinery Arrangement          (1,2,3,4) | A3 | |
| D12 | Shaft Arrangement (1,2,3) | - | |
| D15 | Underwater Inspection Marking Plan | B0 | |
| D16 | Typical Sections | - | FROM HULL 248 JACKIE CHOUEST |
| D20 | Fire and Safety Plan | C0 | |
| D23 | Docking Plan | A4 | |
| D26 | Station Bill | - | |
| D35 | Hazardous Cargo Arrangement | A0 | |
| D36 | Damage Control Plan | B0 | |

| HULL 251 CORCOVADO DRAWINGS | | | |
|---|---|---|---|
| **11/22/2022** | | | |
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | Crane Foundation | - | |
| S21 | Mast Detail | A3 | |
| S40 | Swing Down Thruster Module | - | |
| S41 | Swing Down Thruster Installation | - | |
| S50 | Rudder Arrangement | A2 | |
| S52 | Rudder Stop | - | |
| S53A | Aft Tunnel Thruster Installation | A1 | |
| S53F | Fwd Tunnel Thruster Installation | A1 | |
| S56 | Side Bulwark Gates | A1 | |
| S58 | Rub Rails Installation (Bumper Installation) | - | |
| S59 | Cargo Rails | A1 | |
| S61 | Bilge Keel Installation | - | |
| S63 | Main Deck Hatch | - | |
| S66 | Louver Arrangement | A1 | |
| S68 | Inflatable Liferaft Cradle | A2 | |
| S74 | Strut | A1 | |
| S87 | Tugger Winch Installation | A1 | |
| S107 | Main Engine Foundation | - | |
| S112 | Grid and Channel Cooler Arrangement | A3 | |
| S113 | Generator Foundation | - | |

## HULL 251 CORCOVADO DRAWINGS

**11/22/2022**

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| S114 | Fire Monitor Pump Foundation | A2 | |
| S115 | Seachest Arrangement | B0 | |
| S125 | Anchor Arrangement | A2 | |
| S126 | Rescue / Life Boat Davit | - | |

## HULL 251 CORCOVADO DRAWINGS

**11/22/2022**

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O | Outfits | | |
| O1 | Doors, Windows, Hatches and Manhole (Book) | A1 | |
| O3 | Interior Doors (Joiner Doors) | - | |
| O4 | Exterior / WT Doors | A1 | |
| O5 | Manholes and Hatches | D0 | |
| O6 | Window and Sidelights | A1 | |
| O6YD | Windows (Yard) | - | |
| O7 | Ladders and Stairs | B0 | |
| O9 | Mooring Arrangement | A1 | |
| O10 | Handrails | A3 | |
| O11 | Flooring Plating | A4 | |
| O12 | Deck Boards | A2 | |
| O13 | Room Numbers | - | |
| O14 | Transducer Arrangement | - | |
| O18 | Hull Markings (Draft) | A2 | |
| O19 | Rope Guard | A1 | |
| O20 | Portable Gangway | - | |
| O21 | Joiner Wall Arrangement | - | |
| O23 | Joiner Ceiling Arrangement   (1,2) | - | |
| O26 | Anode Placement | B0 | |
| O31 | Navigation Light Arrangement | A1 | |
| O33 | Load Line Assignment | - | |
| O34 | Bumper Tire Arrangement | - | |
| O35 | Navigation Bridge Visibility | - | |
| O36 | Grab Rails | A1 | |
| O46 | Ventilation System | A1 | |
| O50 | Pilot House Top Layout | B0 | |
| O53 | Stack Logo Location | A2 | |
| O54 | Name Location | A0 | |

## HULL 251 CORCOVADO DRAWINGS

**11/22/2022**

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | Piping | | |
| M1 | Exhaust Gas System          (1,2) | - | |
| M2 | Fuel Oil Service System | - | |
| M3 | Fuel Oil Transfer System (1,2) | - | |
| M4 | Lube Oil Service System | - | |
| M5 | Lube, Hydraulic and Dirty Oil Transfer System | - | |
| M6 | Fresh Water Cooling System | A2 | |
| M8 | Sea Water Cooling System | A1 | |
| M10 | Ballast System | - | |
| M11 | Bilge System | A1 | |
| M12 | Fire Main System | - | |

## HULL 251 CORCOVADO DRAWINGS

**11/22/2022**

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M13 | Tank Soundfast System | - | |
| M14 | Ships Service and Starting Air System | A1 | |
| M16 | Central Hydraulic Oil System | B0 | |
| M18 | Steering Gear Hydraulic Oil System | - | |
| M21 | Potable Water System | A1 | |
| M22 | Grey, Black and Sanitary Water System | - | |
| M24 | Fuel Oil Overflow System | - | |
| M25 | Tank and Misc. Vent System | - | |
| M26 | Tank Level Indication System | - | |
| M27 | Weather Deck Drain System | - | |
| M29 | Dry Bulk System | - | |
| M30 | Drilling Fluid System | - | |
| M31 | Liquid Mud Tank Cleaning System | - | |
| M33 | Fire Monitor System | A2 | |
| M37 | Weather Deck Pipe Penetrations | - | |
| M41 | Vessel Frame Drawings | - | |
| M42 | USCG Transfer Drawings | - | |
| M51 | Engine Crankcase Ventilation System | - | |
| M61 | Water Mist System | - | |

## HULL 251 CORCOVADO DRAWINGS

**11/22/2022**

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| **E** | **Electrical** | | |
| E1 | Electrical Load Analysis | D0 | |
| E2 | Power One Line | E0 | |
| E3 | Cableway Layout | - | |
| E4 | 480VAC Distribution 1 - Line | B1 | |
| E6 | 208 / 120 VAC Distribution 1 - Line | B2 | |
| E7 | 208/120 VAC Distribution Layout | - | |
| E8 | 24 VDC Distribution 1 - line | C1 | |
| E11 | Junction and Control Box Schematic (Book) | - | |
| E13 | General Alarm 1 - Line | - | |
| E15 | Sound Power Phone 1 - Line | - | |
| E16 | Central Communication 1 - Line          (1,2) | A1 | |
| E19 | Control Room Console Layout | - | |
| E21 | Pilot House Console Layout (1,2,3,4) | - | |
| E34 | Hazardous Area Plan | A1 | |
| E35 | EMERGENCY STEERING PROCEDURES | - | |
| E40 | CO2 Alarm System 1 - Line | - | |
| E43 | Steering Control 1 - Line | - | |
| E53 | 6600 VAC Distribution 1-Line | - | |
| E54 | Emergency Stop and Shutdown 1 - Line | C1 | |
| E55 | Bilge System Control 1-Line | A1 | |
| E60 | Watertight Door/Hatch One Line | - | |
| E68 | Engine Order Telegraph One Line | - | |
| E109 | Emergency Generator Switchboard Controls 1-Line | - | |
| E111 | Main Switchboard Controls 1-Line | - | |
| E112 | Main EngMedium Voltage Switchboard Controls 1-Line | - | |
| E117 | Bow and Stern Tunnel Thruster 1-Line | - | |
| E127 | Pilot House Wiring Console & Misc. Cable Pull List | - | |
| E128 | Automation I/O Box 1 - Line | A7 | |
| E129 | Automated Flood and Deck Lights | - | |

## HULL 251 CORCOVADO DRAWINGS

**11/22/2022**

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E130 | Automated Pilot House Wiper Controls | - | |
| E131 | Pilot House Overhead Lighting Arrangement | - | |
| E132 | Stereo Antenna One Line | - | |
| E170 | Antenna Arrangement | A1 | |

**EXHIBIT A-6**
**VESSEL; WORK**

Vessel Name and Official Number: Dante (O.N. 1178758)

**Work**

| HULL 227 DANTE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | Lines Plan | B0 | USE HULL 225 |
| D2 | General Design Plan | C3 | |
| D3 | Tank Arrangement and Capacity Plan | B1 | |
| D5 | Profile and Decks | A1 | USE HULL 225 |
| D6 | Shell Expansion | - | USE HULL 225 |
| D6YD | Shell Expansion - Seam Location | - | USE HULL 225 |
| D8 | Fire Integrity (1,2) | A1 | USE HULL 225 |
| D9 | Insulation Plan (1,2,3,4) | A3 | USE HULL 225 |
| D9M | Mascoat Plan | - | USE HULL 225 |
| D10 | Machinery Arrangement (1,2,3,4) | A2 | |
| D12 | Shaft Arrangement (1,2,3) | A2 | USE HULL 225 |
| D15 | Underwater Inspection Marking Plan | A4 | USE HULL 225 |
| D16 | Typical Sections | A1 | USE HULL 225 |
| D20 | Fire and Safety Plan | B1 | |
| D26 | Station Bill | - | USE HULL 225 |
| D34 | Dangerous Goods Plan | - | |

| HULL 227 DANTE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | Crane Foundation | A1 | USE HULL 225 |
| S21 | Mast Detail (1,2,3,4) | A3 | USE HULL 225 |
| S40 | Swing Down Thruster Module | A1 | USE HULL 225 |
| S41 | Swing Down Thruster Installation | A2 | USE HULL 225 |
| S50 | Rudder Arrangement (1,2,3,4) | A2 | USE HULL 225 |
| S52 | Rudder Stop | A1 | USE HULL 225 |
| S53A | Stern Tunnel Thruster Installation | A1 | USE HULL 225 |
| S53F | FWD Tunnel Thruster Installation | A2 | USE HULL 225 |
| S56 | Side Bulwark Gates | A1 | USE HULL 225 |
| S58 | Rub Rails Installation (Bumper Installation) | A2 | USE HULL 225 |
| S59 | Cargo Rails | A3 | USE HULL 225 |
| S61 | Bilge Keel Installation | A1 | USE HULL 225 |
| S63 | Main Deck Hatch | A1 | USE HULL 225 |
| S66 | Louver Arrangement (1,2,3) | A1 | USE HULL 225 |
| S68 | Inflatable Liferaft Cradle | A2 | USE HULL 225 |
| S74 | Strut | A1 | USE HULL 225 |
| S87 | Tugger Winch Installation | - | USE HULL 225 |
| S107 | Main Engine Foundation | A2 | USE HULL 225 |
| S112 | Grid and Channel Cooler Arrangement | A1 | USE HULL 225 |
| S113 | Generator Foundation (1,2) | - | USE HULL 225 |
| S115 | Seachest Arrangement (1,2) | A2 | USE HULL 225 |
| S125 | Anchor Arrangement | A2 | USE HULL 225 |

| HULL 227 DANTE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S126 | Rescue / Life Boat Davit (1,2) | A2 | USE HULL 225 |

| HULL 227 DANTE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| O | Outfits | | |
| O3 | Interior Doors (Joiner Doors) | A3 | USE HULL 225 |
| O4 | Exterior / WT Doors | A2 | USE HULL 225 |
| O5 | Manholes and Hatches | A4 | USE HULL 225 |
| O6 | Window and Sidelights | A2 | USE HULL 225 |
| O6YD | Windows (Yard) | - | USE HULL 225 |
| O7 | Ladders and Stairs (1,2,3,4) | B1 | |
| O9 | Mooring Arrangement (1,2) | - | USE HULL 225 |
| O10 | Handrails (1,2) | A1 | USE HULL 225 |
| O11 | Flooring Plating (1,2,3) | A1 | |
| O12 | Deck Boards (1,2) | - | USE HULL 225 |
| O13 | Room Numbers | - | USE HULL 225 |
| O14 | Transducer Arrangement | A2 | USE HULL 225 |
| O18 | Hull Markings (Draft) | - | USE HULL 225 |
| O19 | Rope Guard | - | USE HULL 225 |
| O20 | Portable Gangway (1,2) | - | USE HULL 225 |
| O21 | Joiner Wall Arrangement (1,2) | A1 | USE HULL 225 |
| O23 | Joiner Ceiling Arrangement (1,2) | A1 | USE HULL 225 |
| O26 | Anode Placement | A1 | USE HULL 225 |
| O31 | Navigation Light Arrangement | A1 | USE HULL 225 |
| O33 | Load Line Assignment | - | USE HULL 225 |
| O35 | Navigation Bridge Visibility | - | USE HULL 225 |
| O36 | Grab Rails | - | USE HULL 225 |
| O40 | Galley Stove Exhaust System | A2 | USE HULL 225 |
| O41 | Supply Air Ducting (HVAC) | A1 | USE HULL 225 |
| O46 | Ventilation System Drawing | A2 | USE HULL 225 |
| O50 | Pilot House Top Layout | B1 | |
| O53 | Stack Logo Location | - | USE HULL 225 |
| O54 | Name Location | - | USE HULL 225 |

| HULL 227 DANTE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| M | Piping | | |
| M1 | Exhaust Gas System (1,2) | A1 | |
| M2 | Fuel Oil Service System | B2 | |
| M3 | Fuel Oil Transfer System (1,2) | - | USE HULL 225 |
| M4 | Lube Oil Service System | - | USE HULL 225 |
| M5 | Lube, Hydraulic and Dirty Oil Transfer System | - | USE HULL 225 |
| M6 | Fresh Water Cooling System (1,2) | - | USE HULL 225 |
| M8 | Sea Water Cooling System | - | USE HULL 225 |
| M10 | Ballast System (1,2) | - | USE HULL 225 |
| M11 | Bilge System | B1 | USE HULL 225 |
| M12 | Fire Main System | - | USE HULL 225 |
| M13 | Tank Soundfast System | - | USE HULL 225 |
| M14 | Ships Service and Starting Air System (1,2) | - | USE HULL 225 |
| M16 | Central Hydraulic Oil System | A1 | USE HULL 225 |
| M18 | Steering Gear Hydraulic Oil System | - | USE HULL 225 |
| M21 | Potable Water System (1,2) | - | USE HULL 225 |
| M22 | Grey, Black and Sanitary Water System | - | USE HULL 225 |

## HULL 227 DANTE DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M24 | Fuel Oil Overflow System | - | USE HULL 225 |
| M25 | Tank and Misc. Vent System | - | USE HULL 225 |
| M26 | Tank Level Indication System (1,2) | - | USE HULL 225 |
| M27 | Weather Deck Drain System | - | USE HULL 225 |
| M29 | Dry Bulk System | - | USE HULL 225 |
| M30 | Drilling Fluid System | - | USE HULL 225 |
| M31 | Liquid Mud Tank Cleaning System | A1 | |
| M35 | Methanol Transfer System | - | USE HULL 225 |
| M37 | Weather Deck Pipe Penetrations | - | USE HULL 225 |
| M40 | Misc. Piping System | - | USE HULL 225 |
| M41 | Vessel Frame Drawings | - | USE HULL 225 |
| M42 | USCG Transfer Drawings | - | USE HULL 225 |
| M51 | Engine Crankcase Ventilation System | - | USE HULL 225 |

## HULL 227 DANTE DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E1 | Electrical Load Analysis | A2 | |
| E2 | Power One Line | B3 | |
| E3 | Cableway Layout (1,2) | - | USE HULL 225 |
| E4 | 480VAC Distribution 1 - Line | B1 | |
| E6 | 208 / 120 VAC Distribution 1 - Line | A3 | |
| E7 | 208/120 VAC Distribution Arrangement | - | USE HULL 225 |
| E8 | 24 VDC Distribution 1 - line | B1 | |
| E13 | General Alarm 1 - Line | - | USE HULL 225 |
| E15 | Sound Power Phone 1 - Line | - | USE HULL 225 |
| E16 | Central Communication 1 - Line (1,2) | - | USE HULL 225 |
| E19 | Control Room Console Layout | - | USE HULL 225 |
| E21 | Pilot House Console Layout (1,2,3,4) | - | USE HULL 225 |
| E34 | Hazardous Areas Plan | - | USE HULL 225 |
| E35 | Emergency Steering Procedures | - | USE HULL 225 |
| E40 | CO2 Alarm System 1 - Line | - | USE HULL 225 |
| E53 | 6600 VAC Distribution 1-Line | - | USE HULL 225 |
| E54 | Emergency Stop and Shutdown 1 – Line (1,2) | B1 | |
| E55 | Bilge System Control 1-Line | - | USE HULL 225 |
| E109 | Emergency Generator Switchboard Controls 1-Line | - | USE HULL 225 |
| E111 | Main Switchboard Controls 1-Line | - | USE HULL 225 |
| E112 | Main EngMedium Voltage Switchboard Controls 1-Line | - | USE HULL 225 |
| E128 | Automation I/O Box One Line | A2 | |
| E129 | Automated Flood and Deck Lights | - | USE HULL 225 |
| E130 | Automated Pilot House Wiper Controls | - | USE HULL 225 |
| E131 | Pilot House Overhead Lighting Arrangement | - | USE HULL 225 |
| E132 | Stereo Antenna One Line | - | USE HULL 225 |

**EXHIBIT A-7**
**VESSEL; WORK**

Vessel Name and Official Number: Dauphin Island (O.N. 1262978)

**Work**

| HULL 297 DAUPHIN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | HULL 295 PELICAN ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | C0 | |
| D3 | TANK PLAN | A2 | |
| D4 | MIDSHIP SECTION | A2 | HULL 295 PELICAN ISLAND |
| D9 | INSULATION PLAN | A5 | HULL 295 PELICAN ISLAND |
| D10 | MACHINERY ARRANGEMENT | A2 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | Z1 | HULL 295 PELICAN ISLAND |
| D20 | FIRE AND SAFETY PLAN | C0 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | A1 | |
| D34 | DANGEROUS GOODS PLAN | A1 | |

| HULL 297 DAUPHIN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | HULL 295 PELICAN ISLAND |
| S21 | MAST DETAIL | A6 | HULL 295 PELICAN ISLAND |
| S47 | PROPULSION UNIT | A1 | HULL 295 PELICAN ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A3 | HULL 295 PELICAN ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | HULL 295 PELICAN ISLAND |
| S56 | SIDEGATES | A2 | HULL 295 PELICAN ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | - | HULL 295 PELICAN ISLAND |
| S59 | CARGO RAILS | - | |
| S61 | BILGE KEEL INSTALLATION | - | HULL 295 PELICAN ISLAND |
| S63 | MAIN DECK HATCH | - | HULL 295 PELICAN ISLAND |
| S66 | LOUVER ARRANGEMENT | A1 | HULL 295 PELICAN ISLAND |
| S68 | LIFERAFT CRADLE | B1 | HULL 295 PELICAN ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | HULL 295 PELICAN ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | HULL 295 PELICAN ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | A1 | HULL 295 PELICAN ISLAND |
| S107 | MAIN ENGINE FOUNDATION | - | HULL 295 PELICAN ISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A1 | HULL 295 PELICAN ISLAND |
| S113 | GENERATOR FOUNDATION | A2 | HULL 295 PELICAN ISLAND |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | HULL 295 PELICAN ISLAND |
| S115 | SEACHEST ARRANGEMENT | A1 | HULL 295 PELICAN ISLAND |
| S125 | ANCHOR ARRANGEMENT | A3 | HULL 295 PELICAN ISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | HULL 295 PELICAN ISLAND |

## HULL 297 DAUPHIN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **O** | **Outfits** | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | HULL 295 PELICAN ISLAND |
| O3 | INTERIOR DOORS | A3 | HULL 295 PELICAN ISLAND |
| O4 | EXTERIOR WT DOORS | - | HULL 295 PELICAN ISLAND |
| O5 | MANHOLES & HATCHES | C1 | HULL 295 PELICAN ISLAND |
| O6 | WINDOWS & SIDELIGHTS | A1 | HULL 295 PELICAN ISLAND |
| O6YD | WINDOWS (YARD) | - | HULL 295 PELICAN ISLAND |
| O7 | LADDERS & STAIRS | B1 | HULL 295 PELICAN ISLAND |
| O9 | MOORING ARRANGEMENT | A3 | HULL 295 PELICAN ISLAND |
| O10 | HANDRAILS | B1 | HULL 295 PELICAN ISLAND |
| O11 | FLOOR PLATING | A2 | HULL 295 PELICAN ISLAND |
| O12 | DECK BOARDS | B0 | |
| O13 | ROOM NUMBERS | - | HULL 295 PELICAN ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | - | HULL 295 PELICAN ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A2 | HULL 295 PELICAN ISLAND |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | HULL 295 PELICAN ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A3 | HULL 295 PELICAN ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A4 | HULL 295 PELICAN ISLAND |
| O26 | ANODE PLACEMENT | A1 | HULL 295 PELICAN ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | HULL 295 PELICAN ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | HULL 295 PELICAN ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | HULL 295 PELICAN ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | HULL 295 PELICAN ISLAND |
| O36 | GRABRAILS | - | HULL 295 PELICAN ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A1 | HULL 295 PELICAN ISLAND |
| O38 | GALLEY LAYOUT | A4 | HULL 295 PELICAN ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | HULL 295 PELICAN ISLAND |
| O46 | VENTILATION SYSTEM | B1 | |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A8 | |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | HULL 295 PELICAN ISLAND |
| O53 | STACK LOGO LOCATION | - | HULL 295 PELICAN ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | HULL 295 PELICAN ISLAND |

## HULL 297 DAUPHIN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **M** | **PIPING** | | |
| M1 | EXHAUST GAS SYSTEM | - | HULL 295 PELICAN ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | - | HULL 295 PELICAN ISLAND |
| M3 | FUEL OIL TRANSFER SYSTEM | A1 | HULL 295 PELICAN ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | HULL 295 PELICAN ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A1 | HULL 295 PELICAN ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | B1 | |
| M10 | BALLAST SYSTEM | A1 | |
| M11 | BILGE SYSTEM | B1 | HULL 295 PELICAN ISLAND |
| M12 | FIRE MAIN SYSTEM | C0 | HULL 295 PELICAN ISLAND |
| M13 | TANK SOUNDFAST SYSTEM | B1 | HULL 295 PELICAN ISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A1 | HULL 295 PELICAN ISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | B1 | |
| M21 | POTABLE WATER SYSTEM | A1 | HULL 295 PELICAN ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A1 | HULL 295 PELICAN ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | B1 | HULL 295 PELICAN ISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | HULL 295 PELICAN ISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | HULL 295 PELICAN ISLAND |

## HULL 297 DAUPHIN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M27 | WEATHER DECK DRAIN SYSTEM | A3 | HULL 295 PELICAN ISLAND |
| M29 | DRY BULK SYSTEM | B2 | HULL 295 PELICAN ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B3 | HULL 295 PELICAN ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A2 | HULL 295 PELICAN ISLAND |
| M35 | METHANOL TRANSFER SYSTEM | A4 | |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | HULL 295 PELICAN ISLAND |
| M40 | MISC. PIPING SYSTEM | - | HULL 295 PELICAN ISLAND |
| M44 | MISC. CHEMICAL SYSTEM | B1 | |
| M50 | HULL AND DECK PENETRATIONS | - | HULL 295 PELICAN ISLAND |
| M59 | CRUDE OIL SLOP SYSTEM | C0 | HULL 295 PELICAN ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | B3 | HULL 295 PELICAN ISLAND |

## HULL 297 DAUPHIN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | C0 | |
| E3 | CABLEWAY LAYOUT | A2 | HULL 295 PELICAN ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | B0 | |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | A0 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | - | HULL 295 PELICAN ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A0 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | HULL 295 PELICAN ISLAND |
| E13 | GENERAL ALARM ONE LINE | A1 | HULL 295 PELICAN ISLAND |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | - | HULL 295 PELICAN ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | A4 | HULL 295 PELICAN ISLAND |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A2 | HULL 295 PELICAN ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | HULL 295 PELICAN ISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A2 | HULL 295 PELICAN ISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | |
| E35 | EMERGENCY STEERING PROCEDURES | - | HULL 295 PELICAN ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A1 | HULL 295 PELICAN ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | HULL 295 PELICAN ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A2 | HULL 295 PELICAN ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | - | HULL 295 PELICAN ISLAND |
| E47 | METHANOL SYSTEM CONTROL ONE LINE | A1 | HULL 295 PELICAN ISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | | HULL 295 PELICAN ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | - | HULL 295 PELICAN ISLAND |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | A4 | HULL 295 PELICAN ISLAND |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A1 | HULL 295 PELICAN ISLAND |
| E60 | WT DOORS / HATCH ONE LINE | A1 | HULL 295 PELICAN ISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | - | HULL 295 PELICAN ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | - | HULL 295 PELICAN ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | HULL 295 PELICAN ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A1 | HULL 295 PELICAN ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A1 | HULL 295 PELICAN ISLAND |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A1 | HULL 295 PELICAN ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A2 | HULL 295 PELICAN ISLAND |
| E128 | AUTOMATION I/O BOX ONE LINE | A2 | |
| E129 | AUTOMATED FLOOD AND DECK LIGHTS | B2 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A1 | HULL 295 PELICAN ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | HULL 295 PELICAN ISLAND |

| HULL 297 DAUPHIN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| E132 | STEREO ANTENNA ONE LINE | A1 | HULL 295 PELICAN ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A1 | HULL 295 PELICAN ISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A4 | HULL 295 PELICAN ISLAND |

**EXHIBIT A-8**
**VESSEL; WORK**

Vessel Name and Official Number: Deer Island (O.N. 1289730)

**Work**

| HULL 301 DEER ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | G0 | |
| D3 | TANK PLAN | F0 | |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP ISLAND |
| D9 | INSULATION PLAN | F0 | |
| D10 | MACHINERY ARRANGEMENT | F0 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | F0 | |
| D20 | FIRE AND SAFETY PLAN | D0 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | USE HULL 290 SHIP ISLAND |
| D34 | DANGEROUS GOODS PLAN | - | |
| D36 | DAMAGE CONTROL PLAN | C0 | |

| HULL 301 DEER ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP ISLAND |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP ISLAND |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP ISLAND |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S63 | MAIN DECK HATCH | - | USE HULL 290 SHIP ISLAND |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP ISLAND |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIP ISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP ISLAND |
| S113 | GENERATOR FOUNDATION | - | USE HULL 290 SHIP ISLAND |

## HULL 301 DEER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| S114 | FIRE MONITOR PUMP FOUNDATION | A1 | |
| S115 | SEACHEST ARRANGEMENT | A1 | |
| S125 | ANCHOR ARRANGEMENT | A4 | USE HULL 290 SHIP ISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP ISLAND |

## HULL 301 DEER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIP ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP ISLAND |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP ISLAND |
| O5 | MANHOLES & HATCHES | F0 | |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP ISLAND |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP ISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP ISLAND |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP ISLAND |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP ISLAND |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP ISLAND |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A4 | USE HULL 290 SHIP ISLAND |
| O18YD | IMO NUMBERS | A1 | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP ISLAND |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | USE HULL 290 SHIP ISLAND |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIP ISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP ISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP ISLAND |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP ISLAND |

## HULL 301 DEER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | L1 | |
| M10 | BALLAST SYSTEM | F1 | |
| M11 | BILGE SYSTEM | F0 | |

## HULL 301 DEER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M12 | FIRE MAIN SYSTEM | B0 | USE HULL 290 SHIP ISLAND |
| M13 | TANK SOUNDFAST SYSTEM | F1 | |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A1 | |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | F0 | |
| M26 | TANK LEVEL INDICATION SYSTEM | F1 | |
| M27 | WEATHER DECK DRAIN SYSTEM | A0 | |
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIP ISLAND |
| M37 | WEATHER DECK PIPE PENETRATIONS | B2 | |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | D0 | USE HULL 290 SHIP ISLAND |

## HULL 301 DEER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | L2 | |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIP ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | H1 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | K1 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A1 | |
| E13 | GENERAL ALARM ONE LINE | K0 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | G0 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIP ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | F0 | |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | F0 | |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIP ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E47 | METHANOL SYSTEM CONTROL ONE LINE | G0 | |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | F0 | |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | F0 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | F0 | |
| E60 | WT DOORS / HATCH ONE LINE | F0 | |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 290 SHIP ISLAND |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIP ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | USE HULL 290 SHIP ISLAND |

| HULL 301 DEER ISLAND DRAWING LIST | | | |
|---------|-------|-----|----------|
| Drawing | Title | Rev | Comments |
| E128 | AUTOMATION I/O BOX ONE LINE | F0 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | F0 | |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | F0 | |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIP ISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP ISLAND |

**EXHIBIT A-9**
**VESSEL; WORK**

Vessel Name and Official Number: Dino Chouest (O.N. 1207856)

**Work**

| HULL 237 DINO CHOUEST DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D1 | - | LINES PLAN |
| D2 | G0 | GENERAL ARRANGEMENT |
| D3 | C1 | TANK CAPACITY PLAN |
| D5A | A2 | PROFILES & DECKS AFT |
| D5F | - | PROFILES & DECKS FWD |
| D5M | A2 | PROFILES & DECKS MID |
| D5S | - | PROFILES & DECKS SUPERSTRUCTURE |
| D6 | - | SHELL EXPANSION |
| D6YD | - | SHELL EXPANSION SEAM LOCATIONS |
| D8 | A1 | FIRE INTEGRITY |
| D9 | A2 | INSULATION PLAN |
| D9M | - | MASCOAT PLAN |
| D10 | A2 | MACHINERY ARRANGEMENT |
| D12 | A3 | SHAFT ARRANGEMENT |
| D15 | A2 | UNDERWATER INSPECTION MARKING PLAN |
| D16A | A2 | TYPICAL SECTIONS AFT |
| D16F | - | TYPICAL SECTIONS FWD |
| D16M | A2 | TYPICAL SECTIONS MID |
| D16S | - | DECK HOUSE TYPICAL SECTIONS |
| D20 | D0 | FIRE & SAFETY PLAN |
| D23 | - | DOCKING PLAN |
| D26 | - | STATION BILL |
| S14 | A1 | CRANE FOUNDATION |
| S15 | - | CHAIN GUIDE ROLLER |
| S21 | B1 | MAST DETAIL |
| S25 | - | CABLE ANCHOR POINT |
| S31 | A1 | MOON POOL |
| S41F | - | SWING DOWN THRUSTER INSTALLATION FWD |
| S49 | A1 | KORT NOZZLES |
| S50 | A3 | RUDDER ARRANGEMENT |
| S52 | - | RUDDER STOP |
| S53A | - | TUNNEL STERN THRUSTER INSTALLATION |
| S53F | - | FWD TUNNEL THRUSTER INSTALLATION |
| S56 | A1 | SIDEGATES |
| S59 | A2 | CARGO RAILS |
| S61 | - | BILGE KEEL INSTALLATION |
| S63 | - | MAIN DECK HATCH |
| S66 | A6 | LOUVER ARRANGEMENT |
| S67 | - | WINCH FOUNDATION |
| S68 | - | LIFERAFT CRADLE |
| S70 | - | SATCOM FOUNDATION |
| S72 | - | GEAR BOX FOUNDATION |
| S74 | A1 | STRUT |
| S77 | A1 | STORAGE REEL INSTALLATION |
| S77L | A1 | STORAGE REEL INSTALLATION LOWER |

| HULL 237 DINO CHOUEST DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| S85 | C0 | ROV PLATFORM |
| S87 | A6 | TUGGER WINCH INSTALLATION |
| S88 | - | RECESSED TOW EYE |
| S99 | F0 | DECK EQUIPMENT ARRANGEMENT |
| S107 | - | MAIN ENGINE FOUNDATION |
| S112 | B0 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | - | GENERATOR FOUNDATION |
| S115 | A2 | SEACHEST ARRANGEMENT |
| S116 | A1 | TOWING WINCH PUMP FOUNDATION |
| S118 | - | SWING-DOWN THRUSTER ENGINE FOUNDATION |
| S125 | A1 | ANCHOR ARRANGEMENT |
| S126 | A1 | RESCUE LIFEBOAT DAVIT |
| S130 | A2 | STERN ROLLER |
| S131 | A2 | TOW PIN INSTALLATION |
| S132 | A1 | SHARK JAW INSTALLATION |
| S202 | - | SPOOLING SHEAVE |
| S299 | - | UNIT BREAKDOWN |
| S99CP | A2 | DECK EQUIPMENT ARRANGEMENT |
| S146 | A0 | MISC. ELEVATED PLATFORMS AND EQUIPM |
| O1 | A2 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
| O2 | - | DECK COVERINGS |
| O3 | A5 | INTERIOR DOORS |
| O4 | B2 | EXTERIOR WT DOORS |
| O5 | C1 | MANHOLES & HATCHES |
| O6 | A3 | WINDOWS & SIDELIGHTS |
| O6YD | A3 | WINDOWS (YARD) |
| O7 | A4 | LADDERS & STAIRS |
| O9 | D0 | MOORING ARRANGEMENT |
| O10 | A3 | HANDRAILS |
| O11 | A2 | FLOOR PLATING |
| O13 | A1 | ROOM NUMBERS |
| O14 | B1 | TRANSDUCER ARRANGEMENT |
| O14E | A1 | 3UTECH EXTERNAL TRANSDUCER ARRANGE |
| O18 | A1 | HULL MARKINGS |
| O19 | - | ROPE GUARD |
| O20 | - | GANGWAY |
| O21 | A3 | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | A1 | JOINER CEILING ARRANGEMENT |
| O26 | - | ANODE PLACEMENT |
| O31 | B1 | NAVIGATION LIGHT ARRANGEMENT |
| O33 | A1 | LOAD LINE ASSIGNMENT |
| O34 | - | BUMPER TIRE ARRANGEMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | - | GRABRAILS |
| O46 | A2 | VENTILATION SYSTEM |
| O46YD | - | VENTILATION SYSTEM (YARD) |
| O49 | - | TANK LABELING ARRANGEMENT |
| O50 | A5 | PILOT HOUSE TOP LAYOUT |
| O53 | - | STACK LOGO LOCATION |
| O54 | A1 | NAME LOCATION |
| O57 | - | HANGING SCAFFOLD ARRANGMENT |
| O46M | A2 | VENTILATION SYSTEM (MOD) |
| M1 | - | EXHAUST GAS SYSTEM |
| M2 | A1 | FUEL OIL SERVICE SYSTEM |
| M3 | D0 | FUEL OIL TRANSFER SYSTEM |
| HULL 237 DINO CHOUEST DRAWING LIST | | |

| Drawing | Rev | Drawing Title |
|---------|-----|---------------|
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | A2 | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | C0 | FRESH WATER COOLING SYSTEM |
| M8 | B1 | SEAWATER COOLING SYSTEM |
| M10 | D0 | BALLAST SYSTEM |
| M11 | A3 | BILGE SYSTEM |
| M12 | A2 | FIREMAIN SYSTEM |
| M13 | D0 | TANK SOUNDFAST SYSTEM |
| M14 | A1 | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | - | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | A1 | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | A3 | POTABLE WATER SYSTEM |
| M22 | B2 | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | A1 | FUEL OIL OVERFLOW SYSTEM |
| M25 | D0 | TANK & MISC VENT SYSTEM |
| M26 | D0 | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M29 | A1 | DRY BULK SYSTEM |
| M30 | C0 | DRILLING FLUID SYSTEM |
| M31 | A1 | LIQUID MUD TANK CLEANING SYSTEM |
| M37 | D0 | WEATHER DECK PIPE PENETRATIONS |
| M40 | - | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M51 | - | ENGINE CRANKCASE VENTILATION |
| E1 | C0 | ELECTRICAL LOAD ANALYSIS |
| E2 | C0 | POWER ONE LINE |
| E3 | A3 | CABLEWAY LAYOUT |
| E4 | C0 | 480VAC DISTRIBUTION ONE LINE |
| E6 | C0 | 208/120VAC DISTRIBUTION ONE LINE |
| E7H | B1 | 208/120VAC HEATING ARRANGEMENT |
| E7L | B1 | 208/120VAC LIGHTING ARRANGEMENT |
| E7R | B0 | 208/120VAC RECEPTICLE ARRANGEMENT |
| E7YDT | - | 208/120VAC LIGHTING &RECEPTICLE CAB |
| E8 | B1 | 24VDC DISTRIBUTION ONE LINE |
| E11 | A2 | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E13 | C0 | GENERAL ALARM ONE LINE |
| E15 | A1 | SOUND-POWERED PHONE ONE LINE |
| E16 | C0 | CENTRAL COMMUNICATION ONE LINE |
| E19 | A1 | CONTROL ROOM CONSOLE LAYOUT |
| E21 | A1 | PILOT HOUSE CONSOLE LAYOUT |
| E22 | A1 | NAVIGATION LIGHT CONTROL SYSTEM ONE LINE |
| E37YD | - | HYDRAULIC WATERTIGHT DOOR ONE LINE |
| E40 | - | CO2 ALARM SYSTEM ONE LINE |
| E43 | A1 | STEERING CONTROL ONE LINE |
| E51 | A2 | VIDEO MONITORING SYSTEM ONE LINE |
| E53 | A3 | 6600VAC DISTRIBUTION ONE LINE |
| E54 | B2 | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | A4 | BILGE SYSTEM CONTROL ONE LINE |
| E60 | A3 | WATERTIGHT DOOR/HATCH CONTROL ONE LINE |
| E65 | - | TV & ENTERTAINMENT SYSTEM |
| E68 | - | ENGINE ORDER TELEGRAPH ONE LINE |
| E109 | - | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | A1 | MAIN SWITCHBOARD CABLE PULL LIST |
| E129 | | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | A1 | WIPER CONTROL ONE LINE |
| E131 | A3 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |

| HULL 237 DINO CHOUEST DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| E132 | - | STEREO ANTENNA ONE LINE |
| E133 | - | ASI VALVE ONE LINE |
| E134 | - | JRC ELECTRONICS ONE LINE |
| E137 | - | VDR ONE LINE |

**EXHIBIT A-10**
**VESSEL; WORK**

Vessel Name and Official Number: Forte (O.N. 1223605)


**Work**

| HULL 264 FORTE DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D1 | - | LINES PLAN |
| D2 | B0 | GENERAL ARRANGEMENT |
| D3 | A6 | TANK CAPACITY PLAN |
| D4 | - | MIDSHIP SECTION |
| D5 | A2 | PROFILES & DECKS |
| D6 | A1 | SHELL EXPANSION |
| D6YD | - | SHELL EXPANSION SEAM LOCATIONS |
| D8 | A2 | FIRE INTEGRITY |
| D9 | A3 | INSULATION PLAN |
| D9M | A3 | MASCOAT PLAN |
| D10 | A10 | MACHINERY ARRANGEMENT |
| D12 | A5 | SHAFT ARRANGEMENT |
| D15 | A3 | UNDERWATER INSPECTION MARKING PLAN |
| D16 | A2 | TYPICAL SECTIONS |
| D19 | A1 | LOADLINE REFERENCE |
| D20 | B0 | FIRE & SAFETY PLAN |
| D23 | A3 | DOCKING PLAN |
| D26 | | STATION BILL |
| D34 | A1 | DANGEROUS GOODS PLAN |
| D100 | | FIRE PROTECTION AREAS |
| S14 | A2 | CRANE FOUNDATION |
| S21 | A4 | MAST DETAIL |
| S47 | A1 | PROPULSION UNIT |
| S53A | A1 | TUNNEL STERN THRUSTER INSTALLATION |
| S56 | - | SIDEGATES |
| S57 | A2 | BITT DETAILS |
| S58 | A | RUB RAILS/BUMPER INSTALLATION |
| S61 | - | BILGE KEEL INSTALLATION |
| S64 | - | THRUSTER GUARD |
| S64D | - | THRUSTER GUARD |
| S66 | A1 | LOUVER ARRANGEMENT |
| S67 | - | WINCH FOUNDATION |
| S68 | A2 | LIFERAFT CRADLE |
| S87 | - | TUGGER WINCH INSTALLATION |
| S100 | - | SKEG |
| S107 | A1 | MAIN ENGINE FOUNDATION |
| S112 | A1 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | - | GENERATOR FOUNDATION |
| S114 | A2 | FIRE MONITOR PUMP FOUNDATION |
| S115 | - | SEACHEST ARRANGEMENT |
| S126 | A1 | RESCUE LIFEBOAT DAVIT |
| S130 | A1 | STERN ROLLER |
| S131 | A1 | TOW PIN INSTALLATION |
| S140 | - | FLOATING HOSE DEPLOYMENT INSPECTION |
| S160 | | SEWAGE TANKS |

| HULL 264 FORTE DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| S161 | | SAFE WORKING LOAD |
| S299 | A1 | UNIT BREAKDOWN |
| O1 | - | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
| O3 | A3 | INTERIOR DOORS |
| O4 | A2 | EXTERIOR WT DOORS |
| O5 | A6 | MANHOLES & HATCHES |
| O6 | A2 | WINDOWS & SIDELIGHTS |
| O6YD | A2 | WINDOWS (YARD) |
| O7 | A2 | LADDERS & STAIRS |
| O9 | A1 | MOORING ARRANGEMENT |
| O10 | A2 | HANDRAILS |
| O11 | A1 | FLOOR PLATING |
| O13 | A1 | ROOM NUMBERS |
| O14 | - | TRANSDUCER ARRANGEMENT |
| O18 | A1 | HULL MARKINGS (DRAFT) |
| O20 | - | GANGWAY |
| O21 | A1 | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | - | JOINER CEILING ARRANGEMENT |
| O26 | A1 | ANODE PLACEMENT |
| O31 | A1 | NAVIGATION LIGHT ARRANGEMENT |
| O33 | - | LOAD LINE ASSIGNMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | - | GRABRAILS |
| O37 | A1 | CONTAINMENT BARRIER |
| O46 | C2 | VENTILATION SYSTEM |
| O50 | A4 | PILOT HOUSE TOP LAYOUT |
| O53 | A1 | STACK LOGO LOCATION |
| O54 | - | NAME LOCATION |
| O60 | A1 | FOAM DISPERSANT BOOM |
| O101 | - | ANCHOR DEPLOYMENT |
| M1 | A2 | EXHAUST GAS SYSTEM |
| M2 | - | FUEL OIL SERVICE SYSTEM |
| M3 | A1 | FUEL OIL TRANSFER SYSTEM |
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | - | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | - | FRESH WATER COOLING SYSTEM |
| M8 | - | SEAWATER COOLING SYSTEM |
| M10 | - | BALLAST SYSTEM |
| M11 | A2 | BILGE SYSTEM |
| M12 | - | FIREMAIN SYSTEM |
| M13 | - | TANK SOUNDFAST SYSTEM |
| M14 | - | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | - | CENTRAL HYDRAULIC OIL SYSTEM |
| M21 | A1 | POTABLE WATER SYSTEM |
| M22 | A1 | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | A1 | FUEL OIL OVERFLOW SYSTEM |
| M25 | | TANK & MISC VENT SYSTEM |
| M26 | - | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M33 | - | FIRE MONITOR SYSTEM |
| M37 | - | WEATHER DECK PIPE PENETRATIONS |
| M40 | - | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M42 | | USCG TRANSFER DRAWINGS |
| M44 | | DECK FOAM SYSTEM |

| HULL 264 FORTE DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| M49 | - | TANK LABELING ARRANGEMENT |
| M51 | A1 | ENGINE CRANKCASE VENTILATION |
| M58 | A2 | RECOVERY OIL ARRANGEMENT |
| M50 | | HULL PENTERTRATIONS |
| E1 | A1 | ELECTRICAL LOAD ANALYSIS |
| E2 | A5 | POWER ONE LINE |
| E3 | A1 | CABLEWAY LAYOUT |
| E4 | A5 | 480VAC DISTRIBUTION ONE LINE |
| E6 | A2 | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | A5 | 208/120VAC DISTRIBUTION LAYOUT |
| E8 | A5 | 24VDC DISTRIBUTION ONE LINE |
| E11 | - | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E13 | A4 | GENERAL ALARM ONE LINE |
| E14 | - | FIRE DETECTION AND ALARM ONE LINE |
| E15 | A4 | SOUND-POWERED PHONE ONE LINE |
| E16 | A3 | CENTRAL COMMUNICATION ONE LINE |
| E19 | A1 | CONTROL ROOM CONSOLE LAYOUT |
| E21 | A1 | PILOT HOUSE CONSOLE LAYOUT |
| E34 | - | HAZARDOUS AREAS PLAN |
| E35 | - | EMERGENCY STEERING PROCEDURES |
| E36YD | | MISCELLANEOUS CONTROL PANELS |
| E40 | A5 | CO2 ALARM SYSTEM ONE LINE |
| E45 | A1 | VENTILATION SYSTEM CONTROL ONE LINE |
| E51 | - | VIDEO MONITORING SYSTEM ONE LINE |
| E54 | A6 | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E60 | A2 | WATERTIGHT DOOR/HATCH CONTROL ONE LINE |
| E68 | A1 | ENGINE ORDER TELEGRAPH ONE LINE |
| E109 | A2 | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | A1 | MAIN SWITCHBOARD CABLE PULL LIST |
| E130 | A1 | WIPER CONTROL ONE LINE |
| E131 | A4 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | - | STEREO ANTENNA ONE LINE |

**EXHIBIT A-11**
**VESSEL; WORK**

Vessel Name and Official Number: Gavea (O.N. 1211932)


**Work**

| HULL 249 GAVEA DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D1 | A0 | LINES PLAN |
| D2 | B0 | GENERAL ARRANGEMENT |
| D3 | A1 | TANK CAPACITY PLAN |
| D5 | | PROFILES & DECKS |
| D6 | A0 | SHELL EXPANSION |
| D8 | - | FIRE INTEGRITY |
| D9 | A3 | INSULATION PLAN |
| D9M | - | MASCOAT PLAN |
| D10 | A3 | MACHINERY ARRANGEMENT |
| D12 | - | SHAFT ARRANGEMENT |
| D15 | A1 | UNDERWATER INSPECTION MARKING PLAN |
| D16 | | TYPICAL SECTIONS |
| D20 | C0 | FIRE & SAFETY PLAN |
| D23 | A1 | DOCKING PLAN |
| D34 | - | DANGEROUS GOODS PLAN |
| S14 | - | CRANE FOUNDATION |
| S21 | A4 | MAST DETAIL |
| S40 | - | SWING DOWN THRUSTER MODULE |
| S41 | A1 | SWING DOWN THRUSTER INSTALLATION |
| S50 | - | RUDDER ARRANGEMENT |
| S52 | A1 | RUDDER STOP |
| S53A | - | TUNNEL STERN THRUSTER INSTALLATION |
| S53F | - | FWD TUNNEL THRUSTER INSTALLATION FWD |
| S56 | A2 | SIDEGATES |
| S58 | A1 | RUB RAILS/BUMPER INSTALLATION |
| S59 | A1 | CARGO RAILS |
| S61 | - | BILGE KEEL INSTALLATION |
| S63 | - | MAIN DECK HATCH |
| S66 | A1 | LOUVER ARRANGEMENT |
| S68 | A1 | LIFERAFT CRADLE |
| S74 | A1 | STRUT |
| S87 | - | TUGGER WINCH INSTALLATION |
| S99 | - | DECK EQUIPMENT ARRANGEMENT |
| S107 | A1 | MAIN ENGINE FOUNDATION |
| S112 | A4 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | A1 | GENERATOR FOUNDATION |
| S115 | A1 | SEACHEST ARRANGEMENT |
| S125 | A4 | ANCHOR ARRANGEMENT |
| S126 | - | RESCUE LIFEBOAT DAVIT |
| S299 | A1 | UNIT BREAKDOWN |
| O1 | A1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
| O3 | A3 | INTERIOR DOORS |
| O4 | B0 | EXTERIOR WT DOORS |
| O5 | A1 | MANHOLES & HATCHES |
| O6 | - | WINDOWS & SIDELIGHTS |

| HULL 249 GAVEA DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| O6YD | - | WINDOWS (YARD) |
| O7 | A1 | LADDERS & STAIRS |
| O9 | A1 | MOORING ARRANGEMENT |
| O10 | A1 | HANDRAILS |
| O11 | A2 | FLOOR PLATING |
| O12 | A1 | DECK BOARDS |
| O13 | - | ROOM NUMBERS |
| O14 | - | TRANSDUCER ARRANGEMENT |
| O18 | B1 | HULL MARKINGS (DRAFT) |
| O19 | A1 | ROPE GUARD |
| O20 | - | GANGWAY |
| O21 | - | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | - | JOINER CEILING ARRANGEMENT |
| O26 | B1 | ANODE PLACEMENT |
| O31 | A0 | NAVIGATION LIGHT ARRANGEMENT |
| O33 | A1 | LOAD LINE ASSIGNMENT |
| O34 | A1 | BUMPER TIRE ARRANGEMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | - | GRABRAILS |
| O40 | A2 | GALLEY STOVE EXHAUST SYSTEM |
| O41 | - | HVAC SYSTEM |
| O46 | B0 | VENTILATION SYSTEM |
| O49 | - | TANK LABELING ARRANGEMENT |
| O50 | A2 | PILOT HOUSE TOP LAYOUT |
| O53 | B1 | STACK LOGO LOCATION |
| O54 | A1 | NAME LOCATION |
| M1 | - | EXHAUST GAS SYSTEM |
| M2 | - | FUEL OIL SERVICE SYSTEM |
| M3 | B0 | FUEL OIL TRANSFER SYSTEM |
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | A2 | FRESH WATER COOLING SYSTEM |
| M8 | A1 | SEAWATER COOLING SYSTEM |
| M10 | B0 | BALLAST SYSTEM |
| M11 | C0 | BILGE SYSTEM |
| M12 | B0 | FIREMAIN SYSTEM |
| M13 | A0 | TANK SOUNDFAST SYSTEM |
| M14 | A1 | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | - | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | - | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | A1 | POTABLE WATER SYSTEM |
| M22 | - | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | - | FUEL OIL OVERFLOW SYSTEM |
| M25 | A0 | TANK & MISC VENT SYSTEM |
| M26 | A0 | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M29 | - | DRY BULK SYSTEM |
| M30 | - | DRILLING FLUID SYSTEM |
| M31 | - | LIQUID MUD TANK CLEANING SYSTEM |
| M37 | A0 | WEATHER DECK PIPE PENETRATIONS |
| M40 | - | MISCELLANEOUS PIPING SYSTEM |
| M41 | A0 | VESSEL FRAME DRAWINGS |
| M42 | A0 | USCG TRANSFER DRAWINGS |
| M51 | - | ENGINE CRANKCASE VENTILATION |
| M61 | | WATER-BASED FLUID SYSTEM |

| HULL 249 GAVEA DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| E2 | A1 | POWER ONE LINE |
| E3 | A1 | CABLEWAY LAYOUT |
| E4 | A1 | 480VAC DISTRIBUTION ONE LINE |
| E6 | A1 | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | A1 | 208/120VAC DISTRIBUTION LAYOUT |
| E8 | A1 | 24VDC DISTRIBUTION ONE LINE |
| E11 | | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E12 | | ELECTRICAL EQUIPMENT LAYOUT |
| E13 | A1 | GENERAL ALARM ONE LINE |
| E15 | A1 | SOUND-POWERED PHONE ONE LINE |
| E16 | A1 | CENTRAL COMMUNICATION ONE LINE |
| E19 | A1 | CONTROL ROOM CONSOLE LAYOUT |
| E21 | A1 | PILOT HOUSE CONSOLE LAYOUT |
| E34 | - | HAZARDOUS AREAS PLAN |
| E40 | A1 | CO2 ALARM SYSTEM ONE LINE |
| E43 | A1 | STEERING CONTROL ONE LINE |
| E53 | A1 | 6600VAC DISTRIBUTION ONE LINE |
| E54 | A1 | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | A1 | BILGE SYSTEM CONTROL ONE LINE |
| E109 | A1 | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | A1 | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | A1 | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | A1 | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | A1 | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | A1 | AUTOMATION I-O BOX ONE LINE |
| E129 | A1 | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | A1 | WIPER CONTROL ONE LINE |
| E131 | A1 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | A1 | STEREO ANTENNA ONE LINE |
| E14 | VOID | FIRE DETECTION AND ALARM ONE LINE |
| E35 | VOID | EMERGENCY STEERING PROCEDURES |
| E36YD | VOID | MISCELLANEOUS CONTROL PANELS |
| E68 | VOID | ENGINE ORDER TELEGRAPH ONE LINE |

**EXHIBIT A-12**
**VESSEL; WORK**

Vessel Name and Official Number: Grand Isle (O.N. 1250605)

**Work**

| HULL 284 GRAND ISLE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | B4 | |
| D3 | TANK PLAN | A2 | |
| D4 | MIDSHIP SECTION | A2 | |
| D9 | INSULATION PLAN | A7 | |
| D10 | MACHINERY ARRANGEMENT | A11 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A2 | |
| D20 | FIRE AND SAFETY PLAN | A5 | |
| D23 | DOCKING PLAN | A1 | |
| D26 | STATION BILL | - | |
| D34 | DANGEROUS GOODS PLAN | A1 | |

| HULL 284 GRAND ISLE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | A2 | |
| S21 | MAST DETAIL | A5 | |
| S47 | PROPULSION UNIT | A2 | |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A4 | |
| S54 | DROP DOWN THRUSTER INSTALLATION | A2 | |
| S56 | SIDEGATES | A1 | |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | |
| S59 | CARGO RAILS | A4 | |
| S61 | BILGE KEEL INSTALLATION | - | |
| S63 | MAIN DECK HATCH | A2 | |
| S66 | LOUVER ARRANGEMENT | A5 | |
| S68 | LIFERAFT CRADLE | A1 | |
| S87 | TUGGER WINCH INSTALLATION | A2 | |
| S89 | SIDE DOOR INSTALLATION | - | |
| S99 | DECK EQUIPMENT ARRANGEMENT | A0 | |
| S107 | MAIN ENGINE FOUNDATION | - | |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | |
| S113 | GENERATOR FOUNDATION | A1 | |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | |
| S115 | SEACHEST ARRANGEMENT | A2 | |
| S125 | ANCHOR ARRANGEMENT | A2 | |
| S126 | RESCUE LIFEBOAT DAVIT | - | |

| HULL 284 GRAND ISLE DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| O | Outfits | | |

## HULL 284 GRAND ISLE DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | |
| O3 | INTERIOR DOORS | A10 | |
| O4 | EXTERIOR WT DOORS | A6 | |
| O5 | MANHOLES & HATCHES | A5 | |
| O6 | WINDOWS & SIDELIGHTS | A4 | |
| O6YD | WINDOWS (YARD) | A5 | |
| O7 | LADDERS & STAIRS | A7 | |
| O9 | MOORING ARRANGEMENT | A3 | |
| O10 | HANDRAILS | A5 | |
| O11 | FLOOR PLATING | A5 | |
| O12 | DECK BOARDS | A3 | |
| O13 | ROOM NUMBERS | A3 | |
| O14 | TRANSDUCER ARRANGEMENT | A2 | |
| O18 | HULL MARKINGS (DRAFT) | A3 | |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | A1 | |
| O21 | JOINER WALL ARRANGEMENT | A2 | |
| O23 | JOINER CEILING ARRANGEMENT | A3 | |
| O26 | ANODE PLACEMENT | A1 | |
| O31 | NAVIGATION LIGHT ARRANGEMENT | - | |
| O33 | LOAD LINE ASSIGNMENT | - | |
| O34 | BUMPER TIRE ARRANGEMENT | - | |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | |
| O36 | GRABRAILS | A3 | |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A5 | |
| O38 | GALLEY LAYOUT | A2 | |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | |
| O46 | VENTILATION SYSTEM | A5 | |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A5 | |
| O50 | PILOT HOUSE TOP LAYOUT | A2 | |
| O53 | STACK LOGO LOCATION | A1 | |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | |

## HULL 284 GRAND ISLE DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A5 | |
| M2 | FUEL OIL SERVICE SYSTEM | A4 | |
| M3 | FUEL OIL TRANSFER SYSTEM | A6 | |
| M4 | LUBE OIL SERVICE SYSTEM | A1 | |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A2 | |
| M6 | FRESH WATER COOLING SYSTEM | A3 | |
| M10 | BALLAST SYSTEM | A3 | |
| M11 | BILGE SYSTEM | A7 | |
| M12 | FIRE MAIN SYSTEM | A3 | |
| M13 | TANK SOUNDFAST SYSTEM | A2 | |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | - | |
| M21 | POTABLE WATER SYSTEM | A3 | |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | |
| M25 | TANK AND MISC. VENT SYSTEM | A5 | |
| M26 | TANK LEVEL INDICATION SYSTEM | A2 | |
| M27 | WEATHER DECK DRAIN SYSTEM | - | |

## HULL 284 GRAND ISLE DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M29 | DRY BULK SYSTEM | A1 | |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | A6 | |
| M33 | FI-FI FIRE MONITOR SYSTEM | A2 | |
| M37 | WEATHER DECK PIPE PENETRATIONS | A1 | |
| M40 | MISC. PIPING SYSTEM | - | |
| M50 | HULL AND DECK PENETRATIONS | - | |
| M70 | CARGO FRESH WATER SYSTEM | A4 | |

## HULL 284 GRAND ISLE DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | A12 | |
| E3 | CABLEWAY LAYOUT | A3 | |
| E4 | 480VAC DISTRIBUTION ONE LINE | B1 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | B1 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A2 | |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B0 | |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A4 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A5 | |
| E13 | GENERAL ALARM ONE LINE | A6 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | |
| E16 | CENTRAL COMMUNICATION ONE LINE | A7 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A7 | |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A1 | |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A4 | |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A6 | |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | A1 | |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A3 | |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | |
| E53 | MV DISTRIBUTION ONE LINE | A7 | |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B1 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A6 | |
| E60 | WT DOORS / HATCH ONE LINE | A1 | |
| E62 | COMPUTER NETWORK DIAGRAM | - | |
| E65 | TV & ENTERTAINMENT SYSTEM | A4 | |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A5 | |
| E128 | AUTOMATION I/O BOX ONE LINE | A2 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A2 | |
| E133 | HORN & LIGHT JUNCTION BOXES | A4 | |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | - | |

**EXHIBIT A-13**
**VESSEL; WORK**

Vessel Name and Official Number: Horn Island (O.N. 1255030)

**Work**

| HULL 291 HORN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | D3 | |
| D3 | TANK PLAN | D0 | USE HULL 290 SHIP ISLAND |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP ISLAND |
| D9 | INSULATION PLAN | A7 | USE HULL 290 SHIP ISLAND |
| D10 | MACHINERY ARRANGEMENT | A1 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIP ISLAND |
| D20 | FIRE AND SAFETY PLAN | A4 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | |
| D34 | DANGEROUS GOODS PLAN | - | |

| HULL 291 HORN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP ISLAND |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP ISLAND |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP ISLAND |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S63 | MAIN DECK HATCH | - | USE HULL 290 SHIP ISLAND |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP ISLAND |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIP ISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP ISLAND |
| S113 | GENERATOR FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S115 | SEACHEST ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| S125 | ANCHOR ARRANGEMENT | A4 | USE HULL 290 SHIP ISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP ISLAND |

| HULL 291 HORN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| O | Outfits | | |

## HULL 291 HORN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIP ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP ISLAND |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP ISLAND |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIP ISLAND |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP ISLAND |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP ISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP ISLAND |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP ISLAND |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP ISLAND |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP ISLAND |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A4 | USE HULL 290 SHIP ISLAND |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP ISLAND |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | USE HULL 290 SHIP ISLAND |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIP ISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP ISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP ISLAND |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP ISLAND |

## HULL 291 HORN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | A1 | |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIP ISLAND |
| M10 | BALLAST SYSTEM | B2 | USE HULL 290 SHIP ISLAND |
| M11 | BILGE SYSTEM | C0 | USE HULL 290 SHIP ISLAND |
| M12 | FIRE MAIN SYSTEM | B0 | USE HULL 290 SHIP ISLAND |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIP ISLAND |

| HULL 291 HORN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIP ISLAND |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIP ISLAND |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | D0 | USE HULL 290 SHIP ISLAND |

| HULL 291 HORN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| E | Electrical | | |
| E2 | LV POWER ONE LINE | C0 | USE HULL 290 SHIP ISLAND |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIP ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | - | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | USE HULL 290 SHIP ISLAND |
| E13 | GENERAL ALARM ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | A5 | USE HULL 290 SHIP ISLAND |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIP ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIP ISLAND |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIP ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | USE HULL 290 SHIP ISLAND |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | - | |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIP ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E128 | AUTOMATION I/O BOX ONE LINE | A10 | USE HULL 290 SHIP ISLAND |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIP ISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIP ISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP ISLAND |

**EXHIBIT A-14**
**VESSEL; WORK**

Vessel Name and Official Number: Jackie Chouest (O.N. 1210979)

**Work**

| HULL 248 JACKIE CHOUEST DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D1 | A2 | LINES PLAN |
| D2 | D2 | GENERAL ARRANGEMENT |
| D3 | A2 | TANK CAPACITY PLAN |
| D5 | A1 | PROFILES & DECKS |
| D6 | A3 | SHELL EXPANSION |
| D6YD | A2 | SHELL EXPANSION SEAM LOCATIONS |
| D8 | A1 | FIRE INTEGRITY |
| D9 | A4 | INSULATION PLAN |
| D9M | A1 | MASCOAT PLAN |
| D10 | A2 | MACHINERY ARRANGEMENT |
| D12 | A2 | SHAFT ARRANGEMENT |
| D15 | B1 | UNDERWATER INSPECTION MARKING PLAN |
| D16 | A1 | TYPICAL SECTIONS |
| D16S | A1 | DECK HOUSE TYPICAL SECTIONS |
| D20 | F0 | FIRE & SAFETY PLAN |
| D23 | B1 | DOCKING PLAN |
| D26 | A1 | STATION BILL |
| D34 | A0 | DANGEROUS GOODS PLAN |
| S14 | A1 | CRANE FOUNDATION |
| S21 | A5 | MAST DETAIL |
| S41 | A1 | SWING DOWN THRUSTER INSTALLATION |
| S50 | A1 | RUDDER ARRANGEMENT |
| S52 | A2 | RUDDER STOP |
| S53A | A3 | TUNNEL STERN THRUSTER INSTALLATION |
| S53F | A2 | FWD TUNNEL THRUSTER INSTALLATION FWD |
| S56 | A1 | SIDEGATES |
| S58 | A2 | RUB RAILS/BUMPER INSTALLATION |
| S59 | A2 | CARGO RAILS |
| S61 | A1 | BILGE KEEL INSTALLATION |
| S63 | A1 | MAIN DECK HATCH |
| S66 | A2 | LOUVER ARRANGEMENT |
| S68 | A2 | LIFERAFT CRADLE |
| S74 | A2 | STRUT |
| S87 | A3 | TUGGER WINCH INSTALLATION |
| S99 | J0 | DECK EQUIPMENT ARRANGEMENT |
| S107 | A2 | MAIN ENGINE FOUNDATION |
| S112 | A4 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | A2 | GENERATOR FOUNDATION |
| S114 | A1 | FIRE MONITOR PUMP FOUNDATION |
| S115 | B1 | SEACHEST ARRANGEMENT |
| S125 | A4 | ANCHOR ARRANGEMENT |
| S126 | A1 | RESCUE LIFEBOAT DAVIT |
| S166 | A1 | INDEPENDENT TANK STAND ARRANGEMENT |
| S299 | A3 | UNIT BREAKDOWN |
| O1 | A1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |

| HULL 248 JACKIE CHOUEST DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| O3 | A3 | INTERIOR DOORS |
| O4 | A3 | EXTERIOR WT DOORS |
| O5 | A2 | MANHOLES & HATCHES |
| O6 | A1 | WINDOWS & SIDELIGHTS |
| O6YD | A2 | WINDOWS (YARD) |
| O7 | A4 | LADDERS & STAIRS |
| O9 | A2 | MOORING ARRANGEMENT |
| O10 | A5 | HANDRAILS |
| O11 | B1 | FLOOR PLATING |
| O12 | A2 | DECK BOARDS |
| O13 | A2 | ROOM NUMBERS |
| O14 | A1 | TRANSDUCER ARRANGEMENT |
| O18 | A1 | HULL MARKINGS (DRAFT) |
| O19 | A3 | ROPE GUARD |
| O20 | A3 | GANGWAY |
| O21 | A1 | JOINER WALL ARRANGEMENT |
| O22 | A1 | JOINER CONNECTION DETAILS |
| O23 | A1 | JOINER CEILING ARRANGEMENT |
| O26 | A4 | ANODE PLACEMENT |
| O31 | A1 | NAVIGATION LIGHT ARRANGEMENT |
| O33 | A3 | LOAD LINE ASSIGNMENT |
| O34 | A2 | BUMPER TIRE ARRANGEMENT |
| O35 | A1 | NAVIGATION BRIDGE VISIBILITY |
| O36 | A3 | GRABRAILS |
| O40 | A3 | GALLEY STOVE EXHAUST SYSTEM |
| O41 | A2 | HVAC SYSTEM |
| O46 | B0 | VENTILATION SYSTEM |
| O46HA | B0 | VENTILATION SYSTEM |
| O49 | A1 | TANK LABELING ARRANGEMENT |
| O50 | B1 | PILOT HOUSE TOP LAYOUT |
| O53 | A2 | STACK LOGO LOCATION |
| O54 | B0 | NAME LOCATION |
| M1 | A1 | EXHAUST GAS SYSTEM |
| M2 | A4 | FUEL OIL SERVICE SYSTEM |
| M3 | A3 | FUEL OIL TRANSFER SYSTEM |
| M4 | A1 | LUBE OIL SERVICE SYSTEM |
| M5 | A1 | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | A2 | FRESH WATER COOLING SYSTEM |
| M8 | A1 | SEAWATER COOLING SYSTEM |
| M10 | A1 | BALLAST SYSTEM |
| M11 | A2 | BILGE SYSTEM |
| M12 | A1 | FIREMAIN SYSTEM |
| M13 | A2 | TANK SOUNDFAST SYSTEM |
| M14 | B1 | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | A1 | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | A3 | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | A1 | POTABLE WATER SYSTEM |
| M22 | A1 | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | A2 | FUEL OIL OVERFLOW SYSTEM |
| M25 | B1 | TANK & MISC VENT SYSTEM |
| M26 | A2 | TANK LEVEL INDICATION SYSTEM |
| M27 | A1 | WEATHER DECK DRAIN SYSTEM |
| M29 | A1 | DRY BULK SYSTEM |
| M30 | A1 | DRILLING FLUID SYSTEM |
| M31 | A1 | LIQUID MUD TANK CLEANING SYSTEM |
| M33 | - | FIRE MONITOR SYSTEM |

| HULL 248 JACKIE CHOUEST DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| M37 | B1 | WEATHER DECK PIPE PENETRATIONS |
| M40 | A1 | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M51 | A1 | ENGINE CRANKCASE VENTILATION |
| M61 | - | WATER-BASED FLUID SYSTEM |
| E1 | | ELECTRICAL LOAD ANALYSIS |
| E2 | A1 | POWER ONE LINE |
| E3 | - | CABLEWAY LAYOUT |
| E4 | A1 | 480VAC DISTRIBUTION ONE LINE |
| E6 | A0 | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | A0 | 208/120VAC DISTRIBUTION LAYOUT |
| E8 | A0 | 24VDC DISTRIBUTION ONE LINE |
| E11 | - | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E13 | A0 | GENERAL ALARM ONE LINE |
| E15 | - | SOUND-POWERED PHONE ONE LINE |
| E16 | A0 | CENTRAL COMMUNICATION ONE LINE |
| E19 | - | CONTROL ROOM CONSOLE LAYOUT |
| E21 | - | PILOT HOUSE CONSOLE LAYOUT |
| E34 | F0 | HAZARDOUS AREAS PLAN |
| E35 | - | EMERGENCY STEERING PROCEDURES |
| E36YD | - | MISCELLANEOUS CONTROL PANELS |
| E40 | - | CO2 ALARM SYSTEM ONE LINE |
| E43 | - | STEERING CONTROL ONE LINE |
| E53 | - | 6600VAC DISTRIBUTION ONE LINE |
| E54 | - | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | - | BILGE SYSTEM CONTROL ONE LINE |
| E109 | - | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | - | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | - | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | - | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | - | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | | AUTOMATION I-O BOX ONE LINE |
| E129 | - | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | - | WIPER CONTROL ONE LINE |
| E131 | - | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | - | STEREO ANTENNA ONE LINE |

**EXHIBIT A-15**
**VESSEL; WORK**

Vessel Name and Official Number: Kirt Chouest (O.N. 1213707)


**Work**

| HULL 239 KIRT CHOUEST DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D2 | D0 | GENERAL ARRANGEMENT |
| D3 | A3 | TANK CAPACITY PLAN |
| D5A | - | PROFILES & DECKS AFT |
| D5F | - | PROFILES & DECKS FWD |
| D5M | - | PROFILES & DECKS MID |
| D5S | - | PROFILES & DECKS SUPERSTRUCTURE |
| D6 | | SHELL EXPANSION |
| D8 | A0 | FIRE INTEGRITY |
| D9 | A3 | INSULATION PLAN |
| D9LQ | A0 | INSULATION PLAN |
| D9M | - | MASCOAT PLAN |
| D9MLQ | A0 | THERMAL & ACOUSTIC COATING |
| D10 | A2 | MACHINERY ARRANGEMENT |
| D12 | A4 | SHAFT ARRANGEMENT |
| D15 | A1 | UNDERWATER INSPECTION MARKING PLAN |
| D16A | - | TYPICAL SECTIONS AFT |
| D16F | - | TYPICAL SECTIONS FWD |
| D16M | - | TYPICAL SECTIONS MID |
| D16S | - | DECK HOUSE TYPICAL SECTIONS |
| D20 | G0 | FIRE & SAFETY PLAN |
| D23 | A1 | DOCKING PLAN |
| S14 | A0 | CRANE FOUNDATION |
| S21 | - | MAST DETAIL |
| S41 | - | SWING DOWN THRUSTER INSTALLATION |
| S49 | - | KORT NOZZLES |
| S50 | - | RUDDER ARRANGEMENT |
| S53A | | TUNNEL STERN THRUSTER INSTALLATION |
| S55YD | - | REMOVABLE BULWARKS |
| S59 | A2 | CARGO RAILS |
| S66 | - | LOUVER ARRANGEMENT |
| S68 | A0 | LIFERAFT CRADLE |
| S74 | - | STRUT |
| S85 | B0 | ROV PLATFORM |
| S87 | - | TUGGER WINCH INSTALLATION |
| S99 | D0 | DECK EQUIPMENT ARRANGEMENT |
| S112 | A2 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | A1 | GENERATOR FOUNDATION |
| S115 | | SEACHEST ARRANGEMENT |
| S116 | A1 | TOWING WINCH PUMP FOUNDATION |
| S125 | - | ANCHOR ARRANGEMENT |
| S126 | | RESCUE LIFEBOAT DAVIT |
| S126A | | WORKBOAT DAVIT |
| S130 | A2 | STERN ROLLER |
| S299 | | UNIT BREAKDOWN |
| O1 | | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |

## HULL 239 KIRT CHOUEST DRAWING LIST

| Drawing | Rev | Drawing Title |
|---------|-----|---------------|
| O3 | - | INTERIOR DOORS |
| O3LQ | A0 | INTERIOR DOORS |
| O4 | A4 | EXTERIOR WT DOORS |
| O4LQ | A0 | EXTERIOR WT DOORS |
| O5 | - | MANHOLES & HATCHES |
| O6 | | WINDOWS & SIDELIGHTS |
| O6YD | | WINDOWS (YARD) |
| O7 | A2 | LADDERS & STAIRS |
| O9 | - | MOORING ARRANGEMENT |
| O10 | - | HANDRAILS |
| O10LQ | A0 | HANDRAILS |
| O11 | - | FLOOR PLATING |
| O12 | | DECK BOARDS |
| O13 | | ROOM NUMBERS |
| O13LQ | A0 | ROOM NUMBERS |
| O14 | A1 | TRANSDUCER ARRANGEMENT |
| O18 | - | HULL MARKINGS (DRAFT) |
| O19 | - | ROPE GUARD |
| O20 | A1 | GANGWAY |
| O21 | | JOINER WALL ARRANGEMENT |
| O21LQ | A0 | JOINER WALL ARRANGEMENT |
| O22 | | JOINER CONNECTION DETAILS |
| O23 | | JOINER CEILING ARRANGEMENT |
| O23LQ | A0 | JOINER CEILING ARRANGEMENT |
| O26 | | ANODE PLACEMENT |
| O28 | - | FIXED BALLAST INSTALLATION |
| O31 | - | NAVIGATION LIGHT ARRANGEMENT |
| O33 | | LOAD LINE ASSIGNMENT |
| O34 | | BUMPER TIRE ARRANGEMENT |
| O35 | | NAVIGATION BRIDGE VISIBILITY |
| O36 | | GRABRAILS |
| O40 | | GALLEY STOVE EXHAUST SYSTEM |
| O41 | | HVAC SYSTEM |
| O46 | - | VENTILATION SYSTEM |
| O49 | | TANK LABELING ARRANGEMENT |
| O50 | | PILOT HOUSE TOP LAYOUT |
| O50LQ | | PILOT HOUSE TOP LAYOUT |
| O53 | | STACK LOGO LOCATION |
| O54 | - | NAME LOCATION |
| M1 | - | EXHAUST GAS SYSTEM |
| M2 | A3 | FUEL OIL SERVICE SYSTEM |
| M3 | A2 | FUEL OIL TRANSFER SYSTEM |
| M4 | | LUBE OIL SERVICE SYSTEM |
| M5 | A2 | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | - | FRESH WATER COOLING SYSTEM |
| M8 | C0 | SEAWATER COOLING SYSTEM |
| M10 | A2 | BALLAST SYSTEM |
| M11 | A1 | BILGE SYSTEM |
| M12 | B0 | FIREMAIN SYSTEM |
| M13 | A1 | TANK SOUNDFAST SYSTEM |
| M14 | A1 | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M19 | A0 | AUXILIARY HYDRAULIC OIL SYSTEM |
| M21 | B0 | POTABLE WATER SYSTEM |
| M22 | C0 | GRAY, BLACK & SANITARY WATER SYSTEM |

## HULL 239 KIRT CHOUEST DRAWING LIST

| Drawing | Rev | Drawing Title |
|---------|-----|---------------|
| M24 | A1 | FUEL OIL OVERFLOW SYSTEM |
| M25 | B0 | TANK & MISC VENT SYSTEM |
| M26 | A1 | TANK LEVEL INDICATION SYSTEM |
| M27 | A2 | WEATHER DECK DRAIN SYSTEM |
| M29 | | DRY BULK SYSTEM |
| M30 | A1 | DRILLING FLUID SYSTEM |
| M31 | | LIQUID MUD TANK CLEANING SYSTEM |
| M35 | | METHANOL TRANSFER SYSTEM |
| M37 | A1 | WEATHER DECK PIPE PENETRATIONS |
| M40 | | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M42 | | USCG TRANSFER DRAWINGS |
| M51 | - | ENGINE CRANKCASE VENTILATION |
| E1 | D0 | ELECTRICAL LOAD ANALYSIS |
| E2 | D0 | POWER ONE LINE |
| E3 | A1 | CABLEWAY LAYOUT |
| E4 | D0 | 480VAC DISTRIBUTION ONE LINE |
| E6 | F0 | 208/120VAC DISTRIBUTION ONE LINE |
| E7H | B0 | 208 120VAC HEATING ARRANGEMENT |
| E7L | E0 | 208/120VAC LIGHTING ARRANGEMENT |
| E7R | B0 | 208/120VAC RECEPTICLE ARRANGEMENT |
| E8 | C0 | 24VDC DISTRIBUTION ONE LINE |
| E9 | - | CRANE / DECK TUGGER CONTROL ONE LINE |
| E11 | A1 | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E12 | | ELECTRICAL EQUIPMENT LAYOUT |
| E13 | D0 | GENERAL ALARM ONE LINE |
| E14 | | FIRE DETECTION AND ALARM ONE LINE |
| E15 | A1 | SOUND-POWERED PHONE ONE LINE |
| E16 | D0 | CENTRAL COMMUNICATION ONE LINE |
| E19 | A1 | CONTROL ROOM CONSOLE LAYOUT |
| E21 | A2 | PILOT HOUSE CONSOLE LAYOUT |
| E34 | D0 | HAZARDOUS AREAS PLAN |
| E35 | | EMERGENCY STEERING PROCEDURES |
| E36YD | | MISCELLANEOUS CONTROL PANELS |
| E37YD | A2 | HYDRAULIC WATERTIGHT DOOR ONE LINE |
| E40 | A2 | CO2 ALARM SYSTEM ONE LINE |
| E43 | A3 | STEERING CONTROL ONE LINE |
| E45 | A1 | VENTILATION SYSTEM CONTROL ONE LINE |
| E51 | B1 | VIDEO MONITORING SYSTEM ONE LINE |
| E54 | B0 | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | A2 | BILGE SYSTEM CONTROL ONE LINE |
| E60 | A4 | WATERTIGHT DOOR/HATCH CONTROL ONE LINE |
| E62 | A1 | COMPUTER NETWORK SYSTEM ONE LINE |
| E65 | A2 | TV & ENTERTAINMENT SYSTEM |
| E68 | A2 | ENGINE ORDER TELEGRAPH ONE LINE |
| E109 | A1 | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | A3 | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | A2 | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | | AUTOMATION I-O BOX ONE LINE |
| E129 | A4 | AUTOMATED FLOOD AND DECK LIGHTS |
| E129YD | A2 | FLOOD AND DECK LIGHTS |
| E130 | A2 | WIPER CONTROL ONE LINE |
| E131 | A2 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | A1 | STEREO ANTENNA ONE LINE |

| HULL 239 KIRT CHOUEST DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| E133 | A2 | ASI VALVE ONE LINE |
| E134 | A2 | JRC ELECTRONICS ONE LINE |
| E136 | A1 | CAPTAINS WATCH ONE LINE |
| E137 | A3 | VDR ONE LINE |

**EXHIBIT A-16**
**VESSEL; WORK**

Vessel Name and Official Number: Lyman Martin (O.N. 1227085)

**Work**

| HULL 269 LYMAN MARTIN DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D2 | A1 | GENERAL ARRANGEMENT |
| D3 | - | TANK CAPACITY PLAN |
| D6 | - | SHELL EXPANSION |
| D6YD | - | SHELL EXPANSION SEAM LOCATIONS |
| D8 | - | FIRE INTEGRITY |
| D9 | - | INSULATION PLAN |
| D9M | A1 | MASCOAT PLAN |
| D10 | A3 | MACHINERY ARRANGEMENT |
| D12 | - | SHAFT ARRANGEMENT |
| D15 | - | UNDERWATER INSPECTION MARKING PLAN |
| D20 | C0 | FIRE & SAFETY PLAN |
| D23 | - | DOCKING PLAN |
| D34 | | DANGEROUS GOODS PLAN |
| S14 | A1 | CRANE FOUNDATION |
| S21 | - | MAST DETAIL |
| S40 | - | SWING DOWN THRUSTER MODULE |
| S41 | A1 | SWING DOWN THRUSTER INSTALLATION |
| S50 | A1 | RUDDER ARRANGEMENT |
| S52 | - | RUDDER STOP |
| S53A | A2 | TUNNEL STERN THRUSTER INSTALLATION AFT |
| S53F | A2 | FWD TUNNEL THRUSTER INSTALLATION FWD |
| S56 | A1 | SIDEGATES |
| S58 | - | RUB RAILS/BUMPER INSTALLATION |
| S59 | - | CARGO RAILS |
| S61 | - | BILGE KEEL INSTALLATION |
| S63 | A1 | MAIN DECK HATCH |
| S66 | - | LOUVER ARRANGEMENT |
| S68 | - | LIFERAFT CRADLE |
| S72 | - | GEAR BOX FOUNDATION |
| S74 | - | STRUT |
| S87 | A1 | TUGGER WINCH INSTALLATION |
| S107 | - | MAIN ENGINE FOUNDATION |
| S112 | A1 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | A1 | GENERATOR FOUNDATION |
| S114 | - | FIRE MONITOR PUMP FOUNDATION |
| S115 | - | SEACHEST ARRANGEMENT |
| S125 | A1 | ANCHOR ARRANGEMENT |
| S126 | - | RESCUE LIFEBOAT DAVIT |
| S299 | - | UNIT BREAKDOWN |
| O1 | A1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
| O3 | - | INTERIOR DOORS |
| O4 | - | EXTERIOR WT DOORS |
| O5 | A1 | MANHOLES & HATCHES |
| O6 | - | WINDOWS & SIDELIGHTS |
| O6YD | - | WINDOWS (YARD) |

| HULL 269 LYMAN MARTIN DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| O7 | - | LADDERS & STAIRS |
| O9 | A2 | MOORING ARRANGEMENT |
| O10 | A1 | HANDRAILS |
| O11 | A1 | FLOOR PLATING |
| O12 | A1 | DECK BOARDS |
| O13 | - | ROOM NUMBERS |
| O14 | A1 | TRANSDUCER ARRANGEMENT |
| O18 | - | HULL MARKINGS (DRAFT) |
| O19 | - | ROPE GUARD |
| O20 | - | GANGWAY |
| O21 | - | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | - | JOINER CEILING ARRANGEMENT |
| O26 | - | ANODE PLACEMENT |
| O31 | - | NAVIGATION LIGHT ARRANGEMENT |
| O33 | - | LOAD LINE ASSIGNMENT |
| O34 | - | BUMPER TIRE ARRANGEMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | A1 | GRABRAILS |
| O46 | A2 | VENTILATION SYSTEM |
| O50 | A1 | PILOT HOUSE TOP LAYOUT |
| O53 | - | STACK LOGO LOCATION |
| O54 | - | NAME LOCATION |
| M1 | - | EXHAUST GAS SYSTEM |
| M2 | A1 | FUEL OIL SERVICE SYSTEM |
| M3 | A1 | FUEL OIL TRANSFER SYSTEM |
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | - | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | A1 | FRESH WATER COOLING SYSTEM |
| M8 | - | SEAWATER COOLING SYSTEM |
| M10 | - | BALLAST SYSTEM |
| M11 | A1 | BILGE SYSTEM |
| M12 | A1 | FIREMAIN SYSTEM |
| M13 | - | TANK SOUNDFAST SYSTEM |
| M14 | - | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | - | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | - | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | - | POTABLE WATER SYSTEM |
| M22 | - | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | - | FUEL OIL OVERFLOW SYSTEM |
| M25 | - | TANK & MISC VENT SYSTEM |
| M26 | - | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M29 | - | DRY BULK SYSTEM |
| M30 | | DRILLING FLUID SYSTEM |
| M31 | - | LIQUID MUD TANK CLEANING SYSTEM |
| M33 | - | FIRE MONITOR SYSTEM |
| M35 | | METHANOL TRANSFER SYSTEM |
| M37 | - | WEATHER DECK PIPE PENETRATIONS |
| M40 | - | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M42 | | USCG TRANSFER DRAWINGS |
| M49 | - | TANK LABELING ARRANGMENT |
| M50 | | HULL AND DECK PENETRATIONS |
| M51 | - | ENGINE CRANKCASE VENTILATION |
| M61 | - | WATER MIST FLUID SYSTEM |

| HULL 269 LYMAN MARTIN DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| E2 | A2 | POWER ONE LINE |
| E3 | - | CABLEWAY LAYOUT |
| E4 | A2 | 480VAC DISTRIBUTION ONE LINE |
| E6 | - | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | A1 | 208/120VAC DISTRIBUTION LAYOUT |
| E8 | A1 | 24VDC DISTRIBUTION ONE LINE |
| E11 | - | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E13 | - | GENERAL ALARM ONE LINE |
| E14 | - | FIRE DETECTION AND ALARM ONE LINE |
| E15 | A2 | SOUND-POWERED PHONE ONE LINE |
| E16 | A4 | CENTRAL COMMUNICATION ONE LINE |
| E19 | - | CONTROL ROOM CONSOLE LAYOUT |
| E21 | - | PILOT HOUSE CONSOLE LAYOUT |
| E35 | - | EMERGENCY STEERING PROCEDURES |
| E36YD | - | MISCELLANEOUS CONTROL PANELS |
| E40 | - | CO2 ALARM SYSTEM ONE LINE |
| E43 | - | STEERING CONTROL ONE LINE |
| E53 | - | 6600VAC DISTRIBUTION ONE LINE |
| E54 | - | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | A2 | BILGE SYSTEM CONTROL ONE LINE |
| E109 | - | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | - | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | - | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | - | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | - | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | - | AUTOMATION I-O BOX ONE LINE |
| E129 | A1 | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | A1 | WIPER CONTROL ONE LINE |
| E131 | - | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | - | STEREO ANTENNA ONE LINE |

**EXHIBIT A-17**
**VESSEL; WORK**

Vessel Name and Official Number: Marsh Island (O.N. 1266925)

**Work**

| HULL 302 MARSH ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | D3 | |
| D3 | TANK PLAN | D0 | USE HULL 290 SHIP |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP |
| D9 | INSULATION PLAN | A7 | USE HULL 290 SHIP |
| D10 | MACHINERY ARRANGEMENT | - | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIP |
| D20 | FIRE AND SAFETY PLAN | D0 | USE HULL 290 SHIP |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | USE HULL 290 SHIP |
| D34 | DANGEROUS GOODS PLAN | - | |

| HULL 302 MARSH ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 290 SHIP |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIP |
| S63 | MAIN DECK HATCH | - | USE HULL 290 SHIP |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 290 SHIP |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIP |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP |
| S113 | GENERATOR FOUNDATION | - | USE HULL 290 SHIP |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 290 SHIP |
| S115 | SEACHEST ARRANGEMENT | A1 | USE HULL 290 SHIP |
| S125 | ANCHOR ARRANGEMENT | A4 | USE HULL 290 SHIP |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP |

| HULL 302 MARSH ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| O | Outfits | | |

## HULL 302 MARSH ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIP |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIP |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP |
| O18 | HULL MARKINGS (DRAFT) | - | |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | USE HULL 290 SHIP |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIP |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP |
| O54 | NAME LOCATION | A1 | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP |

## HULL 302 MARSH ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP |
| M2 | FUEL OIL SERVICE SYSTEM | - | USE HULL 290 SHIP |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIP |
| M10 | BALLAST SYSTEM | B2 | USE HULL 290 SHIP |
| M11 | BILGE SYSTEM | C0 | USE HULL 290 SHIP |
| M12 | FIRE MAIN SYSTEM | B0 | USE HULL 290 SHIP |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIP |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIP |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIP |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIP |

## HULL 302 MARSH ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIP |
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIP |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIP |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP |
| M70 | CARGO FRESH WATER SYSTEM | D0 | USE HULL 290 SHIP |

## HULL 302 MARSH ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | C0 | USE HULL 290 SHIP |
| E3 | CABLEWAY LAYOUT | A1 | |
| E4 | 480VAC DISTRIBUTION ONE LINE | - | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | A5 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | - | |
| E13 | GENERAL ALARM ONE LINE | - | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | - | |
| E16 | CENTRAL COMMUNICATION ONE LINE | A1 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIP |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A1 | |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | USE HULL 290 SHIP |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIP |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | - | |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP |
| E53 | MV DISTRIBUTION ONE LINE | A2 | USE HULL 290 SHIP |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | A1 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | USE HULL 290 SHIP |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIP |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A1 | |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | - | |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | - | |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | - | |
| E128 | AUTOMATION I/O BOX ONE LINE | A1 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIP |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIP |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIP |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP |

**EXHIBIT A-18**
**VESSEL; WORK**

Vessel Name and Official Number: Mr. Sidney (O.N. 1216539)

## Work

| HULL 252 MR. SIDNEY DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D2 | B0 | GENERAL ARRANGEMENT |
| D3 | B0 | TANK CAPACITY PLAN |
| D5 | | PROFILES & DECKS |
| D8 | - | FIRE INTEGRITY |
| D9 | A5 | INSULATION PLAN |
| D9M | - | MASCOAT PLAN |
| D10 | A4 | MACHINERY ARRANGEMENT |
| D12 | - | SHAFT ARRANGEMENT |
| D15 | B0 | UNDERWATER INSPECTION MARKING PLAN |
| D16 | | TYPICAL SECTIONS |
| D20 | D0 | FIRE & SAFETY PLAN |
| D23 | A3 | DOCKING PLAN |
| D26 | | STATION BILL |
| D34 | - | DANGEROUS GOODS PLAN |
| D35 | A0 | HAZARDOUS CARGO ARRANGEMENT |
| D36 | B0 | DAMAGE CONTROL PLAN |
| S14 | - | CRANE FOUNDATION |
| S21 | A3 | MAST DETAIL |
| S40 | - | SWING DOWN THRUSTER MODULE |
| S41 | A1 | SWING DOWN THRUSTER INSTALLATION |
| S43 | A0 | OIL RECOVERY PLATFORM/EQUIPMENT ARRANGEMENT |
| S50 | B1 | RUDDER ARRANGEMENT |
| S52 | - | RUDDER STOP |
| S53A | A1 | TUNNEL STERN THRUSTER INSTALLATION |
| S53F | A1 | FWD TUNNEL THRUSTER INSTALLATION FWD |
| S55 | A0 | BULWARKS |
| S56 | - | SIDEGATES |
| S58 | - | RUB RAILS/BUMPER INSTALLATION |
| S59 | - | CARGO RAILS |
| S61 | - | BILGE KEEL INSTALLATION |
| S63 | - | MAIN DECK HATCH |
| S66 | A1 | LOUVER ARRANGEMENT |
| S68 | A2 | LIFERAFT CRADLE |
| S72 | - | GEAR BOX FOUNDATION |
| S74 | - | STRUT |
| S87 | A1 | TUGGER WINCH INSTALLATION |
| S99 | - | DECK EQUIPMENT ARRANGEMENT |
| S107 | - | MAIN ENGINE FOUNDATION |
| S112 | A1 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | A1 | GENERATOR FOUNDATION |
| S114 | A3 | FIRE MONITOR PUMP FOUNDATION |
| S115 | B0 | SEACHEST ARRANGEMENT |
| S125 | A2 | ANCHOR ARRANGEMENT |
| S126 | - | RESCUE LIFEBOAT DAVIT |
| S130 | | STERN ROLLER |

| HULL 252 MR. SIDNEY DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| S299 | - | UNIT BREAKDOWN |
| O1 | A1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
| O3 | - | INTERIOR DOORS |
| O4 | A1 | EXTERIOR WT DOORS |
| O5 | D0 | MANHOLES & HATCHES |
| O6 | A1 | WINDOWS & SIDELIGHTS |
| O6YD | - | WINDOWS (YARD) |
| O7 | B0 | LADDERS & STAIRS |
| O9 | A2 | MOORING ARRANGEMENT |
| O10 | A2 | HANDRAILS |
| O11 | A2 | FLOOR PLATING |
| O12 | A3 | DECK BOARDS |
| O13 | A1 | ROOM NUMBERS |
| O14 | A1 | TRANSDUCER ARRANGEMENT |
| O18 | A3 | HULL MARKINGS (DRAFT) |
| O19 | A1 | ROPE GUARD |
| O20 | - | GANGWAY |
| O21 | - | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | - | JOINER CEILING ARRANGEMENT |
| O26 | B0 | ANODE PLACEMENT |
| O31 | - | NAVIGATION LIGHT ARRANGEMENT |
| O33 | - | LOAD LINE ASSIGNMENT |
| O34 | - | BUMPER TIRE ARRANGEMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | A1 | GRABRAILS |
| O46 | A1 | VENTILATION SYSTEM |
| O50 | B0 | PILOT HOUSE TOP LAYOUT |
| O53 | - | STACK LOGO LOCATION |
| O54 | A0 | NAME LOCATION |
| O60 | A0 | FOAM DISPERSANT BOOM |
| M1 | - | EXHAUST GAS SYSTEM |
| M2 | B0 | FUEL OIL SERVICE SYSTEM |
| M3 | C0 | FUEL OIL TRANSFER SYSTEM |
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | A0 | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | A0 | FRESH WATER COOLING SYSTEM |
| M8 | - | SEAWATER COOLING SYSTEM |
| M10 | A0 | BALLAST SYSTEM |
| M11 | A0 | BILGE SYSTEM |
| M12 | A0 | FIREMAIN SYSTEM |
| M13 | B0 | TANK SOUNDFAST SYSTEM |
| M14 | A0 | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | B0 | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | - | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | B0 | POTABLE WATER SYSTEM |
| M22 | - | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | A0 | FUEL OIL OVERFLOW SYSTEM |
| M25 | B0 | TANK & MISC VENT SYSTEM |
| M26 | B0 | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M28 | A0 | CARGO FUEL OIL SYSTEM |
| M29 | A1 | DRY BULK SYSTEM |
| M30 | CY1 | DRILLING FLUID SYSTEM |
| M31 | A0 | LIQUID MUD TANK CLEANING SYSTEM |
| M33 | - | FIRE MONITOR SYSTEM |

## HULL 252 MR. SIDNEY DRAWING LIST

| Drawing | Rev | Drawing Title |
|---|---|---|
| M37 | B0 | WEATHER DECK PIPE PENETRATIONS |
| M40 | - | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M42 | | USCG TRANSFER DRAWINGS |
| M49 | A1 | TANK LABELING ARRANGEMENT |
| M51 | - | ENGINE CRANKCASE VENTILATION |
| M58 | A0 | RECOVERY OIL ARRANGEMENT |
| M61 | - | WATER-BASED FLUID SYSTEM |
| M72 | A0 | CARGO POTABLE WATER |
| E1 | B0 | ELECTRICAL LOAD ANALYSIS |
| E2 | C0 | POWER ONE LINE |
| E3 | - | CABLEWAY LAYOUT |
| E4 | B0 | 480VAC DISTRIBUTION ONE LINE |
| E6 | C1 | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | A0 | 208/120VAC DISTRIBUTION LAYOUT |
| E8 | C1 | 24VDC DISTRIBUTION ONE LINE |
| E11 | A1 | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E12 | - | ELECTRICAL EQUIPMENT LAYOUT |
| E13 | - | GENERAL ALARM ONE LINE |
| E14 | - | FIRE DETECTION AND ALARM ONE LINE |
| E15 | - | SOUND-POWERED PHONE ONE LINE |
| E16 | A1 | CENTRAL COMMUNICATION ONE LINE |
| E19 | A2 | CONTROL ROOM CONSOLE LAYOUT |
| E21 | A1 | PILOT HOUSE CONSOLE LAYOUT |
| E34 | A1 | HAZARDOUS AREAS PLAN |
| E35 | - | EMERGENCY STEERING PROCEDURES |
| E36YD | A3 | MISCELLANEOUS CONTROL PANELS |
| E40 | - | CO2 ALARM SYSTEM ONE LINE |
| E43 | - | STEERING CONTROL ONE LINE |
| E47 | - | METHANOL SYSTEM CONTROL ONE LINE |
| E49 | A1 | COMBUSTIBLE MATERIAL DETECTION ONE LINE |
| E53 | - | 6600VAC DISTRIBUTION ONE LINE |
| E54 | B0 | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | A1 | BILGE SYSTEM CONTROL ONE LINE |
| E109 | - | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | - | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | - | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | - | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | - | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | A5 | AUTOMATION I-O BOX ONE LINE |
| E129 | - | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | - | WIPER CONTROL ONE LINE |
| E131 | - | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | - | STEREO ANTENNA ONE LINE |
| E135 | A1 | MISC ELECTRONICS AND COMMUNICATIONS |

**EXHIBIT A-19**
**VESSEL; WORK**

Vessel Name and Official Number: Ms. Virgie (O.N. 1213714)

**Work**

| HULL 250 MS. VIRGIE DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D2 | B0 | GENERAL ARRANGEMENT |
| D3 | B0 | TANK CAPACITY PLAN |
| D5 | B0 | PROFILES & DECKS |
| D6 | - | SHELL EXPANSION |
| D6YD | - | SHELL EXPANSION SEAM LOCATIONS |
| D8 | - | FIRE INTEGRITY |
| D9 | A1 | INSULATION PLAN |
| D9M | - | MASCOAT PLAN |
| D10 | A6 | MACHINERY ARRANGEMENT |
| D12 | | SHAFT ARRANGEMENT |
| D15 | B0 | UNDERWATER INSPECTION MARKING PLAN |
| D16 | B0 | TYPICAL SECTIONS |
| D16/5 | Y3 | MODIFICATION SKETCH |
| D20 | D0 | FIRE & SAFETY PLAN |
| D23 | A3 | DOCKING PLAN |
| D26 | | STATION BILL |
| D34I | - | INDEPENDENT TANK HAZARDOUS AREAS PL |
| D34 | A0 | DANGEROUS GOODS PLAN |
| D35 | A0 | HAZARDOUS CARGO ARRANGEMENT |
| D36 | B0 | DAMAGE CONTROL PLAN |
| S14 | - | CRANE FOUNDATION |
| S21 | A3 | MAST DETAIL |
| S50 | A1 | RUDDER ARRANGEMENT |
| S52 | A1 | RUDDER STOP |
| S53A | A1 | TUNNEL STERN THRUSTER INSTALLATION AFT |
| S53F | A1 | FWD TUNNEL THRUSTER INSTALLATION FWD |
| S56 | - | SIDEGATES |
| S58 | A1 | RUB RAILS/BUMPER INSTALLATION |
| S59 | - | CARGO RAILS |
| S61 | - | BILGE KEEL INSTALLATION |
| S63 | - | MAIN DECK HATCH |
| S66 | A1 | LOUVER ARRANGEMENT |
| S68 | A3 | LIFERAFT CRADLE |
| S72 | - | GEAR BOX FOUNDATION |
| S74 | - | STRUT |
| S87 | - | TUGGER WINCH INSTALLATION |
| S107 | A1 | MAIN ENGINE FOUNDATION |
| S112 | B2 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | - | GENERATOR FOUNDATION |
| S114 | A3 | FIRE MONITOR PUMP FOUNDATION |
| S115 | B0 | SEACHEST ARRANGEMENT |
| S125 | A3 | ANCHOR ARRANGEMENT |
| S126 | - | RESCUE LIFEBOAT DAVIT |
| S130 | | STERN ROLLER |

| HULL 250 MS. VIRGIE DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| O1 | - | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
| O3 | A2 | INTERIOR DOORS |
| O4 | A2 | EXTERIOR WT DOORS |
| O5 | D0 | MANHOLES & HATCHES |
| O6 | A1 | WINDOWS & SIDELIGHTS |
| O6YD | - | WINDOWS (YARD) |
| O7 | A2 | LADDERS & STAIRS |
| O9 | A1 | MOORING ARRANGEMENT |
| O10 | A2 | HANDRAILS |
| O11 | A2 | FLOOR PLATING |
| O12 | - | DECK BOARDS |
| O13 | - | ROOM NUMBERS |
| O14 | - | TRANSDUCER ARRANGEMENT |
| O18 | A2 | HULL MARKINGS (DRAFT) |
| O19 | - | ROPE GUARD |
| O20 | - | GANGWAY |
| O21 | - | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | - | JOINER CEILING ARRANGEMENT |
| O26 | B0 | ANODE PLACEMENT |
| O31 | - | NAVIGATION LIGHT ARRANGEMENT |
| O33 | - | LOAD LINE ASSIGNMENT |
| O34 | - | BUMPER TIRE ARRANGEMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | A1 | GRABRAILS |
| O40 | A1 | GALLEY STOVE EXHAUST SYSTEM |
| O41 | - | HVAC SYSTEM |
| O46 | B0 | VENTILATION SYSTEM |
| O49 | VOID | TANK LABELING ARRANGEMENT |
| O50 | B0 | PILOT HOUSE TOP LAYOUT |
| O53 | - | STACK LOGO LOCATION |
| O54 | A0 | NAME LOCATION |
| O60 | A0 | FOAM DISPERSANT BOOM |
| M1 | A1 | EXHAUST GAS SYSTEM |
| M2 | B0 | FUEL OIL SERVICE SYSTEM |
| M3 | B0 | FUEL OIL TRANSFER SYSTEM |
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | A1 | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | A1 | FRESH WATER COOLING SYSTEM |
| M8 | A1 | SEAWATER COOLING SYSTEM |
| M10 | B0 | BALLAST SYSTEM |
| M11 | C0 | BILGE SYSTEM |
| M12 | A0 | FIREMAIN SYSTEM |
| M13 | C0 | TANK SOUNDFAST SYSTEM |
| M14 | A3 | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | A0 | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | - | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | B0 | POTABLE WATER SYSTEM |
| M22 | C0 | GRAY, BLACK & SANITARY WATER SYSTEM |
| M25 | A2 | TANK & MISC VENT SYSTEM |
| M24 | - | FUEL OIL OVERFLOW SYSTEM |
| M26 | C0 | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M28 | A2 | CARGO OIL SYSTEM |

| HULL 250 MS. VIRGIE DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| M29 | - | DRY BULK SYSTEM |
| M30 | - | DRILLING FLUID SYSTEM |
| M33 | A3 | FIRE MONITOR SYSTEM |
| M35 | - | METHANOL TRANSFER SYSTEM |
| M37 | A3 | WEATHER DECK PIPE PENETRATIONS |
| M41 | | VESSEL FRAME DRAWINGS |
| M42 | | USCG TRANSFER DRAWINGS |
| M49 | | TANK LABELING ARRANGMENT |
| M51 | A1 | ENGINE CRANKCASE VENTILATION |
| M61 | - | WATER-BASED FLUID SYSTEM |
| E1 | C0 | ELECTRICAL LOAD ANALYSIS |
| E2 | D1 | POWER ONE LINE |
| E3 | A1 | CABLEWAY LAYOUT |
| E4 | B0 | 480VAC DISTRIBUTION ONE LINE |
| E6 | B1 | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | B0 | 208/120VAC DISTRIBUTION LAYOUT |
| E8 | B1 | 24VDC DISTRIBUTION ONE LINE |
| E11 | - | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E13 | A2 | GENERAL ALARM ONE LINE |
| E14 | A2 | FIRE DETECTION AND ALARM ONE LINE |
| E16 | A2 | CENTRAL COMMUNICATION ONE LINE |
| E15 | A1 | SOUND-POWERED PHONE ONE LINE |
| E19 | A1 | CONTROL ROOM CONSOLE LAYOUT |
| E21 | A2 | PILOT HOUSE CONSOLE LAYOUT |
| E34 | - | HAZARDOUS AREAS PLAN |
| E34I | - | INDEPENDENT TANK HAZARDOUS AREAS PL |
| E36YD | A2 | MISCELLANEOUS CONTROL PANELS |
| E40 | A1 | CO2 ALARM SYSTEM ONE LINE |
| E43 | A1 | STEERING CONTROL ONE LINE |
| E53 | A1 | 6600VAC DISTRIBUTION ONE LINE |
| E54 | B0 | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | B1 | BILGE SYSTEM CONTROL ONE LINE |
| E109 | A1 | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | A1 | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | A1 | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | A1 | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | A1 | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | A3 | AUTOMATION I-O BOX ONE LINE |
| E129 | A1 | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | A1 | WIPER CONTROL ONE LINE |
| E131 | A1 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | A1 | STEREO ANTENNA ONE LINE |

**EXHIBIT A-20**
**VESSEL; WORK**

Vessel Name and Official Number: Pao de Acucar (O.N. 1218372)

**Work**

| HULL 253 PAO DE ACUCAR DRAWING LIST | | |
|---|---|---|
| Drawing | Rev | Drawing Title |
| D2 | E1 | GENERAL ARRANGEMENT |
| D3 | A1 | TANK CAPACITY PLAN |
| D5 | - | PROFILES & DECKS |
| D8 | - | FIRE INTEGRITY |
| D9 | A2 | INSULATION PLAN |
| D9M | - | MASCOAT PLAN |
| D10 | A5 | MACHINERY ARRANGEMENT |
| D12 | - | SHAFT ARRANGEMENT |
| D15 | B0 | UNDERWATER INSPECTION MARKING PLAN |
| D16 | - | TYPICAL SECTIONS |
| D20 | B0 | FIRE & SAFETY PLAN |
| D23 | A1 | DOCKING PLAN |
| D26 | | STATION BILL |
| S14 | - | CRANE FOUNDATION |
| S21 | A1 | MAST DETAIL |
| S40 | - | SWING DOWN THRUSTER MODULE |
| S41 | A1 | SWING DOWN THRUSTER INSTALLATION |
| S50 | A2 | RUDDER ARRANGEMENT |
| S52 | - | RUDDER STOP |
| S53A | A1 | TUNNEL STERN THRUSTER INSTALLATION |
| S53F | A1 | FWD TUNNEL THRUSTER INSTALLATION FWD |
| S56 | A2 | SIDEGATES |
| S58 | A1 | RUB RAILS/BUMPER INSTALLATION |
| S59 | | CARGO RAILS |
| S61 | - | BILGE KEEL INSTALLATION |
| S63 | - | MAIN DECK HATCH |
| S66 | A1 | LOUVER ARRANGEMENT |
| S68 | A1 | LIFERAFT CRADLE |
| S72 | - | GEAR BOX FOUNDATION |
| S74 | - | STRUT |
| S85 | B2 | ROV PLATFORM |
| S87 | A1 | TUGGER WINCH INSTALLATION |
| S98 | | UNDER DECK STRUCTURE |
| S99 | D0 | DECK EQUIPMENT ARRANGEMENT |
| S107 | A1 | MAIN ENGINE FOUNDATION |
| S112 | A1 | GRID & CHANNEL COOLER ARRANGEMENT |
| S113 | A1 | GENERATOR FOUNDATION |
| S114 | A2 | FIRE MONITOR PUMP FOUNDATION |
| D2 | E1 | GENERAL ARRANGEMENT |
| S115 | A1 | SEACHEST ARRANGEMENT |
| S125 | A2 | ANCHOR ARRANGEMENT |
| S126 | A3 | RESCUE LIFEBOAT DAVIT |
| S160 | - | CHEMICAL TANK STRUCTURE |
| S299 | - | UNIT BREAKDOWN |
| S190 | - | JIB CRANE FOUNDATION |

| O1 | - | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS |
|---|---|---|
| O3 | - | INTERIOR DOORS |
| O4 | A1 | EXTERIOR WT DOORS |
| O5 | B1 | MANHOLES & HATCHES |
| O6 | A1 | WINDOWS & SIDELIGHTS |
| O6YD | - | WINDOWS (YARD) |
| O7 | A1 | LADDERS & STAIRS |
| O9 | A1 | MOORING ARRANGEMENT |
| O10 | A2 | HANDRAILS |
| O11 | A1 | FLOOR PLATING |
| O12 | A2 | DECK BOARDS |
| O13 | A1 | ROOM NUMBERS |
| O14 | B1 | TRANSDUCER ARRANGEMENT |
| O18 | A1 | HULL MARKINGS (DRAFT) |
| O19 | - | ROPE GUARD |
| O20 | - | GANGWAY |
| O21 | - | JOINER WALL ARRANGEMENT |
| O22 | - | JOINER CONNECTION DETAILS |
| O23 | - | JOINER CEILING ARRANGEMENT |
| O26 | - | ANODE PLACEMENT |
| O31 | - | NAVIGATION LIGHT ARRANGEMENT |
| O33 | - | LOAD LINE ASSIGNMENT |
| O34 | - | BUMPER TIRE ARRANGEMENT |
| O35 | - | NAVIGATION BRIDGE VISIBILITY |
| O36 | A1 | GRABRAILS |
| O46 | - | VENTILATION SYSTEM |
| O50 | A2 | PILOT HOUSE TOP LAYOUT |
| O53 | A1 | STACK LOGO LOCATION |
| O54 | - | NAME LOCATION |
| M1 | - | EXHAUST GAS SYSTEM |
| M2 | - | FUEL OIL SERVICE SYSTEM |
| D2 | E1 | GENERAL ARRANGEMENT |
| M3 | - | FUEL OIL TRANSFER SYSTEM |
| M4 | - | LUBE OIL SERVICE SYSTEM |
| M5 | - | LUBE HYDRAULIC & DIRTY OIL TRANSFER SYSTEM |
| M6 | - | FRESH WATER COOLING SYSTEM |
| M8 | A1 | SEAWATER COOLING SYSTEM |
| M10 | - | BALLAST SYSTEM |
| M11 | A2 | BILGE SYSTEM |
| M12 | - | FIREMAIN SYSTEM |
| M13 | - | TANK SOUNDFAST SYSTEM |
| M14 | - | SHIPS SERVICE & STARTING AIR SYSTEM |
| M16 | - | CENTRAL HYDRAULIC OIL SYSTEM |
| M18 | - | STEERING GEAR HYDRAULIC OIL SYSTEM |
| M21 | - | POTABLE WATER SYSTEM |
| M22 | - | GRAY, BLACK & SANITARY WATER SYSTEM |
| M24 | - | FUEL OIL OVERFLOW SYSTEM |
| M25 | | TANK & MISC VENT SYSTEM |
| M26 | - | TANK LEVEL INDICATION SYSTEM |
| M27 | - | WEATHER DECK DRAIN SYSTEM |
| M29 | - | DRY BULK SYSTEM |
| M30 | - | DRILLING FLUID SYSTEM |
| M31 | - | LIQUID MUD TANK CLEANING SYSTEM |
| M33 | - | FIRE MONITOR SYSTEM |
| M35 | A1 | METHANOL TRANSFER SYSTEM |
| M37 | - | WEATHER DECK PIPE PENETRATIONS |
| M40 | - | MISCELLANEOUS PIPING SYSTEM |
| M41 | | VESSEL FRAME DRAWINGS |
| M42 | | USCG TRANSFER DRAWINGS |

| M49 | - | TANK LABELING ARRANGEMENT |
| M51 | - | ENGINE CRANKCASE VENTILATION |
| M60 | - | MISC CHEMICAL PIPING SYSTEM |
| M61 | - | WATER-BASED FLUID SYSTEM |
| E1 | A4 | ELECTRICAL LOAD ANALYSIS |
| E2 | A3 | POWER ONE LINE |
| E3 | - | CABLEWAY LAYOUT |
| E4 | A4 | 480VAC DISTRIBUTION ONE LINE |
| E6 | B1 | 208/120VAC DISTRIBUTION ONE LINE |
| E7 | B0 | 208/120VAC DISTRIBUTION LAYOUT |
| D2 | E1 | GENERAL ARRANGEMENT |
| E8 | B0 | 24VDC DISTRIBUTION ONE LINE |
| E11 | | JUNCTION & CONTROL BOX SCHEMATICS BOOK |
| E12 | | ELECTRICAL EQUIPMENT LAYOUT |
| E13 | B3 | GENERAL ALARM ONE LINE |
| E14 | B4 | FIRE DETECTION AND ALARM ONE LINE |
| E15 | - | SOUND-POWERED PHONE ONE LINE |
| E16 | B3 | CENTRAL COMMUNICATION ONE LINE |
| E19 | - | CONTROL ROOM CONSOLE LAYOUT |
| E21 | - | PILOT HOUSE CONSOLE LAYOUT |
| E34 | B0 | HAZARDOUS AREAS PLAN |
| E35 | | EMERGENCY STEERING PROCEDURES |
| E36YD | | MISCELLANEOUS CONTROL PANELS |
| E40 | - | CO2 ALARM SYSTEM ONE LINE |
| E43 | - | STEERING CONTROL ONE LINE |
| E53 | - | 6600VAC DISTRIBUTION ONE LINE |
| E54 | - | EMERGENCY STOP & SHUTDOWN ONE LINE |
| E55 | - | BILGE SYSTEM CONTROL ONE LINE |
| E109 | - | EMERGENCY SWITCHBOARD CABLE PULL LIST |
| E111 | - | MAIN SWITCHBOARD CABLE PULL LIST |
| E112 | | MAIN ENGINE MV SWITCHBOARD CABLE PULL LIST |
| E117 | - | BOW AND STERN TUNNEL THRUSTER CABLE PULL LIST |
| E127 | - | PILOT HOUSE CONSOLE WIRING LOCATION & MISC P~ |
| E128 | A2 | AUTOMATION I-O BOX ONE LINE |
| E129 | - | AUTOMATED FLOOD AND DECK LIGHTS |
| E130 | - | WIPER CONTROL ONE LINE |
| E131 | - | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT |
| E132 | - | STEREO ANTENNA ONE LINE |

**EXHIBIT A-21**
**VESSEL; WORK**

Vessel Name and Official Number: Paradise Island (O.N. 1262977)

**Work**

| HULL 294 PARADISE ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | E2 | |
| D3 | TANK PLAN | D0 | USE HULL 290 SHIP |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP |
| D9 | INSULATION PLAN | A7 | USE HULL 290 SHIP |
| D10 | MACHINERY ARRANGEMENT | A1 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIP |
| D20 | FIRE AND SAFETY PLAN | D0 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | |
| D34 | DANGEROUS GOODS PLAN | - | USE HULL 290 SHIP |

| HULL 294 PARADISE ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 290 SHIP |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIP |
| S63 | MAIN DECK HATCH | - | USE HULL 290 SHIP |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 290 SHIP |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIP |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP |
| S113 | GENERATOR FOUNDATION | - | USE HULL 290 SHIP |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 290 SHIP |
| S115 | SEACHEST ARRANGEMENT | A1 | USE HULL 290 SHIP |
| S125 | ANCHOR ARRANGEMENT | A4 | USE HULL 290 SHIP |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP |

## HULL 294 PARADISE ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIP ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIP |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP |
| O18 | HULL MARKINGS (DRAFT) | A4 | USE HULL 290 SHIP |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | USE HULL 290 SHIP |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIP |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP |

## HULL 294 PARADISE ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP |
| M2 | FUEL OIL SERVICE SYSTEM | - | USE HULL 290 SHIP |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIP |
| M10 | BALLAST SYSTEM | B2 | |
| M11 | BILGE SYSTEM | C0 | USE HULL 290 SHIP |
| M12 | FIRE MAIN SYSTEM | B0 | USE HULL 290 SHIP |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIP |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIP |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIP |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIP |
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIP |
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIP |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIP |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP |
| M70 | CARGO FRESH WATER SYSTEM | A3 | |

## HULL 294 PARADISE ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | - | |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIP |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | - | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A1 | |
| E13 | GENERAL ALARM ONE LINE | B1 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP |
| E16 | CENTRAL COMMUNICATION ONE LINE | B1 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | B1 | |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A1 | |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | USE HULL 290 SHIP |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIP |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIP |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP |
| E53 | MV DISTRIBUTION ONE LINE | A2 | USE HULL 290 SHIP |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | USE HULL 290 SHIP |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | USE HULL 290 SHIP |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIP |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIP |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 290 SHIP |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIP |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | USE HULL 290 SHIP |
| E128 | AUTOMATION I/O BOX ONE LINE | - | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIP |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIP |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIP |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP |

**EXHIBIT A-22**
**VESSEL; WORK**

Vessel Name and Official Number: Pecan Island (O.N. 1258532)

Work

| HULL 289 PECAN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | *Design* | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | D3 | |
| D3 | TANK PLAN | D0 | USE HULL 290 SHIP ISLAND |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP ISLAND |
| D9 | INSULATION PLAN | A7 | USE HULL 290 SHIP ISLAND |
| D10 | MACHINERY ARRANGEMENT | A4 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIP ISLAND |
| D20 | FIRE AND SAFETY PLAN | A2 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | USE HULL 290 SHIP ISLAND |
| D34 | DANGEROUS GOODS PLAN | - | |

| HULL 289 PECAN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | *Structure* | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP ISLAND |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP ISLAND |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | - | |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP ISLAND |
| S61 | BILGE KEEL INSTALLATION | - | |
| S63 | MAIN DECK HATCH | - | |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP ISLAND |
| S107 | MAIN ENGINE FOUNDATION | - | |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP ISLAND |
| S113 | GENERATOR FOUNDATION | - | |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 290 SHIP ISLAND |
| S115 | SEACHEST ARRANGEMENT | - | |
| S125 | ANCHOR ARRANGEMENT | - | |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP ISLAND |

## HULL 289 PECAN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 290 SHIP ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP ISLAND |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP ISLAND |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIP ISLAND |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP ISLAND |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP ISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP ISLAND |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP ISLAND |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP ISLAND |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP ISLAND |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP ISLAND |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A4 | USE HULL 290 SHIP ISLAND |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP ISLAND |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP ISLAND |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A1 | |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| O46 | VENTILATION SYSTEM | A8 | USE HULL 290 SHIP ISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP ISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP ISLAND |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP ISLAND |

## HULL 289 PECAN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIP ISLAND |
| M10 | BALLAST SYSTEM | B2 | USE HULL 290 SHIP ISLAND |
| M11 | BILGE SYSTEM | C0 | USE HULL 290 SHIP ISLAND |
| M12 | FIRE MAIN SYSTEM | A4 | |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIP ISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP ISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A6 | |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIP ISLAND |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP ISLAND |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | D0 | USE HULL 290 SHIP ISLAND |

## HULL 289 PECAN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | B0 | |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIP ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | B0 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | - | |
| E13 | GENERAL ALARM ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | A5 | USE HULL 290 SHIP ISLAND |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIP ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP ISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE | A1 | USE HULL 290 SHIP ISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIP ISLAND |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIP ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP ISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | - | |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | - | |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIP ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 290 SHIP ISLAND |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIP ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | - | |
| E128 | AUTOMATION I/O BOX ONE LINE | A10 | USE HULL 290 SHIP ISLAND |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIP ISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | USE HULL 290 SHIP ISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP ISLAND |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP ISLAND |

**EXHIBIT A-23**
**VESSEL; WORK**

Vessel Name and Official Number: Pelican Island (O.N. 1261549)

**Work**

| HULL 295 PELICAN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | C1 | |
| D3 | TANK PLAN | C2 | |
| D4 | MIDSHIP SECTION | A2 | |
| D9 | INSULATION PLAN | A5 | |
| D10 | MACHINERY ARRANGEMENT | B1 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | Z1 | |
| D20 | FIRE AND SAFETY PLAN | B2 | |
| D23 | DOCKING PLAN | A1 | |
| D26 | STATION BILL | - | |
| D34 | DANGEROUS GOODS PLAN | A1 | |

| HULL 295 PELICAN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | |
| S21 | MAST DETAIL | A6 | |
| S47 | PROPULSION UNIT | A1 | |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A3 | |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | |
| S56 | SIDEGATES | A2 | |
| S58 | RUB RAILS/BUMPER INSTALLATION | - | |
| S59 | CARGO RAILS | A2 | |
| S61 | BILGE KEEL INSTALLATION | - | |
| S63 | MAIN DECK HATCH | - | |
| S66 | LOUVER ARRANGEMENT | A1 | |
| S68 | LIFERAFT CRADLE | B1 | |
| S87 | TUGGER WINCH INSTALLATION | A1 | |
| S89 | SIDE DOOR INSTALLATION | - | |
| S99 | DECK EQUIPMENT ARRANGEMENT | A1 | |
| S107 | MAIN ENGINE FOUNDATION | - | |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A1 | |
| S113 | GENERATOR FOUNDATION | A2 | |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | |
| S115 | SEACHEST ARRANGEMENT | A1 | |
| S125 | ANCHOR ARRANGEMENT | A3 | |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | |

## HULL 295 PELICAN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | |
| O3 | INTERIOR DOORS | A3 | |
| O4 | EXTERIOR WT DOORS | - | |
| O5 | MANHOLES & HATCHES | C1 | |
| O6 | WINDOWS & SIDELIGHTS | A1 | |
| O6YD | WINDOWS (YARD) | - | |
| O7 | LADDERS & STAIRS | B1 | |
| O9 | MOORING ARRANGEMENT | A3 | |
| O10 | HANDRAILS | B1 | |
| O11 | FLOOR PLATING | A2 | |
| O12 | DECK BOARDS | B1 | |
| O13 | ROOM NUMBERS | - | |
| O14 | TRANSDUCER ARRANGEMENT | - | |
| O18 | HULL MARKINGS (DRAFT) | A2 | |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | |
| O21 | JOINER WALL ARRANGEMENT | A3 | |
| O23 | JOINER CEILING ARRANGEMENT | A4 | |
| O26 | ANODE PLACEMENT | A1 | |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | |
| O33 | LOAD LINE ASSIGNMENT | - | |
| O34 | BUMPER TIRE ARRANGEMENT | - | |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | |
| O36 | GRABRAILS | - | |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A1 | |
| O38 | GALLEY LAYOUT | A4 | |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | |
| O46 | VENTILATION SYSTEM | A4 | |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A6 | |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | |
| O53 | STACK LOGO LOCATION | - | |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | |

| HULL 295 PELICAN ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | - | |
| M2 | FUEL OIL SERVICE SYSTEM | - | |
| M3 | FUEL OIL TRANSFER SYSTEM | A1 | |
| M4 | LUBE OIL SERVICE SYSTEM | - | |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A1 | |
| M6 | FRESH WATER COOLING SYSTEM | A2 | |
| M10 | BALLAST SYSTEM | B1 | |
| M11 | BILGE SYSTEM | B1 | |
| M12 | FIRE MAIN SYSTEM | C0 | |
| M13 | TANK SOUNDFAST SYSTEM | B1 | |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A1 | |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | |
| M21 | POTABLE WATER SYSTEM | A1 | |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A1 | |
| M24 | FUEL OIL OVERFLOW SYSTEM | B1 | |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | |
| M27 | WEATHER DECK DRAIN SYSTEM | A3 | |
| M29 | DRY BULK SYSTEM | B2 | |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B3 | |
| M33 | FI-FI FIRE MONITOR SYSTEM | A2 | |
| M35 | METHANOL TRANSFER SYSTEM | B1 | |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | |
| M40 | MISC. PIPING SYSTEM | - | |
| M50 | HULL AND DECK PENETRATIONS | - | |
| M59 | CRUDE OIL SLOP SYSTEM | C0 | |
| M70 | CARGO FRESH WATER SYSTEM | B3 | |

## HULL 295 PELICAN ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| **E** | **Electrical** | | |
| E2 | LV POWER ONE LINE | A1 | |
| E3 | CABLEWAY LAYOUT | A2 | |
| E4 | 480VAC DISTRIBUTION ONE LINE | B1 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | A4 | |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | A5 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | - | |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A4 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | |
| E13 | GENERAL ALARM ONE LINE | A1 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | - | |
| E16 | CENTRAL COMMUNICATION ONE LINE | A4 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A2 | |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A2 | |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A3 | |
| E35 | EMERGENCY STEERING PROCEDURES | - | |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A1 | |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A2 | |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | - | |
| E47 | METHANOL SYSTEM CONTROL ONE LINE | A1 | |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | | |
| E53 | MV DISTRIBUTION ONE LINE | - | |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | A4 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A1 | |
| E60 | WT DOORS / HATCH ONE LINE | A1 | |
| E62 | COMPUTER NETWORK DIAGRAM | - | |
| E65 | TV & ENTERTAINMENT SYSTEM | - | |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A1 | |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A1 | |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A1 | |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A2 | |
| E128 | AUTOMATION I/O BOX ONE LINE | B1 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A1 | |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | |
| E132 | STEREO ANTENNA ONE LINE | A1 | |
| E133 | HORN & LIGHT JUNCTION BOXES | A1 | |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A4 | |

**EXHIBIT A-24**
**VESSEL; WORK**

Vessel Name and Official Number: Sanibel Island (O.N. 1257727)

**Work**

| HULL 292 SANIBEL ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 290 SHIP |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | D3 | |
| D3 | TANK PLAN | D0 | USE HULL 290 SHIP |
| D4 | MIDSHIP SECTION | B3 | USE HULL 290 SHIP |
| D9 | INSULATION PLAN | A7 | USE HULL 290 SHIP |
| D10 | MACHINERY ARRANGEMENT | A2 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | USE HULL 290 SHIP |
| D20 | FIRE AND SAFETY PLAN | A3 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | USE HULL 290 SHIP |
| D34 | DANGEROUS GOODS PLAN | - | |

| HULL 292 SANIBEL ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 290 SHIP |
| S21 | MAST DETAIL | A7 | USE HULL 290 SHIP |
| S47 | PROPULSION UNIT | A2 | USE HULL 290 SHIP |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | USE HULL 290 SHIP |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 290 SHIP |
| S56 | SIDEGATES | A1 | USE HULL 290 SHIP |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 290 SHIP |
| S59 | CARGO RAILS | A3 | USE HULL 290 SHIP |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 290 SHIP |
| S63 | MAIN DECK HATCH | - | USE HULL 290 SHIP |
| S66 | LOUVER ARRANGEMENT | A3 | |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 290 SHIP |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 290 SHIP |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 290 SHIP |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | USE HULL 290 SHIP |
| S107 | MAIN ENGINE FOUNDATION | A3 | USE HULL 290 SHIP |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 290 SHIP |
| S113 | GENERATOR FOUNDATION | A1 | |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 290 SHIP |
| S115 | SEACHEST ARRANGEMENT | A1 | USE HULL 290 SHIP |
| S125 | ANCHOR ARRANGEMENT | A4 | USE HULL 290 SHIP |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 290 SHIP |

## HULL 292 SANIBEL ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE | - | USE HULL 290 SHIP |
| O3 | INTERIOR DOORS | A3 | USE HULL 290 SHIP |
| O4 | EXTERIOR WT DOORS | A1 | USE HULL 290 SHIP |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 290 SHIP |
| O6 | WINDOWS & SIDELIGHTS | A2 | USE HULL 290 SHIP |
| O6YD | WINDOWS (YARD) | A4 | USE HULL 290 SHIP |
| O7 | LADDERS & STAIRS | B1 | USE HULL 290 SHIP |
| O9 | MOORING ARRANGEMENT | A5 | USE HULL 290 SHIP |
| O10 | HANDRAILS | B1 | USE HULL 290 SHIP |
| O11 | FLOOR PLATING | A3 | USE HULL 290 SHIP |
| O12 | DECK BOARDS | C2 | USE HULL 290 SHIP |
| O13 | ROOM NUMBERS | A1 | USE HULL 290 SHIP |
| O14 | TRANSDUCER ARRANGEMENT | A1 | USE HULL 290 SHIP |
| O18 | HULL MARKINGS (DRAFT) | A4 | USE HULL 290 SHIP |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 290 SHIP |
| O21 | JOINER WALL ARRANGEMENT | A7 | USE HULL 290 SHIP |
| O23 | JOINER CEILING ARRANGEMENT | A7 | USE HULL 290 SHIP |
| O26 | ANODE PLACEMENT | A2 | USE HULL 290 SHIP |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 290 SHIP |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 290 SHIP |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 290 SHIP |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 290 SHIP |
| O36 | GRABRAILS | A2 | USE HULL 290 SHIP |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | USE HULL 290 SHIP |
| O38 | GALLEY LAYOUT | A5 | USE HULL 290 SHIP |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP |
| O46 | VENTILATION SYSTEM | A2 | |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | USE HULL 290 SHIP |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 290 SHIP |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 290 SHIP |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 290 SHIP |

## HULL 292 SANIBEL ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A1 | USE HULL 290 SHIP |
| M2 | FUEL OIL SERVICE SYSTEM | A1 | |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 290 SHIP |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | USE HULL 290 SHIP |
| M6 | FRESH WATER COOLING SYSTEM | A4 | USE HULL 290 SHIP |
| M10 | BALLAST SYSTEM | B2 | USE HULL 290 SHIP |
| M11 | BILGE SYSTEM | C0 | USE HULL 290 SHIP |
| M12 | FIRE MAIN SYSTEM | B0 | USE HULL 290 SHIP |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 290 SHIP |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 290 SHIP |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 290 SHIP |
| M21 | POTABLE WATER SYSTEM | A2 | USE HULL 290 SHIP |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 290 SHIP |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | USE HULL 290 SHIP |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 290 SHIP |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 290 SHIP |
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | USE HULL 290 SHIP |
| M29 | DRY BULK SYSTEM | B1 | USE HULL 290 SHIP |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | USE HULL 290 SHIP |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | USE HULL 290 SHIP |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 290 SHIP |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 290 SHIP |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 290 SHIP |
| M70 | CARGO FRESH WATER SYSTEM | D0 | USE HULL 290 SHIP |

## HULL 292 SANIBEL ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| **E** | **Electrical** | | |
| E2 | LV POWER ONE LINE | C0 | USE HULL 290 SHIP |
| E3 | CABLEWAY LAYOUT | A1 | USE HULL 290 SHIP |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | - | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | - | |
| E13 | GENERAL ALARM ONE LINE | A2 | USE HULL 290 SHIP |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP |
| E16 | CENTRAL COMMUNICATION ONE LINE | A5 | USE HULL 290 SHIP |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | USE HULL 290 SHIP |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 290 SHIP |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | USE HULL 290 SHIP |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 290 SHIP |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 290 SHIP |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | USE HULL 290 SHIP |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 290 SHIP |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | USE HULL 290 SHIP |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 290 SHIP |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 290 SHIP |
| E53 | MV DISTRIBUTION ONE LINE | A2 | USE HULL 290 SHIP |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | A2 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | USE HULL 290 SHIP |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 290 SHIP |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | USE HULL 290 SHIP |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | USE HULL 290 SHIP |
| E68 | ENGINE ORDER TELEGRAPH (EOT)          ONE LINE DIAGRAM | A1 | USE HULL 290 SHIP |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | USE HULL 290 SHIP |
| E109 | EMERGENCY   GENERATOR   SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 290 SHIP |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 290 SHIP |
| E112 | MEDIUM   VOLTAGE   SWITCHBOARD   CONTROLS CABLE PULL LIST | A4 | USE HULL 290 SHIP |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | USE HULL 290 SHIP |
| E128 | AUTOMATION I/O BOX ONE LINE | A10 | USE HULL 290 SHIP |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 290 SHIP |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 290 SHIP |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 290 SHIP |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | USE HULL 290 SHIP |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A1 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | USE HULL 290 SHIP |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | USE HULL 290 SHIP |

**EXHIBIT A-25**
**VESSEL; WORK**

Vessel Name and Official Number: Ship Island (O.N. 1252958)

**Work**

| HULL 290 SHIP ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | G0 | |
| D3 | TANK PLAN | D0 | |
| D4 | MIDSHIP SECTION | B3 | |
| D9 | INSULATION PLAN | A7 | |
| D10 | MACHINERY ARRANGEMENT | B1 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | A1 | |
| D20 | FIRE AND SAFETY PLAN | D0 | |
| D23 | DOCKING PLAN | A1 | |
| D26 | STATION BILL | - | |
| D34 | DANGEROUS GOODS PLAN | A1 | |

| HULL 290 SHIP ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | |
| S21 | MAST DETAIL | A7 | |
| S47 | PROPULSION UNIT | A2 | |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A5 | |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | |
| S56 | SIDEGATES | A1 | |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | |
| S59 | CARGO RAILS | A3 | |
| S61 | BILGE KEEL INSTALLATION | - | |
| S63 | MAIN DECK HATCH | - | |
| S66 | LOUVER ARRANGEMENT | A5 | |
| S68 | LIFERAFT CRADLE | B1 | |
| S87 | TUGGER WINCH INSTALLATION | A1 | |
| S89 | SIDE DOOR INSTALLATION | - | |
| S99 | DECK EQUIPMENT ARRANGEMENT | B0 | |
| S107 | MAIN ENGINE FOUNDATION | A3 | |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | |
| S113 | GENERATOR FOUNDATION | - | |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | |
| S115 | SEACHEST ARRANGEMENT | A1 | |
| S125 | ANCHOR ARRANGEMENT | A4 | |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | |

## HULL 290 SHIP ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | |
| O3 | INTERIOR DOORS | A3 | |
| O4 | EXTERIOR WT DOORS | A1 | |
| O5 | MANHOLES & HATCHES | C1 | |
| O6 | WINDOWS & SIDELIGHTS | A2 | |
| O6YD | WINDOWS (YARD) | A4 | |
| O7 | LADDERS & STAIRS | B1 | |
| O9 | MOORING ARRANGEMENT | A5 | |
| O10 | HANDRAILS | B1 | |
| O11 | FLOOR PLATING | A3 | |
| O12 | DECK BOARDS | C2 | |
| O13 | ROOM NUMBERS | A1 | |
| O14 | TRANSDUCER ARRANGEMENT | A1 | |
| O18 | HULL MARKINGS (DRAFT) | A4 | |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | |
| O21 | JOINER WALL ARRANGEMENT | A7 | |
| O23 | JOINER CEILING ARRANGEMENT | A7 | |
| O26 | ANODE PLACEMENT | A2 | |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | |
| O33 | LOAD LINE ASSIGNMENT | - | |
| O34 | BUMPER TIRE ARRANGEMENT | - | |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | |
| O36 | GRABRAILS | A2 | |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A3 | |
| O38 | GALLEY LAYOUT | A5 | |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | |
| O46 | VENTILATION SYSTEM | A8 | |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A11 | |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | |
| O53 | STACK LOGO LOCATION | A1 | |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | |

## HULL 290 SHIP ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| **M** | **PIPING** | | |
| M1 | EXHAUST GAS SYSTEM | A1 | |
| M2 | FUEL OIL SERVICE SYSTEM | - | |
| M3 | FUEL OIL TRANSFER SYSTEM | A3 | |
| M4 | LUBE OIL SERVICE SYSTEM | - | |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A3 | |
| M6 | FRESH WATER COOLING SYSTEM | A4 | |
| M10 | BALLAST SYSTEM | B2 | |
| M11 | BILGE SYSTEM | C0 | |
| M12 | FIRE MAIN SYSTEM | B0 | |
| M13 | TANK SOUNDFAST SYSTEM | B1 | |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | |
| M21 | POTABLE WATER SYSTEM | A2 | |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | |
| M24 | FUEL OIL OVERFLOW SYSTEM | A1 | |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | |
| M27 | WEATHER DECK DRAIN SYSTEM | B1 | |
| M29 | DRY BULK SYSTEM | B1 | |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B1 | |
| M33 | FI-FI FIRE MONITOR SYSTEM | A5 | |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | |
| M40 | MISC. PIPING SYSTEM | - | |
| M50 | HULL AND DECK PENETRATIONS | - | |
| M70 | CARGO FRESH WATER SYSTEM | D0 | |

## HULL 290 SHIP ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | C0 | |
| E3 | CABLEWAY LAYOUT | A1 | |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | C1 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | |
| E13 | GENERAL ALARM ONE LINE | A2 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | |
| E16 | CENTRAL COMMUNICATION ONE LINE | A5 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A4 | |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A1 | |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A2 | |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A1 | |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | |
| E53 | MV DISTRIBUTION ONE LINE | A2 | |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A2 | |
| E60 | WT DOORS / HATCH ONE LINE | A1 | |
| E62 | COMPUTER NETWORK DIAGRAM | A1 | |
| E65 | TV & ENTERTAINMENT SYSTEM | A2 | |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A3 | |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A4 | |
| E128 | AUTOMATION I/O BOX ONE LINE | A10 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | |
| E132 | STEREO ANTENNA ONE LINE | A1 | |
| E133 | HORN & LIGHT JUNCTION BOXES | A2 | |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A5 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A1 | |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | B3 | |

**EXHIBIT A-26**
**VESSEL; WORK**

Vessel Name and Official Number: Timbalier Island (O.N. 1251360)

**Work**

| HULL 285 TIMBALIER ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 284 GRAND ISLE |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | D0 | |
| D3 | TANK PLAN | A2 | USE HULL 284 GRAND ISLE |
| D4 | MIDSHIP SECTION | A2 | USE HULL 284 GRAND ISLE |
| D9 | INSULATION PLAN | A7 | USE HULL 284 GRAND ISLE |
| D10 | MACHINERY ARRANGEMENT | A2 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | B1 | |
| D20 | FIRE AND SAFETY PLAN | E0 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | USE HULL 284 GRAND ISLE |
| D34 | DANGEROUS GOODS PLAN | A0 | |

| HULL 285 TIMBALIER ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | A2 | USE HULL 284 GRAND ISLE |
| S21 | MAST DETAIL | A5 | USE HULL 284 GRAND ISLE |
| S47 | PROPULSION UNIT | A2 | USE HULL 284 GRAND ISLE |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A4 | USE HULL 284 GRAND ISLE |
| S54 | DROP DOWN THRUSTER INSTALLATION | A2 | USE HULL 284 GRAND ISLE |
| S56 | SIDEGATES | A1 | USE HULL 284 GRAND ISLE |
| S58 | RUB RAILS/BUMPER INSTALLATION | A1 | USE HULL 284 GRAND ISLE |
| S59 | CARGO RAILS | A4 | USE HULL 284 GRAND ISLE |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 284 GRAND ISLE |
| S63 | MAIN DECK HATCH | A2 | USE HULL 284 GRAND ISLE |
| S66 | LOUVER ARRANGEMENT | A5 | USE HULL 284 GRAND ISLE |
| S68 | LIFERAFT CRADLE | A1 | USE HULL 284 GRAND ISLE |
| S87 | TUGGER WINCH INSTALLATION | A2 | |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 284 GRAND ISLE |
| S99 | DECK EQUIPMENT ARRANGEMENT | A0 | USE HULL 284 GRAND ISLE |
| S107 | MAIN ENGINE FOUNDATION | - | USE HULL 284 GRAND ISLE |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| S113 | GENERATOR FOUNDATION | A1 | USE HULL 284 GRAND ISLE |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 284 GRAND ISLE |
| S115 | SEACHEST ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| S125 | ANCHOR ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| S126 | RESCUE LIFEBOAT DAVIT | - | |

## HULL 285 TIMBALIER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 284 GRAND ISLE |
| O3 | INTERIOR DOORS | A10 | USE HULL 284 GRAND ISLE |
| O4 | EXTERIOR WT DOORS | A6 | USE HULL 284 GRAND ISLE |
| O5 | MANHOLES & HATCHES | A5 | USE HULL 284 GRAND ISLE |
| O6 | WINDOWS & SIDELIGHTS | A4 | USE HULL 284 GRAND ISLE |
| O6YD | WINDOWS (YARD) | A5 | USE HULL 284 GRAND ISLE |
| O7 | LADDERS & STAIRS | A7 | USE HULL 284 GRAND ISLE |
| O9 | MOORING ARRANGEMENT | A3 | USE HULL 284 GRAND ISLE |
| O10 | HANDRAILS | A5 | USE HULL 284 GRAND ISLE |
| O11 | FLOOR PLATING | A5 | USE HULL 284 GRAND ISLE |
| O12 | DECK BOARDS | A3 | |
| O13 | ROOM NUMBERS | A3 | USE HULL 284 GRAND ISLE |
| O14 | TRANSDUCER ARRANGEMENT | B1 | |
| O18 | HULL MARKINGS (DRAFT) | - | |
| O18YD | IMO NUMBERS | - | USE HULL 284 GRAND ISLE |
| O20 | GANGWAY | A1 | USE HULL 284 GRAND ISLE |
| O21 | JOINER WALL ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| O23 | JOINER CEILING ARRANGEMENT | A3 | USE HULL 284 GRAND ISLE |
| O26 | ANODE PLACEMENT | A1 | USE HULL 284 GRAND ISLE |
| O31 | NAVIGATION LIGHT ARRANGEMENT | - | USE HULL 284 GRAND ISLE |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 284 GRAND ISLE |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 284 GRAND ISLE |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 284 GRAND ISLE |
| O36 | GRABRAILS | A3 | USE HULL 284 GRAND ISLE |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A5 | USE HULL 284 GRAND ISLE |
| O38 | GALLEY LAYOUT | A2 | USE HULL 284 GRAND ISLE |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 284 GRAND ISLE |
| O46 | VENTILATION SYSTEM | A5 | USE HULL 284 GRAND ISLE |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A5 | USE HULL 284 GRAND ISLE |
| O50 | PILOT HOUSE TOP LAYOUT | A3 | |
| O53 | STACK LOGO LOCATION | A1 | USE HULL 284 GRAND ISLE |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 284 GRAND ISLE |

## HULL 285 TIMBALIER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | A5 | USE HULL 284 GRAND ISLE |
| M2 | FUEL OIL SERVICE SYSTEM | A1 | |
| M3 | FUEL OIL TRANSFER SYSTEM | A1 | |
| M4 | LUBE OIL SERVICE SYSTEM | A1 | USE HULL 284 GRAND ISLE |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A2 | USE HULL 284 GRAND ISLE |
| M6 | FRESH WATER COOLING SYSTEM | A3 | USE HULL 284 GRAND ISLE |
| M8 | SEAWATER COOLING | A2 | |
| M10 | BALLAST SYSTEM | A3 | USE HULL 284 GRAND ISLE |
| M11 | BILGE SYSTEM | A1 | |
| M12 | FIRE MAIN SYSTEM | A3 | USE HULL 284 GRAND ISLE |
| M13 | TANK SOUNDFAST SYSTEM | A2 | USE HULL 284 GRAND ISLE |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A3 | USE HULL 284 GRAND ISLE |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | - | USE HULL 284 GRAND ISLE |
| M21 | POTABLE WATER SYSTEM | A3 | USE HULL 284 GRAND ISLE |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A2 | USE HULL 284 GRAND ISLE |
| M24 | FUEL OIL OVERFLOW SYSTEM | B1 | |
| M25 | TANK AND MISC. VENT SYSTEM | A5 | USE HULL 284 GRAND ISLE |
| M26 | TANK LEVEL INDICATION SYSTEM | A2 | USE HULL 284 GRAND ISLE |
| M27 | WEATHER DECK DRAIN SYSTEM | - | USE HULL 284 GRAND ISLE |
| M29 | DRY BULK SYSTEM | A1 | USE HULL 284 GRAND ISLE |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | A6 | USE HULL 284 GRAND ISLE |
| M33 | FI-FI FIRE MONITOR SYSTEM | A2 | USE HULL 284 GRAND ISLE |
| M37 | WEATHER DECK PIPE PENETRATIONS | A1 | USE HULL 284 GRAND ISLE |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 284 GRAND ISLE |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 284 GRAND ISLE |
| M70 | CARGO FRESH WATER SYSTEM | A4 | USE HULL 284 GRAND ISLE |

## HULL 285 TIMBALIER ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---------|-------|-----|----------|
| E | Electrical | | |
| E2 | LV POWER ONE LINE | C0 | |
| E3 | CABLEWAY LAYOUT | A3 | USE HULL 284 GRAND ISLE |
| E4 | 480VAC DISTRIBUTION ONE LINE | E1 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | E0 | |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | D0 | |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | C0 | |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A5 | USE HULL 284 GRAND ISLE |
| E13 | GENERAL ALARM ONE LINE | C0 | |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | A1 | USE HULL 284 GRAND ISLE |
| E16 | CENTRAL COMMUNICATION ONE LINE | C0 | |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A7 | USE HULL 284 GRAND ISLE |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A1 | USE HULL 284 GRAND ISLE |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A4 | USE HULL 284 GRAND ISLE |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A0 | USE HULL 284 GRAND ISLE |
| E35 | EMERGENCY STEERING PROCEDURES | A2 | USE HULL 284 GRAND ISLE |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A6 | USE HULL 284 GRAND ISLE |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | A1 | USE HULL 284 GRAND ISLE |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A3 | USE HULL 284 GRAND ISLE |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | A4 | USE HULL 284 GRAND ISLE |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | A1 | USE HULL 284 GRAND ISLE |
| E53 | MV DISTRIBUTION ONE LINE | A7 | USE HULL 284 GRAND ISLE |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B1 | USE HULL 284 GRAND ISLE |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A6 | USE HULL 284 GRAND ISLE |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 284 GRAND ISLE |
| E62 | COMPUTER NETWORK DIAGRAM | - | USE HULL 284 GRAND ISLE |
| E65 | TV & ENTERTAINMENT SYSTEM | A4 | USE HULL 284 GRAND ISLE |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 284 GRAND ISLE |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A2 | USE HULL 284 GRAND ISLE |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A2 | USE HULL 284 GRAND ISLE |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A4 | USE HULL 284 GRAND ISLE |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A5 | USE HULL 284 GRAND ISLE |
| E128 | AUTOMATION I/O BOX ONE LINE | A1 | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A2 | USE HULL 284 GRAND ISLE |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A2 | USE HULL 284 GRAND ISLE |
| E133 | HORN & LIGHT JUNCTION BOXES | A4 | USE HULL 284 GRAND ISLE |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | - | USE HULL 284 GRAND ISLE |

**EXHIBIT A-27**
**VESSEL; WORK**

Vessel Name and Official Number: Wine Island (O.N. 1259152)

**Work**

| HULL 299 WINE ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| D | Design | | |
| D1 | LINES PLAN | - | USE HULL 295 PELICAN ISLAND |
| D2 | GENERAL (ARRANGEMENT) DESIGN PLAN | A8 | |
| D3 | TANK PLAN | C2 | USE HULL 295 PELICAN ISLAND |
| D4 | MIDSHIP SECTION | A2 | USE HULL 295 PELICAN ISLAND |
| D9 | INSULATION PLAN | A5 | USE HULL 295 PELICAN ISLAND |
| D10 | MACHINERY ARRANGEMENT | A2 | |
| D15 | UNDERWATER INSPECTION MARKING PLAN | Z1 | USE HULL 295 PELICAN ISLAND |
| D20 | FIRE AND SAFETY PLAN | A3 | |
| D23 | DOCKING PLAN | - | |
| D26 | STATION BILL | - | |
| D34 | DANGEROUS GOODS PLAN | A1 | |

| HULL 299 WINE ISLAND DRAWING LIST | | | |
|---|---|---|---|
| Drawing | Title | Rev | Comments |
| S | Structure | | |
| S14 | CRANE FOUNDATION | B1 | USE HULL 295 PELICAN ISLAND |
| S21 | MAST DETAIL | A6 | USE HULL 295 PELICAN ISLAND |
| S47 | PROPULSION UNIT | A1 | USE HULL 295 PELICAN ISLAND |
| S53F | FWD TUNNEL THRUSTER INSTALLATION FWD | A3 | USE HULL 295 PELICAN ISLAND |
| S54 | DROP DOWN THRUSTER INSTALLATION | A1 | USE HULL 295 PELICAN ISLAND |
| S56 | SIDEGATES | A2 | USE HULL 295 PELICAN ISLAND |
| S58 | RUB RAILS/BUMPER INSTALLATION | - | USE HULL 295 PELICAN ISLAND |
| S59 | CARGO RAILS | A2 | USE HULL 295 PELICAN ISLAND |
| S61 | BILGE KEEL INSTALLATION | - | USE HULL 295 PELICAN ISLAND |
| S63 | MAIN DECK HATCH | - | USE HULL 295 PELICAN ISLAND |
| S66 | LOUVER ARRANGEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| S68 | LIFERAFT CRADLE | B1 | USE HULL 295 PELICAN ISLAND |
| S87 | TUGGER WINCH INSTALLATION | A1 | USE HULL 295 PELICAN ISLAND |
| S89 | SIDE DOOR INSTALLATION | - | USE HULL 295 PELICAN ISLAND |
| S99 | DECK EQUIPMENT ARRANGEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| S107 | MAIN ENGINE FOUNDATION | - | USE HULL 295 PELICAN ISLAND |
| S112 | GRID & CHANNEL COOLER ARRANGEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| S113 | GENERATOR FOUNDATION | A2 | USE HULL 295 PELICAN ISLAND |
| S114 | FIRE MONITOR PUMP FOUNDATION | - | USE HULL 295 PELICAN ISLAND |
| S115 | SEACHEST ARRANGEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| S125 | ANCHOR ARRANGEMENT | A3 | USE HULL 295 PELICAN ISLAND |
| S126 | RESCUE LIFEBOAT DAVIT | B1 | USE HULL 295 PELICAN ISLAND |

## HULL 299 WINE ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| O | Outfits | | |
| O1 | DOORS, WINDOWS, HATCHES AND MANHOLE DETAILS | - | USE HULL 295 PELICAN ISLAND |
| O3 | INTERIOR DOORS | A3 | USE HULL 295 PELICAN ISLAND |
| O4 | EXTERIOR WT DOORS | - | USE HULL 295 PELICAN ISLAND |
| O5 | MANHOLES & HATCHES | C1 | USE HULL 295 PELICAN ISLAND |
| O6 | WINDOWS & SIDELIGHTS | A1 | USE HULL 295 PELICAN ISLAND |
| O6YD | WINDOWS (YARD) | - | USE HULL 295 PELICAN ISLAND |
| O7 | LADDERS & STAIRS | B1 | USE HULL 295 PELICAN ISLAND |
| O9 | MOORING ARRANGEMENT | A3 | USE HULL 295 PELICAN ISLAND |
| O10 | HANDRAILS | B1 | USE HULL 295 PELICAN ISLAND |
| O11 | FLOOR PLATING | A2 | USE HULL 295 PELICAN ISLAND |
| O12 | DECK BOARDS | B1 | USE HULL 295 PELICAN ISLAND |
| O13 | ROOM NUMBERS | - | USE HULL 295 PELICAN ISLAND |
| O14 | TRANSDUCER ARRANGEMENT | - | USE HULL 295 PELICAN ISLAND |
| O18 | HULL MARKINGS (DRAFT) | A2 | USE HULL 295 PELICAN ISLAND |
| O18YD | IMO NUMBERS | - | |
| O20 | GANGWAY | B1 | USE HULL 295 PELICAN ISLAND |
| O21 | JOINER WALL ARRANGEMENT | A3 | USE HULL 295 PELICAN ISLAND |
| O23 | JOINER CEILING ARRANGEMENT | A4 | USE HULL 295 PELICAN ISLAND |
| O26 | ANODE PLACEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| O31 | NAVIGATION LIGHT ARRANGEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| O33 | LOAD LINE ASSIGNMENT | - | USE HULL 295 PELICAN ISLAND |
| O34 | BUMPER TIRE ARRANGEMENT | - | USE HULL 295 PELICAN ISLAND |
| O35 | NAVIGATION BRIDGE VISIBILITY | - | USE HULL 295 PELICAN ISLAND |
| O36 | GRABRAILS | - | USE HULL 295 PELICAN ISLAND |
| O37 | MODULAR HEAD ARRANGEMENT PLAN | A1 | USE HULL 295 PELICAN ISLAND |
| O38 | GALLEY LAYOUT | A4 | USE HULL 295 PELICAN ISLAND |
| O45 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 295 PELICAN ISLAND |
| O46 | VENTILATION SYSTEM | A4 | USE HULL 295 PELICAN ISLAND |
| O46YD | VENTILATION SYSTEM YARD DRAWING | A6 | USE HULL 295 PELICAN ISLAND |
| O50 | PILOT HOUSE TOP LAYOUT | A6 | USE HULL 295 PELICAN ISLAND |
| O53 | STACK LOGO LOCATION | - | USE HULL 295 PELICAN ISLAND |
| O54 | NAME LOCATION | - | |
| O70 | COLOR SCHEME | - | USE HULL 295 PELICAN ISLAND |

## HULL 299 WINE ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| M | PIPING | | |
| M1 | EXHAUST GAS SYSTEM | - | USE HULL 295 PELICAN ISLAND |
| M2 | FUEL OIL SERVICE SYSTEM | - | USE HULL 295 PELICAN ISLAND |
| M3 | FUEL OIL TRANSFER SYSTEM | A1 | USE HULL 295 PELICAN ISLAND |
| M4 | LUBE OIL SERVICE SYSTEM | - | USE HULL 295 PELICAN ISLAND |
| M5 | LUBE, HYDRAULIC AND DIRTY OIL TRANSFER SYSTEM | A1 | USE HULL 295 PELICAN ISLAND |
| M6 | FRESH WATER COOLING SYSTEM | A2 | USE HULL 295 PELICAN ISLAND |
| M10 | BALLAST SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M11 | BILGE SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M12 | FIRE MAIN SYSTEM | C0 | USE HULL 295 PELICAN ISLAND |
| M13 | TANK SOUNDFAST SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M14 | SHIPS SERVICE AND STARTING AIR SYSTEM | A1 | USE HULL 295 PELICAN ISLAND |
| M16 | CENTRAL HYDRAULIC OIL SYSTEM | A1 | USE HULL 295 PELICAN ISLAND |
| M21 | POTABLE WATER SYSTEM | A1 | USE HULL 295 PELICAN ISLAND |
| M22 | GREY, BLACK AND SANITARY WATER SYSTEM | A1 | USE HULL 295 PELICAN ISLAND |
| M24 | FUEL OIL OVERFLOW SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M25 | TANK AND MISC. VENT SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M26 | TANK LEVEL INDICATION SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M27 | WEATHER DECK DRAIN SYSTEM | A3 | USE HULL 295 PELICAN ISLAND |
| M29 | DRY BULK SYSTEM | B2 | USE HULL 295 PELICAN ISLAND |
| M30 | DRILLING FLUID SYSTEM (LIQUID MUD) | B3 | USE HULL 295 PELICAN ISLAND |
| M33 | FI-FI FIRE MONITOR SYSTEM | A2 | USE HULL 295 PELICAN ISLAND |
| M35 | METHANOL TRANSFER SYSTEM | B1 | USE HULL 295 PELICAN ISLAND |
| M37 | WEATHER DECK PIPE PENETRATIONS | B1 | USE HULL 295 PELICAN ISLAND |
| M40 | MISC. PIPING SYSTEM | - | USE HULL 295 PELICAN ISLAND |
| M50 | HULL AND DECK PENETRATIONS | - | USE HULL 295 PELICAN ISLAND |
| M59 | CRUDE OIL SLOP SYSTEM | C0 | USE HULL 295 PELICAN ISLAND |
| M70 | CARGO FRESH WATER SYSTEM | B3 | USE HULL 295 PELICAN ISLAND |

## HULL 299 WINE ISLAND DRAWING LIST

| Drawing | Title | Rev | Comments |
|---|---|---|---|
| **E** | **Electrical** | | |
| E2 | LV POWER ONE LINE | A0 | |
| E3 | CABLEWAY LAYOUT | A2 | USE HULL 295 PELICAN ISLAND |
| E4 | 480VAC DISTRIBUTION ONE LINE | B0 | |
| E6 | 208 / 120 VAC DISTRIBUTION ONE LINE | B0 | |
| E7L | 208 / 120 VAC LIGHTING ARRANGEMENT | A5 | USE HULL 295 PELICAN ISLAND |
| E7H | 208 / 120 VAC HEATING ARRANGEMENT | - | USE HULL 295 PELICAN ISLAND |
| E7R | 208 / 120 VAC RECEPTACLE ARRANGEMENT | A4 | USE HULL 295 PELICAN ISLAND |
| E8 | 24V DC POWER DISTRIBUTION ONE LINE DIAGRAM | A2 | USE HULL 295 PELICAN ISLAND |
| E13 | GENERAL ALARM ONE LINE | A1 | USE HULL 295 PELICAN ISLAND |
| E15 | SOUND POWERED PHONE (SPP) ONE LINE DIAGRAM | - | USE HULL 295 PELICAN ISLAND |
| E16 | CENTRAL COMMUNICATION ONE LINE | A4 | USE HULL 295 PELICAN ISLAND |
| E19 | CONTROL ROOM CONSOLE LAYOUT | A2 | USE HULL 295 PELICAN ISLAND |
| E21 | PILOT HOUSE CONSOLE LAYOUT | A2 | USE HULL 295 PELICAN ISLAND |
| E22 | NAVIGATIONAL LIGHT CONTROL SYSTEM ONE LINE | A2 | USE HULL 295 PELICAN ISLAND |
| E34 | HAZARD AREA PLAN AND EQUIPMENT LIST | A3 | USE HULL 295 PELICAN ISLAND |
| E35 | EMERGENCY STEERING PROCEDURES | - | USE HULL 295 PELICAN ISLAND |
| E36YD | MISC. CONTROL PANEL ARRANGEMENT (YARD) | A1 | USE HULL 295 PELICAN ISLAND |
| E37YD | HYDRAULIC WT DOOR SYSTEM (YARD) | - | USE HULL 295 PELICAN ISLAND |
| E40 | CO2 ALARM SYSTEM ONE LINE (Used to be Called FIRE SUPPRESSION SYSTEM ONE LINE) | A2 | USE HULL 295 PELICAN ISLAND |
| E45 | A/C VENTILATION SYSTEM CONTROL ONE LINE | - | USE HULL 295 PELICAN ISLAND |
| E47 | METHANOL SYSTEM CONTROL ONE LINE | A1 | USE HULL 295 PELICAN ISLAND |
| E51 | VIDEO MONITORING SYSTEM ONE LINE | | USE HULL 295 PELICAN ISLAND |
| E53 | MV DISTRIBUTION ONE LINE | - | USE HULL 295 PELICAN ISLAND |
| E54 | EMERGENCY STOP AND SHUTDOWN ONE LINE | B0 | |
| E55 | BILGE SYSTEM CONTROL ONE LINE | A1 | USE HULL 295 PELICAN ISLAND |
| E60 | WT DOORS / HATCH ONE LINE | A1 | USE HULL 295 PELICAN ISLAND |
| E62 | COMPUTER NETWORK DIAGRAM | - | USE HULL 295 PELICAN ISLAND |
| E65 | TV & ENTERTAINMENT SYSTEM | - | USE HULL 295 PELICAN ISLAND |
| E68 | ENGINE ORDER TELEGRAPH (EOT) ONE LINE DIAGRAM | A1 | USE HULL 295 PELICAN ISLAND |
| E109 | EMERGENCY GENERATOR SWITCHBOARD CONTROLS ONE LINE | A1 | USE HULL 295 PELICAN ISLAND |
| E111 | MAIN SWITCHBOARD CONTROLS CABLE PULL LIST | A1 | USE HULL 295 PELICAN ISLAND |
| E112 | MEDIUM VOLTAGE SWITCHBOARD CONTROLS CABLE PULL LIST | A1 | USE HULL 295 PELICAN ISLAND |
| E117 | BOW AND STERN TUNNEL THRUSTER ONE LINE | A2 | USE HULL 295 PELICAN ISLAND |
| E128 | AUTOMATION I/O BOX ONE LINE | - | |
| E130 | AUTOMATED PILOT HOUSE WIPER CONTROLS | A1 | USE HULL 295 PELICAN ISLAND |
| E131 | PILOT HOUSE OVERHEAD LIGHTING ARRANGEMENT | A1 | USE HULL 295 PELICAN ISLAND |
| E132 | STEREO ANTENNA ONE LINE | A1 | USE HULL 295 PELICAN ISLAND |
| E133 | HORN & LIGHT JUNCTION BOXES | A1 | USE HULL 295 PELICAN ISLAND |
| E134 | PILOT HOUSE ELECTRONICS DIAGRAM | A4 | USE HULL 295 PELICAN ISLAND |

Exhibit L

### [FORM OF] PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT (as it may be amended, restated, amended and restated, supplemented or modified from time to time, this "Pledge Agreement") is entered into as of [•], 2023 by and among Nautical Solutions Holdings, LLC, a Louisiana limited liability company ("Holdings" or the "Grantor"), and Wilmington Trust, National Association, in its capacity as collateral agent (together with its successors and assigns in such capacity, the "Collateral Agent") for the benefit of the Noteholders and the other Secured Parties.

### PRELIMINARY STATEMENTS

Pursuant to that certain Note Exchange Agreement, dated as of the date hereof (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Note Exchange Agreement"), by and among Nautical Solutions, L.L.C., a Louisiana limited liability company (the "Company"), Holdings, Wilmington Trust, National Association, in its capacity as administrative agent, the Collateral Agent and the noteholders identified therein (the "Noteholders"), the Company is issuing and the Noteholders are acquiring the Company's Senior Secured Notes due 2028 in the aggregate original principal amount set forth in the Note Exchange Agreement (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any notes delivered in substitution or exchange for any of the foregoing senior secured notes, the "Senior Notes"). The Grantor is entering into this Pledge Agreement in order to induce the Noteholders to enter into the Note Exchange Agreement and exchange their Exchanged Debt for the Senior Notes.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to induce the Noteholders to enter into the Note Exchange Agreement and to exchange their Exchanged Debt for the Senior Notes to be issued to the Noteholders thereunder on the date hereof, the Grantor agrees, for the benefit of each Secured Party, as follows:

## ARTICLE I
### DEFINITIONS

1.1     Terms Defined in Note Exchange Agreement. All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Note Exchange Agreement.

1.2     Terms Defined in UCC. Terms defined in the UCC which are not otherwise defined in this Pledge Agreement or the Note Exchange Agreement are used herein as defined in the UCC (even where capitalized herein and not capitalized in the UCC).

1.3     Definitions of Certain Terms Used Herein. As used in this Pledge Agreement, in addition to the terms defined in the introductory paragraph hereto and in the Preliminary Statements, the following terms shall have the following meanings:

"Amendment" shall have the meaning set forth in Section 4.2.

"Article" means a numbered article of this Pledge Agreement, unless another document is specifically referenced.

"Assumption Agreement" has the meaning set forth in Section 4.7.

"Collateral" shall have the meaning set forth in Article II.

"Control" shall have the meaning set forth in Article 8 or, if applicable, in Section 9-104, 9-105, 9-106 or 9-107 of Article 9 of the UCC.

"Equity Interests" of any person means any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity or ownership of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing, excluding any debt security that is convertible or exchangeable into any Equity Interests (provided that any instrument evidencing indebtedness convertible or exchangeable into Equity Interests, whether or not such debt securities include any right of participation with Equity Interests, shall not be deemed to be Equity Interests unless and until such instrument is so converted or exchanged).

"Exhibit" refers to a specific exhibit to this Pledge Agreement (unless another document is specifically referenced), as from time to time supplemented by any Assumption Agreement or an Amendment.

"General Intangibles" shall have the meaning set forth in Article 9 of the UCC.

"Pledged Collateral" means, in respect of the Grantor, all Equity Interests now owned or hereafter acquired by the Grantor including, without limitation, the Equity Interests set forth on Exhibit B hereto and any certificates, instruments or other documents representing such Equity Interests.

"Proceeds" shall have the meaning set forth in Article 9 of the UCC and, in any event shall include, without limitation all dividends or other income from the Pledged Collateral, collections thereon or distributions or payments with respect thereto

"Section" means a numbered section of this Pledge Agreement, unless another document is specifically referenced.

"Secured Parties" means the Collateral Agent, the Agent and the Noteholders.

"Secured Obligations" has the meaning given to the defined term "Note Obligations" in the Note Exchange Agreement.

"Security" has the meaning set forth in Article 8 of the UCC.

"Stock Rights" means all dividends (cash, stock or otherwise), cash, instruments, rights to subscribe, purchase or sell or other distributions and all other rights and property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing which Grantor shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for the Pledged Collateral, any right to receive an Equity Interest and any right to receive earnings, in which the Grantor now has or hereafter acquires any right, issued by an issuer of such Pledged Collateral.

"UCC" means the Uniform Commercial Code, as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the attachment, perfection or priority of, or remedies with respect to, the Collateral Agent's or any Secured Party's Lien on any Collateral.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms.

## ARTICLE II
### GRANT OF SECURITY INTEREST

To secure the prompt and complete payment and performance of the Secured Obligations, the Grantor hereby pledges, assigns and grants to the Collateral Agent, on behalf of and for the ratable benefit of the Secured Parties, a security interest in all of its right, title and interest in, to and under all of the following items, whether

now owned by or owing to, or hereafter acquired by or arising in favor of the Grantor (all of which will be collectively referred to as, the "Collateral"):

(a)    all Pledged Collateral now owned or hereafter acquired by the Grantor or in which the Grantor now has or at any time in the future may acquire any right, title or interest and whether now existing or hereafter coming into existence;

(b)    all rights, privileges, voting rights and benefits of the Grantor (but no duty or obligation) under all agreements, documents and instruments relating to the Pledged Collateral, including all rights under limited liability company, operating, management, partnership and stockholder agreements; and

(c)    all accessions to, substitutions for and replacements, Proceeds (including Stock Rights), and products of the foregoing together with all books and records, other records, Accounts, General Intangibles and Investment Property related thereto;

provided, that any payment made by the Company to Grantor in respect of the Tax Liability Amount and the Final Tax Liability Amount is not collateral hereunder and is not subject to any limitations of this Pledge Agreement.

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES

As of the Closing Date, the Grantor represents and warrants to the Collateral Agent and the Secured Parties that:

3.1    Title, Perfection and Priority. The representations and warranties of the Company and Holdings in the Note Exchange Agreement concerning the Grantor, this Pledge Agreement and the Collateral are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representation or warranty that already is qualified or modified by materiality in the text thereof). The Grantor has the corporate, limited liability company or partnership power, as applicable, to transfer the Collateral and title to the Collateral with respect to which it has purported to grant a security interest hereunder, free and clear of all Liens except for Liens permitted under Section 4.1(e) and has full power and authority to grant to the Collateral Agent the security interest in such Collateral pursuant hereto. When financing statements in appropriate form have been filed in the appropriate offices against the Grantor in the locations listed on Exhibit C, the Collateral Agent will have a fully perfected first priority security interest in that Collateral of the Grantor in which a security interest may be perfected under the UCC by filing.

3.2    Type and Jurisdiction of Organization, Organizational and Identification Numbers. The type of entity of the Grantor, its state of organization, the organizational number issued to it by its state of organization and its federal employer identification number are set forth on Exhibit A.

3.3    Principal Location. The Grantor's mailing address and the location of its place of business (if it has only one) or its chief executive office (if it has more than one place of business), are disclosed in Exhibit A. As of the Closing Date, the Grantor has no other place of business except as set forth in Exhibit A. Such location set forth on Exhibit A is the Grantor's location for the purposes of Section 9-301 and 9-307 of the UCC, and the Grantor has not had a different location for the purposes of Section 9-301 and 9-307 of the UCC during the past five years.

3.4    Exact Names. The Grantor's name in which it has executed this Pledge Agreement is the exact name as it appears in the Grantor's organizational documents, as amended, as filed with the Grantor's jurisdiction of organization. The Grantor has not, (a) in the last four months conducted business under any name except the name in which it has executed this Pledge Agreement, which is the exact name as it appears in the Grantor's

Organizational Documents, as amended, and as filed with the Grantor's jurisdiction of organization as of the Closing Date, and (b) during the past five years prior to its becoming a party hereto, been known by or used any other corporate or fictitious name, or been a party to any merger or consolidation, or been a party to any acquisition, other than the capital contributions of the Equity Interests in the Company to the Grantor concurrently herewith.

3.5     No Financing Statements, Security Agreements. No financing statement or security agreement describing all or any portion of the Collateral naming the Grantor as debtor has been filed or is of record in any jurisdiction except (a) for financing statements or security agreements naming the Collateral Agent on behalf of the Secured Parties as the secured party and (b) as permitted by Section 4.1(e); provided, that nothing herein shall be deemed to constitute an agreement to subordinate any of the Liens of the Collateral Agent under the Note Documents to any Liens otherwise permitted under Section 4.1(e) hereof.

3.6     Pledged Collateral.

(a)     Exhibit B sets forth a complete and accurate list of all Pledged Collateral owned by the Grantor. The Grantor is the direct, sole beneficial owner and sole holder of record of the Pledged Collateral listed on Exhibit B as being owned by it, free and clear of any Liens, except as permitted by Section 4.1(e). The Grantor further represents and warrants that all Pledged Collateral owned by it constituting an Equity Interest has been (to the extent such concepts are relevant with respect to such Pledged Collateral) duly authorized, validly issued, are fully paid and non-assessable and constitute the percentage of the issued and outstanding Equity Interests of the respective issuers thereof indicated on Exhibit B hereto and, in the case of corporations, business trusts, joint stock companies and similar Persons, are represented by a certificate and, in the case of limited liability companies and partnerships, are not represented by a certificate and the organizational documents of the issuer have not provided that they constitute Securities governed by Article 8 of the UCC.

(b)     In addition, (i) none of the Pledged Collateral owned by it has been issued or transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such issuance or transfer may be subject, (ii) the Pledged Collateral is and will continue to be freely transferable (subject to the restrictions set forth in this Pledge Agreement and the Note Exchange Agreement), (iii) there are existing no options, warrants, calls, rights of first refusal or commitments of any character whatsoever relating to such Pledged Collateral and the ability of the Collateral Agent to transfer the Pledged Collateral, and (iv) no consent, approval, authorization, or other action by, and no giving of notice to or filing with, any governmental authority or any other Person is required for the pledge by the Grantor of such Pledged Collateral pursuant to this Pledge Agreement or for the execution, delivery and performance of this Pledge Agreement by the Grantor, or for the exercise by the Collateral Agent of the voting or other rights provided for in this Pledge Agreement or for the remedies in respect of the Pledged Collateral pursuant to this Pledge Agreement (including transfer by foreclosure), except which has already been obtained or as may be required in connection with such disposition by laws affecting the offering and sale of securities generally.

# ARTICLE IV
## COVENANTS

From the date of this Pledge Agreement, and thereafter until this Pledge Agreement is terminated, the Grantor agrees that:

4.1     General.

(a)     Collateral Records. The Grantor will maintain complete and accurate books and records with respect to the Collateral owned by it, and furnish to the Collateral Agent such information, reports and schedules relating to and further identifying such Collateral as the Collateral Agent shall from time to time reasonably request.

(b)       <u>Authorization to File Financing Statements; Ratification</u>. The Grantor hereby authorizes the Collateral Agent (or its designee) to file, and if requested will deliver to the Collateral Agent, all financing statements and other documents and take such other actions as may from time to time be reasonably requested by the Collateral Agent or the Required Holders in order to maintain a perfected security interest in and, if applicable, Control of, the Collateral owned by the Grantor. Any financing statement filed by the Collateral Agent (or its designee) may be filed in any filing office in any UCC jurisdiction and may (i) indicate the Grantor's Collateral by any description which reasonably approximates the description contained in this Pledge Agreement, and (ii) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the Grantor is an organization, the type of organization and any organization identification number issued to the Grantor. Notwithstanding the foregoing, the Grantor hereby authorizes the Collateral Agent (or its designee) to describe the Collateral on any financing statement by using words and phrases with respect to the Grantor similar to "all assets" or "all personal property, whether now owned or hereafter acquired." The Grantor also agrees to furnish any such information to the Collateral Agent promptly upon reasonable request.

(c)       <u>Further Assurances</u>. The Grantor will, if so requested by the Collateral Agent, furnish to the Collateral Agent, as often as the Collateral Agent reasonably requests, statements and schedules further identifying and describing the Collateral owned by it and such other reports and information in connection with its Collateral as the Collateral Agent may reasonably request, all in such detail as the Collateral Agent may reasonably specify. Subject to <u>Section 4.6</u> hereof, the Grantor may from time to time update the Exhibits to this Pledge Agreement by delivering supplemental Exhibits in writing to the Collateral Agent. The Grantor also agrees to take any and all actions necessary to defend title to the Collateral against all persons and to defend the security interest of the Collateral Agent in its Collateral and the priority thereof against any Lien not expressly permitted hereunder.

(d)       <u>Disposition of Collateral</u>. The Grantor will not sell, lease or otherwise dispose of the Collateral.

(e)       <u>Liens</u>. The Grantor will not create, incur, or suffer to exist any Lien on the Collateral owned by it except the security interest created by this Pledge Agreement.

(f)       <u>Other Financing Statements</u>. The Grantor will not authorize the filing of any financing statement naming it as debtor covering all or any portion of the Collateral owned by it, other than in favor of the Collateral Agent. The Grantor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement without the prior written consent of the Collateral Agent (acting at the direction of the Required Holders), subject to the Grantor's rights under Section 9-509(d)(2) of the UCC.

(g)       <u>R e s e r v e d</u>.

(h)       <u>Compliance with Terms</u>. The Grantor will perform and comply with all of its obligations under (x) any Note Document and (y) all material agreements (other than the Note Documents) to which it is a party or by which it is bound relating to such Collateral.

4.2       <u>Delivery of Securities</u>. The Grantor will (a) deliver to the Collateral Agent immediately upon execution of this Pledge Agreement, the originals of all Certificated Securities constituting Collateral owned by it (if any then exist) and, in the case of an instrument or certificate in registered form, accompanied by a stock or securities power in blank and accompanied by any required transfer tax stamps to effect the pledge of such Collateral to the Collateral Agent, (b) hold in trust for the Collateral Agent upon receipt and promptly thereafter deliver to the Collateral Agent any Certificated Securities constituting Collateral and (c) upon the Collateral Agent's request, deliver to the Collateral Agent a duly executed amendment to this Pledge Agreement, in the form of <u>Exhibit D</u> hereto (the "<u>Amendment</u>"), pursuant to which the Grantor will pledge such additional Collateral.

The Grantor hereby authorizes the Collateral Agent to attach each Amendment to this Pledge Agreement and agrees that all additional Collateral owned by it set forth in such Amendments shall be considered to be part of the Collateral.

4.3     Uncertificated Pledged Collateral. The Grantor will permit the Collateral Agent from time to time to cause the appropriate issuers (and, if held with a securities intermediary, such securities intermediary) of uncertificated securities or other types of Pledged Collateral owned by it not represented by certificates to mark their books and records with the numbers and face amounts of all such uncertificated securities or other types of Pledged Collateral not represented by certificates and all rollovers and replacements therefor to reflect the Lien of the Collateral Agent granted pursuant to this Pledge Agreement. With respect to any Pledged Collateral owned by it, upon the Collateral Agent's request, the Grantor will take any actions necessary and reasonably requested by the Collateral Agent to cause (a) the issuers of uncertificated securities which are Pledged Collateral and (b) any securities intermediary which is the holder of any such Pledged Collateral, to cause the Collateral Agent to have and retain Control (within the meaning of Article 8 of the UCC) over such Pledged Collateral.

4.4     Pledged Collateral.

(a)     Changes in Capital Structure of Issuers. The Grantor will not (i) permit or suffer any issuer of an Equity Interest constituting Pledged Collateral owned by it to dissolve, merge, divide, liquidate or retire any such Equity Interests or other Securities evidencing ownership of Pledged Collateral, reduce its capital, sell or encumber all or substantially all of its assets or merge or consolidate with any other entity (except, in the case of each of the foregoing, in any manner not prohibited by the Note Exchange Agreement), or (ii) vote any such Pledged Collateral in favor of any of the foregoing.

(b)     Registration of Pledged Collateral. The Grantor will permit any registerable Pledged Collateral owned by it to be registered in the name of the Collateral Agent or its nominee at any time during the continuance of an Event of Default at the option of the Required Holders.

(c)     Rights in Pledged Collateral.

(i)     Without in any way limiting the foregoing and subject to clause (ii) below, the Grantor shall have the right to exercise all voting rights or other rights relating to the Pledged Collateral owned by it for all purposes not inconsistent with this Pledge Agreement, the Note Exchange Agreement or any other Note Document; *provided however, that* no vote or other right shall be exercised or action taken which would have the effect of impairing or delaying the rights of the Collateral Agent in respect of such Pledged Collateral or which would, reasonably be likely to be inconsistent with, or violate any provision of this Pledge Agreement or the other Note Documents.

(ii)     The Grantor will permit the Collateral Agent or its nominee at any time during the continuance of an Event of Default and upon prior written notice to the Grantor to exercise all voting rights or other rights relating to the Pledged Collateral owned by it, including, without limitation, exchange, subscription or any other rights, privileges, or options pertaining to any Equity Interest or Investment Property constituting such Pledged Collateral as if it were the absolute owner thereof.

(iii)     Subject to clause (iv) below, the Grantor shall be entitled to collect and receive for its own use all dividends, distributions, principal and interest paid in respect of the Pledged Collateral owned by it to the extent not in violation of the Note Exchange Agreement; *provided however, that* (A) until actually paid, all rights to such distributions, dividends, principal and interest shall remain subject to the Lien created by this Pledge Agreement and (B) distributions, dividends principal and interest constituting Collateral shall be subject to the terms of this Pledge Agreement; and

(iv)     At any time during the continuance of an Event of Default and upon prior written notice to the Grantor, all dividends, distributions, principal and interest in respect of any of the Pledged Collateral owned by the Grantor, whenever paid or made, shall be delivered to the Collateral Agent to hold as Pledged Collateral and shall, if received by the Grantor, be received in trust for the benefit of the Collateral Agent, be segregated from the other property or funds of the Grantor, and be forthwith delivered to the Collateral Agent as Pledged Collateral in the same form as so received (with any necessary endorsement).

4.5     No Interference. The Grantor agrees that it will not interfere with any right, power and remedy of the Collateral Agent provided for in this Pledge Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by the Collateral Agent of any one or more of such rights, powers or remedies.

4.6     Information regarding the Grantor. The Grantor shall provide prompt written notice (and in any event not more than thirty (30) days following such change (or such later date as the Collateral Agent (acting at the direction of the Required Holders) may agree in its sole discretion) of any change (i) in the Grantor's corporate name, (ii) in the location of the Grantor's chief executive office or principal place of business, (iii) in the Grantor's identity or corporate structure or in the jurisdiction in which the Grantor is incorporated or formed, (iv) in the Grantor's jurisdiction of organization or the Grantor's organizational identification number in such jurisdiction of organization, and (v) in Grantor's federal taxpayer identification number.

4.7     Additional Grantors. The Grantor agrees to cause each Subsidiary that is required to become a party to this Pledge Agreement pursuant to the Note Exchange Agreement to become a Grantor for all purposes of this Pledge Agreement by execution and delivery by such Subsidiary of an Assumption Agreement in the form of Annex 1 hereto (each, an "Assumption Agreement").

4.8     Limited Liability Company and Partnership Interests.

(a)     The Grantor shall at all times prevent each interest in any limited liability company or partnership controlled by the Grantor and constituting Pledged Collateral, pledged by it hereunder, from being a "security" within the meaning of Article 8 of the UCC (by preventing any such limited liability company or partnership from "opting in" under Article 8 of the UCC), and shall cause each such interest to be, at all times hereafter, General Intangibles under Article 9 of the UCC that is uncertificated unless and until the Pledgor complies with Section 4.8(b).

(b)     With respect to any interest in any limited liability company or partnership controlled by a Grantor and constituting Pledged Collateral, pledged hereunder, the Grantor shall at no time issue any certificate representing such interest, unless prior to such issuance, the applicable Grantor provides notification to the Collateral Agent of such issuance and delivers, as applicable, any such certificate to the Collateral Agent pursuant to the terms hereof along with the other deliverables contemplated by Section 4.2 (it being understood, for avoidance of doubt, that the Pledged Collateral shall only be certificated Article 8 "securities" to the extent contemplated by this Section 4.8(b)).

4.9     Pledged Securities. The granting of the foregoing security interest in and of itself does not make the Collateral Agent or any Secured Party a successor to the Grantor as a partner or member in any issuer that is a partnership, limited partnership or limited liability company, as applicable, and neither the Collateral Agent, any Secured Party, nor any of their respective successors or assigns hereunder shall be deemed to have become a partner or member in any Person, as applicable, by accepting this Pledge Agreement or exercising any right granted herein unless and until such time, if any, when any such Person expressly becomes a partner or member in any Issuer, as applicable, and complies with any applicable transfer provisions set forth in the charter or organizational documents relating to an applicable Pledged Security after a foreclosure thereon or deed in lieu of foreclosure thereon.

# ARTICLE V
## DEFAULT AND REMEDIES

5.1     <u>Remedies</u>.

(a)     Upon the occurrence of and during the continuance of an Event of Default, the Collateral Agent may, or at the direction of the Required Holders, shall, exercise any or all of the following rights and remedies:

(i)     those rights and remedies provided in this Pledge Agreement, the Note Exchange Agreement, or any other Note Document; *provided that,* this <u>Section 5.1(a)</u> shall not be understood to limit any rights or remedies available to the Collateral Agent and the Secured Parties prior to an Event of Default;

(ii)     those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law (including, without limitation, any law governing the exercise of a bank's right of setoff or bankers' lien) when a debtor is in default under a security agreement;

(iii)     without notice (except as specifically provided in <u>Section 7.1</u> or elsewhere herein) sell, lease, assign, grant an option or options to purchase or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, for cash, on credit or for future delivery, and upon such other terms as the Collateral Agent may deem commercially reasonable;

(iv)     concurrently with delivery of written notice to the applicable Grantor, exercise the voting and all other rights as a holder of Pledged Collateral with respect thereto, to collect and receive all cash dividends, interest, principal and other distributions made thereon and to otherwise act with respect to the Pledged Collateral as though the Collateral Agent was the outright owner thereof; and

(v)     concurrently with delivery of written notice to the applicable Grantor, transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, to exchange certificates or instruments representing or evidencing Pledged Collateral for certificates or instruments of smaller or larger denominations.

(b)     The Collateral Agent, on behalf of the Secured Parties, may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(c)     Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the right upon any such public sale or sales and, to the extent permitted by law, upon any such private sale or sales, to purchase for the benefit of the Collateral Agent and the other Secured Parties, the whole or any part of the Collateral so sold, free of any right of equity redemption, which equity redemption the Grantor hereby expressly releases.

(d)     Upon the occurrence and during the continuance of an Event of Default, until the Collateral Agent is able to effect a sale, lease, or other disposition of Collateral, the Collateral Agent shall have the right to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Collateral Agent. The Collateral Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of the Collateral Agent's remedies (for the benefit of the Collateral Agent and the Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment.

(e)        Notwithstanding the foregoing, neither the Collateral Agent nor any Secured Party shall be required to (i) make any demand upon, or pursue or exhaust any of their rights or remedies against, the Grantor, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Secured Obligations or to pursue or exhaust any of their rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof, (ii) marshal the Collateral or any guarantee of the Secured Obligations or to resort to the Collateral or any such guarantee in any particular order, or (iii) effect a public sale of any Collateral.

(f)        The Grantor recognizes that the Collateral Agent may be unable to effect a public sale of any or all the Pledged Collateral under this Article V and may be compelled to resort to one or more private sales thereof in accordance with clause (a) above. The Grantor also acknowledges that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private. The Collateral Agent shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit the Grantor or the issuer of the Pledged Collateral to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws, even if the applicable Grantor and the issuer would agree to do so.

5.2        Grantor's Obligations Upon Default. Upon the request of the Collateral Agent, if an Event of Default has occurred and is continuing, the Grantor will:

(a)        make available to the Collateral Agent the Collateral and all books and records relating thereto at any place or places specified by the Collateral Agent, whether at a Grantor's premises or elsewhere;

(b)        permit the Collateral Agent, by the Collateral Agent's representatives and agents, to enter, occupy and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral or the books and records relating thereto, or both, to remove all or any part of the Collateral or the books and records relating thereto, or both, and to conduct sales of the Collateral, without any obligation to pay the Grantor for such use and occupancy; and

(c)        take, or cause an issuer of Pledged Collateral to take, any and all actions reasonably necessary to enable the Collateral Agent to consummate a sale or disposition of the Pledged Collateral (other than any action to register such securities for public sale under the Securities Act of 1933, as amended, or under applicable state securities laws).

# ARTICLE VI
## ATTORNEY IN FACT; PROXY

6.1        Authorization for Secured Party to Take Certain Action.

(a)        The Grantor irrevocably authorizes the Collateral Agent at any time and from time to time and appoints the Collateral Agent as its attorney in fact, in each case, for the purpose of carrying out the terms of this Pledge Agreement (i) to execute on behalf of the Grantor as debtor and to file financing statements necessary or desirable in the Collateral Agent's sole discretion to perfect and to maintain the perfection and priority of the Collateral Agent's security interest in the Collateral, (ii) to endorse and collect any cash proceeds of the Collateral, (iii) to file a carbon, photographic or other reproduction of this Pledge Agreement or any financing statement with respect to the Collateral as a financing statement and to file any other financing statement or amendment of a financing statement (which does not add new collateral or add a debtor) in such offices as the Collateral Agent in its sole discretion deems necessary or desirable to perfect and to maintain the perfection and priority of the Collateral Agent's security interest in the Collateral, (iv) to contact and enter into one or more agreements with the issuers of uncertificated securities which are Pledged Collateral or with

securities intermediaries holding Pledged Collateral as may be necessary or advisable to give the Collateral Agent Control over such Pledged Collateral, (v) to apply the proceeds of any Collateral received by the Collateral Agent to the Secured Obligations following an Event of Default, or prior to an Event of Default to the extent consistent with the Note Exchange Agreement, (vi) to discharge past due taxes, assessments, charges, fees or Liens on the Collateral (except for such Liens as are specifically permitted hereunder), and (vii) to do all other acts and things necessary to carry out this Pledge Agreement; and the Grantor agrees to reimburse the Collateral Agent on demand for any payment made or any expense incurred by the Collateral Agent in connection with any of the foregoing; *provided that,* this authorization shall not relieve the Grantor of any of its obligations under this Pledge Agreement, the Note Exchange Agreement or under any other Note Document.

(b)     All acts of said attorney or designee are hereby ratified and approved. The powers conferred on the Collateral Agent, for the benefit of the Collateral Agent and Secured Parties, under this <u>Section 6.1</u> are solely to protect the Collateral Agent's interests in the Collateral and shall not impose any duty upon the Collateral Agent or any Secured Party to exercise any such powers.

6.2     <u>Proxy</u>. THE GRANTOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS THE COLLATERAL AGENT AS ITS PROXY AND ATTORNEY-IN-FACT (AS SET FORTH IN <u>SECTION 6.1</u> ABOVE) WITH RESPECT TO THE COLLATERAL, INCLUDING THE RIGHT TO VOTE THE PLEDGED COLLATERAL IN ACCORDANCE WITH THE TERMS HEREOF, WITH FULL POWER OF SUBSTITUTION TO DO SO. IN ADDITION TO THE RIGHT TO VOTE ANY SUCH PLEDGED COLLATERAL, THE APPOINTMENT OF THE COLLATERAL AGENT AS PROXY AND ATTORNEY-IN-FACT SHALL INCLUDE THE RIGHT TO EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES AND REMEDIES TO WHICH A HOLDER OF SUCH PLEDGED COLLATERAL WOULD BE ENTITLED (INCLUDING GIVING OR WITHHOLDING WRITTEN CONSENTS OF MEMBERS OR SHAREHOLDERS, CALLING SPECIAL MEETINGS OF MEMBERS OR SHAREHOLDERS AND VOTING AT SUCH MEETINGS). NOTWITHSTANDING THE FOREGOING, SUCH PROXY SHALL BE EFFECTIVE, AUTOMATICALLY AND WITHOUT THE NECESSITY OF ANY ACTION (INCLUDING ANY TRANSFER OF ANY SUCH PLEDGED COLLATERAL ON THE RECORD BOOKS OF THE ISSUER THEREOF) BY ANY PERSON (INCLUDING THE ISSUER OF SUCH PLEDGED COLLATERAL OR ANY OFFICER OR AGENT THEREOF), ONLY UPON THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT.

6.3     <u>Nature of Appointment; Limitation of Duty</u>. THE APPOINTMENT OF THE COLLATERAL AGENT AS PROXY AND ATTORNEY-IN-FACT IN THIS <u>ARTICLE VI</u> IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE DATE ON WHICH THIS PLEDGE AGREEMENT IS TERMINATED IN ACCORDANCE WITH <u>SECTION 7.13</u>. NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NEITHER THE COLLATERAL AGENT, NOR ANY SECURED PARTY, NOR ANY OF THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE SOLELY TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE JUDGMENT; PROVIDED THAT, IN NO EVENT SHALL THEY BE LIABLE FOR ANY PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES.

# ARTICLE VII
## GENERAL PROVISIONS

7.1     <u>Waivers</u>. The Grantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made. To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to the Grantor, addressed as set forth in Article VIII, at least ten days prior to (a) the date of any such public sale or (b)

the time after which any such private sale or other disposition may be made. To the maximum extent permitted by applicable law, the Grantor waives all claims, damages, and demands against the Collateral Agent or any Secured Party arising out of the repossession, retention or sale of the Collateral, except such as arise solely out of the gross negligence or willful misconduct of the Collateral Agent or such Secured Party as finally determined by a court of competent jurisdiction. To the extent it may lawfully do so, the Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Collateral Agent or any Secured Party, any valuation, stay, appraisal, extension, moratorium, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Pledge Agreement, or otherwise. Except as otherwise specifically provided herein, the Grantor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Pledge Agreement or any Collateral.

7.2    Limitation on Collateral Agent's and any Secured Party's Duty with Respect to the Collateral. Neither the Collateral Agent nor any Secured Party shall have any obligation to prepare the Collateral for sale. The Collateral Agent and each Secured Party shall use reasonable care with respect to the Collateral in its possession or under its control; provided that the Collateral Agent and each Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral, if such Collateral is accorded treatment substantially equal to that which the Collateral Agent or such Secured Party accords its own property. Neither the Collateral Agent nor any Secured Party shall have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of the Collateral Agent or such Secured Party, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto. To the extent that applicable law imposes duties on the Collateral Agent to exercise remedies in a commercially reasonable manner, the Grantor acknowledges and agrees that it is commercially reasonable for the Collateral Agent (a) to fail to incur expenses deemed significant by the Collateral Agent to prepare Collateral for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against account debtors or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (d) to exercise collection remedies against account debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as the Grantor, for expressions of interest in acquiring all or any portion of such Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, such as title or warranties, (k) to purchase insurance or credit enhancements to insure the Collateral Agent against risks of loss, collection or disposition of Collateral or to provide to the Collateral Agent a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by the Collateral Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Collateral Agent in the collection or disposition of any of the Collateral. The Grantor acknowledges that the purpose of this Section 7.2 is to provide non-exhaustive indications of what actions or omissions by the Collateral Agent would be commercially reasonable in the Collateral Agent's exercise of remedies against the Collateral and that other actions or omissions by the Collateral Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 7.2. Without limitation upon the foregoing, nothing contained in this Section 7.2 shall be construed to grant any rights to the Grantor or to impose any duties on the Collateral Agent that would not have been granted or imposed by this Pledge Agreement or by applicable law in the absence of this Section 7.2.

7.3    Secured Party Performance of Debtor Obligations. Without having any obligation to do so, the Collateral Agent may perform or pay any obligation which the Grantor has agreed to perform or pay in this Pledge Agreement but the Grantor nevertheless has not paid when due. The Grantor shall reimburse the Collateral Agent

for any amounts paid by the Collateral Agent pursuant to this <u>Section 7.3</u>. The Grantor's obligation to reimburse the Collateral Agent pursuant to the preceding sentence shall be Secured Obligations payable on demand.

7.4     <u>Specific Performance of Certain Covenants</u>. The Grantor acknowledges and agrees that any breach of <u>Sections 4.2 4.3</u> or <u>4.8</u> of this Pledge Agreement will cause irreparable injury to the Collateral Agent and the Secured Parties, that the Collateral Agent and Secured Parties have no adequate remedy at law in respect of such breaches and therefore agrees, without limiting the right of the Collateral Agent or the Secured Parties to seek and obtain specific performance of other obligations of the Grantor contained in this Pledge Agreement, that such <u>Sections 4.2 4.3</u>, and <u>4.8</u> of this Pledge Agreement shall be specifically enforceable against the Grantor.

7.5     <u>Dispositions Not Authorized</u>. No Grantor is authorized to sell or otherwise dispose of the Collateral except as otherwise set forth in the Note Exchange Agreement and notwithstanding any course of dealing between the Grantor and the Collateral Agent or other conduct of the Collateral Agent, no authorization to sell or otherwise dispose of the Collateral shall be binding upon the Collateral Agent or the Secured Parties unless such authorization is already in the Note Exchange Agreement or otherwise in writing signed by the Collateral Agent with the consent or at the direction of the Required Holders.

7.6     <u>No Waiver; Amendments; Cumulative Remedies</u>. No delay or omission of the Collateral Agent or any Noteholder to exercise any right or remedy granted under this Pledge Agreement shall impair such right or remedy or be construed to be a waiver of any Event of Default or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy. No waiver, amendment or other variation of the terms, conditions or provisions of this Pledge Agreement whatsoever shall be valid unless in writing signed by the Collateral Agent with the concurrence or at the direction of the Noteholders required under Section 16 of the Note Exchange Agreement and then only to the extent in such writing specifically set forth. All rights and remedies contained in this Pledge Agreement or by law afforded shall be cumulative and all shall be available to the Collateral Agent and the Secured Parties until Payment in Full.

7.7     <u>Limitation by Law; Severability of Provisions</u>. All rights, remedies and powers provided in this Pledge Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Pledge Agreement are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they shall not render this Pledge Agreement invalid, unenforceable or not entitled to be recorded or registered, in whole or in part. Any provision in this Pledge Agreement that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of this Pledge Agreement are declared to be severable.

7.8     <u>Reinstatement</u>. This Pledge Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Grantor for liquidation or reorganization, should the Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of the Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

7.9     <u>Benefit of Agreement</u>. The terms and provisions of this Pledge Agreement shall be binding upon and inure to the benefit of the Grantor, the Collateral Agent and the Secured Parties and their respective successors and assigns (including all persons who become bound as a debtor to this Pledge Agreement), except that no Grantor shall have the right to assign its rights or delegate its obligations under this Pledge Agreement or

any interest herein, without the prior written consent of the Collateral Agent. No sales of participations, assignments, transfers, or other dispositions of any agreement governing the Secured Obligations or any portion thereof or interest therein shall in any manner impair the Lien granted to the Collateral Agent, for the benefit of the Collateral Agent and the Secured Parties, hereunder.

7.10     <u>Survival of Representations</u>. All representations and warranties of the Grantor contained in this Pledge Agreement shall survive the execution and delivery of this Pledge Agreement.

7.11     <u>Taxes and Expenses</u>. The Grantor shall reimburse the Collateral Agent for any and all reasonable out-of-pocket expenses and fees (including reasonable attorneys', auditors' and accountants' fees) and charges (excluding time charges of attorneys who may be employees of the Collateral Agent) incurred by the Collateral Agent in connection with the preparation, execution, delivery, administration, collection and enforcement of this Pledge Agreement and in the audit, analysis, administration, collection, preservation or sale of the Collateral (including the expenses and charges associated with any periodic or special audit of the Collateral) all in accordance with, and to the extent provided in, Section 14.1 of the Note Exchange Agreement. Any and all costs and expenses incurred by the Grantor in the performance of actions required pursuant to the terms hereof shall be borne solely by the Grantor.

7.12     <u>Headings</u>. The title of and section headings in this Pledge Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Pledge Agreement.

7.13     <u>Termination</u>. This Pledge Agreement shall continue in effect (notwithstanding the fact that from time to time there may be no Secured Obligations outstanding) until payment in full in cash of the Secured Obligations in accordance with the terms of the Note Exchange Agreement.

7.14     <u>Release of Collateral</u>. The grant of any Lien, pledge and security interest hereunder and all of rights, powers and remedies in connection herewith shall remain in full force and effect until released (in whole or in part) pursuant to Section 16.1 of the Note Exchange Agreement.

7.15     <u>Entire Agreement</u>. This Pledge Agreement, the Note Exchange Agreement and the other Note Documents embody the entire agreement and understanding between the Grantor and the Collateral Agent relating to the Collateral and supersedes all prior agreements and understandings between the Grantor and the Collateral Agent relating to the Collateral.

7.16     <u>CHOICE OF LAW; CONSENT TO JURISDICTION; JURY TRIAL</u>.

(a)     THIS PLEDGE AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK EXCLUDING CHOICE-OF-LAW PRINCIPLES THAT WOULD PERMIT THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

7.17     <u>Counterparts.</u> This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto. The words "execution," "signed," "signature," and words of like import used in this Amendment will be deemed to include electronic signatures or the keeping of records in electronic form, each of which will be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

7.18    <u>Lien Absolute</u>. All obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)    any extension, renewal, settlement, compromise, waiver or release in respect of any of the Secured Obligations, by operation of law or otherwise, or any obligation of any other guarantor of any of the Secured Obligations, or any default, failure or delay, willful or otherwise, in the payment or performance of the Secured Obligations;

(b)    any lack of validity or enforceability relating to or against the Company, any other obligor or any other guarantor of any of the Secured Obligations, for any reason related to the Note Exchange Agreement, any other Note Document or any other agreement or instrument governing or evidencing any Secured Obligations, or any Governmental Requirements purporting to prohibit the payment by the Company, any other obligor or any other guarantor of the Secured Obligations of the principal of or interest on the Secured Obligations;

(c)    any modification or amendment of or supplement to the Note Exchange Agreement or any other Note Document;

(d)    any change in the time, manner or place of payment of, or in any other term of, all or any part of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Note Exchange Agreement, any other Note Document or any other agreement or instrument governing or evidencing any Secured Obligations, including any increase or decrease in the rate of interest thereon;

(e)    any change in the corporate existence, structure or ownership of the Company, any other obligor, or any other guarantor of any of the Secured Obligations, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Company, any other obligor or any other guarantor of the Secured Obligations, or any of their assets or any resulting release or discharge of any obligation of the Company, any other obligor or any other guarantor or any of the Secured Obligations;

(f)    any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of any Note Document or the Secured Obligations;

(g)    any other setoff, defense or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) with respect to the Note Exchange Agreement, any other Note Document, any other agreement or instrument or the transactions contemplated thereby which might constitute a legal or equitable defense available to, or discharge of the Grantor; or

(h)    any other act or omission to act or delay of any kind by the Company, any other obligor, any other guarantor of the Secured Obligations, the Collateral Agent, any Noteholder or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the Grantor's obligations hereunder.

7.19    <u>Collateral Releases</u>. The Collateral Agent is authorized to, and shall release any Lien granted to or held by it upon any Collateral upon the occurrence of the Termination Date and otherwise in accordance with the Note Exchange Agreement; <u>provided</u>, that (i) any such release shall be at the sole expense of the Grantors and (ii) in the case of a release of Collateral prior to the Termination Date, the Grantors shall have provided the Collateral Agent with a certificate of a Responsible Officer certifying that the release is permitted under the Note Documents (and the Secured Parties, by accepting the benefits hereof, hereby authorize the Collateral Agent to rely on such certificate in performing its obligations under this Section 7.19).

# ARTICLE VIII
### NOTICES

All notices and other communications provided for herein shall be in writing, in English, and sent to the Collateral Agent or the Grantor as provided in the Note Exchange Agreement.

# ARTICLE IX
### THE COLLATERAL AGENT

Wilmington Trust, National Association has been appointed Collateral Agent for the Secured Parties hereunder pursuant to Section 20 of the Note Exchange Agreement. It is expressly understood and agreed by the parties to this Pledge Agreement that any authority conferred upon the Collateral Agent hereunder is subject to the terms of the delegation of authority made by the Noteholders to the Collateral Agent pursuant to the Note Exchange Agreement, and that the Collateral Agent has agreed to act (and any successor agent shall act) as such hereunder only on the express conditions contained in the Note Exchange Agreement with respect to the Secured Parties. The Collateral Agent shall be entitled to the rights, privileges, protections, indemnities and immunities set forth in the Note Exchange Agreement, all of which are incorporated herein by reference *mutatis mutandis*, in the performance of any of the transactions contemplated by this Agreement. Any successor agent appointed pursuant to the Section 20 of the Note Exchange Agreement shall be entitled to all the rights, interests and benefits of each agent hereunder.

[Signature Page Follows]

IN WITNESS WHEREOF, the Grantor and the Collateral Agent have executed this Pledge Agreement as of the date first above written.

**GRANTOR:**

NAUTICAL SOLUTIONS HOLDINGS, LLC

By: _____

Name: _____

Name: _____

Title: _____

The Grantor (by signing above) and the undersigned Company (i) consent and agree to the terms and conditions of this Pledge Agreement, notwithstanding any terms and conditions of the Company's articles of organization and operating agreement (the "organizational documents") to the contrary, and (ii) agree that (x) to the extent of any inconsistency between this Pledge Agreement and any agreement, document or instrument now or hereafter executed and delivered in connection with this Pledge Agreement (including without limitation proxies), on the one hand, and any of the organizational documents, on the other hand, the terms and conditions of this Pledge Agreement and such other agreements, documents and instruments will and shall prevail, and (y) each of them shall take all actions necessary to allow the Collateral Agent (or its successors and assigns) to exercise any and all remedies under this Pledge Agreement and such other agreements, documents and instruments and (z) evidence Grantor's consent as the sole member of the Company to the pledge of interests effected by this Pledge Agreement and to the admission into the Company as a member, of any Person who, through the exercise by Collateral Agent of its available rights or remedies under this Pledge Agreement, becomes an owner of any membership interest (or portion thereof) pledged to Collateral Agent pursuant to this Pledge Agreement.

NAUTICAL SOLUTIONS, L.L.C.

By: _____

Name: _____

Name: _____

Title: _____

**COLLATERAL AGENT:**

WILMINGTON TRUST, NATIONAL ASSOCIATION

By:_____
Name:_____
Title: Authorized Officer

**EXHIBIT A**
(See Sections 3.2, 3.3, 4.1 and 8.1 of Pledge Agreement)


PART I – GRANTOR INFORMATION:

NOTICE ADDRESS FOR GRANTOR

Nautical Solutions Holdings, LLC
16201 East Main Street
Cut Off, Louisiana 70345

| Name of Grantor | Jurisdiction of Organization and Type of Entity | Organizational Identification Number | Federal Identification Number | Chief Executive Office or Principal Place of Business | Former Names |
|---|---|---|---|---|---|
| Nautical Solutions Holdings, LLC | Louisiana limited liability company | 45098439K | 92-044002 2 | 16201 East Main Street, Cut Off, LA | None |

A-1

**EXHIBIT B**

(See <u>Section 3.6</u> of Pledge Agreement and Definition of "Pledged Collateral")

LIST OF PLEDGED COLLATERAL

| Grantor | Issuer | Type of Organization | # of Shares Owned/ % of Equity Interests Owned | Total Shares Outstanding | Certificate Number |
|---------|--------|----------------------|----------------------------------------------|--------------------------|--------------------|
| Nautical Solutions Holdings, LLC | Nautical Solutions, L.L.C. | Limited Liability Company | 1,000 Units/100% | 1,000 Units | Uncertificated |

**EXHIBIT C**

(See <u>Section 3.1</u> of Pledge Agreement)


OFFICES IN WHICH FINANCING STATEMENTS MAY BE FILED

| Name of Grantor | Filing Office |
|---|---|
| Nautical Solutions Holdings, LLC | Clerk of Court of any Parish in the State of Louisiana |

**EXHIBIT D**

(See <u>Section 4.2</u> of Pledge Agreement)

AMENDMENT

This Amendment, dated_____, ___ is delivered pursuant to <u>Section 4.2</u> of the Pledge Agreement referred to below. All defined terms herein shall have the meanings ascribed thereto or incorporated by reference in the Pledge Agreement. The undersigned hereby certifies that the representations and warranties in <u>Article III</u> of the Pledge Agreement are and continue to be true and correct. The undersigned further agrees that this Amendment may be attached to that certain Pledge Agreement, dated [•], 2023, between the undersigned, as the Grantor, and Wilmington Trust, National Association, as the Collateral Agent, (as amended, restated, amended and restated, supplemented or otherwise modified, the "<u>Pledge Agreement</u>") and that the Collateral listed on <u>Schedule I</u> to this Amendment shall be and become a part of the Collateral referred to in the Pledge Agreement and shall secure all Secured Obligations referred to in the Pledge Agreement.

By:_____

Name:_____

Title:

_____

D-1

**SCHEDULE I** TO AMENDMENT

STOCKS AND OTHER EQUITY INTERESTS

| Name of Grantor | Issuer | Certificate Number(s) | Number of Shares | Class of Stock | Percentage of Outstanding Shares |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

*Annex 1 to*
*Pledge Agreement*

ASSUMPTION AGREEMENT, dated as of _____, 20_____, by _____, a _____ (the "<u>Additional Grantor</u>"), in favor of Wilmington Trust, National Association, as Collateral Agent (together with its successors and assigns in such capacity, the "<u>Collateral Agent</u>") for the Secured Parties. All capitalized terms not defined herein shall have the meaning ascribed to them in such Note Exchange Agreement.

<div align="center"><strong>PRELIMINARY STATEMENTS</strong></div>

A.      Nautical Solutions, L.L.C., a Louisiana limited liability company, Nautical Solutions Holdings LLC, a Louisiana limited liability company (the "<u>Company</u>"), the Noteholders the agent thereunder and the Collateral Agent have entered into a Note Exchange Agreement, dated as of [•], 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Note Exchange Agreement</u>").

B.      In connection with the Note Exchange Agreement, the Company entered into the Pledge Agreement, dated as of [•], 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Pledge Agreement</u>"), in favor of the Collateral Agent for the benefit of the Secured Parties.

C.      The Note Exchange Agreement requires the Additional Grantor to become a party to the Pledge Agreement.

D.      The Additional Grantor has agreed to execute and deliver this Assumption Agreement in order to become a party to the Pledge Agreement.

ACCORDINGLY, IT IS AGREED:

1.      <u>Pledge Agreement</u>. By executing and delivering this Assumption Agreement, the Additional Grantor, as provided in Section 4.7 of the Pledge Agreement, hereby becomes a party to the Pledge Agreement as a "Grantor" thereunder with the same force and effect as if originally named therein as a Grantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Grantor thereunder. The information set forth in <u>Annex 1-A</u> hereto is hereby added to the information set forth in the appropriate Exhibits to the Pledge Agreement. The Additional Grantor hereby represents and warrants that each of the representations and warranties contained in Article III of the Pledge Agreement is, as to itself, true and correct on and as the date hereof (after giving effect to this Assumption Agreement) as if made on and as of such date.

2.      <u>GOVERNING LAW</u>. THIS PLEDGE AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS PLEDGE AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the undersigned has caused this Assumption Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL GRANTOR]

_____,
a _____

By:_____
Name:_____
Title:
_____

**EXHIBIT M**

**FORM OF COMPLIANCE CERTIFICATE**

as of_____, _____

TO: Each holder of a Note that is an Institutional Investor

This Compliance Certificate is furnished pursuant to Section 7.2 of that certain Note Exchange Agreement dated as of ____, 2023 (as amended, restated, amended and restated, supplemented and/or modified from time to time, the "*Note Exchange Agreement*") among Nautical Solutions, L.L.C., a Louisiana limited liability company (the "*Company*"), Nautical Solutions Holdings, LLC, a Louisiana limited liability company, the respective Noteholders party thereto and Wilmington Trust, National Association, as agent for the Noteholders (including its successors and assigns in such capacity) and as collateral agent for the Noteholders (including its successors and assigns in such capacity). Unless otherwise defined herein, the terms used in this Compliance Certificate have the meanings given to them in the Note Exchange Agreement.

THE UNDERSIGNED SENIOR FINANCIAL OFFICER OF THE COMPANY HEREBY CERTIFIES TO THE APPLICABLE HOLDERS THAT:

1.      I am the duly elected chief financial officer of the Company.

2.      As required by Section 7.1 [(a)] [(b)] of the Note Exchange Agreement, financial statements of the Company for the [quarter] [year] ended_____, _____ (the "*Financial Statements*") prepared in accordance with GAAP are attached to this Compliance Certificate. The Financial Statements present fairly the financial position of the Note Parties as at the date thereof and the results of operations and cash flows of the Note Parties for the period covered thereby (subject only to normal recurring year-end adjustments).[1]

3.      I have reviewed the terms of the Note Exchange Agreement, and have made, or caused to be made, a review of the transactions and conditions of the Company during the accounting period covered by the attached Financial Statements.

4.      The Company has observed or performed all of its covenants and other agreements, and satisfied every condition contained in the Note Exchange Agreement and the other Note Documents to be observed, performed or satisfied by it, and the representations and warranties in the Note Exchange Agreement are true and correct as of the date hereof, except for such representations and warranties that relate to a specific date. The examinations described in

---

[1] [**Subject to negotiations as to Section 7 of the Note Exchange Agreement.**] For financial statements delivered pursuant to Section 7.1 (b), must be accompanied by an opinion thereon (without a "going concern" or similar qualification or exception and without any qualification or exception as to the scope of the audit on which such opinion is based) of independent public accountants of recognized national standing, which opinion shall state that such financial statements present fairly, in all material respects, the financial position of the companies being reported upon and their results of operations and cash flows and have been prepared in conformity with GAAP, and that the examination of such accountants in connection with such financial statements has been made in accordance

with generally accepted auditing standards, and that such audit provides a reasonable basis for such opinion in the circumstances.

representations and warranties that relate to a specific date. The examinations described in paragraph 3 did not disclose, and I have no knowledge of, the existence of any condition or event which constitutes a Default or an Event of Default during or at the end of the accounting period covered by the Financial Statements or as of the date of this Compliance Certificate[, except [describe any condition or event that constitutes a Default or Event of Default, specifying the nature and period of existence thereof and what action the Company has taken or proposes to take with respect thereto].

5.      The financial data and computations set forth in <u>Schedule A</u> hereto for determining compliance by the Company with the financial covenants contained in Section 10.6 of the Note Exchange Agreement are true, complete and correct as of the date hereof.[2] [The ratio of Funded Debt of the Company for the period of four consecutive fiscal quarters ended ___, 202_ to EBITDA for such period is ___ to 1.00 and the interest rate applicable to the Notes for quarter commencing ___, 202_ shall be [8<u>9</u>.50][8.00][7.50]% in accordance with Section 8.1(b) of the Note Exchange Agreement.][3]

6.      <u>Schedule B</u> attached hereto sets forth a list of all the Mortgaged Vessels currently serving as Collateral for the Note Obligations together with the daily charter hire rate currently being earned by each such Mortgaged Vessel.

7.      <u>Schedule C</u> attached hereto sets forth the information (including detailed calculations) that are required in order to determine compliance by the Company with the requirements of Sections 10.7, 10.9, 10.11 and 10.12 of the Note Exchange Agreement during the period covered by the Financial Statements.

8.      [The organizational chart of all Chouest Affiliates last delivered pursuant to Section 7.1(s) of the Note Exchange Agreement remains true and correct as of the date hereof.] [<u>Schedule</u> D attached hereto sets forth a true and correct organizational chart of all Chouest Affiliates having assets of greater than $10,000,000 or Indebtedness of greater than $10,000,000.]

9.      <u>Schedule [E]</u> attached hereto sets forth (i) the total PSV Vessel Sale Proceeds received as of the date of the Financial Statement and the timing of receipt of such PSV Vessel Sale Proceeds and (ii) the total Specified Prepayment Amount received as of the date of the Financial Statement and the timing of receipt of such Specified Prepayment Amount, in each case, for the purposes of calculating any Specified Noteholder Fee pursuant to Section 8.1(c).

10.     The foregoing certifications, together with the computations set forth in <u>Schedules</u> A and C hereto, the Financial Statements delivered with this Compliance Certificate in support hereof, the information set forth on <u>Schedules B</u>, [D] and E] hereto, are made and delivered as of the date first written above.

---

[3] ~~NTD:~~ The leverage ratio is to be delivered starting June 2023, though compliance for financial covenant purposes starts on September 2024.

[3] NTD: To be included commencing with the Compliance Certificate delivered for the fiscal quarter ending [March beginning on April 3 1, 2023].

NAUTICAL SOLUTIONS, L.L.C.


By: _____ _____
Name:_____ _____
Title: Chief Financial Officer

Exhibit M

SCHEDULE A
FINANCIAL COVENANTS

| 10.6(a) | Interest Coverage Ratio | |
|---|---|---|
| | MINIMUM REQUIRED: | ——1.10 : 1.00 |
| | ACTUAL (Previous 12 monthsTest Period): | |
| | (i)    EBITDA | |
| | (ii)    Interest Expense | |
| | (iii)   Actual Interest Coverage Ratio: [Line (i) divided byto (ii)] | _____ : 1.00 |
| | Compliance | [Yes][No] |
| 10.6(b) | EBITDA | |
| | MINIMUM REQUIRED: | ——: 1.00$[o] |
| | ACTUAL EBITDA (Previous 4 fiscal quarters): | $[o] |
| | Compliance | [Yes][No] |
| 10.6(c) | Net Funded Debt to EBITDA Ratio | |
| | MAXIMUM PERMITTED | _____ : 1.00 |
| | ACTUAL (Previous 4 fiscal quarters): | |
| | (i)    Net Funded Debt | |
| | (ii)    EBITDA | |
| | (iii)   Actual Net Funded Debt to EBITDA Ratio: [Line (i) divided byto (ii)] | _____ : 1.00 |
| | Compliance | [Yes][No] |

SCHEDULE B
VESSELS AND CHARTER HIRE RATES

~~Vessel~~          ~~O.N.~~          ~~Day Rate~~

| Vessel | Charterer | Day Rate | Charter Expiration |
|--------|-----------|----------|--------------------|
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |
|        |           |          |                    |

SCHEDULE C
SECTIONS 10.7, 10.9, 10.11 and 10.12

[SCHEDULE D
ORGANIZATIONAL CHART OF ~~ALL~~APPLICABLE CHOUEST
AFFILIATES]

SCHEDULE [E]
PSV VESSEL SALE PROCEEDS AND SPECIFIED PREPAYMENT AMOUNT

Total PSV Vessel Sale Proceeds: $[   ]

Total Specified Prepayment Amount received: $[   ]

Timing of receipt of Specified Prepayment Amounts: **[   ]**

[FORM OF]
**ASSIGNMENT AND ACCEPTANCE**

This Assignment and Acceptance (this "*Assignment and Acceptance*") is dated as of the Effective Date set forth below and is entered into by and between [Insert name of Assignor] (the "Assignor") and [Insert name of Assignee] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Note Exchange Agreement identified below (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Note Exchange Agreement*"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Acceptance as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and accepts from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Note Exchange Agreement, as of the Effective Date inserted by the Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Noteholder under the Note Exchange Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount of and percentage interest in the Notes identified below of all such outstanding rights and obligations of the Assignor in its capacity as a Noteholder under the Note Exchange Agreement and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and other rights of the Assignor (in its capacity as a Noteholder) against any Person, whether known or unknown, arising under or in connection with the Note Exchange Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by the Assignor.

1.    Assignor:

2.    Assignee:

[and is an Affiliate/Approved Fund of [identify Noteholder][1]

3.                                   Issuer:    Nautical Solutions, L.L.C., as issuer of the Notes under the Note Exchange Agreement

4.                                   Agent:    Wilmington Trust, National Association, as the administrative agent under the Note Exchange Agreement

_____

[1] Select as applicable.

5.                             Note Exchange Agreement: The Note Exchange Agreement, dated as of [ ], 2023, among Nautical Solutions, L.L.C., as issuer, Nautical Solutions Holdings, LLC, as Holdings, Wilmington Trust, National Association, as Agent, and the other parties thereto

6.    Notes:

| Aggregate Amount of Notes for all Noteholders | Amount of Notes Assigned | Percentage Assigned of Notes[2] |
| --- | --- | --- |
| $ | $ | % |
| $ | $ | % |
| $ | $ | % |

Effective Date:_____, 20___ [TO BE INSERTED BY THE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Agent a completed Administrative Questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Issuer, the Note Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including federal and state securities laws.

[Signature Pages to Follow]

---

[2] Set forth, to at least 9 decimals, as a percentage of the Notes of all Noteholder thereunder.

The terms set forth in this Assignment and Acceptance are hereby agreed to:

<u>ASSIGNOR</u>

[NAME OF ASSIGNOR]

By: _____
Name: _____
Title: _____

<u>ASSIGNEE</u>

[NAME OF ASSIGNEE]

By: _____
Name: _____
Title: _____

<u>NOMINEE</u>

[NAME OF NOMINEE]

By: _____
Name: _____
Title: _____

Accepted:

<u>Agent</u>

WILMINGTON TRUST, NATIONAL ASSOCIATION


By:_____
Name:_____
Title:_____

ANNEX 1 to
ASSIGNMENT AND ACCEPTANCE

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT AND ACCEPTANCE
1.    <u>Representations and Warranties</u>.

1.1    <u>Assignor</u>. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Notes, (ii) the Notes are free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Note Exchange Agreement or any other Note Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Note Documents or any collateral thereunder, (iii) the financial condition of the Issuer, any Subsidiary or Affiliate or any other Person obligated in respect of any Note Document, (iv) any requirements under applicable law for the Assignee to become a Noteholder under the Note Exchange Agreement or any other Note Document or to charge interest at the rate set forth therein from time to time or (v) the performance or observance by the Issuer, any Subsidiary or Affiliate, or any other Person of any of their respective obligations under any Note Document.

1.2.    <u>Assignee</u>. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Noteholder under the Note Exchange Agreement, (ii) it satisfies the requirements, if any, specified in the Note Exchange Agreement and under applicable law that are required to be satisfied by it in order to acquire the Notes and become a Noteholder, including, without limitation, that, to the extent so required under Section 13.2(c) of the Note Exchange Agreement, it is not a Competitor, (iii) from and after the Effective Date, it shall be bound by the provisions of the Note Exchange Agreement as a Noteholder thereunder and, to the extent of the Notes, shall have the obligations of a Noteholder thereunder, (iv) it has received a copy of the Note Exchange Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.5 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase the Notes on the basis of which it has made such analysis and decision independently and without reliance on the Agent, any arranger or any other Noteholder or their respective Related Parties, and (v) attached to the Assignment and Acceptance is any documentation required to be delivered by it pursuant to the terms of the Note Exchange Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Agent, any arranger, the Assignor or any other Noteholder or their respective Related Parties, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Note Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Note Documents are required to be performed by it as a Noteholder.

2.    <u>Payments</u>. From and after the Effective Date, the Agent shall make all payments in respect of the Notes (including payments of principal, interest, fees and other amounts) to the

Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.      <u>General Provisions</u>. This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument. Acceptance and adoption of the terms of this Assignment and Acceptance by the Assignee and the Assignor by electronic signature or delivery of an executed counterpart of a signature page of this Assignment and Acceptance by any Approved Electronic Platform (as defined in the Note Exchange Agreement) shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance. This Assignment and Acceptance shall be governed by, and construed in accordance with, the law of the State of New York.

<u>Exhibit O</u>

**[FORM OF] ASSIGNMENT OF FIRST PREFERRED
FLEET
MORTGAGE**


**From**


**JPMORGAN CHASE BANK N.A.,
in its capacity as Collateral Agent
and Mortgagee**


**To**


**WILMINGTON TRUST, NATIONAL ASSOCIATION,
in its capacity as Security Trustee
and Collateral Agent**

**[FORM OF] ASSIGNMENT OF FIRST PREFERRED FLEET MORTGAGE**

THIS ASSIGNMENT OF FIRST PREFERRED FLEET MORTGAGE (this "Assignment") effective as of this _____ day of_____, 2023, is executed by JPMORGAN CHASE BANK, N.A., a national banking association, with an address at 201 Saint Charles Avenue, Suite 2800, New Orleans, Louisiana 70170, in its capacity as collateral agent for the Secured Parties (as defined in said First Preferred Fleet Mortgage) ("Assignor") in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, with an address at 1100 North Market Street~~ASSOCIATION, a ; with an~~ , Wilmington, DE 19890, in its capacity as security trustee and collateral agent for the Secured Parties (as such term is defined in that certain Note Exchange Agreement dated as of February 24, 2023 by and among, inter alia, Nautical Solutions, L.L.C., a Louisiana limited liability company (the "Shipowner") and financial institutions from time to time parties thereto, the "Note Agreement") ("Assignee").

_____

RECITALS

WHEREAS, pursuant to the terms and conditions of that certain Credit Agreement, dated as of November 14, 2013, by and among the Shipowner, as borrower, the lenders from time to time parties thereto (collectively, the "Lenders"), and the Assignor, in its capacity as administrative agent and in its capacity as the collateral agent (as the same may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), the Lenders provided the Shipowner with a revolving credit facility in the amount of up to $550,000,000 (collectively, the "Loans"); and

WHEREAS, pursuant to the terms and conditions of substantially identical Note Purchase Agreements dated as of November 4, 2013, by and among the Shipowner and the financial institutions parties thereto (as the same may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time, collectively, the "Note Purchase Agreement"), the Shipowner issued the aggregate principal sum of $500,000,000 of its 5.75% Senior Secured Notes due 2023 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with all notes delivered in substitution or exchange for any of the foregoing senior secured notes, collectively, the "Existing Senior Notes"); and

WHEREAS, it was a condition precedent to the making of the Loans and issuance of the Existing Senior Notes that the Shipowner execute and deliver in favor of the Assignor, to secure its obligations under the Credit Agreement, the Note Agreements and the Existing Senior Notes, a first preferred fleet mortgage over the whole of the various U.S. flagged vessels listed therein, which mortgage was duly filed and recorded with the United Stated Coast Guard, National Vessel Documentation Center ("NVDC") on November 14, 2013 at 9:55 A.M. in Batch #15691200, Doc #3 (the "Original Fleet Mortgage"); and

WHEREAS, subsequent thereto, the parties agreed to supplement and amend the Original Fleet Mortgage to add various additional vessels thereto pursuant to fifteen separate supplements and two separate amendments, as follows:

- Supplement No. 1 to First Preferred Fleet Mortgage dated as of May 5, 2014 and recorded on May 8, 2014 with the NVDC at 9:10 A.M. in Batch #19443000, Doc #4 (the "First Supplement");

- Supplement No. 2 to First Preferred Fleet Mortgage dated as of June 6, 2014 and recorded on June 10, 2014 with the NVDC at 5:38 P.M. in Batch #20334100, Doc #3 (the "Second Supplement");

- Supplement No. 3 to First Preferred Fleet Mortgage dated as of July 22, 2014 and recorded on July 22, 2014 with the NVDC at 4:41 P.M. in Batch #21403800, Doc #3 (the "Third Supplement");

- Supplement No. 4 to First Preferred Fleet Mortgage dated as of October 31, 2014 and recorded on October 31, 2014 with the NVDC at 4:20 P.M. in Batch #23589100, Doc #2 (the "Fourth Supplement");

- Supplement No. 5 to First Preferred Fleet Mortgage dated as of February 4, 2015 and recorded on February 6, 2015 with the NVDC at 1:02 P.M. in Batch #25363500, Doc #2 (the "Fifth Supplement");

- Supplement No. 6 to First Preferred Fleet Mortgage dated as of March 20, 2015 and recorded on March 25, 2015 with the NVDC at 4:46 P.M. in Batch #26354000, Doc #2 (the "Sixth Supplement");

- Supplement No. 7 to First Preferred Fleet Mortgage dated as of March 31, 2015 and recorded on March 31, 2015 with the NVDC at 3:04 P.M. in Batch #26466700, Doc #2 (the "Seventh Supplement");

- Supplement No. 8 to First Preferred Fleet Mortgage dated as of April 17, 2015 and recorded on April 21, 2015 with the NVDC at 2:12 P.M. in Batch #26987700, Doc #2 (the "Eighth Supplement");

- Supplement No. 9 to First Preferred Fleet Mortgage dated as of June 16, 2015 and recorded on June 16, 2015 with the NVDC at 3:26 P.M. in Batch #29173700, Doc #4 (the "Ninth Supplement");

- Supplement No. 10 to First Preferred Fleet Mortgage dated as of September 8, 2015 and recorded on September 8, 2015 with the NVDC at 4:50 P.M. in Batch #30514900, Doc #3 (the "Tenth Supplement");

- Supplement No. 11 to First Preferred Fleet Mortgage dated as of January 25, 2016 and recorded on January 27, 2016 with the NVDC at 10:46 A.M. in Batch #33483700, Doc #4 (the "Eleventh Supplement");

- Supplement No. 12 to First Preferred Fleet Mortgage dated as of July 10, 2017 and recorded on July 10, 2017 with the NVDC at 6:32 P.M. in Batch #45998600, Doc #4 (the "Twelfth Supplement");

- Amendment No. 1 to First Preferred Fleet Mortgage dated as of November 13, 2017 and recorded on November 14, 2017 with the NVDC at 10:47 A.M. in Batch #48673600, Doc #3 (the "Amendment No. 1");

- Supplement No. 13 to First Preferred Fleet Mortgage dated as of January 12, 2018 and recorded on January 23, 2018 with the NVDC at 3:20 P.M. in Batch #50320300, Doc #3 (the "Thirteenth Supplement");

- Supplement No. 14 to First Preferred Fleet Mortgage dated as of February 22, 2018 and recorded on February 26, 2018 with the NVDC at 12:32 P.M. in Batch #50918900, Doc #3 (the "Fourteenth Supplement");

- Amendment No. 2 to First Preferred Fleet Mortgage dated as of December 7, 2018 and recorded on December 10, 2018 with the NVDC at 2:11 P.M. in Batch #58182500, Doc #4 (the "Amendment No. 2"); and

Supplement No. 15 to First Preferred Fleet Mortgage dated as of January 17, 2019 and and recorded on January 29, 2019 with the NVDC at 2:43 P.M. in Batch #59496200, Doc #3 (the "Fifteenth Supplement"); and

(said Original Mortgage, together with the First Supplement, the Second Supplement, the Third Supplement, the Fourth Supplement, the Fifth Supplement, the Sixth Supplement, the Seventh Supplement, the Eighth Supplement, the Ninth Supplement, the Tenth Supplement, the Eleventh Supplement, the Twelfth Supplement, the Amendment No. 1, the Thirteenth Supplement, the Fourteenth Supplement, the Amendment No. 2, and the Fifteenth Supplement, as so supplemented, amended or otherwise modified from time to time being hereinafter called the "Mortgage"); and

WHEREAS, after giving effect to the foregoing Supplements and Amendments and all partial releases granted, the vessels now covered by the Mortgage (collectively, the "Vessels") are set forth on Schedule 1 attached hereto and made a part hereof; and

WHEREAS, on the date hereof, the various financial institutions parties to the Credit Agreement and to the Note Agreements and the Shipowner have entered into a Note Exchange Agreement (the "Exchange Agreement"), pursuant to which the Exchange Agreement shall replace the Credit Agreement and the Note Agreement, and the Shipowner shall issue and transfer to such financial institutions [$587,500,000] aggregate principal amount of its senior secured notes due 2028 (collectively, the "New Senior Notes") in exchange for and in replacement of the Loans and the Existing Senior Notes; and

WHEREAS, contemporaneously therewith and as a condition precedent thereto, Assignor has agreed to assign to Assignee all of its rights, title and interests in and to the Mortgage so that the Mortgage shall continue to secure the Shipowner's obligations under the Exchange Agreement and the New Senior Notes; and

WHEREAS, by this instrument, Assignor now wishes to assign to Assignee of record 100% of its rights, title and interests in and to the Mortgage and all rights and powers incident thereto.

NOW, THEREFORE, THIS ASSIGNMENT WITNESSETH:

That for the sum of One Dollar ($1.00) in hand paid, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Assignor does hereby sell, transfer and assign over unto Assignee all of Assignor's right, title and interests, as mortgagee, under the Mortgage identified above, as heretofore supplemented, amended, released (as to certain other vessels but not the Vessels) or otherwise modified, and in and to the Vessels now covered thereby.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns forever.

AND this Assignment is made without recourse to or any representation or warranty, express or implied, by Assignor.

AND Assignor further agrees to execute and deliver to Assignee any and all other documents and instruments and to do such other acts reasonably required by Assignee to continue to maintain the perfection and priority of the Mortgage as a preferred mortgage in favor of Assignee over the whole of the Vessels described therein to secure the Shipowner's obligations under the Exchange Agreement and the New Senior Notes and to carry out the terms hereof.

[Signature Page Follows]

IN WITNESS WHEREOF, Assignor has ~~duly executed~~caused this Assignment to be executed and delivered by its duly authorized representative on the date indicated in the notarial acknowledgement below, to be effective as of the day and year first above stated.

WITNESS:                                    JPMORGAN CHASE BANK, N.A.,
                                            as Collateral Agent

_____         By: _____
                                            Name: Kelsey R. Box
                                            Title: Authorized Officer


STATE OF ~~NEW YORK~~LOUISIANA   )
                                ) SS:
~~COUNTY~~PARISH OF ORLEANS      )

I HEREBY CERTIFY that, on this ____16th day of February, 2023, before me, the

undersigned officer, personally appeared Kelsey R. Box, who acknowledged himself/herself to be ~~a~~ an Authorized Officer of JPMorgan Chase Bank, N.A., the national banking association described in and which executed the within instrument, and that ~~he/~~she as such Authorized Officer, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the Kelsey R. Box by himself/herself as such ~~as his/~~ Authorized Officer as her free act and deed on behalf of said banking association.

IN WITNESS WHEREOF, I hereunto set my hand.

                                        _____

                                        Notary Public

My commission expires: _____.

Schedule 1

<u>Vessels</u>

| Vessel | Official No. |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

**EXHIBIT P**

**FORM OF AMENDED AND RESTATED
FIRST PREFERRED FLEET MORTGAGE**

*[Link-to-previous setting changed from off in original to on in modified.].*

**[FORM OF] AMENDED AND RESTATED**
**FIRST PREFERRED FLEET MORTGAGE**

**given by**

**NAUTICAL SOLUTIONS, L.L.C.,**
**as mortgagor**

**in favor of**

**WILMINGTON TRUST, NATIONAL ASSOCIATION**
**in its capacity of collateral agent,**
**as mortgagee**

**Dated_____, 2023 and effective_____, 2023**

**United States Flag Vessels**

**Avery Island**
**Brad Dartez**
**Cat Island**
**Celena Chouest**
**Corcovado**
**Dante**
**Dauphin Island**
**Deer Island**
**Dino Chouest**
**Fast Tender**
**Fast Track**
**Forte**
**Gavea**
**Grand Isle**
**Horn Island**
**Jackie Chouest**
**Kirt Chouest**
**Lyman Martin**
**Marsh Island**
**Mr Sidney**
**Ms Virgie**
**Pao de Acucar**
**Paradise Island**
**Pecan Island**
**Pelican Island**
**Sanibel Island**
**Ship Island**
**Timbalier Island**
**Wine Island**

This AMENDED AND RESTATED FIRST PREFERRED FLEET MORTGAGE (this "Mortgage"*)* dated as of_____, 2023 but effective as of_____, 2023, is executed by NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company, with an address of 16201 East Main Street, Cut Off, Louisiana 70345 (the "Shipowner"), to and in favor of WILMINGTON TRUST, NATIONAL ASSOCIATION, with an address of 1100 North Market Street, Wilmington, DE 19890, in its capacity as security trustee and collateral agent for the Secured Parties under and as defined in the Security Agreement (as such term is defined in the Exchange Agreement defined below), as required by the Exchange Agreement (in such capacity, together with its successors and assigns, the "Mortgagee"*).*

WITNESSETH:

WHEREAS, pursuant to the terms and conditions of that certain Credit Agreement, dated as of November 14, 2013 (as the same may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among the Shipowner, as borrower, the lenders from time to time parties thereto, and JPMorgan Chase Bank, N.A., in its capacity as administrative agent and in its capacity as the collateral agent and mortgagee (the "Original Mortgagee"), the Lenders provided the Shipowner with a revolving credit facility in the amount of up to $550,000,000 (collectively, the "Loans"); and

WHEREAS, pursuant to the terms and conditions of substantially identical Note Purchase Agreements dated as of November 14, 2013 (as the same may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time, collectively, the "Note Purchase Agreements"), by and among the Shipowner and the financial institutions parties thereto, the Shipowner issued the aggregate principal sum of $500,000,000 of its 5.75% Senior Secured Notes due 2023 (as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with all notes delivered in substitution or exchange for any of the foregoing senior secured notes, collectively, the "Existing Senior Notes"); and

WHEREAS, it was a condition precedent to the making of such Loans and issuance of such Existing Senior Notes that the Shipowner execute and deliver to and in favor of the Original Mortgagee, to secure the Shipowner's obligations under the Credit Agreement, the Note Agreements and the Existing Senior Notes, a first preferred fleet mortgage over the whole of the various U.S. flagged vessels listed therein, which mortgage was duly filed and recorded with the United Stated Coast Guard, National Vessel Documentation Center ("NVDC") on November 14, 2013 at 9:55 A.M. in Batch #15691200, Doc #3 (the "2013 Fleet Mortgage"); and

WHEREAS, subsequent thereto, the parties agreed to supplement and amend the Original Fleet Mortgage to add various additional vessels thereto pursuant to fifteen (15) separate supplements and two (2) separate amendments, as follows:

- Supplement No. 1 to First Preferred Fleet Mortgage dated as of May 5, 2014 and recorded on May 8, 2014 with the NVDC at 9:10 A.M. in Batch #19443000, Doc #4 (the "First Supplement");

- Supplement No. 2 to First Preferred Fleet Mortgage dated as of June 6, 2014 and recorded on June 10, 2014 with the NVDC at 5:38 P.M. in Batch #20334100, Doc #3 (the "Second Supplement");

- Supplement No. 3 to First Preferred Fleet Mortgage dated as of July 22, 2014 and recorded on July 22, 2014 with the NVDC at 4:41 P.M. in Batch #21403800, Doc #3 (the "Third Supplement");

- Supplement No. 4 to First Preferred Fleet Mortgage dated as of October 31, 2014 and recorded on October 31, 2014 with the NVDC at 4:20 P.M. in Batch #23589100, Doc #2 (the "Fourth Supplement");

- Supplement No. 5 to First Preferred Fleet Mortgage dated as of February 4, 2015 and recorded on February 6, 2015 with the NVDC at 1:02 P.M. in Batch #25363500, Doc #2 (the "Fifth Supplement");

- Supplement No. 6 to First Preferred Fleet Mortgage dated as of March 20, 2015 and recorded on March 25, 2015 with the NVDC at 4:46 P.M. in Batch #26354000, Doc #2 (the "Sixth Supplement");

- Supplement No. 7 to First Preferred Fleet Mortgage dated as of March 31, 2015 and recorded on March 31, 2015 with the NVDC at 3:04 P.M. in Batch #26466700, Doc #2 (the "Seventh Supplement");

- Supplement No. 8 to First Preferred Fleet Mortgage dated as of April 17, 2015 and recorded on April 21, 2015 with the NVDC at 2:12 P.M. in Batch #26987700, Doc #2 (the "Eighth Supplement");

- Supplement No. 9 to First Preferred Fleet Mortgage dated as of June 16, 2015 and recorded on June 16, 2015 with the NVDC at 3:26 P.M. in Batch #29173700, Doc #4 (the "Ninth Supplement");

- Supplement No. 10 to First Preferred Fleet Mortgage dated as of September 8, 2015 and recorded on September 8, 2015 with the NVDC at 4:50 P.M. in Batch #30514900, Doc #3 (the "Tenth Supplement");

- Supplement No. 11 to First Preferred Fleet Mortgage dated as of January 25, 2016 and recorded on January 27, 2016 with the NVDC at 10:46 A.M. in Batch #33483700, Doc #4 (the "Eleventh Supplement");

- Supplement No. 12 to First Preferred Fleet Mortgage dated as of July 10, 2017 and recorded on July 10, 2017 with the NVDC at 6:32 P.M. in Batch #45998600, Doc #4 (the "Twelfth Supplement");

- Amendment No. 1 to First Preferred Fleet Mortgage dated as of November 13, 2017 and recorded on November 14, 2017 with the NVDC at 10:47 A.M. in Batch #48673600, Doc #3 (the "Amendment No. 1");

- Supplement No. 13 to First Preferred Fleet Mortgage dated as of January 12, 2018 and recorded on January 23, 2018 with the NVDC at 3:20 P.M. in Batch #50320300, Doc #3 (the "Thirteenth Supplement");

- Supplement No. 14 to First Preferred Fleet Mortgage dated as of February 22, 2018 and recorded on February 26, 2018 with the NVDC at 12:32 P.M. in Batch #50918900, Doc #3 (the "Fourteenth Supplement");

- Amendment No. 2 to First Preferred Fleet Mortgage dated as of December 7, 2018 and recorded on December 10, 2018 with the NVDC at 2:11 P.M. in Batch #58182500, Doc #4 (the "Amendment No. 2"); and

- Supplement No. 15 to First Preferred Fleet Mortgage dated as of January 17, 2019 and recorded on January 29, 2019 with the NVDC at 2:43 P.M. in Batch #59496200, Doc #3 (the "Fifteenth Supplement"); and

(said 2013 Fleet Mortgage, together with the First Supplement, the Second Supplement, the Third Supplement, the Fourth Supplement, the Fifth Supplement, the Sixth Supplement, the Seventh Supplement, the Eighth Supplement, the Ninth Supplement, the Tenth Supplement, the Eleventh Supplement, the Twelfth Supplement, the Amendment No. 1, the Thirteenth Supplement, the Fourteenth Supplement, the Amendment No. 2, and the Fifteenth Supplement, as so supplemented, amended or otherwise modified from time to time being hereinafter called the "Original Mortgage"); and

WHEREAS, after giving effect to the foregoing Supplements and Amendments and all partial releases granted, the vessels still covered by the Original Mortgage (collectively, the "Vessels") are set forth on Schedule 1 attached hereto and made a part hereof; and

WHEREAS, on the date hereof, the various financial institutions parties to the Credit Agreement and to the Note Agreements (collectively, the "Lenders") and the Shipowner have entered into a Note Exchange Agreement (the "Exchange Agreement"), pursuant to which the parties agreed that the Exchange Agreement shall replace, but not constitute a novation of, the Credit Agreement and the Note Agreements, and the Shipowner shall issue and transfer to such Lenders $587,500,000 aggregate principal amount of its senior secured notes due 2028 (collectively, the "New Senior Notes") in exchange for, and in substitution and replacement but not a novation of, the Loans and the Existing Senior Notes; and

WHEREAS, contemporaneously therewith and as a condition precedent thereto, the Original Mortgagee has assigned to the Mortgagee all of its rights, title and interests in and to the Original Mortgage so that the Original Mortgage shall continue to secure the Shipowner's obligations under the Exchange Agreement and the New Senior Notes; and

WHEREAS, it is a condition precedent to the Lenders' entry into the Exchange Agreement and its acceptance of the New Senior Notes in exchange for and in substitution of the Existing Senior Notes that the Shipowner shall have executed and delivered this Mortgage to the Mortgagee to secure, among other things, the Obligations (as defined in the Exchange Agreement) and the payment of the principal of, Specified Noteholder Fee (if any) and Exit Fee (if any) (as such terms are defined in the Exchange Agreement) and interest on all New Senior Notes outstanding and to be outstanding under the Exchange Agreement.

WHEREAS, the Shipowner is the sole owner of the vessels described on Schedule 1 attached hereto and made a part hereof.

<u>AGREEMENTS</u>

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to secure the payment and performance of any and all present and future indebtedness, obligations and liabilities of the Shipowner, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of or in connection with, the Exchange Agreement, the New Senior Notes issued in connection with the Exchange Agreement or any other Note Document (as defined in the Exchange Agreement), this Mortgage and the other Security Documents (collectively, the "Debt Documents") to which the Shipowner is a party, in each case whether on account of principal, Specified Noteholder Fee (if any), Exit Fee (if any), interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise, including, without limitation, all fees and disbursements of counsel to the Mortgagee and the Noteholders that are required to be paid by the Shipowner pursuant to the terms of any of the Debt Documents (collectively, and including any and all renewals, modifications, amendments, extensions for any period, supplements and restatements of any of the foregoing, the "Secured Obligations"), the Shipowner does by these presents mortgage, convey, and grant a continuing security interest in and first

preferred mortgage lien on, unto Mortgagee, and to Mortgagee's successors and assigns in such capacity, the whole of the vessels described on Schedule 1 attached hereto, together with all auxiliaries, tackle, apparel, accessories, appurtenances, anchors, cables, chains, equipment, cranes, welding machines and stations, cutting systems, pontoons, tensions, davits, dope stations, anchor wires, anchor buoys, generators, compressors, pumps, tools, implements, parts, supplies, and all other accessories, additions, improvements and replacements now or hereafter belonging thereto, whether or not removed therefrom, all of which shall be deemed to be included in the term "Vessel" and, collectively, "Vessels" herein.

TO HAVE AND TO HOLD all and singular the Vessels unto the Mortgagee and its successors and permitted assigns, to its and its successors' and permitted assigns' own use, benefit and behoof forever, subject to the rights of the Shipowner therein as herein provided;

PROVIDED, HOWEVER, and these presents are upon the condition that, if the Secured Obligations are paid and performed in full in accordance with the terms of the Exchange Agreement, this Mortgage and the other Debt Documents, and the New Senior Notes issued under the Exchange Agreement are satisfied and discharged in full, then this Mortgage shall cease; otherwise it shall remain in full force and effect. The Shipowner agrees to perform and to observe the terms, covenants and agreements contained in this Mortgage and in the other Debt Documents, and to hold the Vessels subject thereto.

IT IS HEREBY COVENANTED, DECLARED AND AGREED that each of the Vessels is to be held subject to the further covenants, conditions, provisions, terms and uses hereinafter set forth.

## ARTICLE 1
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE SHIPOWNER

The Shipowner hereby covenants and agrees with the Mortgagee as follows:

Section 1.1     The Shipowner will pay when due all Secured Obligations from time to time payable by the Shipowner under the Exchange Agreement and the other Debt Documents and will observe, perform and comply with the covenants, terms and conditions herein and in the Exchange Agreement and the other Debt Documents, on its part to be observed, performed or complied with.

Section 1.2     The Shipowner is, and shall remain, duly qualified to own, document, operate and mortgage each of the Vessels under the applicable laws and regulations of the United States endorsed for the respective trade in which each applicable Vessel is engaged from time to time. Each of the Vessels is duly documented in the name of the Shipowner as owner under the laws and flag of the United States.

Section 1.3     The Shipowner lawfully owns and is lawfully possessed of each of the Vessels free from any Lien (as defined in the Exchange Agreement), charge or encumbrance whatsoever (except for this Mortgage and the Liens permitted to be created, incurred, assumed or permitted to exist pursuant to Section 10.5(a), (b) and (e) of the Exchange Agreement (collectively, the "Permitted Maritime Liens")), and will warrant and defend the title and possession thereto and to every part thereof for the benefit of the Mortgagee against the claims and demands of all persons whomsoever; provided, however, that notwithstanding anything herein to the contrary, no intention to subordinate the first priority security interest and Lien intended to be granted in favor of the Mortgagee herein is to be hereby implied or expressed by the permitted existence of the Permitted Maritime Liens.

Section 1.4     The Shipowner has caused this Mortgage to be duly filed and will cause it to be duly recorded and will comply with and satisfy all of the provisions and requirements of Chapter 313 of Title 46 of the United States Code and the regulations in effect thereunder from time to time, as amended, in order to establish, perfect and maintain the perfection and priority of, this Mortgage as a valid,

enforceable and duly perfected preferred mortgage lien thereunder (subject only to Permitted Maritime Liens) upon each of the Vessels, with the intention that the preferred mortgage lien hereof be first in priority, and upon all renewals, replacements and improvements made in or to the same for the amount of the Secured Obligations.

Section 1.5    For each of the Vessels, the Shipowner will not (a) cause or permit such Vessel to be operated in any manner contrary to applicable law, rule or regulation, (b) engage in any unlawful trade or operations or violate any law, (c) carry any cargo that will expose such Vessel to penalty, confiscation, forfeiture, capture or condemnation, or (d) do, or suffer or permit to be done, anything which can or may injuriously affect the registration or enrollment of such Vessel under the laws and regulations of the United States. The Shipowner will at all times keep each of the Vessels duly documented as a United States flag vessel under Chapter 121 of Title 46 of the United States Code, eligible for the trade of the United States in which each applicable Vessel is engaged from time to time.

Section 1.6    Neither the Shipowner, any charterer, the master of any of the Vessels nor any other person has or shall have any right, power or authority to create, incur or permit to be placed or imposed or continued upon any of the Vessels, their respective freights, profits or hire, any Lien, charge or encumbrance whatsoever other than this Mortgage and other Permitted Maritime Liens.

Section 1.7    For each of the Vessels, the Shipowner will place, and at all times and places will retain, a properly certified copy of this Mortgage on board such Vessel with her papers and will cause such certified copy and such Vessel's marine document to be exhibited to any and all persons having business therewith which might give rise to any lien thereon other than Permitted Maritime Liens, and to any representative of the Mortgagee; and the Shipowner will place and keep prominently displayed in the chart room and in the master's cabin of such Vessel, or in the case of a rig, in a prominent place aboard the rig, or in such location as the rig's papers are kept, a framed printed notice in plain type reading as follows:

<u>"NOTICE OF MORTGAGE</u>

> This Vessel is covered by an Amended and Restated First Preferred Fleet Mortgage in favor of Wilmington Trust, National Association, as collateral agent. Under the terms of said Mortgage, neither the Shipowner, any charterer, the master of this Vessel nor any other person has any right, power or authority to create, incur or permit to be imposed upon this Vessel any lien whatsoever other than Permitted Maritime Liens (as defined in the Amended and Restated First Preferred Fleet Mortgage)."

Section 1.8    Except for this Mortgage and the other Permitted Maritime Liens, for each of the Vessels, the Shipowner will not suffer to be continued any Lien, encumbrance or charge on such Vessel for longer than thirty (30) days; and in due course and in any event within sixty (60) days after the same becomes due and payable, the Shipowner will pay or cause to be discharged or make adequate provision for the satisfaction or discharge of all claims or demands (except to the extent that the same shall concurrently be contested by the Shipowner in good faith by appropriate proceedings if the Shipowner has established and maintained adequate reserves with respect thereto in accordance with GAAP (as defined in the Exchange Agreement), and the same shall not subject the relevant Vessel, or any part thereof, to sale, forfeiture or loss), or will cause such Vessel to be released or discharged from any Lien, encumbrance or charge therefor.

Section 1.9        For each of the Vessels:

(a)        if a libel or complaint be filed against such Vessel or such Vessel be otherwise attached, arrested, levied upon or taken into custody by any Governmental Authority (as defined in the Exchange Agreement) or any person that purports to be acting on behalf of a Governmental Authority for any cause whatsoever, the Shipowner will promptly notify the Mortgagee by facsimile, confirmed by letter, at its address as specified in this Mortgage, and within thirty (30) days will cause such Vessel to be released and all Liens thereon other than this Mortgage and other Permitted Maritime Liens to be discharged (except to the extent that the claim giving rise to such lien shall concurrently be contested by the Shipowner in good faith by appropriate proceedings if the Shipowner has established and maintained adequate reserves with respect thereto in accordance with GAAP, and the same shall not subject the relevant Vessel, or any part thereof, to sale, forfeiture or loss) and will promptly notify the Mortgagee thereof in the manner aforesaid; and

(b)        if the Shipowner shall fail or neglect to furnish proper security or otherwise to release such Vessel from libel, arrest, levy, seizure or attachment within the time period required by Section 1.9(a) above, the Mortgagee or any person acting on behalf of the Mortgagee may furnish security to release such Vessel and by so doing shall not be deemed to cure the default of the Shipowner unless and until the Shipowner shall have reimbursed the Mortgagee from all costs and expenses (including reasonable attorney's fees) incurred by the Mortgagee or such third party acting at the direction of the Mortgagee in procuring such release, including for any security so furnished.

Section 1.10 For each of the Vessels:

(a)        except while such Vessel is undergoing repairs, maintenance or is in lay- up, the Shipowner will at all times and without cost or expense to the Mortgagee maintain and preserve, or cause to be maintained and preserved, such Vessel (i) in good running order and repair so that such Vessel shall be, insofar as due diligence can make her so, tight, staunch, strong and well and sufficiently tackled, appareled, furnished, equipped and in every respect seaworthy and (ii) in at least as good a working order and condition as when this Mortgage was executed, ordinary wear and tear excepted; and will keep such Vessel, or cause her to be kept, in such condition as will entitle her to such classification rating with the American Bureau of Shipping or other classification society of like standing reasonably acceptable to the Mortgagee (each, a "Classification Society") that companies engaged in the operation of vessels of the same type, size, age and flag as such Vessel maintain respecting their vessels with such Classification Society. Notwithstanding the foregoing, if such Vessel is affected by any partial loss or damage of such Vessel or a portion or component thereof, the Shipowner shall make all necessary repairs and replacements to such Vessel, except where the failure to do so could not reasonably be expected to materially change the value or usefulness of such Vessel;

(b)        such Vessel shall, and the Shipowner covenants that it will, at all times comply with all applicable laws, rules and regulations to the extent set forth in the Exchange Agreement, and such Vessel shall have on board as and when required thereby certificates showing compliance therewith;

(c)        the Shipowner will not make, or permit to be made, any substantial change in the structure, type or speed of such Vessel or change in the rig of such Vessel (i) to the extent such change would be in violation of the provisions of Section 10.24 of the Exchange Agreement, or (ii) if any such change could reasonably be expected to have a material adverse effect on the rights or interest of the Shipowner or the Mortgagee to any insurance which is required under Section 9.2 of the Exchange Agreement; and

(d)     the Shipowner may, in the ordinary course of maintenance, repair or overhaul of such Vessel, remove any item of property constituting a part of such Vessel, provided such item of property is replaced to the extent necessary to maintain such Vessel in the condition required herein or in the Exchange Agreement. Any such replacement item of property shall, without necessity of further act hereunder, become part of such Vessel and subject to this Mortgage.

Section 1.11     The Shipowner will not transfer or change the flag or hailing port of any of the Vessels.

Section 1.12     The Shipowner will not sell, mortgage or transfer any of the Vessels except in accordance with the applicable provisions of the Exchange Agreement. The Shipowner will not charter any of the Vessels on a demise or bareboat basis except in accordance with the applicable provisions of the Exchange Agreement. For any of the Vessels the Shipowner so charters, the Shipowner shall (a) provide Mortgagee a copy of any such charter and all related documents and (b) maintain in favor of Mortgagee a first priority perfected security interest in and lien upon the earnings under the charter agreement and all related rights and the proceeds thereof subject to Permitted Maritime Liens.

Section 1.13     The Shipowner agrees that, if the Shipowner fails to (a) perform covenants or obligations under this Mortgage, including, without limitation, its obligations with respect to insurance, the discharging of Liens, taxes, dues, assessments, governmental charges, fines, penalties lawfully imposed, repairs, reasonable attorneys' fees, and other obligations that are not Permitted Maritime Liens or (b) maintain insurance on each of the Vessels as required by the Debt Documents, the Mortgagee may, but shall not be obligated to, perform the Shipowner's obligations under this Mortgage or arrange for (at the Shipowner's expense and without any responsibility on the Mortgagee's part) the obtaining of the insurance under the Debt Documents, and any reasonable expenses incurred by the Mortgagee in performing the Shipowner's obligations shall be paid by the Shipowner within ten (10) Business Days of demand. Any such performance by the Mortgagee may be made by the Mortgagee in reasonable reliance on any statement, invoice or claim, without inquiry into the validity or accuracy thereof. The amount and nature of any expense of the Mortgagee hereunder shall be conclusively established by a certificate of any officer of the Mortgagee absent manifest error, and such amount shall be included in the Secured Obligations, secured by this Mortgage.

Section 1.14 In the event that at any time and from time to time this Mortgage or any provisions hereof shall be deemed invalidated in whole or in part by reason of any present or future law or any decision of any Governmental Authority, then the Shipowner, forthwith upon the request of the Mortgagee, will execute such other and further assurances and documents as are reasonably requested by the Mortgagee to accomplish the purposes of this Mortgage. From time to time on the reasonable request of the Mortgagee, the Shipowner will furnish to the Mortgagee: (i) such favorable opinions of counsel, including United States legal opinions, in form and substance reasonably satisfactory to the Mortgagee and (ii) such instruments executed by the Shipowner or on its behalf or by any or all officers, members, managers or directors of the Shipowner, in each case, relating to this Mortgage or any of the transactions contemplated hereby, as the Mortgagee may reasonably request.

Section 1.15     In the event of the requisition (whether of title or use), condemnation, sequestration, seizure or forfeiture of any of the Vessels by any Governmental Authority or by anyone else, the Shipowner will give prompt written notice thereof to the Mortgagee, and any payments in respect thereof shall be paid to the Shipowner, and the Shipowner shall cause any such payment to be applied to the Secured Obligations to the extent required, and in accordance with, the terms of the Exchange Agreement.

ARTICLE 2
EVENTS OF DEFAULT AND REMEDIES

Section 2.1     Upon the occurrence and during the continuation of any Event of Default (as defined in the Exchange Agreement), the Mortgagee shall have the right to:

(a)     declare immediately due and payable all of the Secured Obligations (in which case all of the same shall be immediately due), and bring suit at law, in equity or in admiralty, as it may be advised, to recover judgment for the Secured Obligations and satisfy the same out of the Vessels; ·

(b)     exercise all of the rights and remedies in foreclosure with respect to any of the Vessels and otherwise given to mortgagees by the provisions of applicable law, including, but not limited to, the provisions of Chapter 313 of Title 46 of the United States Code and the regulations in effect thereunder from time to time, as amended;

(c)     take and enter into possession of any of the Vessels, at any time, wherever the same may be, without court decision or other legal process and without being responsible for loss or damage, and the Shipowner or other person in possession forthwith upon demand of the Mortgagee shall surrender to the Mortgagee possession of such Vessel or Vessels and the Mortgagee may, without being responsible for loss or damage (except to the extent caused by the Mortgagees gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable judgment), hold, lay-up, lease, charter, operate or otherwise use such Vessel or Vessels for such time and upon such terms as it may deem to be for its best advantage, and demand, collect and retain all hire, freights, earnings, issues, revenues, income, profits, return premiums, salvage awards or recoveries, recoveries in general average, and all other sums due or to become due in respect of such Vessel or Vessels or in respect of any insurance thereon from any person whomsoever, accounting only for the net profits, if any, arising from such use of such Vessel or Vessels and charging upon all receipts from the use of such Vessel or Vessels or from the sale thereof by court proceedings or pursuant to Section 2. l(e) below, all costs, expenses, charges, damages or losses by reason of such use (including reasonable attorney's fees); and if at any time the Mortgagee shall avail itself of the right herein given it to take possession of such Vessel or Vessels, the Mortgagee shall have the right to dock such Vessel or Vessels for a reasonable time at any dock, pier or other premises of the Shipowner without charge; or to dock them at any other place at the cost and expense of the Shipowner, and the Mortgagee shall have the right to require the Shipowner to deliver, and the Shipowner shall on demand, at its own cost and expense, deliver to the Mortgagee such Vessel or Vessels as demanded; and the Shipowner hereby irrevocably instructs the masters of such Vessel or Vessels so long as this Mortgage is outstanding to deliver such Vessel or Vessels (as the case may be) to the Mortgagee as demanded;

(d)     inspect and make copies of all original class records held by the Classification Society relating to such Vessels; and/or

(e)     without being responsible for loss or damage, other than loss or damage due to its own gross negligence or willful misconduct, sell such Vessel or Vessels, at any place and at such time as the Mortgagee may specify and in such manner and such place (whether by public or private sale) as the Mortgagee may deem advisable (without necessity of bringing such Vessel or Vessels to the place designated for such sale), free from any claim by the Shipowner in admiralty, in equity, at law or by statute, after first giving notice of the time and place of any public sale with a general description of the property in the following manner:

(i)     by publishing such notice for ten (10) consecutive days in a daily newspaper of general circulation published in New York City;

(ii)      if the place of sale should not be New York City, then also by publication of a similar notice in a daily newspaper, if any, published at the place of sale; and

(iii)      by mailing a similar notice to the Shipowner at its last known address on the day of first publication;

(iv)      and notice of the time and place of any private sale by mailing such notice to the Shipowner at its last known address.

Section 2.2      Any sale of any of the Vessels or any interest therein made by the Mortgagee after the occurrence and during the continuance of an Event of Default in pursuance of this Mortgage, whether under the power of sale hereby granted or any judicial proceedings, shall operate to divest all right, title and interest of any nature whatsoever of the Shipowner in and to such Vessel or Vessels or such interest therein sold, as the case may be, and shall bar any claim from the Shipowner, its successors and assigns, and all persons claiming by, through or under them. Any sale may be conducted without bringing the Vessel or Vessels subject of such sale to the place designated for such sale and in such manner as the Mortgagee may deem to be for its best advantage. No purchaser shall be bound to inquire whether notice has been given, or whether any default has occurred, or as to the propriety of the sale, or as to the application of the proceeds thereof. In the case of any such sale, the Mortgagee shall be entitled, to apply the proceeds to the Secured Obligations in accordance with the Exchange Agreement. At any such sale, the Mortgagee may bid for and purchase such property and upon compliance with the terms of sale may hold, retain and dispose of such property without further accountability therefor.

Section 2.3      The Mortgagee is hereby appointed attorney-in-fact of the Shipowner to execute and deliver to any purchaser referred to in Section 2.2, and is hereby vested with full power and authority to make, after the occurrence and during the continuation of an Event of Default, in the name and on behalf of the Shipowner, a good conveyance of the title to such Vessel or Vessels so sold. In the event of any sale of any of the Vessels under any power herein contained, the Shipowner will, if and when required by the Mortgagee, execute such form of conveyance of any such Vessel or Vessels and other related documents as the Mortgagee may specify. The powers and authority granted to the Mortgagee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with no interest.

Section 2.4      The Mortgagee is hereby appointed attorney-in-fact of the Shipowner in the name of the Shipowner to, after the occurrence and during the continuation of an Event of Default, demand, collect, receive, compromise and sue for, so far as may be permitted by law, all freights, hire, earnings, issues, revenues, income and profits of each of the Vessels and all amounts due from underwriters under any insurance thereon as payments of losses or as return premiums or otherwise, salvage awards and recoveries of each of the Vessels, recoveries in general average or otherwise in respect of each of the Vessels, and all other sums in respect of each of the Vessels, due or to become due at the time of the occurrence and during the continuation of any Event of Default, or in respect of any insurance thereon, from any person whomsoever, and to make, give and execute in the name of the Shipowner acquittances, receipts, releases or other discharges for the same, whether under seal or otherwise, and to endorse and accept in the name of the Shipowner all checks, notes, drafts, warrants, agreements and other instruments in writing with respect to the foregoing. The powers and authority granted to the Mortgagee herein have been given for a valuable consideration and are hereby declared to be irrevocable and coupled with an interest.

Section 2.5      Whenever any right to enter and take possession of any of the Vessels accrues to the Mortgagee, it may require the Shipowner to deliver, and the Shipowner shall on demand, at its own cost and expense, deliver to the Mortgagee such Vessel or Vessels as demanded. If any legal proceedings shall be taken to enforce any right under this Mortgage, the Mortgagee shall be entitled as a matter of right to the

appointment of a receiver of such Vessel or Vessels and of the freights, hire, earnings, issues, revenues, income and profits due or to become due and arising from the operation thereof.

Section 2.6      The Shipowner authorizes and empowers the Mortgagee or its appointees or any of them to, after the occurrence and during the continuation of an Event of Default, appear in the name of the Shipowner, its successors and assigns, in any court of any country or nation of the world where a suit is pending against any of the Vessels because of or on account of an alleged Lien against such Vessel from which such Vessel has not been released and to take such proceedings as to them or any of them may deem necessary towards the defense of such suit and the purchase or discharge of such lien, and all reasonable expenditures made or incurred by them or any of them for the purpose of such defense or purchase or discharge shall be a debt due from the Shipowner, its successors and assigns, to the Mortgagee, and shall be secured by the lien of this Mortgage in like manner and extent as if the amount and description thereof were written herein.

Section 2.7      The Shipowner covenants that at any time that any Secured Obligations shall be due and payable (whether by acceleration or otherwise), the same shall be paid in accordance with the Exchange Agreement and the other Debt Documents; and in case the Shipowner shall fail to pay the same when due in accordance with the Exchange Agreement and the other Debt Documents, and that failure constitutes an Event of Default, the Mortgagee shall be entitled to recover judgment for the whole amount so due and unpaid, together with such further amounts as shall be provided by the Exchange Agreement, the other Debt Documents and applicable law. All moneys collected by the Mortgagee under this Section 2.7 shall be applied by the Mortgagee in accordance with the terms of the Exchange Agreement.

Section 2.8      Each and every power and remedy herein given to the Mortgagee shall be cumulative and shall be in addition to every other power and remedy herein given or now or hereafter existing at law, in equity, in admiralty, by statute or under any Debt Document or other agreement, and each and every power and remedy whether herein given or otherwise existing may be exercised from time to time and as often and in such order as may be deemed expedient by the Mortgagee, and the exercise or the beginning of the exercise of any power or remedy by the Mortgagee shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other power or remedy. No delay or omission by the Mortgagee in the exercise of any right or power or in the pursuance of any remedy accruing upon the occurrence and during the continuance of any Event of Default shall impair any such right, power or remedy or be construed to be a waiver of any such right, power or remedy; nor shall the acceptance by the Mortgagee of any security or of any payment of or on account of the Secured Obligations be construed to be a waiver of any right that the Mortgagee may have hereunder after the occurrence and during the continuance of such Event of Default or any other Event of Default; including any subsequent Event of Default of the same or a different nature.

Section 2.9      Reserved.

Section 2.10 In case the Mortgagee shall have proceeded to enforce any right, power or remedy under this Mortgage by foreclosure, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Mortgagee, then and in every such case the Shipowner and the Mortgagee shall be restored to their former positions and rights hereunder with respect to the property subject or intended to be subject to this Mortgage, and all rights, remedies and powers of the Mortgagee shall continue as if no such proceedings had been taken.

Section 2.11      Unless otherwise specified herein, any cash proceeds received by the Mortgagee from the sale of, collection of, or other realization upon, any part of any of the Vessels or related collateral or any other amounts received by the Mortgagee hereunder, including the net earnings of any charter operation or other use of any of the Vessels by the Mortgagee under any of the powers specified in Article

1 and/or Article 2, may be, at the reasonable discretion of the Mortgagee (a) held by the Mortgagee in one or more cash collateral accounts as cash collateral for the Secured Obligations under the terms of the Security Agreement or (b) applied to the Secured Obligations. Amounts applied to the Secured Obligations shall be applied to the payment of the Secured Obligations in the order set forth in the Exchange Agreement. Any surplus cash collateral or cash proceeds held by the Mortgagee after payment in full of the Secured Obligations shall be paid over to the Shipowner or to whomever may be lawfully entitled to receive such surplus.

Section 2.12 Unless and until one or more Events of Default shall occur and be continuing, the Shipowner (a) shall be suffered and permitted to retain actual possession and use of each of the Vessels and (b) to the extent permitted by the Exchange Agreement shall have the right, from time to time, in its discretion, and without application to the Mortgagee, and without obtaining a release thereof by the Mortgagee, to dispose of, free from the Lien hereof, any boilers, engines, generators, pumps and pumping equipment, machinery, masts, spars, sails, rigging, boats, anchors, cables, chains, tackle, outfit, apparel, furniture, fittings, equipment, spares, fuel, stores or any other appurtenances of each of the Vessels, provided such item of property is replaced and such Vessel is maintained in the condition required herein and in the Exchange Agreement, and such replacement item, if any, shall forthwith become subject to the lien of this Mortgage as a first preferred mortgage thereon.

ARTICLE 3
SUNDRY PROVISIONS

Section 3.1      The maximum principal amount that may be outstanding under this Mortgage at any time is US $587,500,000, and for purposes of recording this Mortgage, the total amount of this Mortgage is US $587,500,000, plus Specified Noteholder Fee (if any), Exit Fee (if any), fees, costs, expenses and performance of mortgage covenants. There is no separate discharge amount.

Section 3.2      All of the covenants, promises, stipulations and agreements of the Shipowner in this Mortgage contained shall bind the Shipowner and its successors and permitted assigns and shall be binding on and injure to the benefit of the Mortgagee and its successors and permitted assigns. In the event of any assignment of this Mortgage by the Mortgagee in accordance with the applicable provisions of the Exchange Agreement, the term "Mortgagee" as used in this Mortgage shall be deemed to mean any such successor or permitted assignee.

Section 3.3      Wherever and whenever herein any right, power or authority is granted or given to the Mortgagee, such right, power or authority may be exercised in all cases by the Mortgagee or such agent or agents as it may appoint, and the act or acts of such agent or agents when taken shall constitute the act of the Mortgagee hereunder.

Section 3.4      In the event that any provision of this Mortgage or any of the documents or instruments which may from time to time be delivered hereunder or any provision hereof shall be deemed invalid or unenforceable by reason of any present or future law or any decision of any court of competent jurisdiction, the validity and enforceability of any other provision hereof, or of such documents or instruments, shall not be affected thereby. In any such case, the Shipowner covenants and agrees that, on demand, it will execute and deliver such other and further agreements and/or documents and/or instruments and do such things as the Mortgagee in its sole reasonable discretion may deem to be necessary to carry out the true intent of this Mortgage and such other documents or instruments. Any such invalidity or unenforceability of any provision of this Mortgage, or of such other documents or instruments, in any jurisdiction or nation shall not render such provision invalid or unenforceable under the laws of any other jurisdiction or nation.

Section 3.5      Anything herein to the contrary notwithstanding, it is intended that nothing herein shall waive the preferred status of this Mortgage and that, if any provision of this Mortgage or portion thereof shall be construed to waive the preferred status of this Mortgage, then such provision to such extent shall be void and of no effect and shall cease to be a part of this Mortgage, without affecting the remaining provisions hereof, which shall remain in full force and effect. Nothing herein shall be deemed or construed to subject to the Lien hereof any property other than a vessel eligible for documentation as the term is used in 46 U.S.C. §12102, as amended.

Section 3.6 THIS MORTGAGE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND THE GENERAL MARITIME LAW OF THE ·UNITED STATES OF AMERICA. THE SHIPOWNER IRREVOCABLY SUBMITS ITSELF TO THE NON-EXCLUSIVE JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, FOR THE PURPOSES OF (AND SOLELY FOR THE PURPOSES OF) ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF, OR RELATING TO, THIS MORTGAGE OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING. MAY BE HEARD IN SUCH NEW YORK STATE OR FEDERAL COURT AND HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE, OR OTHERWISE, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE ABOVE-NAMED COURTS FOR ANY REASON WHATSOEVER, THAT SUCH SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, OR THAT THE VENUE OF SUCH SUIT, ACTION OR PROCEEDING IS IMPROPER, OR THAT THIS MORTGAGE OR THE SUBJECT MATTER HEREOF MAY NOT BE ENFORCED IN OR BY SUCH COURTS. THE SHIPOWNER HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO THE SHIPOWNER AT ITS ADDRESS LISTED IN SECTION 3.11 HEREOF. THE SHIPOWNER AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS SECTION 3.6 SHALL AFFECT THE RIGHT OF THE MORTGAGEE TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE MORTGAGEE TO BRING ANY ACTION OR PROCEEDING AGAINST THE SHIPOWNER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

Section 3.7      Reserved.

Section 3.8      The term "Dollars" or the symbol "$" as used herein shall mean Dollars in any coin or currency of the United States of America which at the time of payment shall be legal tender for public and private debts.

Section 3.9      Enforcement Expenses; Indemnification.

(a)      Costs and Expenses.[1] The Shipowner shall reimburse the Mortgagee for any and all reasonable out-of-pocket expenses and fees (including reasonable attorneys', auditors' and accountants' fees), costs, expenses and charges (excluding time charges of attorneys who may be employees of the Mortgagee) incurred by the Mortgagee in connection with the preparation, execution, delivery,

[1] NTD- This matches the language from the new Preferred Fleet Mortgage.

administration, collection and enforcement of this Mortgage and in the audit, analysis, administration, collection, preservation or sale of the Vessels (including the expenses and charges associated with any periodic or special audit of the Vessels) all in accordance with, and to the extent provided in, Section 14.1 of the Exchange Agreement. Any and all costs and expenses incurred by the Shipowner in the performance of actions required pursuant to the terms hereof shall be borne solely by the Shipowner.

(b) <u>INDEMNIFICATION BY SHIPOWNER</u>. THE SHIPOWNER SHALL INDEMNIFY THE MORTGAGEE (AND ANY SUB-AGENT THEREOF), THE COLLATERAL AGENT, THE NOTEHOLDERS AND THEIR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ADVISORS, SUCCESSORS AND ASSIGNS (EACH SUCH PERSON BEING CALLED AN "<u>INDEMNITEE</u>") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES (INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE) INCURRED BY ANY INDEMNITEE OR ASSERTED AGAINST ANY INDEMNITEE BY ANY THIRD PARTY OR BY SHIPOWNER OR ANY OTHER NOTE PARTY ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS MORTGAGE, ANY OTHER DEBT DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER, THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, OR, IN THE CASE OF THE MORTGAGEE (AND ANY SUB-AGENT THEREOF) AND ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, ADVISORS, SUCCESSORS AND ASSIGNS ONLY, THE ADMINISTRATION OF THIS MORTGAGE AND THE OTHER SECURITY DOCUMENTS, (II) ANY NEW SENIOR NOTE OR THE USE OR PROPOSED USE OF THE PROCEEDS THEREFROM, (III) ANY PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY ANY NOTE PARTY OR ANY OF THEIR SUBSIDIARIES, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO ANY NOTE PARTY OR OF THEIR SUBSIDIARIES, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, WHETHER BROUGHT BY A THIRD PARTY OR BY THE SHIPOWNER OR ANY OTHER NOTE PARTY, AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE; <u>PROVIDED</u> THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES (X) ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NON-APPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR (Y) OTHER THAN IN THE CASE OF THE MORTGAGEE, THE AGENT AND THEIR RESPECTIVE RELATED INDEMNITEES, RESULT FROM A CLAIM BROUGHT BY SHIPOWNER OR ANY OTHER NOTE PARTY AGAINST AN INDEMNITEE FOR BREACH IN BAD FAITH OF SUCH INDEMNITEE'S OBLIGATIONS HEREUNDER OR UNDER ANY OTHER DEBT DOCUMENT, IF SUCH SHIPOWNER, SUCH NOTE PARTY HAS OBTAINED A FINAL AND NON-APPEALABLE JUDGMENT IN ITS FAVOR ON SUCH CLAIM AS DETERMINED BY A COURT OF COMPETENT JURISDICTION.

(c)     All amounts due under this <u>Section 3.9</u> shall be Secured Obligations and shall be payable not later than ten (10) Business Days after demand therefor. The agreements in this Section shall survive repayment of the other Secured Obligations and all other amounts payable under the Exchange Agreement and the other Debt Documents;

Section 3.10 EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS MORTGAGE OR ANY OTHER DEBT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS MORTGAGE AND THE OTHER DEBT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 3.11    Notices. [2] All notices or other communications required or permitted to be made or given hereunder shall be made in writing, in English, and sent to the Shipowner or the Mortgagee as provided in the Exchange Agreement.

Section 3.12    Release of Mortgage, Etc. The liens, estate and rights hereby granted shall be subject to termination and release in accordance with the terms of the Exchange Agreement, and the parties hereto agree to take the actions required and execute all documents required pursuant to such provision to effectuate such termination and release.

Section 3.13 Amendments. None of the terms or provisions of this Mortgage may be waived, amended, supplemented or otherwise modified except in accordance with the Exchange Agreement.

Section 3.14 Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable law, the Shipowner shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Mortgage, any other Debt Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any New Senior Note or the use of the proceeds thereof.

Section 3.15    Conflict. In the event of a direct conflict between this Mortgage and the Exchange Agreement, the Exchange Agreement shall control; provided, however, the Shipowner understands and agrees that this Mortgage sets forth additional covenants, obligations and rights and the Shipowner will use all reasonable efforts to construe the provisions and covenants in this Mortgage as not being in direct conflict with the Exchange Agreement.

Section 3.16 Mortgagee. Wilmington Trust, National Association has been appointed Collateral Agent for the Secured Parties pursuant to Section 20 of the Exchange Agreement. It is expressly understood and agreed by the parties to this Mortgage that any authority conferred upon the Collateral Agent hereunder is subject to the terms of the delegation of authority made by the Noteholders to the Collateral Agent pursuant to the Exchange Agreement, and that the Collateral Agent has agreed to act (and any successor agent shall act) as such hereunder only on the express conditions contained in the Exchange Agreement with respect to the Secured Parties. The Collateral Agent shall be entitled to the rights, privileges, protections, indemnities and immunities set forth in the Exchange Agreement, all of which are incorporated herein by reference *mutatis mutandis*, in the performance of any of the transactions contemplated by this Mortgage. Any

<del>¹ NTD: This matches the language from the new Preferred Fleet Mortgage.</del>

successor agent appointed pursuant to the Section 20 of the Exchange Agreement shall be entitled to all the rights, interests and benefits of each agent hereunder.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated First Preferred Fleet Mortgage to be executed effective as of the day and year first above written.

WITNESSES:                                    NAUTICAL SOLUTIONS, L.L.C.


                                              By:_____
Printed Name: _____         Name:
                                              Title:

_____
Printed Name:_____




WITNESSES:                                    WILMINGTON TRUST, NATIONAL
                                              ASSOCIATION, as Collateral Agent


                                              By:_____
Printed Name: _____         Name:
                                              Title:

_____
Printed Name:_____

**ACKNOWLEDGMENT**

STATE OF LOUISIANA        )

                                          ) ss:

PARISH OF LAFOURCHE )

        BE IT KNOWN that on this ___ day of _____, 2023, before me personally appeared:

to me known, who, after being by me duly sworn, did depose and say:

        That he/she is an Authorized Agent of Nautical Solutions, L.L.C., the limited liability company

which is described in and which executed the within instrument, that he/she signed his name to the said

instrument at the order of the Manager of the said limited liability company and acknowledged the within

instrument to be the free act and deed of the said limited liability company.

IN TESTIMONY WHEREOF, I have hereto set my hand and seal on this day and year first above written.

_____

~~IN TESTIMONY WHEREOF, I have hereto set my hand and seal on this day and year first above written.~~

                      NOTARY PUBLIC

**ACKNOWLEDGMENT**

STATE OF _____ )

                                       ) ss:

PARISH/COUNTY OF _____ )

        BE IT KNOWN that on this ___ day of _____, 2023, before me personally appeared:

                         _____

to me known, who, after being by me duly sworn, did depose and say:

        That he/she is an Authorized Agent of Wilmington Trust, National Association, the national

banking association which is described in and which executed the within instrument, that he/she signed his

name to the said instrument at the order of the _____ of the said national banking

association and acknowledged the within instrument to be the free act and deed of the said national banking

association.

        IN TESTIMONY WHEREOF, I have hereto set my hand and seal on this day and year first above written. ·

                         _____

                        ~~IN TESTIMONY WHEREOF, I have hereto set my hand and seal on this day and year first above written.~~

                         NOTARY PUBLIC

SCHEDULE 1
<u>VESSELS</u>

| Vessel | Official No. |
|---|---|
| Avery Island | 1253395 |
| Brad Dartez | 1252257 |
| Cat Island | 1257750 |
| Celena Chouest | 1201702 |
| Corcovado | 1215834 |
| Dante | 1178758 |
| Dauphin Island | 1262978 |
| Deer Island | 1289730 |
| Dino Chouest | 1207856 |
| Fast Tender | 1206390 |
| Fast Track | 1208793 |
| Forte | 1223605 |
| Gavea | 1211932 |
| Grand Isle | 1250605 |
| Horn Island | 1255030 |
| Jackie Chouest | 1210979 |
| Kirt Chouest | 1213707 |
| Lyman Martin | 1227085 |
| Marsh Island | 1266925 |
| Mr Sidney | 1216539 |
| Ms Virgie | 1213714 |
| Pao de Acucar | 1218372 |
| Paradise Island | 1262977 |
| Pecan Island | 1258532 |
| Pelican Island | 1261549 |
| Sanibel Island | 1257727 |
| Ship Island | 1252958 |
| Timbalier Island | 1251360 |
| Wine Island | 1259152 |

# [FORM OF] COLLATERAL ASSIGNMENT OF
## MASTER SERVICES AGREEMENT

THIS COLLATERAL ASSIGNMENT OF MASTER SERVICES AGREEMENT (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, including all attachment and exhibits, this "Collateral Assignment") has been executed and delivered as of [ ], 2023, by NAUTICAL SOLUTIONS, L.L.C., a Louisiana limited liability company ("Grantor"), in favor of Wilmington Trust, National Association, as Collateral Agent for itself and for the Noteholders (as defined in the Note Exchange Agreement (as defined below)) (together with its successors and permitted assigns, "Collateral Agent"):

A.      Grantor, on the one hand, and Marine Technologies, L.L.C. (and each of the entities listed on Exhibit A of the Master Services Agreement (as defined below) (collectively, "Contractor") have entered into that certain Master Services Agreement dated as of even date hereof (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "Master Services Agreement"), whereby the parties thereto have agreed to certain business service arrangements, upon and subject to the terms and conditions thereof;

B.      Grantor, Nautical Solutions Holding LLC, a Louisiana limited liability company ("Holdings"), Collateral Agent, Wilmington Trust, National Association, in its capacity as administrative agent (together with its successors and permitted assigns, "Agent"), and the Noteholders have entered into that certain Note Exchange Agreement (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "Note Exchange Agreement") dated as of even date herewith; and

C.      As an inducement to the Noteholders to enter into the Note Exchange Agreement, Grantor has agreed to collaterally assign to Collateral Agent, for the benefit of itself and the Noteholders, all of Grantor's rights, title, benefits, and interests with respect to the Master Services Agreement and all products and proceeds thereunder, in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the facts set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor and Collateral Agent hereby agree as follows:

1.      Unless otherwise defined, all capitalized terms in this Collateral Assignment shall have the definition contained in the Note Exchange Agreement.

2.      As security for the full and timely payment and performance by Grantor of its obligations under the Note Exchange Agreement and other Note Documents, Grantor hereby collaterally assigns, pledges, transfers and grants to Collateral Agent a continuing, first priority security interest in and a general lien upon, (i) all of Grantor's now existing or hereafter arising rights, title, benefits, and interests in, to, under or with respect to, the Master Services Agreement, including claims for damages thereunder (collectively, the "Rights and Remedies"), (ii) all products and proceeds thereof, and (iii) all claims for damages thereunder; provided, that, except as provided in Section 3 below, Collateral Agent shall not exercise such Rights and Remedies

unless an Event of Default has occurred and is continuing. For the avoidance of doubt, Collateral

Agent shall not assume any liabilities or obligations of Grantor under the Master Services Agreement unless the Collateral Agent exercises its Rights and Remedies by becoming a party to the Master Services Agreement.

3.      So long as no Event of Default under the Note Exchange Agreement has occurred and is continuing and the Collateral Agent has not exercised any applicable Rights and Remedies, Grantor will be entitled to exercise such Rights and Remedies diligently and in good faith, in accordance with its reasonable business judgment; provided that, whether prior to or following an Event of Default, the Collateral Agent shall have the option (but not the obligation) to remedy any breach by Grantor of the Master Services Agreement for a period of forty-five (45) days after the Collateral Agent has received notice of such breach (the "Cure Period").

4.      Effective from and after the occurrence of an Event of Default under the Note Exchange Agreement, and until such Event of Default is cured or waived, Grantor hereby irrevocably authorizes and empowers Collateral Agent, in Collateral Agent's sole discretion, to assert, as Collateral Agent may deem proper, either directly or on behalf of Grantor, any of the Rights and Remedies which Grantor may from time to time have under the terms of the Master Services Agreement.

5.      Grantor shall not waive, amend, alter, modify, or terminate the Master Services Agreement or excuse Contractor's non-performance of any material obligation, in each case without the prior written consent of the Collateral Agent (acting at the direction of the Required Holders).

6.      Upon the occurrence of and during the continuance of an Event of Default, Grantor hereby irrevocably constitutes and appoints Collateral Agent as its attorney-in-fact with full power of substitution (in its name or otherwise) to demand, receive and enforce Grantor's rights under the Master Services Agreement, to make payments under the Master Services Agreement, to give appropriate receipts, releases and satisfactions for, and on behalf of, Grantor or, at the option of Collateral Agent, in the name of Collateral Agent, and to do any and all acts in the name of Grantor or in the name of Collateral Agent with the same force and effect as if done by Grantor.

7.      Contractor shall be entitled to rely on written notice received by Contractor from Collateral Agent that there is an Event of Default or that an Event of Default no longer exists. Contractor shall not be charged with knowledge that an Event of Default exists or no longer exists, as the case may be, except upon receipt of written notice thereof from Collateral Agent sent to Contractor in accordance with Section 16.1 of the Master Services Agreement. Contractor shall be a third party beneficiary of this Section 7.

8.      This Collateral Assignment shall continue in effect until the Note Obligations (other than any contingent indemnification obligations not then due and owing) have been indefeasibly paid and discharged in full and in cash.

9.      Notwithstanding the foregoing, Grantor expressly acknowledges and agrees that it shall remain liable under the Master Services Agreement to observe and perform all of the conditions and obligations in the Master Services Agreement which Grantor is bound to observe

and perform, and that neither this Collateral Assignment, nor any action taken pursuant hereto,

shall cause Collateral Agent (or Agent or Noteholders) to be under any obligation or liability in any respect whatsoever to any observance or performance of any of the representations, warranties, conditions, covenants, agreements, or terms of the Master Services Agreement.

10.     This Collateral Assignment may be executed in any number of counterparts, each of which, when so executed and delivered, shall be deemed to be an original. All of such counterparts shall constitute but one and the same agreement. This Collateral Assignment shall become effective upon the execution of a counterpart of this Collateral Assignment by each of the parties hereto.

11.     The provisions regarding jury trial waiver, consent to jurisdiction and governing law in the Note Exchange Agreement are incorporated herein by reference and made a part hereof.

*  *  *

*[remainder of this page intentionally left blank]*

*  *  *

--

Exhibit Q

IN WITNESS WHEREOF, this Collateral Assignment has been executed and delivered as of the date first set forth above.

Grantor:

**NAUTICAL SOLUTIONS, L.L.C.**

By:_____
Name:
Title:

Collateral Agent:

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

By:_____
Name:
Title: